UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 18-CR-20685-WILLIAMS

UNITED STATES OF AMERICA

vs.

ABRAHAM EDGARDO ORTEGA,

    Defendant.

_____

## FACTUAL PROFFER

The United States of America and Abraham Edgardo ORTEGA stipulate and agree that if this matter were to proceed to trial, the Government would prove the stated facts beyond a reasonable doubt that ORTEGA is guilty of violating Count 1 of the Superseding Information, Conspiracy to Commit Money Laundering in violation of Title 18, United States Code, Section 1956(h).

### I. Corrupt Currency Exchange Schemes

1.     At all relevant times, Venezuela had a foreign-currency exchange system under which the government would exchange local currency (Bolivars) at a fixed rate for U.S. Dollars. The fixed exchange rate had been well below the true economic rate by a substantial factor for several years.

2.     For example, in 2014, an individual could exchange 10 million U.S. Dollars for 600 million in Venezuelan Bolivars at the true economic rate. Then, if that individual had access to the government fixed rate, he could convert that same 600 million Bolivars into 100 million U.S. Dollars. Essentially, in two transactions, that person could buy 100 million U.S. Dollars for 10 million U.S. Dollars.

3. The difference between the fixed rate and the true economic rate created opportunity for fraud and abuse, enabling Venezuelan officials to engage in foreign currency exchange schemes in return for bribes and kickbacks.

4. These corrupt foreign currency exchange schemes occurred with significant frequency within the Venezuelan state-owned oil company, Petróleos de Venezuela, S.A. (PDVSA). PDVSA is Venezuela's primary source of income and foreign currency (namely, U.S. Dollars and Euros), and served as the source of foreign currency used to fund corrupt foreign exchange embezzlement schemes.

5. ORTEGA and others conspired to launder and engage in monetary transactions with the proceeds of corrupt currency exchange schemes involving PDVSA.

## II. PDVSA Bribery Schemes

6. From August 2004 through March 2016, ORTEGA worked in various finance positions within PDVSA. From January 2014 through March 2016, ORTEGA was Executive Director of Financial Planning at PDVSA. At all times during this conspiracy, ORTEGA was a "foreign official" as that term is defined in the FCPA.

### A. ORTEGA Agrees to Accept 5 Million U.S. Dollar Bribe Payment for Corrupt PDVSA Joint-Venture Scheme

7. In or about 2006 to 2007, Venezuela established partnerships called "joint ventures" between PDVSA and foreign companies/foreign banks. In general, forty percent of the joint venture was owned by a private company, referred to as the minority shareholder, and sixty percent of the joint venture was owned by PDVSA. Company A, a European oil company, was a minority shareholder in Joint Venture A. Company B, a Russian financial institution, was a minority shareholder in Joint Venture B.

8. Following the 2008 financial crisis, PDVSA began to control the minority shareholders' cash flow in such a way that made it difficult for the minority shareholders to receive the payments necessary to properly fund and maintain the joint ventures' operations. PDVSA offered a solution: a minority shareholder could enter into an agreement with PDVSA, under which the minority shareholder would loan the joint venture the money needed to resume operations and, in return, PDVSA would permit the minority shareholder to regain control of its cash flow. As part of this solution, PDVSA agreed to pay the outstanding monies owed to the minority shareholder, consented to the minority shareholder entering into this loan agreement, and would assign any future invoice payments to an account that guaranteed both payment of those invoices and the loan to the minority shareholder. PDVSA, however, had a limited number of these agreements. A minority shareholder needed to have "priority" status to obtain one of these agreements.

9. ORTEGA participated in a bribery scheme (the "Joint-Venture Scheme") in which ORTEGA received a total of 5 million U.S. Dollars in exchange for acts and decisions in his official capacity to give both Company A and Company B "priority" status for this type of agreement.

10. From in or about 2014 through 2015, ORTEGA, Conspirator 3 (as the representative of Conspirator 1), Subject 1 (a citizen of the United States and a "domestic concern" within the meaning of the FCPA), Subject 2, Subject 3, and Venezuelan Official 4 (a "foreign official" as that term is defined in the FCPA) attended several meetings in Caracas, Venezuela to discuss accepting bribes from Company A.

