```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                          MIAMI DIVISION
              CASE NO.  18-20685-WILLIAMS/Becerra


   UNITED STATES OF AMERICA,

                      Plaintiff,

          vs.

                                         Miami, Florida
                                         May 20, 2019
      GUSTAVO ADOLFO HERNANDEZ FRIERI,   Pages 1-32

                      Defendant.
  _____

                 STATUS CONFERENCE REGARDING BOND
              BEFORE THE HONORABLE JACQUELINE BECERRA
                  UNITED STATES MAGISTRATE JUDGE


  APPEARANCES:

  FOR THE PLAINTIFF:
                       United States Attorney's Office
                       BY:  MICHAEL NADLER,  A.U.S.A.
                       99 Northeast Fourth Street
                       Miami,  Florida 33132


  FOR THE DEFENDANT:
                       Carlton Fields Jorden Burt, P.A.
                       BY:  MICHAEL PASANO, ESQ.
                       100 Southeast Second Street
                       Suite 4000
                       Miami, Florida 33131


  TRANSCRIBED BY:      DAWN M. SAVINO, RPR
                       Official Court Stenographer
                       400 N. Miami Avenue, 10S03
                       Miami, Florida  33128
                       Telephone:  305-523-5598
```

```
1                    P-R-O-C-E-E-D-I-N-G-S

2            COURTROOM DEPUTY:  United States District Court for the

3    Southern District of Florida is now in session, the Honorable

4    Magistrate Judge Jacqueline Becerra presiding.

5            Case number 18-20685-criminal-Williams, United States

6    of America versus Gustavo Hernandez Frieri.

7            Counsel, please state your appearances for the record.

8            MR. NADLER:  Good afternoon, Your Honor.  Michael

9    Nadler on behalf of the United States.

10           THE COURT:  Good afternoon.

11           MR. PASANO:  Good afternoon, Your Honor.  Michael

12   Pasano and David Chee on behalf of Defendant Gustavo Hernandez,

13   whose presence we waive for purposes of this hearing.

14           THE COURT:  Okay.  You may be seated.  The Defendant

15   was called up by the Marshals in any event, so if he makes it

16   while we're still in the hearing, that's fine.  I'll note that

17   his appearance has been waived.

18           Does the Government have any issue with proceeding?

19           MR. NADLER:  No issues, Your Honor.

20           THE COURT:  So let me begin by saying that the Court

21   issued a bond, I won't go into the detail of all the bond

22   requirements, but one requirement on a $1.5 million bond was a

23   10% surety and there would be a Nebbia hearing on that 10%.

24   Counsel for the Defendant called chambers on Friday to see if

25   the Court would be available to sign the bond paperwork.  My
```

1    clerk was directed to tell the Defendant that I wouldn't be

2    signing anything the Government didn't agree to because there

3    was a Nebbia provision.

4         This morning bright and early, we had another call from

5    the defense asking the Court to set a hearing this morning on

6    the bond.  I had a meeting this morning, I had other matters,

7    but generally, I expect that when a party calls asking for a

8    hearing, it's because both parties are prepared and there's a

9    dispute.  I don't mind ruling on disputes with short notice,

10   that's what I'm here for, so that's fine.  If I can do it,

11   obviously I will.  So I asked defense counsel, or my clerk asked

12   to submit any paperwork the Court would have to review with

13   respect to this Nebbia hearing.  At about 11:30 or so, defense

14   counsel provided hundreds of pages in sort of an encrypted

15   manner, which is fine, I'm not disputing the manner in which it

16   was provided.  Typically, large documents like that to the

17   courthouse have to be provided in some particular way, and they

18   were.  I'm still not through reading all those documents.  Now

19   maybe it's because I'm slower than most on that stuff, but

20   that's fine.  But I instructed my law clerk to also call the

21   Government, and the reason I had my law clerk call the

22   Government was, one, to assure myself that if the Government had

23   any documentation it needed to provide the Court for the hearing

24   it would be given the same opportunity the defense had, and to

25   just ascertain that there was, in fact, a dispute on the bond.

1      We heard back -- and again, you can correct anything

2   I've stated here for the record, I just like things that happen

3   in chambers to be on the record.  We heard back from the

4   Government that there had been communications between both

5   parties over the weekend, that the Government had taken the

6   position that the Nebbia hadn't been satisfied, but of course it

7   is the Defendant's right to have it heard before the Court.  The

8   Government doesn't have to agree to it if the Court is

9   satisfied.

10      But what we heard too was that Mr. Nadler had gotten

11   the documentation that we had gotten right about the same time.

12   So I want to do this a little bit one at a time here.

13      Mr. Pasano, is there anything that I've stated on the

14   record that's not accurate as far as you know?

15      MR. PASANO:  No, Your Honor.  Perfectly accurate, and

16   thank you.

17      THE COURT:  Okay.  Mr. Nadler, have you had an

18   opportunity to review the documentation provided?

19      MR. NADLER:  Not the whole thing, Your Honor.

20      THE COURT:  Okay.  So I take it that Mr. Nadler has

21   tried to present a package to satisfy the $150,000 bond that I

22   set and to satisfy the Nebbia condition.  Is the Government in a

23   position to agree to a Nebbia at this time and if not, why not

24   and how does the Government want to proceed?

