Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 05/21/2019 Page 1 of 21


GOVERNMENT EXHIBIT 21 18-CR-20685

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 18-20685-WILLIAMS/Becerra

UNITED STATES OF AMERICA,

Plaintiff,

vs.

GUSTAVO ADOLFO HERNANDEZ FRIERI,

Defendant.

Miami, Florida
May 17, 2019
Pages 1-21

---

TRANSCRIPT OF ARRAIGNMENT and
STATUS CONFERENCE REGARDING BOND
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:
*United States Attorney's Office*
BY: MICHAEL NADLER, A.U.S.A.
99 Northeast Fourth Street
Miami, Florida 33132

FOR THE DEFENDANT:
*Carlton Fields Jorden Burt, P.A.*
BY: MICHAEL PASANO, ESQ.
100 Southeast Second Street
Suite 4000
Miami, Florida 33131

TRANSCRIBED BY:
DAWN M. SAVINO, RPR
Official Court Stenographer
400 N. Miami Avenue, 10S03
Miami, Florida 33128
Telephone: 305-523-5598

TRANSCRIPT RECORDED BY DIGITAL AUDIO RECORDING
PRODUCED BY OFFICIAL STENOGRAPHER

Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 05/21/2019 Page 2 of 21


P-R-O-C-E-E-D-I-N-G-S

THE COURT: United States versus Gustavo Hernandez Frieri, 18-20685-criminal-Williams.

MR. NADLER: Good morning, Your Honor. Michael Nadler on behalf of the United States.

THE COURT: Good morning.

MR. PASANO: Good morning, Your Honor. Michael Pasano on behalf of the Defendant, Gustavo Hernandez, and it's good to see the Court.

THE COURT: Thank you. Good to see you.

So we're here today to arraign the Defendant and for a bond hearing; is that correct?

MR. NADLER: Yes, Your Honor.

MR. PASANO: Yes, Your Honor.

THE COURT: Okay. Do you want to proceed with the bond hearing or with the arraignment first?

MR. PASANO: Arraignment is fast, Your Honor. If you want to go there, we're happy to.

THE COURT: Let's do the arraignment.

MR. PASANO: At this time, we would waive formal reading of the indictment. We would request trial by jury, we would ask the Court to enter the standing discovery order and -- yeah.

THE COURT: Okay. So I'll accept the formal waiver reading of the indictment, we'll enter a plea of not guilty,

Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 05/21/2019 Page 3 of 21


I'll note your demand for jury trial which I think might be what you forgot, right?

MR. PASANO: We filed it as a written demand but --

THE COURT: No problem. So I didn't see that in the record, but that's fine. We'll note the request for jury demand and the standing discovery order will be entered today.

All right. How are we proceeding with bond?

MR. NADLER: The parties have agreed to stipulate to a bond to present to the Court, Your Honor.

THE COURT: Okay.

MR. NADLER: We're going to propose a $500,000 10% bond and a $25 million personal surety bond co-signed by two individuals whose names are?

MR. PASANO: Family members. Cesar Hernandez, his brother who lives here in Miami, and Juan Carlos Gomez, his brother-in-law who lives in Colombia, who is in Florida and in Miami today.

MR. NADLER: We are also asking for home confinement with electronic monitoring to be paid for by the Defendant. We already have the Defendant's passports, but we've also agreed to surrender the passports for Mr. Hernandez's children. We'd ask that the co-signers, as well as Mr. Hernandez, not encumber any property or assets or investments. Mr. Hernandez has also agreed to pledge his share of the Homestead here in Miami.

THE COURT: Anything else?

Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 05/21/2019 Page 4 of 21


MR. NADLER: I believe that is it, Your Honor.

THE COURT: So why is the wife not pledging the Homestead?

MR. PASANO: Your Honor, she's present in court. Mr. Hernandez was arrested almost nine months ago in Italy. The businesses have pretty much crumpled in the face of his indictment, and the wife has been particularly adversely affected both in her job and in her ability to pay and care for the children and it's likely going to be a divorce. And on the advice of her divorce counsel, she's not available to execute.

THE COURT: So the wife is refusing to pledge the property?

MR. NADLER: Her share.

MR. PASANO: Her share, her half.

THE COURT: I thought the property was held in some sort of trust?

MR. NADLER: It is.

THE COURT: So does he have an interest in that trust or no?

MR. NADLER: He does. He is the trustee.

THE COURT: All right. That doesn't mean he has an interest in the trust. So do you know what his interest in the house is?

