**EXHIBIT B**

# Stribling

December 16, 2004

Members of the Board
3 Gramercy Park West Incorporated
New York, NY 10003

> RE:   Parlor Floor Purchase:
> <u>    Amaratti to Hernandez</u>

Dear Members of the Board:

Please find enclosed the Original Board Package (plus 4 copies) for the prospective purchaser, Mr. Gustavo Hernandez-Frieri for the Parlor Floor, presently owned by Mr. Ralf Amaratti and Mrs. Joan Amaratti.

The Board Package is presented in 5 parts:

| | |
|---|---|
| Tab 1 | Transaction Information |
| Tab 2 | Financials |
| Tab 3 | References |
| Tab 4 | Letter from Lawyer of Hernandez-Frieri Family Trust regarding purchase as L.L.C. |
| Tab 5 | Global Securities Documents |

Mr. Hernandez a.k.a. Hernandez-Frieri is a Managing Partner of a family-owned private wealth management business, Global Finance Management Corporation and Global Securities Asset Management with offices in Miami, The Cayman Islands and Greenwich, Connecticut. The business is structured under the umbrella of the Hernandez-Frieri Family Trust, a trust shared by Gustavo and his brother, of which Gustavo Hernandez is a 50% beneficiary. He has a net worth of $28,578,909 which is thoroughly documented under Tab 2 Finances of the Board Package. The firm is currently canvassing prospects for a business office in Manhattan, hopefully in The Chrysler Building.

Mr. Hernandez is very enthusiastic about 3 Gramercy Park West, the Parlor Floor residence and he looks forward to the opportunity to meet with you.

Mr. Hernandez will purchase ALL CASH and plans to be the sole occupant of the property. He would like to purchase in a corporate name 3 Gramercy Park West L.L.C. for estate planning purposes. The details are specified in the Contract of Sale Tab 1 and the Attorney Letter Tab 4.



STRIBLING &
ASSOCIATES, LTD.
REAL ESTATE

NEW YORK, NEW YORK 10021

ALL INFORMATION FURNISHED IS FROM SOURCES BELIEVED TO BE RELIABLE AND IS SUBMITTED SUBJECT TO CHANGE OF PRICE OR RENTAL, CHANGE OF OTHER TERMS AND CONDITIONS, PRIOR SALE, LEASE, OR FINANCING OR WITHDRAWAL WITHOUT NOTICE. NO REPRESENTATION IS MADE AS TO THE ACCURACY OF ANY INFORMATION FURNISHED.

**EXHIBIT B**

**EXHIBIT B**

# Stribling

Members of the Board
RE:    Parlor Floor Purchase:
____  Amaratti to Hernandez
December 16, 2004
Page Two

Stribling & Associates and The Corcoran Group highly recommend Mr. Hernandez-Frieri to you as a tenant in this Tenancy In Common Partnership and are happy to provide any further information you may require.

We believe that in your interview you will find Mr. Hernandez-Frieri a most appealing individual of impeccable background and education with strong financial bona fides.

Thank you for your considered review of this Board Package.

Sincerely,

STRIBLING & ASSOCIATES LTD.                    CORCORAN GROUP

Barbara Evans-Butler                                          Dee Simonson
Vice President                                                      Senior Vice President
212-█████                                                        212-█████

BEB:rb
Enclosures

BY HAND

**EXHIBIT B**

# BOARD PACKAGE
------------------------------------

## Parlor Floor
## 3 Gramercy Park West Incorporated
## New York, NY 10003

------------------------------------

## Mr. Gustavo Hernandez

**EXHIBIT B**

## TABLE OF CONTENTS

1. **Transaction Information**
   - (i)   Personal Letter of Introduction
   - (ii)  Purchase Application
   - (iii) Contract of Sale

2. **Financials:**
   - (i)   Financial statement prepared by CPA
   - (ii)  Verification of Assets & Liabilities
     - Exhibit I    Cash/Bank Statements
     - Exhibit II   Bonds & Stocks
     - Exhibit III  Life Insurance Cash Surrender Value
     - Exhibit IV   Art Collection
     - Exhibit V    Hernandez-Frieri Family Trust
       - (i)  Audited Report of Global Finance Management Corporation
       - (ii) Investment in The Global Securities Market Neutral Fund c/o Dundee Lee Management services (Cayman) Ltd.
     - Exhibit VI   Income
     - Exhibit VII  Liability, Car
   - (iii) Tax Returns – Letter from CPA and Tax Returns for 2003

3. **Reference Letters**
   - (i)   3 Personal
   - (ii)  3 Business
   - (iii) Landlord Letter

4. **Letter from attorney regarding Global Securities Advisors Family Trust**

5. **Global Securities Documents – Annexes Referred to in Personal Letter**
   - (i)   Organization Chart
   - (ii)  NASD Membership Certification
   - (iii) SEC Registration Certification

**EXHIBIT B**

**EXHIBIT B**

1

**EXHIBIT B**

## -1-

# Transaction Information

(i)  **Personal Letter of Introduction from Mr. Gustavo Hernandez**

(ii)  **Purchase Application**

(iii)  **Contract of Sale**

Parlor Floor
3 Gramercy Park West

**EXHIBIT B**

# (i) Personal Letter of Introduction

Parlor Floor
3 Gramercy Park West

**EXHIBIT B**

**EXHIBIT B**

December 6, 2004

Board of Directors
3 Gramercy Park West
New York, New York

Dear Ladies and Gentlemen of the Board,

The following letter serves the purpose of respectfully presenting to your consideration a brief summary of
my personal and professional background, in the context of the approval process for the acquisition of the
Parlor Floor number in 3 Gramercy Park West.

A foreign national with family business concerns in the United States, I am now residing in the country. I
am a PhD candidate –dissertation pending- and hold a Masters degree from the Institut d'Etudes Politiques
de Paris in the discipline of Political Science, as well as a J.D. from the Universidad del Rosario in Bogotá.
I started my professional career as a professor of Political Economy in the Universidad de los Andes,
Bogotá, and after a year effective in the scholar world I started working in our family business -described
below. My leisure pursuit is centered in collecting contemporary art, reading and running, and I attempt to
dedicate my time for social affiliations to charities related with my native country and region -in particular a
philanthropy dedicated to education to which we are affiliated. I was born in Cartagena, Colombia in a
family of Italian descent on my mother's side and Colombian on my father's.

Regarding the background of the family, it was historically involved in the agricultural commodities
business, which helped it attain a moderate degree of wealth in the context of Latin America. Further along,
our business concerns focused on real estate and financial services. With the advent of insecurity and
instability in the region it turned more and more into the latter, and now our business concerns are
predominantly based in the United States but catering partly to clients in Latin America.

In what concerns my personal financial situation with respect to income in the United States, as foreign
citizen for estate planning purposes the family office for my brother Cesar Hernández Frieri and I is an
overseas trust which holds our investments in US entities and banks.[1] In particular Global Securities
Holdings LLC, a US financial services company whose primary interests are centered in two entities

---

[1] Global Finance Management Corp and Global Securities Asset Management. In Annex please see Organizational
Chart and Financial Statements.

involved in this industry: Global Strategic Investments LLC ('GSI'), a Miami-based boutique broker-dealer dedicated to providing wealth management services to Latin American high net-worth individuals, and Global Securities Advisors LLC ('GSA'), a Greenwich-based Investment Advisor dedicated to managing fixed income funds. I happen to be Managing Principal of this entity. In addition, we have modest participations in real estate and private equity ventures in the US. In addition, I hold certain liquid investments in US bank accounts which well exceed the acquisition price of the property in question.[2]

Thanks to the involvement of the family in the financial services industry in the United States, Mexico and other Latin American countries, as shareholder and direct participant in regulated entities, the family has been subject to extensive due diligence by US regulating agencies controlling the industry, as well as by pretty nearly every leading bank with which we have had long-lasting counterparty lines and credit agreements. For instance, GSI is a US SEC Registered Broker-Dealer, member of NASD/SIPC/NFA, correspondent of Pershing, Bank of New York, and holds counterparty lines with nearly every leading bank.[3] Furthermore, the Hernandez-Frieri family has always abided by high ethical and moral standards, credence of which our unblemished personal and professional standing.

Last, for further details regarding my background, please see in Annex ample references available, and as well please accept this letter as consent to perform any further checks you deem of need.[4]

With kind regards,

Gustavo Adolfo Hernandez Frieri

---

※
SEE
TAB
I.

[2] In Annex please see example of Bank Statements.
[3] In Annex please see Global Strategic Investments LLC, SEC Registration, NASD Membership Certification, and Pershing Bank of New York Clearing Agreement.
[4] In Annex please see References.

**EXHIBIT B**

12/23/2004 18:52 9545254847 Law Products
24 CFR Part 35, 40 CFR Part 745, 9-6-96.
Blumberg Excelsior, Publisher, NYC 10013

**EXHIBIT B**

## Disclosure of Information on
## Lead-Based Paint and/or Lead-Based Paint Hazards

### SALES

**Lead Warning Statement**

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards *(Check (i) or (ii) below)*:

   (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing *(explain)*.

     .................................................................................................................................
     .................................................................................................................................
     .................................................................................................................................

   (ii) ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller *(Check (i) or (ii) below)*:

   (i) ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing *(list documents below)*.

     .................................................................................................................................
     .................................................................................................................................

   (ii) ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** *(initial)*

(c) _____ Purchaser has received copies of all information listed above.
(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*
(e) _____ Purchaser has *(check (i) or (ii) below)*:

   (i) ☐ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

   (ii) ☒ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** *(initial)*

(f) _____ Agent has informed the lessor of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | | |
|---|---|---|---|
| SELLER Ralph Ammirati | DATE 12/10/04 | SELLER Joan Ammirati | DATE 12/10/04 |
| PURCHASER Gustavo Adolfo Hernandez Frieri | DATE 12/16/04 | PURCHASER | DATE |
| AGENT | DATE | AGENT | DATE |

**EXHIBIT B**

**EXHIBIT B**

# (ii) Purchase Application

Parlor Floor
3 Gramercy Park West

**EXHIBIT B**



# PURCHASE APPLICATION
## FOR THE SALE OF COOPERATIVE APARTMENT

**BUILDING:** 3 Gramercy Park Incorporated   **APT:** Parlor Floor   **SHARES:** 24% of common interest

**PURCHASE PRICE OF STOCK:** $2,900,000   **MONTHLY MAINTENANCE:** $1,760

**AMOUNT OF FINANCING:** $ 0 - all cash

**DEPOSIT ON CONTRACT:** $ 290,000   **PROPOSED CLOSING DATE:** TBA by mutual agreement Month of January 2005

**SPECIAL CONDITIONS IF ANY:**

**MANAGING AGENT:** Self managed   **TELEPHONE:** ( 201 ) 894-9110

**ADDRESS:** _____ **CONTACT:** _____

---

**SELLER (S):** Joan Ammarati   **SS#:** ___-___-___

Ralf Ammarati   **SS#:** ___-___-___

**PRESENT ADDRESS:**

**ATTORNEY:** Janice Levine, Esq.   **TEL:**( 212 ) ▮   **FAX:**( 212 ) ▮

**FIRM:** Willkie Farr & Gallagher   **ADDRESS:** New York, NY 10019-6099

**PURCHASER (S):** Gustavo Adolfo Hernandez Frieri   **SS#:** ▮

**OFFICE #:**( 203 ) ▮   **HOME #:**( 305 ) ▮

**SS#:** ___-___-___

**OFFICE #:**( ___ ) _____   **HOME #:**( ___ ) _____

**PRESENT ADDRESS:**

**ATTORNEY:** Michael Landesman, Esq.   **TEL:**( 212 ) ▮   **FAX:**( 212 ) ▮

**FIRM:** Holm & O'Hara   **ADDRESS:** ▮ New York, NY 10170

**NAMES(S) COOPERATIVE STOCK WOULD BE HELD IN:**

**BROKER (S):** Barbara Evans-Butler, Stribling / Dee Simonson, Senior VP, Corcoran

**TELEPHONE:** 212-▮   212-▮

**NEW MORTGAGE LENDER:**

**ATTORNEY:** Not Applicable   **TEL:**( ___ ) _____   **FAX:**( ___ ) _____

Rev. Jan./98

**EXHIBIT B**

**EXHIBIT B**

## PERSONAL INFORMATION REGARDING APPLICANT(s)

DATE  16 Dec 2004

**APPLICANT**                    **CO-APPLICANT**

| | | |
|---|---|---|
| **NAME:** | Gustavo Adolfo Hernandez Frieri | |
| **ADDRESS:** | Miami, FL 33127 | |
| **DATES OF RESIDENCE:** | 2001 _____ TO _____ 2004 | _____ TO _____ |
| **CITIZENSHIP:** | Colombian | |
| **OCCUPATION:** | Managing Partner | |
| **NATURE OF BUSINESS:** | Financial Services | |
| **EMPLOYER:** | Global Securities Advisors | |
| **ADDRESS:** | | |
| | Greenwich, CT 00830 | |
| **PERIOD OF EMPLOYMENT:** | Sept. '02 TO present | _____ TO _____ |
| **POSITION HELD:** | Managing Partner | |
| **PRIOR EMPLOYER AND POSITION OR RESIDENCE IF LESS THAN 3 YEARS** | N/A | |
| **INCOME ESTIMATE FOR THIS YEAR:** | $1,116,400 | |
| **ACTUAL INCOME LAST YEAR:** | $1,031,500 | |
| **EDUCATIONAL BACKGROUND:** | M.A. Institut d'Etudes Politiques (Paris) | |
| | Bachelor of Law, University of the Rosary, Bogata | |

Rev. Jan/98

**EXHIBIT B**

## ADDITIONAL INFORMATION REGARDING APPLICANTS

**EXHIBIT B**

Names of all persons who will reside in the Apartment: <u>Sole occupant-Gustavo Adolfo Hernandez</u>

Schools and colleges attended by applicants and occupants (optional): <u>University of Bogata, Institut d'Etudes Politiques (Paris)</u>

Names of anyone in the building known to Applicant: <u>No</u>

Are any pets to be maintained in the Apartment. If yes indicated number and kind: <u>No</u>

Name of organizations to which Applicant belongs (optional): <u>Mr. Hernandez has been working in the U.S. over the last 4 years and is just relocating from Miami to New York. He has spent much time also in Bogata where he is Trustee M.O.M.A.</u>

### REFERENCES

**LANDLORD:** ███████████

**ADDRESS:** ███████████

OCCUPANCY FROM: <u>2001</u> TO <u>2004</u>

Miami, FL 33127

PREVIOUS LANDLORD: _____

ADDRESS: _____

OCCUPANCY FROM: _____ TO _____

### PERSONAL REFERENCES:

**APPLICANT**

**CO-APPLICANT**

1. NAME <u>Mr. Costas C. Hamakiotes</u>

   ADDRESS <u>New York, NY 10022</u>

   NAME _____

   ADDRESS _____

2. NAME <u>Mr. Henry Harper</u>

   ADDRESS <u>New York, NY 10023</u>

   NAME _____

   ADDRESS _____

3. NAME <u>Mr. Jack Tilton</u>

   ADDRESS <u>New York, NY 10128</u>

   3. NAME _____

   ADDRESS _____

4. NAME _____

   ADDRESS _____

   4. NAME _____

   ADDRESS _____

### BUSINESS AND PROFESSIONAL REFERENCES

**APPLICANT**

**CO-APPLICANT**

1. ███████████

2. ███████████

**EXHIBIT B**

**EXHIBIT B**

# (iii) Contract of Sale

**EXHIBIT B**

2

**EXHIBIT B**

**EXHIBIT B**

Prepared by the Committee on Real Property Law of the Association of the Bar of the City of New York.

*Note: This form is intended to deal with matters common in most transactions involving the sale of a condominium unit. Provisions should be added, altered or deleted to suit the circumstances of a particular transaction. No representation is made that this form of contract complies with Section 5-702 of the General Obligations Law ("Plain Language Law").*

CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

## Contract of Sale – Condominium Unit

**Agreement** made as of ~~November~~ December 15, 2004    between

Ralph Ammirati and Joan Ammirati
residing at  3 Gramercy Park West, New York, NY  10003

> together with the exclusive right to occupy the parlor (second) floor apartment contained therein ("Unit")

and  Gustavo Adolfo Hernandez Frieri                                              ("Seller")

residing at  [redacted]  Miami, FL  33131

("Purchaser")

1. **Unit:** Seller agrees to sell and convey, and Purchaser agrees to purchase. ~~Unit No.~~ ~~("Unit")~~ in the building ("Building") known as  Three Gramercy Park, Inc.  Condominium ("Condominium") and located at 3 Gramercy Park West, New York, NY  10003  |Building| , New York, together with a 24%  percent undivided interest in the ~~Common Elements (as defined in para. 5) appurtenant thereto~~, all upon and subject to the terms and conditions set forth herein. The Unit shall be designated in the ~~Declaration of Condominium Ownership~~ (as the same may be amended from time to time, the "Declaration") of the Condominium, ~~recorded in~~ |Co-Ownership Agreement| County. ~~New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.~~

2. **Personal Property:** (a) The sale includes all of Seller's right, title and interest, if any, in and to:

(i) the refrigerators, freezers, ranges, ovens, dishwashers, washing machines, clothes dryers, cabinets and counters, lighting and plumbing fixtures, air conditioning equipment, venetian blinds, shades, screens, storm windows and other window treatments, wall-to-wall carpeting, bookshelves, switchplates, door hardware, built-ins and articles of property and fixtures attached to or appurtenant to the Unit, except those listed in subpara. 2(b), all of which included property and fixtures are represented to be owned by Seller, free and clear of all liens and encumbrances other than those encumbrances ("Permitted Exceptions") set forth on Schedule A annexed hereto and made a part hereof *(strike out inapplicable terms)*; and

(ii) | to the extent currently located at the Unit |

(b) Excluded from this sale are:
(i) furniture and furnishings (other than as specifically provided in this Contract); and
(ii)

(c) The property referred to in subpara. 2(a)(i) and (ii) may not be purchased if title to the Unit is not conveyed hereunder.

3. **Purchase Price:** (a) The purchase price ("Purchase Price") is
$ 2,900,000.00 , payable as follows:
(i) $  290,000.00  ("Downpayment") on the signing of this Contract by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to para. 16; and

(ii) $ 2,610,000.00  constituting the balance of the Purchase Price, by certified check of Purchaser or official bank check (except as otherwise provided in this Contract) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrowee (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Seller (or as Seller otherwise directs pursuant to subpara. 6(e)(ix) or 19(b)).

(c) Except for the Downpayment and checks aggregating not more than ~~$~~ but at least ~~of the purchase of the Purchase Price~~, including payment for closing adjustments, all checks delivered by Purchaser shall be certified or official bank checks as hereinabove provided.

4. **Closing of Title:** The closing documents referred to in para. 6 shall be delivered, and payment of the balance of the Purchase Price shall be made, at the closing of title ("Closing"), to be held on or about January 14, 2004 ~~at~~  at 10:00   A.M., at the offices of Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY  10019
P: 212/728-8000; F: 212/728-8111

or at the office of Purchaser's lending institution or its counsel; provided, however, that such office is located in either the City or County in which either (a) Seller's attorney maintains an office or (b) the Unit is located.

