```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                         MIAMI DIVISION
                     CASE NO. 18-CR-20685-KMW-5
3

4   UNITED STATES OF AMERICA,              Miami, Florida

5                                          February 18, 2021
             vs.
6                                          9:42 a.m. - 4:32 p.m.

7   GUSTAVO ADOLFO HERNANDEZ FRIERI,

8            Defendant.                     Pages 1 to 107

9   _____

10    TRANSCRIPT OF PRE-SENTENCING HEARING ON FINANCIAL MATTERS
                     VIA VIDEOCONFERENCE
11           BEFORE THE HONORABLE EDWIN G. TORRES
                UNITED STATES MAGISTRATE JUDGE
12
    APPEARANCES:
13

14  FOR THE GOVERNMENT:        KURT K. LUNKENHEIMER
                               NALINA SOMBUNTHAM
15                             ASSISTANT UNITED STATES ATTORNEYS
                               UNITED STATES ATTORNEY'S OFFICE
16                             99 NE 4th Street
                               Miami, Florida 33132
17
                               PAUL A. HAYDEN
18                             ASSISTANT UNITED STATES ATTORNEY
                               UNITED STATES DEPARTMENT OF JUSTICE
19                             Criminal Division - Fraud Section
                               1400 New York Avenue NW
20                             Washington, D.C. 20005

21  STENOGRAPHICALLY REPORTED BY:

22                             ILONA LUPOWITZ, CRR, RPR, RMR
                               Official Court Reporter
23                             United States District Court
                               400 North Miami Avenue
24                             8th Floor
                               Miami, Florida 33128
25                             (305) 523-5634
```

```
1   (Appearances continued.)

2   FOR THE DEFENDANT:        MICHAEL S. PASANO, ESQ.
                              CARLTON, FIELDS, JORDEN & BURT, P.A.
3                             100 SE 2nd Street Suite 4000
                              Miami, Florida 33131
4
                              HOWARD SREBNICK
5                             BLACK SREBNICK KORNSPAN & STUMPF
                              210 S. Biscayne Boulevard, Suite
6                             1300
                              Miami, Florida 33131
7

8   FOR THE WITNESS, ALLISON  SAMUEL J. RABIN, JR., ESQ.
    DOMENEGHETTI:             800 Brickell Avenue
9                             Suite 140
                              Miami, Florida 33131
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Call to the Order of the Court at 9:42 a.m.)

 2         THE COURTROOM DEPUTY:  United States District Court for

 3    the Southern District of Florida is now in session; the

 4    Honorable Edwin G. Torres presiding.

 5         Calling case, United States versus Gustavo Adolfo

 6    Hernandez Frieri; case number, 18-20685, criminal, Judge

 7    Williams.

 8         Counsel, please state your appearances, starting with

 9    the government.

10         MR. LUNKENHEIMER:  Good morning, Your Honor.  Kurt

11    Lunkenheimer on behalf of the United States, and with me, via

12    Zoom, is fellow AUSA, Nalina Sonbuntham, and DOJ trial

13    attorney, Paul Hayden.

14         MR. RABIN:  Good morning, Your Honor.  Sam Rabin on

15    behalf of the witness, Allison Domeneghetti.

16         MR. PASANO:  Good morning, Your Honor.  Michael Pasano

17    and Howard Srebnick on behalf of defendant, Gustavo Hernandez.

18         THE COURT:  Good morning.

19         Anybody else making an appearance?

20         Okay.  Good morning, everybody.  This is a continuation

21    of the process we started a couple of weeks ago.

22         Mr. Lunkenheimer, I will first turn to you:  Anything

23    happen in the interim that we should put on the record, or any

24    stipulations that you all have made?

25         MR. LUNKENHEIMER:  Well, Your Honor, I guess the only
```

```
 1    thing would be, one, we did contemplate recalling Olympia De
 2    Castro, but her counsel, who is on the Zoom, Margot Moss and I,
 3    we had discussions, and they provided us with an affidavit that
 4    will suffice.  So we had subpoenaed her, but we are not -- we
 5    are excusing her, so we do not need to recall her now.
 6              THE COURT:  Okay.
 7              MR. LUNKENHEIMER:  And, second, we would like to --
 8    similar to the last hearing, for this witness, Ms. Allison
 9    Domeneghetti, move into evidence the exhibits that I filed last
10    night, 22 to 35, which also include 22-1, 22-2 and 22-3.  I
11    don't -- I forgot to check with Mr. Pasano, but, I assume, for
12    the purposes of this hearing, there won't be an objection.
13              MR. PASANO:  And that's correct.  Given the purpose of
14    this hearing, no objection to the submission of those exhibits.
15              THE COURT:  All right.  Those exhibits -- those
16    exhibits, then, will be made part of the hearing record and
17    exhibits for that purpose only.
18         (Government Exhibits 22 through 35 were received in
19         evidence.)
20              THE COURT:  Okay.  So at this point, Mr. Lunkenheimer,
21    you wish to call Ms. Domeneghetti?
22              MR. LUNKENHEIMER:  Yes, she would be the only witness
23    for today, Your Honor.
24              THE COURT:  Okay.
25              MR. LUNKENHEIMER:  And that would conclude this
```

1    hearing.  We don't plan on calling any other witnesses.

2            THE COURT:  Very well.

3            MR. PASANO:  Your Honor, if I can just -- I apologize.

4            THE COURT:  Go ahead.

5            MR. PASANO:  Once Ms. Domeneghetti has testified -- and

6    I don't anticipate any questions, or, if there are, very few

7    questions of her -- we are likely going to submit one or more

8    affidavits or documents into the record -- probably tomorrow,

9    not today -- so I wanted to let the Court know that.  And I'll

10   identify those, if the Court allows me, at the end of her

11   testimony.

12           THE COURT:  All right.  We'll do that.

13           Okay.  Let's call the witness then.

14           MR. LUNKENHEIMER:  Your Honor, the United States calls

15   Ms. Allison Domeneghetti.

16           THE COURTROOM DEPUTY:  Please raise your right hand.

17           (Government witness, ALLISON DOMENEGHETTI, duly sworn.)

18           THE COURTROOM DEPUTY:  Please state and spell your last

19   name, for the record.

20           THE WITNESS:  Allison Domeneghetti, A-L-L-I-S-O-N,

21   D-O-M-E-N-E-G-H-E-T-T-I.

22           THE COURTROOM DEPUTY:  Thank you.

23           MR. LUNKENHEIMER:  May I proceed, Your Honor?

24           THE COURT:  Go ahead, Mr. Lunkenheimer.

25                        DIRECT EXAMINATION

```
 1    BY MR. LUNKENHEIMER:
 2    Q.   Ms. Domeneghetti, nice to meet you.
 3         Am I saying it right?  Is it -- is there an extra E sound
 4    in there?
 5    A.   Domeneghetti, Domeneghetti.
 6    Q.   Well, I apologize if I mispronounce it during the course of
 7    the hearing.
 8    A.   It's okay.
 9    Q.   I should know better, since my name gets mispronounced all
10    the time.
11         Where do you live?
12    A.   I live in Scarsdale, New York.
13    Q.   And are you currently employed?
14    A.   I am, yes.
15    Q.   And where are you employed?
16    A.   I am an independent contractor for a company called
17    Balthazar Rex, and they're a spirits division.
18    Q.   And how long have you worked there?
19    A.   Since this past -- late summer, early fall.
20    Q.   And how did you obtain your -- your position with Balthazar
21    -- was it Rex?
22    A.   Balthazar Rex, yes.
23    Q.   Okay.  How did you obtain that position?
24    A.   The founder is an old friend, and, in my previous work, we
25    -- I helped him launch his prior brand, which he subsequently
```

```
 1   sold, and when he started this business, he reached out to me
 2   and asked if I would join him.
 3   Q.   And where did you work prior to Balthazar Rex?
 4   A.   I worked at Domaine Select Wine & Spirits.
 5   Q.   Okay.  Did you ever work at a place called Bhakta Spirits?
 6   A.   Bhakta Spirits, yes.
 7        MR. LUNKENHEIMER:  I'm sorry.  For the court reporter,
 8   B-H-A-K-T-A.
 9        THE WITNESS:  Yes.  So Bhakta Spirits is -- is a
10   division of Balthazar Rex, so, it's essentially the same thing.
11   BY MR. LUNKENHEIMER:
12   Q.   And did Olympia De Castro ever work at Bhakta Spirits?
13   A.   Olympia De Castro has been serving as the CFO of the -- of
14   the entity.
15   Q.   When you say "serving," is she doing that for pay, or is
16   she doing that voluntarily?
17   A.   I believe she's getting paid.
18   Q.   Okay.  And, if you know, how long has she been employed by
19   Bhakta Spirits as CFO?
20   A.   I don't know, exactly.
21   Q.   Okay.  And if you know, can you describe what her position
22   as CFO -- what she does as a CFO for Bhakta Spirits?
23   A.   I -- I can't describe the detail of her job description.  I
24   haven't seen a list of her job responsibilities other than
25   seeing her referred to as the CFO.
```

1    Q.   Did the defendant, Gustavo Hernandez Frieri, ever work at

2    Bhakta Spirits?

3    A.   I -- not that I'm aware of; not at Bhakta Spirits, no.

4    Q.   All right.  Do you know if he ever provided any guidance to

5    any of the owners of Bhakta Spirits or -- informally?

6    A.   Could you be more specific?

7    Q.   Well, did he have any say in how Bhakta Spirits was run, as

8    far as you know?

9    A.   Not as far -- not as far as I know.

10   Q.   Are you familiar with Cesar Hernandez Frieri?

11   A.   I believe that's Gustavo's brother.

12   Q.   Do you know if he is involved in the operation of Bhakta

13   Spirits in any way?

14   A.   I do not know.

15   Q.   Are you familiar with an individual named Scott Smith?

16   A.   No.

17   Q.   You don't know if he's ever been employed by Bhakta

18   Spirits?

19   A.   I don't.  The name sounds familiar, but I honestly don't

20   know.

21   Q.   Okay.  Assuming from the answers to my prior questions, you

22   are -- are you familiar with Gustavo Hernandez Frieri?

23   A.   Yes.

24   Q.   And I'm sorry, I forgot.  Who is the owner of Balthazar Rex

25   and, I guess, Bhakta Spirits?

1   A.   The owner is Raj Bhakta.

2   Q.   And do you know if Raj Bhakta was ever in business, prior,

3   with Gustavo Hernandez Frieri?

4   A.   I do not know.

5   Q.   Was he ever in -- prior to Bhakta Spirits, was he ever in

6   business with Olympia De Castro, prior?

7   A.   I do not know.

8   Q.   Going back to Mr. Hernandez Frieri, when did you first meet

9   Mr. Hernandez Frieri?

10  A.   We first met, probably almost 15 years.  Olympia and

11  Gustavo came to my house for dinner one night.

12  Q.   So you met Gustavo Hernandez Frieri and Olympia De Castro

13  at the same time?

14  A.   Yes.

15  Q.   Who introduced you?

16  A.   We were introduced by a very dear friend.  His name was

17  Juan Ernesto Hernandez.

18  Q.   And how would you describe your relationship with either

19  one of them, or both of them, over the past 15 years?

20  A.   We've been extremely close family friends, almost like

21  family.  We refer to each other as family.  They used to live

22  in New York.  We saw each other regularly and still kept in

23  close touch and saw each other after they moved to Florida.

24  Q.   And have you ever worked with Olympia De Castro outside of

25  her work for Bhakta Spirits?

1    A.   No.

2    Q.   Have you ever worked with Mr. Hernandez Frieri?

3    A.   I've worked with him in the capacity of my previous job.

4    Q.   And what was your previous job?

5    A.   At Domaine Select Wine & Spirits.

6    Q.   And what was his title, at that time, with Domaine Select

7    Wine & Spirits?

8    A.   Well, he was not officially an employee of the company.  He

9    was a member of the board of directors, and one of the

10   partners, so we had contact in that capacity.

11   Q.   And what was your title, or job title, with Domaine Select

12   Wine & Spirits?

13   A.   I was the president of the wholesale division.

14   Q.   And what were your duties and responsibilities as president

15   of the wholesale division?

16   A.   I was responsible for recruiting and running the sales

17   teams in the markets where we had wholesale operations.

18   Q.   Do you know how Ms. De Castro came to be employed by Bhakta

19   Spirits?

20   A.   I do not.

21   Q.   Or Balthazar Rex?

22   A.   I -- I don't know.

23   Q.   And when is the last time you talked to

24   Mr. Hernandez Frieri?

25   A.   We speak on the phone, from time to time, and exchange

1   messages, from time to time.  I don't remember exactly when was

2   the last date.

3   Q.  Well, since you've been served with a subpoena to this

4   hearing, have you talked to him, via text or phone?

5   A.  I don't recall.

6   Q.  And when is the last time you talked to Ms. Olympia De

7   Castro?

8   A.  Yesterday.

9   Q.  What did you talk to her about?

10  A.  We were on a work call together, and I spoke to her to

11  confirm an Attorney Advocates of America ID number for -- for

12  the Trust account because I had to open a new bank account.

13  Q.  When you say the "Trust account," what Trust account are

14  you talking to -- about, sorry.

15  A.  Yes, I'm referring to the D.C. 2019 Irrevocable Trust.

16  Q.  Okay.  And we'll discuss that in a little bit.

17      After you were served with your subpoena to testify here,

18  at this hearing, have you talked -- I guess, have you talked

19  with Ms. De Castro about the hearing itself?

20  A.  I have not spoken to her about the hearing itself, no.

21  Q.  And you were asked to provide documents in response to that

22  subpoena -- which you did, so, we thank you -- but did you have

23  any conversations with anyone in order to gather those

24  documents?

25  A.  Not --

1          MR. RABIN:  Excuse me.  Just -- objection, just for

2    clarification.

3          Other than her lawyer, you mean, correct?

4    BY MR. LUNKENHEIMER:

5    Q.  Yes.  I'm not asking if you were talking to your lawyer,

6    Mr. Rabin.

7          MR. RABIN:  Okay.  I just wanted to make that clear.

8          THE WITNESS:  Then, no, I have not.

9    BY MR. LUNKENHEIMER:

10   Q.  Okay.  And just before I forget to ask, why are you opening

11   a new bank account for D.C. 2019 Irrevocable Trust?

12   A.  I have been asked by the manager at the Chase account to

13   move the funds, that Chase would no longer be able to service

14   the account.

15   Q.  Do you know why they would no longer be able to service the

16   account?

17   A.  They did not say.

18   Q.  So where is the new bank account?

19   A.  T.D. Bank.

20   Q.  Okay.  When did you first become aware of Mr. Hernandez

21   Frieri's arrest on the criminal charges that he's pled guilty

22   to?

23   A.  Well, I was with him at the time that he was arrested, so I

24   was pretty much immediately aware.

25   Q.  Okay.  And after he was arrested, did you have any

1  conversations with him about his arrest?

2  A.  Yes.

3  Q.  Can you describe what he discussed in those conversations?

4  A.  Well, I don't remember specifically.  As I said, we've kept

5  in touch regularly, over the course of the last 15 years, so,

6  you know, it was obviously something that came up from time to

7  time.

8  Q.  Well, after his arrest, which you witnessed, did you ever

9  become aware that his assets may be subject to financial

10  penalties, or forfeiture, if he was convicted?

11 A.  Not specifically, no.

12 Q.  What about generally?

13 A.  Other than my general knowledge, no.

14 Q.  Okay.  And after his arrest, did you have any discussions

15 with Mr. Hernandez Frieri about any of his marital assets or

16 property?

17 A.  No.

18 Q.  Sorry.  Was that a no?

19 A.  No.

20 Q.  And were you shocked by Mr. Hernandez's arrest in Italy?

21 A.  Absolutely shocked.

22 Q.  After Mr. Hernandez Frieri's arrest in Italy, did you have

23 any conversations with Ms. De Castro about that arrest?

