UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-20685-cr-WILLIAMS/TORRES

UNITED STATES OF AMERICA,

    Plaintiff,

v.

GUSTAVO ADOLFO HERNANDEZ
FRIERI, et al.,

    Defendants.

_____/

**DEFENDANT GUSTAVO HERNANDEZ FRIERI'S
SENTENCING MEMORANDUM PART B**

Defendant Gustavo Hernandez Frieri, ("Mr. Hernandez"), through counsel hereby submits his Memorandum in Aid of Sentence Part B, addressing Section 3553(a) and other mitigating factors in connection with his sentencing scheduled for April 30, 2021.

**I.    INTRODUCTION**

Operation MoneyFlight involved acts beginning in 2012 or earlier and billions of dollars stolen from the Venezuelan government and laundered around the world, plus tens of millions of dollars paid in bribes. Mr. Hernandez played no part in those actions. Mr. Hernandez did not know or have any relation to the activities in Venezuela or the Venezuelan defendants and co-conspirators identified in the Indictment. Mr. Hernandez did not become involved until early 2016 and his involvement constitutes a de minimis aspect of the MoneyFlight investigation.

Mr. Hernandez allowed one of the investment funds advised by Global Securities, a U.S. regulated financial services company in which he was a partner, to be used by Abraham Ortega and his banker to make investments and thus launder Ortega's illicit monies. It happened that this banker was a confidential source ("CS") working with Government agents throughout the entire period of Mr. Hernandez's activities here. It also happened that Mr. Hernandez did not earn any monies personally from these investments and his company earned ordinary fees.

Based, inter alia, upon the facts of this case, and sentences in other similar cases, and Mr. Hernandez' character and life of service to others, ample and compelling reasons exist calling for a substantial downward variance from the sentencing guidelines as computed in the Pre-Trial Sentencing Investigation Report ("PSR").

## II.   SECTION 3553(a) FACTORS APPLIED TO THIS CASE

We will not burden the Court with a lengthy discussion of the law relating to *Booker*, of which the Court is well aware. Instead, we will focus on the Section 3553(a) factors and issues important for this sentencing. We note that in considering the § 3553(a) factors, the sentencing guidelines are to be given no more or less weight than any other factor. *See United States v. Jaber*, 362 F. Supp. 2d 365, 370-76 (D. Mass. 2005) (providing comprehensive analysis of why sentencing guidelines do not reflect statutory purposes of punishment); *United States v. Ranum*, 353 F. Supp. 2d 984, 987 (E.D. Wis. 2005); *see also United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006) ("if *Booker* is to mean anything, it must be that the district courts are obligated to impose a reasonable sentence, regardless of the guidelines range, so long as the guidelines have been considered.").

Perhaps even more important, however, is that *Booker* establishes an independent limit on the sentence that may be imposed. The primary sentencing mandate of § 3553(a) states that the courts must impose the minimally sufficient sentence to achieve the statutory purposes of punishment/justice, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a). This so-called "parsimony provision" is not simply a factor to be considered in determining sentence; it represents a cap above which the court is statutorily <u>prohibited</u> from sentencing—even where a greater sentence is described by application of the sentencing guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring in part, dissenting in part).

### A.   Section 3553(a).

18 U.S.C. § 3553(a) contains the seven (7) factors that this Court must now critically consider before imposing a sentence, and provides:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed shall consider —

2

125835639.1

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for —

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . .

(5) any pertinent policy statement . . . ;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*Id.*

### B. Application of the Sentencing Factors Set Forth in 18 U.S.C. § 3553(a) to Gustavo Adolfo Hernandez Frieri.

#### 1. The Nature and Circumstances of the Offense.

Mr. Hernandez's plea relates to an investment into the GS Trade Finance Fund ("GSTF"), in June 2016 and in March 2017, for a total of USD $12 million. The investments were done after completing normal paperwork that all subscriptions were asked to complete since the Fund's inception in 2006. The monies were put in legitimate investments, in different and separate share classes, and the shares remained under the subscriber's control. Like other Fund subscribers, Mr. Ortega and his banker, the CS, had the discretion to loan back to themselves some of their monies. Loans of more than $1 million went back to the investors, at their instruction. The remaining monies stayed in the GSTF Fund and were still there at the time of Mr. Hernandez's arrest in July 2018.

3

The total income generated by Global Securities from these subscriptions into the GSTF Fund derived from the same standard annual management fee of 1.5% of assets as paid by all other 50 plus investors in the Fund and amounted to approximately $250,000 during the 24 month period. That is well under 1% of the annual Global Securities revenues. Mr. Hernandez received no money from these investments, and received no money from Mr. Ortega and his banker, the CS, in any capacity. *See* charts attached as **Exhibit A** regarding the MoneyFlight income and the marginal income Global Securities generated from these investments into the Fund.

### 2. The History and Characteristics of the Defendant

#### a. Mr. Hernandez's Background and Family Ties

Mr. Hernandez was born March 8, 1973 in Cartagena, Colombia. His parents, Francia Frieri and Gustavo Hernandez (civil engineer), are both deceased. He has two sisters, Maria Lucia Hernandez (Boston University Economist, 56 years old) and Maria Helena Hernandez (CESA, Business Major 46 years old), both of whom resided in Bogotá, Colombia at the time of his arrest. He has a brother Cesar Hernandez (Boston University Engineer, 57 years old), residing in Miami, Florida, and Mr. Hernandez's former partner in Global Securities.

