UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CR-20685-WILLIAMS/TORRES

UNITED STATES OF AMERICA

v.

GUSTAVO ADOLFO HERNANDEZ FRIERI,

       Defendant,

_____/

MARIA LUCIA HERNANDEZ,
GRAMERCY IRREVOCABLE OPERATING
TRUST, AMERICAS FIDUCIARY LTD.,
3 GRAMERCY PARK WEST LLC, and
HH MASTER SETTLEMENT
TRUST.

       Third-Party Petitioners,

_____/

**MARIA LUCIA HERNANDEZ, GRAMERCY IRREVOCABLE OPERATING
TRUST, AMERICAS FIDUCIARY LTD., 3 GRAMERCY PARK WEST LLC,
AND HH MASTER SETTLEMENT TRUST'S NOTICE OF CLAIM,
VERIFIED PETITION, AND REQUEST FOR HEARING TO ADJUDICATE
THE VALIDITY OF THEIR INTEREST IN REAL PROPERTY**

Petitioners, MARIA LUCIA HERNANDEZ, GRAMERCY IRREVOCABLE
OPERATING TRUST, AMERICAS FIDUCIARY LTD., 3 GRAMERCY PARK WEST LLC,
and HH MASTER SETTLEMENT TRUST, file this notice of claim, verified petition, and
request for ancillary hearing pursuant to 21 U.S.C. § 853(n) and (p) and Rule 32.2(c) of
the Federal Rules of Criminal Procedure.

**I.      INTRODUCTION AND SUMMARY**

Petitioners assert their interest in 314 Hicks Street, Brooklyn, New York 11201
(314 Hicks). *See* DE:353 (preliminary order of forfeiture of 314 Hicks).

Petitioners make their instant claim based on filings by the Government that dispute the validity of the transfer by Petitioners in February 2019 of all the Membership Interests in the record title owner (Petitioner, 3 Gramercy Park West LLC) of the predecessor property, 3 Gramercy Park West, Unit 2, New York (the Gramercy apartment) the sale proceeds of which were used to acquire 314 Hicks. *See* DE:344:8 (Government asserts that transfer of ownership of 3 Gramercy Park West LLC may be "voidable"). If the position asserted by the Government were upheld and transfer of the Membership Interests in 3 Gramercy Park West LLC ("Membership Interests") were to be voided or nullified, then title and ownership of 314 Hicks, the acquisition of which derives directly from disposition of the Gramercy apartment, must revert, in whole or in part, to one or more of the Petitioners.

Petitioners therefore assert their instant petition to protect their interest from unwarranted forfeiture in the event that the Court were to adopt arguments advanced by the Government seeking to void or nullify the transfer of the Membership Interests (and hence ownership of the Gramercy apartment) in February 2019. If the transfer is deemed invalid as contended by the Government, Petitioners' ownership interest in the acquired property, 314 Hicks, should be recognized. *See In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1215 (11th Cir. 2013) (holding, in context of ancillary forfeiture proceeding, that properties acquired with non-forfeitable funds are also non- forfeitable where defendant had no property interest in such funds; "If the funds used to acquire the other properties ... were not proceeds, it follows that any properties purchased with them were not properties derived from proceeds.").

Petitioners assert their interest as an equitable lien and constructive trust in the 314 Hicks property acquired with the proceeds of the sale of the Gramercy apartment, in

that Petitioners are not mere general creditors of the transferees of the Gramercy apartment; instead, the Gramercy apartment provided consideration for acquisition of 314 Hicks, consisting of proceeds of the Gramercy apartment. *See United States v. Shefton*, 548 F.3d 1360, 1366 (11th Cir. 2008) (upholding constructive trust claim in ancillary proceeding; "[W]e agree with the majority of circuits that have held that a constructive trust can serve as a superior legal interest under [21 U.S.C.] § 853(n)(6)(A) and thus can serve as grounds for invalidating a criminal forfeiture order."); *United States v. Ramunno*, 599 F.3d 1269, 1274 (11th Cir. 2010) (in ancillary proceedings, courts do not "throw considerations of fairness and equity out the window when determining whether to recognize a constructive trust").

Under both Florida and New York law, a constructive trust is imposed and an equitable lien is created where, even though no wrongdoing was committed or intended, property of another is acquired under circumstances where authority was lacking for the transfer, such that the transfer by which acquisition occurred is deemed invalid. In such a circumstance, reversion of the interest to the putative transferor and residual owner— in this case, the Petitioners—by means of constructive trust and equitable lien is required. *See Am. Cities Power & Light Corp. v. Williams*, 74 N.Y.S.2d 369, 371 (Sup. Ct. 1947), *aff'd*, 274 A.D. 751, 80 N.Y.S.2d 357 (N.Y. App. Div. 1948) ("when property has been acquired under circumstances requiring that the holder of the legal title may not in good conscience retain the interest ... equity converts him into a trustee ... and where a person holding title to property ought in equity to convey it to another on the theory that he would be unjustly enriched and that it would be inequitable if he were to retain it ... a constructive trust arises") (citing *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386 (N.Y.1919) (Cardozo, J.), *superseded by statute on other grounds*, N.Y. Gen. Oblig.

Law § 15-301); *Bucacci v. Boutin*, 933 So. 2d 580, 587 (Fla. 3rd DCA 2006) ("We have long recognized that equitable lien claims may be brought in this district, even though the suit affects land not within the territorial jurisdiction of the court."). Federal courts recognize such state law constructive trust interests. *See Shefton*, 548 F.3d at 1366; *Ramunno*, 599 F.3d at 1274.

Petitioners' interest satisfies the requirements of 21 U.S.C. § 853(n)(6)(1) (i.e., a legal right, title, or interest in property that was vested in a petitioner rather than the defendant at the time of events leading to the forfeiture of the property), and § 853(n)(6)(2) (i.e., a legal right, title, or interest in property that was superior to any right, title, or interest of the defendant at the time of events leading to the forfeiture of the property).

When the transfer of Membership Interests in 3 Gramercy Park West LLC was sought to be effected in February 2019, the record title owner of the Gramercy apartment was Petitioner 3 Gramercy Park West LLC, the Membership Interests of which were owned by Petitioner Gramercy Irrevocable Operating Trust (GIOT), a Nova Scotia trust established on July 1, 2005. The sole beneficiary of GIOT was the HH Master Settlement Trust, a Nova Scotia trust originally established on February 26, 2003, and subsequently amended and restated on November 13, 2006. In turn, Petitioner Maria Lucia Hernandez was the solebeneficiary of the HH Master Settlement Trust. (A second beneficiary of the trust, Maria Helena Hernandez, disclaimed her beneficial interest in the HH Master Settlement Trust in January 2019, leaving Maria Lucia as the sole beneficiary of the HH Master Settlement Trust. *See* Exhibit A, attached; disclaimer of Maria Helena).

Maria Lucia has offered her sworn statements to the effect that she transferred the Membership Interests to an irrevocable trust created in 2019 (DC Trust), and that

she did so solely for the benefit of the minor children of Olympia De Castro and the defendant, in accordance with her father, Gustavo Hernandez Romero's intention that the Gramercy apartment be used for his grandchildren's benefit. *See* Exhibit B, attached (affidavit of Petitioner Maria Lucia Hernandez). Documents filed in this case, *see* DE:383 (and exhibits attached thereto), indicate that the DC Trust caused 3 Gramercy Park West LLCto sell the Gramercy apartment, held the proceeds for approximately seven months in a trust brokerage account, then used the sale proceeds to purchase 314 Hicks. Thereafter, Maria Lucia caused 3 Gramercy Park West LLC to be liquidated. A separate third-party petition indicates that the DC Trust transactions were undertaken consistently with Gustavo Hernandez Romero's intent that the Gramercy apartment be used for his grandchildren's benefit (as grandfather of the minor children who are third-party petitioners in the petition filed as DocketEntry 383).

No person other than Petitioners had any right to contest or object to any action taken to effect trust purposes as occurred in this matter. Action taken by the Government in this case to retrospectively control Petitioners' asset dispositions exceeds any right of action by the Government under forfeiture laws and violates the due process rights of the Petitioners, whose interest is vested. Petitioners' interests arise from events and funding that predate, and are unrelated to, any occurrence for which a claim of forfeitability could be asserted.

Despite arguing that the relevant transfer of the Membership Interests is voidable, the Government failed to provide direct notice to Petitioners as required by Fed. R. Crim. P. 32.2(b)(6). Thus, it is unclear whether the Government will maintain itspresent claim of a voidable transfer or whether, instead, the Government will conclude that it has no valid basis to challenge transfers made in good faith.

Petitioners' claims are timely filed following publication of a forfeiture notice by the Government. Petitioners request a hearing to adjudicate the validity of their interests and to amend the Fourth Preliminary Order of Forfeiture, DE:353, to exclude 314 Hicks as a substitute asset subject to forfeiture against the defendant Hernandez Frieri.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Petitioner, Gramercy Irrevocable Operating Trust (GIOT) was created and became effective July 1, 2005. *See* Exhibit C, Gramercy Irrevocable Operating Trust, Declaration of Trust. Pursuant to the GIOT Declaration of Trust, dated July 1, 2005, HH Master Settlement Trust was the sole beneficiary of GIOT.  Petitioner, HH Master Settlement Trust was originally created on February 26, 2003 and subsequently amended and restated on November 13, 2006. Gustavo Hernandez Romero was named as the primary beneficiary of the HH Master Settlement Trust and his two daughters, Maria Lucia and Maria Helena Hernandez were the contingent beneficiaries.  *See* Exhibit D. Americas Fiduciary Ltd. was appointed as Trustee of both GIOT and the HH Master Settlement Trust.  *Id.* (authorizing signature by principal Timothy Richards). GIOT held all of the Membership Interests.

Defendant, Gustavo Hernandez Frieri, did not create GIOT, nor did he contribute assets to GIOT, nor did he serve as Trustee of GIOT, nor was ever a beneficiary of GIOT. Equally, the defendant was never a Trustee, nor beneficiary of HH Master Settlement Trust, nor an owner of 3 Gramercy Park West LLC and Americas Fiduciary Ltd. Instead, Gustavo Hernandez Romero was the original beneficiary of the HH Settlement, and his daughters, Maria Lucia and Maria Helena Hernandez were contingent beneficiaries, whose interests became that of sole beneficiaries upon the death of Mr.

Hernandez Romero in November 2006. *See* ExhibitD, Annex "B" (The Amended and Restated HH Settlement).

On July 28, 2005, Petitioner 3 Gramercy Park West LLC was incorporated in New York by GIOT. *See* Exhibit E (Articles of Organization). Shortly after it was formed, 3 Gramercy Park West LLC purchased the Gramercy apartment on August 16, 2005. *See* Exhibit F (Deed and recording information for 3 Gramercy Park West). The defendant was never a member or owner of 3 Gramercy Park West LLC and never owned the Gramercy apartment. *See* Exhibit G (LLC operating agreement).

In February 2019, Maria Lucia Hernandez, as sole beneficiary of HH Master Settlement Trust, assigned ownership of the Membership Interests of 3 Gramercy Park West LLC (which also transferred ownership of the Gramercy apartment) to the DC Trust. *See* Exhibit H (Assignment and Assumption of Limited Liability Company Membership Interest in 3 Gramercy Park West, LLC). Maria Lucia consented to this assignment. *See* Exhibit I.

According to the verified petition filed at DE:383, in November 2019, 3 Gramercy Park West LLC sold the Gramercy apartment. *See* Exhibit J. The Government has stipulated that the proceeds from the sale of the Gramercy apartment were used to buy 314 Hicks. The Government has acknowledged "proceeds from the sale of the Gramercy Apartment funded the 2020 purchase of the 314 Hicks Brooklyn Townhouse." DE:344 at 8; *id.* at 7 (asserting that 3 Gramercy West LLC may have been "owned and controlled" by Hernandez "family relatives through a series of trusts"). *See also* Exhibit K (DC Trust Chase Checking Account November 2019 statement); Exhibit L (DC Trust J.P. Morgan Brokerage Account December 2019 statement).

Petitioners contend that this ownership history renders the Fourth Preliminary Order of Forfeiture invalid in whole or in part because the right, title, or interest was vested in Petitioners rather than the defendant, or was superior to any right, title, or interest of the defendant, at the time of the commission of the acts which gave rise to the Fourth Preliminary Order of Forfeiture and at all other times. *See* 21 U.S.C. § 853(n).

Thus, Petitioners assert vested legal and equitable interests in 314 Hicks. The Government has acknowledged that family trust assets are at issue. DE:402 at 6 (referring to the defendant's "family's trusts" as holding ownership interests in the Gramercy apartment). And the law is clear that trusts for the benefit of family members are a valid and proper means of ownership, preservation, and disposition of property—and that they are to be viewed in that light under the law. *See*, *e.g.*, *In re Kenneth Allen Knight Tr.*, 303 F.3d 671, 676 (6th Cir. 2002) (recognizing that the "basic distinction between business trusts and nonbusiness trusts is that business trusts are created for the purpose of carrying on some kind of business or commercial activity for profit; the object of a nonbusiness trust is to protect and preserve the trust  res") (internal citation omitted).

The plain language of section 853(p) provides that only the substitute property *of the defendant* may be forfeited to the Government.  21 U.S.C. § 853(p) ("[T]he court shall order the forfeiture of any other *property of the defendant*, up to the value of any property" found directly forfeitable due to a criminal nexus) (emphasis added); *see United States v. Seher*, 562 F.3d 1344, 1373 (11th Cir. 2009) (only "Seher's property could be a substitute asset for the personal money judgment"). The defendant did not own the Gramercy apartment.

Because Petitioners, if the Government's position—that the transfer of the Membership Interests to the DC Trust was invalid and should be nullified—were adopted, must be found to hold legal right, title, and interest in 314 Hicks (the successor property to the Gramercy apartment), and their legal right, title, and interest is superior to that of the defendant and the Government, Petitioners request a hearing to adjudicate the validity of their interests and to amend the Fourth Preliminary Order of Forfeiture and exclude the real property 314 Hicks.

WHEREFORE, MARIA LUCIA HERNANDEZ, GRAMERCY IRREVOCABLE OPERATING TRUST, AMERICAS FIDUCIARY LTD., 3 GRAMERCY PARK WEST LLC, and HH MASTER SETTLEMENT TRUST respectfully move for a hearing to adjudicate the validity of their interest in the property and later to amend the forfeiture order and exclude 314 Hicks Street from any future forfeiture order.

Respectfully submitted,

  s/ Richard C. Klugh
Richard C. Klugh, Esq.
Fla. Bar No. 305294
Counsel for Petitioners
40 N.W. 3rd Street, PH1
Miami, Florida 33128
Tel. (305) 536-1191
Fax (305) 536-2170
E-Mail  klughlaw@gmail.com

## VERIFICATION

I have read the Verified Petition in this action.  Based on my personal knowledge and my review of records concerning the matters at issue in this action, the factual matters alleged in the Petition are accurate. In accord with 21 U.S.C. 853(n)(6), I declare under penalty of perjury that the foregoing is true and correct.

By: _____          Dated: __May 28, 2021__
    Maria Lucia Hernandez

By: _____          Dated: __May 28, 2021__
    Timothy D. Richards

**EXHIBIT  A**

## DISCLAIMER OF INTEREST

**THIS DISCLAIMER OF INTEREST** ("Disclaimer") is made by MARIA HELENA HERNANDEZ FRIERI, in connection with The Amended and Restated HII Master Settlement, a Nova Scotia Trust dated November 13th, 2006 (the "Trust").

## RECITALS

**WHEREAS**, Schedule "B" of the Trust grants to me, as a contingent beneficiary, a beneficial interest in the Trust ("Beneficial Interest"); and

**WHEREAS**, I wish not to be a beneficiary of the Trust; and

**WHEREAS**, I desire to disclaim in whole, my Beneficial Interest in the Trust.

**WHEREAS**, I make this disclaimer with legal capacity and under no duress.

## WITH THIS DEED WITNESSETH AS FOLLOWS:

I hereby unconditionally disclaim, in whole, my Beneficial Interest in the Trust, effective immediately.

**IN WITNESS WHEREOF** _____ has executed this Deed on this 17th day of January 2019.

By: _____
**Maria HELENA** _____
**Disclaimant**

Witness: _____

Print Name: Yuliana Garcia

Witness: _____

Print Name: Carol Fernández

# EXHIBIT  B

## <u>AFFIDAVIT OF MARIA LUCIA HERNANDEZ FRIERI</u>

My name is Maria Lucia Hernandez Frieri and I declare pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. My parents were Gustavo Hernandez Romero and Francia del Socorro Frieri de Hernandez.  Gustavo Hernandez Frieri is my brother.  I am married to Juan Carlos Gomez.  I currently live in Bogota, Colombia.

2. I am the aunt to Gustavo and Olympia's three minor children, G█████ H█████ d█ C████ (9 years old), F█████ H█████ d█ C████ (7 years old), and A█████ H█████ d█ C████ (5 years old).

3. In 2004, my mother suddenly passed. Gustavo was the only unwed sibling – my father 18 years her senior – devastated as we all were, told me he wished to organize his matters – leave his wishes settled – by providing for Gustavo's future children.

4. The apartment in New York, 3 Gramercy Park West, was purchased as an asset in my father's trust, for the benefit of Gustavo's future children.

5. My brother Gustavo married Olympia de Castro – they had their first two children. Before the third child was born, they lived at 3 Gramercy Park West – always property of my father's trust. Neither Gustavo nor his wife Olympia had any ownership of the 3 Gramercy Park West apartment in which they lived. Gustavo was never a trustee or a beneficiary of my father's trust that owned 3 Gramercy Park West.

6. When my father passed away, I became beneficiary of the HH Master Settlement Trust, my father's trust.

7. In late 2018 and then into 2019 my husband Juan Carlos, Olympia de Castro and I had discussions regarding my father's trust and the 3 Gramercy Park West apartment. We decided to create a new trust for my brother's children, to date three born children – G█████, F█████ and A█████. I as the sole beneficiary of the HH Master Settlement Trust assigned the membership interests of 3 Gramercy Park West, LLC to the DC 2019 Irrevocable Trust, in order to transfer the 3 Gramercy Park West apartment solely for the benefit of G█████, F█████ and A█████, as per my father's wishes.  My brother Gustavo who at this time had been arrested was never part of these conversations.

8. In conclusion, I confirm that I, Maria Lucia Hernandez Frieri, was the sole beneficiary of the HH Master Settlement Trust, created by my father, Gustavo Hernandez Romero.  The property 3 Gramercy Park West, acquired by the HH Master Settlement Trust was always as intended by my father, an asset belonging to his grandchildren born by Gustavo, my brother.  On February 1st 2019, I, as the sole beneficiary of the HH Master Settlement Trust, assigned the membership interest of 3 Gramercy Park West LLC to the DC 2019 Irrevocable Trust, transferring the property 3 Gramercy Park West to the DC 2019 Irrevocable Trust.  I did not intend for the trust asset, 3 Gramercy Park West, to belong to my brother, Gustavo, or to Olympia de Castro.  This property was to be held in trust solely for the benefit of my nephews and niece, G█████ H█████████ d█ C█████, A█████████ d█ C█████ and F███████ d█ C█████, respectively.

9. As a couple, my husband Juan Carlos Gomez and I decided that he be the Protector to the new trust, the DC 2019 Irrevocable Trust, always making sure that this new Trust be kept in the best interest of all three children.

10. None of the actions in the fulfillment of my father's wishes were ever done to hide any assets from the Government.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is drafted, written by me, all being true and correct.

Executed on April 29, 2021

Maria Lucia Hernandez Frieri

**EXHIBIT  C**

# GRAMERCY IRREVOCABLE OPERATING TRUST

## DECLARATION OF TRUST

**THIS DECLARATION OF TRUST ("TRUST")** dated this _|_ day of July 2005, is made by **AMERICAS FIDUCIARY LTD** ("Trustee"), a Nevis corporation. The Trustee declares that it has received the property listed on the attached Annex "A," to hold such property in trust according to the terms of this Trust.

