```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                   CASE NO:  1:18-cr-20685 KMW-4
 3

 4   UNITED STATES OF AMERICA,            Miami, Florida

 5        Plaintiff,                      May 5, 2021

 6          vs.                           1:43 p.m. to 3:27 p.m.

 7   ABRAHAM EDGARDO ORTEGA

 8        Defendant.                      Pages 1 to 44
     _____

 9

10                           SENTENCING
              BEFORE THE HONORABLE KATHLEEN WILLIAMS
11                  UNITED STATES DISTRICT JUDGE

12   APPEARANCES:

13
     FOR THE USA:
14                           PAUL A. HAYDEN, ESQUIRE
                             US Department of Justice
15                           Criminal Division Fraud Section
                             1400 New York Avenue NW
16                           Washington, DC  20005
                             Paul.hayden2@usdoj.gov
17
                             KURT K. LUNKENHEIMER, ESQUIRE
18                           US Attorney's Office
                             99 NE 4th Street
19                           Miami, FL  33132
                             Kurt.lunkenheimer@usdoj.gov
20

21                           NALINA SOMBUNTHAM, ESQUIRE
                             US Attorney's Office
22                           Southern District of Florida
                             99 NE 4th Street
23                           Miami, FL  33132
                             Nalina.sombuntham2@usdoj.gov
24

25
```

```
 1    FOR THE DEFENDANT:          LILLY ANN SANCHEZ, ESQUIRE
                                  THE LS LAW FIRM
 2                                Four Seasons Tower
                                  1441 Brickell Avenue
 3                                Suite 1200
                                  Miami, FL  33131
 4                                Lsanchez@thelsfirm.com

 5

 6                                LUIS EDUARDO DELGADO, ESQUIRE
                                  HOMER BONNER & DELGADO
 7                                1200 Four Seasons Tower
                                  1441 Brickell Avenue
 8                                Miami, FL  33131
                                  Ldelgado@homerbonnerlaw.com
 9

10

11
      STENOGRAPHICALLY REPORTED BY:
12
                                  SHARON VELAZCO, RPR, FPR
13                                Official Court Reporter
                                  United States District Court
14                                400 North Miami Avenue
                                  Miami, Florida 33128
15

16

17
                                       _     _     _
18

19

20

21

22

23

24

25
```

1          (The following proceedings were had at 1:44 p.m.)

2          THE COURTROOM DEPUTY:  This is the United States versus

3    Abraham Edgardo Ortega, case number 1:18-CR-20685-KMW-4, United

4    States v. Abraham Edgardo Ortega.

5          Counsel, please state your appearances for the record.

6          MR. HAYDEN:  Good afternoon, your Honor.  Paul Hayden,

7    Kurt Lunkenheimer, and Nalina Sombuntham, United States.

8          THE COURT: Good afternoon to you all.

9          MS. SANCHEZ:  Good afternoon, your Honor.  Lilly Ann

10   Sanchez and Luis Delgado on behalf of Abraham Edgardo Ortega,

11   who is present before the Court.

12         THE COURT:  Good afternoon.

13         And everyone may be seated.

14         "Everyone" -- I make it sound as if there are quite a

15   few people in the courtroom.  We are still getting used to

16   in-person hearings.

17         First, let me start by saying that we are conducting

18   court virtually, in that we have allowed public access to this

19   proceeding by telephone.

20         There was not -- there were not as many witnesses or

21   persons involved with the parties who needed to testify, and so

22   the Court did not set up the very complicated Zoom process.

23         But, we are accessible through the phone.  And, because

24   we are, I am going to again ask the parties to please, when you

25   are speaking, speak clearly, slowly.  I forget who the worst

1    transgressor is on that.

2          I see everyone turning their heads toward the

3    transgressor.

4          But, for purposes of those appearing by phone, I shan't

5    name a name.

6          But, please, lean into the microphones, which are

7    covered, for your health, and screened, and keep your voice up.

8          Those who are participating on the phone, I ask that

9    you mute your device so that we here in the courtroom don't

10   hear any background noise.

11         And, with that, I think we are able to proceed.

12         We are here today for sentencing in Mr. Ortega's case.

13         I have received objections from Mr. Ortega, the

14   Government's response, a sentencing memorandum, and many

15   letters written on behalf of Mr. Ortega.

16         But, let me first start by asking you, Ms. Sanchez,

17   have you had an opportunity to review the presentence

18   investigation report and the addendums with your client?

19         MS. SANCHEZ:  Yes, your Honor.

20         THE COURT:  All right.  Let me start with factual edits

21   that are not related, say, to a -- a guideline discussion

22   which, I think, we narrowed considerably.

23         But, do there remain any factual edits that need to be

24   addressed as far as the presentence investigation report?

25         MS. SANCHEZ:  I don't believe so.  I believe that the

1    probation officer has made all those changes.  But, I defer to

2    her if there is anything that is outstanding.

3          THE COURT:  And that is my failing.  I did not ask our

4    probation officer to introduce herself.  If she would do so, at

5    this time, please --

6          THE PROBATION OFFICER:  Good afternoon, your Honor.

7    Vanessa Pulido of Probation.

8          THE COURT:  Good afternoon, Ms. Pulido.

9          I think all the factual matters have been resolved as

10   Ms. Sanchez said; is that correct?

11         PROBATION OFFICER:  Yes.  The ones she addressed, yes.

12   But, I noted, just because the timeframe that has transpired

13   since what was done, that two special corrections need to be

14   made on my part, on Page 2 -- actually, Page 4, the age of the

15   defendant.

16         THE COURT:  Oh, yes.  I remember.

17         PROBATION OFFICER:  The defendant is now 54.

18         Also, in paragraph 117, the age has to be changed, as

19   well.

20         THE COURT:  All right.  Thank you.

21         PROBATION OFFICER:  Thank you.

22         THE COURT:  All right.

23         So, that brings us to the guideline computation.

24         And, let me summarize, if I can, and then ask the

25   parties; one, if I have accurately summarized their position,

1    and two, what additional remarks they have on this matter.

2         I think, originally -- and by "originally," I mean

3    dating to the plea agreement -- both parties mistakenly thought

4    that a two-level enhancement was applicable, pursuant to 1956;

5    that it was a -- this was a conviction under 1956, and the

6    object of the conspiracy, which is the offense of conviction,

7    was a money laundering offense.

8         Since that time, the parties have reviewed in more

9    depth the commentary and case law.  And, while both sides agree

10   that that two-level enhancement is not applicable, Mr. Ortega

11   believes no enhancements should be applied, and the Government

12   believes a one level enhancement should apply.

