**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 18-CR-20685-WILLIAMS/TORRES**

**UNITED STATES OF AMERICA**

**vs.**

**GUSTAVO ADOLFO HERNANDEZ FRIERI,**

      **Defendant.**

_____/

**IN RE:**

**OLYMPIA DE CASTRO,**

      **Third-Party Petitioner.**

_____/

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPEAL OF MAGISTRATE**
**JUDGE TORRES'S ORDER GRANTING GOVERNMENT'S MOTION TO COMPEL**

      The United States of America, through the undersigned Assistant United States Attorneys,

respectfully opposes Defendant Gustavo Adolfo Hernandez Frieri's appeal [ECF No. 476] of U.S.

Magistrate Judge Edwin G. Torres's Orders [ECF No. 468, 470] granting the Government's

motion to compel discovery from Third-Party Petitioner Olympia De Castro, who was joined by

Defendant to oppose production based on an asserted joint-defense agreement ("JDA") and marital

communications privilege.[1] Judge Torres found that De Castro and Defendant (i) failed to establish

a valid JDA that would support the common-interest doctrine, and (ii) failed to establish their

marriage had any reasonable expectation of reconciliation after De Castro filed for divorce on May

_____

[1] On May 13, 2021, the Government served a subpoena on the Defendant in related criminal
forfeiture ancillary proceedings over forfeited real property at 314 Hicks Street, Brooklyn, New
York. Defense counsel served a privilege log on September 20, 2021, withholding 129 specific
documents, as well as any emails between De Castro and Defendant prior to February 10, 2020,
which may precipitate the filing of another motion to compel.

22, 2019, and thus any marital communications privilege ended by that date. Judge Torres also found that a doctored financial affidavit, which De Castro produced in discovery, needed to be produced in an unredacted form. (*Id.*) Defendant appeals the first two rulings.

Judge Torres's rulings legally and factually are sound, and Defendant cannot establish they are clearly erroneous or contrary to law to support his appeal. In this criminal case and related forfeiture ancillary proceedings, Defendant and De Castro repeatedly have sought to excuse their concerted efforts to avoid Defendant's criminal financial liability and the forfeiture of his assets. The Court should affirm Judge Torres's Orders, and recognize what otherwise is obvious: Defendant portrays the protections offered by a JDA and the marital communications privilege to be unbounded in efforts to obscure De Castro's nominal interest in the forfeited $900,000 (plus interest), a property that he acquired and negotiated the payment of, including after his arrest.

## FACTUAL AND PROCEDURAL BACKGROUND

1.   ***The Court entered an agreed-upon forfeiture money judgment against Defendant as a result of his conviction for money laundering.***

On August 16, 2018, a federal grand jury returned an Indictment charging Defendant and others in Count 1 with conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B), among other counts [ECF No. 19]. On November 26, 2019, the Court accepted Defendant's guilty plea to Count 1. (*See* ECF Nos. 162, 163.) On February 4, 2020, the Court entered a Preliminary Order of Forfeiture against Defendant, imposing a $12,330,000.00 forfeiture money judgment. (*See* ECF No. 175 at 2-3.)

On April 30, 2021, following a 2-day hearing, the Court sentenced Defendant to 46 months in prison. (ECF Nos. 388, 392, 403.) At sentencing, the Court remarked that "Mr. Hernandez has been unable to answer the straightforward questions that go to the heart of sentencing and the heart of this case." (4/30/21 Tr. at 149:22-24.) The Court also expressed that "Mr. Hernandez has done

more to obscure who he is than to reveal who he is. I think that has been an issue, and that has been for me—as everyone has noted—one of the difficulties in deciding how to sentence Mr. Hernandez." (*Id.* at 151:21-24.)

2.      ***De Castro, who now is Defendant's ex-wife, filed a claim on forfeited property and failed to comply with discovery.***

On January 11, 2021, the Court entered the Third Preliminary Order of Forfeiture against Defendant, forfeiting approximately $900,000 (plus interest) (the "Subject Asset") [ECF No. 280]. De Castro timely filed a notice of claim and verified petition ("Petition"), asserting ownership of the Subject Asset [ECF No. 296]. The same date, Devine Goodman & Rasco ("DGR")—De Castro's counsel—filed a claim to the Subject Asset [ECF No. 297], which it later withdrew. In support, DGR filed its engagement letter with De Castro, which identified her as the client "c/o [Defendant] Gustavo Hernandez" with only Defendant's e-mail address listed [ECF No. 297-1].[2]

The Subject Asset arose from the sale of an interest in a retail wine shop ("IWM"). In 2008, Defendant invested $900,000 in IWM along with two other friends, for a total of $2.7 million for three shares. (Petition at 2.) Later, Defendant wanted to invest in a wholesale wine business, and in 2015, Defendant purportedly transferred his interest in IWM to De Castro, his then-wife, to avoid running afoul of New York law that prohibits someone from owning both retail and wholesale alcohol businesses. (*Id.* at 3-4.) In 2016, IWM repurchased the three shares for $2.7 million, $900,000 per share. (*Id.* at 4-5.) Defendant's $900,000 payment, however, remained with Daniel Holtz (another investor and friend). (*Id.* at 5.) In 2021, Holtz transferred that money to the Government pursuant to the Third Preliminary Order of Forfeiture.

