**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 18-CR-20685-WILLIAMS/TORRES

UNITED STATES OF AMERICA,

     Plaintiff,

 vs.

GUSTAVO ADOLFO HERNANDEZ FRIERI,

     Defendant.

and

OLYMPIA DE CASTRO,

     Third-Party Petitioner.
_____/


DEPOSITION OF
GUSTAVO ADOLFO HERNANDEZ FRIERI


Taken on Behalf of the Plaintiff


DATE TAKEN:  20th Day of July, 2021
PLACE:       Videoconferencing
TIME:        Scheduled for 10:00 a.m.
             Commencing at 10:16 a.m. to
                        6:30 p.m.


Examination of the witness taken before:


Jared Orozco
Court Reporter
Empire Legal Reporting
110 SE 6th Street, Suite 1700
Fort Lauderdale, FL 33301
(954)241-1010

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

```
 1    APPEARANCES:

 2             On behalf of the Plaintiff:
               NALINA SOMBUNTHAM, ESQUIRE
 3             DEPUTY CHIEF
               ASSET FORFEITURE DIVISION
 4             99 NE 4th Street
               7th Floor
 5             Miami, FL 33132
               305-961-9224
 6             Nalina.sombuntham@usdoj.gov

 7             JOSHUA PASTER, ESQUIRE
               KURT LUNKENHEIMER
 8             U.S. ATTORNEY'S OFFICE
               SOUTHERN DISTRICT OF FLORIDA
 9             99 NE 4th Street
               Miami, FL 33132
10             305-961-9342
               Joshua.paster@usdoj.gov
11             Kurt.lunkenheimer@usdoj.gov

12             On behalf of the Defendant:
               HOWARD SREBNICK, ESQUIRE
13             JACKI PERCZECK, ESQUIRE
               MICHELE VAN MEETEREN, ESQUIRE
14             BLACK SREBNICK KORNSPAN & STUMPF, PA.
               201 S Biscayne Boulevard
15             Suite 1300
               Miami, FL 33131-4311
16             305-371-6421
               Hsrebnick@royblack.com
17

18             On behalf of the Third Party Petitioners:

19             SAM RABIN ESQUIRE.
               SAMUEL J. RABIN, JR., P.A.
20             1 SE 3rd Avenue
               Suite 2600
21             Miami, FL 33131-1715
               305-358-1064
22             Sjr@miamilawyer.com
               Representing Allison Dominguetti
23

24

25
```

## EXHIBIT B

```
 1              MARGOT MOSS, ESQUIRE
                MARKUS/MOSS PLLC
 2              40 NW 3rd Street
                Penthouse 1
 3              Miami, FL 33128-1838
                305-379-6667 x308
 4              Mmoss@markuslaw.com
                Representing 314 Hicks LLC, Olympia De
 5              Castro, GHDC, FHDC, and AHDC

 6              GUY RASCO, ESQUIRE
                DEVINE GOODMAN & RASCO, LLP
 7              2800 Ponce De Leon Boulevard
                Suite 1400
 8              Coral Gables, FL 33134-6921
                305-374-8200
 9              Grasco@devinegoodman.com
                Representing Olympia De Castro
10
                RICHARD KLUGH, ESQUIRE
11              RICHARD C. KLUGH, P.A.
                40 N.W. Third Street
12              Penthouse 1
                Miami, FL 33128
13              305-536-1191
                Rickklu@aol.com
14              Representing Maria Lucia Hernandez,
                America Fiduciary Limited, HH Senema Trust,
15              3 Gramercy Park LLC, Gramercy Irrevocable
                Trust
16

17

18
                          -   -   -
19

20

21

22

23

24

25
```

**EXHIBIT B**

1                   I N D E X

2   Deposition of: Gustavo Adolfo Hernandez Frieri   Page
    Direct Examination BY MS. SOMBUNTHAM              7
3   Certificate of Oath                            175
    Certificate of Reporter                        176
4

5

                 GOVERNMENT'S EXHIBIT INDEX
6
    No.  Description                            Page
7   12   Closing Report of 3 Gramercy Park West:   10
         Bates 183-03 - 234-03
8   23   Draft of Purchaser's Rider Contract of    28
         Sale for 314 Hicks: Bates 369-03 -
9        373-03
    19   July 14, 2020 E-mails: 1319-03 -          29
10       1320-03
    20   House Lease: Bates 374-03 - 393-03        30
11  21   E-mail August 18th, 2020: Bates 1296-03   32
         - 1298-03
12  22   E-mail: Bates 1288-03 - 1293-03           35
    6    Stribling Letter: Bates 76-03 - 1A2-03    40
13  11   Occupancy Agreement: Bates 0DC000363      54
    15   Nagel Letter: Bates 365-2                 79
14  18   Document                                  87
    17   Artwork Document                          94
15  8    3 Gramercy Park West LLC Operating       100
         Agreement
16  10   Written Consent of Authorized Person     101
         Naming Manager for 3 Gramercy Park West
17       LLC: Bates 7880-03
    9    Amended and Restated Operating           105
18       Agreement of 3 Gramercy Park West LLC
    7    Gramercy Irrevocable Operating Trust     119
19       Declaration of Trust
    2    HH Master Settlement Trust Deed: Bates   128
20       1-03 - 19-03
    13   Amended and Restated HH Master           130
21       Settlement Declaration of Trust: Bates
         956-03-973-03
22  3    Letter: Bates 56-03                      135
    4    Certificate of Incorporation and         139
23       Memorandum and Articles of Association
         for HH Securities: Bates 20-03 - 51-03
24  5    Global Irrevocable Trust Declaration of  141
         Trust: Bates 57-03
25

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

## EXHIBIT B

| 1 | Articles of Association for Global Finance Management Corporation: Bates 494-03 - 523-03 | 144 |
| 14 | Document | 153 |
| 25 | E-mail Exchange: Bates ODC001900 | 160 |
| 26 | E-mail: Bates ODC001644 - ODC001648 | 162 |
| 27 | E-mail: Bates 1327-03 - 1330-03 | 164 |
| 28 | HVAC Maintenance Proposal ODC001685 - ODC 01686 | 165 |
| 29 | Rosillo E-mail: Bates ODC001978 - ODC001982 | 167 |
| 30 | Photo: 1749 NE Miami Park Apartment | 170 |

DE CASTRO'S EXHIBIT INDEX

* * * NONE * * *

**EXHIBIT B**

1        THE REPORTER:  The attorneys participating in

2    this deposition acknowledge that I, the court

3    reporter, am not present with the witness and that I

4    will be reporting the proceedings and administering

5    the oath remotely.  This arrangement is pursuant to

6    the Florida Supreme Court Administrative Order No.

7    AOSC-20-16 and extended by AOSC-20-17.  The parties

8    and their counsel consent to this arrangement and

9    waive any objections to this manner of reporting.

10   Please indicate your agreement on the record.

11       MR. SREBNICK:  On behalf of Gustavo Hernandez,

12   Howard Srebnick, no objection.

13       MR. RABIN:  On behalf of Allison Dominguetti,

14   no objection.

15       MS. MOSS:  On behalf of 314 Hicks LLC, Olympia

16   De Castro, GHDC, and FHDC, and AHDC, Margot Moss, no

17   objection.

18       MR. KLUGH:  Richard Klugh on behalf of my

19   client, no objection.

20       MR. RASCO:  No objection, Olympia De Castro.

21       MS. SOMBUNTHAM:  On behalf of the United States

22   no objection.

23   Thereupon,

24          GUSTAVO ADOLFO HERNANDEZ FRIERI,

25   having been first duly sworn or affirmed, was examined

**EXHIBIT B**

1  and testified as follows:

2          THE WITNESS:  I do.

3                  DIRECT EXAMINATION

4  BY MS. SOMBUNTHAM:

5      Q.   **Good morning, Mr. Hernandez Frieri.**

6      A.   Good morning, Ms. Sombuntham.

7      Q.   **I think there might be an echo.  I just want to**

8  **make sure it does not continue before we start.**

9          **So I know you are here with counsel today and**

10 **we went over who that counsel was.  For the record can**

11 **you repeat who is your counsel that is present with you**

12 **today?**

13     A.   Jackie Perczeck, Michele Van Meeteren, and

14 Howard Srebnick.

15     Q.   **And you are at their law offices today, is that**

16 **what I heard earlier?**

17     A.   Yes, I am.

18     Q.   **And you just took on oath earlier.  Do you**

19 **understand the nature of that oath?**

20     A.   Yes, I do.

21     Q.   **Do you understand that you are to fully answer**

22 **each question posed to you today?**

23     A.   Yes, I do.

24     Q.   **And if you are not sure of an answer or do not**

25 **have an answer or don't have a complete answer, you**

**EXHIBIT B**

1  still must answer the question to the extent that you

2  can.  Do you understand that?

3      A.   Yes, I do.

4      Q.   And you understand that you are testifying

5  today under penalty of perjury?

6      A.   Yes, I do.

7      Q.   And that any false answer, that can lead to

8  prosecution for false statement under Title 18 United

9  States Code Section 1001?

10      A.   Yes, I do.

11      Q.   And you understand that is a federal offense

12  that carries a maximum prison sentence of five years

13  and/or a fine of not more than 250,000?

14      A.   Yes, I do.

15      Q.   And just for the record, you are the defendant

16  in a criminal case related to the forfeiture asset

17  proceeding, that is criminal case number

18  18-CR-20685-WILLIAMS/TORRES?

19      A.   Yes, I am.

20      Q.   Mr. Hernandez, are you familiar with a property

21  located at 3 Gramercy Park West, Unit 2?

22      A.   Yes, I am.

23      Q.   And for today I will refer to that Unit 2 as

24  the Gramercy apartment.  How are you familiar with the

25  Gramercy apartment?

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1      A.    I resided in the Gramercy apartment.

2      Q.    **When did you first move into the Gramercy**

3   **apartment?**

4      A.    The first quarter of 2004.

5      Q.    **And when did you reside at the Gramercy**

6   **apartment?**

7      A.    From August, from the -- from September 2005 to

8   approximately the end of 2013 or early 2014.  I do not

9   recall exactly, but around that period.

10      Q.    **And did you find the Gramercy apartment?**

11      A.    Yes, I did.

12      Q.    **And at the time you found that Gramercy**

13   **apartment, were you married?**

14      A.    No, I was not.

15      Q.    **Did you have any children at the time?**

16      A.    No, I did not.

17      Q.    **At the time that you moved into the Gramercy**

18   **apartment, were you married?**

19      A.    No, I was not.

20      Q.    **And did you have any children at that time?**

21      A.    No, I did not.

22      Q.    **Do you recall how the Gramercy apartment was**

23   **paid for?**

24      A.    There were two payments.  One, which I believe

25   took place in December of 2004, and another payment,

**EXHIBIT B**

1    which took place in August of 2005.  The December 2004

2    payment would have been for the initial deposit, I do

3    not recall the actual percentage, but 10 percent or

4    thereabouts, and the residual amount would have been the

5    payment in August of 2005.

6         Q.   Mr. Hernandez, I'm going to share my screen

7    with you.  Do you see this?

8         A.   Yes, I do.

9         Q.   I'm showing what has been marked as

10   Government's Exhibit 12, which you produced with Bates

11   number starting as 183-03 and ending at 234-03.

12   (Government's Exhibit No. 12, Closing Report of 3

13   Gramercy Park West.  Bates 183-03 - 234-03 was marked

14   for identification.)

15   BY MS. SOMBUNTHAM:

16        Q.   Mr. Hernandez, do you recognize the document?

17        A.   Yes, I do.

18        Q.   What is it?

19        A.   I believe that's Holm and Ohara -- Michael

20   Landsman to be exact, an attorney at Holm & O'Hara, was

21   the attorney representing the purchase of the Gramercy

22   apartment, and that letter, I believe, from August 23rd,

23   2005, included the closing report for the closing of the

24   Gramercy apartment.

25        Q.   Mr. Hernandez, did you receive this closing

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1  report in August of 2005, or around that timeframe?

2      A.   I presume that I did.

3      Q.   And is this document a fair and accurate copy

4  of the closing report that you received on that date?

5      A.   I believe it should be, yes.

6      Q.   And you keep on saying you presume.  This is

7  something you produced in response to the subpoena.  Is

8  there any reason why you would think it is not an

9  accurate copy of the closing report you received in

10 August of 2005?

11     A.   No, there is no reason.  It's just that a

12 document from 2005 -- I believe that all the documents

13 that we produced -- and it's one that I recollect, yes.

14 I presume that it is, yes.

15     Q.   And this document was addressed to you, this

16 cover letter of the document on the first page; is that

17 correct?

18     A.   Yes, that is correct.

19     Q.   And there is a Brickell address, Suite 2030.

20 Is that your address at the time?

21     A.   Yes, that was a typo.  It should have been 701,

22 and it's is not "Bricknell," but "Brickell," but yes,

23 that was the address for Global Securities in Miami at

24 the time.

25     Q.   Mr. Hernandez, can you turn to page 6 of

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   Exhibit 12, and can you see this page?

2       A.   Yes, I can.

3       Q.   And what does this page show?

4       A.   If shows a reconciliation of an escrow

5   account -- well, the screen is moving, so I can't really

6   see it properly, but I believe it shows the

7   reconciliation of an escrow account.

8       Q.   And at the top of this page there is the

9   deposit into the escrow account?

10      A.   Yes.

11      Q.   And do you recognize what those deposits are?

12      A.   Yes, I believe that No. 1 reads in the

13  document, "Down payment (including interest)

14  290,514.77," which I believe was the initial deposit for

15  the purchase of the Gramercy apartment.  And below,

16  No. 2, is a wire transfer received on August 15th of

17  2005, for 2,670,000 for a total deposit into escrow

18  account of 2,960,514.77.

19      Q.   Are those the deposits and payments to purchase

20  the Gramercy apartment?

21      A.   Yes, I believe they are.

22      Q.   And how was the down payment made, the

23  290,514.77?

24      A.   My recollection is that the 290,514.77, were a

25  payment made by the trust law firm, Richards &

**EXHIBIT B**

1  Associates, to the Holm & O'Hara escrow account.  Holm &

2  O'Hara being the law firm representing the buyer in the

3  purchase.

4      Q.   And do you know how a wire transfer for $2.67

5  million was made?

6      A.   I do not recollect exactly, but my belief is

7  that it was, again, a wire transfer made by the HH

8  Master Settlement Trust to the Holm & O'Hara escrow

9  accurate.

10     Q.   And do you know whether HH Master Settlement

11  Trust would have had a bank account?

12     A.   Yes, I believe that, at the time, the primary

13  account for the HH Master Settlement Trust was with

14  Banco Atlantico Bank & Trust, which was a Spanish bank

15  and that was, I believe, the primary, or was, excuse me,

16  the primary account for the HH Master Settlement Trust.

17     Q.   And how did you know HH Master had a primary

18  account at Banco Atlantico?

19     A.   Because Banco Atlantico Bank & Trust was the

20  trustee for the HH Master Settlement Trust and the

21  banker with whom my father had a relationship was a

22  banker that worked for Banco Atlantico Bank & Trust.

23     Q.   How would you have known about the bank account

24  at Banco Atlantico?

25     A.   I worked for my family and had an understanding

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    of the different bank accounts and different finance

2    institutions and I knew these individuals personally

3    because my father had introduced me to them.  So that is

4    why I knew Banco Atlantico Bank & Trust, and how I knew

5    that the HH Master Settlement Trust had an account in

6    this bank.

7        Q.   Did you have access to that account at Banco

8    Atlantico?

9        A.   Excuse me?  Access in terms of?

10       Q.   Were you an account signatory or otherwise

11   authorized to conduct transactions with that -- with the

12   HH Master Settlement bank account?

13       A.   No, I do not believe that I had an account,

14   signature, excuse me, over the HH Master Settlement

15   account at Banco Atlantico.

16       Q.   At the time of the wire transfer of the

17   $2.67 million was made, do you know what the balance of

18   that account was or roughly what the balance was?

19       A.   No, I do not know what the balance would have

20   been at the time of this wire transfer.

21       Q.   Do you know what the source of the funds was?

22       A.   The HH Master Settlement Trust had an

23   investment portfolio constituted by, for the most part,

24   bonds, but also other finance instruments.

25       Q.   And how was that portfolio acquired?

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    A.   It was acquired in the open market, in finance

2  transactions in the open market.

3    **Q.   Did you disclose that the payments that were**

4  **made to the escrow account were being funded by someone**

5  **aside from you to anyone?**

6    A.   Did I disclose that the payment -- I apologize.

7  Can you please repeat that.

8    **Q.   Of course.  Did you disclose that the payments**

9  **that funded the purchase of the Gramercy apartment came**

10  **from someone besides you?**

11    A.   I have discussed with my attorneys the

12  purchase, but I don't recall discussing specifics with

13  the source of funds for the purchase of the Gramercy

14  apartment.

15    **Q.   At the time the Gramercy apartment was**

16  **purchased, did you tell anyone that it was being paid**

17  **for by HH Master Settlement?**

18    A.   Did I tell anyone?  I believe that at the time

19  of the purchase, the only individuals with whom we

20  conversed were the board of the 3 Gramercy apartment,

21  and the attorneys representing the trust, which would

22  have been in this case, Holm & O'Hara and Richards &

23  Associates, which had retained Holm & O'Hara.  So I'm

24  trying to remember here in 2005, I believe that those

25  would be the only individuals with whom I conversed, and

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   perhaps it may have also been something I discussed with

2   -- I believe that, I don't recall exactly if there was

3   anyone else in 2005 that I conversed with, but again,

4   the attorneys and the broker I do remember that we

5   discussed in 2005 -- 2004, 2005 about the purchase and

6   on the purchase of the Gramercy apartment by HH Master

7   Settlement Trust.

8   **Q.   So just to make sure I understand, you think**

9   **you talked to the board of the Gramercy apartment, and**

10  **perhaps the attorneys representing you in the purchase**

11  **about HH Master funding the purchase of the Gramercy**

12  **apartment?**

13  A.   To be clear, the attorneys represented the HH

14  Master Settlement Trust.  The attorneys were the

15  attorneys for the trust, and the attorneys incorporated

16  the entity which was constituted to hold the membership

17  interest in the co-ownership of 3 Gramercy Park West LLC

18  on behalf of the Gramercy Irrevocable Trust.

19  **Q.   Who authorized the use of funds to purchase the**

20  **Gramercy apartment?**

21  A.   My father.  Gustavo Hernandez authorized the

22  use of the funds to purchase the Gramercy apartment.

23  **Q.   Are there any documents to show that?**

24  A.   I do not know if there are any documents to

25  show that.

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    Q.    Is there anyone else aside from your family or

2    relatives that could confirm that?

3    A.    That can confirm that my father authorized the

4    purchase?

5    Q.    Yes.

6    A.    I do not know if my father would have discussed

7    it with his banker at the time.  I do not know if he

8    would have discussed it with anybody else other than the

9    family.  It was a family trust, and the purchase for the

10   family trust, so aside from his banker, I don't know he

11   would have discussed it with anybody else at the time.

12   Q.    And just to be clear, HH Master Trust is a

13   foreign trust?

14   A.    Yes, my father was a foreign national that

15   resided in Colombia and he had a trust domiciled in --

16   originally, well, in different -- this trust, if I

17   recall correctly, was domiciled in Canada.  But prior to

18   that, it was domiciled in the Bahamas.

19   Q.    And the Banco Atlantico, the principal account

20   at you said funded the wire transfer, is that a foreign

21   account?

22   A.    Foreign to the U.S. you mean?  Sorry.

23   Q.    Yes.

24   A.    Yes, I don't -- My father, again was a foreign

25   national, and he had most of his accounts and entities

**EXHIBIT B**

1    in these domiciles, foreign domiciles, yes.

2        Q.    Did you ever represent that you were purchasing

3    the Gramercy apartment?

4        A.    Did I ever represent that I was purchasing the

5    Gramercy apartment?  No, I do not believe that I did.

6        Q.    Did you ever represent that you were the

7    beneficial owner of the Gramercy apartment?

8        A.    I believe that I represented that my family was

9    the beneficial owner of the Gramercy apartment.

10       Q.    Did you ever represent that you were the

11   beneficial owner of the Gramercy apartment?

12       A.    No, I believe that I did not.

13       Q.    Mr. Hernandez, what is 3 Gramercy Park West

14   LLC?

15       A.    3 Gramercy Park West LLC is a corporation

16   established in 2000 for the purchase of the membership

17   interest in the Gramercy co-ownership.

18       Q.    And that purchase of the membership of the

19   Gramercy ownership, did that result in the purchase of

20   the Gramercy apartment?

21       A.    Yes, it did.

22       Q.    And so why was the Gramercy apartment purchased

23   in the name of a limited liability company?

24       A.    To my recollection, that is what the attorneys

25   of the trust had advised the trust to do.

**EXHIBIT B**

1       Q.     And why?

2       A.     I believe that -- all the investments of the

3   trust were executed by corporations in the case of

4   investments in the U.S., real estate in particular.  To

5   my recollection, all those investments were done by

6   limited liability corporations for the purposes of the

7   estate planning objectives of the trust.

8       Q.     **Was it to protect from a potential lawsuit?**

9       A.     Sorry?

10          MS. MOSS:  Can you repeat the question?

11  BY MS. SOMBUNTHAM:

12      Q.     **Do you know if the use of a limited liability**

13  **company was to protect from potential lawsuit?**

14      A.     I believe that yes, among other matters.  That

15  is one of the purposes that the attorneys would have

16  advised the trust to incorporate an LLC in order to

17  acquire the membership interests in the Gramercy

18  co-ownership.

19      Q.     **Can you be specific about any of the other**

20  **purchases?**

21      A.     I would presume that there would also be tax

22  planning considerations.  And potentially also others,

23  but that is what comes to mind.  Estate planning as in

24  protection of a family estate, and tax planning.

25      Q.     **When you say "estate planning," what do you**

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    mean?

2        A.   By estate planning, I mean the protection of

3    assets in the state of a family.

4        Q.   And, Mr. Hernandez, what do you mean by

5    "protection"?  Protection from what?

6        A.   In my experience, in holding an interest in an

7    asset, real estate or otherwise, that could be

8    potentially exposed to liabilities that could impair the

9    value of other assets held by the family.  And somehow

10   in the purchase of the Gramercy membership interest, I

11   believe that the estate planning considerations were

12   primarily, again, to plan for protection of assets and

13   potentially also fiscal considerations.

14       Q.   Mr. Hernandez, what was your role, if any, with

15   3 Gramercy Park West LLC?

16       A.   I served as manager for the 3 Gramercy Park

17   West LLC.

18       Q.   And I believe you testified earlier that you

19   lived in the Gramercy apartment for some time?

20       A.   Yes, I did.

21       Q.   And that was from approximately September 2005

22   through the end of 2013, maybe early 2014?

23       A.   Yes, I did.

24       Q.   And during that time period, did you maintain

25   the Gramercy apartment?

**EXHIBIT B**

1     A.   During that time period, I paid for the

2   maintenance fees due to the Gramercy Park Association.

3     Q.   Did you ever rent out the Gramercy apartment?

4     A.   I believe that there was a period, probably

5   2014 or 2015, I do not recall, where there was a

6   short-term rental in the Gramercy apartment.

7     Q.   Was that rental income deposited into a bank

8   account dedicated to 3 Gramercy Park LLC?

9     A.   To my recollection, and I'm not certain, but to

10   my recollection, 3 Gramercy Park West LLC did not have a

11   bank account.

12     Q.   And, Mr. Hernandez, you are not certain.  Why

13   are you not certain?

14     A.   Again, I do not believe that there was a bank

15   account, but I may be mistaken.  There were many

16   different global-related entities with bank accounts, I

17   do not remember there being a specific bank account for

18   3 Gramercy Park West LLC.

19     Q.   If there was a bank account, would you as

20   manager have opened that account?

21     A.   Yes, I believe that if there was a bank

22   account, I as manager would have opened the account.

23     Q.   And you testified earlier that you paid for

24   expenses and there was rental income.  Where was that

25   rental deposited if not in a 3 Gramercy Park West LLC

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    bank account?

2        A.    I do not recall where the rental income for the

3    3 Gramercy apartment would have been deposited in that

4    area of, I believe, 2014.

5        **Q.    And when you paid for expenses, do you recall**

6    **which bank account you used?**

7        A.    No, I don't recall what bank account I used.

8        **Q.    Would it have been a personal account?**

9        A.    Probably not but I am not certain if I used a

10   personal account or a corporate account for Global

11   Securities.

12       **Q.    And do you recall what you did with the rental**

13   **income from the Gramercy apartment?**

14       A.    I do not recall what was done with the rental

15   income.  I presume that this is just -- I don't know.  I

16   don't recall.

17       **Q.    Would they have been used for any personal**

18   **expenses?**

19       A.    I do not believe so.  I would presume that it

20   was used for maintenance, but again, I do not recall.

21   This was, I believe, the first semester of 2014.

22       **Q.    What happened to the Gramercy apartment?**

23       A.    The Gramercy apartment was sold.

24       **Q.    Why sell the Gramercy apartment?**

25       A.    I believe that the Gramercy apartment was sold

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   because the market in the area had already reached a

2   level that was optimum to sell.

3       **Q.   Mr. Hernandez, is your family moving to New**

4   **York?**

5       A.   My children and my ex-wife, I understand, will

6   relocate to New York in the fall of this year.

7       **Q.   And when you say "fall," is that before the**

8   **school year?**

9       A.   Yes, I believe they move for the beginning of

10  the school year.

11      **Q.   Do you know where they would be living.**

12      A.   I believe that they will reside in 314 Hicks.

13      **Q.   And why not move into the Gramercy apartment**

14  **rather than a new residence?**

15      A.   The Gramercy apartment was sold.

16      **Q.   So do you know when it was decided that your**

17  **children will be living at the townhouse in 314 Hicks**

18  **Street?**

19      A.   I do not know exactly when it was decided, no.

20      **Q.   When did you first learn that was a**

21  **possibility?**

22      A.   While I was still in Italy, my now ex-wife

23  communicated to me that she would want for the children

24  to go to school in New York.

25      **Q.   And while you were still in Italy, that was**

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1  when you had been arrested in Italy?

2      A.    That is correct.  I was arrested on July 28,

3  2018, while on a family vacation in Italy.

4      Q.    And at that time, had the Gramercy apartment

5  been sold?

6      A.    No.  At that time, the Gramercy apartment had

7  not been sold.

8      Q.    So was your discussion at the time with your

9  now ex-wife to move into the Gramercy apartment or

10  elsewhere in New York?

11      A.    I don't believe that I had any discussion with

12  my ex-wife regarding where she would want to live in New

13  York or elsewhere.

14      Q.    Were there ever plans for your children to move

15  to Vermont?

16      A.    My ex-wife has suggested different alternative

17  locations to move for the children, and I believe for a

18  period she considered to relocate to Vermont, Shoreham,

19  Vermont, to be exact.

20      Q.    And when was that, what period?

21      A.    I would say the first quarter of 2020, first or

22  second quarter of 2020.

23      Q.    So when was the period that it was decided to

24  move to instead the 314 Hicks Street townhouse?

25      A.    I believe subsequent to this, so after that

**EXHIBIT B**

second quarter.

    Q.    Do you know where your children will be going
to school in the fall?

    A.    Yes, I do.

    Q.    Where is that?

    A.    Poly Prep.

    Q.    And is how was that school chosen?

    A.    It is a well-known school.  I believe that the
main suggestion was made by the headmistress of the
prekinder where our children were enrolled in New York
and this lady recommended this school as an alternative.

    Q.    And you said "you believe."  Was that
recommendation made to you or someone else?

    A.    Not to me directly, no.  It was made to my
ex-wife by this lady that I am blanking now, but I
believe it was that recommendation and the introduction
that the headmistress of this pre-K made to the school
that led to the selection of Poly Prep as the
appropriate school to enroll the children.

    Q.    Mr. Hernandez, for the record, your ex-wife is
Olympia De Castro, one of the petitioners in these
proceedings?

    A.    Yes.

    Q.    And Poly Prep, do you know what the annual
tuition costs are?

**EXHIBIT B**

1    A.    No, I do not know.

2    Q.    **Any rough estimate?**

3    A.    I believe it is in the same range of the

4  current tuition of the school that they are currently

5  enrolled in.

6    Q.    **What happened to the proceeds of the sale of**

7  **the Gramercy apartment?**

8    A.    The Gramercy apartment was sold, I believe, in

9  2019 or 2020, and the proceeds went to the DC2019

10  Irrevocable Trust.

11    Q.    **Do you know what happened with that?**

12    A.    What happened with what?  I'm sorry.

13    Q.    **The proceeds of the sale of the Gramercy**

14  **apartment?**

15    A.    I believe that the DC2019 trust invested the

16  monies, but I do not know exactly what happened.

17    Q.    **You were present at the sentencing hearing**

18  **before Judge Torres; is that correct?**

19    A.    No, I was sentenced by Judge Williams.

20    Q.    **But you were present when your ex-wife Olympia**

21  **De Castro testified before Judge Torres ahead of your**

22  **final sentencing hearing; is that correct?**

23    A.    I believe that I listened into a hearing that

24  took place in front of Judge Torres.  If that is what

25  you are alluding to, yes, I did.

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    Q.    You were present at the hearing?

2    A.    To be clear, this was a video call that took

3    place.  If so, yes; I logged on to a hearing over Zoom,

4    I believe.

5    Q.    Were you involved in purchasing of the 314

6    Hicks townhouse?

7    A.    No, I was not involved in the purchase of the

8    314 Hicks property purchase.

9    Q.    Do you know when it was purchased?

10   A.    Yes.  I believe it was purchased in 2020.

11   Q.    Beginning, middle, or end of 2020?  Do you

12   know?

13   A.    I believe in the middle.

14   Q.    Have you helped in any way with the 314 Hicks

15   property?

16   A.    I helped with the dealing of some service

17   providers.  I believe the HVAC contractor and the --

18   another service provider that I am now blanking, but I

19   assisted Olympia, my ex-wife, in reaching out to service

20   providers for maintenance purposes of the 314 house.

21   Q.    You produced some documents relating to 314

22   Hicks, correct?

23   A.    Yes, I produced the documents related to 314

24   Hicks.

25        MS. SOMBUNTHAM:  I'm going to show, or well

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

 1    I'll share on my screen, what has been marked as

 2    Government's Exhibit 23.

 3  (Government's Exhibit No. 23, Draft of Purchaser's Rider

 4  Contract of Sale for 314 Hicks: Bates 369-03 -- 373-03

 5  was marked for identification.)

 6  BY MS. SOMBUNTHAM:

 7    **Q.   Can you see that?**

 8    A.   Yes, yes, I can.

 9    **Q.   And it has been Bates-stamped in your**

10  **production as 369-03, and it actually ends on 373-03.**

11  **Do you recognize this document?  And I'll turn to page 1**

12  **again.**

13    A.   Yes, I believe that I do.  It is the

14  purchaser's rider to contract of sale.  It appears to be

15  a draft of the purchaser's rider contract of sale for

16  the 314 Hicks house by the DC2017 Irrevocable Trust.

17    **Q.   And, Mr. Hernandez, when did you get this**

18  **document?**

19    A.   I do not recall when I received it exactly.

20    **Q.   How did you obtain this document?**

21    A.   I obtained it from my ex-wife, Olympia de

22  Castro.

23    **Q.   Why did you obtain this document?**

24    A.   I believe that there were some issues with the

25  inspector report, and she asked me if I could take a

**EXHIBIT B**

1    look at those issues that were in the form of a punch

2    list and give her a recommendation of service providers

3    that would help resolve for that.

4        Q.   So did you obtain this document before or after

5    the purchase of the 314 Hicks Street, Brooklyn, New York

6    property?

7        A.   And I do not know if it was before or after the

8    purchase that I obtained this document.

9             MS. SOMBUNTHAM:   I'm going to show you what has

10        been marked as Government's Exhibit 19, and which you

11        produced with Bates stamp numbers starting at 1319-03

12        and ending with 1320-03.

13   (Government's Exhibit No. 19, July 14, 2020 E-mails:

14   1319-03 - 1320-03 was marked for identification.)

15   BY MS. SOMBUNTHAM:

16       Q.   I'm going to back to page 1 of the exhibit.

17            Do you recognize this document, Mr. Hernandez?

18       A.   Yes, it is an e-mail exchange from July 14,

19   2020.

20       Q.   And why did you get this e-mail -- sorry.

21            And you received this e-mail; is that correct?

22       A.   Yes, I received an e-mail from my ex-wife,

23   Olympia De Castro, on July 14th, and I replied to that

24   e-mail on that same day.

25       Q.   And why did you receive this e-mail from your

**EXHIBIT B**

1  ex-wife?

2      A.   I believe she had received a proposal for the

3  maintenance of the 314 Hicks property from a company and

4  she said sent that proposal along to me because she

5  asked that I take a look at it and provide her feedback.

6      Q.   **Why would she send this to you and not someone**

7  **else?**

8      A.   Historically, I always take care of house

9  maintenance matters, so Olympia did not have knowledge

10  of contractors for house-maintenance-related matters,

11  and she would have asked me for my feedback since she

12  knows I did have knowledge of this, and that is what I

13  did.

14          MS. SOMBUNTHAM:  I'm going to now show you what

15      has been marked as Government's Exhibit 20.

16  (Government's Exhibit No. 20, House Lease:  Bates 374-03

17  - 393-03 was marked for identification.)

18  BY MS. SOMBUNTHAM:

19      Q.   **And this was produced by you, for the record,**

20  **with Bates numbers 374-03 to 393-03.  And I'm going back**

21  **to page 1.**

22          **Mr. Hernandez, do you recognize Exhibit 20?**

23      A.   Yes, I do.  This is the standard form of the

24  house lease in New York, and this template was completed

25  for the rental of the 3114 [sic] Hicks property in

**EXHIBIT B**

1   August of 2020.

2       Q.   **And how did you obtain this document?**

3       A.   I obtained this document from my ex-wife,

4   Olympia.

5       Q.   **Do you remember when you received this**

6   **document?**

7       A.   I do not remember exactly when I received it,

8   no.

9       Q.   **Do you remember if it would have been in 2020**

10  **or 2021?**

11      A.   I believe I could have received if in 2020 or

12  2021.

13      Q.   **Do you recall why Olympia would have sent you**

14  **this document?**

15      A.   I do not recall exactly why she would have sent

16  me this document.  I believe that there were certain

17  issues that the renter of the 3114 [sic] Hicks house had

18  with the house related to the maintenance of the house

19  and things that were not working properly, and Olympia

20  had asked to me to see what could be resolved regarding

21  those maintenance issues.  So I do not know if this

22  standard form of lease was related to those issues, and

23  that would have been the issue, the reason why I

24  received this document.

25              MS. SOMBUNTHAM:  I will now show you what has

**EXHIBIT B**

1       been marked as Government's Exhibit 21, and which you

2       produced with Bates numbers 1296-03 through 1298-03.

3   (Government's Exhibit No. 21, E-mail August 18th, 2020:

4   Bates 1296-03 - 1298-03 was marked for identification.)

5   BY MS. SOMBUNTHAM:

6       Q.   And I'm going turn back to the first page of

7   Government's Exhibit 21.

8            Mr. Hernandez, do you recognize this document?

9       A.   Yes, I do recognize this document.

10      Q.   And what is it?

11      A.   It is an e-mail chain in August 18th of 2020

12  between Olympia de Castro, my ex-wife, and myself.

13      Q.   And why are you on the e-mail chain?

14      A.   The e-mail shows Olympia exchanging with I

15  believe her broker, Ravi Kantha, and Leslie Garfield and

16  they are addressing what appears to be the rider to the

17  lease document that you showed earlier, and specifically

18  the insurance from my e-mail reflects and Olympia

19  forwarded me the e-mail with the rider.  There is no

20  text in the forward, so there is no explanation, but I

21  believe she sent the rider related to these insurance

22  issues for maintenance purchases of the lease contract

23  so I would review it and provide her my opinion.

24      Q.   What was the purpose of renting out the 314

25  Brooklyn townhouse?

**EXHIBIT B**

1  A.   I do not know the purpose.  I believe that

2  Olympia had originally decided to move to New York with

3  the children, but because of COVID, they postponed the

4  move and rented the property because they had no use for

5  it at the time.  That is my belief, but I am not

6  certain.

7  **Q.   And when you say that they postponed the move,**

8  **when did this occur?**

9  A.   I don't know exactly when it would have

10 occurred, but it would have occurred some time between

11 last year and this year.

12 **Q.   So the date of this e-mail is August 2020 and**

13 **you would agree that the pandemic hit in March of 2020?**

14 A.   I don't know when it ended or when it starts.

15 **Q.   My question is would it have been sometime**

16 **before this e-mail was sent to decide to postpone moving**

17 **to New York?**

18 A.   I would not be able to answer when she decided

19 to postpone the move to the New York due to the pandemic

20 or otherwise.

21 **Q.   So it would not have been before she decided to**

22 **rent out 314 Hicks?**

23 A.   I am presuming not because if she decided to

24 rent the property, then she would have decided not to

25 move, but again, that is my presumption.

**EXHIBIT B**

1    Q.   Would Olympia have told you if the kids were

2    moving out of the house that you guys resided together?

3    A.   I would like to say yes, but that is not always

4    the case.

5    Q.   Would you not have found out because you live

6    in the same residence with her?

7    A.   If I found out?  You mean if they would have

8    moved out?  Yes, I would have found out that they moved.

9    Q.   She and you discussed that she was planning to

10   move with the kids?

11   A.   Yes, I -- yes, that is correct.

12   Q.   And at some point, those plans changed; is that

13   correct?

14   A.   There have been many changes of plans, yes.

15   Q.   And you testified earlier about the 314 Hicks

16   rental, so the townhouse was actually rented out, and

17   you are aware of that; is that correct?

18   A.   Yes, I believe that the property was rerented

19   sometime last year in the summer.

20   Q.   And do you know who it was rented to?

21   A.   No, I do not know the renter.

22   Q.   Do you know how much rent income was received?

23   A.   No, I do not know the rental income.

24   MS. SOMBUNTHAM:  I'm going to show you what is

25   being marked as Government Exhibit 22, and this is

**EXHIBIT B**

1      from your production with Bates stamp number 1288-03,

2      and to the end, 1293-03.

3  (Government's Exhibit No. 22, E-mail:  Bates 1288-03 -

4  1293-03 was marked for identification.)

5  BY MS. SOMBUNTHAM:

6      **Q.   And then we are turning to the first page.**

7          **Do you recognize the document in Government's**

8  **Exhibit 22?**

9      A.   Yes, I recognize the document.

10      **Q.   What is it?**

11      A.   It is an e-mail that Olympia forwarded me on

12  September 28th of 2020 with a thread below from Moffit,

13  Steven on that same day, September 27, 2020, and I

14  believe the e-mail summarizes maintenance issues of the

15  house.

16      **Q.   And Steven Moffit is the renter of the 314**

17  **Brooklyn Hicks townhouse at the time?**

18      A.   For this e-mail change, yes.  Steven Moffit and

19  Andrea, I do not know her last name, appeared to be the

20  renters of the 314 Hicks house.

21      **Q.   And did you receive this e-mail in September of**

22  **2020?**

23      A.   Yes, I believe that the day after the e-mail

24  was sent by Moffit, Steven to Olympia with copies to an

25  Andrea, no last name, on September 27th; and Olympia

**EXHIBIT B**

1  forwarded the e-mail to me on September 28th, 2020?

2      Q.   And as you mentioned earlier, there are several

3  maintenance issues with the 314 Hicks Brooklyn townhouse

4  that were raised by the renter Steven Moffit; is that

5  correct?

6      A.   Yes, there appears to be leakage issues and

7  appliances that are not working properly, some issues

8  with keys, electrical outlets, and other maintenance

9  issues related to the house.

10     Q.   And why was Steven Moffit's e-mail to Olympia

11  de Castro sent to you?

12     A.   I believe that Olympia forwarded Steven

13  Moffit's e-mail to me to address the maintenance issues,

14  because I have looked the list of service providers for

15  maintenance purposes, and I believe she wanted a

16  recommendation as to who would address these maintenance

17  issues that Steven Moffit, the renter of the house, was

18  addressing in this e-mail to Olympia.

19     Q.   So, for example, if you see it, there is a line

20  here that says the Viking vent hood above the stove is

21  not working and can result in significant smoke backup

22  in the kitchen during normal cooking usage.  Did you

23  provide any information in response to that particular

24  claim from the renter.

25     A.   I do not believe that I provided any specific

**EXHIBIT B**

1    information as to a kitchen vent hood.

2         Q.   Did you work on any of the maintenance issues

3    raised in this e-mail?

4         A.   No, I did not work on resolving any of the

5    maintenance-related issues in this e-mail, but I did

6    suggest the names of maintenance service providers in

7    the areas that could address it.

8         Q.   So you didn't personally fix the issues, but

9    you suggested people that could fix the issues, am I

10   understanding that correctly?

11        A.   I believe that at the time, I sent a list of

12   names with contact information of maintenance service

13   providers in the area.

14        Q.   And how was she sent that information?

15        A.   I do not recall how I would have sent that

16   information.  I do not know if I called these providers.

17   In the case of the HVAC provider, I remember making a

18   call to the service company that I know and asked them

19   to please call Olympia, and I believe the same for the

20   gardener.  I don't recall the specific example about the

21   Viking vent hood above the stove.

22        Q.   And how would you have told Olympia that you

23   had called these people up?

24        A.   I would have informed her that I had called the

25   service provider and had asked for them to contact her,

**EXHIBIT B**

1   to revolve the issues that she had asked me to look

2   into.

3       Q.   So that would be an in-person conversation?

4       A.   Yes, that would be an in-person information.

5       Q.   You would not have responded on the e-mail?

6       A.   Perhaps, perhaps not.  I am not sure.

7       Q.   How about text messages?

8       A.   No, I'm not a -- potentially Whatsapp, but text

9   messages I don't use much or at all.

10      Q.   And Whatsapp is another messaging service that

11  you use?

12      A.   Yes, I do use Whatsapp.

13      Q.   And you use Whatsapp sometimes to communicate

14  with Olympia?

15      A.   I have used Whatsapp to communicate with

16  Olympia, yes.

17      Q.   Any other messaging service or app that you

18  have used?

19      A.   No, no, I do not have any other messaging

20  service that I used to communicate with Olympia.

21      Q.   And do you talk to her on the phone?

22      A.   I do speak with her on the phone, yes.

23      Q.   And is that through your cell phone or through

24  another app like Whatsapp?

25      A.   Both.

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    Q.    Do you use anything else other than Whatsapp?

2    A.    I do not use any other messaging or phone

3    service other than my phone or Whatsapp.

4    Q.    And your phone is your cell phone, is that what

5    you're referring to?

6    A.    Yes, my cell phone.

7    Q.    And what is your cell phone number?

8    A.    305-799-6240.

9    Q.    And how long have you had that number?

10   A.    Over 15 years, probably more.

11   Q.    Have you used any other cell phone in the last

12   five years.

13   A.    No.

14   Q.    Going back to the Gramercy apartment, did you

15   apply to purchase the Gramercy apartment?

16   A.    Yes, I submitted the application to purchase

17   the membership interest in the Gramercy co-ownership.

18   Q.    And that was the purchase of the Gramercy

19   apartment?

20   A.    Yes, that was the purchase of the Gramercy

21   apartment.

22   Q.    And prior to your submission of that

23   application, did you review it?

24   A.    I believe that I would have -- this is 2004,

25   2005, so I cannot say that I recall having reviewed it,

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   but it is probable that I did review the application for

2   the purchase of the Gramercy apartment.

3       Q.   In the application, do you remember making any

4   misrepresentations?

5       A.   I believe that in the application there were

6   various misrepresentations.

7       Q.   Did you ever do anything to correct those

8   misrepresentations?

9       A.   No, I have not remarked on these

10  representations.

11      Q.   You submitted the application knowing that

12  there were misrepresentations made?

13      A.   No, I did not.  I've only remarked on the

14  inaccuracies when I reviewed the application recently.

15      Q.   So at the time you had in mind to purchase the

16  Gramercy apartment, you did not correct any of the

17  misrepresentations?

18      A.   I did not know of the inaccuracies in the

19  application for the purchase of the 3 Gramercy apartment

20  until I reviewed them again recently for the purpose of

21  providing the documents requested.

22      Q.   I'm going to show you what has been marked as

23  Government's Exhibit 6.  Can you see that?

24      A.   Yes, I can.

25  (Government's Exhibit No. 6, Stribling Letter:  Bates

**EXHIBIT B**

1    76-03 - 1A2-03 was marked for identification.)

2    BY MS. SOMBUNTHAM:

3       Q.    And this is a document which you produced with

4    Bates stamps numbers 76-03 to 1A2-03 and I am turning to

5    the first page of that document, Exhibit 6.

6             Do you recognize this document?

7       A.    Yes, I do recognize it.

8       Q.    And what is it?

9       A.    It is a letter from Stribling, the real estate

10   broker representing the purchase of the Gramercy manager

11   it to the board of the Gramercy Association from

12   December 2004.

13      Q.    And is Exhibit 6 a fair and accurate

14   representation of your application to purchase the

15   Gramercy apartment?

16      A.    The exhibit is the application for -- yes,

17   submitted by Stribling to the board of 3 Gramercy.

18      Q.    And so it is an accurate copy of that

19   application that you produced?

20      A.    It is the application that we produced and it

21   is the application that was submitted by Stribling to

22   the Gramercy board in December of 2004?

23      Q.    And at the time of this application, who was

24   going to live in the Gramercy apartment?

25      A.    At the time of this application, I was going to

**EXHIBIT B**

1    live there in Gramercy apartment.

2        Q.   Let's scroll through --

3        MR. RABIN:   Can I ask you a question real

4    quick?  It's Sam Rabin.  I don't have that Exhibit.

5        MS. SOMBUNTHAM:   Exhibit 6.

6        MR. RABIN:   I don't have Exhibit 6.  My

7    exhibits were broken up into two parts.  1 through

8    13, and 14 through 30.  In 1 through 13, my exhibits

9    go 1, 2, 3, 4, 5, and then 8.  So I don't have 6

10   and 7.  Am I the only one?

11       MS. SOMBUNTHAM:   Is that the case -- Jeanette,

12   are you still on with us?

13       MR. RABIN:   Did anybody else get 6 and 7?

14       MS. ROSA:   Yes, I am here.

15       MS. SOMBUNTHAM:   Can you resend 6 and 7 and

16   check to see if everyone else received it.

17       MS. ROSA:   Will do.

18       MR. LUNKENHEIMER:   This is Kurt Lunkenheimer.

19   I just sent Sam and Andrea Exhibit 6.  It's about 5.8

20   megabytes, so hopefully it will go through, Sam.  Let

21   me know if it does not.

22       MS. SOMBUNTHAM:   And for the record, a redacted

23   copy of this document was previously filed as

24   Government Exhibit B and EPS number 344-2.  But, Sam.

25   Can you view the exhibits and we can continue at this

**EXHIBIT B**

1    time?

2          MR. RABIN:  Go ahead.  I just wanted to let you

3    know that I haven't received it, but I can see it on

4    the screen.

5  BY MS. SOMBUNTHAM:

6    **Q.   Mr. Hernandez, I believe I was scrolling from**

7  **the first page to page 4.  And what is on page 4?**

8    A.   On page 4 is a table of contents included in

9  the letter from Stribling, the real estate broker, which

10  includes the contents that were part of the application.

11    **Q.   And I want to scroll down, scroll to page 7 of**

12  **the exhibit.  And what is page 7 of the exhibit?**

13    A.   It reads "Personal letter of introduction."

14    **Q.   And then turning to the next page, page 8, is**

15  **that the start of the personal letter of introduction?**

16    A.   Yes, it is the start of the letter of

17  introduction.

18    **Q.   And turning to page 9, is that your signature**

19  **at the bottom of page 9?**

20    A.   Yes, that is my signature at the bottom of the

21  page.

22    **Q.   And going back to page 8, Mr. Hernandez, what**

23  **is the purpose of this letter?**

24    A.   I believe the real estate broker explained that

25  we had to put together in the application for contents

**EXHIBIT B**

1   required by the association in order to approve the

2   purchase of the Gramercy apartment.

3       **Q.   And so that is the purpose of this letter or**

4   **for the entire application?**

5       A.   I believe that is the purpose for the entire

6   application.

7       **Q.   And what about this letter?**

8       A.   I believe the letter was -- I cannot really

9   read it properly because it is small on the screen that

10  it was a -- I believe that that was an introduction for

11  the members of the Gramercy Park house association to

12  know who would be the individual to reside in the

13  Gramercy apartment.

14      **Q.   And so you wrote the letter so that the board**

15  **can get to know you?**

16      A.   I do not recall if I wrote the letter, but I do

17  believe that the letter was for the board to get to know

18  me as a perspective tenant to reside in the Gramercy

19  apartment.

20      **Q.   Is there anything else inaccurate -- and I**

21  **zoomed in there for the record.  Is there anything**

22  **inaccurate with the letter in connection -- I just**

23  **scrolled and you tell me when you're done reading.**

24          MR. SREBNICK:  This is Harold Srebnick.  Can we

25      take a break and maybe this is a good time to review

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1      the letter while we take a restroom break.

2              MS. SOMBUNTHAM:  That is fine with me.

3              (A brief recess was taken.)

4    BY MS. SOMBUNTHAM:

5        **Q.   Mr. Hernandez, have you had an opportunity to**

6    **review the personal letter of introduction in Exhibit 6**

7    **during the break?**

8        A.   Yes, I have.  Thank you.

9        **Q.   And my question was:  Is there any inaccuracies**

10   **and misrepresentations made in this letter?**

11       A.   Yes, there were multiple inaccuracies in the

12   letter.

13       **Q.   And what are they?**

14       A.   The first inaccuracy is the statement that I

15   was a PhD candidate, dissertation candidate.  At the

16   time of this letter I was no longer a candidate for a

17   PhD degree.  I believe that this was an excerpt from an

18   earlier bio, and was also a mistake in the discipline of

19   the master's degree.  The exact term is political

20   economy and not political science.  That is in the

21   second paragraph.  Shall I continue?

22       **Q.   Yes.**

23       A.   In the fourth paragraph, the footnote and the

24   entity Global Securities Holdings are both inaccurate.

25              In the second page of the letter, top

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1  paragraph, the legal name of the entity, Global Security

2  Advisors, is Global Securities Advisors GP, as a

3  "general partner," and the entity was a Florida entity

4  domiciled in Miami.  It has an office in Connecticut,

5  but it was headquartered in Miami.

6          And the second to last includes Mexico after

7  United States, and that is incorrect.  At the time,

8  December 2004, the family does not have a regulated

9  financial service entity in Mexico.

10      Q.  **Any other inaccuracies or misrepresentations in**

11  **this letter?**

12      A.   No, I believe that that is the list of the

13  inaccuracies inclusive in the second paragraph, the

14  fourth paragraph, and the footnote, and the first two

15  paragraphs in the second letter.  With regards to the

16  second -- excuse me, the fourth paragraph in the first

17  page, the entity Global Securities Holdings is

18  inaccurate, and again, the footnote, Global Finance and

19  Global Securities Asset Management are inaccurate.

20      Q.  **Mr. Hernandez, if you were to correct the**

21  **entities in that paragraph, what would the correct**

22  **information be?**

23      A.   In regards to Global Securities Holdings LLC,

24  the ownership interest that my brother Cesar Hernandez

25  Frieri and I had at the time was a total of 10 percent

**EXHIBIT B**

1    of the entity of which each of us individually had 5

2    percent.  And in regards to the footnote, it should have

3    been Global Securities Asset Management Corp alone, not

4    Global Finance Asset Management Corp.

5        Q.   And Global Securities Management -- or what was

6    the other?

7        A.   No, the entity would be Global Securities Asset

8    Management Corp.

9        Q.   And with all these inaccuracies, why did you

10   sign and submit this letter?

11       A.   I do not recall why I did not review the letter

12   more closely at the time.  I believe that there were a

13   number of documents that I was reviewing and signing for

14   the permits of this closing and I do not recall why I

15   did not review the letter more closely before signing

16   it.

17       Q.   So it seems like -- and this is now, as you

18   have mentioned, some time ago, because this was in 2004,

19   and today we are in 2021 -- that very clearly, even

20   today, a decade and a half later, we had a clear

21   understanding of what the entities are, but you could

22   not have changed at this time when you read this letter,

23   the submission of it.  I just don't understand why you

24   would not have seen these changes.  They seem to be

25   incorrect entities, incorrect title?

**EXHIBIT B**

1   A.   As you noted, this letter is obviously, a long

2   time ago, 17 years plus.  My speculation is that I did

3   not write this letter.  I do not recall sitting down and

4   actually writing this letter, typing this letter.  And I

5   say this more because of the use of words and the

6   inaccuracies in the letter.  The style of the letter and

7   the phraseology is not me.

8   **Q.   Who would have wrote this letter then?**

9   A.   I do not recall who would have typed that

10  letter.  My recollection is that the real estate broker

11  put together the package for the board, but I do not

12  recollect who actually sat down to type the letter.

13  **Q.   Turn to page 11 of Exhibit 6, and what is the**

14  **section entitled?**

15  A.   Literal [sic] II, Purchase application.

16  **Q.   And I'm am going to go to the next page,**

17  **page 2.  Is anyone here listed as the purchaser on this**

18  **application?**

19  A.   I apologize, if you could please increase the

20  size?

21  **Q.   Does that help?**

22  A.   Yes, thank you.

23       So the purchaser appears below on the bottom

24  left, Gustavo Adolfo Hernandez Frieri, and that is my

25  Social Security.  The home number is incorrect, that is

**EXHIBIT B**

1   my mobile number, and the office number is also

2   incorrect.  I do not recognize that number.

3       Q.   I'm going to show you the next page, which is

4   page 13.  And what is on this page, Mr. Hernandez?

5       A.   This appears to be an applicant form from

6   December of 2004.

7       Q.   And is your income anywhere?

8       A.   The third to last line item reads "income

9   estimate for this year," and below "actual income last

10   year."

11      Q.   And so based on the date of the application, is

12   it that the income estimate for "this year" is 2004, and

13   it is approximately 1 million, and the actual income

14   last year which was 2003, is also approximately 1

15   million?

16      A.   Yes, 1,116,400 for this year, and 1,031,500 for

17   last year.

18      Q.   So now I'm going to turn to the last page,

19   page 14 of Government's Exhibit 6.  And at the top, at

20   the top, it says that you will be the sole occupant of

21   the apartment.  Is that correct?

22      A.    "Name of all persons who will reside in the

23   apartment:  Sole occupant - Gustavo Hernandez."

24      Q.   So were you to be the sole occupant of the

25   Gramercy apartment at that time?

**EXHIBIT B**

1    A.    No, I was not.

2    Q.    **Who also would have occupied the apartment?**

3    A.    I lived with my fiancee at the time, Olympia de

4    Castro.

5    Q.    **Where did you live?**

6    A.    At the time we lived in Miami.  The exact

7    address is in fact not the address listed there.  Let me

8    correct you.  This is 120 Northwest 25th Street, Miami,

9    FL 33127.  That was my prior address.  My address at the

10   time was 1749 Northeast 2nd, Miami Court.

11   Q.    **And when did you move to that address?**

12   A.    2003.

13   Q.    **And when did you move out of the address?**

14   A.    Sometime around 2014, 2015.

15   Q.    **And when did Olympia de Castro move in with you**

16   **at that address?**

17   A.    In the 1749 Northeast, yes.  And the 120

18   Northwest 25th Street, also yes.

19   Q.    **I'm going to scroll.**

20   A.    Am I supposed to list other inaccuracies or

21   not?  Just checking.

22   Q.    **At this time I'm going to scroll to the next**

23   **page, page 15.**

24   A.    There was another inaccuracy there.

25   Q.    **You can mention it now, since you're raising**

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   it.

2       A.   No, just looking at it now.  If you don't mind,

3   please, scrolling up.  So on that "name of organization

4   to which application belongs," it says that I am a

5   trustee of MOMA in Bogota.  I am not and was not a

6   trustee of the Museum Of Modern Art.  I was on the board

7   of the Contemporary Art Museum in Bogota, but I have

8   never been a trustee for MOMA in New York.  So just to

9   make sure that is not inaccurate.

10      Q.   **I want to turn to page 15, and what is this**

11  **section of the application?**

12      A.   That is literal [sic] III:  Contract of Sale.

13      Q.   **And I'm going to scroll to page 20 of the**

14  **exhibit and what does this page show?**

15      A.   It shows a rider annexed to the contract of

16  sale that is scribbled with handwriting there on the

17  date, but I believe that it's scratched November and

18  replaced with December 2004, and it is between Ralph

19  Ammirati and Joan Ammirati as seller and Gustavo Adolfo

20  Hernandez Frieri as purchaser.

21      Q.   **And Gustavo Adolfo Hernandez Frieri is you?**

22      A.   Yes, it is me.

23      Q.   **And the Ammiratis are the former owners of the**

24  **Gramercy apartment?**

25      A.   Yes, they were.

**EXHIBIT B**

1    Q.    I'm going to turn to page 23 of Government's

2    Exhibit 6 and, Mr. Hernandez, is that your signature at

3    the bottom as purchaser?

4    A.    Yes, it is my signature, at the bottom.

5    Q.    And right above your signature, or the

6    paragraph of your signature, do you see Item R24?

7    A.    Yes, I do.  I can barely read it on the screen,

8    but yes, I do see the item.

9    Q.    And prior to signing this contract or the rider

10   for the contract of sale, did you review the document?

11   A.    Yes, it reads that this contract is subject to

12   a condition about the consent of majority --

13   Q.    We'll get to that.  Prior to signing the

14   document, my question was did you review the rider?

15   A.    I believe that I did.  I believe that I did.

16   It was part of the documents for the purchase of the

17   apartment.  I believe that I did review the documents,

18   yes.

19   Q.    And now going to the Item R24.  What were the

20   conditions for you to purchase the property, if any?

21   A.    Per this Item R24 in the rider, it says that

22   "this Contract is subject and conditioned upon the

23   consent of the majority percentage interest of the

24   co-owners of the building, to the purchaser's ability,

25   for estate and tax planning purposes, to take title to

**EXHIBIT B**

1    the unit in a domestic liability company."

2              "It shall be formed by Purchaser, wholly owned

3    by Purchaser and/or Purchaser's family and Purchaser

4    shall retain the exclusive right to use the Unit.

5    Purchaser also agrees to execute a personal guarantee

6    that all amounts due with respect to the ownership of

7    the Unit will be paid, and the occupancy agreement that

8    only Purchaser or members of Purchaser's family could

9    occupy the unit."

10             Shall I continue reading?

11    **Q.   No, I think the question is based on this**

12   **paragraph, and your general understanding.  If you had**

13   **not made this agreement and submitted this application,**

14   **would you have been able to purchase the Gramercy**

15   **apartment?**

16    A.   Would I have been able to purchase it?  My

17   understanding was that at the time, December 2004, we

18   had to submit an application to the board of the 3

19   Gramercy co-owners in order to obtain approval.

20    **Q.   And the question is could the board have**

21   **refused you if they found anything that they disliked**

22   **about your application?**

23    A.   Yes, per this rider, it indicates that the

24   co-owners needed to consent to the application and that

25   "the purchaser would take title to the unit in a

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   domestic LLC formed by Purchaser, wholly owned by

2   Purchaser and/or Purchaser's family," and that the

3   purchaser shall retain the exclusive right to use the

4   unit.

5       Q.   This item also mentions a personal guarantee

6   and occupancy agreement.  Did you execute those

7   agreements?

8       A.   I recall signing the certificate of occupancy.

9   I do not recall signing a personal guarantee, but it may

10  have been that I signed it as well.

11          MS. SOMBUNTHAM:  I want to show you what has

12      been marked as Government's Exhibit 11, and this is

13      Bates-stamped actually 0DC000363.

14  (Government's Exhibit No. 11, Occupancy Agreement:

15  Bates 0DC000363 was marked for identification.)

16  BY MS. SOMBUNTHAM:

17      Q.   Mr. Hernandez, sir, do you recognize this

18  document?

19      A.   Yes, I do recognize the document.

20      Q.   So what is it?

21      A.   It reads, "Occupancy Agreement."

22      Q.   Who is the occupancy agreement for?

23      A.   I believe that this was part of the closing

24  documents for the purchase of the Gramercy apartment.

25      Q.   And is that your signature at the bottom?

**EXHIBIT B**

1    A.   Yes, it reads "Gustavo Adolfo Hernandez Frier,

2  3 Gramercy Park West LLC, Gustavo Hernandez, Title

3  Manager."

4    **Q.   And you reviewed this document prior to signing**

5  **it?**

6    A.   This document is dated August 16th, 2005, so I

7  don't recall, but I presume that I did, since I signed

8  it.

9    **Q.   When you say that "you presume that you did,"**

10  **it is because you usually review documents before you**

11  **sign them?**

12    A.   I want to say yes.  I review documents before I

13  sign them.  Quite candidly, with a real estate closing,

14  I can't honestly say in that I review every single

15  document that they put in front of me to sign.

16    **Q.   As for this document that you referenced**

17  **earlier, the occupancy agreement that you recall, do you**

18  **recall reading it before signing it?**

19    A.   I cannot say that I remember reviewing this

20  specific document before signing it.

21    **Q.   But you had to sign this document to purchase**

22  **the Gramercy apartment?**

23    A.   Yes, I believe it was part of the closing

24  documents.

25    **Q.   And look at the first line of the documents.**

**EXHIBIT B**

1   A.   Yes, I see, 3 Gramercy Park West LLC, in

2   parentheses (the owner), a limited liability company

3   wholly owned by Gustavo Adolfo Hernandez Frieri, in

4   parentheses (Frieri).

5   **Q.   Do you recall earlier that you testified that**

6   **you had never represented that you were the beneficial**

7   **owner of the Gramercy apartment?**

8   A.   I do not recall making that representation.

9   **Q.   Would you call this a representation that you**

10  **are the beneficial owner of the Gramercy apartment?**

11  A.   Yes, yes, I would.

12  **Q.   I'm going back to Government's Exhibit 6, and**

13  **I'm going to page 96 of the document, and, Mr.**

14  **Hernandez, what is the section?**

15  A.   It is number 4, "Letter from attorney regarding

16  purchase at 3 Gramercy Park West Property LLC."  It's

17  inaccurate, that name.

18  **Q.   And the correct name is 3 Gramercy Park West**

19  **LLC?**

20  A.   Yes, that is the correct name.

21  **Q.   And the correct name of the actual property is**

22  **Gramercy Park West, Unit 2.**

23  A.   The unit number, I believe, was categorized

24  differently in different documents, but it was the

25  second floor, yes, of the property.

**EXHIBIT B**

1    Q.    I'm going to scroll to the next page, page 97

2    of Government's Exhibit 6.  And if you see the subject

3    line, who is identified as the purchaser in this

4    document?

5    A.    So this is document -- I cannot see above the

6    date or the firm, but I believe it's Dave Richard's law

7    firm, at the time it had a different name, but

8    referencing the purchaser of parlor floor by Mr. Gustavo

9    Adolfo Hernandez Frieri, in parentheses (Purchaser), and

10   it is a letter addressed to the board of directors of

11   the Gramercy Park association.

12   Q.    And who is identified at the purchaser in this

13   document?

14   A.    Gustavo A. Hernandez Frieri.

15   Q.    And is that you?

16   A.    Yes, that is me.

17   Q.    And based on this document, who is the owner of

18   the Gramercy apartment?

19   A.    I don't think that this document establishes

20   ownership.  This is, I believe, a letter sent by an

21   attorney to the members of the board of the Gramercy

22   Park association.

23   Q.    Going to the middle of the paragraph there, is

24   anyone identified as the beneficial owner of the company

25   that would be holding the Gramercy apartment?

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    A.   No.  I do not believe that this letter provided

2    details of the beneficial owner of the Gramercy

3    apartment.

4    Q.   Mr. Hernandez, I'm going to read to you

5    starting on the fourth line, the sentence that starts

6    there and you tell me if I am misstating anything.

7         "By holding the condominium through a limited

8    company of which the purchaser is the beneficial owner,

9    the purchaser may protect his other assets from

10   potential lawsuits filed by any contractors working on

11   his property, any visitors injured on this property, or

12   from any other third-party lawsuits related to the

13   condominium."

14        Mr. Hernandez, did I state that correctly as

15   written in this letter?

16   A.   Yes, that is what the letter states.

17   Q.   Does the letter identify the beneficial

18   owner -- a beneficial owner for the Gramercy apartment?

19   A.   My read, the letter says what you just stated,

20   that by holding the condominium through an LLC, the

21   purchaser is protecting his assets, or his other assets

22   from potential lawsuits filed by contractors, et cetera.

23   Q.   So the purchaser, I think you identified

24   earlier, was you, according to this letter?

25   A.   This letter states that I, Gustavo Adolfo

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

Hernandez Frieri, am the purchaser, yes, that is what the letter states.

Q.   And the letter also states the purchaser is the beneficial owner of the Gramercy apartment; is that fair?

A.   I believe that the letter says that I will be the beneficial owner of the limited liability company, 3 Gramercy Park West LLC.

Q.   I'm going to return now to page 28 of Government Exhibit 6.

And, Mr. Hernandez, what is this section in the application?

A.   It is section number two, "Financials," and it reads "personal financial statements prepared by CPA Jose Padial, verification of assets, net worth: 28,578,909, letter from tax attorney, 2003 tax returns, and liabilities."

Q.   So as part of your application, did you have to provide details of your overall financial position.

A.   Yes, I believe the broker explained financials had to be submitted for the board application.

Q.   And I'm going to turn to page 36 of Exhibit 6 and on these pages, it's a verification of assets.  Is that correct?

A.   Yes, II, "Verification of assets."

**EXHIBIT B**

1    Q.   And just to speed this along, I'm just going to

2    name some of the assets listed here.  There is cash

3    listed of $6,572; is that correct?

4    A.   Yes, that's Exhibit 1.

5    Q.   And bonds and stocks are listed for a value of

6    about 3.9 million?

7    A.   Yes, that is correct.

8    Q.   And there is an art collection listed here

9    valued at $614,161?

10   A.   Yes, that is correct.

11   Q.   And separate from that art collection, you have

12   an interest here listed in the Hernandez Frieri Family

13   Trust; is that correct?

14   A.   Yes, that is correct.

15   Q.   What was the Hernandez Frieri Family Trust?

16   A.   There were multiple family trusts for different

17   members of the Hernandez Frieri family, so I don't know

18   exactly which one they would be alluding to when they

19   categorize this as the Hernandez Frieri Family Trust.

20   Q.   Well, there's assets listed and then it says

21   that you're 50 percent beneficiary.  Do you recall based

22   on the description here and the timing of this

23   application, which of the family trusts it could have

24   been?

25   A.   I believe that they would have been referring

**EXHIBIT B**

 1    to Global Securities Asset Management, but I am not

 2    certain.

 3        Q.    And that is a trust?

 4        A.    That entity was a trust held by my brother

 5    Cesar Hernandez Frieri and I.

 6        Q.    Are you still a beneficiary of that trust, the

 7    Global Securities Asset Management?

 8        A.    No.  I am not.

 9        Q.    What happened to your interest?

10        A.    Global Securities Assets Management interest

11    was dissolved in the mid-2000s on or around 2007, 2008.

12        Q.    And as a consequence of that dissolution did

13    you obtain the 50 percent interest here as indicated?

14        A.    I obtained the ownership in the underlying

15    assets in the Global Securities Asset Management

16    portfolio, or the prorated portion of my ownership.

17        Q.    Which was 50 percent, according to this

18    document?

19        A.    Yes.

20        Q.    Yes?

21        A.    Yes, that is correct.

22        Q.    Do you still maintain interest in those Global

23    Securities Entities?

24        A.    No.  Most of the entities have been dissolved,

25    and it is my understanding, that others of the Global

**EXHIBIT B**

1    Securities affiliated entities are still in the process

2    of dissolution, but I do not know the exact status as of

3    today.

4        **Q.   So maybe just explain to me what happened to**

5    **the $23.9-or-so million of interest you had in these**

6    **entities that you discussed have changed over time, what**

7    **happened to that value?**

8        A.   So, the portfolio of my brother Cesar Hernandez

9    Frieri and I was constituted primarily by the

10   shareholding in Global Securities affiliated entities,

11   which were for the most part financial service

12   companies, regulated financial service companies, which

13   operated in the U.S. and also other countries.  Those

14   entities have been for the most part dissolved or are in

15   the process of dissolution, and hence, the value which

16   they have at the time is no longer the value today.

17       **Q.   Do those entities have access?**

18       A.   No.  If you are referring to the investment as

19   it appears there today, Global Securities Market Neutral

20   Fund, Global Securities Market Neutral Fund was unwound

21   in 2008, 2009; I believe that Global Finance was

22   unwound, I don't recall exactly when, but both entities

23   have been dissolved.

24       **Q.   And during the dissolution, isn't it normal**

25   **that distribution goes to the beneficiary or the**

**EXHIBIT B**

1    shareholders, whoever owns the company?

2        A.    The Global Securities Market Neutral Fund was a

3    fund, it wasn't a company.  And in the days of Global

4    Finance Management, it was a corporation which held, for

5    the most part, shareholdings in financial service

6    operating entities.

7        **Q.    So was this number here assigned to 50 percent**

8    **of the value inaccurate because upon the dissolution of**

9    **these entities and their successor trustees you would**

10   **never have access to any assets?**

11       A.    I cannot say that it is accurate or inaccurate

12   because it is unclear what exact entities it is alluding

13   to.  I believe that if they have a 50 percent ownership

14   interest attributed to me, as the Hernandez Frieri

15   Family Trust, it would be referring to, again, Global

16   Securities Asset Management.  But again, that is my

17   speculation of this document in 2004.

18       **Q.    And I'm going to turn to page 100 of Exhibit 6.**

19   **And what's the section of the application?**

20       A.    It reads literal [sic] I, "Organization Chart."

21       **Q.    And I am going to the next page, page 101, and**

22   **what is on this page?**

23       A.    My apologies on this one.  It is -- okay, thank

24   you.

25       **Q.    I'll zoom in for you.**

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1      A.   Yes, thank you.  So it's an organizational

2   chart which includes HH Securities, Global Finance

3   Management, Global Securities Holdings; and the series

4   of subsidiaries on the right side, Global Strategic

5   Investments, Global Securities Management, Global

6   Securities Advisors; and on the left side, it lists real

7   estate investments and private equity investments.

8      **Q.   And so earlier, you testified about Global**

9   **Securities Asset Management, and that is here on the**

10  **left side here; is that correct?**

11     A.   Yes.

12     **Q.   And this chart at the top of the chart, there**

13  **is an entity, HH Securities, LTD.  Do you see that?**

14     A.   Yes, I see it.

15     **Q.   And so it shows that HH Securities LTD owns**

16  **Global Securities Asset Management.  Is that true in the**

17  **organization chart where it depicts?**

18     A.   Yes.  That is inaccurate, but that is what this

19  chart states.

20     **Q.   Before we go into the why it is inaccurate, HH**

21  **Securities LTD, which is listed at the top here, are**

22  **there any other names for that company?**

23     A.   It was HH Securities Corporation to my

24  recollection.  I don't know if it was in Bahamas or BVI,

25  the domicile of HH Securities.

**EXHIBIT B**

1    Q.    And was there an HH Securities LTD?

2    A.    I do not think so, but I am not certain.

3    Q.    And below it, you referenced Bahamas before,

4    but it also says "100 percent owned by trust of Gustavo

5    and Cesar Hernandez Frieri."  That is correct, that is

6    what it says?

7    A.    That is inaccurate, but that is what the

8    document indicates.  It is difficult to read, but that's

9    -- I believe that's what it indicates, yes.

10   Q.    So why is that incorrect?

11   A.    Well, again, to start, I think the entity was a

12   corporation, and again, I'm not certain if it's a BVI or

13   Bahamas, and to my recollection, HH Securities Corp was

14   a holding company for the HH Master Settlement Trust and

15   to my recollection, the HH Securities shares were held

16   by the Global Irrevocable Trust, which was the trust

17   that held the HH Securities shares.

18   Q.    So in the application, the trust that it refers

19   to is not the HH Master Settlement Trust, but in

20   actuality, based on your testimony now, that is what you

21   believe that wholly owned HH Securities?

22   A.    No, no, no.  I apologize if I misspoke, no.

23   What I was trying to explain is that the HH Securities

24   entity, which was not a trust, it was a corporation, was

25   held by the Global Irrevocable Trust, which had the HH

**EXHIBIT B**

1    Master Settlement Trust as its beneficiary.  Global

2    Securities Asset Management is a separate entity and it

3    was never held under HH Securities.  That entity I do

4    recall was basically my brother Cesar and I, and the

5    Bahamian Entity was a BVI, so that I do recall.

6         **Q.   Mr. Hernandez, who would have created this**

7    **organizational chart that was part of your application**

8    **for the Gramercy apartment?**

9         A.   I honestly do not know who put this chart

10   together for the application.

11        **Q.   But they would have to know at least some of**

12   **the entities that you were affiliated with?**

13        A.   I presume so.

14        **Q.   And you presume so because it lists the**

15   **entities that you are, in fact, affiliated with?**

16        A.   It includes certain of the entities that I was

17   affiliated with, yes, it does.

18        **Q.   And who else would have knowledge of these**

19   **entities?**

20        A.   Many individuals.  Global Securities had maybe

21   200-plus employees.  There are many other entities under

22   the Global Securities umbrella.  These are some of the

23   entities, yes.

24        **Q.   Would the real estate agent or broker that you**

25   **used in purchasing the Gramercy apartment know of these**

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

 1    entities absent talking to you or absent someone

 2    affiliated with you?

 3        A.   No, I do not think so.  I think the real estate

 4    broker would have to converse with me or someone in

 5    Global Securities to obtain this information, because

 6    part of it is public record.  In particular, the

 7    entities that were regulated financial service companies

 8    in the United States, like Global Strategic Investments

 9    LLC the US Property Dealer, or Global Securities

10    Advisors GP LLC the US registered investment advisor.

11        Q.   Would Olympia De Castro know of all these

12    entities?

13        A.   No, no, Olympia de Castro would not know of all

14    these entities.

15        Q.   How about Cesar Hernandez?

16        A.   My brother Cesar Hernandez would definitely

17    know about all these entities.

18        Q.   And what about your sisters.

19        A.   My sisters, Maria Lucia Hernandez Frieri and

20    Maria Elena Hernandez Frieri would know of, I would say

21    all the entities, probably not as well as myself, but

22    definitely they would know HH Securities.

23        Q.   Did Cesar Hernandez create this chart?  Would

24    you think that he could create this chart?

25        A.   Oh, no, for sure not.

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    Q.   How about your sisters, Maria Lucia Hernandez

2   and Maria Elena Hernandez?

3    A.   No, no, for sure not.

4    Q.   Okay, I'm going to go back to the financial

5   section and turn to page 48 of Exhibit 6.  And what is

6   this section of the application?

7    A.   Exhibit 4:  Art Collection.  Valued by Art

8   Insure, dollar number 614,161.

9        MR. SREBNICK:  Nalina, Howard Srebnick here, we

10       just want 30 seconds.  We would like to ask

11       Mr. Hernandez what he would like us to order for food

12       when we break for lunch.  What time do you want to

13       break for lunch, Nalina, if it all?

14       MS. SOMBUNTHAM:  I think we should.  I'll be

15       frank with you, this is taking a little longer than I

16       had anticipated, and I had anticipated it being a

17       little long.  And so I'd like to get through a couple

18       of more things even just this exhibit before we break

19       for lunch, so maybe around 1:30.

20       MR. SREBNICK:  That's fine.  That's fine.

21       Okay.  That's good, thank you.

22   BY MS. SOMBUNTHAM:

23       Q.   All right.  So I'm going back to the financial

24   section, page 48, I think you just testified to, and I'm

25   going to scroll to page 49.  And what is page 49?

**EXHIBIT B**

1    A.   It is a certificate of insurance from

2    artinsure.com.

3    **Q.   And let me know if you could tell here, I'm**

4    **scrolling in, who is the insured here, who is named as**

5    **the insured?**

6    A.   The insured is Gustavo Hernandez.

7    **Q.   And is that referring to you?**

8    A.   Yes, that is referring to me.

9    **Q.   And is the location listed here, 120 NW 25th**

10   **Street, Unit 202 where the artwork is located?**

11   A.   I do not believe so.  I believe that -- I don't

12   recall exactly, because this is actually a long time

13   ago, but that was my address in the 2001 to 2003 period.

14   I believe that I no longer had any works in that address

15   as of that point in time.

16   **Q.   So what was the location of the insured art at**

17   **this time?  Where is the location of the artwork as of**

18   **the time of the application.**

19   A.    I do not know exactly, because it was multiple

20   works, but I believe that the primary location would

21   have been that 1749 NE Miami Court address that I

22   provided earlier.

23   **Q.   And that is where you testified at the time of**

24   **this application that you and Olympia de Castro lived?**

25   A.   Yes, that is correct.

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    Q.    And currently you both live at 597 Hibiscus

2    Lane?

3    A.    Yes.  That is correct.

4    Q.    And was 597 Hibiscus Lane your current

5    residence at the time of your arrest in July of 2018?

6    A.    Yes, that correct.

7    Q.    And in July of 2018.  Did you have any artwork

8    at your residence?

9    A.    Yes, I did.

10   Q.    And what happened to that art?

11   A.    The art is there.

12   Q.    How many pieces of art are currently at 597

13   Hibiscus Lane?

14   A.    I do not know exactly; 10, 15, or thereabout.

15   Q.    And is that the same amount of art of your

16   residence that was there when you were arrested in July

17   of 2018?

18   A.    I don't know if it's the exact same amount.

19   Between 2018 and today, but it should be substantially

20   similar.

21   Q.    So just to be clear, you have not -- you may

22   have acquired and sold art during that time period.  The

23   artwork in your residence there might have been

24   additional art added, but also sold for the time period?

25   A.    I have not acquired or sold any artwork in that

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   time period during that time period.

2       Q.   **Has artwork left the residence during that time**

3   **period?**

4       A.   Yes.  Artwork has left the residence during

5   that time period.

6       Q.   **And it was sold?**

7       A.   I don't believe that all the art which has left

8   the residence has been sold, but some of the art that

9   left the residence has been sold.

10      Q.   **So I'm going to take you to page 50, and I am**

11  **going to zoom in, because it can be a little difficult**

12  **to read this page.  Can you see what this page says?**

13  **And I'm happy to scroll from left to right and top to**

14  **bottom to make it easier for you.**

15      A.   Thank you.  Yes, I can read it.

16      Q.   **And what does this page show?**

17      A.   I believe it is the appendix to the insurance

18  contract with listed asset names, title of works, year

19  of production, the medium, dimensions, acquisition date,

20  invoice number, and the price.

21      Q.   **And so do you see any artwork here, and I'll**

22  **scroll from top to bottom slowly, by Kai Althoff?**

23      A.   Yes, I see line item -- well, there is no

24  numbers.  Well, I do see Althoff, Kai, Liebe, 2002.

25      Q.   **And if I scroll towards the right of the page,**

**EXHIBIT B**

1    does it indicate when that particular piece was

2    purchased?

3        A.    Yes, I read it.

4        Q.    And so when was this piece of artwork acquired?

5        A.    February 19, 2003.

6        Q.    And do you know where it was purchased from?

7        A.    It was purchased from the Jack Tilton Gallery.

8        Q.    And where is that located?

9        A.    Jack Tilton Gallery used to be located in New

10   York City.

11       Q.    You said "used to."  Is it no longer located

12   there?

13       A.    Jack passed away.

14       Q.    So at the time you applied for the Gramercy

15   Park apartments, you owned this Kai Althoff Liebe

16   painting?

17       A.    No.  The Kai Althoff Liebe work was owned by

18   the Global Finance Management Corporation art portfolio.

19       Q.    And are there documents to show that?

20       A.    I believe that the invoice would reflect that

21   it was purchased by Global Finance Management

22   Corporation.

23       Q.    And did you have a role in that purchase?

24       A.    Yes, I did.

25       Q.    What was that role?

**EXHIBIT B**

1   A.   I was the person who selected the artists and

2   the works to purchase.

3   **Q.   And then after it was purchased, where was the**

4   **Liebe item located?**

5   A.   In multiple locations throughout the years.  I

6   believe originally it was in the 1749 address in Miami.

7   Later I believe it may have been in 3 Gramercy, but I'm

8   not certain.  And in fact, earlier than that, it was

9   also probably in the 120 Northeast address.  It may have

10   been in art storage for a period, and it depends on the

11   year where the work would have been stored or installed.

12   **Q.   What about 2018 when you were arrested?**

13   A.   In 2018, it would have at 597 Hibiscus.

14   **Q.   And where is the painting now?**

15   A.   The painting was sold.

16   **Q.   How was it sold?**

17   A.   It was sold by an art dealer.

18   **Q.   Do you know who it was sold to?**

19   A.   The ultimate purchaser, I'm blanking out, it's

20   a German collector who I met, but I don't recall the

21   name.  But the gallery that sold it is the Nagel Draxler

22   Gallerie in Berlin and Cologne.

23   **Q.   And when was it sold?**

24   A.   I believe 2019.

25   **Q.   And how much was it sold for?**

**EXHIBIT B**

1   A.   I think the Liebe piece was sold for -- in the

2   range of $200,000 but I'm not sure the exact amount.

3   **Q.   Do you know what happens to the proceeds of the**

4   **sale, that 200,000 or whatever the range was?**

5   A.   The proceeds of the sale from the Liebe Kai

6   Althoff were paid to the DC2019 Irrevocable Trust.

7   **Q.   Going back to Exhibit 6, have you ever owned**

8   **any pieces of art by Michael Krebber?**

9   A.   I personally have not owned works by Michael

10  Krebber.

11  **Q.   Have you been involved in the purchase of works**

12  **by Michael Krebber?**

13  A.   Yes, I have.

14  **Q.   And who owned them?**

15  A.   I have purchased by Michael Krebber for

16  multiple entities or individuals.

17  **Q.   The entities, are they entities associated with**

18  **your family as well?**

19  A.   Some are, yes.

20  **Q.   If you go back to page Government's Exhibit 6,**

21  **two lines below where you see Kai Althoff, do you see a**

22  **Michael Krebber piece as well?**

23  A.   There is a Krebber untitled 2021, oil on canvas

24  and that is all I can see on the screen.  And I see the

25  dimensions, and I see it was purchased in December 2002,

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    invoice 1961, for $9,900.

2        Q.   So where was this piece of art purchased from,

3    if you know?

4        A.   That I do not know because across the years I

5    was involved in the purchase of multiple works by

6    Krebber, and he rarely titled the works and the

7    dimensions of the canvas are pretty standard, so I don't

8    know exactly which Krebber this would be.

9        Q.   Does it help that this was a list from your

10   application, and this appears to be the only Krebber art

11   that is listed?  Unless you see something else here.  I

12   can zoom in again, as well.

13       A.   It does not because the insurance would only

14   imply that I was holding the work at the time and had it

15   installed, and hence I took the insurance to cover the

16   works that I was basically installing, but I don't know

17   which Krebber art that would be at the time.

18       Q.   When you say "installing," do you mean at your

19   residence?

20       A.   Yes.  So in all the different Global offices I

21   installed works, in my residence or family related, or

22   family relatives, excuse me, also.

23       Q.   So for this particular list, I can go back to

24   the first page on the location, and that's page 49 on

25   Exhibit 6.  What was represented as the location of this

**EXHIBIT B**

1    artwork?

2         A.   Again, that was my address in about 2001 to

3    2003.  I do not remember exactly what I had installed in

4    that address at the time.  I do not remember what works

5    I had there at time.

6         Q.   **Is it your understanding that the insurance**

7    **policy would have been valid if the artwork was not at**

8    **the location that's listed on the policy?**

9         A.   Yes, yes.

10        Q.   **So this would have covered if you moved**

11   **multiple times, the artwork that is listed?**

12        A.   I don't know the exact details of how the

13   coverage works, but I believe that there is a certain

14   degree of flexibility to move works.  I believe that

15   there may by need to inform the carrier.  I do not

16   remember exactly.

17        Q.   **I am going to zoom in here.  I want to see if**

18   **you see something here and ask you about.  I am zooming**

19   **in on an area of page 49 where it says "Limits:  USC**

20   **614,161 at insured's residence above."  And so would the**

21   **policy be focused that these particular pieces of art**

22   **would have to be at your residence?**

23        A.   I don't know.  What I do remember is that I

24   don't think I was residing there at the time.  In fact

25   I'm pretty sure I did not, and I don't think I had works

**EXHIBIT B**

1  at that address at the time.

2      Q.   Okay.  Going back to page 50.  And I'm going to

3  zoom in on the artist and title column, and I'll scroll

4  down, and let me know if there are any other pieces of

5  art there that are purchases from the Jack Tilton

6  Gallery.

7      A.   Most were purchased from the Jack Tilton

8  gallery.

9      Q.   Is there any other art dealer or gallery that

10 you purchased several pieces of art from, like the Jack

11 Tilton gallery?

12     A.   So the only one that I can see here, for

13 instance, might have been Maria Fernanda Cardoso below,

14 so Cardoso, Maria Fernanda.  That I remember was a

15 gallery in New York called Latin Collector.  Everything

16 else I believe was from the Jack Tilton gallery.  If you

17 scroll up, I can see more names.  There may be here and

18 there something that wasn't through Jack, but yes, to my

19 recollection, this was all through Jack.  No, sorry, all

20 those from Fuenmayor Gonzalo that would have been

21 directly me with the artist, and right there, all those

22 listed as Fuenmayor, Gonzalo.

23     Q.   So Fuenmayor, F-u-e-n-m-a-y-o-r, those pieces

24 of art would have been purchased directly from the

25 artist?

**EXHIBIT B**

1    A.   Yes, and that is in fact personal, that I

2    purchased myself for myself.

3         **Q.   And what happened to those pieces of art?**

4    A.   I have some.  I recall -- I believe that I have

5    all these works.

6         **Q.   Where are they located currently?**

7    A.   At 597.

8         **Q.   And that is your personal residence?**

9    A.   That is where I reside, yes.

10        **Q.   And so there are six pieces of art here and**

11   **they are all located at 597?**

12   A.   I don't think that I have six pieces by Motano,

13   but I am sure that I have a couple, three, to my

14   recollection, now.  The others I don't see anything in

15   the transcription here of this document, but I presume

16   that it's the same works by Fuenmayor.  And then above,

17   all of those Colombian artists, those were all from my

18   parents, from the house.  From my parents' house, I

19   meant to say.

20        MS. SOMBUNTHAM:  I am going to go to

21        Exhibit 15.  And for your reference, it's is a letter

22        that you also filed as Exhibit B on page 61 of BTS

23        365-2 ahead of your sentencing, and I'll scroll

24        quickly through it, so you can kind of get a look at

25        it.

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   (Government's Exhibit No. 15, Nagel Letter:  Bates 365-2

2   was marked for identification.)

3   BY MS. SOMBUNTHAM:

4        Q.   **Do you recognize this letter, Mr. Hernandez?**

5        A.   Yes.  Yes, I do.

6        Q.   **And who is the author of this letter?**

7        A.   The author of the letter is Christian Nagel.

8        Q.   **And who is he?**

9        A.   Christian Nagel is a friend and an art gallery

10   in Germany.

11       Q.   **And when did you two meet?**

12       A.   In Miami in 2001, I believe, or 2002.  I am not

13   certain if it is 2001 or 2002.

14       Q.   **And have you bought any pieces of art from**

15   **Mr. Nagel?**

16       A.   Yes.  I met Christian Nagel through Jack

17   Tilton.  I want to say it was 2002 because there was no

18   Basel Miami in 2001 for 9/11.  The first edition of the

19   fair was canceled, so I am pretty sure that I met Nagel

20   in 2012, and I met him through this friend, Jack Tilton.

21       Q.   **And I'm going to go to the second paragraph of**

22   **this letter, and if you can read it, he references a**

23   **painting that he "not much later bought."  I think he is**

24   **referring to you.  Do you know which painting he is**

25   **referring to?**

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1     A.   Yes, I believe that he is referring to a

2   painting by a Chinese artist Gang Zhao.

3     **Q.   Can you spell the last name?**

4     A.   Z-h-a-o.

5     **Q.   And the first time?**

6     A.   Gang, G-a-n-g.

7     **Q.   And was that purchase in 2001 or 2002?**

8     A.   I believe 2002.

9     **Q.   And do you recall how much you purchased for?**

10    A.   No, I do not recall.

11    **Q.   Mr. Hernandez, when was the last time you spoke**

12  **to Mr. Nagel?**

13    A.   I spoke with Christian a couple of months ago.

14    **Q.   What did you discuss?**

15    A.   So we converse regularly, he has come to see me

16  to visit.  And we conversed about my personal situation,

17  and we always converse about art and different cultural

18  related matters.  We also talked about family.

19    **Q.   And when you say he came to visit, do you mean**

20  **at 597 Hibiscus Lane?**

21    A.    No, I last saw Christian and his wife Saskia

22  when they came to visit me in the court-appointed

23  residence where I was held in Italy.

24    **Q.   So did you talk to Mr. Nagel ahead of your**

25  **sentencing?**

**EXHIBIT B**

1    A.   Yes, I spoke with Christian on or around my

2  birthday in March of 2021.

3    **Q.   Did you talk to him about your criminal case?**

4    A.   About my penalty?

5    **Q.   Your criminal case?**

6    A.   In general terms.

7    **Q.   And how about your penalty, how about your**

8  **forfeiture or any other financial liability in this**

9  **case?**

10   A.   No, I do not recall conversing with Christian

11  about forfeiture-related matters.

12   **Q.   How about any kind of any financial liability**

13  **matters?**

14   A.   I'd explain to Christian that I was in a

15  difficult financial situation.  I explained to him my

16  personal situation.  That was the bulk of the time that

17  we conversed, yes.

18   **Q.   Have you talked to Mr. Nagel about him talking**

19  **to German law enforcement about this case in any way?**

20   A.   No, I have not spoken with Mr. Nagel about law

21  enforcement.

22   **Q.   Has Mr. Nagel told you that he was questioned**

23  **about you by German law enforcement?**

24   A.   I believe that Mr. Nagel was questioned by

25  German law enforcement, yes.

**EXHIBIT B**

1    Q.   And how did you understand that?

2    A.   In conversation with my attorneys.

3    Q.   And so you learned that through your attorneys,

4    not through Mr. Nagel?

5    A.   Yes.

6    Q.   Did you learn it through anyone else?

7    A.   Who else?  Nobody else, no.

8    Q.   Do you know if anybody in your family has been

9    in contact with Mr. Nagel?

10   A.   Christian knows multiple members of my family,

11   my sisters, my brother, my friends, but I don't know if

12   he has any contact with them or not.

13   Q.   Do you know if he has any contact with Olympia

14   de Castro?

15   A.   I do not.

16   Q.   How about Juan Carlos Gomez?

17   A.   I do not.

18   Q.   I'm going to turn to Exhibit -- we are actually

19   at 1:30 now and I think the next couple will take a

20   while, so we can get through them by two, but I just

21   want to raise it with anyone if they want to break now

22   or break at 2:00 instead for lunch.

23        MR. SREBNICK:  This is Howard.  Will you have

24   more after 2:00?

25        MS. SOMBUNTHAM:  Yes, I have more after 2:00.

**EXHIBIT B**

1     As I mentioned, this is taking a little bit longer

2     than anticipated.

3          MR. SREBNICK:  No problem.  We'll defer to you

4     for lunch, whatever you prefer, either way.

5          MS. SOMBUNTHAM:  I want to go at least to

6     through until 2:00 because I think it is related and

7     it will be easier and then we can break and hopefully

8     after lunch it'll be much faster.

9          MR. SREBNICK:  Go right ahead.

10          MS. SOMBUNTHAM:  I want to show you what is

11     Government's Exhibit 15.

12   BY MS. SOMBUNTHAM:

13     **Q.   And I'm going to scroll slowly and go through**

14   **it.  This is a two-page document.  I'm going to show you**

15   **page 2.  And then we turn to page 1.**

16          **And, Mr. Hernandez, let me know if you need to**

17   **see anything again, but tell me, do you recognize this**

18   **document?**

19     A.   I do not recognize this specific document, but

20   I can tell what it is.

21     **Q.   Do you recognize the piece of art that is**

22   **listed on this document, the Heimo Zobernig?**

23     A.   Yes, a Heimo -- yes.

24     **Q.   And the piece of art, I think in 2000, Ohne**

25   **Titel?**

**EXHIBIT B**

1      A.    Yes, I recognize the work.

2      **Q.    And how do you recognize the piece of work?**

3      A.    Heimo Zobernig is an Austrian artist that I met

4   through the Nagel Galerie in the early 2000s and this

5   work is from that period.

6      **Q.    And it shows according to this that that piece**

7   **of work was purchased in December 23rd, 2014.  Do you**

8   **recall that that was purchased in or around December of**

9   **2014?**

10     A.    I don't recall that specific purchase, but I do

11  see the Global Finance Management name and the Miami

12  office address, and I do remember that GFM acquired

13  works by Heimo Zobernig from the Nagel Draxler Galerie.

14     **Q.    Would you have been involved in the acquisition**

15  **of this piece of art?**

16     A.    Yes.

17     **Q.    Would anyone else at Global Finance Management**

18  **been involved?**

19     A.    Yes.

20     **Q.    Who else?**

21     A.    Global Finance Management had individuals in

22  the financial department who would have assisted in the

23  payment, storage, insurance, et cetera, of the works.

24     **Q.    Who else would have approved the purchase of**

25  **it?  Did you approve the purchase?**

**EXHIBIT B**

1    A.   I would definitely have recommended the

2  purchase.  And I was the family member responsible to

3  select the works of art that were purchased.  So yes, I

4  would have approved for the purchase of this Zobernig in

5  2014.

6    Q.   **Where is it located today, do you know?**

7    A.   I do not know specifically.  I do not know if

8  it is a still owned by the family trust, specifically

9  the HH Master Settlement Trust, so I do not know exactly

10  where that piece of art would be, if it is still held by

11  the trust.

12    Q.   **And why would it be held by the HH Master**

13  **Settlement Trust?**

14    A.   Well, a GFM -- excuse me, Global Finance

15  Management Corporation was a subsidiary of HH Master

16  Settlement Trust.

17    Q.   **So wouldn't it have been owned by Global**

18  **Finance Management Corp and not HH Master Settlement**

19  **then?**

20    A.   Well, Global Finance Management is one and the

21  same.  So the trust, the HH Master Settlement Trust had

22  an art collection from my parents, and Global Finance

23  Management received monies from the trust, which it

24  invested in artworks inclusive of this Heimo Zobernig

25  piece from 2014?

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    Q.    And why not have the HH Master Settlement just

2    directly purchase it then?

3    A.    To my knowledge, the trust wouldn't directly

4    purchase anything.  Typically it is done by companies

5    held by the trust; in this case, Global Finance

6    Management Corporation.

7    Q.    And is that like the Gramercy apartment that is

8    done for protection purposes?

9    A.    Well, if it is, I believe, just standard

10   practice in my experience with trust-related matters

11   have corporations held by their trust, which performed

12   the different investment activities.

13   Q.    Why is that?  What would the purpose be?

14   A.    Again, it is my experience that that is what is

15   done.  I have never seen a family trust, at least that I

16   have had direct experience with, make investments from

17   the trust itself into assets, but to use corporations

18   owned by the trust to make the investments.

19   Q.    And I just want to clarify.  Earlier I think

20   you testified and I just wanted to know for sure, do you

21   know what happened to this piece of art?

22   A.    I do not know exactly what happened to that

23   piece of art.  I do know that Global Finance Management

24   throughout the years purchased Heimo works, Heimo

25   Zobernig, this artist.  I don't the exact status of this

**EXHIBIT B**

1    piece of art, no.

2           MS. SOMBUNTHAM:  Okay.  I'm going to turn to

3       Government's Exhibit 18, and I will scroll through

4       this document as well.  It's a three-page document

5       and I'm going to return to the first page, and again,

6       Mr. Hernandez, if there are any issues reading

7       anything and you want me to go to any of the pages,

8       let me know.

9           (Government's Exhibit No. 18, Document, was

10      marked for identification.)

11   BY MS. SOMBUNTHAM:

12      Q.   **Do you know what this document is?**

13      A.   So I believe it reads above "sent to" in

14   German, and on the bottom it says "Olympia de Castro,"

15   so I assume it was sent to Olympia de Castro from what

16   it indicates there.  But then below it says to the

17   gallery, and the gallery would be the Nagel Draxler

18   Galerie in Germany, in Cologne, and this is dated

19   July 17th, 2019, and includes a Kai Althoff Untitled

20   from 2004 for $620,000; it includes the Kai Althoff

21   Liebe from 2002 for $180,000; and it includes a Kai

22   Althoff Immo for 180,000, for a total of $960,000.

23      Q.   **And I'm turning to the second page of the**

24   **document.**

25      A.   And then, it includes, Avon Bonin, purple dog

**EXHIBIT B**

1    with box from 2006, dollar amount 40,000.

2         Q.   So I'm going to go back to page 1,

3    Mr. Hernandez.  Do you recognize -- this document, have

4    you seen it before?

5         A.   No, I have not.

6         Q.   Do you recognize the artwork that is listed on

7    this document, any of them on the first page here?

8         A.   Yes, I recognize all three of them.

9         Q.   And how do you recognize these pieces of art

10   listed?

11        A.   I collected and recommended GFM -- excuse me,

12   Global Finance Management Corporation to purchase all

13   three of these works.

14        Q.   And that second piece of art that is a listed

15   here, the Kai Althoff Liebe, is that the same art that

16   we had seen on the Exhibit 6 of the application for the

17   art insurance page, and I can go back to that if you

18   need to see it.

19        A.    No, that is the same work, from 2002, the same

20   Kai Althoff Liebe from 2002 that appears in the

21   insurance policy.

22        Q.   And here according to this, it was sold for

23   about 180,000, and you testified earlier that you

24   thought it sold for 200,000.  Is that right?

25        A.   Yes, I was incorrect.  The amount is $180,000

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1  as per this document, which I believe is correct.

2      **Q.   And why do you believe it is correct?**

3      A.   Because it appears to be, if I'm understanding

4  here correctly, above, the handwritten is "sent to," so

5  that's what it says in the account form, so I believe

6  that this was sent to Olympia from what it reads there,

7  De Castro, by the Nagel Draxler Galerie, on July 17th,

8  2019.

9      **Q.   And so that 597 Hibiscus Lane, that is your**

10  **current residence address?**

11      A.   Yes, that is my current residence address.

12      **Q.   And the Galerie Nagel is Mr. Nagel's Gallery,**

13  **that is the one we reviewed earlier?**

14      A.   Yes, that is the Christian Nagel Galerie in

15  Germany.

16      **Q.   And where were these pieces of art located in**

17  **mid-2019?**

18      A.   So both Liebe and the work below, whose title I

19  do not recall, were at 597 Hibiscus -- excuse me, Immo.

20  The Liebe and the Immo from 2002 and 2004 were at 597

21  Hibiscus.  And the untitled work from 2004 was in a GFM

22  storage, and those three works -- oh excuse me, Bonin

23  was in Germany at the Nagel Gallerie, the Von Bonin

24  sculpture in the following page, this work.

25      **Q.   So on the second page, of this work here, was**

**EXHIBIT B**

1    at the Nagel Galerie?

2        A.   And, that's correct.  The 2006, the Purple

3    Bulldog With Box, from 2006.

4        Q.   And this Kai Althoff that was listed, you said

5    it was in storage.  Where was it in storage?

6        A.   It was in storage, I believe in -- I forget the

7    name of the storage, but it is Extra Storage Space, or

8    something.  It is a storage space that is -- I don't

9    remember the exact address, but it is called Extra

10   Storage Space here in Miami, and that work was held

11   there.  The two works below were held at 597 Hibiscus,

12   and the Von Bonin dog was held in the Nagel Galerie in

13   Germany.

14       Q.   And the Extra Storage Space, where in Miami is

15   it located, roughly?

16       A.   I don't know the exact address.  I don't know

17   the exact address, but it is here in Miami, in downtown.

18   I don't recall the exact address, but I can obviously

19   request the address.

20       Q.   And were these pieces of art insured?

21       A.   I don't know if they were insured.  I do not

22   know.

23       Q.   And so, when these pieces of art, I guess the

24   Kai Althoff ones left Miami, who made those

25   arrangements?

**EXHIBIT B**

1     A.   I did.

2     Q.   **And who did you contract with to ship the art?**

3     A.   No, that was managed by the gallery.

4     Q.   **What arrangement did you make with respect to**

5  **the art?**

6     A.   I basically just coordinated with the art

7  register at the gallery who managed the logistics.

8     Q.   **And so, who was your contract person, if you**

9  **know?**

10    A.   I believe her first name was Clara, I forget

11  her last name, one of the team members at the Nagel

12  Galerie in Germany.

13    Q.   **Okay.  And how did you communicate with her?**

14    A.   I chatted with Clara over the phone in my

15  mediocre German.

16    Q.   **Did you send e-mails?**

17    A.   No, I think that what I had to do was to agree

18  with them on basically the dates, and that's it.

19    Q.   **And how did you learn that these pieces of art**

20  **were sold?**

21    A.   Excuse me?

22    Q.   **How did you learn that these pieces of art were**

23  **sold?**

24    A.   I coordinated the sale.

25    Q.   **Did you negotiate the price as well?**

**EXHIBIT B**

1      A.   Yes, I did.

2      Q.   **And who did you negotiate the price with?**

3      A.   Christian Nagel.

4      Q.   **And was that over the phone or by e-mail or**

5  **message or somehow?**

6      A.   No, we chatted, we conversed over the phone.

7      Q.   **And what happened to the proceeds of the sale**

8  **of the artwork listed in Exhibit 18?**

9      A.   They were transferred to the DC2019 Irrevocable

10 Trust.

11     Q.   **Is you been involved in any other art sales**

12 **since your arrest?**

13     A.   Yes, I have.

14     Q.   **How many?**

15     A.   I would not know exactly.  There are different

16 friends that I advised in the past on works to buy or

17 sell.

18     Q.   **How many pieces of art, either in storage or at**

19 **your residence, that you made arrangements for?**

20     A.   Arrangements to sell?

21     Q.   **Yes.**

22     A.   No, no, no.  Nothing else.

23     Q.   **You have not sold any art through any auction**

24 **sites?**

25     A.   Global Finance Management or myself, I have not

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   arranged for any sale of works in 597 Hibiscus or in

2   storage, no.

3       **Q.   And there is still artwork at 597 Hibiscus?**

4       A.   Yes.

5       **Q.   Is there still artwork in the storage facility?**

6       A.   There may be some works in the Extra Storage

7   Facility, but I am not certain.

8       **Q.   And just at your residence is there any artwork**

9   **by Richard Tuttle?**

10      A.   Yes, there are works by Richard Tuttle at 597

11  Hibiscus.

12      **Q.   How about Michael Krebber?**

13      A.   No, no, I don't think so.

14      **Q.   How about Martin Kippenberger?**

15      A.   No.

16      MS. SOMBUNTHAM:  I want to show you one more

17      exhibit before we break.  This is Government's

18      Exhibit 17.  And, again, this is a four-page

19      document, and I'll scroll through the first page.

20      MS. MOSS:  I am going to object to these lines

21      of questions because they do relate to the petitions

22      that have been filed by third-party petitioners and

23      they are irrelevant.

24      MS. SOMBUNTHAM:  Okay.  I'm going on to the

25      second page of Government's Exhibit 17.

**EXHIBIT B**

1        (Government's Exhibit No. 17, Artwork Document,

2     was marked for identification.)

3   BY MS. SOMBUNTHAM:

4     Q.   The third page, and the fourth page, and again,

5   I'll return to the first page, Mr. Hernandez, but at any

6   time, please feel free to let me know.  I want to scroll

7   just a little bit here, if you could still see it.

8        On page 1, and we don't have to go so much into

9   detail, but do you recognize any pieces of artwork

10  listed here?  I think just for the record there are six

11  pieces of art listed, or line items listed on this

12  document?

13     A.   It is difficult to see them in the document,

14  but I do recognize the first one.  I do not recognize

15  the bottom ones, but they appear to be Michael Krebber

16  drawings from 1995 on paper.

17     Q.   So I want to just go through them and just ask

18  if you recognize them, and I'll zoom in much better so

19  you can see it better and hopefully that will help.

20       So the first one on page 1 of Government's

21  Exhibit 17, do you recognize this piece of work?

22  Michael Krebber 2001?

23     A.   Yes, I do.

24     Q.   And we are going to go to the second line,

25  Michael Krebber, Untitled 1995.  Do you recognize this

**EXHIBIT B**

1   piece of art?

2       A.   No, not exactly, but I know it's clearly a

3   Krebber but I don't recognize that specific piece.

4       Q.   **Line number 3, Michael Krebber also from 1995,**

5   **do you also recognize this piece of art?**

6       A.   No, but again, it seems like a Krebber to me,

7   yes.

8       Q.   **Line Item 4, Michael Krebber 1995, do you**

9   **recognize this piece of art?**

10      A.   No, that's a difficult one to see there, but

11  they appear to be Krebber works on paper.

12      Q.   **Okay, number 5.  Michael Krebber also 1995, I**

13  **know it is hard to see, but do you recognize this piece**

14  **of art?**

15      A.   Not specifically, but they look like Krebbers

16  on paper to me.

17      Q.   **Number 6, do you recognize this piece of art,**

18  **by Michael Krebber from 1995?**

19      A.   No, same as with the prior one.

20      Q.   **And then I'm going to go to page 2.  And there**

21  **are three line items here, so number one on page 2 I'm**

22  **going to zoom in for you, do you recognize this piece of**

23  **art?**

24      A.   No, but they look like Krebbers.

25      Q.   **And the second one on this, number eight of**

**EXHIBIT B**

1    all, Michael Krebber, Untitled, 1995, do you recognize

2    this one?

3        A.   No.

4        Q.   And the final piece of artwork listed, Martin

5    Kippenberger, 1991, do you recognize this piece of work?

6        A.   Yes, that I recognize.  That is a Kippenberger.

7        Q.   And how do you recognize the Kippenberger?

8        A.   Because I selected that piece in 2005 in

9    Cologne, at an art fair in Cologne.

10       Q.   And why did you select this piece?  For whom?

11       A.   That piece was part of the Martin Kippenberger

12   portfolio of Global Finance Management.  Kippenberger

13   was an artist, a German artist that I followed actively

14   throughout the years.

15       Q.   I'm going to go back to page 1 and I believe

16   you testified you recognized the first piece of work by

17   Michael Krebber 2001.  Is that correct?

18       A.   Yes, I recognize the art.

19       Q.   And how do you recognize this particular piece

20   of art?

21       A.   Because I also selected that work, the Krebber

22   from 2001.

23       Q.   And for whom did you select that piece of art

24   for?

25       A.   That was part of the Krebber collection in GFM

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    and I remember that piece.  We have it installed at the

2    701 Brickell offices here in Miami.

3         Q.   And which offices here in Miami was it in?

4         A.   At Global Securities' offices here in Miami.

5         Q.   And is that the location in Brickell?

6         A.   Yes, 701 Brickell, 20th floor.

7         Q.   And Global Finance Management Corporation, what

8    is the current status?

9         A.   I do not know exactly, but per what my brother

10   has indicated, the different Global-affiliated entities

11   have either been dissolved or in the process of being

12   dissolved.

13        Q.   And I want to zoom out to the top of this so

14   you can look at the header.  And do you recognize the

15   name of the gallery in this document?

16        A.   Yes, it's the Nagel Draxler Galerie, and it

17   reads, "Temporary invoice," and if is from the gallery,

18   to the gallery, and I believe, that this is a pro forma

19   invoice, and this is my speculation, but it appears to

20   be that it is for tax purposes to hold -- I don't

21   understand the scribble there on the 3, but it appears

22   to be a pro forma invoice from the gallery, the Nagel

23   Draxler Galerie from June of 2019.

24        Q.   And do you know how many pieces of art ended up

25   with the Nagel Galerie out of the pieces of art that you

**EXHIBIT B**

1    recognize?

2         A.   Yes, I had discussed with my sister and my

3    brother, recommending that basically the bulk of the

4    Krebber collection to be sold, and that was basically

5    the gallery, the Nagel Galerie, which is the original

6    Krebber gallery, as the appropriate gallery to sell the

7    works.

8         Q.   **So you said you discussed with your brother and**

9    **sister.  Who were you referring to, can you provide**

10   **their names?**

11        A.   Yes, Cesar Hernandez and Maria Lucia Hernandez.

12        Q.   **And why would you have discussed that with**

13   **them, these pieces of art?**

14        A.    Well, I believe that in the case of the

15   Krebber, the painting that was at the offices, I just

16   coordinated with my brother the logistics, and with my

17   sister, Maria Lucia, she was the beneficial owner of the

18   HH Master Settlement Trust, and she relied on me to make

19   all decisions in terms of want to purchase or sell for

20   the art portfolio.

21        Q.   **And she has a relationship within Global**

22   **Finance Management corporation?**

23        A.   Sorry, what do you mean by a "relationship"

24   with the corporation.

25        Q.   **Is she an officer of the corporation?  Is she a**

**EXHIBIT B**

1  shareholder of the corporation individually?  I know you

2  mentioned HH Master; I'm asking about Global Finance

3  Management Corporation?

4      A.   Yes, the Global Finance Management Corporation

5  was wholly owned by the HH Master Settlement Trust.

6      **Q.   Right, but on the paperwork for Global Finance**

7  **Management Corporation, is Maria Lucia Hernandez**

8  **anywhere on that paperwork?**

9      A.   What paperwork do you mean exactly, sorry?

10     **Q.   Any paperwork regarding the company's**

11 **documents, it's shareholders, it's minutes, notes,**

12 **anything related to that company.  Would she have a**

13 **direct relationship with that company outside of her**

14 **connection through HH Master?**

15     A.   The registered members of the shareholders, of

16 course.

17     **Q.   So she would be listed there individually?**

18     A.   She would be listed as the beneficial owner.

19     **Q.   She would be listed there, not HH Master**

20 **Settlement?**

21     A.   HH Master Settlement is the trust, the trust

22 doesn't list an entity; it lists individuals as ultimate

23 beneficial owners.

24         MS. SOMBUNTHAM:  I think we can pause and break

25     for lunch right now.

**EXHIBIT B**

```
 1              MR. SREBNICK:  Fine with me.

 2              (A recess is taken.)

 3              MR. SREBNICK:  Howard Srebnick here on behalf

 4         of Gustavo Hernandez, who is here live on video in my

 5         conference room.

 6    BY MS. SOMBUNTHAM:

 7         Q.   And, Gustavo, you are still under oath.

 8         A.   Yes.

 9         Q.   I meant to ask earlier.  Have you talked to

10    anyone during your break about your testimony?

11         A.   With my attorneys.

12         Q.   Let me just get into my next exhibit.  I'm

13    going to share my screen.  Do you see Government's

14    Exhibit 8?

15         A.   Yes, I do.

16              (Government's Exhibit No. 8, 3 Gramercy Park

17    West LLC Operating Agreement, was marked for

18    identification.)

19    By MS. SOMBUNTHAM:

20         Q.   Okay, great.  And for the record, Government's

21    Exhibit 8 is actually Petitioner's Exhibit H, also filed

22    at ECF number 383-8.

23              And, Mr. Hernandez, do you recognize this

24    document?

25         A.   Yes, I do.
```

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    Q.   And what is it?

2    A.   It is the operating agreement of 3 Gramercy

3    Park West LLC.

4    **Q.   And I'm going to turn to page 30 of Exhibit 8,**

5    **the last page, and is that your signature on this page?**

6    A.   Yes, I believe it reads "Manager by Gustavo

7    Adolfo Hernandez Frieri" and below it "Member Gramercy

8    Irrevocable Trust by trustee Americas Fiduciary LTD."

9    **Q.   And you were the initial manager of 3 Gramercy**

10   **Park West LLC?**

11   A.   I believe I was.  I don't know if the trustee

12   served as manager initially and then appointed me as

13   manager, but I recall signing as manager for 3 Gramercy

14   Park West LLC.

15   **Q.   I want to show you what has been marked as**

16   **Government's Exhibit 10, and it has a Bates number that**

17   **you produced, 7880-03.  Do you recognize Government's**

18   **Exhibit 10?**

19   A.   Yes, I do.

20        (Government's Exhibit No. 10, Written Consent

21   of Authorized Person Naming Manager for 3 Gramercy Park

22   West LLC:  Bates 7880-03, was marked for

23   identification.)

24   BY MS. SOMBUNTHAM:

25   **Q.   And what is it?**

**EXHIBIT B**

1    A.    Written consent of authorized person naming the

2  manager for 3 Gramercy Park West LLC.

3    **Q.    I was going to ask who is named as manager?**

4    A.    Gustavo Adolfo Hernandez Frieri is named as

5  manager.

6    **Q.    Is that you?**

7    A.    Yes, it is me.

8    **Q.    And what is the date on this document, do you**

9  **know?**

10    A.    The date is August 5th, 2005.

11    **Q.    And does the document include any description**

12  **of what the manager's role is?**

13    A.    You mean the operating agreement?

14    **Q.    This document, so Government's Exhibit 10.**

15    A.    I believe that that page only states above it

16  the title -- excuse me, just to read the title, if you

17  don't mind, please.  That page is just a written consent

18  naming the manager for the LLC.

19    **Q.    And do you see this part at the middle of the**

20  **page where the says "the manager shall complete the**

21  **organization of the limited liability company by**

22  **appointing officers, issuing units, ownership interest,**

23  **opening bank accounts, and taking all other actions**

24  **necessary for the organization of the company"?**

25    A.    Yes, I believe that Corporate Creations

**EXHIBIT B**

1    International Inc was the corporate register engaged by

2    the trustee's law firm to incorporate the entity,

3    Corporate Creations is the entity.

4        **Q.   As manager of 3 Gramercy Park West, I believe**

5    **you said earlier that you do not recall opening any bank**

6    **account, correct?**

7        A.   Yes, that is the correct.  I do not recall

8    opening any bank account for 3 Gramercy Park West LLC.

9        **Q.   And what about other aspects here, appointing**

10   **officers, did you do that?**

11       A.   I do not recall.  I do remember signing an

12   operating agreement.  I do not know if the operating

13   agreement officers were appointed.  It may be.

14       **Q.   Do you remember how long you served as manager**

15   **of 3 Gramercy Park West LLC, or until what date of the**

16   **year?**

17       A.   I would say approximately 13 years.

18       **Q.   And until what date or year?**

19       A.   I want to say 2018, but it could be 2019.

20       **Q.   And during that time were association fees or**

21   **any utilities being paid by you?**

22       A.   Yes.  During the time, I would have paid

23   maintenance fees for utilities when I resided in the

24   Gramercy apartment.

25       **Q.   And you mentioned an operating agreement**

**EXHIBIT B**

1    earlier?

2        A.   Yes.

3        Q.   **Was the operating agreement followed?**

4        A.   Yes, I believe the trustee established an

5    operating agreement for the 3 Gramercy Park West LLC.

6        Q.   **And was there only one operating agreement or**

7    **was it amended in the future while you were a manager?**

8        A.   To my recollection, there was only one

9    operating agreement.  There may have been amendments

10   throughout the years from 2005 onwards, but I do not

11   recall any specific amendment.

12       Q.   **And who would have that amendment, if it had**

13   **occurred?**

14       A.   The corporate secretary, or the law firm for

15   the trust, I presume would have those amendments, if

16   they existed.

17       Q.   **So who was the corporate secretary?**

18       A.   I believe Corporate Creations, which is the

19   name of the entity in the document on the screen.

20       Q.   **And which trust are you referring to for the**

21   **law firm?**

22       A.   And apologies, it is the Gramercy Irrevocable

23   Trust's law firm, which would be Richards & Associates.

24       Q.   **And you said Gramercy Irrevocable Trust?**

25       A.   Yes, the Gramercy Irrevocable Trust.

**EXHIBIT B**

1    Q.   Okay, I'm going to show you what has been

2    marked as Government's Exhibit 9.

3         (Government's Exhibit No. 9, Amended and

4    Restated Operating Agreement of 3 Gramercy Park West

5    LLC, was marked for identification.)

6    BY MS. SOMBUNTHAM:

7    Q.   And this was actually produced in

8    nonconsecutive Bates numbers and I just wanted to add

9    for the record, it's 847-03 through 848-03, 849-03, and

10   then it jumps, it looks like, to 880-03, and then the

11   end of the document 906-03.  And I'm just going to go to

12   page 1 first.

13        Do you recognize this document, Mr. Hernandez?

14   A.   Yes, I believe it was the operating agreement

15   for 3 Gramercy Park West LLC.

16   Q.   And is this the original or the amended and

17   restated operating agreement?

18   A.   It reads above "Amended and Restated Operating

19   Agreement of 3 Gramercy Park West LLC."

20        MS. SOMBUNTHAM:  And then I'm just going to get

21   to the end of it.

22        MS. PERCZECK:  Forgive me for interrupting.

23   What is the Bates of the first page?

24        MS. SOMBUNTHAM:  The Bates number of the first

25   page is 847-03 and continues the 849-03, and then

**EXHIBIT B**

1    just for the record, it looks like the original

2    operating agreement language, and then looking at the

3    numbering, it picks up again at 880-03.  I think it

4    will be pretty quick.

5    BY MS. SOMBUNTHAM:

6       Q.   But on the last page 30 of Government's

7    Exhibit 9, that is your name here; is that correct?

8       A.   Yes, it is.  That is my name.

9       Q.   And the signature is missing here; is that

10   correct?

11      A.   Yes, I did not sign that document.

12      Q.   Okay.  So for the record, do you know if this

13   amended and restated operating agreement was ever

14   adopted by 3 Gramercy Park West LLC?

15      A.   I believe so, yes.

16      Q.   So you think that this is the operating

17   agreement, one of the amendments that we have discussed

18   previously?

19      A.   I believe so, but this is July 2005, so I am

20   not certain.

21      Q.   It may be helpful, just so you understand,

22   Mr. Hernandez, there are two operating agreements.  This

23   one is Government's Exhibit 9 and earlier in

24   Government's Exhibit 8, and I'm going to go through the

25   first page of both of them.

**EXHIBIT B**

1    I'm going to show you Exhibit 8 now.  This is

2    the original operating agreement, it looks like.  This

3    is the one that was filed as Petitioner's Exhibit H at

4    ECH383-8 and if you can read, what is the date on this

5    one, because I think you reverenced the date on the

6    amended operating agreement on Exhibit 9?

7    A.    The date on this operating agreement is

8    July 29th, 2005.

9    Q.    And then just for your reference, I'll go to

10    Government Exhibit 9, and what is the date here?

11    A.    It appears to be the same date, 29th of July,

12    2005 as well.

13    Q.    So as manager of 3 Gramercy Park West LLC,

14    which operating agreement did you follow?

15    A.    I presume the amended and restated version, but

16    I will need to see what differences, if any, existed

17    between the two operating agreements.

18    Q.    Would it make sense to take a five minute break

19    to decide between the two, because the questions are

20    going to be about that, the operating agreement?

21    A.    Yes, please.

22        MS. SOMBUNTHAM:  And Jackie, Howard, you have

23    these exhibits?

24        MR. SREBNICK:  One moment, please.

25        MS. PERCZECK:  We have it, thank you.

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1      MS. SOMBUNTHAM:  Okay.  Do you want to take

2   just a five minutes or ten minutes?  How much time do

3   you think you would need?  And the question I'm

4   asking is which of the two operating agreements, the

5   one in Exhibit 8 or Exhibit 9, was the operating

6   agreement that 3 Gramercy Park West LLC was under

7   while Mr. Hernandez was manager.

8      MR. SREBNICK:  You want us to come back in 10

9   minutes?

10      MS. SOMBUNTHAM:  Yeah, I think that will be

11   faster than me scrolling through it.

12      MS. PERCZECK:  It's 3:30 here so we'll turn

13   back on at 3:40.

14      (Discussion off record.)

15      MS. PERCZECK:  We checked during the break.  So

16   I just wanted to clarify that what we have as

17   Government's Exhibit 8 is also a document that we

18   produced to you Bates-stamped 817-03.  So I just

19   wanted to make sure that you realize that even though

20   you have included the one that you filed in the

21   record, that's also something produced to you as part

22   of that production in that package.

23      MS. SOMBUNTHAM:  Thank you, Jackie.  Yes, I

24   have that as well.  I think it was in the same set of

25   documents beforehand intermixed, and that's part of

**EXHIBIT B**

1       the question I had between Government's Exhibit 8 and

2       Government's Exhibit 9, is one the right one we

3       should by discussing today for the operating

4       agreement.

5    BY MS. SOMBUNTHAM:

6       Q.   Mr. Hernandez, you are still under oath.  I

7    don't know if you could answer that question?

8       A.   So I do not know, but I believe that the

9    operating agreement and the amended and restated version

10   of the operating agreement, from what I was able to read

11   now, do not have a differences other than the date being

12   repeated in the first paragraph, and this version of the

13   amended and restated operating agreement has the

14   signature of the trustee, but does not have my signature

15   as manager of the LLC.

16      Q.   I guess the question for you, Mr. Hernandez, is

17   you were the manager, I believe, for 13 years, I believe

18   you testified, for 3 Gramercy Park West LLC?

19      A.   Yes, it is correct.

20      Q.   And during that timeframe, there was an

21   operating agreement for 3 Gramercy Park West LLC; is

22   that correct?

23      A.   Yes, it is correct.

24      Q.   And between Exhibit 8 and Exhibit 9, which one

25   did you follow?

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    A.   I believe that they are the same.  From my read

2    it of it, aside from the difference that I remarked

3    regarding the first photograph in the signature line.

4    **Q.   Well, I'll show you one difference in addition**

5    **to that.  If you look at Government's Exhibit 8 and you**

6    **scroll through the definitions starting on page 1 of**

7    **that exhibit, and go to Section 1.3 "Purpose and Power,"**

8    **that's is on the bottom of page 3 of Government's**

9    **Exhibit 8.  Do you see that clause?  You don't have to**

10   **read it or review it.  Do you see that clause?**

11   A.   Yes, I see under 1.3 "Purpose and Powers."

12   **Q.   And then if I go to Exhibit 9, and starting**

13   **from page 1 there are definitions as well, and going to**

14   **the same subsection, 1.3, which starts at the end of**

15   **page 3 into the start of page 4 of Government's**

16   **Exhibit 9, do you see how that subsection is slightly**

17   **different than the one in Government's Exhibit 8?**

18   A.   I see the difference in 1.3.  In the amended

19   and restated version it indicates that sole purpose of

20   the company is to take title to the property located at

21   3 Gramercy Park West, New York, New York, second floor

22   unit, then the company has in power to do any and all

23   acts necessary, et cetera.  And then the initial version

24   of the operating agreement indicates that the purposes

25   of the company are to operate the business, make

**EXHIBIT B**

1    additional investments, and the second seems to be

2    similar to, B seems to be identical, so 1.3A in the

3    amended version circumscribes the businesses of the

4    company to take the title of the property, while 1.3A in

5    the original version is a broader purpose.

6        **Q.   And does that help you determine which of the**

7    **operating agreements was in action during the time you**

8    **were manager, because they are dated the same date?**

9        A.   I believe that there's, again, no fundamental

10   difference.  I don't recollect if we made a

11   determination to follow anything different than what

12   appears in this amended version since the 3 Gramercy

13   Park West LLC only had one purpose, and that was to lay

14   title of the 3 Gramercy Park West LLC property.

15       **Q.   Just so I understand, are you saying that**

16   **Government's Exhibit 9 was the operational operating**

17   **agreement during the time you were manager?**

18       A.   Not exactly.  What I meant to say is that the

19   difference of that 1.3A, in terms of purpose in the

20   amended version circumscribes the purpose solely to take

21   title to the property, and the previous version is very

22   broad.

23       **Q.   I understand the difference between -- I'm just**

24   **asking you a more simple question, Mr. Hernandez.  Which**

25   **one of these documents would be the valid operating**

**EXHIBIT B**

1    agreement for the time that you were manager?

2         A.    Again, as I am trying to say, I do not know

3    exactly which one was followed, but to me they are

4    identical aside from that difference that I noted there.

5         Q.    Okay.  Well, then let's go to Exhibit 8 then,

6    and this is the original operating agreement, not the

7    amended one.  Is Government's Exhibit 8 a fair and

8    accurate copy of the operating agreement for 3 Gramercy

9    Park West LLC when you were its manager?

10        A.    I believe so.  I would have to look at it more

11   closely, but I believe so, yes.

12        Q.    And did you adhere to the terms of this

13   operating agreement in Government's Exhibit 8?

14        A.    I believe so, yes.

15        Q.    And I'm going to go to page 5 of Government's

16   Exhibit 8 and Section 1.7 and you can read that to

17   yourself.  Was this section entitled "Titles of

18   Property" adhered to while you were manager?

19        A.    Yes.

20        Q.    Mr. Hernandez, do you need me to scroll in?

21        A.    No, I have the document in front of me, I am

22   looking at it.

23        Q.    Maybe we'll look at the first sentence and you

24   can say yes or no if you adhere to this.  The first

25   sentence says "All property owned by the company shall

**EXHIBIT B**

1    be owned by the company as an entity and no member shall

2    have any ownership interest in such property in his

3    individual name, and each member's interest in the

4    company shall be personal property for all purposes."

5         Was that adhered to when you were manager of 3

6    Gramercy Park West LLC?

7    A.   I believe so:  I'm not certain exactly as to

8    the legal definitions of the title to the property and

9    the rest of there definitions under this 1.7, but I say

10   that I do not see anything here that I believe is

11   incorrect.

12   Q.   So in your mind the property was owned by 3

13   Gramercy Park West LLC and only by 3 Gramercy Park West

14   LLC?

15   A.   The membership interests in the co-ownership

16   were held by the 3 Gramercy Park West LLC.  Yes, that is

17   my understanding.

18   Q.   The property, so that would be the 3 Gramercy

19   apartments, was owned by the company, and only by the

20   company as an entity.  Is that your understanding?

21   A.   Again, not to complicate, but to be clear, in

22   my understanding, there is no title to the apartment.

23   There were shares in the co-ownership.  So 3 Gramercy

24   Park West LLC held a certain number of shares in the

25   Gramercy co-ownership.

**EXHIBIT B**

1    Q.   So the shares in the company that was --

2    resulted in Unit 2 being the sort of physical property,

3    that was owned by the company solely and no member of

4    the company.  Is that your understanding?

5    A.   My understanding is that the member of the

6    company, per 2.1, under original capital contribution

7    was the Gramercy Irrevocable Operating Trust, America's

8    Fiduciary as trustee, which held 100 percent of the

9    membership interest in the Gramercy property.

10   Q.   Your understanding was the member of the

11   company owned the property of the company, which is the

12   same or different than the first sentence?

13   A.   Again, I'm sorry if I'm being slow here, but I

14   do not follow the difference.

15   Q.   That's fine.

16   A.   I apologize again.

17   Q.   I think we'll move on.  So Section 1.8, that

18   comes right after, you see this, "Payments and

19   Individual Obligations"?

20   A.   Yes.

21   Q.   Was that adhered to while you were the manager

22   of 3 Gramercy Park West LLC?

23   A.   Again, I do not want to speak for the legal

24   definitions that are used here.  I am not comfortable

25   doing so.  There is nothing in this payment and

**EXHIBIT B**

1    individual obligation, Section 1.8, that strikes me as

2    incorrect.

3        Q.   The question is if you adhered to this section

4    as manager of the company?

5        A.   Again, I believe so.  "The company's credit and

6    assets shall" -- I'm reading it to be able to answer

7    properly, but I believe so, yes.

8        Q.   I'm going to go to page 12 and I'm going to

9    scroll down to Section 5.3, and that is titled "Duties

10   and Obligation of the Manager"; is that correct?

11       A.   Yes, that is the title.

12       Q.   And it goes from -- it ends actually on this as

13   you can see.  So on page 12, Section 5.3, reviewing this

14   on your own, did you adhere to this section of the

15   operating agreement?

16       A.   Again, I have to read this closely, but putting

17   aside the legal definitions, this appears to be standard

18   language in an LLC operating agreement, and I don't see

19   anything here, at least at a quick glance that strikes

20   me as incorrect.

21       Q.   So, did you segregate the company's assets?

22       A.   The company did not have any assets other than

23   the membership interest in the Gramercy Park

24   co-ownership.  That was the --

25       Q.   What about the rental income?

**EXHIBIT B**

1    A.    I do not recall what rental income was received

2    and what was the use given to the proceeds of the rental

3    income, so I wouldn't be able to answer.  I do

4    remember --

5    **Q.   And --**

6    A.    I apologize.

7    **Q.   You said you remembered something about the**

8    **rental income?**

9    A.    I do remember that there was a renter at some

10   point in 2013 or 2014, there was a short-term rental,

11   but I do not remember what was the use of the proceeds

12   of the rental.  I believe that it may have been used to

13   cover maintenance and the lights, but I do not remember.

14   **Q.   And were those or any costs of the company**

15   **maintained in a separate book or financial record?**

16   A.    I honestly don't think that this company ever

17   had financial records in the form of a balance sheet or

18   a financial statement.

19   **Q.   And I think you testified earlier that you also**

20   **don't think that there was a bank account for 3 Gramercy**

21   **Park West LLC?**

22   A.    Again, not to my knowledge.  If colleagues in

23   the Global Financial department set up an account back

24   in 2005, it may be the case, but I personally do not

25   remember there being a bank account for that entity.

**EXHIBIT B**

1    Q.   Were any of the global entities the manager of

2    3 Gramercy Park West LLC?

3    A.   No, no, not to my recollection.  The manager

4    for 3 Gramercy Park West LLC was myself.

5    Q.   And so why didn't you open a separate bank

6    account?

7    A.   I never opened -- I don't recall opening

8    personally, bank accounts for any of the global

9    entities, which had bank accounts, and these were many

10   different entities with different bank accounts.  But

11   again, I personally didn't, even though I may have

12   serviced as manager or director, I did not personally

13   open accounts for these entities.

14   Q.   According to the operating agreement, was there

15   anyone else authorized to open a bank account for 3

16   Gramercy Park West LLC?

17   A.   I do not know.  I'd have to read it and

18   understand, but I presume that as manager I could have

19   authorized for the opening of an account.  But again,

20   what I'm saying is I don't remember there being an

21   account.  I'm not saying that there wasn't an account,

22   there could have been an account, but I don't remember

23   that being the case.

24   Q.   And if you look under Section 2.1, "Original

25   Capital Contributions," who is listed here as the member

**EXHIBIT B**

1   of the 3 Gramercy Park West LLC?

2        A.   Gramercy Irrevocable Operating Trust is listed

3   as the member with 100 interest in the 3 Gramercy Park

4   West LLC.

5        Q.   And to your knowledge, is that an accurate

6   description of the 3 Gramercy Park West LLC while you

7   were the manager?

8        A.   Yes.

9        Q.   And HH Master Settlements is not listed here?

10       A.   No, the Gramercy Irrevocable Trust had the HH

11   Master Settlement Trust as its sole beneficiary.  The

12   Gramercy Irrevocable Trust was an affiliated trust to

13   the HH Master Settlement trust.

14       Q.   And so this is another trust within your family

15   control and benefit?

16       A.   My father set up the Gramercy Irrevocable

17   Operating Trust under the HH Master Settlement Trust

18   that he had incorporated earlier, and the trustee was

19   America's Fiduciary LTD, which was the trustee of the HH

20   Master Settlement at the time, 2005 -- 2004, 2005.

21       Q.   I'm going to show you what has been marked as

22   Government's Exhibit 7.

23            MS. SOMBUNTHAM:  And, Jackie, to your point, I

24        think you might have produced this as well under

25        Bates stamp 764-03.  And.

**EXHIBIT B**

1    BY MS. SOMBUNTHAM:

2         Q.   When I say "you," I mean you, Mr. Hernandez,

3    you produced to your attorneys this document as well,

4    but this is actually -- Petition Exhibit D filed under

5    ECF number 383-4.

6              And so first, Mr. Hernandez, do you recognize

7    this document?

8         A.   Apologies, Ms. Sombuntham, there is nothing on

9    the screen.  I don't know what you're referring to.

10        Q.   My apologies.  Do you see it now?

11        A.   Yes, now I see it.

12             (Government's Exhibit No. 7, Gramercy

13   Irrevocable Operating Trust Declaration of Trust, was

14   marked for identification.)

15   BY MS. SOMBUNTHAM:

16        Q.   And so do you recognize this document,

17   Mr. Hernandez?

18        A.   Yes, I believe I do.  It reads "Gramercy

19   Irrevocable Operating Trust Declaration of Trust."  It

20   is dated July 1st, 2005.

21        Q.   As I mentioned before, I think you also

22   produced this document to your production.  Do you

23   recall that?

24        A.   Honestly, I don't recall.  There were so many

25   documents produced.  I don't recall producing this

**EXHIBIT B**

1   specific document but it was probably.

2       Q.   Okay, I'm going to turn to page 2 of Exhibit 7.

3   And just to confirm what you said earlier, the trustee

4   in 3.1.4 is named as "America's Fiduciary LTD, a Nevis

5   Corporation."  Is that correct?

6       A.   Yes, that is my understanding, that America's

7   Fiduciary was the trustee.

8       Q.   And what is America's Fiduciary?

9       A.   I believe it's the trust company.  They are a

10  trustee affiliated with a -- General Guardian, I believe

11  is the name of the trust and estates company.

12      Q.   Due you know why this trustee was chosen?

13      A.   Why my father shows a foreign?  He was a

14  foreigner.  Everything he did was foreign.

15      Q.   And he was from Nevis?

16      A.   No -- my father?  No, my father was from

17  Cartagena, Colombia.

18      Q.   And so he didn't choose a local company in

19  Colombia to be the trust?

20      A.   That wouldn't have been the case.  There is no

21  -- let's just say that trust law in Colombia is very

22  different.

23      Q.   Why not an American company to be a trustee?

24      A.   Why wouldn't he use an American company?  My

25  father didn't reside in the U.S. and didn't do business

**EXHIBIT B**

1    in the U.S.

2        Q.   I'm going to turn to page 9 and I'm going to

3    direct your attention to the bottom of page 9 and the

4    beginning of page 10, just to show you that it starts

5    off Article VI "Protector," and then in Section 6.1.3,

6    H&H Protectors IBC, a Bahamian company, is appointed as

7    the initial protector.  Is that correct?

8        A.   Yes.

9        Q.   And what is H&H Protectors IBC?

10       A.   It was a company domiciled in the Bahamas, I

11   believe it was incorporated by the trustee, which my

12   father used, Banco Atlantico Bank & Trust, and H&H

13   Protectors was to serve as the initial protector for the

14   Gramercy Irrevocable Operating Trust.

15       Q.   And does H&H Protectors IBC have any other

16   name?

17       A.   Not to my recollection, no.  It is used there

18   as an IBC, which is an international business

19   corporation, but I know it has H&H Protectors.

20       Q.   And were you affiliated in any way with H&H

21   Protectors IBC?

22       A.   Yes, I was appointed by my father as codirector

23   of the entity alongside my elder brother.  Some time in

24   the early 2000s, 2002, 2003, I want to say, so a couple

25   of years prior to this.

**EXHIBIT B**

 1          MR. SREBNICK:  Can you just hold one second?

 2          (Discussion off record.)

 3          MR. SREBNICK:  Just to alert the prosecutors

 4      that we've texted the probation officer, Mark

 5      Delesdernier, just to let him know that we are still

 6      here at my office, it is 4:30, and Mr. Hernandez will

 7      be here past the 5:00 deadline for him to get home,

 8      and when we get done then, we'll text him back to

 9      give him a heads up.  That's all, thanks.

10          MS. SOMBUNTHAM:  Okay.  And for the court

11      reporter for you, I believe the spelling of his last

12      name, D-e-l-e-s-d-e-r-n-i-e-r, and it's Mark with a

13      K.

14  BY MS. SOMBUNTHAM:

15      **Q.   And, Mr. Hernandez, as a director of H&H**

16  **Protectors IBC, the protector of Gramercy Irrevocable**

17  **Operating Trust, what were your duties towards the**

18  **Gramercy Irrevocable Operating Trust?**

19      A.   Well, the trust protector duties, as I

20  understand them, in a trust entail protecting the

21  beneficiaries of the trust of any action by the service

22  providers to the trust that could be contrary to the

23  need of the trust.

24      **Q.   And what is the difference between a protector**

25  **and a trustee then?**

**EXHIBIT B**

1      A.    These are in my understanding two very

2   different roles in the context of a trust law, and

3   broadly speaking, estate planning in general.  The

4   trustee, as I understand it, is the institution or

5   individual responsible for the overall mandate that the

6   settler has established in the trust deed.  Protectors,

7   to my knowledge, have a role that is limited to ensure

8   that the trustee and potentially other service providers

9   to the trust do not breach the provisions in the trust

10  deed as member or codirector or member of a protector

11  committee is the same for practical purposes.  That is

12  my understanding of what the protector roles entails.

13      **Q.    I'm going to turn to page 15 of Government's**

14  **Exhibit 7, and, Mr. Hernandez, who signs on behalf of**

15  **the trustee?**

16      A.    I believe that that is the signature for

17  Timothy D Richards, director of America's Fiduciary LTD.

18      **Q.    And who is Timothy D Richards?**

19      A.    A director of America's Fiduciary LTD and a

20  trust and estate attorney.

21      **Q.    And where is he located as a trust and estate**

22  **attorney?**

23      A.    They have a trust company, to my knowledge, in

24  Nevada, I want to say is the domicile for General

25  Guardian and America's Fiduciary is Nevis domiciled, and

**EXHIBIT B**

1    I also believe Nova Scotia Canada.

2        Q.    And when was the least time you communicated

3    with Timothy Richards?

4        A.    I communicated with Timothy Richards, I want to

5    say about six to eight weeks back, or perhaps a bit

6    longer, in the context of the document production

7    request.

8        Q.    And was he located in the United States at that

9    time?

10       A.    Yes, he was located in the United States at the

11   time.

12       Q.    Do you know where he was located?

13       A.    I do not know the exactly address by heart, but

14   I believe that is South Bay Shore Drive, on the street

15   that is towards Coconut Grove, and the office billings,

16   I believe that is South Bay Shore Drive, yes.

17       Q.    And so when you communicated, was that in

18   writing, e-mail, text messages, phone calls, how did you

19   communicate with him?

20       A.    I communicated with Tim Richards via e-mail and

21   over the phone.

22       Q.    And how frequent did you speak with Timothy

23   Richards before then?

24       A.    Well, I had not spoken with him in probably a

25   bit over ten years.  Probably a little bit more, a

**EXHIBIT B**

1  little bit less.

2      Q.   And what did Timothy Richards do on behalf of

3  Gramercy Irrevocable Operating Trust?

4      A.   Timothy Richards served as director for

5  America's Fiduciary LTD, which was the trustee for the

6  Gramercy Irrevocable Operating Trust.

7      Q.   And over the last ten years, you in your role

8  at the director of the protector had no communications

9  with Timothy D Richards?

10     A.   No, I do not recollect having any

11 communications since I do not -- yes, I do not recollect

12 having any communications with Tim Richards in my role

13 as codirector of H&H Protectors for the Gramercy

14 Irrevocable Trust.

15     Q.   And you said that you talked to him about the

16 document production six to eight weeks back.  What

17 documents were you seeking from him?

18     A.   So the 3 Gramercy Park West LLC corporate

19 documents and the Gramercy Irrevocable Operating Trust

20 documents, the HH Master Settlement Trust documents, I

21 believe that those are the documents that I requested

22 for them to provide a copy.

23     Q.   And he provided you that copy?

24     A.   Yes, they did.

25     Q.   I'm going to go to the next page, page 16, and

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   just to confirm here, it says "NSA property, 100 percent

2   membership interest in 3 Gramercy Park West LLC" as a

3   property listed here.  Is there any other property

4   listed other than there 100 Canadian dollars that you

5   see here that was part of the property of Gramercy

6   Irrevocable Operating Trust?

7       A.    That is Annex A.  That is the only property

8   that appears under the Gramercy Irrevocable Operating

9   Trust.

10      Q.    And as far as you know, is there any other

11  property held by Gramercy Irrevocable Operating Trust?

12      A.    No.  No, to my knowledge, there was no other

13  property held under the Gramercy Irrevocable Operating

14  Trust.

15      Q.    And so it's not the interest in the Gramercy

16  corporation that resulted in the Gramercy apartment,

17  that is not listed here; is that correct?

18      A.    Sorry, I don't follow.

19      Q.    We discussed earlier that the Gramercy

20  apartment is basically a purchase through shares in a

21  Gramercy owner corporation; is that correct?

22      A.    Yes, those -- so the co-ownership interests

23  were held, the co-ownership interests in the 3 Gramercy

24  Park co-ownership were held by the 3 Gramercy Park West

25  LLC, which was owned by the Gramercy Irrevocable

**EXHIBIT B**

1  Operating Trust.

2      Q.    But 3 Gramercy Park West LLC the property, the

3  property that is called 3 Gramercy Park West LLC is not

4  listed here, correct?

5      A.    There was no title to any property.  The

6  co-ownership was shared and the shares of the 3 Gramercy

7  Park West LLC property were owned ultimately but the

8  Gramercy Irrevocable Operating Trust.

9      Q.    So the shares are owned ultimately by the

10 Gramercy Irrevocable Operating Trust, but it is not

11 listed here though.  The shares of that corporation are

12 not listed here; is that correct?

13     A.    The shares in Gramercy Park West LLCC are

14 listed on there under numeral II.

15     Q.    The shares in the partial ownership of the

16 company that owned the building is not listed here.  I

17 see the 100 membership interest, I just want to make

18 clear here that the underlying shares that are held by 3

19 Gramercy Park West LLC are not listed under the property

20 of Gramercy Irrevocable Operating Trust.

21     A.    No, the only thing that this lists is under

22 this Annex A is the 100 Canadian dollars and the

23 membership interest in the LLC, which held the

24 co-ownership share.

25     Q.    Turning to the next page, page 17, and this is

**EXHIBIT B**

1   entitled, I believe, "Annex B:  Beneficiary."  Is that

2   correct?

3       A.    Annex B:  Beneficiary, yes, that is correct.

4       Q.    And who is named as the beneficiary, of the

5   Gramercy Irrevocable Operating Trust?

6       A.    The beneficiary of the Gramercy Irrevocable

7   Operating Trust is the HH Master Settlement Trust.

8       Q.    And what is the date of that trust, the

9   beneficiary trust?

10      A.    It date is December 1st, 2004.

11            MS. SOMBUNTHAM:  I'm going to show you what has

12      been marked as Exhibit 2.

13            (Government's Exhibit No. 2, HH Master

14      Settlement Trust Deed:  Bates 1-03 - 19-03 was marked

15      for identification.)

16   BY MS. SOMBUNTHAM:

17      Q.    And this was produced with Bates stamp numbers

18   from you, 1-03 to 19-03.  I'm going back to the first

19   page and zooming out a little bit.

20            Mr. Hernandez, do you recognize this document?

21      A.    Yes, I do.

22      Q.    What is it?

23      A.    It is the HH Master Settlement Trust deed, I

24   believe, trustee Banco Atlantico Bahamas (Bank & Trust

25   LTD).

**EXHIBIT B**

1    Q.    And what is the date of this HH Master

2  Settlement Trust?

3    A.    It says dated 26th of February, 2003.

4    Q.    And I'm going to turn to page 2, and is the

5  same date on the first line of page 2?

6    A.    Yes.

7    Q.    And so is this a different trust than the one

8  that was referenced in the last exhibit?  I can go back

9  if you'd like, Exhibit 7.

10   A.    No need to go back.  Thank you.  I remember,

11  that last exhibit.  No, this is, to my knowledge, the

12  same exact trust.  The had Banco Atlantico Bank & Trust

13  LTD as the original trustee, and it was domiciled

14  originally under Bahamian law, and it was later

15  redomiciled under Canadian law to America's Fiduciary as

16  trustee.

17   Q.    And is there a document that shows that

18  redomicile that you just described for HH Master

19  Settlement?

20   A.    I believe that there should be a document in

21  confirming this in the form of an amended trustee, and

22  contract with the trustee, I believe, would be the

23  document that would formalize the redomiciliation of the

24  trust.

25        MS. SOMBUNTHAM:  I want to show you what has

**EXHIBIT B**

1    been marked as Government's Exhibit 13, and this was

2    filed as Petitioners E at ETF 383-5.  Just for the

3    record, you also produced this document or a copy of

4    this document with Bates number 956-03 through 973-03

5    according to my notes.

6         (Government's Exhibit No. 13, Amended and

7    Restated HH Master Settlement Declaration of Trust:

8    Bates 956-03-973-03 was marked for identification.)

9    BY MS. SOMBUNTHAM:

10        **Q.   And just real quickly, Mr. Hernandez, do you**

11   **recognize this document?**

12        A.   Yes, I believe that I do recognize the

13   document.

14        **Q.   And what is it?**

15        A.   It reads, the "Amended and Restated HH Master

16   Settlement Declaration of Trust."

17        **Q.   And when was it amended and restated?**

18        A.   This version appears the 13th day of

19   November 2006.

20        **Q.   And what version of the HH Master Settlement**

21   **did it amend and restate?**

22        A.   It amended and restated the version dated

23   December 1st, 2004.

24        **Q.   And I want to go back to Exhibit 2.  And what**

25   **was the year that this HH Master Settlement -- I'll turn**

**EXHIBIT B**

1   to page 1.  What is the year of this HH Master

2   Settlement?

3        A.   The year of this version of the deed, which I

4   believe was the initial year, was 2003, February 26,

5   2003.

6        Q.   So is there a version from 2004?

7        A.   Per the amended version of 2006, it appears

8   that there would be a revision in 2004, but I am not

9   certain.

10        Q.   Do you have a copy of the documents from 2004?

11        A.   I don't know if I do.  We would -- I would need

12   to check.  I don't know if I do.

13        Q.   Are you aware the HH Master Settlement was

14   amended more than once?

15        A.   Oh, yes.  The trust was amended when it was

16   redomiciled, and when the trustee changed, and that

17   would have been some time circa 2004.  So that would

18   make sense, yes, because my recollection is that Banco

19   Atlantico shut down some time in 2004 or early 2005.

20        Q.   Do you know where a copy of the December 1st

21   2004 trust documents for HH Master Settlement would be?

22        A.   I don't recall.  I know that what I received

23   from Richards & Associates is what we had in the

24   production, but perhaps the December 2004 version is

25   included.  I'm uncertain.

**EXHIBIT B**

1    Q.    I'm going to show you to Exhibit 13 again.   And

2    just for the record, this is the amended and restated HH

3    Master Settlement Declaration o Trust that you

4    identified earlier.   I'm going to turn to page 10 and

5    then scroll to page 11 and, Mr. Hernandez, who is

6    identified here, if any one, as the protector of the

7    amended and restated HH master settlement?

8    A.    Per numeral 6.1.3, the protector for the time

9    being of the present Trust shall be H&H Protectors LTD,

10   a Bahamas corporation.

11   Q.    And what is H&H Protectors LTD?

12   A.    I believe that that is the original protector

13   entity incorporated by Banco Atlantico in the Bahamas

14   circa 2003.

15   Q.    Is that different than the H&H Protectors IBC

16   that is referenced as the protector of Gramercy

17   Irrevocable Operating Trust?

18   A.    I do not believe that it is different.   I

19   believe it is the same entity.   IBC would just stand for

20   a Bahamas corporation.

21   Q.    I'm going to go back to Exhibit 2.   Just to ask

22   you again, when was the Gramercy apartment purchased,

23   what year?

24   A.    I believe August 2005.

25   Q.    So at the time that it was purchased, would it

**EXHIBIT B**

1   have been this version of the HH Master Settlement or

2   some other version of the trust that was in operation at

3   the time?

4       A.   The version of the trust would have been the

5   same, I believe, same for the trustee and the domicile.

6   But to my recollection, the deed for the HH Master

7   Settlement Trust would remain the same.

8       Q.   Well, turning to Exhibit 2, when the trust was

9   established in 2003, were you a beneficiary of the HH

10  Master Settlement?

11      A.   No, I was not a beneficiary of the HH Master

12  Settlement Trust.

13      Q.   And I'm going to page 2.  Who was the

14  beneficiary, as far as you know?

15      A.   At the time, I believe my father, Gustavo

16  Hernandez Romero.

17      Q.   And if you father had passed away, if you are

18  looking at pages 2 and 3, who would have been the

19  beneficiary at that point?

20      A.   Apologies, I'm not looking at pages 2 and 3.

21      Q.   Towards the bottom of page 2, there is a

22  definition of beneficiaries.  Do you see that?

23      A.   Yes.

24      Q.   It continues to page 3 of the exhibit itself, I

25  know that there is a different numbering.

**EXHIBIT B**

1   A.   Yes.  I do not read this closely, but

2   understanding is that the beneficiaries was the settlor.

3   There should be another section, if you looking at

4   contingent beneficiaries -- a triggering event of the

5   trust, there should be a section for the contingent

6   beneficiaries.

7   Q.   Section 1.7.3, what does that say?

8   A.   "At any time during which there are no

9   beneficiaries, the children and the descendants of the

10  settlor."

11  Q.   And so in 2003, who were the children of the

12  settlor?

13  A.   In 2013, the children of the settlor were my

14  brother Cesar, my sisters Maria Lucia and Maria Elena,

15  and myself.

16  Q.   And in 2004, were the children the same?

17  A.   Yes, the children were the same.

18  Q.   And do your siblings have their own children?

19  A.   Yes, all my siblings have been married and had

20  children by the time that this deed was established in

21  2003.

22  Q.   But in 2003 you were single and without

23  children, so you testified earlier, right?

24  A.   Yes, I was the only sibling without children as

25  of the time of the deed.

**EXHIBIT B**

1    Q.    And that was true in 2004?

2    A.    Yes.

3    Q.    And 2005?

4    A.    Yes.

5    Q.    So when was your first child born?

6    A.    May 31st 2011.

7    Q.    So basically, until 2011, you did not have

8    further descendants from you in the family?

9    A.    No, no descendants from me in the family.

10         MS. SOMBUNTHAM:  All right.  I want to show you

11    what has been marked as Government's Exhibit 3.

12         (Government's Exhibit No. 3, Letter:  Bates

13    56-03 was marked for identification.)

14    BY MS. SOMBUNTHAM:

15    Q.    Do you recognize this document?  It is

16    Bates-stamped 56-03 in your production.

17    A.    Yes, I believe that I do.

18    Q.    And what is it?

19    A.    Do you mind scrolling a little bit just to make

20    sure?  Okay.  Thank you.

21         So Mr. Miguel Angel Cuello was my father's

22    private banker and this is a letter addressed to

23    Mr. Cuello, director of Banco Atlantico Bank & Trust on

24    February 26, 2003, accepting the appointment as the

25    protectors of the HH Master Settlement Trust on behalf

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   of HH Protection LTD.

2       Q.   And is HH Protection LTD or the different or

3   the same as H&H Protection LTD?

4       A.   I do not believe so.  I think it is the same

5   entity.

6       Q.   And is it the same entity as H&H Protection

7   IBC?

8       A.   I believe so.  I am not certain, but to my

9   knowledge, there was only HH Protection entity.

10      Q.   And what was your role at HH Protection LTD?

11      A.   I was the codirector alongside my elder brother

12  of HH Protection.

13      Q.   And what actions did you have to undertake in

14  that role as director?

15      A.   I don't recall taking an action as to

16  codirector of the HH Protection entity.

17      Q.   There was no responsibilities you had as

18  director?

19      A.   I understood the question as what actions did I

20  take.  Again, I don't recall taking specific actions on

21  behalf of HH Protection.  I -- may have taken actions,

22  but again, I don't recall having taken any specific

23  action as codirector of the entity.

24      Q.   Do you have any company documents for HH

25  Protection LTD or any of the H&H entities that we

**EXHIBIT B**

1    discussed in terms of the HH Protection entities?

2        A.   Any document that I have with regards to HH

3    Protection, I presented for the production.

4        Q.   So are you aware of any articles of

5    organization of similar types of incorporation docs for

6    that entity, HH Protection LTD?

7        A.   I assume that they existed.  I cannot say that

8    I remember seeing them.  For sure not recently.  But any

9    document that I had with regards to HH Protection, I

10   presented for the production.

11       Q.   So if you were told that you did not produce

12   any incorporation documents or operating documents for

13   HH Protection, LTD, would that surprise you?

14       A.   I don't know if it would surprise me or not.  I

15   believe again that the entity -- my recollection was

16   that the entity was incorporated by Banco Atlantico Bank

17   & Trust in 2003, so 18 years' back, 19 years' back.  I

18   don't remember having taken any specific action as

19   codirector of the entity.  That doesn't mean that I

20   didn't take it.  I just, again, don't remember.

21       Q.   Is HH Protection LTD still the protector of HH

22   Master Settlement?

23       A.   I do not know if the entity is still

24   operational.  My understanding for my brother Cesar is

25   that either all the entities have been unwound or they

**EXHIBIT B**

1  were in the process of being -- by unwound I mean

2  dissolved or in the process of being dissolved, but I am

3  not sure of what is the legal status of the entity.

4       Q.   So when was the last time you took action as a

5  protector or a director of HH Protection for any of the

6  trusts.

7       A.   Again, I don't remember having taken an action

8  as codirector of the protector entity.  I don't recall

9  any specific action that my brother Cesar and/or I would

10  have taken on behalf of HH Protection LTD.

11       Q.   And just going back a little bit.  You have

12  said that you are not certain of your status with HH

13  Protection LTD.  When was the last time that you were

14  aware that you were a director of HH Protection LTD?

15       A.   I have always been aware that I was a full

16  director of the entity since this period of 2003 when my

17  father was still alive.

18       Q.   So as a director, how do you know if it was

19  still in operation or if it has been unwound by someone

20  else?

21       A.   Well, as a codirector, my consent is not

22  required to have the entity dissolved.

23       Q.   And what is your basis for that?

24       A.   In my experience, if you simply don't pay the

25  fees to the appropriate secretary in the jurisdiction of

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1  the entity, it's struck out automatically.

2      Q.    **Would you not be informed as a director of the**

3  **company that administrative dissolution of some kind has**

4  **taken place?**

5      A.    No, to my knowledge, no. My experience with

6  multiple entities similar to HH Protection, the entity

7  may be dissolved, and there is no formal notice sent to

8  codirectors to my knowledge.  As least I don't remember

9  any specific protocol in this jurisdiction, the Bahamas,

10  I mean, where HH was domiciled.  But also, in my

11  experience, that is not the case.

12      Q.    **And so in the Bahamas, who would be informed if**

13  **HH Protections LTD had been dissolved?**

14      A.    I presume the corporate register, in this case

15  again, the Bahamian corporate register.

16          MS. SOMBUNTHAM:  I'm going to go Government's

17      Exhibit 4.

18          (Government's Exhibit No. 4, Certificate of

19      Incorporation and Memorandum and Articles of

20      Association for HH Securities:  Bates 20-03 - 51-03,

21      was marked for identification.)

22  BY MS. SOMBUNTHAM:

23      Q.    **This was produced with Bates stamp numbers**

24  **20-03 through 51-03.  And turning back to page 1, do you**

25  **recognize what this document is?  And I could zoom in to**

**EXHIBIT B**

1    help.

2         A.    Okay.   So this is the certificate of

3    incorporation and the memorandum and articles of

4    association for HH Securities that was incorporated

5    March 7th, 2003, I believe.

6         **Q.    And has this certificate of incorporation and**

7    **memorandum and articles of association, has it been**

8    **amended in any way?**

9         A.    I do not know, not to my recollection.

10        **Q.    And I'm going to go to the final page of the**

11   **document.   What is HH Securities LTD?**

12        A.    HH Securities LTD was a Bahamas corporation

13   held by the HH Master Settlement Trust.   I believe the

14   operating trust, the Global Irrevocable Operating Trust,

15   was the beneficiary and HH Securities LTD was a holding

16   company under the Global Irrevocable, which held

17   operating securities related company.

18        **Q.    So I'm going to turn to page 32 of Exhibit 4.**

19   **What does this page show?**

20        A.    It shows the register of shareholders for HH

21   Securities LTD.

22        **Q.    And who is named, if anyone?**

23        A.    The Global Irrevocable Trust.

24        **Q.    And there is a date associated with that in the**

25   **far left?**

**EXHIBIT B**

1      A.   Yes.

2      Q.   **And is that a correct date, what is that date?**

3      A.   The date that it states there is March 7th

4   2003.

5      Q.   **And I want to go to Exhibit 5.  And for the**

6   **record, it is Bates-stamped 57-03 from your production**

7   **and the file number of the document is 73-03.  I will go**

8   **back to the first page.**

9           **Mr. Hernandez, do you recognize this document?**

10     A.   Yes, I do.

11          (Government's Exhibit No. 5, Global Irrevocable

12   Trust Declaration of Trust:  Bates 57-03 was marked for

13   identification.)

14   BY MS. SOMBUNTHAM:

15     Q.   **And what is it?**

16     A.   It is the Global Irrevocable Trust declaration

17   of trust.

18     Q.   **And how did you obtain this document?**

19     A.   I believe that I obtained the document from the

20   Richards & Associates law firm or from my brother Cesar.

21   It could have been either/or.

22     Q.   **And what is the date of this trust?  What is**

23   **the date of formation?  Does it say on page 1?**

24     A.   Yes, it says that this declaration of trust,

25   this version is the first day of December 2004, and it

**EXHIBIT B**

1    is made by the General Guardian Corporation, a Nevada

2    corporation, as trustee.

3        Q.   And, Mr. Hernandez, is this the same trust

4    identified in the prior exhibit, Exhibit 4, for HH

5    Securities LTD?

6        A.   I believe so, yes.

7        Q.   And I can go back to Government's Exhibit 4,

8    page 32 of it.  I'm showing you that right now.  Would

9    it help refresh your memory?

10       A.   Yes.  No, I see it.

11       Q.   And so, how is this trust dated December 2004 a

12   shareholder in 2003 of HH Securities LTD?

13       A.   I don't know, it could have been a typo.  I am

14   not sure.  I do know that HH Securities LTD predated the

15   Global Irrevocable Trust.  The Global Irrevocable Trust

16   was added after the HH Master Settlement Trust had been

17   incorporated and after the entities that were held under

18   HH Securities were held by HH Securities.

19       Q.   I'm going to go to the last page of

20   Government's Exhibit 5, page 17, and who is listed, if

21   anyone, as the beneficiary of the Global Irrevocable

22   Trust?

23       A.   Per the annex, the beneficiary the Global

24   Irrevocable Trust is HH Master Settlement, a Nova Scotia

25   Trust dated December 1st, 2004.

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    Q.   And as far as you are aware, is that accurate?

2    A.   Yes, the HH Master Settlement was redomiciled

3  from the Bahamas where it was originally incorporated to

4  Nova Scotia in 2004, so this seems accurate to me.

5    Q.   The date of this trust, Gramercy Irrevocable

6  Trust, is the same date as the beneficiary trust that it

7  has here, HH Master Settlement, both are December 1st,

8  2004?

9    A.   Sorry, this is not -- you said Gramercy, this

10  is the Global Irrevocable Trust.

11    Q.   Sorry, the Global Irrevocable Trust, the date

12  of that trust, and the HH Master Settlement beneficiary

13  of that trust, they're both dated December 1st, 2004?

14    A.   Yes, that would make sense.  When HH Master

15  Settlement was redomiciled to Canada, the Global

16  Irrevocable Trust and the Global Irrevocable Trust had

17  General Guardian as trustee and the HH Master Settlement

18  had it's affiliated America's Fiduciary as trustee.

19    Q.   And those two entities, are they associated

20  with Timothy Richards?

21    A.   Yes.  Timothy Richards is a director for both

22  General Guardian in Nevada, the trust company, as well

23  as America's Fiduciary LTD in Nevis.

24    Q.   So since you produced this exhibit, maybe the

25  document came from him or your brother; is that correct?

**EXHIBIT B**

1        A.    Yes, that is my recollection.

2        Q.    **Would he have a copy of the HH Master**

3   **Settlement dated December 1st, 2004?**

4        A.    I can't speak for them, but I believe that they

5   should.

6        Q.    **Is there any way that the reference to HH**

7   **Master Settlement dated December 1st, 2004, is an error?**

8        A.    It could be.  I'm not certain.  I don't think

9   so, but I am not certain.

10            MS. SOMBUNTHAM:  I'm going to go to

11       Government's Exhibit 1.

12            (Government's Exhibit No. 1, Articles of

13       Association for Global Finance Management

14       Corporation:  Bates 494-03 - 523-03 was marked for

15       identification.)

16   BY MS. SOMBUNTHAM:

17       Q.    **And this was produced in your production with**

18   **Bates number 494-03 through 523-03.  I will go back to**

19   **the first page of Government's Exhibit 1 and ask you:**

20   **Do you recognize this document?**

21       A.    Yes.  I believe these are the articles for --

22   the articles of association for Global Finance

23   Management Corporation.

24       Q.    **And now did you obtain this document?**

25       A.    Either I received a copy from my brother, or I

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    received a copy from Richard's law firm.

2        Q.   And as far as you are aware, this is a fair and

3    accurate copy of the memorandum and articles of

4    association for Global Finance Management Corp?

5        A.   I believe so.

6        Q.   And on page 1, is there any indication of when

7    this entity was incorporated?

8        A.   It appears incorporated on the 28th day of

9    October, 2002.

10        Q.   Now I'm going to go to page 30 of Government's

11    Exhibit 1.  Does it show here who is the director of

12    Global Finance Management Corporation?

13        A.   This is the certificate of incumbency.  I do

14    not see a reference to the director, no.

15        Q.   If you go further down, and I'll scroll a

16    little bit, do you see a reference to director?

17        A.   No.  I don't know if the screen is cut off, but

18    I only see up to "dated the 1st Day of June, 2011."

19        Q.   Do you see the director now?

20        A.   So yes, now I see, director Gustavo Hernandez.

21    Now I read it.

22        Q.   And who is Gustavo Hernandez?

23        A.   My father, Gustavo Hernandez.

24        Q.   And then the day of appointment that is listed

25    there?

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1      A.    October 28th, 2002.

2      Q.    **And when did you father pass away?**

3      A.    My father passed away November 2006.

4      Q.    **And what is the date of the certificate of**

5   **incumbency at the bottom of it on page 30?**

6      A.    The 1st day of June, 2011.

7      Q.    **At that time had your father already passed**

8   **away?**

9      A.    Yes, he had.

10      Q.    **And so who, if anyone, was the actual director**

11   **of Global Finance Management Corporation?**

12      A.    I replaced him as director alongside my brother

13   Cesar as codirector.

14      Q.    **When did that occur?**

15      A.    I do not recall, but some time prior to

16   November 2006.

17      Q.    **So why is this certificate of incumbency**

18   **inaccurate?**

19      A.    Why it would be inaccurate?

20      Q.    **Yeah, why would it be inaccurate?**

21      A.    Why would it be inaccurate?  Sorry?

22      Q.    **Why would it not be inaccurate as to who the**

23   **directors or officers were at the time it was signed?**

24      A.    If you are referring to the date of appointment

25   of director in October 28th 2002, Gustavo Hernandez

**EXHIBIT B**

1   would have been my father.  I happen to be named after

2   my father.  I don't see what --

3        Q.   I'm looking at the middle of page 30, and under

4   "director and shareholder," there is a line that says in

5   bold italics "other than the individuals listed and

6   their titles, there are no additional officers appointed

7   for the company."  Would that be an accurate statement

8   as to Global Finance Management Corporation in 2011?

9        A.   I believe so, yes.  I would have been the

10  director of the entity at that point in time and the

11  shareholder would have been HH Securities LTD.

12       Q.   So when it says "directors above," is that

13  referring to you or your father?  Because I thought you

14  testified that was your father.

15       A.   Well, I looked above where it says October 28,

16  2002.  I would have said my father at that point in

17  time.  I do not remember having been appointed director

18  when he was still alive, or at least, that is my

19  recollection.  But there was no second last name there

20  so I can't really tell you if it is either accurate or

21  inaccurate.  I do not believe it to be inaccurate,

22  because again we have the same name.

23       Q.   You also testified that your brother was a

24  codirector in 2011.  Is your brother listed here?

25       A.   I did not say he was a codirector in 2011.  I

**EXHIBIT B**

```
 1   said he was the codirector.  I do not think he was a

 2   codirector as of 2011.  But he was a codirector of the

 3   entity at some point in time.  But my recollection is

 4   that I was -- by 2017 or 2018, 2017 probably, I had been

 5   replaced by Cesar as director of GFM.

 6        Q.   What was that date again, can you repeat that,

 7   please?

 8        A.   I believe 2017, 2018, 2017.

 9             MS. SOMBUNTHAM:  And I'm going to show you what

10        was marked as Government's Exhibit 24.

11             MR. SREBNICK:  Before you start on 24, can we

12        again get an idea of how much longer you think you

13        are going to go.

14             MS. SOMBUNTHAM:  How much I'd like to go would

15        not be more than an hour.  I have -- as you guys know

16        because you stipulated to exhibits, I have seven more

17        exhibits.  I am hoping to go pretty quickly through

18        them, but I will going through a couple more

19        agreements, and so at least until 6:00 but not a

20        little bit longer.  I know we are taken a couple of

21        breaks today.

22             MR. SREBNICK:  Okay.

23   BY MS. SOMBUNTHAM:

24        Q.   So going to Government's Exhibit 4, and this

25   was produced with the Bates number 1068-03 in your
```

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   production, do you recognize this document?

2      A.   I do not recognize this specific document.

3      Q.   Is that your signature at the bottom of the

4   document?

5      A.   It looks like my signature, yes.

6      Q.   And do you still have an interest in Global

7   Securities Management Corporation?

8      A.   I don't think that -- Global Securities

9   Management Corporation BVI?  No, I do not think I do,

10   no.

11      Q.   And when did you not have or released that

12   interest in Global Securities Management Corporation?

13      A.   I do not recall exactly as of when, but I

14   belive sometime in the 2010, or 2011 period or

15   thereabouts.

16      Q.   At the time, what was the value of your

17   interest in Global Securities Management Corporation?

18      A.   I don't think it had any value.

19      Q.   Do you know when you signed this document?

20      A.   No, I do not recall, and it's pretty strange

21   that it's just a blank stock power without any

22   information in terms of who was receiving the shares and

23   -- I do not know.

24      Q.   Do you know why it was signed?

25      A.   No, I do not.

**EXHIBIT B**

1   Q.   Mr. Hernandez, what is the status of HH Master

2   Settlement?

3   A.   Again, what I understand is that the Global

4   Securities related entities have been dissolved or are

5   in the process of being dissolved.  I don't know the

6   exact status of the HH Master Settlement Trust.

7   Q.   What in what capacity did you last deal with

8   that trust then?

9   A.   I just requested information for Richards &

10  Associates in order to produce the documents.

11  Q.   And do you know what the current status of

12  Gramercy Irrevocable Trust is?

13  A.   No, I do not know what is the exact status of

14  the Gramercy Irrevocable Trust.

15  Q.   And in what capacity did you last deal with

16  that trust?

17  A.   Again, I don't believe that I have dealt with

18  the trust in any capacity.  I have reached out to the

19  attorneys in order to obtain copies of that

20  documentation.

21  Q.   And do you know what the current status of HH

22  Securities LTD is?

23  A.   No, I don't know what the current status of HH

24  Securities LTD is.

25  Q.   And in what capacity did you last deal with HH

**EXHIBIT B**

1   Securities LTD?

2       A.   I again, I do not believe that I dealt in any

3   capacity with HH Securities LTD.

4       Q.   Ever?

5       A.   I understand you meant just in the recent past.

6   Ever?  HH Securities LTD was -- I don't think I served

7   as director for the entity.  No, not to my recollection.

8       Q.   What is the current status of Gramercy

9   Irrevocable Operating Trust?

10      A.   I do not know the current status of the

11  Gramercy Irrevocable Operating Trust.

12      Q.   And in what capacity did you last deal with

13  that trust?

14      A.   Again, my last interaction was for the purposes

15  of obtaining the documentation for the Gramercy

16  Irrevocable Trust.

17      Q.   Do you know what the current status of 3

18  Gramercy Park West LLC is?

19      A.   I believe the entity has been dissolved, but I

20  am not certain.

21      Q.   Okay.  Do you know whether that occurred?

22      A.   Again, I'm not certain if it has been

23  dissolved, so I cannot say the last update.

24      Q.   And in what capacity did you last deal with 3

25  Gramercy Park West LLC?

**EXHIBIT B**

1    A.   I don't remember in what capacity I last dealt

2  with in regards to the entity, 3 Gramercy Park West LLC.

3    **Q.   Prior to your arrest in 2018, were these trusts**

4  **and entities operational, have they been dissolved yet?**

5    A.   What specific entity?  Sorry?

6    **Q.   HH Master Settlement?**

7    A.   The HH Master Settlement Trust, as of when?

8  Sorry.

9    **Q.   Prior to your arrest in 2018?**

10    A.   My understanding is that the entity HH Master

11  Settlement Trust well predates my arrest on July 2018.

12    **Q.   Was it dissolved?  Do you know if it was**

13  **dissolved or operational prior to your arrest?**

14    A.   Well, my understanding is that trusts, unlike

15  an entity, it's not dissolved.  It can be operational or

16  not operational, but I don't believe that the trust was

17  dissolved, no, prior to July --

18    **Q.   "Trust" was your word, but I guess the question**

19  **is where these entities in existence prior to your**

20  **arrest?**

21    A.   I believe so, yes.

22    **Q.   And so I think that is HH Master Settlement,**

23  **Gramercy Irrevocable Trust, HH Securities LTD, Gramercy**

24  **Irrevocable Operating, Trust, and 3 Gramercy Park**

25  **Gramercy Park LLC.  Were each of these entities in**

**EXHIBIT B**

1    existence at the time prior to your arrest?

2        A.    I belive so, yes.

3        Q.    I am going to show you what has been marked as

4    Government's Exhibit 14.  And so Exhibit 14, which was

5    filed as Petitioner's Exhibit N, ECF 383-4E.

6            Do you recognize this document, Mr. Hernandez?

7        A.    Not this one, sorry.  I may have produced it,

8    but I do not recognize it.  February 1st, 2019?  No, I

9    do not recognize it.

10            (Government's Exhibit No. 14, Document, was

11    marked for identification.)

12    BY MS. SOMBUNTHAM:

13        Q.    At the time of February 1st, 2019, were you the

14    manager of 3 Gramercy Park West LLC?

15        A.    I do not recall as of February 2019, I was

16    still manager.  I believe not, but I am not certain.

17        Q.    When was the last time you were acting as

18    manager of 3 Gramercy Park West LLC?

19        A.    I do not recall the exact date acted as manager

20    at 3 Gramercy Park West LLC.

21        Q.    I'm going to turn your attention to page 2 of

22    this document and I'm going to scroll down to this --

23    I'm sorry, I'm going to scroll up to the top.

24            Who is identified, if anyone, as the member of

25    3 Gramercy Park West LLC in this document?

**EXHIBIT B**

1    A.   The member is identified as the DC Trust, a

2  Florida Irrevocable Trust.

3    **Q.   And then, as far as you are aware, the DC**

4  **Trust?**

5    A.   Yes, I believe that is -- I'm not if it's DC

6  Trust or DC2019 trust.  It may be the same entity.  I

7  don't know.

8    **Q.   Are there two DC trusts, or just one?**

9    A.   I believe there is only one, but I am not

10  certain.

11   **Q.   And the other one that you referred to as**

12  **DC2019 irrevocable trust?**

13   A.   Yes, that is correct.

14   **Q.   I'm going to turn to page 18 of Government's**

15  **Exhibit 14.**

16        **Who is named as the member on this page, if**

17  **anyone?**

18   A.   The D.C. Irrevocable Trust is.

19   **Q.   Is that the same as the DC Trust?**

20   A.   I believe so, but I not certain.

21   **Q.   And that is the same as the DC2019 Irrevocable**

22  **Trust?**

23   A.   I believe so, but I am not certain.

24   **Q.   And then page 19 of the same exhibit, who is**

25  **identified on this page, if anyone, as the member?**

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    A.    It reads DC Irrevocable Trust.

2    **Q.    And is that there same as the DC Trust?**

3    A.    I believe so, but I am not certain.

4    **Q.    And prior to this -- as far as I aware, your**

5    **years at manager of the 3 Gramercy Park West LLC, who**

6    **was the member of that company?**

7    A.    The member of 3 Gramercy Park West LLC was the

8    Gramercy Irrevocable Operating Trust operating.

9    **Q.    And do you know how Gramercy Irrevocable**

10   **Operating Trust's interests ended up into the DC Trust,**

11   **whether if is the 2019 Irrevocable Trust or the DC**

12   **Irrevocable Trust?**

13   A.    I believe that the membership interests in the

14   3 Gramercy Park West LLC entity assigned to the DC2019

15   Irrevocable Trust by the Gramercy Irrevocable Operating

16   Trust operating.

17   **Q.    And were you the manager of 3 Gramercy Park**

18   **West LLC at the time that transfer took place?**

19   A.    No, I believe not.  I believe that I was no

20   longer manager of 3 Gramercy Park West LLC at the time

21   the transfer took place.

22   **Q.    And who was the manager at that time?**

23   A.    I believe that the manager at the time was

24   Olympia de Castro.

25   **Q.    And when did that change in manager occur, if**

**EXHIBIT B**

1   you recall?

2       A.   I do not recall exactly, but I believe it was

3   sometime in the fourth quarter, third or fourth quarter

4   of 2018.

5       Q.   And was there any documents you are aware of on

6   behalf of Gramercy Irrevocable Operating Trust that

7   transfers that interest to one of the DC Trusts?

8       A.   I cannot say that I'm aware of a specific

9   document.  I believe that I have seen in the production

10  of documents -- I can't saw that I do, no.  I don't

11  know.

12      Q.   By the fourth quarter of 2018, were you

13  involved in the 3 Gramercy Park West LLC?

14      A.   I believe not.  I believe that I had resigned,

15  as I said, sometime on or around the third or the fourth

16  quarter 2018.

17      Q.   Mr. Hernandez, do you have an interest in the

18  314 Hicks Brooklyn townhouse?

19      A.   No, I do how have an interest in the 314 Hicks

20  townhouse.

21          MR. SREBNICK:  Can we clarify?  You mean an

22      ownership interest, right?

23          MS. SOMBUNTHAM:  Any interest.

24          MR. SREBNICK:  What other interest do you have

25      in mind?

**EXHIBIT B**

1      MS. SOMBUNTHAM:  It could be an ownership

2      interest.  I mean I think we define it in different

3      ways, so if he thinks he has an interest, I want to

4      know what that interest would be.

5  BY MS. SOMBUNTHAM:

6      Q.   So if the answer is yes, you can explain what

7  the interest is?

8      A.   No, I do not believe I have any form of

9  interest.

10     Q.   Do you have any interest in 314 Hicks LLC?

11     A.   No, I do not believe that I have any interest.

12     Q.   Do you have any interest in HH Master

13  Settlements?

14     A.   No, I do not believe that I have any interest.

15     Q.   Do you have any interest in Gramercy

16  Irrevocable Operating Trust?

17     A.   No, I do not have any interest.

18     Q.   Do you have any interest in Global Finance

19  Management corporation?

20     A.   No, I have no interest in Global Finance

21  Management Corporation.

22     Q.   How did you get the documents of the different

23  entities that we just named that you have no interest

24  in?

25     A.   How did I get -- well, to go in order, the HH

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1   Master Settlement documents and I obtained either from

2   my brother Cesar or from Richards & Associates, the

3   trustee.  That would apply as well to the Gramercy

4   Irrevocable, and to the 3 Gramercy Park West.  The DC

5   and 314 Hicks, I obtained the documents from Olympia De

6   Castro.

7           MR. SREBNICK:  This is Howard again.  I just

8       want to clarify my objection to the term "interest"

9       as being a term that is ambiguous.  Thank you.

10          MS. SOMBUNTHAM:  Understood.

11  BY MS. SOMBUNTHAM:

12      **Q.   Mr. Hernandez, have you been previously deposed**

13  **in other cases?**

14      A.   Yes, in, I believe, 2012.

15      **Q.   Tell me how many times have you been deposed?**

16      A.   I remember attending a deposition around 2012

17  for a Global Securities Holdings' civil

18  arbitration-related matter.

19      **Q.   Is that the only time?**

20      A.   That I remember of now, yes.

21      **Q.   Have you testified in court or in a hearing**

22  **previously?**

23      A.   Not that I remember.

24      **Q.   Did you discuss your deposition today with**

25  **anyone?**

**EXHIBIT B**

1    A.    I discussed it with my attorneys.

2    Q.    **Anyone else?**

3    A.    No, nobody else.

4    Q.    **And just for clarity's sake, when we broke, and**

5    **you said that you talked to your attorneys, are those**

6    **the only attorneys that are in the room with you**

7    **currently or anyone else?**

8    A.    There attorneys that are in the room with me,

9    yes.

10    Q.    **Did you talk to any other attorney?**

11    A.    I did not speak with any other attorney.

12    Q.    **Did you speak or otherwise communicate with**

13    **Allison Dominguetti regarding your deposition today?**

14    A.    No, I did.

15    Q.    **With Olympia de Castro?**

16    A.    No, I did not.

17    Q.    **With Guy Rasco?**

18    A.    No, I did not.

19    Q.    **With Sam Rabin?**

20    A.    No, I did not.

21    Q.    **With Margot Moss?**

22    A.    Margot called my attorneys and I heard her

23    speak and I did not speak, but I have not spoken with

24    Margot myself.

25    Q.    **How about with Richard Klugh?**

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1      A.   No, I did not.

2      **Q.   Have you communicated with Olympia De Castro in**

3   **the last several months?**

4      A.   Yes, I have communicated with Olympia de

5   Castro.

6      **Q.   And did you discuss the topic of this case?**

7      A.   No, I have not.

8      **Q.   And did you review any documents for this**

9   **deposition?**

10      A.   With Olympia, absolutely not.

11      **Q.   Did you review, on your own or with your**

12   **attorneys, any documents for this deposition?**

13      A.   Yes, I did, on my own and with my attorneys.

14      **Q.   And did you review the documents you produced**

15   **in response to this subpoena ahead of this deposition?**

16      A.   Yes, I did.

17      **Q.   And were all responsive documents produced?**

18      A.   Yes, I believe that is the case.

19      MS. SOMBUNTHAM:   I'm going to go and share

20   Government's Exhibit 25, and this was produced with a

21   Bates number from Ms. De Castro ODC001900.

22      (Government's Exhibit No. 25, E-mail Exchange:

23   Bates ODC001900 was marked for identification.)

24   BY MS. SOMBUNTHAM:

25      **Q.   And, Mr. Hernandez, do you recognize this**

**EXHIBIT B**

1  document?

2      A.   Yes, I do.

3      Q.   What is it?

4      A.   I believe that this is an exchange with the

5  Gramercy Park co-owners from April 10th, 2019, that

6  addresses the legal fees owed by the co-ownership for

7  litigation of the building, the attorneys Anderson &

8  Ochs, and Bonnie, I forget her last name, that

9  represented the Gramercy Park co-ownership in that

10  litigation.

11      Q.   When this was sent on April 10th 2018, did you

12  have a role at 3 Gramercy Park West LLC?

13      A.   I do not believe that I did, no.

14      Q.   So why did you send this e-mail?

15      A.   I sent this e-mail because I have been tracking

16  on behalf of the house since 2017 or early 2018 the

17  legal fees.  The house was a small house, so everybody

18  should pay and assume the responsibility.  I was just

19  keeping tabs of what had been spent in legal fees for

20  that arbitration.

21      Q.   And was this e-mail in response to a subpoena

22  that was issued to you?

23      A.   I don't know.  I believe so, that is why we are

24  looking at it.  I don't know.

25      Q.   It is marked ODC001900.  And do you recall if

**EXHIBIT B**

1    you produced this e-mail?

2        A.   Honestly, there were so many e-mails, I don't

3    remember.  I don't remember this individual e-mail, but

4    I know that there is a ton of e-mails that were

5    produced.  I know that there is a very long list of

6    e-mails with Anderson & Ochs that are under the

7    privileged log because per my understanding if it was

8    e-mails with a legal counsel, or related to legal

9    counsel, they were to be in the privileged log.  But I

10   don't know if this was under the Anderson & Ochs tab,

11   but I know I basically put together all of the e-mail

12   that I had with the search words that were requested.

13            MS. SOMBUNTHAM:  I'm going to what has been

14        marked Government's Exhibit 26, and this as been

15        Bates-stamped starting ODC001644.  It is a five-page

16        document and it ends on ODC001648.

17            (Government's Exhibit No. 26, E-mail:  Bates

18        ODC001644 - ODC001648 was marked for identification.)

19   BY MS. SOMBUNTHAM:

20        Q.   Do you recognize this document, Mr. Hernandez?

21        A.   I do not recognize it, but I can see that it is

22   an e-mail from one of the Gramercy Park co-owners in

23   relation to the sale of the unit that was involved in

24   the arbitration, and later sold by the co-ownership.

25        Q.   And this an e-mail dated April 12th 2019; is

**EXHIBIT B**

1  that correct?

2      A.   Yes, that is the date.

3      Q.   And in the to section, is that your e-mail

4  address, ghernandez@gsadvisers.net?

5      A.   Yes, that is correct.

6      Q.   And would you have received a copy of this

7  e-mail?

8      A.   Yes, I've been cc'd so, I believe I should have

9  received a copy, yes.

10      Q.   I'm going to scroll to page 2.  And there is a

11  photo here on page 2, and there is a photo again on page

12  -- photo on page 3.  Going back to page 2.

13          Do you recognize this photo that is on page 2?

14      A.   No, I do not.  It the first time that I've seen

15  it.

16      Q.   And do you recognize what is in the photo on

17  page 3?

18      A.   I recognize the park.  I do not recognize the

19  bottom photos.

20      Q.   And these are not photos of the Gramercy

21  apartment that you resided in?

22      A.   No, no, no, no.  No, these were pictures of the

23  Bandershaw apartments, which was sold by the

24  co-ownership after a lengthy litigation in the house.

25      Q.   And then Apartment 2 is not the Gramercy

**EXHIBIT B**

1    apartment that you resided it in?

2        A.    No.

3        Q.    What was your unit or floor or whatever number

4    that was associated with the apartment you resided in?

5        A.    It's an old house, so they at times called it

6    number 2, but this is a separate apartment.

7        Q.    I'm showing you what has been marked -- one

8    more question.  Do you recall if you produced this

9    e-mail chain in your production to the United States in

10   response to the subpoena?

11       A.    No.  I honestly don't even remember ever seeing

12   this e-mail.

13       Q.    I'm going to show you what has been marked

14   Government's Exhibit 27.  And for your reference,

15   although Government 27 is the production with Bates ODC

16   from Olympia De Castro, yesterday you produced the same

17   with Bates numbers 1327-03 to 1330-03, showing here for

18   reference.

19            Do you recognize Government's Exhibit 27?

20       A.    Yes, I believe that I do, yes.

21            (Government's Exhibit No. 27, E-mail:  Bates

22   1327-03 - 1330-03 was marked for identification.)

23   BY MS. SOMBUNTHAM:

24       Q.    And what is the date of this e-mail?

25       A.    May 18th, 2020.

**EXHIBIT B**

1    Q.    And who sent this e-mail?

2    A.    I believe it is an e-mail from Jill Ryder, Jill

3  Levy Ryder to Olympia de Castro that Olympia forwards to

4  me on the same date, May 18th, 2020.

5    Q.    Is Olympia the person who forwards it to you,

6  or is she the sender or receiver of this e-mail,

7  according to the top of this e-mail?

8    A.    So the bottom e-mail is from Jill Ryder to

9  Olympia, and then I think it's strictly to see the

10  thread, but I don't know if who sends it, if it's

11  Olympia that sends it to me e-mail or vice versa.  It

12  appears Olympia is sending me the e-mail, but I am not

13  sure.

14    Q.    What is the subject line of this e-mail?

15    A.    FW as in "forward," 314 Hicks.

16    Q.    And why would you have received an e-mail

17  regarding 314 Hicks?

18    A.    The e-mail says "punchlist attached."  It

19  includes all ending items of the inspection report.  I

20  believe that this is in regards to the punch list with

21  maintenance-related issues of the house that Olympia had

22  asked me to look at.

23        MS. SOMBUNTHAM:  I want to show you what has

24    been marked as Exhibit 28.

25        (Government's Exhibit No. 28, HVAC Maintenance

**EXHIBIT B**

1    Proposal ODC001685 - ODC 01686 was marked for

2    identification.)

3  BY MS. SOMBUNTHAM:

4    Q.   And it is a two-page document Bates-stamped

5  ODC001685 and ODC001686.

6         Mr. Hernandez, do you recognize this document?

7    A.   Yes, I do.

8    Q.   What is it?

9    A.   I think that this was an HVAC maintenance

10  proposal sent to Olympia, which she forwarded to me to

11  look at the maintenance proposal.

12    Q.   And there is a reference to a Bret.  Do you

13  know who Bret is?

14    A.   Yes, Bret is a contractor or -- a contractor

15  for lack of a better word, that works in New York and I

16  was suggesting for Olympia to contact him and see if he

17  knew of a better HVAC company to recommend.

18    Q.   At the time of the e-mail of July 14, 2020, did

19  you have a role at 314 Hicks LLC?

20    A.   No, I did not have a role in 314 Hicks.

21    Q.   And do you know if this e-mail was produced in

22  response to the subpoena that was issued to you by the

23  government?

24    A.   I do not know.

25    Q.   I'm going to show you what has been marked as

**EXHIBIT B**

1    Government's Exhibit 29.  And this a five-page document

2    beginning with ODC001978 and ending with ODC001982.

3    Turning page 1, and I'll scroll out just a little bit.

4              Mr. Hernandez, do you recognize this document?

5        A.   If you can please increase a little bit, I am

6    by now having -- seeing double.

7              (Government's Exhibit No. 29, Rosillo E-mail:

8    Bates ODC001978 - ODC001982 was marked for

9    identification.)

10   BY MS. SOMBUNTHAM:

11       A.   Okay.  So I recognize the name.  It is Frank

12   Rosillo, the CPA e-mailing Olympia, on July 15th, 2020.

13   And Olympia forwarded me the e-mail that Frank Rosillo

14   sent her asking for a new accountant.

15             MR. SREBNICK:  Forgive me, Nalina.  Do you

16        think we will be done by 6:30 as I have another

17        appointment at 6:30.

18             MS. SOMBUNTHAM:  I think so.  I only have one

19        quick exhibit and hopefully this will be done, so I

20        hope so by then.  And I'm meaning to do so; it might

21        be 10 minutes after.  My apologies.

22   BY MS. SOMBUNTHAM:

23       Q.   And going back to this e-mail, what is the

24   subject line of this e-mail time?

25       A.   "Time sensitive, gift filings and invoice

**EXHIBIT B**

1    review."

2        Q.   And do you know why Olympia de Castro wrote to

3    you in this e-mail "Can you please find me a new

4    accountant?"

5        A.   I believe Olympia had expressed interest in not

6    using the accountant that I used and that she was using

7    when we filed jointly.

8        Q.   So I'm going to scroll down, and just take a

9    second to review it and let me know what you see from

10   the bottom up?

11       A.   I can see it is an e-mail from the CPA to

12   Olympia with a copy to someone in the CPA's office.

13       Q.   And so is this an e-mail where Olympia is

14   looking for a new accountant because he doesn't want to

15   share your accountant, as you described?

16       A.   No, I believe that from what I read here, she

17   may have had a difference with the accountant on the

18   amounts that they were invoiced, but I don't know.

19   Again, it is an exchange from the CPA to her that she

20   forwarded to me.  I was not part of their exchange.

21       Q.   Mr. Hernandez, did you find her a new

22   accountant?

23       A.   No, Olympia selected her new accountant.

24       Q.   Has Mr. Frank Rosillo worked for you?

25       A.   Frank Rosillo's firm has been my CPA that did

**EXHIBIT B**

1    my tax filings, yes.

2         Q.   And since when?

3         A.   I'd like to say 2013, 2014, approximately.

4         Q.   And did he prepare any income tax returns for

5    you?

6         A.   Yes.

7         Q.   And which years, if you recall?

8         A.   I am very certain that from 2017 onwards, Frank

9    Rosillo's firm, CPA firm, prepared my tax accounts, tax

10   filing.

11        Q.   And when were those returns filed from 2015

12   onwards?

13        A.   Upon my return to the U.S. after I was arrested

14   in Italy.

15        Q.   So some time after 2018?

16        A.   No, I returned in May 3rd of 2019.

17        Q.   So some time in 2019, my correction.

18             On page 3 of the document, and, Mr. Hernandez,

19   I don't know if you can see this here, but there is a

20   reference to a gift.  Do you know what is being referred

21   to right here regarding "gift"?

22        A.   So this appears to be an e-mail Olympia sends

23   Frank Rosillo, the CPA, and an associate of his, Diana

24   Dos Santos, and from what I can read here, Olympia is

25   asking Frank for the filing of the IRS of a gift

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1    declaration and the payment of fees.

2        Q.    Do you know what the gifts are referenced here,

3    what they are?

4        A.    No, I do not know what they are.

5        Q.    And so if you don't know what is the subject

6    matter of this e-mail chain, why would Olympia forward

7    this to you, if you know?

8        A.    I don't know.  She said as the e-mail reads,

9    "Can you please find me a new a accountant?"

10       Q.    I'm going to show you Government's Exhibit 30,

11   and, Mr. Hernandez, do you recognize what is in this

12   photo?

13       A.    Yes, of course.

14             (Government's Exhibit No. 30, Photo:  1749 NE

15   Miami Park Apartment was marked for identification.)

16   BY MS. SOMBUNTHAM:

17       Q.    What is it?

18       A.    That is a picture of my apartment at 1749 NE

19   Miami Park.

20       Q.    And do you recognize any of the persons who are

21   in the photo, if there are any?

22       A.    Yes, I do.

23       Q.    Who do you recognize?

24       A.    Mostly everyone.  Friends and family members,

25   and Olympia and I.

**EXHIBIT B**

1   Q.   Do you know when this photo was taken?

2   A.   Probably around 2006, 2007, I am not sure.

3   Q.   I don't know if you could see it, but do you

4   see what is on the walls in the background?

5   A.   Yes, I see it.

6   Q.   And are those paintings?

7   A.   Those are paintings and sculptures, yes.

8   Q.   And do you still have any of these paintings or

9   sculptures at your current residence?

10   A.   No.  Nothing that appears in this picture is at

11   my current residence, no.

12   Q.   And so what happened to each of these pieces of

13   art?  You can start from the left side.  I can zoom a

14   little.  It's kind of pixilated.

15   A.   This bottom, this is probably one of the only

16   parts there.  On the bottom left there is a box.  That

17   is a Polish artist by the name Hamed Aldamer, and back

18   in the days of the Soviet bloc, they used to get into

19   these dark alleys and trade, and barter, and they used

20   to have an empty box and they put inside the box

21   whatever they were bartering, and in this case it is

22   cleaning products.  So it was a cardboard box with

23   cleaning products on top.  And the police came and they

24   would just put everything inside the box and run.

25   Basically, when this apartment was shut down, that is

**EXHIBIT B**

1   what was thrown away, thinking it was old cleaning

2   products that had been left behind.

3          To the right, the wooden sculpture, it's a

4   wooden and cardboard black piece.  That I have, that I

5   have, that's Nicada Visen.  To the bottom right, that's

6   a Neon Cube by Yerbe Heine that I have.  On the top,

7   that is a Martin Kippenberger piece, and that was sold

8   2008, probably 2008-2009.  Then, by the windows, that is

9   Luis Caballero, that I no longer have either.  And on

10  the back wall, that is an Alina Rosca work that I no

11  longer have either.

12         MS. SOMBUNTHAM:  Give me just one moment to

13     make sure I don't have anything else.

14         MR. SREBNICK:  We are going to put you on mute

15     for a second so we can talk amongst ourselves.

16         (A brief recess was taken.)

17         MS. SOMBUNTHAM:  I have completed my

18     questioning and will turn over the witness to you.  I

19     know if is before 6:30 at least.

20         MR. SREBNICK:  Hold on at least one second

21     everybody, one moment.

22         MS. PERCZECK:  I just wanted to put on the

23     record that in terms of the subpoena production that

24     summary document is being prepared letting you know

25     which communications, either e-mails or Whatsapp

**EXHIBIT B**

1  communications have not been turned over, and I know

2  you and I have spoken about this, but I wanted to

3  make sure that it was on this record.  We are

4  proposing to finish this by next week obviously

5  before he surrenders, and then you had asked Gustavo

6  from whom you obtained documents, and he wanted to

7  clarify that he also obtained documents from Michael

8  Landman.

9      MS. SOMBUNTHAM:  I think he needs to testify to

10  clarify that, but I know I have seen the production

11  and I know what those documents are, so I understand.

12  Anyone else have any questions?  I just want to make

13  sure that we conclude.

14      MS. PERCZECK:  Howard has to leave at 6:30.  So

15  we can't proceed without him right now.

16      MS. MOSS:  So I had a few questions Jackie, but

17  if we can't proceed is there a time we can proceed?

18      MS. PERCZECK:  Yeah, what is your availability?

19      MS. MOSS:  Well, I guess if we get everybody

20  here.  I mean I have various availability.

21      MS. PERCZECK:  Mr. Hernandez and I, we have the

22  calendar.  If you give me some dates, I'll let you

23  know what the calendar looks like.  I don't think we

24  need the court reporter on here for this, right?

25      MS. MOSS:  No.

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

1                 (The deposition was continued at 6:30 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT B**

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF MIAMI DADE

I, Jared Orozco, Court Reporter, Notary Public,
State of Florida, certify that Gustavo Adolfo Hernandez
Frieri personally appeared before me on 20th of
July, 2021, and was duly sworn.

Signed this 20th Day of July, 2021.

*Jared Orozco*
_____

Jared Orozco
Court Reporter
Notary Public, State of Florida
My Commission # GG963786
Expires: June 26, 2024

**EXHIBIT B**

1            CERTIFICATE OF REPORTER

2    STATE OF FLORIDA      )
     COUNTY OF MIAMI DADE )
3

4            I, Jared Orozco, Notary Public in and for the
     State of Florida at large, do hereby certify that I was
     authorized to and did stenographically report the
5    deposition of Gustavo Adolfo Hernandez Frieri; and that
     the foregoing transcript, pages 1 through 174, is a true
6    record of my stenographic notes.

7            I FURTHER CERTIFY that I am not a relative,
     employee, or attorney, or counsel of any of the parties,
8    nor am I a relative or employee of any of the parties'
     attorney or counsel connected with the action, nor am I
9    financially interested in the action.

10           DATED this 20th day of July, 2021, at Fort
     Lauderdale, Broward County, Florida.
11

12
                    _Jared Orozco_
13      _____
                    Jared Orozco
14                  Court Reporter

15

16

17

18

19

20

21

22

23

24

25

## EXHIBIT B

### WORD INDEX

**< $ >**
**$180,000** 87:*21* 88:*25*
**$2.67** 13:*4* 14:*17*
**$200,000** 74:*2*
**$23.9-or-so** 62:*5*
**$6,572** 60:*3*
**$614,161** 60:*9*
**$620,000** 87:*20*
**$9,900** 75:*1*
**$960,000** 87:*22*

**< 0 >**
**01686** 5:*5* 166:*1*
**0DC000363** 4:*13*
  54:*13, 15*

**< 1 >**
**1** 2:*20* 3:*2, 12* 5:*1*
  12:*12* 28:*11* 29:*16*
  30:*21* 42:*7, 8, 9*
  49:*13, 14* 60:*4* 83:*15*
  88:*2* 94:*8, 20* 96:*15*
  105:*12* 110:*6, 13*
  131:*1* 139:*24* 141:*23*
  144:*11, 12, 19* 145:*6,*
  *11* 167:*3* 176:*5*
**1,031,500** 49:*16*
**1,116,400** 49:*16*
**1.3** 110:*7, 11, 14, 18*
**1.3A** 111:*2, 4, 19*
**1.7** 112:*16* 113:*9*
**1.7.3** 134:*7*
**1.8** 114:*17* 115:*1*
**1:30** 68:*19* 82:*19*
**10** 4:*7, 16* 10:*3*
  46:*25* 70:*14* 101:*16,*
  *18, 20* 102:*14* 108:*8*
  121:*4* 132:*4* 167:*21*
**10:00** 1:*17*
**10:16** 1:*17*
**100** 4:*15* 63:*18* 65:*4*
  114:*8* 118:*3* 126:*1, 4*
  127:*17, 22*
**1001** 8:*9*
**101** 4:*16* 63:*21*
**1-03** 4:*20* 128:*14, 18*
**105** 4:*17*

**1068-03** 148:*25*
**10th** 161:*5, 11*
**11** 4:*13* 48:*13* 54:*12,*
  *14* 132:*5*
**110** 1:*23*
**119** 4:*18*
**12** 4:*7* 10:*10, 12*
  12:*1* 115:*8, 13*
**120** 50:*8, 17* 69:*9*
  73:*9*
**128** 4:*19*
**1288-03** 4:*12* 35:*1, 3*
**1293-03** 4:*12* 35:*2, 4*
**1296-03** 4:*11* 32:*2, 4*
**1298-03** 4:*11* 32:*2, 4*
**12th** 162:*25*
**13** 4:*20* 42:*8* 49:*4*
  103:*17* 109:*17* 130:*1,*
  *6* 132:*1*
**130** 4:*20*
**1300** 2:*15*
**1319-03** 4:*9* 29:*11, 14*
**1320-03** 4:*10* 29:*12,*
  *14*
**1327-03** 5:*4* 164:*17,*
  *22*
**1330-03** 5:*4* 164:*17,*
  *22*
**135** 4:*22*
**139** 4:*22*
**13th** 130:*18*
**14** 4:*9* 5:*2* 29:*13, 18*
  42:*8* 49:*19* 153:*4, 10*
  154:*15* 166:*18*
**1400** 3:*7*
**141** 4:*24*
**144** 5:*1*
**14th** 29:*23*
**15** 4:*13* 39:*10* 50:*23*
  51:*10* 70:*14* 78:*21*
  79:*1* 83:*11* 123:*13*
**153** 5:*2*
**15th** 12:*16* 167:*12*
**16** 125:*25*
**160** 5:*3*
**162** 5:*3*
**164** 5:*4*
**165** 5:*4*
**167** 5:*5*
**16th** 55:*6*

**17** 4:*14* 48:*2* 93:*18,*
  *25* 94:*1, 21* 127:*25*
  142:*20*
**170** 5:*6*
**1700** 1:*23*
**174** 176:*5*
**1749** 5:*6* 50:*10, 17*
  69:*21* 73:*6* 170:*14,*
  *18*
**175** 4:*3*
**176** 4:*3*
**17th** 87:*19* 89:*7*
**18** 4:*14* 8:*8* 87:*3, 9*
  92:*8* 137:*17* 154:*14*
**180,000** 87:*22* 88:*23*
**183-03** 4:*7* 10:*11, 13*
**18-CR-20685-**
**WILLIAMS/TORRES**
  1:*2* 8:*18*
**18th** 4:*11* 32:*3, 11*
  164:*25* 165:*4*
**19** 4:*9* 29:*10, 13*
  72:*5* 137:*17* 154:*24*
**19-03** 4:*20* 128:*14, 18*
**1961** 75:*1*
**1991** 96:*5*
**1995** 94:*16, 25* 95:*4,*
  *8, 12, 18* 96:*1*
**1A2-03** 4:*12* 41:*1, 4*
**1st** 119:*20* 128:*10*
  130:*23* 131:*20*
  142:*25* 143:*7, 13*
  144:*3, 7* 145:*18*
  146:*6* 153:*8, 13*

**< 2 >**
**2** 4:*19* 8:*21, 23*
  12:*16* 42:*9* 48:*17*
  56:*22* 83:*15* 95:*20,*
  *21* 114:*2* 120:*2*
  128:*12, 13* 129:*4, 5*
  130:*24* 132:*21* 133:*8,*
  *13, 18, 20, 21* 153:*21*
  163:*10, 11, 12, 13, 25*
  164:*6*
**2,670,000** 12:*17*
**2,960,514.77** 12:*18*
**2.1** 114:*6* 117:*24*
**2:00** 82:*22, 24, 25*
  83:*6*

**20** 4:*10* 30:*15, 16, 22*
  51:*13*
**200,000** 74:*4* 88:*24*
**2000** 18:*16* 83:*24*
**2000s** 84:*4* 121:*24*
**2001** 69:*13* 76:*2*
  79:*12, 13, 18* 80:*7*
  94:*22* 96:*17, 22*
**2002** 71:*24* 74:*25*
  79:*12, 13, 17* 80:*7, 8*
  87:*21* 88:*19, 20*
  89:*20* 121:*24* 145:*9*
  146:*1, 25* 147:*16*
**2003** 49:*14* 50:*12*
  59:*16* 69:*13* 72:*5*
  76:*3* 121:*24* 129:*3*
  131:*4, 5* 132:*14*
  133:*9* 134:*11, 21, 22*
  135:*24* 137:*17*
  138:*16* 140:*5* 141:*4*
  142:*12*
**20-03** 4:*23* 139:*20, 24*
**2004** 9:*4, 25* 10:*1*
  16:*5* 39:*24* 41:*12, 22*
  46:*8* 47:*18* 49:*6, 12*
  51:*18* 53:*17* 63:*17*
  87:*20* 89:*20, 21*
  118:*20* 128:*10*
  130:*23* 131:*6, 8, 10,*
  *17, 19, 21, 24* 134:*16*
  135:*1* 141:*25* 142:*11,*
  *25* 143:*4, 8, 13* 144:*3,*
  *7*
**2005** 9:*7* 10:*1, 5, 23*
  11:*1, 10, 12* 12:*17*
  15:*24* 16:*3, 5* 20:*21*
  39:*25* 55:*6* 96:*8*
  102:*10* 104:*10*
  106:*19* 107:*8, 12*
  116:*24* 118:*20*
  119:*20* 131:*19*
  132:*24* 135:*3*
**2006** 88:*1* 90:*2, 3*
  130:*19* 131:*7* 146:*3,*
  *16* 171:*2*
**2007** 61:*11* 171:*2*
**2008** 61:*11* 62:*21*
  172:*8*
**2008-2009** 172:*8*

**EXHIBIT B**

**2009** 62:*21*
**200-plus** 66:*21*
**201** 2:*14*
**2010** 149:*14*
**2011** 135:6, 7 145:*18*
 146:6 147:*8, 24, 25*
 148:2 149:*14*
**2012** 79:20 158:*14,*
 *16*
**2013** 9:8 20:22
 116:*10* 134:*13* 169:*3*
**2014** 9:8 20:22 21:5
 22:*4, 21* 50:*14* 84:7,
 *9* 85:5, *25* 116:*10*
 169:*3*
**2015** 21:5 50:*14*
 169:*11*
**2017** 148:4, 8 161:*16*
 169:*8*
**2018** 24:3 70:5, 7, *17,*
 *19* 73:*12, 13* 103:*19*
 148:*4, 8* 152:*3, 9, 11*
 156:*4, 12, 16* 161:*11,*
 *16* 169:*15*
**2019** 26:9 73:*24*
 87:*19* 89:8 97:*23*
 103:*19* 153:*8, 13, 15*
 155:*11* 161:5 162:*25*
 169:*16, 17*
**202** 69:*10*
**2020** 4:9, *11* 24:*21,*
 *22* 26:9 27:*10, 11*
 29:*13, 19* 31:*1, 9, 11*
 32:3, *11* 33:*12, 13*
 35:*12, 13, 22* 36:*1*
 164:*25* 165:4 166:*18*
 167:*12*
**2021** 1:*16* 31:*10, 12*
 47:*19* 74:23 81:2
 175:*7, 8* 176:*10*
**2024** 175:*14*
**2030** 11:*19*
**20th** 1:*16* 97:6
 175:*6, 8* 176:*10*
**21** 4:*11* 32:*1, 3, 7*
**22** 4:*12* 34:25 35:*3,*
 *8*
**23** 4:*8* 28:*2, 3* 52:*1*
**234-03** 4:7 10:*11, 13*

**23rd** 10:22 84:7
**24** 148:*10, 11*
**25** 5:3 160:*20, 22*
**250,000** 8:*13*
**25th** 50:*8, 18* 69:9
**26** 5:3 131:4 135:*24*
 162:*14, 17* 175:*14*
**2600** 2:*20*
**26th** 129:*3*
**27** 5:*4* 35:*13* 164:*14,*
 *15, 19, 21*
**27th** 35:25
**28** 4:8 5:4 24:2
 59:9 147:*15* 165:*24,*
 *25*
**28,578,909** 59:*16*
**2800** 3:*7*
**28th** 35:*12* 36:*1*
 145:*8* 146:*1, 25*
**29** 4:9 5:5 167:*1, 7*
**290,514.77** 12:*14, 23,*
 *24*
**29th** 107:*8, 11*
**2nd** 50:*10*

**< 3 >**
**3** 3:*15* 4:7, *15, 16, 18,*
 *22* 8:*21* 10:*12* 15:*20*
 16:*17* 18:*13, 15*
 20:*15, 16* 21:8, *10, 18,*
 *25* 22:*3* 40:*19* 41:*17*
 42:*9* 53:*18* 55:2
 56:*1, 16, 18* 59:7
 73:7 95:*4* 97:*21*
 100:*16* 101:*2, 9, 13,*
 *21* 102:*2* 103:*4, 8, 15*
 104:5 105:*4, 15, 19*
 106:*14* 107:*13* 108:6
 109:*18, 21* 110:*8, 15,*
 *21* 111:*12, 14* 112:*8*
 113:*5, 12, 13, 16, 18,*
 *23* 114:22 116:*20*
 117:*2, 4, 15* 118:*1, 3,*
 *6* 125:*18* 126:*2, 23,*
 *24* 127:*2, 3, 6, 18*
 133:*18, 20, 24* 135:*11,*
 *12* 151:*17, 24* 152:*2,*
 *24* 153:*14, 18, 20, 25*
 155:*5, 7, 14, 17, 20*

**156:*13** 158:*4* 161:*12*
 163:*12, 17* 169:*18*
**3.1.4** 120:*4*
**3.9** 60:*6*
**3:30** 108:*12*
**3:40** 108:*13*
**30** 4:*10* 5:*6* 42:*8*
 68:*10* 101:*4* 106:*6*
 145:*10* 146:5 147:*3*
 170:*10, 14*
**305-358-1064** 2:*21*
**305-371-6421** 2:*16*
**305-374-8200** 3:*8*
**305-379-6667** 3:*3*
**305-536-1191** 3:*13*
**305-799-6240** 39:*8*
**305-961-9224** 2:*5*
**305-961-9342** 2:*10*
**3114** 30:25 31:*17*
**314** 3:*4* 4:8 6:*15*
 23:*12, 17* 24:*24* 27:*5,*
 *8, 14, 20, 21, 23* 28:*4,*
 *16* 29:5 30:*13* 32:*24*
 33:*22* 34:*15* 35:*16,*
 *20* 36:3 156:*18, 19*
 157:*10* 158:*5* 165:*15,*
 *17* 166:*19, 20*
**31st** 135:*6*
**32** 4:*11* 140:*18*
 142:*8*
**33127** 50:*9*
**33128** 3:*12*
**33128-1838** 3:*3*
**33131-1715** 2:*21*
**33131-4311** 2:*15*
**33132** 2:*5, 9*
**33134-6921** 3:*8*
**33301** 1:*23*
**344-2** 42:*24*
**35** 4:*12*
**36** 59:*22*
**365-2** 4:*13* 78:*23*
 79:*1*
**369-03** 4:*8* 28:*4, 10*
**373-03** 4:*9* 28:*4, 10*
**374-03** 4:*10* 30:*16, 20*
**383-4** 119:*5*
**383-4E** 153:*5*
**383-5** 130:*2*

**383-8** 100:*22*
**393-03** 4:*10* 30:*17, 20*
**3rd** 2:*20* 3:2 169:*16*

**< 4 >**
**4** 4:*22* 42:*9* 43:*7, 8*
 56:*15* 68:*7* 95:*8*
 110:*15* 139:*17, 18*
 140:*18* 142:*4, 7*
 148:*24*
**4:30** 122:*6*
**40** 3:*2, 11* 4:*12*
**40,000** 88:*1*
**48** 68:*5, 24*
**49** 68:25 75:*24*
 76:*19*
**494-03** 5:2 144:*14, 18*
**4th** 2:*4, 9*

**< 5 >**
**5** 4:24 42:9 47:*1*
 95:*12* 112:*15* 141:*5,*
 *11* 142:*20*
**5.3** 115:*9, 13*
**5.8** 42:*19*
**5:00** 122:*7*
**50** 60:*21* 61:*13, 17*
 63:*7, 13* 71:*10* 77:*2*
**51-03** 4:*23* 139:*20, 24*
**523-03** 5:2 144:*14, 18*
**54** 4:*13*
**56-03** 4:22 135:*13, 16*
**57-03** 4:*24* 141:6, *12*
**597** 70:*1, 4, 12* 73:*13*
 78:*7, 11* 80:20 89:9,
 *19, 20* 90:*11* 93:*1, 3,*
 *10*
**5th** 102:*10*

**< 6 >**
**6** 4:*12* 11:*25* 40:*23,*
 *25* 41:*5, 13* 42:*5, 6, 9,*
 *13, 15, 19* 45:6 48:*13*
 49:*19* 52:*2* 56:*12*
 57:2 59:*10, 22* 63:*18*
 68:5 74:*7, 20* 75:*25*
 88:*16* 95:*17*
**6.1.3** 121:*5* 132:*8*
**6:00** 148:*19*

**EXHIBIT B**

**6:30** 1:*18* 167:*16*, *17*
172:*19* 173:*14* 174:*1*
**61** 78:*22*
**614,161** 68:*8* 76:*20*
**6th** 1:*23*

**< 7 >**
**7** 4:*2*, *18* 42:*10*, *13*,
*15* 43:*11*, *12* 118:*22*
119:*12* 120:*2* 123:*14*
129:*9*
**701** 11:*21* 97:*2*, *6*
**73-03** 141:*7*
**76-03** 4:*12* 41:*1*, *4*
**764-03** 118:*25*
**7880-03** 4:*17* 101:*17*,
*22*
**79** 4:*13*
**7th** 2:*4* 140:*5* 141:*3*

**< 8 >**
**8** 4:*15* 42:*9* 43:*14*,
*22* 100:*14*, *16*, *21*
101:*4* 106:*24* 107:*1*
108:*5*, *17* 109:*1*, *24*
110:*5*, *9*, *17* 112:*5*, *7*,
*13*, *16*
**817-03** 108:*18*
**847-03** 105:*9*, *25*
**848-03** 105:*9*
**849-03** 105:*9*, *25*
**87** 4:*14*
**880-03** 105:*10* 106:*3*

**< 9 >**
**9** 4:*17* 43:*18*, *19*
105:*2*, *3* 106:*7*, *23*
107:*6*, *10* 108:*5*
109:*2*, *24* 110:*12*, *16*
111:*16* 121:*2*, *3*
**9/11** 79:*18*
**906-03** 105:*11*
**94** 4:*14*
**954)241-1010** 1:*24*
**956-03** 130:*4*
**956-03-973-03** 4:*21*
130:*8*
**96** 56:*13*
**97** 57:*1*

**973-03** 130:*4*
**99** 2:*4*, *9*

**< A >**
**a.m** 1:*17*
**ability** 52:*24*
**able** 33:*18* 53:*14*, *16*
109:*10* 115:*6* 116:*3*
**about** 13:*23* 16:*5*, *11*
19:*19* 34:*15* 37:*20*
38:*7* 42:*19* 44:*7*
52:*12* 53:*22* 60:*6*
64:*8* 67:*15*, *17*, *18*
68:*1* 73:*12* 76:*2*, *18*
80:*16*, *17*, *18* 81:*3*, *4*,
*7*, *11*, *12*, *18*, *19*, *20*, *23*
82:*16* 88:*23* 93:*12*,
*14* 99:*2* 100:*10*
103:*9* 107:*20* 115:*25*
116:*7* 124:*5* 125:*15*
159:*25* 173:*2*
**above** 36:*20* 37:*21*
52:*5* 57:*5* 76:*20*
78:*16* 87:*13* 89:*4*
102:*15* 105:*18*
147:*12*, *15*
**absent** 67:*1*
**absolutely** 160:*10*
**accepting** 135:*24*
**access** 14:*7*, *9* 62:*17*
63:*10*
**according** 58:*24*
61:*17* 84:*6* 88:*22*
117:*14* 130:*5* 165:*7*
**account** 12:*5*, *7*, *9*, *18*
13:*1*, *11*, *13*, *16*, *18*, *23*
14:*5*, *7*, *10*, *12*, *13*, *15*,
*18* 15:*4* 17:*19*, *21*
21:*8*, *11*, *15*, *17*, *19*, *20*,
*22* 22:*1*, *6*, *7*, *8*, *10*
89:*5* 103:*6*, *8* 116:*20*,
*23*, *25* 117:*6*, *15*, *19*,
*21*, *22*
**accountant** 167:*14*
168:*4*, *6*, *14*, *15*, *17*, *22*,
*23* 170:*9*
**accounts** 14:*1* 17:*25*
21:*16* 102:*23* 117:*8*,
*9*, *10*, *13* 169:*9*

**accurate** 11:*3*, *9*
13:*9* 41:*13*, *18* 63:*11*
112:*8* 118:*5* 143:*1*, *4*
145:*3* 147:*7*, *20*
**acknowledge** 6:*2*
**acquire** 19:*17*
**acquired** 14:*25* 15:*1*
70:*22*, *25* 72:*4* 84:*12*
**acquisition** 71:*19*
84:*14*
**across** 75:*4*
**acted** 153:*19*
**acting** 153:*17*
**action** 111:*7* 122:*21*
136:*15*, *23* 137:*18*
138:*4*, *7*, *9* 176:*8*, *9*
**actions** 102:*23*
136:*13*, *19*, *20*, *21*
**actively** 96:*13*
**activities** 86:*12*
**acts** 110:*23*
**actual** 10:*3* 49:*9*, *13*
56:*21* 146:*10*
**actuality** 65:*20*
**actually** 28:*10* 34:*16*
48:*4*, *12* 54:*13* 69:*12*
82:*18* 100:*21* 105:*7*
115:*12* 119:*4*
**add** 105:*8*
**added** 70:*24* 142:*16*
**addition** 110:*4*
**additional** 70:*24*
111:*1* 147:*6*
**address** 11:*19*, *20*, *23*
36:*13*, *16* 37:*7* 50:*7*,
*9*, *11*, *13*, *16* 69:*13*, *14*,
*21* 73:*6*, *9* 76:*2*, *4*
77:*1* 84:*12* 89:*10*, *11*
90:*9*, *16*, *17*, *18*, *19*
124:*13* 163:*4*
**addressed** 11:*15*
57:*10* 135:*22*
**addresses** 161:*6*
**addressing** 32:*16*
36:*18*
**adhere** 112:*12*, *24*
115:*14*
**adhered** 112:*18*
113:*5* 114:*21* 115:*3*
**administering** 6:*4*

**Administrative** 6:*6*
139:*3*
**ADOLFO** 1:*2*, *13*
4:*2* 6:*24* 48:*24*
51:*19*, *21* 55:*1* 56:*3*
57:*9* 58:*25* 101:*7*
102:*4* 175:*5* 176:*5*
**adopted** 106:*14*
**advised** 18:*25* 19:*16*
92:*16*
**advisor** 67:*10*
**Advisors** 46:*2* 64:*6*
67:*10*
**affiliated** 62:*1*, *10*
66:*12*, *15*, *17* 67:*2*
118:*12* 120:*10*
121:*20* 143:*18*
**affirmed** 6:*25*
**after** 24:*25* 29:*4*, *7*
35:*23* 46:*6* 73:*3*
82:*24*, *25* 83:*8*
114:*18* 142:*16*, *17*
147:*1* 163:*24* 167:*21*
169:*13*, *15*
**again** 13:*7* 16:*3*
17:*24* 20:*12* 21:*14*
22:*20* 28:*12* 33:*25*
40:*20* 46:*18* 63:*15*,
*16* 65:*11*, *12* 75:*12*
76:*2* 83:*17* 86:*14*
87:*5* 93:*18* 94:*4*
95:*6* 106:*3* 111:*9*
112:*2* 113:*21* 114:*13*,
*16*, *23* 115:*5*, *16*
116:*22* 117:*11*, *19*
132:*1*, *22* 136:*20*, *22*
137:*15*, *20* 138:*7*
139:*10*, *15* 147:*22*
148:*6*, *12* 150:*3*, *17*
151:*2*, *14*, *22* 158:*7*
163:*11* 168:*19*
**agent** 66:*24*
**ago** 47:*18* 48:*2*
69:*13* 80:*13*
**agree** 33:*13* 91:*17*
**Agreement** 4:*13*, *15*,
*18* 6:*10* 53:*7*, *13*
54:*6*, *14*, *21*, *22* 55:*17*
100:*17* 101:*2* 102:*13*
103:*12*, *13*, *25* 104:*3*,

## EXHIBIT B

*5, 6, 9*  105:*4, 14, 17, 19*  106:*2, 13, 17*  107:*2, 6, 7, 14, 20*  108:*6*  109:*4, 9, 10, 13, 21*  110:*24*  111:*17*  112:*1, 6, 8, 13*  115:*15, 18*  117:*14*

**agreements**  54:*7*  106:*22*  107:*17*  108:*4*  111:*7*  148:*19*

**agrees**  53:*5*

**AHDC**  3:*5*  6:*16*

**ahead**  26:*21*  43:*2*  78:*23*  80:*24*  83:*9*  160:*15*

**Aldamer**  171:*17*

**alert**  122:*3*

**Alina**  172:*10*

**alive**  138:*17*  147:*18*

**all**  11:*12*  19:*2, 5*  38:*9*  47:*9*  49:*22*  53:*6*  67:*11, 13, 17, 21*  68:*13, 23*  71:*7*  74:*24*  75:*20*  77:*19, 21*  78:*5, 11, 17*  88:*8, 12*  96:*1*  98:*19*  102:*23*  110:*22*  112:*25*  113:*4*  122:*9*  134:*19*  135:*10*  137:*25*  160:*17*  162:*11*  165:*19*

**alleys**  171:*19*

**Allison**  2:*22*  6:*13*  159:*13*

**alluding**  26:*25*  60:*18*  63:*12*

**alone**  47:*3*

**along**  30:*4*  60:*1*

**alongside**  121:*23*  136:*11*  146:*12*

**already**  23:*1*  146:*7*

**also**  14:*24*  16:*1*  19:*21, 22*  20:*13*  45:*18*  49:*1, 14*  50:*2, 18*  53:*5*  54:*5*  59:*3*  62:*13*  65:*4*  70:*24*  73:*9*  75:*22*  78:*22*  80:*18*  95:*4, 5, 12*  96:*21*  100:*21*  108:*17, 21*  116:*19*  119:*21*

124:*1*  130:*3*  147:*23*  173:*7*

**alternative**  24:*16*  25:*11*

**Althoff**  71:*22, 24*  72:*15, 17*  74:*6, 21*  87:*19, 20, 22*  88:*15, 20*  90:*4, 24*

**although**  164:*15*

**always**  30:*8*  34:*3*  80:*17*  138:*15*

**ambiguous**  158:*9*

**amend**  130:*21*

**Amended**  4:*17, 20*  104:*7*  105:*3, 16, 18*  106:*13*  107:*6, 15*  109:*9, 13*  110:*18*  111:*3, 12, 20*  112:*7*  129:*21*  130:*6, 15, 17, 22*  131:*7, 14, 15*  132:*2, 7*  140:*8*

**amendment**  104:*11, 12*

**amendments**  104:*9, 15*  106:*17*

**AMERICA**  1:*2*  3:*14*

**American**  120:*23, 24*

**Americas**  101:*8*

**America's**  114:*7*  118:*19*  120:*4, 6, 8*  123:*17, 19, 25*  125:*5*  129:*15*  143:*18, 23*

**Ammirati**  51:*19*

**Ammiratis**  51:*23*

**among**  19:*14*

**amongst**  172:*15*

**amount**  10:*4*  70:*15, 18*  74:*2*  88:*1, 25*

**amounts**  53:*6*  168:*18*

**and/or**  8:*13*  53:*3*  54:*2*  138:*9*

**Anderson**  161:*7*  162:*6, 10*

**Andrea**  35:*19, 25*  42:*19*

**Angel**  135:*21*

**Annex**  126:*7*  127:*22*  128:*1, 3*  142:*23*

**annexed**  51:*15*

**annual**  25:*24*

**another**  9:*25*  27:*18*  38:*10, 24*  50:*24*  118:*14*  134:*3*  167:*16*

**answer**  7:*21, 24, 25*  8:*1, 7*  33:*18*  109:*7*  115:*6*  116:*3*  157:*6*

**anticipated**  68:*16*  83:*2*

**anybody**  17:*8, 11*  42:*13*  82:*8*

**anyone**  15:*5, 16, 18*  16:*3*  17:*1*  48:*17*  57:*24*  82:*6, 21*  84:*17*  100:*10*  117:*15*  140:*22*  142:*21*  146:*10*  153:*24*  154:*17, 25*  158:*25*  159:*2, 7*  173:*12*

**anything**  39:*1*  40:*7*  44:*20, 21*  53:*21*  58:*6*  78:*14*  83:*17*  86:*4*  87:*7*  99:*12*  111:*11*  113:*10*  115:*19*  172:*13*

**anywhere**  49:*7*  99:*8*

**AOSC-20-16**  6:*7*

**AOSC-20-17**  6:*7*

**Apartment**  5:*6*  8:*24, 25*  9:*1, 3, 6, 10, 13, 18, 22*  10:*22, 24*  12:*15, 20*  15:*9, 14, 15, 20*  16:*6, 9, 12, 20, 22*  18:*3, 5, 7, 9, 11, 20, 22*  20:*19, 25*  21:*3, 6*  22:*3, 13, 22, 23, 24, 25*  23:*13, 15*  24:*4, 6, 9*  26:*7, 8, 14*  39:*14, 15, 19, 21*  40:*2, 16, 19*  41:*15, 24*  42:*1*  44:*2, 13, 19*  49:*21, 23, 25*  50:*2*  51:*24*  52:*17*  53:*15*  54:*24*  55:*22*  56:*7, 10*  57:*18, 25*  58:*3, 18*  59:*4*  66:*8, 25*  86:*7*  103:*24*  113:*22*  126:*16, 20*  132:*22*  163:*21, 25*  164:*1, 4, 6*  170:*15, 18*  171:*25*

**apartments**  72:*15*  113:*19*  163:*23*

**apologies**  63:*23*  104:*22*  119:*8, 10*  133:*20*  167:*21*

**apologize**  15:*6*  48:*19*  65:*22*  114:*16*  116:*6*

**app**  38:*17, 24*

**appear**  94:*15*  95:*11*

**APPEARANCES**  2:*1*

**appeared**  35:*19*  175:*6*

**appears**  28:*14*  32:*16*  36:*6*  48:*23*  49:*5*  62:*19*  75:*10*  88:*20*  89:*3*  97:*19, 21*  107:*11*  111:*12*  115:*17*  126:*8*  130:*18*  131:*7*  145:*8*  165:*12*  169:*22*  171:*10*

**appendix**  71:*17*

**appliances**  36:*7*

**applicant**  49:*5*

**application**  39:*16, 23*  40:*1, 3, 5, 11, 14, 19*  41:*14, 16, 19, 20, 21, 23, 25*  43:*10, 25*  44:*4, 6*  48:*15, 18*  49:*11*  51:*4, 11*  53:*13, 18, 22, 24*  59:*12, 18, 21*  60:*23*  63:*19*  65:*18*  66:*7, 10*  68:*6*  69:*18, 24*  75:*10*  88:*16*

**applied**  72:*14*

**apply**  39:*15*  158:*3*

**appointed**  101:*12*  103:*13*  121:*6, 22*  147:*6, 17*

**appointing**  102:*22*  103:*9*

**appointment**  135:*24*  145:*24*  146:*24*  167:*17*

**appropriate**  25:*19*  98:*6*  138:*25*

**approval**  53:*19*

**approve**  44:*1*  84:*25*

**approved**  84:*24*  85:*4*

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

## EXHIBIT B

**approximately** 9:8 20:21 49:13, 14 103:17 169:3

**April** 161:5, 11 162:25

**arbitration** 161:20 162:24

**arbitration-related** 158:18

**area** 22:4 23:1 37:13 76:19

**areas** 37:7

**around** 9:9 11:1 50:14 61:11 68:19 81:1 84:8 156:15 158:16 171:2

**arranged** 93:1

**arrangement** 6:5, 8 91:4

**arrangements** 90:25 92:19, 20

**arrest** 70:5 92:12 152:3, 9, 11, 13, 20 153:1

**arrested** 24:1, 2 70:16 73:12 169:13

**Art** 51:6, 7 60:8, 11 68:7 69:16 70:10, 11, 12, 15, 22, 24 71:7, 8 72:18 73:10, 17 74:8 75:2, 10, 17 76:21 77:5, 9, 10, 24 78:3, 10 79:9, 14 80:17 83:21, 24 84:15 85:3, 10, 22 86:21, 23 87:1 88:9, 14, 15, 17 89:16 90:20, 23 91:2, 5, 6, 19, 22 92:11, 18, 23 94:11 95:1, 5, 9, 14, 17, 23 96:9, 18, 20, 23 97:24, 25 98:13, 20 171:13

**Article** 121:5

**Articles** 4:23 5:1 137:4 139:19 140:3, 7 144:12, 21, 22 145:3

**artinsure.com** 69:2

**artist** 77:3, 21, 25 80:2 84:3 86:25 96:13 171:17

**artists** 73:1 78:17

**Artwork** 4:14 69:10, 17 70:7, 23, 25 71:2, 4, 21 72:4 76:1, 7, 11 88:6 92:8 93:3, 5, 8 94:1, 9 96:4

**artworks** 85:24

**aside** 15:5 17:1, 10 110:2 112:4 115:17

**asked** 28:25 30:5, 11 31:20 37:18, 25 38:1 165:22 173:5

**asking** 99:2 108:4 111:24 167:14 169:25

**aspects** 103:9

**ASSET** 2:3 8:16 20:7 46:19 47:3, 4, 7 61:1, 7, 15 63:16 64:9, 16 66:2 71:18

**assets** 20:3, 9, 12 58:9, 21 59:15, 23, 25 60:2, 20 61:10, 15 63:10 86:17 115:6, 21, 22

**assigned** 63:7 155:14

**assisted** 27:19 84:22

**associate** 169:23

**associated** 74:17 140:24 143:19 164:4

**Associates** 13:1 15:23 104:23 131:23 141:20 150:10 158:2

**Association** 4:23 5:1 21:2 41:11 44:1, 11 57:11, 22 103:20 139:20 140:4, 7 144:13, 22 145:4

**assume** 87:15 137:7 161:18

**Atlantico** 13:14, 18, 19, 22, 24 14:4, 8, 15 17:19 121:12 128:24 129:12 131:19 132:13 135:23 137:16

**attached** 165:18

**attending** 158:16

**attention** 121:3 153:21

**attorney** 10:20, 21 56:15 57:21 59:16 123:20, 22 159:10, 11 176:7, 8

**attorneys** 6:1 15:11, 21 16:4, 10, 13, 14, 15 18:24 19:15 82:2, 3 100:11 119:3 150:19 159:1, 5, 6, 8, 22 160:12, 13 161:7

**ATTORNEY'S** 2:8

**attributed** 63:14

**auction** 92:23

**August** 4:11 9:7 10:1, 5, 22 11:1, 10 12:16 31:1 32:3, 11 33:12 55:6 102:10 132:24

**Austrian** 84:3

**author** 79:6, 7

**Authorized** 4:16 14:11 16:19, 21 17:3 101:21 102:1 117:15, 19 176:4

**automatically** 139:1

**availability** 173:18, 20

**Avenue** 2:20

**Avon** 87:25

**aware** 34:17 131:13 137:4 138:14, 15 143:1 145:2 154:3 155:4 156:5, 8

**away** 72:13 133:17 146:2, 3, 8 172:1

**< B >**

**back** 29:16 30:20 32:6 39:14 43:22 56:12 68:4, 23 74:7, 20 75:23 77:2 88:2, 17 96:15 108:8, 13 116:23 122:8 124:5 125:16 128:18 129:8, 10 130:24 132:21 137:17 138:11 139:24 141:8 142:7

**144:18** 163:12 167:23 171:17 172:10

**background** 171:4

**backup** 36:21

**Bahamas** 17:18 64:24 65:3, 13 121:10 128:24 132:10, 13, 20 139:9, 12 140:12 143:3

**Bahamian** 66:5 121:6 129:14 139:15

**balance** 14:17, 18, 19 116:17

**Banco** 13:14, 18, 19, 22, 24 14:4, 7, 15 17:19 121:12 128:24 129:12 131:18 132:13 135:23 137:16

**Bandershaw** 163:23

**bank** 13:11, 14, 19, 22, 23 14:1, 4, 6, 12 21:7, 11, 14, 16, 17, 19, 21 22:1, 6, 7 102:23 103:5, 8 116:20, 25 117:5, 8, 9, 10, 15 121:12 128:24 129:12 135:23 137:16

**banker** 13:21, 22 17:7, 10 135:22

**barely** 52:7

**barter** 171:19

**bartering** 171:21

**based** 49:11 53:11 57:17 60:21 65:20

**Basel** 79:18

**basically** 66:4 75:16 91:6, 18 98:3, 4 126:20 135:7 162:11 171:25

**basis** 138:23

**Bates** 4:7, 8, 10, 11, 12, 13, 17, 19, 21, 22, 23, 24 5:1, 3, 4, 5 10:10, 13 28:4 29:11 30:16, 20 32:2, 4 35:1, 3 40:25 41:4 54:15 79:1 101:16,

**EXHIBIT B**

*22* 105:*8, 23, 24*
118:*25* 128:*14, 17*
130:*4, 8* 135:*12*
139:*20, 23* 141:*12*
144:*14, 18* 148:*25*
160:*21, 23* 162:*17*
164:*15, 17, 21* 167:*8*
**Bates-stamped** 28:*9*
54:*13* 108:*18* 135:*16*
141:*6* 162:*15* 166:*4*
**Bay** 124:*14, 16*
**before** 1:*18* 7:*8*
23:*7* 26:*18, 21* 29:*4,
7* 33:*16, 21* 47:*15*
55:*10, 12, 18, 20*
64:*20* 65:*3* 68:*18*
88:*4* 93:*17* 119:*21*
124:*23* 148:*11*
172:*19* 173:*5* 175:*6*
**beforehand** 108:*25*
**beginning** 23:*9*
27:*11* 121:*4* 167:*2*
**Behalf** 1:*13* 2:*2, 12,
18* 6:*11, 13, 15, 18, 21*
16:*18* 100:*3* 123:*14*
125:*2* 135:*25* 136:*21*
138:*10* 156:*6* 161:*16*
**behind** 172:*2*
**being** 13:*2* 15:*4, 16*
21:*17* 34:*25* 68:*16*
97:*11* 103:*21* 109:*11*
114:*2, 13* 116:*25*
117:*20, 23* 132:*9*
138:*1, 2* 150:*5* 158:*9*
169:*20* 172:*24*
**belief** 13:*6* 33:*5*
**believe** 9:*24* 10:*19,
22* 11:*5, 12* 12:*6, 12,
14, 21* 13:*12, 15*
14:*13* 15:*18, 24* 16:*2*
18:*5, 8, 12* 19:*2, 14*
20:*11, 18* 21:*4, 14, 21*
22:*4, 19, 21, 25* 23:*9,
12* 24:*11, 17, 25* 25:*8,
12, 16* 26:*3, 8, 15, 23*
27:*4, 10, 13, 17* 28:*13,
24* 30:*2* 31:*11, 16*
32:*15, 21* 33:*1* 34:*18*
35:*14, 23* 36:*12, 15,
25* 37:*11, 19* 39:*24*

40:*5* 43:*6, 24* 44:*5, 8,
10, 17* 45:*17* 46:*12*
47:*12* 51:*17* 52:*15,
17* 54:*23* 55:*23*
56:*23* 57:*6, 20* 58:*1*
59:*6, 20* 60:*25* 62:*21*
63:*13* 65:*9, 21* 69:*11,
14, 20* 71:*7, 17* 72:*20*
73:*6, 7, 24* 76:*13, 14*
77:*16* 78:*4* 79:*12*
80:*1, 8* 81:*24* 86:*9*
87:*13* 89:*1, 2, 5* 90:*6*
91:*10* 96:*15* 97:*18*
98:*14* 101:*6, 11*
102:*15, 25* 103:*4*
104:*4, 18* 105:*14*
106:*15, 19* 109:*8, 17*
110:*1* 111:*9* 112:*10,
11, 14* 113:*7, 10*
115:*5, 7* 116:*12*
119:*18* 120:*9, 10*
121:*11* 122:*11*
123:*16* 124:*1, 14, 16*
125:*21* 128:*1, 24*
129:*20, 22* 130:*12*
131:*4* 132:*12, 18, 19,
24* 133:*5, 15* 135:*17*
136:*4, 8* 137:*15*
140:*5, 13* 141:*19*
142:*6* 144:*4, 21*
145:*5* 147:*9, 21*
148:*8* 150:*17* 151:*2,
19* 152:*16, 21* 153:*16*
154:*5, 9, 20, 23* 155:*3,
13, 19, 23* 156:*2, 9, 14*
157:*8, 11, 14* 158:*14*
160:*18* 161:*4, 13, 23*
163:*8* 164:*20* 165:*2,
20* 168:*5, 16*
**belive** 149:*14* 153:*2*
**belongs** 51:*4*
**below** 12:*15* 35:*12*
48:*23* 49:*9* 65:*3*
74:*21* 77:*13* 87:*16*
89:*18* 90:*11* 101:*7*
**beneficial** 18:*7, 9, 11*
56:*6, 10* 57:*24* 58:*2,
8, 17, 18* 59:*4, 7*
98:*17* 99:*18, 23*

**beneficiaries** 122:*21*
133:*22* 134:*2, 4, 6, 9*
**beneficiary** 60:*21*
61:*6* 62:*25* 66:*1*
118:*11* 128:*1, 3, 4, 6,
9* 133:*9, 11, 14, 19*
140:*15* 142:*21, 23*
143:*6, 12*
**benefit** 118:*15*
**Berlin** 73:*22*
**besides** 15:*10*
**better** 94:*18, 19*
166:*15, 17*
**between** 32:*12* 33:*10*
51:*18* 70:*19* 107:*17,
19* 109:*1, 24* 111:*23*
122:*24*
**billings** 124:*15*
**bio** 45:*18*
**birthday** 81:*2*
**Biscayne** 2:*14*
**bit** 83:*1* 94:*7* 124:*5,
25* 125:*1* 128:*19*
135:*19* 138:*11*
145:*16* 148:*20* 167:*3,
5*
**BLACK** 2:*14* 172:*4*
**blank** 149:*21*
**blanking** 25:*15*
27:*18* 73:*19*
**bloc** 171:*18*
**board** 15:*20* 16:*9*
41:*11, 17, 22* 44:*14,
17* 48:*11* 51:*6* 53:*18,
20* 57:*10, 21* 59:*21*
**Bogota** 51:*5, 7*
**bold** 147:*5*
**bonds** 14:*24* 60:*5*
**Bonin** 87:*25* 89:*22,
23* 90:*12*
**Bonnie** 161:*8*
**book** 116:*15*
**born** 135:*5*
**Both** 38:*25* 45:*24*
62:*22* 70:*1* 89:*18*
106:*25* 143:*7, 13, 21*
**bottom** 43:*19, 20*
48:*23* 52:*3, 4* 54:*25*
71:*14, 22* 87:*14*
94:*15* 110:*8* 121:*3*

133:*21* 146:*5* 149:*3*
163:*19* 165:*8* 168:*10*
171:*15, 16* 172:*5*
**bought** 79:*14, 23*
**Boulevard** 2:*14* 3:*7*
**box** 88:*1* 90:*3*
171:*16, 20, 22, 24*
**breach** 123:*9*
**break** 44:*25* 45:*1, 7*
68:*12, 13, 18* 82:*21,
22* 83:*7* 93:*17* 99:*24*
100:*10* 107:*18*
108:*15*
**breaks** 148:*21*
**Bret** 166:*12, 13, 14*
**Brickell** 11:*19, 22*
97:*2, 5, 6*
**Bricknell** 11:*22*
**brief** 45:*3* 172:*16*
**broad** 111:*22*
**broader** 111:*5*
**broadly** 123:*3*
**broke** 159:*4*
**broken** 42:*7*
**broker** 16:*4* 32:*15*
41:*10* 43:*9, 24* 48:*10*
59:*20* 66:*24* 67:*4*
**Brooklyn** 29:*5* 32:*25*
35:*17* 36:*3* 156:*18*
**brother** 46:*24* 61:*4*
62:*8* 66:*4* 67:*16*
82:*11* 97:*9* 98:*3, 8,
16* 121:*23* 134:*14*
136:*11* 137:*24* 138:*9*
141:*20* 143:*25*
144:*25* 146:*12*
147:*23, 24* 158:*2*
**Broward** 176:*10*
**BTS** 78:*22*
**building** 52:*24*
127:*16* 161:*7*
**bulk** 81:*16* 98:*3*
**Bulldog** 90:*3*
**business** 110:*25*
120:*25* 121:*18*
**businesses** 111:*3*
**buy** 92:*16*
**buyer** 13:*2*
**BVI** 64:*24* 65:*12*

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

**EXHIBIT B**

66:5   149:9

**< C >**
**Caballero**   172:9
**calendar**   173:22, 23
**call**   27:2   37:18, 19
   56:9
**called**   37:16, 23, 24
   77:15   90:9   127:3
   159:22   164:5
**calls**   124:18
**came**   15:9   80:19, 22
   143:25   171:23
**Canada**   17:17   124:1
   143:15
**Canadian**   126:4
   127:22   129:15
**canceled**   79:19
**candidate**   45:15, 16
**candidly**   55:13
**cannot**   39:25   44:8
   55:19   57:5   63:11
   137:7   151:23   156:8
**canvas**   74:23   75:7
**capacity**   150:7, 15, 18,
   25   151:3, 12, 24
   152:1
**capital**   114:6   117:25
**cardboard**   171:22
   172:4
**Cardoso**   77:13, 14
**care**   30:8
**Carlos**   82:16
**carrier**   76:15
**carries**   8:12
**Cartagena**   120:17
**CASE**   1:2   8:16, 17
   15:22   19:3   34:4
   37:17   42:11   81:3, 5,
   9, 19   86:5   98:14
   116:24   117:23
   120:20   139:11, 14
   160:6, 18   171:21
**cases**   158:13
**cash**   60:2
**CASTRO**   1:2   3:5, 9
   6:16, 20   25:21   26:21
   28:22   29:23   32:12
   36:11   50:4, 15   67:11,
   13   69:24   82:14

87:14, 15   89:7
   155:24   158:6   159:15
   160:2, 5, 21   164:16
   165:3   168:2
**CASTRO'S**   5:8
**categorize**   60:19
**categorized**   56:23
**cc'd**   163:8
**cell**   38:23   39:4, 6, 7,
   11
**certain**   21:9, 12, 13
   22:9   31:16   33:6
   61:2   65:2, 12   66:16
   73:8   76:13   79:13
   93:7   106:20   113:7,
   24   131:9   136:8
   138:12   144:8, 9
   151:20, 22   153:16
   154:10, 20, 23   155:3
   169:8
**Certificate**   4:3, 22
   54:8   69:1   139:18
   140:2, 6   145:13
   146:4, 17   175:1
   176:1
**certify**   175:5   176:4, 7
**Cesar**   46:24   61:5
   62:8   65:5   66:4
   67:15, 16, 23   98:11
   134:14   137:24   138:9
   141:20   146:13   148:5
   158:2
**cetera**   58:22   84:23
   110:23
**chain**   32:11, 13
   164:9   170:6
**change**   35:18   155:25
**changed**   34:12   47:22
   62:6   131:16
**changes**   34:14   47:24
**Chart**   63:20   64:2, 12,
   17, 19   66:7, 9   67:23,
   24
**chatted**   91:14   92:6
**check**   42:16   131:12
**checked**   108:15
**checking**   50:21
**CHIEF**   2:3
**child**   135:5

**children**   9:15, 20
   23:5, 17, 23   24:14, 17
   25:2, 10, 19   33:3
   134:9, 11, 13, 16, 17,
   18, 20, 23, 24
**Chinese**   80:2
**choose**   120:18
**chosen**   25:7   120:12
**Christian**   79:7, 9, 16
   80:13, 21   81:1, 10, 14
   82:10   89:14   92:3
**circa**   131:17   132:14
**circumscribes**   111:3,
   20
**City**   72:10
**civil**   158:17
**claim**   36:24
**Clara**   91:10, 14
**clarify**   86:19   108:16
   156:21   158:8   173:7,
   10
**clarity's**   159:4
**clause**   110:9, 10
**cleaning**   171:22, 23
   172:1
**clear**   16:13   17:12
   27:2   47:20   70:21
   113:21   127:18
**clearly**   47:19   95:2
**client**   6:19
**closely**   47:12, 15
   112:11   115:16   134:1
**Closing**   4:7   10:12,
   23, 25   11:4, 9   47:14
   54:23   55:13, 23
**Coconut**   124:15
**Code**   8:9
**codirector**   121:22
   123:10   125:13
   136:11, 16, 23   137:19
   138:8, 21   146:13
   147:24, 25   148:1, 2
**codirectors**   139:8
**colleagues**   116:22
**collected**   88:11
**collection**   60:8, 11
   68:7   85:22   96:25
   98:4
**collector**   73:20   77:15

**Cologne**   73:22   87:18
   96:9
**Colombia**   17:15
   120:17, 19, 21
**Colombian**   78:17
**column**   77:3
**come**   80:15   108:8
**comes**   19:23   114:18
**comfortable**   114:24
**Commencing**   1:17
**Commission**   175:14
**committee**   123:11
**communicate**   38:13,
   15, 20   91:13   124:19
   159:12
**communicated**   23:23
   124:2, 4, 17, 20   160:2,
   4
**communications**
   125:8, 11, 12   172:25
   173:1
**companies**   62:12
   67:7   86:4
**company**   18:23
   19:13   30:3   37:18
   53:1   56:2   57:24
   58:8   59:7   63:1, 3
   64:22   65:14   99:12,
   13   102:21, 24   110:20,
   22, 25   111:4   112:25
   113:1, 4, 19, 20   114:1,
   3, 4, 6, 11   115:4, 22
   116:14, 16   120:9, 11,
   18, 23, 24   121:6, 10
   123:23   127:16
   136:24   139:3   140:16,
   17   143:22   147:7
   155:6   166:17
**company's**   99:10
   115:5, 21
**complete**   7:25   102:20
**completed**   30:24
   172:17
**complicate**   113:21
**conclude**   173:13
**condition**   52:12
**conditioned**   52:22
**conditions**   52:20
**condominium**   58:7,

**EXHIBIT B**

*13, 20*
**conduct** 14:*11*
**conference** 100:*5*
**confirm** 17:*2, 3*
120:*3* 126:*1*
**confirming** 129:*21*
**connected** 176:*8*
**Connecticut** 46:*4*
**connection** 44:*22*
99:*14*
**Consent** 4:*16* 6:*8*
52:*12, 23* 53:*24*
101:*20* 102:*1, 17*
138:*21*
**consequence** 61:*12*
**considerations** 19:*22*
20:*11, 13*
**considered** 24:*18*
**constituted** 14:*23*
16:*16* 62:*9*
**contact** 37:*12, 25*
82:*9, 12, 13* 166:*16*
**Contemporary** 51:*7*
**contents** 43:*8, 10, 25*
**context** 123:*2* 124:*6*
**contingent** 134:*4, 5*
**continue** 7:*8* 42:*25*
45:*21* 53:*10*
**continued** 174:*1*
**continues** 105:*25*
133:*24*
**Contract** 4:*8* 28:*4,
14, 15* 32:*22* 51:*12,
15* 52:*9, 10, 11, 22*
71:*18* 91:*2, 8* 129:*22*
**contractor** 27:*17*
166:*14*
**contractors** 30:*10*
58:*10, 22*
**contrary** 122:*22*
**contribution** 114:*6*
**Contributions** 117:*25*
**control** 118:*15*
**conversation** 38:*3*
82:*2*
**converse** 67:*4* 80:*15,
17*
**conversed** 15:*20, 25*
16:*3* 80:*16* 81:*17*

92:*6*
**conversing** 81:*10*
**cooking** 36:*22*
**coordinated** 91:*6, 24*
98:*16*
**co-owners** 52:*24*
53:*19, 24* 161:*5*
162:*22*
**co-ownership** 16:*17*
18:*17* 19:*18* 39:*17*
113:*15, 23, 25* 115:*24*
126:*22, 23, 24* 127:*6,
24* 161:*6, 9* 162:*24*
163:*24*
**copies** 35:*24* 150:*19*
**copy** 11:*3, 9* 41:*18*
42:*23* 112:*8* 125:*22,
23* 130:*3* 131:*10, 20*
144:*2, 25* 145:*1, 3*
163:*6, 9* 168:*12*
**Coral** 3:*8*
**Corp** 47:*3, 4, 8*
65:*13* 85:*18* 145:*4*
**corporate** 22:*10*
102:*25* 103:*1, 3*
104:*14, 17, 18* 125:*18*
139:*14, 15*
**Corporation** 5:*1*
18:*15* 63:*4* 64:*23*
65:*12, 24* 72:*18, 22*
85:*15* 86:*6* 88:*12*
97:*7* 98:*22, 24, 25*
99:*1, 3, 4, 7* 120:*5*
121:*19* 126:*16, 21*
127:*11* 132:*10, 20*
140:*12* 142:*1, 2*
144:*14, 23* 145:*12*
146:*11* 147:*8* 149:*7,
9, 12, 17* 157:*19, 21*
**corporations** 19:*3, 6*
86:*11, 17*
**correct** 11:*17, 18*
24:*2* 26:*18, 22* 27:*22*
29:*21* 34:*11, 13, 17*
36:*5* 40:*7, 16* 46:*20,
21* 49:*21* 50:*8* 56:*18,
20, 21* 59:*24* 60:*3, 7,
10, 13, 14* 61:*21*
64:*10* 65:*5* 69:*25*
70:*3, 6* 89:*1, 2* 90:*2*

96:*17* 103:*6, 7* 106:*7,
10* 109:*19, 22, 23*
115:*10* 120:*5* 121:*7*
126:*17, 21* 127:*4, 12*
128:*2, 3* 141:*2*
143:*25* 154:*13* 163:*1,
5*
**correction** 169:*17*
**correctly** 17:*17*
37:*10* 58:*14* 89:*4*
**costs** 25:*25* 116:*14*
**could** 17:*2* 20:*7, 8*
28:*25* 31:*11, 20* 37:*7,
9* 47:*21* 48:*19* 53:*8,
20* 60:*23* 67:*24* 69:*3*
94:*7* 103:*19* 109:*7*
117:*18, 22* 122:*22*
139:*25* 141:*21*
142:*13* 144:*8* 157:*1*
171:*3*
**counsel** 6:*8* 7:*9, 10,
11* 162:*8, 9* 176:*7, 8*
**countries** 62:*13*
**COUNTY** 175:*2*
176:*2, 10*
**couple** 68:*17* 78:*13*
80:*13* 82:*19* 121:*24*
148:*18, 20*
**course** 15:*8* 99:*16*
170:*13*
**COURT** 1:*1, 22* 6:*2,
6* 50:*10* 69:*21*
122:*10* 158:*21*
173:*24* 175:*4, 13*
176:*14*
**court-appointed**
80:*22*
**cover** 11:*16* 75:*15*
116:*13*
**coverage** 76:*13*
**covered** 76:*10*
**COVID** 33:*3*
**CPA** 59:*14* 167:*12*
168:*11, 19, 25* 169:*9,
23*
**CPA's** 168:*12*
**create** 67:*23, 24*
**created** 66:*6*
**Creations** 102:*25*

103:*3* 104:*18*
**credit** 115:*5*
**criminal** 8:*16, 17*
81:*3, 5*
**Cube** 172:*6*
**Cuello** 135:*21, 23*
**cultural** 80:*17*
**current** 26:*4* 70:*4*
89:*10, 11* 97:*8*
150:*11, 21, 23* 151:*8,
10, 17* 171:*9, 11*
**currently** 26:*4* 70:*1,
12* 78:*6* 159:*7*
**cut** 145:*17*

**< D >**
**D.C** 154:*18*
**DADE** 175:*2* 176:*2*
**dark** 171:*19*
**DATE** 1:*16* 11:*4*
33:*12* 49:*11* 51:*17*
57:*6* 71:*19* 102:*8, 10*
103:*15, 18* 107:*4, 5, 7,
10, 11* 109:*11* 111:*8*
128:*8, 10* 129:*1, 5*
140:*24* 141:*2, 3, 22,
23* 143:*5, 6, 11* 146:*4,
24* 148:*6* 153:*19*
163:*2* 164:*24* 165:*4*
**dated** 55:*6* 87:*18*
111:*8* 119:*20* 129:*3*
130:*22* 142:*11, 25*
143:*13* 144:*3, 7*
145:*18* 162:*25*
176:*10*
**dates** 91:*18* 173:*22*
**Dave** 57:*6*
**Day** 1:*16* 29:*24*
35:*13, 23* 130:*18*
141:*25* 145:*8, 18, 24*
146:*6* 175:*8* 176:*10*
**days** 63:*3* 171:*18*
**DC** 154:*1, 3, 5, 8, 19*
155:*1, 2, 10, 11* 156:*7*
158:*4*
**DC2017** 28:*16*
**DC2019** 26:*9, 15*
74:*6* 92:*9* 154:*6, 12,
21* 155:*14*

## EXHIBIT B

**DE** 1:*2* 3:*4, 7, 9* 5:*8*
6:*16, 20* 25:*21* 26:*21*
28:*21* 29:*23* 32:*12*
36:*11* 50:*3, 15* 67:*11,*
*13* 69:*24* 82:*14*
87:*14, 15* 89:*7*
155:*24* 158:*5* 159:*15*
160:*2, 4, 21* 164:*16*
165:*3* 168:*2*
**deadline** 122:*7*
**deal** 150:*7, 15, 25*
151:*12, 24*
**Dealer** 67:*9* 73:*17*
77:*9*
**dealing** 27:*16*
**dealt** 150:*17* 151:*2*
152:*1*
**decade** 47:*20*
**December** 9:*25* 10:*1*
41:*12, 22* 46:*8* 49:*6*
51:*18* 53:*17* 74:*25*
84:*7, 8* 128:*10*
130:*23* 131:*20, 24*
141:*25* 142:*11, 25*
143:*7, 13* 144:*3, 7*
**decide** 33:*16* 107:*19*
**decided** 23:*16, 19*
24:*23* 33:*2, 18, 21, 23,*
*24*
**decisions** 98:*19*
**Declaration** 4:*19, 21,*
*24* 119:*13, 19* 130:*7,*
*16* 132:*3* 141:*12, 16,*
*24* 170:*1*
**dedicated** 21:*8*
**Deed** 4:*19* 123:*6, 10*
128:*14, 23* 131:*3*
133:*6* 134:*20, 25*
**Defendant** 1:*2* 2:*12*
8:*15*
**defer** 83:*3*
**define** 157:*2*
**definitely** 67:*16, 22*
85:*1*
**definition** 133:*22*
**definitions** 110:*6, 13*
113:*8, 9* 114:*24*
115:*17*
**degree** 45:*17, 19*

76:*14*
**Delesdernier** 122:*5*
**D-e-l-e-s-d-e-r-n-i-e-r**
122:*12*
**department** 84:*22*
116:*23*
**depends** 73:*10*
**depicts** 64:*17*
**deposed** 158:*12, 15*
**deposit** 10:*2* 12:*9, 14,*
*17*
**deposited** 21:*7, 25*
22:*3*
**DEPOSITION** 1:*11*
4:*2* 6:*2* 158:*16, 24*
159:*13* 160:*9, 12, 15*
174:*1* 176:*5*
**deposits** 12:*11, 19*
**DEPUTY** 2:*3*
**descendants** 134:*9*
135:*8, 9*
**described** 129:*18*
168:*15*
**Description** 4:*3*
60:*22* 102:*11* 118:*6*
**detail** 94:*9*
**details** 58:*2* 59:*19*
76:*12*
**determination** 111:*11*
**determine** 111:*6*
**DEVINE** 3:*6*
**Diana** 169:*23*
**did** 9:*2, 5, 10, 11, 15,*
*16, 20, 21* 10:*25* 11:*2*
13:*17* 14:*7* 15:*3, 6, 8,*
*16, 18* 18:*2, 4, 5, 6, 10,*
*12, 19, 21* 20:*20, 23,*
*24* 21:*3, 10* 22:*12*
23:*20* 26:*25* 28:*17,*
*20, 23* 29:*4, 20, 25*
30:*9, 12, 13* 31:*2*
33:*8* 35:*21* 36:*22*
37:*2, 4, 5* 39:*14, 23*
40:*1, 7, 13, 16, 18*
42:*13* 47:*9, 11, 15*
48:*2* 50:*5, 11, 13, 15*
52:*10, 14, 15, 17* 54:*6*
55:*7, 9* 58:*14* 59:*18*
61:*12* 67:*23* 70:*7, 9*
72:*23, 24* 76:*25*

79:*11* 80:*14, 24* 81:*3*
82:*1, 6* 84:*25* 91:*1, 2,*
*4, 13, 16, 19, 22, 25*
92:*1, 2* 96:*10, 23*
103:*10* 106:*11*
107:*14* 109:*25*
112:*12* 115:*14, 21, 22*
117:*12* 120:*14*
124:*18, 22* 125:*2, 24*
130:*21* 135:*7* 136:*13,*
*19* 137:*11* 141:*18*
144:*24* 146:*2, 14*
147:*25* 149:*11* 150:*7,*
*15, 25* 151:*12, 24*
155:*25* 157:*22, 25*
158:*24* 159:*10, 11, 12,*
*14, 16, 18, 20, 23*
160:*1, 6, 8, 11, 13, 14,*
*16* 161:*11, 13, 14*
166:*18, 20* 168:*21, 25*
169:*4* 176:*4*
**didn't** 37:*8* 117:*5, 11*
120:*18, 25* 137:*20*
**difference** 110:*2, 4,*
*18* 111:*10, 19, 23*
112:*4* 114:*14* 122:*24*
168:*17*
**differences** 107:*16*
109:*11*
**different** 14:*1* 17:*16*
21:*16* 24:*16* 56:*24*
57:*7* 60:*16* 75:*20*
80:*17* 86:*12* 92:*15*
97:*10* 110:*17* 111:*11*
114:*12* 117:*10*
120:*22* 123:*2* 129:*7*
132:*15, 18* 133:*25*
136:*2* 157:*2, 22*
**differently** 56:*24*
**difficult** 65:*8* 71:*11*
81:*15* 94:*13* 95:*10*
**dimensions** 71:*19*
74:*25* 75:*7*
**Direct** 4:*2* 7:*3*
86:*16* 99:*13* 121:*3*
**directly** 25:*14* 77:*21,*
*24* 86:*2, 3*
**director** 117:*12*
122:*15* 123:*17, 19*
125:*4, 8* 135:*23*

136:*14, 18* 138:*5, 14,*
*16, 18* 139:*2* 143:*21*
145:*11, 14, 16, 19, 20*
146:*10, 12, 25* 147:*4,*
*10, 17* 148:*5* 151:*7*
**directors** 57:*10*
146:*23* 147:*12*
**discipline** 45:*18*
**disclose** 15:*3, 6, 8*
**discuss** 80:*14* 158:*24*
160:*6*
**discussed** 15:*11* 16:*1,*
*5* 17:*6, 8, 11* 34:*9*
62:*6* 98:*2, 8, 12*
106:*17* 126:*19* 137:*1*
159:*1*
**discussing** 15:*12*
109:*3*
**discussion** 24:*8, 11*
108:*14* 122:*2*
**disliked** 53:*21*
**dissertation** 45:*15*
**dissolution** 61:*12*
62:*2, 15, 24* 63:*8*
139:*3*
**dissolved** 61:*11, 24*
62:*14, 23* 97:*11, 12*
138:*2, 22* 139:*7, 13*
150:*4, 5* 151:*19, 23*
152:*4, 12, 13, 15, 17*
**distribution** 62:*25*
**DISTRICT** 1:*1* 2:*8*
**DIVISION** 2:*3*
**docs** 137:*5*
**Document** 4:*14* 5:*2*
10:*16* 11:*3, 12, 15, 16*
12:*13* 28:*11, 18, 20,*
*23* 29:*4, 8, 17* 31:*2, 3,*
*6, 14, 16, 24* 32:*8, 9,*
*17* 35:*7, 9* 41:*3, 5, 6*
42:*23* 52:*10, 14*
54:*18, 19* 55:*4, 6, 15,*
*16, 20, 21* 56:*13* 57:*4,*
*5, 13, 17, 19* 61:*18*
63:*17* 65:*8* 78:*15*
83:*14, 18, 19, 22* 87:*4,*
*9, 12, 24* 88:*3, 7* 89:*1*
93:*19* 94:*1, 12, 13*
97:*15* 100:*24* 102:*8,*
*11, 14* 104:*19* 105:*11,*

## EXHIBIT B

*13* 106:*11* 108:*17*
112:*21* 119:*3, 7, 16,*
*22* 120:*1* 124:*6*
125:*16* 128:*20*
129:*17, 20, 23* 130:*3,*
*4, 11, 13* 135:*15*
137:*2, 9* 139:*25*
140:*11* 141:*7, 9, 18,*
*19* 143:*25* 144:*20, 24*
149:*1, 2, 4, 19* 153:*6,*
*10, 22, 25* 156:*9*
161:*1* 162:*16, 20*
166:*4, 6* 167:*1, 4*
169:*18* 172:*24*
**documentation**
150:*20* 151:*15*
**documents** 11:*12*
16:*23, 24* 27:*21, 23*
40:*21* 47:*13* 52:*16,*
*17* 54:*24* 55:*10, 12,*
*24, 25* 56:*24* 72:*19*
99:*11* 108:*25* 111:*25*
119:*25* 125:*17, 19, 20,*
*21* 131:*10, 21* 136:*24*
137:*12* 150:*10* 156:*5,*
*10* 157:*22* 158:*1, 5*
160:*8, 12, 14, 17*
173:*6, 7, 11*
**does** 7:*8* 12:*3* 42:*21*
46:*8* 48:*21* 51:*14*
58:*17* 66:*17* 71:*16*
72:*1* 75:*9, 13* 102:*11*
109:*14* 111:*6* 121:*15*
134:*7* 140:*19* 141:*23*
145:*11*
**doesn't** 99:*22* 137:*19*
168:*14*
**dog** 87:*25* 90:*12*
**doing** 114:*25*
**dollar** 68:*8* 88:*1*
**dollars** 126:*4* 127:*22*
**domestic** 53:*1* 54:*1*
**domicile** 64:*25*
123:*24* 133:*5*
**domiciled** 17:*15, 17,*
*18* 46:*4* 121:*10*
123:*25* 129:*13*
139:*10*
**domiciles** 18:*1*

**Dominguetti** 2:*22*
6:*13* 159:*13*
**done** 19:*5* 22:*14*
44:*23* 86:*4, 8, 15*
122:*8* 167:*16, 19*
**don't** 7:*25* 15:*12*
16:*2* 17:*10, 24* 22:*7,*
*15, 16* 24:*11* 33:*9, 14*
37:*20* 38:*9* 42:*4, 6, 9*
47:*23* 51:*2* 55:*7*
57:*19* 60:*17* 62:*22*
64:*24* 69:*11* 70:*18*
71:*7* 73:*20* 75:*7, 16*
76:*12, 23, 24, 25*
78:*12, 14* 82:*11*
84:*10* 86:*25* 90:*8, 16,*
*18, 21* 93:*13* 94:*8*
95:*3* 97:*20* 101:*11*
102:*17* 109:*7* 110:*9*
111:*10* 115:*18*
116:*16, 20* 117:*7, 20,*
*22* 119:*9, 24, 25*
126:*18* 131:*11, 12, 22*
136:*15, 20, 22* 137:*14,*
*18, 20* 138:*7, 8, 24*
139:*8* 142:*13* 144:*8*
145:*17* 147:*2* 149:*8,*
*18* 150:*5, 17, 23*
151:*6* 152:*1, 16*
154:*7* 156:*10* 161:*23,*
*24* 162:*2, 3, 10*
164:*11* 165:*10*
168:*18* 169:*19* 170:*5,*
*8* 171:*3* 172:*13*
173:*23*
**Dos** 169:*24*
**double** 167:*6*
**Down** 12:*13, 22*
43:*11* 48:*3, 12* 77:*4*
115:*9* 131:*19* 145:*15*
153:*22* 168:*8* 171:*25*
**downtown** 90:*17*
**Draft** 4:*8* 28:*3, 15*
**drawings** 94:*16*
**Draxler** 73:*21* 84:*13*
87:*17* 89:*7* 97:*16, 23*
**Drive** 124:*14, 16*
**due** 21:*2* 33:*19* 53:*6*
120:*12*
**duly** 6:*25* 175:*7*

**during** 20:*24* 21:*1*
36:*22* 45:*7* 62:*24*
70:*22* 71:*1, 2, 4*
100:*10* 103:*20, 22*
108:*15* 109:*20* 111:*7,*
*17* 134:*8*
**Duties** 115:*9* 122:*17,*
*19*

**< E >**
**each** 7:*22* 47:*1*
113:*3* 152:*25* 171:*12*
**earlier** 7:*16, 18*
20:*18* 21:*23* 32:*17*
34:*15* 36:*2* 45:*18*
55:*17* 56:*5* 58:*24*
64:*8* 69:*22* 73:*8*
86:*19* 88:*23* 89:*13*
100:*9* 103:*5* 104:*1*
106:*23* 116:*19*
118:*18* 120:*3* 126:*19*
132:*4* 134:*23*
**early** 9:*8* 20:*22*
84:*4* 121:*24* 131:*19*
161:*16*
**easier** 71:*14* 83:*7*
**ECF** 100:*22* 119:*5*
153:*5*
**ECH383-8** 107:*4*
**echo** 7:*7*
**economy** 45:*20*
**edition** 79:*18*
**eight** 95:*25* 124:*5*
125:*16*
**either** 83:*4* 92:*18*
97:*11* 137:*25* 144:*25*
147:*20* 158:*1* 172:*9,*
*11, 25*
**either/or** 141:*21*
**elder** 121:*23* 136:*11*
**electrical** 36:*8*
**Elena** 67:*20* 68:*2*
134:*14*
**else** 16:*3* 17:*1, 8, 11*
25:*13* 30:*7* 39:*1*
42:*13, 16* 44:*20*
66:*18* 75:*11* 77:*16*
82:*6, 7* 84:*17, 20, 24*
92:*22* 117:*15* 138:*20*

159:*2, 3, 7* 172:*13*
173:*12*
**elsewhere** 24:*10, 13*
**E-mail** 4:*11, 12* 5:*3,*
*4, 5* 29:*18, 20, 21, 22,*
*24, 25* 32:*3, 11, 13, 14,*
*18, 19* 33:*12, 16* 35:*3,*
*11, 14, 18, 21, 23* 36:*1,*
*10, 13, 18* 37:*3, 5*
38:*5* 92:*4* 124:*18, 20*
160:*22* 161:*14, 15, 21*
162:*1, 3, 11, 17, 22, 25*
163:*3, 7* 164:*9, 12, 21,*
*24* 165:*1, 2, 6, 7, 8, 11,*
*12, 14, 16, 18* 166:*18,*
*21* 167:*7, 13, 23, 24*
168:*3, 11, 13* 169:*22*
170:*6, 8*
**e-mailing** 167:*12*
**E-mails** 4:*9* 29:*13*
91:*16* 162:*2, 4, 6, 8*
172:*25*
**Empire** 1:*22*
**employee** 176:*7, 8*
**employees** 66:*21*
**empty** 171:*20*
**end** 9:*8* 20:*22* 27:*11*
35:*2* 105:*11, 21*
110:*14*
**ended** 33:*14* 97:*24*
155:*10*
**ending** 10:*11* 29:*12*
165:*19* 167:*2*
**ends** 28:*10* 115:*12*
162:*16*
**enforcement** 81:*19,*
*21, 23, 25*
**engaged** 103:*1*
**enroll** 25:*19*
**enrolled** 25:*10* 26:*5*
**ensure** 123:*7*
**entail** 122:*20*
**entails** 123:*12*
**entire** 44:*4, 5*
**entities** 17:*25* 21:*16*
46:*21* 47:*21, 25*
61:*23, 24* 62:*1, 6, 10,*
*14, 17, 22* 63:*6, 9, 12*
66:*12, 15, 16, 19, 21,*
*23* 67:*1, 7, 12, 14, 17,*

## EXHIBIT B

*21* 74:*16, 17* 97:*10*
117:*1, 9, 10, 13*
136:*25* 137:*1, 25*
139:*6* 142:*17* 143:*19*
150:*4* 152:*4, 19, 25*
157:*23*
**entitled** 48:*14*
112:*17* 128:*1*
**entity** 16:*16* 45:*24*
46:*1, 3, 9, 17* 47:*1, 7*
61:*4* 64:*13* 65:*11, 24*
66:*2, 3, 5* 99:*22*
103:*2, 3* 104:*19*
113:*1, 20* 116:*25*
121:*23* 132:*13, 19*
136:*5, 6, 9, 16, 23*
137:*6, 15, 16, 19, 23*
138:*3, 8, 16, 22* 139:*1,*
*6* 145:*7* 147:*10*
148:*3* 151:*7, 19*
152:*2, 5, 10, 15* 154:*6*
155:*14*
**EPS** 42:*24*
**equity** 64:*7*
**error** 144:*7*
**escrow** 12:*4, 7, 9, 17*
13:*1, 8* 15:*4*
**ESQUIRE** 2:*2, 7, 12,*
*13, 19* 3:*1, 6, 9*
**established** 18:*16*
104:*4* 123:*6* 133:*9*
134:*20*
**establishes** 57:*19*
**estate** 19:*4, 7, 23, 24,*
*25* 20:*2, 7, 11* 41:*9*
43:*9, 24* 48:*10* 52:*25*
55:*13* 64:*7* 66:*24*
67:*3* 123:*3, 20, 21*
**estates** 120:*11*
**estimate** 26:*2* 49:*9,*
*12*
**et** 58:*22* 84:*23*
110:*23*
**ETF** 130:*2*
**even** 47:*19* 68:*18*
108:*19* 117:*11*
164:*11*
**event** 134:*4*
**ever** 18:*2, 4, 6, 10*
21:*3* 24:*14* 40:*7*

74:*7* 106:*13* 116:*16*
151:*4, 6* 164:*11*
**every** 55:*14*
**everybody** 161:*17*
172:*21* 173:*19*
**everyone** 42:*16*
170:*24*
**Everything** 77:*15*
120:*14* 171:*24*
**exact** 10:*20* 24:*19*
45:*19* 50:*6* 62:*2*
63:*12* 70:*18* 74:*2*
76:*12* 86:*25* 90:*9, 16,*
*17, 18* 129:*12* 150:*6,*
*13* 153:*19*
**exactly** 9:*9* 13:*6*
16:*2* 23:*19* 26:*16*
28:*19* 31:*7, 15* 33:*9*
60:*18* 62:*22* 69:*12,*
*19* 70:*14* 75:*8* 76:*3,*
*16* 85:*9* 86:*22* 92:*15*
95:*2* 97:*9* 99:*9*
111:*18* 112:*3* 113:*7*
124:*13* 149:*13* 156:*2*
**Examination** 1:*18*
4:*2* 7:*3*
**examined** 6:*25*
**example** 36:*19* 37:*20*
**excerpt** 45:*17*
**Exchange** 5:*3* 29:*18*
160:*22* 161:*4* 168:*19,*
*20*
**exchanging** 32:*14*
**exclusive** 53:*4* 54:*3*
**excuse** 13:*15* 14:*9,*
*14* 46:*16* 75:*22*
85:*14* 88:*11* 89:*19,*
*22* 91:*21* 102:*16*
**execute** 53:*5* 54:*6*
**executed** 19:*3*
**EXHIBIT** 4:*3* 5:*8*
10:*10, 12* 12:*1* 28:*2,*
*3* 29:*10, 13, 16* 30:*15,*
*16, 22* 32:*1, 3, 7*
34:*25* 35:*3, 8* 40:*23,*
*25* 41:*5, 13, 16* 42:*4,*
*5, 6, 19, 24* 43:*12*
45:*6* 48:*13* 49:*19*
51:*14* 52:*2* 54:*12, 14*
56:*12* 57:*2* 59:*10, 22*

60:*4* 63:*18* 68:*5, 7,*
*18* 74:*7, 20* 75:*25*
78:*21, 22* 79:*1* 82:*18*
83:*11* 87:*3, 9* 88:*16*
92:*8* 93:*17, 18, 25*
94:*1, 21* 100:*12, 14,*
*16, 21* 101:*4, 16, 18,*
*20* 102:*14* 105:*2, 3*
106:*7, 23, 24* 107:*1, 3,*
*6, 10* 108:*5, 17* 109:*1,*
*2, 24* 110:*5, 7, 9, 12,*
*16, 17* 111:*16* 112:*5,*
*7, 13, 16* 118:*22*
119:*4, 12* 120:*2*
123:*14* 128:*12, 13*
129:*8, 9, 11* 130:*1, 6,*
*24* 132:*1, 21* 133:*8,*
*24* 135:*11, 12* 139:*17,*
*18* 140:*18* 141:*5, 11*
142:*4, 7, 20* 143:*24*
144:*11, 12, 19* 145:*11*
148:*10, 24* 153:*4, 5,*
*10* 154:*15, 24* 160:*20,*
*22* 162:*14, 17* 164:*14,*
*19, 21* 165:*24, 25*
167:*1, 7, 19* 170:*10,*
*14*
**exhibits** 42:*7, 8, 25*
107:*23* 148:*16, 17*
**existed** 104:*16*
107:*16* 137:*7*
**existence** 152:*19*
153:*1*
**expenses** 21:*24* 22:*5,*
*18*
**experience** 20:*6*
86:*10, 14, 16* 138:*24*
139:*5, 11*
**Expires** 175:*14*
**explain** 62:*4* 65:*23*
81:*14* 157:*6*
**explained** 43:*24*
59:*20* 81:*15*
**explanation** 32:*20*
**exposed** 20:*8*
**expressed** 168:*5*
**extended** 6:*7*
**extent** 8:*1*
**Extra** 90:*7, 9, 14*
93:*6*

**ex-wife** 23:*5, 22* 24:*9,*
*12, 16* 25:*15, 20*
26:*20* 27:*19* 28:*21*
29:*22* 30:*1* 31:*3*
32:*12*

**< F >**
**facility** 93:*5, 7*
**fact** 50:*7* 66:*15*
73:*8* 76:*24* 78:*1*
**fair** 11:*3* 41:*13* 59:*5*
79:*19* 96:*9* 112:*7*
145:*2*
**fall** 23:*6, 7* 25:*3*
**false** 8:*7, 8*
**familiar** 8:*20, 24*
**family** 13:*25* 17:*1, 9,*
*10* 18:*8* 19:*24* 20:*3,*
*9* 23:*3* 24:*3* 46:*8*
53:*3, 8* 54:*2* 60:*12,*
*15, 16, 17, 19, 23*
63:*15* 74:*18* 75:*21,*
*22* 80:*18* 82:*8, 10*
85:*2, 8* 86:*15* 118:*14*
135:*8, 9* 170:*24*
**far** 126:*10* 133:*14*
140:*25* 143:*1* 145:*2*
154:*3* 155:*4*
**faster** 83:*8* 108:*11*
**father** 13:*21* 14:*3*
16:*21* 17:*3, 6, 14, 24*
118:*16* 120:*13, 16, 25*
121:*12, 22* 133:*15, 17*
138:*17* 145:*23* 146:*2,*
*3, 7* 147:*1, 2, 13, 14,*
*16*
**father's** 135:*21*
**February** 72:*5* 129:*3*
131:*4* 135:*24* 153:*8,*
*13, 15*
**federal** 8:*11*
**feedback** 30:*5, 11*
**feel** 94:*6*
**fees** 21:*2* 103:*20, 23*
138:*25* 161:*6, 17, 19*
170:*1*
**Fernanda** 77:*13, 14*
**few** 173:*16*
**FHDC** 3:*5* 6:*16*
**fiancee** 50:*3*

## EXHIBIT B

**Fiduciary** 3:*14*
101:*8* 114:*8* 118:*19*
120:*4, 7, 8* 123:*17, 19,*
*25* 125:*5* 129:*15*
143:*18, 23*
**file** 141:*7*
**filed** 42:*23* 58:*10, 22*
78:*22* 93:*22* 100:*21*
107:*3* 108:*20* 119:*4*
130:*2* 153:*5* 168:*7*
169:*11*
**filing** 169:*10, 25*
**filings** 167:*25* 169:*1*
**final** 26:*22* 96:*4*
140:*10*
**Finance** 5:*1* 14:*1, 24*
15:*1* 46:*18* 47:*4*
62:*21* 63:*4* 64:*2*
72:*18, 21* 84:*11, 17,*
*21* 85:*14, 18, 20, 22*
86:*5, 23* 88:*12* 92:*25*
96:*12* 97:*7* 98:*22*
99:*2, 4, 6* 144:*13, 22*
145:*4, 12* 146:*11*
147:*8* 157:*18, 20*
**financial** 46:*9* 59:*14,*
*19* 62:*11, 12* 63:*5*
67:*7* 68:*4, 23* 81:*8,*
*12, 15* 84:*22* 116:*15,*
*17, 18, 23*
**financially** 176:*9*
**Financials** 59:*13, 20*
**find** 9:*10* 168:*3, 21*
170:*9*
**fine** 8:*13* 45:*2*
68:*20* 100:*1* 114:*15*
**finish** 173:*4*
**firm** 12:*25* 13:*2*
57:*6, 7* 103:*2* 104:*14,*
*21, 23* 141:*20* 145:*1*
168:*25* 169:*9*
**first** 6:*25* 9:*2, 4*
11:*16* 22:*21* 23:*20*
24:*21* 32:*6* 35:*6*
41:*5* 43:*7* 45:*14*
46:*14, 16* 55:*25*
75:*24* 79:*18* 80:*5*
87:*5* 88:*7* 91:*10*
93:*19* 94:*5, 14, 20*
96:*16* 105:*12, 23, 24*

106:*25* 109:*12* 110:*3*
112:*23, 24* 114:*12*
119:*6* 128:*18* 129:*5*
135:*5* 141:*8, 25*
144:*19* 163:*14*
**fiscal** 20:*13*
**five** 8:*12* 39:*12*
107:*18* 108:*2*
**five-page** 162:*15*
167:*1*
**fix** 37:*8, 9*
**FL** 1:*23* 2:*5, 9, 15,*
*21* 3:*3, 8, 12* 50:*9*
**flexibility** 76:*14*
**Floor** 2:*4* 56:*25*
57:*8* 97:*6* 110:*21*
164:*3*
**FLORIDA** 1:*1* 2:*8*
6:*6* 46:*3* 154:*2*
175:*2, 5, 13* 176:*2, 4,*
*10*
**focused** 76:*21*
**follow** 107:*14*
109:*25* 111:*11*
114:*14* 126:*18*
**followed** 96:*13*
104:*3* 112:*3*
**following** 89:*24*
**follows** 7:*1*
**food** 68:*11*
**footnote** 45:*23* 46:*14,*
*18* 47:*2*
**foregoing** 176:*5*
**foreign** 17:*13, 14, 20,*
*22, 24* 18:*1* 120:*13,*
*14*
**foreigner** 120:*14*
**FORFEITURE** 2:*3*
8:*16* 81:*8*
**forfeiture-related**
81:*11*
**forget** 90:*6* 91:*10*
161:*8*
**Forgive** 105:*22*
167:*15*
**form** 29:*1* 30:*23*
31:*22* 49:*5* 89:*5*
116:*17* 129:*21* 157:*8*
**forma** 97:*18, 22*

**formal** 139:*7*
**formalize** 129:*23*
**formation** 141:*23*
**formed** 53:*2* 54:*1*
**former** 51:*23*
**Fort** 1:*23* 176:*10*
**forward** 32:*20*
165:*15* 170:*6*
**forwarded** 32:*19*
35:*11* 36:*1, 12*
166:*10* 167:*13*
168:*20*
**forwards** 165:*3, 5*
**found** 9:*12* 34:*5, 7, 8*
53:*21*
**four-page** 93:*18*
**fourth** 45:*23* 46:*14,*
*16* 58:*5* 94:*4* 156:*3,*
*12, 15*
**frank** 68:*15* 167:*11,*
*13* 168:*24, 25* 169:*8,*
*23, 25*
**free** 94:*6*
**frequent** 124:*22*
**friend** 79:*9, 20*
**friends** 82:*11* 92:*16*
170:*24*
**Frier** 55:*1*
**FRIERI** 1:*2, 13* 4:*2*
6:*24* 7:*5* 46:*25*
48:*24* 51:*20, 21* 56:*3,*
*4* 57:*9, 14* 59:*1*
60:*12, 15, 17, 19* 61:*5*
62:*9* 63:*14* 65:*5*
67:*19, 20* 101:*7*
102:*4* 175:*6* 176:*5*
**front** 26:*24* 55:*15*
112:*21*
**Fuenmayor** 77:*20, 22,*
*23* 78:*16*
**F-u-e-n-m-a-y-o-r**
77:*23*
**full** 138:*15*
**fully** 7:*21*
**Fund** 62:*20* 63:*2, 3*
**fundamental** 111:*9*
**funded** 15:*4, 9* 17:*20*
**funding** 16:*11*
**funds** 14:*21* 15:*13*
16:*19, 22*

**further** 135:*8* 145:*15*
176:*7*
**future** 104:*7*
**FW** 165:*15*

**< G >**
**Gables** 3:*8*
**Galerie** 84:*4, 13*
87:*18* 89:*7, 12, 14*
90:*1, 12* 91:*12* 97:*16,*
*23, 25* 98:*5*
**Gallerie** 73:*22* 89:*23*
**Gallery** 72:*7, 9*
73:*21* 77:*6, 8, 9, 11,*
*15, 16* 79:*9* 87:*17*
89:*12* 91:*3, 7* 97:*15,*
*17, 18, 22* 98:*5, 6*
**Gang** 80:*2, 6*
**G-a-n-g** 80:*6*
**gardener** 37:*20*
**Garfield** 32:*15*
**general** 46:*3* 53:*12*
81:*6* 120:*10* 123:*3,*
*24* 142:*1* 143:*17, 22*
**German** 73:*20* 81:*19,*
*23, 25* 87:*14* 91:*15*
96:*13*
**Germany** 79:*10*
87:*18* 89:*15, 23*
90:*13* 91:*12*
**get** 28:*17* 29:*20*
42:*13* 44:*15, 17*
52:*13* 68:*17* 78:*24*
82:*20* 100:*12* 105:*20*
122:*7, 8* 148:*12*
157:*22, 25* 171:*18*
173:*19*
**GFM** 84:*12* 85:*14*
88:*11* 89:*21* 96:*25*
148:*5*
**GG963786** 175:*14*
**GHDC** 3:*5* 6:*16*
**ghernandez@gsadvise**
**rs.net** 163:*4*
**gift** 167:*25* 169:*20,*
*21, 25*
**gifts** 170:*2*
**give** 29:*2* 122:*9*
172:*12* 173:*22*

## EXHIBIT B

**given** 116:*2*
**glance** 115:*19*
**Global** 4:*24* 5:*1*
 11:*23* 22:*10* 45:*24*
 46:*1, 2, 17, 18, 19, 23*
 47:*3, 4, 5, 7* 61:*1, 7,*
 *10, 15, 22, 25* 62:*10,*
 *19, 20, 21* 63:*2, 3, 15*
 64:*2, 3, 4, 5, 8, 16*
 65:*16, 25* 66:*1, 20, 22*
 67:*5, 8, 9* 72:*18, 21*
 75:*20* 84:*11, 17, 21*
 85:*14, 17, 20, 22* 86:*5,*
 *23* 88:*12* 92:*25*
 96:*12* 97:*4, 7* 98:*21*
 99:*2, 4, 6* 116:*23*
 117:*1, 8* 140:*14, 16,*
 *23* 141:*11, 16* 142:*15,*
 *21, 23* 143:*10, 11, 15,*
 *16* 144:*13, 22* 145:*4,*
 *12* 146:*11* 147:*8*
 149:*6, 8, 12, 17* 150:*3*
 157:*18, 20* 158:*17*
**Global-affiliated**
 97:*10*
**global-related** 21:*16*
**go** 23:*24* 42:*9, 20*
 43:*2* 48:*16* 64:*20*
 68:*4* 74:*20* 75:*23*
 78:*20* 79:*21* 83:*5, 9,*
 *13* 87:*7* 88:*2, 17*
 94:*8, 17, 24* 95:*20*
 96:*15* 105:*11* 106:*24*
 107:*9* 110:*7, 12*
 112:*5, 15* 115:*8*
 125:*25* 129:*8, 10*
 130:*24* 132:*21*
 139:*16* 140:*10* 141:*5,*
 *7* 142:*7, 19* 144:*10,*
 *18* 145:*10, 15* 148:*13,*
 *14, 17* 157:*25* 160:*19*
**goes** 62:*25* 115:*12*
**going** 10:*6* 25:*2*
 27:*25* 29:*9, 16* 30:*14,*
 *20* 32:*6* 34:*24* 39:*14*
 40:*22* 41:*24, 25*
 43:*22* 48:*16* 49:*3, 18*
 50:*19, 22* 51:*13* 52:*1,*
 *19* 56:*12, 13* 57:*1, 23*
 58:*4* 59:*9, 22* 60:*1*

63:*18, 21* 68:*4, 23, 25*
 71:*10, 11* 74:*7* 76:*17*
 77:*2* 78:*20* 79:*21*
 82:*18* 83:*13, 14* 87:*2,*
 *5* 88:*2* 93:*20, 24*
 94:*24* 95:*20, 22*
 96:*15* 100:*13* 101:*4*
 102:*3* 105:*1, 11, 20*
 106:*24* 107:*1, 20*
 110:*13* 112:*15* 115:*8*
 118:*21* 120:*2* 121:*2*
 123:*13* 125:*25*
 128:*11, 18* 129:*4*
 132:*1, 4, 21* 133:*13*
 138:*11* 139:*16*
 140:*10, 18* 142:*19*
 144:*10* 145:*10* 148:*9,*
 *13, 18, 24* 153:*3, 21,*
 *22, 23* 154:*14* 160:*19*
 162:*13* 163:*10, 12*
 164:*13* 166:*25*
 167:*23* 168:*8* 170:*10*
 172:*14*
**Gomez** 82:*16*
**Gonzalo** 77:*20, 22*
**Good** 7:*5, 6* 44:*25*
 68:*21*
**GOODMAN** 3:*6*
**Government** 34:*25*
 42:*24* 59:*10* 107:*10*
 164:*15* 166:*23*
**GOVERNMENT'S**
 4:*3* 10:*10, 12* 28:*2, 3*
 29:*10, 13* 30:*15, 16*
 32:*1, 3, 7* 35:*3, 7*
 40:*23, 25* 49:*19* 52:*1*
 54:*12, 14* 56:*12* 57:*2*
 74:*20* 79:*1* 83:*11*
 87:*3, 9* 93:*17, 25*
 94:*1, 20* 100:*13, 16,*
 *20* 101:*16, 17, 20*
 102:*14* 105:*2, 3*
 106:*6, 23, 24* 108:*17*
 109:*1, 2* 110:*5, 8, 15,*
 *17* 111:*16* 112:*7, 13,*
 *15* 118:*22* 119:*12*
 123:*13* 128:*13* 130:*1,*
 *6* 135:*11, 12* 139:*16,*
 *18* 141:*11* 142:*7, 20*
 144:*11, 12, 19* 145:*10*

148:*10, 24* 153:*4, 10*
 154:*14* 160:*20, 22*
 162:*14, 17* 164:*14, 19,*
 *21* 165:*25* 167:*1, 7*
 170:*10, 14*
**GP** 46:*2* 67:*10*
**Gramercy** 3:*15* 4:*7,*
 *15, 16, 18* 8:*21, 24, 25*
 9:*1, 2, 5, 10, 12, 17, 22*
 10:*13, 21, 24* 12:*15,*
 *20* 15:*9, 13, 15, 20*
 16:*6, 9, 11, 17, 18, 20,*
 *22* 18:*3, 5, 7, 9, 11, 13,*
 *15, 17, 19, 20, 22*
 19:*17* 20:*10, 15, 16,*
 *19, 25* 21:*2, 3, 6, 8, 10,*
 *18, 25* 22:*3, 13, 22, 23,*
 *24, 25* 23:*13, 15* 24:*4,*
 *6, 9* 26:*7, 8, 13* 39:*14,*
 *15, 17, 18, 20* 40:*2, 16,*
 *19* 41:*10, 11, 15, 17,*
 *22, 24* 42:*1* 44:*2, 11,*
 *13, 18* 49:*25* 51:*24*
 53:*14, 19* 54:*24* 55:*2,*
 *22* 56:*1, 7, 10, 16, 18,*
 *22* 57:*11, 18, 21, 25*
 58:*2, 18* 59:*4, 8* 66:*8,*
 *25* 72:*14* 73:*7* 86:*7*
 100:*16* 101:*2, 7, 9, 13,*
 *21* 102:*2* 103:*4, 8, 15,*
 *24* 104:*5, 22, 24, 25*
 105:*4, 15, 19* 106:*14*
 107:*13* 108:*6* 109:*18,*
 *21* 110:*21* 111:*12, 14*
 112:*8* 113:*6, 13, 16,*
 *18, 23, 25* 114:*7, 9, 22*
 115:*23* 116:*20* 117:*2,*
 *4, 16* 118:*1, 2, 3, 6, 10,*
 *12, 16* 119:*12, 18*
 121:*14* 122:*16, 18*
 125:*3, 6, 13, 18, 19*
 126:*2, 5, 8, 11, 13, 15,*
 *16, 19, 21, 23, 24, 25*
 127:*2, 3, 6, 8, 10, 13,*
 *19, 20* 128:*5, 6*
 132:*16, 22* 143:*5, 9*
 150:*12, 14* 151:*8, 11,*
 *15, 18, 25* 152:*2, 23,*
 *24, 25* 153:*14, 18, 20,*
 *25* 155:*5, 7, 8, 9, 14,*

15, 17, 20* 156:*6, 13*
 157:*15* 158:*3, 4*
 161:*5, 9, 12* 162:*22*
 163:*20, 25*
**Grasco@devinegoodm**
**an.com** 3:*9*
**great** 100:*20*
**Grove** 124:*15*
**guarantee** 53:*5* 54:*5,*
 *9*
**Guardian** 120:*10*
 123:*25* 142:*1* 143:*17,*
 *22*
**guess** 90:*23* 109:*16*
 152:*18* 173:*19*
**GUSTAVO** 1:*2, 13*
 4:*2* 6:*11, 24* 16:*21*
 48:*24* 49:*23* 51:*19,*
 *21* 55:*1, 2* 56:*3* 57:*8,*
 *14* 58:*25* 65:*4* 69:*6*
 100:*4, 7* 101:*6* 102:*4*
 133:*15* 145:*20, 22, 23*
 146:*25* 173:*5* 175:*5*
 176:*5*
**GUY** 3:*6* 159:*17*
**guys** 34:*2* 148:*15*

**< H >**
**H&H** 121:*6, 9, 12, 15,*
 *19, 20* 122:*15* 125:*13*
 132:*9, 11, 15* 136:*3, 6,*
 *25*
**had** 13:*11, 17, 21, 25*
 14:*3, 5, 13, 22* 15:*23*
 17:*15, 25* 18:*25* 23:*1*
 24:*1, 4, 6, 11* 30:*2*
 31:*17, 20* 33:*2, 4*
 37:*23, 24, 25* 38:*1*
 39:*9* 40:*15* 43:*25*
 45:*5* 46:*25* 47:*1, 20*
 53:*12, 18* 55:*21* 56:*6*
 57:*7* 59:*21* 62:*5*
 65:*25* 66:*20* 68:*16*
 69:*14* 75:*14* 76:*3, 5,*
 *25* 84:*21* 85:*21*
 86:*16* 88:*16* 91:*17*
 98:*2* 104:*12* 109:*1*
 111:*13* 116:*17* 117:*9*
 118:*10, 18* 124:*24*
 125:*8* 129:*12* 131:*23*

## EXHIBIT B

133:*17*  134:*19*
136:*17*  137:*9*  139:*13*
142:*16*  143:*16, 18*
146:7, *9*  148:*4*
149:*18*  156:*14*
161:*19*  162:*12*
165:*21*  168:5, *17*
172:2  173:5, *16*
**half**  47:*20*
**Hamed**  171:*17*
**handwriting**  51:*16*
**handwritten**  89:*4*
**happen**  147:*1*
**happened**  22:*22*
26:6, *11, 12, 16*  61:*9*
62:*4, 7*  70:*10*  78:*3*
86:*21, 22*  92:*7*
171:*12*
**happens**  74:*3*
**happy**  71:*13*
**hard**  95:*13*
**Harold**  44:*24*
**header**  97:*14*
**headmistress**  25:*9, 17*
**headquartered**  46:*5*
**heads**  122:*9*
**heard**  7:*16*  159:*22*
**hearing**  26:*17, 22, 23*
27:*1, 3*  158:*21*
**heart**  124:*13*
**Heimo**  83:*22, 23*
84:*3, 13*  85:*24*  86:*24*
**Heine**  172:*6*
**held**  20:*9*  61:*4*  63:*4*
65:*15, 17, 25*  66:*3*
80:*23*  85:*10, 12*  86:*5,*
*11*  90:*10, 11, 12*
113:*16, 24*  114:*8*
126:*11, 13, 23, 24*
127:*18, 23*  140:*13, 16*
142:*17, 18*
**help**  29:*3*  48:*21*
75:*9*  94:*19*  111:*6*
140:*1*  142:*9*
**helped**  27:*14, 16*
**helpful**  106:*21*
**HERNANDEZ**  1:*2,*
*13*  3:*14*  4:*2*  6:*11, 24*
7:*5*  8:*20*  10:*6, 16, 25*
11:*25*  16:*21*  18:*13*

20:*4, 14*  21:*12*  23:*3*
25:*20*  28:*17*  29:*17*
30:*22*  32:*8*  43:*6, 22*
45:*5*  46:*20, 24*  48:*24*
49:*4, 23*  51:*20, 21*
52:*2*  54:*17*  55:*1, 2*
56:*3, 14*  57:*9, 14*
58:*4, 14*  59:*1, 11*
60:*12, 15, 17, 19*  61:*5*
62:*8*  63:*14*  65:*5*
66:*6*  67:*15, 16, 19, 20,*
*23*  68:*1, 2, 11*  69:*6*
79:*4*  80:*11*  83:*16*
87:*6*  88:*3*  94:*5*
98:*11*  99:*7*  100:*4, 23*
101:*7*  102:*4*  105:*13*
106:*22*  108:*7*  109:*6,*
*16*  111:*24*  112:*20*
119:*2, 6, 17*  122:*6, 15*
123:*14*  128:*20*
130:*10*  132:*5*  133:*16*
141:*9*  142:*3*  145:*20,*
*22, 23*  146:*25*  150:*1*
153:*6*  156:*17*  158:*12*
160:*25*  162:*20*  166:*6*
167:*4*  168:*21*  169:*18*
170:*11*  173:*21*  175:*5*
176:*5*
**HH**  3:*14*  4:*19, 20, 23*
13:*7, 10, 13, 16, 17, 20*
14:*5, 12, 14, 22*  15:*17*
16:*6, 11, 13*  17:*12*
64:*2, 13, 15, 20, 23, 25*
65:*1, 13, 14, 15, 17, 19,*
*21, 23, 25*  66:*3*  67:*22*
85:*9, 12, 15, 18, 21*
86:*1*  98:*18*  99:*2, 5,*
*14, 19, 21*  118:*9, 10,*
*13, 17, 19*  125:*20*
128:*7, 13, 23*  129:*1,*
*18*  130:*7, 15, 20, 25*
131:*1, 13, 21*  132:*2, 7*
133:*1, 6, 9, 11*  135:*25*
136:*1, 2, 9, 10, 12, 16,*
*21, 24*  137:*1, 2, 6, 9,*
*13, 21*  138:*5, 10, 12,*
*14*  139:*6, 10, 13, 20*
140:*4, 11, 12, 13, 15,*
*20*  142:*4, 12, 14, 16,*
*18, 24*  143:*2, 7, 12, 14,*

*17*  144:*2, 6*  147:*11*
150:*1, 6, 21, 23, 25*
151:*3, 6*  152:*6, 7, 10,*
*22, 23*  157:*12, 25*
**Hibiscus**  70:*1, 4, 13*
73:*13*  80:*20*  89:*9, 19,*
*21*  90:*11*  93:*1, 3, 11*
**Hicks**  3:*4*  4:*8*  6:*15*
23:*12, 17*  24:*24*  27:*6,*
*8, 14, 22, 24*  28:*4, 16*
29:*5*  30:*3, 25*  31:*17*
33:*22*  34:*15*  35:*17,*
*20*  36:*3*  156:*18, 19*
157:*10*  158:*5*  165:*15,*
*17*  166:*19, 20*
**Historically**  30:*8*
**hit**  33:*13*
**hold**  16:*16*  97:*20*
122:*1*  172:*20*
**holding**  20:*6*  57:*25*
58:*7, 20*  65:*14*  75:*14*
140:*15*
**Holdings**  45:*24*
46:*17, 23*  64:*3*
158:*17*
**Holm**  10:*19, 20*  13:*1,*
*8*  15:*22, 23*
**home**  48:*25*  122:*7*
**honestly**  55:*14*  66:*9*
116:*16*  119:*24*  162:*2*
164:*11*
**hood**  36:*20*  37:*1, 21*
**hope**  167:*20*
**hopefully**  42:*20*  83:*7*
94:*19*  167:*19*
**hoping**  148:*17*
**hour**  148:*15*
**House**  4:*10*  27:*20*
28:*16*  30:*8, 16, 24*
31:*17, 18*  34:*2*  35:*15,*
*20*  36:*9, 17*  44:*11*
78:*18*  161:*16, 17*
163:*24*  164:*5*  165:*21*
**house-maintenance-
related**  30:*10*
**HOWARD**  2:*12*
6:*12*  7:*14*  68:*9*
82:*23*  100:*3*  107:*22*
158:*7*  173:*14*

Hsrebnick@royblack.c
om  2:*16*
**HVAC**  5:*4*  27:*17*
37:*17*  165:*25*  166:*9,*
*17*

**< I >**
**IBC**  121:*6, 9, 15, 18,*
*21*  122:*16*  132:*15, 19*
136:*7*
**idea**  148:*12*
**identical**  111:*2*  112:*4*
**identification**  10:*14*
28:*5*  29:*14*  30:*17*
32:*4*  35:*4*  41:*1*
54:*15*  79:*2*  87:*10*
94:*2*  100:*18*  101:*23*
105:*5*  119:*14*  128:*15*
130:*8*  135:*13*  139:*21*
141:*13*  144:*15*
153:*11*  160:*23*
162:*18*  164:*22*  166:*2*
167:*9*  170:*15*
**identified**  57:*3, 12, 24*
58:*23*  132:*4, 6*  142:*4*
153:*24*  154:*1, 25*
**identify**  58:*17*
**II**  48:*15*  59:*25*
127:*14*
**III**  51:*12*
**Immo**  87:*22*  89:*19,*
*20*
**impair**  20:*8*
**imply**  75:*14*
**inaccuracies**  40:*14,*
*18*  45:*9, 11*  46:*10, 13*
47:*9*  48:*6*  50:*20*
**inaccuracy**  45:*14*
50:*24*
**inaccurate**  44:*20, 22*
45:*24*  46:*18, 19*  51:*9*
56:*17*  63:*8, 11*  64:*18,*
*20*  65:*7*  146:*18, 19,*
*20, 21, 22*  147:*21*
**include**  102:*11*
**included**  10:*23*  43:*8*
108:*20*  131:*25*
**includes**  43:*10*  46:*6*
64:*2*  66:*16*  87:*19, 20,*

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

## EXHIBIT B

*21, 25* 165:*19*
**including** 12:*13*
**inclusive** 46:*13* 85:*24*
**income** 21:*7, 24* 22:*2,
13, 15* 34:*22, 23* 49:*7,
8, 9, 12, 13* 115:*25*
116:*1, 3, 8* 169:*4*
**incorporate** 19:*16*
103:*2*
**incorporated** 16:*15*
118:*18* 121:*11*
132:*13* 137:*16* 140:*4*
142:*17* 143:*3* 145:*7,
8*
**Incorporation** 4:*22*
137:*5, 12* 139:*19*
140:*3, 6*
**incorrect** 46:*7* 47:*25*
48:*25* 49:*2* 65:*10*
88:*25* 113:*11* 115:*2,
20*
**increase** 48:*19* 167:*5*
**incumbency** 145:*13*
146:*5, 17*
**INDEX** 4:*3* 5:*8*
**indicate** 6:*10* 72:*1*
**indicated** 61:*13*
97:*10*
**indicates** 53:*23* 65:*8,
9* 87:*16* 110:*19, 24*
**indication** 145:*6*
**individual** 44:*12*
113:*3* 114:*19* 115:*1*
123:*5* 162:*3*
**individually** 47:*1*
99:*1, 17*
**individuals** 14:*2*
15:*19, 25* 66:*20*
74:*16* 84:*21* 99:*22*
147:*5*
**inform** 76:*15*
**information** 36:*23*
37:*1, 12, 14, 16* 38:*4*
46:*22* 67:*5* 149:*22*
150:*9*
**informed** 37:*24*
139:*2, 12*
**initial** 10:*2* 12:*14*
101:*9* 110:*23* 121:*7,

13* 131:*4*
**initially** 101:*12*
**injured** 58:*11*
**in-person** 38:*3, 4*
**inside** 171:*20, 24*
**inspection** 165:*19*
**inspector** 28:*25*
**installed** 73:*11*
75:*15, 21* 76:*3* 97:*1*
**installing** 75:*16, 18*
**instance** 77:*13*
**instead** 24:*24* 82:*22*
**institution** 123:*4*
**institutions** 14:*2*
**instruments** 14:*24*
**insurance** 32:*18, 21*
69:*1* 71:*17* 75:*13, 15*
76:*6* 84:*23* 88:*17, 21*
**Insure** 68:*8*
**insured** 69:*4, 5, 6, 16*
90:*20, 21*
**insured's** 76:*20*
**interaction** 151:*14*
**interest** 12:*13* 16:*17*
18:*17* 20:*6, 10* 39:*17*
46:*24* 52:*23* 60:*12*
61:*9, 10, 13, 22* 62:*5*
63:*14* 102:*22* 113:*2,
3* 114:*9* 115:*23*
118:*3* 126:*2, 15*
127:*17, 23* 149:*6, 12,
17* 156:*7, 17, 19, 22,
23, 24* 157:*2, 3, 4, 7, 9,
10, 11, 12, 14, 15, 17,
18, 20, 23* 158:*8*
168:*5*
**interested** 176:*9*
**interests** 19:*17*
113:*15* 126:*22, 23*
155:*10, 13*
**intermixed** 108:*25*
**International** 103:*1*
121:*18*
**interrupting** 105:*22*
**introduced** 14:*3*
**introduction** 25:*16*
43:*13, 15, 17* 44:*10*
45:*6*
**invested** 26:*15* 85:*24*

**investment** 14:*23*
62:*18* 67:*10* 86:*12*
**investments** 19:*2, 4, 5*
64:*5, 7* 67:*8* 86:*16,
18* 111:*1*
**invoice** 71:*20* 72:*20*
75:*1* 97:*17, 19, 22*
167:*25*
**invoiced** 168:*18*
**involved** 27:*5, 7*
74:*11* 75:*5* 84:*14, 18*
92:*11* 156:*13* 162:*23*
**irrelevant** 93:*23*
**Irrevocable** 3:*15*
4:*18, 24* 16:*18* 26:*10*
28:*16* 65:*16, 25* 74:*6*
92:*9* 101:*8* 104:*22,
24, 25* 114:*7* 118:*2,
10, 12, 16* 119:*13, 19*
121:*14* 122:*16, 18*
125:*3, 6, 14, 19* 126:*6,
8, 11, 13, 25* 127:*8, 10,
20* 128:*5, 6* 132:*17*
140:*14, 16, 23* 141:*11,
16* 142:*15, 21, 24*
143:*5, 10, 11, 16*
150:*12, 14* 151:*9, 11,
16* 152:*23, 24* 154:*2,
12, 18, 21* 155:*1, 8, 9,
11, 12, 15* 156:*6*
157:*16* 158:*4*
**IRS** 169:*25*
**issue** 31:*23*
**issued** 161:*22* 166:*22*
**issues** 28:*24* 29:*1*
31:*17, 21, 22* 32:*22*
35:*14* 36:*3, 6, 7, 9, 13,
17* 37:*2, 5, 8, 9* 38:*1*
87:*6* 165:*21*
**issuing** 102:*22*
**italics** 147:*5*
**Italy** 23:*22, 25* 24:*1,
3* 80:*23* 169:*14*
**item** 49:*8* 52:*6, 8, 19,
21* 54:*5* 71:*23* 73:*4*
95:*8*
**items** 94:*11* 95:*21*
165:*19*
**it'll** 83:*8*

**its** 66:*1* 112:*9*
118:*11*

**< J >**
**Jack** 72:*7, 9, 13* 77:*5,
7, 10, 16, 18, 19* 79:*16,
20*
**JACKI** 2:*13*
**Jackie** 7:*13* 107:*22*
108:*23* 118:*23*
173:*16*
**Jared** 1:*18* 175:*4, 11*
176:*2, 13*
**Jeanette** 42:*11*
**Jill** 165:*2, 8*
**Joan** 51:*19*
**jointly** 168:*7*
**Jose** 59:*15*
**JOSHUA** 2:*7*
**Joshua.paster@usdoj.
gov** 2:*10*
**JR** 2:*19*
**Juan** 82:*16*
**Judge** 26:*18, 19, 21,
24*
**July** 1:*16* 4:*9* 24:*2*
29:*13, 18, 23* 70:*5, 7,
16* 87:*19* 89:*7*
106:*19* 107:*8, 11*
119:*20* 152:*11, 17*
166:*18* 167:*12* 175:*7,
8* 176:*10*
**jumps** 105:*10*
**June** 97:*23* 145:*18*
146:*6* 175:*14*
**jurisdiction** 138:*25*
139:*9*

**< K >**
**Kai** 71:*22, 24* 72:*15,
17* 74:*5, 21* 87:*19, 20,
21* 88:*15, 20* 90:*4, 24*
**Kantha** 32:*15*
**keep** 11:*6*
**keeping** 161:*19*
**keys** 36:*8*
**kids** 34:*1, 10*
**kind** 78:*24* 81:*12*
139:*3* 171:*14*

## EXHIBIT B

**Kippenberger** 93:*14* 96:*5, 6, 7, 11, 12* 172:*7*

**kitchen** 36:*22* 37:*1*

**KLUGH** 3:*9, 11* 6:*18* 159:*25*

**knew** 14:*2, 4* 166:*17*

**know** 7:*9* 13:*4, 10, 17* 14:*17, 19, 21* 16:*24* 17:*6, 7, 10* 19:*12* 22:*15* 23:*11, 16, 19* 25:*2, 24* 26:*1, 11, 16* 27:*9, 12* 29:*7* 31:*21* 33:*1, 9, 14* 34:*20, 21, 22, 23* 35:*19* 37:*16, 18* 40:*18* 42:*21* 43:*3* 44:*12, 15, 17* 60:*17* 62:*2* 64:*24* 66:*9, 11, 25* 67:*11, 13, 17, 20, 22* 69:*3, 19* 70:*14, 18* 72:*6* 73:*18* 74:*3* 75:*3, 4, 8, 16* 76:*12, 23* 77:*4* 79:*24* 82:*8, 11, 13* 83:*16* 85:*6, 7, 9* 86:*20, 21, 22, 23* 87:*8, 12* 90:*16, 21, 22* 91:*9* 92:*15* 94:*6* 95:*2, 13* 97:*9, 24* 99:*1* 101:*11* 102:*9* 103:*12* 106:*12* 109:*7, 8* 112:*2* 117:*17* 119:*9* 120:*12* 121:*19* 122:*5* 124:*12, 13* 126:*10* 131:*11, 12, 20, 22* 133:*14, 25* 137:*14, 23* 138:*18* 140:*9* 142:*13, 14* 145:*17* 148:*15, 20* 149:*19, 23, 24* 150:*5, 11, 13, 21, 23* 151:*10, 17, 21* 152:*12* 154:*7* 155:*9* 156:*11* 157:*4* 161:*23, 24* 162:*4, 5, 10, 11* 165:*10* 166:*13, 21, 24* 168:*2, 9, 18* 169:*19, 20* 170:*2, 4, 5, 7, 8* 171:*1, 3* 172:*19, 24* 173:*1, 10, 11, 23*

**knowing** 40:*11*

**knowledge** 30:*9, 12* 66:*18* 86:*3* 116:*22* 118:*5* 123:*7, 23* 126:*12* 129:*11* 136:*9* 139:*5, 8*

**known** 13:*23*

**knows** 30:*12* 82:*10*

**KORNSPAN** 2:*14*

**Krebber** 74:*8, 10, 12, 15, 22, 23* 75:*6, 8, 10, 17* 93:*12* 94:*15, 22, 25* 95:*3, 4, 6, 8, 11, 12, 18* 96:*1, 17, 21, 25* 98:*4, 6, 15*

**Krebbers** 95:*15, 24*

**KURT** 2:*7* 42:*18*

**Kurt.lunkenheimer@u sdoj.gov** 2:*11*

**< L >**

**lack** 166:*15*

**lady** 25:*11, 15*

**Landman** 173:*8*

**Landsman** 10:*20*

**Lane** 70:*2, 4, 13* 80:*20* 89:*9*

**language** 106:*2* 115:*18*

**large** 176:*4*

**last** 33:*11* 34:*19* 35:*19, 25* 39:*11* 46:*6* 49:*8, 9, 14, 17, 18* 80:*3, 11, 21* 91:*11* 101:*5* 106:*6* 122:*11* 125:*7* 129:*8, 11* 138:*4, 13* 142:*19* 147:*19* 150:*7, 15, 25* 151:*12, 14, 23, 24* 152:*1* 153:*17* 160:*3* 161:*8*

**later** 47:*20* 73:*7* 79:*23* 129:*14* 162:*24*

**Latin** 77:*15*

**Lauderdale** 1:*23* 176:*10*

**law** 7:*15* 12:*25* 13:*2* 57:*6* 81:*19, 20, 23, 25* 103:*2* 104:*14, 21, 23* 120:*21* 123:*2* 129:*14,*

**15** 141:*20* 145:*1*

**lawsuit** 19:*8, 13*

**lawsuits** 58:*10, 12, 22*

**lay** 111:*13*

**lead** 8:*7*

**leakage** 36:*6*

**learn** 23:*20* 82:*6* 91:*19, 22*

**learned** 82:*3*

**Lease** 4:*10* 30:*16, 24* 31:*22* 32:*17, 22*

**least** 66:*11* 83:*5* 86:*15* 115:*19* 124:*2* 139:*8* 147:*18* 148:*19* 172:*19, 20*

**leave** 173:*14*

**led** 25:*18*

**left** 48:*24* 64:*6, 10* 71:*2, 4, 7, 9, 13* 90:*24* 140:*25* 171:*13, 16* 172:*2*

**Legal** 1:*22* 46:*1* 113:*8* 114:*23* 115:*17* 138:*3* 161:*6, 17, 19* 162:*8*

**lengthy** 163:*24*

**Leon** 3:*7*

**Leslie** 32:*15*

**less** 125:*1*

**Letter** 4:*12, 13, 22* 10:*22* 11:*16* 40:*25* 41:*9* 43:*9, 13, 15, 16, 23* 44:*3, 7, 8, 14, 16, 17, 22* 45:*1, 6, 10, 12, 16, 25* 46:*11, 15, 17* 47:*10, 11, 15, 22* 48:*1, 3, 4, 6, 8, 10, 12* 56:*15* 57:*10, 20* 58:*1, 15, 16, 17, 19, 24, 25* 59:*2, 3, 6, 16* 78:*21* 79:*1, 4, 6, 7, 22* 135:*12, 22*

**letting** 172:*24*

**level** 23:*2*

**Levy** 165:*3*

**liabilities** 20:*8* 59:*17*

**liability** 18:*23* 19:*6, 12* 53:*1* 56:*2* 59:*7* 81:*8, 12* 102:*21*

**Liebe** 71:*24* 72:*15, 17* 73:*4* 74:*1, 5*

**87**:*21* 88:*15, 20* 89:*18, 20*

**lights** 116:*13*

**like** 34:*3* 38:*24* 47:*17* 67:*8* 68:*10, 11, 17* 77:*10* 86:*7* 95:*6, 15, 24* 105:*10* 106:*1* 107:*2* 129:*9* 148:*14* 149:*5* 169:*3* 173:*23*

**Limited** 3:*14* 18:*23* 19:*6, 12* 56:*2* 58:*7* 59:*7* 102:*21* 123:*7*

**Limits** 76:*19*

**line** 36:*19* 49:*8* 55:*25* 57:*3* 58:*5* 71:*23* 94:*11, 24* 95:*4, 8, 21* 110:*3* 129:*5* 147:*4* 165:*14* 167:*24*

**lines** 74:*21* 93:*20*

**list** 29:*2* 36:*14* 37:*11* 46:*12* 50:*20* 75:*9, 23* 99:*22* 162:*5* 165:*20*

**listed** 48:*17* 50:*7* 60:*2, 3, 5, 8, 12, 20* 64:*21* 69:*9* 71:*18* 75:*11* 76:*8, 11* 77:*22* 83:*22* 88:*6, 10, 14* 90:*4* 92:*8* 94:*10, 11* 96:*4* 99:*17, 18, 19* 117:*25* 118:*2, 9* 126:*3, 4, 17* 127:*4, 11, 12, 14, 16, 19* 142:*20* 145:*24* 147:*5, 24*

**listened** 26:*23*

**lists** 64:*6* 66:*14* 99:*22* 127:*21*

**Literal** 48:*15* 51:*12* 63:*20*

**litigation** 161:*7, 10* 163:*24*

**little** 68:*15, 17* 71:*11* 83:*1* 94:*7* 124:*25* 125:*1* 128:*19* 135:*19* 138:*11* 145:*16* 148:*20* 167:*3, 5* 171:*14*

**live** 24:*12* 34:*5* 41:*24* 42:*1* 50:*5* 70:*1* 100:*4*

**lived** 20:*19* 50:*3, 6* 69:*24*

**living** 23:*11, 17*

**LLC** 3:*4, 15* 4:*15, 17, 18* 6:*15* 16:*17* 18:*14, 15* 19:*16* 20:*15, 17* 21:*8, 10, 18, 25* 46:*23* 54:*1* 55:*2* 56:*1, 16, 19* 58:*20* 59:*8* 67:*9, 10* 100:*17* 101:*3, 10, 14, 22* 102:*2, 18* 103:*8, 15* 104:*5* 105:*5, 15, 19* 106:*14* 107:*13* 108:*6* 109:*15, 18, 21* 111:*13, 14* 112:*9* 113:*6, 13, 14, 16, 24* 114:*22* 115:*18* 116:*21* 117:*2, 4, 16* 118:*1, 4, 6* 125:*18* 126:*2, 25* 127:*2, 3, 7, 19, 23* 151:*18, 25* 152:*2, 25* 153:*14, 18, 20, 25* 155:*5, 7, 14, 18, 20* 156:*13* 157:*10* 161:*12* 166:*19*

**LLCC** 127:*13*

**LLP** 3:*6*

**local** 120:*18*

**located** 8:*21* 69:*10* 72:*8, 9, 11* 73:*4* 78:*6, 11* 85:*6* 89:*16* 90:*15* 110:*20* 123:*21* 124:*8, 10, 12*

**location** 69:*9, 16, 17, 20* 75:*24, 25* 76:*8* 97:*5*

**locations** 24:*17* 73:*5*

**log** 162:*7, 9*

**logged** 27:*3*

**logistics** 91:*7* 98:*16*

**long** 39:*9* 48:*1* 68:*17* 69:*12* 103:*14* 162:*5*

**longer** 45:*16* 62:*16* 68:*15* 69:*14* 72:*11* 83:*1* 124:*6* 148:*12, 20* 155:*20* 172:*9, 11*

**look** 29:*1* 30:*5* 38:*1* 55:*25* 78:*24* 95:*15, 24* 97:*14* 110:*5*

112:*10, 23* 117:*24* 165:*22* 166:*11*

**looked** 36:*14* 147:*15*

**looking** 51:*2* 106:*2* 112:*22* 133:*18, 20* 134:*3* 147:*3* 161:*24* 168:*14*

**looks** 105:*10* 106:*1* 107:*2* 149:*5* 173:*23*

**Lucia** 3:*14* 67:*19* 68:*1* 98:*11, 17* 99:*7* 134:*14*

**Luis** 172:*9*

**lunch** 68:*12, 13, 19* 82:*22* 83:*4, 8* 99:*25*

**LUNKENHEIMER** 2:*7* 42:*18*

**< M >**

**made** 12:*22, 25* 13:*5, 7* 14:*17* 15:*4* 25:*9, 13, 14, 17* 40:*12* 45:*10* 53:*13* 90:*24* 92:*19* 111:*10* 142:*1*

**main** 25:*9*

**maintain** 20:*24* 61:*22*

**maintained** 116:*15*

**Maintenance** 5:*4* 21:*2* 22:*20* 27:*20* 30:*3, 9* 31:*18, 21* 32:*22* 35:*14* 36:*3, 8, 13, 15, 16* 37:*2, 6, 12* 103:*23* 116:*13* 165:*25* 166:*9, 11*

**maintenance-related** 37:*5* 165:*21*

**majority** 52:*12, 23*

**making** 37:*17* 40:*3* 56:*8*

**managed** 91:*3, 7*

**Management** 5:*1* 46:*19* 47:*3, 4, 5, 8* 61:*1, 7, 10, 15* 63:*4, 16* 64:*3, 5, 9, 16* 66:*2* 72:*18, 21* 84:*11, 17, 21* 85:*15, 18, 20, 23* 86:*6, 23* 88:*12* 92:*25* 96:*12* 97:*7* 98:*22* 99:*3, 4, 7* 144:*13, 23* 145:*4, 12* 146:*11*

147:*8* 149:*7, 9, 12, 17* 157:*19, 21*

**Manager** 4:*16* 20:*16* 21:*20, 22* 41:*10* 55:*3* 101:*6, 9, 12, 13, 21* 102:*2, 3, 5, 18, 20* 103:*4, 14* 104:*7* 107:*13* 108:*7* 109:*15, 17* 111:*8, 17* 112:*1, 9, 18* 113:*5* 114:*21* 115:*4, 10* 117:*1, 3, 12, 18* 118:*7* 153:*14, 16, 18, 19* 155:*5, 17, 20, 22, 23, 25*

**manager's** 102:*12*

**mandate** 123:*5*

**manner** 6:*9*

**many** 21:*15* 34:*14* 66:*20, 21* 70:*12* 92:*14, 18* 97:*24* 117:*9* 119:*24* 158:*15* 162:*2*

**March** 33:*13* 81:*2* 140:*5* 141:*3*

**MARGOT** 3:*1* 6:*16* 159:*21, 22, 24*

**Maria** 3:*14* 67:*19, 20* 68:*1, 2* 77:*13, 14* 98:*11, 17* 99:*7* 134:*14*

**Mark** 122:*4, 12*

**marked** 10:*9, 13* 28:*1, 5* 29:*10, 14* 30:*15, 17* 32:*1, 4* 34:*25* 35:*4* 40:*22* 41:*1* 54:*12, 15* 79:*2* 87:*10* 94:*2* 100:*17* 101:*15, 22* 105:*2, 5* 118:*21* 119:*14* 128:*12, 14* 130:*1, 8* 135:*11, 13* 139:*21* 141:*12* 144:*14* 148:*10* 153:*3, 11* 160:*23* 161:*25* 162:*14, 18* 164:*7, 13, 22* 165:*24* 166:*1, 25* 167:*8* 170:*15*

**market** 15:*1, 2* 23:*1* 62:*19, 20* 63:*2*

**MARKUS/MOSS** 3:*1*

**married** 9:*13, 18* 134:*19*

**Martin** 93:*14* 96:*4, 11* 172:*7*

**Master** 4:*19, 20* 13:*8, 10, 13, 16, 17, 20* 14:*5, 12, 14, 22* 15:*17* 16:*6, 11, 14* 17:*12* 65:*14, 19* 66:*1* 85:*9, 12, 15, 18, 21* 86:*1* 98:*18* 99:*2, 5, 14, 19, 21* 118:*9, 11, 13, 17, 20* 125:*20* 128:*7, 13, 23* 129:*1, 18* 130:*7, 15, 20, 25* 131:*1, 13, 21* 132:*3, 7* 133:*1, 6, 10, 11* 135:*25* 137:*22* 140:*13* 142:*16, 24* 143:*2, 7, 12, 14, 17* 144:*2, 7* 150:*1, 6* 152:*6, 7, 10, 22* 157:*12* 158:*1*

**master's** 45:*19*

**matter** 158:*18* 170:*6*

**matters** 19:*14* 30:*9, 10* 80:*18* 81:*11, 13* 86:*10*

**maximum** 8:*12*

**maybe** 20:*22* 44:*25* 62:*4* 66:*20* 68:*19* 112:*23* 143:*24*

**mean** 17:*22* 20:*1, 2, 4* 34:*7* 75:*18* 80:*19* 98:*23* 99:*9* 102:*13* 119:*2* 137:*19* 138:*1* 139:*10* 156:*21* 157:*2* 173:*20*

**meaning** 167:*20*

**meant** 78:*19* 100:*9* 111:*18* 151:*5*

**mediocre** 91:*15*

**medium** 71:*19*

**meet** 79:*11*

**MEETEREN** 2:*13* 7:*13*

**megabytes** 42:*20*

**member** 85:*2* 101:*7* 113:*1* 114:*3, 5, 10* 117:*25* 118:*3* 123:*10*

153:*24*  154:*1, 16, 25*
155:*6, 7*
**members**  44:*11*  53:*8*
57:*21*  60:*17*  82:*10*
91:*11*  99:*15*  170:*24*
**member's**  113:*3*
**membership**  16:*16*
18:*16, 18*  19:*17*
20:*10*  39:*17*  113:*15*
114:*9*  115:*23*  126:*2*
127:*17, 23*  155:*13*
**Memorandum**  4:*23*
139:*19*  140:*3, 7*
145:*3*
**memory**  142:*9*
**mention**  50:*25*
**mentioned**  36:*2*
47:*18*  83:*1*  99:*2*
103:*25*  119:*21*
**mentions**  54:*5*
**message**  92:*5*
**messages**  38:*7, 9*
124:*18*
**messaging**  38:*10, 17,
19*  39:*2*
**met**  73:*20*  79:*16, 19,
20*  84:*3*
**Mexico**  46:*6, 9*
**Miami**  2:*5, 9, 15, 21*
3:*3, 12*  5:*6*  11:*23*
46:*4, 5*  50:*6, 8, 10*
69:*21*  73:*6*  79:*12, 18*
84:*11*  90:*10, 14, 17,
24*  97:*2, 3, 4*  170:*15,
19*  175:*2*  176:*2*
**Michael**  10:*19*  74:*8,
9, 12, 15, 22*  93:*12*
94:*15, 22, 25*  95:*4, 8,
12, 18*  96:*1, 17*  173:*7*
**MICHELE**  2:*13*  7:*13*
**mid-2000s**  61:*11*
**mid-2019**  89:*17*
**middle**  27:*11, 13*
57:*23*  102:*19*  147:*3*
**might**  7:*7*  70:*23*
77:*13*  118:*24*  167:*20*
**Miguel**  135:*21*
**million**  13:*5*  14:*17*
49:*13, 15*  60:*6*  62:*5*

**mind**  19:*23*  40:*15*
51:*2*  102:*17*  113:*12*
135:*19*  156:*25*
**minute**  107:*18*
**minutes**  99:*11*  108:*2,
9*  167:*21*
**misrepresentations**
40:*4, 6, 8, 12, 17*
45:*10*  46:*10*
**missing**  106:*9*
**misspoke**  65:*22*
**misstating**  58:*6*
**mistake**  45:*18*
**mistaken**  21:*15*
**Mmoss@markuslaw.c
om**  3:*4*
**mobile**  49:*1*
**Modern**  51:*6*
**Moffit**  35:*12, 16, 18,
24*  36:*4, 17*
**Moffit's**  36:*10, 13*
**MOMA**  51:*5, 8*
**moment**  107:*24*
172:*12, 21*
**monies**  26:*16*  85:*23*
**months**  80:*13*  160:*3*
**more**  8:*13*  39:*10*
47:*12, 15*  48:*5*  68:*18*
77:*17*  82:*24, 25*
93:*16*  111:*24*  112:*10*
124:*25*  131:*14*
148:*15, 16, 18*  164:*8*
**morning**  7:*5, 6*
**MOSS**  3:*1*  6:*15, 16*
19:*10*  93:*20*  159:*21*
173:*16, 19, 25*
**most**  14:*23*  17:*25*
61:*24*  62:*11, 14*  63:*5*
77:*7*
**Mostly**  170:*24*
**Motano**  78:*12*
**move**  9:*2*  23:*9, 13*
24:*9, 14, 17, 24*  33:*2,
4, 7, 19, 25*  34:*10*
50:*11, 13, 15*  76:*14*
114:*17*
**moved**  9:*17*  34:*8*
76:*10*
**moving**  12:*5*  23:*3*
33:*16*  34:*2*

**multiple**  45:*11*  60:*16*
69:*19*  73:*5*  74:*16*
75:*5*  76:*11*  82:*10*
139:*6*
**Museum**  51:*6, 7*
**mute**  172:*14*

**< N >**
**N.W**  3:*11*
**Nagel**  4:*13*  73:*21*
79:*1, 7, 9, 15, 16, 19*
80:*12, 24*  81:*18, 20,
22, 24*  82:*4, 9*  84:*4,
13*  87:*17*  89:*7, 12, 14,
23*  90:*1, 12*  91:*11*
92:*3*  97:*16, 22, 25*
98:*5*
**Nagel's**  89:*12*
**NALINA**  2:*2*  68:*9,
13*  167:*15*
**Nalina.sombuntham@
usdoj.gov**  2:*6*
**name**  18:*23*  35:*19,
25*  46:*1*  49:*22*  51:*3*
56:*17, 18, 20, 21*  57:*7*
60:*2*  73:*21*  80:*3*
84:*11*  90:*7*  91:*10, 11*
97:*15*  104:*19*  106:*7,
8*  113:*3*  120:*11*
121:*16*  122:*12*
147:*19, 22*  161:*8*
167:*11*  171:*17*
**named**  69:*4*  102:*3, 4*
120:*4*  128:*4*  140:*22*
147:*1*  154:*16*  157:*23*
**names**  37:*6, 12*
64:*22*  71:*18*  77:*17*
98:*10*
**Naming**  4:*16*  101:*21*
102:*1, 18*
**national**  17:*14, 25*
**nature**  7:*19*
**NE**  2:*4, 9*  5:*6*  69:*21*
170:*14, 18*
**necessary**  102:*24*
110:*23*
**need**  76:*15*  83:*16*
88:*18*  107:*16*  108:*3*
112:*20*  122:*23*

**129:*10*  131:*11*
173:*24*
**needed**  53:*24*
**needs**  173:*9*
**negotiate**  91:*25*  92:*2*
**Neon**  172:*6*
**net**  59:*15*
**Neutral**  62:*19, 20*
63:*2*
**Nevada**  123:*24*
142:*1*  143:*22*
**never**  51:*8*  56:*6*
63:*10*  66:*3*  86:*15*
117:*7*
**Nevis**  120:*4, 15*
123:*25*  143:*23*
**New**  23:*3, 6, 14, 24*
24:*10, 12*  25:*10*  29:*5*
30:*24*  33:*2, 17, 19*
51:*8*  72:*9*  77:*15*
110:*21*  166:*15*
167:*14*  168:*3, 14, 21,
23*  170:*9*
**Nicada**  172:*5*
**NO**  1:*2*  4:*3*  6:*6, 12,
14, 16, 19, 20, 22*  9:*14,
16, 19, 21*  10:*12*
11:*11*  12:*12, 16*
14:*13, 19*  18:*5, 12*
22:*7*  23:*19*  24:*6*
25:*14*  26:*1, 19*  27:*7*
28:*3*  29:*13*  30:*16*
31:*8*  32:*3, 19, 20*
33:*4*  34:*21, 23*  35:*3,
25*  37:*4*  38:*8, 19*
39:*13*  40:*9, 13, 25*
45:*16*  46:*12*  47:*7*
50:*1*  51:*2*  53:*11*
54:*14*  58:*1*  61:*8, 24*
62:*16, 18*  65:*22*  67:*3,
13, 25*  68:*3*  69:*14*
71:*23*  72:*11, 17*
77:*19*  79:*1, 17*  80:*10,
21*  81:*10, 20*  82:*7*
83:*3*  87:*1, 9*  88:*5, 19*
91:*3, 17*  92:*6, 22*
93:*2, 13, 15*  94:*1*
95:*2, 6, 10, 19, 24*
96:*3*  100:*16*  101:*20*
105:*3*  111:*9*  112:*21,*

# EXHIBIT B

*24* 113:*1, 22* 114:*3*
117:*3* 118:*10* 119:*12*
120:*16, 20* 121:*17*
125:8, *10* 126:*12*
127:5, *21* 128:*13*
129:*10, 11* 130:*6*
133:*11* 134:8 135:*9,
12* 136:*17* 139:*5, 7,
18* 141:*11* 142:*10*
144:*12* 145:*14, 17*
147:*6, 19* 149:*9, 10,
20, 25* 150:*13, 23*
151:*7* 152:*17* 153:8,
*10* 155:*19* 156:*10, 19*
157:8, *11, 14, 17, 20,
23* 159:*3, 14, 16, 18,
20* 160:*1, 7, 22*
161:*13* 162:*17*
163:*14, 22* 164:2, *11,
21* 165:25 166:*20*
167:7 168:*16, 23*
169:*16* 170:*4, 14*
171:*10, 11* 172:*9, 10*
173:*25*

**Nobody** 82:7 159:*3*

**nonconsecutive** 105:8

**NONE** 5:*9*

**nor** 176:8

**normal** 36:22 62:*24*

**Northeast** 50:*10, 17*
73:*9*

**Northwest** 50:8, *18*

**not** 6:*3* 7:8, *24* 8:*13*
9:8, *14, 16, 19, 21*
10:*3* 11:8, *22* 13:6
14:*13, 19* 16:*24* 17:6,
7 18:*5, 12* 21:*5, 9, 10,
12, 13, 14, 17, 25* 22:2,
9, 14, 19, 20* 23:*13, 19*
24:7 25:*14* 26:*1, 16*
27:7 28:*19* 29:7
30:6, *9* 31:7, *15, 19,
21* 33:*1, 5, 18, 21, 23,
24* 34:*3, 5, 21, 23*
35:*19* 36:7, *21, 25*
37:*4, 15, 16* 38:5, *6, 8,
19* 39:2 40:*9, 13, 16,
18* 42:*21* 44:*16*
45:*20* 46:8 47:*3, 11,
14, 15, 22, 24* 48:*3, 7,*

9, *11* 49:2 50:*1, 7, 21*
51:*5, 9* 53:*13* 54:*9*
56:8 58:*1* 61:*1, 8*
62:2 65:*2, 12, 19, 24*
66:*9* 67:*3, 13, 21, 25*
68:*3* 69:*11, 19* 70:*14,
21, 25* 73:8 74:*2, 9*
75:*4, 13* 76:*3, 4, 7, 15,
25* 79:*12, 23* 80:*10*
81:*10, 20* 82:*4, 12, 15,
17* 83:*19* 85:*7, 9, 18*
86:*1, 22* 88:*5* 89:*19*
90:*21* 92:*15, 23, 25*
93:7 94:*14* 95:2, *15*
97:*9* 99:*19* 103:*5, 7,
11, 12* 104:*10* 106:*11,
20* 109:8, *11, 14*
111:*18* 112:*2, 6*
113:*7, 10, 21* 114:*14,
23, 24* 115:*22* 116:*1,
11, 13, 22, 24* 117:*3,
12, 17, 21* 118:*9*
120:*23* 121:*17* 123:*9*
124:*13, 24* 125:*10, 11*
126:*15, 17* 127:*3, 10,
12, 16, 19* 131:8
132:*18* 133:*11, 20*
134:*1* 135:7 136:*4, 8*
137:8, *11, 14, 23*
138:*3, 12, 21* 139:*2,
11* 140:*9* 142:*14*
143:*9* 144:8, *9*
145:*14* 146:*15, 22*
147:*17, 21, 25* 148:*1,
15, 19* 149:*2, 9, 11, 13,
20, 23, 25* 150:*13*
151:*2, 7, 10, 20, 22*
152:*15, 16* 153:*7, 8, 9,
15, 16, 19* 154:*5, 9, 20,
23* 155:*3, 19* 156:*2,
14* 157:8, *11, 14, 17*
158:*23* 159:*11, 16, 18,
20, 23* 160:*1, 7, 10*
161:*13* 162:*21*
163:*14, 18, 20, 25*
165:*12* 166:*20, 24*
168:*5, 20* 170:*4*
171:*2* 173:*1* 176:7

**Notary** 175:*4, 13*

176:*2*

**noted** 48:*1* 112:*4*

**notes** 99:*11* 130:*5*
176:*6*

**Nothing** 92:*22*
114:*25* 119:8 171:*10*

**notice** 139:7

**Nova** 124:*1* 142:*24*
143:*4*

**November** 51:*17*
130:*19* 146:*3, 16*

**now** 23:22 24:*9*
25:*15* 27:*18* 30:*14*
31:*25* 47:*17* 49:*18*
50:*25* 51:2 52:*19*
59:*9* 65:*20* 73:*14*
78:*14* 82:*19, 21*
99:*25* 107:*1* 109:*11*
119:*10, 11* 142:8
144:*24* 145:*10, 19, 20,
21* 158:*20* 167:*6*
173:*15*

**NSA** 126:*1*

**number** 8:*17* 10:*11*
35:*1* 39:*7, 9* 42:*24*
47:*13* 48:25 49:*1, 2*
56:*15, 23* 59:*13* 63:7
68:*8* 71:*20* 95:*4, 12,
17, 21, 25* 100:*22*
101:*16* 105:*24*
113:*24* 119:*5* 130:*4*
141:7 144:*18* 148:*25*
160:*21* 164:*3, 6*

**numbering** 106:*3*
133:*25*

**numbers** 29:*11*
30:*20* 32:*2* 41:*4*
71:*24* 105:8 128:*17*
139:*23* 164:*17*

**numeral** 127:*14*
132:*8*

**NW** 3:*2* 69:*9*

< O >

**Oath** 4:*3* 6:*5* 7:*18,
19* 100:7 109:*6*
175:*1*

**object** 93:*20*

**objection** 6:*12, 14, 17,*

*19, 20, 22* 158:*8*

**objections** 6:*9*

**objectives** 19:*7*

**obligation** 115:*1, 10*

**Obligations** 114:*19*

**obtain** 28:*20, 23*
29:*4* 31:2 53:*19*
61:*13* 67:*5* 141:*18*
144:*24* 150:*19*

**obtained** 28:*21* 29:8
31:*3* 61:*14* 141:*19*
158:*1, 5* 173:*6, 7*

**obtaining** 151:*15*

**obviously** 48:*1* 90:*18*
173:*4*

**Occupancy** 4:*13*
53:7 54:*6, 8, 14, 21,
22* 55:*17*

**occupant** 49:*20, 23,
24*

**occupied** 50:*2*

**occupy** 53:*9*

**occur** 33:8 146:*14*
155:*25*

**occurred** 33:*10*
104:*13* 151:*21*

**Ochs** 161:8 162:*6, 10*

**October** 145:*9* 146:*1,
25* 147:*15*

**ODC** 5:5 164:*15*
166:*1*

**ODC001644** 5:*3*
162:*15, 18*

**ODC001648** 5:*3*
162:*16, 18*

**ODC001685** 5:*4*
166:*1, 5*

**ODC001686** 166:*5*

**ODC001900** 5:*3*
160:*21, 23* 161:*25*

**ODC001978** 5:*5*
167:*2, 8*

**ODC001982** 5:*6*
167:*2, 8*

**offense** 8:*11*

**OFFICE** 2:8 46:*4*
49:*1* 84:*12* 122:*6*
124:*15* 168:*12*

**officer** 98:*25* 122:*4*

**EXHIBIT B**

officers 102:22
103:10, 13  146:23
147:6
offices 7:15  75:20
97:2, 3, 4  98:15
Oh 67:25  89:22
131:15
Ohara 10:19
O'Hara 10:20  13:1,
2, 8  15:22, 23
Ohne 83:24
oil 74:23
okay 63:23  68:4, 21
77:2  87:2  91:13
93:24  95:12  100:20
105:1  106:12  108:1
112:5  120:2  122:10
135:20  140:2  148:22
151:21  167:11
old 164:5  172:1
OLYMPIA 1:2  3:4,
9  6:15, 20  25:21
26:20  27:19  28:21
29:23  30:9  31:4, 13,
19  32:12, 14, 18  33:2
34:1  35:11, 24, 25
36:10, 12, 18  37:19,
22  38:14, 16, 20  50:3,
15  67:11, 13  69:24
82:13  87:14, 15  89:6
155:24  158:5  159:15
160:2, 4, 10  164:16
165:3, 5, 9, 11, 12, 21
166:10, 16  167:12, 13
168:2, 5, 12, 13, 23
169:22, 24  170:6, 25
once 131:14
One 9:24  11:13
19:15  25:21  42:10
60:18  63:23  77:12
85:20  89:13  91:11
93:16  94:14, 20
95:10, 19, 21, 25  96:2
104:6, 8  106:17, 23
107:3, 5, 24  108:5, 20
109:2, 24  110:4, 17
111:13, 25  112:3, 7
122:1  129:7  132:6
153:7  154:8, 9, 11
156:7  162:22  164:7

167:18  171:15
172:12, 20, 21
ones 90:24  94:15
onwards 104:10
169:8, 12
open 15:1, 2  117:5,
13, 15
opened 21:20, 22
117:7
opening 102:23
103:5, 8  117:7, 19
operate 110:25
operated 62:13
Operating 4:15, 17,
18  63:6  100:17
101:2  102:13  103:12,
25  104:3, 5, 6, 9
105:4, 14, 17, 18
106:2, 13, 16, 22
107:2, 6, 7, 14, 17, 20
108:4, 5  109:3, 9, 10,
13, 21  110:24  111:7,
16, 25  112:6, 8, 13
114:7  115:15, 18
117:14  118:2, 17
119:13, 19  121:14
122:17, 18  125:3, 6,
19  126:6, 8, 11, 13
127:1, 8, 10, 20  128:5,
7  132:17  137:12
140:14, 17  151:9, 11
152:24  155:8, 10, 15,
16  156:6  157:16
operation 133:2
138:19
operational 111:16
137:24  152:4, 13, 15,
16
opinion 32:23
opportunity 45:5
optimum 23:2
Order 6:6  19:16
44:1  53:19  68:11
150:10, 19  157:25
organization 51:3
63:20  64:17  102:21,
24  137:5
organizational 64:1
66:7

original 98:5  105:16
106:1  107:2  111:5
112:6  114:6  117:24
129:13  132:12
originally 17:16
33:2  73:6  129:14
143:3
Orozco 1:18  175:4,
11  176:2, 13
other 14:24  17:8
19:14, 19  20:9  36:8
38:17, 19  39:1, 2, 3,
11  46:10  47:6  50:20
58:9, 12, 21  62:13
64:22  66:21  77:4, 9
81:8  92:11  102:23
103:9  109:11  115:22
121:15  123:8  126:3,
4, 10, 12  133:2  147:5
154:11  156:24
158:13  159:10, 11
others 19:22  61:25
78:14
otherwise 14:10  20:7
33:20  159:12
our 25:10
ourselves 172:15
out 21:3  27:19
32:24  33:22  34:2, 5,
7, 8, 16  50:13  73:19
97:13, 25  128:19
139:1  150:18  167:3
outlets 36:8
outside 99:13
over 7:10  14:14
27:3  39:10  62:6
91:14  92:4, 6  124:21,
25  125:7  172:18
173:1
overall 59:19  123:5
owed 161:6
own 115:14  134:18
160:11, 13
owned 53:2  54:1
56:3  65:4, 21  72:15,
17  74:7, 9, 14  85:8,
17  86:18  99:5
112:25  113:1, 12, 19
114:3, 11  126:25
127:7, 9, 16

owner 18:7, 9, 11
56:2, 7, 10  57:17, 24
58:2, 8, 18  59:4, 7
98:17  99:18  126:21
owners 51:23  99:23
ownership 18:19
46:24  53:6  57:20
61:14, 16  63:13
102:22  113:2  127:15
156:22  157:1
owns 63:1  64:15

< P >
P.A 2:19  3:11
p.m 1:18  174:1
PA 2:14
package 48:11
108:22
Padial 59:15
Page 4:2, 3  11:16, 25
12:1, 3, 8  28:11
29:16  30:21  32:6
35:6  41:5  43:7, 8, 11,
12, 14, 18, 19, 21, 22
45:25  46:17  48:13,
16, 17  49:3, 4, 18, 19
50:23  51:10, 13, 14
52:1  56:13  57:1
59:9, 22  63:18, 21, 22
68:5, 24, 25  71:10, 12,
16, 25  74:20  75:24
76:19  77:2  78:22
83:15  87:5, 23  88:2,
7, 17  89:24, 25  93:19,
25  94:4, 5, 8, 20
95:20, 21  96:15
101:4, 5  102:15, 17,
20  105:12, 23, 25
106:6, 25  110:6, 8, 13,
15  112:15  115:8, 13
120:2  121:2, 3, 4
123:13  125:25
127:25  128:19  129:4,
5  131:1  132:4, 5
133:13, 21, 24  139:24
140:10, 18, 19  141:8,
23  142:8, 19, 20
144:19  145:6, 10
146:5  147:3  153:21
154:14, 16, 24, 25

**EXHIBIT B**

163:*10, 11, 12, 13, 17*
167:*3* 169:*18*
**pages** 59:*23* 87:*7*
133:*18, 20* 176:*5*
**paid** 9:*23* 15:*16*
21:*1, 23* 22:*5* 53:*7*
74:*6* 103:*21, 22*
**painting** 72:*16* 73:*14,
15* 79:*23, 24* 80:*2*
98:*15*
**paintings** 171:*6, 7, 8*
**pandemic** 33:*13, 19*
**paper** 94:*16* 95:*11,
16*
**paperwork** 99:*6, 8, 9,
10*
**paragraph** 45:*21, 23*
46:*1, 13, 14, 16, 21*
52:*6* 53:*12* 57:*23*
79:*21* 109:*12*
**paragraphs** 46:*15*
**parentheses** 56:*2, 4*
57:*9*
**parents** 78:*18* 85:*22*
**Park** 3:*15* 4:*7, 15,
16, 18* 5:*6* 8:*21*
10:*13* 16:*17* 18:*13,
15* 20:*15, 16* 21:*2, 8,
10, 18, 25* 44:*11* 55:*2*
56:*1, 16, 18, 22* 57:*11,
22* 59:*8* 72:*15*
100:*16* 101:*3, 10, 14,
21* 102:*2* 103:*4, 8, 15*
104:*5* 105:*4, 15, 19*
106:*14* 107:*13* 108:*6*
109:*18, 21* 110:*21*
111:*13, 14* 112:*9*
113:*6, 13, 16, 24*
114:*22* 115:*23*
116:*21* 117:*2, 4, 16*
118:*1, 3, 6* 125:*18*
126:*2, 24* 127:*2, 3, 7,
13, 19* 151:*18, 25*
152:*2, 24, 25* 153:*14,
18, 20, 25* 155:*5, 7, 14,
17, 20* 156:*13* 158:*4*
161:*5, 9, 12* 162:*22*
163:*18* 170:*15, 19*
**parlor** 57:*8*

**part** 14:*23* 43:*10*
52:*16* 54:*23* 55:*23*
59:*18* 62:*11, 14* 63:*5*
66:*7* 67:*6* 96:*11, 25*
102:*19* 108:*21, 25*
126:*5* 168:*20*
**partial** 127:*15*
**participating** 6:*1*
**particular** 19:*4*
36:*23* 67:*6* 72:*1*
75:*23* 76:*21* 96:*19*
**parties** 6:*7* 176:*7, 8*
**partner** 46:*3*
**parts** 42:*7* 171:*16*
**Party** 2:*18*
**pass** 146:*2*
**passed** 72:*13* 133:*17*
146:*3, 7*
**past** 92:*16* 122:*7*
151:*5*
**PASTER** 2:*7*
**pause** 99:*24*
**pay** 138:*24* 161:*18*
**payment** 9:*25* 10:*2,
5* 12:*13, 22, 25* 15:*6*
84:*23* 114:*25* 170:*1*
**payments** 9:*24*
12:*19* 15:*3, 8* 114:*18*
**penalty** 8:*5* 81:*4, 7*
**Penthouse** 3:*2, 12*
**people** 37:*9, 23*
**percent** 10:*3* 46:*25*
47:*2* 60:*21* 61:*13, 17*
63:*7, 13* 65:*4* 114:*8*
126:*1*
**percentage** 10:*3*
52:*23*
**PERCZECK** 2:*13*
7:*13* 105:*22* 107:*25*
108:*12, 15* 172:*22*
173:*14, 18, 21*
**performed** 86:*11*
**perhaps** 16:*1, 10*
38:*6* 124:*5* 131:*24*
**period** 9:*9* 20:*24*
21:*1, 4* 24:*18, 20, 23*
69:*13* 70:*22, 24* 71:*1,
3, 5* 73:*10* 84:*5*
138:*16* 149:*14*

**perjury** 8:*5*
**permits** 47:*14*
**Person** 4:*16* 73:*1*
91:*8* 101:*21* 102:*1*
165:*5*
**personal** 22:*8, 10, 17*
43:*13, 15* 45:*6* 53:*5*
54:*5, 9* 59:*14* 78:*1, 8*
80:*16* 81:*16* 113:*4*
**personally** 14:*2* 37:*8*
74:*9* 116:*24* 117:*8,
11, 12* 175:*6*
**persons** 49:*22* 170:*20*
**perspective** 44:*18*
**Petition** 119:*4*
**Petitioner** 1:*2*
**Petitioners** 2:*18*
25:*21* 93:*22* 130:*2*
**Petitioner's** 100:*21*
107:*3* 153:*5*
**petitions** 93:*21*
**PhD** 45:*15, 17*
**phone** 38:*21, 22, 23*
39:*2, 3, 4, 6, 7, 11*
91:*14* 92:*4, 6* 124:*18,
21*
**Photo** 5:*6* 163:*11, 12,
13, 16* 170:*12, 14, 21*
171:*1*
**photograph** 110:*3*
**photos** 163:*19, 20*
**phraseology** 48:*7*
**physical** 114:*2*
**picks** 106:*3*
**picture** 170:*18*
171:*10*
**pictures** 163:*22*
**piece** 72:*1, 4* 74:*1,
22* 75:*2* 83:*21, 24*
84:*2, 6, 15* 85:*10, 25*
86:*21, 23* 87:*1* 88:*14*
94:*21* 95:*1, 3, 5, 9, 13,
17, 22* 96:*4, 5, 8, 10,
11, 16, 19, 23* 97:*1*
172:*4, 7*
**pieces** 70:*12* 74:*8*
76:*21* 77:*4, 10, 23*
78:*3, 10, 12* 79:*14*
88:*9* 89:*16* 90:*20, 23*
91:*19, 22* 92:*18* 94:*9,

*11* 97:*24, 25* 98:*13*
171:*12*
**pixilated** 171:*14*
**PLACE** 1:*16* 9:*25*
10:*1* 26:*24* 27:*3*
139:*4* 155:*18, 21*
**Plaintiff** 1:*2, 13* 2:*2*
**plan** 20:*12*
**planning** 19:*7, 22, 23,
24, 25* 20:*2, 11* 34:*9*
52:*25* 123:*3*
**plans** 24:*14* 34:*12, 14*
**Please** 6:*10* 15:*7*
37:*19* 48:*19* 51:*3*
94:*6* 102:*17* 107:*21,
24* 148:*7* 167:*5*
168:*3* 170:*9*
**PLLC** 3:*1*
**plus** 48:*2*
**point** 34:*12* 69:*15*
116:*10* 118:*23*
133:*19* 147:*10, 16*
148:*3*
**police** 171:*23*
**policy** 76:*7, 8, 21*
88:*21*
**Polish** 171:*17*
**political** 45:*19, 20*
**Poly** 25:*6, 18, 24*
**Ponce** 3:*7*
**portfolio** 14:*23, 25*
61:*16* 62:*8* 72:*18*
96:*12* 98:*20*
**portion** 61:*16*
**posed** 7:*22*
**position** 59:*19*
**possibility** 23:*21*
**postpone** 33:*16, 19*
**postponed** 33:*3, 7*
**potential** 19:*8, 13*
58:*10, 22*
**potentially** 19:*22*
20:*8, 13* 38:*8* 123:*8*
**Power** 110:*7, 22*
149:*21*
**Powers** 110:*11*
**practical** 123:*11*
**practice** 86:*10*
**predated** 142:*14*

**EXHIBIT B**

**predates** 152:*11*
**prefer** 83:*4*
**pre-K** 25:*17*
**prekinder** 25:*10*
**Prep** 25:*6, 18, 24*
**prepare** 169:*4*
**prepared** 59:*14*
169:*9* 172:*24*
**present** 6:*3* 7:*11*
26:*17, 20* 27:*1* 132:*9*
**presented** 137:*3, 10*
**presume** 11:*2, 6, 14*
19:*21* 22:*15, 19* 55:*7,*
*9* 66:*13, 14* 78:*15*
104:*15* 107:*15*
117:*18* 139:*14*
**presuming** 33:*23*
**presumption** 33:*25*
**pretty** 75:*7* 76:*25*
79:*19* 106:*4* 148:*17*
149:*20*
**previous** 111:*21*
**previously** 42:*23*
106:*18* 158:*12, 22*
**price** 71:*20* 91:*25*
92:*2*
**primarily** 20:*12* 62:*9*
**primary** 13:*12, 15, 16,*
*17* 69:*20*
**principal** 17:*19*
**prior** 17:*17* 39:*22*
50:*9* 52:*9, 13* 55:*4*
95:*19* 121:*25* 142:*4*
146:*15* 152:*3, 9, 13,*
*17, 19* 153:*1* 155:*4*
**prison** 8:*12*
**private** 64:*7* 135:*22*
**privileged** 162:*7, 9*
**pro** 97:*18, 22*
**probable** 40:*1*
**probably** 21:*4* 22:*9*
39:*10* 67:*21* 73:*9*
120:*1* 124:*24, 25*
148:*4* 171:*2, 15*
172:*8*
**probation** 122:*4*
**problem** 83:*3*
**proceed** 173:*15, 17*
**proceeding** 8:*17*

**proceedings** 6:*4*
25:*22*
**proceeds** 26:*6, 9, 13*
74:*3, 5* 92:*7* 116:*2,*
*11*
**process** 62:*1, 15*
97:*11* 138:*1, 2* 150:*5*
**produce** 137:*11*
150:*10*
**produced** 10:*10* 11:*7,*
*13* 27:*21, 23* 29:*11*
30:*19* 32:*2* 41:*3, 19,*
*20* 101:*17* 105:*7*
108:*18, 21* 118:*24*
119:*3, 22, 25* 128:*17*
130:*3* 139:*23* 143:*24*
144:*17* 148:*25* 153:*7*
160:*14, 17, 20* 162:*1,*
*5* 164:*8, 16* 166:*21*
**producing** 119:*25*
**production** 28:*10*
35:*1* 71:*19* 108:*22*
119:*22* 124:*6* 125:*16*
131:*24* 135:*16* 137:*3,*
*10* 141:*6* 144:*17*
149:*1* 156:*9* 164:*9,*
*15* 172:*23* 173:*10*
**products** 171:*22, 23*
172:*2*
**properly** 12:*6* 31:*19*
36:*7* 44:*9* 115:*7*
**property** 8:*20* 27:*8,*
*15* 29:*6* 30:*3, 25*
33:*4, 24* 34:*18* 52:*20*
56:*16, 21, 25* 58:*11*
67:*9* 110:*20* 111:*4,*
*14, 21* 112:*18, 25*
113:*2, 4, 8, 12, 18*
114:*2, 9, 11* 126:*1, 3,*
*5, 7, 11, 13* 127:*2, 3, 5,*
*7, 19*
**Proposal** 5:*4* 30:*2, 4*
166:*1, 10, 11*
**proposing** 173:*4*
**prorated** 61:*16*
**prosecution** 8:*8*
**prosecutors** 122:*3*
**protect** 19:*8, 13* 58:*9*
**protecting** 58:*21*
122:*20*

**protection** 19:*24*
20:*2, 5, 12* 86:*8*
136:*1, 2, 3, 6, 9, 10, 12,*
*16, 21, 25* 137:*1, 3, 6,*
*9, 13, 21* 138:*5, 10, 13,*
*14* 139:*6*
**Protections** 139:*13*
**Protector** 121:*5, 7, 13*
122:*16, 19, 24* 123:*10,*
*12* 125:*8* 132:*6, 8, 12,*
*16* 137:*21* 138:*5, 8*
**Protectors** 121:*6, 9,*
*13, 15, 19, 21* 122:*16*
123:*6* 125:*13* 132:*9,*
*11, 15* 135:*25*
**protocol** 139:*9*
**provide** 30:*5* 32:*23*
36:*23* 59:*19* 98:*9*
125:*22*
**provided** 36:*25* 58:*1*
69:*22* 125:*23*
**provider** 27:*18*
37:*17, 25*
**providers** 27:*17, 20*
29:*2* 36:*14* 37:*6, 13,*
*16* 122:*22* 123:*8*
**providing** 40:*21*
**provisions** 123:*9*
**public** 67:*6* 175:*4,*
*13* 176:*2*
**punch** 29:*1* 165:*20*
**punchlist** 165:*18*
**purchase** 10:*21*
12:*15, 19* 13:*3* 15:*9,*
*12, 13, 19* 16:*5, 6, 10,*
*11, 19, 22* 17:*4, 9*
18:*16, 18, 19* 20:*10*
27:*7, 8* 29:*5, 8* 39:*15,*
*16, 18, 20* 40:*2, 15, 19*
41:*10, 14* 44:*2* 48:*15*
52:*16, 20* 53:*14, 16*
54:*24* 55:*21* 56:*16*
72:*23* 73:*2* 74:*11*
75:*5* 80:*7* 84:*10, 24,*
*25* 85:*2, 4* 86:*2, 4*
88:*12* 98:*19* 126:*20*
**purchased** 15:*16*
18:*22* 27:*9, 10* 72:*2,*
*6, 7, 21* 73:*3* 74:*15,*
*25* 75:*2* 77:*7, 10, 24*

78:*2* 80:*9* 84:*7, 8*
85:*3* 86:*24* 132:*22,*
*25*
**purchaser** 48:*17, 23*
51:*20* 52:*3* 53:*2, 3, 5,*
*8, 25* 54:*1, 2, 3* 57:*3,*
*8, 9, 12* 58:*8, 9, 21, 23*
59:*1, 3* 73:*19*
**Purchaser's** 4:*8* 28:*3,*
*14, 15* 52:*24* 53:*3, 8*
54:*2*
**purchases** 19:*20*
32:*22* 77:*5*
**purchasing** 18:*2, 4*
27:*5* 66:*25*
**purple** 87:*25* 90:*2*
**purpose** 32:*24* 33:*1*
40:*20* 43:*23* 44:*3, 5*
86:*13* 110:*7, 11, 19*
111:*5, 13, 19, 20*
**purposes** 19:*6, 15*
27:*20* 36:*15* 52:*25*
86:*8* 97:*20* 110:*24*
113:*4* 123:*11* 151:*14*
**pursuant** 6:*5*
**put** 43:*25* 48:*11*
55:*15* 66:*9* 162:*11*
171:*20, 24* 172:*14, 22*
**putting** 115:*16*

**< Q >**
**quarter** 9:*4* 24:*21,*
*22* 25:*1* 156:*3, 12, 16*
**question** 7:*22* 8:*1*
19:*10* 33:*15* 42:*3*
45:*9* 52:*14* 53:*11, 20*
108:*3* 109:*1, 7, 16*
111:*24* 115:*3* 136:*19*
152:*18* 164:*8*
**questioned** 81:*22, 24*
**questioning** 172:*18*
**questions** 93:*21*
107:*19* 173:*12, 16*
**quick** 42:*4* 106:*4*
115:*19* 167:*19*
**quickly** 78:*24*
130:*10* 148:*17*
**Quite** 55:*13*

**EXHIBIT B**

< R >
R24 52:6, 19, 21
RABIN 2:19 6:13
42:3, 4, 6, 13 43:2
159:19
raise 82:21
raised 36:4 37:3
raising 50:25
Ralph 51:18
range 26:3 74:2, 4
rarely 75:6
RASCO 3:6 6:20
159:17
rather 23:14
Ravi 32:15
reached 23:1 150:18
reaching 27:19
read 44:9 47:22
52:7 58:4, 19 65:8
71:12, 15 72:3 79:22
102:16 107:4 109:10
110:1, 10 112:16
115:16 117:17 134:1
145:21 168:16
169:24
reading 44:23 53:10
55:18 87:6 115:6
reads 12:12 43:13
49:8 52:11 54:21
55:1 59:14 63:20
87:13 89:6 97:17
101:6 105:18 119:18
130:15 155:1 170:8
real 19:4 20:7 41:9
42:3 43:9, 24 48:10
55:13 64:6 66:24
67:3 130:10
realize 108:19
really 12:5 44:8
147:20
reason 11:8, 11 31:23
recall 9:9, 22 10:3
15:12 16:2 17:17
21:5 22:2, 5, 7, 12, 14,
16, 20 28:19 31:13,
15 37:15, 20 39:25
44:16 47:11, 14 48:3,
9 54:8, 9 55:7, 17, 18
56:5, 8 60:21 62:22
66:4, 5 69:12 73:20

78:4 80:9, 10 81:10
84:8, 10 89:19 90:18
101:13 103:5, 7, 11
104:11 116:1 117:7
119:23, 24, 25 131:22
136:15, 20, 22 138:8
146:15 149:13, 20
153:15, 19 156:1, 2
161:25 164:8 169:7
receive 10:25 29:25
35:21
received 11:4, 9
12:16 28:19 29:21,
22 30:2 31:5, 7, 11,
24 34:22 42:16 43:3
85:23 116:1 131:22
144:25 145:1 163:6,
9 165:16
receiver 165:6
receiving 149:22
recent 151:5
recently 40:14, 20
137:8
recess 45:3 100:2
172:16
recognize 10:16
12:11 28:11 29:17
30:22 32:8, 9 35:7, 9
41:6, 7 49:2 54:17,
19 79:4 83:17, 19, 21
84:1, 2 88:3, 6, 8, 9
94:9, 14, 18, 21, 25
95:3, 5, 9, 13, 17, 22
96:1, 5, 6, 7, 18, 19
97:14 98:1 100:23
101:17 105:13 119:6,
16 128:20 130:11, 12
135:15 139:25 141:9
144:20 149:1, 2
153:6, 8, 9 160:25
162:20, 21 163:13, 16,
18 164:19 166:6
167:4, 11 170:11, 20,
23
recognized 96:16
recollect 11:13 13:6
48:12 111:10 125:10,
11
recollection 12:24
18:24 19:5 21:9, 10

48:10 64:24 65:13,
15 77:19 78:14
104:8 117:3 121:17
131:18 133:6 137:15
140:9 144:1 147:19
148:3 151:7
recommend 166:17
recommendation
25:13, 16 29:2 36:16
recommended 25:11
85:1 88:11
recommending 98:3
reconciliation 12:4, 7
record 6:10 7:10
8:15 25:20 30:19
42:22 44:21 67:6
94:10 100:20 105:9
106:1, 12 108:14, 21
116:15 122:2 130:3
132:2 141:6 172:23
173:3 176:6
records 116:17
redacted 42:22
redomicile 129:18
redomiciled 129:15
131:16 143:2, 15
redomiciliation
129:23
refer 8:23
reference 78:21
107:9 144:6 145:14,
16 164:14, 18 166:12
169:20
referenced 55:16
65:3 129:8 132:16
170:2
references 79:22
referencing 57:8
referred 154:11
169:20
referring 39:5 60:25
62:18 63:15 69:7, 8
79:24, 25 80:1 98:9
104:20 119:9 146:24
147:13
refers 65:18
reflect 72:20
reflects 32:18
refresh 142:9
refused 53:21

regarding 24:12
31:20 56:15 99:10
110:3 159:13 165:17
169:21
regards 46:15, 23
47:2 137:2, 9 152:2
165:20
register 91:7 103:1
139:14, 15 140:20
registered 67:10
99:15
regularly 80:15
regulated 46:8 62:12
67:7
relate 93:21
related 8:16 27:23
31:18, 22 32:21 36:9
58:12 75:21 80:18
83:6 99:12 140:17
150:4 162:8
relating 27:21
relation 162:23
relationship 13:21
98:21, 23 99:13
relative 176:7, 8
relatives 17:2 75:22
released 149:11
relied 98:18
relocate 23:6 24:18
remain 133:7
remarked 40:9, 13
110:2
remember 15:24
16:4 21:17 31:5, 7, 9
37:17 40:3 55:19
76:3, 4, 16, 23 77:14
84:12 90:9 97:1
103:11, 14 116:4, 9,
11, 13, 25 117:20, 22
129:10 137:8, 18, 20
138:7 139:8 147:17
152:1 158:16, 20, 23
162:3 164:11
remembered 116:7
remotely 6:5
rent 21:3 33:22, 24
34:22
rental 21:6, 7, 24, 25
22:2, 12, 14 30:25

**EXHIBIT B**

34:*16*, *23*  115:*25*
116:*1*, *2*, *8*, *10*, *12*
**rented**  33:*4*  34:*16*, *20*
**renter**  31:*17*  34:*21*
35:*16*  36:*4*, *17*, *24*
116:*9*
**renters**  35:*20*
**renting**  32:*24*
**repeat**  7:*11*  15:*7*
19:*10*  148:*6*
**repeated**  109:*12*
**replaced**  51:*18*
146:*12*  148:*5*
**replied**  29:*23*
**Report**  4:*7*  10:*12*, *23*
11:*1*, *4*, *9*  28:*25*
165:*19*  176:*4*
**Reporter**  1:*22*  4:*3*
6:*1*, *3*  122:*11*  173:*24*
175:*4*, *13*  176:*1*, *14*
**Reporting**  1:*22*  6:*4*, *9*
**represent**  18:*2*, *4*, *6*,
*10*
**representation**  41:*14*
56:*8*, *9*
**representations**  40:*10*
**represented**  16:*13*
18:*8*  56:*6*  75:*25*
161:*9*
**Representing**  2:*22*
3:*4*, *9*, *14*  10:*21*  13:*2*
15:*21*  16:*10*  41:*10*
**request**  90:*19*  124:*7*
**requested**  40:*21*
125:*21*  150:*9*  162:*12*
**required**  44:*1*  138:*22*
**rerented**  34:*18*
**resend**  42:*15*
**reside**  9:*5*  23:*12*
44:*12*, *18*  49:*22*  78:*9*
120:*25*
**resided**  9:*1*  17:*15*
34:*2*  103:*23*  163:*21*
164:*1*, *4*
**residence**  23:*14*  34:*6*
70:*5*, *8*, *16*, *23*  71:*2*, *4*,
*8*, *9*  75:*19*, *21*  76:*20*,
*22*  78:*8*  80:*23*  89:*10*,
*11*  92:*19*  93:*8*  171:*9*,

*11*
**residing**  76:*24*
**residual**  10:*4*
**resigned**  156:*14*
**resolve**  29:*3*
**resolved**  31:*20*
**resolving**  37:*4*
**respect**  53:*6*  91:*4*
**responded**  38:*5*
**response**  11:*7*  36:*23*
160:*15*  161:*21*
164:*10*  166:*22*
**responsibilities**
136:*17*
**responsibility**  161:*18*
**responsible**  85:*2*
123:*5*
**responsive**  160:*17*
**rest**  113:*9*
**restate**  130:*21*
**Restated**  4:*17*, *20*
105:*4*, *17*, *18*  106:*13*
107:*15*  109:*9*, *13*
110:*19*  130:*7*, *15*, *17*,
*22*  132:*2*, *7*
**restroom**  45:*1*
**result**  18:*19*  36:*21*
**resulted**  114:*2*
126:*16*
**retain**  53:*4*  54:*3*
**retained**  15:*23*
**return**  59:*9*  87:*5*
94:*5*  169:*13*
**returned**  169:*16*
**returns**  59:*16*  169:*4*,
*11*
**reverenced**  107:*5*
**review**  32:*23*  39:*23*
40:*1*  44:*25*  45:*6*
47:*11*, *15*  52:*10*, *14*,
*17*  55:*10*, *12*, *14*
110:*10*  160:*8*, *11*, *14*
168:*1*, *9*
**reviewed**  39:*25*
40:*14*, *20*  55:*4*  89:*13*
**reviewing**  47:*13*
55:*19*  115:*13*
**revision**  131:*8*
**revolve**  38:*1*

**RICHARD**  3:*9*, *11*
6:*18*  93:*9*, *10*  159:*25*
**Richards**  12:*25*
15:*22*  104:*23*  123:*17*,
*18*  124:*3*, *4*, *20*, *23*
125:*2*, *4*, *9*, *12*  131:*23*
141:*20*  143:*20*, *21*
150:*9*  158:*2*
**Richard's**  57:*6*  145:*1*
**Rickklu@aol.com**
3:*13*
**Rider**  4:*8*  28:*3*, *14*,
*15*  32:*16*, *19*, *21*
51:*15*  52:*9*, *14*, *21*
53:*23*
**right**  52:*5*  53:*4*
54:*3*  64:*4*  68:*23*
71:*13*, *25*  77:*21*  83:*9*
88:*24*  99:*6*, *25*  109:*2*
114:*18*  134:*23*
135:*10*  142:*8*  156:*22*
169:*21*  172:*3*, *5*
173:*15*, *24*
**role**  20:*14*  72:*23*, *25*
102:*12*  123:*7*  125:*7*,
*12*  136:*10*, *14*  161:*12*
166:*19*, *20*
**roles**  123:*2*, *12*
**Romero**  133:*16*
**room**  100:*5*  159:*6*, *8*
**ROSA**  42:*14*, *17*
**Rosca**  172:*10*
**Rosillo**  5:*5*  167:*7*, *12*,
*13*  168:*24*  169:*23*
**Rosillo's**  168:*25*
169:*9*
**rough**  26:*2*
**roughly**  14:*18*  90:*15*
**run**  171:*24*
**Ryder**  165:*2*, *3*, *8*

**< S >**
**sake**  159:*4*
**Sale**  4:*8*  26:*6*, *13*
28:*4*, *14*, *15*  51:*12*, *16*
52:*10*  74:*4*, *5*  91:*24*
92:*7*  93:*1*  162:*23*
**sales**  92:*11*
**SAM**  2:*19*  42:*4*, *19*,
*20*, *24*  159:*19*

**same**  26:*3*  29:*24*
34:*6*  35:*13*  37:*19*
70:*15*, *18*  78:*16*
85:*21*  88:*15*, *19*
95:*19*  107:*11*  108:*24*
110:*1*, *14*  111:*8*
114:*12*  123:*11*  129:*5*,
*12*  132:*19*  133:*5*, *7*
134:*16*, *17*  136:*3*, *4*, *6*
142:*3*  143:*6*  147:*22*
154:*6*, *19*, *21*, *24*
155:*2*  164:*16*  165:*4*
**SAMUEL**  2:*19*
**Santos**  169:*24*
**Saskia**  80:*21*
**sat**  48:*12*
**saw**  80:*21*  156:*10*
**saying**  11:*6*  111:*15*
117:*20*, *21*
**says**  36:*20*  49:*20*
51:*4*  52:*21*  58:*19*
59:*6*  60:*20*  65:*4*, *6*
71:*12*  76:*19*  87:*14*,
*16*  89:*5*  102:*20*
112:*25*  126:*1*  129:*3*
141:*24*  147:*4*, *12*, *15*
165:*18*
**Scheduled**  1:*17*
**school**  23:*8*, *10*, *24*
25:*3*, *7*, *8*, *11*, *17*, *19*
26:*4*
**science**  45:*20*
**Scotia**  124:*1*  142:*24*
143:*4*
**scratched**  51:*17*
**screen**  10:*6*  12:*5*
28:*1*  43:*4*  44:*9*  52:*7*
74:*24*  100:*13*  104:*19*
119:*9*  145:*17*
**scribble**  97:*21*
**scribbled**  51:*16*
**scroll**  42:*2*  43:*11*
50:*19*, *22*  51:*13*  57:*1*
68:*25*  71:*13*, *22*, *25*
77:*3*, *17*  78:*23*  83:*13*
87:*3*  93:*19*  94:*6*
110:*6*  112:*20*  115:*9*
132:*5*  145:*15*  153:*22*,
*23*  163:*10*  167:*3*

## EXHIBIT B

168:*8*

**scrolled** 44:*23*

**scrolling** 43:*6* 51:*3*
69:*4* 108:*11* 135:*19*

**sculpture** 89:*24*
172:*3*

**sculptures** 171:*7, 9*

**SE** 1:*23* 2:*20*

**search** 162:*12*

**second** 24:*22* 25:*1*
45:*21, 25* 46:*6, 13, 15,
16* 56:*25* 79:*21*
87:*23* 88:*14* 89:*25*
93:*25* 94:*24* 95:*25*
110:*21* 111:*1* 122:*1*
147:*19* 168:*9* 172:*15,
20*

**seconds** 68:*10*

**secretary** 104:*14, 17*
138:*25*

**Section** 8:*9* 48:*14*
51:*11* 56:*14* 59:*11,
13* 63:*19* 68:*5, 6, 24*
110:*7* 112:*16, 17*
114:*17* 115:*1, 3, 9, 13,
14* 117:*24* 121:*5*
134:*3, 5, 7* 163:*3*

**Securities** 4:*23*
11:*23* 22:*11* 45:*24*
46:*2, 17, 19, 23* 47:*3,
5, 7* 61:*1, 7, 10, 15, 23*
62:*1, 10, 19, 20* 63:*2,
16* 64:*2, 3, 5, 6, 9, 13,
15, 16, 21, 23, 25* 65:*1,
13, 15, 17, 21, 23* 66:*2,
3, 20, 22* 67:*5, 9, 22*
97:*4* 139:*20* 140:*4,
11, 12, 15, 17, 21*
142:*5, 12, 14, 18*
147:*11* 149:*7, 8, 12,
17* 150:*4, 22, 24*
151:*1, 3, 6* 152:*23*
158:*17*

**Security** 46:*1* 48:*25*

**see** 10:*7* 12:*1, 6*
28:*7* 31:*20* 36:*19*
40:*23* 42:*16* 43:*3*
52:*6, 8* 56:*1* 57:*2, 5*
64:*13, 14* 71:*12, 21,
23, 24* 74:*21, 24, 25*

75:*11* 76:*17, 18*
77:*12, 17* 78:*14*
80:*15* 83:*17* 84:*11*
88:*18* 94:*7, 13, 19*
95:*10, 13* 100:*13*
102:*19* 107:*16* 110:*9,
10, 11, 16, 18* 113:*10*
114:*18* 115:*13, 18*
119:*10, 11* 126:*5*
127:*17* 133:*22*
142:*10* 145:*14, 16, 18,
19, 20* 147:*2* 162:*21*
165:*9* 166:*16* 168:*9,
11* 169:*19* 171:*3, 4, 5*

**seeing** 137:*8* 164:*11*
167:*6*

**seeking** 125:*17*

**seem** 47:*24*

**seen** 47:*24* 86:*15*
88:*4, 16* 156:*9*
163:*14* 173:*10*

**segregate** 115:*21*

**select** 85:*3* 96:*10, 23*

**selected** 73:*1* 96:*8,
21* 168:*23*

**selection** 25:*18*

**sell** 22:*24* 23:*2*
92:*17, 20* 98:*6, 19*

**seller** 51:*19*

**semester** 22:*21*

**send** 30:*6* 91:*16*
161:*14*

**sender** 165:*6*

**sending** 165:*12*

**sends** 165:*10, 11*
169:*22*

**Senema** 3:*14*

**sense** 107:*18* 131:*18*
143:*14*

**sensitive** 167:*25*

**sent** 30:*4* 31:*13, 15*
32:*21* 33:*16* 35:*24*
36:*11* 37:*11, 14, 15*
42:*19* 57:*20* 87:*13,
15* 89:*4, 6* 139:*7*
161:*11, 15* 165:*1*
166:*10* 167:*14*

**sentence** 8:*12* 58:*5*
112:*23, 25* 114:*12*

**sentenced** 26:*19*

**sentencing** 26:*17, 22*
78:*23* 80:*25*

**separate** 60:*11* 66:*2*
116:*15* 117:*5* 164:*6*

**September** 9:*7* 20:*21*
35:*12, 13, 21, 25* 36:*1*

**series** 64:*3*

**serve** 121:*13*

**served** 20:*16* 101:*12*
103:*14* 125:*4* 151:*6*

**service** 27:*16, 18, 19*
29:*2* 36:*14* 37:*6, 12,
18, 25* 38:*10, 17, 20*
39:*3* 46:*9* 62:*11, 12*
63:*5* 67:*7* 122:*21*
123:*8*

**serviced** 117:*12*

**set** 108:*24* 116:*23*
118:*16*

**Settlement** 4:*19, 21*
13:*8, 10, 13, 16, 20*
14:*5, 12, 14, 22* 15:*17*
16:*7, 14* 65:*14, 19*
66:*1* 85:*9, 13, 16, 18,
21* 86:*1* 98:*18* 99:*5,
20, 21* 118:*11, 13, 17,
20* 125:*20* 128:*7, 14,
23* 129:*2, 19* 130:*7,
16, 20, 25* 131:*2, 13,
21* 132:*3, 7* 133:*1, 7,
10, 12* 135:*25* 137:*22*
140:*13* 142:*16, 24*
143:*2, 7, 12, 15, 17*
144:*3, 7* 150:*2, 6*
152:*6, 7, 11, 22* 158:*1*

**Settlements** 118:*9*
157:*13*

**settler** 123:*6*

**settlor** 134:*2, 10, 12,
13*

**seven** 148:*16*

**several** 36:*2* 77:*10*
160:*3*

**share** 10:*6* 28:*1*
100:*13* 127:*24*
160:*19* 168:*15*

**shared** 127:*6*

**shareholder** 99:*1*
142:*12* 147:*4, 11*

**shareholders** 63:*1*
99:*11, 15* 140:*20*

**shareholding** 62:*10*

**shareholdings** 63:*5*

**shares** 65:*15, 17*
113:*23, 24* 114:*1*
126:*20* 127:*6, 9, 11,
13, 15, 18* 149:*22*

**sheet** 116:*17*

**ship** 91:*2*

**Shore** 124:*14, 16*

**Shoreham** 24:*18*

**short-term** 21:*6*
116:*10*

**should** 11:*5, 21* 47:*2*
68:*14* 70:*19* 109:*3*
129:*20* 134:*3, 5*
144:*5* 161:*18* 163:*8*

**show** 12:*3* 16:*23, 25*
27:*25* 29:*9* 30:*14*
31:*25* 34:*24* 40:*22*
49:*3* 51:*14* 54:*11*
71:*16* 72:*19* 83:*10,
14* 93:*16* 101:*15*
105:*1* 107:*1* 110:*4*
118:*21* 121:*4* 128:*11*
129:*25* 132:*1* 135:*10*
140:*19* 145:*11* 148:*9*
153:*3* 164:*13* 165:*23*
166:*25* 170:*10*

**showed** 32:*17*

**showing** 10:*9* 142:*8*
164:*7, 17*

**shows** 12:*4, 6* 32:*14*
51:*15* 64:*15* 84:*6*
120:*13* 129:*17*
140:*20*

**shut** 131:*19* 171:*25*

**sibling** 134:*24*

**siblings** 134:*18, 19*

**sic** 30:*25* 31:*17*
48:*15* 51:*12* 63:*20*

**side** 64:*4, 6, 10*
171:*13*

**sign** 47:*10* 55:*11, 13,
15, 21* 106:*11*

**signatory** 14:*10*

**signature** 14:*14*
43:*18, 20* 52:*2, 4, 5, 6*
54:*25* 101:*5* 106:*9*

## EXHIBIT B

109:*14*  110:*3*  123:*16*
149:*3, 5*

**signed**  54:*10*  55:7
146:*23*  149:*19, 24*
175:*8*

**significant**  36:*21*

**signing**  47:*13, 15*
52:*9, 13*  54:*8, 9*  55:*4,
18, 20*  101:*13*  103:*11*

**signs**  123:*14*

**similar**  70:*20*  111:*2*
137:*5*  139:*6*

**simple**  111:*24*

**simply**  138:*24*

**since**  30:*11*  50:*25*
55:*7*  92:*12*  111:*12*
125:*11*  138:*16*
143:*24*  161:*16*  169:*2*

**single**  55:*14*  134:*22*

**sir**  54:*17*

**sister**  98:*2, 9, 17*

**sisters**  67:*18, 19*
68:*1*  82:*11*  134:*14*

**sites**  92:*24*

**sitting**  48:*3*

**situation**  80:*16*
81:*15, 16*

**six**  78:*10, 12*  94:*10*
124:*5*  125:*16*

**size**  48:*20*

**Sjr@miamilawyer.com**
2:*22*

**slightly**  110:*16*

**slow**  114:*13*

**slowly**  71:*22*  83:*13*

**small**  44:*9*  161:*17*

**smoke**  36:*21*

**Social**  48:*25*

**sold**  22:*23, 25*  23:*15*
24:*5, 7*  26:*8*  70:*22,
24, 25*  71:6, *8, 9*
73:*15, 16, 17, 18, 21,
23, 25*  74:*1*  88:*22, 24*
91:*20, 23*  92:*23*  98:*4*
162:*24*  163:*23*  172:*7*

**sole**  49:*20, 23, 24*
110:*19*  118:*11*

**solely**  111:*20*  114:*3*

**SOMBUNTHAM**  2:*2*
4:*2*  6:*21*  7:*4, 6*
10:*15*  19:*11*  27:*25*
28:*6*  29:*9, 15*  30:*14,
18*  31:*25*  32:*5*  34:*24*
35:*5*  41:*2*  42:*5, 11,
15, 22*  43:*5*  45:*2, 4*
54:*11, 16*  68:*14, 22*
78:*20*  79:*3*  82:*25*
83:*5, 10, 12*  87:*2, 11*
93:*16, 24*  94:*3*  99:*24*
100:*6, 19*  101:*24*
105:*6, 20, 24*  106:*5*
107:*22*  108:*1, 10, 23*
109:*5*  118:*23*  119:*1,
8, 15*  122:*10, 14*
128:*11, 16*  129:*25*
130:*9*  135:*10, 14*
139:*16, 22*  141:*14*
144:*10, 16*  148:*9, 14,
23*  153:*12*  156:*23*
157:*1, 5*  158:*10, 11*
160:*19, 24*  162:*13, 19*
164:*23*  165:*23*  166:*3*
167:*10, 18, 22*  170:*16*
172:*12, 17*  173:*9*

**some**  20:*19*  27:*16,
21*  28:*24*  33:*10*
34:*12*  36:*7*  47:*18*
60:*2*  66:*11, 22*  71:*8*
74:*19*  78:*4*  93:*6*
116:*9*  121:*23*  131:*17,
19*  133:*2*  139:*3*
146:*15*  148:*3*  169:*15,
17*  173:*22*

**somehow**  20:*9*  92:*5*

**someone**  15:*4, 10*
25:*13*  30:*6*  67:*1, 4*
138:*19*  168:*12*

**something**  11:*7*  16:*1*
75:*11*  76:*18*  77:*18*
90:*8*  108:*21*  116:*7*

**sometime**  33:*15*
34:*19*  50:*14*  149:*14*
156:*3, 15*

**sometimes**  38:*13*

**Sorry**  17:*22*  19:*9*
26:*12*  29:*20*  77:*19*
98:*23*  99:*9*  114:*13*
126:*18*  143:*9, 11*

146:*21*  152:*5, 8*
153:*7, 23*

**sort**  114:*2*

**source**  14:*21*  15:*13*

**South**  124:*14, 16*

**SOUTHERN**  1:*1*  2:*8*

**Soviet**  171:*18*

**Space**  90:*7, 8, 10, 14*

**Spanish**  13:*14*

**speak**  38:*22*  114:*23*
124:*22*  144:*4*  159:*11,
12, 23*

**speaking**  123:*3*

**specific**  19:*19*  21:*17*
36:*25*  37:*20*  55:*20*
83:*19*  84:*10*  95:*3*
104:*11*  120:*1*  136:*20,
22*  137:*18*  138:*9*
139:*9*  149:*2*  152:*5*
156:*8*

**specifically**  32:*17*
85:*7, 8*  95:*15*

**specifics**  15:*12*

**speculation**  48:*2*
63:*17*  97:*19*

**speed**  60:*1*

**spell**  80:*3*

**spelling**  122:*11*

**spent**  161:*19*

**spoke**  80:*11, 13*  81:*1*

**spoken**  81:*20*  124:*24*
159:*23*  173:*2*

**SREBNICK**  2:*12, 14*
6:*11, 12*  7:*14*  44:*24*
68:*9, 20*  82:*23*  83:*3,
9*  100:*1, 3*  107:*24*
108:*8*  122:*1, 3*
148:*11, 22*  156:*21, 24*
158:*7*  167:*15*  172:*14,
20*

**stamp**  29:*11*  35:*1*
118:*25*  128:*17*
139:*23*

**stamps**  41:*4*

**stand**  132:*19*

**standard**  30:*23*
31:*22*  75:*7*  86:*9*
115:*17*

**start**  7:*8*  43:*15, 16*
65:*11*  110:*15*  148:*11*
171:*13*

**starting**  10:*11*  29:*11*
58:*5*  110:*6, 12*
162:*15*

**starts**  33:*14*  58:*5*
110:*14*  121:*4*

**state**  20:*3*  58:*14*
175:*2, 5, 13*  176:*2, 4*

**stated**  58:*19*

**statement**  8:*8*  45:*14*
116:*18*  147:*7*

**statements**  59:*14*

**STATES**  1:*1, 2*  6:*21*
8:*9*  46:*7*  58:*16, 25*
59:*2, 3*  64:*19*  67:*8*
102:*15*  124:*8, 10*
141:*3*  164:*9*

**status**  62:*2*  86:*25*
97:*8*  138:*3, 12*  150:*1,
6, 11, 13, 21, 23*  151:*8,
10, 17*

**stenographic**  176:*6*

**stenographically**
176:*4*

**Steven**  35:*13, 16, 18,
24*  36:*4, 10, 12, 17*

**still**  8:*1*  23:*22, 25*
42:*12*  61:*6, 22*  62:*1*
85:*8, 10*  93:*3, 5*  94:*7*
100:*7*  109:*6*  122:*5*
137:*21, 23*  138:*17, 19*
147:*18*  149:*6*  153:*16*
171:*8*

**stipulated**  148:*16*

**stock**  149:*21*

**stocks**  60:*5*

**storage**  73:*10*  84:*23*
89:*22*  90:*5, 6, 7, 8, 10,
14*  92:*18*  93:*2, 5, 6*

**stored**  73:*11*

**stove**  36:*20*  37:*21*

**strange**  149:*20*

**Strategic**  64:*4*  67:*8*

**Street**  1:*23*  2:*4, 9*
3:*2, 11*  23:*18*  24:*24*
29:*5*  50:*8, 18*  69:*10*
124:*14*

Gustavo Adolfo Hernandez Frieri taken on 7/20/2021

## EXHIBIT B

**Stribling** 4:*12* 40:*25* 41:*9, 17, 21* 43:*9*
**strictly** 165:*9*
**strikes** 115:*1, 19*
**struck** 139:*1*
**STUMPF** 2:*14*
**style** 48:*6*
**subject** 52:*11, 22* 57:*2* 165:*14* 167:*24* 170:*5*
**submission** 39:*22* 47:*23*
**submit** 47:*10* 53:*18*
**submitted** 39:*16* 40:*11* 41:*17, 21* 53:*13* 59:*21*
**subpoena** 11:*7* 160:*15* 161:*21* 164:*10* 166:*22* 172:*23*
**subsection** 110:*14, 16*
**subsequent** 24:*25*
**subsidiaries** 64:*4*
**subsidiary** 85:*15*
**substantially** 70:*19*
**successor** 63:*9*
**suggest** 37:*6*
**suggested** 24:*16* 37:*9*
**suggesting** 166:*16*
**suggestion** 25:*9*
**Suite** 1:*23* 2:*15, 20* 3:*7* 11:*19*
**summarizes** 35:*14*
**summary** 172:*24*
**summer** 34:*19*
**supposed** 50:*20*
**Supreme** 6:*6*
**sure** 7:*8, 24* 16:*8* 38:*6* 51:*9* 67:*25* 68:*3* 74:*2* 76:*25* 78:*13* 79:*19* 86:*20* 108:*19* 135:*20* 137:*8* 138:*3* 142:*14* 165:*13* 171:*2* 172:*13* 173:*3, 13*
**surprise** 137:*13, 14*
**surrenders** 173:*5*
**sworn** 6:*25* 175:*7*

**< T >**
**tab** 162:*10*
**table** 43:*8*
**tabs** 161:*19*
**take** 28:*25* 30:*5, 8* 44:*25* 45:*1* 52:*25* 53:*25* 71:*10* 82:*19* 107:*18* 108:*1* 110:*20* 111:*4, 20* 136:*20* 137:*20* 168:*8*
**Taken** 1:*13, 16, 18* 45:*3* 100:*2* 136:*21, 22* 137:*18* 138:*7, 10* 139:*4* 148:*20* 171:*1* 172:*16*
**taking** 68:*15* 83:*1* 102:*23* 136:*15, 20*
**talk** 38:*21* 80:*24* 81:*3* 159:*10* 172:*15*
**talked** 16:*9* 80:*18* 81:*18* 100:*9* 125:*15* 159:*5*
**talking** 67:*1* 81:*18*
**tax** 19:*21, 24* 52:*25* 59:*16* 97:*20* 169:*1, 4, 9*
**team** 91:*11*
**tell** 15:*16, 18* 44:*23* 58:*6* 69:*3* 83:*17, 20* 147:*20* 158:*15*
**template** 30:*24*
**Temporary** 97:*17*
**ten** 108:*2* 124:*25* 125:*7*
**tenant** 44:*18*
**term** 45:*19* 158:*8, 9*
**terms** 14:*9* 81:*6* 98:*19* 111:*19* 112:*12* 137:*1* 149:*22* 172:*23*
**testified** 7:*1* 20:*18* 21:*23* 26:*21* 34:*15* 56:*5* 64:*8* 68:*24* 69:*23* 86:*20* 88:*23* 96:*16* 109:*18* 116:*19* 134:*23* 147:*14, 23* 158:*21*
**testify** 173:*9*
**testifying** 8:*4*
**testimony** 65:*20* 100:*10*

**text** 32:*20* 38:*7, 8* 122:*8* 124:*18*
**texted** 122:*4*
**Thank** 45:*8* 48:*22* 63:*23* 64:*1* 68:*21* 71:*15* 107:*25* 108:*23* 129:*10* 135:*20* 158:*9*
**thanks** 122:*9*
**thereabout** 70:*14*
**thereabouts** 10:*4* 149:*15*
**thing** 127:*21*
**things** 31:*19* 68:*18*
**think** 7:*7* 11:*8* 16:*8* 53:*11* 57:*19* 58:*23* 65:*2, 11* 67:*3, 24* 68:*14, 24* 74:*1* 76:*24, 25* 78:*12* 79:*23* 82:*19* 83:*6, 24* 86:*19* 91:*17* 93:*13* 94:*10* 99:*24* 106:*3, 16* 107:*5* 108:*3, 10, 24* 114:*17* 116:*16, 19, 20* 118:*24* 119:*21* 136:*4* 144:*8* 148:*1, 12* 149:*8, 9, 18* 151:*6* 152:*22* 157:*2* 165:*9* 166:*9* 167:*16, 18* 173:*9, 23*
**thinking** 172:*1*
**thinks** 157:*3*
**Third** 2:*18* 3:*11* 49:*8* 94:*4* 156:*3, 15*
**Third-Party** 1:*2* 58:*12* 93:*22*
**though** 108:*19* 117:*11* 127:*11*
**thought** 88:*24* 147:*13*
**thread** 35:*12* 165:*10*
**three** 78:*13* 88:*8, 13* 89:*22* 95:*21*
**three-page** 87:*4*
**through** 20:*22* 32:*2* 38:*23* 42:*2, 7, 8, 20* 58:*7, 20* 68:*17* 77:*18, 19* 78:*24* 79:*16, 20* 82:*3, 4, 6, 20* 83:*6, 13* 84:*4* 87:*3* 92:*23* 93:*19* 94:*17* 99:*14* 105:*9* 106:*24* 108:*11*

**110:*6* 126:*20* 130:*4* 139:*24* 144:*18* 148:*17, 18* 176:*5*
**throughout** 73:*5* 86:*24* 96:*14* 104:*10*
**thrown** 172:*1*
**Tilton** 72:*7, 9* 77:*5, 7, 11, 16* 79:*17, 20*
**Tim** 124:*20* 125:*12*
**TIME** 1:*17* 9:*12, 15, 17, 20* 11:*20, 24* 13:*12* 14:*16, 20* 15:*15, 18* 17:*7, 11* 20:*19, 24* 21:*1* 24:*4, 6, 8* 33:*5, 10* 35:*17* 37:*11* 40:*15* 41:*23, 25* 43:*1* 44:*25* 45:*16* 46:*7, 25* 47:*12, 18, 22* 48:*2* 49:*25* 50:*3, 6, 10, 22* 53:*17* 57:*7* 62:*6, 16* 68:*12* 69:*12, 15, 17, 18, 23* 70:*5, 22, 24* 71:*1, 2, 5* 72:*14* 75:*14, 17* 76:*4, 5, 24* 77:*1* 80:*5, 11* 81:*16* 94:*6* 103:*20, 22* 108:*2* 111:*7, 17* 112:*1* 118:*20* 121:*23* 124:*2, 9, 11* 131:*17, 19* 132:*8, 25* 133:*3, 15* 134:*8, 20, 25* 138:*4, 13* 146:*7, 15, 23* 147:*10, 17* 148:*3* 149:*16* 153:*1, 13, 17* 155:*18, 20, 22, 23* 158:*19* 163:*14* 166:*18* 167:*24, 25* 169:*15, 17* 173:*17*
**timeframe** 11:*1* 109:*20*
**times** 76:*11* 158:*15* 164:*5*
**timing** 60:*22*
**Timothy** 123:*17, 18* 124:*3, 4, 22* 125:*2, 4, 9* 143:*20, 21*
**Titel** 83:*25*
**Title** 8:*8* 47:*25* 52:*25* 53:*25* 55:*2* 71:*18* 77:*3* 89:*18*

## EXHIBIT B

102:*16* 110:*20* 111:*4, 14, 21* 113:*8, 22* 115:*11* 127:5
**titled** 75:6 115:9
**Titles** 112:*17* 147:6
**today** 7:*9, 12, 15, 22* 8:*5, 23* 47:*19, 20* 62:*3, 16, 19* 70:*19* 85:*6* 109:*3* 148:*21* 158:*24* 159:*13*
**together** 34:2 43:*25* 48:*11* 66:*10* 162:*11*
**told** 34:*1* 37:22 81:*22* 137:*11*
**ton** 162:*4*
**top** 12:*8* 45:*25* 49:*19, 20* 64:*12, 21* 71:*13, 22* 97:*13* 153:*23* 165:7 171:*23* 172:6
**topic** 160:*6*
**Torres** 26:*18, 21, 24*
**total** 12:*17* 46:*25* 87:22
**townhouse** 23:*17* 24:*24* 27:6 32:25 34:*16* 35:*17* 36:3 156:*18, 20*
**tracking** 161:*15*
**trade** 171:*19*
**transactions** 14:*11* 15:2
**transcript** 176:5
**transcription** 78:*15*
**transfer** 12:*16* 13:*4, 7* 14:*16, 20* 17:20 155:*18, 21*
**transferred** 92:*9*
**transfers** 156:7
**triggering** 134:*4*
**true** 64:*16* 135:*1* 176:5
**Trust** 3:*14, 15* 4:*18, 19, 21, 24* 12:25 13:*8, 11, 13, 14, 16, 19, 20, 22* 14:*4, 5, 22* 15:*21* 16:7, *14, 15, 18* 17:*9, 10, 12, 13, 15, 16* 18:*25* 19:*3, 7, 16* 26:*10, 15* 28:*16*

60:*13, 15, 19* 61:*3, 4, 6* 63:*15* 65:*4, 14, 16, 18, 19, 24, 25* 66:*1* 74:6 85:*8, 9, 11, 13, 16, 21, 23* 86:*3, 5, 11, 15, 17, 18* 92:*10* 98:*18* 99:*5, 21* 101:*8* 104:*15, 20, 24, 25* 114:7 118:*2, 10, 11, 12, 13, 14, 17* 119:*13, 19* 120:*9, 11, 19, 21* 121:*12, 14* 122:*17, 18, 19, 20, 21, 22, 23* 123:*2, 6, 9, 20, 21, 23* 125:*3, 6, 14, 19, 20* 126:*6, 9, 11, 14* 127:*1, 8, 10, 20* 128:*5, 7, 8, 9, 14, 23, 24* 129:*2, 7, 12, 24* 130:*7, 16* 131:*15, 21* 132:*3, 9, 17* 133:*2, 4, 7, 8, 12* 134:5 135:*23, 25* 137:*17* 140:*13, 14, 23* 141:*12, 16, 17, 22, 24* 142:*3, 11, 15, 16, 22, 24, 25* 143:*5, 6, 10, 11, 12, 13, 16, 22* 150:*6, 8, 12, 14, 16, 18* 151:*9, 11, 13, 16* 152:*7, 11, 16, 18, 23, 24* 154:*1, 2, 4, 6, 12, 18, 19, 22* 155:*1, 2, 8, 10, 11, 12, 15, 16* 156:*6* 157:*16*
**trustee** 13:*20* 51:*5, 6, 8* 101:*8, 11* 104:*4* 109:*14* 114:*8* 118:*18, 19* 120:*3, 7, 10, 12, 23* 121:*11* 122:25 123:*4, 8, 15* 125:5 128:*24* 129:*13, 16, 21, 22* 131:*16* 133:5 142:2 143:*17, 18* 158:*3*
**trustees** 63:*9*
**trustee's** 103:*2*
**trust-related** 86:*10*
**trusts** 60:*16, 23* 138:*6* 152:*3, 14* 154:*8* 156:7
**Trust's** 104:*23* 155:*10*

**trying** 15:*24* 65:*23* 112:2
**tuition** 25:25 26:*4*
**turn** 11:25 28:*11* 32:6 48:*13* 49:*18* 51:*10* 52:*1* 59:22 63:*18* 68:5 82:*18* 83:*15* 87:2 101:*4* 108:*12* 120:2 121:2 123:*13* 129:*4* 130:25 132:*4* 140:*18* 153:*21* 154:*14* 172:*18*
**turned** 173:*1*
**turning** 35:6 41:*4* 43:*14, 18* 87:23 127:25 133:*8* 139:*24* 167:*3*
**Tuttle** 93:*9, 10*
**two** 9:*24* 42:7 46:*14* 59:*13* 74:*21* 79:*11* 82:*20* 90:*11* 106:22 107:*17, 19* 108:*4* 123:*1* 143:*19* 154:*8*
**two-page** 83:*14* 166:*4*
**type** 48:*12*
**typed** 48:*9*
**types** 137:5
**Typically** 86:*4*
**typing** 48:*4*
**typo** 11:*21* 142:*13*

**< U >**
**U.S** 2:*8* 17:22 19:*4* 62:*13* 120:25 121:*1* 169:*13*
**ultimate** 73:*19* 99:*22*
**ultimately** 127:*7, 9*
**umbrella** 66:*22*
**uncertain** 131:*25*
**unclear** 63:*12*
**under** 8:*5, 8* 66:*3, 21* 100:*7* 108:*6* 109:*6* 110:*11* 113:*19* 114:6 117:*24* 118:*17, 24* 119:*4* 126:*8, 13* 127:*14, 19, 21* 129:*14, 15* 140:*16* 142:*17* 147:*3* 162:*6, 10*

**underlying** 61:*14* 127:*18*
**understand** 7:*19, 21* 8:*2, 4, 11* 16:*8* 23:*5* 47:*23* 82:*1* 97:*21* 106:*21* 111:*15, 23* 117:*18* 122:*20* 123:*4* 150:*3* 151:*5* 173:*11*
**understanding** 13:*25* 37:*10* 47:*21* 53:*12, 17* 61:*25* 76:6 89:*3* 113:*17, 20, 22* 114:*4, 5, 10* 120:6 123:*1, 12* 134:2 137:*24* 152:*10, 14* 162:7
**understood** 136:*19* 158:*10*
**undertake** 136:*13*
**Unit** 8:*21, 23* 53:*1, 4, 7, 9, 25* 54:*4* 56:*22, 23* 69:*10* 110:*22* 114:2 162:*23* 164:*3*
**UNITED** 1:*1, 2* 6:*21* 8:*8* 46:7 67:*8* 124:*8, 10* 164:*9*
**units** 102:*22*
**Unless** 75:*11*
**unlike** 152:*14*
**untitled** 74:*23* 87:*19* 89:*21* 94:*25* 96:*1*
**unwound** 62:*20, 22* 137:*25* 138:*1, 19*
**up** 37:*23* 42:7 51:*3* 77:*17* 97:*24* 106:*3* 116:*23* 118:*16* 122:*9* 145:*18* 153:*23* 155:*10* 168:*10*
**update** 151:*23*
**usage** 36:*22*
**USC** 76:*19*
**use** 16:*19, 22* 19:*12* 33:*4* 38:*9, 11, 12, 13* 39:*1, 2* 48:*5* 53:*4* 54:*3* 86:*17* 116:*2, 11* 120:*24*
**used** 22:*6, 7, 9, 17, 20* 38:*15, 18, 20* 39:*11* 66:*25* 72:*9, 11* 114:*24* 116:*12*

**EXHIBIT B**

121:*12*, *17*   168:*6*
171:*18*, *19*
**using**   168:*6*
**usually**   55:*10*
**utilities**   103:*21*, *23*

< V >
**vacation**   24:*3*
**valid**   76:*7*   111:*25*
**value**   20:*9*   60:*5*
   62:*7*, *15*, *16*   63:*8*
   149:*16*, *18*
**valued**   60:*9*   68:*7*
**VAN**   2:*13*   7:*13*
**various**   40:*6*   173:*20*
**vent**   36:*20*   37:*1*, *21*
**verification**   59:*15*, *23*,
   25
**Vermont**   24:*15*, *18*, *19*
**versa**   165:*11*
**version**   107:*15*
   109:*9*, *12*   110:*19*, *23*
   111:*3*, *5*, *12*, *20*, *21*
   130:*18*, *20*, *22*   131:*3*,
   6, *7*, *24*   133:*1*, *2*, *4*
   141:*25*
**very**   47:*19*   111:*21*
   120:*21*   123:*1*   162:*5*
   169:*8*
**VI**   121:*5*
**vice**   165:*11*
**video**   27:*2*   100:*4*
**Videoconferencing**
   1:*16*
**view**   42:*25*
**Viking**   36:*20*   37:*21*
**Visen**   172:*5*
**visit**   80:*16*, *19*, *22*
**visitors**   58:*11*
**Von**   89:*23*   90:*12*
**vs**   1:*2*

< W >
**waive**   6:*9*
**wall**   172:*10*
**walls**   171:*4*
**want**   7:*7*   23:*23*
   24:*12*   43:*11*   51:*10*
   54:*11*   55:*12*   68:*10*,
   *12*   76:*17*   79:*17*

82:*21*   83:*5*, *10*   86:*19*
87:*7*   93:*16*   94:*6*, *17*
97:*13*   98:*19*   101:*15*
103:*19*   108:*1*, *8*
114:*23*   121:*24*
123:*24*   124:*4*   127:*17*
129:*25*   130:*24*
135:*10*   141:*5*   157:*3*
158:*8*   165:*23*   168:*14*
173:*12*
**wanted**   36:*15*   43:*2*
   86:*20*   105:*8*   108:*16*,
   *19*   172:*22*   173:*2*, *6*
**way**   27:*14*   81:*19*
   83:*4*   121:*20*   140:*8*
   144:*6*
**ways**   157:*3*
**we**   7:*8*, *10*   11:*13*
   15:*19*   16:*4*   35:*6*
   41:*20*   42:*25*   43:*25*
   44:*24*   45:*1*   47:*19*, *20*
   50:*6*   53:*17*   64:*20*
   68:*9*, *10*, *12*, *14*, *18*
   80:*15*, *16*, *17*, *18*
   81:*17*   82:*18*, *20*   83:*7*,
   *15*   88:*16*   89:*13*   92:*6*
   93:*17*   94:*8*, *24*   97:*1*
   99:*24*   106:*17*   107:*25*
   108:*15*, *16*, *17*   109:*2*
   111:*10*   122:*5*, *8*
   126:*19*   131:*11*, *23*
   136:*25*   147:*22*
   148:*11*, *20*   156:*21*
   157:*2*, *23*   159:*4*
   161:*23*   167:*16*   168:*7*
   172:*14*, *15*   173:*3*, *13*,
   *15*, *17*, *19*, *21*, *23*
**week**   173:*4*
**weeks**   124:*5*   125:*16*
**well**   12:*5*   17:*16*
   27:*25*   54:*10*   60:*20*
   65:*11*   67:*21*   71:*23*,
   *24*   74:*18*, *22*   75:*12*
   85:*14*, *20*   86:*9*   87:*4*
   91:*25*   98:*14*   107:*12*
   108:*24*   110:*4*, *13*
   112:*5*   118:*24*   119:*3*
   122:*19*   124:*24*   133:*8*
   138:*21*   143:*22*

147:*15*   152:*11*, *14*
157:*25*   158:*3*   173:*19*
**well-known**   25:*8*
**went**   7:*10*   26:*9*
**West**   4:*7*, *15*, *16*, *18*
   8:*21*   10:*13*   16:*17*
   18:*13*, *15*   20:*15*, *17*
   21:*10*, *18*, *25*   55:*2*
   56:*1*, *16*, *18*, *22*   59:*8*
   100:*17*   101:*3*, *10*, *14*,
   *22*   102:*2*   103:*4*, *8*, *15*
   104:*5*   105:*4*, *15*, *19*
   106:*14*   107:*13*   108:*6*
   109:*18*, *21*   110:*21*
   111:*13*, *14*   112:*9*
   113:*6*, *13*, *16*, *24*
   114:*22*   116:*21*   117:*2*,
   *4*, *16*   118:*1*, *4*, *6*
   125:*18*   126:*2*, *24*
   127:*2*, *3*, *7*, *13*, *19*
   151:*18*, *25*   152:*2*
   153:*14*, *18*, *20*, *25*
   155:*5*, *7*, *14*, *18*, *20*
   156:*13*   158:*4*   161:*12*
**we've**   122:*4*
**Whatsapp**   38:*8*, *10*,
   *12*, *13*, *15*, *24*   39:*1*, *3*
   172:*25*
**wholly**   53:*2*   54:*1*
   56:*3*   65:*21*   99:*5*
**wife**   80:*21*
**Williams**   26:*19*
**windows**   172:*8*
**wire**   12:*16*   13:*4*, *7*
   14:*16*, *20*   17:*20*
**witness**   1:*18*   6:*3*
   7:*2*   172:*18*
**wooden**   172:*3*, *4*
**word**   152:*18*   166:*15*
**words**   48:*5*   162:*12*
**work**   37:*2*, *4*   72:*17*
   73:*11*   75:*14*   84:*1*, *2*,
   *5*, *7*   88:*19*   89:*18*, *21*,
   *24*, *25*   90:*10*   94:*21*
   96:*5*, *16*, *21*   172:*10*
**worked**   13:*22*, *25*
   168:*24*
**working**   31:*19*   36:*7*,
   *21*   58:*10*

**works**   69:*14*, *20*
   71:*18*   73:*2*   74:*9*, *11*
   75:*5*, *6*, *16*, *21*   76:*4*,
   *13*, *14*, *25*   78:*5*, *16*
   84:*13*, *23*   85:*3*   86:*24*
   88:*13*   89:*22*   90:*11*
   92:*16*   93:*1*, *6*, *10*
   95:*11*   98:*7*   166:*15*
**worth**   59:*15*
**write**   48:*3*
**writing**   48:*4*   124:*18*
**Written**   4:*16*   58:*15*
   101:*20*   102:*1*, *17*
**wrote**   44:*14*, *16*   48:*8*
   168:*2*

< X >
**x308**   3:*3*

< Y >
**Yeah**   108:*10*   146:*20*
   173:*18*
**year**   23:*6*, *8*, *10*
   33:*11*   34:*19*   49:*9*, *10*,
   *12*, *14*, *16*, *17*   71:*18*
   73:*11*   103:*16*, *18*
   130:*25*   131:*1*, *3*, *4*
   132:*23*
**years**   8:*12*   39:*10*, *12*
   48:*2*   73:*5*   75:*4*
   86:*24*   96:*14*   103:*17*
   104:*10*   109:*17*
   121:*25*   124:*25*   125:*7*
   137:*17*   155:*5*   169:*7*
**Yerbe**   172:*6*
**Yes**   7:*17*, *20*, *23*   8:*3*,
   *6*, *10*, *14*, *19*, *22*   9:*11*
   10:*8*, *17*   11:*5*, *13*, *14*,
   *18*, *21*, *22*   12:*2*, *10*, *12*,
   *21*   13:*12*   17:*5*, *14*, *23*,
   *24*   18:*1*, *21*   19:*14*
   20:*20*, *23*   21:*21*   23:*9*
   25:*4*, *23*   26:*25*   27:*3*,
   *10*, *23*   28:*8*, *13*   29:*18*,
   *22*   30:*23*   32:*9*   34:*3*,
   *8*, *11*, *14*, *18*   35:*9*, *18*,
   *23*   36:*6*   38:*4*, *12*, *16*,
   *22*   39:*6*, *16*, *20*   40:*24*
   41:*7*, *16*   42:*14*   43:*16*,
   *20*   45:*8*, *11*, *22*   48:*22*

**EXHIBIT B**

49:*16*  50:*17, 18*
51:*22, 25*  52:*4, 7, 8,*
*11, 18*  53:*23*  54:*19*
55:*1, 12, 23*  56:*1, 11,*
*20, 25*  57:*16*  58:*16*
59:*1, 20, 25*  60:*4, 7,*
*10, 14*  61:*19, 20, 21*
64:*1, 11, 14, 18*  65:*9*
66:*17, 23*  69:*8, 25*
70:*3, 6, 9*  71:*4, 15, 23*
72:*3, 24*  74:*13, 19*
75:*20*  76:*9*  77:*18*
78:*1, 9*  79:*5, 16*  80:*1*
81:*1, 17, 25*  82:*5, 25*
83:*23*  84:*1, 16, 19*
85:*3*  88:*8, 25*  89:*11,*
*14*  92:*1, 13, 21*  93:*4,*
*10*  94:*23*  95:*7*  96:*6,*
*18*  97:*6, 16*  98:*2, 11*
99:*4*  100:*8, 15, 25*
101:*6, 19*  102:*7, 25*
103:*7, 22*  104:*2, 4, 25*
105:*14*  106:*8, 11, 15*
107:*21*  108:*23*
109:*19, 23*  110:*11*
112:*11, 14, 19, 24*
113:*16*  114:*20*  115:*7,*
*11*  118:*8*  119:*11, 18*
120:*6*  121:*8, 22*
124:*10, 16*  125:*11, 24*
126:*22*  128:*3, 21*
129:*6*  130:*12*  131:*15,*
*18*  133:*23*  134:*1, 17,*
*19, 24*  135:*2, 4, 17*
141:*1, 10, 24*  142:*6,*
*10*  143:*2, 14, 21*
144:*1, 21*  145:*20*
146:*9*  147:*9*  149:*5*
152:*21*  153:*2*  154:*5,*
*13*  157:*6*  158:*14, 20*
159:*9*  160:*4, 13, 16,*
*18*  161:*2*  163:*2, 5, 8,*
*9*  164:*20*  166:*7, 14*
169:*1, 6*  170:*13, 22*
171:*5, 7*
**yesterday**  164:*16*
**York**  23:*4, 6, 24*
24:*10, 13*  25:*10*  29:*5*
30:*24*  33:*2, 17, 19*

51:*8*  72:*10*  77:*15*
110:*21*  166:*15*

**< Z >**
**Zhao**  80:*2*
**Z-h-a-o**  80:*4*
**Zobernig**  83:*22*  84:*3,*
*13*  85:*4, 24*  86:*25*
**Zoom**  27:*3*  63:*25*
71:*11*  75:*12*  76:*17*
77:*3*  94:*18*  95:*22*
97:*13*  139:*25*  171:*13*
**zoomed**  44:*21*
**zooming**  76:*18*
128:*19*

**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO: 18-CR-20685-WILLIAMS/TORRES

UNITED STATES OF AMERICA,

     Plaintiff,

 vs.

GUSTAVO ADOLFO HERNANDEZ FRIERI,

     Defendant.

and

OLYMPIA DE CASTRO,

     Third-Party Petitioner.
_____/

CONTINUATION OF DEPOSITION OF
GUSTAVO ADOLFO HERNANDEZ FRIERI

Taken on Behalf of the Plaintiff

DATE TAKEN:  26th Day of July, 2021
PLACE:       Videoconferencing
TIME:        Scheduled for 9:30 a.m.
             Commencing at 9:36 a.m. to
                       12:53 p.m.

Examination of the witness taken before:

Jared Orozco
Court Reporter
Empire Legal Reporting
110 SE 6th Street, Suite 1700
Fort Lauderdale, FL 33301
(954)241-1010

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

```
 1      APPEARANCES:

 2                     On behalf of the Plaintiff:
                       NALINA SOMBUNTHAM, ESQUIRE
 3                     DEPUTY CHIEF
                       ASSET FORFEITURE DIVISION
 4                     99 NE 4th Street
                       7th Floor
 5                     Miami, FL 33132
                       305-961-9224
 6                     Nalina.sombuntham@usdoj.gov

 7                     JOSHUA PASTER, ESQUIRE
                       KURT LUNKENHEIMER
 8                     U.S. ATTORNEY'S OFFICE
                       SOUTHERN DISTRICT OF FLORIDA
 9                     99 NE 4th Street
                       Miami, FL 33132
10                     305-961-9342
                       Joshua.paster@usdoj.gov
11                     Kurt.lunkenheimer@usdoj.gov

12                     PAUL HAYDEN, ESQUIRE
                       TRIAL ATTORNEY
13                     FRAUD SECTION, CRIMINAL DIVISION
                       U.S. DEPARTMENT OF JUSTICE
14                     1400 New York Avenue, N.W.
                       Washington, D.C. 20005
15                     202-353-9370
                       Paul.hayden2@usdoj.gov

16

17                     On behalf of the Defendant:
                       HOWARD SREBNICK, ESQUIRE
18                     JACKI PERCZECK, ESQUIRE
                       MICHELE VAN MEETEREN, ESQUIRE
19                     BLACK SREBNICK KORNSPAN & STUMPF, PA.
                       201 S. Biscayne Boulevard
20                     Suite 1300
                       Miami, FL 33131-4311
21                     305-371-6421
                       Hsrebnick@royblack.com

22

23

24

25
```

**EXHIBIT B**

1          On behalf of the Third-Party Petitioners:

2          SAM RABIN ESQUIRE.
           SAMUEL J. RABIN, JR., P.A.
3          1 SE 3rd Avenue
           Suite 2600
4          Miami, FL 33131-1715
           305-358-1064
5          Sjr@miamilawyer.com
           Representing Allison Dominguitti
6

7          MARGOT MOSS, ESQUIRE
           MARKUS/MOSS PLLC
8          40 NW 3rd Street
           Penthouse 1
9          Miami, FL 33128-1838
           305-379-6667 x308
10         Mmoss@markuslaw.com
           Representing 314 Hicks LLC, Olympia De
11         Castro, GHDC, FHDC, and AHDC

12         Guy Rasco, Esquire
           Devine Goodman & Rasco, LLP
13         2800 Ponce De Leon Boulevard
           Suite 1400
14         Coral Gables, FL 33134-6921
           305-374-8200
15         Grasco@devinegoodman.com
           Representing Olympia De Castro
16

17         RICHARD KLUGH, ESQUIRE
           RICHARD C. KLUGH, P.A.
18         40 NW Third Street
           Penthouse 1
19         Miami, FL 33128
           305-536-1191
20         Rickklu@aol.com
           Representing Maria Lucia Hernandez,
           America Fiduciary Limited, HH Senema Trust,
21         3 Gramercy Park LLC, Gramercy Irrevocable
           Trust

22

23
                            -   -   -
24

25

**EXHIBIT B**

I N D E X

Deposition of: Gustavo Adolfo Hernandez Frieri    Page
Cross-Examination BY MS. MOSS:                     181
Redirect Examination By MS. SOMBUNTHAM             209
Cross-Examination By MR. RASCO                     232
Direct Examination By MR. PASTER                   257
Certificate of Oath                                273
Certificate of Reporter                            274

GOVERNMENT'S EXHIBIT INDEX

No.   Description                                  Page
13    Amended and Restated HH Master               211
      Settlement Declaration of Trust:
      Bates 956-03-973-03
31    E-mails:  Bates ODC001909 - ODC 01911        219
32    Rasco E-mail                                 266

DE CASTRO'S EXHIBIT INDEX

No.   Description                                  Page
1     Keven Danow Memo 2/21/14                      235
2     Keven Danow Memo 6/3/14                       237
3     Document: Permissions to Transfer            239
      Interest to Spouse 2/24/2018
4     Joinder Agreement                            240
5     Acknowledgement of Termination of            241
      Membership
6     Transfer Document                            242
7     IWM Financial Log                            243
8     Holtz e-mail, 12/3/2017                      248
9     E-mails 10/4/2018 - 11/27/2018               250

**EXHIBIT B**

1    Thereupon,

2              GUSTAVO ADOLFO HERNANDEZ FRIERI,

3    having been first duly sworn or affirmed, was examined

4    and testified as follows:

5              THE WITNESS:  I do.

6                        CROSS EXAMINATION

7    BY MS. MOSS:

8         Q.   **Good morning, Mr. Hernandez.**

9         A.   Good morning.

10        Q.   **How are you doing today?**

11        A.   Well, thank you.

12        Q.   **The Government completed their questions of you**

13   **in the deposition last week, so now I'm going to be**

14   **asking you questions to clarify some of the matters that**

15   **were discussed then.  So first I'd like to ask you --**

16   **the Government had asked you questions about the**

17   **purchase of 3 Gramercy Park West, the apartment.  Do you**

18   **recall those questions?**

19        A.   Yes, I do.

20        Q.   **And you had testified that there were two**

21   **payments that were made for the purchase of the**

22   **apartment, one initially in December of 2004 and a final**

23   **one in August 2005; is that correct?**

24        A.   Yes.  I believe that is correct.

25        Q.   **And the Government had asked you who authorized**

**EXHIBIT B**

1    those payments and you testified your father, Gustavo

2    Hernandez Romero; is that correct?

3         A.   Yes, that is correct.

4         Q.   And I want to clarify, those two payments came

5    from Banco Atlantico from the HH Master Settlement trust

6    account; is that correct?

7         A.   Yes, that is my belief.

8         Q.   And so the source of those funds that purchased

9    the apartment at 3 Gramercy Park West was the family

10   trust, the HH Master Settlement?

11        A.   My father's trust, yes.

12        Q.   And, Mr. Hernandez, were you a trustee, ever a

13   trustee of the HH Master Settlement Trust?

14        A.   No, I was never a trustee for HH.

15        Q.   Were you ever a beneficiary of the HH Master

16   Settlement Trust?

17        A.   No, I was never a beneficiary.

18        Q.   And were you ever a guarantor, did you ever

19   contribute any assets to the HH Master Settlement Trust?

20        A.   No, I was never a guarantor nor did I

21   contribute any assets.

22        Q.   And so did you put any of your own money into

23   the purchase of the apartment, 3 Gramercy Park West?

24        A.   No, I did not.

25        Q.   Did you even have any of the cash to pay for

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1  it?  Did you have $2.9 million in cash personally to pay

2  for the apartment?

3      A.   No, I did not.

4      Q.   And had you put any of your own money into the

5  bank accounts for the HH Master Settlement Trust?

6      A.   No, I did not.

7      Q.   So was any of your own money used to purchase 3

8  Gramercy Park West?

9      A.   No.

10      Q.   And my understanding is that the apartment was

11  purchased in all cash; is that correct?

12      A.   Yes, that's correct.

13      Q.   And so did anyone have to obtain a mortgage in

14  order to purchase the apartment?

15      A.   No.  There was no mortgage.

16      Q.   And, Mr. Hernandez, since you testified that it

17  was purchased from the family trust, who was the owner

18  of the apartment, 3 Gramercy Park West?

19      A.   The owner of the apartment was the Gramercy

20  Irrevocable Trust and its subsidiary, 3 Gramercy Park

21  West LLC.

22      Q.   And who owned or who was above 3 -- who was the

23  owner of Gramercy Irrevocable Operating Trust?

24      A.   The HH Master Settlement Trust.

25      Q.   Okay.  And is it correct that the family trust

**EXHIBIT B**

1   purchased and held the apartment because it was your

2   father's intention to have an asset that will provide

3   for his future grandchildren, your children?

4           MS. SOMBUNTHAM:  Objection, form.

5   BY MS. MOSS:

6       Q.   You may answer, Mr. Hernandez.

7       A.   Yes, that was my father's wish.

8       Q.   And I'd like to share my screen briefly.

9            Mr. Hernandez, can you see that on the screen?

10      A.   Yes, I do.

11      Q.   And I believe that you testified on direct that

12   you recognized this document, correct?

13      A.   I do not see a document.

14      Q.   You don't see a document.  What do you see on

15   the screen?

16          MR. SREBNICK:  Margot, it's the directory.  It

17      shows the document.  You have to click on the

18      document, I think.  It is showing the directory of

19      exhibits.

20   BY MS. MOSS:

21      Q.   Okay.  So I'm going to do this the

22   old-fashioned way and I'm sorry for doing this, but do

23   you see this document, Mr. Hernandez?

24      A.   Yes, I do.

25      Q.   And I believe you say that you recognize this

**EXHIBIT B**

1   as the original HH Master Settlement Trust, correct?

2       A.   Yes.

3       Q.   And you produced this document.  Is that right?

4       A.   I believe so, yes.

5       Q.   And the item that you produced, that was a fair

6   and accurate copy of the HH Master Settlement Trust?

7       A.   Yes, I believe so.

8       Q.   And your father was the settlor of this trust;

9   is that correct?

10      A.   Yes, he was.

11      Q.   And your father was also the beneficiary of

12  this trust, correct?

13      A.   Yes, he was.

14      Q.   Now the Government in it's direct pointed to a

15  section in the document that essentially said that if

16  your father passed away and there were no other

17  beneficiaries, then your father's children would become

18  the beneficiaries.  Do you recall that?

19      A.   I recall that.

20      Q.   Let me ask you, Mr. Hernandez.  In 2002, was

21  your father still alive?

22      A.   Yes, he was.

23      Q.   And in 2004, was your father still alive?

24      A.   Yes, he was.

25      Q.   And in 2005, was your father still alive?

**EXHIBIT B**

1      A.   Yes, he was.

2      Q.   So because your father was still alive in 2004,

3   you were not a beneficiary in 2004 of the HH Master

4   Settlement Trust, were you?

5      A.   No, I was not.

6      Q.   So that is correct?

7      A.   That is correct.

8      Q.   And because your father was still alive in

9   2005, you were also not a beneficiary in 2005 of the HH

10   Master Settlement Trust; is that correct?

11      A.   That's correct.

12      Q.   And in 2005, that is when the apartment 3

13   Gramercy Park West was purchased, correct?

14      A.   Yes.

15      Q.   And your father passed away November 17th of

16   2006?

17      A.   Yes.

18      Q.   And even then you were not and did not become a

19   beneficiary of the HH Master Settlement Trust; is that

20   correct?

21      A.   That's correct.

22      Q.   And that is because, at least by 2005, the HH

23   Master Settlement Trust had been amended, correct?

24      A.   Yes, that is correct.

25      Q.   And at that time that it was amended and

**EXHIBIT B**

1    restated, there were contingent beneficiaries that were

2    named, correct?

3        A.    Yes, that is correct.

4        Q.    And those contingent beneficiaries were Maria

5    Lucia and Maria Elena Hernandez, your sisters, correct?

6        A.    Yes, that is correct.

7        Q.    The Government also asked you questions about 3

8    Gramercy Park West LLC.  Do you recall that?

9        A.    Yes, I do.

10       Q.    And the apartment, 3 Gramercy Park West, was

11   purchased in the name of an LLC, 3 Gramercy Park West

12   LLC?

13       A.    Yes.

14       Q.    And you had testified that to your

15   recollection, that is what the attorneys of the trust

16   had advised the trust to do.  Is that correct?

17       A.    Yes, that is correct.

18       Q.    And you also testified that you believe it had

19   been done for estate planning purposes, for tax planning

20   considerations, and other purposes, correct?

21       A.    Yes, that is correct.

22       Q.    And in terms of asset protection, you testified

23   that one of the reasons to purchase in the name of an

24   LLC, to your understanding, is because any liability of

25   the LLC could not impair the any other assets of the

**EXHIBIT B**

1    family trust; is that right?

2        A.   Yes, that is correct.

3        Q.   So is purchasing the apartment in the name of

4    an LLC done to hide ownership of the apartment?

5        A.   No.

6        Q.   And was purchasing the apartment in the name of

7    the LLC done to hide ownership from the Government for

8    forfeiture purposes?

9        A.   No.

10       Q.   And this structure of having an LLC purchases 3

11   Gramercy Park West, that was one in 2005?

12       A.   Yes.

13       Q.   And is that before you met Abraham Ortega?

14       A.   Yes.

15       Q.   Was that 11 years before you met Mr. Ortega?

16       A.   I met Mr. Ortega in 2016, so yes, that is

17   correct.

18       Q.   And was that approximately 13 years before

19   where you were every indicted by the Government?

20       A.   Yes, that is correct.

21       Q.   And is it correct that you were not indicted by

22   the Government in 2005 when 3 Gramercy Park West was

23   purchased?

24       A.   Yes, that is correct.

25       Q.   And no one in your family was under indictment

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    by the Government in 2005 at the time of the purchase?

2        A.   Yes, that is correct.

3        Q.   And the Government asked you about your role,

4    if any, with 3 Gramercy Park West LLC, and you said that

5    you served as a manager for the LLC; is that correct?

6        A.   Yes.

7        Q.   Were you an owner of 3 Gramercy Park West LLC?

8        A.   No.

9        Q.   Were you a member of 3 Gramercy Park West LLC?

10       A.   No.

11       Q.   Were you ever an owner or a member of 3

12   Gramercy Park West LLC?

13           MS. SOMBUNTHAM:   Objection, form.

14   BY MS. MOSS:

15       Q.   You may answer the question.   Were you ever an

16   owner of 3 Gramercy Park West LLC?

17       A.   No.

18       Q.   Were you ever a member of 3 Gramercy Park West

19   LLC?

20       A.   No.

21       Q.   In 2005, was the only member of 3 Gramercy Park

22   West LLC the Gramercy Irrevocable Operating Trust?

23           MS. SOMBUNTHAM:   Objection, form.

24   BY MS. MOSS:

25       Q.   You may answer, Mr. Hernandez.

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1      A.   Yes.

2      Q.   And back to your understanding, is that the

3  only member of 3 Gramercy Park West LLC was the Gramercy

4  Irrevocable Operating Trust, correct?

5      A.   Yes, that is correct.

6      Q.   And that was true for many years, correct?

7      A.   Yes, that's correct.

8      Q.   And that was true until at least 2019, correct?

9      A.   Yes, I believe that is correct.

10      Q.   So, again, Mr. Hernandez, you did not own the

11  apartment, 3 Gramercy Park West?

12      A.   No, I did not.

13      Q.   You did not own the LLC that held the

14  apartment, 3 Gramercy Park West?

15      A.   No, I did not.

16      Q.   And we have spoken about Gramercy Irrevocable

17  Operating Trust.  Were you a trustee of the Gramercy

18  Irrevocable Operating Trust?

19      A.   No, I was not.

20      Q.   Were you a beneficiary of the Gramercy

21  Irrevocable Operating Trust?

22      A.   No, I was not.

23      Q.   Were you a guarantor or did you contribute any

24  assets to the Gramercy Irrevocable Operating Trust?

25      A.   No.

**EXHIBIT B**

1    Q.   And did you ever become a trustee or

2  beneficiary or guarantor of the Gramercy Irrevocable

3  Operating Trust?

4    A.   No.

5    Q.   And so because you did not own the apartment or

6  the LLC, could you have sold the apartment, 3 Gramercy

7  Park West without the permission of the trust or the

8  trustee?

9    A.   No.

10   Q.   And because you did not own the apartment or

11 the LLC, which held the apartment, could you have given

12 away or transferred ownership of the apartment without

13 the permission of the trust or the trustee?

14   A.   No.

15   Q.   And so is it true that you could not do

16 anything about change the legal ownership of the

17 apartment or the beneficial ownership of the apartment

18 without the trust's permission, because the apartment

19 was not yours?

20   A.   Yes.

21   Q.   Now eventually the apartment was sold, correct?

22   A.   Yes.

23   Q.   And the Government asked you about the

24 proceeds, about the sale of the apartment, 3 Gramercy

25 Park West, in 2019.  Do you recall that?

**EXHIBIT B**

1      A.    Yes.

2      Q.    Did you receive any of the proceeds from the

3    sale of the apartment, 3 Gramercy Park West?

4      A.    No, I did not.

5      Q.    Would you have been entitled to any the

6    proceeds from the sale of the apartment?

7      A.    No.

8      Q.    And is it true that you wouldn't have been

9    entitled to the proceeds because you didn't own the

10   apartment?

11     A.    Yes, that is correct.

12     Q.    And is that true if the apartment had been sold

13   in 2006?

14     A.    It would be true as well.

15     Q.    It would be true that you would not be entitled

16   to the proceeds from the sale of the apartment if it had

17   been sold in 2006?

18     A.    I would not have been entitled to the proceeds

19   of the sale had it been sold in 2006.

20     Q.    And the same for 2007?

21     A.    Yes.

22     Q.    So for any time before your arrest, you would

23   not have been entitled to the proceeds of the sale of

24   that apartment because you did not own the apartment; is

25   that correct?

**EXHIBIT B**

1        A.    That's correct.

2              MS. SOMBUNTHAM:  Objection, form.

3   BY MS. MOSS:

4        Q.    And following your arrest, you would not have

5   been entitled to the proceeds of that apartment -- or

6   from the sale of that apartment because you did not own

7   the apartment; is that correct?

8              MS. SOMBUNTHAM:  Objection, form.

9   BY MS. MOSS:

10       Q.    You can answer, Mr. Hernandez.

11       A.    No, I did not own the apartment.

12       Q.    And, Mr. Hernandez, were you trying to hide

13  this asset from the Government?

14       A.    No, I was not.

15       Q.    As far as you understand, did the Government

16  know about the New York apartment?

17       A.    Yes, I believe so.

18       Q.    And in fact, wasn't the New York apartment

19  raised during your bond hearing?

20       A.    Yes, it was.

21       Q.    And do you recall that the Government

22  represented to the magistrate judge that there was a

23  piece of property in New York that is in an irrevocable

24  trust for the benefit of the kids that Mr. Hernandez has

25  no interest in?  Do you remember the Government saying

**EXHIBIT B**

1    that?

2        A.   Yes, I do.

3        Q.   And was that a true statement?

4        A.   Yes, it was a true statement.

5        Q.   Now I'd like to ask you about 314 Hicks Street,

6    the townhouse located there.  The Government asked you

7    questions about 314 Hicks.  Do you recall that?

8        A.   Yes, I do.

9        Q.   And you were asked were you involved in the

10   purchase of 314 Hicks townhouse, and you said no, you

11   were not involved.  Is that correct that you were not

12   involved?

13       A.   That is correct.

14       Q.   And did you contribute personally any funds

15   towards the purchase of 314 Hicks?

16       A.   No, I did not.

17       Q.   Did you contribute any of the closing costs of

18   for the purchase of 314 Hicks?

19       A.   No, I did not.

20       Q.   Did you contribute any funds to pay the

21   attorney for the closing on 314 Hicks?

22       A.   No, I did not.

23       Q.   And as far as you know, does your name appear

24   on any ownership documents regarding 314 Hicks?

25       A.   No.

**EXHIBIT B**

1      Q.   So do you own 314 Hicks, Mr. Hernandez?

2      A.   No, I did not.

3      Q.   Do you have the title of 314 Hicks?

4      A.   No, I do not.

5      Q.   Do you have any legal interest in the ownership

6   of 314 Hicks?

7      A.   No, I do not.

8           MS. SOMBUNTHAM:   Objection, form.

9   BY MS. MOSS:

10     Q.   And did you form 314 Hicks LLC?

11     A.   No, I did not.

12     Q.   Were you involved in any way in the creation or

13  the formation of 314 Hicks LLC?

14     A.   No, I was not.

15     Q.   So is it correct that you are not an owner of

16  314 Hicks LLC?

17          MS. SOMBUNTHAM:   Objection, form.

18  BY MS. MOSS:

19     Q.   You can answer.   Is that correct?

20     A.   Could you please repeat that, I apologize.

21     Q.   Are you an owner of 314 Hicks LLC?

22          MS. SOMBUNTHAM:   Objection, form.

23  BY MS. MOSS:

24     A.   No, I am not.

25     Q.   Are you a manager of 314 Hicks LLC?

**EXHIBIT B**

1      A.    No, I am not.

2      Q.    Are you involved in any way with 314 Hicks LLC?

3      A.    No, I am not.

4      Q.    The Government also asked if you had helped in

5  any way with the 314 Hicks property, and you testified

6  that you had helped in dealing with some of the service

7  providers.  Do you recall that?

8      A.    Yes, I do.

9      Q.    And, Mr. Hernandez, did you help because you

10  considered yourself on owner of 314 Hicks?

11      A.    No.

12      Q.    Did you help because you consider 314 Hicks to

13  be your property and your home?

14      A.    No.

15      Q.    And as far as you know, is this property, like

16  the apartment 3 Gramercy Park West, held for the benefit

17  of your children?

18      A.    Yes.

19      Q.    And these are children that you have with

20  Olympia De Castro?

21      A.    Yes.

22      Q.    And now you are divorced from Ms. De Castro; is

23  that correct?

24      A.    Yes.

25      Q.    But do you still speak with Ms. De Castro, your

**EXHIBIT B**

1    ex-wife?

2         A.   Yes.

3         Q.   Do you discuss events surrounding your

4    children?

5         A.   Yes.

6         Q.   Do you discuss matters that affect your

7    children?

8         A.   Yes.

9         Q.   So even though you are divorced, you still have

10   a joint interest in your children?

11        A.   Absolutely.

12             MS. SOMBUNTHAM:   Objection, form.

13   BY MS. MOSS:

14        Q.   And do you still have an interest in making

15   sure your children are protected and provided for?

16        A.   Absolutely.

17        Q.   And does that include having an interest in

18   assets that are being held to protect and provide for

19   your children?

20        A.   No.

21        Q.   Let me ask you about e-mails.  The Government

22   asked you about e-mails in 2020, regarding things like

23   landscaping for 314 Hicks, a punch list, things not

24   working properly at the townhouse, things like that.  Do

25   you recall that?

**EXHIBIT B**

1      A.    Yes, I do.

2      Q.    And you testified that historically, you took

3  care of the house maintenance matters; is that correct?

4      A.    Yes, that is correct.

5      Q.    And also during the time of these e-mails in

6  2020, you are not working; is that right?

7      A.    No, I was not.

8      Q.    And Ms. De Castro she is workings, correct?

9      A.    Yes, she is.

10     Q.    She is working multiple jobs?

11     A.    Yes, she has multiple jobs.

12     Q.    She is working a lot, correct?

13     A.    Yes.

14     Q.    Is it fair to say that you had more time than

15  Ms. De Castro?

16     A.    Yes.

17     Q.    Is it fair to say that you had more experience

18  dealing with maintenance matters of a home than

19  Ms. De Castro?

20     A.    Yes.

21     Q.    And even though divorced, did you still advise

22  or give your opinion on matters that ultimately affected

23  your children?

24     A.    Absolutely, yes.

25     Q.    And were you trying to hide the asset of 314

**EXHIBIT B**

1    Hicks in any way from the Government?

2         A.    No.

3         Q.    Mr. Hernandez, you were asked questions about

4    your application package that was submitted to purchase

5    the apartment 3 Gramercy Park West.  Do you recall that?

6         A.    Yes.

7         Q.    Now I'm going and switching back to 3 Gramercy

8    Park West.  And you had stated that there were several

9    inaccuracies in that application package; is that

10   correct?

11        A.    Yes.

12        Q.    And it sounds like you did not put much of that

13   package together; is that fair to say?

14        A.    Yes.

15        Q.    Including a letter that was signed by you that

16   the Government pointed out?

17        A.    Yes.

18        Q.    And I believe that you stated that the style

19   and phraseology of that letter was not you; is that

20   correct?

21        A.    Yes.

22        Q.    And so there were inaccuracies in that letter

23   and other parts of the package, regarding things like

24   whether you were a candidate for a PhD, whether you

25   would be the sole occupant of the apartment; is that

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1  correct?

2      A.   Yes.

3      Q.   Is it also correct that the board had to

4  approve the purchase of the apartment?

5      A.   Yes.

6      Q.   Is it fair to say that the board of the

7  building required certain representations before they

8  would approve the sale of the apartment?

9      A.   Yes.

10      Q.   And the real estate broker Stribling &

11  Associates submitting the application knew that?

12      A.   Yes.

13      Q.   And the real estate broker Stribling &

14  Associates received a commission from the closing on the

15  apartment?

16      A.   Yes.

17      Q.   So you have testified that were some

18  inaccuracies in the application package.  But I want to

19  talk about what the reality was, what the truth was, and

20  again, you were not the true purchaser of 3 Gramercy

21  Park West; isn't that correct?

22      A.   That's correct.

23      Q.   And you were not the beneficial owner of 3

24  Gramercy Park West?

25      MS. SOMBUNTHAM:  Objection, form.

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    BY MS. MOSS:

2         Q.    Were you the beneficial owner of 3 Gramercy

3    Park West, Mr. Hernandez?

4         A.    No, I was not.

5         Q.    Were you the owner of 3 Gramercy Park West LLC?

6         A.    No, I was not.

7         Q.    And I'd like to ask you about some of the

8    entities that were referenced in the package and some of

9    the inaccuracies, starting with Global Finance

10   Management Corporation.  This was an entity that was

11   created in 2002, correct?

12        A.    Yes, I believe 2002.

13        Q.    And that was owned by HH Securities?

14        A.    Yes, it was.

15        Q.    Do you own Global Finance Management,

16   Mr. Hernandez?

17        A.    No, I do not.

18        Q.    Did you own Global Finance Management in 2004

19   or 2005?

20        A.    No, I did not.

21        Q.    Was Global Finance Management owned by HH

22   Securities?

23        A.    It was originally owned by my father when it

24   was incorporated, and later by HH Securities when that

25   entity was incorporated, I believe in 2003.

**EXHIBIT B**

1    Q.    And HH Securities was held by the Global

2   Irrevocable Trust?

3    A.    Yes, it was.

4    Q.    And the Global Irrevocable Trust was created in

5   December of 2004?

6    A.    Yes, I believe so.

7    Q.    And to be clear, were you a guarantor of the

8   Global Irrevocable Trust?

9    A.    No, I was not.

10   Q.    Were you a beneficiary of the Global

11  Irrevocable Trust?

12   A.    No, I was not.

13   Q.    Are you a trustee of the Global Irrevocable

14  Trust?

15   A.    No.

16   Q.    Did you ever become a guarantor or beneficiary

17  or trustee of the Global Irrevocable Trust?

18   A.    No.

19   Q.    Was the beneficiary of the Global Irrevocable

20  Trust the HH Master Settlement Trust?

21   A.    Yes.

22   Q.    Now I believe you testified that some of these

23  entities that we talked about, the global entities, were

24  regulated financial service companies in the United

25  States; is that right?

**EXHIBIT B**

1    A.   Yes, certain of the Global Securities entities

2    were regulated financial institutions in the U.S.

3    **Q.   Does that mean they were regulated by the FCC?**

4    A.   Yes, they were regulated by the FCC.

5    **Q.   And by FINRA?**

6    A.   One particular entity was a member of FINRA.

7    **Q.   And so was the organizational structure public**

8    **for some of that entities?**

9    A.   Yes, the organizational structure was public

10   for those entities.

11   **Q.   And was that ever challenged by anyone as not**

12   **being accurate?**

13   A.   No, it was never challenged.

14   **Q.   And the beneficial owners, was that ever**

15   **challenged?**

16   A.   No, the beneficial owners were not challenged.

17   **Q.   And I'd like to ask you about the beneficial**

18   **owners of the HH Master Settlement Trust, and actually**

19   **the entities that we were speaking about, the Global**

20   **Finance Management Corporation, HH Securities, Global**

21   **Irrevocable Trust, and the HH Master Settlement Trust,**

22   **were the beneficial owners of those entities and trusts**

23   **your sisters, Maria Lucia and Maria Elena?**

24   A.   Yes, that is correct.

25   **Q.   And was that determined by outside entities to**

**EXHIBIT B**

1    be the fact?

2         A.   Yes, it was.

3              MS. SOMBUNTHAM:   Objection, form.

4    BY MS. MOSS:

5         Q.   It's important that we establish the ownership

6    of the entities as we move on.   The Government asked you

7    a lot of questions about the artwork.   Do you recall

8    that?

9         A.   Yes, I do.

10        Q.   And you were asked about one invoice that

11   contained four pieces of art, three paintings by Kai

12   Althoff, and one sculpture by Von Bonin.   Do you recall

13   that?

14        A.   Yes, I do.

15        Q.   And these are pieces of art that were sold in

16   2019?

17        A.   Yes.

18        Q.   Did you own these pieces of art?

19        A.   No.

20        Q.   Do you have art that you have personally

21   purchased and owned?

22        A.   Yes.

23        Q.   Did that include these four pieces?

24        A.   No.

25        Q.   So let's talk about who actually owned these

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1   four pieces, three paintings by Kai Althoff and the

2   sculpture by Von Bonin.  It was Global Finance

3   Management Corporation that originally purchased these

4   pieces of art?

5       A.   Yes.

6       Q.   And so were they owned by Global Finance

7   Management?

8       A.   Yes.

9       Q.   Now I believe you testified that because you

10  are knowledgeable in art, you were the individual who

11  advised Global Finance Management or the family trust on

12  what pieces of art to purchase, a curator in an art

13  museum; is that correct?

14      A.   Yes, that is correct.

15      Q.   Does that mean that you owned the art because

16  you advised Global Finance Management or the family

17  trust?

18      A.   No.

19      Q.   Did Ms. De Castro own this cart?

20      A.   No.

21      Q.   Did the ownership of these four pieces of art

22  ever change?

23      A.   No, it did not.

24      Q.   So they were purchased by the Global Finance

25  Management and they were sold by Global Finance

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1   Management; is that correct?

2       A.    Yes, it is Global Irrevocable Trust.

3       Q.    Mr. Hernandez, I just have a few more

4   questions, just to repeat some of the things we already

5   stated.  Did you have any legal ownership in 314 Hicks?

6       A.    No.

7             MS. SOMBUNTHAM:  Objection, form.

8             MS. MOSS:  What is your problem with the form?

9             MS. SOMBUNTHAM:  Cause for speculation, legal

10   conclusion.

11   BY MS. MOSS:

12       Q.    Do you believe hat you had any legal or

13   ownership interest in 314 Hicks, Mr. Hernandez?

14       A.    No, I do not believe so.

15       Q.    And did you ever contribute money again to 314

16   Hicks?

17       A.    No, I did not contribute any money to 314

18   Hicks.

19       Q.    And did your name appear on any title or

20   ownership paperwork for 314 Hicks?

21       A.    No, it did not.

22       Q.    Did you have any ownership interest in 314

23   Hicks LLC?

24       A.    No, I did not.

25       Q.    Did you have any ownership or did you have any

**EXHIBIT B**

1  interest in the HH Master Settlement Trust?

2      A.   No, I did not.

3      Q.   Did you have any interest in the Gramercy

4  Irrevocable Operating Trust?

5      A.   No, I did not.

6      Q.   And did you have any interest in Global Finance

7  Management Corporation?

8      A.   No, I did not.

9      MS. MOSS:  Thank you, Mr. Hernandez.  That is

10     all the questions I have.

11      MS. SOMBUNTHAM:  Are we proceeding with Sam's

12     questions now?

13      MR. RABIN:  I have no questions.

14      Guy, you are up.

15      MS. SOMBUNTHAM:  Hold on.  Give me ten minutes.

16  I want to see if I want to ask anything.

17      MR. SREBNICK:  Of course.

18      (Discussion off record.)

19  BY MS. MOSS:

20      Q.   Mr. Hernandez, I just have two remaining

21  questions for you, and these are regarding the

22  application package that was submitted for the purchase

23  of the apartment 3 Gramercy Park West, and I believe

24  this was Exhibit 6 in the deposition last week.  I'd

25  like to ask you in particular about the letter that was

**EXHIBIT B**

1  written for you that you signed.  Do you recall the

2  letter that I am talking about?

3      A.   Yes, I do.

4      Q.   There is one sentence in the letter, and I

5  can't share my screen, so I'll read it, and it's on

6  page 2 of the letter.  And it says "I hold certain

7  liquids investments in U.S. bank accounts which well

8  exceed the acquisition price of the property in

9  question.  That statement is included in this latter in

10  the application package, and, Mr. Hernandez, I want to

11  ask you whether that statement was correct at the time

12  that this application was submitted in 2004?

13      A.   No, I believe that that is inaccurate.

14      Q.   And so when we are talking about liquid, say

15  cash, how much cash did you actually have personally in

16  banks in 2004 when this application was submitted?

17      A.   I do not recall the exact amount of cash that I

18  had as of that point in time.

19      Q.   Well, let me ask you this:  There is a

20  financial statement submitted along with the package

21  that shows you had cash on hand in accounts at less than

22  $7,000.  Was that accurate at the time?

23      A.   I looked at the bank statement of Bank of

24  America, if I recall correctly, and yes, it seems

25  accurate, the statement, the bank statement.

**EXHIBIT B**

1     Q.   So again, you did not have $2.9 million in cash

2     that would have covered the purchase of 3 Gramercy Park

3     West, you did not have that personally?

4     A.   No, I did not.

5          MS. MOSS:  Thank you, Mr. Hernandez.

6          MS. SOMBUNTHAM:  Good morning, Mr. Hernandez.

7          THE WITNESS:  Good morning.

8          MS. SOMBUNTHAM:  I think Ms. Moss passed the

9     witness to me and I think for the record Mr. Rabin

10    does not have any questions.  Is that correct, Sam?

11         MR. RABIN:  That is correct.

12                    REDIRECT EXAMINATION

13    BY MS. SOMBUNTHAM:

14    Q.   So for today's deposition, Mr. Hernandez, did

15    you take any steps to prepare?

16    A.   I apologize, can you please repeat.

17    Q.   Did you take any steps for today's deposition

18    to prepare for it?

19    A.   Yes, I did.

20    Q.   Did you talk with Ms. Moss about her questions?

21    A.   No, I did not speak with Ms. Moss about her

22    questions.

23    Q.   Did you receive any questions ahead of today's

24    testimony?

25    A.   No, I did not receive any questions ahead of

**EXHIBIT B**

1    today's testimony.

2        Q.   What are the things that you did to prepare

3    then?

4        A.   I had a call with my attorneys to review the

5    material prior to the deposition.

6        Q.   And you testified earlier, and I think Ms. Moss

7    asked this, but I want to make sure it is correct, that

8    your father passed away on November 17th, 2006?

9        A.   My father passed away on November of 2006, but

10   I do not recall the exact date.

11       Q.   But it was in November of 2006?

12       A.   Yes, it was.

13       Q.   And at the time of his passing, were you

14   married?

15       A.   No, I lived with my fiancee, but we were not

16   married yet.

17       Q.   And you didn't have any kids at the time?

18       A.   No, at the time we did not have any children.

19       Q.   And when did you get married?

20       A.   April 2007.

21       Q.   And when was your child born?

22       A.   May 31st, 2011.

23       Q.   And you have three children; is that right?

24       A.   Yes, I do.

25       Q.   And when was your last child born?

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    A.    In 2015, February 10th, 2015.

2         MS. SOMBUNTHAM:  I want to show you what is

3    marked as Government's Exhibit 13.  It is something

4    that you reviewed last time.

5         (Government's Exhibit No. 13, Amended and

6    Restated HH Master Settlement Declaration of Trust:

7    Bates 956-03-973-03, previously marked, was not offered

8    for identification.)

9    BY MS. SOMBUNTHAM:

10   Q.    Do you see this document, Exhibit 13?

11   A.    Yes, I do.

12   Q.    So I'm going to turn to -- or actually looking

13   at this first page of Government's Exhibit, what the

14   date at the HH Master Settlement was amended and

15   restated?

16   A.    I believe that it was amended and restated on

17   December 1st, 2004.

18   Q.    2004 was the most recent draft, or is it the

19   other date on the top that says the 13th day of

20   November, 2006?  I'll zoom in if it helps.

21   A.    Thank you.  Okay.  Yes, I believe that there

22   was an amendment as for this document dated

23   December 1st, 2004, and then subsequently another

24   amendment in November of 2006 for the HH Master

25   Settlement Trust.

**EXHIBIT B**

1    Q.   And you testified that when this last amendment

2    in November 13th, 2006 occurred, that was when your

3    sisters became the beneficiaries?

4    A.   I believe the contingent beneficiary amendment

5    took place in 2004 when the HH Master Settlement Trust

6    was amended in December of 2004.

7    Q.   I want to turn to page 17 at the top of this

8    document.  So as of November 13th, 2006, and I'm showing

9    you page 17 of this document, the beneficiary of the

10   trust, the beneficiary was still your Father, Gustavo

11   Hernandez Romero, is that correct.

12   A.   Yes, my father was the primary beneficiary, and

13   he made my sisters Maria Lucia and Maria Elena the

14   contingent beneficiaries of this trust.

15   Q.   And I'm going to turn your attention to

16   paragraph 2, under part B, and ask you the question:

17   Upon the death of your father, was this particular

18   section adhered to of the trust?  And I can scroll if

19   necessary.

20   A.   It is just that the screen is obstructed with

21   the camera images.

22        MS. SOMBUNTHAM:  I'll try to make it smaller if

23        it will be helpful.  I can read it out loud for you

24        if you like.  I don't know if that is helpful or not.

25        MR. RABIN:  You can move the screen images for

**EXHIBIT B**

1      him so they are not in the way.

2           MR. SREBNICK:  Okay, hold on.

3           THE WITNESS:  Thank you.

4   BY MS. SOMBUNTHAM:

5      A.   Yes.  I believe that this is accurate.

6      **Q.   So upon the death of your father, all assets**

7   **were transferred and distributed to the contingent**

8   **beneficiaries?**

9      A.   Well, I don't know if the exact legal term will

10  be transferred, but I do believe that as this states,

11  the contingent beneficiaries were attributed their share

12  in the trust estate.

13     **Q.   So -- I think the term used here is**

14  **"distribute."  "Upon the death of the settlor, the**

15  **trustee shall divide the remaining principal and**

16  **accumulated but undistributed income of the trust into**

17  **separate and equal shares of 50 percent a share for the**

18  **benefit of the contingent beneficiaries, and shall**

19  **distribute each trust shares in accordance with the**

20  **following provision."**

21          **So the distribution should be occurring after**

22  **or upon the death, is that not what paragraph 2 on the**

23  **bottom of about page 17 of Exhibit 13 say?**

24     A.   Again, in my limited understanding, the trustee

25  will divide the principal and the undistributed income

**EXHIBIT B**

1   into the shares, prorated for the benefit of the

2   contingent beneficiaries.

3       Q.   And do you know if that occurred, if the

4   trustee did that?

5       A.   I believe that the trustee had allocated the

6   shares according to the provisions of the deed, but I am

7   not certain.  I have not -- I have no specific knowledge

8   of what the trustee has done or not in regard to this

9   numeral II.

10      Q.   In response to the subpoena that we issued of

11  this deposition, did you make requests for documents of

12  the trustee?

13      A.   Yes, I requested both the attorneys, my

14  father's attorneys, the trust attorneys, and my brother

15  to please send me copies of the trust documents.

16      Q.   And within those documents, was any type of

17  distribution included?

18      A.   Apologies, what do you mean by "distribution"?

19      Q.   What you are saying here that you thought that

20  had occurred, the action the trustee took upon the death

21  of your father, in respect to the HH Master Settlement

22  Trust.  Was there any documents included in that

23  production that you received or you turned over to the

24  United States that would show and substantiate that that

25  occurred?

**EXHIBIT B**

1    A.   I do not believe so.  Within my knowledge of

2    this, I don't know of any specific document which would

3    reflect that.

4    Q.   **I'm going to show you -- I'm going to turn to**

5    **the next page, page 18, paragraph 3.  Do you know if**

6    **this section of the amended and restated November 13,**

7    **2006 trust HH Master Settlement occurred?**

8    A.   No, it did not because the trust has stayed

9    continued.

10   Q.   **And then until when did the trust estate**

11   **continue?**

12   A.   I am not certain, but I believe that the trust

13   estate still continues as of today.

14   Q.   **So the assets of the trust have not been fully**

15   **distributed after your father's death as of today; is**

16   **that your understanding?**

17   A.   No, I did not say that.  What I said is that I

18   believe that the trust still continues.  The trust

19   estate, to my knowledge, can distribute assets and

20   continue and it only terminates upon the final

21   distribution of all assets.

22   Q.   **What was the -- after your father's death, when**

23   **did the distribution of assets start?**

24   A.   I do not know exactly when the distribution of

25   assets started after my father passed.

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1      Q.    Roughly then?

2      A.    I don't know exactly.  It would have been --

3      Q.    It's been how many years since your father has

4    passed away?

5      A.    16 years.

6      Q.    Would it have been in the first half of that 16

7    years; would it have been in the second half of that

8    16 years?  When did it start?

9      A.    I would not know exactly when.

10          MS. PERCZECK:  What exhibit number was that?

11          MS. SOMBUNTHAM:  It was Exhibit Number 13 from

12      Government's exhibit, and it was pages 17 and 18.

13          MS. PERCZECK:  Thank you.

14          MS. SOMBUNTHAM:  No problem.

15    BY MS. SOMBUNTHAM:

16      Q.    Mr. Hernandez, earlier Ms. Moss asked you about

17    your bond hearing.  Do you recall that?

18      A.    Yes, I do.

19      Q.    And she asked you, and I think suggested that

20    certain assets were disclosed as part of your bond

21    hearing.  Do you recall that?

22      A.    Yes, I did.

23      Q.    And she mentioned that the Gramercy apartment

24    was disclosed to the Government during the bond hearing;

25    is that correct?

**EXHIBIT B**

1    A.   Yes, it is.

2    Q.   And you recall also that your current

3    residence, 597 Hibiscus Lane, was disclosed as well?

4    A.   Yes, it was.

5    Q.   And during that time period, what discussion,

6    if any, did you have with Olympia De Castro regarding

7    the property that were used to secure your bond?

8         MS. MOSS:  Objection.  Privilege.

9         MS. SOMBUNTHAM:  You opened the door to the

10        question.

11        MS. MOSS:  I am objecting to privilege.  I am

12        instructing Mr. Hernandez not to answer questions

13        about conversations with Ms. De Castro.

14   BY MS. SOMBUNTHAM:

15   Q.   What conversation did you have that related to

16   the substance that Ms. Moss questioned about in terms of

17   what was disclosed and not disclosed to the Government

18   regarding the property?

19        MS. MOSS:  Objection.  Mr. Hernandez, I am

20        instructing you not to answer any questions about

21        privileged conversations that you had with your wife.

22   BY MS. SOMBUNTHAM:

23   Q.   During the bond hearing -- you were present at

24   that hearing?

25   A.   Yes, I was present at the hearing.

**EXHIBIT B**

1    Q.    And your now ex-wife Olympia De Castro was also

2    present at the hearing?

3    A.    Yes, she was present.

4    Q.    And she was aware that you were going to be

5    putting up 597 Hibiscus Lane to secure your bond,

6    correct?

7         MS. MOSS:  Objection as to form, as to what she

8         may have been aware of.  He doesn't know what was in

9         her mind.

10   BY MS. SOMBUNTHAM:

11   Q.    Was 597 Hibiscus Lane discussed during the bond

12   hearing?

13   A.    Was it discussed by whom?  Sorry.

14   Q.    Was 597 discussed at all during the bond

15   hearing?

16   A.    Yes, I believe that there were references to

17   597 Hibiscus during the bond hearing.

18   Q.    And what were those references, do you recall?

19   A.    I was still detained at the FDC, and I believe

20   that the judge asked where I would reside and my

21   attorneys explained that I would reside at 597 Hibiscus.

22   That is my recollection.

23   Q.    That you recall that you pledged that property

24   as part of the bond?

25   A.    No, I do not recall.

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1      Q.    Do you recall any statements made about it

2  being pledged as part of your bond?

3      A.    That was quite an eventful day, so I cannot say

4  that I recall exactly about this.

5      Q.    At the time of your bond, were Ms. De Castro

6  and your children residing at 597 Hibiscus Lane?

7      A.    Yes, they were.

8           MS. MOSS:  Objection, relevance.  Beyond the

9      scope.

10  BY MS. SOMBUNTHAM:

11     Q.    After the time of the bond, were there any

12  plans from Ms. De Castro to move with the children from

13  Miami?

14           MS. MOSS:  Objection, calls for privileged

15      material.  I am instructing Mr. Hernandez not to

16      answer.

17           MS. SOMBUNTHAM:  I am going to show you what

18      was turned over and I will mark that as Government's

19      Exhibit 31.

20           (Government's Exhibit No. 31, E-mails:  Bates

21  ODC001909 - ODC 01911 was marked for identification.)

22  BY MS. SOMBUNTHAM:

23     Q.    And this is marked is Bates Stamp ODC001909

24  through ODC001911.  I'll read page 2 of this document,

25  and, Mr. Hernandez, do you recognize the name and e-mail

**EXHIBIT B**

 1  from the "from" category?

 2          MS. MOSS:  Are you going to be showing the

 3      document?

 4          MS. SOMBUNTHAM:  Oh, sorry.

 5  BY MS. SOMBUNTHAM:

 6      Q.   Same question:  Do you remember who is this

 7  being sent from?

 8      A.   I believe it is an exchange between my

 9  attorneys and Olympia dated May 16th, 2019.

10      Q.   And you ever seen this document before?

11      A.   No, I have not.

12      Q.   Were you ever aware about communications

13  between your now ex-wife and your attorney regarding any

14  of the bond -- any properties to pledged up for bond?

15      A.   I understood that my ex-wife had discussed with

16  my attorneys why I was detained at the FDC, which is

17  during the date of this e-mail.

18      Q.   And we are going to go to -- let me say,

19  halfway through this initial e-mail on May 16th, 2019,

20  where Olympia writes to your attorney "We can also

21  include the Miami property."  Do you know what -- which

22  property she is referring to?

23      A.   No, I do not.

24      Q.   Could it be any other property besides the 597

25  Hibiscus Lane property?

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    A.   I do not think so.

2    Q.   And then on the first couple paragraphs, she

3    talked about the New York property.  Do you know what

4    property she may be referring to there?

5    A.   The only property to my knowledge would be 3

6    Gramercy Park West.

7    Q.   And she writes there that "the trustee would be

8    filing a fiduciary to pledge assets or personally

9    guarantee whatsoever as it would not be considered in

10   the best interest of beneficiaries."  At the time of

11   this e-mail, May 16th, 2019, which trustee would she be

12   talking about?

13   A.   I do not know.

14   Q.   So in 2019, based on your understanding of the

15   documents and the estimate, was the property still held

16   by HH Master Settlement Trust or any of its successor

17   trusts?

18   A.   I believe so, but I am not certain.

19   Q.   It had not been transferred to the DC2019

20   Irrevocable Trust?

21   A.   I don't recall the exact dates.

22   Q.   And just for completeness, I'm going to scan to

23   the top, which is the other e-mail from Olympia, and

24   this is starting on the bottom of page 1 and just ask

25   you the same questions, on the bottom of page 1, she

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1   says "New York."  Is that referring to the 3 Gramercy

2   apartment that we have been discussing during this

3   deposition?

4       A.   I believe so.  I do not know of any other

5   property.

6       Q.   And then with respect to the Miami property,

7   she writes "I am uncertain if I want to cosign for this.

8   I will be filing for divorce next week and want to

9   consult with my divorce lawyer if I should even do

10  this."  Is that in respect to the 597 Hibiscus Lane or

11  another Miami property?

12      A.   I do not know.  I believe they were discussing

13  with my brother if they could use a property of theirs,

14  of my brother, but I am not certain.

15      Q.   Would Olympia De Castro be able to cosign for

16  your brother's property?

17      A.   No, she would not.

18      Q.   And so what properties would she be able to

19  cosign that she would be referencing here, as far as you

20  are aware?

21      A.   I do not know, she just says "Miami.  I am

22  uncertain if I even want to cosign for this," so this is

23  the first time I've seen this e-mail.

24      Q.   Could it be the 597 Hibiscus Lane property

25  then?

**EXHIBIT B**

1    A.   Yes, it could.

2    Q.   And then I want to go to last e-mail in this

3  e-mail chain from Olympia De Castro.  Do you see this

4  e-mail on the top of page 1 of this e-mail chain?

5    A.   Yes, I do.

6    Q.   And again, she references the New York

7  property.  Is that the Gramercy apartment, again?

8    A.   I believe so, yes.

9    Q.   And then the last sentence, she writes "I can

10  commit to keep the kids here during this process and you

11  can use that to build Gustavo's bond hearing."  Is that

12  what you see here, is that accurate?

13    A.   My children have been with me since I was

14  released from the FDC until today.

15    Q.   It was your understanding, and I might pull

16  Margot, as well as Howard, about privilege here because

17  of this e-mail, but is it your understanding through

18  your attorneys that your wife intended to keep the kids

19  in Miami pending your proceedings your parole

20  proceedings or part of your criminal case?

21        MS. MOSS:  Objection.  That calls for

22     privileged material from the attorneys and also from

23     the wife.

24  BY MS. SOMBUNTHAM:

25    Q.   Are you aware if your wife disclosed what her

**EXHIBIT B**

1    plans were about moving to your attorney?

2        A.   I apologize.  Am I aware that --

3        Q.   **Were you aware if your wife disclosed anything**

4    **to your attorney regarding your kids and their continued**

5    **presence and residence in Miami?**

6            MR. SREBNICK:  Nalina, this is Howard.  It

7        sound like the question calls for an answer either

8        from his attorney, which is privileged, or from his

9        wife, which is privileged.

10           MS. SOMBUNTHAM:  What I'm trying to get to is:

11       Is this statement true and accurate?  And what it

12       seems like here, was this was produced, obviously as

13       correspondence between Olympia and Mr. Hernandez's

14       attorneys.  I just want to verify this particular

15       statement.

16           MS. MOSS:  Mr. Hernandez has testified he never

17       seen this before.

18           MS. SOMBUNTHAM:  But did he learn of it through

19       his attorneys.

20           MS. MOSS:  That would be privileged

21       communication.

22           MS. SOMBUNTHAM:  I'm just thinking it through.

23   BY MS. MOSS:

24       Q.   **Is this statement consistent with your**

25   **understanding of your kids' situation at any time during**

**EXHIBIT B**

1   the time of your bond?

2        MR. SREBNICK:  Nalina, I still think the

3   responses call for revealing communications between

4   Gustavo and his then-wife or Gustavo and his

5   then-lawyer.

6        MS. SOMBUNTHAM:  I understand the issue, I

7   think the problem I have is with the shield aspect of

8   it, which is he can't hide behind privilege on the

9   one hand and then be sort of asking about -- the

10  issue is that he has disclosed prior that this wife

11  was intending to move, he disclosed this to his

12  probation officer in the initial report.  If I

13  remember correctly, he disclosed this to others.

14  It's not a secret whatsoever.

15       Last week we had a discussion and I think you

16  guys recall that I asked him what timeframe that

17  these discussions were being had about what happened

18  about the move.  This is a document that shows to

19  some extent when that would have been.  I am just

20  wondering if he knew about it at the time.  That's

21  what I'm trying to get to.

22       MR. SREBNICK:  Can you scroll to the top of the

23  document?

24       MS. SOMBUNTHAM:  I don't know if we can get a

25  stipulation or something to get around this, because

**EXHIBIT B**

 1     I don't want to ask him anything about conversations,

 2     I just want to stipulate to this part which is at

 3     this time, was this the plan or not.

 4         MR. SREBNICK:  Can you just pose the question

 5     so I can analyze it?  Your question is:  Is it

 6     correct that -- and what is it that you want to

 7     determine?

 8         MS. SOMBUNTHAM:  Is it correct at the time of

 9     his bond hearing, which is May 2019, that his kids

10     were going to continue to reside in Miami.

11         MR. SREBNICK:  Hold that thought.  I'm muting

12     you a second.

13         MS. SOMBUNTHAM:  Okay.

14         MR. SREBNICK:  Hang on, Nalina.  We will turn

15     off the camera for one second.

16         (Discussion off record.)

17         MR. SREBNICK:  This is Howard again.  Are you

18     all there?

19         MS. SOMBUNTHAM:  I'm here.

20         MR. SREBNICK:  So, Nalina, is the question:

21     Mr. Hernandez, was it your expectation at the time of

22     May of 2019 that your children would be remaining in

23     Miami for the immediate future pending the outcome of

24     your case?  Is that the question, Nalina?

25         MS. SOMBUNTHAM:  Yes.

**EXHIBIT B**

 1          MR. SREBNICK:  And your answer, Mr. Hernandez,

 2     is?

 3   BY MS. MOSS:

 4     A.   Yes.

 5     Q.   And currently, have your children left Miami?

 6     A.   No, they leave Sunday.

 7     Q.   And, Mr. Hernandez, how old are you children,

 8   again?

 9     A.   My oldest son GH is ten, my daughter FH is

10   eight, and my youngest son AH is six.

11     Q.   And did they contribute any funds to the

12   purchase of the Gramercy apartment?

13     A.   No, they did not.

14     Q.   Do they earn any income?  Have they ever earned

15   any income?

16     A.   No, they have not.

17     Q.   And I believe Ms. Moss asked you a while ago

18   about your unemployment; is that correct?

19     A.   Yes, that's correct.

20     Q.   And you testified you were not working for a

21   certain period of time; is that correct?

22     A.   Yes, that is correct.

23     Q.   And between which days were you not working?

24     A.   As of the date of my arrest onwards.

25     Q.   Does your involvement with the Bhakta entities

**EXHIBIT B**

1  or anything related to Raj Bhakta would not be

2  considered working?

3       A.   No, I would not consider that formal work, no.

4       Q.   **What would you consider "formal work"?**

5       A.   Being employed and earning a salary.

6       Q.   **So if you are your own business owner, you**

7  **would not consider that necessarily work?**

8       A.   Yes, self-employment I would consider work.

9       Q.   **So when you were establishing Drunken Meats,**

10 **was that considered work?**

11           MS. MOSS:  Objection.  This has nothing to do

12      with the 314 case position.

13 BY MS. SOMBUNTHAM:

14      Q.   **You may answer.**

15      A.   No, I would not consider that wrk.

16      Q.   **So it would not be self-employment?**

17           MS. MOSS:  Objection to relevance.  This has

18      nothing to do with the 314 Hicks position.

19 BY MS. SOMBUNTHAM:

20      Q.   **You may answer.**

21      A.   No, I do not believe so.

22      Q.   **And why don't you believe so?**

23           MS. MOSS:  Objection, relevance as to his whole

24      line of questioning.

25 BY MS. SOMBUNTHAM:

**EXHIBIT B**

1    Q.   Mr. Hernandez, you may answer.

2    A.   Because I do not consider it work.  I was

3  assisting a friend, multiple friends with multiple

4  matters.  I am not an expert in the business and was

5  helping out without any role or compensation, so I do

6  not consider it work.

7    Q.   With respect to Drunken Meats, who do you

8  consider the owner?

9    A.   Raj Bhakta.

10   Q.   And then there was a loan agreement between a

11 Raj Bhakta entity and other entity; is that correct?

12   A.   Yes, an entity owned by Raj Bhakta.

13   Q.   And with whom did Raj Bhakta contract with

14 respect to Drunken Meats?

15   A.   An entity that Raj owned, Charlemagne Kaiser.

16   Q.   Was there any other entity involved with

17 regarding Drunken Meats?

18   A.   Yes, there were multiple other entities.

19   Q.   Were any of those entities owned by Olympia De

20 Castro?

21   A.   No, they were not.

22   Q.   There were no entities that were created or had

23 bank accounts or anything else related to Olympia De

24 Castro?

25   A.   No, there were not.

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1     Q.    Does Olympia De Castro have any role in Drunken

2    Meats?

3     A.    Olympia De Castro serves as CFO for Bhakta

4    Farms and Bhakta Enterprises, and Drunken Meats is a

5    subsidiary of the Bhakta companies.  But no, she has not

6    had any specific role in regards to Drunken Meats.

7     Q.    And do you have a role at Drunken Meats?

8     A.    No, I do not.

9     Q.    Did you ever a role with Drunken Meats?

10     A.    I helped Raj set it up.  I never had a formal

11    role with the company.

12     Q.    And you didn't sign a guarantee with respect to

13    that company or any related company?

14     A.    I did sign a personal guarantee.

15     Q.    And what was that for?

16     A.    For a loan.

17     Q.    What was the loan for?

18     A.    Raj offered me a loan so I could invest in the

19    company.

20     Q.    And did you invest in the company?

21     A.    No, I did not.

22     Q.    Who did?

23     A.    Raj did.

24     Q.    And when did that occur?

25     A.    From 2018 onward.  I wouldn't recall the exact

**EXHIBIT B**

1    dates.

2        Q.   Why did you sign the guarantee?

3        A.   I signed the guarantee in anticipation to the

4    lien.

5        Q.   And when did you sign the guarantee?

6        A.   I do not recall the exact dates, but I believe

7    it was in 2021.

8        Q.   Did you have a role up until 2021 in Drunken

9    Meats?

10       A.   No, I did not have any formal role in Drunken

11   Meats.

12       Q.   As far as any informal role, did you take any

13   actions as supervisor?

14       A.   No, I did not.

15       Q.   Did you ever represent that you were a

16   supervisor?

17       A.   No, I did not.

18       Q.   How about for Bhakta Farms?

19       A.   No, I did not.

20       Q.   So as far as you're concerned, your

21   relationship with any of the Bhakta entities for the

22   last couple of years, was informal; is that your

23   characterization?

24       A.   Yes.

25            MS. SOMBUNTHAM:   Give me one second.

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    Thank you, Mr. Hernandez.  Those are all my

2    questions for today.

3         MR. SREBNICK:  Can we have a five- or

4    ten-minute bathroom break?

5         MS. SOMBUNTHAM:  Yes.

6         MR. SREBNICK:  Anyone else asking questions?

7         MR. RASCO:  I have some questions.

8         MR. SREBNICK:  And how long will you be.  More

9    than five or ten minutes?

10        MR. RASCO:  Yes.

11        (Discussion off record.)

12                  CROSS-EXAMINATION

13   BY MR. RASCO:

14   **Q.   Good morning, Mr. Hernandez.  My name is Guy**

15   **Rasco.  I represent Olympia De Castro regarding her**

16   **claim to $900,000 proceeds for the sale of a mobile home**

17   **park in Dania, and I'm going to ask you to shift gears**

18   **in your mind and I'm going to be asking you some**

19   **questions about those $900,000 proceeds.  Fair enough?**

20   A.   Yes, sir.

21   **Q.   Do you recall making an investment in Italian**

22   **Wine Merchants?**

23   A.   Yes.

24   **Q.   And I might refer to Italian Wine Merchants as**

25   **IWM.  Is that okay?**

**EXHIBIT B**

1      A.    Yes.

2      Q.    **How much money did you invest in IWM?**

3      A.    I believe it was $900,000.

4      Q.    **And approximately when did you make that**

5    **investment?**

6      A.    I believe it was 2008.

7      Q.    **Were there any other investors that joined you**

8    **in making that investment at the time?**

9      A.    Yes.

10      Q.    **Do you recall who they were?**

11      A.    Daniel Holtz, Jorge Mora, and Sergio Esposito.

12      Q.    **And type of business was IWM?**

13      A.    It is a wine merchant.

14      Q.    **Is it a retail shop?**

15      A.    Yes.

16      Q.    **Who ran the day-to-day business for IWM?**

17      A.    There was a team of individuals, the managing

18    partner was Sergio Esposito.  I don't recall the exact

19    names of all the other individuals.

20      Q.    **Were you an employee of IWM?**

21      A.    No, I was not.

22      Q.    **And was Danny Holtz or Jorge Mora an employee**

23    **of IWM?**

24      A.    No, they were not.

25      Q.    **And how would you characterize your investment**

**EXHIBIT B**

1    in IWM, it was passive?

2         MR. SREBNICK:  Objection to form.

3    BY MR. RASCO:

4    A.   My investment in IWM would be categorized as

5    passive, yes.

6    Q.   Did you ever get an opportunity to become an

7    owner of Domaine Select Wine & Spirts?

8    A.   Yes, I did.

9    Q.   And approximately when did that opportunity

10   come around?

11   A.   Some time in the latter part of 2013 or early

12   2014.

13   Q.   And what type of business was Domaine Select

14   Wine & Spirts in?

15   A.   The company is an importer and wholesaler of

16   wines and spirits.

17   Q.   And was IWM ever in the place of being an

18   importer or a wholesaler regarding alcoholic beverages?

19   A.   No, it was not.

20   Q.   Do you recall seeking legal advice on the issue

21   of becoming potentially an owner of Domaine?

22   A.   Yes, I do.

23        MR. RASCO:  Let me show you Exhibit 1, and I'm

24   going to show you -- have Virginia share the screens

25   so you can see it.

**EXHIBIT B**

1            (De Castro's Exhibit No. 1, Keven Danow Memo

2      2/21/14, was marked for identification.)

3      BY MR. RASCO

4          Q.    It is a memo February 21, 2014 to you from

5      Keven Danow.  Do you recall receiving this memo?

6          A.    Yes, I do.

7          Q.    And who is Keven Danow?

8          A.    A liquor attorney in New York.

9          Q.    Did you ever speak to Mr. Danow about this

10     memo?

11         A.    Yes, I believe I spoke with Mr. Danow about

12     this memo.

13         Q.    And do you recall the advice contained in this

14     memo from Mr. Danow?

15         A.    Yes, I believe Mr. Danow advised us that we

16     could not hold an interest in an alcohol beverage

17     retailer if we were to hold an interest in an alcohol

18     beverage importer and distributor.

19         Q.    And the issue that is addressed in this memo,

20     it goes by the name "tied-house laws."  Is that correct?

21         A.    Yes, I believe that that is correct.

22         Q.    Let me show you the second paragraph down

23     towards the bottom.  And it talks about there being

24     penalties.  Do you see that in the last sentence of the

25     second paragraph?  I'll read for you.  It says, "The

**EXHIBIT B**

1    penalties for these types of violations are serious and

2    may result in significant fines, suspension or

3    cancellation of the licenses."  Do you see that?

4        A.   Yes, I do.

5        Q.   And do you recall that Mr. Danow told you that

6    violation of tied-house laws were very serious and had

7    series consequences if they were violated?

8        A.   Yes, I recall.

9        Q.   Let me show you on page 3 of the memo about two

10   thirds of the way down.  There is a sentence, and I'm

11   going to read it.  And it says, "It is imperative that

12   all retail entities are separate from wholesale and

13   import entities.  There could be no ownership in

14   finances or management."  Do you see that?

15       A.   Yes, I do.

16       Q.   And did you take the advice of Mr. Danow?

17       A.   Yes, I believe that I did take the advice of

18   Mr. Danow.

19       Q.   Did you ever get any conflicting advice from

20   Mr. Danow or anybody else on this issue?

21       A.   No, I believe that I did not receive any

22   conflicting advice regarding this issue.

23       Q.   Did Mr. Danow ever tell you that the transfer

24   out of your interest in IWM did not have to be real?

25       A.   No, Mr. Danow never said that.

**EXHIBIT B**

1      Q.   Did Mr. Danow give you just the opposite

2   advice, Mr. Hernandez?

3      A.   Yes, Mr. Danow said that the transfer had to be

4   a real transfer.

5      Q.   Let me show you Exhibit 2.  This is another

6   memo from Keven Danow.  It's dated June 3rd, 2014.

7           Do you recall receiving this memo?

8      A.   Yes, I believe I do.

9           (De Castro's Exhibit No. 2, Keven Danow Memo

10   6/3/14, was marked for identification.)

11   BY MS. MOSS:

12      Q.   And on page 5 of the memo, there is a

13   recommendation, the top of page 5.  I'll read it to you.

14   It says, "I recommend that you transfer the interest in

15   Italian Wine Merchants to a trust."  Do you see that?

16      A.   Yes, I do.

17      Q.   Now, ultimately, do you recall if a trust was

18   used to make the transfer of your interest in IWM?

19      A.   No, I do not recall ever using a trust to

20   transfer my interest of IWM at the time.

21      Q.   Do you recall actually transferring your

22   interest in IWM?

23      A.   Yes, I recall transferring the interest in IWM.

24      Q.   And who did you transfer your interest to?

25      A.   I transferred my interest to my wife at the

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

time, Olympia De Castro.

Q.   Did Danny Holtz also transfer his interest in IWM?

A.   Yes, he did.

Q.   Who did he transfer his interest to?

A.   I believe he transferred his interest to his wife.

Q.   And his wife at the time was Toni Holtz; is that right?

A.   Yes, that that is correct.

Q.   And did Jorge Mora transfer his interest in IWM?

A.   Yes, he did.

Q.   Do you recall who he transferred his interest to?

A.   To his daughter and I believe under a trust.

Q.   Did you have any discussions with Mr. Holtz to the effect that the transfers made by you and him to your spouses at the time did not have to be real?

A.   No.

Q.   Did you have any such discussion with Jorge Mora?

A.   No.

Q.   And ultimately, did the three of you, in fact, make those transfers to your two spouses and in Jorge

**EXHIBIT B**

1    Mora's case, in trust for his daughter?

2        A.    Yes.

3        Q.    Let me show you the next exhibit, which is

4    Exhibit 3.  This is a document dated February 24, 2018.

5    It's a two-page document, and there is a discussion in

6    the middle of the document about permissions to make

7    transfer to a spouse or other immediate family member.

8    I don't know if you see that in the second full

9    paragraph.  Do you see that?

10       A.    Yes, I do.

11            (De Castro's Exhibit No. 3, Document:

12   Permissions to Transfer Interest to Spouse 2/24/2018 was

13   marked for identification.)

14   BY MR. RASCO:

15       Q.    And on page 2, there is a signature line for

16   you.  Do you recall signing this document?

17       A.    Yes, I believe so.

18       Q.    And do you recall that all the four people on

19   the document on page 2 signed it?

20       A.    Yes I believe so.

21       Q.    And did an attorney prepare this document, do

22   you recall?

23       A.    Yes, I believe so.

24       Q.    Was it Keven Danow or was there other counsel

25   involved for this document?

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1      A.   I do not recall which attorney drafted it.

2           MR. RASCO:  Let me show you the next exhibit

3      which is 4.

4           (De Castro's Exhibit No. 4, Joinder Agreement,

5      was marked for identification.)

6      BY MR. RASCO:

7      Q.   It's a joinder agreement.  It has the same

8      date, February 24, 2015.  Do you recall this document?

9      A.   Yes, I recall this document.

10     Q.   And on page 3, there is a signature line for

11     you.  Do you see that?  Let me show you that, scroll

12     down.

13     A.   Yes.

14     Q.   The copy I have is signed by Danny Holtz.  I

15     don't have a copy signed by you, but did you sign this

16     document?

17     A.   I believe I did.

18     Q.   And did all of the people whose signature

19     blocks also appear on page 3 also sign the document?

20     A.   I believe they did, yes.

21     Q.   Let me turn your attention to page 4.  On

22     page 4, there is an Exhibit A.  You could see the

23     transferor, and for you, Daniel Holtz and Jorge Mora,

24     the transferee is identical:  It's Solandera LLC.  Do

25     you see that?

**EXHIBIT B**

1    A.   Yes, I do.

2    Q.   And did the three of you, in fact, transfer

3  your interest to the entity, Solandera?

4    A.   Yes.

5    Q.   And who, then, where the members or owners of

6  Solandera.  Do you recall?

7    A.   Toni Holtz, Olympia De Castro, and the trust

8  for Jorge's daughter.

9    Q.   And did you ever have any ownership in

10  Solandera?

11    A.   No, I did not.

12    Q.   Let me show you the next exhibit, which is

13  Exhibit 5, also dated February 24, 2014.  It's

14  acknowledgement of termination of membership.  And

15  document five paragraphs down, the last line, the

16  transferor says "Each transferor shall cease to be a

17  member of the company effective upon the effective

18  date."

19        Do you recall this document?

20    A.   Yes, I believe I do.

21        (De Castro's Exhibit No. 5, Acknowledgement of

22  Termination of Membership, was marked for

23  identification.)

24  BY MS. MOSS:

25    Q.   Again, on page 3, there are several signature

**EXHIBIT B**

1    blocks.  You have Daniel Holtz' signature.  Do you

2    recall signing this?

3        A.   Yes, I recall.

4        Q.   And do you recall that all of the individuals

5    in this signature block on page 3 also signed the

6    document?

7        A.   Yes, I believe so.

8        Q.   Let me show you the next exhibit, also

9    February 24th, 2015.  Do you recall this document?

10       A.   Yes, I believe I do, yes.

11           (De Castro's Exhibit No. 6, Transfer Document,

12   was marked for identification.)

13   BY MR. RASCO:

14       Q.   On page 3, there is a line for your signature.

15   Do you recall signing this document?

16       A.   I believe so, yes.

17       Q.   And did all of the people whose signature

18   blocks appear on page 3 also sign it?

19       A.   I believe so, yes.

20       Q.   Let me refer you to page 4 of the exhibit.

21   This is actually in Exhibit 1 of -- to the exhibit

22   itself.  Do you see that?

23       A.   Yes, I do.

24       Q.   And do you recall that this is roughly an

25   accurate picture of what entities became owners after

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    the transfer that we have just been discussing?

2        A.   Yes, I believe it is accurate.

3        Q.   So as of the transfer date.  Is it true that

4    Solandera, the entity, would become the owner of

5    56.9 percent of IWM?

6        A.   Yes.

7        Q.   And the Esposito Trust would become the owner

8    of the other 43.1 percent; is that right?

9        A.   Yes.

10       Q.   And was Sergio Esposito the one who was

11   involved with the Sergio Esposito Trust?

12       A.   I believe, yes.

13       Q.   And did Sergio Esposito maintain the day-to-day

14   operations of IWM after the transfer from you to Olympia

15   De Castro or your interest?

16       A.   Yes, he did.

17            MR. RASCO:  Let me show you the next exhibit,

18       which is 7.

19            (De Castro's Exhibit No. 7, IWM Financial Log,

20   was marked for identification.)

21   BY MR. RASCO:

22       Q.   We are going way back in time now, and it is an

23   e-mail where you are listed as a recipient.  Maybe we

24   can scroll down and just show you the e-mail.  If you

25   want, you can read it.  Do you recall receiving this

**EXHIBIT B**

1    e-mail back in time, in 2008?

2        A.    I recall the subject matter.  I don't recall

3    the exact e-mail.

4        Q.    **The e-mail subject matter is concerning a**

5    **financial model for IWM; is that right?**

6        A.    Yes.

7        Q.    **Was a financial model prepared for IWM back in**

8    **the 2008 time period?**

9        A.    Yes, it was.

10       Q.    **Do you recall why?**

11       A.    Every business needs a proper financial model,

12   and when this investment was made, the company required

13   a financial model in order to organize its business plan

14   going forward.

15       Q.    **Do you recall who worked on the financial model**

16   **for IWM back in 2008?**

17       A.    Yes, there was a group on the IWM front, Sergio

18   and this team provided the data and the inputs, and the

19   modeling was done by a financial analyst that Olympia

20   had hired by the name of Ford Harrington, and I think

21   that there were multiple iterations, and Jorge, for the

22   most part was involved.  I personally was not actively

23   involved in the production of the model.

24       Q.    **Now, Olympia de Castro, do you see that she**

25   **shows up on this e-mail string?**

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    A.   Yes.

2    Q.   Was she involved in working on the financial

3    model for IWM in the 2008 timeframe.

4    A.   Yes, she was.

5    Q.   And do you recall what her involvement was?

6    A.   Well, that is what she did.  Olympia was -- she

7    basically was a financial modeling banker, and that was

8    her work, to produce financial models.  So they worked,

9    she worked with Ford to produce this model for IWM.

10   Q.   And do you recall there being a board of

11   directors or an advisory board of directors for IWM?

12   A.   Yes I recall a board of advisors for IWM.

13   Q.   Do you recall who was on that board in the 2008

14   timeframe?

15   A.   Yes, Sergio, Sergio Esposito, Danny Holtz,

16   Jorge Mora, Myself, the CFO at the time, I forget his

17   name, and the head of sales also participated.

18   Q.   Do you recall that the board for IWM discussed

19   the financial model back in the 2008 timeframe?

20   A.   I don't recall any specific discussion, but it

21   would be obvious that the board would address the

22   projections and the outputs of a model, but I don't

23   recall a specific discussion, no.

24   Q.   Now the transfer of your interest to Olympia De

25   Castro, do you remember that that occurred on June 10,

**EXHIBIT B**

1    2015?  Would that be roughly accurate?

2        A.    In 2015.  I don't remember the exact month and

3    date.

4        Q.    After the transfer from you to Olympia De

5    Castro, your interest in IWM, did you have any other

6    role with IWM in terms of being on the board or involved

7    with IWM's management?

8        A.    No.  We no longer had an IWM board as of the

9    transfer date.

10       Q.    Did you, as a board member of IWM, ever get

11   paid for being a board member prior to the transfer of

12   your interest to Olympia De Castro?

13       A.    Yes, I believe that there was some

14   compensation.  There was some board fees that were paid

15   at IWM, yes.

16       Q.    Did you receive any fees from IWM after you

17   made your transfer in 2015 to Olympia De Castro.

18       A.    No, I did not.

19       Q.    Did there ever come a time that Olympia De

20   Castro sold her interest in IWM?

21       A.    Yes.

22       Q.    And did that occur through the sale of the

23   Solandera LLC entity that we discussed?

24       A.    Yes.

25       Q.    And do you recall when that sale took place of

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    Solandera?

2        A.   I believe some time towards the latter part of

3    2016 or early 2017.

4        Q.   **Do you recall who was buying that interest?**

5        A.   Sergio Esposito, the managing partner.

6        Q.   **And do you recall the purchase price for that**

7    **interest?**

8        A.   I believe it was the same amount originally

9    invested.

10       Q.   **Would that be $900,000 for each of you, Danny**

11   **Holtz, and Jorge Mora with his trust for his daughter?**

12       A.   I believe so, yes.

13       Q.   **And do you recall who the closing agent was for**

14   **Solandera with respect to that sale?**

15       A.   Closing agent as in an escrow agent?

16       Q.   **Yeah, let's go with escrow agent.  Do you**

17   **recall who it was?**

18       A.   I think it was Walden Capital, but I am not

19   certain.

20       Q.   **And was Walden Capital an entity controlled by**

21   **Danny Holtz?**

22       A.   Yes.

23       Q.   **And did Toni Holtz and Jorge Mora's trust also**

24   **sell their interest in Solandera at the same time that**

25   **Olympia De Castro sold her interest?**

**EXHIBIT B**

1      A.   Yes.

2      Q.   So Mr. Sergio Esposito would have paid $2.7

3  million for their collective interest in Solandera, is

4  that right?

5      A.   Yes I believe so.

6      Q.   Now, at the time of the closing in late 2016 of

7  that sale, did Olympia de Castro receive any money?

8      A.   No, I do not believe so.

9      Q.   Did you receive any money in the late 2016 to

10  early 2017 time frame in connection with the timeframe?

11      A.   No, I did not receive any moneys.

12      Q.   Do you know if Toni Holtz received her share of

13  $900,000 from the sale?

14      A.   I do not know.

15      Q.   Do you know if Jorge Mora's daughter received

16  her share of the $900,000?

17      A.   I understand that she did.

18          MR. RASCO:   Let me show you the next exhibit,

19      which is Exhibit 8.

20          (De Castro's Exhibit No. 8, Holtz e-mail,

21  12/3/2017, was marked for identification.)

22  BY MR. RASCO:

23      Q.   This is an e-mail dated December 4th, 2017.  It

24  is from Danny Holtz to you.  Take a look at it, and it

25  starts down towards the bottom of the page.  It says,

**EXHIBIT B**

1   "Difficult to send, just returned to office and started

2   review of accounts, major F-up on my part."  Do you see

3   that?

4        A.   Yes, I do.

5        Q.   Do you recall receiving this e-mail from

6   Mr. Holtz?

7        A.   Yes, I do.

8        Q.   And is Mr. Holtz telling you that he has in

9   essence spent Olympia De Castro's $900,000 from the

10   sale?

11        A.   Yes.

12        Q.   Did Danny Holtz ever tell you what he or Walden

13   spent the $900,000 that was supposed to go to Olympia De

14   Castro on?

15            MR. PASTER:  Objection to form.

16   BY MR. RASCO:

17        Q.   You can answer.

18        A.   Danny never told me what he did with the

19   $900,000 due to Olympia.

20        Q.   Isn't it true that he did tell you that's he

21   spent that money?

22        A.   Yes, it is true that Danny told me he spent the

23   money.

24        Q.   Do you recall the sad time when you were

25   arrested in Italy when you were on vacation?

**EXHIBIT B**

1      A.    Yes, I do.

2      Q.    And was that approximately late July of 2018?

3      A.    July 25th, 2018.

4      Q.    And were you in Italy until approximately

5   May 21st, 2019?

6      A.    May 2nd, 2019.

7      Q.    And all those months you were in Italy; is that

8   right?

9      A.    Nine months and eight days.

10     Q.    Do you recall that while you were in Italy that

11  you were trying to engage defense counsel to represent

12  you in the criminal case?

13     A.    Yes.

14     Q.    Do you recall that in connection with that

15  effort, you needed to amass money to pay defense

16  counsel?

17     A.    Yes.

18     Q.    And do you recall e-mailing Danny Holtz while

19  you were in Italy to attempt to raise money for your

20  criminal defense?

21     A.    Yes.

22           MR. RASCO:  Let me show you the next exhibit,

23     which is nine.

24           (De Castro's Exhibit No. 9, E-mails 10/4/2018 -

25  11/27/2018, was marked for identification.)

**EXHIBIT B**

1    BY MR. RASCO:

2         Q.   And it is an e-mail string from October 14,

3    2018, to November 27, 2018.  It starts in reverse order,

4    and the first e-mail is October 14, 2018, that e-mail

5    starts on page 19.  Unfortunately this e-mail is skinny,

6    because that's the only way we could obtain it, but take

7    a look at e-mail, that October 4th, 2018, e-mail.  Can

8    you scroll the e-mail?  It starts in the middle of

9    page 9.

10             Now at the time of this e-mail were you still

11   in Italy?

12        A.   Yes.

13        Q.   Did Walden or Danny Holtz still owe the

14   $900,000 to Olympia De Castro?

15             MR. PASTER:  Objection, form.

16   BY MR. RASCO:

17        A.   Yes, Danny and Walden still owed the $900,000

18   to Olympia.

19        Q.   And do you recall that in this e-mail you were

20   attempting to get Walden or Danny Holtz to pay that

21   $900,000?

22        A.   Yes.

23        Q.   At the very end of the e-mail on page 12, there

24   is a statement that says, "Just to share with you my

25   burden, I need to wire $500,000 into Carlton Fields'

**EXHIBIT B**

1   escrow."  Do you recall that?

2        A.   Yes, I do.

3        Q.   And is that where Michael Pasano is a lawyer

4   at, Carlton Fields?

5        A.   Yes.

6        Q.   Also there is a reference on page 11 about

7   halfway down where you talk about Danny being in the

8   process of selling Dania and some assets.  Do you see

9   that?  Let's see if we can find that.  It's on page --

10  there, do you see it there?  And what are you referring

11  to when you say "selling Dania"?

12       A.   Danny had explained that he was selling a real

13  estate property he owned in Dania in order to pay

14  Olympia the $900,000 that he owed her from IWM.

15       Q.   And is that the same property that was

16  ultimately sold not too long ago, the Dania mobile home

17  park?

18       A.   I believe so, yes.

19       Q.   Also, on this same page, a little bit higher

20  up, on that same page in the e-mail, you say, "You told

21  me last year you needed time to pay me the 900,000 for

22  my share of the IWM monies you received."

23            Do you see that?

24       A.   Yes, I do.

25       Q.   Now, who was the owner of the $900,000?

**EXHIBIT B**

1     A.    Olympia De Castro.

2     Q.    And if Holtz or Walden had paid the $900,000

3  back in time when you were writing this e-mail, who

4  would be entitled to receive that $900,000?

5     A.    Olympia De Castro.

6     Q.    And if that money was paid by Danny Holtz or

7  Walden to Olympia De Castro, did you have any intention

8  to potentially ask her for that money to use for your

9  criminal defense?

10     A.    Yes.

11     Q.    But Holtz and Walden never paid that $900,000,

12  is that right, until very recently when the sale took

13  place?

14     A.    I believe that Holtz and Walden paid Olympia

15  some monies, but I do not know exactly how much.

16     Q.    But they did not pay the full monies, right?

17     A.    That's correct.

18     Q.    On the issue of partial payments, do you recall

19  approximately the amount of money that was paid to

20  Olympia De Castro?

21     A.    No, I do not, but I understand, it is a

22  marginal amount relative to the principal owed.

23     Q.    If I told you that the amount was $82,250 would

24  that sound right, to help refresh your recollection?

25     A.    I understand that it was 5 or 10 percent or so,

**EXHIBIT B**

1  so yes.

2      Q.   Do you recall when the partial payments from

3  Danny Holtz or Walden started occurring to Olympia De

4  Castro?

5      A.   No, I do not.  I was still held in Italy, I

6  don't recall the exact dates.

7      Q.   If I told you that April 5th, 2019, was the

8  first payment, would that help refresh your recollection

9  at all?

10      A.   I don't, I don't have any recollection as to

11  specific dates or payments.

12      Q.   Do you recall if these payments started when

13  you were still in Italy?

14      A.   I think they did, but I don't know.

15      Q.   And did those payments go to Olympia De Castro?

16      A.   Yes, the payments went to Olympia De Castro.

17      Q.   Did any of those payments from Danny Holtz or

18  Walden, or partial payments we have been discussing, go

19  to you?

20      A.   No.  No payments went to me.

21      Q.   And did those payments that went to Olympia De

22  Castro go to a bank account that she alone controlled?

23  Do you know?

24      A.   Yes, I believe so.  I did not have any account

25  with Olympia De Castro.

**EXHIBIT B**

1    Q.   Did you have any joint account with Olympia De

2    Castro back in time in the spring or summer of 2019

3    timeframe?

4    A.   No.

5    Q.   And again, just to be clear, did Danny Holtz or

6    Walden ever pay to you any portion of that $900,000 debt

7    owed to Olympia De Castro?

8    A.   No.

9    Q.   Do you recall that Olympia ultimately filed a

10   lawsuit in January of 2020 with respect to the $900,000?

11   A.   I recall the legal action.  I don't recall the

12   exact month.

13   Q.   But you recall that Olympia De Castro sued

14   Walden and Danny Holtz with respect to the $900,000?

15   A.   Yes, I do.

16   Q.   Do you recall that in connection with that

17   suit, Danny Holtz had some affirmative defenses in the

18   case?

19   A.   Yes, I do.

20   Q.   Do you recall that one of the affirmative

21   defenses of Danny Holtz was that the $900,000 did not

22   belong to Olympia, but rather it belonged to you?

23   A.   Yes, I do.

24   Q.   Is that true?

25   A.   No, it is not.

**EXHIBIT B**

1   Q.   Who is the owner of the $900,000?

2   A.   Olympia De Castro.

3   Q.   Do you recall that Danny Holtz and Walden had

4   another affirmative defense in that civil lawsuit that

5   the transfer of your interest in IWM to Olympia De

6   Castro was fraudulent and to disguise ownership?

7   A.   Yes, I do.

8   Q.   Is that true?

9   A.   No.

10  Q.   Did you commit fraud in transferring your

11  interest to Olympia De Castro for IWM?

12  A.   No, I did not.

13  Q.   Did you follow the advice of Keven Danow in

14  transferring your interest in IWM to Olympia De Castro?

15  A.   Yes, I believe that we followed the advice of

16  liquor law counsel as Mr. Danow in the transfer of the

17  IWM interest.

18  Q.   Who is the owner of the $900,000 plus interest?

19  A.   Olympia De Castro.

20  Q.   If Olympia de Castro were to recover in this

21  forfeiture proceeding any of the $900,000, do you have

22  any expectation to get any of that money?

23  A.   Absolutely not.

24  Q.   Do I have any ownership of any kind or any

25  expectation to the $900,000 plus interest?

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1      A.   No.

2           MR. RASCO:   No further questions.

3           MR. PASTER:   We are going to have some

4      questions, but let's take a ten-minute break.   It'll

5      significantly shorten the amount of time we need.

6                     DIRECT EXAMINATION

7  BY MR. PASTER:

8      Q.   Good afternoon, Mr. Hernandez.   My name is

9  Joshua Paster.   Let me know if you don't hear my

10 question or if you just don't understand my questions.

11     A.   Thank you.

12     Q.   Earlier, Mr. Rasco had shown you a memo from

13 Keven Danow.   Do you remember that?

14     A.   Yes, I did.

15     Q.   And can you see the memo on your screen?

16     A.   I do.

17     Q.   For the record, this is De Castro Exhibit 1.

18 And Mr. Rasco pointed you specifically to the penalties

19 for violation of tied-house laws.   Do you recall that?

20     A.   Yes, I do.

21     Q.   Do you know what the penalty is for federal

22 money laundering?

23     A.   No, I do not.

24     Q.   Mr. Rasco also showed you an e-mail concerning

25 an IWM financial log that was Exhibit 7.   Do you recall

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    that?

2         A.    Yes, I do.

3         Q.    **And can you seen Exhibit 7 up on your screen?**

4         A.    I see an e-mail exchange.

5         Q.    **Can you see what this is regarding?**

6         A.    Yes, I see the subject line.

7         Q.    **And this is concerning IWM's financial model?**

8         A.    Yes.

9         Q.    **Can you explain again why Jorge Mora asked**

10   **Olympia to go over the financial model with him?**

11        A.    Well, that is what Olympia did.  She was a

12   banker that produced financial models.

13        Q.    **So when you say a banker that produced**

14   **financial models, what sort of expertise goes into that?**

15        A.    She worked at Goldman Sachs in the investment

16   banking division producing financial models for other

17   lines.

18        Q.    **Would you consider her financially savvy?**

19        A.    I believe that Olympia is an expert in

20   financial modeling.

21        Q.    **Do you consider Olympia financially savvy?**

22        A.    I consider her an expert in financial modeling

23   matters, yes.

24        Q.    **Do you consider what Olympia did here, working**

25   **on this financial model, to be work under the definition**

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    you provided earlier in this deposition?

2             MR. RASCO:  Objection, relevance.

3             You can answer.

4             THE WITNESS:  Can you please repeat to

5        understand properly?

6    BY MR. PASTER:

7        Q.   Sure.  Earlier in your deposition, you -- there

8    was some questions about what you consider to be the

9    definition of "work."  Do you recall that?

10       A.   Yes, I do.

11       Q.   Under your definition of work, is what Olympia

12   De Castro did in 2008 concerning the IWM financial model

13   considered work?

14            MR. RASCO:  Objection, relevance.

15   BY MR. PASTER:

16       A.   If the question is was she employed by IWM, no,

17   I do not think, at least to my recollection, that

18   Olympia was ever employed by IWM.

19       Q.   I didn't ask whether she was employed by IWM.

20   My question is under your definition of work, which you

21   provided earlier during your deposition, is what Olympia

22   did for IWM's financial model "work"?

23            MR. RASCO:  Objection, relevance.

24   BY MR. PASTER:

25       A.   I believe I said that I did not consider it

**EXHIBIT B**

1    formal work, the lack of employment or compensation.  To

2    my recollection, Olympia was never compensated by IWM

3    and I do not believe, I may be wrong, but I do not

4    believe that she was engaged by IWM formally.  Again, I

5    may be wrong, that's is my recollection.

6        Q.   **That helps a little bit, but my question is**

7    **under your definition of "work," was this "work"?**

8            MR. RASCO:  Objection, relevance, form.

9    BY MR. PASTER:

10       A.   I'll attempt to elaborate once more.  The

11   categorization I provided with regards to work in my

12   opinion is a formal engagement and the compensation for

13   the engagement.  So if you're asking if Olympia was

14   engaged by IWM and did he receive a payment, my belief

15   is no, but I am not certain.

16       Q.   **So then your answer is no, this was not work?**

17       A.   Again, I want to be clear.  What I am saying is

18   that I do not believe that Olympia was compensated for

19   producing the IWM financial model and I not recall her

20   being engaged to produce the IWM financial model, but I

21   may be wrong.

22       Q.   **So under your definition, if she wasn't paid,**

23   **she wasn't doing, quote, "work"?**

24           MR. RASCO:  Objection.

25   BY MR. PASTER:

**EXHIBIT B**

1    A.   I reiterate, she, to my knowledge, was not

2    engaged by IWM and to my knowledge did not receive a

3    payment from IWM to produce the IWM financial model, but

4    I may be wrong.

5         **Q.   Now it also appears that this gentleman Ford**

6    **Harrington was also working on the financial model for**

7    **IWM; is that correct?**

8         A.   Yes, I believe that is correct.

9         **Q.   Did Ford obtain any sort of membership interest**

10   **in IWM for making a financial model for IWM?**

11        A.   I believe Ford had been -- I am not certain if

12   Ford was part of the equity option package for IWM.  He

13   worked for IWM in the holdings for a number of years.

14   He may have received equity in the company, I don't

15   recall.

16        **Q.   That is not my question.  My question is by**

17   **preparing this finance model, did that provide him with**

18   **equity in IWM?**

19        A.   By preparing there financial model, will that

20   grant him equity?

21        **Q.   Yeah.**

22        A.   No, he was an employee of the company and as

23   such received a compensation, and I believe he may have

24   had equity, but I am not certain.

25        **Q.   At some point Solandera became owner of an**

**EXHIBIT B**

1    interest in IWM; is that right?

2        A.   Yes, that's correct.

3        Q.   And then at some point Solandera sold that

4    interest back to IWM?

5        A.   I believe it was sold back to IWM.

6        Q.   Who was it sold to?

7        A.   My understanding is that it was sold to Sergio

8    Esposito, the managing partner of IWM.

9        Q.   Okay.  During that sale either to IWM or

10   Esposito, was Olympia De Castro involved in the sale at

11   all?

12            MR. RASCO:  Objection to the form.

13   BY MR. PASTER:

14       A.   Involved in what capacity.

15       Q.   Negotiating the sale?

16       A.   I do not recall who negotiated the sale.  I do

17   not know if Olympia participated.

18       Q.   If she was, would she be included in the

19   e-mails?

20            MR. RASCO:  Objection, form.

21   BY MR. PASTER:

22       A.   What e-mail?

23       Q.   During the time of the sale, there were several

24   e-mails going back and forth showing negotiations of

25   various terms and conditions.  If Olympia De Castro were

**EXHIBIT B**

1  involved in those negotiations, would she be included in

2  those e-mails?

3           MR. RASCO:  Objection to the form.

4  BY MR. PASTER:

5      A.   Sorry, I don't know what e-mails you are

6  alluding to, but I presume that there were multiple

7  individuals that took part of the discussion for the

8  sale of the Solandera interest.

9      Q.   Were you involved?

10     A.   Yes, I was involved in the exchanges with Keven

11 Danow and the attorneys for Solandera.  I recall being

12 involved in the e-mail exchanges, yes.

13     Q.   Mr. Rasco also showed you in Exhibit 8 an

14 e-mail exchange between you and Daniel Holtz.  It looks

15 like it was in December of 2017.  I am showing you that

16 exhibit on the screen right now.  Do you see that?

17     A.   Yes, I see that.

18     Q.   And if you look above, it's just a disclaimer,

19 do you see that?

20     A.   Yes.

21     Q.   So I'm going to scroll down to get that off the

22 screen, and then after you look at this page, I'll

23 scroll to the next.  But can you showm, e where on this

24 exhibit Olympia was mentioned at all?  I'll highlight

25 this one e-mail, so I can scroll to the next page.  Is

**EXHIBIT B**

1    she mentioned in the highlighted portion of your e-mail

2    sent December 4th, 2017 at 4:44 p.m.?

3        A.   No, she is not.

4        Q.   **Can you see Daniel Holtz's full e-mail at all?**

5        A.   Yes, I do.

6        Q.   **Is Olympia mentioned at all that e-mail?**

7        A.   Danny's, e-mail, the December 4th e-mail?

8        Q.   **Yes, is Olympia mentioned in that e-mail?**

9        A.   No, Danny does not mention Olympia in his

10   e-mail.

11       Q.   **Going now to De Castro Exhibit 9, this is the**

12   **lengthy e-mail chain between you and Danny Holtz.  Do**

13   **you remember this exhibit?**

14       A.   If you could please scroll down a little bit.

15       Q.   **This is the bottom, here is the first e-mail,**

16   **October 4th, 2018, that you sent.**

17       A.   Yes, I see the e-mail.

18       Q.   **In this entire exchange between you and Danny**

19   **Holtz, I think you mentioned Olympia twice, once to note**

20   **that you have had to work less to spend more time with**

21   **her, and two to note that she was coming to visit you in**

22   **Italy.  And I don't know if you have the paper version**

23   **of this document in front of you, but other than those**

24   **two mentions of Olympia, is she otherwise mentioned at**

25   **all in this e-mail chain?**

**EXHIBIT B**

 1          MR. RASCO:  Objection, form.

 2     BY MR. PASTER:

 3        A.   I don't see the entire thread, but if you say

 4     that she is mentioned twice, she is mentioned twice.

 5        **Q.   Do you have a paper copy that you can look**

 6     **through?**

 7        A.   No, I do not have a paper copy of any exhibits.

 8        **Q.   Mr. Rasco also asked you about a lawsuit that**

 9     **Olympia De Castro had filed against Danny Holtz, do you**

10     **recall that?**

11        A.   Yes, I do.

12        **Q.   Do you have any role in that lawsuit?**

13        A.   With "role," can you please explain.

14        **Q.   Did you do anything with regards to that**

15     **lawsuit?**

16          MR. RASCO:  I am going to assert a

17          joint-defense work-product attorney-client objection.

18          To the extent that those privileges are violated, I

19          would instruct the witness not to answer if he could

20          answer without invading those ridges, then he could

21          answer.

22          MR. PASTER:  It is a yes or no question if he

23          had a role.

24     BY MR. PASTER:

25        A.   I introduced Guy to Olympia.

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1    Q.   And how did you meet Guy?

2    A.   Through my attorneys.

3    Q.   Through your criminal defense attorneys?

4    A.   Yes.

5    Q.   Did you retain Mr. Rasco?

6    A.   No.

7    Q.   Did you retain Mr. Rasco on Olympia's behalf?

8    A.   No.

9    Q.   I am showing what I will show Government's

10   Exhibit 1, or I guess it is 32, continuing from Nalina's

11   exhibits earlier.  Can you see this document?

12   A.   Yes.

13        (Government's Exhibit No. 32, Rasco E-mail, was

14   marked for identification.)

15   BY MR. PASTER:

16   Q.   And do you see what is dated?

17   A.   Yes.

18   Q.   When it is dated?

19   A.   December 27th, 2019.

20   Q.   And can you see who this e-mail is from?

21   A.   Yes.

22   Q.   Who is it from?

23   A.   Guy Rasco.

24   Q.   And who is this addressed to?

25   A.   Olympia De Castro.

**EXHIBIT B**

1    Q.    In care of who?

2    A.    Gustavo Hernandez.

3    Q.    Is that you?

4    A.    Yes.

5    Q.    Is that your e-mail?

6    A.    Yes.

7    Q.    Why were you e-mailed?

8    A.    I presume Guy e-mailed me as a courtesy since I

9    had been introduced to him by my attorneys.

10    Q.    It is care of you, right, it is not CC'ing you?

11    A.    I don't know, Mr. Rasco can probably address

12    the question as to why he sent me the e-mail.  I don't

13    know.

14    Q.    Do you know if Guy had Olympia's e-mail?

15    A.    I presume.  I don't know.

16    Q.    Did you pay Olympia's legal fees?

17    A.    No, I did not.

18    Q.    So where Mr. Rasco here talks about a rate of

19    $450 an hour, did you pay any of that?

20    A.    No, I did not.

21    Q.    Do you know if Mr. Rasco does not get paid

22    whether you are liable for any outstanding fees?

23         MR. RASCO:  Objection no.

24    BY MR. PASTER:

25    A.    To my knowledge, I am not liable for any fees.

**EXHIBIT B**

1    Q.   And Mr. Rasco also required a $15,000 retainer

2    to undertake that representation.   Did you pay that

3    $15,000 retainer?

4    A.   No, I did not.

5    Q.   Without divulging the nature of any

6    communications, other than this letter, did you

7    communicate with Mr. Rasco about the lawsuit against

8    Danny Holtz?

9    A.   Guy asked me for information related to --

10       MR. RASCO:  Objection.  Objection.  He was

11   asking a yes or no question and he was asking you not

12   to invade any privilege.  You can give a yes or no

13   answer, but would you were just answering I would

14   object to because that is an invasion of the

15   work-product attorney-client joint-defense

16   privileges.

17       THE WITNESS:  Apologies.

18       MR. SREBNICK:  What is the pending question?

19       MR. PASTER:  Whether they had discussions

20   concerning the lawsuit against Danny Holtz.

21       MR. SREBNICK:  Who is "they."

22       MR. PASTER:  Mr. Hernandez and Guy Rasco match.

23       MR. SREBNICK:  So you heard the objection.  The

24   objection is joint-defense and so Guy Rasco --

25       MR. RASCO:  I'm sorry, Howard, but it is a yes

**EXHIBIT B**

1    or no, then I don't believe that violates the

2    privilege, if he could answer yes or no without

3    invading the privilege.  If you believe that invades

4    the privilege, I would support your objection on that

5    as well.

6         MR. PASTER:  The "yes" or "no" is the

7    equivalent of a privileged log, which obviously

8    discloses the existence of communications with enough

9    explanation such that we could presume whether we

10   believe it is or is not privileged.  So the same

11   information that you would provide in a privileged

12   log is all we are asking about.

13        MR. SREBNICK:  So can you start the question

14   again and avoid using prepositions so we know exactly

15   your intentions?

16   BY MR. PASTER:

17        **Q.   Mr. Hernandez, over the course of the lawsuit**

18   **between Olympia De Castro and Danny Holtz, did you have**

19   **any conversations with Mr. Rasco concerning that**

20   **lawsuit, without divulging the nature or substance of**

21   **those communications?**

22        MR. SREBNICK:  The question is did you have any

23   conversations without discussing the contents.

24   BY MR. PASTER:

25        A.   Yes.

**EXHIBIT B**

 1      Q.   Did you ever sign an engagement letter with

 2   Mr. Rasco?

 3      A.   No.

 4      Q.   Is Mr. Rasco your attorney?

 5      A.   No.

 6      Q.   Did you provide documents to Mr. Rasco?

 7      A.   Yes.

 8      Q.   Earlier I believe you testified that you had

 9   invested $900,000 into IWM; is that right?

10      A.   Yes.

11      Q.   What was the source of those funds?

12      A.   Personal investments.  I don't recall exactly.

13      Q.   Did you contribute through any other entities?

14      A.   Sorry, what exactly did you mean "did you

15   contribute through any other entities"?

16      Q.   Sure, did you contribute the $900,000 into IWM

17   from your personal account?

18      A.   Yes, I invested personally and held the

19   interest personally.

20      Q.   Did you make any contributions to that $900,000

21   also from a trust?

22      A.   No, I do not think so.

23      Q.   Did you also contribute to any of that $900,000

24   through any LLC?

25      A.   No, I do not think so.

**EXHIBIT B**

1      Q.   Did you contribute any of that $900,000 through

2   Global Securities?

3      A.   No, I contributed personally.

4      Q.   Mr. Hernandez, in your divorce, did you obtain

5   any interest in the $900,000 as part of equitable

6   distribution?

7      A.   No, I do not think so.

8      Q.   You didn't get any interest in the assets as

9   part of your divorce?

10      A.   No, I do not think so.

11      Q.   There's no equitable distribution as part of

12   that $900,000?

13          MR. SREBNICK:  Objection, call for a legal

14      conclusion.

15          MR. RASCO:  And asked and answered, joining the

16      objection.

17   By MR. PASTER:

18      Q.   You can answer.

19      A.   No, I do not think so.

20      Q.   You didn't get any equitable distribution in

21   the $900,000 even though you personally made the initial

22   $900,000 investment?

23          MR. SREBNICK:  Same objection.

24          MR. RASCO:  Same objection.

25   BY MS. MOSS:

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

1      A.   No.

2      Q.   Did you speak with Mr. Rasco in advance of

3   today's deposition?

4      A.   No, I did not.

5      Q.   You didn't speak with him between last week,

6   the first part of the deposition and today?

7      A.   No, I have not spoken with Mr. Rasco.

8      Q.   Did you speak with Olympia De Castro about

9   today's deposition?

10      A.   No, I did not.

11      Q.   Did you speak with Jorge Mora about today's

12   deposition?

13      A.   No, I did not.

14      MR. PASTER:  I think I am done if you give me

15   two minutes to review my notes.

16      (Discussion off record.)

17      MR. PASTER:  I have no further question at this

18   time.

19      MR. RASCO:  I have nothing further.  Okay.

20   Thank you very much.

21      (The deposition was concluded at 12:53 p.m.)

22

23

24

25

**EXHIBIT B**

CERTIFICATE OF OATH

1

2   STATE OF FLORIDA
    COUNTY OF MIAMI DADE

3

4          I, Jared Orozco, Court Reporter, Notary Public,

5   State of Florida, certify that Gustavo Adolfo Hernandez

6   Frieri personally appeared before me on 26th of

7   July, 2021, and was duly sworn.

8          Signed this 10th Day of August, 2021.

9

10

11   _____

12

13   Jared Orozco
     Court Reporter
     Notary Public, State of Florida
14   My Commission # GG963786
     Expires:  June 26, 2024

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT B**

```
 1                    CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA      )
      COUNTY OF MIAMI DADE )
 3

 4            I, Jared Orozco, Notary Public in and for the
      State of Florida at large, do hereby certify that I was
      authorized to and did stenographically report the
 5    deposition of Gustavo Adolfo Hernandez Frieri; that a
      review of the transcript was not requested; and that the
 6    foregoing transcript, pages 1 through 273, is a true
      record of my stenographic notes.
 7

 8            I FURTHER CERTIFY that I am not a relative,
      employee, or attorney, or counsel of any of the parties,
      nor am I a relative or employee of any of the parties'
 9    attorney or counsel connected with the action, nor am I
      financially interested in the action.
10

11            DATED this 26th day of July, 2021, at Fort
      Lauderdale, Broward County, Florida.
12

13                    Jared Orozco

14    _____
                      Jared Orozco
                      Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT B**

### WORD INDEX

**< $ >**
**$15,000** 268:*1, 3*
**$2.7** 248:*2*
**$2.9** 183:*1* 209:*1*
**$450** 267:*19*
**$500,000** 251:*25*
**$7,000** 208:*22*
**$82,250** 253:*23*
**$900,000** 232:*16, 19*
233:*3* 247:*10* 248:*13,
16* 249:*9, 13, 19*
251:*14, 17, 21* 252:*14,
25* 253:*2, 4, 11* 255:*6,
10, 14, 21* 256:*1, 18,
21, 25* 270:*9, 16, 20,
23* 271:*1, 5, 12, 21, 22*

**< 0 >**
**01911** 180:*10* 219:*21*

**< 1 >**
**1** 179:*3, 8, 18* 180:*13*
221:*24, 25* 223:*4*
234:*23* 235:*1* 242:*21*
257:*17* 266:*10* 274:*6*
**10** 245:*25* 253:*25*
**10/4/2018** 180:*18*
250:*24*
**10th** 211:*1* 273:*8*
**11** 188:*15* 252:*6*
**11/27/2018** 180:*18*
250:*25*
**110** 177:*23*
**12** 251:*23*
**12/3/2017** 180:*18*
248:*21*
**12:53** 177:*18* 272:*21*
**13** 180:*8* 188:*18*
211:*3, 5, 10* 213:*23*
215:*6* 216:*11*
**1300** 178:*20*
**13th** 211:*19* 212:*2, 8*
**14** 251:*2, 4*
**1400** 178:*14* 179:*13*
**16** 216:*5, 6, 8*
**16th** 220:*9, 19*
221:*11*

**17** 212:*7, 9* 213:*23*
216:*12*
**1700** 177:*23*
**17th** 186:*15* 210:*8*
**18** 215:*5* 216:*12*
**181** 180:*2*
**18-CR-20685-
WILLIAMS/TORRES**
177:*2*
**19** 251:*5*
**1st** 211:*17, 23*

**< 2 >**
**2** 180:*14* 208:*6*
212:*16* 213:*22*
219:*24* 237:*5, 9*
239:*15, 19*
**2/21/14** 180:*13* 235:*2*
**2/24/2018** 180:*15*
239:*12*
**20005** 178:*14*
**2002** 185:*20* 201:*11,
12*
**2003** 201:*25*
**2004** 181:*22* 185:*23*
186:*2, 3* 201:*18*
202:*5* 208:*12, 16*
211:*17, 18, 23* 212:*5,
6*
**2005** 181:*23* 185:*25*
186:*9, 12, 22* 188:*11,
22* 189:*1, 21* 201:*19*
**2006** 186:*16* 192:*13,
17, 19* 210:*8, 9, 11*
211:*20, 24* 212:*2, 8*
215:*7*
**2007** 192:*20* 210:*20*
**2008** 233:*6* 244:*1, 8,
16* 245:*3, 13, 19*
259:*12*
**201** 178:*19*
**2011** 210:*22*
**2013** 234:*11*
**2014** 234:*12* 235:*4*
237:*6* 241:*13*
**2015** 211:*1* 240:*8*
242:*9* 246:*1, 2, 17*
**2016** 188:*16* 247:*3*
248:*6, 9*

**2017** 247:*3* 248:*10,
23* 263:*15* 264:*2*
**2018** 230:*25* 239:*4*
250:*2, 3* 251:*3, 4, 7*
264:*16*
**2019** 190:*8* 191:*25*
204:*16* 220:*9, 19*
221:*11, 14* 226:*9, 22*
250:*5, 6* 254:*7* 255:*2*
266:*19*
**2020** 197:*22* 198:*6*
255:*10*
**2021** 177:*16* 231:*7, 8*
273:*7, 8* 274:*9*
**202-353-9370** 178:*15*
**2024** 273:*14*
**209** 180:*3*
**21** 235:*4*
**211** 180:*8*
**219** 180:*10*
**21st** 250:*5*
**232** 180:*3*
**235** 180:*13*
**237** 180:*14*
**239** 180:*14*
**24** 239:*4* 240:*8*
241:*13*
**240** 180:*15*
**241** 180:*16*
**242** 180:*17*
**243** 180:*17*
**248** 180:*18*
**24th** 242:*9*
**250** 180:*18*
**257** 180:*4*
**25th** 250:*3*
**26** 273:*14*
**2600** 179:*3*
**266** 180:*10*
**26th** 177:*16* 273:*6*
274:*9*
**27** 251:*3*
**273** 180:*4* 274:*6*
**274** 180:*5*
**27th** 266:*19*
**2800** 179:*13*
**2nd** 250:*6*

**< 3 >**

**3** 179:*21* 180:*14*
181:*17* 182:*9, 23*
183:*7, 18, 20, 22*
186:*12* 187:*7, 10, 11*
188:*10, 22* 189:*4, 7, 9,
11, 16, 18, 21* 190:*3,
11, 14* 191:*6, 24*
192:*3* 196:*16* 199:*5,
7* 200:*20, 23* 201:*2, 5*
207:*23* 209:*2* 215:*5*
221:*5* 222:*1* 236:*9*
239:*4, 11* 240:*10, 19*
241:*25* 242:*5, 14, 18*
**305-358-1064** 179:*4*
**305-371-6421** 178:*21*
**305-374-8200** 179:*14*
**305-379-6667** 179:*9*
**305-536-1191** 179:*19*
**305-961-9224** 178:*5*
**305-961-9342** 178:*10*
**31** 180:*10* 219:*19, 20*
**314** 179:*10* 194:*5, 7,
10, 15, 18, 21, 24*
195:*1, 3, 6, 10, 13, 16,
21, 25* 196:*2, 5, 10, 12*
197:*23* 198:*25* 206:*5,
13, 15, 17, 20, 22*
228:*12, 18*
**31st** 210:*22*
**32** 180:*10* 266:*10, 13*
**33128** 179:*18*
**33128-1838** 179:*9*
**33131-1715** 179:*4*
**33131-4311** 178:*20*
**33132** 178:*5, 9*
**33134-6921** 179:*14*
**33301** 177:*23*
**3rd** 179:*3, 8* 237:*6*

**< 4 >**
**4** 180:*15* 240:*3, 4, 21,
22* 242:*20*
**4:44** 264:*2*
**40** 179:*8, 17*
**43.1** 243:*8*
**4th** 178:*4, 9* 248:*23*
251:*7* 264:*2, 7, 16*

**< 5 >**

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

**5** 180:*16*  237:*12, 13*
241:*13, 21*  253:*25*
**50** 213:*17*
**56.9** 243:*5*
**597** 217:*3*  218:*5, 11,
14, 17, 21*  219:*6*
220:*24*  222:*10, 24*
**5th** 254:*7*

**< 6 >**
**6** 180:*17*  207:*24*
242:*11*
**6/3/14** 180:*14*  237:*10*
**6th** 177:*23*

**< 7 >**
**7** 180:*17*  243:*18, 19*
257:*25*  258:*3*
**7th** 178:*4*

**< 8 >**
**8** 180:*18*  248:*19, 20*
263:*13*

**< 9 >**
**9** 180:*18*  250:*24*
251:*9*  264:*11*
**9:30** 177:*17*
**9:36** 177:*17*
**900,000** 252:*21*
**954)241-1010** 177:*24*
**956-03-973-03** 180:*9*
211:*7*
**99** 178:*4, 9*

**< A >**
**a.m** 177:*17*
**able** 222:*15, 18*
**about** 181:*16*  187:*7*
189:*3*  190:*16*  191:*16,
23, 24*  193:*16*  194:*5,
7*  197:*21, 22*  199:*3*
200:*19*  201:*7*  202:*23*
203:*17, 19*  204:*7, 10,
25*  207:*25*  208:*2, 14*
209:*20, 21*  213:*23*
216:*16*  217:*13, 16, 20*
219:*1, 4*  220:*12*
221:*3, 12*  223:*16*
224:*1*  225:*9, 17, 18,

20*  226:*1*  227:*18*
231:*18*  232:*19*  235:*9,
11, 23*  236:*9*  239:*6*
252:*6, 7*  259:*8*  265:*8*
267:*18*  268:*7*  269:*12*
272:*8, 11*
**above** 183:*22*  263:*18*
**Abraham** 188:*13*
**Absolutely** 197:*11, 16*
198:*24*  256:*23*
**accordance** 213:*19*
**according** 214:*6*
**account** 182:*6*
254:*22, 24*  255:*1*
270:*17*
**accounts** 183:*5*
208:*7, 21*  229:*23*
249:*2*
**accumulated** 213:*16*
**accurate** 185:*6*
203:*12*  208:*22, 25*
213:*5*  223:*12*  224:*11*
242:*25*  243:*2*  246:*1*
**Acknowledgement**
180:*16*  241:*14, 21*
**acquisition** 208:*8*
**action** 214:*20*
255:*11*  274:*9*
**actions** 231:*13*
**actively** 244:*22*
**actually** 203:*18*
204:*25*  208:*15*
211:*12*  237:*21*
242:*21*
**address** 245:*21*
267:*11*
**addressed** 235:*19*
266:*24*
**adhered** 212:*18*
**ADOLFO** 177:*2, 13*
180:*2*  181:*2*  273:*5*
274:*5*
**advance** 272:*2*
**advice** 234:*20*
235:*13*  236:*16, 17, 19,
22*  237:*2*  256:*13, 15*
**advise** 198:*21*
**advised** 187:*16*
205:*11, 16*  235:*15*

**advisors** 245:*12*
**advisory** 245:*11*
**affect** 197:*6*
**affected** 198:*22*
**affirmative** 255:*17,
20*  256:*4*
**affirmed** 181:*3*
**after** 213:*21*  215:*15,
22, 25*  219:*11*  242:*25*
243:*14*  246:*4, 16*
263:*22*
**afternoon** 257:*8*
**again** 190:*10*  200:*20*
206:*15*  209:*1*  213:*24*
223:*6, 7*  226:*17*
227:*8*  241:*25*  255:*5*
258:*9*  260:*4, 17*
269:*14*
**against** 265:*9*  268:*7,
20*
**agent** 247:*13, 15, 16*
**ago** 227:*17*  252:*16*
**Agreement** 180:*15*
229:*10*  240:*4, 7*
**AH** 227:*10*
**AHDC** 179:*11*
**ahead** 209:*23, 25*
**alcohol** 235:*16, 17*
**alcoholic** 234:*18*
**alive** 185:*21, 23, 25*
186:*2, 8*
**all** 183:*11*  207:*10*
213:*6*  215:*21*  218:*14*
226:*18*  232:*1*  233:*19*
236:*12*  239:*18*
240:*18*  242:*4, 17*
250:*7*  254:*9*  262:*11*
263:*24*  264:*4, 6, 25*
269:*12*
**Allison** 179:*5*
**allocated** 214:*5*
**alluding** 263:*6*
**alone** 254:*22*
**along** 208:*20*
**already** 206:*4*
**also** 185:*11*  186:*9*
187:*7, 18*  196:*4*
198:*5*  200:*3*  217:*2*
218:*1*  220:*20*  223:*22*
238:*2*  240:*19*  241:*13*

242:*5, 8, 18*  245:*17*
247:*23*  252:*6, 19*
257:*24*  261:*5, 6*
263:*13*  265:*8*  268:*1*
270:*21, 23*
**Althoff** 204:*12*  205:*1*
**amass** 250:*15*
**Amended** 180:*8*
186:*23, 25*  211:*5, 14,
16*  212:*6*  215:*6*
**amendment** 211:*22,
24*  212:*1, 4*
**AMERICA** 177:*2*
179:*20*  208:*24*
**amount** 208:*17*
247:*8*  253:*19, 22, 23*
257:*5*
**analyst** 244:*19*
**analyze** 226:*5*
**another** 211:*23*
222:*11*  237:*5*  256:*4*
**answer** 184:*6*  189:*15,
25*  193:*10*  195:*19*
217:*12, 20*  219:*16*
224:*7*  227:*1*  228:*14,
20*  229:*1*  249:*17*
259:*3*  260:*16*  265:*19,
20, 21*  268:*13*  269:*2*
271:*18*
**answered** 271:*15*
**answering** 268:*13*
**anticipation** 231:*3*
**anybody** 236:*20*
**anyone** 183:*13*
203:*11*  232:*6*
**anything** 191:*16*
207:*16*  224:*3*  226:*1*
228:*1*  229:*23*  265:*14*
**apartment** 181:*17, 22*
182:*9, 23*  183:*2, 10,
14, 18, 19*  184:*1*
186:*12*  187:*10*  188:*3,
4, 6*  190:*11, 14*  191:*5,
6, 10, 11, 12, 17, 18, 21,
24*  192:*3, 6, 10, 12, 16,
24*  193:*5, 6, 7, 11, 16,
18*  196:*16*  199:*5, 25*
200:*4, 8, 15*  207:*23*
216:*23*  222:*2*  223:*7*
227:*12*

## EXHIBIT B

Apologies 214:*18* 268:*17*

apologize 195:*20* 209:*16* 224:*2*

appear 194:*23* 206:*19* 240:*19* 242:*18*

APPEARANCES 178:*1*

appeared 273:*6*

appears 261:*5*

application 199:*4, 9* 200:*11, 18* 207:*22* 208:*10, 12, 16*

approve 200:*4, 8*

approximately 188:*18* 233:*4* 234:*9* 250:*2, 4* 253:*19*

April 210:*20* 254:*7*

around 225:*25* 234:*10*

arrest 192:*22* 193:*4* 227:*24*

arrested 249:*25*

art 204:*11, 15, 18, 20* 205:*4, 10, 12, 15, 21*

artwork 204:*7*

asked 181:*16, 25* 187:*7* 189:*3* 191:*23* 194:*6, 9* 196:*4* 197:*22* 199:*3* 204:*6, 10* 210:*7* 216:*16, 19* 218:*20* 225:*16* 227:*17* 258:*9* 265:*8* 268:*9* 271:*15*

asking 181:*14* 225:*9* 232:*6, 18* 260:*13* 268:*11* 269:*12*

aspect 225:*7*

assert 265:*16*

ASSET 178:*3* 184:*2* 187:*22* 193:*13* 198:*25*

assets 182:*19, 21* 187:*25* 190:*24* 197:*18* 213:*6* 215:*14, 19, 21, 23, 25* 216:*20* 221:*8* 252:*8* 271:*8*

assisting 229:*3*

Associates 200:*11, 14*

Atlantico 182:*5*

attempt 250:*19* 260:*10*

attempting 251:*20*

attention 212:*15* 240:*21*

ATTORNEY 178:*12* 194:*21* 220:*13, 20* 224:*1, 4, 8* 235:*8* 239:*21* 240:*1* 270:*4* 274:*8, 9*

attorney-client 265:*17* 268:*15*

attorneys 187:*15* 210:*4* 214:*13, 14* 218:*21* 220:*9, 16* 223:*18, 22* 224:*14, 19* 263:*11* 266:*2, 3* 267:*9*

ATTORNEY'S 178:*8*

attributed 213:*11*

August 181:*23* 273:*8*

authorized 181:*25* 274:*4*

Avenue 178:*14* 179:*3*

avoid 269:*14*

aware 218:*4, 8* 220:*12* 222:*20* 223:*25* 224:*2, 3*

away 185:*16* 186:*15* 191:*12* 210:*8, 9* 216:*4*

< B >

back 190:*2* 199:*7* 243:*22* 244:*1, 7, 16* 245:*19* 253:*3* 255:*2* 262:*4, 5, 24*

Banco 182:*5*

bank 183:*5* 208:*7, 23, 25* 229:*23* 254:*22*

banker 245:*7* 258:*12, 13*

banking 258:*16*

banks 208:*16*

based 221:*14*

basically 245:*7*

Bates 180:*9, 10*

211:*7* 219:*20, 23*

bathroom 232:*4*

becoming 234:*21*

before 177:*18* 188:*13, 15, 18* 192:*22* 200:*7* 220:*10* 224:*17* 273:*6*

Behalf 177:*13* 178:*2, 17* 179:*1* 266:*7*

behind 225:*8*

being 197:*18* 203:*12* 219:*2* 220:*7* 225:*17* 228:*5* 234:*17* 235:*23* 245:*10* 246:*6, 11* 252:*7* 260:*20* 263:*11*

belief 182:*7* 260:*14*

believe 181:*24* 184:*11, 25* 185:*4, 7* 187:*18* 190:*9* 193:*17* 199:*18* 201:*12, 25* 202:*6, 22* 205:*9* 206:*12, 14* 207:*23* 208:*13* 211:*16, 21* 212:*4* 213:*5, 10* 214:*5* 215:*1, 12, 18* 218:*16, 19* 220:*8* 221:*18* 222:*4, 12* 223:*8* 227:*17* 228:*21, 22* 231:*6* 233:*3, 6* 235:*11, 15, 21* 236:*17, 21* 237:*8* 238:*6, 16* 239:*17, 20, 23* 240:*17, 20* 241:*20* 242:*7, 10, 16, 19* 243:*2, 12* 246:*13* 247:*2, 8, 12* 248:*5, 8* 252:*18* 253:*14* 254:*24* 256:*15* 258:*19* 259:*25* 260:*3, 4, 18* 261:*8, 11, 23* 262:*5* 269:*1, 3, 10* 270:*8*

belong 255:*22*

belonged 255:*22*

beneficial 191:*17* 200:*23* 201:*2* 203:*14, 16, 17, 22*

beneficiaries 185:*17, 18* 187:*1, 4* 212:*3, 14* 213:*8, 11, 18* 214:*2* 221:*10*

beneficiary 182:*15, 17* 185:*11* 186:*3, 9, 19* 190:*20* 191:*2* 202:*10, 16, 19* 212:*4, 9, 10, 12*

benefit 193:*24* 196:*16* 213:*18* 214:*1*

besides 220:*24*

best 221:*10*

between 220:*8, 13* 224:*13* 225:*3* 227:*23* 229:*10* 263:*14* 264:*12, 18* 269:*18* 272:*5*

beverage 235:*16, 18*

beverages 234:*18*

Beyond 219:*8*

Bhakta 227:*25* 228:*1* 229:*9, 11, 12, 13* 230:*3, 4, 5* 231:*18, 21*

Biscayne 178:*19*

bit 252:*19* 260:*6* 264:*14*

BLACK 178:*19*

block 242:*5*

blocks 240:*19* 242:*1, 18*

board 200:*3, 6* 245:*10, 11, 12, 13, 18, 21* 246:*6, 8, 10, 11, 14*

bond 193:*19* 216:*17, 20, 24* 217:*7, 23* 218:*5, 11, 14, 17, 24* 219:*2, 5, 11* 220:*14* 223:*11* 225:*1* 226:*9*

Bonin 204:*12* 205:*2*

born 210:*21, 25*

both 214:*13*

bottom 213:*23* 221:*24, 25* 235:*23* 248:*25* 264:*15*

Boulevard 178:*19* 179:*13*

break 232:*4* 257:*4*

briefly 184:*8*

broker 200:*10, 13*

brother 214:*14* 222:*13, 14*

**EXHIBIT B**

**brother's** 222:*16*
**Broward** 274:*11*
**build** 223:*11*
**building** 200:*7*
**burden** 251:*25*
**business** 228:6 229:*4*
233:*12, 16* 234:*13*
244:*11, 13*
**buying** 247:*4*

**< C >**
**call** 210:*4* 225:*3*
271:*13*
**calls** 219:*14* 223:*21*
224:*7*
**came** 182:*4*
**camera** 212:*21*
226:*15*
**cancellation** 236:*3*
**candidate** 199:*24*
**cannot** 219:*3*
**capacity** 262:*14*
**Capital** 247:*18, 20*
**care** 198:*3* 267:*1, 10*
**Carlton** 251:25 252:*4*
**cart** 205:*19*
**CASE** 177:*2* 223:*20*
226:*24* 228:*12* 239:*1*
250:*12* 255:*18*
**cash** 182:25 183:*1,
11* 208:*15, 17, 21*
209:*1*
**CASTRO** 177:*2*
179:*11, 15* 196:20, 22,
25* 198:8, *15, 19*
205:*19* 217:6, *13*
218:*1* 219:5, *12*
222:*15* 223:3 229:*20,
24* 230:*1, 3* 232:*15*
238:*1* 241:7 243:*15*
244:*24* 245:25 246:*5,
12, 17, 20* 247:*25*
248:*7* 249:*14* 251:*14*
253:*1, 5, 7, 20* 254:*4,
15, 16, 22, 25* 255:2, *7,
13* 256:2, 6, *11, 14, 19,
20* 257:*17* 259:*12*
262:*10, 25* 264:*11*
265:9 266:25 269:*18*
272:8

**CASTRO'S** 180:*12*
235:*1* 237:9 239:*11*
240:4 241:*21* 242:*11*
243:*19* 248:*20* 249:9
250:*24*
**categorization** 260:*11*
**categorized** 234:*4*
**category** 220:*1*
**Cause** 206:9
**CC'ing** 267:*10*
**cease** 241:*16*
**certain** 200:7 203:*1*
208:6 214:7 215:*12*
216:20 221:*18*
222:*14* 227:*21*
247:*19* 260:*15*
261:*11, 24*
**Certificate** 180:*4, 5*
273:*1* 274:*1*
**certify** 273:5 274:*4, 6*
**CFO** 230:*3* 245:*16*
**chain** 223:3, *4*
264:*12, 25*
**challenged** 203:*11, 13,
15, 16*
**change** 191:*16*
205:22
**characterization**
231:*23*
**characterize** 233:*25*
**Charlemagne** 229:*15*
**CHIEF** 178:*3*
**child** 210:*21, 25*
**children** 184:*3*
185:*17* 196:*17, 19*
197:*4, 7, 10, 15, 19*
198:23* 210:*18, 23*
219:6, *12* 223:*13*
226:22 227:5, *7*
**civil** 256:*4*
**claim** 232:*16*
**clarify** 181:*14* 182:*4*
**clear** 202:7 255:*5*
260:*17*
**click** 184:*17*
**closing** 194:*17, 21*
200:*14* 247:*13, 15*
248:6
**collective** 248:*3*

**come** 234:*10* 246:*19*
**coming** 264:*21*
**Commencing** 177:*17*
**commission** 200:*14*
273:*14*
**commit** 223:*10*
256:*10*
**communicate** 268:*7*
**communication**
224:*21*
**communications**
220:*12* 225:*3* 268:6
269:*8, 21*
**companies** 202:*24*
230:*5*
**company** 230:*11, 13,
19, 20* 234:*15* 241:*17*
244:*12* 261:*14, 22*
**compensated** 260:*2,
18*
**compensation** 229:*5*
246:*14* 260:*1, 12*
261:*23*
**completed** 181:*12*
**completeness** 221:*22*
**concerned** 231:*20*
**concerning** 244:*4*
257:*24* 258:7 259:*12*
268:*20* 269:*19*
**concluded** 272:*21*
**conclusion** 206:*10*
271:*14*
**conditions** 262:*25*
**conflicting** 236:*19, 22*
**connected** 274:9
**connection** 248:*10*
250:*14* 255:*16*
**consequences** 236:*7*
**consider** 196:*12*
228:*3, 4, 7, 8, 15*
229:*2, 6, 8* 258:*18, 21,
22, 24* 259:8, *25*
**considerations** 187:*20*
**considered** 196:*10*
221:*9* 228:*2, 10*
259:*13*
**consistent** 224:*24*
**consult** 222:*9*
**contained** 204:*11*

235:*13*
**contents** 269:*23*
**contingent** 187:*1, 4*
212:*4, 14* 213:*7, 11,
18* 214:*2*
**CONTINUATION**
177:*11*
**continue** 215:*11, 20*
226:*10*
**continued** 215:*9*
224:*4*
**continues** 215:*13, 18*
**continuing** 266:*10*
**contract** 229:*13*
**contribute** 182:*19, 21*
190:*23* 194:*14, 17, 20*
206:*15, 17* 227:*11*
270:*13, 15, 16, 23*
271:*1*
**contributed** 271:*3*
**contributions** 270:*20*
**controlled** 247:*20*
254:*22*
**conversation** 217:*15*
**conversations** 217:*13,
21* 226:*1* 269:*19, 23*
**copies** 214:*15*
**copy** 185:6 240:*14,
15* 265:*5, 7*
**Coral** 179:*14*
**Corporation** 201:*10*
203:*20* 205:3 207:*7*
**correct** 181:*23, 24*
182:*2, 3, 6* 183:*11, 12,
25* 184:*12* 185:*1, 9,
12* 186:6, *7, 10, 11, 13,
20, 21, 23, 24* 187:*2, 3,
5, 6, 16, 17, 20, 21*
188:*2, 17, 20, 21, 24*
189:*2, 5* 190:*4, 5, 6, 7,
8, 9* 191:*21* 192:*11,
25* 193:*1, 7* 194:*11,
13* 195:*15, 19* 196:23
198:*3, 4, 8, 12* 199:*10,
20* 200:*1, 3, 21, 22*
201:*11* 203:*24*
205:*13, 14* 206:*1*
208:*11* 209:*10, 11*
210:7 212:*11* 216:*25*
218:6 226:*6, 8*

**EXHIBIT B**

227:*18, 19, 21, 22*
229:*11* 235:*20, 21*
238:*10* 253:*17* 261:*7,*
*8* 262:*2*
**correctly** 208:*24*
225:*13*
**correspondence**
224:*13*
**cosign** 222:*7, 15, 19,*
*22*
**costs** 194:*17*
**could** 187:*25* 191:*6,*
*11, 15* 195:*20* 220:*24*
222:*13, 24* 223:*1*
230:*18* 235:*16*
236:*13* 240:*22* 251:*6*
264:*14* 265:*19, 20*
269:*2, 9*
**counsel** 239:*24*
250:*11, 16* 256:*16*
274:*8, 9*
**COUNTY** 273:*2*
274:*2, 11*
**couple** 221:*2* 231:*22*
**course** 207:*17* 269:*17*
**COURT** 177:*1, 22*
273:*4, 13* 274:*14*
**courtesy** 267:*8*
**covered** 209:*2*
**created** 201:*11*
202:*4* 229:*22*
**creation** 195:*12*
**CRIMINAL** 178:*13*
223:*20* 250:*12, 20*
253:*9* 266:*3*
**CROSS** 181:*6*
**Cross-Examination**
180:*2, 3* 232:*12*
**curator** 205:*12*
**current** 217:*2*
**currently** 227:*5*

**< D >**
**D.C** 178:*14*
**DADE** 273:*2* 274:*2*
**Dania** 232:*17* 252:*8,*
*11, 13, 16*
**Daniel** 233:*11*
240:*23* 242:*1* 263:*14*
264:*4*

**Danny** 233:*23* 238:*2*
240:*14* 245:*15*
247:*10, 21* 248:*24*
249:*12, 18, 22* 250:*18*
251:*13, 17, 20* 252:*7,*
*12* 253:*6* 254:*3, 17*
255:*5, 14, 17, 21*
256:*3* 264:*9, 12, 18*
265:*9* 268:*8, 20*
269:*18*
**Danny's** 264:*7*
**Danow** 180:*13, 14*
235:*1, 5, 7, 9, 11, 14,*
*15* 236:*5, 16, 18, 20,*
*23, 25* 237:*1, 3, 6, 9*
239:*24* 256:*13, 16*
257:*13* 263:*11*
**data** 244:*18*
**DATE** 177:*16*
210:*10* 211:*14, 19*
220:*17* 227:*24* 240:*8*
241:*18* 243:*3* 246:*3,*
*9*
**dated** 211:*22* 220:*9*
237:*6* 239:*4* 241:*13*
248:*23* 266:*16, 18*
274:*9*
**dates** 221:*21* 231:*1,*
*6* 254:*6, 11*
**daughter** 227:*9*
238:*16* 239:*1* 241:*8*
247:*11* 248:*15*
**Day** 177:*16* 211:*19*
219:*3* 273:*8* 274:*9*
**days** 227:*23* 250:*9*
**day-to-day** 233:*16*
243:*13*
**DC2019** 221:*19*
**DE** 177:*2* 179:*10, 13,*
*15* 180:*12* 196:*20, 22,*
*25* 198:*8, 15, 19*
205:*19* 217:*6, 13*
218:*1* 219:*5, 12*
222:*15* 223:*3* 229:*19,*
*23* 230:*1, 3* 232:*15*
235:*1* 237:*9* 238:*1*
239:*11* 240:*4* 241:*7,*
*21* 242:*11* 243:*15, 19*
244:*24* 245:*24* 246:*4,*
*12, 17, 19* 247:*25*

248:*7, 20* 249:*9, 13*
250:*24* 251:*14* 253:*1,*
*5, 7, 20* 254:*3, 15, 16,*
*21, 25* 255:*1, 7, 13*
256:*2, 5, 11, 14, 19, 20*
257:*17* 259:*12*
262:*10, 25* 264:*11*
265:*9* 266:*25* 269:*18*
272:*8*
**dealing** 196:*6* 198:*18*
**death** 212:*17* 213:*6,*
*14, 22* 214:*20* 215:*15,*
*22*
**debt** 255:*6*
**December** 181:*22*
202:*5* 211:*17, 23*
212:*6* 248:*23* 263:*15*
264:*2, 7* 266:*19*
**Declaration** 180:*9*
211:*6*
**deed** 214:*6*
**Defendant** 177:*2*
178:*17*
**defense** 250:*11, 15,*
*20* 253:*9* 256:*4*
266:*3*
**defenses** 255:*17, 21*
**definition** 258:*25*
259:*9, 11, 20* 260:*7,*
*22*
**DEPARTMENT**
178:*13*
**DEPOSITION**
177:*11* 180:*2* 181:*13*
207:*24* 209:*14, 17*
210:*5* 214:*11* 222:*3*
259:*1, 7, 21* 272:*3, 6,*
*9, 12, 21* 274:*5*
**DEPUTY** 178:*3*
**Description** 180:*8, 13*
**detained** 218:*19*
220:*16*
**determine** 226:*7*
**determined** 203:*25*
**Devine** 179:*12*
**did** 182:*18, 20, 22, 24,*
*25* 183:*1, 3, 6, 13*
186:*18* 190:*10, 12, 13,*
*15, 23* 191:*1, 5, 10*
192:*2, 4, 24* 193:*6, 11,*

*15* 194:*14, 16, 17, 19,*
*20, 22* 195:*2, 10, 11*
196:*9, 12* 198:*21*
199:*12* 201:*18, 20*
202:*16* 204:*18, 23*
205:*19, 21, 23* 206:*5,*
*15, 17, 19, 21, 22, 24,*
*25* 207:*2, 3, 5, 6, 8*
208:*15* 209:*1, 3, 4, 14,*
*17, 19, 20, 21, 23, 25*
210:*2, 18, 19* 214:*4,*
*11* 215:*8, 10, 17, 23*
216:*8, 22* 217:*6, 15*
224:*18* 227:*11, 13*
229:*13* 230:*9, 14, 20,*
*21, 22, 23, 24* 231:*2, 5,*
*8, 10, 12, 14, 15, 17, 19*
233:*2, 4* 234:*6, 8, 9*
235:*9* 236:*16, 17, 19,*
*21, 23, 24* 237:*1, 24*
238:*2, 4, 5, 11, 13, 17,*
*19, 21, 24* 239:*21*
240:*15, 17, 18, 20*
241:*2, 9, 11* 242:*17*
243:*13, 16* 245:*6*
246:*5, 10, 16, 18, 19,*
*22* 247:*23* 248:*7, 9,*
*11, 17* 249:*12, 18, 20*
251:*13* 253:*7, 16*
254:*14, 15, 17, 21, 24*
255:*1, 5, 21* 256:*10,*
*12, 13* 257:*14* 258:*11,*
*24* 259:*12, 22, 25*
260:*14* 261:*2, 9, 17*
265:*14* 266:*1, 5, 7*
267:*16, 17, 19, 20*
268:*2, 4, 6* 269:*18, 22*
270:*1, 6, 13, 14, 16, 20,*
*23* 271:*1, 4* 272:*2, 4,*
*8, 10, 11, 13* 274:*4*
**didn't** 192:*9* 210:*17*
230:*12* 259:*19* 271:*8,*
*20* 272:*5*
**Difficult** 249:*1*
**Direct** 180:*4* 184:*11*
185:*14* 257:*6*
**directors** 245:*11*
**directory** 184:*16, 18*
**disclaimer** 263:*18*

## EXHIBIT B

**disclosed** 216:*20, 24* 217:*3, 17* 223:*25* 224:*3* 225:*10, 11, 13*
**discloses** 269:*8*
**discuss** 197:*3, 6*
**discussed** 181:*15* 218:*11, 13, 14* 220:*15* 245:*18* 246:*23*
**discussing** 222:*2, 12* 243:*1* 254:*18* 269:*23*
**Discussion** 207:*18* 217:*5* 225:*15* 226:*16* 232:*11* 238:*21* 239:*5* 245:*20, 23* 263:*7* 272:*16*
**discussions** 225:*17* 238:*17* 268:*19*
**disguise** 256:*6*
**distribute** 213:*14, 19* 215:*19*
**distributed** 213:*7* 215:*15*
**distribution** 213:*21* 214:*17, 18* 215:*21, 23, 24* 271:*6, 11, 20*
**distributor** 235:*18*
**DISTRICT** 177:*1* 178:*8*
**divide** 213:*15, 25*
**DIVISION** 178:*3, 13* 258:*16*
**divorce** 222:*8, 9* 271:*4, 9*
**divorced** 196:*22* 197:*9* 198:*21*
**divulging** 268:*5* 269:*20*
**Document** 180:*14, 17* 184:*12, 13, 14, 17, 18, 23* 185:*3, 15* 211:*10, 22* 212:*8, 9* 215:*2* 219:*24* 220:*3, 10* 225:*18, 23* 239:*4, 5, 6, 11, 16, 19, 21, 25* 240:*8, 9, 16, 19* 241:*15, 19* 242:*6, 9, 11, 15* 264:*23* 266:*11*
**documents** 194:*24* 214:*11, 15, 16, 22* 221:*15* 270:*6*

**does** 194:*23* 197:*17* 203:*3* 205:*15* 209:*10* 227:*25* 230:*1* 264:*9* 267:*21*
**doesn't** 218:*8*
**doing** 181:*10* 184:*22* 260:*23*
**Domaine** 234:*7, 13, 21*
**Dominguitti** 179:*5*
**done** 187:*19* 188:*4, 7* 214:*8* 244:*19* 272:*14*
**don't** 184:*14* 212:*24* 213:*9* 215:*2* 216:*2* 221:*21* 225:*24* 226:*1* 228:*22* 233:*18* 239:*8* 240:*15* 244:*2* 245:*20, 22* 246:*2* 254:*6, 10, 14* 255:*11* 257:*9, 10* 261:*14* 263:*5* 264:*22* 265:*3* 267:*11, 12, 15* 269:*1* 270:*12*
**door** 217:*9*
**down** 235:*22* 236:*10* 240:*12* 241:*15* 243:*24* 248:*25* 252:*7* 263:*21* 264:*14*
**draft** 211:*18*
**drafted** 240:*1*
**Drunken** 228:*9* 229:*7, 14, 17* 230:*1, 4, 6, 7, 9* 231:*8, 10*
**due** 249:*19*
**duly** 181:*3* 273:*7*
**during** 193:*19* 198:*5* 216:*24* 217:*5, 23* 218:*11, 14, 17* 220:*17* 222:*2* 223:*10* 224:*25* 259:*21* 262:*9, 23*

**< E >**
**each** 213:*19* 241:*16* 247:*10*
**earlier** 210:*6* 216:*16* 257:*12* 259:*1, 7, 21* 266:*11* 270:*8*
**early** 234:*11* 247:*3* 248:*10*
**earn** 227:*14*
**earned** 227:*14*

**earning** 228:*5*
**effect** 238:*18*
**effective** 241:*17*
**effort** 250:*15*
**eight** 227:*10* 250:*9*
**either** 224:*7* 262:*9*
**elaborate** 260:*10*
**Elena** 187:*5* 203:*23* 212:*13*
**else** 229:*23* 232:*6* 236:*20*
**E-mail** 180:*10, 18* 219:*25* 220:*17, 19* 221:*11, 23* 222:*23* 223:*2, 3, 4, 17* 243:*23, 24* 244:*1, 3, 4, 25* 248:*20, 23* 249:*5* 251:*2, 4, 5, 7, 8, 10, 19, 23* 252:*20* 253:*3* 257:*24* 258:*4* 262:*22* 263:*12, 14, 25* 264:*1, 4, 6, 7, 8, 10, 12, 15, 17, 25* 266:*13, 20* 267:*5, 12, 14*
**e-mailed** 267:*7, 8*
**e-mailing** 250:*18*
**E-mails** 180:*10, 18* 197:*21, 22* 198:*5* 219:*20* 250:*24* 262:*19, 24* 263:*2, 5*
**Empire** 177:*22*
**employed** 228:*5* 259:*16, 18, 19*
**employee** 233:*20, 22* 261:*22* 274:*8*
**employment** 260:*1*
**end** 251:*23*
**engage** 250:*11*
**engaged** 260:*4, 14, 20* 261:*2*
**engagement** 260:*12, 13* 270:*1*
**enough** 232:*19* 269:*8*
**Enterprises** 230:*4*
**entire** 264:*18* 265:*3*
**entities** 201:*8* 202:*23* 203:*1, 8, 10, 19, 22, 25* 204:*6* 227:*25* 229:*18, 19, 22* 231:*21* 236:*12, 13* 242:*25* 270:*13, 15*

**entitled** 192:*5, 9, 15, 18, 23* 193:*5* 253:*4*
**entity** 201:*10, 25* 203:*6* 229:*11, 12, 15, 16* 241:*3* 243:*4* 246:*23* 247:*20*
**equal** 213:*17*
**equitable** 271:*5, 11, 20*
**equity** 261:*12, 14, 18, 20, 24*
**equivalent** 269:*7*
**escrow** 247:*15, 16* 252:*1*
**Esposito** 233:*11, 18* 243:*7, 10, 11, 13* 245:*15* 247:*5* 248:*2* 262:*8, 10*
**ESQUIRE** 178:*2, 7, 12, 17, 18* 179:*2, 7, 12, 15*
**essence** 249:*9*
**essentially** 185:*15*
**establish** 204:*5*
**establishing** 228:*9*
**estate** 187:*19* 200:*10, 13* 213:*12* 215:*10, 13, 19* 252:*13*
**estimate** 221:*15*
**even** 182:*25* 186:*18* 197:*9* 198:*21* 222:*9, 22* 271:*21*
**eventful** 219:*3*
**events** 197:*3*
**eventually** 191:*21*
**ever** 182:*12, 15, 18* 189:*11, 15, 18* 191:*1* 202:*16* 203:*11, 14* 205:*22* 206:*15* 220:*10, 12* 227:*14* 230:*9* 231:*15* 234:*6, 17* 235:*9* 236:*19, 23* 237:*19* 241:*9* 246:*10, 19* 249:*12* 255:*6* 259:*18* 270:*1*
**every** 188:*19* 244:*11*
**exact** 208:*17* 210:*10* 213:*9* 221:*21* 230:*25* 231:*6* 233:*18* 244:*3* 246:*2* 254:*6* 255:*12*

## EXHIBIT B

exactly 215:24 216:2, 9 219:4 253:15 269:14 270:12, 14

Examination 177:18 180:3, 4 181:6 209:12 257:6

examined 181:3

exceed 208:8

exchange 220:8 258:4 263:14 264:18

exchanges 263:10, 12

EXHIBIT 180:7, 12 207:24 211:3, 5, 10, 13 213:23 216:10, 11, 12 219:19, 20 234:23 235:1 237:5, 9 239:3, 4, 11 240:2, 4, 22 241:12, 13, 21 242:8, 11, 20, 21 243:17, 19 248:18, 19, 20 250:22, 24 257:17, 25 258:3 263:13, 16, 24 264:11, 13 266:10, 13

exhibits 184:19 265:7 266:11

existence 269:8

expectation 226:21 256:22, 25

experience 198:17

expert 229:4 258:19, 22

expertise 258:14

Expires 273:14

explain 258:9 265:13

explained 218:21 252:12

explanation 269:9

extent 225:19 265:18

ex-wife 197:1 218:1 220:13, 15

< F >

fact 193:18 204:1 238:24 241:2

fair 185:5 198:14, 17 199:13 200:6 232:19

family 182:9 183:17, 25 188:1, 25 205:11, 16 239:7

far 193:15 194:23 196:15 222:19 231:12, 20

Farms 230:4 231:18

father 182:1 185:8, 11, 16, 21, 23, 25 186:2, 8, 15 201:23 210:8, 9 212:10, 12, 17 213:6 214:21 215:25 216:3

father's 182:11 184:2, 7 185:17 214:14 215:15, 22

FCC 203:3, 4

FDC 218:19 220:16 223:14

February 211:1 235:4 239:4 240:8 241:13 242:9

federal 257:21

fees 246:14, 16 267:16, 22, 25

few 206:3

FH 227:9

FHDC 179:11

fiancee 210:15

Fiduciary 179:20 221:8

Fields 251:25 252:4

filed 255:9 265:9

filing 221:8 222:8

final 181:22 215:20

Finance 201:9, 15, 18, 21 203:20 205:2, 6, 11, 16, 24, 25 207:6 261:17

finances 236:14

Financial 180:17 202:24 203:2 208:20 243:19 244:5, 7, 11, 13, 15, 19 245:2, 7, 8, 19 257:25 258:7, 10, 12, 14, 16, 20, 22, 25 259:12, 22 260:19, 20 261:3, 6, 10, 19

financially 258:18, 21 274:9

find 252:9

fines 236:2

FINRA 203:5, 6

first 181:3, 15 211:13 216:6 221:2 222:23 251:4 254:8 264:15 272:6

five 232:3, 9 241:15

FL 177:23 178:5, 9, 20 179:4, 9, 14, 18

Floor 178:4

FLORIDA 177:1 178:8 273:2, 5, 13 274:2, 4, 11

follow 256:13

followed 256:15

following 193:4 213:20

follows 181:4

Ford 244:20 245:9 261:5, 9, 11, 12

foregoing 274:6

FORFEITURE 178:3 188:8 256:21

forget 245:16

form 184:4 189:13, 23 193:2, 8 195:8, 10, 17, 22 197:12 200:25 204:3 206:7, 8 218:7 234:2 249:15 251:15 260:8 262:12, 20 263:3 265:1

formal 228:3, 4 230:10 231:10 260:1, 12

formally 260:4

formation 195:13

Fort 177:23 274:9

forth 262:24

forward 244:14

four 204:11, 23 205:1, 21 239:18

frame 248:10

FRAUD 178:13 256:10

fraudulent 256:6

friend 229:3

friends 229:3

FRIERI 177:2, 13 180:2 181:2 273:6 274:5

front 244:17 264:23

full 239:8 253:16 264:4

fully 215:14

funds 182:8 194:14, 20 227:11 270:11

F-up 249:2

further 257:2 272:17, 19 274:6

future 184:3 226:23

< G >

Gables 179:14

gears 232:17

gentleman 261:5

get 210:19 224:10 225:21, 24, 25 234:6 236:19 246:10 251:20 256:22 263:21 267:21 271:7, 20

GG963786 273:14

GH 227:9

GHDC 179:11

give 198:22 207:15 231:25 237:1 268:12 272:14

given 191:11

Global 201:9, 15, 18, 21 202:1, 4, 8, 10, 13, 17, 19, 23 203:1, 19, 20 205:2, 6, 11, 16, 24, 25 206:2 207:6 271:2

go 220:18 223:2 247:16 249:13 254:15, 18, 22 258:10

goes 235:20 258:14

going 181:13 184:21 199:7 211:12 212:15 215:4 218:4 219:17 220:2, 18 221:22 226:10 232:17, 18 234:24 236:11 243:22 244:14 257:3 262:24 263:21 264:11 265:16

Goldman 258:15

Good 181:8, 9 209:6, 7 232:14 257:8

Goodman 179:12

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

## EXHIBIT B

Government 181:*12, 16, 25* 185:*14* 187:*7* 188:*7, 19, 22* 189:*1, 3* 191:*23* 193:*13, 15, 21, 25* 194:*6* 196:*4* 197:*21* 199:*1, 16* 204:*6* 216:*24* 217:*17*

GOVERNMENT'S 180:*7* 211:*3, 5, 13* 216:*12* 219:*18, 20* 266:*9, 13*

Gramercy 179:*21* 181:*17* 182:*9, 23* 183:*8, 18, 19, 20, 23* 186:*13* 187:*8, 10, 11* 188:*11, 22* 189:*4, 7, 9, 12, 16, 18, 21, 22* 190:*3, 11, 14, 16, 17, 20, 24* 191:*2, 6, 24* 192:*3* 196:*16* 199:*5, 7* 200:*20, 24* 201:*2, 5* 207:*3, 23* 209:*2* 216:*23* 221:*6* 222:*1* 223:*7* 227:*12*

grandchildren 184:*3*

grant 261:*20*

Grasco@devinegoodman.com 179:*15*

group 244:*17*

guarantee 221:*9* 230:*12, 14* 231:*2, 3, 5*

guarantor 182:*18, 20* 190:*23* 191:*2* 202:*7, 16*

guess 266:*10*

GUSTAVO 177:*2, 13* 180:*2* 181:*2* 182:*1* 212:*10* 225:*4* 267:*2* 273:*5* 274:*5*

Gustavo's 223:*11*

Guy 179:*12* 207:*14* 232:*14* 265:*25* 266:*1, 23* 267:*8, 14* 268:*9, 22, 24*

guys 225:*16*

< H >

had 181:*16, 20, 25* 183:*4* 186:*23* 187:*14, 16, 18* 192:*12, 16, 19*

196:*4, 6* 198:*14, 17* 199:*8* 200:*3* 206:*12* 208:*18, 21* 210:*4* 214:*5, 20* 217:*21* 220:*15* 221:*19* 225:*15, 17* 229:*22* 230:*6, 10* 236:*6* 237:*3* 244:*20* 246:*8* 252:*12* 253:*2* 255:*17* 256:*3* 257:*12* 261:*11, 24* 264:*20* 265:*9, 23* 267:*9, 14* 268:*19* 270:*8*

half 216:*6, 7*

halfway 220:*19* 252:*7*

hand 208:*21* 225:*9*

Hang 226:*14*

happened 225:*17*

Harrington 244:*20* 261:*6*

hat 206:*12*

HAYDEN 178:*12*

head 245:*17*

hear 257:*9*

heard 268:*23*

hearing 193:*19* 216:*17, 21, 24* 217:*23, 24, 25* 218:*2, 12, 15, 17* 223:*11* 226:*9*

held 184:*1* 190:*13* 191:*11* 196:*16* 197:*18* 202:*1* 221:*15* 254:*5* 270:*18*

help 196:*9, 12* 253:*24* 254:*8*

helped 196:*4, 6* 230:*10*

helpful 212:*23, 24*

helping 229:*5*

helps 211:*20* 260:*6*

HERNANDEZ 177:*2, 13* 179:*20* 180:*2* 181:*2, 8* 182:*2, 12* 183:*16* 184:*6, 9, 23* 185:*20* 187:*5* 189:*25* 190:*10* 193:*10, 12, 24* 195:*1* 196:*9* 199:*3* 201:*3, 16* 206:*3, 13* 207:*9, 20* 208:*10*

209:*5, 6, 14* 212:*11* 216:*16* 217:*12, 19* 219:*15, 25* 224:*16* 226:*21* 227:*1, 7* 229:*1* 232:*1, 14* 237:*2* 257:*8* 267:*2* 268:*22* 269:*17* 271:*4* 273:*5* 274:*5*

Hernandez's 224:*13*

HH 179:*20* 180:*8* 182:*5, 10, 13, 14, 15, 19* 183:*5, 24* 185:*1, 6* 186:*3, 9, 19, 22* 201:*13, 21, 24* 202:*1, 20* 203:*18, 20, 21* 207:*1* 211:*6, 14, 24* 212:*5* 214:*21* 215:*7* 221:*16*

Hibiscus 217:*3* 218:*5, 11, 17, 21* 219:*6* 220:*25* 222:*10, 24*

Hicks 179:*10* 194:*5, 7, 10, 15, 18, 21, 24* 195:*1, 3, 6, 10, 13, 16, 21, 25* 196:*2, 5, 10, 12* 197:*23* 199:*1* 206:*5, 13, 16, 18, 20, 23* 228:*18*

hide 188:*4, 7* 193:*12* 198:*25* 225:*8*

higher 252:*19*

highlight 263:*24*

highlighted 264:*1*

hired 244:*20*

historically 198:*2*

Hold 207:*15* 208:*6* 213:*2* 226:*11* 235:*16, 17*

holdings 261:*13*

Holtz 180:*18* 233:*11, 22* 238:*2, 8, 17* 240:*14, 23* 241:*7* 242:*1* 245:*15* 247:*11, 21, 23* 248:*12, 20, 24* 249:*6, 8, 12* 250:*18* 251:*13, 20* 253:*2, 6, 11, 14* 254:*3, 17* 255:*5, 14, 17, 21* 256:*3* 263:*14* 264:*12,*

19* 265:*9* 268:*8, 20* 269:*18*

Holtz's 264:*4*

home 196:*13* 198:*18* 232:*16* 252:*16*

hour 267:*19*

house 198:*3*

HOWARD 178:*17* 223:*16* 224:*6* 226:*17* 268:*25*

Hsrebnick@royblack.com 178:*21*

< I >

identical 240:*24*

identification 211:*8* 219:*21* 235:*2* 237:*10* 239:*13* 240:*5* 241:*23* 242:*12* 243:*20* 248:*21* 250:*25* 266:*14*

II 214:*9*

images 212:*21, 25*

immediate 226:*23* 239:*7*

impair 187:*25*

imperative 236:*11*

import 236:*13*

important 204:*5*

importer 234:*15, 18* 235:*18*

inaccuracies 199:*9, 22* 200:*18* 201:*9*

inaccurate 208:*13*

include 197:*17* 204:*23* 220:*21*

included 208:*9* 214:*17, 22* 262:*18* 263:*1*

Including 199:*15*

income 213:*16, 25* 227:*14, 15*

incorporated 201:*24, 25*

INDEX 180:*7, 12*

indicted 188:*19, 21*

indictment 188:*25*

individual 205:*10*

individuals 233:*17,*

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

*19* 242:*4* 263:*7*
**informal** 231:*12, 22*
**information** 268:*9*
269:*11*
**initial** 220:*19* 225:*12*
271:*21*
**initially** 181:*22*
**inputs** 244:*18*
**institutions** 203:*2*
**instruct** 265:*19*
**instructing** 217:*12,*
*20* 219:*15*
**intended** 223:*18*
**intending** 225:*11*
**intention** 184:*2* 253:*7*
**intentions** 269:*15*
**Interest** 180:*15*
193:*25* 195:*5* 197:*10,*
*14, 17* 206:*13, 22*
207:*1, 3, 6* 221:*10*
235:*16, 17* 236:*24*
237:*14, 18, 20, 22, 23,*
*24, 25* 238:*2, 5, 6, 11,*
*14* 239:*12* 241:*3*
243:*15* 245:*24* 246:*5,*
*12, 20* 247:*4, 7, 24, 25*
248:*3* 256:*5, 11, 14,*
*17, 18, 25* 261:*9*
262:*1, 4* 263:*8*
270:*19* 271:*5, 8*
**interested** 274:*9*
**introduced** 265:*25*
267:*9*
**invade** 268:*12*
**invades** 269:*3*
**invading** 265:*20*
269:*3*
**invasion** 268:*14*
**invest** 230:*18, 20*
233:*2*
**invested** 247:*9* 270:*9,*
*18*
**investment** 232:*21*
233:*5, 8, 25* 234:*4*
244:*12* 258:*15*
271:*22*
**investments** 208:*7*
270:*12*
**investors** 233:*7*
**invoice** 204:*10*

**involved** 194:*9, 11, 12*
195:*12* 196:*2* 229:*16*
239:*25* 243:*11*
244:*22, 23* 245:*2*
246:*6* 262:*10, 14*
263:*1, 9, 10, 12*
**involvement** 227:*25*
245:*5*
**Irrevocable** 179:*21*
183:*20, 23* 189:*22*
190:*4, 16, 18, 21, 24*
191:*2* 193:*23* 202:*2,*
*4, 8, 11, 13, 17, 19*
203:*21* 206:*2* 207:*4*
221:*20*
**issue** 225:*6, 10*
234:*20* 235:*19*
236:*20, 22* 253:*18*
**issued** 214:*10*
**Italian** 232:*21, 24*
237:*15*
**Italy** 249:*25* 250:*4, 7,*
*10, 19* 251:*11* 254:*5,*
*13* 264:*22*
**item** 185:*5*
**iterations** 244:*21*
**It'll** 257:*4*
**its** 183:*20* 221:*16*
244:*13*
**IWM** 180:*17* 232:*25*
233:*2, 12, 16, 20, 23*
234:*1, 4, 17* 236:*24*
237:*18, 20, 22, 23*
238:*3, 12* 243:*5, 14,*
*19* 244:*5, 7, 16, 17*
245:*3, 9, 11, 12, 18*
246:*5, 6, 8, 10, 15, 16,*
*20* 252:*14, 22* 256:*5,*
*11, 14, 17* 257:*25*
259:*12, 16, 18, 19*
260:*2, 4, 14, 19, 20*
261:*2, 3, 7, 10, 12, 13,*
*18* 262:*1, 4, 5, 8, 9*
270:*9, 16*
**IWM's** 246:*7* 258:*7*
259:*22*

**< J >**
**JACKI** 178:*18*
**January** 255:*10*

**Jared** 177:*18* 273:*4,*
*11* 274:*2, 14*
**jobs** 198:*10, 11*
**Joinder** 180:*15*
240:*4, 7*
**joined** 233:*7*
**joining** 271:*15*
**joint** 197:*10* 255:*1*
**joint-defense** 265:*17*
268:*15, 24*
**Jorge** 233:*11, 22*
238:*11, 21, 25* 240:*23*
244:*21* 245:*16*
247:*11, 23* 248:*15*
258:*9* 272:*11*
**Jorge's** 241:*8*
**JOSHUA** 178:*7*
257:*9*
**Joshua.paster@usdoj.**
**gov** 178:*10*
**JR** 179:*2*
**judge** 193:*22* 218:*20*
**July** 177:*16* 250:*2, 3*
273:*7* 274:*9*
**June** 237:*6* 245:*25*
273:*14*
**JUSTICE** 178:*13*

**< K >**
**Kai** 204:*11* 205:*1*
**Kaiser** 229:*15*
**keep** 223:*10, 18*
**Keven** 180:*13, 14*
235:*1, 5, 7* 237:*6, 9*
239:*24* 256:*13*
257:*13* 263:*10*
**kids** 193:*24* 210:*17*
223:*10, 18* 224:*4, 25*
226:*9*
**kind** 256:*24*
**KLUGH** 179:*15, 17*
**knew** 200:*11* 225:*20*
**know** 193:*16* 194:*23*
196:*15* 212:*24* 213:*9*
214:*3* 215:*2, 5, 24*
216:*2, 9* 218:*8*
220:*21* 221:*3, 13*
222:*4, 12, 21* 225:*24*
239:*8* 248:*12, 14, 15*
253:*15* 254:*14, 23*

257:*9, 21* 262:*17*
263:*5* 264:*22* 267:*11,*
*13, 14, 15, 21* 269:*14*
**knowledge** 214:*7*
215:*1, 19* 221:*5*
261:*1, 2* 267:*25*
**knowledgeable** 205:*10*
**KORNSPAN** 178:*19*
**KURT** 178:*7*
**Kurt.lunkenheimer@u**
**sdoj.gov** 178:*11*

**< L >**
**lack** 260:*1*
**landscaping** 197:*23*
**Lane** 217:*3* 218:*5,*
*11* 219:*6* 220:*25*
222:*10, 24*
**large** 274:*4*
**last** 181:*13* 207:*24*
210:*25* 211:*4* 212:*1*
223:*2, 9* 225:*15*
231:*22* 235:*24*
241:*15* 252:*21* 272:*5*
**late** 248:*6, 9* 250:*2*
**later** 201:*24*
**latter** 208:*9* 234:*11*
247:*2*
**Lauderdale** 177:*23*
274:*11*
**laundering** 257:*22*
**law** 256:*16*
**laws** 235:*20* 236:*6*
257:*19*
**lawsuit** 255:*10* 256:*4*
265:*8, 12, 15* 268:*7,*
*20* 269:*17, 20*
**lawyer** 222:*9* 252:*3*
**learn** 224:*18*
**least** 186:*22* 190:*8*
259:*17*
**leave** 227:*6*
**left** 227:*5*
**Legal** 177:*22* 191:*16*
195:*5* 206:*5, 9, 12*
213:*9* 234:*20* 255:*11*
267:*16* 271:*13*
**lengthy** 264:*12*
**Leon** 179:*13*
**less** 208:*21* 264:*20*

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

## EXHIBIT B

letter  199:*15, 19, 22*
207:*25*  208:*2, 4, 6*
268:*6*  270:*1*
liability  187:*24*
liable  267:*22, 25*
licenses  236:*3*
lien  231:*4*
like  181:*15*  184:*8*
194:*5*  196:*15*  197:*22,
24*  199:*12, 23*  201:*7*
203:*17*  207:*25*
212:*24*  224:*7, 12*
263:*15*
Limited  179:*20*
213:*24*
line  228:*24*  239:*15*
240:*10*  241:*15*
242:*14*  258:*6*
lines  258:*17*
liquid  208:*14*
liquids  208:*7*
liquor  235:*8*  256:*16*
list  197:*23*
listed  243:*23*
little  252:*19*  260:*6*
264:*14*
lived  210:*15*
LLC  179:*10, 21*
183:*21*  187:*8, 11, 12,
24, 25*  188:*4, 7, 10*
189:*4, 5, 7, 9, 12, 16,
19, 22*  190:*3, 13*
191:*6, 11*  195:*10, 13,
16, 21, 25*  196:*2*
201:*5*  206:*23*  240:*24*
246:*23*  270:*24*
LLP  179:*12*
loan  229:*10*  230:*16,
17, 18*
located  194:*6*
Log  180:*17*  243:*19*
257:*25*  269:*7, 12*
long  232:*8*  252:*16*
longer  246:*8*
look  248:*24*  251:*7*
263:*18, 22*  265:*5*
looked  208:*23*
looking  211:*12*
looks  263:*14*

lot  198:*12*  204:*7*
loud  212:*23*
Lucia  179:*20*  187:*5*
203:*23*  212:*13*
LUNKENHEIMER
178:*7*

< M >
made  181:*21*  212:*13*
219:*1*  238:*18*  244:*12*
246:*17*  271:*21*
magistrate  193:*22*
maintain  243:*13*
maintenance  198:*3,
18*
major  249:*2*
making  197:*14*
232:*21*  233:*8*  261:*10*
Management  201:*10,
15, 18, 21*  203:*20*
205:*3, 7, 11, 16, 25*
206:*1*  207:*7*  236:*14*
246:*7*
manager  189:*5*
195:*25*
managing  233:*17*
247:*5*  262:*8*
many  190:*6*  216:*3*
marginal  253:*22*
MARGOT  179:*7*
184:*16*  223:*16*
Maria  179:*20*  187:*4,
5*  203:*23*  212:*13*
mark  219:*18*
marked  211:*3, 7*
219:*21, 23*  235:*2*
237:*10*  239:*13*  240:*5*
241:*22*  242:*12*
243:*20*  248:*21*
250:*25*  266:*14*
MARKUS/MOSS
179:*7*
married  210:*14, 16,
19*
Master  180:*8*  182:*5,
10, 13, 15, 19*  183:*5,
24*  185:*1, 6*  186:*3, 10,
19, 23*  202:*20*  203:*18,
21*  207:*1*  211:*6, 14,*

24  212:*5*  214:*21*
215:*7*  221:*16*
match  268:*22*
material  210:*5*
219:*15*  223:*22*
matter  244:*2, 4*
matters  181:*14*
197:*6*  198:*3, 18, 22*
229:*4*  258:*23*
Maybe  243:*23*
mean  203:*3*  205:*15*
214:*18*  270:*14*
Meats  228:*9*  229:*7,
14, 17*  230:*2, 4, 6, 7, 9*
231:*9, 11*
meet  266:*1*
MEETEREN  178:*18*
member  189:*9, 11, 18,
21*  190:*3*  203:*6*
239:*7*  241:*17*  246:*10,
11*
members  241:*5*
Membership  180:*16*
241:*14, 22*  261:*9*
Memo  180:*13, 14*
235:*1, 4, 5, 10, 12, 14,
19*  236:*9*  237:*6, 7, 9,
12*  257:*12, 15*
mention  264:*9*
mentioned  216:*23*
263:*24*  264:*1, 6, 8, 19,
24*  265:*4*
mentions  264:*24*
merchant  233:*13*
Merchants  232:*22, 24*
237:*15*
met  188:*13, 15, 16*
Miami  178:*5, 9, 20*
179:*4, 9, 18*  219:*13*
220:*21*  222:*6, 11, 21*
223:*19*  224:*5*  226:*10,
23*  227:*5*  273:*2*
274:*2*
Michael  252:*3*
MICHELE  178:*18*
middle  239:*6*  251:*8*
might  223:*15*  232:*24*
million  183:*1*  209:*1*
248:*3*
mind  218:*9*  232:*18*

minutes  207:*15*
232:*9*  272:*15*
Mmoss@markuslaw.c
om  179:*10*
mobile  232:*16*
252:*16*
model  244:*5, 7, 11, 13,
15, 23*  245:*3, 9, 19, 22*
258:*7, 10, 25*  259:*12,
22*  260:*19, 20*  261:*3,
6, 10, 17, 19*
modeling  244:*19*
245:*7*  258:*20, 22*
models  245:*8*  258:*12,
14, 16*
money  182:*22*  183:*4,
7*  206:*15, 17*  233:*2*
248:*7, 9*  249:*21, 23*
250:*15, 19*  253:*6, 8,
19*  256:*22*  257:*22*
moneys  248:*11*
monies  252:*22*
253:*15, 16*
month  246:*2*  255:*12*
months  250:*7, 9*
Mora  233:*11, 22*
238:*11, 22*  240:*23*
245:*16*  247:*11*  258:*9*
272:*11*
Mora's  239:*1*  247:*23*
248:*15*
more  198:*14, 17*
206:*3*  232:*8*  260:*10*
264:*20*
morning  181:*8, 9*
209:*6, 7*  232:*14*
mortgage  183:*13, 15*
MOSS  179:*7*  180:*2*
181:*7*  184:*5, 20*
189:*14, 24*  193:*3, 9*
195:*9, 18, 23*  197:*13*
201:*1*  204:*4*  206:*8,
11*  207:*9, 19*  209:*5, 8,
20, 21*  210:*6*  216:*16*
217:*8, 11, 16, 19*
218:*7*  219:*8, 14*
220:*2*  223:*21*  224:*16,
20, 23*  227:*3, 17*
228:*11, 17, 23*  237:*11*

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

241:*24*  271:*25*
**most**  211:*18*  244:*22*
**move**  204:*6*  212:*25*
219:*12*  225:*11*, *18*
**moving**  224:*1*
**multiple**  198:*10*, *11*
229:*3*, *18*  244:*21*
263:*6*
**museum**  205:*13*
**muting**  226:*11*

**< N >**
**N.W**  178:*14*
**NALINA**  178:*2*
224:*6*  225:*2*  226:*14*,
20, *24*
**Nalina.sombuntham@**
**usdoj.gov**  178:*6*
**Nalina's**  266:*10*
**name**  187:*11*, *23*
188:*3*, *6*  194:*23*
206:*19*  219:*25*
232:*14*  235:*20*
244:*20*  245:*17*  257:*8*
**named**  187:*2*
**names**  233:*19*
**nature**  268:*5*  269:*20*
**NE**  178:*4*, *9*
**necessarily**  228:*7*
**necessary**  212:*19*
**need**  251:*25*  257:*5*
**needed**  250:*15*
252:*21*
**needs**  244:*11*
**negotiated**  262:*16*
**Negotiating**  262:*15*
**negotiations**  262:*24*
263:*1*
**never**  182:*14*, *17*, *20*
203:*13*  224:*16*
230:*10*  236:*25*
249:*18*  253:*11*  260:*2*
**New**  178:*14*  193:*16*,
*18*, *23*  221:*3*  222:*1*
223:*6*  235:*8*
**Nine**  250:*9*, *23*
**NO**  177:*2*  180:*8*, *13*
182:*14*, *17*, *20*, *24*
183:*3*, *6*, *9*, *15*  185:*16*
186:*5*  188:*5*, *9*, *25*

189:*8*, *10*, *17*, *20*
190:*12*, *15*, *19*, *22*, *25*
191:*4*, *9*, *14*  192:*4*, *7*
193:*11*, *14*, *25*  194:*10*,
*16*, *19*, *22*, *25*  195:*2*, *4*,
*7*, *11*, *14*, *24*  196:*1*, *3*,
*11*, *14*  197:*20*  198:*7*
199:*2*  201:*4*, *6*, *17*, *20*
202:*9*, *12*, *15*, *18*
203:*13*, *16*  204:*19*, *24*
205:*18*, *20*, *23*  206:*6*,
*14*, *17*, *21*, *24*  207:*2*, *5*,
*8*, *13*  208:*13*  209:*4*,
*21*, *25*  210:*15*, *18*
211:*5*  214:*7*  215:*8*,
*17*  216:*14*  218:*25*
219:*20*  220:*11*, *23*
222:*17*  227:*6*, *13*, *16*
228:*3*, *15*, *21*  229:*21*,
*22*, *25*  230:*5*, *8*, *21*
231:*10*, *14*, *17*, *19*
233:*21*, *24*  234:*19*
235:*1*  236:*13*, *21*, *25*
237:*9*, *19*  238:*20*, *23*
239:*11*  240:*4*  241:*11*,
*21*  242:*11*  243:*19*
245:*23*  246:*8*, *18*
248:*8*, *11*, *20*  250:*24*
253:*21*  254:*5*, *20*
255:*4*, *8*, *25*  256:*9*, *12*
257:*1*, *2*, *23*  259:*16*
260:*15*, *16*  261:*22*
264:*3*, *9*  265:*7*, *22*
266:*6*, *8*, *13*  267:*17*,
*20*, *23*  268:*4*, *11*, *12*
269:*1*, *2*, *6*  270:*3*, *5*,
*22*, *25*  271:*3*, *7*, *10*, *11*,
*19*  272:*1*, *4*, *7*, *10*, *13*,
*17*
**nor**  182:*20*  274:*8*, *9*
**not**  182:*24*  183:*3*, *6*
184:*13*  186:*3*, *5*, *9*, *18*
187:*25*  188:*21*
190:*10*, *12*, *13*, *15*, *19*,
*22*  191:*5*, *10*, *15*, *19*
192:*4*, *15*, *18*, *23*, *24*
193:*4*, *6*, *11*, *14*
194:*11*, *16*, *19*, *22*
195:*2*, *4*, *7*, *11*, *14*, *15*,
*24*  196:*1*, *3*  197:*23*

198:*6*, *7*  199:*12*, *19*
200:*20*, *23*  201:*4*, *6*,
*17*, *20*  202:*9*, *12*
203:*11*, *16*  205:*23*
206:*14*, *17*, *21*, *24*
207:*2*, *5*, *8*  208:*17*
209:*1*, *3*, *4*, *10*, *21*, *25*
210:*10*, *15*, *18*  211:*7*
212:*24*  213:*1*, *22*
214:*7*, *8*  215:*1*, *8*, *12*,
*14*, *17*, *24*  216:*9*
217:*12*, *17*, *20*  218:*25*
219:*15*  220:*11*, *23*
221:*1*, *9*, *13*, *18*, *19*
222:*4*, *12*, *14*, *17*, *21*
225:*14*  226:*3*  227:*13*,
*16*, *20*, *23*  228:*1*, *3*, *7*,
*15*, *16*, *21*  229:*2*, *4*, *6*,
*21*, *25*  230:*5*, *8*, *21*
231:*6*, *10*, *14*, *17*, *19*
233:*21*, *24*  234:*19*
235:*16*  236:*21*, *24*
237:*19*  238:*19*  240:*1*
241:*11*  244:*22*
246:*18*  247:*18*  248:*8*,
*11*, *14*  252:*16*  253:*15*,
*16*, *21*  254:*5*, *24*
255:*21*, *25*  256:*12*, *23*
257:*23*  259:*17*, *25*
260:*3*, *15*, *16*, *18*, *19*
261:*1*, *2*, *11*, *16*, *24*
262:*16*, *17*  264:*3*, *9*
265:*7*, *19*  267:*10*, *17*,
*20*, *21*, *25*  268:*4*, *11*
269:*10*  270:*22*, *25*
271:*7*, *10*, *19*  272:*4*, *7*,
*10*, *13*  274:*5*, *6*
**Notary**  273:*4*, *13*
274:*2*
**note**  264:*19*, *21*
**notes**  272:*15*  274:*6*
**nothing**  228:*11*, *18*
272:*19*
**November**  186:*15*
210:*8*, *9*, *11*  211:*20*,
*24*  212:*2*, *8*  215:*6*
251:*3*
**now**  181:*13*  185:*14*
191:*21*  194:*5*  196:*22*
199:*7*  202:*22*  205:*9*

207:*12*  218:*1*  220:*13*
237:*17*  243:*22*
244:*24*  245:*24*  248:*6*
251:*10*  252:*25*  261:*5*
263:*16*  264:*11*
**number**  216:*10*, *11*
261:*13*
**numeral**  214:*9*
**NW**  179:*8*, *17*

**< O >**
**Oath**  180:*4*  273:*1*
**object**  268:*14*
**objecting**  217:*11*
**Objection**  184:*4*
189:*13*, *23*  193:*2*, *8*
195:*8*, *17*, *22*  197:*12*
200:*25*  204:*3*  206:*7*
217:*8*, *19*  218:*7*
219:*8*, *14*  223:*21*
228:*11*, *17*, *23*  234:*2*
249:*15*  251:*15*  259:*2*,
*14*, *23*  260:*8*, *24*
262:*12*, *20*  263:*3*
265:*1*, *17*  267:*23*
268:*10*, *23*, *24*  269:*4*
271:*13*, *16*, *23*, *24*
**obstructed**  212:*20*
**obtain**  183:*13*  251:*6*
261:*9*  271:*4*
**obvious**  245:*21*
**obviously**  224:*12*
269:*7*
**occupant**  199:*25*
**occur**  230:*24*  246:*22*
**occurred**  212:*2*
214:*3*, *20*, *25*  215:*7*
245:*25*
**occurring**  213:*21*
254:*3*
**October**  251:*2*, *4*, *7*
264:*16*
**ODC**  180:*10*  219:*21*
**ODC001909**  180:*10*
219:*21*, *23*
**ODC001911**  219:*24*
**offered**  211:*7*  230:*18*
**OFFICE**  178:*8*  249:*1*
**officer**  225:*12*
**Oh**  220:*4*

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

**Okay** 183:*25* 184:*21*
211:*21* 213:*2* 226:*13*
232:*25* 262:*9* 272:*19*
**old** 227:*7*
**oldest** 227:*9*
**old-fashioned** 184:*22*
**OLYMPIA** 177:*2*
179:*10, 15* 196:*20*
217:*6* 218:*1* 220:*9,
20* 221:*23* 222:*15*
223:*3* 224:*13* 229:*19,
23* 230:*1, 3* 232:*15*
238:*1* 241:*7* 243:*14*
244:*19, 24* 245:*6, 24*
246:*4, 12, 17, 19*
247:*25* 248:*7* 249:*9,
13, 19* 251:*14, 18*
252:*14* 253:*1, 5, 7, 14,
20* 254:*3, 15, 16, 21,
25* 255:*1, 7, 9, 13, 22*
256:*2, 5, 11, 14, 19, 20*
258:*10, 11, 19, 21, 24*
259:*11, 18, 21* 260:*2,
13, 18* 262:*10, 17, 25*
263:*24* 264:*6, 8, 9, 19,
24* 265:*9, 25* 266:*25*
269:*18* 272:*6*
**Olympia's** 266:*7*
267:*14, 16*
**once** 260:*10* 264:*19*
**one** 181:*22, 23*
187:*23* 188:*11, 25*
203:*6* 204:*10, 12*
208:*4* 225:*9* 226:*15*
231:*25* 243:*10*
255:*20* 263:*25*
**onward** 230:*25*
**onwards** 227:*24*
**opened** 217:*9*
**Operating** 183:*23*
189:*22* 190:*4, 17, 18,
21, 24* 191:*3* 207:*4*
**operations** 243:*14*
**opinion** 198:*22*
260:*12*
**opportunity** 234:*6, 9*
**opposite** 237:*1*
**option** 261:*12*
**order** 183:*14* 244:*13*
251:*3* 252:*13*

**organizational** 203:*7,
9*
**organize** 244:*13*
**original** 185:*1*
**originally** 201:*23*
205:*3* 247:*8*
**Orozco** 177:*18* 273:*4,
11* 274:*2, 14*
**Ortega** 188:*13, 15, 16*
**other** 185:*16* 187:*20,
25* 199:*23* 211:*19*
220:*24* 221:*23* 222:*4*
229:*11, 16, 18* 233:*7,
19* 239:*7, 24* 243:*8*
246:*5* 258:*16* 264:*23*
268:*6* 270:*13, 15*
**others** 225:*13*
**otherwise** 264:*24*
**out** 199:*16* 212:*23*
229:*5* 236:*24*
**outcome** 226:*23*
**outputs** 245:*22*
**outside** 203:*25*
**outstanding** 267:*22*
**over** 214:*23* 219:*18*
258:*10* 269:*17*
**owe** 251:*13*
**owed** 251:*17* 252:*14*
253:*22* 255:*7*
**own** 182:*22* 183:*4, 7*
190:*10, 13* 191:*5, 10*
192:*9, 24* 193:*6, 11*
195:*1* 201:*15, 18*
204:*18* 205:*19* 228:*6*
**owned** 183:*22*
201:*13, 21, 23* 204:*21,
25* 205:*6, 15* 229:*12,
15, 19* 252:*13*
**owner** 183:*17, 19, 23*
189:*7, 11, 16* 195:*15,
21* 196:*10* 200:*23*
201:*2, 5* 228:*6* 229:*8*
234:*7, 21* 243:*4, 7*
252:*25* 256:*1, 18*
261:*25*
**owners** 203:*14, 16, 18,
22* 241:*5* 242:*25*
**ownership** 188:*4, 7*
191:*12, 16, 17* 194:*24*
195:*5* 204:*5* 205:*21*

206:*5, 13, 20, 22, 25*
236:*13* 241:*9* 256:*6,
24*


**< P >**
**P.A** 179:*2, 17*
**p.m** 177:*18* 264:*2*
272:*21*
**PA** 178:*19*
**package** 199:*4, 9, 13,
23* 200:*18* 201:*8*
207:*22* 208:*10, 20*
261:*12*
**Page** 180:*2, 8, 13*
208:*6* 211:*13* 212:*7,
9* 213:*23* 215:*5*
219:*24* 221:*24, 25*
223:*4* 236:*9* 237:*12,
13* 239:*15, 19* 240:*10,
19, 21, 22* 241:*25*
242:*5, 14, 18, 20*
248:*25* 251:*5, 9, 23*
252:*6, 9, 19, 20*
263:*22, 25*
**pages** 216:*12* 274:*6*
**paid** 246:*11, 14*
248:*2* 253:*2, 6, 11, 14,
19* 260:*22* 267:*21*
**paintings** 204:*11*
205:*1*
**paper** 264:*22* 265:*5,
7*
**paperwork** 206:*20*
**paragraph** 212:*16*
213:*22* 215:*5* 235:*22,
25* 239:*9*
**paragraphs** 221:*2*
241:*15*
**Park** 179:*21* 181:*17*
182:*9, 23* 183:*8, 18,
20* 186:*13* 187:*8, 10,
11* 188:*11, 22* 189:*4,
7, 9, 12, 16, 18, 21*
190:*3, 11, 14* 191:*7,
25* 192:*3* 196:*16*
199:*5, 8* 200:*21, 24*
201:*3, 5* 207:*23*
209:*2* 221:*6* 232:*17*
252:*17*
**parole** 223:*19*

**part** 212:*16* 216:*20*
218:*24* 219:*2* 223:*20*
226:*2* 234:*11* 244:*22*
247:*2* 249:*2* 261:*12*
263:*7* 271:*5, 9, 11*
272:*6*
**partial** 253:*18* 254:*2,
18*
**participated** 245:*17*
262:*17*
**particular** 203:*6*
207:*25* 212:*17*
224:*14*
**parties** 274:*8*
**partner** 233:*18*
247:*5* 262:*8*
**parts** 199:*23*
**Pasano** 252:*3*
**passed** 185:*16*
186:*15* 209:*8* 210:*8,
9* 215:*25* 216:*4*
**passing** 210:*13*
**passive** 234:*1, 5*
**PASTER** 178:*7*
180:*4* 249:*15* 251:*15*
257:*3, 7, 9* 259:*6, 15,
24* 260:*9, 25* 262:*13,
21* 263:*4* 265:*2, 22,
24* 266:*15* 267:*24*
268:*19, 22* 269:*6, 16,
24* 271:*17* 272:*14, 17*
**PAUL** 178:*12*
**Paul.hayden2@usdoj.g**
**ov** 178:*15*
**pay** 182:*25* 183:*1*
194:*20* 250:*15*
251:*20* 252:*13, 21*
253:*16* 255:*6* 267:*16,
19* 268:*2*
**payment** 254:*8*
260:*14* 261:*3*
**payments** 181:*21*
182:*1, 4* 253:*18*
254:*2, 11, 12, 15, 16,
17, 18, 20, 21*
**penalties** 235:*24*
236:*1* 257:*18*
**penalty** 257:*21*
**pending** 223:*19*

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

226:23  268:18
**Penthouse**  179:8, 18
**people**  239:18
240:18  242:17
**percent**  213:17
243:5, 8  253:25
**PERCZECK**  178:18
216:10, 13
**period**  217:5  227:21
244:8
**permission**  191:7, 13, 18
**Permissions**  180:14
239:6, 12
**personal**  230:14
270:12, 17
**personally**  183:1
194:14  204:20
208:15  209:3  221:8
244:22  270:18, 19
271:3, 21  273:6
**Petitioner**  177:2
**Petitioners**  179:1
**PhD**  199:24
**phraseology**  199:19
**picture**  242:25
**piece**  193:23
**pieces**  204:11, 15, 18,
23  205:1, 4, 12, 21
**PLACE**  177:16
212:5  234:17  246:25
253:13
**Plaintiff**  177:2, 13
178:2
**plan**  226:3  244:13
**planning**  187:19
**plans**  219:12  224:1
**please**  195:20
209:16  214:15  259:4
264:14  265:13
**pledge**  221:8
**pledged**  218:23
219:2  220:14
**PLLC**  179:7
**plus**  256:18, 25
**point**  208:18  261:25
262:3
**pointed**  185:14
199:16  257:18

**Ponce**  179:13
**portion**  255:6  264:1
**pose**  226:4
**position**  228:12, 18
**potentially**  234:21
253:8
**prepare**  209:15, 18
210:2  239:21
**prepared**  244:7
**preparing**  261:17, 19
**prepositions**  269:14
**presence**  224:5
**present**  217:23, 25
218:2, 3
**presume**  263:6
267:8, 15  269:9
**previously**  211:7
**price**  208:8  247:6
**primary**  212:12
**principal**  213:15, 25
253:22
**prior**  210:5  225:10
246:11
**Privilege**  217:8, 11
223:16  225:8  268:12
269:2, 3, 4
**privileged**  217:21
219:14  223:22  224:8,
9, 20  269:7, 10, 11
**privileges**  265:18
268:16
**probably**  267:11
**probation**  225:12
**problem**  206:8
216:14  225:7
**proceeding**  207:11
256:21
**proceedings**  223:19,
20
**proceeds**  191:24
192:2, 6, 9, 16, 18, 23
193:5  232:16, 19
**process**  223:10  252:8
**produce**  245:8, 9
260:20  261:3
**produced**  185:3, 5
224:12  258:12, 13
**producing**  258:16
260:19

**production**  214:23
244:23
**projections**  245:22
**proper**  244:11
**properly**  197:24
259:5
**properties**  220:14
222:18
**property**  193:23
196:5, 13, 15  208:8
217:7, 18  218:23
220:21, 22, 24, 25
221:3, 4, 5, 15  222:5,
6, 11, 13, 16, 24  223:7
252:13, 15
**prorated**  214:1
**protect**  197:18
**protected**  197:15
**protection**  187:22
**provide**  184:2
197:18  261:17
269:11  270:6
**provided**  197:15
244:18  259:1, 21
260:11
**providers**  196:7
**provision**  213:20
**provisions**  214:6
**public**  203:7, 9
273:4, 13  274:2
**pull**  223:15
**punch**  197:23
**purchase**  181:17, 21
182:23  183:7, 14
187:23  189:1  194:10,
15, 18  199:4  200:4
205:12  207:22  209:2
227:12  247:6
**purchased**  182:8
183:11, 17  184:1
186:13  187:11
188:23  204:21  205:3,
24
**purchaser**  200:20
**purchases**  188:10
**purchasing**  188:3, 6
**purposes**  187:19, 20
188:8
**put**  182:22  183:4

199:12
**putting**  218:5

**< Q >**
**question**  189:15
208:9  212:16  217:10
220:6  224:7  226:4, 5,
20, 24  257:10  259:16,
20  260:6  261:16
265:22  267:12
268:11, 18  269:13, 22
272:17
**questioned**  217:16
**questioning**  228:24
**questions**  181:12, 14,
16, 18  187:7  194:7
199:3  204:7  206:4
207:10, 12, 13, 21
209:10, 20, 22, 23, 25
217:12, 20  221:25
232:2, 6, 7, 19  257:2,
4, 10  259:8
**quite**  219:3
**quote**  260:23

**< R >**
**RABIN**  179:2
207:13  209:9, 11
212:25
**raise**  250:19
**raised**  193:19
**Raj**  228:1  229:9, 11,
12, 13, 15  230:10, 18,
23
**ran**  233:16
**Rasco**  179:12  180:3,
10  232:7, 10, 13, 15
234:3, 23  235:3
239:14  240:2, 6
242:13  243:17, 21
248:18, 22  249:16
250:22  251:1, 16
257:2, 12, 18, 24
259:2, 14, 23  260:8,
24  262:12, 20  263:3,
13  265:1, 8, 16  266:5,
7, 13, 23  267:11, 18,
21, 23  268:1, 7, 10, 22,
24, 25  269:19  270:2,

## EXHIBIT B

*4, 6* 271:*15, 24* 272:*2, 7, 19*

**rate** 267:*18*

**rather** 255:*22*

**read** 208:*5* 212:*23* 219:*24* 235:*25* 236:*11* 237:*13* 243:*25*

**real** 200:*10, 13* 236:*24* 237:*4* 238:*19* 252:*12*

**reality** 200:*19*

**reasons** 187:*23*

**recall** 181:*18* 185:*18, 19* 187:*8* 191:*25* 193:*21* 194:*7* 196:*7* 197:*25* 199:*5* 204:*7, 12* 208:*1, 17, 24* 210:*10* 216:*17, 21* 217:*2* 218:*18, 23, 25* 219:*1, 4* 221:*21* 225:*16* 230:*25* 231:*6* 232:*21* 233:*10, 18* 234:*20* 235:*5, 13* 236:*5, 8* 237:*7, 17, 19, 21, 23* 238:*14* 239:*16, 18, 22* 240:*1, 8, 9* 241:*6, 19* 242:*2, 3, 4, 9, 15, 24* 243:*25* 244:*2, 10, 15* 245:*5, 10, 12, 13, 18, 20, 23* 246:*25* 247:*4, 6, 13, 17* 249:*5, 24* 250:*10, 14, 18* 251:*19* 252:*1* 253:*18* 254:*2, 6, 12* 255:*9, 11, 13, 16, 20* 256:*3* 257:*19, 25* 259:*9* 260:*19* 261:*15* 262:*16* 263:*11* 265:*10* 270:*12*

**receive** 192:*2* 209:*23, 25* 236:*21* 246:*16* 248:*7, 9, 11* 253:*4* 260:*14* 261:*2*

**received** 200:*14* 214:*23* 248:*12, 15* 252:*22* 261:*14, 23*

**receiving** 235:*5* 237:*7* 243:*25* 249:*5*

**recent** 211:*18*

**recently** 253:*12*

**recipient** 243:*23*

**recognize** 184:*25* 219:*25*

**recognized** 184:*12*

**recollection** 187:*15* 218:*22* 253:*24* 254:*8, 10* 259:*17* 260:*2, 5*

**recommend** 237:*14*

**recommendation** 237:*13*

**record** 207:*18* 209:*9* 226:*16* 232:*11* 257:*17* 272:*16* 274:*6*

**recover** 256:*20*

**Redirect** 180:*3* 209:*12*

**refer** 232:*24* 242:*20*

**reference** 252:*6*

**referenced** 201:*8*

**references** 218:*16, 18* 223:*6*

**referencing** 222:*19*

**referring** 220:*22* 221:*4* 222:*1* 252:*10*

**reflect** 215:*3*

**refresh** 253:*24* 254:*8*

**regard** 214:*8*

**regarding** 194:*24* 197:*22* 199:*23* 207:*21* 217:*6, 18* 220:*13* 224:*4* 229:*17* 232:*15* 234:*18* 236:*22* 258:*5*

**regards** 230:*6* 260:*11* 265:*14*

**regulated** 202:*24* 203:*2, 3, 4*

**reiterate** 261:*1*

**related** 217:*15* 228:*1* 229:*23* 230:*13* 268:*9*

**relationship** 231:*21*

**relative** 253:*22* 274:*6, 8*

**released** 223:*14*

**relevance** 219:*8* 228:*17, 23* 259:*2, 14, 23* 260:*8*

**remaining** 207:*20* 213:*15* 226:*22*

**remember** 193:*25* 220:*6* 225:*13* 245:*25* 246:*2* 257:*13* 264:*13*

**repeat** 195:*20* 206:*4* 209:*16* 259:*4*

**report** 225:*12* 274:*4*

**Reporter** 177:*22* 180:*5* 273:*4, 13* 274:*1, 14*

**Reporting** 177:*22*

**represent** 231:*15* 232:*15* 250:*11*

**representation** 268:*2*

**representations** 200:*7*

**represented** 193:*22*

**Representing** 179:*5, 10, 15, 20*

**requested** 214:*13* 274:*5*

**requests** 214:*11*

**required** 200:*7* 244:*12* 268:*1*

**reside** 218:*20, 21* 226:*10*

**residence** 217:*3* 224:*5*

**residing** 219:*6*

**respect** 214:*21* 222:*6, 10* 229:*7, 14* 230:*12* 247:*14* 255:*10, 14*

**response** 214:*10*

**responses** 225:*3*

**Restated** 180:*8* 187:*1* 211:*6, 15, 16* 215:*6*

**result** 236:*2*

**retail** 233:*14* 236:*12*

**retailer** 235:*17*

**retain** 266:*5, 7*

**retainer** 268:*1, 3*

**returned** 249:*1*

**revealing** 225:*3*

**reverse** 251:*3*

**review** 210:*4* 249:*2* 272:*15* 274:*5*

**reviewed** 211:*4*

**RICHARD** 179:*15, 17*

Rickklu@aol.com 179:*19*

**ridges** 265:*20*

**right** 185:*3* 188:*1* 198:*6* 202:*25* 210:*23* 238:*9* 243:*8* 244:*5* 248:*4* 250:*8* 253:*12, 16, 24* 262:*1* 263:*16* 267:*10* 270:*9*

**role** 189:*3* 229:*5* 230:*1, 6, 7, 9, 11* 231:*8, 10, 12* 246:*6* 265:*12, 13, 23*

**Romero** 182:*2* 212:*11*

**Roughly** 216:*1* 242:*24* 246:*1*

**< S >**

**Sachs** 258:*15*

**sad** 249:*24*

**salary** 228:*5*

**sale** 191:*24* 192:*3, 6, 16, 19, 23* 193:*6* 200:*8* 232:*16* 246:*22, 25* 247:*14* 248:*7, 13* 249:*10* 253:*12* 262:*9, 10, 15, 16, 23* 263:*8*

**sales** 245:*17*

**SAM** 179:*2* 209:*10*

**same** 192:*20* 220:*6* 221:*25* 240:*7* 247:*8, 24* 252:*15, 19, 20* 269:*10* 271:*23, 24*

**Sam's** 207:*11*

**SAMUEL** 179:*2*

**savvy** 258:*18, 21*

**saying** 193:*25* 214:*19* 260:*17*

**says** 208:*6* 211:*19* 222:*1, 21* 235:*25* 236:*11* 237:*14* 241:*16* 248:*25* 251:*24*

**scan** 221:*22*

**Scheduled** 177:*17*

**scope** 219:*9*

**screen** 184:*8, 9, 15* 208:*5* 212:*20, 25*

## EXHIBIT B

257:*15*  258:*3*  263:*16,*
*22*

**screens**  234:*24*

**scroll**  212:*18*  225:*22*
240:*11*  243:*24*  251:*8*
263:*21, 23, 25*  264:*14*

**sculpture**  204:*12*
205:*2*

**SE**  177:*23*  179:*3*

**second**  216:*7*  226:*12,*
*15*  231:*25*  235:*22, 25*
239:*8*

**secret**  225:*14*

**SECTION**  178:*13*
185:*15*  212:*18*  215:*6*

**secure**  217:*7*  218:*5*

**Securities**  201:*13, 22,*
*24*  202:*1*  203:*1, 20*
271:*2*

**see**  184:*9, 13, 14, 23*
207:*16*  211:*10*  223:*3,*
*12*  234:*25*  235:*24*
236:*3, 14*  237:*15*
239:*8, 9*  240:*11, 22,*
*25*  242:*22*  244:*24*
249:*2*  252:*8, 9, 10, 23*
257:*15*  258:*4, 5, 6*
263:*16, 17, 19*  264:*4,*
*17*  265:*3*  266:*11, 16,*
*20*

**seeking**  234:*20*

**seen**  220:*10*  222:*23*
224:*17*  258:*3*

**Select**  234:*7, 13*

**self-employment**
228:*8, 16*

**sell**  247:*24*

**selling**  252:*8, 11, 12*

**send**  214:*15*  249:*1*

**Senema**  179:*20*

**sent**  220:*7*  264:*2, 16*
267:*12*

**sentence**  208:*4*  223:*9*
235:*24*  236:*10*

**separate**  213:*17*
236:*12*

**Sergio**  233:*11, 18*
243:*10, 11, 13*  244:*17*
245:*15*  247:*5*  248:*2*

262:*7*

**series**  236:*7*

**serious**  236:*1, 6*

**served**  189:*5*

**serves**  230:*3*

**service**  196:*6*  202:*24*

**set**  230:*10*

**Settlement**  180:*9*
182:*5, 10, 13, 16, 19*
183:*5, 24*  185:*1, 6*
186:*4, 10, 19, 23*
202:*20*  203:*18, 21*
207:*1*  211:*6, 14, 25*
212:*5*  214:*21*  215:*7*
221:*16*

**settlor**  185:*8*  213:*14*

**several**  199:*8*  241:*25*
262:*23*

**share**  184:*8*  208:*5*
213:*11, 17*  234:*24*
248:*12, 16*  251:*24*
252:*22*

**shares**  213:*17, 19*
214:*1, 6*

**shield**  225:*7*

**shift**  232:*17*

**shop**  233:*14*

**shorten**  257:*5*

**should**  213:*21*  222:*9*

**show**  211:*2*  214:*24*
215:*4*  219:*17*  234:*23,*
*24*  235:*22*  236:*9*
237:*5*  239:*3*  240:*2,*
*11*  241:*12*  242:*8*
243:*17, 24*  248:*18*
250:*22*  266:*9*

**showed**  257:*24*
263:*13*

**showing**  184:*18*
212:*8*  220:*2*  262:*24*
263:*15*  266:*9*

**showm**  263:*23*

**shown**  257:*12*

**shows**  184:*17*  208:*21*
225:*18*  244:*25*

**sign**  230:*12, 14*
231:*2, 5*  240:*15, 19*
242:*18*  270:*1*

**signature**  239:*15*
240:*10, 18*  241:*25*
242:*1, 5, 14, 17*

**signed**  199:*15*  208:*1*
231:*3*  239:*19*  240:*14,*
*15*  242:*5*  273:*8*

**significant**  236:*2*

**significantly**  257:*5*

**signing**  239:*16*  242:*2,*
*15*

**since**  183:*16*  216:*3*
223:*13*  267:*8*

**sir**  232:*20*

**sisters**  187:*5*  203:*23*
212:*3, 13*

**situation**  224:*25*

**six**  227:*10*

**Sjr@miamilawyer.com**
179:*5*

**skinny**  251:*5*

**smaller**  212:*22*

**Solandera**  240:*24*
241:*3, 6, 10*  243:*4*
246:*23*  247:*1, 14, 24*
248:*3*  261:*25*  262:*3*
263:*8, 11*

**sold**  191:*6, 21*
192:*12, 17, 19*  204:*15*
205:*25*  246:*20*
247:*25*  252:*16*  262:*3,*
*5, 6, 7*

**sole**  199:*25*

**SOMBUNTHAM**
178:*2*  180:*3*  184:*4*
189:*13, 23*  193:*2, 8*
195:*8, 17, 22*  197:*12*
200:*25*  204:*3*  206:*7,*
*9*  207:*11, 15*  209:*6, 8,*
*13*  211:*2, 9*  212:*22*
213:*4*  216:*11, 14, 15*
217:*9, 14, 22*  218:*10*
219:*10, 17, 22*  220:*4,*
*5*  223:*24*  224:*10, 18,*
*22*  225:*6, 24*  226:*8,*
*13, 19, 25*  228:*13, 19,*
*25*  231:*25*  232:*5*

**some**  181:*14*  196:*6*
200:*17*  201:*7, 8*
202:*22*  203:*8*  206:*4*

225:*19*  232:*7, 18*
234:*11*  246:*13, 14*
247:*2*  252:*8*  253:*15*
255:*17*  257:*3*  259:*8*
261:*25*  262:*3*

**something**  211:*3*
225:*25*

**son**  227:*9, 10*

**sorry**  184:*22*  218:*13*
220:*4*  263:*5*  268:*25*
270:*14*

**sort**  225:*9*  258:*14*
261:*9*

**sound**  224:*7*  253:*24*

**sounds**  199:*12*

**source**  182:*8*  270:*11*

**SOUTHERN**  177:*1*
178:*8*

**speak**  196:*25*  209:*21*
235:*9*  272:*2, 5, 8, 11*

**speaking**  203:*19*

**specific**  214:*7*  215:*2*
230:*6*  245:*20, 23*
254:*11*

**specifically**  257:*18*

**speculation**  206:*9*

**spend**  264:*20*

**spent**  249:*9, 13, 21, 25*

**spirits**  234:*16*

**Spirts**  234:*7, 14*

**spoke**  235:*11*

**spoken**  190:*16*  272:*7*

**Spouse**  180:*15*  239:*7,*
*12*

**spouses**  238:*19, 25*

**spring**  255:*2*

**SREBNICK**  178:*17,*
*19*  184:*16*  207:*17*
213:*2*  224:*6*  225:*2,*
*22*  226:*4, 11, 14, 17,*
*20*  227:*1*  232:*3, 6, 8*
234:*2*  268:*18, 21, 23*
269:*13, 22*  271:*13, 23*

**Stamp**  219:*23*

**start**  215:*23*  216:*8*
269:*13*

**started**  215:*25*  249:*1*
254:*3, 12*

**starting**  201:*9*  221:*24*

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

## EXHIBIT B

starts 248:*25* 251:*3, 5, 8*

STATE 273:*2, 5, 13* 274:*2, 4*

stated 199:*8, 18* 206:*5*

statement 194:*3, 4* 208:*9, 11, 20, 23, 25* 224:*11, 15, 24* 251:*24*

statements 219:*1*

STATES 177:*1, 2* 202:*25* 213:*10* 214:*24*

stayed 215:*8*

stenographic 274:*6*

stenographically 274:*4*

steps 209:*15, 17*

still 185:*21, 23, 25* 186:*2, 8* 196:*25* 197:*9, 14* 198:*21* 212:*10* 215:*13, 18* 218:*19* 221:*15* 225:*2* 251:*10, 13, 17* 254:*5, 13*

stipulate 226:*2*

stipulation 225:*25*

Street 177:*23* 178:*4, 9* 179:*8, 17* 194:*5*

Stribling 200:*10, 13*

string 244:*25* 251:*2*

structure 188:*10* 203:*7, 9*

STUMPF 178:*19*

style 199:*18*

subject 244:*2, 4* 258:*6*

submitted 199:*4* 207:*22* 208:*12, 16, 20*

submitting 200:*11*

subpoena 214:*10*

subsequently 211:*23*

subsidiary 183:*20* 230:*5*

substance 217:*16* 269:*20*

substantiate 214:*24*

successor 221:*16*

sued 255:*13*

suggested 216:*19*

suit 255:*17*

Suite 177:*23* 178:*20* 179:*3, 13*

summer 255:*2*

Sunday 227:*6*

supervisor 231:*13, 16*

support 269:*4*

supposed 249:*13*

sure 197:*15* 210:*7* 259:*7* 270:*16*

surrounding 197:*3*

suspension 236:*2*

switching 199:*7*

sworn 181:*3* 273:*7*

< T >

take 209:*15, 17* 231:*12* 236:*16, 17* 248:*24* 251:*6* 257:*4*

Taken 177:*13, 16, 18*

talk 200:*19* 204:*25* 209:*20* 252:*7*

talked 202:*23* 221:*3*

talking 208:*2, 14* 221:*12*

talks 235:*23* 267:*18*

tax 187:*19*

team 233:*17* 244:*18*

tell 236:*23* 249:*12, 20*

telling 249:*8*

ten 207:*15* 227:*9* 232:*9*

ten-minute 232:*4* 257:*4*

term 213:*9, 13*

terminates 215:*20*

Termination 180:*16* 241:*14, 22*

terms 187:*22* 217:*16* 246:*6* 262:*25*

testified 181:*4, 20* 182:*1* 183:*16* 184:*11* 187:*14, 18, 22* 196:*5* 198:*2* 200:*17* 202:*22* 205:*9* 210:*6* 212:*1* 224:*16* 227:*20* 270:*8*

testimony 209:*24* 210:*1*

thank 181:*11* 207:*9* 209:*5* 211:*21* 213:*3* 216:*13* 232:*1* 257:*11* 272:*20*

theirs 222:*13*

then-lawyer 225:*5*

then-wife 225:*4*

things 197:*22, 23, 24* 199:*23* 206:*4* 210:*2*

think 184:*18* 209:*8, 9* 210:*6* 213:*13* 216:*19* 221:*1* 225:*2, 7, 15* 244:*20* 247:*18* 254:*14* 259:*17* 264:*19* 270:*22, 25* 271:*7, 10, 19* 272:*14*

thinking 224:*22*

Third 179:*17*

Third-Party 177:*2* 179:*1*

thirds 236:*10*

though 197:*9* 198:*21* 271:*21*

thought 214:*19* 226:*11*

thread 265:*3*

three 204:*11* 205:*1* 210:*23* 238:*24* 241:*2*

through 219:*24* 220:*19* 223:*17* 224:*18, 22* 246:*22* 265:*6* 266:*2, 3* 270:*13, 15, 24* 271:*1* 274:*6*

tied-house 235:*20* 236:*6* 257:*19*

TIME 177:*17* 186:*25* 189:*1* 192:*22* 198:*5, 14* 208:*11, 18, 22* 210:*13, 17, 18* 211:*4* 217:*5* 219:*5, 11* 221:*10* 222:*23* 224:*25* 225:*1, 20* 226:*3, 8, 21* 227:*21* 233:*8* 234:*11* 237:*20* 238:*1, 8, 19* 243:*22* 244:*1, 8* 245:*16* 246:*19* 247:*2, 24* 248:*6, 10* 249:*24* 251:*10* 252:*21* 253:*3*

255:*2* 257:*5* 262:*23* 264:*20* 272:*18*

timeframe 225:*16* 245:*3, 14, 19* 248:*10* 255:*3*

title 195:*3* 206:*19*

today 181:*10* 215:*13, 15* 223:*14* 232:*2* 272:*6*

today's 209:*14, 17, 23* 210:*1* 272:*3, 9, 11*

together 199:*13*

told 236:*5* 249:*18, 22* 252:*20* 253:*23* 254:*7*

Toni 238:*8* 241:*7* 247:*23* 248:*12*

top 211:*19* 212:*7* 221:*23* 223:*4* 225:*22* 237:*13*

townhouse 194:*6, 10* 197:*24*

transcript 274:*5, 6*

Transfer 180:*14, 17* 236:*23* 237:*3, 4, 14, 18, 20, 24* 238:*2, 5, 11* 239:*7, 12* 241:*2* 242:*11* 243:*1, 3, 14* 245:*24* 246:*4, 9, 11, 17* 256:*5, 16*

transferee 240:*24*

transferor 240:*23* 241:*16*

transferred 191:*12* 213:*7, 10* 221:*19* 237:*25* 238:*6, 14*

transferring 237:*21, 23* 256:*10, 14*

transfers 238:*18, 25*

TRIAL 178:*12*

true 190:*6, 8* 191:*15* 192:*8, 12, 14, 15* 194:*3, 4* 200:*20* 224:*11* 243:*3* 249:*20, 22* 255:*24* 256:*8* 274:*6*

Trust 179:*20, 21* 180:*9* 182:*5, 10, 11, 13, 16, 19* 183:*5, 17, 20, 23, 24, 25* 185:*1, 6,*

## EXHIBIT B

*8, 12* 186:*4, 10, 19, 23* 187:*15, 16* 188:*1* 189:*22* 190:*4, 17, 18, 21, 24* 191:*3, 7, 13* 193:*24* 202:*2, 4, 8, 11, 14, 17, 20* 203:*18, 21* 205:*11, 17* 206:*2* 207:*1, 4* 211:*6, 25* 212:*5, 10, 14, 18* 213:*12, 16, 19* 214:*14, 15, 22* 215:*7, 8, 10, 12, 14, 18* 221:*16, 20* 237:*15, 17, 19* 238:*16* 239:*1* 241:*7* 243:*7, 11* 247:*11, 23* 270:*21*

**trustee** 182:*12, 13, 14* 190:*17* 191:*1, 8, 13* 202:*13, 17* 213:*15, 24* 214:*4, 5, 8, 12, 20* 221:*7, 11*

**trusts** 203:*22* 221:*17*

**trust's** 191:*18*

**truth** 200:*19*

**try** 212:*22*

**trying** 193:*12* 198:*25* 224:*10* 225:*21* 250:*11*

**turn** 211:*12* 212:*7, 15* 215:*4* 226:*14* 240:*21*

**turned** 214:*23* 219:*18*

**twice** 264:*19* 265:*4*

**two** 181:*20* 182:*4* 207:*20* 236:*9* 238:*25* 264:*21, 24* 272:*15*

**two-page** 239:*5*

**type** 214:*16* 233:*12* 234:*13*

**types** 236:*1*

**< U >**

**U.S** 178:*8, 13* 203:*2* 208:*7*

**ultimately** 198:*22* 237:*17* 238:*24* 252:*16* 255:*9*

**uncertain** 222:*7, 22*

**under** 188:*25* 212:*16* 238:*16* 258:*25* 259:*11, 20* 260:*7, 22*

**understand** 193:*15* 225:*6* 248:*17* 253:*21, 25* 257:*10* 259:*5*

**understanding** 183:*10* 187:*24* 190:*2* 213:*24* 215:*16* 221:*14* 223:*15, 17* 224:*25* 262:*7*

**understood** 220:*15*

**undertake** 268:*2*

**undistributed** 213:*16, 25*

**unemployment** 227:*18*

**Unfortunately** 251:*5*

**UNITED** 177:*1, 2* 202:*24* 214:*24*

**up** 207:*14* 218:*5* 220:*14* 230:*10* 231:*8* 244:*25* 252:*20* 258:*3*

**use** 222:*13* 223:*11* 253:*8*

**used** 183:*7* 213:*13* 217:*7* 237:*18*

**using** 237:*19* 269:*14*

**< V >**

**vacation** 249:*25*

**VAN** 178:*18*

**various** 262:*25*

**verify** 224:*14*

**version** 264:*22*

**very** 236:*6* 251:*23* 253:*12* 272:*20*

**Videoconferencing** 177:*16*

**violated** 236:*7* 265:*18*

**violates** 269:*1*

**violation** 236:*6* 257:*19*

**violations** 236:*1*

**Virginia** 234:*24*

**visit** 264:*21*

**Von** 204:*12* 205:*2*

**vs** 177:*2*

**< W >**

**Walden** 247:*18, 20* 249:*12* 251:*13, 17, 20* 253:*2, 7, 11, 14* 254:*3, 18* 255:*6, 14* 256:*3*

**want** 182:*4* 200:*18* 207:*16* 208:*10* 210:*7* 211:*2* 212:*7* 222:*7, 8, 22* 223:*2* 224:*14* 226:*1, 2, 6* 243:*25* 260:*17*

**Washington** 178:*14*

**way** 184:*22* 195:*12* 196:*2, 5* 199:*1* 213:*1* 236:*10* 243:*22* 251:*6* 252:*9*

**we** 190:*16* 202:*23* 203:*19* 204:*5, 6* 206:*4* 207:*11* 208:*14* 210:*15, 18* 214:*10* 220:*18, 20* 222:*2* 225:*15, 24* 226:*14* 232:*3* 235:*15, 17* 243:*1, 22, 23* 246:*8, 23* 251:*6* 252:*9* 254:*18* 256:*15* 257:*3, 5* 269:*9, 12, 14*

**week** 181:*13* 207:*24* 222:*8* 225:*15* 272:*5*

**Well** 181:*11* 192:*14* 208:*7, 19* 213:*9* 217:*3* 223:*16* 245:*6* 258:*11* 269:*5*

**went** 254:*16, 20, 21*

**West** 181:*17* 182:*9, 23* 183:*8, 18, 21* 186:*13* 187:*8, 10, 11* 188:*11, 22* 189:*4, 7, 9, 12, 16, 18, 22* 190:*3, 11, 14* 191:*7, 25* 192:*3* 196:*16* 199:*5, 8* 200:*21, 24* 201:*3, 5* 207:*23* 209:*3* 221:*6*

**whatsoever** 221:*9* 225:*14*

**wholesale** 236:*12*

**wholesaler** 234:*15, 18*

**wife** 217:*21* 223:*18, 23, 25* 224:*3, 9*

225:*10* 237:*25* 238:*7, 8*

**Wine** 232:*22, 24* 233:*13* 234:*7, 14* 237:*15*

**wines** 234:*16*

**wire** 251:*25*

**wish** 184:*7*

**witness** 177:*18* 181:*5* 209:*7, 9* 213:*3* 259:*4* 265:*19* 268:*17*

**wondering** 225:*20*

**work** 228:*3, 4, 7, 8, 10* 229:*2, 6* 245:*8* 258:*25* 259:*9, 11, 13, 20, 22* 260:*1, 7, 11, 16, 23* 264:*20*

**worked** 244:*15* 245:*8, 9* 258:*15* 261:*13*

**working** 197:*24* 198:*6, 10, 12* 227:*20, 23* 228:*2* 245:*2* 258:*24* 261:*6*

**workings** 198:*8*

**work-product** 265:*17* 268:*15*

**writes** 220:*20* 221:*7* 222:*7* 223:*9*

**writing** 253:*3*

**written** 208:*1*

**wrk** 228:*15*

**wrong** 260:*3, 5, 21* 261:*4*

**< X >**

**x308** 179:*9*

**< Y >**

**Yeah** 247:*16* 261:*21*

**year** 252:*21*

**years** 188:*15, 18* 190:*6* 216:*3, 5, 7, 8* 231:*22* 261:*13*

**Yes** 181:*19, 24* 182:*3, 7, 11* 183:*12* 184:*7, 10, 24* 185:*2, 4, 7, 10, 13, 22, 24* 186:*1, 14, 17, 24* 187:*3, 6, 9, 13, 17, 21* 188:*2, 12, 14,*

Gustavo Adolfo Hernandez Frieri taken on 7/26/2021

**EXHIBIT B**

*16, 20, 24*  189:*2, 6*
190:*1, 5, 7, 9*  191:*20,
22*  192:*1, 11, 21*
193:*17, 20*  194:*2, 4, 8*
196:*8, 18, 21, 24*
197:*2, 5, 8*  198:*1, 4, 9,
11, 13, 16, 20, 24*
199:*6, 11, 14, 17, 21*
200:*2, 5, 9, 12, 16*
201:*12, 14*  202:*3, 6,
21*  203:*1, 4, 9, 24*
204:*2, 9, 14, 17, 22*
205:*5, 8, 14*  206:*2*
208:*3, 24*  209:*19*
210:*12, 24*  211:*11, 21*
212:*12*  213:*5*  214:*13*
216:*18, 22*  217:*1, 4,
25*  218:*3, 16*  219:*7*
223:*1, 5, 8*  226:*25*
227:*4, 19, 22*  228:*8*
229:*12, 18*  231:*24*
232:*5, 10, 20, 23*
233:*1, 9, 15*  234:*5, 8,
22*  235:*6, 11, 15, 21*
236:*4, 8, 15, 17*  237:*3,
8, 16, 23*  238:*4, 10, 13*
239:*2, 10, 17, 20, 23*
240:*9, 13, 20*  241:*1, 4,
20*  242:*3, 7, 10, 16, 19,
23*  243:*2, 6, 9, 12, 16*
244:*6, 9, 17*  245:*1, 4,
12, 15*  246:*13, 15, 21,
24*  247:*12, 22*  248:*1,
5*  249:*4, 7, 11, 22*
250:*1, 13, 17, 21*
251:*12, 17, 22*  252:*2,
5, 18, 24*  253:*10*
254:*1, 16, 24*  255:*15,
19, 23*  256:*7, 15*
257:*14, 20*  258:*2, 6, 8,
23*  259:*10*  261:*8*
262:*2*  263:*10, 12, 17,
20*  264:*5, 8, 17*
265:*11, 22*  266:*4, 12,
17, 21*  267:*4, 6*
268:*11, 12, 25*  269:*2,
6, 25*  270:*7, 10, 18*
**York**  178:*14*  193:*16,
18, 23*  221:*3*  222:*1*

223:*6*  235:*8*
**youngest**  227:*10*

**< Z >**
**zoom**  211:*20*