11. Conspirator 3 and others conspired to pay ORTEGA 3 million U.S. Dollars in exchange for ORTEGA's decision to give "priority" status for Company A. Specifically,

3

ORTEGA agreed to accept 3 million U.S. Dollars from Conspirator 3 for ORTEGA's recommendation to the PDVSA Board of Directors that Company A be given "priority" status.

12. In or about 2014, ORTEGA met with Francisco Convit Guruceaga, who represented Company B's interests. ORTEGA and Convit met in a private room in a building in Caracas. They met in a private room because they were discussing illegal bribes. ORTEGA and Convit agreed that Convit would pay ORTEGA 2 million U.S. Dollars in exchange for ORTEGA's decision to give "priority" status for Company B. Specifically, ORTEGA agreed to accept 2 million U.S. Dollars from Convit for ORTEGA's recommendation to the PDVSA Board of Directors that Company B be given "priority" status. Convit told ORTEGA that Convit would give 2 million U.S. Dollars to a confidential source (CS) for payment to ORTEGA. Venezuelan Official 4 also received bribe payments in exchange for facilitating assistance in these schemes.

B. ORTEGA Agrees to Accept 10 Million U.S. Dollar Bribe Payment for Corrupt PDVSA Loan Scheme with Companies C and D

13. In or about 2012, ORTEGA, Venezuelan Official 1 (a "foreign official" as that terms is defined in the FCPA), Subject 4, Subject 5, and Venezuelan Official 5 (a "foreign official" as that term is defined in the FCPA) conspired to execute a corrupt currency exchange scheme involving bribes to PDVSA officials, including ORTEGA and Venezuelan Official 5 (the Companies C-D Loan Scheme).

14. As part of this scheme, Company C agreed to loan PDVSA approximately 17.4 billion Bolivars in multiple tranches. Under this contract, PDVSA would repay the loan to Company C in U.S. Dollars in an amount equivalent to the "loaned" Venezuelan Bolivars at the Venezuelan government's fixed exchange rate. After it was determined that Company C was not reputable enough to sign the "loan" contract with PDVSA, Subject 5 found a suitable Venezuelan entity, Company D, to enter into the PDVSA loan contract. Subject 5 then paid Company D 10

4

million U.S. Dollars to assign Company D's rights under the "loan" contract to Company C. As part of this scheme, ORTEGA received 10 million U.S. Dollars as a bribe payment from Subject 4 to ensure ORTEGA's cooperation, which would allow PDVSA to repay the "loan" in U.S. Dollars in accordance with the contract.

### C. Venezuelan Official 1 Accepts Bribe Payment for Corrupt PDVSA Loan Scheme with Rantor Capital and Eaton Global

15. On December 17, 2014, Rantor Capital C.A. (Rantor), a Venezuelan shell company, executed a contract with PDVSA in which Rantor agreed to "loan" 7.2 billion Venezuelan Bolivars to PDVSA. The "loan" contract was executed by Venezuelan Official 1 as Vice President of PDVSA. Venezuelan Official 1 was a "foreign official" as that term is defined in the FCPA.

16. On December 23, 2014, an assignment contract was executed between Rantor and Eaton Global (Eaton), in which Rantor assigned its rights as PDVSA's creditor under the "loan" contract to Eaton and in which it was contemplated that PDVSA was given the right to cancel the debt within 180 days by paying 600 million U.S. Dollars.

17. On December 23, 2014, Eaton sent a notice of assignment to PDVSA (Venezuelan Official 1) and suggested that PDVSA repay the 7.2 billion Bolivar loan in the Euro equivalent of 600 million U.S. Dollars. The letter included instructions for PDVSA to wire the funds to European Financial Institution 1 accounts for the benefit of Eaton.

18. In short, Eaton, a company controlled by members of the conspiracy, ended up with the right to pay PDVSA about 7.2 billion Bolivars (worth around 35 million Euros) and receive about 510 million Euros (the "Eaton-Rantor Loan Scheme").