25      MR. NADLER:  It is not ready, Your Honor.  Even in my

1    cursory review of what was provided today, the biggest concern

2    about the Nebbia is the source of funds.

3         What occurred on Friday was that Mr. Pasano, in an

4    attempt to get Mr. Hernandez out before the end of the day, was

5    trying to get and acquire this money.  On Friday, he had three

6    sources:  One was Mr. Mora for $100,000; one was going to be

7    Olympia de Castro, the wife for $45,000; and then an individual

8    named Cesar Hernandez, Junior, which is Mr. Hernandez's nephew,

9    was going to be the last $5,000.

10        Mr. Pasano and I communicated quite a lot on Friday to

11   try to obtain the documents that would show the source of funds.

12   I think there was an issue related to Mr. Mora and his immediate

13   liquidity; he needed to seek a loan from a third party based on

14   my understanding is some securitization of assets he had.  In

15   communications I had with Mr. Mora, he was willing to give me an

16   affidavit swearing to the funds that they were legal.  However,

17   my obligation to the Court is to go one step further and find

18   out where the funds came from.  I had received an e-mail

19   forwarded on from Mr. Mora saying essentially I appreciate you

20   lending me this $100,000 from a person named Steven, and I

21   pledge a number of my assets.  This was Mr. Mora's e-mail.

22   However, Mr. Mora, in his concern, whited out the individual who

23   he was sending the e-mail to, who was lending the $100,000.

24        THE COURT:  That kind of ends the discussion probably,

25   right?

6

```
1              MR. NADLER:  And Mr. Pasano, incredibly sympathetic.  I
2    had been on the phone with him maybe every five minutes, so he
3    was absolutely trying to do his due diligence.  And his concern
4    was, of course, getting his client out as soon as possible; at
5    the same time his obligations to get me the require Nebbia.
6    It's just -- everybody was rushing, I think.
7              Ms. De Castro, the documents she sent were incredibly
8    concerning.  It was an account that showed no connection to the
9    $45,000.
10             THE COURT:  That's the wife?
11             MR. NADLER:  The wife.  It was a trust account that had
12   $62,000 moving in, $63,000 moving out.  A beginning balance of
13   $30,000 and ending balance of 29,000, but it did not show
14   anything related to the 45.  And given the money going in and
15   out was not the $45,000, and with a $30,000 ending balance,
16   can't justify a $45,000 cashier's check.  Mr. Pasano and I
17   talked.  At the end of the day, it became apparent that we were
18   not going to get to where we needed sufficient to get to the
19   Nebbia.
20             I think by that point, Mr. Mora then tried to obtain
21   the documents at least he felt were necessary.  The problem is
22   it's a loan.  It's not -- let me back up.  The $100,000 has now
23   ballooned to 145, because Ms. De Castro is no longer
24   participating in the $150,000.  So it's $145,000.  Mr. Mora has
25   shown that he could afford it, but I have not seen where the
```

1   145,000 is coming from.  Wire confirmations, because it's my

2   understanding at least the $100,000 initially was coming from a

3   wire to Mr. Pasano's trust account who then was cashing a

4   cashier's check to make the payment.  So I haven't received a

5   wire confirmation.  Until this morning, I didn't know the full

6   name of the individual who I believe was Sterling Partners,

7   which again is quite -- it's an equity firm, investment firm in

8   Chicago.

9        So given all of this, I let Mr. Pasano know at this

10  point I was very uncomfortable, and I didn't believe, at least

11  as it related to the 145,000, I could identify the source of

12  funds.  I understand that in certain instances because I'm

13  considered the federal prosecutor, the big bad government, there

14  was concern of maybe giving me the documents directly based on

15  they came from a friend.  I offered them to forego, to by-pass.

16  If there was a concern, to give them to the Court.  But I just

17  don't think that we could match up sufficient, so I could

18  determine where that 145 was coming from.

19        THE COURT:  Okay.  I've heard the Government.

20        Mr. Pasano, two things here.  So one, I want to hear

21  from you because I do think that the Defendant obviously has a

22  right to have the hearing, and maybe you've given Mr. Nadler

23  everything and he doesn't like it and I do.  Right?  That's one

24  way to go.

25        The other way to go is to say we're not there yet,

1   we're working on it, we still need more information, or we think

2   we have it, maybe the Government needs a little bit more time

3   and a little bit more time.

4          Where are you?  Is it the first or the second?

5          MR. PASANO:  I would like to tell the Court it's a

6   little bit in between, and if I could explain.  One of the

7   concerns obviously is trying to do this in a proper and timely

8   fashion.  There is a related concern, not Mr. Nadler's fault,

9   but he's leaving and is going to be away after this afternoon

10  for a few days, so it was our effort to try to get this to head.