MR. PASANO: The three children are the beneficiaries of the trust, Your Honor. But prior to the trust, Your Honor,

and this is simply to point out the legal issue, the Government would have a stake, they may or may not win it, they filed a lis pendens to protect it with regard to his share of the property so it does have value and it is, I believe, a reasonable property to sit behind the bond in addition to these other terms.

THE COURT: Where is he going to reside?

MR. PASANO: At the house. The wife -- we've had discussions late into the night. It's on Hibiscus, it's not actually that far from here, and he will live there and remain there with his children and his wife as they go through this process. Now that he's back, I hope things will change, but I can't tell the Court it will.

THE COURT: I have to tell you, I'm not entirely comfortable. I think the bond is low given the nature of the offense, given fact that he had to be extradited from Italy and given the assets that involved are in the case.

MR. PASANO: Judge, may I explain? Because we understand the Court's concerns. As to the extradition, Mr. Hernandez was, upon his arrest a day later, released into house confinement in Italy and has been, in essence, at liberty for nine months. When the extradition rulings occurred in January of this year, he decided not to further contest and so withdrew further appeals and had his lawyers arrange with the US to have him brought back.

Throughout the time that he was in Italy for those nine months, he had his two passports. He actually ultimately was living for months in a house alongside the sea. The idea that a man who, for nine months could have fled, would agree to come back to the United States knowing that he would be in custody and then somehow leave here knowing potentially the chaos that was awaiting him, we suggest, gives us further confidence as to why he's not a bond risk. But to protect against that, we've agreed to the idea of home confinement.

As to assets, unfortunately whereas a year ago this was a man who was well off with businesses that were functioning, the businesses have all cratered. He has no current assets and his role in this very large alleged crime actually reduces itself to receipt of some monies through his investment hedge fund which are still available, ultimately to be returned to the Government. So it's not as if this is a man who received a lot of money or who has money hidden abroad. He actually has nothing. He has investments tied up, there's a protective order in place that is covering those, and he's pledging all of that, whatever he has, against his promise to return.

MR. NADLER: Your Honor, I can comment a little bit about the extradition. In terms of he was extradited, he was extradited because he was caught up in a complaint while on vacation. There was an individual flying into the United States on a particular day that we felt if we didn't arrest him and

Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 05/21/2019 Page 9 of 21


file a complaint on that day, then we may not have gotten him again. He was a German, I believe a German citizen with concerns of extradition if he ever got out, so Mr. Hernandez was caught up in that. It wasn't that he was extradited because he was living in some foreign country; he was literally on vacation with his family.

In addition, at the beginning, within a couple days, Mr. Pasano actually reached out, offered to surrender. Unfortunately, he was caught up in the extradition and it wasn't possible.

So given the current state of his finances, and we are still working out the full extent, the year, the wife, we just don't believe he is a flight risk based on this set of circumstances. But you're right, Your Honor, it is a risk. We've had a large conversation over the last two days about assets and we believe we pushed the bounds of liquidity as --

THE COURT: I think the bounds of liquidity are $50,000 in this case?

MR. NADLER: That's what I was told. Anything else would be loans from other people.

MR. PASANO: As is for the last year, he has lived on loans from friends and family. When I say the business has cratered, I'm not exaggerating, Your Honor. There is no income that he's receiving, and he's resigned from every position and every entity because of this indictment.

Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 05/21/2019 Page 8 of 21


MR. NADLER: I know his business is, as far as we see, not currently bringing much income or any income. The original asset, which was the trade finance, is no longer operating.

THE COURT: I got to tell you, I'm uncomfortable not having the wife sign. I mean, they may think they're getting a divorce, maybe she thinks she's getting a divorce now, but he's going to go back and live in a fairly significant home with the wife. They have minor children. Is the wife not surrendering her documents?

MR. PASANO: She works and travels when she gets a new job outside the US. Originally we had contemplated that. She is present in court. If the Court wants to inquire, I have no objection to that, Your Honor.

THE COURT: Why is the Government not requesting that she co-sign at least a personal surety bond?

MR. NADLER: I asked, she said no. So if she doesn't do it, it's essentially asking for a detention. She refuses. So it's asking for something that's never going to happen. So Mr. Pasano and I had a long talk this morning. Trust me, I voiced the same concerns as the Court.

MR. PASANO: Now Your Honor, his brother, who has a business and who has been kind enough to agree to co-sign also, you know, has significant property and family here in Miami. Mr. Hernandez himself lived here for 20 years, he is a US citizen, he was born in Colombia. Both of his passports are in

the custody of the Government. We are arranging so the three minor children's passports will be held along with -- you know, along with all these other conditions we urge the Court more than suffices. Again, if he was going to flee, he had ample opportunity. And the fact of electronic monitoring covers any other additional risk if there was one.