5. **Representations, Warranties and Covenants:** Seller represents, warrants and covenants that:
(a) Seller is the sole owner of the Unit and the property referred to in subpara. 2(a), and Seller has the full right, power and authority to sell, convey and transfer the same;

---

(b) The common charges (excluding separately billed utility charges) for the Unit on the date hereof are $ 1,760.00  per month:

(c) Seller has not received any written notice of any intended assessment or increase in common charges not reflected in subpara. 5(b). Purchaser acknowledges that it will not have the right to cancel this Contract in the event of the imposition of any assessment or increase in common charges after the date hereof of which Seller has not heretofore received written notice;

~~(d) The real estate taxes for the Unit for the fiscal year of~~
~~through~~ ~~are~~
~~(e) Seller is not a member of the "spousal" under any plan~~
~~of condominium organization affecting the Unit~~

(f) All refrigerators, freezers, ranges, dishwashers, washing machines, clothes dryers and air conditioning equipment included in this sale will be in working order as of the time of Closing;

~~(g) If a copy is attached to this Contract, the copy of the Certificate of Occupancy covering the Unit is a true and correct copy; and~~

(h) Seller is not a "foreign person" as defined in para. 18. *(If inapplicable, delete and provide for compliance with Code Withholding Section, as defined in para. 18.)*

6. **Closing Documents:** (a) At the Closing, Seller shall deliver to Purchaser the following: | Quit Claim |
(i) ~~Bargain and sale deed with~~ ~~against~~ ~~grantor's act~~ ("Deed"), ~~complying with RPL §339-o and containing the covenant required by RPL §13~~, conveying to Purchaser title to the Unit ~~together with its undivided interest in the Common Elements~~ ~~and its appurtenant interest in the Declaration and By-Laws which shall be deemed to be owned by Seller (any assignment thereof to be owned by Purchaser)~~ appurtenant thereto, free and clear of all liens and encumbrances other than Permitted Exceptions. The Deed shall be executed and acknowledged by Seller and, ~~if required by the Condominium, executed and acknowledged by Purchaser,~~ in proper statutory form for recording;

~~(ii) If a corporation is a Seller pursuant to DOL § 909, Seller shall deliver to Purchaser (i) a resolution of its board of directors authorizing the delivery of the Deed and (ii) a certificate of its officers setting forth facts showing that the delivery of the Deed is in conformity with the requirements of DOL § 909. The Deed shall also contain a recital sufficient to establish compliance with such law;~~ | co-owners |

(iii) A waiver of right of first refusal of the board of managers of the Condominium ("Board") if required in accordance with para. 8;

(iv) A statement by the ~~Condominium or its managing agent~~ that the common charges and any assessments then due and ~~or~~ payable by the Condominium have been paid to the date of the Closing; | to |

(v) All keys to the doors of, and mailbox for, the Unit

(vi) Such affidavits and/or other evidence as the title company ("Title Company") from which Purchaser has ordered a title insurance report and which is authorized to do business in New York State shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against Seller and persons or entities whose names are the same as or are similar to Seller's name;

~~(vii) Official New York State Real Property Transfer Gains Tax Tentative Assessment and Return (or, if applicable, Official Statement of No Tax Due) duly completed by the New York State Department of Taxation and Finance (or, if applicable, a statement from Seller that (A) the Unit is the principal residence of Seller (or his spouse) and (B) the consideration is less than Two Hundred Fifty Thousand Dollars);~~

(viii) New York City Real Property Transfer Tax Return, if applicable, and combined Real Property Transfer Gains Tax Affidavit, prepared, executed and acknowledged by Seller in proper form for submission;

*[Left margin, vertical text:]* that is a member of the New York Clearing House Association $1,000.00 | and shall be endorsed cashier's, official, bank or certified checks of Purchaser | accountant for the building or of content of all co-owners to the sale to Purchaser

**EXHIBIT B**

**EXHIBIT B**

and that Escrowee shall not be liable ~~to either Seller or Purchaser~~ for any act or omission on its part unless taken or suffered in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally agree to defend, indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in willful disregard of this Contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this para. 16 by signing in the place indicated in this Contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

~~17. New York State Gains Tax. The (a) Seller and Purchaser agree to~~ comply in a timely manner with the requirements of article 31-B of the Tax Law and the regulations applicable thereto, as the same form, from time to time may be amended (collectively, the "Gains Tax Law"). Purchaser agrees to deliver to Seller a duly executed and acknowledged Transferee Questionnaire simultaneously with the execution of this Contract or within 5 business days after subsequent written request from Seller or Seller's attorney. At the Closing, Seller shall deliver (i) an Official Statement of No Tax Due or (ii) an Official Tentative Assessment and Return accompanied by a certified or official bank check drawn on any banking institution described in subpara. 9(b), payable to the order of the State Tax Commission, in the amount of the tax shown to be due thereon, or (iii) if applicable, a duly executed and acknowledged affidavit in form permitted under the Gains Tax Law claiming exemption therefrom.

(b) Seller agrees (i) to pay promptly any tax due under the Gains Tax Law and any interest and penalties thereon which may be assessed or due after the Closing, (ii) to indemnify and save Purchaser harmless from and against any of the foregoing and any cost, claim and expense (including reasonable attorneys' fees) incurred by Purchaser by reason of the non-payment thereof, and (iii) to make any other payments and execute, acknowledge and deliver such further documents as may be necessary to comply with the Gains Tax Law.

~~(c) The obligations under this para. 17 shall survive the Closing.~~

**18. FIRPTA:** Seller represents and warrants to Purchaser that Seller is not a "foreign person" as defined in IRC § 1445, as amended, and the regulations issued thereunder ("Code Withholding Section"). At the Closing Seller shall deliver to Purchaser a certification stating that Seller is not a foreign person in the form then required by the Code Withholding Section. In the event Seller fails to deliver the aforesaid certification or in the event that Purchaser is not entitled under the Code Withholding Section to rely on such certification, Purchaser shall deduct and withhold from the Purchase Price a sum equal to 10% thereof and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

**19. Title Report:** Acceptable Title: (a) Purchaser shall, promptly after the date hereof, ~~or after receipt of the mortgage commitment letter, if applicable,~~ order a title insurance report from the Title Company. Promptly after receipt of the title report and thereafter of any continuations thereof and supplements thereto, Purchaser shall forward a copy of each such report, continuation or supplement to the attorney for Seller. Purchaser shall further notify Seller's attorney of any objections to title not reflected in such title report of which Purchaser becomes aware following the delivery of such report, reasonably promptly after becoming aware of such objections.

~~(b) Seller shall deliver the Unit free of all encumbrances and liens together with the interest and penalties thereon to a date not less than two days~~ following the date of Closing, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser at the Closing official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments and recordable form sufficient to discharge any other liens and encumbrances of record. Upon requests made not less that 3 business days before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with subpara. 9(b). If the Title Company is willing to insure Purchaser that such charges, liens and encumbrances will not be collected out of or enforced against the Unit and is willing to insure the lien of Purchaser's Institutional Lender (as hereinafter defined) free and clear of any such charges, liens and encumbrances, then Seller shall have the right in lieu of payment and discharge to deposit with the Title Company such funds or to give such assurances or to pay such penalty or additional premiums as the Title Company may require in order to so insure in such case the charges, liens and encumbrances with respect to which the Title Company has agreed to so insure shall not be considered objections to title.

(c) Seller shall convey and Purchaser shall accept fee simple title to the Unit in accordance with the terms of this Contract, subject only to: (a) the Permitted Exceptions and (b) such other matters as (i) the Title Company or any other title insurer licensed to do business by the State of New York shall be willing, without special or additional premium, to omit as exceptions to coverage or to except with insurance against collection out of or

~~which has committed to making to provide mortgage financing to Purchaser for the Unit (an "Institutional Lender")~~ except that if such acceptance by Purchaser's Institutional Lender would, within a delay of such acceptance shall be deemed to have been given.

(d) Notwithstanding any contrary provisions in this Contract, express or implied, or any contrary rule of law or custom, if Seller shall be unable to convey the Unit in accordance with this Contract (provided that Seller shall release, discharge or otherwise cure at or prior to Closing any matter created by Seller after the date hereof ~~and any existing mortgage unless this matter is subject to it~~) and if Purchaser elects not to complete this transaction without abatement of the Purchase Price, the sole obligation and liability of Seller shall be to refund the Downpayment to Purchaser, together with the reasonable cost of the examination of title to, and departmental violation searches in respect of, the Unit, and upon the making of such refund and payment, this Contract shall be deemed cancelled and of no further force or effect and neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract. However, nothing contained in this subpara. 19(d) shall be construed to relieve Seller from liability due to a willful default.

**20. Risk of Loss; Casualty:** (a) The risk of loss or damage to the Unit or the personal property included in this sale, by fire or other casualty, until the earlier of the Closing or possession of the Unit by Purchaser, is assumed by Seller, but without any obligation of Seller to repair or replace any such loss or damage unless Seller elects to do so as hereinafter provided. Seller shall notify Purchaser of the occurrence of any such loss or damage to the Unit or the personal property included in this sale within 10 days after such occurrence or by the date of Closing, whichever first occurs, and by such notice shall state whether or not Seller elects to repair or restore the Unit and/or the personal property, as the case may be. If Seller elects to make such repairs and restorations, Seller's notice shall set forth an adjourned date for the Closing, which shall be not more than 60 days after the date of the giving of Seller's notice. If Seller either does not elect to do so or, having elected to make such repairs and restorations, fails to complete the same on or before said adjourned date for the Closing, Purchaser shall have the following options:

(i) To declare this Contract cancelled and of no further force or effect and receive a refund of the Downpayment in which event neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this Contract; or

(ii) To complete the purchase in accordance with this Contract without reduction in the Purchase Price, except as provided in the next paragraph. If Seller carries hazard insurance covering such loss or damage, Seller shall turn over to Purchaser at the Closing the net proceeds actually collected by Seller under the provisions of such hazard insurance policies to the extent that they are attributable to loss of or damage to any property included in this sale, less any sums theretofore expended by Seller in repairing or replacing such loss or damage or in collecting such proceeds; and Seller shall further assign (without recourse to Seller) Seller's right to receive any additional insurance proceeds which are attributable to the loss of or damage to any property included in this sale.

(h) If Seller does not elect to make such repairs and restorations, Purchaser may exercise the resulting option under (i) or (ii) of (a) above only by notice given to Seller within 10 days after receipt of Seller's notice. If Seller elects to make such repairs and restorations and fails to complete the same on or before the adjourned closing date, Purchaser may exercise either of the resulting options within 10 days after the adjourned closing date.

(c) In the event of any loss of or damage to the [Building] which materially and adversely affects access to or use of the Unit, arising after the date of this Contract but prior to the Closing, Seller shall notify Purchaser of the occurrence thereof within 10 days after such occurrence or by the date of Closing, whichever occurs first, in which event Purchaser shall have the following options:

(i) To complete the purchase in accordance with this Contract without reduction in the Purchase Price; or

(ii) To adjourn the Closing until the first to occur of (1) completion of the repair and restoration of the loss or damage to the point that there is no longer a materially adverse effect on the access to or use of the Unit or (2) the 60th day after the date of the giving of Seller's aforesaid notice. In the event Purchaser elects to adjourn the Closing as aforesaid and such loss or damage is not so repaired and restored within 60 days after the date of the giving of Seller's aforesaid notice, then Purchaser shall have the right either to (x) complete the purchase in accordance with this Contract without reduction in the Purchase Price or (y) declare this Contract cancelled and of no further force or effect and receive a refund of the Downpayment, in which latter event neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this Contract.

(d) In the event of any loss of or damage to the [Building] which does not materially and adversely affect access to or use of the Unit, Purchaser shall accept title to the Unit in accordance with this Contract without abatement of the Purchase Price.

**21. Internal Revenue Service Reporting Requirement:** Each party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, as such other party may reasonably request in order to comply with IRC § 6045(e), as amended, or any successor provision or any regulations promulgated pursuant thereto, insofar as the same requires reporting of information in respect of real estate transactions. The provisions of this para. 21 shall survive the Closing. The parties designate

Witkie Farr & Gallagher LLP

as the attorney responsible for reporting this information as required by law.

**EXHIBIT B**

**EXHIBIT B**

that the only real estate broker with whom Purchaser has had any connection with this Contract and the transaction set forth herein is

The Corcoran Group and Stribling Associates Ltd.

and that they know of no other real estate broker who has claimed or may have the right to claim a commission in connection with this transaction. The commission of such real estate broker shall be paid by Seller pursuant to separate agreement. If no real estate broker is specified above, the parties acknowledge that this Contract was brought about by direct negotiation between Seller and Purchaser and each represents to the other that it knows of no real estate broker entitled to a commission in connection with this transaction. Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses (including reasonable attorneys' fees) arising out of the breach on their respective parts of any representation, warranty or agreement contained in this para. 22. The provisions of this para. 22 shall survive the Closing or, if the Closing does not occur, the termination of this Contract.

23. Mortgage Contingency. (Delete if inapplicable) (a) The obligations of Purchaser hereunder are conditioned upon issuance on or before (the "Commitment Date") of a written commitment from any Institutional Lender pursuant to which such Institutional Lender agrees to make a loan, other than a VA, FHA or other governmentally insured loan to Purchaser, at Purchaser's sole cost and expense, of $

or such lesser sum as Purchaser shall be willing to accept, at the prevailing fixed rate of interest not to exceed % or initial adjustment rate of interest not to exceed for a term of at least years and on other customary commitment terms, whether or not conditioned upon any factors other than an appraisal satisfactory to the Institutional Lender, secured by a first mortgage on the Unit together with its undivided interest in the Common Elements, Purchaser shall (i) make prompt application to an Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information on Purchaser and members of Purchaser's family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, (v) cooperate in good faith with such Institutional Lender to the end of securing such first mortgage loan and (vi) promptly give Notice to Seller of the name and address of each Institutional Lender to which Purchaser has made such application. Purchaser shall comply with all requirements of such commitment (or of any commitment accepted by Purchaser) and shall furnish Seller with a copy thereof promptly after receipt thereof. If such commitment is not issued on or before the Commitment Date, then, unless Purchaser has accepted a commitment that does not comply with the requirements set forth above, Purchaser may cancel this Contract by giving Notice to Seller within 5 business days after the Commitment Date, in which case this Contract shall be deemed cancelled and thereafter neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract except that the Downpayment shall be promptly refunded to Purchaser and except as set forth in para. 22. If Purchaser fails to give Notice of cancellation or if Purchaser shall accept a commitment that does not comply with the terms set forth above, then Purchaser shall be

tained in this para. 23.

(b) For purposes of this Contract, an "Institutional Lender" is any bank, savings bank, private banker, trust company, savings and loan association and credit union or similar banking institution whether organized under the laws of this state, the United States or any other state; foreign banking corporation licensed by the Superintendent of Banks of New York or the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United State or any state with the power to make mortgage loans.

(Delete if inapplicable) (c) Purchaser and Seller agree that the submission of an application to a mortgage broker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the terms and conditions set forth in para. 23(a)(1) of this Contract, and that Purchaser's cooperation in good faith with such Mortgage Broker to obtain a commitment from an Institutional Lender (together with Purchaser's cooperation in good faith with any Institutional Lender to which Purchaser's application has been submitted by such Mortgage Broker), and the prompt giving of Notice by Purchaser to Seller of the name and address of each Mortgage Broker to which Purchaser has submitted such an application shall constitute full compliance with the terms and conditions set forth in para. 23(a)(i) and (vi) of this Contract.

24. Gender, Etc.: As used in this Contract, the neuter includes the masculine and feminine, the singular includes the plural and the plural includes the singular, as the context may require.

25. Entire Contract: All prior understandings and agreements between Seller and Purchaser are merged in this Contract and this Contract supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof.

26. Captions: The captions in this Contract are for convenience and reference only and in no way define, limit or describe the scope of this Contract and shall not be considered in the interpretation of this Contract or any provision hereof.

27. No Assignment by Purchaser: Purchaser may not assign this Contract or any of Purchaser's rights hereunder.

28. Successors and Assigns: Subject to the provisions of para. 27, the provisions of this Contract shall bind and inure to the benefit of both Purchaser and Seller and their respective distributees, executors, administrators, heirs, legal representatives, successors and permitted assigns.

29. No Oral Changes: This Contract cannot be changed or terminated orally. Any changes or additional provisions must be set forth in a rider attached hereto or in a separate written agreement signed by both parties to this Contract.

30. Contract Not Binding Until Signed: This Contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

**In Witness Whereof**, the parties hereto have duly executed this Contract on the day and year first above written.

Seller Jean Ampstrati (Soc. Sec. No.)

Seller (Ralph Ampirati) (Soc. Sec. No.)

Agreed to as to para. 16: By: Willkie Farr & Gallagher LLP
A Partner Escrowee

Purchaser Gustavo Adolfo Hernández Frias (Soc. Sec. No.)

Purchaser (Soc. Sec. No.)

Escrow Depository:

1. Zoning laws and regulations and landmark, historic or wetlands designation which are not violated by the Unit and which are not violated by the Common Elements to the extent that access to or use of the Unit would be materially and adversely affected. [Building]

2. Consents for the erection of any structure or structures on, under or above any street or streets on which the Building may abut.

3. The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations set forth in the Declaration, By-Laws and rules and regulations of the Condominium, the Power of Attorney from Purchaser to the board of managers of the Condominium and the floor plans of the Condominium, all as may be amended from time to time.

4. Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Building and the Common Elements, provided that none of such rights imposes any monetary obligation on the owner of the Unit or materially interferes with the use of or access to the Unit.

5. Encroachments of stoops, areas, cellar steps, trim, cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Building over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Common Elements.

6. Any state of facts which an accurate survey or personal inspection of the Building, Common Elements or Unit would disclose, provided that

such facts do not prevent the use of the Unit for dwelling purposes. For the purposes of this Contract, none of the facts shown on the survey, if any, identified below, shall be deemed to prevent the use of the Unit for dwelling purposes, and Purchaser shall accept title subject thereto.

7. The lien of any unpaid common charge, real estate tax, water charge, sewer rent or vault charge, provided the same are paid as appropriate at the Closing as herein provided.

8. The lien of any unpaid assessments to the extent of installments thereof payable after the Closing. [Building]

9. Liens, encumbrances and title conditions affecting the Common Elements which do not materially and adversely affect the right of the Unit owner to use and enjoy the Common Elements. [Building]

10. Notes or notices of violations of law or governmental orders, ordinances or requirements (a) affecting the Unit and noted or issued subsequent to the date of this Contract by any governmental department, agency or bureau having jurisdiction and (b) any such notes or notices affecting only the Common Elements which were noted or issued prior to or on the date of this Contract or at any time hereafter. [Building]

11. Any other matters or encumbrances subject to which Purchaser is required to accept title to the Unit pursuant to this Contract.

**EXHIBIT B**

**EXHIBIT B**

RIDER ANNEXED TO CONTRACT OF SALE
DATED AS OF NOVEMBER 16, 2004 BETWEEN
RALPH AMMIRATI AND JOAN AMMIRATI, AS SELLER
AND GUSTAVO ADOLFO HERNANDEZ FRIERI, AS PURCHASER

R1.    In the event of any inconsistency or conflict between the terms and provisions of this Rider and those contained in the agreement to which this Rider is annexed, the terms and provisions of this Rider shall govern and be binding.

The following definitions shall apply to the Contract and this Rider:

(a)    use of the term "Condominium" shall be deemed to mean the "co-ownership interests in the building located at 3 Gramercy Park West, New York, New York 10003" as defined in paragraph 1 of the Contract.

(b)    use of the term "Unit" shall be deemed to mean "Seller's 24% undivided interest in the Building, together with the right to occupy the parlor (second) floor apartment contained therein" as defined in paragraph 1 of the Contract.

(c)    use of the term "Board" shall be deemed to mean the "co-owners of the Building" as defined in paragraph 6(iii) of the Contract.

(d)    use of the term "Declaration" shall be deemed to mean that "certain Co-Ownership Agreement dated December 12, 1969, as amended by that certain Amendment of October 1, 1974, to Co-Ownership Agreement dated December 12, 1969, as further amended by that certain Second Amendment of May 25, 1975 to Co-Ownership Agreement dated December 12, 1969, as further amended by that certain Third Amendment to Co-Ownership Agreement dated December 12, 1969, dated January 8, 1982, as further amended by Amendments dated April 26, 1993, February 22, 1997 and as further amended by that certain Sixth Amendment to Co-Ownership Agreement dated October 1, 2001.

R2.    Supplementing Paragraph 16 of the printed form of this Contract, Purchaser shall not receive any credit against the purchase price hereunder for any interest earned on the Downpayment.

(a)    With respect to the indemnity set forth in Paragraph 16(b) of the printed form of this Contract, reasonable attorneys' fees shall include, but not be limited to, the fair value of legal services, if any, rendered by Escrowee to itself.

(b)    Notices from Escrowee to Seller and Purchaser shall be given in the same manner as notices to either party are given under this Contract.  Notices from Seller or Purchaser to Escrowee shall be given in the same manner as notices to either party given under the Contract, addressed to it at 787 Seventh Avenue, New York, New York  10019-6099, marked "Attention: Janice E. Levine, Esq." with a copy by telephone facsimile to (212) 728-8111, or to such other address and/or facsimile number as Escrowee may hereafter notify Seller and Purchaser.

R3.    Supplementing and modifying Paragraph 2 of the printed form of this Contract, no portion of the Purchase Price is allocated to the personal property included in this transaction.

R4.    Seller may omit from the deed to be delivered under this Contract all of the "subject to" provisions contained herein, and Purchaser agrees that such provisions shall, nevertheless, survive the delivery of the deed.