24 A.  Yes.

25 Q.  And did you discuss with her the charges against

```
 1   Mr. Hernandez Frieri?
 2   A.   Yes.
 3   Q.   And what, generally, did you discuss with her about them?
 4   A.   I don't remember specifically.  She was very distraught and
 5   upset, so, you know, I was there to support her as a friend.
 6   Q.   And with Ms. De Castro, did you have any conversations with
 7   her about her marital property with Mr. Hernandez Frieri after
 8   the arrest?
 9   A.   No.
10   Q.   But you were -- you were aware that they owned, I guess, a
11   co-op unit in New York City, New York?
12   A.   I -- I am aware of that property, yes.
13   Q.   Well, have you been in it prior --
14   A.   Yes.
15   Q.   I'm sorry?
16   A.   Yes.
17   Q.   How many times?
18   A.   Multiple times.
19   Q.   Over 20?
20        MR. RABIN:  Mr. Lunkenheimer, can I just ask for a
21   clarification?  I think there's more than one property in New
22   York.  If you can just, for the record, make clear which one
23   you're talking about.
24        MR. LUNKENHEIMER:  I'm referring first to the 3
25   Gramercy Park West co-op, unit number two.
```

```
 1   BY MR. LUNKENHEIMER:
 2   Q.  Ms. Domeneghetti, how many times have you been to that
 3   property?
 4   A.  I -- I don't remember exactly how many times, but it was
 5   many times.
 6   Q.  Okay.  And there is another property in New York City, 13
 7   -- sorry -- it's actually in Brooklyn, New York.
 8       314 Hicks, have you ever been to that property?
 9   A.  I've been to the outside of that property, yes.
10   Q.  And when was that?
11   A.  That was late last year.
12   Q.  Were you accompanied by anyone?
13   A.  I was with my husband at the time.
14   Q.  And what's the -- your -- name of your husband?
15   A.  Paolo Domeneghetti.
16   Q.  And you are also aware that Mr. Hernandez Frieri and
17   Ms. De Castro own a property in Florida, you said?
18       MR. PASANO:  I'm sorry.  Your Honor, the assertion of
19   ownership is obviously -- it's something the government's
20   pursuing, but the statement to the witness that, is she aware
21   that these people owned property, when they made it clear that
22   the property's owned either in a trust or otherwise, I think is
23   improper.  I'm trying not to say anything, but I can't stay
24   silent on that.
25       MR. LUNKENHEIMER:  I can rephrase it.
```

1          THE COURT:  Overruled.  The question is not improper.

2     If the witness doesn't know, the witness can say so, and the

3     witness can also ask the attorney to clarify anything that

4     she's unsure about as well.

5          With that clarification, I'll overrule the objection.

6     BY MR. LUNKENHEIMER:

7     Q.   Ms. Domeneghetti, are you familiar with a property in

8     Florida at 597 Hibiscus Lane?

9     A.   Yes.

10    Q.   And how are you familiar with it?

11    A.   It has been the residence of Olympia and Gustavo and their

12    children.

13    Q.   And were you aware of when that property was purchased?

14    A.   Could you be more specific?

15    Q.   Well, did you learn that Mr. Hernandez Frieri and/or

16    Olympia De Castro bought that property?

17    A.   I don't -- I don't know how the property was purchased, in

18    the sense of who had title to it, but I'm aware that they moved

19    to Florida; they moved into that house and have been living

20    there ever since.

21    Q.   And despite that you're like family with these people, you

22    didn't ask them how they bought it or where the money came

23    from?

24    A.   No, I didn't.

25    Q.   Well, also, they maintain ownership of -- or someone

1   maintained ownership of -- that apartment, or condo, in New

2   York, at 3 Gramercy Park West, right?

3   A.   I'm sorry.  Could you repeat the question?

4   Q.   Well, when they moved to Florida, at 519 -- 597 Hibiscus

5   Lane, you understand that they also maintained -- or someone

6   maintained -- ownership of the 3 Gramercy Park West, Unit 2,

7   co-op, correct?

8   A.   Yes, I'm aware of that.

9   Q.   So it never came up, despite how close you are, that these

10   individuals maintained possession of two very expensive

11   properties, one in New York and one in Florida?

12   A.   No, it never -- it never came up.

13   Q.   Okay.

14   A.   I know a lot of people that have multiple residences, so it

15   didn't seem unusual to me.

16   Q.   Do you know when 597 Hibiscus Lane was purchased?

17   A.   No, I don't know exactly when that was purchased.

18   Q.   Do you have a rough time frame?

19   A.   No, I really don't.

20   Q.   Would it be before or after Mr. Hernandez Frieri's arrest?

21   A.   It was well before that.

22   Q.   And just going back to the co-op unit at 3 Gramercy Park

23   West, from all your visits there, who did you think owned that

24   property during your visits?

25   A.   I never thought about who owned the property.

```
 1    Q.   Well, did they live there together prior or -- sorry.

 2         Well, did they live there together prior to their marriage,

 3    Mr. Hernandez Frieri and Ms. De Castro's marriage?

 4    A.   Yes, they did.

 5    Q.   Do you know if Mr. Hernandez Frieri ever lived there alone

 6    prior to their marriage?

 7    A.   I don't know.  I didn't know them, individually, before

 8    they were together.

 9    Q.   Well, before they got married, do you know if Ms. De Castro

10    ever resided in another property in the New York City area?

11    A.   Not that I'm aware of.

12    Q.   Okay.  And as to 597 Hibiscus Lane, who did you think owned

13    that property from your time visiting there?

14    A.   I assumed that they owned the property, but I didn't know,

15    specifically, if they personally owned it, if an entity owned

16    it, and I -- I didn't ask, so I -- I don't know.

17    Q.   From your time visiting both those properties, are you

18    aware of any valuable artwork that was kept in them?

19    A.   No, I'm not aware of valuable artwork that was kept in the

20    houses.

21    Q.   But you are knowledgeable in the field of fine arts, right?

22    A.   Yes.

23    Q.   Okay.  So you would know if they -- I assume -- and correct

24    me if I'm wrong -- you would know if they owned a valuable

25    piece of art in either the New York co-op property or the
```

1    Florida property that we've been discussing.

2    A.   Not necessarily, no.

3    Q.   So you wouldn't be able to recognize a valuable piece of

4    art, as a fine-arts expert, as opposed to not?

5    A.   Well, I'm flattered, but I wouldn't define myself as an

6    expert.  I have knowledge of art, but in very specific

7    categories, so, outside of that, it would be difficult for me

8    to, you know, make any estimation on value.

9    Q.   Do you know if they collected any fine art?

10   A.   Yes, they did collect fine art.

11   Q.   Can you -- can you tell us some of the artists from which

12   art they collected -- of whose art they had collected?

13   A.   No.

14   Q.   Are you familiar with the name Kai Althoff, A-L-T-H-O-F-F?

15   First name, K-A-I.

16   A.   I'm only familiar with it in the context of seeing the name

17   from the sale of -- of one of his pieces -- or her pieces.  I'm

18   actually not sure if it's a male or female artist.

19   Q.   And do you know who sold that piece that you're describing

20   to us?

21   A.   Well, the piece was -- to my knowledge, it was owned as

22   part of a trust that was then gifted -- the proceeds were

23   gifted to the D.C. 2019 Irrevocable Trust.

24   Q.   And which trust, I guess, owned that property -- that

25   piece, if you know, or who gets --

1    A.   It was called --

2    Q.   Sorry.

3    A.   It was called the H.H. Trust.

4    Q.   Okay.  And we'll get into that in a little bit.

5         And I forget if I asked you this, but, after Mr. Hernandez

6    Frieri's arrest -- and you may have answered this -- did you

7    have any discussions with Ms. De Castro about the marital

8    property and how it would be split up, or what to do with it,

9    or any property that they owned together?

10   A.   No, I did not.

11   Q.   Did there come a point in time that you became aware that

12   Mr. Hernandez Frieri and Ms. De Castro were heading towards

13   divorce?

14   A.   Yes, I was aware.

15   Q.   And can you tell us when that was, approximately?

16   A.   Well, I believe their divorce happened about a year ago.  I

17   think it was January or February of 2019 -- of 20 -- I'm sorry

18   -- of 2020.

19   Q.   Okay.  Did you become aware of that divorce, or that it was

20   happening, prior to that, February of 2020?

21   A.   Yes, yes.

22   Q.   How much prior to that?

23   A.   I don't remember exactly.

24   Q.   And do you recall having discussions with Ms. De Castro

25   about the decision to make -- to have -- to divorce her husband

1    at the time, Mr. Hernandez Frieri?

2    A.   Yes, we had discussions.

3    Q.   Did any of those discussions resolve the need to have her

4    maintain some of the marital property or to keep the property?

5    A.   No, they did not.

6    Q.   What, in general, did you discuss with Ms. De Castro about

7    the pending divorce?

8    A.   Well, again, I was there to support her as a friend.  I

9    know that she had been genuinely injured and was, you know,

10   obviously impacted by that, and she felt that divorce was,

11   unfortunately, you know, the only way for her to, you know,

12   exist practically.

13   Q.   When you say, "exist practically," what do you mean?

14   A.   Yeah.  Well, I think she -- you know, aside from the

15   emotional distress, she lost her job.  She was shunned by her

16   friends, and, you know, I think she genuinely needed to, you

17   know, separate herself from, you know, what she could.

18   Q.   When you say she lost her job, which job did she lose?

19   A.   She worked for a firm that was based in San Francisco.  I

20   don't recall the name.

21   Q.   And was she also -- do you know if she was self-employed at

22   the time?

23   A.   I don't know.

24   Q.   Okay.  But she told you that she lost her job from the San

25   Francisco firm?

1   A.   Yes.

2   Q.   Okay.  And when she was discussing the pending divorce with

3   you, did she express any concerns about how she was going to

4   maintain or get income since she had lost her job?

5   A.   I'm sorry.  Could you repeat the question?

6   Q.   While she was discussing the pending divorce with you, did

7   she express any concerns or ideas about how she would get an

8   income, since she had lost her job, if she divorced

9   Mr. Hernandez Frieri?

10  A.   Yes.  So I know that she was actively seeking employment

11  and felt confident that, you know, forging a new path ahead,

12  that she was able to secure employment and provide for her

13  children.

14  Q.   And during those discussions, did she ever discuss with you

15  the -- I guess, the marital settlement that her and Gustavo

16  Hernandez Frieri were entering into?

17  A.   No, she did not.

18  Q.   Did they ever -- did she ever discuss with you the division

19  of the marital assets in that settlement?

20  A.   No, she did not.

21  Q.   Did she ever discuss with you, as the divorce was pending,

22  any gifts that may be coming from Mr. Hernandez Frieri's

23  family?

24  A.   No, she did not.

25  Q.   But I think you said previously, you are aware of gifts to

1    a trust that she controlled.

2    A.   I'm sorry.  Could you be more specific?

3    Q.   You are aware that Ms. De Castro has opened some trusts

4    that you are a part of, correct?

5    A.   Yes, one trust.

6    Q.   Okay.  So there's only one trust.

7    A.   Yes.

8    Q.   And that --

9    A.   That I'm aware of, yes, that I'm the trustee of, yes.

10   Q.   And that's the D.C. 2019 Irrevocable Trust?

11   A.   Correct.

12   Q.   Okay.  I ask about the one trust because I've seen the name

13   referred to as just the D.C. Trust, so -- I want to make sure

14   if there's not more trusts that you're aware of, so that's why

15   I'm asking.

16   A.   There's just one trust, and, improperly, I abbreviate it

17   sometimes.

18   Q.   Okay.  But you are aware of gifts to that trust, correct?

19   A.   Correct.

20   Q.   Do you know where those gifts came from?  You might have

21   said it was just the H.H. Trust earlier.

22   A.   Yes, that is correct.

23   Q.   Did all gifts to the D.C. 2019 Trust come from the H.H.

24   Trust, as far as you know?

25   A.   Yes, as far as I know.

1   Q.   And you never had any discussions with Ms. De Castro about

2   those gifts?

3   A.   Well, she advised me that they were being gifted, so I was

4   aware in advance that the gifts were being given to the trust,

5   to the D.C. 2019 Irrevocable Trust, yes.

6   Q.   Do you know who controlled the H.H. Trust?

7   A.   My understanding is that Maria Hernandez was or is

8   controlling that trust.

9   Q.   And do you know if Ms. Maria Hernandez has any relationship

10  to Mr. Hernandez Frieri or Ms. De Castro?

11  A.   Yes, she's the sister of Gustavo Hernandez and

12  sister-in-law of Olympia.

13  Q.   Okay.  So the sister-in-law of Mr. Hernandez Frieri is in

14  control of H.H. Trust, which was gifting -- making gifts to the

15  D.C. 2019 Trust.

16  A.   I'm sorry.  Could you repeat the question?

17  Q.   I just want to make sure I have it right.

18       As far as you know, the H.H. Trust, which is controlled by

19  Maria Hernandez, was gifting things to the D.C. 2019 Trust; is

20  that correct?

21  A.   As far as I know, yes.

22  Q.   And were those gifts made while there were discussions

23  about a divorce happening between Mr. Hernandez Frieri and

24  Ms. De Castro?

25  A.   No, not as far as I know.

1    Q.   Okay.  You are aware that Ms. De Castro spent -- with her

2    children, spent two months with Mr. Hernandez Frieri while he

3    was on house arrest in Italy, right?

4    A.   I am aware that they spent time in Italy with him.  I don't

5    recall exactly how long they were there.

6    Q.   And as a friend of Ms. De Castro, did you know that she was

7    going to discuss a potential divorce with him during that trip

8    or one of those trips?

9    A.   She did not share that with me, no.

10   Q.   When she returned from a trip to Italy to visit her then

11   husband on house arrest, did she share with you she was going

12   to divorce Mr. Hernandez Frieri?

13   A.   I don't remember when she shared that information with me.

14   Q.   Okay.  And when Mr. Hernandez Frieri's sister-in-law was

15   gifting these things, these items or properties to the D.C.

16   2019 Trust, this was after his arrest, right?

17   A.   Well, yes, because the D.C. 2019 Irrevocable Trust was

18   formed in 2019, yes.

19   Q.   Okay.  And you never asked Ms. De Castro why, after

20   Mr. Hernandez Frieri's arrest, his sister would be gifting

21   these things to the D.C. 2019 Trust?

22   A.   I never asked because she had explained to me that -- that

23   H.H. Trust was formed for the benefit of the grandchildren,

24   Olympia's children, so it didn't seem unusual to me that those

25   gifts would be made to their benefit.

1    Q.   Even after Mr. Hernandez Frieri's arrest for money

2    laundering?

3    A.   Well, yes, that didn't change the -- the nature of that

4    trust.

5    Q.   Okay, but -- we'll get into it, but these gifts were --

6    would you say that they're sizeable gifts?

7    A.   I mean, I -- I don't know how to qualify a sizeable gift.

8    I mean, it's -- it depends on the context, I suppose.

9    Q.   So you don't think that, I guess, the proceeds from the

10   sale of artwork for $997,000 is a sizeable gift?

11   A.   I don't know.  As -- you know, as you alluded to before, I,

12   you know, have experience in certain areas of fine art, and

13   I've seen paintings sold for, you know, 20 or $30,000,000, so,

14   it just depends on the context, I think.

15   Q.   And you don't think that transfer of a property worth

16   approximately 5.5 million is a sizeable gift?

17   A.   I -- I suppose that you could qualify it as a sizeable

18   gift, sure.

19   Q.   Okay.  If the -- if you know, if the H.H. Trust was for the

20   benefit of the grandchildren, why did a new trust have to be

21   created, the D.C. 2019 Trust?