After graduating from high school in 1991, Mr. Hernandez went to law school in Colombia (Universidad del Rosario: 1996), and then did a Masters and Doctoral Program in Political Economy in France (Institut d'Etudes Politiques de Paris, SciencesPo: 1999).

In 2007, Mr. Hernandez married his wife with whom he had been since 2002. They have 3 children ages 5, 7 and 9 years old. His wife has an undergraduate degree in Finance from University of Miami and a Masters in Economic Development from Columbia University, and worked in finance until she was terminated after Mr. Hernandez's arrest. Due to his arrest, Mr. Hernandez and his wife have divorced.

Mr. Hernandez started his professional career in 1999 as a university professor and research associate. By 2001 his brother had established in Miami, Global Strategic Investments, LLC, the SEC Registered and FINRA member US investment bank ("GSI"). His brother asked Mr. Hernandez to join him and start the economic research unit.

By 2002, Mr. Hernandez, his brother and their partners incorporated an affiliated company, Global Securities Advisors, LLC ("GSA"), an SEC Registered Investment Advisor specializing in emerging markets asset management, and they established an office in Greenwich, CT. Mr. Hernandez worked for GSA so he split his time between Miami and New York. GSA managed

4

125835639.1

various investment funds including GS Market Neutral Fund ("GSMNF", 2002 inception), GS Emerging Market Relative Value ("GSEMRV", 2006 inception) and GS Trade Finance ("GSTF", 2006 inception). By 2006, GSA managed closed to $800 million dollars from leading financial service firms. Up to the time of his arrest, Mr. Hernandez remained as a principal of GSA and served as co-director of the GSTF fund, along with the other 10 plus Global Securities funds and entities for which he also served as co-director.

Together with his brother and other partners, Mr. Hernandez served as a partner in multiple Global Securities registered investment banks across different countries in Latin America, for which Mr. Hernandez acted as a director of the board and member of the investment committee.

By December 31, 2017, the year prior to Mr. Hernandez's arrest, Global Securities employed about 300 team members and serviced more than 100,000 clients for whom they managed savings worth more than $2 billion. Due to Mr. Hernandez's arrest, the Global Securities entities have been either dissolved or are in the process of dissolution.

Along with his financial services career, from 2008 onward Mr. Hernandez invested in wine related companies for which he served as director. Mr. Hernandez also co-founded the management company of a wine investment fund, for which he served as director. Due to his arrest, these entities are also in the process of dissolution.

b. **Mr. Hernandez is deeply loved and respected**

*See* attached hereto as **Exhibit B** are a wide array of letters from family, friends, and colleagues on Mr. Hernandez's behalf. The sentiments in these letters are consistent and strong: Mr. Hernandez is a good, family man, an exceptionally charitable person, and an honest businessman who deserves a mitigated sentence. Here are just a few highlights of what the letters repeatedly emphasize about Mr. Hernandez:

*Claudia Silva*

> Over the years I watched with pride how Gusti, through plain hard work, integrity, and discipline, grew both personally and professionally. He built a beautiful family and a successful and reputable company, without ever forgetting to give back - Techo (a nonprofit organization to fight extreme poverty in Latin America) was always one of his big priorities. It all seemed like a dream come true for Gusti, he was finally enjoying the results of so many years of hard work. And then it all came crashing down.
>
> Gusti is broken, deeply ashamed, and guilt-ridden. Sorry is a word that is not enough to explain what he is feeling ... he would give everything to turn back the

125835639.1

clock and get on the right track. He know s that there is nothing in this world that can justify or even compensate for what he has done. All these years he has spent in house arrest has allowed him to reflect deeply on his actions and its repercussions. He knows that he has lost everything and that he is the only one responsible for so much misfortune.

*Francesco Noero*

More than most people I know, Gustavo is fully committed to his family. This commitment is what keeps him positive and moving forward despite his current situation. The times that I've been with him and his family, be it in Miami or elsewhere, there is nothing he seems to enjoy more than engaging in conversation with his children and wife. I once heard him having a 15 minute conversation with his son, Gabriel, about why thunder lights-up the house before you hear the rumble. Another activity that is prevalent in the Hernandez household is book-reading; you will often find Gustavo flanked by his three children in pajamas pouring over a Dr. Zeus book. Gustavo's presence is incredibly important for his children.

*Rosanna de la Espriella*

Gustavo has always been very generous and caring with me as a friend and with his family. … God is present and lives in the Hernandez family. A loving and united family is an important value, and I am sure that family is all to the Hernandez Frieri. Gustavo has a big generous heart, the example that he learned thanks to his parents. …  I remember when Gustavo's parents were ill how much he took care of them. He travelled frequently to spend quality time with them. He used to read the newspaper and books with his dad and sat with him for hours discussing about politics and other.

*Maria Mora*

In case you do not yet know this about my uncle, he is first and foremost an intellectual and academic. He loves reading, learning, and sharing these passions of his with others. As a partial Philosophy and Political Science major, I am able to find a lot of guidance in my uncle's extensive knowledge of different philosophers and theorists and he is always happy to help. . . .  Apart from always being present in my studies for whatever I may need, Gustavo is always trying to increase my intellectual and academic curiosity. Oftentimes when I go visit him, he will bring me to his library and allow me to keep any book I would like, in hopes that I will read it and experience as much fascination in its words as he does. He works hard to expand and cultivate the minds of his children as well. For their entire lives he has been wholeheartedly present in reading to them and encouraging their love of learning, rather than living a life glued to the TV.