**NOW THIS TRUST WITNESSETH AS FOLLOWS**:

### ARTICLE ONE
### The Trust

1.1.   <u>Name</u>.  This Trust shall be known and designated as the GRAMERCY IRREVOCABLE OPERATING TRUST.

1.2.   The Trust:

1.2.1.   The sum of one hundred Canadian dollars (CDN $100) which has been paid to the Trustee herein together with any other property which may from time to time be held by the Trustee in lieu thereof or in addition thereto to be listed in Annex "A," as amended from time to time (all of which is hereinafter collectively referred to as the ("Trust Estate"), shall be held by the Trustee for the benefit of the beneficiaries herein described (hereinafter referred to as the "Beneficiaries") and in accordance with this Trust as is herein provided.  Any additions to the Trust Estate, other than those derived from the administration of the said Estate by the Trustee, shall be subject to the prior approval of the Protector (hereinafter referred to as the "Protector").

1.2.2.   The Trustee shall stand possessed of and hold the Trust Estate in trust to invest same or such portion thereof as may thereafter be delivered to the Trustee pursuant to the provisions of the present Trust in its absolute discretion, either to retain the same as then invested or to sell or convert the same and to invest the monies realized from such sale or conversion in such investments as the Trustee may deem fit.

Exhibit  C

## ARTICLE TWO
### Trust Period

2.1.    The duration of the Trust Period shall run from the date of the execution of these presents and shall expire upon the date:

2.1.1.    on which shall expire the period of eighty (80) years from the execution of this Trust; or

2.1.2.    on which shall expire the period of twenty (20) years from the death of the last survivor of all the descendants, male and female, of His late Majesty King George the Fifth living at the date hereof; or

2.1.3.    one (l) year after the day on which there shall be no Beneficiary in existence, whichever shall first occur; or

2.1.4.    such earlier date as the Protector, as hereinafter described, shall in its absolute discretion by Deed appoint.

2.2.    The completion of distribution shall be deemed to have taken place when the Trust Estate has been distributed in toto in conformity with the provisions of this Trust.

## ARTICLE THREE
### The Trustee

3.1.    Definition and Number

3.1.1.    Trustee means one or more Trustees who is or who are for the time being in office whether he, she, they or it be the Trustee originally appointed hereby or subsequently appointed in accordance with this Trust.

3.1.2.    Those individuals who are Beneficiaries or may become Beneficiaries of this Trust as well as their spouses and relatives to the second degree, including the relatives to the second degree of their spouses, cannot be named Trustee to this Trust.

3.1.3.    An individual, company, corporation or body politic may be named a Trustee to this Trust.  Any Trustee named herein shall assent to all of the terms of this Trust, including paragraph 4.13. of Article Four.

3.1.4.    The Trustee herein named is the Trustee for the time being of the Trust, namely:

**AMERICAS FIDUCIARY LTD.,**
a Nevis corporation

2

Exhibit  C

3.2.  Vacancy and Replacement

    3.2.1.  An individual shall cease to be a Trustee when he or she dies, resigns or becomes unable or unwilling to act or to continue to act or becomes insolvent or bankrupt. A corporation shall cease to be a Trustee hereunder when the Trustee resigns or becomes insolvent or bankrupt or ceases to exist.

    3.2.2.  The power to dismiss, replace, appoint new or additional Trustees shall be vested in the Protector as hereinafter provided.

    3.2.3.  The replacing of a Trustee when a vacancy occurs shall be effected by an appointment as Trustee of any individual or corporation with power under law to contract. If more than one (1) Trustee has been appointed, the remaining Trustees shall agree upon and appoint the Trustee or Trustees required to fill such vacancy or vacancies subject to the approval of the Protector. In the event that any remaining Trustees cannot so agree or that there be no remaining Trustees, the Protector shall appoint the Trustee or Trustees required to fill such vacancy or vacancies.

    3.2.4.  Resignation by a Trustee shall be effected by the delivery or mailing by registered mail of a written notice of resignation to the other Trustee or Trustees acting hereunder, as the case may be, to the Beneficiaries and to the Protector. However, in the case of impossibility to give notice to all parties, the giving of notice to at least one of the above parties shall constitute good and valid notice hereunder.

    3.2.5.  A retiring or replaced Trustee shall execute all transfers and do all acts or things that may be necessary for vesting the Trust Estate in the new, continuing or replacing Trustee or Trustees.

## ARTICLE FOUR
### Administration of Trust

4.1.  Wherever discretion is vested in or power is conferred upon more than one (1) Trustee, such discretion or power must be exercised by a majority of the Trustees. If at any time there are fewer than three (3) Trustees, such discretion or power must be exercised by unanimity if there are two (2) Trustees; and if there is only one (1) Trustee, it may validly exercise such discretion or power alone.

4.2.  Subject to the Protector's approval, as described in Section 6.3 of Article Six, the Trustee hereunder has unlimited rights of ownership of the Trust Estate and, as an owner, has absolute discretion to invest, manage, administer and otherwise deal with any part or the whole of the Trust Estate as the Trustee sees fit, the whole in accordance with the provisions of this Trust. Not to in any way limit or restrict the generality of the foregoing, the Trustee may exercise and/or delegate, in its sole and absolute discretion, whenever and as often as the Trustee shall deem it advisable until the duration of the Trust Period has expired, the power and authority:

3

Exhibit  C

4.2.1.     to invest the cash funds from time to time constituting part of the Trust Estate in any investments or securities which the Trustee may consider advisable and the Trustee is not to be limited to those investments authorized by law for trustees;

4.2.2.     from time to time and at any time to sell, transfer, assign, exchange, or otherwise dispose of any of the securities or investments from time to time constituting the Trust Estate, in any manner the Trustee may deem proper, at any price and terms considered desirable by the Trustee, and the Trustee shall not be bound to secure the consent or approval of any person, official, authority, tribunal or Court whomsoever or whatsoever;

4.2.3.     to vote all stocks and shares, to exercise all rights incidental to the ownership of stocks, shares, bonds, other securities and investments and property held as part of the Trust Estate, and to issue proxies to others; to sell or exercise any subscription rights and in connection with the exercise of subscription rights, to use trust monies for that purpose; to consent to and join in any plan, reorganization, readjustment or amalgamation or consolidation with respect to any corporation whose stock, shares, bonds or other securities at any time form part of the Trust Estate, and to authorize the sale of the undertaking or assets or a substantial portion of the assets or undertaking of any corporation and generally to act in respect of the Trust Estate as fully and effectually from time to time as if the same were not trust property but always for the benefit of the Trust Estate;

4.2.4.     to hold any or all securities or other property in bearer form or in the name of the Trustee or in the name of some other person, company or partnership or in the name or names of nominees without disclosing the fiduciary relationship, and to deposit the said securities and any title deeds or documents belonging or relating to the Trust Estate in any part of the world with any bank or trust company or any other company that undertakes the safe custody of securities as part of its business without being responsible for the default of such bank, trust company or other company or for any loss occasioned thereby;

4.2.5.     notwithstanding anything herein otherwise contained or rule of law to the contrary, to purchase as an investment of the Trust Estate, and hold as part of the Trust Estate, any securities or property at any price and upon any terms that may be deemed expedient or desirable by the Trustee, and any such purchase so made, or the price paid or terms agreed upon in reference thereto shall not be subject to question by any person who may be entitled hereunder or by any Court or tribunal whatsoever;

4

Exhibit  C

4.2.6.    to make any payments, provisions or distributions which may be required under the terms hereof in whole or in part in money, securities or other property and on every division or distribution, the judgment and apportionment of the Trustee and valuations made by the Trustee shall be binding and conclusive on all persons whomsoever;

4.2.7.    to incorporate any company or companies under the laws of any jurisdiction in the world at the expense of the Trust Estate, for the purposes of the powers and authority of the Trustee and more particularly, to invest the whole or any part of the Trust Estate wholly or partly in shares or other securities of such company or companies;

4.2.8.    to lease at any time and from time to time real property or interests in real property entrusted to the Trustee or from time to time held by the Trustee hereunder for such term or terms of months or years, to begin presently or in the future, as to the Trustee may seem proper, even though such lease or leases shall be for a term or terms exceeding that especially authorized by law and be beyond the term of the termination of any trust estate herein cre-ated, such leases to be with such options to the lessees of renewal and/or purchase or for the purchase or disposal of buildings thereon or to be placed thereon, and upon such covenants, terms, conditions, agreements and provisions as to the Trustee shall seem proper; and in connection therewith, to make, execute, acknowledge and deliver any and all instruments that may be necessary, proper or desirable;

4.2.9.    to acquire, hold and sell real estate anywhere in the world;

4.2.10.   to acquire and hold debts secured by hypothec or mortgage on real estate anywhere in the world;

4.2.11.   to renew and keep renewed any hypothec or mortgage upon real estate anywhere in the world;

4.2.12.   to register any property, immovable or moveable, in the name of the Trustee or in the names of the nominees;

4.2.13.   to deposit any cash balances in the hands of the Trustee at any time at any bank or trust company;

4.2.14.   to keep the whole or any part of the Trust Estate at any place within the Trustee's discretion;

4.2.15.   to retain any life insurance policy entrusted to the Trustee or from time to time held by the Trustee hereunder; to purchase insurance on the life of any Beneficiary hereunder or on the life of anyone and to select such type of policy and mode of premium payments as the Trustee may deem advisable;

5

Exhibit  C

to exercise all rights with regard to such retained or purchased insurance as the policy contracts grant to the owner thereof; to pay premiums on such policies either out of the principal or out of income or partly out of principal and partly out of income as the Trustee shall deem proper;  to name as Beneficiaries of the said new policies either the Trust Estate or the Beneficiaries thereof; to purchase annuities for one or more Beneficiaries and to select such type of annuity and mode of payment therefor as the Trustee may deem advisable; and to purchase and pay the premiums on policies of insurance against fire, other casualty or public liability or other insurance of a similar character, but the Trustee shall not be liable for any omission to purchase any insurance or to purchase a particular amount of any type of insurance;

4.2.16.  to determine whether any monies shall, for the purpose of this Trust, be considered as principal or income of the Trust Estate or whether any taxes, expenses or losses shall be paid out of or borne by principal or income.

4.3.  Notwithstanding the foregoing powers and authority conferred upon the Trustee hereunder, in respect of any corporation the shares of which are comprised in the Trust Estate, the shares not be realized or liquidated but, to the greatest extent possible, that they be distributed in specie to the Beneficiaries in accordance with this Declaration of Trust, in order to ensure to the greatest extent possible the continued existence of such corporations and the ownership of the shares thereof by the Beneficiaries as aforesaid.

4.4.  The Trustee may furthermore act upon the opinion or advice of or information obtained from any reputable solicitor, valuer, broker, auctioneer, accountant or other expert but the Trustee shall not be bound to act upon such opinion or advice and the Trustee shall not be responsible for any loss occasioned by so acting or by not so acting as the case may be.

4.5.  Without limiting the generality of any power or authority otherwise conferred upon the Trustee hereunder, the Trustee shall have the full power and authority, instead of acting personally, to appoint any agent or agents in any part of the world, to assist in the administration of this Trust and in the management of the Trust Estate and, provided that the Trustee exercises reasonable care in the appointment of such agent or agents, the Trustee shall not be responsible for any act or neglect of any such agent or agents.

4.6.  Any Trustee being engaged in a professional business or trade, may, in the discretion of the Trustee, be paid all usual professional, business and trade charges and remuneration for business transacted and time expended and acts done by the Trustee or any employee or partner of the Trustee or by any firm or corporation with which the Trustee is connected in connection with the Trusts hereof including acts which a Trustee not being in any profession, business or trade could have done personally. Amounts paid under the foregoing shall be in addition to that Trustee's remuneration.

4.7.  In addition to their disbursements, the Trustee and the Protector shall be remunerated such fees as are usual for the type of administration.

6

Exhibit  C

4.8.   The Trustee may, with the prior approval of the Protector, receive and hold as part of the Trust Estate, subject to the Trusts hereof, any property made available by any other person or persons to be added to and to become part of the Trust Estate.

4.9.   The Trustee shall inform personally the Beneficiary or Beneficiaries of the age of majority upon their request with respect to the position of the investment of the Trust Estate. The Trustee shall not, however, give this information, if, in its opinion, the information might be used in an abusive or illicit manner or in any way detrimental to the interests of the Trust Estate or the other Beneficiary or Beneficiaries. The Trustee shall decide in its sole discretion whether the prerequisites for a disclosure of information are met.

4.10.   Notwithstanding the foregoing, the Trustee and the Protector may divulge any and all information relating to this Trust and the Trust Estate if the Trustee is legally bound to do so by ordinance or imperative statutory provision of law.

4.11.   The Trustee and the Protector hereunder agree to execute any further documents or deeds which may be necessary to effectively transfer the Trust Estate to the Trustee.

4.12.   The Trustee shall be protected in acting upon any direction, paper or document believed by the Trustee to be genuine and to have been signed by the proper person or persons.   In case of doubt, the Trustee may refer to the Protector and shall in such case be protected in acting upon any direction, paper or document confirmed or believed by the Protector to be genuine and to have been signed by the proper person or proper persons.

4.13.   Neither the Trustee nor the Protector shall be liable for any error in judgment but only for their own intentional fault or willful misconduct. The Trustee and the Protector shall not be personally liable for any monies to become due by or any claims against this Trust Estate or upon any instrument executed by the Trustee under the provisions hereof. The Trustee shall be indemnified and saved harmless out of the funds of the Trust Estate from time to time and at all times from and against:

    4.13.1.   all costs, charges, and expenses whatsoever which such Trustee sustains or incurs in or about any actions, suits or proceedings which are brought, commenced or prosecuted against the Trustee for or in respect of any act, deed, matter or thing whatsoever done or permitted by the Trustee in or about the execution of the duties of this Trust, and

    4.13.2.   all other costs, charges and expenses which the Trustee sustains or incurs in or about or in relation to the affairs of the present Trust and Trust Estate.

4.14.   The Trustee shall have the power to bind the Trust Estate but shall not render itself personally liable.

Exhibit  C

## ARTICLE FIVE
### Benefit of Trust

5.1.  The Beneficiaries of this Trust shall be those persons enumerated in Annex "B" attached hereto and forming an integral part hereof.

5.2.  The Trust Estate together with any other property which may from time to time be held by the Trustee in lieu thereof or in addition thereto, shall be held by the Trustee upon the following Trust:

    5.2.1.  The Trustee shall hold the Trust Estate during the Trust Period and may accumulate the whole of the income of the Trust Estate for the maximum period of accumulation permitted by law and add such accumulations to the capital thereof provided that during the Trust Period the Trustee may apply any of the capital or the income of the Trust Estate to or for the benefit of the Beneficiaries designated in paragraph 5.1. of this Article Five provided, however, that in the interests of any Beneficiary, the Trustee may, taking into consideration the country of residence of the Beneficiary, tax and duties there exigible, foreign exchange rates and other financial, political, economic or personal considerations, retain any such distribution or payment for the benefit of the Beneficiary.

    5.2.2.  The Trustee shall determine the time of payments, appropriations and applications of the income and/or capital of the Trust Estate to the Beneficiaries as aforesaid at all times in view of the requirements of an adequate standard of living of the Beneficiaries.

5.3.  Upon expiration of the Trust Period and subject to such powers of appointment as may be hereinafter contained, the Trustee shall pay or transfer the remaining capital and income to the Beneficiaries; provided that if at the expiration of the Trust Period no Beneficiary as defined herein shall be alive, the capital and income then remaining in the Trust Estate shall be distributed according 5.10. of this Article Five.

5.4.  All gifts, payments, or benefits made under the present Trust from the proceeds of the Trust Estate are intended as aliment and shall not be subject to seizure for the payment of any debts of the Beneficiaries or their representatives except in the case of express hypothecation or pledge after delivery, donation, or payment to them of any portion of the Trust Estate.

5.5.  The proceeds, payment or other donation of any property to the Beneficiaries shall be and remain his or her private and separate property, free from the control of any consort, and shall not be liable for the debts of the said consort, and shall not form part of any community of property which may subsist between such consorts.

8

Exhibit  C

5.6.   If any person should become entitled to any portion or share of the Trust Estate either before attaining the age of 21 or at such time when such person is determined to be mentally incapacitated, such portion or share may, in the Trustee's discretion, in consultation with the Protector, be held and kept invested by the Trustee and the income and capital or some amount thereof as the Trustee, in consultation with the Protector, considers necessary or advisable, shall be used and applied for the benefit of such person until either he or she has either attained the age of 21, whereupon his or her portion or share, or the amount thereof then remaining in the hands of the Trustee shall be paid or transferred to such person or, as the case may be, in the case of mental incapacity, until such time as the Trustee has been determined by the Trustee, in consultation with the Protector, that it is necessary or advisable to pay and transfer the amount of such portion or share to the acting guardian of such person.

5.7.   The Trustee shall also have the power to make any payment for any person under the age of 21 to the parent or legal guardian of any such person whose receipt thereof shall be sufficient discharge to the Trustee.

5.8.   The determination of mental incapacity shall be made by the Protector after consultation with the Trustee and upon such medical or other expert assessment as the Protector considers necessary or advisable.

5.9.   If the Trustee deems it necessary, a prerequisite of the enjoyment of the proceeds of the Trust Estate by any Beneficiary shall be that within a period of two (2) months after the date when any such person becomes a Beneficiary hereunder, he or she declares to the Trustee in a form satisfactory to the Trustee and its legal counsel, that he or she promises to respect all the provisions laid down in the present Trust and the provisions of any conveyance of property by any person or persons to the Trustee to be held as part of the Trust Estate sub-ject to the Trusts hereof.  If he or she is in default to so declare and promise, he or she shall lose all of his or her rights to the enjoyment or the proceeds of the present Trust and Trust Estate, and any other trust fund which may have been created in consequence hereof.

5.10.  The charitable institutions and purposes to which the right or benefit of the Trust Estate shall possibly pass in accordance with the provisions of this Trust shall be those designated, if any, in Annex "B" hereto.

## ARTICLE SIX
### The Protector

6.1.   Definition

6.1.1.   The Protector shall mean that person or persons or any successors thereto appointed to act as Protector of this Trust.

6.1.2.   Any individuals who are not U.S. citizens or residents, or any corporations that are not organized in any state or territory of the U.S., may be the Protector whether individuals (resident or non-resident of Canada) or corporations (Canadian or

Exhibit  C

foreign). Those individuals who are Beneficiaries or may become Beneficiaries of this Trust as well as their spouses and relatives, including the relatives of their spouses, may only be named Protector to this Trust to the extent that, in the aggregate, the Trustee does not comprise a majority of the total of persons and corporations appointed to and currently occupying the office of the Protector.

6.1.3.   H&H PROTECTORS IBC, a Bahamian company, is hereby appointed as the initial Protector of the Trust Estate.

6.2.   Resignation and Replacement

6.2.1.   Any Protector shall cease to be a Protector when he or she dies, resigns or becomes unable or unwilling to act or continue to act or becomes insolvent or bankrupt. A corporation shall cease to be a Protector hereunder when the corporation resigns or becomes insolvent or bankrupt or ceases to exist.

6.2.2.   In the event an individual appointed as Protector in section 6.1.3. of Article 6 is unable or unwilling to serve as a Protector, then a successor protector shall be appointed by a majority vote of the Beneficiaries then entitled to receive income. If there are only two (2) Beneficiaries then entitled to receive income, such power shall be exercised by unanimity. If there is only one (1) Beneficiary then entitled to receive income, such power shall be exercised alone.

6.2.3.   Resignation by any Protector shall be effected by the delivery or mailing by registered mail of a written notice of resignation to the Trustee acting hereunder and to the Beneficiaries.

6.2.4.   However, in the case of impossibility to give notice to all parties, the giving of a notice to at least one of the above parties shall constitute good and valid notice hereunder.