13        Have I gotten that correct?

14        MS. SANCHEZ:  Yes, your Honor.

15        MR. HAYDEN:  And yes, from the United States, your

16   Honor.

17        THE COURT:  And, just so I understand, the parties also

18   believe that the two-level enhancement for sophisticated means

19   is also not applicable.

20        Is that also correct?

21        MS. SANCHEZ:  Yes, your Honor.

22        MR. HAYDEN:  Correct, your Honor.

23        THE COURT:  And could I get a little more -- is that

24   because that was a negotiated point of the parties, or is this

25   one of those matters that, after a review, and because of the

1    1957 object of conspiracy, it does not -- does not have any

2    role here in the guidelines calculation?

3         MS. SANCHEZ:  Your Honor, what happened was when we

4    initially -- when we got back the -- I believe the first

5    presentence report --

6         THE COURT:  I think you need to pull the mic a little

7    closer, Ms. Sanchez.

8         Thank you so much.

9         MS. SANCHEZ:  When we received the initial presentence

10   report with the guidelines calculation therein, I was going

11   through it.  And, I was looking at it, and I was comparing all

12   of the guidelines sections to the actual guidelines.

13         And, going through to confirm that everything was

14   correct, I realized that under the guidelines section noted,

15   which is 2S1.1(b)2B, if the -- they -- it had stated that if

16   the defendant was convicted under 18 USC 1956, to increase two

17   levels.

18         But, when you continue on, as stated, it says that if

19   the defendant was convicted of the conspiracy of 1956 and the

20   sole object of that conspiracy was to commit an offense under

21   1957, then that two points is not applicable.

22         And, that's application note three to the -- to the

23   sentencing guidelines book.

24         THE COURT:  Right.

25         MS. SANCHEZ:  So, then now that 19 -- that it doesn't,

1    that that does not apply, then you go to -- 2S1.1(b)3, which

2    states that if Subsection (b)2B applies, and the offense

3    involves sophisticated means, you increase it by two.

4         So, that's when you have the four points.

5         But now, since it does not apply, that section would

6    not apply, and thus, the -- that sophisticated means of two

7    points would also be removed, which were the four levels that

8    we -- we reduced from the guidelines calculation.

9         And, initially, when it was AUSA Michael Nadler who was

10   on the case, we reviewed it, and he had agreed that that was

11   correct, that analysis was correct.

12        So, we called Ms. Pulido and advised her of that, and

13   filed that joint letter that has since been filed with the

14   Court regarding that.

15        THE COURT:  So the two enhancement, it's a domino

16   effect, in essence?

17        MS. SANCHEZ:  Correct.

18        So, what I understand now from the Government now is

19   that -- is when they looked at the guideline calculations,

20   their opinion is that although those two domino effects carry,

21   and they are correct, they have now gone back to 2S1.1(b)2A,

22   which says that if the defendant was convicted under 1957, it's

23   increased by one level.

24        THE COURT:  Okay.

25        MS. SANCHEZ:  So -- and that's where we -- the defense

1    objects, because we still think that he was -- the count of

2    conviction was a 1956.  The underlying would be a 1957,

3    however.

4         So, we don't believe that it is -- would carry back to

5    a 1957, where you would have to add that point under that

6    subsection.

7         THE COURT:  Okay.

8         MS. SANCHEZ:  So, we believe that the guidelines are 57

9    on the low end, 57 months on the low end, and I believe the

10   Government believes we should start at 63 months on the low

11   end.

12        THE COURT:  All right.

13        Mr. Hayden, I think Ms. Sanchez has given a fairly

14   comprehensive overview.  Is there anything else you wish to

15   say, or anything that she said that you disagree with?

16        MR. HAYDEN:  No, your Honor.

17        I think she characterized it correctly, that there is

18   that domino effect in place, and that those two enhancements

19   get knocked out.

20        And, I would just obviously cite to our filing with the

21   Court as to Ruin and as to Tetter as to why we believe the

22   1957.1 enhancement does apply in this situation.

23        THE COURT:  Okay.

24        All right.  I have reviewed the arguments and

25   Probation's position as set forth in the addendums -- addenda,

1      and I have looked at the cases cited by Mr. Hayden.

2           And, while I appreciate that the parties had a

3      different view of this going in, I think the correct

4      calculation, at this juncture, even with that understanding, is

5      that advanced by the United States, which is -- and everyone is

6      invited to correct my math -- which brings us to a total

7      offense Level 26, a criminal history Category 1, and an

8      advisory guideline range of 63 to 78 months.

9           Do I have concurrence that that is the appropriate

10     calculation?

11          MR. HAYDEN:  Yes, your Honor.

12          MS. SANCHEZ:  Yes, your Honor.

13          THE COURT:  Then I will ask Ms. Pulido, with her other

14     edits, to also make this final edit as to the guideline

15     calculation.

16          And, that -- that is where we will begin our

17     discussion.

18          I don't know, Mr. Hayden, if you -- if you or

19     Mr. Lunkenheimer, your colleague, wishes to go first.

20          My first question is actually directed to the

21     Government.  Where are we on the forfeiture issue, which is

22     noted as something that will be incorporated into the judgment

23     and commitment, but before we get into arguments with regard to

24     3553 and the like.  I was wondering if we had an update on

25     that.

1          MR. HAYDEN:  I am going to turn it over to          Ms.

2     Sombuntham.

3          MS. SOMBUNTHAM:  Good afternoon, your Honor.

4          THE COURT:  Good afternoon.

5          MS. SOMBUNTHAM:  Your Honor has entered several orders

6     of forfeiture in Mr. Ortega's criminal case.  Those are docket

7     entries 124, 160, and 237.

8          The Court has imposed a $12 million forfeiture money

9     judgment, and has forfeited certain specific property in

10    partial satisfaction of that judgment, including the contents

11    of an account being held by Green Valley, City National Bank

12    accounts, Bahamian accounts, as well as the shares in domains

13    like wine.  And, as we discussed at last week's sentencing,

14    those assets -- most of them have nominal value.

15         The accounts -- we have collected about $818,000 from

16    that.  And, that has -- should be credited to both Mr. Ortega's

17    forfeiture money judgment balance, as well as the defendant,

18    Gustavo Hernandez Frieri's balance.

19         In addition to that, the Government has an inquiry as

20    to Mr. Ortega's assets.  It is our understanding, after going

21    through his finances and even speaking with him today again, to

22    confirm, that he has no other assets available to satisfy the

23    balance of that forfeiture money judgment.