In the Petition, De Castro asserts she alone has an interest in the Subject Asset, and also

---

[2] When deposed, Defendant testified that Guy Rasco (of DGR) was not his attorney.

claims to be a *bona fide* purchaser for value.[3] (*Id.* at 5-7; *accord* Rasco Decl. ¶ 5 (claiming Subject Asset is "[De Castro's] and hers alone"), ECF No. 427-1.) The Government responded to the Petition on March 8, 2021. (ECF No. 323.) The Government asserted that De Castro is a nominal owner of the Subject Asset, is not "other than the defendant" under 21 U.S.C. § 853(n)(2), and does not hold a superior interest under 21 U.S.C. § 853(n)(6)(A). (*Id.* at 9-15.) In support, the Government relied on Holtz's testimony from a pre-sentencing hearing, in which Holtz testified he communicated only with Defendant about IWM. (*Id.* at 10-12; *see also* 2/8/21 Tr. at 28:1-30:15 (Holtz viewed the Subject Asset as Defendant's until 2019 or 2020—assuming De Castro had then received the Subject Asset in the divorce), ECF No. 323-1.) The Government further relied on e-mails Defendant sent to Holtz in the fall of 2019—after his arrest in this case—requesting the $900,000 to pay for his criminal defense. For example, Defendant wrote "You told me last year you needed time to pay me the $900k for ***my share*** of the IWM monies you received … ***I really need these monies back*** at the earliest possible convenience." (Resp. at 10 (emphasis added) (quoting ECF No. 294-1).) And the Government relied on affirmative defenses Holtz asserted in a state civil lawsuit De Castro filed over the Subject Asset, in which Holtz stated "Plaintiff [De Castro] is simply a titular nominee with no real interest in this matter. The real party in interest is Gustavo Hernandez, the former husband of the Plaintiff," and that Defendant conveyed his interest in the retail wine shop to De Castro "for the purposes of disguising ownership." (*Id.* at 12-13; *see also* 2/8/21 Tr. at 28:20-30:6 (Holtz testifying before Judge Torres that the factual statements in the affirmative defenses are accurate).)

Discovery then commenced. Based on DGR's engagement letter, the Government included

---

[3] De Castro testified in a pre-sentencing hearing, however, that Defendant invested the money in IWM and she did not contribute money. (2/8/21 Tr. at 42:11-42:19, 98:2-98:7, ECF No. 421-7.)

requests aimed at communications, or documents shared, with Defendant. (ECF No. 421-1 at RFPs 2-4; ECF No. 421-2 at Rogs 2-3.) De Castro objected to the Government's discovery requests and withheld documents, relying on a purported JDA and the marital communications privilege [ECF Nos. 421-5, 421-6]. In addition, De Castro produced a heavily redacted, financial affidavit, purportedly from divorce proceedings between her and Defendant [ECF No. 427-1]. The Government inquired whether the affidavit had been doctored after the fact—it was mostly filled out by hand and executed and notarized in December 2019, but had a typed-in reference to a 2020 lawsuit. (*Id.* at 10-11.) The Government also requested an unredacted, file-stamped version. De Castro refused, asserting the affidavit was "not relevant," and saying it never was "filed."

3.     ***Judge Torres grants the Government's Motion to Compel.***

On June 2, 2021, the Government moved to compel (i) discovery withheld based on the purported JDA, (ii) discovery withheld based on the marital privilege after De Castro filed for divorce, and (iii) an unredacted version of the financial affidavit [ECF No. 421]. The parties fully briefed the motion by June 23, 2021 [ECF Nos. 427, 431], and then Defendant moved to join De Castro's "assertion of the joint defense privilege" on July 14, 2021 [ECF No. 444]. The Government responded [ECF No. 448], made a supplemental filing [ECF No. 454], and De Castro responded again on August 4, 2021 [ECF No. 460]. Also on August 4, 2021, De Castro filed an amended privilege log [ECF No. 459].

On August 25, 2021, in a comprehensive opinion, Judge Torres granted the Government's motion, (*see* ECF Nos. 468 ("Order")), in which he considered and rejected Defendant's arguments (*see* ECF No. 470). First, Judge Torres found that neither De Castro nor Defendant had met their burden to establish any joint-defense privilege. (Order at 6-11.) De Castro "never explain[ed] how she and her husband share a common legal interest to sustain the existence of a JDA," and proffered only a common adversary and a shared rooting interest in the outcome of litigation—which are not

sufficient to meet their burden. (*Id.* at 9-11.)