19. Venezuelan Official 1, and others, took acts and made decisions in their official capacity to facilitate the Eaton-Rantor Loan Scheme in exchange for receiving kickbacks from the proceeds. For example, members of the conspiracy gave cash kickbacks to Venezuelan Official 1

in exchange for Venezuelan Official 1's acts in signing the loan contract in his capacity as Vice President of PDVSA. The bribery of Venezuelan Official 1 violated not only Venezuelan law, but also the FCPA because one or more members of the conspiracy engaged in corrupt acts from within the territory of the United States. Convit sent and received BlackBerry Messenger chats from the United States to arrange for the payment of the PDVSA funds to the CS, which caused the payment of the bribes from the CS to Venezuelan Official 1. At all relevant times:

    a.    Embezzlement of public funds by a public official and bribery of a public official was an offense against the nation of Venezuela, under more than one provision of Venezuelan law.

    b.    The corrupt use of facilities of interstate commerce or any other act, while in the territory of the United States, to further a payment or promise of a payment to a foreign official for the purpose of influencing or inducing that official to act, was a felony violation of the FCPA.

20.    Accordingly, the proceeds of the Eaton-Rantor Loan Scheme, as well as the kickbacks and bribe payments made to the conspirators, were the proceeds of specified unlawful activity as defined in Title 18, United States Code, Section 1956(c)(7).

21.    The members of the conspiracy agreed to split the net proceeds of the Eaton-Rantor Loan Scheme as follows:

    a.    227 million Euros went to the "Bolichicos" or "Boli" (Convit and "Conspirator 2"); and

    b.    227 million Euros went to "Conspirator 7."

22.    From there, the members of the conspiracy agreed to further distribute the proceeds, for instance:

6

    a. The "Bolichicos" routed approximately 78 million Euros to a CS, who was instructed to deliver the funds to ORTEGA, Carmelo Urdaneta Aqui, Conspirators 1 and 3, and Venezuelan Official 1; and

    b. "Conspirator 7" routed approximately 159 million Euros to three individuals known as "Los Chamos," the stepsons of "Venezuelan Official 2," who was a "foreign official" as that term is defined in the FCPA.

### III. Scheme to Launder the Proceeds of the Corrupt PDVSA Schemes

23. ORTEGA, Hernandez Frieri, Convit, Gutierrez, and others conspired to launder a total of approximately 12 million U.S. Dollars that were given to ORTEGA as bribe payments in exchange for ORTEGA's corrupt acts and decisions in his official capacity as Executive Director of Financial Planning at PDVSA.

#### A. Scheme to Launder ORTEGA's 5 Million U.S. Dollar Bribe Proceeds Related to the Joint-Venture Scheme and Derived From Eaton-Rantor Loan Scheme

24. In order to facilitate the bribe payment to ORTEGA for the Joint-Venture Scheme, Conspirators 1 and 3 told the CS to assign to ORTEGA 5 million U.S. Dollars from Conspirators 1 and 3's share of the 78 million Euros in proceeds from the Eaton-Rantor Loan Scheme. To this end, in April 2016, ORTEGA, Hernandez Frieri, and the CS met in Panama to discuss how Hernandez Frieri would conceal or disguise the source of ORTEGA's 5 million U.S. Dollar bribe payment so that ORTEGA's funds would appear to have been legitimately acquired. Hernandez Frieri explained that his brokerage firm, which is headquartered in Miami, Florida, operates in the United States and Latin America, and has a fake mutual fund. Hernandez Frieri explained that the mutual fund receives money made to look like investments, and then launders such payments out of the fund.