11         Mr. Mora has advised that if the $100,000 that he was

12  able to obtain on Friday from a loan from Sterling Investments

13  is not sufficient in terms of the Government's comfort, that the

14  documents that he's provided today which show a UBS account with

15  more than a million dollars of assets in it, cash available to

16  him, that today he could post actually the full 145 from his UBS

17  account.  He has other assets that we've included in the

18  documents.  We've provided the W-2, the tax returns, those are

19  the biggest and lengthiest of the documents.  There are several

20  documents that go to an arbitration award that Mr. Mora has

21  recently received that will net him another $6 million.  His

22  current net worth is about 20 million before that award.  So

23  what we hoped was that in the documents that if we couldn't use

24  the 100 because of simply the rush to get it, that the

25  Government would agree that Mr. Mora has more than enough net

1   worth to cover the 145 out of his UBS account; that if the

2   Government said yes and Your Honor said yes, he could then

3   arrange to get to me, if it came in by late this afternoon or

4   first thing tomorrow, whenever we got it, we would immediately

5   post it with the clerk of the court and then having already had

6   the signed bond paperwork that the Defendant and his co-signers

7   have executed, he would be eligible to be released.

8           And Mr. Mora is here ready to testify under oath to

9   verify the accuracy of the documents.

10          MR. NADLER:  As to the USB account, it's a review.  I

11  don't know if the Court's seen the two.  I would just need the

12  first or the last month, at least the last month's statement to

13  determine the funds weren't deposited yesterday, the day before

14  and Friday.  It's essentially an executive summary of assets

15  with a cash allocation of 51,000.  That's where my concern

16  generally comes in.

17          THE COURT:  Well, I mean, the concern I have, if we're

18  all talking about the same documents --

19          MR. NADLER:  It's a summary.

20          THE COURT:  -- not Bates stamped or anything like that,

21  it says JM accounts description value on the top and there's a

22  net worth page on the second page.  Is that it?

23          MR. NADLER:  No, I'm sorry.  I'm looking at the UBS

24  portfolio holdings.

25          THE COURT:  Right.  But that doesn't tell me anything.

```
1              MR. NADLER:  No.

2              THE COURT:  Right.  So that doesn't help me out.

3              MR. NADLER:  So the JBS, I have that as well, Your

4    Honor.

5              MR. PASANO:  As of May 17th, Your Honor, that's it

6    exactly, a two-page document.

7              THE COURT:  Mr. Nadler, when is it that you're leaving

8    out of town?

9              MR. NADLER:  I'm leaving this afternoon, but I can have

10   someone available to review the documents if the Court orders

11   additional.  Nalina Soboton (ph), the asset forfeiture attorney

12   assigned to this, has been involved in this case, she knows it

13   intimately.

14             THE COURT:  When are you back?

15             MR. NADLER:  I'm back Saturday morning.

16             THE COURT:  My concern is -- I know Mr. Mora is here

17   and I know everyone is pressed and ready to go, and the

18   Defendant, I'm sure, thought he had an agreed-upon bond and he

19   would be home for the weekend and that didn't turn out.  And I

20   get that that makes everybody anxious and nervous, and

21   Mr. Pasano has an obligation to his client to do everything he

22   can to get his client out, because I'm fairly sure Mr. Pasano

23   told his client that given that there had been some agreement

24   with the Government, he wouldn't be sitting at FDC too long.  I

25   get that, been in your shoes, been in everybody's shoes here.  I
```

1    understand that.

2          The problem I have is I'll tell you I was, and I made

3    this very clear in open court on Friday, I'm uncomfortable with

4    this bond to begin with, and that's why I tripled the initial

5    request.  I'm not happy with the bond.  I'm not entirely

6    satisfied but now I have to live with it, that's the bond I set

7    on Friday.  But I'm not willing to just give it short shrift and

8    not make sure that all our Is are dotted and our Ts are crossed,

9    especially when I'm looking at a Defendant whose children have a

10   $5 million apartment in New York held in trust, clearly those

11   children didn't generate those monies.  Those are monies

12   generated by their parents and held in trust for their

13   protection.  I'm not saying there's anything improper or illegal

14   about that, but clearly that money wasn't the children's because

15   they're all very young.  And he lives in a $4 million home in

16   Miami also held in a trust really for purposes of protecting it

17   from exactly what's going on here today.

18         Now, for those of us who own homes, guess what?  When

19   you turn the lights on in a $4 million home, the FPL bill isn't

20   the way it is for a condo down the street.  So somebody with

21   some funds is maintaining a significant number of properties and

22   holdings and a lifestyle.  The children are in a private school,

23   it's in a public document that was filed with the Court before

24   his arrival, to the tune of over $75,000 a year, and $100,000

25   pledged to a school.  So $150,000 should not be this much of a

```
 1    problem.  It should be easily satisfied, and the Government
 2    should feel and be in a position to be extraordinarily
 3    comfortable with that.  And the fact that it's not, I'm just
 4    telling you Mr. Pasano, the likelihood that I'm going to get
 5    over it if the Government isn't comfortable with it is not high.
 6            MR. PASANO:  And Judge, I want both the Court and the
 7    Government to be comfortable with it.  Obviously our concern is
 8    to do this dotting every "I" correctly so that Mr. Hernandez is
 9    released appropriately.  Mr. Mora does ask me if the Court would
10    just entertain him to explain what's in the UBS account, what he
11    can provide to the Government and why these concerns actually
12    can be answered if the Court would be willing to hear from him.
13            THE COURT:  Well, what I don't want to do is push the
14    Government because we have a weird timetable here because your
15    client, you know, thought he was going to go home Friday and
16    because Mr. Nadler has a plane to catch.  So I'm not going to
17    short shrift the people's work because we sort of have like an
18    artificial deadline to try to get this done.
19            Mr. Nadler, how do you want to proceed?
20            MR. NADLER:  As soon as -- if the money is going to
21    come from the UBS account, if I could just get the most recent
22    statements to see cash on hand what he's going to sell, because
23    based on the summary sheet, there's not enough cash to cover the
24    145.  So I would just need to know where the money's coming
25    from.  That's all Mr. Pasano and I have been talking about, just
```

1   the source of funds.  If Mr. Mora wants to take the stand, I'm

2   just not sure it's necessary because the money came from a third

3   party on a loan.  There are no loan documents, just a

4   confirmation e-mail from Mr. Mora to that individual saying

5   thank you for the loan.  How do I know where that money came

6   from?