Again, if this was the lead defendant in the case with hundreds of millions of dollars of money passing through his hands, I'd appreciate even more the Court's concern. But, you know, while not a small amount of money, the money that came into his hedge fund and went back out in investments is not money in his hands, and it is not anything compared to the amounts of money that others were involved in.

THE COURT: What about all the real property that's noted in the forfeiture, Counsel? Counsel for the Government?

MR. NADLER: The house is -- has a lis pendens for substitute.

MR. PASANO: And there's investments that are also now covered by Judge Williams' protective order.

MR. NADLER: Correct. The bottle asset fund which is a fund into the distribution of certain wines, that is covered by the protective order as well. Those are assets that the Defendant promises not to encumber as part of this.

MR. PASANO: And those are the only items in that long list that are his.

MR. NADLER: There's a piece of property in New York that's an irrevocable trust for the benefit of the kids that Mr. Hernandez has no interest in. He is not a trustee nor beneficiary.

THE COURT: Who is the trustee and the beneficiary of that apartment?

MR. PASANO: It's, as I understand it, one of his wife's sisters and a family friend of the wife.

THE COURT: All right. This is what I'm going to do. I mean, the Government has stated that it has no concerns that the Defendant is a flight risk; is that correct?

MR. NADLER: I wouldn't say I have no concerns. I believe the bond is sufficient to ensure he's showing up. As I told the Court, I do have concerns not having the wife sign. I was notified late last night. We talked about it. I am more confident than not that he will not flee, that he will face charges.

There's also other circumstances I prefer not to put out into the public that go into that factor that I'm happy to notify the Court at sidebar if the Court wants to know about that, that alleviates a lot of my concern.

THE COURT: I would actually like to know about that. The parties can come to sidebar please.

(SIDEBAR CONFERENCE:

MR. PASANO: It was not fun night last night, Your

Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 03/21/2019 Page 11 of 21


Honor.

THE COURT: $50,000 is nothing. In fact, peanuts.

MR. PASANO: But the home confinement is huge, and if I had more, I mean, trust me, the Government has pushed for everything. Originally we thought we had the wife's signature, we thought we had even the trustees. I don't know what advice she's gotten from an ex-judge who now does divorce work, but it has complicated our lives. We are finalizing a resolution of the case in terms of a plea and he has already -- he's had a reverse proffer, next week he'll be, court-permitting, meeting with the Government to begin the process of debriefing and cooperating, and you know --

MR. NADLER: That is really the impetus behind allowing the wife not to sign. As you, I made a big deal about it but I have been assured that we are on the path to plea, that Mr. Pasano has assured me that the money we're asking for is it. He has no other assets.

MR. PASANO: And, Judge --

MR. NADLER: And I've been assured that he is going to cooperate to his fullest.

MR. PASANO: And to that end, I've had occasion, the family has been kind enough to have paid for my flights and such to spend substantial time with the client in Italy while this process was pending. To the extent that, you know, we ever believed that we've seen enough to have at least a sense of what

this man can do or will do, I am satisfied there are no other accounts anywhere. I've had substantial conversations, I've traveled to Colombia to verify that, I've met with family members down there, all of whom, you know, live there but are educated in the United States and who, you know, and others down there support him. So in terms of my concern, I'm stronger than the Government, as you know it should be, that having seen him and, you know, believing in what he could have done and didn't and what he can do here, I'm convinced that, you know, the personal bond which ties up not just him but his brother and the brother-in-law. But the brother-in-law has no assets in the US, but the home confinement is the key. The 50 is just the sweetener to make sure that, you know, he -- but the reality is in my opinion, based upon his agreement to work with the Government, he's not going anywhere.

THE COURT: So I'll tell you how I feel about the electronic monitoring where that was a cinch, I can't tell you how many cases I've had in the three and a half months I've been here where people manage to cut those off and flee.

MR. PASANO: It's --

MR. NADLER: I agree. The electronic monitor is not a big deal.

THE COURT: I mean, so --

MR. NADLER: It's also -- I'm sorry.

THE COURT: Go ahead.

Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 03/21/2019 Page 13 of 21


MR. NADLER: The extradition part is also kind of interesting. He was -- the Italian government determined that he had certain health issues and they didn't want to confine him in prison, so they let him stay in the villa that he had rented with his passports with no armed guards.

THE COURT: Right, but his ability to flee from Italy is very different than his ability to flee from Miami.

MR. NADLER: He doesn't have that many places to go.

MR. PASANO: I would actually suggest it's easier from Italy, Judge. I've been there. I mean, outside his door were boats.