R5.    Supplementing Schedule A of the printed form of this Contract, the Unit is sold and shall be conveyed subject to:

a.    Those items listed on Schedule B Exception Nos. 5 and 15 of Title Policy Number R953157NY (TPS6-712590) of Commonwealth Land Title Insurance Company dated January 8, 1982;

**EXHIBIT B**

2692623.4

**EXHIBIT B**

b.      All other covenants, agreements, reservations and restrictions of record, provided Purchaser's title company insures that any violations thereof will not result in a forfeiture or reversion of title;

c.      Variations between fences and record lines, if any; variations between record lines and tax lot lines, if any; and

d.      Standard printed exceptions to coverage contained in the form of title insurance policy insuring Purchaser's title to the Unit;

R6.     Supplementing the provisions of Paragraph 19 of the printed form of this Contract, Purchaser shall furnish a written statement to Seller setting forth any objections that Purchaser may have to the title to the Unit within 10 days after receipt of a copy of the title report and within 10 days after receipt of any additions thereto.

R7.     Supplementing and modifying Paragraph 14 of the printed form of this Contract, copies of all Notices to Seller shall be given at the same time and in the same manner to Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099, Attention: Janice E. Levine, Esq. Copies of all Notices to Purchaser shall be given at the same time and in the same manner to Holm & O'Hara, 420 Lexington Avenue, Suite 1745, New York, NY 10170, Attention: Michael L. Landsman, Esq. (LLP)

R8.     If any instrument for the payment of the Downpayment fails of collection, Seller may, at its option, sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided that Seller gives Purchaser notice of such failure of collection and Purchaser fails to deliver to Escrowee, within six (6) business days after notice is given, the uncollected funds by good, unendorsed certified check, bank check or immediately available funds. Purchaser's failure to cure such default shall entitle Seller to terminate this contract and exercise its remedies under Paragraph 13 of the printed form of this Contract.

R9.     This Contract shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of New York applicable to agreements made and to be performed wholly within such State.

R10.    This Contract shall not be recorded by either party.

R11.    Purchaser is hereby notified that the subject property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in children may produce permanent neurological damage, including learning disabilities, reduced intelligent quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. Sellers of real property built prior to 1978 are required to provide Purchaser with any information on lead-based paint hazards from risk assessments or inspections in Seller's possession and to notify the Purchaser of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

Purchaser hereby acknowledges receipt of the above Lead Warning Statement, has received a lead hazard information pamphlet and has had a ten (10) day opportunity before becoming obligated under this Contract to conduct a risk assessment or inspection for lead-based hazards, or by signing below hereby waives the right to conduct such risk assessment or inspection. In the event that the Condominium requires any lead paint remediation work to be performed in the Unit as a condition to the Closing, Purchaser shall be solely responsible for complying with the Condominium's requirements, and all such remediation work shall be performed at Purchaser's sole cost and expense.

R12.    In the event of any dispute arising hereunder, the parties agree that jurisdiction shall be vested solely with the courts of New York State in New York County.

R13.    Purchaser shall be solely responsible for the New York State "Mansion Tax" (if any) and Purchaser shall indemnify and hold Seller harmless from the imposition of the "Mansion Tax" or any other tax which is primarily the responsibility of Purchaser. The provisions of this paragraph shall survive the Closing.

2

**EXHIBIT B**

**EXHIBIT B**

R14.    This Contract may be executed by facsimile and/or in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same original.

R15.    Purchaser acknowledges that the floors, doors, walls, ceilings and other surfaces at the Unit are being sold in their "as is" condition and Purchaser agrees that Seller shall not be required to repaint or refinish the floors, doors, walls, ceilings or any other surface at the Unit. Furthermore, Purchaser shall accept the walls at the Unit subject to such chips, holes and/or indentations as are ordinarily created by the removal of hanging pictures and other removable items being taken by Seller, provided that such chips, holes and/or indentations are capable of being repaired by the application of spackling or other similar compound. The repair of such chips, holes and/or indentations shall be the responsibility of Purchaser, at Purchaser's expense, to repair.

R16.    Purchaser agrees that Purchaser is responsible for the replacement of any checks paid at Closing for the balance of the Purchase Price and any adjustments in the event that any such checks are returned to Seller due to insufficient funds or for any other reason, whether such checks shall have been tendered by Purchaser, Purchaser's lending institution or any other party acting on behalf of Purchaser or Purchaser's lending institution. The amount of any unpaid or returned checks shall constitute a lien on the Premises for which Seller may file a Notice of Pendency and foreclose upon. The provisions of this paragraph shall survive the Closing.

R17.    Seller shall use reasonable efforts to deliver to Purchaser copies of any notices from the Condominium, Board or other co-owners relating to: (1) any increase in the amount of the monthly common charges; (2) any proposed assessment; (3) any intended or proposed changes to the "flip tax" or other transfer fee imposed by the Board, or co-owners; (4) any proposed amendment or modification of the Declaration or other condominium document, or the Condominium's by-laws, rules or regulations; (5) any proposed construction or repair work the cost of which is intended to be borne by the Seller and/or other co-owners of the building; (6) any damage or casualty to the Unit or the Premises; or (7) any increase in the amount of property taxes imposed on the Premises. Failure to deliver any such notices to Purchaser shall not be a default under this Contract.

R18.    Seller hereby represents, to Seller's actual knowledge, that: (a) there have been no leaks into the walls, bathrooms or any other areas of the Unit and Seller has not been notified of any water leaks which purport to emanate from the Unit within the past twelve (12) months; and (b) there have been no complaints by Seller regarding noise, offensive odors or offensive conduct to the Condominium, Board or other co-owners of the building.

R19.    Should either party default in its obligations hereunder, the defaulting party shall be liable to the other party for reasonable attorneys' fees and costs incurred by the other party in enforcing the Contract. The prevailing party in any lawsuit shall recover its reasonable attorneys' fees and costs from the non-prevailing party.

R20.    The parties hereto agree and acknowledge that although the obligations of the Purchaser hereunder are not conditioned upon obtaining a loan commitment letter, Purchaser may obtain a loan from an Institutional Lender in order to finance Purchaser's purchase of the Unit provided same shall not delay the Closing.

R21.    Seller represents and warrants that the heating, cooling, plumbing, electric system, fixtures and appliances within the Unit, to the extent that they are Seller's responsibility under the co-ownership agreement to maintain or repair, shall be in working order at the time of the Closing, other than the fireplaces and the exhaust fan in the master bathroom. If any of such systems, fixture or appliances are not in working order at the time of the Closing, then Seller shall, at Seller's sole cost and expense, make any necessary repairs or, at Seller's option, give Purchaser a credit for the costs of such repairs, against the balance of the purchase price due at Closing.

R22.    Seller agrees to transfer Seller's right, if any, to use a storage space located in the basement of the Premises to Purchaser at the Closing.

R23.    Notwithstanding anything to the contrary contained herein, if the co-owners of the Building do not approve the transfer to Purchaser, Seller shall promptly refund to Purchaser the

3

**EXHIBIT B**

**EXHIBIT B**

Downpayment and upon the making of such refund, this Contract shall be deemed cancelled and of no further force or effect and neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract.

R24.   This Contract is subject to and conditioned upon the consent of the majority percentage interest of the co-owners of the Building to the Purchaser's ability, for estate and tax planning purposes, to take title to the Unit in a domestic Limited Liability Company (LLC). The LLC shall be formed by Purchaser, wholly owned by Purchaser and/or Purchaser's family and Purchaser shall retain the exclusive right to use the Unit. Purchaser also agrees to execute a personal guaranty (that all amounts due with respect to the ownership of the Unit will be paid) and an occupancy agreement (that only Purchaser or members of Purchaser's family can occupy the Unit). Upon receipt of a fully executed counterpart of the Contract, Purchaser shall promptly provide the co-owners with information reasonably requested about the LLC. If the majority co-owners of the Building refuse to permit the Purchaser to take title to the Unit in a domestic LLC, then Seller or Seller's attorney shall notify Purchaser's attorney in writing of such refusal and Purchaser shall have the right to cancel this Contract by written notice to Seller within five (5) business days after Purchaser's attorney's receipt of notification from Seller or Seller's attorney of such refusal. Upon such cancellation, Seller shall promptly refund the Downpayment to Purchaser, the Contract shall terminate and neither party shall have any further claim against the other hereunder except with respect to any provisions that are specifically stated to survive a termination of the Contract. If such cancellation notice is not sent by Purchaser as required hereunder, Purchaser's right to cancel the Contract pursuant to this provision shall be deemed waived.

SELLER:

Ralph Ammirati

Joan Ammirati

PURCHASER:

Gustavo Adolfo Hernandez Frieri

Escrowee agrees to the provisions of Paragraph R2 hereof.

Willkie Farr & Gallagher LLP

By: _____
        A Partner

4

**EXHIBIT B**

**EXHIBIT B**

## SCHEDULE A

ALL that certain plot, piece or parcel of land, with the buildings
and improvements thereon erected, situate, lying and being in the
Borough of Manhattan, City and County and State of New York, being
one of the 66 lots surrounding the park square mentioned or
referred to in a certain deed from Samuel B. Ruggles and his wife
to Charles A. Davis and others, dated December 17, 1831, and recorded
with the map annexed to the Register's Office of New York County in
Liber 278 of Conveyances, page 528, the lot hereby described being
laid down and distinguished on the said map by Lot Number 3 and is
bounded and described as follows:

BEGINNING at a point on the westerly side of a street or way
running from 20th Street to 21st Street on the westerly side of
Gramercy Park at the center of the northerly side or gable wall
of house on the premises hereby described, which is erected as
a party wall resting partly on the lot hereby described and partly
on Lot Number 2 on said 66 lots at a point 52 feet 6-6/7 inches
southerly from 21st Street;

RUNNING THENCE westerly on a line parallel with 21st Street and
through the center of said gable or side wall 110 feet;

THENCE southerly parallel with said street or way on the westerly
side of Gramercy Park, 26 feet 3-3/7 inches to Lot Number 4 as
laid down on said map;

THENCE easterly parallel with 21st Street, and through the center
of a party wall between the house on the premises hereby described
and the house adjoining on the south along the northerly line of
said Lot Number 4, 110 feet to said street on the westerly side of
Gramercy Park; and

THENCE Northerly along said last mentioned street, 26 feet 3-3/7
inches  to the point or place of BEGINNING.

For conveyancing only,    { Together with all right, title and interest of, in and to any streets and
  if intended to be conveyed.  { roads abutting the above described premises, to the center line thereof

-00-938-1   CERTIFICATE AND REPORT OF TITLE—NEW YORK       **EXHIBIT B**

**EXHIBIT B**

SCHEDULE B

SCHEDULE B in which are set forth the additional matters which will appear in the policy as exceptions from coverage, unless disposed of to the Company's satisfaction prior to the closing or delivery of the policy:

1. ~~Taxes, tax liens, tax sales, water rates, sewer rents and assessments set forth in schedule herein.~~

2. ~~Mortgages returned herein ( two ). Detailed statement within.~~

3. ~~Any state of facts which an accurate survey might show.~~
   ~~-or-~~
   ~~Survey exceptions set forth herein.~~

4. ~~Rights of tenants or persons in possession.~~

5. Covenants, conditions, easements, leases, agreements of record, etc., more fully set forth in Schedule herein:—

   a.  Declaration and Agreement contained in deed recorded in Liber 278 cp 528 – copy within.

   b.  Confirmation Agreement recorded in Liber 308 cp 194 a re-recorded in Liber 167 Sec. 3 cp 462.

   c.  Covenants and Restrictions contained in deed recorded in Liber 280 cp 309 and repeated in deeds recorded in Liber 314 cp 570; Liber 324 cp 1; Liber 392 cp 420 and subsequent deeds of record.

   d.  Sewer Agreement recorded in Liber 509 cp 424 – copy within.

   e.  Notice of Designation as a landmark recorded in Record Liber 108 pg 211 – copy within.

6. ~~Proof is required that R. GREGORY SWOFFORD aka REASE GREGORY SWOFFORD and SUSAN KELLEY aka SUSAN SWOFFORD have not been known by any other names within the past ten (10) years; otherwise, such other name(s) must be revealed to the Company and the Office searches amended to cover.~~

7. ~~NOTE: The purpose of this search is to insure the undivided 24% fee interest to be conveyed by R. Gregory Swofford and Susan Kelley Swofford. All other matters set forth herein as affecting other undivided fee interests in the premises described in Schedule "A", are set forth~~

**EXHIBIT B**

**EXHIBIT B**

SCHEDULE "B" CONTINUED

for information only and without liability for any omissions.

8.   Except the right of the City of New York to maintain vaults, if any, in streets and charges therefore if any.

9.   Application states title (as to the 24% undivided interest) in Susan Kelley aka Swoffeld, we find title as certified.

10.   Consents to the subject transaction, if any, which may be required by the other signatories to the co-ownership agreement dated 12/12/1969 as modified by amendment dated 10/1/1974 and further modified by amendment dated May, 1975.

11.   Subject to the terms and conditions of the agreements recited in Exception 10 above (copies to be provided to this Company).

12.   Subject to the Right of first refusal, and possible unpaid carrying charges, as set forth in the agreements recited in Exception 10.

13.   Proof is required that there are no outstanding unpaid common charges or assessments levied against the subject apartment unit or interest.

14.   Four (4) judgments and nine (9) parking violations returned herein to be disposed of.

15.   SURVEY READING:   See within.

16.   Policy will except any state of facts an accurate survey would show subsequent to 4/23/1969.

17.   FOR INFORMATION:   Returned herein are judgments and parking violations which may affect other interests in the described premises.   (See Schedule)

18.   NOTE:   If the purchase price of $320,000. does not take into account the unpaid balance of the Tremont Savings and Loan Association mortgage, then the insurance being issued herein should be increased by 24% of the unpaid principal balance of said mortgage.

CONTINUED.....

**EXHIBIT B**

**EXHIBIT B**

## S U R V E Y   E X C E P T I O N S

Survey made by George C. Hollerith dated October 18, 1926, inspected
by J. George Hollerith on November 14, 1931 and inspected by Earl B.
Lovell - S. P. Belcher, Inc. on April 23, 1959 shows a four story
and basement brick and brownstone building with party walls on the
north and south, three story and basement brick building with party
wall on south at rear of said four story and basement brick and
brownstone building and two story and basement brick building at rear
of said three story and basement brick building and the following
survey exceptions:

1. Encroachments on Gramercy Park West: Court yard, fence,
   stoop, stoop column, stoop wall and fence on stoop wall.

2. The northerly party wall of the four story and basement
   building on the premises herein has been carried upward
   for the use of the four story and basement building on
   the premises adjoining on the north. Some windows in
   said upward extension when open, project on the premises
   herein - extent not shown, and air conditioners at
   windows in said upward extension project 8 inches on the
   premises herein.

3. Roof of porch of four story and basement building on the
   premises herein projects 4 inches on the premises adjoining
   on the north.

4. Variation between yard coping, yard walls, fence and the
   northerly and southerly record lines of title.

5. The southerly independent wall of the four story and basement
   building on the premises adjoining on the north encroaches
   up to 6-1/2 inches on the premises herein.

6. Porch and stoop of one story and basement building on premises
   adjoining on the south and chimney of said building are
   anchored to the southerly wall of the two story and basement
   building on the premises herein and all encroach 2 inches
   on the premises herein.

7. The northerly wall of the one story and basement building
   on the premises adjoining on the south encroaches up to
   2 inches on the premises herein.

8. The southerly wall of the three story and basement building
   on the premises herein consists of a party wall used by said
   building and the two story and basement building on the
   premises adjoining on the south and an independent wall which
   overtops said party wall. Said overtopping independent wall
   encroaches 4-1/2 inches on the premises adjoining on the
   south, but policy insures that the same may remain undisturbed
   so long as said building stands.

**EXHIBIT B**

**EXHIBIT B**

## -2-
# Financials

(i)      Personal Financial Statement prepared by CPA Jose Padial

(ii)     Verification of Assets
       Net worth $28,578,909

(iii)    Letter from Tax Attorney
       2003 Tax Returns

(iv)     Liabilities

Parlor Floor
3 Gramercy Park West

**EXHIBIT B**

**EXHIBIT B**

# (i) Financial Statement prepared by CPA

Parlor Floor
3 Gramercy Park West

**EXHIBIT B**



*Jose I. Padial*,PA.
*Certified Public Accountant · Consultant*

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT

Gustavo Hernandez
Miami, Florida

I have compiled the accompanying statement of financial condition of Gustavo Hernandez as of November 30, 2004 in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

My compilation is limited to presenting in a prescribed form, information that is the representation of the individuals whose financial statement is presented. I have not audited or reviewed the accompanying financial statement, and accordingly, do not express an opinion or any other form of assurance on them.

This financial statement is presented in accordance with the requirements of a prescribed form which differs from generally accepted accounting principles. Accordingly, this financial statement is not designed for those who are not informed about such differences.

Except as prescribed by the form, this financial statement is intended to present assets of Gustavo Hernandez at estimated current values and their liabilities at estimated current amounts.

December 7, 2004

Member of American Institute of Certified Public Accountants • Florida Institute of Certified Public Accountants

• Coral Gables, FL 33134 •

**EXHIBIT B**

**EXHIBIT B**

## FINANCIAL STATEMENT — Individual

Name _GUSTAVO HERNANDEZ_

Home address _____ MIAMI, FL. 33127 _____   Phone _305-_ _____

Business address _____ MIAMI, FL. 33131 _____   Phone _____

### INSTRUCTIONS

**Please:**   1. Complete the Balance Sheet Section:
  a) Review the Balance Sheet
  b) Complete the appropriate schedules (Pages 2 & 3)
  c) Total each schedule's balances & transfer totals to Balance Sheet
  d) Complete the remaining Balance Sheet items
  e) Total Assets, Liabilities, & calculate Net Worth

  2. Complete the remaining two Sections:
  a) Contingent Liabilities (Page 1)
  b) Income Statement (Page 4)

  3. Sign & date Page 4 after reviewing financial & credit report statements
  (Please use additional sheets if necessary)

I guarantee that the information I have given you below is a true and accurate statement of my financial condition as of

_NOVEMBER 30,_ _____ , _2004_

### BALANCE SHEET

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash on Hand & in Accounts (Sch. 1) . . . . . . | . . . . 6,572.00 | Accounts Payable . . . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . |
| Accounts & Notes Receivable (Sch. 2) . . . . . | . . . . . . . . . . . . . | Notes Payable (Sch. 6) . . . . . . . . . . . . . . . | . . . 44,121.00 |
| U.S. Government Bonds . . . . . . . . . . . . . . . | . . . . . . . . . . . . . | Mortgages (Sch. 5) . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . |
| Listed Marketable Stocks & Bonds (Sch. 3) . . | 3,936,529.00 | Installment Loans (Sch. 7) . . . . . . . . . . . . . | . . . . . . . . . . . . |
| Unlisted, Non-Liquid Stocks & Bonds (Sch. 4) | . . . . . . . . . . . . . | Life Insurance Loans . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . |
| Real Estate (Sch. 5) . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . | Other Liabilities: (Detail Below) . . . . . . . . . | . . . . . . . . . . . . |
| Life Insurance (Cash Value) . . . . . . . . . . . . | . . . . . . . 7,787 | | |
| Furniture & Fixtures . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . | | |
| Automobiles . . . . . . . . . . . . . . . . . . . . . . . . | . . . . . . 90,000 | | |
| Other Assets: (Detail Below, Include IRA,-KEOGH, & Vested Pension Funds) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | . . 24,582,142 | | |
| Total Assets . . . . . . . . . . . . . . . . . . . . . . . . | 28,623,030.00 | Total Liabilities . . . . . . . . . . . . . . . . . . . . . . . | . . . . 44,121.00 |
| | | Net Worth . . . . . . . . . . . . . . . . . . . . . . . . . . | 28,578,909.00 |

### CONTINGENT LIABILITIES

Do you have any contingent liabilities? If so, please describe:

| | | | | | |
|---|---|---|---|---|---|
| As endorser, co-maker or guarantor? . . . . . | $ _____0 | | Legal claims . . . . . . . . . . . . . . . . . . . . | $ _____0 |
| On leases or contracts? . . . . . . . . . . . . . . | $ _____0 | | Other special debt . . . . . . . . . . . . . . . | $ _____0 |
| Amount of contested income tax liens . . . . . | $ _____0 | | | |

STF PRA1018F.1

**EXHIBIT B**

**EXHIBIT B**

Schedule 1: CASH ACCOUNTS

| Depository Institution | In Name Of | Account Type | Balance |
|---|---|---|---|
| BANK OF AMERICA | GUSTAVO HERNANDEZ | CHECKING | 6,572 |