22   A.   Well, I don't have the details of the H.H. Trust in terms

23   of specifically who the beneficiaries are, if there are other

24   grandchildren involved.  I really don't know anything about it

25   in terms of that detail, so -- you know, my understanding, when

```
 1    Olympia created the D.C. 2019, was for the benefit,
 2    specifically, of her three children.
 3    Q.   Even though the H.H. Trust was also benefiting them or --
 4    from what you've been told.
 5    A.   Potentially, yes.
 6    Q.   Okay.  I just want to backtrack.  And we'll get into some
 7    of the documents concerning this trust in a bit, but do you
 8    know where Ms. De Castro lives now?
 9    A.   She lives on Hibiscus Drive, in Miami.
10    Q.   Do you know where -- if she plans to move anywhere after
11    her husband goes to jail or the school year ends?
12    A.   She had told me that she was planning on moving to New
13    York.  I don't know, given the current situation of COVID, if
14    that process will be slowed down at all.
15    Q.   When she informed you she was looking to move to New York,
16    would that be to 314 Hicks, in Brooklyn, New York?
17    A.   Yes.  May I -- I'm sorry.  Can I clarify that?
18    Q.   Of course.
19    A.   Yeah.  So that property is a rental property right now, so
20    assuming that they would be able to afford to live there, yes.
21    Otherwise, she would find alternate housing.
22    Q.   Okay.  And that property is, roughly, five -- worth roughly
23    5.9 million dollars?
24    A.   Well, that was the purchase price, yes.  I don't know what
25    its value is today.
```

```
 1  Q.   Okay.  And you're familiar that Ms. De Castro has a work
 2  website, correct?
 3  A.   I'm sorry.  A work website?
 4  Q.   Well, she has a website in her name, Olympia De Castro, I
 5  think, dot com.
 6       Are you familiar with that?
 7  A.   No, I'm not.
 8  Q.   So it would surprise you that such a website would say that
 9  she actually lives in New York City right now?
10  A.   I am not familiar with that website.  I've never seen it.
11  Q.   Are you familiar with the internet app., LinkedIn?
12  A.   Yes.
13  Q.   Are you friends with Ms. De Castro on LinkedIn?
14  A.   I don't know, to be honest with you.
15  Q.   Okay.  Would it surprise you that her LinkedIn profile says
16  that she lives in Brooklyn, New York, right now?
17  A.   I don't know.
18  Q.   You don't know that it would say that, or, you don't know
19  if it would surprise you?
20  A.   I don't know if it would surprise me.  I mean, now it
21  wouldn't surprise me because I know -- you just told me that it
22  says that, if it does, but I don't know if it would have
23  surprised me.
24  Q.   And how many discussions did you have with Ms. De Castro
25  about potentially moving to New York City in the future?
```

1    A.   Many conversations.

2    Q.   Were any of those conversations around the time that 314

3    Hicks was being purchased?

4    A.   Yes.

5    Q.   So there was discussion -- just to clarify, there was

6    discussion between the two of you that 314 Hicks was being

7    purchased as a potential place where she could live when she

8    moved to New York City area?

9    A.   Potentially, yes, and a couple of those conversations also

10   were with the -- the Trust attorney, you know, to ensure that

11   it could be done in a compliant way.

12   Q.   Without telling me about the discussions, who is the Trust

13   attorney?

14   A.   I don't remember the name of the firm right now.

15   Q.   Is it a firm located in Tampa, Florida?

16   A.   Yes.

17   Q.   Do you know how that firm became or was retained to be the

18   Trust attorney?

19   A.   No, I don't.

20   Q.   So you don't know if it was a prior firm that worked for

21   Mr. Hernandez Frieri in some of his business dealings?

22   A.   Olympia said that she had a relationship with the firm and

23   Tate, who is one of the attorneys that was drafting some of the

24   documents.

25   Q.   Did she describe how that -- how she had that relationship,

1    whether it was between -- from her only, or, from her husband

2    -- or ex-husband?

3    A.   She did not describe that.

4    Q.   You are a trustee of D.C. 2019 Trust; is that correct?

5    A.   Yes, the D.C. 2019 Irrevocable Trust, yes.

6    Q.   I mean, I guess -- whenever -- I guess -- I don't want us

7    to say the long name every time, so is it okay --

8    A.   Yeah.

9    Q.   -- if I refer to it as the D.C. 2019 Trust, with the

10   understanding that it's the irrevocable trust that we're

11   talking about?

12   A.   Yes.

13   Q.   As trustee, did you have any say in which attorney to hire?

14   A.   No, I don't -- I didn't ask to be involved with that, and

15   the Trust formation, from my understanding, was already

16   underway.

17   Q.   Okay.  And -- one second.  We're going to come back to the

18   Trust, but I just want to dive into Domaine Select Wine &

19   Spirits, if I may.

20   A.   Okay.

21   Q.   You told us about -- were you an owner of that company at

22   some point in time?

23   A.   I was one of the partners, yes.

24   Q.   But when you say "partner," I guess, for the lay person,

25   would that also be owner?

1    A.   Yeah, right.  Yes, I had equity in the business at one

2    point in time.

3    Q.   Did you share that equity with your husband?

4    A.   Yes.

5    Q.   Okay.  And can you just remind me, what was your role with

6    that company?

7    A.   Sure.  I was the president of the wholesale division.

8    Q.   Okay.  And equity owner.

9    A.   Yes.

10   Q.   And did your husband have a role in the company?

11   A.   Yes.

12   Q.   And what was his role?

13   A.   He was the president of the import division.

14   Q.   Did you -- was there anyone else that had a say in how

15   Domaine Select Wine & Spirits was run besides the two of you?

16   A.   Yes.

17   Q.   Who was that?

18   A.   Well, there was an interim present who became president --

19   his name is Evis Savvides -- and both my husband and I reported

20   to him.  And as I mentioned previously, there was a board of

21   directors for the company.

22   Q.   Okay.  And it's my understanding -- correct me if I'm wrong

23   -- Domaine Select Wine & Spirits has been sold twice, or, I

24   guess, had investors acquire it, twice, in the past few years;

25   is that right?

1   A.   So the original company, which my husband and I founded

2   over 20 years ago, was bought in 2015.  My husband and I gave

3   up controlling interest in 2015, when the new partners came in,

4   and then it was sold again -- well, that process started in

5   2019 and, I think, completed in January or February of 2020.

6   Q.   Okay.  So there -- my information might be wrong.

7        There's no other sale in 2018, or, I guess, acquisition by

8   an investment group, in 2018, that you're aware of?

9   A.   I'm not aware of any acquisition in 2018, no.

10  Q.   Okay.  And -- but despite these acquisitions, you still

11  worked for Domaine Select Wine & Spirits up until February of

12  2020, right?

13  A.   Yes.

14  Q.   And I want to draw your attention to, I guess, roughly, the

15  time period of September, 2016.

16       Are you aware of Domaine Select Wine & Spirits, I guess,

17  seeking investors through note purchases in that time frame?

18  A.   I was aware of the company seeking investors to

19  recapitalize the business.

20  Q.   And did you have any involvement in recruiting investors to

21  do that?

22  A.   No, I did not.

23  Q.   Did any of your friends invest at that time?

24  A.   No, no, I didn't have any friends invest.

25  Q.   Are you aware of the company, Global Securities Trade

1    Finance?

2    A.   I'm aware of the company, Global Securities, yes; it was

3    Gustavo's company.

4    Q.   Okay.  And while were you aware that Gustavo owned -- I'm

5    sorry -- Mr. Hernandez Frieri owned Global Securities, you have

6    no knowledge of whether they purchased a $1,000,000 note from

7    Domaine Select Wine & Spirits?

8    A.   From my perspective, there was -- the company, as I said,

9    needed to be recapitalized, and the three partners that came in

10   in 2015 were -- had taken responsibility to do that, so -- I

11   know that there were -- I'm not clear on how the financial

12   structure specifically was set up, but the -- the partners were

13   involved with -- with that, yes, so -- if that answers your

14   question.

15   Q.   Who are the three partners you're talking about just now?

16   A.   Gustavo Hernandez, Daniel Holtz and Jorge Mora.

17   Q.   Okay.  And that's of Global Securities, as far as you know,

18   or is that -- sorry.  That's who acquired Domaine Select Wine &

19   Spirits.  I apologize.

20   A.   Yes.

21   Q.   So when your close friend, Mr. Hernandez Frieri, who is

22   like family, was involved in a partnership that acquired

23   Domaine Select Wine & Spirits, did you have any discussions

24   with him about the company?

25   A.   At the time that it was being acquired?

1    Q.   Yes.

2    A.   Yes, of course.

3    Q.   And while you know about the note purchase, you have no

4    knowledge of where or -- Global Securities Trade Finance's

5    purchasing a $1,000,000 note on September 22, 2016?

6    A.   Is there a note that I could see, that could remind me?

7    That was many years ago, so --

8    Q.   Okay.  Well, it's a -- it's very large, so it's been hard

9    to -- but that's okay.

10        Do you know why Mr. Holtz, Mr. Mora and

11   Mr. Hernandez Frieri purchased Domaine Select Wine & Spirits or

12   acquired it?

13   A.   Well, we -- we, meaning, my husband and I -- had been

14   looking for investors to come into the business, to help it

15   grow.  We knew that they had been involved with -- in the wine

16   business previously, on the retail side, so we naturally had

17   conversations, primarily with Jorge and Gustavo, and

18   subsequently with Danny Holtz, about the opportunity.

19   Q.   And why did Domaine Select Wine & Spirits need to

20   recapitalize at that time?

21   A.   Well, the business was growing, and we needed outside

22   investment to continue to grow.  Otherwise, we would have

23   likely had to downsize.

24   Q.   And do you know how much the group involving Mr. Holtz,

25   Mr. Mora, Mr. Hernandez Frieri, I guess, paid for that

```
 1    acquisition or -- to be a part of Domaine Select Wine & Spirits
 2    in total?
 3    A.  I don't know exactly, no.  I don't recall.
 4    Q.  Was it --
 5    A.  I don't know if I ever knew exactly.
 6    Q.  Do you know, due to your close relationship with
 7    Mr. Hernandez Frieri, how much he invested in that acquisition?
 8    A.  Well, again, I don't believe that there -- I don't recall
 9    that there was any payment for the business, but there was the
10    goal of recapitalizing the business, as I said, raising money
11    so the business could grow.
12    Q.  Is there anyone that would know the answer to those
13    questions about the -- I guess, how much they contributed at
14    Domaine Select Wine & Spirits?
15    A.  Yeah.  I mean, Daniel Holtz was chairman of the board and,
16    I think, was leading some of those endeavors.  He may know, but
17    I'm not sure.
18    Q.  And who would we talk to, if you know, about the need to
19    recapitalize.
20    A.  Could you be more specific?
21    Q.  Well, at Domaine Select Wine & Spirits, I assume when --
22    I'm assuming this, so correct me if I'm wrong -- when there's a
23    decision you need to recapitalize to continue to grow, someone
24    had to be involved in that decision, so I'm wondering who that
25    someone was, if you know.
```

1   A.   Well, we spoke about it at the -- at the board level.

2   Q.   Okay.  Would there be minutes at the board level, or,

3   minutes of board meetings where those discussions occurred?

4   A.   Potentially, yes.  I don't have those.

5   Q.   And -- okay.  And are you aware that Mr. Hernandez Frieri,

6   himself, or his name, purchased a $1,000,000 note belonging to

7   Domaine Select Wine & Spirits in October 18, 2017?

8   A.   I'm not sure I understand the question.  I'm sorry.

9   Q.   Well, you're aware that Domaine Select Wine & Spirits was

10  seeking a -- raising more money in 2016 and 2017, right?  I

11  think you said that.

12  A.   Mmm-hmm, yes.

13  Q.   And that they were doing that through the issuance of

14  notes, right?

15  A.   I -- I don't know if that was done through the issuance of

16  notes.

17  Q.   Okay.  So you don't know if Mr. Hernandez Frieri purchased

18  a note from Domaine Select Wine & Spirits in 2018 -- in 2017.

19  A.   I don't remember.

20  Q.   Okay.  And Domaine Select Wine & Spirits, are they still

21  operational?

22  A.   The company was -- as I mentioned -- was sold early last

23  year to a new investment group.  The primary lender had

24  essentially taken over all operations of the business, and,

25  since then, the company has been re-branded.

```
 1    Q.   And going back to that note in 2017, did you sign any of
 2    the notes that were purchased, as president of the company?
 3    A.   I don't recall.  If you have anything that you could show
 4    me to help, as a reminder -- again, that was many years ago,
 5    and I don't recall specifically.  I signed a lot of documents
 6    around the time of the transaction.
 7    Q.   Well, how about, do you know if any of the notes were paid
 8    back?
 9    A.   I don't know.
10    Q.   And you said, I think -- well, I guess -- who -- you said
11    the primary lender acquired Domaine Select Wine & Spirits and
12    re-branded it.
13         Who was the primary lender?
14    A.   Okay.  Just to clarify, the primary lender did not acquire
15    the company.
16    Q.   Oh.
17    A.   They took over the management of the operation of the
18    business, for a period of time, during the transition from the
19    previous ownership to what is now the current ownership.
20    Q.   Okay.  Who is that primarily lender?
21    A.   Rosenthal & Rosenthal.
22    Q.   And who is the current -- I guess, the way you describe it,
23    who is the current management now?  I forgot the term you used.
24    I apologize.
25    A.   So the current ownership -- well, at least as of a year
```

1   ago -- was Jureta Partners.  I have no idea what the current

2   state of the business is.

3   Q.  So do you know if that entity has any value, as we speak

4   today?

5   A.  I don't know.

6   Q.  And do you recall any conversations with

7   Mr. Hernandez Frieri as he -- of him trying to be paid back for

8   those note purchases?

9   A.  No.

10  Q.  Are you aware of whether Ms. De Castro made any inquiries

11  about being paid back by those note purchases?

12  A.  No.

13  Q.  And when you -- I guess -- when exactly did you and your

14  husband give up control of Domaine Select Wine & Spirits?

15  A.  That was in July of 2015.

16  Q.  And how much money did you -- you and your husband make for

17  giving up ownership?

18  A.  Nothing.

19  Q.  Were you ever bought out as an equity partner of Domaine --

20  you and your husband -- of Domaine Select Wine & Spirits?

21  A.  I'm sorry.  I don't understand the difference between that

22  question and the previous one.

23  Q.  Well, I guess, at any point after that acquisition in 2015,

24  were you -- did you ever get bought out as an equity partner,

25  or was that -- in 2015, that's when you were bought out?

```
 1   A.   Well, our equity was reduced.

 2        As I said, we didn't receive any payment for the reduction

 3   of that equity, and, then, our equity was further reduced,

 4   later.   I think it was -- I don't remember exactly, but, after

 5   2015, it was further reduced, and by the time the company was

 6   sold again, we were -- had been reduced to about one percent.

 7   Q.   So do you still own that one percent?

 8   A.   No.

 9   Q.   Okay.   And you -- you left in February of 2020?

10   A.   I was terminated without cause.

11   Q.   I'm sorry to hear that.

12        Do you -- you said they re-branded.

13        Do you know the name of, I guess, the company now that used

14   to be Domaine Select Wine & Spirits?

15   A.   They re-branded it to Trinity.

16   Q.   Just Trinity?   If you know.

17   A.   I -- I don't know.   Trinity is what I remember.

18   Q.   I know you said you were terminated without cause.

19        Did you have any discussions about why you were being

20   terminated in February of 2020?

21   A.   You mean, with who terminated me, or --

22   Q.   Yeah, yeah.   Who terminated you?   Who informed you of your

23   termination?

24   A.   The CRO of the organization at the time.

25   Q.   And who was that?
```

1    A.   Gordon Lewis.

2    Q.   And at the time you were terminated, I know he -- it might

3    have been said without cause, but did he tell you -- say any --

4    give you any specific reasons as to why you were being

5    terminated at that time?