*Dario Pacheco Angulo*

Gustavo has been a major influence in my life, having made sure to be there for me during important life decisions.  There are plenty of those moments that I could tell

you about, but there is one in particular that I'd like to bring to your attention: a difficult time after my father had committed suicide. Gustavo remained close to me with kind words of encouragement and gave me the right advice, as well as infinite support, to help me stay sane . . . it is important to mention Gustavo the *human being*, the father, the husband, the brother, the uncle, and the friend. A human being, with a big heart . ."

*Jorge Mora*

I mentioned earlier in this letter that he taught me how to be a better friend. Over the years I started to notice that he would never miss a birthday or anniversary of any of his friends. All the while I missed many. My always busy schedule giving me the excuse to not get on a plane to make a 40th birthday, a 10th anniversary, a baptism, a wedding, or a funeral. But when my father died a decade ago, I flew home to be with my mother and family for the funeral. As I walked out of the church the first person I saw was Gustavo; he had also flown in to be there. I remember that I had not cried since my father's death, but that gesture of being there made me break-down, and I will never forget it. Gustavo is THE friend I know I can always turn to, and if anything ever happened to me, I would want him to take care of my daughter.

### 3. Rehabilitation, Deterrence and Recidivism

The Sentencing Commission's report, "Measuring Recidivism" offers a statistical analysis of the type of person most likely and least likely to re-offend. Mr. Hernandez poses no risk to re-offend and he is not in need of rehabilitation. Mr. Hernandez has lost his reputation, his ability to work in finance, his professional licenses, and every business he built over the past twenty years in the United States and abroad. Mr. Hernandez has already been publicly disgraced by the glare of media attention over the MoneyFlight investigation, despite the fact that Mr. Hernandez did not know of or have any relation to the activities in Venezuela.

Mr. Hernandez was confined in Italy for over 9 months. Mr. Hernandez was incarcerated and later placed under strict house arrest in Miami for another 24 months. Mr. Hernandez has already suffered catastrophic consequences, such that a sentence is not needed to provide further deterrence.

### 4. The Minimally Sufficient Sentence.

Section 3553(a)(2) identifies four purposes a sentence should serve. The sentence imposed should reflect the seriousness of the crime; promote respect for the law; provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed educational training, medical care, or treatment

in the most effective manner. Given these considerations, we respectfully submit that a probationary sentence with Intermittent Confinement, Community Confinement, or Home Detention for Imprisonment, and with the condition that Mr. Hernandez perform, for a significant period, a rigorous, full-time program of community service is appropriate and adequately fulfills the purposes of sentencing. As noted, Mr. Hernandez presents no risk of recidivism. General deterrence is amply served by the already severe impositions as well as the many consequences Mr. Hernandez has already received. *See, e.g., United States v. Speed Joyeros, S.A.*, 204 F. Supp. 2d 412, 439-40; *United States v. Redemann*, 295 F.Supp.2d 887, 894-97 (E.D. Wis. 2003); *United States v. Gaind*, 829 F. Supp. 669, 670-71 (S.D.N.Y. 1993).

      a.    **Proportionality Among the Sentences/Punishment of Co-Conspirators and Avoidance of Unwarranted Sentence Disparities.**

There should be proportionality among the sentences and/or punishment of any co-conspirators. The statutory mandate that punishment be just and promote respect for the law incorporates the principle that "punishment should correlate with culpability . . .." This means that in appropriate cases, a court has discretion to "align codefendants' sentences somewhat in order to reflect comparable degrees of culpability." *United States v. Martin*, 520 F.3d 87, 95 (1st Cir. 2008).

Attached as **Exhibit C** are charts showing relevant sentencing statistics in cases involving money laundering comparable to the instant case. The average sentence in Venezuela-related money laundering cases is 29 months. Other money laundering cases, related to other countries in the region, yield an average sentence of 24 months. It is noteworthy that the dollar amounts laundered in these cases for the most part, drastically exceed the amounts in issue relating to Mr. Hernandez. Furthermore, the amount of profits generated by the defendants in Venezuela related money laundering cases are incredibly substantial, versus Mr. Hernandez, whose company generated minimal profits.

Some representative cases similar to the instant case are as follows. Others are set out in **Exhibit D** attached.

*U.S. v. Luis Javier Diaz and Luis Diaz Jr.*, 17 Cr. 0077 (SDNY) – **4 Months and 8 Months respectively**

Luis Javier Diaz and his son Luis Diaz Jr. (the "Diaz's") were the owners and managers of Miami Equipment and Export Company ("Miami Equipment"), a Florida domiciled company, that

125835639.1

from 2010 to 2016 was used to **transmit at least $100,000,000 dollars** from entities in Venezuela, to bank accounts in the U.S. and elsewhere, in exchange for a fee. Miami Equipment was not registered with the State of Florida or the Financial Crimes Enforcement Network (FinCEN), as required for money transmitting.

The Diaz's received the monies from the Venezuelan company, along with instructions about where to send the money, as well as fake invoices and contracts purporting to set forth a valid business reason for these payments. In this manner, the defendants sent money on behalf of the Venezuelan company to U.S. and foreign bank accounts of shell companies located around the world, for the benefit of Venezuelan government officials, employees of the company in Venezuela, and others who had no relationship with Miami Equipment. Through this conduct, the defendants functioned as an unregulated financial institution allowing foreign entities to move funds through the U.S. without scrutiny. For these activities, the Diaz's **received over $1,000,000 dollars in fees** from the Venezuelan company.