6.3.   Powers of the Protector.   Notwithstanding any other provisions of the present Trust and particularly the powers and authority herein granted to the Trustee, the Protector shall at any time or from time to time during the Trust Period or any extension thereof, have the full power and authority:

6.3.1.   to amend, vary or otherwise modify the terms of this Declaration of Trust from time to time with written notice to the Trustee and without limiting the generality of the foregoing, to amend, vary or modify the terms of this Declaration of Trust for the purpose of facilitating the administration of the Trust and Trust Estate provided, however, that nothing herein contained shall permit the Protector to alter the rights of Beneficiaries or change the Beneficiaries by addition to or exclusion and deletion of any of the Beneficiaries named in Article Five nor shall the powers herein contained permit this Declaration of Trust to be amended to increase the obligations or liabilities of the Trustee or the Protector without the consent of the Trustee or each person appointed to the office of the Protector, as the case may be, then in

10

Exhibit  C

office and no amendment hereto or to paragraph 4.2.14. of Article Four of this Declaration of Trust shall have any effect on the rights of any person who was then serving or has served as a Trustee or as Protector arising out of any state of facts or occurrences which existed or took place before such amendment;

6.3.2. to appoint in writing the whole or part of the capital or the income of the Trust Estate or create by deed a new trust fund and appoint either in respect of the new trust fund or in respect of the trust fund constituted under any new trust, all or any part of the capital or income thereof to or for anyone or more of the Beneficiaries in such manner as the Protector shall consider advisable, provided, however, that any appointment or distribution of capital or income to such new trust fund or trust fund constituted under a new trust shall respect and be in accordance with paragraph 5.1. of Article Five of this Declaration of Trust;

6.3.3. to remove from office, or replace the Trustee or appoint new or additional Trustees as the Protector shall consider advisable and without limiting the generality of the foregoing, to fill any vacancy in the office of the Trustee;

6.3.4. to extinguish, diminish, reduce or otherwise limit the Protector's own powers as Protector during the tenure of persons appointed to and then in the office of the Protector; however, such extinction, diminishment, reduction or limitation shall not affect the powers of subsequent persons who may by replacement or later appointment be named to the office of the Protector subsequently;

6.3.5. to supervise the accounts of the Trust Estate, receive an accounting from any or all of the Trustee or any other person, company, institution or creditor holding any assets or property of the Trust Estate or any other trust fund which may be created in consequence hereof;

6.3.6. without limiting the generality of any power or authority otherwise conferred upon the Protector hereunder, the Protector shall have the full power and authority, instead of acting personally, to appoint any agent or agents in any part of the world to assist in the carrying out of the powers of the Protector; and, provided that the Protector exercises reasonable care in the appointment of such agent or agents, the Protector shall not be responsible for any act or neglect of any such agent or agents;

6.3.7. any person appointed to the office of the Protector being engaged in a profession, business or trade, shall be paid all usual professional business and trade charges and remuneration for business transacted and time expended and acts done by them or any employee or partner of theirs or by any firm or corporation with which they are connected in connection with the present Trust, including acts which persons appointed to the office of the Protector not being in any profession, business or trade could have done personally;

6.3.8. to appoint, by any irrevocable deed or deeds and without infringing the Trust Period of this Trust or the rule against perpetuities, that the whole or any part of the Trust

Exhibit  C

Estate shall thenceforth be held upon the trusts and with and subject to the powers and provisions of any other trust not infringing the rule against perpetuities applicable to this Trust and approved by the Protector and in favor or for the benefit of all or any one or more exclusively of the others or other of the Beneficiaries, and upon any such appointment being made, the Protector shall direct the transfer to the Trustee for the time being of the said appointment and thereupon the Trusts herein contained concerning such property shall cease and determine and the said property shall for all purposes be subject to the trust, powers and provisions contained in the said other trusts and be subject to and governed by the proper law of this Trust or not, provided, however, that such appointment and transfer of the whole or any part of the Trust Estate to such other trust or trusts shall respect and be in accordance with paragraph 5.1. of Article Five of this Trust.  For the purposes of the present paragraph, "trust" shall mean any trust created by any settlement, declaration of trust, will, codicil, or other instrument under the law in force in any part of the world;

6.3.9.   to change at any time and from time to time during the Trust Period the governing law and forum for the administration of this Declaration of Trust as hereinafter provided; the power of changing the governing law and the forum for the administration of this Declaration of Trust shall be vested in the Protector who may at the Protector's absolute discretion, direct any such change to some other place in any part of the world on giving not less than fourteen days' notice as hereinafter provided with copies addressed to the Trustee and to the Beneficiaries;

6.3.10.  to extend from time to time the Trust Period for further periods of two (2) years upon sending of a notice in writing at least three (3) months prior to the expiration of the Trust Period to the Trustee and Beneficiaries without, however, violating the rule against perpetuities.  The provisions of this paragraph 6.3.10. of this Article Six and all the powers of the Protector shall have effect notwithstanding any rule of law or equity restricting the delegation of a power or discretion.

6.3.11.  Any reference to the "Protector" or "Protectors" in this Trust shall be construed as a reference to all of the persons appointed to and then in the office of the Protector if there be more than one.

6.3.12.  Wherever herein discretion is vested in or power is conferred upon the Protectors, such discretion or power must be exercised by a majority of the persons appointed to and then in the office of the Protector. If it should happen at any time that there are fewer than three (3) persons then in the office of the Protector, such discretion or power must be exercised by unanimity if there are two (2) such persons and if there is only one (1) such person, he may validly exercise such discretion or power alone.

## ARTICLE SEVEN
### Interpretation

7.1.   Any provision or condition of the present Trust which is or becomes void for any reason

Exhibit  C

whatsoever including the fact that it is considered to be or constitutes an impossible condition or one contrary to good morals, to law, to equity, or to public order, shall not annul the present Trust but shall only be considered as not written.

7.2.    For greater clarity, the present Trust is comprised of and includes this Trust and Annexes A and B hereto and any further annexes as may subsequently to the execution hereof be added in accordance with and pursuant to its terms.

## ARTICLE EIGHT
### Governing Laws

8.1.    Subject to the terms of subparagraph 6.3.9. of Article Six hereof, the Trust Estate created herein is created under the law of the Province of Nova Scotia, Canada and the rights of all parties and the construction and effect of every provision hereof shall be subject to the exclusive jurisdiction of and construed and regulated only according to the law of the Province of Nova Scotia, Canada.

8.2.    If the governing law of this Trust is changed and any provision of this Trust be found to be in violation of or contrary to such new governing law, including, by way of example, but without limitation, any law or rule therein prevailing relating to accumulation of trust income and to perpetuity periods, such provision shall be deemed to be amended and to comply with the new governing law.

8.3.    If at any time it appears that the Trust falls within the definition of a "United States Person," as defined in Section 7701(a)(30)(E) of the United States Internal Revenue Code of 1986 and the regulations thereunder, the Trustee may amend the Declaration, change the jurisdiction of the Trust, or do otherwise as it sees fit so the Trust will not fall within such definition.

8.4.    Notwithstanding anything in the Declaration to the contrary, if at any time a United States court attempts to assert jurisdiction over or otherwise supervise the administration of the Trust directly or indirectly, the Trustee shall cause the Trust to migrate from the United States. Notwithstanding anything in the Declaration to the contrary, if any governmental agency or creditor attempts to collect information from or assert a claim against the Trust, the Trustee shall cause one or more substantial decisions of the Trust to be controlled by a person or entity that is not a United States fiduciary. The Trustee may accomplish its objectives set forth in this Section 8.4. by amending the Declaration, changing the jurisdiction of the Trust, or otherwise as the Trustee sees fit at its sole discretion.

## ARTICLE NINE
### Acceptance of Trustee and Protector

The Trustee accepts the Trust hereby created, and both the Trustee and Protector agree to carry out the provisions hereof to be performed on their part.

Exhibit  C

## ARTICLE TEN
### Notices

10.1.   Any notice required or permitted to be given under any of the provisions of this Trust of the provisions of this Trust shall be sent by registered air mail, postage pre-paid, to the last known address of the addressee.  No evidence that such notice has been received by any addressee shall be necessary to constitute good and valid notification.  Any such notice given as aforesaid shall be deemed to have been given two (2) weeks after the envelope containing same is mailed, pre-paid registered air mail as aforesaid.  There shall be no obligation to give any such notice to any party in the case of impossibility to give any such notice.

10.2.   Notwithstanding anything contained in the present Trust, any notice required or permitted to be given to the Beneficiaries shall be given to the Protector and, with the prior written consent of the Protector, to the Beneficiaries, and to such other persons as the Protector may from time to time designate.

## ARTICLE ELEVEN
### Exclusion from Benefits

Whoever contests the validity of this Trust, of the Trust created under it, of the Trusts created by virtue of the present Trust, of the provisions of any conveyance of property by any person or persons to the Trustee to form and be held as part of the Trust Estate, shall cease to be a Beneficiary of any of these Trusts and shall be excluded from any benefits, direct or indirect, deriving from the Trust Estate.

## ARTICLE TWELVE
### Severability

Should any provision of this Trust be determined to be contrary to or invalid under the Governing Law of this Trust by a competent court of that jurisdiction, provided that its removal would not substantially affect or render contradictory or incomprehensible the remainder of this Trust, such provision shall be considered as unwritten and shall not invalidate or otherwise affect this Trust and the Trust hereby created.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

14

Exhibit  C

WHEREFORE, the parties hereto have executed this Trust on the date first hereinabove written.

ACCEPTED by the Trustee:

AMERICAS FIDUCIARY LTD.,
a Nevis corporation

By: _____        _____
    Timothy D. Richards, Director              Witness

                                              _____
                                              Witness

15

Exhibit  C

ANNEX "A"

<u>PROPERTY</u>

1.      One Hundred Canadian Dollars (CDN $100.00);

2.      100% of the Membership Interest in 3 Gramercy Park West LLC, a New York limited liability company.

Exhibit  C

ANNEX "B"

## BENEFICIARY

The Beneficiary of the GRAMERCY IRREVOCABLE OPERATING TRUST ("Trust") is the HH MASTER SETTLEMENT, a Nova Scotia trust, dated December 1, 2004.

Annex B

Exhibit  C

**EXHIBIT  D**

### THE AMENDED AND RESTATED
### HH MASTER SETTLEMENT

### DECLARATION OF TRUST

THIS DECLARATION OF TRUST ("TRUST") is made this 13th day of November 2006 by Americas Fiduciary Ltd ("Trustee"), a Nevis corporation which hereby Amends and Restates the HH MASTER SETTLEMENT dated December 1st, 2004. The Trustee declares that it has received the property listed on the attached Annex "A", to hold such property in trust according to the terms of this Trust.

NOW THIS TRUST WITNESSETH AS FOLLOWS:

This Trust shall be known and designated as the:

HH MASTER SETTLEMENT.

1.2.    The Trust:

1.2.1.    The sum of two hundred Canadian dollars (CDN $200) which has been paid to the Trustee herein together with any other property which may from time to time be held by the Trustee in lieu thereof or in addition thereto, listed in Annex "A" hereto as amended from time to time (all of which is hereinafter referred to as the "Trust Estate"), shall be held by the Trustee for the benefit of the beneficiaries herein described (hereinafter referred to as the "Beneficiaries") and in accordance with this Trust as is herein provided.  Any additions to the Trust Estate, other than those derived from the administration of the said Estate by the Trustee, shall be subject to prior notice of the Protector (hereinafter referred to as the "Protector").

1.2.2.    The Trustee shall stand possessed of and hold the Trust Estate in trust to invest same or such portion thereof as may thereafter be delivered to it pursuant to the provisions of the present Trust in its absolute discretion, either to retain the same as then invested or to sell or convert the same and to invest the monies realized from such sale or conversion in such investments as the Trustee may deem fit.

Exhibit  D

## ARTICLE TWO
## Trust Period

2.1.    The duration of the Trust Period shall run from the date of the execution of these presents and shall expire upon the date:

    2.1.1.  on which shall expire the period of eighty (80) years from the execution of this Trust; or

    2.1.2.  on which shall expire the period of twenty (20) years from the death of the last survivor of all the descendants, male and female, of His late Majesty King George the Fifth living at the date hereof; or

    2.1.3.  one (l) year after the day on which there shall be no beneficiary in existence; whichever shall first occur.

    2.1.4.  such earlier date as the Protector, as hereinafter described, shall in its absolute discretion by Declaration appoint.

2.2.    The completion of distribution shall be deemed to have taken place when the Trust Estate has been distributed in toto in conformity with the provisions of this Trust.

## ARTICLE THREE
## The Trustee

3.1.    Definition and Number

    3.1.1.  Trustee means one or more Trustees who is or who are for the time being in office whether he, she, they or it be the Trustee originally appointed hereby or subsequently appointed in accordance with this Trust.

    3.1.2.  Those individuals who are Beneficiaries or may become Beneficiaries of this Trust as well as their spouses and relatives to the second degree, including the relatives to the second degree of their spouses, cannot be named Trustee to this Trust.

    3.1.3.  An individual, company, corporation or body politic may be named a Trustee to this Trust.  Any Trustee named herein shall assent to all of the terms of this Trust, including paragraph 4.13. of Article Four.

    3.1.4.  The Trustee herein named is the Trustee for the time being of the Trust, namely:

**AMERICAS FIDUCIARY LIMITED,**
a Nevis corporation

Exhibit  D

3.2.  Vacancy and Replacement

3.2.1.  An individual shall cease to be a Trustee when he or she dies, resigns or becomes unable or unwilling to act or to continue to act or becomes insolvent or bankrupt. A corporation shall cease to be a Trustee hereunder when the Trustee resigns or becomes insolvent or bankrupt or ceases to exist.

3.2.2.  The power to dismiss, replace, appoint new or additional Trustees shall be vested in the Protector as hereinafter provided.

3.2.3.  The replacing of a Trustee when a vacancy occurs shall be effected by an appointment as Trustee of any individual or corporation with power under law to contract. If more than one (1) Trustee has been appointed, the remaining Trustees shall agree upon and appoint the Trustee or Trustees required to fill such vacancy or vacancies subject to the approval of the Protector. In the event that the remaining Trustees cannot so agree or that there be no remaining Trustees, the Protector shall appoint the Trustee or Trustees required to fill such vacancy or vacancies.

3.2.4.  Resignation by a Trustee shall be effected by the delivery or mailing by registered mail of a written notice of resignation to the other Trustee or Trustees acting hereunder, as the case may be to the Beneficiaries and to the Protector. However, in the case of impossibility to give notice to all parties, the giving of notice to at least one of the above parties shall constitute good and valid notice hereunder.

3.2.5.  A retiring or replaced Trustee shall execute all transfers and do all acts or things that may be necessary for vesting the Trust Estate in the new, continuing or replacing Trustee or Trustees.

**ARTICLE FOUR**
**Administration of Trust**

4.1.  Wherever discretion is vested in or power is conferred upon more than one (1) Trustee, such discretion or power must be exercised by a majority of the Trustees. If there are fewer than three Trustees, such discretion or power must be exercised by unanimity if there are two Trustees and if there is only one Trustee, it may validly exercise such discretion or power alone.

4.2.  The Trustee hereunder has unlimited rights of ownership of the Trust Estate and, as owners, have absolute discretion to invest, manage, administer and otherwise deal with any part or the whole of the Trust Estate as the Trustee sees fit, the whole in accordance with the provisions of this Trust. Not to in any way limit or restrict the generality of the foregoing, the Trustee shall provide prior written notice to the Protector in investing, managing, administering and otherwise dealing with any part or the whole of the Trust Estate and may exercise and/or delegate, in its sole and absolute discretion, whenever and as often as the Trustee shall deem it advisable until the duration of the Trust Period has expired, the power and authority:

3

Exhibit D

4.2.1.        to invest the cash funds from time to time constituting part of the Trust Estate in any investments or securities which the Trustee may consider advisable and the Trustee is not to be limited to those investments authorized by law for trustees;

4.2.2.        from time to time and at any time to sell, transfer, assign, exchange, or otherwise dispose of any of the securities or investments from time to time constituting the Trust Estate, in any manner the Trustee may deem proper, at any price and terms considered desirable by the Trustee, and the Trustee shall not be bound to secure the consent or approval of any person, official, authority, tribunal or Court whomsoever or whatsoever;

4.2.3.        to vote all stocks and shares, to exercise all rights incidental to the ownership of stocks, shares, bonds, other securities and investments and property held as part of the Trust Estate, and to issue proxies to others; to sell or exercise any subscription rights and in connection with the exercise of subscription rights, to use trust monies for that purpose; to consent to and join in any plan, reorganization, readjustment or amalgamation or consolidation with respect to any corporation whose stock, shares, bonds or other securities at any time form part of the Trust Estate, and to authorize the sale of the undertaking or assets or a substantial portion of the assets or undertaking of any corporation and generally to act in respect of the Trust Estate as fully and effectually from time to time as if the same were not trust property but always for the benefit of the Trust Estate;

4.2.4.        to hold any or all securities or other property in bearer form or in the name of the Trustee or in the name of some other person, company or partnership or in the name or names of nominees without disclosing the fiduciary relationship, and to deposit the said securities and any title deeds or documents belonging or relating to the Trust Estate in any part of the world with any bank or trust company or any other company that undertakes the safe custody of securities as part of its business without being responsible for the default of such bank, trust company or other company or for any loss occasioned thereby;

4.2.5.        notwithstanding anything herein otherwise contained or rule of law to the contrary, to purchase as an investment of the Trust Estate, and hold as part of the Trust Estate, any securities or property at any price and upon any terms that may be deemed expedient or desirable by the Trustee;

4.2.6.        to make any payments, provisions or distributions which may be required under the terms hereof in whole or in part in money, securities or other property and on every division or distribution, the judgment and apportionment of the Trustee and valuations made by the Trustee shall be binding and conclusive on all persons whomsoever;

4

Exhibit D

4.2.7.  to incorporate any company or companies under the laws of any jurisdiction in the world at the expense of the Trust Estate, for the purposes of the powers and authority of the Trustee and more particularly, to invest the whole or any part of the Trust Estate wholly or partly in shares or other securities of such company or companies;

4.2.8.  to lease at any time and from time to time real property or interests in real property entrusted to it or from time to time held by it hereunder for such term or terms of months or years, to begin presently or in the future, as to them may seem proper, even though such lease or leases shall be for a term or terms exceeding that especially authorized by law and be beyond the term of the termination of any trust estate herein created, such leases to be with such options to the lessees of renewal and/or purchase or for the purchase or disposal of buildings thereon or to be placed thereon, and upon such covenants, terms, conditions, agreements and provisions as to it shall seem proper; and in connection therewith, to make, execute, acknowledge and deliver any and all instruments that may be necessary, proper or desirable;

4.2.9.  to acquire, hold and sell real estate anywhere in the world;

4.2.10.  to acquire and hold debts secured by hypothec or mortgage on real estate anywhere in the world;

4.2.11.  to renew and keep renewed any hypothec or mortgage upon real estate anywhere in the world;

4.2.12.  to register any property, immovable or moveable, in the name of the Trustee or in the names of the nominees;

4.2.13.  to deposit any cash balances in the hands of the Trustee at any time at any bank or trust company;

4.2.14.  to keep the whole or any part of the Trust Estate at any place within its discretion;

4.2.15.  to retain any life insurance policy entrusted to it or from time to time held by it hereunder; to purchase insurance on the life of any Beneficiary hereunder or on the life of anyone and to select such type of policy and mode of premium payments as the Trustee may deem advisable; to exercise all rights with regard to such retained or purchased insurance as the policy contracts grant to the owner thereof; to pay premiums on such policies either out of the principal or out of income or partly out of principal and partly out of income as the Trustee shall deem proper; to name as Beneficiaries of the said new policies either the Trust Estate or the Beneficiaries thereof; to

Exhibit D

purchase annuities for one or more Beneficiaries and to select such type of annuity and mode of payment therefore as the Trustee may deem advisable; and to purchase and pay the premiums on policies of insurance against fire, other casualty or public liability or other insurance of a similar character, but the Trustee shall not be liable for any omission to purchase any insurance or to purchase a particular amount of any type of insurance;

4.2.16.          to determine whether any monies shall, for the purpose of this Trust, be considered as principal or income of the Trust Estate or whether any taxes, expenses or losses shall be paid out of or borne by principal or income.