24         If your Honor recalls, last week, we presented some

25    documentation where the parties have agreed about 2.8 million

1    or 3 million of the $12 million that defendant Ortega had

2    defendant Hernandez launder, that went to defendant Ortega's

3    benefit to -- what is his counsel, and that was some time ago.

4         And, the remaining 9 million was invested by the

5    defendant Hernandez.

6         Those funds, as we discussed, are accounted for in loan

7    receivables that have not been collected yet, for the most

8    part.

9         With respect to defendant Ortega's assets, it is the

10   Government's understanding that there are two real properties

11   in Portugal that were associated with defendant Ortega that are

12   no longer his, one of which is under investigation by

13   Portuguese authorities, and some investments in Venezuela,

14   which your Honor can appreciate would be very difficult to

15   collect at this time.

16        And so, as a matter of fact, Ortega --

17        (Brief interruption)

18        THE COURT:  Excuse me.  Whoever is on the phone needs

19   to mute or I will have to disconnect those persons appearing on

20   the phone, not knowing which one of you is not abiding by my

21   directive to mute your phone.

22        You may continue, counsel.

23        MS. SOMBUNTHAM:  So, at this point, we would ask that

24   the existing forfeiture orders be included as part of defendant

25   Ortega's judgment commitment.

1              I would note that we just reviewed the J and C that was

2    issued for defendant Hernandez at docket entry 392.

3              And, if your Honor recalls, we did put on the

4    record some housekeeping, but the forfeiture orders in his case

5    were not included.

6              And, separately -- separately, I will be -- I am

7    consulting with defense counsel for Mr. Hernandez, and we will

8    be filing a Rule 36 clerical error motion for that.

9              But, again, the referenced orders for Mr. Ortega are

10   docket entries 124, 160, and 237.

11             THE COURT:  Okay.  I guess my question was more

12   substantive than procedural.

13             Does the Government have any issues as far as

14   Mr. Ortega's compliance with his plea agreement in terms of

15   identifying assets and assisting the Government in identifying

16   assets in order to satisfy the money forfeiture that everybody

17   agreed to?

18             MS. SOMBUNTHAM:  No, your Honor.

19             And, if you note the guidelines here, we have the three

20   levels of acceptance because Mr. Ortega has been compliant with

21   his plea agreement terms regarding assistance on financial

22   condition and disclosing that information.

23             THE COURT:  Okay.  And there is no similar issue as to

24   income or funds which would make a fine appropriate in -- if

25   Probation has reviewed financial documentation, and all of the

1    matters that you have pointed out, and counsel has recommended

2    that -- counsel has recommended that, I think -- I don't see a

3    particular recommendation as to a fine on the sheet.

4         But, what would be the Government's position in that

5    regard?

6         MS. SOMBUNTHAM:  Your Honor, our position is based on

7    what our knowledge is of the defendant's finances.

8         And, our understanding is that the defendant is solely

9    reliant on his family members, at this point, for his finances;

10   that he does not have the ability to pay a fine in addition to

11   the forfeiture money judgment already imposed by the Court.

12        THE COURT:  All right.

13        Thank you, counsel.

14        MS. SOMBUNTHAM:  Thank you, your Honor.

15        THE COURT:  All right.

16        Ms. Sanchez, then, I will now turn to you for any 3553

17   argument, or any clarification or rebuttal, as it were, to what

18   has already been presented by the United States on behalf of

19   Mr. Ortega.

20        MS. SANCHEZ:  Yes, your Honor.

21        The one clarification that I do want to make was the

22   fact that of the $3 million that we were just talking about, of

23   that -- that went to Mr. Hernandez, counsel noted that 2.8 of

24   it, or approximately, went to an attorney for Mr. Ortega.

25        And, I just want to make sure that I clarify that it

1    was an attorney in Venezuela that was assisting him in

2    Venezuela with several issues there in Venezuela, and was also

3    a mechanism to get access, some of the money, to his family

4    from Mr. Hernandez.  It was not counsel here, nor anything in

5    the recent timeframe.

6         I just want to make sure the record is clear on that

7    point.

8         THE COURT:  I had not assumed that.  But, thank you,

9    Ms. Sanchez

10        MS. SANCHEZ:  Well, I just wanted to make sure that is

11   clear on the record.

12        THE COURT:  Sure.

13        MS. SANCHEZ:  And, in fact, we provided to -- as the

14   Government knows, we provided to the Government all of those

15   different types of promissory notes and other items that were

16   used with Mr. Hernandez, at Mr. Hernandez' request, in order to

17   move that money.

18        Aside from that, obviously, the Court has the motion

19   filed by the Government, and we wanted to also speak to a

20   separate issue, which has to deal with how Mr. Ortega arrived

21   in the United States.

22        And, we believe that his arrival and his immediate

23   assistance to the Government should be factored into the final

24   sentence that the Court deems appropriate, at this point.

25        Mr. Ortega, as the Court is aware from some of the

1    documents that have been filed, worked at PDVSA, which is the

2    Venezuelan oil company, for approximately 12 years, from 2004

3    to 2016.  And, he rose to the levels where he was actually

4    director of finance at the oil company, the Venezuelan oil

5    company.

6            In that role, and through his years there, he was able

7    to amass a tremendous amount of knowledge as to the

8    interworkings of the oil company.  And, in fact, that amount of

9    knowledge that he had acquired and the information that he had

10   led him to the place where on November 30th of 2017, he

11   actually had to flee Venezuela because Maduro had -- President

12   Maduro had decided to take over and remove the own individuals

13   that he had put into place at the oil company at that time,

14   from their positions.  And, it was the same day that there were

15   the arrests of Nelson Martinez and Angelio Del Pino, which were

16   the president and vice president of the oil company at that

17   time.

18           Upon seeing those arrests, Mr. Ortega, nervous that

19   they, the group that Maduro had sent out to collect these

20   officials, would be coming after him, too, he had to leave,

21   through the Colombian border, to get out of Venezuela.

22           So, it starts to be a little bit more difficult, and

23   about 8 or 9 months, even before the offense in this case comes

24   to light, which is July 2018 -- on July of 2018, when

25   Mr. Ortega reads about the complaint, the criminal complaint

1   that was initially filed, he immediately contacted counsel.

2   Literally, it was about 48 or 49 days from the time the

3   criminal complaint came out on July -- in July, I believe it

4   was July 25th -- to the day that I flew him in on

5   September 11th.  And, during that time, he immediately

6   instructed counsel to negotiate with the Government and advise

7   the Government that he was willing to come in and assist the

8   Government in any way possible, and so we very quickly brought

9   him in and he immediately assisted the Government.