Second, Judge Torres determined that De Castro's and Defendant's marital privilege ended by May 22, 2019—the date De Castro filed for divorce—because at that point their marriage was "moribund" notwithstanding their continued shared residence as part of Defendant's court-ordered home confinement. (*Id.* at 11-18.) Judge Torres analyzed the Eleventh Circuit's decision in *United States v. Singleton*, 260 F.3d 1295 (11th Cir. 2001), and found that De Castro failed to meet her burden to establish that, notwithstanding the pending divorce, her marriage with Defendant remained viable. (*Id.*) Judge Torres reviewed De Castro's own sworn testimony and filings, which established that she decided to divorce Defendant while he was detained in Rome pending extradition proceedings, and immediately served divorce papers once Defendant was released on bond. (*Id.* at 15-18.) Judge Torres quoted De Castro's own words, where she said she "allowed [Mr. Hernandez Frieri] to reside at her home until his sentencing *for the sake of their children*, the parents are no longer a couple and [he] has no right or dominion over her home." (*Id.* at 15 (emphasis and alterations in original) (quoting ECF No. 261 at 10, n.3).) And Judge Torres observed that De Castro ignored the circumstances of the case—in addition to the above, that Defendant was on house arrest as a bond condition, and that Defendant's friend testified De Castro and Defendant lived separately within the home. (*Id.*) Finally, Judge Torres noted that "all the evidence in the record" showed no reasonable expectation of reconciliation as of May 2019. (*Id.*)

Third, Judge Torres ordered De Castro to produce an unredacted financial affidavit from her divorce proceedings with Defendant. (*Id.* at 18-22.) In discovery, De Castro produced a heavily redacted version of the affidavit that was handwritten, signed, and notarized in ***2019***, but contained a typed-in docket number from a ***2020*** lawsuit. (*Id.* at 18-19.) Judge Torres observed several "shortfalls" and "unanswered questions" raised by De Castro's "explanation" that the affidavit was a "draft," including "why her lawyer altered the affidavit to include a case number for a civil

6

lawsuit *after* she entered into a marital settlement agreement and *after* her divorce was finalized." (*Id.* (emphasis in original).) Judge Torres also remarked that the marital settlement agreement "noticeably" did not mention the Subject Asset or lawsuit. (*Id.* at 20 n.12.) He concluded those

> questions raise substantial doubts as to whether the redacted financial affidavit can be relied upon because (1) it contains a previously undisclosed alteration, (2) there are no assurances that it differs in any respects that might impact the disposition of the pending petition, and (3) there are unanswered questions as to why Ms. De Castro modified it in the first place following the termination of her divorce.

(*Id.* at 21.) After entry of the Order now pending Defendant's appeal, De Castro produced an unredacted financial affidavit on September 8, 2021, after requesting a seven-day extension to do so as that would be the same date for filing an appeal [ECF No. 471].

## LEGAL STANDARD

The Court's standard of review of Judge Torres's non-dispositive order[4] is whether his rulings are "clearly erroneous or contrary to law." Local Mag. R. 4(a)(1); Fed. R. Civ. P. 72(a);[5] *see also* 28 U.S.C. § 636(b)(1)(A); *accord* Fed. R. Crim. P. 59(a). A ruling is "clearly erroneous" when "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)). A court cannot reverse as "clearly erroneous" "simply because it is convinced that it would have decided the case differently." *Id.*; *Cinci. Ins. Co. v. Cochran*, 2005 WL 5277203, at *3 (N.D. Fla. Sept. 22, 2005) ("The question for the reviewing court is not whether the finding is the best or only conclusion that can be drawn from the evidence. Instead, the test is whether there is evidence in the record to

---

[4] *McGrath v. Nassau Cty. Health Care Corp.*, 204 F.R.D. 240, 243 (E.D.N.Y. 2001) ("Orders requiring the production of allegedly privileged materials are non-dispositive pretrial orders.").

[5] This ancillary forfeiture proceeding is governed by Federal Rule of Criminal Procedure 32.2. Under Criminal Rule 32.2(c)(1)(B), discovery is governed by the Federal Rules of Civil Procedure.

support the lower court's findings, and whether its construction of that evidence is a reasonable one.") (citation omitted) *aff'd*, 198 F. App'x 831 (11th Cir. 2006). This standard of review is "highly deferential" because magistrate judges are "afforded broad discretion in resolving discovery disputes, and reversal is appropriate only if that discretion is abused." *Storms v. United States*, 2014 WL 3547016, at \*4 (E.D.N.Y. July 16, 2014) (citations omitted). Defendant therefore "bears a heavy burden." *Id.*

## **ARGUMENT**

Defendant and De Castro—as Judge Torres specifically remarked—want to "have [their] cake and eat it too where [De Castro] claims that the $900,000 is 'hers and hers alone,' and, in the same breath, suggest[s] that [Defendant] has some legal interest to secure the assets for the former couple's children." (Order at 10, ECF No. 468 (quoting Rasco Decl. ¶ 5, ECF no. 427-3).) The irrationality of Defendant's and De Castro's argument is—*if* they share a *common legal interest* in the Subject Asset to support a JDA (also referred to as the common-interest doctrine), then the Government must prevail in this ancillary proceeding. *See* 21 U.S.C. § 853(n)(6) (to prevail, third-party petitioner must show "a *legal* right, title, or *interest* in the property … [that] was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture") (emphasis added).[6] If they share a *common legal interest*, De Castro cannot claim to have a *superior legal interest* to Defendant. Defendant's efforts to dance around this reality preclude him from establishing that the common-interest doctrine applies. The Court should affirm Judge Torres' Orders, and deny Defendant's efforts to have his cake and eat it too by raising a JDA and expanding

---

[6] De Castro also alleged she was a *bona fide* purchaser for value but admitted under oath not to have funded the asset. *See supra* note 3.

the scope of marital communications where the facts do not support either.