7

25. On February 21, 2017, Hernandez Frieri emailed the CS subscription instructions and a subscription agreement for the fake fund, Global Securities Trade Finance, a Cayman Islands entity. On February 24, 2017, the CS instructed Deltec Bank & Trust Limited in Nassau, The Bahamas (where a portion of ORTEGA's illicit funds were then held) to subscribe to the fund. On or about February 28, 2017, at the direction of ORTEGA and Hernandez Frieri, approximately 5 million U.S. Dollars was transferred from account/portfolio number xxxx3311-00 at Deltec Bank & Trust Limited in Nassau, The Bahamas (where a portion of ORTEGA's illicit funds were then held) to account numberxxxx6054 at U.S. Financial Institution 1 in New Jersey in the name of Global Securities Trade Finance. On March 14, 2017, the 5 million U.S. Dollars were further transferred to account number xxxx2421 at U.S. Financial Institution 1 in the name of Global Securities Trade Finance. The fake subscription in Global Securities Trade Finance was deposited at Deltec Bank, thus making the 5 million U.S. Dollars available to Hernandez Frieri for distribution to ORTEGA.

26. In exchange for the CS's assistance, Hernandez Frieri, with ORTEGA's agreement, transferred 396,000 U.S. Dollars to the CS using a fake loan contract between Global Securities Trade Finance and an undercover shell company to justify the "fee." An additional 4,000 U.S. Dollars was transferred to a bank account in Miami, Florida, held by a company associated with Hernandez Frieri as a 1-percent structuring "fee."

### B. Scheme to Launder ORTEGA's 7 Million U.S. Dollar Bribe Proceeds Related to the Companies B-C Loan Scheme

27. ORTEGA conspired with Hernandez Frieri to launder 7 million of the 10 million U.S. Dollars that ORTEGA received as a bribe payment for his participation in the Companies C-D Loan Scheme. At all relevant times, Hernandez Frieri knew that the 7 million U.S. Dollars were criminally derived proceeds.

28. The CS managed ORTEGA's 7 million U.S. Dollar bribe payment after the funds were deposited into an account at Banca Zarattini & Co. SA (Banca Zarattini) in Lugano, Switzerland. Hernandez Frieri directed that the 7 million U.S. Dollars be transferred to U.S. Financial Institution 1 in New Jersey. At the direction of ORTEGA and Hernandez Frieri, the CS transferred 7 million U.S. Dollars to account number xxxx5724 at U.S. Financial Institution 1 in the name of Global Securities Trade Finance in order to subscribe to Global Securities Trade Finance securities, which were then deposited into account/portfolio number xxxx9020 at Banca Zarattini in the name of Big Green Valley SA.

29. To justify the transactions that would allow ORTEGA access to some of the illicit 7 million U.S. Dollars, Hernandez Frieri created fake contracts between a British Virgin Islands company controlled by ORTEGA, Great Walls FS, and a company controlled by Hernandez Frieri. Hernandez Frieri also created fake contracts with individuals well-known to ORTEGA in order to justify transactions that would allow ORTEGA to access some of the $7 million U.S. Dollar funds. Hernandez Frieri assisted ORTEGA in opening an account at U.S. Financial Institution 2 in Puerto Rico for the purpose of laundering the 7 million U.S. Dollars. Hernandez Frieri told ORTEGA that Hernandez Frieri had influence at U.S. Financial Institution 2. When the account at U.S. Financial Institution 2 was closed, Hernandez Frieri assisted ORTEGA in opening an account in the Bahamas, and transferring the balance of ORTEGA's funds at U.S. Financial Institution 2 to that account. Funds were transferred into these accounts for the benefit of ORTEGA from bank accounts in the Southern District of Florida held by companies associated with Hernandez Frieri.

## IV. CONCLUSION

30. During all relevant times, ORTEGA knew that he was participating in an illegal money laundering conspiracy and that the funds he sought to conceal and transact in were the proceeds of criminal activity and foreign bribery in particular.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: 10/31/18

By: _____
MICHAEL B. NADLER
ASSISTANT UNITED STATES ATTORNEY

SANDRA L. MOSER
ACTING CHIEF, FRAUD SECTION
U.S. Department of Justice, Criminal Division

Date: 10-30-18

By: _____
DAVID JOHNSON
ASSISTANT CHIEF

Date: 10-31-18

_____
LILLY ANN SANCHEZ
ATTORNEY FOR DEFENDANT

Date: 10-31-18

_____
LUIS DELGADO
ATTORNEY FOR DEFENDANT

Date: 10-31-18

_____
ABRAHAM EDGARDO ORTEGA
DEFENDANT