7           THE COURT:  But they're not doing that anymore.  Now

8   they're saying they're just going to take it out of the UBS.

9           MR. NADLER:  The 145?  Once I get the statements, I

10  think we'll be fine.

11          MR. PASANO:  Your Honor, then perhaps once the Court is

12  satisfied that we've reached whatever proper conclusion we've

13  reached today, perhaps Mr. Mora and I could go outside, Mr. Mora

14  can talk to Mr. Nadler, explain this and then we can get the

15  other documents that Mr. Nadler needs in his hands and then

16  ideally, either he or one of the other prosecutors, Nalina or

17  whomever, could be the person that could allow me to represent

18  to the Court that the Government is satisfied so we could get

19  this done.

20          THE COURT:  Let me make sure that we're on the same

21  page.  So I think the loan thing they've abandoned because that

22  didn't work, and now it's 145,000.  Mr. Mora keeps being very

23  agitated back there and holding his hand and stuff like that.

24  Well, you're not entitled to speak so you need to wait.

25          So I believe Mr. Pasano's representing that it's funds

1    that are going to come from an account and not a loan?

2            MR. PASANO:  Correct, Your Honor.

3            THE COURT:  Okay.  This is what I'll do.  It is 1:21

4    now.  I'll note for the record that the Defendant was brought in

5    about five minutes ago.  So I'm going to take a recess, that

6    will give Mr. Pasano some time to fill in his client as to

7    what's been going on.  Your lawyer waived your appearance for

8    the hearing which is why we started without you, and it's a

9    hearing to try to decide whether or not the bond conditions I

10   set on Friday have been satisfied so that you may be released

11   pursuant to that bond.  The paperwork isn't all ready, it's not

12   ready, we're not where we need to be in order to release you.  I

13   understand you thought you had a worked out arrangements already

14   where you would be released, that's just not where we are just

15   yet.

16           So I'm going to take a 30 minute recess.  If you need

17   more time, let Donna, my courtroom deputy, know.  If you can

18   work something out, if you can get those documents, if you work

19   something else out in 30 minutes, great.  If not, I'll come back

20   on the bench in 30 minutes and see where we are.  Ideally, the

21   Government will reach a point where it's satisfied, it will be

22   agreed to and then I can get way more comfortable.  If that

23   can't happen this afternoon, Mr. Nadler, maybe it needs to

24   happen tomorrow and then Mr. Pasano can file something with the

25   Court that sets out why the Nebbia condition has been satisfied

1    and sets out the details in the paperwork and that can be part

2    of the court record and we can do this in a better fashion.

3         I'll just speak to the Defendant briefly and say I'm

4    sure there's a lot of stress and anxiety because you thought

5    this was going to happen Friday.  It didn't.  It's no fault of

6    your defense lawyer.  Trust me, he's pushing every button he can

7    to get this to happen quickly, but there's just a timetable here

8    that's not set by the Defense or by the Government.

9         So I'll take a recess for 30 minutes and we'll see

10   where we are in 30 minutes.  Is that okay?

11        MR. PASANO:  Yes, Your Honor.

12        MR. NADLER:  Thank you, Your Honor.

13        COURTROOM DEPUTY:  All rise.  Court is in --

14        THE COURT:  All right.  I'm back a little earlier than

15   planned because I heard that there is some agreement by the

16   parties.

17        MR. NADLER:  Yes, Your Honor.  I had a conversation

18   with Mr. Mora.  I got an understanding and explanation of where

19   the funds are going to come from.  I'm going to get an e-mail

20   within the next couple of hours to confirm the source of funds.

21   Once that happens, I will respond to Mr. Pasano.  If it's what

22   I'm being told, that Nebbia has been satisfied.  The wires are

23   coming in from family and I'm just going to get confirmation of

24   who those family members are from Mr. Mora.

25        MR. PASANO:  And from the UBS account?

1          MR. NADLER:  From the UBS account.

2          THE COURT:  I know Mr. Mora was asked to step outside

3     given his somewhat agitated state.  Is he still available?

4          MR. PASANO:  He is.  He's immediately outside.

5          THE COURT:  I want him here and I want him under oath.

6     Mr. Nadler, whatever representation he's made to you, I want him

7     under oath.  No, I want him in the well.

8          (Witness placed under oath)

9          COURTROOM DEPUTY:  Okay.  Please have a seat and then

10    please state your first and last name, and then spell your first

11    and last name for the record.

12         THE WITNESS:  Sure.  My full name is Jorge Ignacio

13    Gonzalez Mora.  My first name is spelled J-O-R-G-E; my last name

14    is M as in Mary, O-R-A.