MR. NADLER: He was in Messina, which is a coastal town.

MR. PASANO: It's -- I mean, any day he could have walked away and it would have been days.

THE COURT: Right. But his ability to have the kind of contacts he would need to effectuate fleeing are different in Miami than they are in Italy. You're not going to convince me otherwise on that. I'll save you some time.

MR. NADLER: Your Honor, I do have the same concerns. We have talked about it. The wife was a big deal not only because there was an agreement to sign, the refusal --

MR. PASANO: It's a major issue for us.

THE COURT: This is what I'm going to do. I'm going to -- I can't -- I'm not going to require the wife to sign because

I don't want to put you in a situation where it's a pretrial detention issue necessarily, because the Government isn't asking for that. But I am going to increase the 10%, and if he can't come up with that money, then, you know, what I'll do is I'll reset it for a status two weeks from now before me. But if he can come up with 50, he can come up with 150.

MR. PASANO: Judge, may I?

THE COURT: I mean, the wife is sitting on a multimillion dollar property.

MR. PASANO: So if I can ask the Court to consider this. When it became apparent in the early conversations with Michael that the Government was more interested in a cash bond than in a corporate surety, we then went back to his brother-in-law and to the wife when she was talking to me and family, friends agreed that they could come up with as much as 100. It wouldn't be easy. Michael was kind enough to agree to accept 50, which was easier. If that's -- so if the Court's inclined to increase it, I would ask you not to go over the 100 because at least I've heard that that number is money that they could come up with.

THE COURT: I'm going to go to 150. I'll tell you this, with the wife, I'm not entirely comfortable with it. She's here. She's not surrendering any of her travel documents, which I think is concerning because he's going to go back to live with her, right? So I'm going to require $150,000 cash

Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 05/21/2019 Page 15 of 21


bond.

MR. NADLER: So 1.5 million.

THE COURT: 1.5, 10%. And I'm going to ask for a Nebbia on the 10%.

MR. NADLER: I agree.

THE COURT: I mean --

MR. NADLER: A Nebbia was --

THE COURT: Yeah.

MR. PASANO: Will the Court accept, if we make the -- assuring the Government a stipulation on that as opposed to having to come into court?

THE COURT: Well, yeah. I mean, if the Government is satisfied on the Nebbia, I'll accept the Government's stipulation on that, sure. And let's see where we are two weeks from now. When is he scheduled for that debrief?

MR. NADLER: We're going to start next week.

MR. PASANO: He's been in custody, because we wanted to work this out with the Government, so he arrived two weeks ago and he's been at the FDC. So my goal would be to work through the weekend to see if we can get everything posted, satisfy the Government on that condition, and then in our perfect world, we would have him out on Monday.

THE COURT: And if not, he can debrief from FDC.

MR. NADLER: I'm happy to do a status if you comply with the terms on Monday morning. Or if the Court wants to

Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 03/21/2019 Page 16 of 21


reset for two weeks to see.

THE COURT: Well, we're going to change -- it's going to be the 1.5, 10% with a Nebbia, all right? So I could -- I don't want to set it for Monday. I think what I'd like to do is reset it for a time for a status on the bond to see whether or not he, in fact, is in a cooperative fashion with the Government. I'm going to note for the record that that -- I'm taking that into consideration when I decide to give him this bond. If he should decide that, you know, maybe he doesn't want to be as cooperative as he thinks he's going to be today, then I want the ability to reconsider the bond.

MR. PASANO: And I apologize for, you know, belaboring this with Your Honor. Does the Court then envision that he remains in custody through that date, whatever the Court day is?

THE COURT: No, if he can post 150 and --

MR. PASANO: And satisfy the Nebbia.

THE COURT: You know, he's going to be released.

MR. PASANO: And then we can notify you that that's happened.

THE COURT: You'll notify me that that's happened. I still want a status in two weeks because if the cooperation is not successful or it's not --

MR. PASANO: You'll revisit bond.

THE COURT: Then I'm going to revisit the bond.

MR. PASANO: And it may be that something changes on

the wife's end that might make the Court more comfortable. I mean, I'm not giving up on that, but I've given up on it for the last 12 hours.

MR. NADLER: Hopefully this --

THE COURT: Well, walk me through on the issue with the house, right? So the house is held in a trust. He's got an interest in that trust. She would not be able to sell or encumber the house because his interests has a lis pendens on it?

MR. PASANO: Exactly. So that's why the Miami property is available.

THE COURT: All right. So that's what I'm --

MR. NADLER: Cesar, the brother, who is co-signing has a $2.7 million property.