Total: _____ 6,572.00

Schedule 2: NOTES AND ACCOUNTS RECEIVABLE

| Debtor's Name | Purpose | Monthly Payment | (Specify if Principal and/or Interest) | Balance |
|---|---|---|---|---|
| | | | | |

Total: _____

Schedule 3: LISTED MARKETABLE STOCKS AND BONDS

| No. Shares | Issue | Owner | Pledged Yes | Pledged No | Market Value |
|---|---|---|---|---|---|
| 3,165 | GLOBAL SECURITIES GROUP FUND | GUSTAVO HERNANDEZ | | X | 3,936,529 |

Total: _____ 3,936,529.00

SIF PRA101BF.2

**EXHIBIT B**

**EXHIBIT B**

## Schedule 4: UNLISTED, NON-LIQUID STOCKS AND BONDS

| No. Shares | Issue | Owner | Valuation Method | Value |
|---|---|---|---|---|
| | | | | Market Value |
| | | | Total: | |

## Schedule 5: REAL ESTATE

| No. | Location and Description | Title In Name Of | Purchase Date and Price | Market Value |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | Total: | |

| Mortgage | Collateral Position | Original Amount | Monthly Payment | (Specify if Principal and/or Interest) | Present Balance |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | Total: | |

## Schedule 6: NOTES PAYABLE

| Creditor's Name | Purpose | Collateral | Monthly Payment | (Specify if Principal and/or Interest) | Balance |
|---|---|---|---|---|---|
| PORSCHE FINANCIAL | AUTO LOAN | AUTO | | | 44,121.21 |
| | | | | Total: | 44,121.00 |

## Schedule 7: INSTALLMENT LOANS

| Creditor's Name | Purpose | Collateral | Monthly Payment | Balance |
|---|---|---|---|---|
| | | | | |
| | | | Total: | |

STF FRA1008F.3

**EXHIBIT B**

**EXHIBIT B**

## INCOME STATEMENT

A simplified Income Statement is outlined below. If you would prefer to attach your Income Tax Return for a recent year, this form does not have to be completed.

| Fiscal Year Ended DECEMBER 31 | , 2004 | Amount |
|---|---|---|
| Business Income | | |
| Salary | | 168,000 |
| Commissions and Bonuses | | |
| Dividends | | 850,000 |
| Interest | | 98,400 |
| Capital Gains | | |
| Net Rental | | |
|    (Depreciation)  $_____ | | |
|    (Interest)  $_____ | | |
| Other: (Describe Below) | | |
| | | |
| | | |
| | Total | 1,116,400.00 |

Signature _Jose J. Padial_    Date _17 Dec 2004_

STF PRA1018F.4

**EXHIBIT B**

**EXHIBIT B**

STATEMENT ATTACHED AND MADE
PART OF THE PERSONAL FINANCIAL STATEMENT OF

GUSTAVO HERNANDEZ

NOVEMBER 30, 2004

OTHER ASSETS

| | | |
|---|---|---:|
| Beneficial Interest in Trust | | |
| of the Hernandez Frieri Family: | | |
| Investment in Global Finance Management | | |
| Corporation and Subsidiaries | $ | 24,649,602 |
| Investment in The Global Securities Market | | |
| Neutral Fund c/o Dundee Leeds Management | | |
| Services (Cayman) Ltd. | | 23,286,359 |
| Total Assets of the Trust | $ | 47,935,961 |
| | | |
| Gustavo Hernandez Beneficial Interest- 50% | $ | 23,967,981 |
| | | |
| Art Objects | | 614,161 |
| | | |
| TOTAL OTHER ASSETS | $ | 24,582,142 |

See accountant's compilation report.

**EXHIBIT B**

**EXHIBIT B**

# (ii) Verification of Assets

| | | |
|---|---|---:|
| **Exhibit I** | Cash | $ 6,572 |
| **Exhibit II** | **Bonds  & Stocks** | $ 3,936,529 |
| **Exhibit III** | **Life Insurance** | |
| | **Cash surrender value** | $ 7,787 |
| **Exhibit IV** | **Art Collection** | $ 614,161 |
| **Exhibit V** | **Hernandez Frieri Family Trust** | $23,967,981 |
| | **Gustavo Hernandez 50% beneficiary** | |
| (iii) | **Global Finance Management Corporation and subsidiaries** | $24,649,602 |
| (iv) | **Investment in The Global Securities Market Neutral Fund c/o Dundee Lees Managements Services (Cayman) Ltd.** | $23,286,359 |
| | | |
| **Total Assets of Trust** | | $47,935,961 |
| **Gustavo Hernandez Beneficial Interest 50%** | | $23,967,981 |
| **Exhibit VI** | **Income 2004** | $ 1,116,400 |

**EXHIBIT B**

# Exhibit I
# Cash/Bank Statements
**Bank of America**
**$6,572**

Parlor Floor
3 Gramercy Park West

**EXHIBIT B**

**EXHIBIT B**

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

Page 1 of 3
Statement Period
10-22-04 through 11-19-04
Number of checks enclosed: 0
B  14  0  A  P   14                        0329766

Account Number:         6082

II.II...II....II.II....II.II.II.I.II.I.II.I.III....I.I.I.I.I

22075 001 SCM999 I1 34 0

GUSTAVO HERNANDEZ FRIERI
CESAR GABRIEL HERNANDEZ

MIAMI FL 33131-2834

*Premier Banking Client*

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
**With Online Banking you can also view up to 18 months of this statement
online and even turn off delivery of your paper statement.**
Enroll at www.bankofamerica.com.

## Customer Service Information
## www.bankofamerica.com

For additional information or service, you may call:
1.800.432.1000 Priority Telephone Banking
1.800.288.4408 TDD/TTY Users Only
1.800.688.6086 En Español

Or you may write to:
Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

## Regular Checking
GUSTAVO HERNANDEZ FRIERI                    CESAR GABRIEL HERNANDEZ

### Your Account at a Glance

| | |
|---|---|
| Account Number .......................................... | 6082 |
| Beginning Balance on 10-22-04 ................... $ | 9,366.68 |
| Deposits and Other Additions .............+ | 10,457.50 |
| Checks Posted ........................................ - | 10,992.55 |
| ATM and Debit Card Subtractions .... - | 1,759.27 |
| Other Subtractions ................................ - | 500.00 |
| **Ending Balance on 11-19-04 ................. $** | **6,572.36** |

Did you know that your online statements are secure and protected in Online Banking? You can even stop delivery of
this paper statement altogether. Enroll or sign in to Online Banking today at www.bankofamerica.com. Select the
Account Activity tab and click on the "Stop/Resume mailing paper statements" link.

**EXHIBIT B**

**EXHIBIT B**

GUSTAVO HERNANDEZ FRIERI
CESAR GABRIEL HERNANDEZ

Page 2 of 3
Statement Period
10-22-04 through 11-19-04
Number of checks enclosed: 0
B 14 0 A P 14

Account Number: ████ 6082

## Regular Checking Additions and Subtractions

| Date Posted | Amount($) | Resulting Balance($) | Transaction |
|---|---|---|---|
| 10-25 | 158.32- | 9,208.36 | Svb 4046_boca 10/24 #000882685 Withdrwl 4046_boca Grande 1300100Cartag |
| 10-25 | 158.12- | 9,050.24 | Svb 4046_boca 10/24 #000882715 Withdrwl 4046_boca Grande 1300100Cartag |
| 10-25 | 158.12- | 8,892.12 | Svb 4046_boca 10/24 #000882737 Withdrwl 4046_boca Grande 1300100Cartag |
| 10-25 | 63.37- | 8,828.75 | CheckCard 1023 Carulla Castillo Grande Cartagena 74513074298298030509203 |
| 10-26 | 500.00- | 8,328.75 | Metlife ;Des= payment ;ID= 20005138767 Eff Date: 041026;Indn:Gustavo Hernandez |
| 10-27 | 51.60- | 8,277.15 | Check 365 |
| 10-28 | 80.00- | 8,197.15 | Check 367 |
| 10-29 | 5,228.75+ | 13,425.90 | Global Securitie;Des= payroll ;ID= 14622200006717X Eff Date: 041029;Indn:Hernandez, Gustavo |
| 10-29 | 5,000.00- | 8,425.90 | Check 373 |
| 11-01 | 200.00- | 8,225.90 | BkofAmerica ATM 10/30 #000009876 Withdrwl Brickell #2 Miami FL |
| 11-02 | 1,760.00- | 6,465.90 | Check 374 |
| 11-02 | 20.80- | 6,445.10 | Check 366 |
| 11-10 | 105.15- | 6,339.95 | Check 579 |
| 11-15 | 5,228.75+ | 11,568.70 | Global Securitie;Des= payroll ;ID= 14729800017895X Eff Date: 041115;Indn:Hernandez, Gustavo |
| 11-15 | 1,000.00- | 10,568.70 | Check 577 |
| 11-15 | 258.15- | 10,310.55 | 24000 11/13 #000024809 Withdrwl Ubs Sa Cointrin |
| 11-15 | 163.76- | 10,146.79 | CheckCard 1113 Le Cintra 74Megeve 74976064318654244062578 |
| 11-15 | 130.91- | 10,015.88 | LA Poste/Avenu 11/13 #000009579 Withdrwl LA Poste/Avenue D Sallanches |
| 11-15 | 45.00- | 9,970.88 | Check 375 |
| 11-16 | 2,000.00- | 7,970.88 | Check 578 |
| 11-16 | 930.00- | 7,040.88 | Check 580 |
| 11-16 | 34.66- | 7,006.22 | CheckCard 1114 Le Gerbier 5636167 7474 Megeve 74975684321868820824943 |
| 11-18 | 260.32- | 6,745.90 | 78800 11/18 #000078369 Withdrwl Banque Cantonale Geneve |
| 11-18 | 173.54- | 6,572.36 | 78800 11/18 #000078370 Withdrwl Banque Cantonale Geneve |

## Checks Posted in Numerical Order

| Check Number | Date Posted | Amount($) | Check Number | Date Posted | Amount($) | Check Number | Date Posted | Amount($) |
|---|---|---|---|---|---|---|---|---|
| 365 | 10-27 | 51.60 | 374 | 11-02 | 1,760.00 | 579 | 11-10 | 105.15 |
| 366 | 11-02 | 20.80 | 375 | 11-15 | 45.00 | 580 | 11-16 | 930.00 |
| 367 | 10-28 | 80.00 | 577* | 11-15 | 1,000.00 | | | |
| 373* | 10-29 | 5,000.00 | 578 | 11-16 | 2,000.00 | | | |

**Total Checks Posted** $10,992.55

* The asterisk shows a break in the check number order. Your check may have been in a previous statement or may still be outstanding.

**EXHIBIT B**

**EXHIBIT B**

GUSTAVO HERNANDEZ FRIERI
CESAR GABRIEL HERNANDEZ

Page 3 of 3
Statement Period
10-22-04 through 11-19-04
Number of checks enclosed: 0
B 14 0 A P 14                0329768

Account Number: ████ 6082

## Daily Balance Summary

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| Beginning | 9,366.68 | 10-28 | 8,197.15 | 11-10 | 6,339.95 |
| 10-25 | 8,828.75 | 10-29 | 8,425.90 | 11-15 | 9,970.88 |
| 10-26 | 8,328.75 | 11-01 | 8,225.90 | 11-16 | 7,006.22 |
| 10-27 | 8,277.15 | 11-02 | 6,445.10 | 11-18 | 6,572.36 |

**EXHIBIT B**

## EXHIBIT B

### How To Balance Your Bank of America Account

**FIRST, start with your Account Register/Checkbook:**

1. List your Account Register/Checkbook Balance here ........................................................... $ _____

2. Subtract any service charges or other deductions not previously recorded that are listed on this statement .................. $ _____

3. Add any credits not previously recorded that are listed on this statement (for example interest) ................................. $ _____

4. This is your NEW ACCOUNT REGISTER BALANCE ................................................................. $ _____

**NOW, with your Account Statement:**

1. List your Statement Ending Balance here ............................................................................... $ _____

2. Add any deposits not shown on this statement ...................................................................... $ _____

_____

SUBTOTAL ........................... $ _____

3. List and total all outstanding checks, ATM, Check Card and other electronic withdrawals

| Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | |
|---|---|---|---|---|---|
| Date/Check # | Amount | Date/Check # | Amount | Date/Check # | Amount |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

4. TOTAL OF OUTSTANDING CHECKS, ATM, Check Card and other electronic withdrawals .................................. $ _____

5. Subtract total outstanding checks, ATM, Check Card and other electronic withdrawals from Subtotal
This Balance should match your new Account Register Balance ..................................................... $ _____

Upon receipt of your statement, differences, if any, should be reported to the bank promptly in writing and in accordance with provisions in your deposit agreement.

### Important Information

**Change of Address.** Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Deposit Agreement.** When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule, which contain the current version of the terms and conditions of your account relationship, may be obtained at our banking centers.

**Electronic transfers: In case of errors or questions about your electronic transfers**
If you think your statement or receipt is wrong or if you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
* Tell us your name and account number
* Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
* Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting Other Problems.** You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or unauthorized transactions within the time periods specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree not to make a claim against us for the problems or unauthorized transactions.

**Direct Deposits.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.

Bank of America, N.A. Member FDIC and  Equal Housing Lender

*Thank You for Choosing Bank of America*

## EXHIBIT B

**EXHIBIT B**



GLOBAL STRATEGIC INVESTMENTS, LLC

A000000004371ZC8F30001

# Brokerage
## Account Statement

**Account Number:** 0048
**Statement Period:** 11/01/2004 - 11/30/2004

## Valuation at a Glance

| | This Period |
|---|---|
| Beginning Account Value | $3,936,529.05 |
| Change in Account Value | 0.00 |
| Ending Account Value | $3,936,529.05 |

GUSTAVO HERNANDEZ

MIAMI FL 33127

**Your Portfolio Manager:**
CESAR HERNANDEZ
(305)

## Asset Allocation

| | Value This Period | Percent Allocation |
|---|---|---|
| Equities | 3,936,532.05 | 100% |
| Cash and Cash Equivalents | -3.00 | 0% |
| **Account Total** | **$3,936,529.05** | **100%** |

Your Account is 100% invested in Equities.

Clearing through **Pershing** A BNY Securities Group Co.
Solutions from The Bank of New York

One Pershing Plaza, Jersey City, New Jersey 07399
Pershing LLC, member NASB, NYSE, SIPC, Industrials of Pershing Investments LLC

PAT-02-CUTSHEET

A000000004371ZC8F30001

DALBAR RATED
FOR COMMUNICATION

**EXHIBIT B**

**EXHIBIT B**

## Customer Service Information

Your Portfolio Manager:
Identification Number: 502
CESAR HERNANDEZ

MIAMI                FL 33131-2834
Telephone Number: (305)
Fax Number: (305)

Customer Service Telephone Number: (888)

## Portfolio Holdings

| Quantity | Description | Opening Balance | Closing Balance | Accrued Income | Income This Year | 30-day Yield |
|---|---|---|---|---|---|---|
| **Cash and Cash Equivalents  0.00% of Portfolio** | | | | | | |
| | Cash Balance | -3.00 | -3.00 | | | |
| **Total Cash and Cash Equivalents** | | **-$3.00** | **-$3.00** | **$0.00** | **$0.00** | |

| Quantity | Description | Market Price | Market Value | | Estimated Annual Income | Estimated Yield |
|---|---|---|---|---|---|---|
| **Equities  100.00% of Portfolio** | | | | | | |
| **Stocks, Rights and Warrants** | | | | | | |
| 3,165.000 | GLOBAL SECURITIES GROUP FUNDS SPC USD CL A NON VTG PTG SHS SER 1 MKT NEUTRAL FD PORT ISIN#KYG39303105 2 *Dividend Option:* Cash *Security Identifier:* G39303105 | 1,243.7700 | 3,936,532.05 | | | |
| **Total Stocks, Rights and Warrants** | | | **$3,936,532.05** | | **$0.00** | |
| **Total Equities** | | | **$3,936,532.05** | | **$0.00** | |

| Description | Market Value | Estimated Annual Income |
|---|---|---|
| **Total Portfolio Holdings** | **$3,936,529.05** | **$0.00** |

Clearing Through **Pershing** A BNY Securities Group Co. A member of the Bank of New York Mellon    One Pershing Plaza, Jersey City, New Jersey 07399
Pershing LLC, member FINRA, NYSE, SIPC, the brokerdealer of Pershing Investments LLC

Account Number        00048
GUSTAVO HERNANDEZ

A0000000043712C6F30001

**EXHIBIT B**

**EXHIBIT B**

GLOBAL STRATEGIC INVESTMENTS, LLC

**Brokerage**

**Account Statement**

Statement Period: 11/01/2004 - 11/30/2004

## Portfolio Holdings *(continued)*

**Disclosures and Other Information**

**Pricing** - Securities prices may vary from actual liquidation value. Prices shown should only be used as a general guide to portfolio value. Prices are received from various pricing services. However, pricing services are sometimes unable to provide timely information. Where pricing sources are not readily available, particularly on certain debt securities, estimated prices may be generated by a matrix system taking various factors into consideration. The pricing of listed options takes into account the last closing price, as well as the current bid and offer prices. Where securities have not been priced, such securities have not been included in the Asset Allocation information at the beginning of this statement.

**Reinvestment** - The dollar amount of Mutual Fund distributions, Money Market Fund income, or dividends or other securities shown on your statement may have been reinvested into additional shares. You will not receive confirmation of these reinvestment transactions. However, information pertaining to these transactions which would otherwise appear on confirmations, including the time of

execution and the name of the person from whom your security was purchased, will be furnished to you upon written request to your introducing firm. In dividend reinvestment transactions, Pershing acts as your agent and receives payment for order flow, the source and nature of which payment will be furnished to you upon written request to your introducing firm.

**Option Disclosure** - Information with respect to commissions and other charges incurred in connection with the execution of option transactions has been included in confirmations previously furnished to you. A summary of this information is available to you promptly upon your written request directed to your introducing firm. In order to assist your introducing firm in maintaining current background and financial information concerning your option accounts, please promptly advise them in writing of any material change in your investment objectives or financial situation. Expiring options which are valuable are exercised automatically pursuant to the exercise by exception procedure of the Options Clearing Corporation. Additional information regarding this procedure is available upon written request to your introducing firm.

Account Number
GUSTAVO HERNANDEZ

DIAL-BAR ALERTED FOR COMMUNICATION

Clearing through **Pershing** A BNY Securities Group Co. One Pershing Plaza, Jersey City, New Jersey 07399
Subsidiary from The Bank of New York Member NYSE, SIPC. Redistributed of Pershing Investment LLC

PAR-02-CUTSHEET

A00000000643712CSF50001

**EXHIBIT B**

# Exhibit III
# Life Insurance Cash Surrender Value
### New England Financial Products
### $7,787

**EXHIBIT B**

DEC. 07. 2004 (TUE) 16:14

New England Financial Products

Page 1 of 2

Client Search > Client List > Product List >

 print

## Gustavo Hernandez

Disclaimers

### Life Insurance

| Policy Number | Policy | | AsOfDate | Benefit |
|---|---|---|---|---|
| Y132541 | Variable Universal Life (variable death benefit) | | 11/27/04 (A) | $1,007,863.74 |

| Owner | Gustavo Hernandez | Basic Death Benefit | $1,007,864.00 |
|---|---|---|---|
| Insured | Gustavo Hernandez | Net Death Benefit (1) (2) | $1,007,863.74 |
| Premium (P) - Freq | $500.00 - Monthly | | |
| Next Premium Due | Dec 27, 2004 | Gross Cash Value (1B) | $7,787.83 |
| Date Issued | Dec 27, 2002 | - As of Date | Dec 6, 2004 |
| Status | Active | Loan (3) | $0.00 |
| | | Cash Value (4) | $7,787.83 |

Sub Accounts as of Dec 6, 2004

| Name | Class | Future Allocation | Accum Units | Accum Unit Value | Balance | % of Total |
|---|---|---|---|---|---|---|
| Amer Funds Growth | Growth | 20% | 1.006988631 | $ 1601.489068 | $1,612.46 | 20.71% |
| Davis Venture Value | Growth | 20% | 4.640170172 | $ 349.860592 | $1,622.46 | 20.83% |
| SSR Investment | Growth | 20% | 1.831817765 | $ 876.982410 | $1,600.05 | 20.02% |
| PIMCO Total Return | Income | 20% | 11.372955757 | $ 127.425994 | $1,474.85 | 18.94% |
| SSR Bond Income | Income | 20% | 2.418796190 | $ 808.640304 | $1,472.18 | 18.90% |

Riders

| Name | Benefit Amount |
|---|---|
| Waiver of Monthly Deduct | n/a |

| Address | 120 NW 25TH ST | Servicing Agent/Agency: | JOSE F VELASCO |
|---|---|---|---|
| | STE 202 | | German Plasencia & Associates |
| | MIAMI, FL 33127-4459 | | |

For a printed version of this account click here then press your browser's "print" button.
This portion of Asset View prepared on Dec 7, 2004.