6    A.   He told me that the company couldn't afford to pay me.

7    Q.   How much were you being paid at that time?

8    A.   My annual salary was 240 or 245,000.

9    Q.   Okay.  And are you aware of a company called Italian Wine

10   Merchants?

11   A.   Yes.

12   Q.   How are you familiar with it?

13   A.   The original owner was a close friend of my husband and

14   myself, and it's a prominent retail business in New York State.

15   Q.   And do you know if Mr. Hernandez Frieri ever invested in

16   Italian Wine Merchants?

17   A.   I believe so.  I am not sure if he invested personally or

18   otherwise, but he was -- he was involved with that business,

19   yes.

20   Q.   Okay.  And did he actually do any work for the business, as

21   far as you know?

22   A.   I don't know.

23   Q.   Okay.  So you never -- did you ever have any discussions

24   with him about Italian Wine Merchants, once he invested in it,

25   or an entity invested in it that he was involved in?

1    A.   Only so far as it became a question in -- in the

2    acquisition of -- and creation of Domaine Select Wine &

3    Spirits.

4    Q.   Can you describe those discussions?

5    A.   Well, I don't recall if those were discussions with him

6    specifically or generally, as a group, but they were just

7    related to the licensing of -- of the entities.

8    Q.   Do you know if Ms. De Castro worked for Italian Wine

9    Merchants?

10   A.   I don't know.

11   Q.   Do you know if she invested in Italian Wine Merchants?

12   A.   I don't know.

13   Q.   Do you recall, around the time of the acquisition of --

14   well, let me go back.

15       When Mr. Hernandez Frieri was part of the group that

16   acquired Domaine Select Wine & Spirits, had he already invested

17   in Italian Wine Merchants?

18   A.   Yes.

19   Q.   And are you familiar with any potential legal issues that

20   occurred, or that came about, when he acquired Domaine Select

21   Wine & Spirits due to the fact that he was an investor in

22   Italian Wine Merchants?

23   A.   Well, I wouldn't really define them as legal issues.  We

24   were communicating with a regulatory attorney for liquor law

25   attorney in New York State, to understand how to best handle

 1   the scenario, and he recommended, after consulting with the

 2   State Liquor Authority of New York, that the three partners who

 3   were coming into Domaine Select Wine & Spirits either divest or

 4   transfer ownership, whatever ownership they had in Italian Wine

 5   Merchants, so that they could then be put on the import

 6   wholesale license of Domaine Select Wine & Spirits.

 7   Q.   Okay.  As far as you know, Ms. De Castro never worked for

 8   Italian Wine Merchants?

 9   A.   I don't know.

10   Q.   Okay.  Well, I mean, you're very involved and have a long

11   history in the wine and spirits business, right?

12   A.   You could say so, yes.

13   Q.   No, I think it's quite an accomplishment.  But, I guess, if

14   a close friend started working for a company like Italian Wine

15   Merchants, it's normal that that may come up, correct?

16   A.   Yes.  I -- I don't recall if she was ever an employee

17   there.  I think, sometimes, there can be confusion between

18   owners and employees, or, a perception of that, so I'm just

19   trying to be correct in my answer, that I really don't know if

20   she was ever officially an employee, or did any consulting

21   work, or was in the capacity of ownership.  I'm really not

22   certain.

23   Q.   Did she ever seek out your advice on the management of

24   Italian Wine Merchants?

25   A.   No.

 1   Q.   She never discussed with you the wine business, as it

 2   pertains to Italian Wine Merchants, as far as you know or as

 3   you recall?

 4   A.   Not that I recall.

 5   Q.   Okay.  Do you know, after that advice to -- for

 6   Mr. Hernandez Frieri and others to divest in Italian Wine

 7   Merchants, whether they actually -- or whether they still, kind

 8   of, maintained control of Italian Wine Merchants despite their

 9   divestiture?

10   A.   I don't know.

11   Q.   Okay.  I want to go back to D.C. 2019 Irrevocable Trust.

12        When did you first learn of the Trust?

13   A.   I don't -- I don't remember when I first learned of the

14   trust exactly.

15   Q.   Well, prior to its creation, did you have any discussion

16   with anyone about the trust?

17   A.   Olympia and I may have discussed it, but I -- I don't

18   recall how far prior to the actual -- you know, that the Trust

19   was actualized.

20   Q.   And I think you stated that it was created for the benefit

21   of her children, her three children, right?

22   A.   Yes, that's correct.

23   Q.   And I forgot if you answered this:  Did she have any

24   conversations with you about why, at that time, this trust was

25   specifically being created?

1  A.  No.

2  Q.  And as far as you recall, it had nothing to do with the

3  fact that her husband had been arrested, in Italy, and pending

4  criminal charges in Miami, Florida?

5  A.  No.

6  Q.  And as you discussed this with Ms. De Castro, what -- did

7  you discuss any role that you would have in the trust?

8  A.  She asked me if I would serve as a trustee.

9  Q.  And did you agree to do so?

10  A.  Yes, without hesitation.

11  Q.  And can you describe your role as trustee for D.C. 2019

12  Trust?

13  A.  Well, I, you know, had shared with her that I had very

14  little time, and, as a result of that, it was decided that she

15  would be able to take on administrative responsibilities as it

16  related to the Trust, so -- yeah.

17  Q.  All right.  So is it fair to say that you are a trustee --

18  for a period of time, you were a trustee, in name only, with

19  D.C. 2019 Trust?

20  A.  No, I considered myself to be the trustee.

21  Q.  Well, did you consider yourself to be an active trustee

22  with the Trust?

23  A.  I don't really know what the difference is between an

24  active trustee or a trustee.

25  Q.  Well, one that's involved in -- do you consider yourself a

1   trustee that's involved in decisions as they relate to the

2   Trust and have an equal say in such decisions?

3   A.   Frankly, I rely on Olympia.  The Trust is for the benefit

4   of her children, so, she obviously has an interest in that.

5   They're her children.  So as a practical matter, probably a

6   much higher priority than -- you know, for me, frankly, at the

7   time, it was low on the list of my priority scale.

8   Q.   Did you -- as Trustee, have you ever had any conversations

9   with the protector of the trust?

10  A.   Just via email or written communications.

11  Q.   And what was the substance of those communications?

12  A.   Well, one I recall was Olympia explaining to us, in an

13  email, the functionality of the trust, and, more recently, as a

14  protector, it related to my legal fees to -- with regard to

15  this matter.

16  Q.   Okay.  So what -- since you weren't as active and deferred

17  to Ms. De Castro, what do you consider yourself

18  responsibilities or role with the Trust, besides the title of

19  Trustee?

20  A.   Well, I've executed documents that needed to be executed by

21  the trustee.  I have, you know, helped relative to, you know,

22  making investments for the children's education.

23  Q.   So you were involved in decisions to make investments for

24  their education?

25  A.   Well, Olympia and I have had ongoing conversations, so it's

1  not -- you know, it's not a formalized, you know, scenario

2  where, you know, we sit down and have a formal meeting about

3  it.  The conversations have been much more casual in nature.

4  Q.  And have you -- let me back up, I guess.

5      Just so I have it correct, the Trust is paying for your

6  legal fees related to this hearing.

7  A.  Yes.

8  Q.  And prior -- with these decisions that Ms. De Castro

9  presented to you concerning the Trust, did you ever do any due

10 diligence, or follow-up, on her decisions?

11 A.  No, I didn't feel the need to do that.

12 Q.  Even though you're the trustee?

13 A.  Yes.

14 Q.  And these educational investments, would they be 529

15 college investments for the children?

16 A.  Yes, that's correct.

17 Q.  Okay.  Any other -- I guess -- I forgot how you termed it,

18 but, any other educational investments besides the 529s?

19 A.  No, that's what I was referring to.

20 Q.  Okay.  And when you became or agreed to be trustee, did you

21 have any discussions with Ms. De Castro about how she was going

22 to fund the Trust?

23 A.  She advised me of the -- the gifts that were being made to

24 the Trust.

25 Q.  Okay.  And what were those gifts as far as -- as you

 1   recall?

 2   A.   So they were the Gramercy property and -- and, then,

 3   artwork that -- that was sold --

 4   Q.   Okay.

 5   A.   -- or funds from proceeds of the sale of the artwork.

 6   Q.   And, again, was this a phone call, an in-person meeting, an

 7   email exchange, if you recall?

 8   A.   I don't remember.

 9   Q.   I want to show you government's exhibit 22.  I'll share my

10   screen.

11        Do you see government's exhibit 22 in front of you?

12   A.   Yes.

13   Q.   Okay.  I'll zoom out a little bit.

14        All right.  Do you recall this document?

15   A.   Yes, I've seen this document.

16   Q.   Okay.  And how did you -- when did you first see this

17   document?

18   A.   I don't remember when I first saw it.

19   Q.   Do you possess this document?

20   A.   I believe so, yes.

21   Q.   Do you recall how you came into possession of this

22   document?

23   A.   Well, Olympia and I, she set up a shared drive where we

24   could have easy access to -- to documents related to the Trust.

25   Q.   And when was that shared drive set up?

1    A.   In 2019.  I don't remember the exact date.

2    Q.   Okay.  And the date of this document, Government's Exhibit

3    Number 22 -- 22 -- what's the date?

4    A.   It looks like the first day of February of 2019.

5    Q.   And do you recognize the two signatures on the document?  I

6    can zoom in, if need be.

7    A.   It looks like Maria Hernandez and Olympia De Castro.

8    Q.   And Ms. De Castro is signing as -- in what role in relation

9    to the Trust?

10   A.   She's signing as the administrative agent.

11   Q.   And was she made administrative agent prior to February 21,

12   2019?

13   A.   I believe it was simultaneous.

14   Q.   So it all happened at once.

15   A.   Yes.

16   Q.   Do you know why everything was simultaneous?

17   A.   No.

18   Q.   Did it strike you as odd that on the same -- that all these

19   things would happen simultaneously, the creation of the Trust

20   and the transfer of this 3 Gramercy Park West, LLC?

21   A.   No, not at all.

22   Q.   And it didn't strike you as odd that this all happened

23   simultaneously, after Mr. Hernandez Frieri's arrest, in Italy,

24   for money-laundering charges in the United States?

25   A.   No, not at all.

1    Q.   Are you familiar with 3 Gramercy Park West, LLC?

2    A.   In what sense exactly?

3    Q.   Well, do you know --

4    A.   It know it exists, yes.

5    Q.   Okay.  Prior to the signing this document, do you know who

6    controlled the LLC?

7    A.   My understanding was that Olympia managed the LLC.

8    Q.   Did Gustavo Hernandez Frieri ever have a management role in

9    the LLC, as far as you know?

10   A.   I don't know.  Not as far as I know.

11   Q.   And, I guess, prior to this document -- I guess, prior to

12   February 1, 2019, did you -- were you given any background by

13   anyone concerning the LLC, what it did, or what it owned, if

14   anything?

15   A.   Not that I recall.

16   Q.   Do you recall the purpose of this document, outside of what

17   it says on its face, that it's assigning, from the H.H. Master

18   Settlement Trust, the interest to the 3 Gramercy Park West LLC

19   to the D.C. 2019 Trust?

20   A.   I don't know.  I don't think it has a purpose other than

21   its face value, which is what I understood it as.

22   Q.   And I think you might have answered this, but, prior to

23   February -- how long prior to February 1, 2019 -- when did you

24   first -- sorry.

25        In relation to February 1 of 2019, when did you discuss the

1    creation of the D.C. 2019 Trust?

2    A.  I think I answered that.  I don't recall.

3    Q.  Okay.  Could it have been a day or two before?

4    A.  I don't recall.

5    Q.  Okay.  So it could have been longer; it could have been a

6    day.  You don't know.

7    A.  I -- I really don't know.  There was a lot that I was

8    dealing with, as I had mentioned previously, that were higher

9    priorities and -- I just don't recall.  Besides, it was a

10   couple of years ago now.

11   Q.  Do you know if it was prior -- did you have any discussions

12   about the creation of this trust prior to Mr. Hernandez

13   Frieri's arrest?

14   A.  I don't believe so.

15   Q.  Okay.  I want to share with you government's exhibit 22-1.

16   I'm going to scroll through it, but -- and I'm going to ask

17   you -- and I'll give you time, after I scroll through it -- if

18   you're familiar with this document.  And if you need me to stop

19   at any point, or go back, let me know.

20        Are you familiar with this document?

21   A.  Yes.

22   Q.  How so?

23   A.  Well, this appears to be the operating agreement for 3

24   Gramercy Park West, LLC.

25   Q.  As of February 1, 2019.

1    A.    Yes.

2    Q.    On page 18 of this document, government's exhibit 22-1, do

3    you recognize the signatures on it?

4    A.    Yes, signature of Olympia De Castro and myself as trustee.

5    Q.    At this point in time, had the Trust officially been

6    created, if you know?

7    A.    It was created on February 1st, so, yes.

8    Q.    Okay.  Again, all simultaneous, all happening on the same

9    day.

10   A.    Yeah, I -- I don't think that that's necessarily unusual.

11   I know that, as I mentioned, Olympia had been consulting with

12   an attorney, and they were drafting the documents that were

13   necessary for the execution of the Trust and the receipt of,

14   you know, gifts that it would receive.

15   Q.    Okay.  And my recollection from your testimony earlier is,

16   as of February 1, 2019, you did not know that Ms. De Castro was

17   going to be divorcing Mr. Hernandez Frieri.

18   A.    No, I didn't -- I don't believe I knew that, no.

19   Q.    Okay.  So you may have had discussions prior to this date,

20   February 1st of 2019, about wanting to divorce

21   Mr. Hernandez Frieri.

22   A.    It's possible, but I -- I don't -- again, I don't recall

23   specific dates.  We spoke regularly, at least on a weekly

24   basis, so it's very difficult to, you know, try to put a date

25   on what we talked about when.

1  Q.   But if she was thinking about -- I mean, you're a close

2  friend, almost family.  If she was thinking about divorcing her

3  husband prior to this date, it would seem like something you

4  would know; is that correct?

5  A.   I mean, as I said, I was going through a very tumultuous

6  period myself, and it's -- it's really difficult to put a date

7  there.

8  Q.   I want to show you government's exhibit 22-2.

9       Are you familiar with this document?

10  A.   Yes.  Could you -- could you scroll back up a second,

11  please?

12  Q.   Of course.

13       Do you need me to zoom in?

14  A.   Yes, please.

15  Q.   Okay.

16  A.   Okay, that's better.

17  Q.   Let me know if you want me to scroll down.

18  A.   Okay.  Yes, this looks like the document that appointed

19  Olympia as a -- as a manager of the Gramercy LLC; is that

20  correct?

21  Q.   Okay.  And the date of this -- this document?

22  A.   Dated as of February 22, 2019.

23  Q.   And signed by you as a member of the Trust -- Trustee of

24  the Trust.

25  A.   Yes.

1   Q.   And acknowledged and agreed to by Ms. De Castro?

2   A.   Yes.

3   Q.   And that's, I guess, 21 days after the documents we've

4   already looked at concerning the LLC and its transfer to the

5   D.C. Trust, right?

6   A.   That would be correct, yes.

7   Q.   Do you recall any conversations with anyone, prior to

8   signing this document, about what it meant and what its impact

9   was?

10  A.   No, I do not.

11  Q.   Including -- I don't know if I'm highlighting this or not.

12       Can you see the part I'm putting in the blue box?

13  A.   Okay, yes.

14  Q.   I mean, you don't recall -- do you recall any discussions,

15  that -- that paragraph that starts -- the last, "RESOLVED

16  FURTHER" paragraph starts:  "that any actions taken by the

17  Manager prior to this date" were, I guess, retroactively

18  "ratified, confirmed and approved?"

19  A.   I don't recall any -- any specific conversations about

20  that, no.