Diaz Jr. and his father Luis Javier Diaz were convicted at trial of International Money Laundering and Operating an Unlicensed Money Transmitting Business. Per the Sentencing Judge, the Guideline calculation count for the total offense was Level 34, with a sentencing range of 151 to 188 months. The comments of the Judge are instructive: "*I find, if I haven't already said it, that the guidelines' calculation here, the guidelines' range is wildly inappropriate in this case. ... I have in my informed discretion the ability to do what I think ultimately is right in this case. I must say that there is a need for some incarceration because of the magnitude, the potential gravity, the need for general deterrence, but I think that that can be adequately covered by the Court.*"

***U.S. v. Maria de los Angeles Gonzalez*, 13-cr-00901 (SDNY) – Time Served (16 1/2 Months)**

Maria de los Angeles Gonzalez de Hernandez ("Gonzalez") was VP of Finance of Venezuelan state-owned economic development bank, Banco de Desarrollo Economico y Social de Venezuela ("BANDES"). Gonzalez participated in a scheme in which Gonzalez received bribes from employees of Direct Access Partners LLC ("DAP"), in exchange for Gonzalez steering BANDES business to DAP, that resulted in DAP generating **over $60,000,000.00 in revenue**, of which **ca. $9,000,000.00 dollars were kicked back to Gonzalez as bribes**. Gonzalez's total offense level was Level 41, with a sentencing range of 324-405 months of imprisonment.

Per the Sentencing Judge: "*I assume that I would be sentencing you to somewhere between 36 to 48 months, given my view of the seriousness of your conduct and what was appropriate, taking into account by comparison with your codefendants your cooperation, your role in the offense. Issues of deterrence were really not at the forefront of my mind, either personal or general... I think appropriate punishment was the principal driving factor and all the other issues under 3553(a). I am affected by the degree of remorse that you state and your individual circumstances.*"

***U.S. v. Tomas Alberto Clarke Bethancourt*, 13-cr-670 (SDNY) – 24 Months**

Tomas Alberto Clarke Bethancourt ("Clarke") was a Senior VP of Direct Access Partners LLC ("DAP"), which made bribe payments to Maria de los Angeles Gonzalez de Hernandez ("Gonzalez"), in exchange for Gonzalez steering to DAP business from the Venezuelan state-owned

9

economic development bank, Banco de Desarrollo Economico y Social de Venezuela ("BANDES"). Gonzalez carried out bond transactions with Clarke, that resulted in DAP generating over **$60,000,000 in revenue**. **Clarke earned $5,788,424 in profits from the scheme**.

Per the Sentencing Judge: "*This is a case in which the guidelines are calculated as life based on an offense level of 43 and a criminal history category of I. The probation department recommends a sentence of 15 years' imprisonment. By comparison to the defendants Chinea and Demeneses, Mr. Clarke agreed to cooperate. He (Clarke) also made less money from his malfeasance than the other cooperating defendants Mr. Lujan, Mr. Hurtado, and at least the Direct Access Partners defendants.*"

*U.S. v. Moisés Abraham Millán Escobar,* 16-cr-009 (SD Texas) – ==Probation==

Moises Abraham Millan Escobar ("Millan") was a businessman who worked with companies supplying services to Petroleos de Venezuela, S.A. ("PDVSA"). Between 2009 and 2012, Millan and other businessmen paid bribes to PDVSA officials in exchange for lucrative energy contracts. The Guideline calculation for the offense was Level 19, with a range of 30 to 37 months.

Per the Judge: "*I understand the differences, in terms of people who are receiving bribes and people who are paying bribes. But I think in terms of the personal gain that he (defendant) did -- that he made in the case and what he's already forfeited, I think probation is what I'm going to do. I think under the circumstances I haven't really seen many defendants that I think are good candidates for probation. I think this one is. And I think that we still have the deterrent effect, but also when you consider the nature and circumstances of the offense and particularly the characteristics and history of this defendant, I think probation is the right sentence for this defendant.*"

*U.S. v. José Luis Ramos-Castillo*, 15-cr-00636 (SD Texas) – ==18 Months==

José Luis Ramos-Castillo ("Ramos-Castillo") was employed by Petroleos de Venezuela, S.A. ("PDVSA"). Ramos held a number of positions related to purchasing. Between 2009 and 2013, various businessmen made bribe payments to Ramos-Castillo in exchange for lucrative energy contracts with PDVSA, of which **Ramos-Castillo earned over $10 Million in profits from the scheme**. The guideline calculation was level 27, with a range of 70 to 87 months.

Per the Sentencing Judge: "*I think some period of incarceration is required just because of the deterrent value of this more than anything else. But I am going to go down farther than the government has asked me to do, but I think a period of 18 months in prison is sufficient but not greater than necessary considering all of the circumstances of this case and the 3553(a) factors.*"

*U.S. v. Darwin Enrique Padrón Acosta*, 16-cr-00437 (S.D. Texas) – ==18 Months==

Darwin Enrique Padrón Acosta ("Padrón"), controlled a number of companies used to secure contracts with Petroleos de Venezuela S.A. ("PDVSA"). Between 2009 and 2014, Padrón conspired with others to bribe PDVSA officials in order to obtain and retain lucrative energy contracts with PDVSA, of which Padrón received over **$9 Million dollars in profits**. Padrón wired the bribe

125835639.1

payments from bank accounts of Padrón's companies to the bank accounts of PDVSA officials, their relatives, or others designated by the PDVSA officials who received the bribes. In addition to the monetary payments, Padrón made bribes of gifts, meals, and travel. Padron's total offense level was Level 27, with a sentencing range of 70 to 87 months.