4.3.   Notwithstanding the foregoing powers and authority conferred upon the Trustee hereunder, in respect of any corporation the shares of which are comprised in the Trust Estate, the shares not be realized or liquidated but, to the greatest extent possible, that they be distributed in specie to the Beneficiaries in accordance with this Declaration of Trust, in order to ensure to the greatest extent possible the continued existence of such corporations and the ownership of the shares thereof by the Beneficiaries as aforesaid.

4.4.   The Trustee may furthermore act upon the opinion or advice of or information obtained from any reputable solicitor, valuer, broker, auctioneer, accountant or other expert but the Trustee shall not be bound to act upon such opinion or advice and the Trustee shall not be responsible for any loss occasioned by so acting or by not so acting as the case may be save for its own intentional default or willful misconduct.

4.5.   Without limiting the generality of any power or authority otherwise conferred upon the Trustee hereunder, the Trustee shall have the full power and authority, instead of acting personally, to appoint any agent or agents in any part of the world, to assist in the administration of this Trust and in the management of the Trust Estate and, provided that the Trustee exercises reasonable care in the appointment of such agent or agents, the Trustee shall not be responsible for any act or neglect of any such agent or agents.

4.6.   Any Trustee being engaged in a professional business or trade, may, in the discretion of the Trustee, be paid all usual professional, business and trade charges and remuneration for business transacted and time expended and acts done by it or any employee or partner of the Trustee or by any firm or corporation with which it is connected in connection with the Trusts hereof including acts which a Trustee not being in any profession, business or trade could have done personally. Amounts paid under the foregoing shall be in addition to that Trustee's remuneration.

4.7.   In addition to their disbursements, the Trustee and the Protector shall be remunerated such fees as are usual for the type of administration.

4.8.   The Trustee may, with the prior approval of the Protector, receive and hold as part of the Trust Estate, subject to the Trusts hereof, any property made available by any other person or persons to be added to and to become part of the Trust Estate.

6

Exhibit D

4.9.    The Trustee shall inform personally the Beneficiary or Beneficiaries of the age of majority upon their request with respect to the position of the investment of the Trust Estate. The Trustee shall not, however, give this information, if, in its opinion, the information might be used in an abusive or illicit manner or in any way detrimental to the interests of the Trust Estate or the other Beneficiary or Beneficiaries. The Trustee shall decide in its sole discretion whether the prerequisites for a disclosure of information are met.

4.10.   Notwithstanding the foregoing, the Trustee and the Protector may divulge any and all information relating to this Trust and the Trust Estate if the Trustee is legally bound to do so by ordinance or imperative statutory provision of law.

4.11.   The Trustee and the Protector hereunder agree to execute any further documents or deeds which may be necessary to effectively transfer the Trust Estate to the Trustee.

4.12.   The Trustee shall be protected in acting upon any direction, paper or document believed by them to be genuine and to have been signed by the proper person or persons.   In case of doubt, the Trustee may refer to the Protector and shall in such case be protected in acting upon any direction, paper or document confirmed or believed by the Protector to be genuine and to have been signed by the proper person or proper persons.

4.13.   Neither the Trustee nor the Protector shall be liable for any error in judgment but only for its own intentional fault or willful misconduct. The Trustee and the Protector shall not be personally liable for any monies to become due by or any claims against this Trust Estate or upon any instrument executed by the Trustee under the provisions hereof. The Trustee shall be indemnified and saved harmless out of the funds of the Trust Estate from time to time and at all times from and against:

    4.13.1.         all costs, charges, and expenses whatsoever which such Trustee sustains or incurs in or about any actions, suits or proceedings which are brought, commenced or prosecuted against the Trustee for or in respect of any act, deed, matter or thing whatsoever done or permitted by it in or about the execution of the duties of this Trust, and

    4.13.2.         all other costs, charges and expenses which the Trustee sustains or incurs in or about or in relation to the affairs of the present Trust and Trust Estate.

4.14.   The Trustee shall have the power to bind the Trust Estate but shall not render itself personally liable.

4.15.   Power to Amend.

    4.15.1 Subject to the prior written notice to the Protector the Trustee may, at any time or times during the Trust Period, by writing, make any alterations or additions to the provisions of the Trust which it considers, in its absolute discretion, to be for the

7

Exhibit D

benefit of all or any one or more of the Beneficiaries (and for the avoidance of doubt, may change or amend the duration of the Trust Period, provided that in no case shall the Trust Period exceed the period as may be permitted from time to time by the Applicable Law or be shorter than ten (10) years from the date hereof).

4.15.2   Subject to the prior written notice to the Protector the Trustee may, at any time or times during the Trust Period, by writing, extinguish or restrict the future exercise of any of the powers conferred on it by the Trust or by the Applicable Law, including the exercise of any of the powers contained in this Article 4.

4.15.3   Subject to the prior written notice to the Protector the Trustee may during the Trust Period in its sole discretion by deed exercise its powers pursuant to this Article 4, to add or remove any Beneficiary or Beneficiaries. Any such addition or exclusion so made shall name or describe the Person or Persons or class or classes of Persons to be thereby added or excluded and shall specify the date (not being earlier than the date of the declaration, but during the Trust Period) from which such Person or Persons or class or classes of Persons shall be so added or excluded and the period (if terminating before the end of the Trust Period) for which such Person or Persons shall be added or excluded. In exercising its power pursuant to this Section 4.15.4, the Trustee may add or delete a Beneficiary or Beneficiaries without regard for the interests of the current Beneficiaries' in the Trust Fund or any income thereon.

4.15.4   Except as otherwise provided herein, any appointment or exclusion made pursuant to this Section 4.15.4. may be revocable or irrevocable, and shall have effect from the date specified by the Trustee.

4.15.5   Notwithstanding the provisions of this Trust, in no circumstances shall a Beneficiary be appointed as Trustee and if any Trustee becomes a Beneficiary such Trustee shall immediately and without further action retire as Trustee in accordance with Section 3.2.4 or 6.2.3 hereof.

4.16   Subject to the prior written notice to the Protector the Trustee may change at any time and from time to time during the Trust Period the governing law and forum for the administration of this Trust as hereinafter provided.

## ARTICLE FIVE
### Benefit of Trust

5.1.   The Beneficiaries of this Trust shall be those persons enumerated in Annex "B" attached hereto and forming an integral part hereof or as appointed by deed pursuant to the powers under clause 4.15.4 hereof.

5.2.   The Trust Estate together with any other property which may from time to time be held by the Trustee in lieu thereof or in addition thereto, shall be held by the Trustee upon the following Trust:

8

Exhibit D

5.2.1.     The Trustee shall hold the Trust Estate during the Trust Period and may accumulate the whole of the income of the Trust Estate for the maximum period of accumulation permitted by law and add such accumulations to the principal thereof provided that during the Trust Period the Trustee may, upon making payments, apply any of the principal or the income of the Trust Estate to or for the benefit of the Beneficiaries designated in paragraph 5.1. of this Article Five provided, however, that in the interests of any Beneficiary, the Trustee may, taking into consideration the country of residence of the Beneficiary, tax and duties there eligible, foreign exchange rates and other financial, political, economic or personal considerations, retain any such distribution or payment for the benefit of the Beneficiary and provided further that any discretion herein contained shall be subject to Annex "B" referred to in paragraph 5.1. of this Article Five.

5.2.2.     The Trustee shall, in its sole discretion, determine the time and amount of payments, appropriations and applications of the income and/or principal of the Trust Estate to the Beneficiaries as aforesaid at all times.

5.3.   Upon expiration of the Trust Period and subject to such powers of appointment as may be hereinafter contained, the Trustee shall pay or transfer the remaining principal and income to the Beneficiaries as shall then be living in such manner as set forth in Annex "B" referred to in subparagraph 5.1. of this Article Five; provided that if at the expiration of the Trust Period no Beneficiary as defined herein shall be alive, the principal and income then remaining in the Trust Estate shall be distributed according to subparagraph 5.11. of this Article Five.

5.4.   All gifts, payments, or benefits made under the present Trust from the proceeds of the Trust Estate are intended as aliment and shall not be subject to seizure for the payment of any debts of the Beneficiaries or their representatives except in the case of express hypothecation or pledge after delivery, donation, or payment to them of any portion of the Trust Estate.

5.5    The proceeds, payment or other donation of any property to the Beneficiaries shall be and remain his or her private and separate property, free from the control of any consort, and shall not be liable for the debts of the said consort, and shall not form part of any community of property which may subsist between such consorts.

5.6.   If any person should become entitled to any portion or share of the Trust Estate either before attaining the age of 21 or at such time when such person is determined to be mentally incapacitated, such portion or share may, in the Trustee's discretion, in consultation with the Protector, be held and kept invested by the Trustee and the income and principal or some amount thereof as the Trustee, in consultation with the Protector, considers necessary or advisable, shall be used and applied for the benefit of such person until either he or she has either attained the age of 21, whereupon his or her portion or share, or the amount thereof then remaining in the hands of the Trustee shall be paid or transferred to such person or, as the case may be, in the case of mental incapacity, until such time as the Trustee has been

Exhibit  D

determined by the Trustee, in consultation with the Protector, that it is necessary or advisable to pay and transfer the amount of such portion or share to the acting guardian of such person.

5.7.     The Trustee shall also have the power to make any payment for any person under the age of 21 to the parent or legal guardian of any such person whose receipt thereof shall be sufficient discharge to the Trustee.

5.8.     The determination of mental incapacity shall be made by the Protector after consultation with the Trustee and upon such medical or other expert assessment as the Protector considers necessary or advisable.

5.9.     The words "child," "children," "issue" when used herein, refer to a legitimate child, legitimate children or their respective legitimate issue but do not include an adopted child, adopted children, or their respective issue or adopted issue.

5.10.    If the Trustee deems it necessary, a prerequisite of the enjoyment of the proceeds of the Trust Estate by any Beneficiary shall be that within a period of two months after the date when any such person is appointed Beneficiary hereunder, he or she declares to the Trustee in a form satisfactory to the Trustee and the Trustee's legal counsel, that he or she promises to respect all the provisions laid down in the present Trust and the provisions of any conveyance of property by any person or persons to the Trustee to be held as part of the Trust Estate subject to the Trusts hereof. If he or she is in default to so declare and promise, he or she shall lose all of his or her rights to the enjoyment or the proceeds of the present Trust and Trust Estate, and any other trust fund which may have been created in consequence hereof and be excluded by the Trustee in accordance with the positions of clause 4.15.4 hereof.

5.11.    The charitable institutions and purposes to which the right or benefit of the Trust Estate shall possibly pass in accordance with the provisions of this Trust shall be those designated, if any, in Annex "B" hereto or as appointed by deed pursuant to the power under clause 4.15.4 hereof.

**ARTICLE SIX**
**The Protector**

6.1.     Definition

6.1.1.   The Protector shall be the person who is, for the time being, in office, whether the Protector originally appointed hereby or subsequently appointed in accordance with this Trust.

6.1.2.   Any individual who is not a U.S. citizen or resident, or any corporation that is not organized in any state or territory of the U.S., may be the Protector whether an individual (resident or non-resident of Canada) or a corporation (Canadian or

10

Exhibit D

foreign). Those individuals who are Beneficiaries or may become Beneficiaries of this Trust as well as their spouses and relatives, including the relatives of their spouses, may only be named Protector to this Trust to the extent that, in the aggregate, the Trustee does not comprise a majority of the total of persons and corporations appointed to and currently occupying the office of the Protector.

6.1.3.   The Protector(s), for the time being, of the present Trust, shall be H&H Protectors Ltd., a Bahamas corporation.

6.2.   <u>Resignation and Replacement</u>

6.2.1.   A Protector shall cease to be a Protector when he or she dies, resigns or becomes unable or unwilling to act or continue to act or becomes insolvent or bankrupt. A corporation shall cease to be a Protector hereunder when the Trustee resigns or becomes insolvent or bankrupt or ceases to exist.

6.2.2.   In the event an individual appointed as Protector in section 6.1.3. of Article 6 is unable or unwilling to serve as a Protector, then a successor protector shall be appointed by the Trustee.

6.2.3.   Resignation by a Protector shall be effected by the delivery or mailing by registered mail of a written notice of resignation to the Trustee acting.

6.3.   <u>Powers of the Protector</u>.  Notwithstanding any other provisions of the present Trust and particularly the powers and authority herein granted to the Trustee, the Protector shall at any time or from time to time during the Trust Period or any extension thereof, have the full power and authority:

6.3.1.   to remove from office, or appoint new or additional Trustees as the Protector shall consider advisable and without limiting the generality of the foregoing, to fill any vacancy in the office of the Trustee.

6.3.2.   to veto distributions of capital or income by the Trustee to any Beneficiary, provided such veto is exercised reasonably.

6.3.3.   to extinguish, diminish, reduce or otherwise limit the Protector's own powers as Protector during the tenure of persons appointed to and then in the office of the Protector; however, such extinction, diminishment, reduction or limitation shall not affect the powers of subsequent persons who may by replacement or later appointment be named to the office of Protector subsequently.

6.3.4.   to supervise the accounts of the Trust Estate, receive an accounting from any or all of the Trustee or any other person, company, institution or creditor holding any assets or property of the Trust Estate or any other trust fund which may be created in consequence hereof.

11

Exhibit D

6.3.5.   without limiting the generality of any power or authority otherwise conferred upon the Protector hereunder, the Protector shall have the full power and authority, instead of acting personally, to appoint any agent or agents in any part of the world to assist in the carrying out of the powers of the Protector; and, provided that the Protector exercises reasonable care in the appointment of such agent or agents, the Protector shall not be responsible for any act or neglect of any such agent or agents.

6.3.6.   any person appointed to the office of Protector being engaged in a profession, business or trade, shall be paid all usual professional business and trade charges and remuneration for business transacted and time expended and acts done by it or any employee or partner of the Trustee or by any firm or corporation with which it is connected in connection with the present Trust, including acts which persons appointed to the office of Protector not being in any profession, business or trade could have done personally.

6.3.7.   Any reference to the "Protector" in this Trust shall be construed as a reference to all of the persons appointed to and then in the office of the Protector if there be more than one.

6.3.8.   Wherever herein discretion is vested in or power is conferred upon the Protector, such discretion or power must be exercised by a majority of the persons appointed to and then in the office of the Protector. If it should happen at any time that there are fewer than three (3) persons then in the office of the Protector, such discretion or power must be exercised by unanimity if there are two (2) such persons and if there is only one (1) such person, he may validly exercise such discretion or power alone.

### ARTICLE SEVEN
### Power to Revoke and Amend

This Trust is irrevocable and no Trust provisions or interests may be altered, amended, revoked or terminated under this Trust or under any statute or other rule of law.

### ARTICLE EIGHT
### Interpretation

8.1.   Any provision or condition of this declaration of Trust which is or becomes void for any reason whatsoever including the fact that it is considered to be or constitutes an impossible condition or one contrary to good morals, to law, to equity, or to public order, shall not annul this declaration Trust but shall only be considered as not written.

Exhibit  D

## ARTICLE NINE
### Governing Laws

9.1.     Subject to the terms of subparagraph 4.16 of Article Four hereof, the Trust Estate created herein is created under the law of the Province of Nova Scotia, Canada and the rights of all parties and the construction and effect of every provision hereof shall be subject to the exclusive jurisdiction of and construed and regulated only according to the law of the Province of Nova Scotia, Canada.

9.2.     If the governing law of this Trust is changed and any provision of this Trust be found to be in violation of or contrary to such new governing law, including, by way of example, but without limitation, any law or rule therein prevailing relating to accumulation of trust income and to perpetuity periods, such provision shall be deemed to be amended and to comply with the new governing law.

9.3.     If at any time it appears that the Trust falls within the definition of a "United States Person," as defined in Section 7701(a)(30)(E) of the United States Internal Revenue Code of 1986 and the regulations thereunder, the Trustee may amend the Declaration, change the jurisdiction of the Trust, or do otherwise as it sees fit so the Trust will not fall within such definition in accordance with the provisions of subparagraph 4.16 hereof.

9.4.     Notwithstanding anything in the Declaration to the contrary, if at any time a United States court attempts to assert jurisdiction over or otherwise supervise the administration of the Trust directly or indirectly, the Trustee shall cause the Trust to migrate from the United States. Notwithstanding anything in the Declaration to the contrary, if any governmental agency or creditor attempts to collect information from or assert a claim against the Trust, the Trustee shall cause one or more substantial decisions of the Trust to be controlled by a person or entity that is not a United States fiduciary. The Trustee may accomplish its objectives set forth in this Section 9.4. by amending the Declaration, changing the jurisdiction of the Trust, or otherwise as the Trustee sees fit at its sole discretion.

## ARTICLE TEN
### Acceptance of Trustee and Protector

The Trustee accepts the Trust hereby created, and both the Trustee and Protector agree to carry out the provisions hereof to be performed on their part.

## ARTICLE ELEVEN
### Notices

11.1.     Any notice required or permitted to be given under any of the provisions of this Trust of the provisions of this Trust shall be sent by registered air mail, postage pre-paid, to the last known address of the addressee.  No evidence that such notice has been received by any addressee shall be necessary to constitute good and valid notification.  Any such notice given as aforesaid shall be deemed to have been given two (2) weeks after the envelope containing same is mailed, pre-paid registered air mail as aforesaid.  There shall be no

13

Exhibit D

obligation to give any such notice to any party in the case of impossibility to give any such notice.

## ARTICLE TWELVE
### Exclusion from Benefits

Whoever contests the validity of this Trust, of the Trust created under it, of the Trusts created by virtue of the present Trust, of the provisions of any conveyance of property by any person or persons to the Trustee to form and be held as part of the Trust Estate, shall cease to be a Beneficiary of any of these Trusts and shall be excluded from any benefits, direct or indirect, deriving from the Trust Estate in accordance with the provisions of subparagraph 4.15.4 hereof

## ARTICLE THIRTEEN
### Severability

Should any provision of this Trust be determined to be contrary to or invalid under the Governing Law of this Trust by a competent court of that jurisdiction, provided that its removal would not substantially affect or render contradictory or incomprehensible the remainder of this Trust, such provision shall be considered as unwritten and shall not invalidate or otherwise affect this Trust and the Trust hereby created.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

Exhibit D

**WHEREFORE,** the parties hereto have executed this Trust on the date first hereinabove written.

**ACCEPTED** by

The Trustee:

AMERICAS FIDUCIARY LIMITED,
a Nevis corporation

By: _____        _____
    TIMOTHY D. RICHARDS, Director      Witness

                                       _____
                                       Witness

15

Exhibit  D

**AMENDED AND RESTATED**
**ANNEX "A"**

**November 13, 2006**

**THE TRUST ESTATE**

1.  Two Hundred Canadian Dollars (CDN $200.00);

2.  100% of the Beneficial interest in the Global Irrevocable Trust, a Nova Scotia Trust dated December 1, 2004;

3.  100% of the Beneficial interest in the Gramercy Irrevocable Operating Trust, a Nova Scotia Trust dated July 1, 2005.

16

Exhibit D

**AMENDED AND RESTATED**
**ANNEX "B"**

**November 13, 2006**

**BENEFICIARIES**

A.   Beneficiaries

    1.    The Beneficiary of the HH MASTER SETTLEMENT ("Trust") shall be GUSTAVO HERNANDEZ ROMERO (the "Settlor").

    2.    Upon the death of GUSTAVO HERNANDEZ ROMERO, the Contingent Beneficiaries of the Trust shall be the Settlor's daughters: MARIA LUCIA HERNANDEZ FRIERI and MARIA ELENA HERNANDEZ FRIERI.

    4.    During the lifetime of the Settlor, the Trust Estate shall not be vested in the Contingent Beneficiaries and the Contingent Beneficiaries shall have no claim of any kind, including the right to receive accountings on the Trust Estate.

    5.    Upon the death of the Settlor, the remainder of the Trust Estate shall become vested in the Contingent Beneficiary.