10          In fact, starting September 13th -- and this is very

11   important because we believe that that immediate reaction to

12   the offense and the fact that he didn't wait to be indicted, he

13   didn't wait to be arrested, he didn't fight extradition, he

14   never put up any kind of obstruction to Government.  He

15   immediately came to this country and did the right thing.

16          And, most significantly is the fact that he was -- he

17   is the first official within the oil, Venezuela oil company

18   that has come to the United States.

19          So, the assistance was more than invaluable, and

20   immediate.  So, we believe that there should be a percentage of

21   20 percent credit for, in addition to the other because of this

22   extraordinary acceptance from the initial -- from the time the

23   criminal complaint was filed.

24          I believe that I had a conversation with the prosecutor

25   at the time, which I believe was Michael Nadler, within ten

1    days of that criminal complaint being filed, and we started the

2    process of bringing him into the country.

3          So, as far as the other issues, if the Court needs a

4    little bit more context, which we would like to give, we would

5    be happy to go sidebar.

6          THE COURT:  Well, I think sidebar is a vestige of times

7    gone by.  I actually don't have a way, as we are currently

8    constituted, to do that.

9          If both parties wish to offer information in that

10   context, we could complete the public discussion and then go

11   into a separate -- a separate discussion under seal.  But, I --

12   that is the only way I think that information can be provided

13   to the Court, in light of the -- in light of the way we are

14   proceeding.

15         MS. SANCHEZ:  That is fine, your Honor.

16         THE COURT:  Okay.

17         MR. HAYDEN:  Your Honor, I think we might have to

18   object to going under seal completely, just for the basis that

19   we have not, you know, sought clearance through the Department,

20   and for us, that goes all the way up to the Deputy Attorney

21   General.

22         THE COURT:  Okay.  Well, I wish that had been worked

23   out before.

24         MR. HAYDEN:  Can we just have one second, your Honor?

25         THE COURT:  Sure.

1          (Whereupon, there was a discussion off the record,

2    after which the following proceedings were had:)

3          MS. SANCHEZ:  Your Honor, I guess my question would be,

4    if the Court would like to have more information, that is what

5    is outlined in the sealed pleadings.

6          THE COURT:  I -- I never take an opportunity to

7    discourage more information.  But, I think I understand the

8    position of the parties.  I think I understand the scope of

9    what it is you are referring to.  And, maybe we can address the

10   subject in another way with other questions.

11         So, my first question, actually, would be to the

12   Government, and I guess it would depending on your answer.  I

13   may -- or, we may or may not have to get more involved.  But,

14   is this the last time we are going to talk about this?

15         MR. HAYDEN:  No, your Honor.  There could be another

16   opportunity to discuss this in the future.

17         THE COURT:  I understand you can't give a guarantee,

18   Mr. Hayden, because of the nature of not only your

19   responsibilities, but of the case.  But, in your mind's eye,

20   are we going to reconvene on this issue?

21         MR. HAYDEN:  Yes, Your Honor.

22         THE COURT:  Then that, Ms. Sanchez, tells me really

23   what I would have wanted to know, other than what has been

24   provided to me in other submissions.

25         If I understand you, the Government has made a

1    recommendation, you are asking for additional recognition today

2    because of what you've characterized as sort of a super

3    acceptance and cooperation, and amount -- and I -- I hear you,

4    and I understand that.  But, I will leave it to you, and in

5    consultation with the Government, to see if you, you feel the

6    need to give me more particulars and/or a more granular

7    assessment today.

8         MS. SANCHEZ:  Your Honor, I -- I don't believe that the

9    Government has an objection to my request for a variance based

10   on what I am calling super cooperation.

11        THE COURT:  Right.

12        MS. SANCHEZ:  And, generally, in the cases in the

13   Court, I have seen different judges give anywhere with --

14   between 10 to 20 percent, or even more, for that super

15   acceptance, which I think, in this case, merits 20 percent.

16   And, of course, based on what the Government is requesting, we

17   basically fall out at about a 53 percent reduction of the

18   sentence, at this point.

19        THE COURT:  Okay.

20        All right.  Now, did you have any other testimony or

21   documentation that you wished me to hear before I turn to the

22   Government for their -- and you are familiar, Ms. Sanchez, with

23   the Court -- I will turn to Government and then, of course, I

24   will turn back to you for any additional comments before

25   Mr. Ortega speaks.

 1          But, is there anyone else who you wish to hear from?

 2          MS. SANCHEZ:  Yes.

 3          Mr. Ortega's brother is here, and he's going to be

 4  speaking on behalf of the family that is not in the country.

 5  And, it is not possible for them to be here.  So, he is going

 6  to be speaking on behalf of the entire family, and -- that are

 7  out of the country.  And, and -- obviously, elaborating a

 8  little bit more on the numerous letters we provided the Court

 9  that I think provide a good sense and background of who

10  Mr. Ortega is, as a man, as a father, as an individual, outside

11  of the offense here.

12          THE COURT:  Okay.  If he could come forward --

13          Madam interpreter, do we have to --

14          THE INTERPRETER:  Your Honor, I believe that the --

15          MS. SANCHEZ:  He speaks English.

16          THE COURT:  Sorry.  I jumped to conclusions.

17          MS. SANCHEZ:  He has been in the United States for

18  many, many years.

19          THE COURT:  Okay.  I am just trying to --

20          Come forward, sir.  Thank you.  I was just trying to

21  stay ahead of us, ahead of ourselves, technologically.

22          Right up here to the podium, sir.

23          The microphone -- that one.  Yes.  Thank you.

24          THE WITNESS:  Thank you, your Honor.  Thank you for

25  giving me the opportunity to speak on behalf of our family.

1          The family is a very close-knit family; six siblings,

2     two boys, six -- four girls.  And, we come from very humble

3     origins.  My father and my mother never finished high school.

4     But, they raised a family believing in the power of education

5     and hard work.

6          THE COURT:  I don't mean to interrupt, except I do mean

7     to interrupt.  If you are comfortable, you may take off your

8     mask.  It is entirely up to you.

9          THE WITNESS:  Yes.

10         THE COURT:  I know our court reporter is having a

11    difficult time -- and I am sorry.  I didn't ask you to state

12    your full name.

13         THE WITNESS:  I appreciate it.

14         THE COURT:  What is your name?

15         THE WITNESS:  That is Abraham Ortega, just like my

16    brother.