1.      ***The Court should affirm Judge Torres's ruling that no JDA applies.***

      a.     **Defendant does not identify a common *legal* interest with De Castro to establish JDA that would support the common-interest doctrine.**

Defendant contends Judge Torres erred in finding he lacked a valid JDA with De Castro. But like before Judge Torres, Defendant fails to meet his burden to show he shared a common *legal* interest with De Castro. He thus cannot show Judge Torres's ruling was clearly erroneous.

The joint-defense or common-interest doctrine[7] is not itself a privilege, but an exception to the rule that disclosure of privileged materials waives privilege. *Del Monte Int'l GMBH v. Ticofrut, S.A.*, 2017 WL 1709784, at *7 (S.D. Fla. May 2, 2017). The doctrine "applies only 'when the parties have a shared interest in actual or potential litigation against a common adversary, and the nature of their common interest is *legal*, and not solely commercial.'" *Id.* (emphasis in original) (citation omitted); *Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 18 (E.D.N.Y. 1996) ("The parties claiming protection under the doctrine must show that they had a common legal, as opposed to commercial, interest, and that they cooperated in formulating a common legal strategy."). "A shared interest in the outcome of litigation, or the fact that an opponent is a common adversary, is insufficient to justify successful invocation of the common interest doctrine." *Del Monte*, 2017 WL 1709784, at *7 (citation omitted).

Defendant fails to identify any *legal* interest he shares with De Castro in the Subject Asset, state civil suit over it, or this ancillary litigation. He purports his "shared common legal interest and legal strategy" is "to secure *Ms. De Castro's rights* to the $900,000 from the sale of the IWM interests that De Castro had obtained from her husband Hernandez" and "to protect [the $900,000]

---

[7] Courts refer to the same doctrine as "joint defense" or "common interest." *Spencer v. Taco Bell, Corp.*, 2013 WL 12156093, at *2 (M.D. Fla. Apr. 23, 2013).

from the unjustified predations of the government, to the benefit of the couple's children." (Obj. at 4, 5 (emphasis added); *id.* at 14 ("they shared a unified interest to prevent the forfeiture of $900,000 (as part of Hernandez's sentence and punishment in this criminal case) and to preserve the $900,000 *for De Castro (its rightful owner)* for the care of the Hernandez / De Castro minor children.") (emphasis added); *accord* Rasco Decl. ¶¶ 5-6, 12-13 (De Castro identifying a "common legal interest" as "securing Ms. De Castro's rights in the $900,000 Asset, primarily to ensure that the Asset – which was hers and hers alone – would be secured for Ms. De Castro to provide for their three children," and a "common legal strategy" to "force a favorable settlement" in the state litigation and "establishing fact-based defenses" in this forfeiture proceeding).)

As Judge Torres correctly held, none of the above identifies a common *legal* interest Defendant shares with De Castro. (Order at 9-11.) At best, Defendant proffers a rooting interest in the outcome of litigation against a common adversary; that he hopes to help vindicate his ex-wife's rights. A rooting interest for De Castro is insufficient, and although it could be characterized as a personal or commercial interest, is not a legal interest. *Del Monte*, 2017 WL 1709784, at *7 ("A shared interest in the outcome of litigation, or the fact that an opponent is a common adversary, is insufficient to justify successful invocation of the common interest doctrine."); *McCullough v. Fraternal Ord. of Police, Chi. Lodge 7*, 304 F.R.D. 232, 240 (N.D. Ill. 2014) ("A shared rooting interest in the 'successful outcome of a case' is not a common legal interest."). Judge Torres correctly found, "[i]ndeed, the only connection that Mr. Hernandez Frieri has with respect to the $900,000 asset is his status as the former husband of Ms. De Castro and the father of three children. … to the extent Ms. De Castro suggests that Mr. Hernandez Frieri had a desire to help her succeed in litigation, that too is equally insufficient." (Order at 10-11 (citing and quoting *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props LLC*, 2002 WL 1334821, at *3 (S.D.N.Y. June 19, 2002) ("Sharing a desire to succeed in an action does not create a 'common interest.'")).)