15         THE COURT:  Mr. Nadler, you may proceed.

16                          DIRECT EXAMINATION

17    BY MR. NADLER:

18    Q.  Good morning.  Or -- I'm sorry.  Good afternoon, Mr. Mora.

19    A.  Good afternoon.

20    Q.  We just had a brief conversation outside.

21    A.  Yes, sir.

22    Q.  Our conversation revolved around the fact of where this now

23    $145,000 is going to come from.  Correct?

24    A.  Correct.

25    Q.  It was originally going to come from a loan.  That is no

1   longer going to be the case, right?

2   A.  It's no longer coming from Sterling Capital where I had

3   assets that there were.

4   Q.  Correct.  Just tell us what you told me where this money is

5   going to come from.

6   A.  Okay.  So because securities, I have -- the accounts at UBS

7   are securities mostly, not cash.  They take three to five days

8   to settle if you sell them, plus you have to pay taxes on all

9   the gains.

10          I basically called in money that was owed to me quickly

11   because I wasn't expecting to need this cash.  You know, on

12   Friday, I was sitting in the courtroom and I went on a mad

13   scramble trying to find cash.  So I basically called in people

14   that owed me money, including my brother who is sending me some

15   money today, and another person that owed me money, and they're

16   sending it.  The money is literally in my account probably right

17   now and it's coming in cash from my UBS account.

18          I know that if I lie to the Court, I am a criminal and

19   I would never do that.  I mean, even for any reason.  I mean, I

20   have a sterling reputation in business for over 26 years.  So to

21   get him out of jail for two, three days, I'm not going to put my

22   reputation and my character at risk.  This is my money that I am

23   putting forward to help a dear friend.

24          THE COURT:  So how do you know the Defendant?

25          THE WITNESS:  We met through mutual friends about 10,

1    12 years ago.

2          THE COURT:  Are you related to the Defendant in any

3    way?

4          THE WITNESS:  No.

5          THE COURT:  Do you have any business dealings with the

6    Defendant or his wife?

7          THE WITNESS:  We have owned some wine businesses

8    together.  Unfortunately, the main wine business we owned, we

9    were raising funds when this all happened and the company

10   unfortunately is going to go bankrupt or be sold for almost no

11   money in the next few weeks.

12         THE COURT:  Does the wife still have an interest in

13   that wine company?

14         THE WITNESS:  No.  I think the -- when he got arrested,

15   he resigned from the board and I think he's been diluted to very

16   little.  I'm sure there is some remnant, but there's no money

17   coming out of that sale.  We're all losing our money on that.

18         THE COURT:  And the $145,000 that you need to pledge,

19   you said you're getting it back from loans you made to family

20   members?

21         THE WITNESS:  Some of it is going to be from my

22   brother.  We do a lot of business together, one of my brothers,

23   and then another one is coming from a friend of mine who is my

24   next door neighbor and we also have done a lot of business

25   together over the years, completely not related to Latin America

1    in any way.  Not related to Mr. Hernandez in any way whatsoever.

2         THE COURT:  When did you lend your brother that money?

3         THE WITNESS:  I wouldn't call it a loan.  It's

4    basically we own an office in South Beach together.  We own a

5    property in Costa Rica together.  We've made investments in art

6    together and so we kind of have a running ledger of things that

7    we kind of owe each other back and forth.  And when this

8    happened on Friday morning, he was one of my first phone calls,

9    I said I need -- you know, I need cash.

10        THE COURT:  How much are you getting from your brother?

11        THE WITNESS:  I think he's sending me today 30.

12        THE COURT:  And how much are you getting from this

13   neighbor?

14        THE WITNESS:  100.

15        THE COURT:  What's the name of the neighbor.

16        THE WITNESS:  Phokion Potamianos.

17        THE COURT:  Can you please spell that for the record?

18        THE WITNESS:  P-H-O-K-I-O-N, P-O-T-A-M-I-A-N-O-S.

19        THE COURT:  And when did you lend the neighbor that

20   money?

21        THE WITNESS:  This is -- again, this is one of my

22   oldest friends and we have a bunch of art.  He's an art dealer

23   family, and so I have a very large art collection as you've seen

24   from my net worth statement.  So it's just a matter of I'm

25   putting the art -- you know, to get the money so I could have it

20

 1    again cleanly against my name, not with any other potential

 2    liens.

 3           I'm going to have, as you heard from a statement of

 4    arbitration that I just won in New York, that I'm going to have

 5    $6 million in my account by the end of the week probably.  So

 6    again, I wouldn't be risking -- you know, providing funds that

 7    are dirty when, you know, when I've got a significant net worth

 8    to protect.  I mean, it just makes no sense why I would do that.

 9           THE COURT:  So what kind of conditions are going to be

10    put -- is Mr. Mora going to be signing the personal surety bond

11    as well or no?  Because he's not really putting anything other

12    than the 150 at stake.

13           MR. PASANO:  Correct, Your Honor.  He was just posting

14    the money.  I've asked him, it's sensitive.  He indicated to me

15    that if it wasn't necessary, he wasn't inclined to because the

16    Court hadn't originally included him.  If that's what it takes,

17    I'd ask him to reconsider.  But at the original plan was that he

18    would come up with the money and use that, you know, to help his

19    friend.

20           THE COURT:  Mr. Nadler, what's the Government's

21    position?