MR. PASANO: And he lives here.

MR. NADLER: Here in Miami also.

MR. PASANO: In Miami also.

MR. NADLER: He can't encumber that.

MR. PASANO: And that's why we --

THE COURT: He cannot encumber that?

MR. NADLER: He cannot encumber that.

MR. PASANO: But the signature bond, that's what's made this so complicated. But Cesar will sign and not encumber any of that property. Gustavo will sign and not encumber his Miami property, and they'll have the assistance because he will have

signed with the brother-in-law who comes back and forth between Colombia. They're the three business partners. It's just --

THE COURT: Well, I don't care who is coming back and forth from Colombia, doesn't interest me one bit.

MR. PASANO: I agree.

THE COURT: But the two that are here in Miami, I mean, why aren't they willing the pledge the properties?

MR. NADLER: The wife?

THE COURT: No, the brothers.

MR. PASANO: I mean, he will agree not to encumber it and he'll stand behind the $25 million personal bond.

MR. NADLER: I mean, that was the point of not encumbering it, it will be the asset backing it. At least part of the asset. His business is also still generating income.

MR. PASANO: Yeah, and it's a regulated business. He's the securities side of an investment business, separate from his brother.

THE COURT: Okay.

MR. NADLER: Thank you, Your Honor.

THE COURT: Well, that's how I'm going to change the bond, and then we'll see you in two weeks.

(END OF SIDEBAR)

THE COURT: Okay. We're back on the record. So we're going to set the Defendant's bond to $1.5 million, 10% bond. That 10% bond will have a Nebbia condition. There will be a $25

Case 1:18-cr-20685-KMW Document 101 Entered on FLSD Docket 03/21/2019 Page 19 of 21


million personal surety bond co-signed by the brother and the business partner, Mr. Gonzalez. Both the brother and Mr. Gonzalez agree not to encumber any of their properties, in particular the brothers -- is the brother in court today?

MR. PASANO: He is, Your Honor. That's Cesar and the brother-in-law's name is Juan Carlos Gomez. I apologize, Your Honor.

THE COURT: All right. I think those -- that's my bad handwriting, probably not your mistake.

So let's make sure that those bond papers make particularly clear that there can be no attempt whatsoever to encumber those properties because if there's any attempt to encumber those properties, obviously that will be a violation of the bond, and the brother and the business partner could face their own civil and criminal penalties.

The Defendant will be home confined. He will pay for the confinement. His children will surrender their passports. And I've been told by the Government that there is a lis pendens on the homestead which he will be living in.

In addition to that, he will execute whatever is necessary with the bond paperwork to make sure that his interest in that property is also pledged as part of the bond.

MR. NADLER: Thank you, Your Honor.

THE COURT: And then in addition to this, we're going to have a status hearing before me two weeks from today.

MR. PASANO: Judge, could I request sometime the week of June 4th which is a little more than two weeks?

MR. NADLER: That works better for me too, if it's okay with the Court.

THE COURT: Donna?

COURTROOM DEPUTY: Okay. Which day?

MR. PASANO: Any time, 5th, 6th or 7th would be perfect.

COURTROOM DEPUTY: June 5th, 10 a.m.

MR. NADLER: Thank you, Your Honor.

THE COURT: All right. So it will be before me June 5th, 10 a.m.

Anything else on behalf of the Government?

MR. NADLER: No, Your Honor. Thank you.

THE COURT: On behalf of the defense?

MR. PASANO: No, Your Honor. Thank you, Your Honor.

THE PROBATION OFFICER: Your Honor, Ilene Alonso with pretrial. Just wanted to request, in addition to the conditions that have already been stated on the record, to have him report to pretrial services as directed and not to visit any commercial transportation establishments, if it's agreed on by the Court.

THE COURT: Okay. So we're going to add a couple of things to the bond. First of all, sir, you're going to report to pretrial services as directed. I understand that all his passports and travel documents are already in the possession of

the United States Government; is that correct?

MR. NADLER: Yes, Your Honor.

THE COURT: Okay. Sir, you're also not to visit any commercial transportation establishments: Airports, seaports, marinas, bus terminals, train stations whatsoever.

All right. Anything else? Sorry about that, I forgot pretrial services.

THE PROBATION OFFICER: Thank you, Your Honor.

THE COURT: All right. Thank you very much.

MR. NADLER: Thank you, Your Honor.

(PROCEEDINGS CONCLUDED)

* * * * *

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript from the **digital audio recording** of proceedings in the above-entitled matter.

5/20/2019 /s/ Dawn M. Savino
Date DAWN M. SAVINO, RPR