*SURRENDER VALUE #*

### Important Disclaimer Information

(A) **Death benefit and loan values are updated monthly. Sub-account values and gross cash values are updated daily.**
(1) Net Death Benefit includes rider benefits on the primary insured(s) only and is net of Loan amount shown.
(2) Loans are not available on all contracts. If a loan has been taken against a policy, loan shown does not include outstanding loan interest due. Loan values will affect the payout values. For variable products, any loan values will not participate in selected sub-account performances.
(4) Cash Value, though net of loan amount shown, does not take into account any applicable surrender charge and is not the surrender value.
(P) Premium payment amount includes rider charges.
(1B) Gross cash value does not consider any loan, applicable surrender charges and is not the surrender value.

Life insurance and annuities issued by New England Life Insurance Company, 501 Boylston Street, Boston, MA 02116. Variable products and other securities offered through New England Securities Corporation, 501 Boylston Street, Boston, MA 02116.

**EXHIBIT B**

**EXHIBIT B**

DEC. 07. 2004 (TUE) 16:15

### Surrender Quote

**Policy Number:  0Y132541**

**REQ: A097BJO  DATE: 120704  NEL  VUNIV  TNEGA  TNE01**

| | | | |
|---|---|---|---|
| **SURRENDER VALUE AS OF:** | *120604* | **PREMIUMS ASSUMED PAID TO:** | *122704* |
| **BASIC POLICY VALUE** | | **PREMIUM REFUND:** | |
| **GENERAL ACCOUNT:** | | **DISC PREMIUM REFUND:** | |
| **SSR Bond Income** | *382.37* | **LOAN BALANCE:** | |
| **Davis Venture Value** | *421.40* | **LOAN INTEREST:** | |
| **SSR Investment** | *417.13* | **CLAIM VALUE:** | *2,022.71* |
| **PIMCO Total Return** | *383.01* | | SURRENDER VALUE. |
| **Amer Funds Growth** | *418.80* | | |
| | | **SURRENDER CHARGE:** | *5,850.00* |

*W-V55 QUOTE EFFECTIVE DATE CHANGED 120604*
*H-G250 TRANSACTION COMPLETE*

Copyright © 1998, 1999 NELIC, New England Financial All Rights Reserved. Terms and Conditions of Use and Privacy Statement.

**EXHIBIT B**

# Exhibit IV

## Art Collection
### Valued by Art Insure - $614,161

Third Floor
3 Gramercy Park West

**EXHIBIT B**



# artinsure.com

SURPLUS LINES AGENT'S NAME: ▉
SURPLUS LINES AGENT'S ADDRESS ▉
SURPLUS LINES AGENT'S LICENSE ▉
PRODUCING AGENT'S NAME: ▉
PRODUCING AGENT'S ADDRESS: ▉

CERTIFICATE OF INSURANCE
No: **THIS INSURANCE IS ISSUED PURS▉LINES LAW. PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER.**

TOTAL PREMIUM: *1625* TAX: *105.63* SER▉ *88*

SURPLUS LINES AGENT'S COUNTERSIGNATURE: ▉

| | |
|---|---|
| **TYPE:** | ALL RISKS FINE ART |
| **REFERENCE NUMBER:** | 1077016608/004 |
| **FORM:** | (J) Form plus wording as attached. |
| **ASSURED:** | GUSTAVO HERNANDEZ |
| **LOCATION** | ▉ MIAMI, Florida, 33127, US |
| **PERIOD:** | 12 months |
| | From: 22 April 2004 at 12:01 a.m. Local Standard Time. |
| | To: 22 April 2005 at 12:01 a.m. Local Standard Time. |
| **INTEREST:** | Fine Art of every nature and description (and/or interest as described below) as per schedule held in the office of Benfield Limited. |
| **MAX LIMIT:** | USD 614,161 |
| **LIMITS:** | USD 614,161 at the Assured's residence as above. |
| **CONDITIONS:** | Lloyd's Privacy Policy Statement (LSW 1135) Premium Payment Clause (LSW 3000) Service of Suit Clause (NY) Several Liability Clause LSW 1001 NMA2920 Terorism Exclusion CL370 CL380 As standard wording |

| **PREMIUM & DEDUCTIBLE:** | Premium (USD) | Deductible (USD) |
|---|---|---|
| | 1,600.00 | 1,000.00 |

| | |
|---|---|
| **U.S. CLASSIFICATION** | Fidelity & Marine 15476 N.W. 77 Court Box 248 Miami Lakes FL 33016, USA |
| **TAX:** | Plus Local Taxes as applicable |
| **AUTHORISED SIGNATORY:** | For and on behalf of certain Underwriters at Lloyd's |
| **DATE:** | 23 April 2004 |

**EXHIBIT B**

**EXHIBIT B**

| ARTIST | TITLE | YEAR | MATERIALS | DIMENSIONS | ACQ DATE | INV # | PRICE |
|---|---|---|---|---|---|---|---|
| von Bonin, Cosima | Internationales Weltlebertariat | 2003 | Wood, cotton, Joden | 108 1/4 x 113 | 3/14/03 | Inv 03-89 | $ 32,670.00 |
| Klasewetter, Thomas | Untitled | 2000 | Painted metal and wood | 115 x 63 x 53 | 3/14/03 | Inv 3-92 | $ 15,000.00 |
| Peyton, Elizabeth | Nick (one) | 2002 | Monotype on Twinrocker paper | 11 x 8 1/2 | 4/16/03 | Inv 3-138 | $ 5,670.00 |
| Klasewetter, Thomas | Untitled | 1999 | Metal and wood | 26 x 20 1/2 x 19 | 6/30/03 | Inv 3-219 | $ 7,920.00 |
| Jensen, Sergej | Komm wir machen halbe halbe | 2003 | Fabric on linen | 89 3/4 x 54 2/3 | 7/1/03 | Inv 03-220 | $ 7,700.00 |
| Kippenberger, Martin | Leiden Warum, Leiden Wozu | 1982 | Oil on canvas | 47 1/4 x 39 1/4 | 7/3/03 | Inv 3-227 | $ 82,500.00 |
| Müller, Stefan | Untitled | 2002 | Acrylic, crayon, felt pen on nettle | 59 x 69 | 7/21/03 | Inv 3-255 | $ 5,221.00 |
| Grosofer, Mark | Communism Time for a Bath (origin) | 2002 | Acrylic paint on MDF-box | 78 3/4 x 59 x 11 | 10/30/03 | Inv 03-339 | $ 15,000.00 |
| Wolff, Katharine | Die Befreiung | 2003 | Colored pencil and pencil on paper | 8 x 11 | 11/7/03 | Inv 03-338 | $ 2,293.50 |
| Grotjahn, Mark | Butterfly (black, red, orange) | 2003 | Pastel on paper | 24 x 19 | 11/18/03 | Inv 3-356 | $ 1,980.00 |
| Grenfort, Tue | Untitled | 1983 | Acrylic and lacquer on fabric | Dieryc 36 x 96" 0 | 11/21/03 | Inv 3-362 | $ 80,200.00 |
| Pöhle, Sigmar | Untitled | 2003 | Mixed media on paper | 18 x 13 1/8 | 1/5/04 | Inv 4-14 | 1,106.80 |
| Bell, Dirk | Untitled (man in suit) | 1993 | Oil on canvas | 6 x 7 3/4 | 1/5/04 | Inv 4-17 | 20,900.00 |
| Ales, Francis | Untitled (mental map, wild wild wir) | 2003 | Mixed media on paper | 8 x 5 1/2 | 1/7/04 | Inv 4-31 | 5,115.00 |
| Adammann, Franz | Liebe | 2002 | Boat lacquer, paper on canvas, | 23.6 x 31.5 x 3.3 | 2/19/03 | Inv 1996 | 24,000 |
| Althoff, Kai | Untitled | 2003 | Plastic straws and silicone | 15 x 19 x 19 | 4/27/03 | Inv 2136 | 4,100 |
| Abauts, Eduardo | Untitled | 2001 | Oil on canvas | 47.2 x 39.4 | 12/11/02 | Inv 1961 | 9,900 |
| Krebber, Michael | Mein Weg is dein Weg | 2002 | Acrylic on canvas | 59 x 59 | 12/11/02 | Inv 1961 | 5,610 |
| Selg, Marcus | Dick Evé | 2002 | Red Silicone Rubber | 22 x 18 1/8 x 15 | 1/13/04 | Apr-37 | 66,000 |
| McCarthy, Paul | | | | | | | |
| Olowska, Paulina | Cry lubisz malarstwo abstrakcyjne | 2000 | Oil on canvas | 27 x 22 cm | 10/29/03 | Inv 3-362 | $ 2,106 |
| Ostrowa, Paulina | Untitled | 2002 | Gouache on paper | 26x21 cm | 10/29/03 | Inv 3-14 | 1,170 |
| Tokarski, Wawrzyniec | Preview nr II | 2001 | Aquarell auf Papier | 82 x 125 cm | 4/28/03 | | 2,441 |
| Tokarski, Wawrzyniec | | 2001 | | | 4/28/03 | | 1,920 |
| Heneken, Uwe | Summer comes again | 2003 | Oil on canvas | 88 x 67 cm | 11/5/03 | | 3,192 |
| Meise, Michael | Bas Jan Ader Box | 2003 | Cardboard, colour copy, oil, edding | 36.5*29.5 cm | 11/3/03 | | 944 |
| Cardoso, Maria Fernanda | Dibujo de Mariposa | 2003 | Acrylic, Archival Butterflies, metal | 49 * 40.7 cm | 12/22/03 | | 11,200 |
| Mabo, Roberto | Untitled | 1957 | Pastel and charcoal on paper | 54 x 68 cm | 4/2/03 | | $ 75,000 |
| Lum, Wilfredo | Untitled | | | | 2/15/03 | | 25,000 |
| Quintana, Carlos | | | | | | | 7,000 |
| Leiva, Nicolás | | | | | | | 5,000 |
| Grau, Enrique | | | | | | | $ 8,000 |
| Salcedo, Bernardo | | | | | | | 5,000 |
| Obregon, Alejandro | | | | | | | 12,000 |
| Obregon, Alejandro | | | | | | | 20,000 |
| Wiedermann, Guillermo | | | | | | | 22,000 |
| Caballero, Luis | | | | | | | 14,000 |
| Jaramillo, Lorenzo | | | | | | | 2,000 |
| Fuenmayor, Gonzalo | | | | | | | $ 1,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Van Der Heide, Sara | Untitled (Sean Penh and Susan Sar | 2002 | Chinese ink on paper | 11 3/4 x 15 2/3 | 4/1/03 | Inv3-125 | $ 770 |
| | | | | | | | $914,161.30 |

**EXHIBIT B**

**EXHIBIT B**

Fine Art and Collectibles Insurance     011-44-20-7578-7102     Page 1 of 4

# Fine Art and Collectibles Insurance

**I. General Information**

A. Name:     GUSTAVO HERNANDEZ

    Address:

    City/Town:     MIAMI

    Country:     United States

    State/County:     Florida

    Zip/Postal Codes:     33127

B. Date of Birth:     18   03   1973

C. Number of Other locations to be included:     0

    Number/Name/Street     City/Town     State/County     Zip     Country

D. Occupation:     FUND MANAGER

E. Marital Status:     ☐ Married ☑ Single ☐ Divorced

F. Person to Contact (if different from Applicant):     GUSTAVO HERNANDEZ

**II. Insurance Period**

From which date would you wish Twelve Months Insurance to Attach?     13   02   2004

**III. Building Construction and Security**

A. Please state the building type and construction of each location:
E.g. House, Apartment, Office etc.
Built of Brick, Wood Frame, Concrete etc.     Location 1: MASONRY

B. Are any of the properties used Professionally or Commercially?     ☐ Yes ☑ No

C. Are all locations occupied?     ☑ Yes ☐ No

D. What Protective Devices or Systems are in use?
E.g. Central Station Alarm, Security Alarm, Fire Alarm, Safe etc.     CENTRAL ALARM

E. Has a Security Survey been carried out on all or any of the locations?     ☑ Yes ☐ No

Number of documents to be uploaded:     3

Please upload document(s) here:

**IV. Coverage**

A. Coverage Limit Required per Location:     Currency United States Dollars

    Location 1:

    Total Limit Required:     $614,161.30

B. Is any of the Collection to be exhibited?     ☐ Yes ☑ No

C. Is any of the Collection to be kept permanently outside?     ☐ Yes ☑ No

E.g. Statues, Garden Ornaments, Machinery etc.

**V. Schedule of Property**

A. Please provide detailed description of each item that you wish to insure on an agreed value basis. Values should be supported by the attachment of copies of all available Appraisals, Bills of Sale or other evidence of true value.

Number of items to be included:     44

**EXHIBIT B**

**EXHIBIT B**

Fine Art and Collectibles Insurance

| | Description | Purchase/Appraisal Date | | | Amount of Insurance |
|---|---|---|---|---|---|
| 1. | VON BONIN, COSINA | 01 | 01 | 2003 | 32,670.00 |
| 2. | KIESEWETTER, THOMAS | 01 | 01 | 2000 | 15,000 |
| 3. | PEYTON, ELIZABETH | 01 | 01 | 2002 | 5,670.00 |
| 4. | KIESEWETTER, THOMAS | 01 | 01 | 1999 | 7,920.00 |
| 5. | JENSON, SERGEL | 01 | 01 | 2003 | 7,700.00 |
| 6. | KIPPEBERGER, MARTIN | 01 | 01 | 1982 | 82,500.00 |
| 7. | MULLER, STEFAN | 01 | 01 | 2002 | 5,221.00 |
| 8. | CARPENTER, MERLIN | 01 | 01 | 2003 | 11,440.00 |
| 9. | WULFF, KATHARINA | 01 | 01 | 2003 | 2,293.50 |
| 10. | GROTJAHN, MARK | 01 | 01 | 2003 | 1,980.00 |
| 11. | POLKE, SIGMAR | 01 | 01 | 1983 | 80,290.00 |
| 12. | BELL, DIRK | 01 | 01 | 2003 | 1,108.00 |
| 13. | ALYS, FRANCIS | 01 | 01 | 1993 | 20,900.00 |
| 14. | ACKERMAN, FRANZ | 01 | 01 | 2003 | 5,115.00 |
| 15. | ALTHOFF, KAI | 01 | 01 | 2002 | 24,000.00 |
| 16. | ABAROA, EDUARDO | 01 | 01 | 2003 | 4,100.00 |
| 17. | KREBBER, MICHAEL | 01 | 01 | 2001 | 9,900.00 |
| 18. | SELQ, MARCUS | 01 | 01 | 2002 | 5,610.00 |
| 19. | McCARTHY, PAUL | 01 | 01 | 2002 | 66,000.00 |
| 20. | OLOWSKA, PAULINA | 01 | 01 | 2000 | 2,106.00 |
| 21. | OSKOWA, PAULINA | 01 | 01 | 2002 | 1,170.00 |
| 22. | TOKARSKI, WAWRZYNIEC | 01 | 01 | 2001 | 2,441.00 |
| 23. | TOKARSKI, WAWRZYNIEC | 01 | 01 | 2001 | 1,920.00 |
| 24. | HENEKKEN, UWE | 01 | 01 | 2003 | 3,192.00 |
| 25. | MEISE, MICHAEL | 01 | 01 | 2003 | 944.00 |
| 26. | CARDOSO, MARIA FERNANDA | 01 | 01 | 2003 | 11,200.00 |
| 27. | MATTA, ROBERTO | 01 | 01 | 1957 | 75,000.00 |
| 28. | LAM, WILFREDO | DD | MM | YYYY | 25,000.00 |
| 29. | QUINTANA, CARLOS | DD | MM | YYYY | 7,000.00 |
| 30. | LEIVA, NICOLAS | DD | MM | YYYY | 5,000.00 |
| 31. | GRAU, ENRIQUE | DD | MM | YYYY | 8,000.00 |
| 32. | SALCEDO, BERNARDO | DD | MM | YYYY | 5,000.00 |
| 33. | OBREGON, ALEJANDRO | DD | MM | YYYY | 12,000.00 |
| 34. | OBREGON, ALEJANDRO | DD | MM | YYYY | 20,000.00 |
| 35. | OBREGON, ALEJANDRO | DD | MM | YYYY | 22,000.00 |
| 36. | WEIDEMMAN, GUILLERMO | DD | MM | YYYY | 14,000.00 |
| 37. | CABALLERO, LUIS | DD | MM | YYYY | 2,000.00 |
| 38. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |
| 39. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |
| 40. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |
| 41. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |
| 42. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |

**EXHIBIT B**

**EXHIBIT B**

Fine Art and Collectibles Insurance                                          Page 3 of 4

| 43. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |
| 44. | VAN DER HELDE SARA | DD | MM | YYYY | 770.00 |

Number of documents to be uploaded:  44

Please upload document(s) here:

**EXHIBIT B**

**EXHIBIT B**

Fine Art and Collectibles Insurance                                         Page 4 of 4

B. What further coverage limits are required for items not schedule above?

   1.  Fine Arts:            614,161.30

   2.  Jewellery:

   3.  Silverware:

   4.  Coins:

   5.  Stamps:

   6.  Books:

   7.  Furs:

   8.  Musical Instruments:

   9.  Other

VI. History

A. Have any losses been suffered or claims been made during the last three years?  ◯ Yes  ◉ No

B. Have you ever had previous insurance cancelled by a previous insurer?  ◯ Yes  ◉ No

C. Applicants Statement:

The Applicant warrants to the best of his or her knowledge and belief that the statements set forth herein are true and include all material information. The Applicant further warrants that if the information supplied on this application changes between the date of this application and the inception date of the policy, the Applicant will immediately notify underwriters of such change. Signing this application does not bind the Underwriters to offer nor the Applicant to accept insurance, but it is agreed that this application shall be the basis of the insurance and will be attached and made part of the policy should the policy be issued.  ☑ I agree

Please supply any additional information to support this application:

Additionally, please attach any supporting documentation.

Number of documents to be uploaded:

Please upload document(s) here:

Submit

**EXHIBIT B**

**EXHIBIT B**

## Exhibit V
## Hernandez Frieri Family Trust

(i)  Audited Report of Global Finance Management Corporation                         $24,649,602

(ii)  Investment in The Global Securities Market Neutral Fund c/o Dundee Lee Management Services (Cayman) Ltd.                $23,286,359

**EXHIBIT B**

## *REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS*

To the Partners of
HH Securities Ltd.

We have audited the accompanying consolidated statement of financial condition of Global Finance Management Corporation and Subsidiaries (A Wholly-Owned Subsidiary of HH Securities Ltd.) as of June 30, 2004. This consolidated financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this consolidated financial statement based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statement is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statement referred to above presents fairly, in all material respects, the consolidated financial position of Global Finance Management Corporation as of June 30, 2004 in conformity with accounting principles generally accepted in the United States of America.

*Morrison, Brown, Argiz & Farra, LLP*

Miami, Florida
October 19, 2004

**EXHIBIT B**

**EXHIBIT B**

# GLOBAL FINANCE MANAGEMENT
# CORPORATION AND SUBSIDIARIES
### (A Wholly-Owned Subsidiary of HH Securities Ltd.)

CONSOLIDATED FINANCIAL STATEMENT

JUNE 30, 2004

**EXHIBIT B**

**GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)**

CONSOLIDATED STATEMENT OF FINANCIAL CONDITION
JUNE 30, 2004

### *ASSETS*

| | |
|---|---:|
| CASH | $ 472,459 |
| RECEIVABLES FROM BROKER-DEALERS AND CLEARING ORGANIZATIONS | 1,167,872 |
| ACCOUNTS RECEIVABLE | 1,082,928 |
| INVESTMENT IN MARKETABLE SECURITIES | 18,236,152 |
| REPURCHASE AGREEMENT | 2,080,000 |
| PROPERTY AND EQUIPMENT, NET | 232,764 |
| INVESTMENTS CARRIED ON THE EQUITY METHOD | 1,095,644 |
| OTHER ASSETS | |
| Customer list | 2,274,014 |
| Due from related party | 810,615 |
| Due from shareholders | 390,004 |
| Prepaid | 236,142 |
| Other assets | 8,990 |
| | $ 28,087,584 |

### *LIABILITIES AND STOCKHOLDER'S EQUITY*

| | |
|---|---:|
| LIABILITIES | |
| Accounts payable and accrued expenses | $ 756,673 |
| Note payable due to acquisition (note 2) | 1,180,000 |
| Note payable capital calls (note 4) | 383,400 |
| Payable to broker-dealers and clearing organizations | 149,453 |
| Due to related parties | 757,372 |
| TOTAL LIABILITIES | 3,226,898 |
| MINORITY INTEREST | 211,084 |
| COMMITMENTS AND CONTINGENCIES | |
| STOCKHOLDER'S EQUITY | |
| Common stock, par value $1, authorized, issued and outstanding 50,000 shares | 50,000 |
| Paid-in-capital | 20,846,000 |
| Retained earnings | 834,556 |
| Accumulated other comprehensive income | 2,919,046 |
| TOTAL STOCKHOLDER'S EQUITY | 24,649,602 |
| | $ 28,087,584 |

The accompanying notes are an integral part of this consolidated financial statement.