21  Q.   Okay.  So you don't recall any conversations about what

22  this document actually did or its impact on the Trust or the

23  LLC.

24  A.   No, I don't recall.

25  Q.   And I want to go to government's exhibit 22-3.

```
1        Are you familiar with this document?
2   A.   Yes.
3   Q.   And what are we looking at here?
4   A.   This is the Schedule A property transfer of 3 Gramercy Park
5   West.
6   Q.   The actual property that is part of the LLC, right?
7   A.   It appears to be.
8   Q.   Okay.  And, again, what's the value of the property in -- 3
9   Gramercy Park West LLC?
10  A.   Well, according to this schedule, it says 5.5 million.
11  Q.   And the date of this document?
12  A.   22nd day of February, 2019.
13  Q.   I think you said before, that's a value that you don't
14  think is that large, that it's not a lot of worth relative --
15  A.   No, I don't think I said that.  I said it was a significant
16  gift.
17  Q.   And you signed this document, correct?
18  A.   Yes.
19  Q.   And you saw -- you knew that Ms. De Castro and
20  Mr. Hernandez Frieri lived in a co-op apartment at 3 Gramercy
21  Park West, correct?
22  A.   Correct.
23  Q.   So when you saw this property was valued at 5.5 million,
24  and, then, being transferred into the Trust, you didn't ask any
25  questions about it?
```

1   A.   What type of questions?

2   Q.   Like, wow, Olympia, that's a hell of a gift.  Who gave it

3   to you?

4   A.   No.  I mean, as you have indicated, you know, I was

5   familiar with the property.  I've lived in New York for almost

6   30 years.  I guess, knowing or having an idea that it was a

7   valuable property, I was -- you know, it was -- when she told

8   me that that property would be gifted into the Trust, I already

9   knew or realized that it had a significant value, so it wasn't

10  -- it wasn't a shock at the time, is what I'm trying to

11  explain.

12  Q.   And you said the reason -- as far as you know, the reason

13  why this was gifted was to be for the benefit of her children;

14  is that correct?

15  A.   Yes.

16  Q.   There is no other reason.

17  A.   That is correct, yes.

18  Q.   There is no other reason?

19  A.   No, no, there was no other reason.

20  Q.   And do you know if this is at the time that Ms. De Castro

21  lost her job with that company in San Francisco?

22  A.   I don't know exactly.

23  Q.   Do you know, at this time, being her close friend, whether

24  she had any income on her own, from any source, at this time?

25  A.   I don't know.  We didn't usually talk about our personal

1    finances.

2    Q.   But I thought you -- I mean, I thought you said you did

3    have conversations that she was worried about the effects of

4    her husband's arrest and his possible imprisonment, right?

5    A.   Of course, yes.

6    Q.   But none of those involved, you know, Allison, how am I

7    gonna make money; how am I -- what am I gonna live off of now

8    that he's going to jail, potentially?

9    A.   Well, like I said, I think she had the confidence that she

10   would be able to find, you know, favorable and good employment,

11   and so -- you know, I know that it was a concern, and it was a

12   stress, but I think that ultimately she believed that she

13   would, you know, be able to prevail in finding a good position

14   to be able to have her support her family.

15   Q.   Obviously, a 5.5 million dollars gift would relieve a lot

16   of those concerns, right?

17   A.   Well, I mean, it's not her money, so I don't -- I mean, I

18   don't know that it would relieve those concerns.

19   Q.   But she's managing -- she's a manager of the LLC, right?

20   You gave her administrative powers for the Trust, right?

21   A.   Yes.

22   Q.   So she has some control over it.

23   A.   She has control over the administrative elements of the

24   Trust, but she can't take the money out for her own personal

25   use.

1   Q.   But she can -- as far as you know, can she take the money

2   out for her children?

3   A.   Not without my approval.  I don't -- I don't think she can

4   without my approval or consent.

5   Q.   Did you ever consent for her -- her using any of the income

6   from the Trust for her children?

7   A.   For their education?

8   Q.   Yeah, I guess; for their living.

9   A.   Yeah.

10  Q.   The costs of living their daily life.

11  A.   No.   In fact, we had a conversation with the Trust attorney

12  because I wanted to clarify that, for both of us, whereby if

13  she were to live, as I mentioned before, at the Hicks property

14  in Brooklyn, that she would have to pay fair-market rent

15  because it would be her responsibility, as guardian of the

16  children, to provide, you know, shelter for them.  So it was

17  never my understanding that, you know, anything in the Trust

18  would be, you know, helpful to her for day-to-day living

19  expenses for the children.

20  Q.   All right.  But she also -- she could sell the property at

21  3 Gramercy Park West as settlor of the Trust?

22  A.   As a --

23  Q.   Settlor.

24  A.   Sorry.  Earbud just fell on the floor.  Can I just -- can

25  you excuse me for one minute?  I just want to --

```
 1    Q.   Of course.

 2    A.   Okay.  Sorry about that.  Could you repeat the question?

 3    Q.   Well, could she sell -- I guess, can she sell -- at that

 4    time, do you know if she could sell the property on her own, at

 5    3 Gramercy Park West?

 6    A.   Oh, I don't know.

 7    Q.   Okay.  Going to government's exhibit 23, are you familiar

 8    with this document?

 9    A.   Yes, I am.  And that's the name of the firm that drafted

10    it, yes.

11    Q.   All right.  On the first page, the name of the law firm

12    from Tampa, Florida?

13    A.   Yes.

14    Q.   I'm just jumping ahead.  Let's see if I can do this.

15         Page -- I think it's, potentially, 27 of 28.  That's your

16    signature there?

17    A.   Yes, it is.

18    Q.   And who are those witnesses, if you know?

19    A.   Yes, they were people that worked in my office at the time.

20    Q.   Okay.

21         MR. RABIN:  I think that was page 26.

22         MR. LUNKENHEIMER:  I think it's 20 -- page 26 of the

23    document, but, for some reason, it's page 27 of 28, at least on

24    the top there.  But, yes.  I think the cover page did not get

25    numbered.
```

1   BY MR. LUNKENHEIMER:

2   Q.   And what is the date of this?

3   A.   Date is 22nd of February, 2019.

4   Q.   Again, 21 days after those other -- after the transfer on

5   February 1, 2019, by Maria Lucia Hernandez?

6   A.   Yes.

7   Q.   Okay.  So the -- I mean, you're trustee, but is it fair to

8   say that there was a transfer to the Trust that had not

9   actually been created yet on February 21, 2019?

10  A.   I don't think so.

11  Q.   Okay.  But there are -- there are two separate dates, about

12  three weeks apart.

13  A.   Yes.

14  Q.   Okay.  And, again, no discussion about the rush or -- or a

15  delay in the creation of this document here, government's

16  exhibit 23?

17  A.   I'm sorry.  I'm not sure I understand the question.

18  Q.   Well, as I said before, I think there's -- a lot of things

19  happened simultaneously on February 1, 2019.  You would agree

20  with that, right?

21  A.   Yes.

22  Q.   Including the transfer of property to D.C. 2019 Irrevocable

23  Trust.

24  A.   Yes.

25  Q.   But according to government's exhibit 23, the Trust hadn't

60

```
 1   actually been created yet, officially, right?

 2   A.  Well, I think it was created.  I just didn't sign it until

 3   the 21st or the 22nd.

 4   Q.  I mean, we're looking at page 26 of 28 -- I think, numbered

 5   page 25.  Ms. De Castro didn't even sign it until February 22,

 6   2019, right?

 7   A.  It appears that way, yes.

 8   Q.  Okay.

 9   A.  And I think the same -- they're the same witnesses, right?

10   Yes.

11   Q.  Yes.  So you don't recall any discussion about the time

12   difference between the February 1, 2019, documents and this

13   document?

14   A.  No.

15   Q.  And do you know if there was a trust -- co-trustee named in

16   this document?

17   A.  Not that I'm aware of.

18   Q.  So you don't know if this document names Maria Lucia

19   Hernandez as co-trustee, or trustee, if you pass?

20   A.  I don't -- I can -- I can read it right now, if you'd like

21   me to.

22   Q.  I'm trying to find the -- the page.  I'm sorry.

23       Starting at the bottom of what's numbered page 10 of the

24   document, page 11 of 28 -- do you see that there?

25   A.  Yes, I do.
```

1    Q.   And reading that paragraph that goes from numbered page 10

2    to numbered page 11, do you recall this paragraph now?

3    A.   I see it, now that you're showing it to me, but I'm not

4    sure what the significance is.

5    Q.   Okay.  And are you familiar with an individual by the name

6    of Juan Carlos Gomez?

7    A.   Yes.

8    Q.   And who is that?

9    A.   He is the protectorate of the D.C. Trust.

10   Q.   Did you know him prior to becoming protector of the D.C.

11   2019 Trust?

12   A.   Yes, he's Maria Lucia's husband, and I've met him on

13   several occasions.

14   Q.   So Gustavo Hernandez Frieri's brother-in-law is protector

15   of the D.C. 2019 Trust.

16   A.   Yes, that's correct.

17   Q.   And he's still protector, despite the fact that

18   Ms. De Castro and Mr. Hernandez Frieri have divorced.

19   A.   Yes, that's correct.  I know that she trusts him a great

20   deal.

21   Q.   And he's family, right?

22   A.   Yes.

23   Q.   Do you know if, as well as protector, Mr. Carlos Gomez, if

24   he takes direction from Mr. Hernandez Frieri?

25   A.   Not that I'm aware of, but, I would think, absolutely not.

```
 1   Q.   But you don't know.
 2   A.   I -- I -- not that I'm aware of, as I said, and I would
 3   think, absolutely not.
 4   Q.   I want to draw your attention to numbered page 18 of
 5   government's exhibit 23, 19 of 28.
 6        Do you see this paragraph that says the grantor's husband's
 7   power to remove and replace the Trust protector?
 8   A.   Yes.
 9   Q.   At the time this document was signed, the grantor's husband
10   is Mr. Hernandez Frieri, right?
11   A.   Yes.
12   Q.   All right.  So he did -- obviously, you acknowledged it.
13        So he did -- if Ms. De Castro, sadly, passed, he would have
14   some power over this trust; is that correct?  Is that fair to
15   say?
16   A.   I'm not a lawyer, so I -- I would have to, you know, really
17   read this very carefully and understand it.
18   Q.   Okay.  But you see here, in this paragraph -- I'll read it
19   to you, for time's sake.  "If the grantor should die, and if
20   the grantor's husband survives the grantor, then during the
21   lifetime of the grantor's husband, he may, in his absolute
22   discretion, remove the Trust protector then serving and may
23   appoint a Trust protector in lieu thereof."
24        Do you see that?
25   A.   I do, but, he's not her husband anymore.
```

1  Q.  But I'm talking about at the time of this -- this document

2  was created, it did give Mr. Hernandez Frieri some power over

3  the Trust, at least in naming the Trust protector.

4  A.  I mean, I -- I don't really know the power that the Trust

5  protector has, other than to be a protector, so I really -- I

6  really don't feel qualified to answer that.

7  Q.  So what does it mean to -- you just said you don't know the

8  powers of a trust protector besides being a protector.

9      What does being a protector mean to you?

10  A.  Well, that would mean that, you know, they -- they ensure

11  that nothing is done with the trust that would, you know, harm

12  its -- its -- interest of its beneficiaries, I guess.

13  Q.  And those beneficiaries would be the children.

14  A.  These children.

15  Q.  The D.C. united -- D.C. 2019 Trust?

16  A.  Yes, the children.

17  Q.  I guess, just -- for a number of times -- during your time

18  as trustee of D.C. 2019 Trust, how often or how many times have

19  you had conversations with the Trust protector, Mr. Carlos

20  Gomez, about decisions concerning the Trust?

21  A.  As I said, I didn't.  I mean, I just wasn't -- it never

22  seemed to be necessary.  I viewed the Trust protector as just

23  another, you know, layer of security.

24  Q.  But if he's not involved in decisions, is he actually

25  protecting anything?

1   A.   I mean, if -- if bad decisions are being made, I -- I

2   mean -- I don't know.

3   Q.   Do you know if Mr. Carlos Gomez, as Trust protector, is

4   taking direction from Ms. De Castro or Mr. Hernandez Frieri at

5   all?

6   A.   I don't know.

7   Q.   Moving to government's exhibit 24, are you familiar with

8   this document?

9   A.   Yes, I am.

10   Q.   And what is this document?

11   A.   This is the delegation of administrative powers and the

12   appointment of Olympia as the administrative agent of the

13   Trust.

14   Q.   And that is dated February 1, 2019?

15   A.   Yes.

16   Q.   And I think you stated before, this document gives her the

17   power to take action with the Trust, without you being

18   involved; is that fair to say?

19   A.   I don't know if it's without me being involved, but, again,

20   the intention of this document, when it was signed, was to

21   relieve me of heavy burden, if any -- if there would be any --

22   of administrative responsibilities.

23   Q.   Right.  And that's stated in the paragraph, I guess, under

24   the purpose of delegation, right?

25   A.   Right, right.  And we did that, knowing, as I said before,

1    that I just would not be able to treat this as a priority, you

2    know, due to time that I had available.

3    Q.   Is it fair to say that it -- despite you being the trustee,

4    it was giving most of the control of the Trust to

5    Ms. De Castro, at this time, where you were distracted or had

6    other things going on in your life?

7    A.   I don't -- I don't see it as that, no.  I mean, it gives

8    her, you know, the administrative authority, or, to serve as an

9    administrative agent.  But I even spoke to one of my own

10   attorneys, at the time, and asked if it would be a good idea to

11   have the appointment as an administrative agent, and, she said,

12   absolutely, so, I didn't see it as a --

13        MR. RABIN:  Ms. Domeneghetti, I'm going to ask you not

14   to discuss what your lawyers told you, if it was between you

15   and your lawyer, okay?

16        MR. LUNKENHEIMER:  Are you asking her or telling her,

17   Mr. Rabin?

18        MR. RABIN:  I'm advising that she has an

19   attorney/client relationship with another attorney, and I

20   think, unless she wants to voluntarily waive it and understand

21   the ramifications of doing so, that she shouldn't do it.

22        MR. LUNKENHEIMER:  Okay.  I just wanted her to be aware

23   of that.

24        MR. RABIN:  Thank you.  I appreciate it.

25

1    BY MR. LUNKENHEIMER:

2    Q.   And, Ms. Domeneghetti, again, this -- this document was

3    created on February 1, 2019, prior to the actual D.C. 2019

4    Trust agreement, right?

5    A.   Well, prior to the signature of that, yeah.  I don't --

6    yeah.

7    Q.   Well, can it -- do you know?  Can a trust be -- can a trust

8    be operable if the trust agreement hasn't been signed by all

9    parties?

10   A.   I don't know.

11   Q.   Okay.  Again, you didn't ask any questions about the time

12   difference between the D.C. Trust agreement being signed and

13   the signing of this document?

14   A.   I'm sorry.  Could you repeat that question?

15   Q.   You didn't have any conversations with Ms. De Castro

16   concerning the three-week delay in the signing of the D.C.

17   Trust agreement as opposed to this being signed on February 1,

18   2019?

19   A.   No, I don't remember why there was any delay.

20   Q.   Okay.  And these witnesses over here -- Paolo Domeneghetti,

21   that's your husband?

22   A.   Yes.

23   Q.   And the name below his, I guess, is Federica Domeneghetti?

24   A.   Federica, yes; that's my older daughter.

25   Q.   And I may have already asked this at the very beginning,

```
 1    but, when you're creating this document, or this trust, for

 2    these gifts, do you recall any conversations concerning the

 3    ramifications of Mr. Hernandez's criminal case and any property

 4    under his control belonging to --

 5    A.  No.

 6    Q.  -- his family?

 7    A.  No.

 8    Q.  Okay.  Do you know where, I guess, any Trust mail or Trust

 9    paperwork is sent to?  I mean, what's the address of the Trust?

10    A.  I believe the address was the -- the firm in Tampa, but I

11    have my address, for example, for some of the statements, bank

12    statements, and so forth.

13    Q.  So you receive all the bank statements concerning the

14    Trust.

15    A.  Yeah.  Well, they're electronic.

16    Q.  Were they ever, at any point in time, prior to February 1,

17    2019, ever mailed to you?

18    A.  I have received some -- some -- some statements from the

19    bank mailed to me, and the Vanguard statements are mailed to

20    me, at my address.

21    Q.  And going back to government's exhibit 23, the last page,

22    the initial --

23    A.  Hello?

24          THE COURT:  I think we may have lost Mr. Lunkenheimer.

25          Well, it's been a nice hearing all along.  Let's see if
```

 1     he comes back.  Hold on.