Per the Sentencing Judge: "*I think under the circumstances of this particular case and in view of this particular Defendant and the actions he has taken, cooperating immediately once he was approached by the agents, paying a substantial amount of money judgment that has been imposed on him in this case, accepting responsibility, cooperating, and three years, basically, on pretrial release without any issues, I think I'm going to depart downward further than the Government has asked me to do*."

### *U.S. v. Juan Sebastián Espinoza Calderón*, 19-cr-20626 (SDFL) – <mark>8 Months</mark>

Juan Sebastian Espinoza Calderón was an Ecuadorian and U.S. businessperson involved in a bribery scheme at Ecuador's state-owned oil company Empresa Pública de Hidrocarburos del Ecuador ("PetroEcuador"). Espinoza facilitated <u>bribe payments to PetroEcuador officials totaling $3,270,980, which secured contracts worth $27,800,000</u>. Espinoza conspired to launder the money connected with the bribery allegations.

### *U.S. v. José Melquiades Cisneros Alarcón,* 19-cr-20284 (SDFL) – <mark>20 Months</mark>

Jose Melquiades Cisneros Alarcon ("Cisneros"), from 2012 through 2015 conspired with others to pay bribes to officials at Empresa Publica de Hidrocarburos del Ecuador ("Petro Ecuador"), the Ecuadoran state-owned oil company, to secure fraudulent contracts from the company. $4.4 million in profits came from this scheme. Per the Guidelines calculation, the offense was Level 31, with a sentencing range of 108 to 135 months.

b. **Downward Departure/Variance**

The Supreme Court in *Booker* makes it apparent that sentencing courts must no longer ignore the individual characteristics of the person being sentenced, as the former mandatory guideline system required of courts. Specifically, the remedial majority in *Booker* directs sentencing courts to consider all of the § 3553(a)(1) factors, many of which the former mandatory guideline system ignored or rejected. Applying the facts of the case and information about Mr. Hernandez to the sentencing factors in § 3553(a) yields numerous general grounds supporting what has been called a "guidelines variance" but is better termed a "statutory sentencing application." These generally include:

1. Mr. Hernandez's unblemished history of lawful behavior. *See, e.g. United States v. Lam*, 20 F.3d 999, 1003-05 (9th Cir. 1994).

2. Mr. Hernandez's family considerations. *See, e.g. United States v. Leon*, 341 F.3d 928 (9th Cir. 2003).

11

125835639.1

3. The fact that prison time impacts a person like Mr. Hernandez (i.e., a first-time offender) more significantly.

4. Mr. Hernandez's otherwise outstanding character and the absence of risk of recidivism. *See, e.g., United States v. Nellum*, 2005 WL 300073 (N.D. Ind. Feb 3, 2005).

Here, in addition to general considerations, there are very specific grounds that support a departure/variance.

### (1) Introduction.

Guidelines and sentencing analysis, even in the era of "advisory guidelines," call for a two-step analysis. First, the Court should consider what is the proper guideline calculation. Second, the Court should consider departures. Whether to depart from the sentencing guidelines is a decision which requires a district court to make both factual and legal findings. Under 18 U.S.C. § 3553(b), a district court may depart from the applicable guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Thus, to depart from the sentencing guidelines, a district court must make two fundamental determinations: (1) what, if any, factor makes the case "atypical" (*i.e.*, unlike the typical case found under the applicable sentencing guideline), and (2) should that factor result in a different sentence. *Koon v. United States*, 518 U.S. 81, 91 (1996). The first of these determinations is factual in nature, *Id.* at 97, while the second involves both legal and factual considerations, *Id.* at 98.

### (2) This Is A Non-Typical Case.

Cases implicating a factor not adequately taken into consideration by the Sentencing Commission are said to fall outside the "heartland" of typical cases embodying the conduct described in the applicable guideline. *See* U.S.S.G. ch.1, pt. A, intro. comment. 4(b). A district court determines whether a case falls outside the heartland by making a refined assessment of the facts of the case and comparing those facts to the facts of other cases falling within the guideline's heartland. *See Koon*, 518 U.S. at 82. The instant case falls outside the heartland of cases because of the unique facts herein regarding Mr. Hernandez.

A typical money laundering case sees money "washed" and then transferred, making the funds difficult to trace and giving them appearances somewhat different than what the funds started as. That is not the case here. All monies were easily traceable. Almost all monies stayed in the Fund. This is not "heartland" money laundering. *See* charts attached as **Exhibit E** demonstrating the very minimal role Mr. Hernandez had in Money Flight and how his actions are not typical money-laundering.

There never was, in fact, actual money laundering. The Government's CS controlled what happened. At all times here the CS was working with Government agents. The $7 million invested in the GSTF Fund in June 2016 occurred under the watchful eyes and with the approval of the Government agents. So too the loans out and the $5 million investment in the GSTF Fund in March 2017. Further, the $5 million were wired to and from an undercover Government bank account. Simply put, what happened with Mr. Hernandez was akin to a Government "sting." This does not excuse Mr. Hernandez's conduct. But it does show that the instant case is not a typical money laundering case.