B.   Payments from the Trust Estate

    1.  During the lifetime of the Settlor, the Trustee, at its discretion, may pay to or for the benefit of the Settlor so much of the capital or income of the Trust Estate as the Trustee deems necessary in view of the requirements of an adequate standard of living of the Settlor, and taking into consideration the accustomed standard of living of the Settlor and any special needs of the Settlor, such as health, educational expenses or other similar needs.

    2.  Upon the death of the Settlor, the Trustee shall divide the remaining principal and accumulated but undistributed income of the Trust Estate into separate and equal shares of Fifty-Percent (50%) ("Trust Share") for the benefit of the Contingent Beneficiaries and shall distribute each respective Trust Shares in accordance with the following provisions:

        a.  The Trustee may pay to or for the benefit of each Contingent Beneficiary his/her respective Trust Share as the Trustee deems necessary in view of the requirements of an adequate standard of living of the Contingent Beneficiary, taking into consideration the accustomed standard of living of the Contingent Beneficiary and any special needs of the Contingent Beneficiary, such as health care, educational expenses or other similar needs.

17

Exhibit D

     i.    Upon the Protector's determination, the Trustee shall pay to each of the Contingent Beneficiaries his/her respective Trust Share, outright, Per Stirpes.

    ii.    If any of the Contingent Beneficiaries die prior to receiving full and final distribution, with surviving Issue, then the deceased Contingent Beneficiary's Trust Share shall be divided into so many shares so as to provide one (1) separate and equal share ("Issue's Share") for each of the deceased Contingent Beneficiary's then-living Issue.  Any payments from an Issue's Share shall be made in accordance with the provisions of this section (2) of Annex B.

    iii.    If any of the Contingent Beneficiaries die prior to receiving full and final distribution, without surviving Issue, then the deceased Contingent Beneficiary's Trust Share shall be distributed among the other Contingent Beneficiaries, Per Stirpes, in equal shares.

    iv.    In the event no Contingent Beneficiary survives prior to full and final distribution of the Trust Estate, then the Trustee shall distribute the Trust Estate pursuant to written instructions of the Protector.  In default and subject as aforesaid, the Trustee shall stand possessed of the principal and income of the Trust Estate absolutely for the Beneficiaries at the expiry of the Trust Period and if more than one, in equal shares, Per Stirpes.

3.  Upon distribution of the entire Trust Estate and any income thereon to the Beneficiaries hereunder, the Trust shall terminate.

4.  "Per Stirpes" shall mean that method of distribution pursuant to which a class or group of distributees take by right of representation through a deceased ancestor, a share to which such ancestor would have been entitled had he/she not been deceased. If, for example, distribution is to be made "Per Stirpes" to a specified person, and said person is deceased but is survived by children, then the share which would otherwise have been distributable to such deceased specified person had he/she then been living shall be divided equally among the children of such deceased person. As a further example, and consistent with the example in the preceding sentence, if all of the children of such specified person shall be deceased, then the share which would otherwise have been distributable to each such deceased child shall be divided equally among the children of each deceased child, with the effect that the children of each such deceased child of each such specified person will receive by right of representation the share which his/her parent would have received had he/she then been living.

Exhibit  D

**EXHIBIT  E**

*F* 050729000 767

# DC-08

## Articles of Organization
### of
## 3 GRAMERCY PARK WEST, LLC
under Section 203 of the Limited Liability Company Law

**FIRST:**  The name of this New York limited liability company is:
3 GRAMERCY PARK WEST, LLC

**SECOND:**  The county within this state in which the office of the limited liability company is to be located is:   ROCKLAND

**THIRD:**  The Secretary of state is designated as agent of the limited liability company upon whom process against it may be served. The post office address within or without this state to which the secretary of state shall mail a copy of any process against the limited liability company served upon him or her is:

c/o Corporate Creations Network Inc.
15 North Mill Street
Nyack NY 10960

**FOURTH:**  The name and street address within this state of the registered agent of the limited liability company upon whom and at which process against the limited liability company can be served is:
Corporate Creations Network Inc.
15 North Mill Street
Nyack NY 10960

**FIFTH:**  The effective date of the Articles of Organization, if not effective upon filing is:

**SIXTH:**  The limited liability company is to be managed by (check appropriate box):

☐ 1 or more members
☐ A class or classes of members
☒ 1 or more managers
☐ A class or classes of managers

IN WITNESS WHEREOF, this certificate has been subscribed this __28__ day of
___July___, 20 _05_, by the undersigned who affirms that the statements made herein are true under the penalties of perjury.

**Karla Sarria**  – ORGANIZER

Exhibit  E

F 050729000 767

# ARTICLES OF ORGANIZATION

## OF

## 3 GRAMERCY PARK WEST, LLC

/ CC

STATE OF NEW YORK
DEPARTMENT OF STATE

FILED   JUL 2 9 2005
TAX $ _____ 0
BY: _____ LB

*Under Section 203 of the Limited Liability Company Law*

RECEIVED
2005 JUL 29  PH 1: 04

2005 JUL 29  PH 4: 17

Filed By:

Corporate Creations International, Inc.
941 Fourth Street
Miami Beach            FL      33139

2   050729000 808

D.C. -08
DRAWDOWN

☐ ROUTINE          ☐ SAME DAY
■ 24 HOUR          ☐ 2 HOUR

Exhibit E

**EXHIBIT  F**

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2005081702019001001EB090

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 5 |
|---|---|

| Document ID: 2005081702019001 | Document Date: 08-16-2005 | Preparation Date: 08-17-2005 |
|---|---|---|

Document Type: DEED
Document Page Count: 3

| PRESENTER: | RETURN TO: |
|---|---|
| PHILIP OHARA ASSOCIATES, AS AGENT FOR COMMONWEALTH TITLE COMPANY 140 REMSEN STREET BROOKLYN, NY 11201 718-875-7506 MTB-36534 | MICHAEL L. LANDSMAN, ESQ. HOLM & O'HARA LLP 420 LEXINGTON AVENUE, SUITE 1745 NEW YORK, NY 10170-1799 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 876 | 12   Entire Lot | 2ND F | 3 GRAMERCY PARK WEST |

Property Type: SINGLE RESIDENTIAL CONDO UNIT

**CROSS REFERENCE DATA**

CRFN_____ or Document ID_____ or _____ Year_____ Reel_____ Page_____ or File Number_____

**PARTIES**

| GRANTOR/SELLER: | GRANTEE/BUYER: |
|---|---|
| RALPH AMMIRATI 3 GRAMERCY PARK WEST NEW YORK, NY 10003 | 3 GRAMERCY PARK WEST, LLC 701 BRICKELL AVENUE, SUITE 2030 MIAMI, FL 33131 |

x  Additional Parties Listed on Continuation Page

**FEES AND TAXES**

| Mortgage | | | Recording Fee: $ | 52.00 |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Affidavit Fee:  $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | | $ | 75.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $11,600.00 + $29,000.00 = $ | 40,600.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | |
| MTA: | $ | 0.00 | |
| NYCTA: | $ | 0.00 | |
| Additional MRT: | $ | 0.00 | |
| TOTAL: | $ | 0.00 | |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

NYC HPD Affidavit in Lieu of Registration Statement

Recorded/Filed      08-30-2005 11:21
City Register File No.(CRFN):
            2005000485735

*Annette M. Hill*

***City Register Official Signature***

Exhibit  F

## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2005081702019001001EB090

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 5 |
|---|---|---|
| Document ID: 2005081702019001 | Document Date: 08-16-2005 | Preparation Date: 08-17-2005 |

Document Type: DEED
Document Page Count: 3

| PRESENTER: | RETURN TO: |
|---|---|
| PHILIP OHARA ASSOCIATES, AS AGENT FOR COMMONWEALTH TITLE COMPANY 140 REMSEN STREET BROOKLYN, NY 11201 718-875-7506 MTB-36534 | MICHAEL L. LANDSMAN, ESQ. HOLM & O'HARA LLP 420 LEXINGTON AVENUE, SUITE 1745 NEW YORK, NY 10170-1799 |

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 876 | 12 | Entire Lot | 2ND F | 3 GRAMERCY PARK WEST |

**Property Type:** SINGLE RESIDENTIAL CONDO UNIT

### CROSS REFERENCE DATA

CRFN_____ *or* Document ID_____ *or* _____ Year_____ Reel ____ Page _____ *or* File Number_____

### PARTIES

| GRANTOR/SELLER: | GRANTEE/BUYER: |
|---|---|
| RALPH AMMIRATI 3 GRAMERCY PARK WEST NEW YORK, NY 10003 | 3 GRAMERCY PARK WEST, LLC 701 BRICKELL AVENUE, SUITE 2030 MIAMI, FL 33131 |

☒ Additional Parties Listed on Continuation Page

### FEES AND TAXES

| Mortgage | | | Recording Fee: $ | 52.00 |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Affidavit Fee: $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | | $ | 75.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $11,600.00 + $29,000.00 = $ | 40,600.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |

NYC HPD Affidavit in Lieu of Registration Statement

Exhibit F

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2005081702019001001CB210

| RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION) | PAGE 2 OF 5 |
|---|---|

| **Document ID:** 2005081702019001 | Document Date: 08-16-2005 | Preparation Date: 08-17-2005 |
|---|---|---|

Document Type: DEED

**PARTIES**
**GRANTOR/SELLER:**
JOAN AMMIRATI
3 GRAMERCY PARK WEST
NEW YORK, NY 10003

Exhibit F

T 693—Standard N.Y.B.T.U. Form 8004 * Quitclaim deed.
Individual or Corporation (single sheet). 11-98

DISTRIBUTED BY Blumberg Excelsior Inc.
PUBLISHER NYC 10015

### CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

**THIS INDENTURE,** made the 16ᵗʰ day of August, 2005

**BETWEEN**

Ralph Ammirati and Joan Ammirati, husband and wife
having an address at
3 Gramercy Park West
New York, New York  10003

party of the first part, and

3 GRAMERCY PARK WEST, LLC
a New York limited liability company
having an address at
701 Brickell Avenue, Suite 2030
Miami, FL  33131

party of the second part,

**WITNESSETH,** that the party of the first part, in consideration of ten dollars paid by the party of the second part, does hereby remise, release and quitclaim unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

~~ALL~~ ~~that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the~~

An undivided twenty-four percent (24%) interest as tenants in common in the land, with the buildings and improvements thereon, known as 3 Gramercy Park West, New York, New York, and more particularly described in

SCHEDULE A ANNEXED HERETO AND MADE A PART HEREOF

TOGETHER with the right to occupy the parlor (second) floor apartment contained therein, ALL PURSUANT AND SUBJECT to a certain co-ownership agreement dated December 12, 1969 among Richard W. McCabe, Iris Whitney, Richard J. Wolfenden, William D. McCabe and William Ditfort, as amended by agreements dated October 1, 1974, May 23, 1975, January 8, 1982, April 26, 1993, February 22, 1997, October 1, 2001 and of even date (the "Agreement").

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, hereby covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF,** the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF:

_Ralph Ammirati_

_Joan Ammirati_

**Exhibit  F**

**ACKNOWLEDGMENT IN NEW YORK STATE (RPL 309-a)**

State of New York, County of New York ss.:
On August 16, 2005 before me, the undersigned,
personally appeared

Ralph Ammirati and Joan Ammirati
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)
SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County
Commission Expires March 30, 2006

**ACKNOWLEDGMENT OUTSIDE NEW YORK STATE (RPL 309-b)**

State of          County of          ss.:
On          before me, the undersigned,
personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in

*(insert city or political subdivision and state or county or other place acknowledgment taken)*

_____
(signature and office of individual taking acknowledgment)

**ACKNOWLEDGMENT BY SUBSCRIBING WITNESS(ES)**

State of          }
County of          } ss.:

On          before me, the undersigned,
personally appeared

the subscribing witness(es) to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he/she/they reside(s) in *(if the place of residence is in a city, include the street and street number, if any, thereof);*

that he/she/they know(s)

to be the individual(s) described in and who executed the foregoing instrument; that said subscribing witness(es) was (were) present and saw said

execute the same; and that said witness(es) at the same time subscribed his/her/their name(s) as a witness(es) thereto.
( ☐ *if taken outside New York State insert city or political subdivision and state or country or other place acknowledgment taken* And that said subscribing witness(es) made such appearance before the undersigned in

_____)

_____
(signature and office of individual taking acknowledgment)

**Quitclaim Deed**
WITH COVENANT AGAINST GRANTOR'S ACTS
TITLE No. MTB-36534

Ralph Ammirati and
Joan Ammirati
TO

3 Gramercy Park West, LLC

| | |
|---|---|
| SECTION | 3 |
| BLOCK | 876 |
| LOT | 12 |
| COUNTY OR TOWN | New York |

**RETURN BY MAIL TO:**

Michael L. Landsman, Esq.
Holm & O'Hara LLP
420 Lexington Avenue, Suite 1745
New York, New York
Zip No.   10170-1799

*Reserve this space for use of Recording Office.*

Exhibit F

SCHEDULE A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, being one of the 66 Lots surrounding the park square mentioned or referred to in a certain Deed from Samuel B. Ruggles and Wife to Charles A. Davis and others, dated December 17, 1831 and recorded with the Map annexed in the Register's Office of New York County in Liber 278 of Conveyances, Page 528, the Lot hereby described being laid down and distinguished on the said Map by the Lot Number 3 and is bounded and described as follows:

BEGINNING at a point on the westerly side of a street or way running from 20th Street to 21st Street on the westerly side of Gramercy Park at the center of the northerly side or gable wall of house on the premises hereby described, which is erected as a party wall resting partly on the Lot hereby described and partly on Lot Number 2 of said 66 Lots at a point 52 feet 6-6/7 inches southerly from 21st Street;

RUNNING THENCE westerly on a line parallel with 21st Street and through the center of said gable or side wall, 110 feet;

THENCE southerly, parallel with said street or way on the westerly side of Gramercy Park, 26 feet 3-3/7 inches to Lot Number 4 laid down on said Map;

THENCE easterly, parallel with 21st Street and through the center of a party wall between the house on the premises hereby described and the house adjoining on the south and along the northerly line of said Lot Number 4, 110 feet to said street on the westerly side of Gramercy Park;

AND THENCE northerly along the said last mentioned street, 26 feet 3-3/7 inches to the point or place of BEGINNING.

Exhibit  F

**EXHIBIT  G**

# OPERATING AGREEMENT
## OF
## 3 GRAMERCY PARK WEST LLC

In accordance with the New York Limited Liability Company Act (the "Act") and subject to the Articles of Organization, which were filed on the 29th day of July, 2005 with the New York Department of State. The Gramercy Irrevocable Trust, a Nova Scotia Trust (the "Trust"), as sole member of 3 GRAMERCY PARK WEST LLC adopts the following resolutions regarding the conduct of the business and affairs of 3 GRAMERCY PARK WEST LLC, a New York limited liability company ("Company").

## SECTION 1
## THE COMPANY

1.1     Definitions.

Capitalized words and phrases used in this Operating Agreement have the following meanings:

"Act" means the New York Limited Liability Company Act, Chapter 18, as amended from time to time (or any corresponding provisions of succeeding law).

"Articles" means the Articles of Organization filed with the New York Department of State pursuant to the Act to form the Company, as originally executed and amended, modified, supplemented or restated from time to time, as the context requires.

"Articles of Dissolution" means a certificate filed in accordance with the New York Limited Liability Company Act Section 705.

"Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy." A "Voluntary Bankruptcy" means, with respect to any Person (i) the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; (ii) the filing of any petition or answer by such Person seeking to adjudicate itself as bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property; or, (iii) corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or without the consent or

Exhibit  G

acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within ninety (90) days.

"Business" means the business of operating and managing 3 GRAMERCY PARK WEST LLC.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed pursuant to this Operating Agreement and the Articles and the limited liability company continuing the business of this Company in the event of dissolution of the Company as herein provided.

"Debt" means (i) any indebtedness for borrowed money or the deferred purchase price of property as evidenced by a note, bonds, or other instruments; (ii) obligations as lessee under capital leases; (iii) obligations secured by any mortgage, pledge, security interest, encumbrance, lien or charge of any kind existing on any asset owned or held by the Company whether or not the Company has assumed or become liable for the obligations secured thereby; (iv) accounts payable; and, (v) obligations under direct or indirect guarantees of [including obligations (contingent or otherwise) to assure a creditor against loss in respect of] indebtedness or obligations of the kinds referred to in clauses (i), (ii), (iii) and (iv), above provided that Debt shall not include obligations in respect of any accounts payable that are incurred in the ordinary course of the Company's business and are not delinquent or are being contested in good faith by appropriate proceedings.

"Dissolution Event" shall have the meaning set forth in Section 10.1 hereof.

"Effective Date" means the date the Articles of Organization were filed.

"GAAP" means generally accepted accounting principles in effect in the United States of America from time to time.

"Involuntary Bankruptcy" has the meaning set forth in the definition of Bankruptcy.

"Liquidation Period" has the meaning set forth in Section 10.7 hereof.

"Liquidator" has the meaning set forth in Section 10.9(a) hereof.

"Manager" means the Member who shall also serve as the Manager of the Company.

"Member" means any Person (i) who is referred to as such in Section 2.1, or who has become a substituted Member pursuant to the terms of this Operating Agreement; and, (ii) who has not ceased to be a Member. "Member(s)" means all such Persons.

"Percentage Interests" means a Member's percentage of LLC interests reflected in Section 2.1.

Exhibit  G

"Person" means any individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee or other entity.

"Reconstitution Period" has the meaning set forth in Section 10.1(b) hereof.

"Regulations" mean this Operating Agreement of 3 GRAMERCY PARK WEST LLC including all Exhibits and Schedules attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Operating Agreement as a whole, unless the context otherwise requires.

"Treasury Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

"Securities Act" means the Securities Act of 1933, as amended.

"Tax Matters Member" has the meaning set forth in Section 7.3(a) hereof.

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of.

"Units or Unit" means any ownership interest in the Company representing a Capital Contribution of $1.00, including any and all benefits to which the holder of such Units may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this agreement. The Company shall issue 100 Units.

"Voluntary Bankruptcy" has the meaning set forth in the definition of "Bankruptcy."

1.2     Name.

The name of the Company shall be 3 GRAMERCY PARK WEST LLC and all business of the Company shall be conducted in such name. The Manager may change the name of the Company upon ten (10) days notice to the Member(s).

1.3     Purpose; Powers.

(a)     The purposes of the Company are (i) to operate the Business; (ii) to make such additional investments and engage in such additional activities as the Members may approve; and, (iii) to engage in any and all activities related or incidental to the purposes set forth in clauses (i) and (ii).

(b)     The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the purposes of the Company set forth in Section 1.3(a) hereof and has, without limitation, any and all powers that may be exercised on behalf of the Company by the Manager pursuant to Section 5 hereof.

Exhibit  G

1.4     Principal Place of Business.

The principal place of business of the Company shall be 2665 South Bayshore Drive, Suite 703, Miami, Florida 33133.  The Manager may change the principal place of business of the Company to any other place within or without the State of New York upon ten (10) days notice to the Member(s). The registered office of the Company in the State of New York initially is located at Corporate Creations Network, Inc., 15 North Mill Street, Nyack, New York 10960.

1.5     Term.

The term of the Company shall commence on the date the articles of organization of the Company (the "Articles") are filed with the New York Department of State in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed following a Dissolution Event, as provided in Section 10 hereof.

1.6     Filings; Agent for Service of Process.

(a)     The Manager is hereby authorized to and shall cause the Articles to be filed with the New York Department of State in accordance with the Act. The Manager shall take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of New York, including the preparation and filing of such amendments to the Articles and such other assumed name articles, documents, instruments and publications as may be required by law, including, without limitation, action to reflect:

(i)     a change in the Company name;

(ii)     a correction of false or erroneous statements in the Articles or the desire of the Member(s) to make a change in any statement therein in order that it shall accurately represent the agreement among the Member(s); or,

(iii)     a change in the time for dissolution of the Company as stated in the Articles and in this Operating Agreement.

(b)     The Member(s) and the Manager shall execute and cause to be filed original or amended articles and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the laws of any other jurisdictions in which the Company engages in business.