17         THE COURT:  Thank you, sir.

18         THE WITNESS:  And I was telling you, your Honor, that

19    the Ortegas are a very close family.  So, there are four

20    sisters, my brother and I.

21         My parents are very humble beginnings; never went to

22    high school, even.  But, they value education and hard work as

23    the pillars of a good human being, as a good citizen.  We all

24    get very well educated, multiple degrees.  We all worked very,

25    very hard.

1                Together, with that, we were raised believing that

2       honesty and that empathy for the pain of others and humanity

3       are the right formula to go through life.

4                We call my brother, in the family, Edgardo.  And,

5       Edgardo got a huge dose of that growing up.

6                He had -- he went to school in Venezuela, to a

7       prestigious school.  He had -- he had two degrees from there.

8                I helped him because I stayed in the United States for

9       most of my life, 47 years, and I stayed here after going

10      through school, getting the job, starting a family.

11               Today, with me is my daughter, my son, and my ex-wife.

12      And, I can tell you that my brother is a good person.  He is a

13      very intelligent, hard-working individual.

14               After turning the -- finishing his education in

15      Venezuela, he was able to go to England and get an MBA with his

16      own money, what little savings he had at the time, with his

17      wife and a baby.  He finished his MBA, came back to Venezuela.

18      He did not want to stay in Europe.  He wanted to go back home

19      and be close to the family and contribute to the country.  He

20      eventually got a job with Venezuela, and he ascended very

21      quickly.  He ascended very quickly because of his technical

22      prowess, because of his education, and his ability to analyze

23      situations for them.

24               He was very happy.  He thought he was -- definitely

25      contributed to the country.  He was a very respected figure

1    internationally, amongst international institutions and his

2    peers.

3         But, his last four years at PDVSA were absolutely pure

4    hell.  And, I am sorry to use that word.  You know, what he

5    joined to execute to do there was not what he expected it to

6    be.  Life became very, very hard.  And, if you add to that, in

7    the almost three years he has been in the U.S., His life has

8    been an absolute hell.  Sorry to repeat that.

9         When I went to Mexico with his lawyers to get him and

10   bring him back to the U.S., that was an extremely hard

11   experience.  Okay?

12        I actually -- you know, we were very concerned about

13   his health.  But, I can tell you, he has worked very hard to

14   try to survive this crisis.  He feels huge remorse.  He

15   described -- has cried himself to sleep repeatedly, because I

16   live with him.  I have seen him.  He shed a sea of tears.

17        Every time he speaks to our parents, you know, he tries

18   to do the best -- they are old now.  And the question is, "Will

19   we ever see you again?"

20        So, that is extremely hard.  His days are too long.

21   Every time he wakes up in the morning, you know, he is wishing

22   it was night so he could go to sleep.  He spends a lot of time

23   tutoring his son, which makes him very happy.  But, when that

24   is not happening, he is always thinking about Why this all

25   happened?

1            Why did I make some decision that I should have not

2    made?

3            Why didn't I stay in Venezuela?

4            Because he feels extremely sorry about what has

5    happened and the damage he has caused to the family and his

6    friends.

7            He is a very caring person.  He is a very loving

8    father.  He is a great brother.  He is a great uncle.

9            He --

10           Sorry.

11           THE COURT:  Take your time.

12           THE WITNESS:  All he wants to do is to get a second

13    chance to the second chapter of his life.

14           He has suffered enough.  He has helped a lot of people

15    before he was in this situation, and he continues to help, you

16    know.

17           When he was in Venezuela, he was one of the sponsors of

18    the Little League organization down there.  Out of the Little

19    League programs, a lot of major leaguers have emerged.

20           He was always willing to help people, family and

21    nonfamily, with whatever means he was able to muster at the

22    time.

23           He is a very caring, very caring person.  And, except

24    for what happened down there -- he understands the rules of law

25    and he is very respectful.

 1          When he arrived in the U.S., you can ask Mr. Simpson

 2    and Mr. Nunez, now, what kind of -- I guess reserve, for lack

 3    of a better word -- all he wants -- recognizing his offense,

 4    and what happened, all he wants is an opportunity to go on and

 5    continue to be a productive citizen.

 6          He has -- has been doing now seven years of suffering.

 7    And I don't want to sound like I am -- sound biased here

 8    because he is my brother, but, very much, I think, he paid his

 9    dues, because he has been in an absolute hardship.  It has been

10    terrible to live under the circumstances he has lived.

11          I implore of you, I beg of you the highest leniency, to

12    give him a chance for him to go on because I truly believe that

13    the last seven years, I don't know how he is still alive, you

14    know, the way he feels about what he has gone through -- to

15    allow him to resume his life as soon as possible.

16          What I have got to do now, when I leave this courtroom,

17    is to make one of the toughest calls I will ever make in my

18    lifetime, to my elderly parents and tell them how it went.  And

19    I hope I have some good news for them.

20          Thank you, your Honor.

21          THE COURT:  Thank you, Mr. Ortega.

22          If I could ask you to just to -- for a moment --

23          Mr. Hayden, do you have any questions of Mr. Ortega?

24          MR. HAYDEN:  No questions, your Honor.

25          THE COURT:  All right.  Thank you, Mr. Ortega.

 1          You may proceed.  You are excused.

 2          Ms. Sanchez, anyone else you would like me to hear

 3   from?

 4          MS. SANCHEZ:  No, your Honor.

 5          THE COURT:  All right.  Is it -- Mr. Hayden, did you

 6   submit the sentencing memo?

 7          Or is that you, Mr. Lunkenheimer?

 8          MR. LUNKENHEIMER:  Your Honor, I electronically filed

 9   it, but all three of us worked on it together and reviewed it

10   to submit to the Court.  I think Mr. Hayden was going to

11   address any sentencing issues, your Honor.

12          THE COURT:  Okay.  I just wanted to say that your

13   postulations on Pages 11 and 12 were mostly right.

14          MR. HAYDEN:  That's exactly where I was going to start,

15   your Honor.

16          THE COURT:  Mostly.

17          MR. HAYDEN:  I think, yes.  Without sort of knowing,

18   you know, your Honor's position at last week's sentencing, or

19   sort of the guideline as the basis for your Honor's decision,

20   the Government does view the defendant sort of in the same band

21   as Mr. Hernandez Frieri.  But, we also believe that he is

22   slightly more culpable in the sense that he is the foreign

23   official who accepted bribes for his participation in the

24   underlying joint venture schemes as well as the company CD

25   loans scheme, as well.

 1          We also note that he did recruit Mr. Hernandez Frieri

 2     to help him launder his money, conceal those assets, and make

 3     them available to him, as well.