On appeal, Defendant again bears the "heavy" burden to establish that the common-interest doctrine applies, and all necessary elements have been met. *Del Monte*, 2017 WL 1709784, at *7 (citing *Bridgewater v. Carnival Corp.*, 286 F.R.D. 636, 639 (S.D. Fla. 2011)); *Spencer*, 2013 WL 12156093, at *2. Defendant attempts to divert the Court's attention from that relevant inquiry over a common legal interest by trying to shore up his "connections" to the Subject Asset. (*Compare* Obj. at 12-13 *with* Order at 10.) In his appeal, Defendant proceeds to list five "connections" he had to the Subject Asset in hopes they can overcome his failure to identify a legal interest: (1) he obtained minority membership interest in IWM during his marriage; (2) he was a director of IWM while De Castro, his then wife, did some tasks for the company; (3) he transferred his interest to De Castro while they were married; (4) the Subject Asset was forfeited as part of Defendant's criminal case; and (5) Defendant currently is incarcerated for the next few years as a result of his laundering conviction in the above-captioned case, leaving De Castro, his now ex-wife, to support their minor children. (Obj. at 12-13.)

None show Defendant shared a legal or any interest with De Castro, especially during the relevant time period. Tellingly, the first three "connections" occurred before or at the time Defendant purportedly divested himself of the Subject Asset (which occurred by 2015), and it is unclear how those "connections" support Defendant having any legal interest to evidence the purported JDA as of 2019. (ECF No. 460 at 2 (De Castro claims JDA arose in December 2019).) As noted above, the fifth "connection" is not a connection at all and is, at best, a rooting interest.

Turning to the fourth "connection," that "the government sought forfeiture of De Castro's $900,000 as purported substitute assets of Hernandez and proposed that the funds be forfeited as part of Hernandez's sentence and punishment in this criminal case." (Obj. at 13 (emphasis omitted).) This underscores the fatal flaw in Defendant's and De Castro's quixotic quest to invoke the JDA and common-interest doctrine. To do so, they must establish they share a legal interest.

De Castro, however, opposes forfeiture by claiming the Subject Asset solely is hers. To the extent that Defendant, in the context of the JDA, admits he does share a common legal interest with De Castro, he establishes De Castro's petition must fail. 21 U.S.C. § 853(n)(6)(A) (petitioner must show *superior* legal interest). In other words, if the common-interest doctrine applies, then De Castro and Defendant recognize that Defendant shared a legal interest with her in the Subject Asset, which was forfeited. (3rd Preliminary Order of Forfeiture, ECF No. 280.)

These "connections" do not advance Defendant's argument that a JDA applies. Failing to identify a common *legal* interest, Defendant cannot meet his burden to establish the common-interest doctrine applies, or that Judge Torres's ruling was clearly erroneous. *Bridgewater*, 286 F.R.D. at 639 (failure to prove any element of privilege causes privilege to fail).

   b.   **Defendant's reliance on *Almeida* and *Caterpillar* is misplaced.**

In another attempt at misdirection, Defendant argues on appeal that the exception afforded by a JDA should apply here because the circumstances of other cases warranted such protection, citing to *United States v. Almeida*, 341 F.3d 1318 (11th Cir. 2003), and *Companhia Energetica Potiguar v. Caterpillar Inc.*, 2015 WL 13779201, at *1 (S.D. Fla. Nov. 5, 2015). In doing so, Defendant appears to be arguing for a nearly limitless application of the JDA, contrary to law.

First, Defendant relies largely on *Almeida* to argue that "joint ownership of an asset" is not required to establish a JDA. (Obj. at 8-12; *see also id.* at 6-7.) Judge Torres did not rule on ownership of the Subject Asset, and Defendant misstates what *Almeida* held and misapplies the case. *Almeida* concerned two defendants charged as co-conspirators in the same indictment, who entered into a JDA to "coordinate" their defense. *Almeida*, 341 F.3d at 1319-20; *see* Indictment, *United States v. Fainberg et al.*, Case No. 97-CR-054 (S.D. Fla. filed Jan. 28, 1997). Ultimately, one co-defendant cooperated against the other. *Id.* at 1320. While it addressed the common-interest doctrine, the Eleventh Circuit presumed the JDA existed and the question on appeal was what

12

happens to joint communications when one defendant decides to testify for the Government. *Id.* at 1323-26. At trial, the question was what information, shared during the joint defense, could be used on cross examination. *Id.* at 1320. The Eleventh Circuit held "that [the testifying defendant] waived his attorney-client privilege when he turned state's evidence, thereby entirely removing the possibility of a conflict of interest from the case." *Id.* at 1324.

Defendant recognizes *Almeida* requires him to prove a common legal interest, but argues that under *Almeida*, he need not show "joint ownership" of property (Obj. at 8-9 (asking "how the two defendants in *Almeida* had a greater *common legal interest* against the United States government than Hernandez and De Castro do in this case") (emphasis added).) This argument ignores that to identify if parties share a common legal interest a court must look to the subject matter of the actual or threatened litigation. In *Almeida*, the litigation was a prosecution of co-defendants, and the JDA related to defending against the common charges.[8] And both defendants in *Almeida* certainly had a legal interest in the outcome of that litigation—each could be found guilty and face prison and other penalties. That is a far cry from here—where De Castro claims the Subject Asset is "hers and hers alone," and the JDA purportedly arose in pursuing state litigation over her legal interest in the property. (Rasco Decl. ¶ 5.) Because the litigation here concerns property (money), the common legal interest must relate to that property. Indeed, Defendant's and De Castro's own efforts to articulate a common legal interest focus on the Subject Asset. (Obj. at 4, 5, 14.) As Judge Torres properly found, those efforts just do not meet their burden. (Order at 6-11.)