22           MR. NADLER:  There would be a certain amount of relief

23    if he put up the money and signed it, but it wasn't part of the

24    Court's original order as well.  So I understand if there's a

25    hesitation to do that.

21

1          MR. PASANO:  And Judge, just to fill in a gap, the

2    little bit of interest that Mr. Hernandez has in that wine

3    business is actually restrained under the court order.

4          THE COURT:  No, I know the Court has restrained it, but

5    there's 30 from the brother which isn't that much and the other

6    100 is from a neighbor, and you're talking about an individual

7    with a significant net worth who's unwilling to sign on a

8    personal surety bond, but is happy to lose 150 which is -- you

9    know, one is 30,000 on a running tab with his brother that he's

10   had for years so not anything that he was expecting to have any

11   time soon, and $100,000 is from some neighbor who is an art

12   dealer on what he's saying is a significant art collection so

13   100,000 doesn't seem like much there either.

14          And Mr. Pasano, you've inquired of him and he's

15   unwilling to sign a personal surety bond?

16          MR. PASANO:  I asked him this morning whether if that

17   came up, I told him that the Court might actually ask him that,

18   and his inclination was if he didn't have to, he would prefer

19   not.  And that was where we left the conversation.

20          THE COURT:  So one of the things that could provide the

21   Court more comfort as to the bond at issue and the nature of the

22   funds that you've provided is you signing a personal surety bond

23   where if your friend here decided to flee, you know, you would

24   be responsible for the personal security bond.

25          THE WITNESS:  Well Judge, if I may answer, I mean, I

```
 1    just think it's not unreasonable to ask when there's three

 2    people signing that.  I'm providing this capital because you're

 3    requesting it on Friday.  Again, I have a very long, clean

 4    reputation and so --

 5          THE COURT:  Which is why I was hoping that you wouldn't

 6    oppose signing a personal surety bond.

 7          THE WITNESS:  But again, I have to have -- to get

 8    somebody to review these things, so I've never done this before

 9    in my life, and I think to ask me to sign a surety bond when I

10    haven't had a personal attorney review it, I don't think that's

11    a reasonable request.  And --

12          THE COURT:  Well, interestingly enough, the person who

13    decides what's reasonable is me.

14          THE WITNESS:  Sorry.  From my perspective, you would

15    never sign a document without -- you're a lawyer, you can review

16    your own documents.  I'm not a lawyer, I need a lawyer to review

17    a document before I sign it.

18          THE COURT:  Happy to have a lawyer help you review it.

19    Mr. Pasano can tell you what it means.  Your friend doesn't show

20    up to court, you're on the line for the amount of money that you

21    pledged.  I mean, the folks who sign the $25 million pledge on

22    Friday were the Defendant's brother and a business partner who's

23    --  the brother-in-law who's not even here.  I have to be

24    satisfied that the money on the 150 that's being put in is

25    clean.  You might be very reputable, I'm not at all suggesting
```

1    that you're not.  But the money that you're pledging, you're not

2    saying to me I'm a man that makes a million dollars a year doing

3    this, I've saved this money, this is my hard-earned capital.

4    You're pledging $30,000 from your brother that you have a long

5    tally with, so again, it doesn't seem to me that I've got much

6    on the 30; and $100,000 on a neighbor that the Government hasn't

7    done any due diligence on, I assume because they've probably

8    just heard the name now.

9           And so the whole point of these bonds, sir, is to make

10   sure that the Defendant understands that people around him, if

11   he doesn't have the funds, that people around him would have

12   significant penalty if he chose not to appear.  And the reason

13   we have these hearings on these, what we call, Nebbia hearings

14   is under the theory that the money that's pledged is not money

15   that's -- clean money is one way of putting it, but it's not the

16   kind of money that you wouldn't mind losing then you're not

17   losing much if your friend doesn't come back to court.  And so

18   that's why I'm inquiring of where you got that $150,000.

19   Because if it's $150,000 you've been working for, that you made

20   on a deal, that you made when you sold on a house, you don't

21   want to lose that money, and your friend should know that you

22   wouldn't want to lose that money.  But if it's $145,000 that,

23   you know, if it disappeared tomorrow you wouldn't care because

24   100 is some neighbor who you have art with -- I don't even

25   understand how that's working.  Did you pledge a piece of art to

1   him?  Is it just a running tally with him too?  I'm not feeling

2   the comfort, Mr. Pasano, that I need to feel on the 145.

3           MR. PASANO:  And Your Honor, if I can add to what the

4   Court is saying, this is really directed to Mr. Mora, he and I

5   had a very brief conversation about what it meant to co-sign on

6   the bond.  And the position I've always taken is, you know,

7   first question is do you have any reason to believe that this

8   individual would flee.  I will advise the Court that I had that

9   very conversation beginning late Thursday night when his wife,

10  Olympia, expressed her position to me and I was assured that

11  this had nothing to do with any concern she told me that her

12  husband would flee, she's confident he will not.

13          THE COURT:  But yet, she won't sign for the husband.

14          MR. PASANO:  Exactly.  But I had to ask the question

15  and then at some point, you know, the conversation got personal.