**EXHIBIT B**

**GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)**

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 1.    *SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES*

### *Description of Business and Organization*

Global Finance Management Corporation and subsidiaries (the "Company"), a wholly-owned subsidiary of HH Securities Ltd., is a registered corporation in the British Virgin Islands. The Company has 100% ownership interest in Strategic Asset Management ("SAM"), a registered corporation in the British Virgin Islands and Global Fixed Income Advisors ("GFIA"). The Company also has 90% ownership interest in Global Securities Holdings, LLC ("GSH"). GSH, a Florida limited liability corporation, has three wholly owned subsidiaries, Global Strategic Investments, LLC ("GSI"), a broker dealer registered with the Securities and Exchange Commission (SEC), Global Securities Management, LLC, a Florida limited liability corporation and GSI Consultores Mexico, SA, a company registered in Mexico. In addition, GSH has a 50% ownership interest in Global Securities Advisors, LLC ("GSA"), an investment advisor.

GSI, a Florida limited liability corporation, membership in the National Association of Securities Dealers, Inc. (NASD) became effective June 6, 2002. It acts in an agency capacity, buying and selling securities for its customers, primarily within Latin America, and charging a commission.

GFIA, a corporation registered in the British Virgin Islands and the investment advisor of a fixed income offshore fund, Global Securities Fixed Income Fund ("Fund II"), that is related by common ownership. GFIA is responsible for monitoring the funds, investments, and it has full discretion to decide the investment securities to be purchased and sold by the fund consistent with the fund's investment objectives.

GSA is a Florida limited liability corporation formed on October 25, 2002. GSA is the investment advisor and general partner of The Global Securities Market Neutral Fund Segregated Portfolio, an offshore fund, ("Fund") which is related by common ownership. GSA is responsible for monitoring the Fund's investments and it has full discretion to decide the investment securities to be purchased and sold by the Fund consistent with the Fund's investment objectives. As of June 30, 2004, the assets under management of the Fund were approximately $50 million.

**EXHIBIT B**

**GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)**

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 1.    *SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)*

### Basis of Financial Reporting

The accompanying consolidated financial statement has been prepared in conformity with accounting principles generally accepted in the United States of America. The following is a summary of the significant accounting principles followed by the Company.

### Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its subsidiaries. Intercompany transactions and balances have been eliminated in consolidation.

### Government and Other Regulation

GSI's business is subject to significant regulation by various governmental agencies and self-regulatory organizations, including the SEC and the NASD. Such regulation includes, among other things, periodic examinations by these regulatory bodies to determine whether the Company is conducting and reporting its operations in accordance with the applicable requirements of these organizations.

### Cash and Cash Equivalents

The Company considers all highly liquid debt instruments having maturities of three months or less at the date of acquisition to be cash equivalents. The Company may, during the ordinary course of business, maintain account balances with banks in excess of federally insured limits.

### Concentration of Credit Risk

Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of cash deposits which at times are in excess of FDIC-insured limit, accounts receivable and investments. The Company generally limits its exposure regarding cash deposits by placing its deposits with quality financial institutions. The Company has approximately $20 million invested in the Fund. A decline in the market value of this investment could have a material effect in the Company's financial position.

**EXHIBIT B**

**GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)**

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 1.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Securities Transactions

Securities transactions, along with related commission income, clearing costs and commission expenses, are reported by GSI on a trade date basis.

### Investment Securities

Investment in marketable securities consist of shares of the Fund. The Company classifies its investment in marketable securities as available for sale.

Available-for-sale securities are recorded at fair value. Unrealized holdings gains or losses, net of the related tax effect, on available-for-sale securities are excluded from earnings and are reported as a separate component of other comprehensive income until realized. Realized gains and losses from the sale of securities are determined on a specific-identification basis.

A decline in the fair value of any available-for-sale securities below cost that is deemed other than temporary results in a reduction in carrying amount to fair value. The impairment is charged to earnings and a new cost basis for the security is established. Dividend and interest income are recognized when earned.

### Property and Equipment, Net

Property and equipment is recorded at cost. Expenditures for major betterments and additions are charged to the asset accounts while replacements, maintenance and repairs which do not improve or extend the lives of the respective assets are charged to expense currently.

Depreciation and amortization are computed using the straight-line method based upon estimated useful lives of five to seven years.

### Use of Estimates in the Preparation of Financial Statements

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**EXHIBIT B**

**GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)**

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 1.   *SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)*

### *Impairment of Long-Lived Assets*

The Company adopted Statement of Financial Accounting Standard ("SFAS") No. 144, Accounting for the Impairment or Disposal of Long-Term Assets. SFAS No. 144 provides a single accounting model for long-lived assets to be disposed of. SFAS No. 144 also changes the criteria for classifying an asset as held for sale; and broadens the scope of businesses to be disposed of that qualify for reporting as discontinued operations and changes the timing of recognizing losses on such operations.

### *Revenue Recognition of Fees*

Management and incentive fees are recorded as revenues when earned. Management fees are billed monthly, in arrears, based on 1.5% of the Fund's net asset value. Incentive fees are recognized, quarterly, at a rate of 20% of the Fund's new high net profits per share per series of shares for the then past quarter multiplied by the number of outstanding shares per series when performance has been completed and the fees have been earned.

### *Income Taxes*

The Company accounts for income taxes under the liability method, which provides that deferred tax assets and liabilities are recorded based on the difference between the tax bases of assets and liabilities and their carrying amounts for financial reporting purposes, referred to as "temporary differences."

Under this method, deferred taxes are adjusted for tax rate changes as they occur. Deferred income taxes arise from differences between the treatment for income tax purposes and for financial reporting purposes.

### *Other Assets*

The Company adopted the provision of Statement of Financial Accounting Standard No. 142, "Goodwill and Other Intangible Assets" ("SFAS No. 142"). SFAS No. 142 requires that goodwill and intangible assets not subject to amortization are tested annually for impairment, and are tested for impairment more frequently if events and circumstances indicate that the assets might be impaired. An impairment loss is recognized to the extent that the carrying amount exceeds the asset's fair value. Based on its most recent analysis, the Company believes that no impairment of its Customer List intangible asset exist as of June 30, 2004. (See Note 2)

**EXHIBIT B**

## GLOBAL FINANCE MANAGEMENT
## CORPORATION AND SUBSIDIARES
### (A Wholly-Owned Subsidiary of HH Securities Ltd.)

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

### NOTE 2.   ACQUISITIONS

On June 8, 2004, GSI acquired 50%, 49% and 51% of the outstanding common stock of First Capital Securities Corp. ("FCSC"), Capital Asesoria Internacional, S.A. de C.V. ("CAI") and Capital Asesoria Patrimonial, S.A. de C.V. ("CAP"), respectively.  The combined purchase price for the three companies was $2,495,290 including costs of approximately $245,000 directly associated with the acquisition.  The Company financed the acquisitions by paying approximately $70,000 and transferring shares of the Fund valued at approximately $1,000,000. The remaining balance in the amount of $1,180,000 plus accrued interest at prime plus 1% is payable in two installments of $350,000, plus accrued interest, on December 5, 2004 and $830,000, plus accrued interest in June, 2005. GSI accounted for the purchase of the three entities in accordance with the purchase method of accounting. The investment in these companies is recorded under the equity method of accounting. The excess of the purchase price over the recorded amount of the net assets purchased and liabilities assumed, was assigned to a customer list intangible asset, which is not subject to amortization. The value assigned to the customer list was approximately $2,274,000.  In accordance with the provisions of SFAS 142, the recorded amount of the customer list will be assessed for impairment on an annual basis.

### NOTE 3.   INVESTMENT SECURITIES AVAILABLE FOR SALE

As of June 30, 2004, the cost of the available for sales securities and the fair value were approximately $15,617,000 and $18,236,000, respectively. The gross unrealized holding gain was approximately $2,619,000 and is included in accumulated other comprehensive income in the consolidated statement of financial condition.

### NOTE 4.   INVESTMENTS

The Company invested $800,000 for a 31% partnership ownership interest in Vail, Colorado property ("Partnership"). The investment is recorded under the equity method. In addition, the Company is responsible for additional capital calls that may be made from time to time. As of June 30, 2004, there were additional capital calls in the amount of $383,400 made. The Company financed these amounts with the Partnership. The amounts due plus interest at 24% were due on September 1, 2004. Of this amount, $180,000 plus the accrued interest was paid on September 9, 2004.

**EXHIBIT B**

GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 5.   PROPERTY AND EQUIPMENT, NET

Property and equipment consisted of the following at June 30, 2004:

| | | |
|---|---|---:|
| Furniture and fixtures | $ | 61,270 |
| Leasehold improvements | | 67,594 |
| Office equipment | | 145,017 |
| | | 273,881 |
| Less accumulated depreciation and amortization | | (41,117) |
| | $ | 232,764 |

## NOTE 6.   NET CAPITAL REQUIREMENTS

GSI, as a registered broker-dealer, is subject to the Securities and Exchange Commission Uniform Net Capital Rule (Rule 15c3-1), which requires that GSI maintain "Net Capital" equal to the greater of $100,000 or 6 2/3% of "Aggregate Indebtedness", as defined, and requires that the ratio of aggregate indebtedness to net capital shall not exceed 15 to 1. At June 30, 2004, GSI's "Net Capital" was $500,493 and the "Required Net Capital" was $100,000. At June 30, 2004, GSI's ratio of "Aggregate Indebtedness" to "Net Capital" was 1.25 to 1.

## NOTE 7.   RISK CONCENTRATIONS

### Clearing and Depository Concentrations

The clearing and depository operations for GSI securities transactions are provided by Pershing Investments LLC and Bear Stearns Securities Corp. At June 30, 2004, the receivables from brokers included in the accompanying consolidated statement of financial condition are due from these brokers.

## NOTE 8.   INCOME TAXES

The Company and its subsidiaries file all appropriate U.S. state and federal income tax returns.

The Company has approximately $40,000 of Federal net operating loss carryforwards which expire in the year 2024. A valuation allowance was recorded to reduce the deferred tax asset that is expected to more likely than not be realized. This valuation allowance reflects management's assessment, based on available information, that it is more likely than not that the net deferred income tax asset will not be realized. The benefit of these net deferred income tax assets may be recognized when management believes it is more likely than not that the deferred income tax is realizable.

**EXHIBIT B**

**EXHIBIT B**

GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 9.    COMMITMENTS

### Leases

The Company is obligated under non-cancelable operating leases for office facilities and equipment through the year 2009. The Company has secured the office lease with a stand-by letter of credit for $40,000.

GSA leases its office facilities on a month-to-month basis. The lease calls for monthly rental payments of approximately $2,900.

Approximate future minimum payments under the non-cancelable operating leases and service contracts as of June 30, 2004 are as follows:

| | |
|---|---|
| 2005 | $    156,000 |
| 2006 | 161,000 |
| 2007 | 166,000 |
| 2008 | 171,000 |
| 2009 | 59,000 |
| | $    713,000 |

### Employment Contracts

GSA has employment contracts with two of its members who provide Fund manager services for minimum annual salaries of $240,000 collectively, subject to other incentives based on the Fund's increase in "assets under management".

## NOTE 10.    REPURCHASE AGREEMENT

On May 13, 2004, the Company participated in a repurchase agreement transaction. A transaction whereby the Servicio De Cesantia De La Policia Nacional Del Ecuador (the "Cesantia") lent $800,000 to Global Securities Asset Management Corp. ("GSAM"), a related party, collateralized by 1,780 shares of Global Securities Market Neutral Fund (the "Collateral") owned by the Company. The Cesantia acknowledges that upon the repayment of all principal and interest obligations by GSAM to the Cesantia related to this transaction, the Cesantia will release any claim to the Collateral and return it to the account of the Company. The Cesantia further acknowledges that it has not placed any claims or liens on the Collateral and all interest payments have been received and the transaction is in good standing.

**GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)**

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

**NOTE 10.   *REPURCHASE AGREEMENT (CONTINUED)***

As of June 30, 2004, the fair market value of this Collateral was approximately $2,080,000 and the unrealized gain, which is included in accumulated other comprehensive income, was approximately $300,000.

**NOTE 11.   *RELATED PARTY TRANSACTIONS***

GSAM, a British Virgin Islands Corporation, owned by common ownership by the shareholders of the Company, has a due from / due to the Company of $810,615 and $757,372, respectively, as of June 30, 2004. These amounts bear interest at a rate of 5% and are due within one year.

As of June 30, 2004, the total amount due to GSA from the Fund for management and incentive fees amounted to approximately $490,000.

GSA has trailer fee agreements with companies related by common ownership. The trailer fee paid out by GSA from the management fee charged to the Fund ranges from 0.5% to 0.75% and it is based on the current aggregate value of all investments in the Fund made by investors in compliance with the distribution relationship on the valuation date. As of June 30, 2004, the total amount due by GSA for trailer fees amounted to approximately $130,000.

As of June 30, 2004, GFIA has a receivable in the amount of $445,599 from the Fund II.

**NOTE 12.   *FINANCIAL INSTRUMENTS WITH OFF-BALANCE-SHEET RISK***

GSI enters into various transactions involving off-balance sheet financial instruments. These financial instruments include securities purchased and sold on a when-issued basis (when-issued securities). These financial instruments are used to meet the needs of customers and are subject to varying degrees of market and credit risk.

GSI's customer securities activities are provided to a diverse group of institutional, corporate and individual investors. In the normal course of business, the GSI's customer activities involve the execution, settlement, and financing of various customer securities transactions. These activities may expose GSI to off-balance-sheet risk in the event the customer or other broker is unable to fulfill its contracted obligations and GSI has to purchase or sell the financial instrument underlying the contract at a loss.

**EXHIBIT B**

## GLOBAL FINANCE MANAGEMENT
## CORPORATION AND SUBSIDIARES
### (A Wholly-Owned Subsidiary of HH Securities Ltd.)

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

### NOTE 12.   *FINANCIAL INSTRUMENTS WITH OFF-BALANCE-SHEET RISK (CONTINUED)*

GSI is engaged in various securities, trading and brokerage activities in which GSI counterparties primarily include broker/dealers, banks, other financial institutions and corporations. In the event counterparties do not fulfill their obligations GSI may be exposed to risk. The risk of default depends on the creditworthiness of the counterparty or issuer of the instrument. It is GSI's policy to review, as necessary, the credit standing of each counterparty.

In the normal course of business, GSA and GFIA encounter economic risk, mainly comprised of credit risk and market risk. Credit risk arises from the potential inability of counterparties to perform in accordance with the terms of the contract. GSA and GFIA generate management fees based on a percentage of assets under management and its incentive fees are based on the Funds' investment performance versus various market indicators as dictated by the management agreement. Large fluctuations in market prices of financial instruments could have a material adverse effect on the companies operations.

### NOTE 13.   *SUBSEQUENT EVENT*

On July 28, 2004, GSI exercised an option to purchase an additional 10% of the shares of capital of FCSC and CAP and an additional 11% of CAI for $540,251. In addition, on August 2, 2004, GSI contributed as additional capital, $24,453 and $215,606 to FCSC and to CAI respectively, in response to a capital call.

**EXHIBIT B**

DEC. 10. 2004 (FRI) 19:34

# The Global Securities Market Neutral Fund

c/o Dundee Leeds Management Services (Cayman) Ltd.
George Town
GRAND CAYMAN, CAYMAN ISLANDS, B.W.I.

December 10, 2004

Citivic Nominees Limited

London EC4Y 0PA
United Kingdom

| Post It® Fax Note | 7671 | Date 12/10 | # of pages ▶ |
|---|---|---|---|
| To | | From | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # | |
| Fax # 305 | | Fax # | |

Attention:  Citivic Nominees Limited
Facsimile #:

The following exhibit is an unaudited statement of changes in your shareholder account
for the month ended  October 31, 2004.
If you have questions on this information, please feel free to contact us at shareholderservices@dundeeleeds.bm.

### STATEMENT OF CHANGES IN NET ASSET VALUE & SHARES

For the Month Ended October 31, 2004

CITIVIC NOMINEES LIMITED - Class A Series 1

| | Shares | | Dollars | |
|---|---|---|---|---|
| | Month | Year | Month | Year |
| At beginning of period | 18,721.0000 | | $ 23,284,543.29 | $ 0.00 |
| Shareholder's contributions | | 18,721.0000 | $ 0.00 | $ 18,721,000.00 |
| Shareholder's transfers | | | $ 0.00 | $ 0.00 |
| Shareholder's withdrawals | | | $ 0.00 | $ 0.00 |
| Net income | | | $ 1,815.94 | $ 4,565,359.22 |
| At October 31, 2004 | 18,721.0000 | 18,721.0000 | $ 23,286,359.22 | $ 23,286,359.22 |
| Net asset value per share | | | $ 1,243.8630 | $ 1,243.8630 |
| % change in net asset value per share | | | 0.01% | 8.45% |

Prepared by

**DUNDEE
LEEDS**

Dundee Leeds Management Services (Cayman) Ltd.

TOTAL P. 01

**EXHIBIT B**

# Exhibit VI
## *Income

# *Note:   we have not included income in
## the asset total

**EXHIBIT B**



*Jose I. Padial, P.A.*
Certified Public Accountant & Consultant

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT

Gustavo Hernandez
Miami, Florida

I have compiled the accompanying Summary of Income of Gustavo Hernandez for the years 2002, 2003 and 2004 in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

My compilation is limited to presenting information that is the representation of the individuals whose financial statement is presented. I have not audited or reviewed the accompanying financial statement, and accordingly, do not express an opinion or any other form of assurance on them.

This financial statement is presented in accordance with the requirements of a prescribed form which differs from generally accepted accounting principles. Accordingly, this financial statement is not designed for those who are not informed about such differences.

December 16, 2004

**EXHIBIT B**

**EXHIBIT B**

Gustavo Hernandez

Summary of Income

For the Years 2002, 2003 and 2004

| | | 2004 | | 2003 | | 2002 |
|---|---|---|---|---|---|---|
| Salary | $ | 168,000 | $ | 150,000 | $ | 145,000 |
| Dividends | | 850,000 | | 790,000 | | 683,000 |
| Interests | | 98,400 | | 91,500 | | 94,700 |
| Total | $ | 1,116,400 | $ | 1,031,500 | $ | 922,700 |

**EXHIBIT B**

**EXHIBIT B**

# (iii) Tax Returns – Letter from CPA

**EXHIBIT B**

miami, florida 33133

305 ▮
305 ▮

www.kaufmanrossin.com

December 9, 2004

Board of Directors
3 Gramercy Park West
New York, NY 10003

Ref: Purchase of Parlor by Mr. Gustavo Hernandez
Purchaser: 3 Gramercy Park West Property LLC

To Whom It May Concern:

We are the accountants for Mr. Hernandez.   Mr. Hernandez has given us authorization to correspond with you regarding 2003 tax year.

Please be advised that Form 4868, Application for Automatic Extension of Time To File U.S. Individual Income Tax Return and Form 2688, Application for Additional Extension of Time To File U.S. Individual Income Tax Return were filed on behalf of Mr. Hernandez.



**KAUFMAN
ROSSIN &
CO.** PROFESSIONAL
ASSOCIATION
CERTIFIED PUBLIC ACCOUNTANTS

The additional extension of time was requested because Mr. Hernandez was expecting additional tax information.  As soon as the additional information is received, we will be in a position to accurately complete Mr. Hernandez's Form 1040, U.S. Individual Income Tax Return for 2003.