 2             (Discussion was held off the record.)

 3             THE COURT:  Why don't we -- it's been an hour.

 4     Actually, it's been two hours, so, for the court reporter --

 5     let's take five minutes to give the court reporter a break and

 6     give the witness a break.  We'll wait for Mr. Lunkenheimer, and

 7     we'll come back in five minutes.

 8             MR. LUNKENHEIMER:  Sorry, Your Honor.  I'm back.

 9             THE COURT:  Oh, there he is.

10             We'll just take a five-minute break at this point.

11             THE COURTROOM DEPUTY:  Court is now in recess.

12             (Court recessed at 11:32 a.m.)

13             (Back on the record at 11:41 a.m.)

14             THE COURTROOM DEPUTY:  Court is back in session.

15             THE WITNESS:  Judge, may I just make a quick comment?

16             THE COURT:  Who is that speaking?

17             MR. LUNKENHEIMER:  That's Ms. Domeneghetti, Your Honor.

18             THE COURT:  Yes, go ahead.

19             THE WITNESS:  Just related to one of the previous

20     questions, I don't recall my exact answer, but I just wanted to

21     confirm that related to the D.C. Trust, the effective date of

22     the Trust is February 1st.  I knew that he had questions about

23     the date of my signature on the Trust, but the effective date

24     -- I had a chance to look at the document on the break, and it

25     is February 1st.

1          THE COURT:  Okay.  That you.

2     BY MR. LUNKENHEIMER:

3     Q.   Thank you for that clarification.

4     A.   Thank you.

5          MR. LUNKENHEIMER:  May I continue, Your Honor?

6     Hopefully, I don't lose you all again.

7     BY MR. LUNKENHEIMER:

8     Q.   Just -- I guess -- Ms. Domeneghetti, I think before we

9     broke -- or, I was disconnected -- you were saying that the

10    statements, I guess, came to you, as Trustee, electronically,

11    the bank statements.

12    A.   So the statements for the JP Morgan Chase accounts, I had

13    -- through an online portal, I have access to those online, and

14    the -- as well as -- I mean, I have online access, like

15    everyone does these days, to all those statements, but I did

16    receive also mail -- physical mail at my home address.

17    Q.   Okay.  Do you know if Ms. De Castro ever received physical

18    mail for the Trust at her -- one of her addresses?

19    A.   I don't know.

20    Q.   I'm showing you government's exhibit 25.

21         Are you familiar with this document?

22    A.   Yes, I am.

23    Q.   Is that your signature on the bottom there?

24    A.   Yes, it is.

25    Q.   Okay.  And what is this document?

1  A.   This is a schedule of the property transferred to the

2  Trust, with me as trustee, of 997,000 in cash.

3  Q.   On September 18, 2019?

4  A.   Yes.

5  Q.   And I think you said -- was this the $997,000 that was the

6  proceeds of an art sale?

7  A.   Yes, that's correct.

8  Q.   And do you know who owned that piece of art that was sold?

9  A.   Well, before this was gifted to the D.C. Trust, it was

10  owned by the H.H. Trust.

11  Q.   And I think you said, you don't know the specific piece of

12  art that was sold or that the proceeds are from?

13  A.   Other than what was on the bank statement from the wire

14  information, that's the extent of the detail I know about the

15  piece.

16  Q.   After you saw the name of the artist on that bank

17  statement, did you talk to Olympia about it?

18  A.   About the artwork?

19  Q.   Yeah, about the artwork being sold and the proceeds coming

20  in.  I mean, I think you're kind of -- I forget exactly what

21  your LinkedIn bio says, but you're -- have a history in fine

22  arts.

23  A.   No, she just advised me that this gift was coming in, and

24  to look out for it, and I did.  As I said, I'm not an expert in

25  art.  I'm an advocate of art, but I was well-versed in American

1  contemporary, which is a -- you know, a different field.

2  Q.   I'm sorry.  I was just going off what you wrote on

3  LinkedIn, that you have a history in fine arts.  I apologize.

4      Again, when this transfer of almost a million dollars came

5  in on September 18, 2019, did you have any discussions

6  concerning the criminal case of Mr. Hernandez Frieri, of the

7  timing of this transfer?

8  A.   No, I did not.

9  Q.   Do you know if Mr. Hernandez Frieri pled guilty to the

10  charges against him?

11  A.   I do not know exactly what his plea is.

12  Q.   But you do know he has pled guilty, right?

13  A.   As I said, I know that it's a very complex matter, and I

14  don't know exactly what his plea is.

15  Q.   Okay.  But as of September 18, 2019, did you know the

16  status of the criminal case against him in Miami, Florida?

17  A.   I'm sorry; I just had an interruption here.  Could you

18  please repeat that?

19  Q.   Yes.  On the date that you signed this document, September

20  18, 2019 -- were you aware of the status of Mr. Hernandez

21  Frieri's criminal case when you signed this?

22  A.   Other than there was a criminal case, I don't recall,

23  specifically, what I was aware of at that time.

24  Q.   Okay.  And, again, as far as you know, the piece of art

25  that was sold, that resulted in this cash, was owned by H.H.

1    Trust.

2    A.   I'm sorry.  Could you repeat that?

3    Q.   Yeah, it's okay.  It happens all the time, nowadays.

4    A.   Yeah.  There's someone banging on my front door.

5    Q.   As far as you know, the art that was sold, that resulted in

6    this cash, was owned -- the piece of art was owned by H.H.

7    Trust.

8    A.   That's what I was told, yes.

9    Q.   And you were told by who?

10   A.   Olympia.

11   Q.   And prior to receiving this -- the cash into the Trust, do

12   you recall if you had conversations about the pending divorce

13   of Olympia De Castro and Mr. Hernandez Frieri?

14   A.   I don't -- I don't recall.

15   Q.   Okay.  I think you said they were divorced in late January

16   or February of 2020.

17   A.   I believe so, but I'm sure there's a document that

18   specifically references the date of their divorce, right?

19   Q.   Yeah, I -- it's in 2020.

20   A.   Yeah.  So if it was in 2020, then it was about a year ago,

21   yeah.  I think it was January or February.

22   Q.   This cash that came into the Trust, where did it go?

23   A.   It went into the Chase account.

24   Q.   Okay.  And that's a JP Morgan Chase account?

25   A.   Yes.

```
 1    Q.   And it's owned by, or in the name of, the Trust.
 2    A.   Correct.
 3    Q.   And are you familiar whether -- you are familiar that the
 4    Gramercy -- 3 Gramercy Park West, Unit 2, became a property of
 5    the Trust as well, correct?
 6    A.   Yes.
 7    Q.   Okay.  I'm showing you government's exhibit 26.
 8         Do you recall this document?
 9    A.   Yes, I've seen this document.
10    Q.   Okay.  And what is this document?
11    A.   This is beneficiary consent form, where Olympia provides
12    her consent to receive a large real estate position in the
13    Trust.
14    Q.   And that's dated May 14, 2020.
15    A.   Yes.
16    Q.   After the divorce of Ms. De Castro from
17    Mr. Hernandez Frieri.
18    A.   If their divorce, indeed, was early in 2020, then, yes,
19    this would have been afterwards.
20    Q.   And do you know what that, quote, unquote "large real
21    estate position" was?
22    A.   Yes.  That was in anticipation of the purchase of another
23    property in New York, which ended up to be the 314 Hicks.
24    Q.   Okay.  The property in Brooklyn, New York?
25    A.   Yes.
```

1    Q.   And government's exhibit 27, do you recognize this

2    document?

3    A.   Yes, I do.

4    Q.   And what is this?

5    A.   This is a waiver of accounting, where Olympia is waiving

6    her right to an accounting and a report for the D.C. 2019

7    Irrevocable Trust.

8    Q.   As trustee, did you receive the accounting in a report for

9    the D.C. 2019 Irrevocable Trust?

10   A.   No, I have not received any accounting to date, but I have

11   access to that, I'm sure.

12   Q.   So there -- you're saying that there is an accounting

13   report for the Trust.

14   A.   Well, there's an accountant, but I don't know what reports

15   there are, if any.

16   Q.   Okay.  Did you waive your right to accounting and report to

17   the Trust, as Trustee?

18   A.   Not that I recall, no.

19   Q.   Okay.  But you -- you don't recall ever seeing such a

20   report or being provided one, as Trustee.

21   A.   No.  I mean, just as a practical matter, I have visibility

22   into, you know, all of the accounts that exist related to the

23   Trust, so...

24   Q.   Okay.  And who is the accountant?

25   A.   The accountant is Lowenstein, Bill Colbert (phonetic).

1   Q.   And is that accountant hired by the Trust, Ms. De Castro,

2   or the protector, if you know?

3   A.   Olympia has been the one in contact with the accountant.

4   Q.   All right.   Despite the fact that you're the trustee,

5   right?

6   A.   Yes.   Well, she has administrative -- she is the

7   administrative agent, yes.   That was the intention of that.

8   Q.   And outside of yourself and Ms. De Castro, do you know if

9   anyone else has access to the accounts?

10  A.   Well, no.   Not that I'm aware of, no.

11  Q.   So you don't know if Mr. Hernandez Frieri has access to the

12  bank accounts, or brokerage accounts, associated with the

13  Trust.

14  A.   Well, let me clarify.   He does not have access to those

15  accounts.   Olympia does not have access to the D.C. 2019 Trust

16  accounts either.   She doesn't have, in fact, any visibility

17  into them.

18      So as I said, we have a shared Google Drive, where I put

19  the bank statements, so that she can handle some of the

20  administrative functioning.

21  Q.   Okay.   So on that shared Google Drive, I mean, she has

22  access to the account information, is what you're saying, but

23  she doesn't have -- she can't control what goes -- you know,

24  the funds inside the account.

25  A.   That is correct.   She has access to the bank statements,

1    only so far as I put them there, and I try to stay up to date

2    with downloading them and putting them in the Google Drive.

3    But she does not have any access to the D.C. Trust accounts in

4    terms of any -- she doesn't have any transactional authority or

5    visibility into those accounts.

6    Q.   Do you know if Mr. Hernandez Frieri has visibility to those

7    statements you put on the shared drive?

8    A.   No, he does not.

9    Q.   Ms. De Castro and Mr. Hernandez Frieri live together right

10   now, right?

11   A.   They live in the same house, yes.

12   Q.   But, you're saying, you unequivocally know that he does not

13   have visibility -- the ability to look at those statements?

14   A.   I know that Olympia keeps her matters very separate, so I

15   -- I would say, no, that he does not have visibility into that.

16   Q.   But you aren't -- you don't know for sure.

17   A.   I would practically bet my life on him not having

18   visibility into that.

19   Q.   Okay.  When did you first learn of the possibility that

20   Unit 2 at 3 Gramercy Park West was going to be sold?

21   A.   I don't remember the specific date.

22   Q.   Well, was that unit actually sold?

23   A.   The Gramercy unit was sold, yes.

24   Q.   And do you recall, roughly, when it was sold?

25   A.   I think I have a note.  If I'm permitted to look at that, I

1    can give you a precise date.

2    Q.   I have no objection.

3          MR. LUNKENHEIMER:   Mr. Pasano, do you have an objection

4    to her looking at her note?

5          MR. PASANO:   I do not.

6          THE WITNESS:   So the -- the contract-of-sale document

7    indicates that the property was contracted for sale on

8    September the 13th of 2019.

9    BY MR. LUNKENHEIMER:

10   Q.   As trustee, I mean, that property belonged to the Trust,

11   right?

12   A.   Yes.

13   Q.   So is it fair to say that you learned of that potential

14   sale months in advance of September 13, 2019?

15   A.   I don't recall how far in advance I learned of the

16   opportunity to sell that property.

17   Q.   Okay.  Well, were you, as Trustee, ever consulted in the

18   selling of that property?

19   A.   Olympia and I had discussions about it, yes, and I didn't

20   object.  I agreed that it was -- you know, the sale should

21   happen.

22   Q.   Did Ms. De Castro say why she wanted to sell that property?

23   A.   Well, again, you know, as a practical matter, it was a

24   beautiful property, but not a place where someone with a large

25   family could live, and -- and, so, you know, it seemed to be --

1    if there was to be an investment in real estate and have a

2    place where potentially the children could reside with her,

3    again, with, you know, paying rent and -- that was the

4    direction.

5    Q.   I guess that's -- I guess, for them to have a place to

6    live, that would be more for -- you're talking more about 314

7    Hicks, correct?

8    A.   Correct.

9    Q.   But, I guess, as for the sale of Unit 2 at 3 Gramercy Park,

10   which is -- well, actually, let me strike that.

11       What was the sale price of 3 Gramercy Park, Unit 2?

12   A.   I believe that it was around 5.7; 5.7 million, I believe.

13   Q.   Knowing that's the potential sale price, I guess,

14   Ms. De Castro didn't say to you why she wanted to sell it?  I

15   mean, that's a place to live, so did she say why she wanted to

16   sell it for that amount?

17   A.   Well, as I mentioned, I mean, it was not -- the apartment

18   wasn't really appropriate for raising three children.  It was a

19   two-bedroom apartment, so it was not -- it just wasn't

20   practical.  It wasn't a practical place for someone to live

21   with many children.

22   Q.   And you said you approved of the sale, as Trustee?

23   A.   Yes.

24   Q.   Were you presented with any written proposal for the sale,

25   or, is it -- was it just these oral communications that you've

```
1    described to us?

2    A.   I don't recall.

3    Q.   But, obviously, if you had them, you would have produced

4    them with the other documents that you produced to us, right?

5    A.   That is correct, yes.

6    Q.   And when did you first learn of 314 -- the property at 314

7    Hicks, in Brooklyn, New York?

8    A.   I don't remember exactly when I learned of the property.

9    Q.   Okay.  Are you familiar with 314 Hicks, LLC?

10   A.   Yes, I am.

11   Q.   Okay.  When did you first learn of 314 Hicks, LLC?

12   A.   Well, Olympia and I had conversations related to the

13   formation of an LLC for that property in an effort to more

14   efficiently manage the operations of the property.  I don't

15   remember exactly when those conversations were.

16   Q.   Who first told you about the property at 314 Hicks?

17   A.   Olympia.

18   Q.   Okay.  And in what context did she tell you about the

19   property?

20   A.   In the context of potentially purchasing the property.

21   Q.   Herself purchasing the property or the Trust purchasing the

22   property?

23   A.   The Trust purchasing the property.

24   Q.   Okay.  Do you know if Mr. Hernandez Frieri had any role in

25   finding 314 Hicks as a property to purchase for the Trust?
```

1   A.   No, he did not.  Olympia was -- she was in New York, on a

2   few occasions, and she was responsible.

3   Q.   Okay.  And outside of the potential place for her and her

4   children to live in the New York City area, did she -- did she

5   give you other reasons as to why to purchase this property at

6   314 Hicks?

7   A.   Can you be more specific?

8   Q.   Well -- and you're the trustee, right?  I mean, did she

9   describe it as an investment property at all?

10  A.   Yes.  And, in fact, I think that the seller came down quite

11  a bit in the concession on price from what it had originally

12  been listed at.  I don't recall the original list price, but I

13  recall there being a pretty significant concession on the

14  price, so it was thought to be a good investment.

15  Q.   Thought by whom?

16  A.   By Olympia and -- and myself, the limited knowledge I have

17  of the real estate market, but --

18  Q.   Well, what's the expected return of investment on the

19  property?