### (3) The Loss as computed by the Guidelines overstates Mr. Hernandez's Culpability.

Even under the mandatory guidelines regime, a departure where the loss substantially overstated the culpability of individual defendants was an "encouraged" ground for departure. *See* U.S.S.G. § 2B1.1 Application note 19(C). Courts have departed and/or varied in many cases where the criminal conduct initially was not organized and implemented specifically as a fraudulent scheme by the defendants and/or the defendants did not directly benefit from the fraud or benefitted from it to a much lesser extent than the loss figure would otherwise indicate. *See United States v. Hill,* 643 F.3d 807, 848 (11th Cir. 2011); *United States v. Broderson,* 67 F.3d 452 (2d Cir. 1995); *United States v. Nachamie,* 121 F.Supp. 2d 285 (S.D.N.Y. 2000); *United States v. Forchette,* 220 F.Supp 2d 914 (E.D. Wis. 2002); *United States v. Costello,* 16 F. Supp. 2d 36 (D. Mass. 1998); *United States v. Jackson*, 798 F. Supp. 556 (D. Minn. 1992); *United States v. Schaffer*, 121 F. Supp. 2d 29 (D.D.C. 2000); *United States v. Walters,* 87 F.3d 663 (5th Cir. 1996).

In *United States v. Hill, supra*, the Eleventh Circuit affirmed the sentence of an appraiser in a mortgage fraud scheme with a total loss of over $4 million. She earned not a single penny as a result of her participation in the scheme. The defendant, a first-time offender, faced a sentencing range of 63-78 months. Acknowledging "her extraordinary lack of profit" and "how the amount

of loss grossly overstated her criminal conduct compared to that of the other defendants," she was sentenced to 5 months imprisonment. *Id.*

Courts have the discretion to depart downward in cases like the present one where the offense level is pegged to a numerical figure, such as the amount of loss inflicted, and the resulting offense level overstates the seriousness of a defendant's conduct. *See* 18 U.S.C. § 3553(b); U.S.S.G. § 2F1.1, comment (n.11); U.S.S.G. § 5K2.0. *United States v. Restrepo*, 936 F.2d 661 (2d Cir. 1991) was such a case. The Second Circuit affirmed a downward departure for three money laundering defendants whose criminal activity bore "little relation" to the amount of money laundered. *Id.* at 667. The three defendants were paid only to load boxes of money at a warehouse. *See id.* at 667. The amount involved in the offense was $18.3 million, the amount of money seized at the warehouse when federal agents raided it. *See id.* at 664. The court concluded that there was little or no "connection between the quantity of money implicated and the extent of [the defendants'] participation in the offense." *Id.* at 667.

Other courts have also approved *Restrepo*. In *United States v. Stuart*, the Third Circuit held that "[w]here application of the Guidelines' monetary tables bears little or no relationship to the defendant's role in the offense and greatly magnifies the sentence, the district court should have the discretion to depart downward." 22 F.3d 76, 83 (3d Cir. 1994).

As these decisions illustrate, a sentencing court must examine the particular circumstances surrounding each individual defendant's participation in the crimes charged. If the guidelines' assumption that the losses claimed to exist in the PSR is indicative of Mr. Hernandez's culpability is contradicted by the facts of the case, the Court should depart downward:

> The United States Sentencing Commission, Guidelines Manual § 2B1.1 (Nov. 1997), points me first to the value of the loss to the victim, under the general theory that the amount of loss is an appropriate proxy for the gravity of the defendant's offense. But that is not the end of the analysis. I am obliged to look at the specific facts of the case before me, the human beings involved, the nature of the charges, and the circumstances of the offense to determine whether the factual circumstance I confront are "of a kind or to a degree not adequately taken into account by the Sentencing Commission."

*United States v. Costello*, 16 F.Supp.2d at 36, 37 (D. Mass. 1998).

In this case, while $12 million were invested in the fund for which Mr. Hernandez served as co-director, using that amount to establish a guidelines score is wrong-minded. $12 million did not go back out. $12 million was <u>not</u> in fact "laundered" in the traditional sense. None of the

125835639.1

monies ever left the sight of Government agents. In addition, Mr. Hernandez did not profit from the $12 million. In fact, Mr. Hernandez personally received no monies. The firm in which he was a partner received fees of approximately $250,000, which represented a de minimis amount of its earnings and was a standard fee charged to all fund subscribers. No additional fees or surcharges were imposed on the Ortega transactions. *See* attached as **Exhibit F** a chart demonstrating the absence of any gain by Mr. Hernandez in this case. The guidelines computation, driven by the $12 million investment amount, grossly overstates Mr. Hernandez's culpability.

### (4)     Other Departure/Variance Grounds.

#### (a)     **Extraordinary Philanthropy and Good Works**

Mr. Hernandez is by his nature a philanthropist. At an early time he became involved with TECHO US, the non for profit organization for which he served as Vice-Chairman from 2012 onwards, and prior to this as a volunteer for many years. Mr. Hernandez worked to raise many millions of dollars every year from charitable donations of individuals and corporations around the world for this charity. More importantly, Mr. Hernandez went to work in the most poverty-stricken slums across different countries Latin America, starting in his native Cartagena, where in 2012 Mr. Hernandez raised the monies and participated in the building of 100 transitional homes for families living in unacceptable conditions. Three months prior to his arrest, Mr. Hernandez and his family were back building homes in the Cartagena slums.

Mr. Hernandez was drawn to TECHO because it is a youth-led organization that was the opposite of the traditional non for profits. Mr. Hernandez was instrumental helping TECHO which has built over 120,000 homes for families in need, across 19 countries in the Americas and the Caribbean. To do this, TECHO mobilized over 1,000,000 youth volunteers that, through collaborative work with the families living in extreme poverty, are seeking to overcome the unacceptable conditions in which many people live in slums across the region. Together with his then wife, his three minor children, and many of his family members, friends and business colleagues, Mr. Hernandez organized and participated in community work for TECHO in slums across many different countries. Another example of the initiatives Mr. Hernandez started and led for TECHO is an event hosted every year in New York and in Miami that resulted in many millions of dollars of charitable donations annually.