(c)     The registered agent for service of process on the Company in the State of New York shall be Corporate Creations Network, Inc., 15 North Mill Street, Nyack, New York 10960 or any successor as appointed by the Member(s) in accordance with the Act.

(d)     Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with Section 10, the Manager shall promptly execute and cause to be filed

Exhibit  G

articles of dissolution in accordance with the Act and the laws of any other jurisdictions in which the Manager deems such filing necessary or advisable.

    1.7    <u>Title to Property</u>.

All property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in his individual name, and each Member's interest in the Company shall be personal property for all purposes. At all times after the Effective Date, the Company shall hold title to all of its property in the name of the Company and not in the name of any Member. The Member(s) hereby agree that no Member, nor any successor in interest to any Member, shall have the right while this Operating Agreement remain in effect, including, without limitation, during the period the Company is in liquidation following any dissolution, to have any Company asset partitioned, or to file a complaint or institute any proceedings at law or in equity to have such asset partitioned; and each Member, on behalf of himself, his successors, successors-in-title, and assigns, hereby waives any such right.

    1.8    <u>Payments of Individual Obligations</u>.

The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member.

    1.9    <u>Independent Activities; Transactions with Member(s)</u>.

    (a)    The Manager shall be required to devote such time to the affairs of the Company as may be necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that the Manager may deem appropriate in his discretion.

    (b)    Insofar as permitted by applicable law, neither this Operating Agreement nor any activity undertaken pursuant hereto shall prevent any Member or the Manager from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member or the Manager to permit the Company or any other Member to participate in any such activities, and as a material part of the consideration for the execution of this Operating Agreement by each Member, each Member hereby waives, relinquishes, and renounces any such right or claim of participation.

    (c)    To the extent permitted by applicable law and subject to the provisions of this Operating Agreement, the Manager is hereby authorized to cause the Company to purchase property from, sell property to or otherwise deal with any Member or Manager, <u>provided</u> that any such purchase, sale or other transaction shall be made on terms and conditions which are no less favorable to the Company than if the sale, purchase or other transaction had been made with an independent third party.

Exhibit  G

## SECTION 2
## MEMBER(S)' CAPITAL CONTRIBUTIONS

2.1   Original Capital Contributions.

The name, address, original capital contribution, and initial percentage interest of each of the Member(s) is as follows:

| Names and Address | Original Capital Percentage Contribution | Interest (%) | Units |
|---|---|---|---|
| Gramercy Irrevocable Operating Trust A Nova Scotia Trust C/O Trustee AMERICAS FIDUCIARY LTD., a Nevis corporation P.O. Box 3463 Road Town, Tortola BVI | $100.00 | 100% | 100 |

2.2   Additional Capital Contributions.

The Member(s) may make additional capital contributions only with the written consent of all Member(s). If any Member contributes additional capital, his Percentage Interest shall not change. Nothing herein shall be construed to require the Member(s) to make any additional capital contributions.

2.3   Capital Account.

A Capital Account shall be maintained for each Member in accordance with Code Section 704(c), and such account shall be adjusted annually to reflect (i) additions or withdrawals of capital by any Member and (ii) allocations of profit, loss or gain allocated to such Member in accordance with Section 3, below. Capital Accounts shall be adjusted at the end of each calendar year, or more frequently at the direction of the Managers. No Member shall be permitted to withdraw any capital from his Capital Account without the approval of the majority of the Member(s).

## SECTION 3
## ALLOCATIONS

3.1   Allocation of Profits and Losses.

Except as to special allocations set forth in Sections 3.2 and 3.3, all profits, income, gain, deduction and loss shall be allocated to the Member(s) according to their Percentage Interests in the Company. All allocations of profit, gain or loss shall be reflected in each Member's Capital Account.

3.2   Regulatory Allocations.

Exhibit  G

     (a)     <u>Minimum Gain Chargeback</u>. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in the Company's minimum gain during any fiscal year, each Member shall be specially allocated items of the Company's income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's portion of the net decrease in the Company's minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 3.2(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

     (b)     <u>Member Minimum Gain Chargeback</u>. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in the Member's nonrecourse debt minimum gain attributable to a Member nonrecourse debt during the Company's fiscal year, each Member who has a portion of the Member nonrecourse debt minimum gain attributable to such Member nonrecourse debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of the Company's income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's portion of the net decrease in Member nonrecourse debt minimum gain attributable to such Member nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 3.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

     (c)     <u>Nonrecourse Deductions</u>. Nonrecourse deductions for any fiscal year shall be specially allocated to the Member(s) in proportion to their respective percentage interests.

     (d)     <u>Member Nonrecourse Deductions</u>. Any Member nonrecourse deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member nonrecourse debt to which such Member nonrecourse deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

     (e)     <u>Section 754 Adjustments</u>. To the extent an adjustment to the adjusted tax basis of the Company's assets, pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining capital accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to the capital accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Member(s) in accordance with their interests in the Company in the event Treasury

Exhibit  G

Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member(s) to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

3.3     Curative Allocations.

The allocations set forth in Section 3.2 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Member(s) that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 3.3. Therefore, notwithstanding any other provision of this Section 3.3 (other than the Regulatory Allocations), the Tax Matters Member, as provided in Section 7.3(a) shall make such offsetting special allocations of the Company's income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's capital account balance is, to the extent possible, equal to the capital account balance such Member would have had if the Regulatory Allocations were not part of this Operating Agreement and all of the Company's items were allocated pursuant to Sections 3.1.

3.4     Other Allocation Rules.

(a)     The Member(s) are aware of the income tax consequences of the allocations made by this Section 3 and hereby agree to be bound by the provisions of this Section 3 in reporting their shares of the Company's income and loss for income tax purposes.

(b)     Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Member(s)' interests in the Company's profits are in proportion to their percentage interests.

(c)     To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Tax Matters Member shall endeavor to treat distributions of net cash from operations or net cash from sales or refinancings as having been made from the proceeds of a nonrecourse liability or a Member nonrecourse debt.

3.5     Tax Allocations: Code Section 704(c).

In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Member(s) so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial fair market value.

Any elections or other decisions relating to such allocations shall be made by the Tax Matters Member in any manner that reasonably reflects the purpose and intention of this Operating Agreement. Allocations pursuant to this Section 3.5 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's

Exhibit  G

capital account or share of profits, losses, other items, or distributions pursuant to any provision of this Operating Agreement.

## SECTION 4
## DISTRIBUTIONS

4.1     <u>Distribution</u>.

The Manager shall make distributions of profits and gain to the Member(s) in accordance with their Percentage Interests at such times as the Manager may determine. All such distributions shall be deducted from the respective Member(s)' Capital Account.

4.2     <u>Minimum Distributions</u>.

Notwithstanding Section 4.1, the Manager shall make minimum annual distributions from the Company on the last day of any calendar year to the extent that any Member incurs an income tax liability due to allocation of profit or gain according to the Member's Percentage Interests in the Company.

4.3     <u>Amounts Withheld</u>.

All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Member(s) shall be treated as amounts paid or distributed, as the case may be, to the Member(s) with respect to which such amount was withheld pursuant to this Section 4.3 for all purposes under this Operating Agreement. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Member(s), and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Member(s) with respect to which such amount was withheld.

4.4     <u>Limitations on Distributions</u>.

(a)     The Company shall make no distributions to the Member(s) except (i) as provided in this Section 4 and Section 10 hereof; or, (ii) as agreed to by a majority of the Member(s).

(b)     A Member may not receive a distribution from the Company to the extent that, after giving effect to the distribution, all liabilities of the Company, other than liability to Member(s) on account of their capital contributions, would exceed the fair value of the Company's assets.

## SECTION 5
## MANAGEMENT

5.1     <u>Manager</u>.

Exhibit  G

(a)     The management of the Company shall be vested in the Manager designated by the Members as provided in Section 5.1(c) hereof.

(b)     The number of Managers shall be no less than one (1) unless otherwise provided herein. The initial manager of the Company shall be Gustavo Adolfo Hernandez Frieri.

(c)     Each Member shall have the right to appoint one Manager, which may be such Member.

(d)     A Manager shall remain in office until removed by the Class Member who appointed the Manager, or upon the resignation, disability or death of such Manager. The respective Class Member shall replace the departing Manager by delivering to the Company a statement designating a successor Manager and setting forth such successor Manager's business addresses and telephone numbers.

(e)     The Manager shall perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A person who so performs his duties shall not have any liability by reason of being or having been the Manager of the Company.

(f)     The Manager shall have the power to delegate authority to such officers, employees, agents and representatives of the Company, as they may from time to time deem appropriate.

(g)     The Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the Company.

5.2     <u>Manager's Powers</u>.

(a)     Except as otherwise provided in this Operating Agreement, all powers to control and manage the Business and affairs of the Company shall be exclusively vested in the Manager and the Manager may exercise all powers of the Company and do all such lawful acts as are not by statute, the Articles or this Operating Agreement directed or required to be exercised or done by the Member(s) and in so doing shall have the right and authority to take all actions which the Manager deems necessary, useful or appropriate for the management and conduct of the Business, including exercising the following specific rights and powers:

(i)     Conduct its business, carry on its operations and have and exercise the powers granted by the Act in any state, territory, district or possession of the United States, or in any foreign country which may be necessary or convenient to effect any or all of the purposes for which it is organized;

(ii)     Acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(iii)     Operate, maintain, finance, improve, construct, own, grant operations with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(iv)     Execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of the Business, or in connection with managing the affairs of the Company, including, executing amendments to this Operating Agreement and the Articles in accordance with the terms of this Operating Agreement, both as Manager and, if required, as attorney-in-fact for the Member(s) pursuant to any power of attorney granted by the Member(s) to the Manager;

(v)     Borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Company assets;

(vi)     Execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Company assets;

(vii)     Prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the assets of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of such assets;

(viii)     Care for and distribute funds to the Member(s) by way of cash income, return of capital, or otherwise, all in accordance with the provisions of this Operating Agreement, and perform all matters in furtherance of the objectives of the Company or this Operating Agreement;

(ix)     Contract on behalf of the Company for the employment and services of employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(x)     Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company assets and Manager liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified;

(xi)     Take, or refrain from taking, all actions, not expressly proscribed or limited by this Operating Agreement, as may be necessary or appropriate to accomplish the purposes of the Company;

Exhibit  G

    (xii) Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company, the Member(s) or the Manager in connection with activities arising out of, connected with, or incidental to this Operating Agreement, and to engage counsel or others in connection therewith;

    (xiii) Purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited companies, other limited liability companies, or individuals or direct or indirect obligations of the United States or of any government, state, territory, government district or municipality or of any instrumentality of any of them;

    (xiv) Indemnify a Member or the Manager or former Member or Manager, and to make any other indemnification that is authorized by this Operating Agreement in accordance with the Act.

    (xv) All acts of the Manager, taken voluntarily and in good faith, shall be authorized hereunder. Any acts of the Manager under duress or on behalf of any creditor of a Member shall not be authorized hereunder.

  5.3  <u>Duties and Obligations of the Manager</u>.

    (a) The Manager shall cause the Company to conduct its business and operations separate and apart from that of any Member or the Manager, including, without limitation, (i) segregating Company assets and not allowing funds or other assets of the Company to be commingled with the funds or other assets of, held by, or registered in the name of, any Member or the Manager; (ii) maintaining books and financial records of the Company separate from the books and financial records of any Member or the Manager, and observing all Company procedures and formalities, including, without limitation, maintaining minutes of Company meetings and acting on behalf of the Company only pursuant to due authorization of the Member(s); (iii) causing the Company to pay its liabilities from assets of the Company; and, (iv) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity.

    (b) The Manager shall take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of New York and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Member(s) or to enable the Company to conduct the business in which it is engaged; and, (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of property in accordance with the provisions of this Operating Agreement and applicable laws.

    (c) The Manager shall be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the Member(s), including the safekeeping and use of all of the property and the use thereof for the exclusive benefit of the Company.

Exhibit  G

5.4     Indemnification of the Manager.

(a)     Unless otherwise provided in Section 5.4(d) hereof, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Company's property) shall indemnify, save harmless, and pay all judgments and claims against the Manager relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Manager in connection with the Business, including reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred.

(b)     Unless otherwise provided in Section 5.4(d) hereof, in the event of any action by a Member against the Manager, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of the Manager, including reasonable attorneys' fees incurred in the defense of such action.

(c)     Unless otherwise provided in Section 5.4(d) hereof, the Company shall indemnify, save harmless, and pay all expenses, costs, or liabilities of the Manager, if for the benefit of the Company and in accordance with this Operating Agreement the Manager makes any deposit or makes any other similar payment or assumes any obligation in connection with any property proposed to be acquired by the Company and suffers any financial loss as the result of such action.

(d)     Notwithstanding the provisions of Sections 5.4(a), 5.4(b) and 5.4(c) above, such Sections shall be enforced only to the maximum extent permitted by law and the Manager shall not be indemnified from any liability for the fraud, intentional misconduct, gross negligence or a knowing violation of the law which was material to the cause of action.

(e)     The obligations of the Company set forth in this Section 5.4 are expressly intended to create third party beneficiary rights of the Manager and any Member is authorized, on behalf of the Company, to give written confirmation to the Manager of the existence and extent of the Company's obligations to the Manager hereunder.

5.5     Bankruptcy, Other Circumstances, and Involuntary Assignment by Managers.

The Manager shall not cease to be such by reason of any of the following. An order for relief against the Manager is entered under Chapter 7 of the federal bankruptcy law, or the Manager: (a) makes a general assignment for the benefit of creditors; (b) files a voluntary petition under the federal bankruptcy law; (c) files a petition or answer seeking for the Manager any reorganization arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; (d) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Manager in any proceeding of this nature; or, (e) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Manager or of all or any substantial part of the Manager's properties. In addition the following circumstance shall not cause a person to cease to be a Manager: sixty days after the commencement of any

proceeding against the Manager seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, the proceeding has not been dismissed, or if with sixty days after the appointment without the Manager's consent or acquiescence of a trustee, receiver, or liquidator of the Manager or of all or any substantial part of the Manager's properties, the appointment is not vacated or stayed, or within sixty days after the expiration of any such stay, the appointment is not vacated.

## SECTION 6
## ROLE OF MEMBER(S)

### 6.1    Rights or Powers.

The Member(s) shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way as a Member. Notwithstanding the foregoing, the Member(s) have all the rights and powers specifically set forth in this Operating Agreement and, to the extent not inconsistent with this Operating Agreement, in the Act.

### 6.2    Voting Rights.

No Member has any voting right except with respect to those matters specifically reserved for a Member vote which are set forth in this Operating Agreement and as required in the Act.

### 6.3    Meetings of the Member(s).

(a)    Meetings of the Member(s) may be called upon the written request of any Member. The call shall state the location of the meeting and the nature of the business to be transacted. Notice of any such meeting shall be given to all Member(s) not less than seven (7) days nor more than thirty (30) days prior to the date of such meeting. Member(s) may vote in person, by proxy or by telephone at such meeting and may waive advance notice of such meeting. Whenever the vote or consent of Member(s) is permitted or required under this Operating Agreement, such vote or consent may be given at a meeting of the Member(s). Except as otherwise expressly provided in this Operating Agreement, the unanimous vote of the Member(s) shall be required to constitute the act of the Member(s).

(b)    For the purpose of determining the Member(s) entitled to vote on, or to vote at, any meeting of the Member(s) or any adjournment thereof, the Manager or the Member requesting such meeting may fix, in advance, a date as the record date for any such determination. Such date shall not be more than thirty (30) days nor less than ten (10) days before any such meeting.

(c)    Each Member may authorize any Person or Persons to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or its attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date

Exhibit  G

thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it.

(d)  Notwithstanding this Section 6.3, the Company may take any action contemplated under this Operating Agreement as approved by the consent of the Member(s), such consent to be provided in writing, or by telephone or facsimile, if such telephone conversation or facsimile is followed by a written summary of the telephone conversation or facsimile communication sent by registered or certified mail, postage and charges prepaid, addressed as described in Section 12.1 hereof, or to such other address as such Person may from time to time specify by notice to the Member(s) and the Manager.

6.4     Withdrawal/Resignation.

Except as otherwise provided in Sections 4 and 10 hereof, no Member shall demand or receive a return on or of its capital contributions or withdraw from the Company without the consent of all Member(s). Except as otherwise provided in the Act or this Operating Agreement, upon resignation, any resigning member is entitled to receive only the distribution to which he is entitled under this Operating Agreement, which shall be equal to the fair value of his LLC interests the Company as of the date of resignation. Under circumstances requiring a return of any capital contributions, no Member has the right to receive any property other than cash except as may be specifically provided herein.

6.5     Member Compensation.

No Member shall receive any interest, salary or drawing with respect to its capital contributions or its capital account or for services rendered on behalf of the Company, or otherwise, in its capacity as a Member, except as otherwise provided in this Operating Agreement.

6.6     Member(s)' Liability.

No Member shall be liable under a judgment, decree or order of a court, or in any other manner for the Debts or any other obligations or liabilities of the Company. A Member shall be liable only to make its capital contributions and shall not be required to restore a deficit balance in its capital account or to lend any funds to the Company or, after its capital contributions have been made, to make any additional contributions, assessments or payments to the Company, provided that a Member may be required to repay distributions made to it as provided in this Operating Agreement or Section 18-504 of the Act. The Manager shall not have any personal liability for the repayment of any capital contributions of any Member.

6.7     Partition.

While the Company remains in effect or is continued, each Member agrees and waives its rights to have any of the Company's property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any of the Company's property partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

Exhibit  G

6.8     Confidentiality.

Except as contemplated hereby or required by a court of competent authority, each Member shall keep confidential and shall not disclose to others without the prior written consent of all Member(s) any information which (i) pertains to this Operating Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the Business of the Company; or, (ii) pertains to confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary. No Member shall use any information which (i) pertains to this Operating Agreement, any negotiations pertaining hereto, any of the transactions contemplated hereby, or the Business of the Company; or, (ii) pertains to the confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary, except in connection with the transactions contemplated hereby. The term "confidential information" is used in this Section 6.8 to describe information which is confidential, non-public or proprietary in nature, was provided to such Member or its representatives by the Company, any other Member, and relates either directly, or indirectly to the Company or the Business. Information which (i) is available, or becomes available, to the public through no fault or action by such Member; or (ii) becomes available on non-confidential basis from any source other than the Company, any other Member, and such source is not prohibited from disclosing such information, shall not be deemed confidential information.

6.9     Transactions Between a Member and the Company.

Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a person or entity who is not a Member. A Member may also be an employee or be retained as an agent of the Company. The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

6.10    Other Instruments.

Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Manager deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Operating Agreement.

## SECTION 7
## ACCOUNTING, BOOKS AND RECORDS

7.1     Accounting, Books and Records.

Exhibit  G

(a)     The Company shall keep on site at its principal place of business each of the following:

(i)     A current list of the full name and last known business address of each Member and the Manager, separately identifying the Member(s) in alphabetical order and the Manager, in alphabetical order;

(ii)     A copy of the filed Articles of Organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any document has been executed; and

(iii)     Copies of any then effective Regulations of the Company.

(b)     The Manager shall determine the accounting methods utilized by the Company.

7.2     Reports.

(a)     In General. The Tax Matters Member of the Company shall be responsible for causing the preparation of financial reports of the Company and the coordination of financial matters of the Company with the Company's accountants.

(b)     Reports. Within ninety (90) days after the end of each fiscal year, the Tax Matters Member shall furnish each Member with a copy of the balance sheet of the Company as of the last day of the applicable period, an income statement for the Company for such period, and a statement of the Company's cash flow for such period. Annual statements shall also include a statement of the Member's capital accounts and changes therein for such fiscal year.

7.3     Tax Matters.

(a)     Tax Elections. The Member of the Company has elected Gustavo Adolfo Hernandez Frieri to act as the "Tax Matters Member" under the Code and in any similar capacity under state or local law.

(b)     Tax Information. Necessary tax information shall be delivered to each Member as soon as practicable after the end of each fiscal year of the Company but not later than five (5) months after the end of each fiscal year.