 4          And, the Government's position would be that, you know,

 5     we would start -- we would recommend the Court start at the low

 6     end of the 63 months, which is the guidelines here, and then

 7     any variance, in addition to the Government's request, you

 8     know, that the Court would then start from that position.  It

 9     would be our, Government's -- I would just also note for the

10     record that the Government is not necessarily agreeing to a

11     53 percent variance as represented by the defense, but we

12     certainly understand why they are asking.

13          THE COURT:  So, on Page 11, you again reiterate the

14     tiered approach, which I think everyone is in some agreement

15     with, in some way, shape, or form.

16          I am just curious.  Have the masterminds -- have they

17     been identified, at least in my courtroom?

18          MR. HAYDEN:  One of them has, your Honor.  He is a

19     defendant, Francisco Convit --

20          THE COURT:  Okay.

21          MR. HAYDEN:  --is one of the named defendants.

22          The others are unindicted co-conspiritors at the

23     moment.

24          THE COURT:  I just wanted to know if I have run across

25     one of those persons yet.

1          MR. HAYDEN:  Oh, and I -- and also, I think it may be

2     slightly lower, but up there would be Mr. Ferdinand.

3          THE COURT:  Okay.  Okay.

4          And, I asked about the forfeiture, and I think -- I

5     understand and I apologize for having created extra work by not

6     listening as closely when the Government did make the request

7     about the J and C.  But, in this instance, there is -- I just

8     want everyone to be clear, there is still the outstanding

9     matter of restitution.

10         And, I'm just going to set that 90 days out, because I

11    know that there is a motion that has yet to be ruled upon, and

12    I didn't want the parties to think I was unaware of that, or

13    wasn't going to address it.  I just want to keep on schedule

14    for this hearing, and so I -- I wanted to point that that out.

15         MR. HAYDEN:  We -- the United States spoke with counsel

16    for Cabeza, you know, and our understanding is they may be on

17    the phone today, your Honor.

18         They -- our understanding is from them -- and

19    obviously, your Honor can correct me if I am wrong -- but they

20    would stand on their papers, and did not wish to make any

21    statements today at the hearing.

22         THE COURT:  Right.  I mean, I would have -- I know that

23    they have, the lawyers for Cabeza are very diligent, and they

24    have monitored the proceedings.

25         And I -- perhaps wrongly, but I assumed that if there

1    was something that needed to be said today, someone would have

2    advised me.

3           Otherwise, understanding that, I would put that portion

4    90 days out, and that that matter would still be pending.

5           And so if additional comments or briefing is requested,

6    it can always -- someone can always file something to the

7    docket.

8           But, getting back now to any --

9           MR. HAYDEN:  Your Honor --

10          THE COURT:  Yes -- I'm sorry, sir.  I know there is

11   someone speaking.  I just can't hear you.  So, if you are on a

12   speakerphone, if you would pick up --

13          SPEAKER ON PHONE:  Sorry, your Honor.  Is this better?

14          THE COURT:  A little bit.  But, you are very

15   soft-spoken, so --

16          SPEAKER ON PHONE:  I will try to yell, your Honor.

17          THE COURT:  Very good.

18          SPEAKER ON PHONE:  I don't want to disrupt the

19   proceedings.  It's Kent Yalowitz, Arnold and Porter, on behalf

20   of Cabeza, simply to confirm that the United States has

21   correctly described our conversation and our views, which is

22   that we wish to stand on our papers.

23          THE COURT:  Okay.

24          SPEAKER ON PHONE:  And that is all I have to say.

25   Thank you.

1          THE COURT:  Thank you, sir.  And you did a fine job of

2    yelling into the phone.  We heard every word.

3          Thank you so much.  I appreciate it.

4          SPEAKER ON PHONE:  Thank you.

5          THE COURT:  All right.

6          Mr. Hayden, so, with regard to Ms. -- Ms. Sanchez' 3553

7    argument or anything having to do, additionally, with the

8    Government's motion, is there any -- anything else you wish for

9    me to consider, or remarks you wish to make in that regard?

10         MR. HAYDEN:  Nothing else, Your Honor.  We will stand

11   on our memo.

12         THE COURT:  Okay.  And, as I said, Ms. Sanchez, I am

13   going to turn back to you.  Is there anything you wish to add,

14   or clarify, or --

15         MS. SANCHEZ:  Well, your Honor, what I would like to

16   do -- and because you referred to Pages 11 and 12, I did the

17   same -- and so I did my calculations, because I do like to

18   compare apples to apples, et cetera.

19         And, when you look at Matthias Krull, who was initially

20   sentenced to 120 months, and then his sentence was reduced down

21   to 42 months, that was a 65 percent reduction of his initial

22   sentence for his cooperation.

23         And, although Mr. Krull is -- the Court has recognized

24   and sees him in a different tier as the Government does, it is

25   still significant that his cooperation resulted in a 65 percent

1    reduction.

2              THE COURT:  Excuse me.

3              Again, if someone on the phone would mute, please.

4              It is -- we, in the courtroom, are having difficulty

5    hearing, if you do not mute your phone.

6              Or, you can leave.  That is also an option.

7              Go ahead, Ms. Sanchez.

8              MS. SANCHEZ:  So -- and I believe -- and I think

9    rightly so, that Mr. Ortega's cooperation was probably much

10   more significant than Mr. Krull's simply because of the

11   tremendous amount of history, background, and knowledge that he

12   provided to the United States, not only here, but in numerous

13   districts and in different jurisdictions worldwide.

14             So -- and so I just want to note that that was the

15   reduction that Mr. Krull got, which was 65 percent.

16             But, if we want to go and then deal with what the

17   Government believes are equal tiers, although my client, being

18   slightly more culpable than Mr. Hernandez -- Mr. Hernandez was

19   facing a guideline sentence of what I believe was 97 months to

20   120 months, as the Court knows.

21             I believe that the Government was asking for a

22   mid-range point, which was 108 months.  And, Mr. Hernandez

23   ended up getting 46 months.

24             46 months from that midpoint was -- it was a 57 percent

25   reduction of the sentence, which is quite significant.

 1          And, he got a 57 percent reduction of the guideline

 2   range, albeit I understand that the Court believed it was

 3   slightly elevated, and I understand that, and I -- but still,

 4   it was a 57 percent reduction.  And, that was with Mr.