_____

[8] Defendant argues that "[u]nder Judge Torres' order, co-defendants in criminal cases could not enter into valid joint defense agreements unless they also admit ownership of assets the government seeks to forfeit." (Obj. at 12.) For the reasons described above, that is wrong. Judge Torres ruled on whether Defendant (and De Castro) established the elements of a JDA, which analysis would still apply in criminal cases.

Defendant's reliance on *Caterpillar*—a case cited to counter *Del Monte*[9] and in which a JDA was upheld—similarly is misplaced. In *Caterpillar*, the JDA arose out of a common threat of litigation. There, the purchaser of defective generators sent a demand letter to both the seller and manufacturer of the generators. Upon receipt of the demand letters, the seller and manufacturer entered into a JDA. *Id.* The purchaser ultimately sued the manufacturer only, who, in turn, labeled the seller an indispensable party. *Id.* at *2. Judge Goodman found the JDA existed when the parties received the demand letter, which was "powerful evidence that [the manufacturer and seller] share a common *legal* interest in dealing with the threatened claim (and then the actual claim, after the lawsuit was filed)." *Id.* at *4 (emphasis added). That the manufacturer later suggested the seller could be sued and held liable did not vitiate the earlier agreement, or any continued joint defense against the plaintiff. *Id.* at *5.

The facts as asserted by Defendant and De Castro, however, do not comport. Here, if Defendant and De Castro are to be believed, the JDA purportedly arose over the Subject Asset which De Castro claims is "hers and hers alone" in "the very end of 2019," when she filed a state-court lawsuit against Holtz, in which Defendant was not a party.[10] (De Castro 2d Resp. at 2, ECF

---

[9] Defendant similarly argues that in *Del Monte*, Judge Goodman did "not require common ownership of assets to sustain a joint defense." Again, that case did not concern litigation over interest in an asset. In *Del Monte*, defendant claimed a joint privilege with another company after the plaintiff threatened litigation and the companies entered into an indemnity agreement "designed to 'assuage any concerns [defendant] may have had about continuing to purchase pineapples[from a company other than plaintiff].'" 2017 WL 1709784. Judge Goodman held that that was "insufficient to establish a common *legal* interest (as opposed to a commercial or business interest)." *Id.* at *10 (emphasis in original).

[10] The fact that Defendant and De Castro claim the JDA began with De Castro's state-court suit undercuts any claim that, by virtue of both being involved in this case (albeit very differently—Defendant as a criminal defendant, De Castro as a third-party petitioner in ancillary forfeiture proceedings) they share a common interest. If the purported JDA began with De Castro's civil suit (to which neither Defendant nor the Government were parties), later having the Government as a "common adversary" was immaterial to the genesis of their purported JDA.

No. 460; De Castro Resp. at 9.) There was no threat of lawsuit against Defendant.

In short, Defendant still fails to establish any shared legal interest sufficient to support the common-interest doctrine, and his efforts to expand the doctrine to anyone who holds any amorphous "interest" in a litigation runs counter to well-settled law on privilege. *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987) ("[P]rivilege is not a favored evidentiary concept in the law since it serves to obscure the truth, and it should be construed as narrowly as is consistent with its purpose."); *Del Monte*, 2017 WL 1709784, at *7 ("[P]rivileges are 'not lightly created nor expansively construed, for they are in derogation of the search for truth.'") (citations omitted). He thus has failed to show Judge Torres's decision was clearly erroneous.

### c.   Defendant's purported reliance on advice of counsel cannot create privilege where none exists.

Recognizing he cannot show a common legal interest, Defendant asks to the Court to cloak his communications with privilege because he "reasonably believed" his communications would be protected after his criminal-defense attorney purportedly encouraged the conversations with third parties. This should be rejected out of hand.

Defendant's argument effectively would eliminate the need to establish any of the elements necessary to invoke the common-interest doctrine, so long as a client subjectively believed he could talk with a third party because an attorney said so. That turns privilege law on its head and effectively eliminates waiver, giving attorneys the power to bless a client to talk with any third party without waiver. Courts have rejected this very same argument to provide a blanket attorney-client communication privilege in the context of the common-interest doctrine.[11] *See, e.g.*, *Strougo*

---

[11] This argument also must fail because it was not supported by affidavit. *Del Monte*, 2017 WL 1709784, at *6 (proponent of privilege must establish facts by affidavit). But because Defendant's argument is wrong legally, an affidavit, or opportunity to present one, would not matter. Also, a district court cannot consider evidence or argument presented for the first time on appeal. *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 92 (3d Cir. 1992); *United States v. Garcia-Reyes*, 2020 WL

*v. BEA Assocs.*, 199 F.R.D. 515, 525 (S.D.N.Y. 2001) ("Regardless of the client's subjective belief, the attorney-client privilege is waived for communications made in the presence of third parties who are objectively not necessary to informed attorney-client contact.").