16  It was not appropriate for me to take that further.

17          The reason I say that in front of Mr. Mora is likewise

18  based on what -- I've spoken to Mr. Mora, I know he has no

19  belief or concern that Mr. Hernandez would flee.  And yet,

20  someone who signs on to a bond, as I've tried to tell him, you

21  know, is obligated if the person does flee and thus has a reason

22  to keep an eye on that person to take steps as necessary to, in

23  essence, protect that signature, to be available if there's even

24  the slightest problem, to advise counsel or the Court so that if

25  someone was actually looking to flee, who had the people stand

1    up for him or her that stood up, those people could take steps

2    to protect themselves by making sure that he did not flee or

3    have the ability to.  And it lasts as long as the case lasts.

4    It goes away when the case is done.

5            I'm hoping if that's what the Court needs to give you

6    the confidence that Mr. Mora has in essence a stake in this,

7    that he would reconsider and agree to co-sign.

8            THE WITNESS:  May I comment, Judge?

9            THE COURT:  No.  This is what I want, because this

10   doesn't have to be in open court.  The testimony I've heard,

11   Government, doesn't satisfy me on the Nebbia because there's

12   just not enough there.  I thought he was going to testify that

13   he's a wealthy individual with a $23 million net worth; he's got

14   money in the bank and he's willing to pledge money he's earned

15   in the bank.  What I've heard is some odd account with the

16   brother that goes back and forth where there's no real

17   accounting, they just have a running tab, so he's going to get

18   $30,000 from a brother that isn't here, isn't going to pledge

19   anything.  The Government has no information on.  And then

20   $100,000, which is something he called a neighbor about to

21   pledge artwork.  Again, that's just not sufficient.  That

22   doesn't mean that the neighbor or the brother are engaged in any

23   illegal conduct, it just means that I'm not satisfied that

24   they're not because there's not enough on this record.

25           So you can either get more on this record for that 150

```
1    because two days ago, the 150 was some loan that we couldn't get

2    comfort on.  So now we have this arrangement that I'm not

3    comfortable with.  So either we got $150,000 that both the

4    Government and I are comfortable on, and if we can't get that

5    150 and the Defense and the Government want to propose something

6    different for my consideration like other people signing the

7    bond, I will absolutely consider that.  I don't think I can, on

8    my own motion, now require the bond to change because I've set

9    the bond.  So I think on that one, I'm going to have to live

10   with what I did on Friday, which obviously I'm perfectly

11   prepared to do.

12        But if you can't get the Nebbia on the 150 and you want

13   to reopen it for a different bond, that's a different situation.

14        MR. PASANO:  And Your Honor, I think, if I understand

15   and if Mr. Mora, if the Court thinks it appropriate, could

16   clarify, in part, we've all been rushing because of the desire

17   that Mr. Hernandez not sit any day more than he needs to.  I do

18   understand that from this settlement that's an award in an

19   arbitration, that a large sum of money, perhaps by as early as

20   later in this week, will be hitting Mr. Mora's account.  That

21   would be easy to show the source of funds.  In fact, the

22   documents about the settlement are in the package that was

23   submitted.  It may be that there's other immediately

24   ascertainable sources that don't involve third parties, and I'll

25   work with Mr. Mora and Mr. Nadler to try to identify those.
```

1        THE COURT:  Let me just say this, again -- what time do
2    you have to leave, Mr. Nadler?
3        MR. NADLER:  I leave for the airport around 3.
4    Somebody will --
5        MR. PASANO:  We've agreed to stay in touch.
6        THE COURT:  This is what I want to do, and I want to
7    make this clear to the Defendant who's here, unless Mr. Pasano,
8    you have some objection.  The problem by doing it in this
9    hurried fashion and hurried fashion is that the more you try to
10   slap this thing together, the worse it looks for the Court.
11   Right?  It's not looking better, it looks worse because it would
12   be easier to come before the Court on Tuesday or Wednesday with
13   $150,000 bond that's got a bow on it that the Government is
14   comfortable with and that I'm comfortable with and be done, as
15   opposed to trying to come up with something on Friday and trying
16   to come up with something over the weekend and Monday morning it
17   was one thing, now Monday afternoon the source is someplace
18   else.  I understand, you know, you've got a bond.  You have a
19   right to meet it, you have a right to be released under those
20   conditions once the bond is met.  But the bond's got to be met.
21        So I'll tell you what.  If we could work it out with
22   Mr. Nadler, I'm more comfortable with that.  I'd prefer that.
23   I'm sure wherever he's going he'll feel better not to leave a
24   colleague with Mr. Pasano's calls, which probably come at the
25   rate of every 10 minutes, knowing Mr. Pasano.  And that's fine.

1    That's Mr. Pasano for you.  And he's also representing the

2    interests of a client, so I respect that.  I'm not at all trying

3    to suggest that calling the Government is a bad thing or even

4    calling them every 10 minutes is a bad thing.  That's what

5    they're there for.

6              MR. NADLER:  I just want to be clear.  Mr. Mora was

7    going to provide not just his word, but the back-up

8    documentation for these source of funds of where they were

9    coming from.  I understand the Court's concern.

10             THE COURT:  Right, but then we're going to be back to

11   square one.  He's going to give you something from some art

12   dealer, and you're going to scratch your head and say I don't

13   know if this is good enough, and we're going to be back and

14   forth, back and forth, back and forth and we're back to square

15   one.

16             MR. NADLER:  I was hoping that wasn't going to be the

17   case.