With respect to Mr. Hernandez's 2002 U.S. Individual Income Tax Return, please note that he was considered a nonresident alien for purposes of U.S. income taxation.  Since he was not present in the U.S. for 183 days or more (weighted–average over three years), and did not possess a Green-Card (permanent lawful status in the U.S.) he is treated as a nonresident alien for 2002.  Moreover, given that Mr. Hernandez did not earn any U.S. source income nor had a business in the U.S., he was not required to file a U.S. Nonresident Income Tax Return – Form 1040NR for the year ended December 31, 2002.

Should you have any questions, please contact us.

Very truly yours,

Jorge De Cardenas
Manager
Kaufman, Rossin & Co.

cc:     Gustavo Hernandez
         I▮▮▮ E▮▮▮▮

f:\cl\08077000\2003\gco\ltr re 2003 tax return in process.doc

**EXHIBIT B**

**EXHIBIT B**

| Form **1040** | | U.S. Individual Income Tax Return | **2003** | (99) | | IRS Use Only - Do not write or staple in this space. | |
|---|---|---|---|---|---|---|---|

For the year Jan. 1-Dec. 31, 2003, or other tax year beginning ____, 2003, ending ____, 20 ____   OMB No. 1545-0074

**Label**
(See instructions on page 19.)
Use the IRS label. Otherwise, please print or type.

| Your first name and initial | Last name | Your social security number |
|---|---|---|
| GUSTAVO | HERNANDEZ | ▓▓▓▓▓▓ |
| If a joint return, spouse's first name and initial | Last name | Spouse's social security number |

Home address (number and street). If you have a P.O. box, see page 19.   Apt. no.

City, town or post office, state, and ZIP code. If you have a foreign address, see page 19.
MIAMI , FL   33127

▲ **Important!** ▲
You must enter your SSN(s) above.

**Presidential Election Campaign** (See page 19.)
Note. Checking "Yes" will not change your tax or reduce your refund.
Do you, or your spouse if filing a joint return, want $3 to go to this fund? ▶   You [ ] Yes [ ] No   Spouse [ ] Yes [ ] No

**Filing Status**
Check only one box.

1 [X] Single
2 [ ] Married filing jointly (even if only one had income)
3 [ ] Married filing separately. Enter spouse's SSN above and full name here. ▶
4 [ ] Head of household (with qualifying person). (See page 20.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 [ ] Qualifying widow(er) with dependent child. (See page 20.)

**Exemptions**

6a [X] Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a
b [ ] Spouse

No. of boxes checked on 6a and 6b   **1**

c Dependents:
| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see page 21) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

*DRAFT*

No. of children on 6c who:
● lived with you
● did not live with you due to divorce or separation (see page 21)

Dependents on 6c not entered above

If more than five dependents, see page 21.

d Total number of exemptions claimed   Add numbers on lines above ▶ **1**

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see page 22.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | | 7 | 131,955. |
|---|---|---|---|---|
| 8a | Taxable interest. Attach Schedule B if required | | 8a | |
| b | Tax-exempt interest. Do not include on line 8a | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required | | 9a | |
| b | Qualified dividends (see page 23) | 9b | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes | | 10 | |
| 11 | Alimony received | | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | | 12 | |
| 13a | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ [ ] | | 13a | |
| b | If box on 13a is checked, enter post-May 5 capital gain distributions | 13b | | |
| 14 | Other gains or (losses). Attach Form 4797 | | 14 | |
| 15a | IRA distributions | 15a | b Taxable amount (see page 25) | 15b | |
| 16a | Pensions and annuities | 16a | b Taxable amount (see page 25) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | | 17 | 35,000. |
| 18 | Farm income or (loss). Attach Schedule F | | 18 | |
| 19 | Unemployment compensation | | 19 | |
| 20a | Social security benefits | 20a | b Taxable amount (see page 27) | 20b | |
| 21 | Other income. List type and amount (see page 27) | | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | | 22 | 166,955. |

**Adjusted Gross Income**

| 23 | Educator expenses (see page 29) | 23 | | |
|---|---|---|---|---|
| 24 | IRA deduction (see page 29) | 24 | | |
| 25 | Student loan interest deduction (see page 31) | 25 | | |
| 26 | Tuition and fees deduction (see page 32) | 26 | | |
| 27 | Moving expenses. Attach Form 3903 | 27 | | |
| 28 | One-half of self-employment tax. Attach Schedule SE | 28 | | |
| 29 | Self-employed health insurance deduction (see page 33) | 29 | | |
| 30 | Self-employed SEP, SIMPLE, and qualified plans | 30 | | |
| 31 | Penalty on early withdrawal of savings | 31 | | |
| 32a | Alimony paid   b Recipient's SSN ▶ | 32a | | |
| 33 | Add lines 23 through 32a | | 33 | |
| 34 | Subtract line 33 from line 22. This is your **adjusted gross income** ▶ | | 34 | 166,955. |

310001
11-18-03

LHA   For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 77.   Form **1040** (2003)

**EXHIBIT B**

**EXHIBIT B**

| Form 1040 (2003) | GUSTAVO HERNANDEZ | | 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 | | Page 2 |
|---|---|---|---|---|---|

| Tax and Credits | 35 | Amount from line 34 (adjusted gross income) | | 35 | 166,955. |
|---|---|---|---|---|---|
| Standard Deduction for - | 36a | Check if: ☐ You were born before January 2, 1939, ☐ Blind. ☐ Spouse was born before January 2, 1939, ☐ Blind. Total boxes checked ▶ 36a | | | |
| ● People who checked any box on line 36a or 36b OT who can be claimed as a dependent. | b | If you are married filing separately and your spouse itemizes deductions, or you were a dual-status alien ▶ 36b ☐ | | | |
| | 37 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | | 37 | 4,750. |
| | 38 | Subtract line 37 from line 35 | | 38 | 162,205. |
| ● All others: Single, or Married filing separately, $4,750 | 39 | If line 35 is $104,625 or less, multiply $3,050 by the total number of exemptions claimed on line 6d. If line 35 is over $104,625, see the worksheet on page 35 | | 39 | 2,379. |
| Married filing jointly or Qualifying widow(er), $9,500 | 40 | Taxable income. Subtract line 39 from line 38. If line 39 is more than line 38, enter -0- | | 40 | 159,826. |
| | 41 | Tax. Check if any tax is from: a ☐ Form(s) 8814 b ☐ Form 4972 | | 41 | 40,314. |
| Head of household, $7,000 | 42 | Alternative minimum tax. Attach Form 6251 | | 42 | |
| | 43 | Add lines 41 and 42 ▶ | | 43 | 40,314. |
| | 44 | Foreign tax credit. Attach Form 1116 if required | 44 | | |
| | 45 | Credit for child and dependent care expenses. Attach Form 2441 | 45 | | |
| | 46 | Credit for the elderly or the disabled. Attach Schedule R | 46 | | |
| | 47 | Education credits. Attach Form 8863 | 47 | | |
| | 48 | Retirement savings contributions credit. Attach Form 8880 | 48 | | |
| | 49 | Child tax credit (see page 40) | 49 | | |
| | 50 | Adoption credit. Attach Form 8839 | 50 | | |
| | 51 | Credits from: a ☐ Form 8396 b ☐ Form 8859 | 51 | | |
| | 52 | Other credits. Check applicable box(es): a ☐ Form 3800 b ☐ Form 8801 c ☐ Specify | 52 | | |
| | 53 | Add lines 44 through 52. These are your total credits | | 53 | |
| | 54 | Subtract line 53 from line 43. If line 53 is more than line 43, enter -0- ▶ | | 54 | 40,314. |
| Other Taxes | 55 | Self-employment tax. Attach Schedule SE | | 55 | |
| | 56 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | | 56 | |
| | 57 | Tax on qualified plans, including IRAs, and other tax-favored accounts. Attach Form 5329 if required | | 57 | |
| | 58 | Advance earned income credit payments from Form(s) W-2 | | 58 | |
| | 59 | Household employment taxes. Attach Schedule H | | 59 | |
| | 60 | Add lines 54 through 59. This is your total tax ▶ | | 60 | 40,314. |
| Payments | 61 | Federal income tax withheld from Forms W-2 and 1099 | 61 | 28,664. | |
| If you have a qualifying child, attach Schedule EIC. | 62 | 2003 estimated tax payments and amount applied from 2002 return | 62 | | |
| | 63 | Earned income credit (EIC) | 63 | | |
| | 64 | Excess social security and tier 1 RRTA tax withheld (see page 56) STMT 3 | 64 | 3,449. | |
| | 65 | Additional child tax credit. Attach Form 8812 | 65 | | |
| | 66 | Amount paid with request for extension to file (see page 56) | 66 | 5,000. | |
| | 67 | Other payments from: a ☐ Form 2439 b ☐ Form 4136 c ☐ Form 8885 | 67 | | |
| | 68 | Add lines 61 through 67. These are your total payments ▶ | | 68 | 37,113. |
| Refund | 69 | If line 68 is more than line 60, subtract line 60 from line 68. This is the amount you overpaid | | 69 | |
| Direct deposit? See page 56 and fill in 70b, 70c, and 70d. | 70a | Amount of line 69 you want refunded to you ▶ | | 70a | |
| | b | Routing number ▶ c Type ☐ Checking ☐ Savings ▶ d Account number | | | |
| | 71 | Amount of line 69 you want applied to your 2004 estimated tax ▶ | 71 | | |
| Amount You Owe | 72 | Amount you owe. Subtract line 68 from line 60. For details on how to pay, see page 57 ▶ | | 72 | 3,321. |
| | 73 | Estimated tax penalty (see page 58) | 73 | 120. | |

| Third Party Designee | Do you want to allow another person to discuss this return with the IRS (see page 58)? ☒ Yes. Complete the following. ☐ No | | |
|---|---|---|---|
| | Designee's name ▶ PREPARER | Phone no. ▶ | Personal identification number (PIN) ▶ |

**Sign Here**
Joint return? See page 20. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | DRAFT | Date | Your occupation BROKER DEALER | Daytime phone number |
|---|---|---|---|---|
| Spouse's signature. If a joint return, both must sign. | | Date | Spouse's occupation | |

| Paid Preparer's Use Only | Preparer's signature ▶ | | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code | KAUFMAN, ROSSIN & CO., P.A. MIAMI, FLORIDA 33133 | | EIN | Phone no. ( 305 ) |

310002 12-12-03

**EXHIBIT B**

**EXHIBIT B**

Schedule E (Form 1040) 2009

Name(s) shown on return. Do not enter name and social security number if shown on page 1.

Attachment Sequence No. **13**

Page **2**

Your social security number

GUSTAVO    HERNANDEZ

**Part II**   **Income or Loss From Partnerships and S Corporations**  Note. If you report a loss from an at-risk activity for which any amount is not at risk, you must check column (e) on line 28 and attach Form 6198. See page E-1.

27   Are you reporting losses not allowed in prior years due to the at-risk or basis limitations, passive losses not reported on Form 8582, or unreimbursed partnership expenses? ....................................................... ☐ Yes   ☒ No

If you answered "Yes," see page E-5 before completing this section.

Caution: The IRS compares amounts reported on your tax return with amounts shown on Schedule(s) K-1.

| 28 | (a) Name | (b) Enter P for partnership; S for S corporation | (c) Check if foreign partnership | (d) Employer identification number | (e) Check if any amount is not at risk |
|---|---|---|---|---|---|
| A | GLOBAL   SECURITY   HOLDINGS,   LLC | P | | | |
| B | | | | | |
| C | | | | | |
| D | | | | | |

| | Passive Income and Loss | | | Nonpassive Income and Loss | |
|---|---|---|---|---|---|
| | (f) Passive loss allowed (attach Form 8582 if required) | (g) Passive income from Schedule K-1 | (h) Nonpassive loss from Schedule K-1 | (i) Section 179 expense deduction from Form 4562 | (j) Nonpassive income from Schedule K-1 |
| A | | 35,000. | | | |
| B | | | | | |
| C | | | | | |
| D | | | | | |
| 29a | Totals | 35,000. | | | |
| b | Totals | | | | |

| 30 | Add columns (g) and (j) of line 29a | | .30 | 35,000. |
|---|---|---|---|---|
| 31 | Add columns (f), (h), and (i) of line 29b | | 31 | ( ) |
| 32 | Total partnership and S corporation income or (loss). Combine lines 30 and 31. Enter the result here and include in the total on line 41 below | | 32 | 35,000. |

**Part III**   **Income or Loss From Estates and Trusts**

| 33 | (a) Name | (b) Employer identification number |
|---|---|---|
| A | | |
| B | | |

| | Passive Income and Loss | | Nonpassive Income and Loss | |
|---|---|---|---|---|
| | (c) Passive deduction or loss allowed (attach Form 8582 if required) | (d) Passive income from Schedule K-1 | (e) Deduction or loss from Schedule K-1 | (f) Other income from Schedule K-1 |
| A | | | | |
| B | | | | |
| 34a | Totals | | | |
| b | Totals | | | |

| 35 | Add columns (d) and (f) of line 34a | | 35 | |
|---|---|---|---|---|
| 36 | Add columns (c) and (e) of line 34b | | 36 | ( ) |
| 37 | Total estate and trust income or (loss). Combine lines 35 and 36. Enter the result here and include in the total on line 41 below | | 37 | |

**Part IV**   **Income or Loss From Real Estate Mortgage Investment Conduit (REMICs) – Residual Holder**

| 38 | (a) Name | (b) Employer identification number | (c) Excess inclusion from Schedules Q, line 2c | (d) Taxable income (net loss) from Schedules Q, line 1b | (e) Income from Schedules Q, line 3b |
|---|---|---|---|---|---|
| | | | | | |

| 39 | Combine columns (d) and (e) only. Enter the result here and include in the total on line 41 below | | 39 | |
|---|---|---|---|---|

**Part V**   **Summary**

| 40 | Net farm rental income or (loss) from Form 4835. Also, complete line 42 below | | 40 | |
|---|---|---|---|---|
| 41 | Total income or (loss). Combine lines 26, 32, 37, 39, and 40. Enter the result here and on Form 1040, line 17 ▶ | | 41 | 35,000. |
| 42 | Reconciliation of Farming and Fishing Income. Enter your gross farming and fishing income reported on Form 4835, line 7; Schedule K-1 (Form 1065), line 15b; Schedule K-1 (Form 1120S), line 23; and Schedule K-1 (Form 1041), line 14 (see page E-6) | 42 | | |
| 43 | Reconciliation for Real Estate Professionals. If you were a real estate professional, (see page E-1), enter the net income or (loss) you reported anywhere on Form 1040 from all rental real estate activities in which you materially participated under the passive activity loss rules | 43 | | |

321501
10-06-03

Schedule E (Form 1040) 2003

**EXHIBIT B**

**EXHIBIT B**

## 2003 Income from Passthroughs

GLOBAL SECURITY HOLDINGS, LLC

TYPE: PARTNERSHIP

ACTIVITY INFORMATION:

GLOBAL SECURITY HOLDINGS, LLC

OTHER PASSIVE ACTIVITY

| | |
|---|---|
| ORDINARY INCOME (LOSS) | 35,000 |
| SCHEDULE E ACTIVITY INCOME (LOSS) | 35,000 |

**EXHIBIT B**

**EXHIBIT B**

GUSTAVO  HERNANDEZ

---

| FORM 1040 | PERSONAL EXEMPTION WORKSHEET | STATEMENT 1 |
|---|---|---|

1.  IS THE AMOUNT ON FORM 1040, LINE 35, MORE THAN THE AMOUNT SHOWN ON LINE 4
    BELOW FOR YOUR FILING STATUS?
    NO.  STOP. MULTIPLY $3,050 BY THE TOTAL NUMBER OF EXEMPTIONS CLAIMED ON
         FORM 1040, LINE 6D, AND ENTER THE RESULT ON LINE 39.
    YES. GO TO LINE 2.

2.  MULTIPLY $3,050 BY THE TOTAL NUMBER OF EXEMPTIONS CLAIMED
    ON FORM 1040, LINE 6D . . . . . . . . . . . . . . . . . .            3,050.

3.  ENTER THE AMOUNT FROM FORM 1040, LINE 35 . .         166,955.

4.  ENTER THE AMOUNT FOR YOUR FILING STATUS  . .         139,500.
        MARRIED FILING SEPARATE        $104,625
        SINGLE                         $139,500
        HEAD OF HOUSEHOLD              $174,400
        MARRIED FILING JOINT OR WIDOW(ER)   $209,250

5.  SUBTRACT LINE 4 FROM LINE 3 . . . . . . . .          27,455.
    IF LINE 5 IS MORE THAN $122,500 ($61,250 IF
    MARRIED FILING SEPARATE) ENTER ZERO
    ON FORM 1040, LINE 39.

6.  DIVIDE LINE 5 BY $2,500 ($1,250 IF MFS)  . .              11.

7.  MULTIPLY LINE 6 BY 2% (.02) AND ENTER THE RESULT
    AS A DECIMAL . . . . . . . . . . . . . . . . .            0.22

8.  MULTIPLY LINE 2 BY LINE 7 . . . . . . . . . . . . . . . . .           671.

9.  SUBTRACT LINE 8 FROM LINE 2. TOTAL TO FORM 1040, LINE 39.           2,379.

---

| FORM 1040 | WAGES RECEIVED AND TAXES WITHHELD | STATEMENT 2 |
|---|---|---|

| T S EMPLOYER'S NAME | AMOUNT PAID | FEDERAL TAX WITHHELD | STATE TAX WITHHELD | CITY SDI TAX W/H | FICA TAX | MEDICARE TAX |
|---|---|---|---|---|---|---|
| GLOBAL SECURITIES ADVISORS LLC | 76,319. | 14,772. | | | 5,394. | 1,281. |
| GLOBAL SECURITIES ADVISORY CORP | 11,636. | 1,921. | | | 721. | 169. |
| GLOBAL SECURITY HOLDINGS LLC | 44,000. | 11,971. | | | 2,728. | 638. |
| TOTALS | 131,955. | 28,664. | | | 8,843. | 2,088. |

**EXHIBIT B**

GUSTAVO  HERNANDEZ

████████████

FORM 1040           EXCESS SOCIAL SECURITY TAX WORKSHEET           STATEMENT   3

|  | TAXPAYER | SPOUSE |
|---|---|---|
| 1. ADD ALL SOCIAL SECURITY TAX WITHHELD BUT NOT MORE THAN $5,394.00 FOR EACH EMPLOYER (THIS TAX SHOULD BE SHOWN IN BOX 4 OF YOUR W-2 FORMS). ENTER THE TOTAL HERE . . . . . . . . . . . . . . . . . . . . . | 8,843. | |
| 2. ENTER ANY UNCOLLECTED SOCIAL SECURITY TAX ON TIPS OR GROUP-TERM LIFE INSURANCE INCLUDED IN THE TOTAL ON FORM 1040, LINE 60 . . . . . . . . . . . . . . . . . | | |
| 3. ADD LINES 1 AND 2 . . . . . . . . . . . . . . . . | 8,843. | |
| 4. SOCIAL SECURITY TAX LIMIT  . . . . . . . . . . . . | 5,394. | |
| 5. SUBTRACT LINE 4 FROM LINE 3. EXCESS SOCIAL SECURITY TAX INCLUDED IN FORM 1040, LINE 64.  . . . . . . . . | 3,449. | |

**EXHIBIT B**

# Exhibit VII
# Liabilities, Car

**EXHIBIT B**

DEC. 16. 2004 (THU) 16:00

**Champion MOTORS**

PAGE. 2/2

POMPANO BEACH, FLORIDA 33064

VEHICLE PURCHASE CONTRACT

**AUDi**

| BUYER | CO-BUYER |
|---|---|
| GUSTAVO HERNANDEZ | ADDRESS |

| | | CITY | STATE | ZIP |
|---|---|---|---|---|
| MIAMI FL 33127 | ZIP | | | |

| COUNTY | | COUNTY | RES. PHONE | BUS. PHONE |
|---|---|---|---|---|
| DADE | | SOC. SEC. # | | D.O.B. |
| | 973 | DRIVER'S LICENSE # | | STATE |
| DRIVER'S LICENSE # | STATE | | | |

| STOCK #: 031217 | MILEAGE: 30 | MODEL #: TURBO COUPE | SALESMAN: |
|---|---|---|---|

| | YEAR | MAKE | MODEL | COLOR | INTERIOR | VEHICLE IDENTIFICATION NUMBER |
|---|---|---|---|---|---|---|
| ☑ NEW ☐ USED ☐ DEMO | 2003 | PORSCHE | TURBO COU | SILVER | | W P O A B 2 9 9 6 3 S 6 8 6 4 3 6 |

| INSURANCE CO. | | LIST PRICE OF VEHICLE | $ | 115000.00 |
|---|---|---|---|---|
| POLICY NO. | | FACTORY INSTALLED EQUIPMENT: | + | |
| AGENT | PHONE NO. | | + | |

**TRADE-IN INFORMATION**

| YEAR | MAKE | MODEL | COLOR |
|---|---|---|---|
| 2001 | PORSCHE | CPE | BLUE |

VEHICLE IDENTIFICATION NUMBER   WP0AA29911S620487

TAG NO.          MILEAGE

| TRADE ALLOW. | *55000.00 | TOTAL PRICE | | DEALER INSTALLED EQUIPMENT: |
|---|---|---|---|---|
| LESS PAYOFF | 21134.45 | TRADE ALLOW. | 55000.00 | |
| NET EQUITY | 33865.55 | TRADE DIFFERENCE | | |

**PAYOFF INFORMATION**

| LIEN HOLDER | |
|---|---|
| ADDRESS | |
| CITY | STATE | ZIP |
| PHONE NO. | ACCOUNT NO. |

| CONFIRMED AMOUNT $ | 21134.45 | GOOD TIL |
|---|---|---|
| VERIFIED TITLE | | |
| CONFORMING ☐ | NON-CONFORMING ☐ | |
| QUOTED BY | CONFIRMED BY | |

| TOTAL PRICE OF VEHICLE WITH OPTIONS | $ | 115000.00 |
|---|---|---|
| EXTENDED WARRANTY  YEARS _____ MILES _____ | + | N/A |
| FL. LAW-WASTE TIRE FEE | + | 5.00 |
| FL. LAW-ACID BATTERY FEE | + | 1.50 |
| TOTAL TAXABLE PRICE | $ | 115006.50 |
| SALES TAX | + | 3627.39 |
| TAG AND TITLE FEES | + | 103.10 |
| LUXURY EXCISE TAX | + | N/A |
| IMPACT FEE | + | |

Owing #44,121

**EXHIBIT B**

3

**EXHIBIT B**

# -3-
# Reference Letters

**EXHIBIT B**

### (i)　　3 Personal Letters



**EXHIBIT B**

███████████████

New York, NY 10022
Home Tel. No. (212) ██████████
Home e-mail: ████████████████

December 13, 2004

Board of Directors
3 Gramercy Park West
New York City, NY 10003

Dear Members of the Board:

It is with great pleasure that I write this recommendation letter for Gustavo Adolfo Hernandez. I have known him for four years. What started as a business client relationship grew to a dear personal friendship and, subsequently, to a new business partnership that we formed two and a half years ago.