20  A.   Well, it's currently a rental property, and there's a

21  tenant in there paying rent every month.

22  Q.   Okay.  But you don't know -- I mean, since you said you

23  have very limited knowledge of the real estate market, you

24  don't know what it would be worth a year or two years from now,

25  right?

1    A.   I don't think anyone would know that.

2    Q.   I mean, you could have hired someone to potentially valuate

3    it as a real estate investment, right?

4    A.   Well, I think that all happened as part of the closing

5    process.

6    Q.   Okay.  But I'm trying to find out, I guess -- you're

7    trustee of the D.C. 2019 Trust.  Ms. De Castro comes forward

8    with this investment property.  Your role is to evaluate that,

9    right?

10   A.   I -- I'm not sure if that's my role, to -- to evaluate it

11   or, you know.

12   Q.   Was your role just to green-light whatever Ms. De Castro

13   says to do with the property of the Trust, no questions asked?

14   A.   No.  As I said, we discussed it, and the seller had come

15   down significantly on the purchase price, and it seemed like a

16   good investment.  I mean, I -- I have limited knowledge of real

17   estate, but, I know, you know, generally speaking, what

18   properties are worth, and what they have been, you know, and

19   how they gain value over time, so, that, combined with the fact

20   that it would be a lucrative rental property -- and the

21   property is profitable now; it's making money, so, from my

22   perspective, it's serving the purpose that was intended.

23   Q.   That money that's used to purchase it -- and we'll get into

24   it -- that was at JP Morgan Chase prior to it being used for

25   the purchase, right?

1    A.   Yes.

2    Q.   In a brokerage account at JP Morgan Chase.

3    A.   Yes.

4    Q.   As the trustee on the Trust, what's the average return on

5    investment in that brokerage account?

6    A.   It was fairly low, but, again, I was relying on Olympia,

7    and her expertise and her background in investments, to, you

8    know, provide guidance there.

9    Q.   Does she have a background in real estate investments?

10   Ms. De Castro, that is.

11   A.   No, she has a background in finance, which, I guess, could

12   include real estate investment.

13   Q.   Okay.  So you didn't ask any questions on the return of

14   investment on this 314 Hicks property versus JP Morgan

15   brokerage account, a well-established financial institution --

16   you didn't ask any questions about whether that was the proper

17   -- you know, moving that from the brokerage account to the

18   property -- the proper investment for the kids?

19   A.   Well, we -- Olympia and I discussed it, and it was

20   understood that -- that this real estate investment would yield

21   a better return.

22   Q.   Did she provide you any documentation exhibiting that, or

23   was it just her word?

24        MR. SREBNICK:  Your Honor, this is Howard Srebnick.  I

25   have a relevance objection to this entire line of questions,

```
 1   choice of investment strategies, whether JP Morgan is a better
 2   strategy than real estate.  I'm not understanding what the
 3   possible relevance of all of this is in connection with Gustavo
 4   Hernandez's sentencing.
 5           THE COURT:  Overruled.  Obviously, if the witness
 6   doesn't know, she can say so, but, overruled as to the actual
 7   relevancy.
 8   BY MR. LUNKENHEIMER:
 9   Q.   Ms. Domeneghetti, was there any documentation provided to
10   you concerning this investment in a property and its benefits
11   for the children versus keeping it in the brokerage account?
12   A.   We did -- we did not share documentation related to the
13   analyzation of that, no.
14   Q.   And is there a mortgage on that property?
15   A.   No, there is not.
16   Q.   So it was all cash, upfront?
17   A.   Yes.
18   Q.   And we'll get to it in a second, but, how much was that
19   property worth at 314 Hicks?
20   A.   The purchase price, I believe, was 5.9 million.
21   Q.   Okay.  And you stated that the LLC was created to accept --
22   I guess, to help manage that property?
23   A.   That is correct.
24   Q.   I'm showing you government's exhibit 28.
25           Are you familiar with this document?
```

1    A.   Yes, I am.

2    Q.   And what is it?

3    A.   This is the operating agreement for 314 Hicks, LLC.

4    Q.   And this agreement is dated June 4, 2020?

5    A.   I don't -- I don't see the signature page on my screen.

6    Q.   Let me get to it.  I'm sorry.

7         Well, here's page 6 of 7, with a signature in the members

8    section.  I guess, what are the dates of the signatures?

9    A.   Yes.  So the -- let's see.

10        Could you zoom in a little bit?

11   Q.   Yeah, yeah.  Yes.

12   A.   It's very small on my screen.  I'm sorry.

13   Q.   It's hard for me to tell what you're actually seeing, so --

14   is that better?

15   A.   Yeah, yes.  Yes.

16        So I signed this in November of 2020, and Olympia signed,

17   on behalf of the children, June 4, 2020, and the document's

18   dated June 4, 2020.

19   Q.   And that's your signature under -- at the top, the first

20   signature.

21   A.   Yes, it is.

22   Q.   Why this delay in your signing this document?

23   A.   I don't recall specifically.  I think it was probably a

24   housekeeping matter, that we realized, later, that I hadn't

25   signed the document.

 1   Q.   Because, I mean, 314 Hicks was purchased the next day, June

 2   5, 2020.

 3   A.   Yes, that's correct.

 4        Well, the closing date was actually later.  I think the

 5   closing date was in July.

 6   Q.   Okay.  But the sales contract, if you recall --

 7   A.   Yes.

 8   Q.   -- was June 5th?

 9   A.   Yes, I think it was June 5th.

10   Q.   Government's exhibit 29 -- actually -- what are we looking

11   at here?

12   A.   Yes.  This is the contract of sale for 314 Hicks.

13   Q.   And the execution date is?

14   A.   June the 5th.

15   Q.   And you signed this document?

16   A.   Yes, I did.

17   Q.   And what position did you sign the document as?  I mean,

18   what role?

19   A.   Well, I signed as the -- the member of 314 Hicks, which was

20   owned -- is owned by the D.C. 2019 Irrevocable Trust.

21   Q.   Okay.  But you -- you've seen this document before, right?

22   A.   Yes, uh-huh.

23   Q.   And you're familiar that there's various cross-outs, D.C.

24   2019 Trust, and handwritten notes, 314 Hicks, right?

25   A.   Yes, that's my handwriting.

1   Q.   That's your handwriting there.

2   A.   Mmm-hmm.

3   Q.   We're looking at page 1 there.

4   A.   Yes.

5   Q.   Why did you cross out the Trust and put the LLC?

6   A.   I crossed it out -- there was an email communication

7   between the real estate attorney and Olympia and myself.

8   Because the 314 Hicks, LLC, had just been established the prior

9   day, there wasn't time to change the contract-of-sale document,

10   and so Jill Reiter, who is a real estate attorney, said just

11   cross it out and write it in, which is what I did.

12   Q.   And the purchase price was 5.9 million, there on that page

13   1?

14   A.   Yes, that's correct.

15   Q.   Did -- I mean, you're saying that's your handwriting that

16   says 314 Hicks, but did anyone initial it, or approve it, the

17   cross-out?

18   A.   Are you referencing the Xs or my write-in?

19   Q.   Your write-ins.

20   A.   Well, as I told you, I have an email from Jill Reiter, who

21   is a real estate attorney, who told me to cross it out and

22   write it in, meaning, cross out D.C. 2019 Irrevocable Trust and

23   write in 314 Hicks.

24   Q.   Okay.  Even though 314 Hicks -- you had not signed the 314

25   Hicks, LLC, document until November of this same year.

```
 1   A.  Yeah.  I said before, I don't think that -- obviously, I
 2   didn't, or, Olympia realized that I had not signed that
 3   document yet.
 4   Q.  Okay.  So let me scroll through -- again, page 16 of 25,
 5   this is your cross-out of the Trust and the placing of 314
 6   Hicks?
 7   A.  Yes, it is.
 8   Q.  I'm showing you page -- I guess, was this done when you
 9   signed on June 5th?
10   A.  Are you talking about the cross-outs here?
11   Q.  Yes.
12   A.  This was like this when the document was sent -- was given
13   to me to sign.
14   Q.  Okay.
15   A.  This, as well as the other X'd-out part of the contracts,
16   they were like that when it was given to me to sign.
17   Q.  You see page 20 here -- you see under kids floor, fourth,
18   there's a line there that looks like initials of EJ; do you see
19   that?
20   A.  Yeah, I see initials there.  It's hard to make it out, but,
21   yeah, it looks like an EJ.
22   Q.  Are there any other initials on any other of the cross-outs
23   on this document that you're familiar -- that you're aware of?
24   A.  I would have to look at it again more carefully.  I mean, I
25   see that one right now, but --
```

1   Q.   Well -- and the document speaks for itself.

2        Would it surprise you that there are no other initials on

3   this 25-page document?

4   A.   I -- I don't think it would surprise me, no.

5   Q.   And page 25 of 25, do you see it on the screen there?

6   A.   Yeah.  Could you enlarge it a little bit, please?  Thank

7   you.

8   Q.   Yes.  Do you see that there?

9   A.   Yes.

10  Q.   And that signature -- that's your signature?

11  A.   Yes, it is.

12  Q.   As purchaser of the Trust, right?

13  A.   Yes.

14  Q.   So I guess I'm just wondering, why is this one not crossed

15  out?

16  A.   Could you scroll up a bit so I could see which doc --

17  exactly which document this is?

18       Yeah, okay.  So this is the lead-paint disclosure.  Well,

19  it looks like I signed this on June the 4th, so it was the day

20  prior.  So that -- yeah.

21  Q.   I'm going to show you government's -- and just to be clear,

22  the cross-outs were done on June 5th by yourself?

23  A.   Yes.  Yes, that's correct.

24  Q.   Government's exhibit 30, do you recognize this document?

25  A.   Yes, I do.

1    Q.   And what are we looking at here?

2    A.   I think this is the -- from the title company.  It's a

3    standard document produced by the title company.

4    Q.   And this document, on page 2 of 4, the purpose has been

5    representing the purchaser, right?

6    A.   Mmm-hmm.

7    Q.   That's you, right?  That's your name filled out in that

8    section.

9    A.   That's me, yes.

10   Q.   As Trustee.

11   A.   Yes.  That's what it says, yes.

12   Q.   Because the purchaser is the Trust, right?

13   A.   Yes, it says the name of purchaser, D.C. 2019 Irrevocable

14   Trust.

15   Q.   Right.  I mean, going back up to page 1, this is a document

16   that's disclosed to the Treasury Department's Financial Crimes

17   Enforcement Network, right, for -- you're aware of that?

18   A.   I can see that, yes.

19   Q.   All right.  And that's this document that's filed with the

20   Department of Treasury says the purchaser is the Trust.

21   A.   Okay.  Well, that's what it says, yes.  I'm not aware of

22   any other document other than this one.

23   Q.   And this -- the city -- and, obviously, the address is

24   redacted, but the city of the Trust is Tampa, Florida?

25   A.   Yes.

1   Q.   Is that the law firm --

2   A.   Yes, that is -- that is the law firm, that's correct.

3   Q.   And, obviously, on page 3 -- I think, 3 of 4 -- those are

4   the -- it's the information of the children, right?

5   A.   Yes.

6   Q.   Okay.  And the last page, that's your signature on June 28,

7   2020?

8   A.   Yes, that is my signature.

9   Q.   As trustee, not as 314 Hicks, LLC.

10  A.   Yes.  As I mentioned before, they -- 314 Hicks, LLC, is

11  owned by the Trust.

12  Q.   Okay.  I want to turn to exhibit 31.

13       Do you see this here?  I'm going to zoom in.

14  A.   Yes.

15  Q.   Are you familiar with this document?

16  A.   This looks like a bank statement, yes, for one of the

17  accounts.

18  Q.   Okay.  It's a composite exhibit of various account

19  statements.  There's five pages.  I guess, you see the first

20  page is an August statement.

21       Do you see that?

22  A.   Yes.  Yes, I do.

23  Q.   And, then, the second page is the September one.  October,

24  page 3; November, page 4; December, page 5.

25       Do you see that?

1    A.   Yes, yes.

2    Q.   Okay.  And when we were discussing previously that the

3    trust had a bank account at Chase Bank, this is -- this is the

4    one you're talking about ending in 0860?

5    A.   Yes, that's one of the accounts.

6    Q.   And what's the address for the Trust?

7    A.   Here, referenced is 597 Hibiscus Lane.

8    Q.   And that's Mr. -- Ms. De Castro's and Mr. -- and Mr.

9    Frieri's address, not yours, right?

10   A.   Yes, it is.

11   Q.   And -- sorry, it keeps -- and the initial deposit was $400

12   into the account for Ms. De Castro on page 1?

13   A.   Yes, it appears that way, yes.

14   Q.   And then you see here, on page 2, $997,000 comes into the

15   account, right?

16   A.   Yes.

17   Q.   And is that from the sale of that Kai Althoff artwork

18   piece?

19   A.   Yes.  As indicated on the transaction detail there, yes, it

20   is.

21   Q.   And then the October, page 3, statement, that money goes

22   out, the 997,000 -- or $996,025 goes out?

23   A.   That was moved into the brokerage account.  Yeah, it says

24   manual, I think, DB, for debit, brokerage.

25   Q.   Did you make that transfer?

1    A.   I would -- yes, I did.

2    Q.   And why would you -- why would you transfer the money to

3    the brokerage account?

4    A.   As I mentioned, Olympia and I discussed with some

5    regularity the -- you know, the application of the funds for --

6    for investment.  It was an area of expertise -- or is for her

7    much more than myself.

8         As the administrative agent for the Trust, you know, my

9    view is that she has every right to do that and provide those

10   recommendations, so, that's what happened.

11   Q.   As a brokerage account, it's going to make more money, or

12   it's going to have a return on investment as to this Chase

13   checking account, right (check)?

14   A.   As to IT, yes (check).

15   Q.   And did you authorize the transfer to this brokerage

16   account or as opposed to actually going online and -- bank

17   transfer --

18   A.   Yeah.  I think it would have probably had to be an

19   authorization.

20   Q.   Do you know if -- you don't know for sure or you don't

21   recall?

22   A.   I don't recall.

23   Q.   So is it possible that Mr. Hernandez Frieri transferred it?

24   A.   That's not possible.

25   Q.   Is it possible that Ms. De Castro transferred it?

1    A.   No, it would have been me.  I just don't recall if it was

2    done electronically or if I spoke with the relationship manager

3    at Chase to do it.

4    Q.   Okay.  And, then, on page 4 of government's exhibit 31, the

5    November statement, there's now -- it looks like there's now

6    two checking accounts under this one.

7         Do you know why that is?

8    A.   Yes.  I -- I do not recall why that is.  I don't know why

9    that is.

10   Q.   Okay.  But you see here that this -- in this month,

11   $5,351,520.54 comes into the account?

12   A.   Yes, that was the deposit that I made from the proceeds of

13   the Gramercy property.

14   Q.   Of Unit 2.

15   A.   Yes.

16   Q.   And, then, December's statement, page 5, that money goes

17   out, right?  That 5,350,000 goes out?

18   A.   Yes.

19   Q.   Do you know where that was going to?

20   A.   Could you scroll up to the date of this?

21   Q.   This was -- we had to kind of take a picture of it, because

22   it was secure, and I couldn't do anything with it, but do you

23   recall if it went to the brokerage account --

24   A.   Well, it -- it would have -- yes.  That's why I asked.  It

25   would have gone to the brokerage account unless it was the time

 1    around when the Hicks property was purchased.

 2    Q.  If you -- if the brokerage account was in existence, why

 3    did you also need a checking account at Chase?

 4    A.  Because that was where the deposits would go.  I don't know

 5    that you can deposit money directly into the brokerage account.

 6    Q.  Okay.

 7    A.  But -- the brokerage account came later, but I started with

 8    the checking account.