*See* attached at **Exhibit G** are examples of some of the community building work Mr. Hernandez arranged and hosted, including TECHO Community Building trips from 2012 to 2018.

Also attached is an article about TECHO as well as letters describing Mr. Hernandez and his charity work. A few excerpts from these letters are as follows:

> *Diego Firpo*
>
> TECHO owes most of its accomplishments in the U.S. to Gustavo's generosity. And I'm not referring particularly to donations made but him and his family, but to his acts. Since Gustavo heard about TECHO's work for the first time, he has worked tirelessly and consistently to help grow TECHO's community in the US, trying to involve every single person in his network. Both in 2012 and early this year, he and Olympia, his wife, with the baptism of their children as a hook, organized building trips to Cartagena, Colombia. During these trips they would volunteer their time and raise funds to build transitional homes with TECHO for families living in slums. Over 100 people joined each trip. All of them spouses and children of Gustavo's and Olympia's closest friends/colleagues from the US, Latin America and Europe, who would also join the fundraising and volunteer efforts.
>
> *Paulo Gaio de Castro*
>
> Gustavo has also been a major supporter and patron of the Latin American NGO TECHO… Over the past 20 years, it has mobilized over a million young volunteers in 19 countries and built over 120,000 pre-fab wooden homes for the extreme poor in slums throughout Latin America… My first contact with TECHO was in 2012: Gustavo invited me, and 50+ family and friends from all over the world to Cartagena, Colombia, to celebrate my first grandson's baptism. Over the next two days, Gustavo combined the celebration of his son's baptism with introducing all of us to TECHO, as we all participated in building homes in the slums for 10 families. I later learned he not only funded the 10 homes we built, but also an additional 90 homes, later built by local youth volunteers.
>
> *Juan E. Hernandez*
>
> As a family man, Gustavo is an example to all around for he is a caring, protective, and above all, a loyal and devoted husband and father… It was also Gustavo Hernandez who showed me the infinite rewards of helping the less privileged through his charitable yet always hands on approach to helping those needy everywhere in his native Latin America as a very active member of TECHO.
>
> *Ahmet Erkaya*
>
> I am grateful for life for just having met such an amazing human. I am not however the only one who looked up to [Gustavo]. Through the charities, he is heavily involved he made many people in need a house owner. Many kids in need got a proper education. He also supported young artists who needed the right platform to expose their work. Every person he touched in life has learned something morally constructive from him.
>
> *Ignacio Cruz*
>
> I know Gustavo Hernandez since the beginning of the year 2016, when I joined the Board of Dirtectors of American Friends of Un Techo para mi Pais of which

16

125835639.1

> Gustavo was member. From that position I got to know Gustavo's great dedication and generosity in supporting TECHO activities, not only as a Board member, but also involving himself, his family and many of his friends and their families in the TECHO cause. This support resulted in the development of fundraising events and their active participation in the field work with the families with whom TECHO works, especially in Colombia, building transitional houses and engaging in activities of community development. Undoubtedly, Gustavo's contribution has been very valuable for the most vulnerable people, both in the personal contribution and in the involvement of many people supporting the overcoming of poverty in Latin America.

In addition to work with TECHO described above, Mr. Hernandez has been working for the past year in a pro bono capacity for youth focused charities. The charitable work Mr. Hernandez has performed and Mr. Hernandez's philanthropic contributions in general are more fully described in Mr. Hernandez's letter, attached as **Exhibit H**.

      (b)    **Extradition and Confinement in Italy**

Mr. Hernandez was arrested while on family vacation in Italy in July 2018, on a warrant seeking his extradition. Mr. Hernandez spent more than nine (9) months under confinement in Italy.

The extradition treaty between the United States and Italy calls for reciprocal treatment. One aspect of this relates to Mr. Hernandez's confinement while he was in Italy. In the United States, a defendant released on bond receives no credit for his time on house arrest. No so in Italy, where a defendant cannot be released on bond. The cornerstone provision is art. 657 of the Italian Criminal Code of Procedure. Here is the Italian text:

> [1] Il pubblico ministero, nel determinare la pena detentiva da eseguire, computa il periodo di custodia cautelare subita per lo stesso o per altro reato, anche se la custodia è ancora in corso. Allo stesso modo procede in caso di applicazione provvisoria di una misura di sicurezza detentiva, se questa non è stata applicata definitivamente.

Here is the relevant translation:

> [1] As he determines the amount of time to be served, the Prosecutor computes the amount of time the offender has spent in pre-trial arrest for the offence at stake, or for another offence, even if the offender remains under custody. Likewise, when an arrest measure was ordered as a pre-trial measure, if the measure has not been imposed with the conviction.

It is not debatable that under the current Italian criminal legislation if a person spent a certain amount of time in pre-trial detention (any type of arrest included pursuant to art. 284, par. 5, Italian Criminal Code of the Procedure) for an offence and ends up being convicted thereof, said

17

amount of time has to be deducted from the amount that person will serve. In other words, under Italian law pretrial restraint is deducted from the ultimate sentence, even if it is in relation to a foreign extradition.

*See* attached as **Exhibit I** the letter of attestation issued by the Italian Ministero della Giustizia, Dipartimento dell'Amministrazione Penitenziaria (DAP), the Italian Ministry of Justice, Department of Prisons, confirming per Italian law that Mr. Hernandez was under arrest for the entire period from July 25, 2018, to May 2, 2019, that is 282 days. Also attached under the same Exhibit is Article 657 of the Italian Criminal Code of Procedure and additional materials demonstrating the time Mr. Hernandez was in custody under Italian law.