## SECTION 8
## AMENDMENTS

Amendments to this Operating Agreement may be proposed by any Member(s). Following such proposal, the Member(s) shall submit a verbatim statement of any proposed amendment, providing that counsel for the Company shall have approved of the same in writing as to form, and the Member(s) shall include in any such submission a recommendation as to the proposed amendment. The Member(s) shall seek the written vote of the Member(s) on the proposed

Exhibit  G

amendment or shall call a meeting to vote thereon and to transact any other business that it may deem appropriate. A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the unanimous affirmative vote of the Member(s). Notwithstanding the foregoing, this Operating Agreement shall not be amended without the consent of each Member adversely affected (i) if such amendment would modify the limited liability of a Member; or, (ii) alter the interest of a Member in profits, losses, other items, or any Company distributions.

**SECTION 9**
**TRANSFERS**

9.1     Restrictions on Transfers.

No Member may Transfer all or any portion of its LLC interests without the written consent of a majority of the Member(s)

9.2     Right of First Refusal.

The Member(s) have a right of first refusal on any LLC interests sold by Member(s) to third parties. A selling Member must offer to sell all, but not less than all of his or her LLC interests to the remaining Member(s), prior to selling to third parties. The sale price shall be at fair market value based on the performance of the Company as determined by the Company's accountant (as defined hereinafter) computed in accordance with Section 9.4 hereof, and payable as provided in Section 9.6(a) of this Operating Agreement.

9.3     Sale of LLC Interests Upon Death of Member.

(a)     Purchase of LLC Interests. Upon the death of a Member, such deceased Member's spouse or personal representative shall have the right to sell such deceased Member's LLC interests at fair market value to third parties, subject to the provisions of Section 9.2. The remaining Member(s) may purchase the deceased Member's LLC interests pro rata, in accordance with the procedures and terms set forth in this Section 9.

(b)     Notice of Death. In the event of the death of a Member, the personal representative or administrator of the deceased Member's estate shall notify the Company (the "Notice") of such Member's death, within thirty (30) days of appointment as personal representative. The actual giving of Notice by the personal representative shall not be construed to be a condition to the right of the remaining Member(s) to purchase the deceased Member's LLC interests.

(c)     Meeting Following Notice. Within ninety (90) days of the Company's receipt of Notice or discovery of the death of the Member, whichever occurs first, the Managers of the Company shall call a meeting of the Member(s) of the Company. At the meeting, a proportionate share of the LLC interests of the deceased Member shall be offered for sale to the remaining Member(s). If anyone Member declines to purchase his pro rata allocation of LLC interests so offered, the remaining Member(s) shall have an option to purchase such LLC interests on a pro rata basis, under the terms hereof.

Exhibit  G

(d)     Purchase Price.   The purchase price for the deceased Member's LLC interests shall be determined as set forth in Section 9.4 hereof, and shall be payable as set forth in Section 9.6(b) of this Operating Agreement.

(e)     Continuing Restrictions.  In the event that all of such LLC interests of the deceased Member so offered for sale are not purchased by the remaining Member(s), the heirs or beneficiaries, as the case may be, of the deceased Member shall become the owner(s) of the deceased Member's LLC interests, and the restrictions imposed by this Operating Agreement upon such LLC interests shall continue to apply.  In no event shall the deceased Member's Personal Representative be required to sell less than all of the deceased Member's LLC interests.

9.4   Purchase Price Under Section 9.2.

(a)     For purposes of a purchase and sale of LLC interests pursuant to Section 9.2 hereunder, the purchase price of each interest shall be its fair market value as determined by the Company's accountant ("Accountant"), as of the end of the month immediately preceding the month in which the sale of LLC interests is scheduled to occur.

(b)     In the event a selling Member disagrees with the fair market value as determined by the Company's Accountant, then the selling Member shall appoint his own Accountant to determine such fair market value in accordance with the terms hereof.  In the event such two Accountants cannot agree as to the fair market value of such LLC interests, then the two Accountants shall select one additional Accountant to make such determination, whereupon the fair market value shall be as determined by the majority of such Accountants, or failing a majority decision as to one fair market value, then the average of all three Accountant's estimates shall be and constitute the fair market value of the LLC interests.

(c)     The fair market value determined under this Section 9.4 shall be binding and conclusive on all parties.

(d)     The fees and charges of the Accountant(s) shall be borne by the party who appointed the Accountant, except with respect to the third Accountant, whose fees shall be borne equally by the parties to such purchase and sale.

9.5.   Purchase Price Under Sections 9.3.

(a)     For purposes of a purchase and sale of LLC interests pursuant to Sections 9.3 hereof, the purchase price of each interest shall be the appraised value of each interest taking into consideration goodwill (the "Appraised Value") as determined by a qualified appraiser, familiar with the Business of the Company (the "Appraiser"), and appointed by the Company.

(b)     In the event the personal representative of the deceased Member, as the case may be, disagrees with the Appraised Value as determined by the Company's Appraiser, then the

Exhibit  G

personal representative of the deceased Member shall appoint his own Appraiser to determine the Appraised Value of each interest. In the event such two Appraisers cannot agree as to the Appraised Value of the LLC interests, then the two Appraisers shall select a third Appraiser to make such determination, whereupon the Appraised Value shall be as determined by the majority of such Appraisers, or failing a majority decision as to one Appraised Value, then the average of all three Appraiser's determinations shall be and constitute the Appraised Value of the LLC interests.

       (c)    The Appraised Value determined in accordance with this Section 9.5 shall be binding and conclusive on all parties.

       (d)    The fees and charges of the Appraiser(s) shall be borne by the party who appointed the Appraiser, except as to the third Appraiser, whose fees shall be borne equally by the parties to such purchase and sale.

    9.6.    Payment of Purchase Price.

       (a)    Purchase From Selling Member Pursuant to Section 9.2.  Unless otherwise agreed to by the parties, the purchase price for the LLC interests of the selling Member, pursuant to any sale governed by Section 9.2 hereof, shall be paid at the election of the Company either (i) in cash or (ii) by the payment to the selling Member of an amount equal to 10% of the purchase price in cash or by bank or certified check, and the delivery of a promissory note (the "Note") for the balance of the purchase price. The Note shall be paid in twelve (12) consecutive equal quarterly installments of principal and interest in the amount necessary to fully amortize the principal plus interest in thirty six (36) months, the first of which installments shall be payable ninety (90) days from the date of sale, with the remaining eleven (11) installments payable on the same day of each third month as the date of sale over the next thirty six (36) months.  The Note shall bear simple interest at the rate of interest (not necessarily the best or lowest rate) announced by Chase Manhattan Bank, as its prime rate in effect on the date of sale, provided, however, that such interest rate shall never exceed the maximum rate allowed under law on the date of sale.

       (b)    Purchase From Deceased Member Pursuant to Section 9.3. Unless otherwise agreed to by the parties, the purchase price for the LLC interests of the deceased Member pursuant to any sale governed by Section 9.3 hereof, shall be paid in cash at the time of the sale.

       (c)    Promissory Note.

       Events of Default; Remedies.  A failure by the purchasing Member(s) to pay any installment of the promissory note within ten (10) days from the date such installment is due shall constitute a default hereunder.  In the event of a default, the entire amount of the promissory note shall, at the option of the holder, become immediately due and payable. No remedy conferred herein is intended to be exclusive of any other remedy or remedies and each and every remedy shall be cumulative to every other remedy granted herein or now or hereafter existing at law or in equity or by statute.

    9.7    Prohibited Transfers.

Exhibit  G

Any purported Transfer of LLC interests that is not a permitted Transfer shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a permitted Transfer (or if the Manager, in his sole discretion, elects to recognize a Transfer that is not a permitted Transfer), the LLC interests Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Operating Agreement with respect to the transferred LLC interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such interest may have to the Company. The restrictions set forth herein shall not restrict any pledging of interest required pursuant to any loan

In the case of a Transfer or attempted Transfer of LLC interests that is not a Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Member(s) from all cost, liability, and damage that any of such indemnified Member(s) may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

9.8     Rights of Unadmitted Assignees.

A Person who acquires LLC interests but who is not admitted as a substituted Member pursuant to Section 9.9 hereof shall be entitled only to allocations and distributions with respect to such LLC interests in accordance with this Operating Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Operating Agreement.

9.9     Admission of Substituted Member(s).

Subject to the other provisions of this Section 9, a transferee of LLC interests may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this Section 9.9:

(a)     A majority of the Member(s) consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the Member(s);

(b)     The LLC interests with respect to which the transferee is being admitted was acquired by means of a permitted Transfer;

(c)     The transferee of LLC interests (other than, with respect to clause (i) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and substance reasonably satisfactory to the Manager (and, in the case of clause (ii) below, the transferor Member), (i) accept and adopt the terms and provisions of this Operating Agreement, including this Section 9; and, (ii) assume the obligations of the transferor Member under this Operating Agreement with respect to the transferred LLC interests. The transferor Member shall be released from all such assumed obligations except (A) those obligations or liabilities of the transferor

Exhibit  G

Member arising out of a breach of this Operating Agreement; (B) in the case of a Transfer to any Person other than a Member, those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer;

(d)     The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred LLC interests; and,

(e)     Except in the case of an Involuntary Transfer by operation of law, if required by the Manager, the transferee (other than a transferee that was a Member prior to the Transfer) shall deliver to the Company evidence of the authority of such Person to become a Member and to be bound by all of the terms and conditions of this Operating Agreement, and the transferee and transferor shall each execute and deliver such other instruments as the Manager reasonably deems necessary or appropriate to effect, and as a condition to, such Transfer, including amendments to the Articles or any other instrument filed with the State of New York or any other state or governmental authority.

9.10    Distributions and Allocations in Respect of Transferred LLC Interests.

If any LLC interests are Transferred during any fiscal year in compliance with the provisions of this Section 10, profits, losses, each item thereof, and all other items attributable to the Transferred LLC interests for such fiscal year shall be divided and allocated between the transferor and the transferee by taking into account their varying percentage LLC interests during the fiscal year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Tax Matters Member. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Company is given notice of a Transfer at least ten (10) days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer, and provided further that if the Company does not receive a notice stating the date such LLC interests were transferred and such other information as the Tax Matters Member may reasonably require within thirty (30) days after the end of the fiscal year during which the Transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the LLC interests on the last day of such fiscal year. Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 9.10, whether or not any Tax Matters Member or the Company has knowledge of any Transfer of ownership of any LLC interests.

**SECTION 10**
**DISSOLUTION AND WINDING UP**

10.1    Dissolution Events.

(a)     Dissolution. The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

Exhibit  G

(i)        The unanimous vote of the Member(s) to dissolve, wind-up, and liquidate the Company.

(ii)       A judicial determination that an event has occurred that makes it unlawful, impossible or impractical to carry on the Business.

(iii)      Unless Sections 10(a)(i) or 10(a)(ii) cause a prior dissolution, the Company's existence shall terminate on December 31, 2049.

The Member(s) hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

(b)      Reconstitution. If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Dissolution Event, then within an additional ninety (90) days after such determination (the "Reconstitution Period"), all of the Member(s) may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Operating Agreement by forming a new limited liability company on terms identical to those set forth in this Operating Agreement. Unless such an election is made within the Reconstitution Period, the Company shall liquidate and wind up its affairs in accordance with Section 10.2 hereof. If such an election is made within the Reconstitution Period, then:

(i)        The reconstituted limited liability company shall continue until the occurrence of a Dissolution Event as provided in this Section 10.1(a);

(ii)       Unless otherwise agreed to by a majority of the Member(s), the Articles and this Operating Agreement shall automatically constitute the Articles and this Operating Agreement of such new Company. All of the assets and liabilities of the dissolved Company shall be deemed to have been automatically assigned, assumed, conveyed and transferred to the new Company. No bond, collateral, assumption or release of any Member's or the Company's liabilities shall be required; provided that the right of the Member(s) to select successor managers and to reconstitute and continue the Business shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted limited liability company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

10.2     Winding Up.

Upon the occurrence of (i) a Dissolution Event; or, (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 10.1(b) hereof), the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Member(s), and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's

business and affairs, _provided_ that all covenants contained in the Regulations and obligations provided for in this Operating Agreement shall continue to be fully binding upon the Member(s) until such time as the property has been distributed pursuant to this Section 10.2 and the Articles has been canceled pursuant to the Act. The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event and within ninety (90) days after the last day on which the Company may be reconstituted pursuant to Section 10.1(b) hereof. The Liquidator shall take full account of the Company's liabilities and property and shall cause the property or the proceeds from the sale thereof (as determined pursuant to Section 10.9 hereof), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

        (a)     First, to creditors (including Member(s) and Managers who are creditors, to the extent otherwise permitted by law) in satisfaction of all of the Company's Debts and other liabilities (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Member(s) under Section 18-504 or Section 18-604 of the Act;

        (b)     Second, except as provided in this Operating Agreement, to Member(s) and former Member(s) of the Company in satisfaction of liabilities for distribution under Section 18-504 or Section 18-604 of the Act; and

        (c)     The balance, if any, to the Member(s) in accordance with the positive balance in their capital accounts, after giving effect to all contributions, distributions and allocations for all periods.

No Member or Manager shall receive additional compensation for any services performed pursuant to this Section 10.

10.3    Compliance With Certain Requirements of Operating Agreement; Deficit Capital Accounts.

In the event the Company is "liquidated" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Section 10 to the Member(s) who have positive capital accounts in compliance with Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his capital account (after giving effect to all contributions, distributions and allocations for all fiscal years, including the fiscal year during which such liquidation occurs), such Member shall have an obligation to contribute to the capital of the Company the amount necessary to restore such deficit balance to zero in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(3). In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the Member(s) pursuant to this Section 10 may be:

        (a)     Distributed to a trust established for the benefit of the Member(s) for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall

be distributed to the Member(s) from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Member(s) pursuant to Section 10.2 hereof; or

(b)     Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Member(s) as soon as practicable.

10.4   <u>Deemed Distribution and Recontribution</u>.

Notwithstanding any other provision of this Section 10, in the event the Company is liquidated within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g) but no Dissolution Event has occurred, the Property shall not be liquidated, the Company's Debts and other liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed the property in-kind to the Member(s), who shall be deemed to have taken subject to all Debts of the Company and other liabilities all in accordance with their respective capital accounts. Immediately thereafter, the Member(s) shall be deemed to have recontributed the property in-kind to the Company, which shall be deemed to have taken subject to all such liabilities.

10.5   <u>Rights of Member(s)</u>.

Except as otherwise provided in this Operating Agreement, each Member shall look solely to the property of the Company for the return of its capital contribution and has no right or power to demand or receive property other than cash from the Company. If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such capital contribution, the Member(s) shall have no recourse against the Company or any other Member or the Manager.

10.6   <u>Notice of Dissolution/Termination</u>.

(a)     In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 10.1, result in a dissolution of the Company, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Member(s) and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Managers) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Manager).

(b)     Upon completion of the distribution of the Company's property as provided in this Section 10, the Company shall be terminated, and the Liquidator shall cause the filing of the Articles of Dissolution pursuant to Section 705 of the Act and shall take all such other actions as may be necessary to terminate the Company.

10.7   <u>Allocations During Period of Liquidation</u>.

Exhibit  G

During the period commencing on the first day of the fiscal year during which a Dissolution Event occurs and ending on the date on which all of the assets of the Company have been distributed to the Member(s) pursuant to Section 10.2 hereof (the "Liquidation Period"), the Member(s) shall continue to share profits, losses, gain, loss and other items of Company income, gain, loss or deduction in the manner provided in Section 3 hereof.

10.8    Character of Liquidating Distributions.

All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

10.9    The Liquidator.

(a)    Definition. The "Liquidator" shall mean a Person appointed by the Managers to oversee the liquidation of the Company.

(b)    Fees. The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this Section 9 and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)    Indemnification. The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator which was material to the cause of action.

10.10    Form of Liquidating Distributions.

For purposes of making distributions required by Section 10.2 hereof, the Liquidator may determine whether to distribute all or any portion of the property in-kind or to sell all or any portion of the property and distribute the proceeds therefrom.

**SECTION 11**
**POWER OF ATTORNEY**

11.1    Manager as Attorney-In-Fact.

Each Member hereby makes, constitutes, and appoints the Manager, with full power of substitution and resubstitution, its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file, publish and record (i) all articles of formation, amended name or similar articles, and other articles and

Exhibit  G

instruments (including counterparts of this Operating Agreement) which the Manager may deem necessary to be filed by the Company under the laws of the State of New York or any other jurisdiction in which the Company is doing or intends to do business; (ii) any and all amendments, restatements or changes to this Operating Agreement and the instruments described in clause (i), as now or hereafter amended, which the Manager may deem necessary to effect a change or modification of the Company in accordance with the terms of this Operating Agreement, including, without limitation, amendments, restatements or changes to reflect (A) any amendments adopted by the Member(s) in accordance with the terms of this Operating Agreement, (B) the admission of any substituted Member and (C) the disposition by any Member of its interest in the Company; (iii) all articles of cancellation and other instruments which the Manager deems necessary or appropriate to effect the dissolution and termination of the Company pursuant to the terms of this Operating Agreement; and, (iv) any other instrument which is now or may hereafter be required by law to be filed on behalf of the Company or is deemed necessary by the Manager to carry out fully the provisions of this Operating Agreement in accordance with its terms. Each Member authorizes each such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary in connection with any of the foregoing, hereby giving each such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite to be done in connection with the foregoing as fully as such Member might or could do personally, and hereby ratify and confirm all that any such attorney-in-fact shall lawfully do, or cause to be done, by virtue thereof or hereof.

  11.2   Nature of Special Power.

The power of attorney granted to the Manager pursuant to this Section 11:

    (a)   Is a special power of attorney coupled with an interest and is irrevocable;

    (b)   May be exercised by any such attorney-in-fact by listing the Member(s) executing any agreement, certificate, instrument, or other document with the single signature of any such attorney-in-fact acting as attorney-in-fact for such Member(s); and

    (c)   Shall survive and not be affected by the subsequent Bankruptcy, insolvency, dissolution, or cessation of existence of a Member and shall survive the delivery of an assignment by a Member of the whole or a portion of its interest in the Company (except that where the assignment is of such Member's entire interest in the Company and the assignee, with the consent of the other Member(s), is admitted as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling any such attorney-in-fact to effect such substitution) and shall extend to such Member's, or assignee's successors and assigns.

## SECTION 12
## MISCELLANEOUS

  12.1   Notices.

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the Person or to an

officer of the Person to whom the same is directed; or, (ii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, or by facsimile, if such facsimile is followed by a hard copy of the facsimile communication sent promptly thereafter by registered or certified mail, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Member(s) and Managers:

      (a)    If to the Company, to the address determined pursuant to Section 1.3 hereof;

      (b)    If to the Manager or to a Member, to the address set forth in Section 2.1 hereof.

### 12.2   Binding Effect.

Except as otherwise provided in this Operating Agreement, every covenant, term, and provision of this Operating Agreement shall be binding upon and inure to the benefit of the Member(s) and their respective successors, transferees, and assigns.

### 12.3   Construction.

Every covenant, term, and provision of this Operating Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

### 12.4   Time.

In computing any period of time pursuant to this Operating Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

### 12.5   Headings.

Section and other headings contained in this Operating Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Operating Agreement or any provision hereof.

### 12.6   Severability.

Except as otherwise provided in the succeeding sentence, every provision of this Operating Agreement is intended to be severable, and, if any term or provision of this Operating Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Operating Agreement. The preceding sentence of this Section 12.6 shall be of no force or effect if the consequence of enforcing the remainder of this Operating Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

Exhibit  G

12.7    Incorporation by Reference.

Every exhibit, schedule, and other appendix attached to this Operating Agreement and referred to herein is not incorporated in this Operating Agreement by reference unless this Operating Agreement expressly otherwise provide.

12.8    Variation of Terms.

All terms and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

12.9    Governing Law.

The laws of the State of New York shall govern the validity of this Operating Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder.

12.10   Waiver of Jury Trial.

Each of the Member(s) irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Operating Agreement.