 5   Hernandez fighting extradition for over nine months and trying

 6   not to come to the U.S. to face charges.  And then, upon coming

 7   here to the U.S., having much complications with his

 8   cooperation and compliance with the Government, to the point

 9   that he is still contesting the forfeiture numbers, when it is

10   very clear and has been provided and documented in bank

11   statements and witness testimony and emails that my client,

12   Mr. Ortega, handed to him $12 million, and he took the

13   $12 million and, aside from the three that went back to

14   Mr. Ortega, $9 million is in his hands.

15          And, he is still fighting the return of those

16   $9 million.

17          But, he was still deemed to be able to have gotten a

18   57 percent reduction, lower.

19          THE COURT:  Well, I think that -- apples to apples,

20   Ms. Sanchez, following 11 -- Pages 11 and 12, if, say, my

21   calculation for an appropriate guideline was more in line with

22   60 months, or of 63 months, then any kind of reduction would

23   have been more in the neighborhood of less than 20 percent for

24   cooperation that the Government acknowledged, although

25   certainly -- and no one is arguing it is as extensive, nor is

1    it as straightforward and credible than Mr. Ortega's.  But,

2    that would have been -- that would have been the point where

3    one would start subtracting.

4          MS. SANCHEZ:  And I recognize that.

5          THE COURT:  Okay.

6          MS. SANCHEZ:  I am just placing the numbers out there

7    because when we now look at Mr. Ortega and we try to fashion

8    where he should land --

9          THE COURT:  Well, and that's why I also asked the

10   Government the question I did.  One assumes that this is a

11   preliminary landing, as opposed to a final destination, at

12   least, if I credit Mr. Hayden, which I -- you know, he has been

13   straightforward both in his representations and his

14   disagreements with the Court.  So, I have no reason to think he

15   is -- we are not to assume another hearing sometime in the

16   future.

17         MS. SANCHEZ:  Correct.  But, if we take now what would

18   be the approximately 20 percent, where Mr. Hernandez ended up,

19   and we look at what the Government's request is, plus the

20   extraordinary acceptance which, for lack of a better word, I

21   will call it, I do believe that my client should end up

22   somewhere between 25 and 28 months, at this point.

23         And, when you do the percentage calculations, that is

24   exactly where it lands, between 53 and 57 percent.

25         Okay.

1          THE COURT:  All right.  Let me -- again, according to

2     the CDC, we should be taking at least ten-minute breaks, which

3     I am trying to adhere to, and have been not very successful.

4     But, let's all take a ten-minute break.  We will open the doors

5     to the courtroom so that we can get some significant airflow,

6     and we will return at ten after three.

7          (Whereupon, there was a recess at 3:00 p.m., after

8     which the following proceedings were had at 3:10 p.m.:)

9          THE COURT:  We are back on the record.  The parties

10    have presented their arguments, and so now I'm going to turn to

11    you, Mr. Ortega.

12          Your lawyer -- I am certain Ms. Sanchez has advised you

13    that you have a chance to talk to me directly and tell me

14    anything it is you think I need to know about you or your case.

15          Take all the time you need.  If you have to talk to

16    Ms. Sanchez, or you just want to talk to her at any moment, you

17    may.  But, if you have something you want to share with me, now

18    is your opportunity.

19          If you remain there, Mr. Ortega, just pull the

20    microphone in so Madam Interpreter can hear you.

21          And, you may -- as I have told others, if you wish to

22    take off your mask for that purpose, it is entirely up to you.

23          THE DEFENDANT:  Yes.  I believe you can hear me

24    perfectly?

25          THE COURT:  Yes.

1      THE DEFENDANT:  Good afternoon, your Honor, ladies and

2  gentlemen.

3      In July 2015, a document was published pointing out

4  several negative things regarding me and the laws of this

5  country.

6      MS. SANCHEZ:  Your Honor --

7      -- sorry --

8      -- I believe it was '18.

9      THE COURT:  2018?

10      THE INTERPRETER:  The interpreter stands corrected.

11      THE COURT:  Thank you.

12      THE DEFENDANT:  So, immediately, I got in touch with

13  the attorneys that are present here with me today, that are

14  representing me, Ms. Lilly Sanchez and attorney counsel

15  Delgado, to whom I relayed my absolute and total desire to help

16  justice.

17      A few weeks later, on September 11, 2018, I arrived in

18  Miami and, totally voluntarily on my part, I was at the service

19  of local authorities.

20      Today, I see with eyes of despair the terrible

21  situation, the deep sorrow and the pain that my country,

22  Venezuela, is currently undergoing due to their situation,

23  which is in economic, political, and social crisis, all of this

24  due to the development of the massive corruption on the part of

25  politicians, businessmen, and public servants.

 1           Today, as a result of my own actions today, I find

 2      myself steeped in sadness, completely desolate and in economic

 3      ruin, and having had -- having gone through more than three

 4      years of not seeing my only son or most of my family.

 5           Today, I would like to say before God and men that I am

 6      deeply sorry for my mistakes.

 7           So today, I would like to thank you, your Honor, as

 8      well as all of the officials that I have been involved with

 9      during this process for the very respectful and dignified way I

10      have been treated throughout the process.

11           Thank you.  Thank you very much.

12           THE COURT:  Thank you, Mr. Ortega.

13           Is there anything else that either Mr. Ortega or the

14      United States wishes to bring to the Court's attention before I

15      impose sentence?

16           MR. HAYDEN:  Nothing on behalf of the United States,

17      your Honor.

18           MS. SANCHEZ:  No, your Honor.  Nothing further.

19           THE COURT:  Thank you.

20           The Court has considered the statement of all of the

21      parties, the presentence report, which contains the advisory

22      guidelines and statutory factors set forth in 18 USC 3553(a).

23           It is the finding of the Court that Mr. Ortega is not

24      able to pay a fine.

25           First, let me start by saying I am granting the

1    Government's motion filed at docket entry 391, and I will

2    discuss the extent of the Court's consideration of that motion

3    in just a moment.

4         As to the 3553(a) factors, again, starting with the

5    seriousness of the offense, that is -- that is a matter that is

6    not in dispute in this case, or the cases of any of the

7    codefendants, either for this Court or other courts.

8         I think, as Mr. Ortega rightly recognizes, the

9    devastation that this conspiracy has wracked upon the financial

10   and governmental institutions, not only of Venezuela, but also

11   the United States, is significant, to say the least.

12        I mentioned earlier that the Government had mostly, I

13   thought, sussed out the Court's perspective in its sentencing

14   memorandum.  But, I do take issue with one statement that the

15   Government made.  I agree that a sentence fashioned in

16   Mr. Ortega's case should deter others from engaging in similar

17   conduct.