Defendant's referenced caselaw is inapposite, and a close reading shows it actually supports the Government's position. Defendant cites cases concerning application of first-person attorney-client privilege (as opposed to here, where we are discussing a common-interest doctrine exception to waiver), where an individual consults with someone he or she reasonably believes is an attorney for legal advice. (*See* Obj. at 15-16.) That is not the situation here. Defendant does not claim he sought legal advice from Mr. Rasco on the "genuine, but mistaken belief" that Mr. Rasco was Defendant's attorney. Rather, with full knowledge that Mr. Rasco was an attorney who did *not* represent him,[12] Defendant spoke with him (and De Castro) anyway. Defendant's own caselaw establishes that his subjective belief, where he knew Mr. Rasco did not represent him, cannot transform otherwise unprivileged conversations into privileged ones:

> Because Mrs. Clinton **does not claim that she believed that the White House lawyers represented her personally**, her argument must be that she believed that the law sweeps broadly enough to cloak these conversations within the attorney-client privilege. But **we know of no authority, and Mrs. Clinton has cited none, holding that a client's beliefs, subjective or objective, about the law of privilege can transform an otherwise unprivileged conversation into a privileged one**. … we are satisfied that there is no compelling reason that a reasonable-mistake-of-law rule should apply in the realm of privileges.

*In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 923-24 (8th Cir. 1997) (emphasis added)

---

3490182, at *1 (M.D. Fla. June 26, 2020) ("Because Defendant raises new arguments for the first time on appeal, the Court is hard-pressed to find the Magistrate Judge's order to be contrary to law or clearly erroneous," applying Crim. R. 59(a)); *Nasdaq, Inc. v. Miami Int'l Holdings, Inc.*, 2020 WL 8920588, at *4 (D.N.J. Mar. 10, 2020) ("Court may not consider new evidence on appeal that was not presented to the Magistrate Judge, as the Court cannot rely on such new evidence to determine whether the Magistrate Judge's ruling was clearly erroneous or contrary to law.").

[12] Indeed, Defendant testified that Mr. Rasco was not his attorney. If there were an attorney-client relationship between Mr. Rasco and Defendant, he would just invoke the attorney-client privilege.

(cited by Defendant, Obj. at 16).

What's more, Defendant and De Castro claim privilege over numerous e-mails between them without any attorney. (*See* Am. Priv. Log at 11, ECF No. 459-1.) Defendant does not even attempt to explain how those communications fall within his own cited caselaw. They do not.

### d. Defendant never requested a hearing.

Defendant claims that he requested a hearing with Judge Torres. (Obj. at 16-17.) This is revisionist reading of the text of his motion to manufacture an issue on appeal. Defendant did not request a hearing. Rather, he "request[ed] an opportunity to be heard." (ECF No. 444 ¶ 2.) That request should be read in light of the fact that he "is not a party to the ancillary forfeiture proceedings giving rise to Judge Torres' order." (Obj. at 2.) Defendant was heard; Judge Torres granted his motion to "join[] in the assertion of the joint defense privilege by Olympia De Castro," and considered his arguments when granting the Government's motion. (Order, ECF No. 470.)

### 2. *The Court should affirm Judge Torres's ruling that the marital communications privilege did not survive De Castro's divorce filing.*

Defendant also appeals from Judge Torres's ruling that the marital communications privilege terminated on May 22, 2019. (Obj. at 17-19.) Defendant, however, never joined in De Castro's assertion of the marital privilege below. In any event, he fails to show Judge Torres's ruling was clearly erroneous.

Below, Defendant only "join[ed] in the assertion of the joint defense privilege by Olympia De Castro in ECF#427." (Joinder at 1, ECF No. 444; *accord* Joinder Reply, ECF No. 451 (addressing only joint-defense privilege).) He did not join De Castro's arguments on the marital privilege. (*See* Joinder; Joinder Reply.) Because Defendant never joined the argument below, he cannot raise this argument on appeal. *E.g.*, *United States v. Kirkland*, 637 F.2d 654, 656 n.2 (9th Cir. 1980) ("Kirkland joins in this argument on appeal, but he did not object to the instruction

below and cannot therefore raise it now.").

If the Court were to consider Defendant's substantive arguments for the first time on appeal, he fails to show Judge Torres's ruling was clearly erroneous. Defendant's assertion of marital privilege suffers from the same flaws that Judge Torres noted doomed De Castro's arguments. In *Singleton*, the Eleventh Circuit observed that "[t]he unanimous rulings of other circuit courts … have held that marital communications made while the parties are legally married but permanently separated are not privileged," and then held "the [marital communication] privilege is not available when the parties are permanently separated; that is, living separately with no reasonable expectation of reconciliation." 260 F.3d at 1300-01 & n.2 ("[M]arital communication privilege is not available in cases of permanent separation prior to divorce"). "[T]here is no reasonable basis for asserting the privilege when the marriage is 'moribund,'" and after separation, "the reasonableness of the expectation of the spouse who asserts the privilege that the communication will be kept confidential is diminished." *Id.* ("less societal interest in protecting the marital relationship of permanently separated spouses ….'") (citation omitted). To determine whether there was a permanent separation, the Eleventh Circuit directs courts to consider whether the couple was cohabitating, among several other factors, and if not, how long were they separated for, and had either spouse filed for divorce. *Id.* at 1301.