18             THE WITNESS:  I can provide you a bill of sale.

19             THE COURT:  Why don't you not say anything.  I'm going

20   to get off the bench now.  It's still not even 2.  See what you

21   guys can work out.  You don't have to head to the airport until

22   3?

23             MR. NADLER:  Correct, Your Honor.

24             THE COURT:  See if you can do something in the next

25   hour for me.  I'm here.  I got nowhere to go these days except

1    be here.  So if we can work it out, like I said I'm not -- I

2    don't want to be difficult, I'm not trying to prevent you from

3    meeting your bond obligations, but I have an obligation to make

4    sure the bond satisfies the bond I set and satisfies me.  And at

5    least what I've heard so far does not.  So see if you can come

6    up with something.  You all have been around plenty, I think you

7    know what I'm looking for.

8            MR. NADLER:  Yes, Your Honor.

9            THE COURT:  Let's get it.  If not, we're just going to

10   have to wait until you can.

11           COURT SECURITY OFFICER:  All rise.

12           THE COURT:  All right.  I hear we -- I don't know if we

13   have an agreement, but I was told to get back on the bench.

14           So where are we?

15           MR. PASANO:  Your Honor, trying to simplify providing

16   the monies that are sufficient to satisfy Nebbia, this is what

17   we have identified.  We discussed it with Mr. Nadler and we

18   believe we can have all the paperwork in Mr. Nadler's hands this

19   afternoon.

20           Mr. Mora owns a painting called *Flower Drawing*

21   *(Orange)*, it's by an artist named Jeffrey Koons.  He recently

22   sold the painting for $90 million.  Mr. Mora bought that

23   painting and he has the documentation that he'll provide to

24   Mr. Nadler in 2012.  The current market value is well over

25   $100,000.  He has agreed to sell it to his neighbor, whose name

1    he spelled for you, who is an art dealer and the neighbor has

2    agreed to pay him $100,000 for that painting.  That transaction

3    can actually close today, and we can get the documentation to

4    Mr. Nadler.  The other 50 comes from the monies he has, a little

5    over 50 -- the other 45 comes from the monies he has, the other

6    50 plus in that brokerage account at UBS, the documents to which

7    have been provided.  So --

8         THE COURT:  But that's not coming from the brother, so

9    it's going to be 50 from his UBS account?

10        MR. PASANO:  Exactly.  Take the brother out because it

11   was getting too complicated.  Simply the sale of a piece of art

12   which we can document both its value and its providence and the

13   monies that had been in the UBS account for a while and --

14        THE COURT:  Did you misspeak?  You said the painting

15   had been sold for 90 million?

16        MR. PASANO:  I said recently the artist Koons sold a

17   painting.

18        THE COURT:  Koons had sold for 90 million, but not this

19   one.

20        MR. PASANO:  This one we think is six figures plus the

21   100,000 is below market, but Mr. Mora is willing to do it to

22   help.  And frankly, the value and his desire to, you know, try

23   to get that painting back at some point, maybe buying it back

24   once this case is over, will drive him to stand for his friend.

25   But it's a little more personal with the painting.

1          THE COURT:  I got to tell you, I mean, if he's got the

2    net worth he says he's got, it is what it is.  All I can do is

3    make a ruling as to whether or not the funds are legitimate and

4    I'm stuck with that.  Do I think that that's going to make his

5    friend not flee?  I hope you don't go anywhere sir, because if

6    you go somewhere, you're going to be in a world of hurt with

7    your children, your wife, your brother who pledged 25 million,

8    this friend, the brother-in-law.  I mean -- and you know what?

9    Where are you going to go?  Colombia?  We have extradition in

10   Colombia, you'll be right back before you know it.  I'd like to

11   think that you're not going to do that, that you fully

12   understand what's at risk here if you flee.

13          Like I said, I set the bond that I set, it's 150 that

14   has to pass the Nebbia.  That paperwork will be given to the

15   Government.  Once I have in it chambers, if it looks right, I'll

16   sign it.  If it can't look right today, make it look right

17   tomorrow.  Like I said, don't make me anymore weary of it than I

18   already am by giving me something that isn't done because quite

19   frankly, even if this is done today, you're probably not going

20   anywhere today, the clerk's office closes at 4:30.  The Marshals

21   won't process you tonight in any event.  So even if this all

22   works out, you're still looking at a Tuesday at best, or

23   Wednesday situation.  I only tell you that so that you're not

24   disappointed with your lawyer because it's got nothing to do

25   with him.  This is just the way the system works, and you're

1   just going to have to wait until the clerk's office processes

2   everything and Mr. Nadler agrees to everything.

3        So I'm in chambers all afternoon.  If I get something

4   that I can sign, I will.  If not, I'll call you back up.

5        MR. NADLER:  Thank you, Your Honor.

6        THE COURT:  All right.

7        MR. PASANO:  Thank you.

8        (PROCEEDINGS CONCLUDED)
                        * * * * *

9
                   C E R T I F I C A T E
10  I certify that the foregoing is a correct transcript from the
    digital audio recording of proceedings in the above-entitled
11  matter.

12
    5/21/2019                /s/ Dawn M. Savino
13  Date                     DAWN M. SAVINO, RPR

14

15

16

17

18

19

20

21

22

23

24

25