During our two-and-a-half year partnership, our business has grown successfully albeit not without its share of growing pains. Every step of the way, Gustavo has been a tireless worker, a steady and relentless leader, a loyal friend, a savvy businessman and a reliable partner. His word is his bond. On every transaction, that I have been directly or indirectly involved, Gustavo has always followed through and performed impeccably.

Personally, I have had occasion to get to know Gustavo and his family very well. When in Cartagena, my family and I always stay with Gustavo in his family home with his parents, brother and sisters. When in New York City, Gustavo stays with me and my family. My wife and my three young daughters so enjoy Gustavo. He is the most pleasant and quiet guest we have ever had. He works almost all the time or reads quietly in his room. My daughters adore him and love to play with him and read with him. He is always fun, courteous, polite and patient. I notice that he finds a way to play with them in a creative and educational way. Gustavo is very generous and thoughtful. He is always bringing gifts to my wife and children. He is extremely appreciative of our hospitality as it has allowed him to look carefully for his Manhattan home. He has told us how much he is looking forward to the possibility of living at #3 Gramercy Park West. Listening to him, my wife and children became a bit sad and told him how much they will miss his company and presence in our household. Gustavo is family to us now and vice versa. In Columbia when we visit with his family we feel very much at home. Gustavo's family is very sophisticated and cosmopolitan. They have all been highly educated at American, French and local Universities. They are all very cultured, well read individuals who are extremely well versed in history and international relations. Gustavo has an impressive collection of Latin American Contemporary Art as well as books and furniture.

**EXHIBIT B**

**EXHIBIT B**

He is a bon vivant , a wine aficionado and a person who appreciates fine cuisine and sharing it with friends.

It is a pleasure for me to act as a reference for Gustavo. His character, work ethic, business principles and moral values that I have got to know in him over the years make this a very easy task for me.

For further questions regarding Gustavo I shall be at your disposal any time and unreserved through telephone, ████████████ or e-mail, ████████ @gsadvisors.net

Sincerely,

███████████████

**EXHIBIT B**

**EXHIBIT B**

New York, NY 10128
December 10, 2004

Board of Directors
3 Gramercy Park West
New York, NY 10003

Ref: Purchase of Parlor Floor by Mr. Gustavo Hernandez, Purchaser; 3 Gramercy Park West Property LLC

Dear Madame/Sir:

It is with great pleasure that I write this recommendation letter for Gustavo Adolfo Hernandez. I have known him 3 years.

Gustavo has always displayed a high degree of integrity, responsibility, and ambition. He is definitely a leader rather than a follower. In addition to his well rounded personality he has proven his loyalty and friendship throughout the years.

He is also a most dependable friend. His good judgment and outlook on life ensure a logical and practical approach to his endeavors.

It has been a true blessing having had the opportunity to have Gustavo as a friend, and I am happy to have been to give this opportunity to express wholehearted to be able to comment on a friend such as Gustavo.

If you would like additional information about Gustavo please feel free to contact me directly at 212-

Sincerely,

**EXHIBIT B**

**EXHIBIT B**



**REAL ESTATE COMPANY**
*Private Equity & Development*

Board of Directors
3 Gramercy Park West
New York, NY 10003

Dear Members of the Board:

I, ███████████████ have known Mr. Gustavo Hernandez for over 11 years. Moreover, over time I have had the pleasure to meet his parents, brother, sisters, nieces and nephews. During that time both personal and professional time has been spent in the company of Gustavo Hernandez.

Gustavo is the rare combination of a multifaceted academic character with the ambition required for a financial executive. He is reliable, responsible and loyal; always to be counted upon if one is in need. In today's world of shallow two dimensional individuals; Gustavo is as comfortable speaking about the nuances of Italian Opera or Egon Schiele as he is structuring complex financial derivatives. Gustavo is also a very loyal family man; who travels to spend at least one weekend a month –religiously- with his father no matter what his financial or social commitment might be. Gustavo is a lover or poetry, modern art, philosophy, politics, jogging and the financial markets.

Gustavo's business career is as interesting as his personal elements and as successful as one could wish to be. His company based in Greenwich, CT has excellent managers and many of his clients are people whom I respect and who more importantly continue to enjoy conducting capitalist affairs with his firm.

I would recommend Gustavo Hernandez to your board for approval without question. He is a solid gentleman in every respect.

Yours truly,

New York, New York 10024

**EXHIBIT B**

Miami FL 33131

**EXHIBIT B**

## (ii)　　**3 Business Letters**



**EXHIBIT B**

**EXHIBIT B**



December 1st 2004

Dear Mrs. Barbara Evans-Butler
Stribling and Associates
924 Madison Av
New York, NY.

Re: Mr. Gustavo Hernandez
     Global Securities Asset Management

This letter serves to confirm that Mr. Hernandez's Firm, Global Securities Asset Management, has been a valued customer and friend of our institution for the past 5 years. GSAM has maintained significant six figure deposits with ▮▮▮▮▮ since inception and has always conducted its financial affairs in a very satisfactory manner.

Our Firm has always enjoyed an outstanding relationship with Mr. Hernandez and his Firm and we anticipate this relationship to continue.

Please feel free to contact me at any time to confirm my friendship and the highest respect towards Mr.Hernandez and his family. My friendship with his family dates back to 1998.

Best regards,

Miami, Fl
(305) ▮▮▮▮



MIAMI , FLORIDA 33131

**EXHIBIT B**

**EXHIBIT B**



miami, florida 33133

305
305

www.kaufmanrossin.com

December 1, 2004

Board of 3 Gramercy Park West
3 Gramercy Park West
New York, NY 10003

Re: Acquisition of Parlor (Second) Floor

To Whom It May Concern:

I have known Gustavo Adolfo Hernandez-Frieri for over four years, both professionally and personally. My accounting firm has been working with his companies for over four years. His companies have been excellent clients of the firm and we look forward to serving them and their business interests for many years to come.

During the time I have worked with Mr. Hernandez-Frieri, he has shown very high professional standards, extensive knowledge of the matters he get involved with, and has conducted his affairs with the utmost integrity.

If you have any questions, please feel free to contact me.

Very truly yours,

**KAUFMAN
ROSSIN
CO.** PROFESSIONAL
ASSOCIATION
CERTIFIED PUBLIC ACCOUNTANTS

Jorge De Cardenas
Kaufman, Rossin & Co.

cc: Ms. Barbara Evans-Butler - Stribling & Associates

s:\08077000,2004,gco,reference ltr board 3 gramercy park.dot

**EXHIBIT B**
MIAMI ■ FT LAUDERDALE ■ BOCA RATON

**EXHIBIT B**



# GLOBAL SECURITIES ADVISORS, LLC

December 10, 2004

Board of Directors
3 Gramercy Park West
New York, NY 10003

Dear Members of the Board:

I am pleased to provide this letter of recommendation for Gustavo Adolfo Hernandez. I have known Gustavo for 6 years on both a personal and a professional level.

Gustavo and I are partners in Global Securities Advisors, an investment management firm that we started two and a half years ago. Our activities are focused on managing our flagship product – a fixed-income arbitrage hedge fund. I have found working with Gustavo a thoroughly satisfying experience; he has sharp business acumen, a resolutely ethical approach to management issues, and a tireless work ethic. Under his stewardship, the investment advisor has grown by leaps and bounds. In just 2 short years, Gustavo has tripled the investment advisor's assets under management, and has worked diligently to ensure that the firm runs on a sound operational platform. He has developed a strong relationship for our firm with leading institutional investors and in the process has ensured that that our client base is both solid and diversified.

On a personal level, Gustavo has many diverse cultural interests, and is one of the most well-rounded individuals I have met. More importantly, Gustavo has consistently displayed loyalty and friendship throughout the years. He is a most dependable friend, and his good judgment and outlook on life ensure a logical and practical approach to his endeavors.

It has been a true blessing to have had the opportunity to have Gustavo as a partner and friend, and I am happy to have been given this opportunity to express unreserved support for him.

Sincerely,

Co-Managing Partner
Global Securities Advisors, LLC

**EXHIBIT B**

### (iii)   **Landlord Letter**

Parlor Floor
3 Gramercy Park West

**EXHIBIT B**

**EXHIBIT B**

Miami, FL 33127

December 9, 2004

Board of Directors
3 Gramercy Park West
New York, NY 10003

**Re: Purchase of Parlor Floor by Mr. Gustavo Hernandez, Purchaser: 3 Gramercy Park
West Property, LLC**

To Whom It May Concern:

I am writing this letter in reference to Mr. Gustavo Hernandez who has been a tenant of mine at
in Miami, FL for over 3 years. Mr. Hernandez has been nothing but a
pleasure to have, as he takes great care of both his apartment and the building. His rental payment
history is immaculate, always on time and in full. I would highly recommend Mr. Hernandez for
your building as he has been a wonderful tenant in mine.

In the event of any additional questions please feel free to call me at 305

Sincerely,

**EXHIBIT B**

**EXHIBIT B**

4

**EXHIBIT B**

**EXHIBIT B**

-4-

## Letter from Attorney regarding purchase as 3 Gramercy Park West Property LLC

**EXHIBIT B**

**EXHIBIT B**

# RICHARDS & POLANSKY

A PROFESSIONAL ASSOCIATION

ATTORNEYS AT LAW

GRAND BAY PLAZA

2665 SOUTH BAYSHORE DRIVE

SUITE 703

MIAMI, FLORIDA 33133

TELEPHONE: 305-858-9900

TELECOPIER: 305-285-0015

E-MAIL: rpa@richards-polansky.com

http://www.richards-polansky.com

**VIA COURIER**
Board of Directors
Gramercy Park West
Gramercy, NY 10003

Re: Purchase of Parlor Floor by Mr. Gustavo A. Hernandez Frieri ("Purchaser")

Dear Members of the Board of Directors:

Please be advised that I represent the Purchaser. As the Purchaser's legal advisor, I am recommending that he purchase and hold the condominium located at 3 Gramercy Park West (the "Condominium") through a limited liability company, 3 Gramercy Park West Property LLC, for asset protection purposes. By holding the Condominium through a limited liability company of which the Purchaser is the beneficial owner, the Purchaser may protect his other assets from potential lawsuits filed by any contractors working on his property; any visitors injured on his property or from any other third party lawsuits related to the Condominium.

Should you have any further questions regarding the foregoing matter, please do not hesitate to contact me.

Sincerely,

Andrea Darling de Cortés, Esq.

**EXHIBIT B**

INTEGRATED ADVISORY GROUP IAG INTERNATIONAL®

An association of independent professional firms

**EXHIBIT B**

5

**EXHIBIT B**

**EXHIBIT B**

# -5-
# Global Securities Documents -
# Annexes Referred to in Personal Letter

**EXHIBIT B**

**EXHIBIT B**

### (i)    Organization Chart

Parlor Floor
3 Gramercy Park West



**EXHIBIT B**

**EXHIBIT B**

# (ii) NASD Membership Certification

**EXHIBIT B**

# GLOBAL STRATEGIC INVESTMENTS, LLC

MEMBER NASD AND SIPC

---

FULLY DISCLOSED CLEARING AGREEMENT

OF

PERSHING LLC

THIS AGREEMENT is made and entered into this ᵇᵗʰ day of JANUARY, 200 4 by and between the Pershing LLC ("Pershing"), a Limited Liability Company, and Global Strategic Investments ("Broker"), a Limited Liability Company Corporation.

## 1.0 APPROVAL

This Agreement shall be subject to approval by the New York Stock Exchange, Inc. ("NYSE") and by any other self-regulatory organization vested with the authority to review or approve it. Pershing shall submit this Agreement to the NYSE and Broker shall submit the Agreement to any other such organization from which Broker is required to obtain approval. In the event of disapproval, the parties shall bargain in good faith to achieve the requisite approval.

## 2.0 AGREEMENT

From the date of this Agreement until the termination of this Agreement as provided in Paragraph 22 hereof, Pershing shall carry the proprietary accounts of Broker and the cash and margin accounts of the customers of Broker introduced by Broker to Pershing, and accepted by Pershing, and shall clear transactions on a fully disclosed basis for such accounts, in the manner and to the extent set forth in this Agreement.

## 3.0 ALLOCATION OF RESPONSIBILITY

### 3.1 Responsibilities of the Parties.

Pursuant to NYSE Rule 382, responsibility for compliance with applicable laws, rules, and regulations of the Securities and Exchange Commission ("SEC"), the National Association of Securities Dealers, Inc. ("NASD"), the NYSE, and any other regulatory or self-regulatory agency or organization (collectively the "Rules") shall be allocated between Pershing and Broker as set forth in this Agreement. To the extent that a particular function is allocated to one party under this Agreement, the other party shall supply that party with information in its possession pertinent to the performance and supervision of that function.

### 3.2 Relationship with Customers.

Except as provided in Paragraph 27.11 of this Agreement, all customers receiving services pursuant to this Agreement shall remain customers of Broker. Pershing shall provide services under this Agreement to Broker only to the extent explicitly required by specific provisions contained in this Agreement and shall not be responsible for any duties or obligations not specifically allocated to Pershing pursuant to this Agreement. Broker shall enter into appropriate contractual arrangements with customers on its own behalf, and such agreements shall make Broker, and not Pershing, responsible to customers for the provision of services. Broker shall not be deemed to be an agent of Pershing for any purpose, nor

◆ MIAMI, FL 33131

**EXHIBIT B**

instructs Pershing to provide access to information concerning options contracts, it has obtained a written agreement in which the customer agrees that he or she: (1) shall receive options information solely for such person's own use; (2) shall not retransmit or otherwise furnish options information to any other person; (3) shall acknowledge that options information is and shall remain the property of the respective exchange or other market on which a reported transaction took place or a reported quotation was entered; and (4) shall acknowledge that; (i) neither the Options Price Reporting Authority (OPRA), OPRA's processor, nor any OPRA Participant guarantees the

timeliness, sequence, accuracy, or completeness of any options last sale price, quotation information, or other market information provided by OPRA; (ii) neither OPRA, OPRA's processor nor any OPRA Participant shall be liable in any way to such customer, broker or any other person for any loss, damages, cost, or expense which may arise from any failure of performance by OPRA, OPRA's processor, or any OPRA Participant, or from any delays, inaccuracies, errors in or omissions of, any Options Information, or in the transmission or delivery thereof, whether or not due to any negligent act or omission on the part of OPRA, OPRA's processor or any OPRA Participant; and (iii) in no event shall OPRA, OPRA's processor or any OPRA Participant be liable for any incidental, special, indirect, or consequential damages, including but not limited to, lost profits, trading losses, or damages resulting from inconvenience, or loss of use of the Service. Such written agreement shall state that it is for the express benefit of OPRA, OPRA's processor, and each OPRA Participant. In addition, Broker, on its own behalf, acknowledges its understanding of OPRA's responsibilities under this Paragraph 28.6. In addition, Broker agrees that it shall maintain and preserve for at least three years sufficient records to identify the names and addresses of its customers to whom it is authorized to provide the Service, together with copies of all customer agreements and billing records. At the request of OPRA, Broker agrees to permit representatives of OPRA to have access to such records, and to provide to OPRA any information that OPRA may reasonably request concerning its customers. Broker further acknowledges that its acknowledgments and agreements as stated above should are for the express benefit of OPRA, OPRA's processor, and each OPRA participant.

28.7    Receipt of Information from Third-Parties and Reality Online Inc. In providing the Systems and Software Products, Broker may allow access to information to its customers or itself, which information has been licensed to Pershing by a third-party, including without limitation Reality Online Inc. Broker acknowledges that it has read and executed the agreement attached hereto as Exhibit A – Reuters Services – NetExchange ClientTM Agreement and thereby has the right to distribute the information provided by Reality Online Inc.

IN WITNESS WHEREOF the parties have hereto affixed their hands and seals by their duly authorized officers on the day and date first above written.

   This Agreement contains a pre-dispute arbitration clause in Paragraph 26. Broker acknowledges receiving a copy of this Agreement.

   BROKER: GLOBAL STRATEGIC INVESTMENTS

   By: _____

   Title: _____ PRESIDENT

   PERSHING LLC

   By: _____

   Title: MANAGING DIRECTOR

# (iii) SEC Registration Certification

**EXHIBIT B**

# GLOBAL STRATEGIC INVESTMENTS, LLC

MEMBER NASD AND SIPC

---

Document Title                                                    Page 1 of 1

⌐File for:                                              Data Current as of: 05/18/2004
CRD# 117028
GLOBAL STRATEGIC INVESTMENTS, LLC

## ADDRESS/GENERAL INFORMATION

This section provides the brokerage firm's name, CRD number, SEC number, Applicant Name on Form BD, NASD District where the brokerage firm is located, and the brokerage firm's main and mailing addresses.

| | |
|---|---|
| **NASD Member Firm** | GLOBAL STRATEGIC INVESTMENTS, LLC |
| **CRD Number** | 117028 |
| **SEC Number** | 8-053580 |
| **Applicant Name on Form BD** | GLOBAL STRATEGIC INVESTMENTS, LLC |
| **Business Phone Number** | 305▮ |
| **Main Office** | Located in NASD District: 7-Atlanta |
| **Main Office Address** | ▮▮▮▮▮▮▮ MIAMI, FL 33131 |
| **Mailing Address** | ▮▮▮▮▮▮▮ MIAMI, FL 33131 |

**EXHIBIT B** ◆ MIAMI, FL 33131

**EXHIBIT B**

 **GLOBAL STRATEGIC INVESTMENTS,** LLC

MEMBER NASD AND SIPC

## Organization Registration Status

| Organization CRD#: 117028 | Organization Name: GLOBAL STRATEGIC INVESTMENTS, LLC |
|---|---|
| Organization SEC#: 8-53580 | Applicant Name: GLOBAL STRATEGIC INVESTMENTS, LLC |
| No IA Record | |

| SEC / SRO / Jurisdiction | Registration Status | Status Effective Date |
|---|---|---|
| SEC | Approved  - | 06/06/2002 |
| NASD | Approved  - | 06/06/2002 |
| FL | Approved  - | 06/11/2002 |
| NY | Approved  - | 09/17/2002 |

◆ MIAMI, FL 33131