 9    Q.  Government's exhibit 30 -- actually, I'm going to skip to

10    33.  Sorry about that.

11        Are you familiar with this document, government's exhibit

12    33?

13    A.  This is one of the bank statements.

14    Q.  Is this the brokerage account, as far as you know?

15    A.  I can't see the account number.

16    Q.  Well, I guess -- it was redacted, but if it ends in 4870,

17    would that be the brokerage account for the Trust at JP Morgan?

18    A.  4870 is the brokerage account, yes.

19    Q.  And, again, the address for the Trust or the brokerage

20    account is the Hibiscus Lane address and not yours?

21    A.  Yes, yes.

22    Q.  And you see the graph there, that I'm highlighting here,

23    kind of in the middle, bottom of the screen; do you see that?

24    A.  Yes, I do.

25    Q.  Does that --

1    A.   I can't see any of the text or the numbers, but I see the

2    graph.

3    Q.   Let me zoom in.  Is it -- can you see it better now?

4    A.   Yes.

5    Q.   And does that graph represent the money coming in from the

6    sale of 3 Gramercy Park West, Unit 2, and then going out for

7    the purchase of 314 Hicks?

8    A.   It appears to, yes.

9    Q.   And, again, the decision to purchase 314 Hicks as opposed

10   to leaving it in this brokerage account, that was Olympia De

11   Castro's decision or yours?

12   A.   Well, as I said, you know, we -- we had been discussing the

13   purchase of that property, and agreed that it would be a good

14   investment, and so the property was purchased.

15   Q.   Did you consult with the protector of the Trust when that

16   decision was made?

17   A.   Olympia -- I don't know.  Olympia may have.  I did not.

18   Q.   And, obviously, I guess, after that, the purchase, there

19   was 300 some thousand dollars remaining in the brokerage

20   account?

21   A.   Yes.

22   Q.   Is that still there today?

23   A.   No, that brokerage account is not active anymore.

24   Q.   So where did the money go?

25   A.   So part of the money was used to invest in the Vanguard 529

```
 1   plans, and then the balance was moved into the checking
 2   account, which is now, as I mentioned earlier, going to be
 3   moved into a TD Bank account.
 4   Q.  So, I guess, I'm going to skip ahead to government's
 5   exhibit 35.
 6        Are you familiar with this document?
 7   A.  Yes, I am.  That's the Vanguard statement.
 8   Q.  Okay.  And this is the -- the Vanguard statement for the
 9   529s that were invested in as part of the Trust for the benefit
10   of the children?
11   A.  Yes, that's correct.
12   Q.  And I'm no mathematician, but, that's roughly, you know,
13   $80,000 more than the 300 we last saw in the brokerage account;
14   is that a fair estimate?
15   A.  Yes.  Well, again, I don't -- I don't have the date of the
16   brokerage account.  I would have to, you know, go through the
17   dates and look at the reconciliations.
18   Q.  I guess -- I'm going back to government's exhibit 33.
19        That's October, right?
20   A.  Yes, mmm-hmm.
21   Q.  And the Vanguard account, which was produced, I think, by
22   you, is as of February, correct?
23   A.  Yeah, yeah, but there was also a balance in the checking
24   account as well.
25   Q.  Okay.  The checking account for --
```

1    A.   The Chase checking account for the trust.

2    Q.   And, then, as you said, going to government exhibit 32,

3    there was an account for the 314 Hicks, LLC; is that correct?

4    A.   Yes, that's correct, mmm-hmm.

5    Q.   Okay.  Where did the money -- what was the source of the

6    money that came into this account?

7    A.   That was from the tenant.

8    Q.   And this is the account that you stated earlier was going

9    to be -- was going to be closed?

10   A.   All of the JP Morgan Chase accounts were going to be

11   closed.  Most of them are inactive.

12   Q.   But that was at the direction of the bank or a decision

13   made by you or others?

14   A.   It was a request by the bank.

15   Q.   And you -- I think you said it's been moved into a TD Bank

16   account, right?

17   A.   That's correct, yes.

18   Q.   And showing you government's exhibit 34, does this reflect

19   -- as of January, 2021, or, January 31 of 2021, does that

20   reflect the 314 Hicks bank account?

21   A.   Yes.

22   Q.   Again, the address of that on government's exhibit 34?

23   A.   Yes.

24   Q.   That's the Hibiscus Lane address, Ms. De Castro's and

25   Mr. Hernandez Frieri's address.

```
 1   A.   Yes, it is.

 2   Q.   Not yourself, as Trustee.

 3   A.   That is not my address, no.

 4   Q.   It's hard to see on my screen with all the boxes for the

 5   Zoom, but, looking at the other credits, the posting date of

 6   1/27, wire transfer incoming, is that a wire transfer from the

 7   JP Morgan 314 Hicks account?

 8   A.   Yes, it is.

 9   Q.   Okay.  And this -- this account receives the rent, or, I

10   guess, will receive the rent from 314 Hicks, the property

11   there?

12   A.   Yes, there -- yes, there has already been a rent payment

13   for the month of February.  It also handles any expenses

14   related to that property.  If the dishwasher or refrigerator

15   break down, or if there's some maintenance that needs to be

16   performed, funds from this account will be used for that.

17   Q.   And are you aware of the rental price?

18   A.   Yes, I am.

19   Q.   And what is that?

20   A.   17,500 monthly.

21   Q.   Okay.  And, again, there's no mortgage to pay off monthly,

22   right?

23   A.   That is correct.

24   Q.   And do you know the term or how long the lease lasts?

25   A.   I do not.
```

1    Q.   Okay.  Would it surprise you that it ends this spring,

2    around May or June?

3    A.   No, it wouldn't surprise me.  A lot of leases are year

4    long.

5    Q.   Right.  Because that would -- that would allow

6    Ms. De Castro to move into it prior to the start of the next

7    school year, right?

8    A.   We haven't discussed that.

9    Q.   Well, I thought at the very beginning you had discussed her

10   potentially moving into 314 Hicks, after her husband's case is

11   over?

12   A.   Yes.  Well, we discussed her moving to New York and

13   potentially moving into 314 Hicks, but we have not, in the past

14   couple of months, discussed the timing of her moving to New

15   York, or, you know, that she would necessarily live there.  We

16   said, if -- we discussed that if she could afford to live

17   there, you know, now that we know what the rental income can

18   be, then she would consider that for sure, but no decisions

19   have been made yet.

20   Q.   But it's -- that lease ending in May would allow her to

21   move up to that property and enroll her kids in school in New

22   York -- in the Brooklyn area, right?

23   A.   It could, yes.

24   Q.   And the lease that was signed, it's only an eight-month

25   lease right, September to --

1   A.   I -- I don't know.

2   Q.   As trustee, you're not -- you're not aware of the term of

3   the lease or the length of the lease?

4   A.   I am not.  The Hicks LLC was created to manage that

5   property, and, again, that's an administrative function that

6   Olympia is handling.

7   Q.   But you're -- I mean, you've lived in the New York City

8   area for a long time, right?

9   A.   Yes, I have.

10   Q.   Is an eight-month lease normal, from your experience,

11   living in the New York City area?

12   A.   There's really not much normal about New York City.  I

13   mean, I would say that a year lease is probably average.  I

14   know some people that have rented places for six months; some

15   do month-to-month; some do two years, so, I think, you know, it

16   depends on the circumstances.

17   Q.   Okay.  And do you know, or are you aware of any plans that

18   Ms. De Castro or Mr. Hernandez have to sell 597 Hibiscus Lane?

19   A.   No, I am not.

20   Q.   Are you being compensated -- outside of the payment for

21   your attorneys, are you being compensated in any way for your

22   role as Trustee of D.C. 2019 Trust?

23   A.   No, I am not.

24   Q.   For your role with, I guess, 3 -- if you had one -- with 3

25   Gramercy Park West, LLC, and now with 314 Hicks, LLC, are you

1  receiving any income for your role there?

2  A.  No compensation at all, no.

3  Q.  Are you aware of whether Ms. De Castro has received

4  compensation for the work she did as manager or what -- her

5  position with 3 Gramercy Park West, LLC?

6  A.  I -- I don't know.  I'm not aware.

7  Q.  Okay.  But, I mean, you're a trustee overseeing that LLC,

8  right?

9  A.  (No verbal response.)

10  Q.  The LLC was a part of the Trust, right, for a time being?

11  A.  For a brief period, yes, at that time.  I'm not aware that

12  she received any compensation for being part of that LLC.

13  Q.  And for Ms. De Castro's role, for her involvement with 314

14  Hicks, LLC, is she receiving any compensation that you're aware

15  of?

16  A.  No, she's not, not that I'm aware of.

17  Q.  And, again, this $75,000 that we're looking at here in

18  government's exhibit 34, is that all rental income, as far as

19  you know, and -- and the remainder of any monies left in the JP

20  Morgan Chase brokerage account after the creation of the 529s?

21  A.  Yes.

22  Q.  Are you aware of any other properties that

23  Mr. Hernandez Frieri and/or Ms. De Castro have control over or

24  have -- have control over in some sort of way?

25  A.  Besides the Hicks -- the Trust of Hicks and the 597?

1    Q.   Yes.

2    A.   No, I'm not.

3    Q.   Are you aware of any other bank accounts for the benefit --

4    are there any other bank accounts connected to the D.C. 2019

5    Irrevocable Trust that you're aware of?

6    A.   No.

7    Q.   Are you -- do you know how -- do you know what

8    Ms. De Castro -- or how she's making income right now?

9    A.   As I mentioned previously, she -- I know she serves as the

10   CFO for Balthazar Rex.  I don't know what her income is.  I

11   have not asked her.

12   Q.   And do you know if Mr. Hernandez Frieri is receiving any

13   income, of any sort, right now?

14   A.   I do not know.

15   Q.   Have you or your husband, or any other entity you're

16   involved in, lent him any money since his arrest in Italy in

17   2018?

18   A.   No, we have not.

19   Q.   Are you aware of people lending them money since his

20   arrest?

21   A.   No, I'm not.

22        MR. LUNKENHEIMER:  Your Honor, I have no further

23   questions at this time.

24        THE COURT:  Thank you, Mr. Lunkenheimer.

25        Anybody else have any follow-up questions for the

1   witness?

2          MR. PASANO:  This is Mr. Pasano.

3          No questions from me, Your Honor.

4          THE COURT:  Anybody else?

5          MR. RABIN:  Judge, I don't know that I have standing to

6   ask questions, so, I have none.

7          THE COURT:  Okay.  All right.  Very well.  In that

8   case, I believe that we can safely say we've concluded the

9   testimony from Ms. Domeneghetti.

10          MR. LUNKENHEIMER:  Yes, Your Honor.

11          THE COURT:  And at this point -- I guess there's no

12   need to reschedule any further hearings at this point, right,

13   Mr. Lunkenheimer?

14          MR. LUNKENHEIMER:  I defer to Mr. Pasano, Your Honor.

15   He said he -- I think he said he's only going to submit

16   affidavits, so -- none on behalf of the Government.

17          MR. PASANO:  And, Your Honor, thank you.  Thank you,

18   Your Honor.  Yes.  So by hopefully late today, or, no earlier

19   than tomorrow, we're going to submit a couple of documents.

20   One is a proffer from Mr. Hernandez that will follow up on --

21   attorney proffers that Ben Curtis and I have made with the

22   government regarding these issues of assets.  There will be a

23   proffer from Attorney Guy Rasco attaching documents.  He was

24   the attorney what handled Olympia De Castro's lawsuit against

25   Mr. Holtz.  And Mr. Rasco will dispute some parts of what Mr.

1    Holtz said, perhaps most important being that Olympia De Castro

2    met with Mr. Holtz in March of 2019, in New York, and,

3    thereafter, Mr. Holtz began to pay directly to Olympia

4    De Castro, monies toward the debt owed to her, paid about 80

5    plus thousand dollars, stopped paying.  That's when the lawsuit

6    was actually filed.  The lawsuit was settled.

7         And he also indicates and has provided documents that

8    at the time of the settlement, both Mr. Holtz and his wife

9    signed, but there is no request from Mr. Holtz for Gustavo

10   Hernandez to sign.  So that will be in those documents.

11        Then, we also have a short document, declaration from

12   Maria Lucia Hernandez -- Your Honor, we have a short

13   declaration from Maria Lucia Hernandez, who is the

14   sister-in-law, attesting to the H.H. Trust and explaining that

15   the family made a decision, after Mr. Hernandez's arrest, given

16   that the parents who formed the Trust had both died, to

17   disburse the Trust consistent with the parent's wishes, which

18   monies would go to the benefit of their grandchildren, and

19   that's what's part of what helps create the 2019 D.C.

20   Irrevocable Trust.  That's in her declaration.

21        And we may provide one other declaration, Your Honor,

22   also disputing some of what Mr. Holtz thought about the

23   transfer of title to the assets of I -- International Wine

24   Merchants.  At most, four documents, with attachments, and I'll

25   try to have them to the Court, but no witnesses.

1          THE COURT:  Okay.  Very well.

2          MR. LUNKENHEIMER:  Your Honor, this is

3   Mr. Lunkenheimer.  Look, we weren't really aware of any

4   proposed affidavits until today, and I guess for -- and,

5   honestly, for the purposes of this sentencing hearing, for the

6   reason why we're having this, if Mr. Pasano is going to put in

7   these affidavits, we would preserve the right -- that he would

8   present them, and we get to cross-examine them on the

9   affidavits, especially Ms. Maria Lucia Hernandez, I think,

10  because she is out of the country and kind of beyond our reach,

11  so -- and for everyone he mentions he's going to submit an

12  affidavit, outside of any of the attorney proffers, we would

13  reserve the right to cross-examine them after we review them.

14         THE COURT:  Why don't we just revisit that part --

15  revisit that issue after you take a look at it, and then decide

16  if you want to re -- reopen it.

17         MR. LUNKENHEIMER:  Thank you, Your Honor.

18         THE COURT:  We can tackle it then.

19         MR. LUNKENHEIMER:  Sounds good.

20         THE COURT:  I know, at this point, the sentencing date

21  is not -- it's set, but it's not imminent, right?

22         MR. PASANO:  It's the end of March, Your Honor.

23         THE COURT:  End of March.  Okay.  So you have a little

24  time, especially if there's agreement.  Even if there's not

25  agreement, you can always contact us, and we can follow up on

1    it.

2            MR. PASANO:  Your Honor, I don't mind proffering to the

3    Court and Mr. Lunkenheimer, we're trying to arrange to get

4    Maria Lucia Hernandez into the United States for the sentencing

5    so that she would be available, physically, and could be

6    questioned by the government at that time.  Given COVID issues,

7    that's tricky for the March sentencing date.  We're trying to

8    see how we can resolve it, but -- we're working on that.

9            THE COURT:  Okay.  Well, you know, to pick up

10   Mr. Lunkenheimer's point, scheduling an advanced hearing might

11   make sense for that purpose, but I'll leave it to you.

12           MR. PASANO:  Thank you, Your Honor.

13           MR. LUNKENHEIMER:  Thank you, Your Honor.

14           THE COURT:  Thank you all very much.  We're adjourned.

15           MR. PASANO:  Have a good day, Your Honor.

16           THE COURT:  You too.

17           THE COURTROOM DEPUTY:  Court is now adjourned.

18           (Court recessed at 12:41 p.m.)

19

20                  C E R T I F I C A T E

21

22        I hereby certify that the foregoing is an

23   accurate transcription of the proceedings in the

     above-entitled matter.

24

25           This hearing occurred during the COVID-19 pandemic

1    and is therefore subject to the technological limitations of

2    reporting remotely.

3

4    DATE:  March 24, 2021        /s/Ilona Lupowitz
                                  ILONA LUPOWITZ, CRR, RPR, RMR
                                  Official Court Reporter
5                                 United States District Court
                                  400 North Miami Avenue, 8th Floor
6                                 Miami, Florida 33128
                                  (305) 523-5634

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25