See also *Hernandez v. United States*, 2013 WL 12131612 (S.D. Fla. Apr. 30, 2013) aff'd, 542 F. App'x 865 (11th Cir. 2013) where the sentencing court sentenced the defendant below the guidelines range, subtracted nine months for the time served in Colombia, and imposed an additional six-month downward departure due to the conditions in the Colombian prison.

(c) **Confinement in the U.S.**

Mr. Hernandez was confined at the Federal Detention Center from May 2, 2019 until May 21, 2019. Subsequent to this, for the past 24 months, Mr. Hernandez has been under a highly restrictive 24-hour house confinement and electronic monitoring regime, authorized to leave his home during the day *only* for meetings with his attorneys.

(d) **Extraordinary Cooperation**

An additional ground for variance is Mr. Hernandez' extraordinary cooperation with the Government in this case. We take this position notwithstanding current Government counsel's refusal to seek a 5k departure or award Mr. Hernandez a third "acceptance" point.

The fact is that as part of his plea agreement, Mr. Hernandez pledged to meet with the Government lawyers and agents and assist them in any way possible regarding ongoing investigations. Government counsel accepted that Mr. Hernandez had no direct knowledge of possible wrongdoing. What Mr. Hernandez did offer, and what the Government readily accepted as his cooperation was his expertise and understanding of financial transactions. Over the course of meetings with the government, prosecutors and agents presented Mr. Hernandez with information the government had obtained in a separate cross-border investigation and requested the assistance of Mr. Hernandez in understanding the different financial structures, investment vehicles, and layers of transactions. Agents from various law enforcement agencies joined in these

meetings, where Mr. Hernandez became a de facto expert helping the prosecutors and agents understand these transactions and how money moved and why.

On four occasions prior to his plea, Mr. Hernandez and his lawyers met with the Government. Six more sessions occurred after the plea was entered. These meetings were held in person during the COVID crisis at the Carlton Fields law offices, since Government offices were unavailable. The amount of technical information Mr. Hernandez provided was substantial. A summary of this cooperation is attached as **Exhibit J** (to be submitted under seal). As part of Mr. Hernandez's cooperation, he also provided the Government a vast array of materials, at times binders filled with documents and analysis.

In addition, from the outset of meeting with the Government and prior to entry of his plea, Mr. Hernandez endeavored to assist in repatriating monies that were invested through the Class C and D shares in GSTF held by Ortega and the CS. Mr. Hernandez identified where monies were invested, along with the contact information and relevant documentation regarding who was holding those funds. Much of the investments were in Colombia to businesses in the form of loans with fixed maturities. Some of these loans already matured. Once it became clear that the Government was unable to obtain repayment directly, Mr. Hernandez had his lawyers contacted the Fund borrowers. Several millions of dollars in Ortega loan repayments are available. We have offered that these monies be wired to a Carlton Fields escrow account for forfeiture to the Government. A breakdown of the investment in the GSTF Fund, as well as the investment statements by the Fund's third party administrator, Apex Fund Services, are attached as **Exhibit K**. The value of the GSTF Fund shares invested by Ortega and the CS and seized by the Government, as of June 30, 2018, amounted to $12,144,705.26. This matters because the value of assets seized by the Government pursuant to this Court's Preliminary Order of Forfeiture, dated June 24, 2019 (DE 124), actually equals or exceeds the forfeiture money judgment. Mr. Hernandez understood that the issue regarding forfeiture was how the Government could monetize that asset valuation and has endeavored to work with Government counsel over the past two years to help the Government recover Ortega funds.

### III. CONCLUSION

The circumstances stated above, taken either separately or collectively with the other 18 USC §3553 sentencing factors offered in this memorandum, represent a mitigating circumstance of a kind, or to a degree, that have not been adequately taken into consideration by the Sentencing

Commission in formulating the guidelines, §5K2.0. Thus, a downward departure/variance is amply justified. *See also* **Exhibit L**, a video relating to Mr. Hernandez's character and charitable good works.

Mr. Hernandez respectfully asks that this Court consider all of his arguments and the factors of 18 U.S.C. § 3553(a) and impose a "reasonable" but not greater than necessary sentence. Regardless of how this Court resolves issues relating to the advisory guidelines here, we urge the Court to grant a variance to Mr. Hernandez and to impose a probationary sentence with Intermittent Confinement, Community Confinement, or Home Detention for Imprisonment, and with the condition that Mr. Hernandez perform, for a significant period, a rigorous, full-time program of community service. Attached as **Exhibit M** is an explanation of the proposed community service sentence.

Respectfully submitted,

*s/ Howard Srebnick*
Howard Srebnick (FBN 919063)
Email: hsrebnick@royblack.com
Black, Srebnick, Kornspan & Stumpf
201 South Biscayne Blvd., Suite 1300
Miami, Florida 33131
Tel: 305-371-6421
*Co-Counsel for Defendant, Gustavo Adolfo Hernandez Frieri.*

*s/ Michael S. Pasano*
Michael S. Pasano (FBN 0475947)
Email:  mpasano@carltonfields.com
CARLTON FIELDS
2 MiamiCentral
700 N.W. 1st Avenue, Suite 1200
Miami, Florida 33136
Tel: (305) 530-0050
Fax: (305) 530-0055
*Counsel for Defendant, Gustavo Adolfo Hernandez Frieri.*

Dated: April 20, 2021