12.11   Counterpart Execution.

This Operating Agreement may be executed in any number of counterparts with the same effect as if all of the Member(s) had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

Exhibit  G

## OPERATING AGREEMENT OF 3 GRAMERCY PARK WEST LLC
### [SIGNATURE PAGE]

**IN WITNESS WHEREOF,** the parties have executed and entered into this Operating Agreement of the Company as of the day first above set forth.

MANAGER:

By: _____

Gustavo Adolfo Hernandez Frieri

MEMBER:

Gramercy Irrevocable Trust,
a Nova Scotia Trust

By:   Trustee
      Americas Fiduciary, Ltd.,
      A Nevis corporation

By: _____

Timothy D. Richards, Director

H:\CLIENTS\Gustavo Hernandez\Corp\3 Gramercy Park West LLC\OPERATING AGREEMENT.doc

Exhibit  G

**EXHIBIT  H**

## ASSIGNMENT AND ASSUMPTION OF
## LIMITED LIABILITY COMPANY
## MEMBERSHIP INTEREST IN
## 3 GRAMERCY PARK WEST, LLC

As Beneficiary of the HH MASTER SETTLEMENT TRUST (the "Assignor"), I hereby assign and convey one hundred percent (100%) Membership Interests in 3 GRAMERCY PARK WEST, LLC, a New York limited liability company (the "Company"), to the DC 2019 IRREVOCABLE TRUST (the "Assignee").

Effective upon the signing of this Assignment and Assumption and Consent by the Managers of the Company and the Members of the Company (other than the Assignor), the Assignee shall be entitled to receive the share of the profits or other compensation by way of income to which the Assignor would otherwise be entitled and to the return of the contribution to the capital of the Company by reason of the Membership Interests in the Company hereby assigned and transferred. In the event that all of the other Managers and Members of the Company consent thereto, the Assignee shall be entitled to all the rights that the Assignor, as a Member, had by reason of his Membership Interests in the Company hereby assigned and transferred.

The Assignee hereby accepts and agrees to assume the assignment of the aforesaid Membership Interests in the Company and also to be a substituted Member of the Company, pursuant to the terms of the Operating Agreement of the Company.

IN WITNESS WHEREOF, the Assignor and Assignee have executed this Assignment and Assumption as of the 1 day of February, 2019.

Maria Lucia Hernandez
ASSIGNOR

Olympia De Castro, as Administrative Agent
of the DC 2019 IRREVOCABLE TRUST

ASSIGNEE

Exhibit  H

# EXHIBIT  I

**CONSENT TO**
**ASSIGNMENT AND ASSUMPTION OF**
**LIMITED LIABILITY COMPANY**
**MEMBERSHIP INTEREST IN**
**3 GRAMERCY PARK WEST, LLC**

The undersigned, constituting all of the Members of 3 GRAMERCY PARK WEST, LLC, a New York limited liability company (the "Company"), hereby consent to the assignment of the above-described Membership Interest from myself as Beneficiary of HH MASTER SETTLEMENT TRUST (the "Assignor') to the DC 2019 IRREVOCABLE TRUST (the "Assignee") and to the admission of the Assignee as a substituted Member of the Company as of the 1 day of February, 2019. This consent may be separately executed by the undersigned in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

DATED as of February 1, 2019.

Maria Lucia Hernandez

Exhibit  I

**EXHIBIT  J**

New York City Department of Finance
## Office of the City Register

HELP
[Click help for additional instructions]
Selecting a help option will open new window

# Detailed Document Information

**Current Search Criteria:**
**Name:** 3 GRAMERCY PARK WEST*
**Date:** To Current Date
**Party Type:** All Parties
**Borough/County:** All Boroughs/Counties
**Document Class:** All Document Classes

| | | | | | |
|---|---|---|---|---|---|
| **DOCUMENT ID:** | 2019112201003001 | **CRFN:** | 2019000385194 | **COLLATERAL:** | N/A |
| **# of PAGES:** | 2 | **REEL-PAGE:** | N/A-N/A | **EXPIRATION DATE:** | N/A |
| **DOC. TYPE:** | BOTH RPTT AND RETT | **FILE NUMBER:** | N/A | **ASSESSMENT DATE:** | N/A |
| **DOC. DATE:** | 11/21/2019 | **RECORDED / FILED:** | 11/25/2019 2:11:56 PM | **SLID #:** | N/A |
| **DOC. AMOUNT:** | $5,700,000 00 | **BOROUGH:** | MANHATTAN | | |
| **% TRANSFERRED:** | 100% | **RPTT #:** | N/A | **MAP SEQUENCE #:** | N/A |
| **MESSAGE:** | N/A | | | | |

## PARTY 1

| NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|
| 3 GRAMERCY PARK WEST, LLC | 3 GRAMERCY PARK WEST | | NEW YORK | NY | 10003 | US |

## PARTY 2

| NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|
| BRAJOVIC, KATHRYN | 3 GRAMERCY PARK WEST | | NEW YORK | NY | 10003 | US |
| BRAJOVIC, M LOS | 3 GRAMERCY PARK WEST | | NEW YORK | NY | 10003 | US |

## PARTY 3/Other

| NAME | ADDRESS 1 | ADDRESS 2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|
| | | | | | | |

## PARCELS

| BOROUGH | BLOCK | LOT | PARTIAL | PROPERTY TYPE | EASEMENT | AIR RIGHTS | SUBTERRANEAN RIGHTS | PROPERTY ADDRESS | UNIT | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|
| MANHATTAN / NEW YORK | 876 | 12 | ENT RE LOT | SINGLE RESIDENTIAL COOP UNIT | N | N | N | 3 GRAMERCY PARK WEST | 2 | |



| REFERENCES | | | | | | |
|---|---|---|---|---|---|---|
| CRFN | DOCUMENT ID | BOROUGH | YEAR | REEL | PAGE | FILE NBR |
| | | | | | | |

**REMARKS**



Print    View Document    Search Results    Search Options    Main Options

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2019112201003001001E7481

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 2 |
|---|---|

**Document ID:** 2019112201003001  **Document Date:** 11-21-2019  **Preparation Date:** 11-22-2019
Document Type:  BOTH RPTT AND RETT
Document Page Count: 0

| PRESENTER: | RETURN TO: |
|---|---|
| MUTUAL ABSTRACT CORP. ***PICK UP*** <br> 132 NASSAU STREET, 812 <br> 99182 (JLR) 3 GRAMERCY <br> NEW YORK, NY 10038 <br> 212-964-4686 <br> INFO@MUTUALABSTRACT.COM | MUTUAL ABSTRACT CORP. ***PICK UP*** <br> 132 NASSAU STREET, 812 <br> 99182 (JLR) 3 GRAMERCY <br> NEW YORK, NY 10038 <br> 212-964-4686 <br> INFO@MUTUALABSTRACT.COM |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 876 | 12 | Entire Lot  2 | 3 GRAMERCY PARK WEST |

**Property Type:**  SINGLE RESIDENTIAL COOP UNIT

### CROSS REFERENCE DATA

CRFN_____  *or*  DocumentID_____  *or*  _____Year_____ Reel____ Page_____  *or*  File Number_____

### PARTIES

| GRANTOR/SELLER: | GRANTEE/BUYER: |
|---|---|
| 3 GRAMERCY PARK WEST, LLC <br> 3 GRAMERCY PARK WEST <br> NEW YORK, NY 10003 | KATHRYN BRAJOVIC <br> 3 GRAMERCY PARK WEST <br> NEW YORK, NY 10003 |

☒  Additional  Parties Listed on Continuation  Page

### FEES AND TAXES

| Mortgage : | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ 100.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | | $ 81,225.00 |
| TAXES:  County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $37,050.00  +  $128,250.00 = $ | 165,300.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |
| Recording Fee: | $ | 0.00 | | |
| Affidavit Fee: | $ | 0.00 | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed          11-25-2019 14:11
City Register File No.(CRFN):
            **2019000385194**

*Annette M Hill*

*City Register Official Signature*

Exhibit  J

| NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER |  |
|---|---|

2019112201003001001C7601

| RECORDING AND ENDORSEMENT COVER PAGE  (CONTINUATION) | | PAGE 2 OF 2 |
|---|---|---|
| **Document ID: 2019112201003001** | Document Date: 11-21-2019 | Preparation Date: 11-22-2019 |
| Document  Type: BOTH RPTT AND RETT | | |

**PARTIES**

**GRANTEE/BUYER:**
MILOS BRAJOVIC
3 GRAMERCY PARK WEST
NEW YORK, NY 10003

| NYC DEPARTMENT OF FINANCE<br>OFFICE OF THE CITY REGISTER |  |
|---|---|

**2019112201003001001SBA00**

| SUPPORTING DOCUMENT COVER PAGE | PAGE 1 OF 1 |
|---|---|

**Document ID: 2019112201003001**  Document Date: 11-21-2019  Preparation Date: 11-22-2019
**Document Type: BOTH RPTT AND RETT**

**SUPPORTING DOCUMENTS SUBMITTED:**

Page Count

SMOKE DETECTOR AFFIDAVIT                                                    1

Exhibit J

# AFFIDAVIT OF COMPLIANCE
## WITH SMOKE DETECTOR REQUIREMENT
## FOR ONE- AND TWO-FAMILY DWELLINGS

State of New York }
County of New York } SS.:

The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

**3 GRAMERCY PARK WEST**                                                2
_____
Street Address Unit/Apt.

**MANHATTAN** _____ New York, ___876___ ___12___ (the "Premises"):
Borough                          Block      Lot

That the Premises is a one or two family dwelling, or a cooperative apartment or condominium unit in a one- or two-family dwelling, and that installed in the Premises is an approved and operational smoke detecting device in compliance with the provisions of Article 6 of Subchapter 17 of Chapter 1 of Title 27 of the Administrative Code of the City of New York concerning smoke detecting devices;

That they make affidavit in compliance with New York City Administrative Code Section 11-2105 (g). (The signatures of at least one grantor and one grantee are required, and must be notarized).

3 Gramercy Park West LLC                    MILOS PRAJOVIC
_____                    _____
Name of Grantor (Type or Print)            Name of Grantee (Type or Print)

_____                    _____
Signature of Grantor                       Signature of Grantee

                                                          SEAL

Sworn to before me                         Sworn to before me
this __21__ day of __NOVEMBER__ 20 _19_    this __21__ day of __NOVEMBER__ 20 _19_

JOSEPH T. COLASURDO                        JOSEPH T. COLASURDO
Notary Public, State of New York           Notary Public, State of New York
No. 02CO4898497                            No. 02CO4898497
Qualified in Westchester County            Qualified in Westchester County
Commission Expires May 26, 2013            Commission Expires May 26, 2013

                    SEAL

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Law.

**NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED ON OR AFTER FEBRUARY 6th, 1990, WITH RESPECT TO THE CONVEYANCE OF A ONE- OR TWO-FAMILY DWELLING, OR A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT IN A ONE- OR TWO-FAMILY DWELLING, WILL NOT BE ACCEPTED FOR FILING UNLESS ACCOMPANIED BY THIS AFFIDAVIT.**

2019110800198101

Exhibit J

**EXHIBIT  K**



**CHASE PRIVATE CLIENT**
JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218 - 2051

November 01, 2019 through November 29, 2019
Primary Account: ███████**0860**

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **Chase.com** |
| Service Center: | **1-888-994-5626** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| International Calls: | 1-713-262-1679 |

00003732 DRE 021 141 33419 NNNNNNNNNNN T  1 000000000 60 0000
DC 2019 IRREVOCABLE TRUST
ALLISON DOMENEGHETTI TRUSTEE
597 HIBISCUS LN
MIAMI FL 33137-3322



## CONSOLIDATED BALANCE SUMMARY

### ASSETS

| Checking & Savings | ACCOUNT | BEGINNING BALANCE THIS PERIOD | ENDING BALANCE THIS PERIOD |
|---|---|---|---|
| Chase Private Client Checking | ████0860 | $1,384.70 | $5,352,905.24 |
| Chase Private Client Checking | ████1165 | 25.00 | 25.00 |
| **Total** | | **$1,409.70** | **$5,352,930.24** |

| **TOTAL  ASSETS** | **$1,409.70** | **$5,352,930.24** |
|---|---|---|

## CHASE PRIVATE CLIENT CHECKING

DC 2019 IRREVOCABLE TRUST                                    Account Number: ███████0860

ALLISON DOMENEGHETTI TRUSTEE

### CHECKING SUMMARY

| | AMOUNT |
|---|---|
| **Beginning Balance** | **$1,384.70** |
| Deposits and Additions | 5,351,520.54 |
| **Ending Balance** | **$5,352,905.24** |
| Annual Percentage Yield Earned This Period | 0.01% |
| Interest Paid This Period | $7.24 |
| Interest Paid Year-to-Date | $16.94 |

### TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | **Beginning Balance** | | **$1,384.70** |
| 11/25 | Deposit      1908949512 | 5,351,513.30 | 5,352,898.00 |
| 11/29 | Interest Payment | 7.24 | 5,352,905.24 |
| | **Ending Balance** | | **$5,352,905.24** |

Exhibit  K



**CHASE PRIVATE CLIENT**

November 01, 2019 through November 29, 2019
Primary Account: **0860**

## CHASE PRIVATE CLIENT CHECKING

DC 2019 IRREVOCABLE TRUST

Account Number: 1165

ALLISON DOMENEGHETTI TRUSTEE

## CHECKING SUMMARY

|  | AMOUNT |
|---|---|
| Beginning Balance | $25.00 |
| Ending Balance | $25.00 |
| Annual Percentage Yield Earned This Period | 0.00% |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC



**JPMorgan Chase Bank, N.A. Member FDIC**

Exhibit  K

**EXHIBIT  L**

19CS00083524870S0010

# J.P.Morgan

Statement Period
**November 30 - December 31, 2019**

Account Number

4870

## Investment Statement

YNNNNNNNNNN
**DC 2019 IRREVOCABLE TRUST**
U/A DTD 02/01/2019
ALLISON DOMENEGHETTI TTEE
597 HIBISCUS LN
MIAMI FL 33137-3322

### Account Value with Accruals

| Account Description | Previous Period | This Period |
|---|---|---|
| Brokerage | 996,006.61 | 6,346,030.58 |
| **ACCOUNT VALUE** | **$996,006.61** | **$6,346,030.58** |

See page 3 for footnotes and more detail.

## Questions?

*For Full Service Accounts, Call Private Client Advisor*

☎ **(305) 913 0228**    Ryan Whiteman

**Customer Service**
(888) 994 5626
**Branch Address**
320 Crandon Blvd
Key Biscayne, FL, 33149

www.chase.com          More contact information on page 9

If you have any questions about your statement or concerns about your account, please call us at
the toll free number provided above.

**Account Value with Accruals**
(October 2019 to December 2019)

| | |
|---|---|
| $7,701,250 | |
| $6,091,750 | |
| $4,482,250 | |
| $2,872,750 | |
| $1,263,250 | |
| -$346,250 | |

Oct 2019

INVESTMENT AND INSURANCE PRODUCTS ARE: · NOT FDIC INSURED · NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY
· NOT A DEPOSIT OR OTHER OBLIGATION OF, OR GUARANTEED BY, JPMORGAN CHASE BANK, N.A. OR ANY OF ITS AFFILIATES
· SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED

Page 1 of 16

Account is held at J.P. Morgan Securities LLC (JPMS), member Financial Industry Regulatory Authority (FINRA) and Securities Investor Protection Corporation (SIPC). **This statement summary is provided for convenience purposes only.** For information about your JPMS account(s), please refer to your official JPMS account statement(s), which follows this statement summary. **Neither this statement summary nor your official JPMS account statement(s) should be used for tax reporting purposes.**

| STATEMENT SUMMARY | BROKERAGE | IMPORTANT INFORMATION |
|---|---|---|

Exhibit  L

# J.P.Morgan

Statement Period
## November 30 - December 31, 2019

Last Statement: November 29, 2019

Account Number
4870

**DC 2019 IRREVOCABLE TRUST**
U/A DTD 02/01/2019
ALLISON DOMENEGHETTI TTEE
597 HIBISCUS LN
MIAMI FL 33137-3322

Account Value With Accruals: **$6,346,030.58**

**LIVING TRUST**

## Account Activity Summary

| Description | This Period | Year-to-Date |
|---|---|---|
| **Beginning Account Value** | **$996,006.61** | **$0.00** |
| Deposits (Cash & Securities) | 5,350,000.00 | 6,346,000.00 |
| Withdrawals (Cash & Securities) | 0.00 | 0.00 |
| **Net Deposits / Withdrawals** | **$5,350,000.00** | **$6,346,000.00** |
| Income | 23.97 | 30.58 |
| Fees [1] | 0.00 | 0.00 |
| Change In Investment Value | 0.00 | 0.00 |
| **ENDING ACCOUNT VALUE** | **$6,346,030.58** | **$6,346,030.58** |
| Net Accrued Income | 0.00 | 0.00 |
| **Account Value With Accruals** | **$6,346,030.58** | **$6,346,030.58** |

1 Account fees, management fees, and debit interest are included. Trade related fees charged by brokers and commissions impact the total cost or proceeds of your trades and are not included here.

Month End Closing Method: First In, First Out (FIFO)

Your Broker/Dealer is  J.P. MORGAN SECURITIES LLC, 4 Chase Metrotech Center, Brooklyn, New York 11245-0001

INVESTMENT AND INSURANCE PRODUCTS ARE: · NOT FDIC INSURED  · NOT INSURED BY ANY FEDERAL GOVERNMENT AGENCY
· NOT A DEPOSIT OR OTHER OBLIGATION OF, OR GUARANTEED BY, JPMORGAN CHASE BANK, N.A. OR ANY OF ITS AFFILIATES
· SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED

*Page 3 of 16*

Investment products and services are offered through **J.P. Morgan Securities LLC** (JPMS), a registered broker-dealer and investment advisor, member of FINRA and SIPC. Annuities are made available through Chase Insurance Agency, Inc. (CIA), a licensed insurance agency, doing business as Chase Insurance Agency Services, Inc. in Florida. JPMS, CIA and JPMorgan Chase Bank, N.A. are affiliated companies under the common control of JPMorgan Chase & Co. Products not available in all states. For information about your account, please refer to your official JPMS account statement **which should not be used for tax reporting purposes**. Please read the important disclosures at the end of the statement. For questions, please call (888) 994 5626.

| STATEMENT SUMMARY | BROKERAGE | IMPORTANT INFORMATION |
|---|---|---|

Exhibit L

# J.P.Morgan

| LIVING TRUST  (Acct # ████4870) | DC 2019 IRREVOCABLE TRUST<br>U/A DTD 02/01/2019 | Statement Period: November 30 - December 31, 2019 |
|---|---|---|

## Activity

### CASH FLOW SUMMARY

| Description | This Period | Year-to-Date |
|---|---|---|
| Opening Cash Balance | $996,006.61 | $0.00 |
| Income | 23.97 | 30.58 |
| Cash Deposits | 5,350,000.00 | 6,346,000.00 |
| Total Credits | $5,350,023.97 | $6,346,030.58 |
| Trade and Investment Activity | (6,346,000.00) | (6,346,000.00) |
| Total Debits | ($6,346,000.00) | ($6,346,000.00) |
| Net Cash Activity | ($995,976.03) | $30.58 |
| CLOSING CASH BALANCE | $30.58 | $30.58 |

"Opening Cash Balance" and "Closing Cash Balance" include Sweep Funds.



### DEPOSITS AND WITHDRAWALS

**Cash**

| Date | Date Cleared | Transaction | Description | Withdrawal Value | Deposit Value |
|---|---|---|---|---|---|
| 09 Dec 2019 | | ACH CREDIT | BANKLINK<br>ACH PULL 4587263 | | 5,350,000.00 |

See additional footnotes on the last page of this account.

Please read the important disclosures at the end of the statement. For questions, please contact us using the information provided on the front of this statement.

| STATEMENT SUMMARY | BROKERAGE | IMPORTANT INFORMATION |
|---|---|---|

Exhibit  L