18        As to Mr. Ortega and his conduct throughout this

19   litigation, I -- I have no reason to think he will re-offend in

20   any way, in any context.

21        But, the Government went on to say that the Court

22   cannot leave the impression that money laundering merits only a

23   few years in jail, or can be outweighed by a defendant's good

24   conduct in other respects.

25        If the Government had that impression, I -- I think it

1   is -- it is the Government's take, but it is certainly not the

2   intent of the Court.

3        The Court must calculate the guidelines, assess their

4   applicability in light of the facts of the case, and then take

5   into account the 3553(a) factors, including the seriousness of

6   the crime.

7        But, as to Mr. Ortega, I think not only are those

8   factors independently warranting a variance, they also dovetail

9   into the Government's motion which the Court has granted and

10  which we discussed in terms of his cooperation.

11       Before I get to that, I will say, however, that I also

12  agree with the Government that I find Mr. Ortega's culpability,

13  for lack of a lack of a better quantifying or qualifying term

14  is higher than that of Mr. Frieri, since it is his conduct, his

15  corrupt acts that led to the laundering of the funds.

16       And, I appreciate his brother's remarks before the

17  Court, and credit his assessment of Mr. Ortega's life and

18  career.  But, it makes it all the more puzzling, as it did last

19  week and as it will in hearings to come, how people who are

20  vested with great trust and responsibility, who are neither

21  destitute nor desperate, would engage in conduct that led them

22  to betray not only the law, but their own values, their family,

23  and ultimately their country.

24       I still don't have an answer to that question.  And, I

25  don't know that I ever will.

1          But, one way Mr. Ortega has endeavored to answer that

2    is through his cooperation which, unlike that which the Court

3    addressed last week, was immediate, was not just substantial

4    but, I think, could be characterized as extraordinary, was

5    ongoing, and is ongoing, and is untainted by either evasion or

6    inaccuracy.  And, because of that cooperation, and because of

7    the 3553 considerations that were presented to me not only by

8    Ms. Sanchez but by Mr. Ortega's brother and the many people who

9    sent letters to the Court, the Court is going to vary from the

10   guidelines sentence.

11         It is the judgment of the Court that the defendant,

12   Abraham Edgardo Ortega is committed to the Bureau of Prisons,

13   to be imprisoned for 28 months.

14         Upon release from imprisonment, Mr. Ortega shall be

15   placed on supervised release for three years.  Within 72 hours

16   of release, Mr. Ortega shall report in person to the probation

17   office in the district where he was released.

18         While on supervised release, Mr. Ortega shall comply

19   with the mandatory and the standard conditions of supervised

20   release, including not committing any crimes, being prohibited

21   from possessing a firearm or other dangerous device, and not

22   unlawfully possessing a controlled substance, and in

23   cooperation in the collection of DNA.

24         And, he shall also comply with the following special

25   conditions; financial disclosure requirement, no new debt,

1    self-employment restriction, payment of any restitution, fine,

2    or special assessment, and cooperation with immigration for

3    removal after imprisonment.  And, he shall immediately pay to

4    the United States a special assessment of $100.

5         So, total sentence; 28 months imprisonment, three years

6    supervised release, and $100 special assessment.

7         Forfeiture of Mr. Ortega's right, title and interest in

8    certain properties is ordered, consistent with the plea

9    agreement, and with the docket entries that were identified by

10   Government's counsel earlier.

11        If I have to sign any additional orders, if the

12   Government could submit those --

13        MS. SOMBUNTHAM:  No, your Honor.  Not in this case.

14        THE COURT:  Okay.  Now that sentence has been imposed,

15   does Mr. Ortega or his counsel object to the Court's finding of

16   fact, or the manner in which sentence has been imposed?

17        MS. SANCHEZ:  No, your Honor.

18        THE COURT:  Mr. Ortega, you have the right to appeal

19   this sentence imposed within the conditions and confines of

20   your plea agreement.

21        Any notice must be filed within 14 days after I enter

22   this judgment.  If you are unable to pay the cost, the cost

23   will be waived and a lawyer will be appointed to represent you.

24        It was a superseding information, so there is no

25   additional announcement by the United States.  I am assuming,

1    again, we are discussing a voluntary surrender date.  In light

2    of what we all believe to be the future of the litigation, what

3    time would we set out --

4         MR. HAYDEN:  The Government would recommend 90 to

5    120 days, your Honor.

6         THE COURT:  Just to be on the safe side, because as

7    last week indicates, the attorneys' estimate of time is never

8    quite as accurate as they assume it is.

9         I am going to go with 120 days, just to be on the safe

10   side.

11        Ms. Sanchez, is that --

12        MS. SANCHEZ:  That's fine, your Honor.  I was actually

13   going to ask for a little bit longer than that.  I was going to

14   say 180, six months, to give enough time to complete several

15   things.

16        THE COURT:  Let's -- let's do this.  Let's -- because

17   the BOP must initiate the process, if you both need to come

18   back to me on status, and there are some other dates you would

19   like to consider, we can do that in the future.

20        MS. SANCHEZ:  That's fine.

21        MR. HAYDEN:  That's fine.

22        THE COURT:  All right.

23        Is there anything else?

24        Any recommendations on designation, Ms. Sanchez?

25        MS. SANCHEZ:  Your Honor, just anywhere close to the

1   Southern District of Florida.

2          THE COURT:  All right.

3          And is there anything else I need to take up on behalf

4   of Mr. Ortega?

5          MS. SANCHEZ:  I don't believe so, your Honor.  Not at

6   this time.

7          THE COURT:  And on behalf of the United States?

8          MR. HAYDEN:  Yes, your Honor.  Probation may need a

9   date certain, to start with.  And then we can -- as to his

10  surrender, your Honor.

11         THE CLERK:  September 2nd.

12         THE COURT:  But by noon, September 2nd.

13         MR. HAYDEN:  Nothing else on behalf of the United

14  States, your Honor.

15         THE COURT:  All right.

16         Thank you all, and we are adjourned.

17         Thank you.

18         (Proceedings concluded at 3:27 p.m.)

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3              I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7              Please note:  This hearing occurred during the

8    COVID-19 pandemic and is therefore subject to the

9    technological limitations of reporting remotely.

10

11

12

13
     June 1, 2021            /s/SHARON VELAZCO
14   DATE                    SHARON VELAZCO RPR, FPR
                             Official Court Reporter
15                           United States District Court
                             400 North Miami Avenue
16                           Miami, Florida 33128

17

18

19

20

21

22

23

24

25
```