Here, Defendant and De Castro's divorce was "moribund" by the time De Castro filed for divorce on May 22, 2019. Although Defendant continued to reside with De Castro in court-ordered home confinement after she filed for divorce while he was on pre-trial release, De Castro's sworn statements establish that, under *Singleton*, Defendant and De Castro permanently were separated as a couple when De Castro filed for divorce. Any marital privilege did not extend past that day.

De Castro's decision to divorce Defendant was a considered one, made in advance of her May 22, 2019 filing. (*See* May 16, 2019 e-mail, ECF No. 454-1 (De Castro writing, "I will file for

divorce next week regardless of what happens tomorrow. As a single mother provider for three children – and under the circumstances – a divorce does not feel premature to me.").) De Castro testified that she "made up [her] mind to get divorced" while Defendant was still in Italy pending extradition proceedings and before he returned to the United States (2/8/21 Tr. at 52:22-53:13), which happened in early May 2019 (*see* Status and Minute Entry, ECF Nos. 93, 95). After Defendant obtained bond, De Castro served him with divorce papers, and later, under oath, testified that she allowed Defendant to stay in the home only "so he could be with the children." (2/8/21 Tr at 53:19-22.) Although they continued to live under the same roof, De Castro affirmed she and Defendant no longer were together. (De Castro Hibiscus Petition at 10 n.1, ECF No. 262 ("[W]hile Ms. De Castro [] allowed [Defendant] to reside at her home until his sentencing for the sake of their children, the parents are no longer a couple").) Defendant's friend Jorge Mora[13] also testified that Defendant and De Castro lived separately even if under the same roof. (5/7/21 Tr. at 97:19-23, ECF No. 431-2 ("they're living in separate rooms and under the same roof. I'm not exactly sure what other living arrangements you would want them to have given that [the Government has] frozen all the assets").)

Like De Castro argued before Judge Torres, Defendant's arguments on appeal rely solely on the fact that he lived with De Castro to assert that it was "objectively reasonable" for him to expect communications to remain confidential. (Obj. at 19.) There are two fatal flaws with that argument. First, Defendant's "expectation" is immaterial. The question is whether there is societal interest in protecting communications in a moribund relationship, not whether Defendant "expects" them to be protected. *Singleton*, 260 F.3d at 1300; *see also supra* (subjective beliefs do

---

[13] Jorge Mora wrote letters to the Court on Defendant's behalf, posted $145,000 for Defendant's bond, paid $225,000 for Defendant's attorneys, and paid Defendant's fine imposed by the Court. (ECF Nos. 50, 365-2 at 58; 5/7/21 Tr. at 145:20-147:9; 152:17-153:3; ECF No. 438 ¶ 6.)

not create privilege). Second, and more fundamentally, living together does not alone determine whether the privilege applies. As Judge Torres observed, "*Singleton* never makes cohabiting a controlling factor; rather, it is one factor to be considered among others." (Order at 14-15); *see Singleton*, 260 F.3d at 1301 (instructing courts to consider whether couple was cohabiting among other factors).

Further undercutting Defendant's argument that "cohabitation" here suggested a viable marriage—Defendant continued to reside with De Castro for well over a year even after their divorce was final. So, while true that Defendant and De Castro lived (and continued to live even post-divorce) under the same roof, that was not indicative that they were "cohabitating" as a couple as of May 22, 2019 (they were not). *Accord Atkinson v. Atkinson*, 157 So. 3d 473, 479 (Fla. 2d DCA 2015) (cohabitation requires more than the "mere presence" under the same roof). As Judge Torres observed, the above "suggests that, while the former couple may have been living under the same roof, they did so only for the sake of their children because the marital relationship terminated the day Ms. De Castro filed for divorce." (Order at 15.)

Finally, "[o]nce the Government opposed the allowance of the [marital] privilege, the burden of proof was on the [proponent] to prove by a preponderance of the evidence that she and [her husband] were not permanently separated at the time of the subject communication." *Singleton*, 260 F.3d at 1301. Here, after the Government opposed De Castro's assertion of the marital privilege, neither she nor Defendant proffered any additional facts (beyond living under the same roof) to indicate their marriage had a chance of survival after she filed for divorce or otherwise had a pulse. (*See* Order at 17-18 (Judge Torres observing De Castro "fail[ed] to rely on anything to meet her burden of showing reconciliation.").)

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

By:_____/s/_____
Joshua Paster, Court ID No. A5502616
Nalina Sombuntham, Fla. Bar No. 96139
Assistant United States Attorneys
99 N.E. 4th Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9342
Facsimile: (305) 536-4089
joshua.paster@usdoj.gov
nalina.sombuntham@usdoj.gov
*Counsel for United States of America*