**EXHIBIT C**

No. 518734

British Virgin Islands
The International Business Companies Act (Cap. 291)

# Memorandum of Association & Articles of Association of

**GLOBAL FINANCE MANAGEMENT CORPORATION**

Incorporated the 28th day of October, 2002

CERTIFIED A TRUE COPY

TRIDENT TRUST COMPANY (B.V.I.) LIMITED

Date: May 31, 2011

BVI COMPANY FORMATIONS LTD
PO Box 146, Road Town, Tortola
British Virgin Islands

GOVERNMENT
EXHIBIT
1

000494-03

**EXHIBIT C**

# MEMORANDUM OF ASSOCIATION

## OF

## GLOBAL FINANCE MANAGEMENT CORPORATION

### INDEX

| CLAUSE | | PAGES |
|---|---|---|
| 1 | Name | 1 |
| 2 | Registered Office | 1 |
| 3 | Registered Agent | 1 |
| 4 | General Objects and Powers | 1 |
| 5 | Exclusions | 1-3 |
| 6 | Share Capital | 3 |
| 7 | Amendments | 4 |
| 8 | Definitions | 4 |

000495-03

**EXHIBIT C**

## TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
### (CAP. 291)

## MEMORANDUM OF ASSOCIATION

## OF

## GLOBAL FINANCE MANAGEMENT CORPORATION

1.   **NAME**

The name of the company is  Global Finance Management Corporation.

2.   **REGISTERED OFFICE**

The Registered Office of the Company will be the offices of Trident Trust Company (B.V.I.) Limited, Trident Chambers, P.O. Box 146, Road Town, Tortola, British Virgin Islands or such other place within the British Virgin Islands as the Company from time to time may determine by a resolution of directors.

3.   **REGISTERED AGENT**

The Registered Agent of the Company will be Trident Trust Company (B.V.I.) Limited or such other qualified person in the British Virgin Islands as the Company from time to time may determine by a resolution of directors.

4.   **GENERAL OBJECTS AND POWERS**

The object of the Company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands.

The Company shall have all such powers as are permitted by law for the time being in force in the British Virgin Islands which are necessary or conducive to the conduct, promotion or attainment of the object of the Company.

5.   **EXCLUSIONS**

5.1   The Company has no power to:

1

000496-03

**EXHIBIT C**

5.1.1 carry on business with persons resident in the British Virgin Islands,

5.1.2 own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph 5.2.5 of sub clause 5.2,

5.1.3 carry on banking or trust business unless it is licensed under the Banks and Trust Companies Act, 1990;

5.1.4 carry on business as an insurance or reinsurance company, insurance agent or insurance broker unless it is licensed under an enactment authorising it to carry on that business;

5.1.5 carry on business of company management, unless it is licensed under the Company Management Act, 1990; or

5.1.6 carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

5.2 For the purposes of paragraph 5.1.1 of sub clause 5.1, the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if,

5.2.1 it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands,

5.2.2 it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands,

5.2.3 it prepares or maintains books and records within the British Virgin Islands,

5.2.4 it holds within the British Virgin Islands meetings of its directors or members,

5.2.5 it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained,

5.2.6 it holds shares, debt obligations or other securities in a company

2

**EXHIBIT C**

incorporated under the International Business Companies Act, or

5.2.7 shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Act.

6. **SHARE CAPITAL**

6.1 **CURRENCY**

Shares in the Company shall be issued in the currency of The United States of America.

6.2 **AUTHORISED CAPITAL**

The Authorised Share Capital of the Company is US$50,000.00 divided into 50,000 shares of US$1.00 each, with one vote per share.

6.3 **CLASSES OF SHARES**

The shares shall be divided into such number of classes and series as the directors shall by resolution from time to time determine and until so divided shall comprise one class and series.

6.4 **RIGHTS, QUALIFICATIONS OF SHARES**

The directors shall by resolution have the power to issue any class or series of shares that the company is authorised to issue in its capital, original or increased, with or subject to any designations, powers, preferences, rights, qualifications, limitations and restrictions.

6.5 **REGISTERED SHARES**

The Company may only issue shares in registered form. The issuance of bearer shares by the Company is not permitted.

6.6 **TRANSFER OF SHARES**

Registered shares in the Company may be transferred subject to the prior or subsequent approval of the Company as evidenced by a resolution of directors or by a resolution of members.

3

**EXHIBIT C**

## 7. AMENDMENTS

The Company may amend its Memorandum of Association and Articles of Association in any way permitted by the International Business Companies Act by a resolution of members or a resolution of directors.

## 8. DEFINITIONS

The meanings of words in this Memorandum of Association are as defined in the Articles of Association annexed hereto.

We, the undersigned of the address stated below for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association the 28th day of October, 2002 in the presence of the undersigned witness:

NAME AND ADDRESS                          SUBSCRIBER
OF WITNESS


SGD:  DION KENDALL                        SGD:  LINDA ANDREWS
      Dion Kendall                              Linda Andrews
      c/o P. O. Box 146                         For and on behalf of
      Road Town, Tortola                        Trident Trust Company (B.V.I.)
      British Virgin Islands                    Limited
                                                Trident Chambers
                                                P. O. Box 146
                                                Road Town, Tortola
                                                British Virgin Islands

4

000499-03

**EXHIBIT C**

## ARTICLES OF ASSOCIATION

## OF

## GLOBAL FINANCE MANAGEMENT CORPORATION

### INDEX

| CLAUSE | | PAGES |
|---|---|---|
| 1 | Interpretation | 1-3 |
| 2 | Shares | 3-4 |
| 3 | Shares, Authorised Capital and Capital | 4-6 |
| 4 | Transfer of Shares | 6 |
| 5 | Transmission of Shares | 6-7 |
| 6 | Reduction or Increase in Authorised Capital or Capital | 7-8 |
| 7 | Mortgages and Charges of Shares | 8 |
| 8 | Forfeiture | 8-9 |
| 9 | Meetings and Consents of Members | 9-12 |
| 10 | Directors | 12-13 |
| 11 | Powers of Directors | 13-15 |
| 12 | Proceedings of Directors | 15-16 |
| 13 | Officers | 17 |
| 14 | Conflicts of Interest | 17 |
| 15 | Indemnification | 17-18 |
| 16 | Seal | 18-19 |
| 17 | Dividends | 19-20 |
| 18 | Accounts | 20 |
| 19 | Audit | 20-21 |
| 20 | Notices | 21 |
| 21 | Pension and Superannuation Funds | 21 |
| 22 | Arbitration | 21-22 |
| 23 | Voluntary Winding Up and Dissolution | 22 |
| 24 | Continuation | 22 |

**EXHIBIT C**

## TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
### (CAP. 291)

## ARTICLES OF ASSOCIATION OF

## GLOBAL FINANCE MANAGEMENT CORPORATION

## 1.  INTERPRETATION

In these Articles, if not inconsistent with the context, the words and expressions standing in the first column of the following table shall bear the meanings set opposite them respectively in the second column thereof.

|  | **Expression:** | **Meaning:** |
|---|---|---|
| 1.1 | capital | The sum of the aggregate par value of all outstanding shares with par value of the Company and shares with par value held by the Company as treasury shares plus |
|  |  | 1.1.1 the aggregate of the amounts designated as capital of all outstanding shares without par value of the Company and shares without par value held by the Company as treasury shares, and |
|  |  | 1.1.2 the amounts as are from time to time transferred from surplus to capital by a resolution of directors. |
| 1.2 | member | A person who holds shares in the Company. |
| 1.3 | person | An individual, a corporation, a trust, the estate of a deceased individual, a partnership or an unincorporated association of persons. |
| 1.4 | resolution of directors | 1.4.1 A resolution approved at a duly constituted meeting of directors or of a committee of directors of the Company, by affirmative vote of a simple majority of the directors present at the meeting who voted and did not abstain; or |
|  |  | 1.4.2 A resolution consented to in writing by all the directors or all the members of the committee, as the case may be; |

1

**EXHIBIT C**

|       |                        |         |                                                                                                                                                                                                                                                                                                                                                                                                                    |
|-------|------------------------|---------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|       |                        | 1.4.3   | where a director is given more than one vote in any circumstances, he shall in the circumstances be counted for the purposes of establishing a majority by the number of votes he casts.                                                                                                                                                                                                                             |
| 1.5   | **resolution of members** | 1.5.1   | A resolution approved at a duly constituted meeting of the members of the company by the affirmative vote of                                                                                                                                                                                                                                                                                                     |
|       |                        | 1.5.1.1 | a simple majority, or such larger majority as may be specified in the Articles, of the votes of the shares that were present at the meeting and entitled to vote thereon and were voted and did not abstain, or                                                                                                                                                                                                      |
|       |                        | 1.5.1.2 | a simple majority, or such larger majority as may be specified in the Articles, of the votes of each class or series of shares which were present at the meeting and entitled to vote thereon as a class or series and were voted and not abstained and of a simple majority, or such larger majority as may be specified in the Articles, of the votes of the remaining shares entitled to vote thereon that were present at the meeting and were voted and not abstained; or |
|       |                        | 1.5.2   | a resolution consented to in writing by                                                                                                                                                                                                                                                                                                                                                                            |
|       |                        | 1.5.2.1 | a majority, or such larger majority as may be specified in the Articles, of the votes of shares entitled to vote thereon, or                                                                                                                                                                                                                                                                                        |
|       |                        | 1.5.2.2 | a majority, or such larger majority as may be specified in the Articles, of the votes of each class or series of shares entitled to vote thereon and of a majority, or such larger majority as may be specified in the Articles, of the votes of the remaining shares entitled to vote thereon.                                                                                                                        |
| 1.6   | **securities**         |         | Shares and debt obligations of every kind, and options, warrants and rights to acquire shares, or debt obligations.                                                                                                                                                                                                                                                                                                 |
| 1.7   | **surplus**            |         | The excess, if any, at the time of the determination of the total assets of the Company over the aggregate of its total liabilities, as shown in its books of accounts, plus the Company's capital.                                                                                                                                                                                                                  |
| 1.8   | **the Act**            |         | The International Business Companies Act (Cap. 291), including any modification, extension, re-enactment or renewal thereof and any regulations made thereunder.                                                                                                                                                                                                                                                      |

2

000502-03

**EXHIBIT C**

1.9    **the Memorandum**    The Memorandum of Association of the Company as originally framed or as from time to time amended.

1.10   **the Seal**    Any seal which has been adopted as the Seal of the Company.

1.11   **these Articles**    These Articles of Association as originally framed or as from time to time amended.

1.12   **treasury shares**    Shares in the Company that were previously issued but were repurchased, redeemed or otherwise acquired by the Company and not cancelled.

1.13   **"Written"** or any term of like import includes words typewritten, printed, painted, engraved, lithographed, photographed or re-presented or reproduced by any mode of representing or re-producing words in a visible form, including telex, telegram, facsimile, cable or other form of writing produced by electronic communication.

1.14   Save as aforesaid any words or expressions defined in the Act shall bear the same meaning in these Articles.

1.15   Whenever the singular or plural number, or the masculine, feminine or neuter gender is used in these Articles, it shall equally, where the context admits, include the others.

1.16   A reference in these Articles to voting in relation to shares shall be construed as a reference to voting by members holding the shares except that it is the votes allocated to the shares that shall be counted and not the number of members who actually voted and a reference to shares being present at a meeting shall be given a corresponding construction.

1.17   A reference to money in these Articles is, unless otherwise stated, a reference to the currency in which shares in the Company shall be issued according to the provisions of the Memorandum.

2.                                            **SHARES**

2.1    The Company shall issue to every member holding shares in the Company a certificate signed by a director or officer of the Company and under the Seal specifying the share or shares held by him and the signature of the director or officer and the Seal may be a facsimile.

2.2    Any member receiving a share certificate for shares shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of the wrongful or fraudulent use or representation made by any person by virtue of the possession thereof. If a share certificate for shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a resolution of directors.

3

000503-03

**EXHIBIT C**

2.3   If several persons are registered as joint holders of any shares, any one of such persons may be given receipt for any dividend payable in respect of such shares.

## 3.                    SHARES, AUTHORISED CAPITAL AND CAPITAL

3.1   Subject to the provisions of these Articles and any resolution of members the unissued shares of the Company shall be at the disposal of the directors who may, without limiting or affecting any rights previously conferred on the holders of any existing shares or class or series of shares, offer, allot, grant options over or otherwise dispose of the shares to such persons, at such times and upon such terms and conditions as the Company may by resolution of directors determine.

3.2   No share in the Company may be issued until the consideration in respect thereof is fully paid, and when issued the share is for all purposes fully paid and non-assessable save that a share issued for a promissory note or other written obligation for payment of a debt may be issued subject to forfeiture in the manner prescribed in these Articles.

3.3   Shares in the Company shall be issued for money, services rendered, personal property, an estate in real property, a promissory note or other binding obligation to contribute money or property or any combination of the aforegoing as shall be determined by a resolution of directors.

3.4   Shares in the Company may be issued for such amount of consideration as the directors may from time to time by resolution of directors determine, except that in the case of shares with par value, the amount shall not be less than the par value, and in the absence of fraud the decision of the directors as to the value of the consideration received by the Company in respect of the issue is conclusive unless a question of law is involved.   The consideration in respect of the shares constitutes capital to the extent of the par value and the excess constitutes surplus.

3.5   A share issued by the Company upon conversion of, or in exchange for, another share or a debt obligation or other security in the Company, shall be treated for all purposes as having been issued for money equal to the consideration received or deemed to have been received by the Company in respect of the other share, debt obligation or security.

3.6   Treasury shares may be disposed of by the Company on such terms and conditions (not otherwise inconsistent with these Articles) as the Company may by resolution of directors determine.

3.7   The Company may issue fractions of a share and a fractional share shall have the same corresponding fractional liabilities, limitations, preferences, privileges, qualifications, restrictions, rights and other attributes of a whole share of the same class or series of shares.

3.8   Upon the issue by the Company of a share without par value, if an amount is stated in the Memorandum to be authorized capital represented by such shares then each share shall be issued for no less than the appropriate proportion of such amount which shall constitute capital, otherwise the consideration in respect of the share constitutes

4

**EXHIBIT C**

capital to the extent designated by the directors and the excess constitutes surplus, except that the directors must designate as capital an amount of the consideration that is at least equal to the amount that the share is entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

3.9 The Company may, subject to any limitations imposed by the Act, purchase, redeem or otherwise acquire and hold its own shares but only out of surplus or in exchange for newly issued shares of equal value.

3.10 Subject to provisions to the contrary in

3.10.1 the Memorandum or these Articles;

3.10.2 the designations, powers, preferences, rights, qualifications, limitations and restrictions with which the shares were issued; or

3.10.3 the subscription agreement for the issue of the shares,

the Company may not purchase, redeem or otherwise acquire its own shares without the consent of members whose shares are to be purchased, redeemed or otherwise acquired.

3.11 No purchase, redemption or other acquisition of shares shall be made unless the directors determine that immediately after the purchase, redemption or other acquisition the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realizable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account, and its capital and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

3.12 A determination by the directors under the preceding Regulation is not required where shares are purchased, redeemed or otherwise acquired

3.12.1 pursuant to a right of a member to have his shares redeemed or to have his shares exchanged for money or other property of the Company;

3.12.2 by virtue of a transfer of capital pursuant to Regulation 6.3;

3.12.3 by virtue of the provisions of Section 83 of the Act; or

3.12.4 pursuant to an order of the Court.

3.13 The Company may purchase, redeem or otherwise acquire its shares at a price lower than the fair value if permitted by, and then only in accordance with, the terms of

3.13.1 the Memorandum or these Articles; or

3.13.2 a written agreement for the subscription for the shares to be purchased, redeemed or otherwise acquired.

5

**EXHIBIT C**

3.14  Shares that the Company purchases, redeems or otherwise acquires pursuant to the preceding Regulations may be cancelled or held as treasury shares. Upon the cancellation of a share, the amount included as capital of the Company with respect to that share shall be deducted from the capital of the Company.

3.15  Where shares in the Company are held by the Company as treasury shares or are held by another company of which the Company holds, directly or indirectly, shares having more than 50 percent of the votes in the election of directors of the other company, such shares of the Company are not entitled to vote or to have dividends paid thereon and shall not be treated as outstanding for any purpose except for purposes of determining the capital of the Company.

## 4              TRANSFER OF SHARES

4.1  Subject to the limitations in the Memorandum, registered shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the directors may accept such evidence of a transfer of shares as they consider appropriate.

4.2  The Company shall not be required to treat a transferee of a registered share in the Company as a member until the transferee's name has been entered in the share register.

4.3  Subject to any limitations in of the Memorandum, the Company must, on the application of the transferor or transferee of a registered share in the Company, enter in the share register the name of the transferee of the share save that the registration of transfers may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of directors determine provided always that such registration shall not be suspended and the share register closed for more than 60 days in any period of 12 months.

## 5.              TRANSMISSION OF SHARES

5.1  The executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognised by the Company as having any title to his shares but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the next following two regulations.

5.2  Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the directors. An application by any such person to be registered as a member shall be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

5.3  Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered

6

**EXHIBIT C**

himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

5.4   What amounts to incompetence on the part of a person is a matter to be determined by a court of competent jurisdiction having regard to all the relevant evidence and the circumstances of the case.

## 6.   REDUCTION OR INCREASE IN AUTHORISED CAPITAL OR CAPITAL

6.1   The Company may by a resolution of members or a resolution of directors amend the Memorandum to increase or reduce its authorised capital and in connection therewith the Company may in respect of any unissued shares increase or reduce the number of such shares, increase or reduce the par value of any shares or effect any combination of the foregoing.

6.2   The Company may amend the Memorandum to

6.2.1   divide the shares, including issued shares, of a class or series into a larger number of shares of the same class or series; or

6.2.2   combine the shares, including issued shares, of a class or series into a smaller number of shares of the same class or series;

provided however, that where shares are divided or combined under this Regulation, the aggregate par value of the new shares must be equal to the aggregate par value of the original shares.

6.3   The capital of the Company may by a resolution of directors be increased by transferring an amount of the surplus of the Company to capital.

6.4   Subject to the provisions of Regulations 6.5 and 6.6 the capital of the Company may by resolution of directors be reduced by transferring an amount of the capital of the Company to surplus.

6.5   No reduction of capital shall be effected that reduces the capital of the Company to an amount that immediately after the reduction is less than the aggregate par value of all outstanding shares with par value and all shares with par value held by the Company as treasury shares and the aggregate of the amounts designated as capital of all outstanding shares without par value and all shares without par value held by the Company as treasury shares that are entitled to a preference, if any, in the assets of the Company upon liquidation of the Company.

6.6   No reduction of capital shall be effected unless the directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realisable assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in the books of the Company, and its remaining capital, and, in the absence of fraud, the decision of the directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved.

7

**EXHIBIT C**

6.7    Where the Company reduces its capital the Company may

    6.7.1    return to its members any amount received by the Company upon the issue of any of its shares;

    6.7.2    purchase, redeem or otherwise acquire its shares out of capital; or

    6.7.3    cancel any capital that is lost or not represented by assets having a realisable value.

6.8    The Company may by a resolution of directors include in the computation of surplus for any purpose the unrealized appreciation of the assets of the Company, and, in the absence of fraud, the decision of the directors as to the value of the assets is conclusive, unless a question of law is involved.

## 7.    MORTGAGES AND CHARGES OF SHARES

7.1    Members may mortgage or charge their shares in the Company and upon satisfactory evidence thereof the Company shall give effect to the terms of any valid mortgage or charge except insofar as it may conflict with any requirements herein contained for consent to the transfer of shares.

7.2    In the case of the mortgage or charge of shares there may be entered in the share register of the Company at the request of the registered holder of such shares

    7.2.1    a statement that the shares are mortgaged or charged;

    7.2.2    the name of the mortgagee or chargee; and

    7.2.3    the date on which the aforesaid particulars are entered in the share register.

7.3    Where particulars of a mortgage or charge are registered, such particulars shall be cancelled

    7.3.1    with the consent of the named mortgagee or chargee or anyone authorized to act on his behalf; or

    7.3.2    upon evidence satisfactory to the directors of the discharge of the liability secured by the mortgage or charge and the issue of such indemnities as the directors shall consider necessary or desirable.

7.4    Whilst particulars of a mortgage or charge are registered, no transfer of any share comprised therein shall be effected without the written consent of the named mortgagee or chargee or anyone authorized to act on his behalf.

## 8.    FORFEITURE

8.1    When shares issued for a promissory note or other written obligation for payment of

8

**EXHIBIT C**

a debt have been issued subject to forfeiture, the following provisions shall apply.

8.2     Written notice specifying a date for payment to be made and the shares in respect of which payment is to be made shall be served on the member who defaults in making payment pursuant to a promissory note or other written obligations to pay a debt.

8.3     The written notice specifying a date for payment shall

8.3.1   name a further date not earlier than the expiration of 14 days from the date of service of the notice on or before which payment required by the notice is to be made; and

8.3.2   contain a statement that in the event of non-payment at or before the time named in the notice the shares, or any of them, in respect of which payment is not made will be liable to be forfeited.

8.4     Where a written notice has been issued and the requirements have not been complied with within the prescribed time, the directors may at any time before tender of payment forfeit and cancel the shares to which the notice relates.

8.5     The Company is under no obligation to refund any moneys to the member whose shares have been forfeited and cancelled pursuant to these provisions. Upon forfeiture and cancellation of the shares the member is discharged from any further obligation to the Company with respect to the shares forfeited and cancelled.

9.      **MEETINGS AND CONSENTS OF MEMBERS**

9.1     The directors of the Company may convene meetings of the members of the Company at such times and in such manner and places within or outside the British Virgin Islands as the directors consider necessary or desirable.

9.2     Upon the written request of members holding 10 percent or more of the outstanding voting shares in the Company the directors shall convene a meeting of members.

9.3     The directors shall give not less than 7 days notice of meetings of members to those persons whose names on the date the notice is given appear as members in the share register of the Company and are entitled to vote at the meeting. The directors may fix the date notice is given of a meeting of members as the record date for determining those shares that are entitled to vote at a meeting.

9.4     A meeting of members held in contravention of the requirement in Regulation 9.3 is valid:

9.4.1   if members holding not less than 90 percent of the total number of shares entitled to vote on all matters to be considered at the meeting, or 90 percent of the votes of each class or series of shares where members are entitled to vote thereon as a class or series together with not less than a 90 percent majority of the remaining votes, have agreed to shorter notice of the meeting, or

9

**EXHIBIT C**

9.4.2 if all members holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting and for this purpose presence at the meeting shall be deemed to constitute waiver.

9.5 The inadvertent failure of the directors to give notice of a meeting to a member, or the fact that a member has not received notice, does not invalidate the meeting.

9.6 A member may be represented at a meeting of members by a proxy who may speak and vote on behalf of the member.

9.7 The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

9.8 An instrument appointing a proxy shall be in substantially the following form or such other form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy.

(Name of Company)

I/We _____

being a member of the above Company with _____

shares HEREBY APPOINT _____

of _____ or failing

him

_____ of _____

to be my/our proxy to vote for me/us at the meeting of members to be

held on the _____ day _____, 20___ and at any

adjournment thereof.

(Any restrictions on voting to be inserted here)

Signed this day of _____, _____.

_____
Member

9.9 The following shall apply in respect of joint ownership of shares:

10

**EXHIBIT C**

9.9.1   if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of members and may speak as a member;

9.9.2   if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners, and;

9.9.3   if two or more of the joint owners are present in person or by proxy they must vote as one.

9.10   A member shall be deemed to be present at a meeting of members if he participates by telephone or other electronic means and all members participating in the meeting are able to hear each other.

9.11   A meeting of members is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 percent of the votes of the shares or class or series of shares entitled to vote on resolutions of members to be considered at the meeting. If a quorum be present, notwithstanding the fact that such quorum may be represented by only one person, then such person may resolve any matter and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy form shall constitute a valid resolution of members.

9.12   If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of members, shall be dissolved; in any other case it shall stand adjourned to the next business day at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class or series of shares entitled to vote on the resolutions to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

9.13   At every meeting of members, the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting, the members present shall choose someone of their number to be the chairman. If the members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual member or representative of a member present shall take the chair.

9.14   The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

9.15   At any meeting of the members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes thereof. If the chairman shall have any doubt as to the outcome of any

11

**EXHIBIT C**

resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall thereupon cause a poll to be taken. If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meeting by the chairman.

9.16    Any person other than an individual shall be regarded as one member and subject to Regulation 9.17 the right of any individual to speak for or represent such member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence. In case of doubt, the directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any member.

9.17    Any person other than an individual which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the person which he represents as that person could exercise if it were an individual member of the Company.

9.18    The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

9.19    Directors of the Company may attend and speak at any meeting of members of the Company and at any separate meeting of the holders of any class or series of shares in the Company.

9.20    An action that may be taken by the members at a meeting may also be taken by a resolution of members consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication, without the need for any notice, but if any resolution of members is adopted otherwise than by the unanimous written consent of all members, a copy of such resolution shall forthwith be sent to all members not consenting to such resolution. The consent may be in the form of counterparts, each counterpart being signed by one or more members.

10.        **DIRECTORS**

10.1    The first directors of the Company shall be elected by the subscribers to the Memorandum; and thereafter, the directors shall be elected

        10.1.1 by the members for such terms as the members determine, or

        10.1.2 by the directors for such terms as the directors may determine.

10.2    Until directors are appointed the subscribers to the Memorandum of Association

12

000512-03

**EXHIBIT C**

shall have the power to act as directors.

10.3 The minimum number of directors shall be one and the maximum number shall be twenty.

10.4 Each director shall hold office for the term, if any, fixed by resolution of members or directors, as the case may be. In the case of a director who is an individual the term of office of a director shall terminate on the director's death, bankruptcy, resignation or removal. The insolvency of a corporate director shall terminate the term of office of such director.

10.5 A director may be removed from office, with or without cause, by a resolution of members or, with cause, by a resolution of directors.

10.6 A director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

10.7 A vacancy in the Board of Directors may be filled by a resolution of members or by a resolution of a majority of the remaining directors.

10.8 With the prior or subsequent approval by a resolution of members, the directors may, by a resolution of directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

10.9 A director shall not require a share qualification, and may be an individual or a company.

10.10 The Company shall determine by resolution of directors to keep a register of directors containing

    10.10.1    the names and addresses of the persons who are directors of the Company;

    10.10.2    the date on which each person whose name is entered in the register was appointed as a director of the Company; and

    10.10.3    the date on which each person named as a director ceased to be a director of the Company.

10.11 A copy of the register of directors shall be kept at the registered office of Company and the Company may determine by resolution of directors to register a copy of the register with the Registrar of Corporate Affairs.

## 11.                  POWERS OF DIRECTORS

11.1 The business and affairs of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by

13

**EXHIBIT C**

the members of the Company, subject to any delegation of such powers as may be authorised by these Articles and to such requirements as may be prescribed by a resolution of members; but no requirement made by a resolution of members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

11.2    The directors may, by a resolution of directors, appoint any person, including a person who is a director, to be an officer or agent of the Company. The resolution of directors appointing an agent may authorize the agent to appoint one or more substitutes or delegates to exercise some or all of the powers conferred on the agent by the Company.

11.3    Every officer or agent of the Company has such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the resolution of directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to the matters requiring a resolution of directors under the Act.

11.4    Any director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the Board of Directors or with respect to unanimous written consents.

11.5    The continuing directors may act notwithstanding any vacancy in their body, save that if their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of directors, the continuing directors or director may appoint directors to fill any vacancy that has arisen or summon a meeting of members.

11.6    The directors may by resolution of directors exercise all the powers of the Company to borrow money and to mortgage or charge its undertakings and property or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as as security for any debt, liability or obligation of the Company or of any third party.

11.7    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by resolution of directors.

11.8    The directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons whether appointed directly or indirectly by the directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Regulations) and for such period and subject to such conditions as they may think fit and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with such attorney or attorneys as the directors may think fit and may also authorise any such attorney or attorneys to delegate all or any powers, authorities and discretions vested in them.

14

000514-03

11.9   The Company may determine by resolution of directors to maintain at its registered office a register of mortgages, charges and other encumbrances in which there shall be entered the following particulars regarding each mortgage, charge and other encumbrance:

    11.9.1 the sum secured;

    11.9.2 the assets secured;

    11.9.3 the name and address of the mortgagee, chargee or other encumbrancer;

    11.9.4 the date of creation of the mortgage, charge or other encumbrance; and

    11.9.5 the date on which the particulars specified above in respect of the mortgage, charge or other encumbrance are entered in the register.

11.10  The Company may further determine by a resolution of directors to register a copy of the register of mortgages, charges or other encumbrances with the Registrar of Corporate Affairs.

## 12.      PROCEEDINGS OF DIRECTORS

12.1   The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable.

12.2   A director shall be deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

12.3   A director shall be given not less than 3 days notice of meetings of directors, but a meeting of directors held without 3 days notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend, waive notice of the meeting; and for this purpose, the presence of a director at the meeting shall be deemed to constitute waiver on his part. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

12.4   A director may by a written instrument appoint an alternate who need not be a director and an alternate is entitled to attend meetings in the absence of the director who appointed him and to vote or consent in place of the director.

12.5   A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one half of the total number of directors, unless there are only two directors in which case the quorum shall be two.

12.6   If the Company shall have only one director the provisions herein contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Act or the

15

000515-03

Memorandum or these Articles required to be exercised by the members of the Company and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of directors. Such a note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

12.7   At every meeting of the directors the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting the Vice Chairman of the Board of Directors shall preside. If there is no Vice Chairman of the Board of Directors or if the Vice Chairman of the Board of Directors is not present at the meeting the directors present shall choose someone of their number to be chairman of the meeting.

12.8   An action that may be taken by the directors or a committee of directors at a meeting may also be taken by a resolution of directors or a committee of directors consented to in writing or by telex, telegram, cable, facsimile or other written electronic communication by all directors or all members of the committee, as the case may be, without the need for any notice. The consent may be in the form of counterparts, each counterpart being signed by one or more directors.

12.9   The directors shall cause the following corporate records to be kept:

12.9.1 minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members;

12.9.2 copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members; and

12.9.3 such other accounts and records as the directors by resolution of directors consider necessary or desirable in order to reflect the financial position of the Company.

12.10  The books, records and minutes shall be kept at the registered office of the Company, its principal place of business or at such other place as the directors determine.

12.11  The directors may, by a resolution of directors, designate one or more committees, each consisting of one or more directors.

12.12  Each committee of directors has such powers and authorities of the directors, including the power and authority to affix the Seal, as are set forth in the resolution of directors establishing the committee, except that no committee has any power or authority either to amend the Memorandum or these Articles, to appoint directors or fix their emoluments, or to appoint officers or agents of the Company.

12.13  The meetings and proceedings of each committee of directors consisting of 2 or more directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the resolution establishing the committee.

16

000516-03

**EXHIBIT C**

## 13.        OFFICERS

13.1    The Company may by resolution of directors appoint officers of the Company at such times as shall be considered necessary or expedient. Such officers may consist of a Chairman of the Board of Directors, a Vice Chairman of the Board of Directors, President and one or more Vice Presidents, Secretaries and Treasurers and such other officers as may from time to time be deemed desirable. Any number of offices may be held by the same person.

13.2    The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of directors or resolution of members, but in the absence of any specific allocation of duties it shall be the responsibility of the Chairman of the Board of Directors to preside at meetings of directors and members, the Vice Chairman to act in the absence of the Chairman, the President to manage the day to day affairs of the Company, the Vice Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the President, the Secretaries to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

13.3    The emoluments of all officers shall be fixed by resolution of directors.

13.4    The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of directors. Any vacancy occurring in any office of the Company may be filled by resolution of directors.

## 14.        CONFLICTS OF INTEREST

14.1    No agreement or transaction between the Company and one or more of its directors or any person in which any director has a financial interest or to whom any director is related including as a director of that other person, is void or voidable for this reason only or by reason only that the director is present at the meeting of directors or at the meeting of the committee of directors that approves the agreement or transaction or that the vote or consent of the director is counted for that purpose if the material facts of the interest of each director in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other directors.

14.2    A director who has an interest in any particular business to be considered at a meeting of directors or members may be counted for purposes of determining whether the meeting is duly constituted.

## 15.        INDEMNIFICATION

15.1    Subject to the limitations hereinafter provided the Company may indemnify against all expenses, including legal fees, and against all judgements, fines and

17

**EXHIBIT C**

amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings, any person who

15.1.1 is or was a party or is threatened to be made a party to any threatened, pending or contemplated proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director, an officer or a liquidator of the Company; or

15.1.2 is or was, at the request of the Company, serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

15.2 The Company may only indemnify a person if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

15.3 The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is, in the absence of fraud, sufficient for the purposes of these Articles, unless a question of law is involved.

15.4 The termination of any proceedings by any judgement, order, settlement, conviction or the entering of a nolle prosequi does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

15.5 If a person to be indemnified has been successful in defence of any proceedings referred to in that Regulation the person is entitled to be indemnified against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

15.6 The Company may purchase and maintain insurance in relation to any person who is or was a director, an officer or a liquidator of the Company, or who at the request of the Company is or was serving as a director, an officer or a liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability under Regulation 15.1.

16.                                                **SEAL**

The directors shall provide for the safe custody of the Seal. An imprint of the Seal shall be kept at the registered office of the company. The Seal when affixed to any written instrument shall be witnessed by a director or any other person so authorised from time to time by resolution of directors. The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or

18

000518-03

**EXHIBIT C**

other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

## 17.            DIVIDENDS

17.1    The Company may by a resolution of directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus. In the event that dividends are paid in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorising the dividends, a fair and proper value for the assets to be so distributed.

17.2    The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the profits of the Company.

17.3    The directors may, before declaring any dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund, and may invest the sum so set apart as a reserve fund upon such securities as they may select.

17.4    No dividend shall be declared and paid unless the directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realisable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its capital. In the absence of fraud, the decision of the directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved.

17.5    Notice of any dividend that has been declared shall be given to each member in the manner hereinafter mentioned and all dividends unclaimed for 3 years after having been declared may be forfeited by resolution of directors for the benefit of the Company.

17.6    No dividend shall bear interest as against the Company and no dividend shall be paid on shares described in Regulation 3.15.

17.7    A share issued as a dividend by the Company shall be treated for all purposes as having been issued for money equal to the surplus that is transferred to capital upon the issue of the share.

17.8    In the case of a dividend of authorised but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

17.9    In the case of a dividend of authorized but unissued shares without par value, the amount designated by the directors shall be transferred from surplus to capital at the time of the distribution, except that the directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

17.10   A division of the issued and outstanding shares of a class or series of shares into a larger number of shares of the same class or series having a proportionately smaller

19

**EXHIBIT C**

par value does not constitute a dividend of shares.

18.                              **ACCOUNTS**

The Company shall keep such accounts and records as the directors consider necessary or desirable in order to reflect the financial position of the Company.

19.                              **AUDIT**

19.1   The Company may by resolution of members call for the accounts to be examined by auditors in which event the remaining provisions of this Regulation 19 shall apply to the appointment and activities of the auditors.

19.2   The first auditors shall be appointed by resolution of directors; subsequent auditors shall be appointed by a resolution of members.

19.3   The auditors may be members of the Company but no director or other officer shall be eligible to be an auditor of the Company during his continuance in office.

19.4   The remuneration of the auditors of the Company

19.4.1 in the case of auditors appointed by the directors, may be fixed by resolution of directors;

19.4.2 subject to the foregoing, shall be fixed by resolution of members or in such manner as the Company may by resolution of members determine.

19.5   The auditors shall examine each profit and loss account and balance sheet required to be served on every member of the Company or laid before a meeting of the members of the Company and shall state in a written report whether or not

19.5.1 in their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period;

19.5.2 all the information and explanations required by the auditors have been obtained.

19.6   The report of the auditors shall be annexed to the accounts and shall be read at the meeting of members at which the accounts are laid before the Company or shall be served on the members.

19.7   Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of his duties as an auditor.

20

**EXHIBIT C**

19.8   The auditors of the Company shall be entitled to receive notice of and to attend any meetings of members of the Company at which the Company's profit and loss account and balance sheet are to be presented.

## 20.        NOTICES

20.1   Any notice, information or written statement to be given by the Company to members may be served in any way by which it can reasonably be expected to reach each member or by mail addressed to each member at the address shown in the share register.

20.2   Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail, to the registered agent of the Company.

20.3   Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was delivered to the registered office or the registered agent of the Company or that it was mailed in such time as to admit to its being delivered to the registered agent of the Company in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

## 21.        PENSION AND SUPERANNUATION FUNDS

The directors may establish and maintain or procure the establishment and maintenance of any non-contributory or contributory pension or superannuation funds for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances or emoluments to, any persons who are or were at any time in the employment or service of the Company or any company which is a subsidiary of the Company or is allied to or associated with the Company or with any such subsidiary, or who are or were at any time directors or officers of the Company or of any such other company as aforesaid or who hold or held any salaried employment or office in the Company or such other company, or any persons in whose welfare the Company or any such other company as aforesaid is or has been at any time interested, and to the wives, widows, families and dependents of any such person, and may make payments for or towards the insurance of any such persons as aforesaid, and may do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid. Subject always to the proposal being approved by resolution of members, a director holding any such employment or office shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension allowance or emolument.

## 22.        ARBITRATION

22.1   Whenever any difference arises between the Company on the one hand and any of the members or their executors, administrators or assigns on the other hand, touching the true intent and construction or the incidence or consequences of these Articles or

21

000521-03

**EXHIBIT C**

of the Act, touching anything done or executed, omitted or suffered in pursuance of the Act or touching any breach or alleged breach or otherwise relating to the premises or to these Articles, or to any Act affecting the Company or to any of the affairs of the Company, such difference shall, unless the parties agree to refer the same to a single arbitrator, be referred to two arbitrators, one to be chosen by each of the parties to the difference, and the arbitrators shall before entering on the reference appoint an umpire.

22.2   If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for 10 days after the other party has given him notice to appoint the same, such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party.

23.              **VOLUNTARY WINDING UP AND DISSOLUTION**

The Company may voluntarily commence to wind up and dissolve by a resolution of members but if the Company has never issued shares it may voluntarily commence to wind up and dissolve by resolution of directors.

24.              **CONTINUATION**

The Company may by resolution of members or by resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those law.

We, the undersigned of the address stated below for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to these Articles of Association this 28th day of October, 2002 in the presence of the undersigned witness:

NAME AND ADDRESS                    SUBSCRIBER
OF WITNESS


SGD: DION KENDALL                   SGD: LINDA ANDREWS
        Dion Kendall                       Linda Andrews
        c/o P. O. Box 146                  For and on behalf of
        Road Town, Tortola                 Trident Trust Company (B.V.I.)
        British Virgin Islands             Trident Chambers
                                           P. O. Box 146
                                           Road Town, Tortola
                                           British Virgin Islands

22

**EXHIBIT C**

# Certificate of Incumbency

NAME OF COMPANY:      GLOBAL FINANCE MANAGEMENT CORPORATION

INCORPORATION DATE:      October 28, 2002

COMPANY REGISTRATION NO. : 518734

AUTHORIZED SHARE CAPITAL:     US$50,000.00 divided into 50,000 shares of US$1.00 par value

COMPANY STATUS:      GOOD STANDING

The Company was automatically re-registered as a Business Company under the BVI Business Companies Act on January 1, 2007.

| DIRECTOR(S) | DATE OF APPOINTMENT |
|---|---|
| Gustavo Hernandez | October 28, 2002 |

| SHAREHOLDER(S) | NO. OF SHARES HELD |
|---|---|
| HH Securities | 50,000 Shares |

*Other than the individuals listed and their title/s, there are no additional officers appointed for the Company.*

We, Trident Trust Company (B.V.I.) Limited, being the Registered Agent/Registered Office of the above Company, at Trident Chambers, Wickhams Cay 1, P.O. Box 146, Road Town, Tortola, British Virgin Islands, hereby certify that according to our records the above information is correct.

**ROAD TOWN, TORTOLA**
**BRITISH VIRGIN ISLANDS**

Dated the 1st day of June, 2011

......................................................
**TRIDENT TRUST COMPANY (B.V.I.) LIMITED**
**REGISTERED AGENT**

**EXHIBIT C**

DATED 26th FEBRUARY 2003

_____

THE HH MASTER SETTLEMENT

_____

TRUSTEE

BANCO ATLÁNTICO (BAHAMAS) BANK & TRUST LIMITED

_____

GOVERNMENT
EXHIBIT
2
_____

000001-03

**EXHIBIT C**

**THIS SETTLEMENT** is made this 26th day of February of Two thousand and Three between:

**GUSTAVO HERNANDEZ ROMERO**, of Calle 5 No 8-77 Castillogrande, Cartagena Colombia, ("**the Settlor**") and,

**BANCO ATLÁNTICO BANK & TRUST LIMITED**, a company incorporated in accordance with the laws of The Commonwealth of The Bahamas and carrying on business in that jurisdiction as a duly licensed Bank and Trust Company ("**the Trustee**").

**WHEREAS**

1. The Settlor has transferred the property specified in the First Schedule below to the Original Trustee.

2. This Settlement shall be known as **THE HH MASTER SETTLEMENT**

3. The Trustee has agreed to act in the trusts of this Settlement.

**NOW THIS DEED WITNESSES AS FOLLOWS**:

**1.    Definitions**

In this Deed, except where the context otherwise requires

1.1    "**The Trustee**" means the Original Trustee, any successor or additional Trustee or Trustees of this Settlement, or the Trustee or Trustees of this Settlement for the time being.

1.2    "**The Trust Fund**" means:

1.2.1    The Property specified in the First Schedule below and any other Property which may be transferred to the Trustee to hold on the terms of this Settlement, and

1.2.2    All property from time to time representing the above.

1.3    "**Trust Property**" means any property comprised in the Trust Fund.

1.4    "**The Trust Period**" means the period ending on the day before the last day of the period of eighty (80) years from the Date of Execution.

1.5    "**Date of Execution**" means the date this Settlement is made.

1.6    "**The Protector**" means the person (if any) appointed as Protector of this Settlement for the time being pursuant to Clause 9 of this Settlement.

1.7    "**The Beneficiaries**" means:

1.7.1    The Settlor;

2

1.7.2    When there is a Protector of this Settlement for the time being and this power has been conferred on him, any Person or class of Persons nominated to the Trustee by the Protector and whose nomination is accepted in writing by the Trustee; at other times any Person or class of Persons nominated to the Trustee by the Settlor and whose nomination is accepted in writing by the Trustee;

1.7.3    At any time during which there are no Beneficiaries: the children and descendants of the Settlor.

"**Beneficiary**" means any of the Beneficiaries.

1.8    "**The Alternate Trustee**" means any person or persons not resident in any territory in which any Trustee is resident whom the Protector may during the Trust Period by deed delivered to the Trustee appoint provided always that the appointment of any such Alternate Trustee may be revoked by the Protector by deed delivered to the Trustee at any time during the Trust Period and will be revoked automatically in the event that the territory in which an Alternate Trustee is resident becomes the residence of any Trustee.

1.9    "**Person**" includes a person anywhere in the world and includes a Trustee.

## 2.    Proper Law and Place of Administration

2.1    The proper law of this Settlement shall be the law of The Commonwealth of The Bahamas and all rights arising under this Deed and its construction and effect shall be governed by the laws of The Commonwealth of The Bahamas and shall be subject to the jurisdiction of their courts.

2.2    Notwithstanding the provisions of Clause 2.1, when there is a Protector of this Settlement for the time being and this power has been conferred on him, the Protector and at other times the Trustee may at any time during the Trust Period declare by deed that, as from the date of that declaration, the proper law of this Settlement shall be that of whatever territory he specifies and thereafter all rights arising under this Deed and its construction and effect shall governed by the laws of that territory and shall be subject to the jurisdiction of that territory's courts.

2.3    No exercise of the power conferred by Clause 2.2 shall be effective unless the law of the territory specified recognises the irrevocability of this Settlement and the enforceability and effectiveness of all or substantially all the trusts, powers and provisions of this Deed.

2.4    Following any exercise of the power conferred by Clause 2.2, the Trustee shall, by deed, subject, when there is a Protector of this Settlement for the time being and the power conferred by Clause 2.2 has been conferred on him, to the consent of the

3

Protector manifested by him being a party to that deed, make such consequential alterations and additions to this Deed as he considers necessary or desirable to ensure that its trusts, powers and provisions remain as valid and effective as they were previously.

2.5 The Trustee shall in the first instance carry out the general administration of this Settlement in The Commonwealth of The Bahamas.

2.6 Notwithstanding the provisions of Clause 2.5, when there is a Protector of this Settlement for the time being and this power has been conferred on him, the Protector and at other times the Trustee may at any time during the Trust Period declare by deed that, as from the date of that declaration, the administration of this Settlement shall be carried out in whatever territory he specifies whether or not the law of that territory is for the time being the proper law of this Settlement and whether or not any Trustee is for the time being resident or domiciled in or connected in any other way with that territory.

3.    **Trust Income**

Subject to the Overriding Powers below, during the Trust Period:

3.1 When there is a Protector of this Settlement for the time being and this power has been conferred on him, the Trustee shall accumulate the whole or such part of the income of the Trust Fund as the Protector may direct and the income so accumulated shall be added to the Trust Fund.

3.2 Subject to that the Trustee shall accumulate the whole or such part of the income of the Trust Fund as he may think fit and the income so accumulated shall be added to the Trust Fund.

3.3 When there is a Protector of this Settlement for the time being and this power has been conferred on him, the Trustee shall pay or apply the remainder of the income of the Trust Fund to or for the benefit of such of the Beneficiaries as the Protector may direct.

3.4 Subject to that, the Trustee shall pay or apply the remainder of the income of the Trust Fund to or for the benefit of such of the Beneficiaries as he may think fit.

3.5 When the Beneficiary for whose benefit any of the income of the Trust Fund is to be paid or applied is at the time of payment under the age of 25 years or is mentally incapacitated (something which is to be determined by two medical doctors at least one of whom must be a psychiatrist), the Trustee shall

3.5.1 accumulate that income as a separate fund for the benefit of that Beneficiary and pay the accumulated income to that Beneficiary when he

attains the age of 25 or at such time as he ceases to be incapacitated and in the event that he dies without attaining that age or ceasing to be incapacitated pay the accumulated income to whoever is, according to the laws of The Commonwealth of The Bahamas, entitled to his estate

4.      **Overriding Powers**

When there is a Protector of this Settlement for the time being and these powers have been conferred on him, the Protector and at other times the Trustee shall have the following powers ("**Overriding Powers**"):

4.1     Power of Appointment:

    4.1.1     He may appoint that the Trustee shall hold the Trust Fund for the benefit of any of the Beneficiaries on such terms as he thinks fit.

    4.1.2     In exercising the power of appointment referred to in clause 4.1.1, the following rules shall apply:

        4.1.2.1     The appointment shall be made by deed during the Trust Period and may be revocable or irrevocable;

        4.1.2.2     It may appoint discretionary trust exercisable by any Person;

        4.1.2.3     It may include dispositive or administrative powers exercisable by any Person;

        4.1.2.4     It may be made in respect of income or capital or in respect of both.

    4.1.3     An Appointment shall be made by deed and may be revocable or irrevocable.

4.2     Transfer of Trust Property to a new Settlement:

He may by deed declare that the Trustee holds any Trust Property on trust to transfer it to the Trustee of a Qualifying Settlement to be held on the terms of that Qualifying Settlement, freed and released from the terms of this Settlement. "**A Qualifying Settlement**" here means any settlement, wherever established, under which every Person who may benefit is (or would if living be) a Beneficiary of this Settlement.

4.3     Power of Advancement:

He may by deed direct the payment or application of any Trust Property for the advancement or benefit of any Beneficiary.

4.4     The Overriding Powers shall be exercisable only during the Trust Period.

4.5     Clause 3.5 shall apply when any Overriding Power is exercised so as to make any income or capital payable to any Beneficiary of the type described in that Sub-Clause.

**EXHIBIT C**

4.6     Removal of Trustee:

He may by deed remove the Trustee of this Settlement

5.     **Trust Capital**

Subject to that, at the end of the Trust Period the Trustee shall hold the Trust Fund on the following trusts absolutely:

5.1     If there is then a Protector of this Settlement and this power has been conferred on him, on trust for such one or more of the Beneficiaries as are then living or in existence and in the shares which the Protector shall in his absolute discretion direct provided always that if none of the human beneficiaries is then living the Protector may in his absolute discretion direct that some or all of the Trust Fund be held on trust for whoever is, according to the laws of The Commonwealth of The Bahamas, entitled to the estate of any deceased Beneficiary;

5.2     Subject to that, on trust for such one or more of the Beneficiaries as are then living or in existence and in the shares which the Trustee shall in his absolute discretion think fit provided always that if none of the human beneficiaries is then living the Trustee may in his absolute discretion direct that some or all of the Trust Fund be held on trust for whoever is, according to the laws of The Commonwealth of The Bahamas, entitled to the estate of any deceased Beneficiary.

6.     **Default Clause**

Subject to that, the Trustee shall hold the Trust Fund on trust for **GUSTAVO HERNANDEZ ROMERO** in 100% shares.

7.     **Matrimonial Property Regimen**

It is hereby declared that any Benefit under this Settlement to which a Beneficiary becomes entitled or which is applied pursuant to Clause 3.5 shall not become subject to any matrimonial property regime providing for community of property between husband and wife to which in the absence of this declaration it would or might become subject and that any such benefit shall be and remain the sole separate and exclusive property of that Beneficiary and shall not be subject to the interference, control or marital power of the spouse of that Beneficiary. "**Benefit**" here includes any payment of income or capital and any interest of any type in movable or immovable property and the provisions of this clause shall apply not only to the benefit in question but also to the property producing the income or out of which the interest in question is carved.

**EXHIBIT C**

8.     **Appointment, Removal and Retirement of Trustee**

8.1     The power of appointing a replacement or additional Trustee of this Settlement is exercisable by the Protector when there is a Protector of this Settlement for the time being and this power has been conferred on him and at other times is exercisable by the Settlor or, following his death, by the majority of the Beneficiaries who are *sui iuris*, voting per stirpes.

8.2     When there is a Protector of this Settlement for the time being and this power has been conferred on him, the Protector and at other times the Settlor or, after his death, the majority of the Beneficiaries who are *sui iuris*, voting per stirpes, may at any time exercise the statutory power for the removal of any Trustee of this Settlement whether or not any of the conditions specified in Section 42 of the Trustee Act 1998 is satisfied in relation to the Trustee to be removed.

8.3     Any Trustee of this Settlement may at any time resign his Trusteeship by giving not less than 45 days notice in writing to the Protector (if any), to the Settlor, and to the other Trustee (if any) and, if a replacement Trustee is not appointed before the expiry of the period of notice, the Trustee shall be entitled to apply to the Court for the appointment of a new Trustee of this Settlement.

8.4     No Trustee of this Settlement shall be required to give any bond or other form of security for the due administration of the Trust Fund or for the due discharge of the Trusts of this Settlement.

8.5     On retirement or removal any Trustee of this Settlement shall be entitled to receive an Indemnity from the other Trustee (if any) and from the new Trustee (if any) and shall not be obliged to transfer the Trust Property out of his name until he has received such an Indemnity and been paid all fees and remuneration due to him.

9.     **Appointment, Removal and Retirement of Protector**

9.1     The Settlor may at any time during his lifetime by deed appoint any Person (including himself) other than the Trustee to be the Protector of this Settlement for the time being and shall in that deed specify which of the powers and discretions which are at other times exercisable by the Trustee shall instead be exercisable by the Protector and, upon the Trustee receiving both a copy of this deed and confirmation in writing from the Person so appointed of his willingness to act, that Person shall immediately become the Protector of this Settlement.

9.2     The Settlor may at any time during his lifetime by deed remove the Protector of this Settlement and, upon the Trustee receiving a copy of this deed, the Person so removed shall immediately cease to be Protector of this Settlement.

7

9.3     The Protector of this Settlement shall cease to hold office on death if an individual and on dissolution if a corporation or in either case on becoming unable or unfit to act, on giving not less than 45 days notice in writing to the Settlor and to the Trustee, or on making a valid appointment under Clause 9.5 below.

9.4     The Settlor and, after his death, the Protector may by deed revocably nominate any Person other than the Trustee to become the Protector of this Settlement when the current Protector ceases to hold office and when he does so, provided that the Trustee has received a copy of this deed and the nomination remains unrevoked, upon the Trustee receiving confirmation in writing from the Person so nominated of his willingness to act, that Person shall immediately become the Protector of this Settlement.

9.5     After the death of the Settlor, the Protector may by deed irrevocably appoint any Person other than the Trustee to be the Protector of this Settlement in his place and, upon the Trustee receiving both a copy of this deed and confirmation in writing from the Person so appointed of his willingness to act, that Person shall immediately become the Protector of this Settlement.

9.6     If there is a Protector of this Settlement at the death of the Settlor and, notwithstanding the remaining provisions of this Clause, there is at any time thereafter no Protector, the Trustee may by deed irrevocably appoint any Person other than a Trustee to be the Protector of this Settlement.

## 10.     Administrative Provisions

10.1    The Trustee may exercise the power of delegation conferred by Section 31 of the Trustee Act 1998.

10.2    Sections 37, 38, 80 and 89 (2), (3) & (4) of the Trustee Act 1998 shall not apply to this Settlement.

10.3    The provisions set out in the Second Schedule below shall have effect.

10.4    When there is a Protector of this Settlement for the time being and the Deed appointing him has so provided, the powers conferred on the Trustee by Paragraph 1 of the Second Schedule shall be exercisable only with the prior consent in writing of the Protector.

10.5    Paragraph 5 of the Second Schedule shall apply to the Protector.

10.6    Paragraphs 6, 7, 8 and 9 of the Second Schedule shall apply both to the Trustee and to the Protector.

8

**EXHIBIT C**

11. **Flee Clause**

11.1    This Clause applies if and only if

      11.1.1    there is a Protector of this Settlement for the time being, and

      11.1.2    one of the events listed in Clause 11.3 occurs in the territory which is for the time being that of the proper law and/or of the place of administration of this Settlement, and

      11.1.3    at that time either a Trustee, or an Alternate Trustee, or the Protector is resident outside that territory.

11.2    If these conditions are satisfied,

      11.2.1    on the happening of one of the events listed in Clause 11.3, any Trustee resident in the territory in which the event occurs ("**the Retiring Trustee**") shall automatically cease to be a Trustee of this Settlement;

      11.2.2    thereafter the Trustee of this Settlement ("**the New Trustee**") shall be any Trustee resident outside that territory, failing whom any Alternate Trustee resident outside that territory, failing whom the person or persons whom the Protector may by deed delivered to the Retiring Trustee appoint, failing whom the Protector;

      11.2.3    the Trust Property shall vest automatically in the New Trustee for which purpose the New Trustee is irrevocably granted all necessary powers of attorney to transfer the Trust Property to himself on behalf of the Retiring Trustee; and

      11.2.4    the proper law and/or the place of administration of this Settlement shall automatically cease to be that of the territory in which the event occurred and shall become that of the territory in which the New Trustee or, if there is more than one New Trustee, the New Trustee first appointed resides.

11.3    The events referred to in Clauses 11.1 and 11.2 are:

      11.3.1    an attack upon or the occupation of the territory in question by hostile military forces;

      11.3.2    the occurrence in that territory of civil war or of violent civil disturbances lasting for more than one week;

      11.3.3    the acquisition by the government or by any other public authority of that territory of a controlling interest in any Trustee; or

      11.3.4    the enactment of any law or the taking of any action by the government or by any other public authority, the effect of which is (or would be if the Trustee in question had sole control of the Trust Property):

9

11.3.4.1    to expropriate or to confiscate any of the Trust Property or to require the payment out of the Trust Property of any sum other than one due under the pre-existing fiscal legislation or as reasonable consideration for services or benefits provided by the government or other public authority;

11.3.4.2    to determine or substantially to restrict the power of the Trustee to transfer the Trust Property out of that territory;

11.3.4.3    to restrict, to suspend, to abrogate, to withdraw, to cancel or to rescind any exemptions of a fiscal or any other nature previously enjoyed by this Settlement; or

11.3.4.4    to interfere materially in the manner in which the Trustee can administer the Trust Property or in which the Trustee and the Protector can exercise the discretions vested in them by this Settlement.

11.4    In the event of any dispute as to whether or not one of the events listed in Clause 11.3 has occurred, the decision of the Protector certified by him in writing shall be conclusive as between the Retiring Trustee, the New Trustee and the Beneficiaries.

11.5    The Protector may in his absolute discretion direct in writing that, notwithstanding the occurrence of one of the events listed in Clause 11.3, Clause 11.2 shall be deemed not to have had effect but such direction shall be without prejudice to anything done by the New Trustee prior to the receipt by him of that direction.

11.6    The Protector shall, at the request of the New Trustee, certify in writing that one of the events listed in Clause 11.3 has occurred and that he has not exercised the discretion conferred on him by Clause 11.5.

**IN WITNESS of the above the Parties have executed this Deed**

**SIGNED SEALED AND DELIVERED BY**
the said  **GUSTAVO HERNANDEZ ROMERO**
in the presence of

Felipe Valbuena
...................................................
...................................................

**EXHIBIT C**

The **COMMON SEAL** of **BANCO ATLÁNTICO**
**(BAHAMAS) BANK & TRUST COMPANY** was affixed to
this Deed by these two members of the Company

....Miguel..Coello.............................. and

....Elonido..Encinar........................

who have signed this Deed in the presence of

Michelle Rahming
P.O Box SS6286
East Bay Street
Nassau, Bahamas

SETTLED

000011-03

11

**EXHIBIT C**

## THE FIRST SCHEDULE

1. One hundred per cent (100%) shares in the company known as **HH SECURITIES LTD.,** incorporated in **THE COMMOWEALTH OF THE BAHAMAS**, domiciled at EAST BAY STREET, NASSAU, THE BAHAMAS and registered in the Companies Registry of **NASSAU, THE BAHAMAS**.

## THE SECOND SCHEDULE

1.   **Administrative Powers**

The Trustee has the following additional powers:

1.1   Investment

1.1.1   The Trustee may retain the shares in **HH SECURITIES LTD.** which have been transferred to him by the Settlor and any other shares in that or any other company which may be transferred to him. In respect of all such shares the Trustee must treat himself and be regarded as having no obligation to diversify the Trust Fund and as having no duty to hold a balance between conflicting interests of the different Beneficiaries of this Settlement.

1.1.2   The Trustee may promote and incorporate companies in any jurisdiction in the world and may dissolve any such companies and distribute their assets in any manner.

1.1.3   The Trustee must treat himself and be regarded as having no power to inquire into or intervene in the affairs of any company in which the Trust Fund has a controlling interest or a majority or any part of a controlling interest unless it comes to his actual knowledge that the affairs of the company are being run dishonestly or by a person suffering from mental incapacity and must also treat himself and be regarded as having no power to ascertain whether or not the affairs of the company are being run dishonestly or by a person suffering from mental incapacity so that he is entitled and bound to assume that the affairs of the company are being run honestly and by a person of full capacity until the contrary comes to his actual knowledge.

1.1.4   The Trustee may invest Trust Property in any manner as if he were its beneficial owner. In particular the Trustee may invest in property in any part of the world and in unsecured loans. Section 5 (2) of the Trustee Act 1998 shall not apply to this Settlement.

1.1.5    The Trustee is under no obligation to diversify the Trust Fund. Section 5
(1) (b) & (c) of the Trustee Act 1998 shall not apply to this Settlement.

1.1.6    The Trustee may invest in speculative or hazardous investments.

1.1.7    The Trustee may acquire:

1.1.7.1    wasting assets; and

1.1.7.2    assets which yield little or no income;

for investment or any other purpose.

1.2    Joint Property

The Trustee may acquire property jointly with any Person and may blend Trust
Property with other property.

1.3    General Power of Management and Disposition

The Trustee may effect any transaction relating to the management or disposition of
Trust Property as if he were its beneficial owner.

1.4    Repair and Improvement

1.4.1    The Trustee may repair and maintain Trust Property.

1.4.2    The Trustee may develop or improve Trust Property in any way.

1.5    Income and Capital

1.5.1    The Trustee may waive the payment of income before it becomes payable
to this Settlement.

1.5.2    The Trustee is under no duty to procure distributions from a company in
which this Settlement is interested.

1.5.3    The Trustee may utilise the income of this Settlement to pay taxes and
other expenses although they would normally be paid out of capital. The
power of the Trustee to pay taxes includes taxes payable in respect of the
Trust Property in any jurisdiction in the world.

1.5.4    Generally, the Trustee is under no duty to hold a balance between
conflicting interests of the different Beneficiaries of this Settlement.
Section 5 (5) of the Trustee Act 1998 shall not apply to this Settlement.

1.5.5    The Trustee may (subject to the jurisdiction of the Court) determine
whether the receipts and liabilities of this Settlement are to be considered
as capital or income, and whether expenses ought to be paid out of capital
or income. The Trustee shall not be liable for any act done in pursuance
of such determination (in the absence of fraud or negligence) even though
his determination shall subsequently be held to have been erroneous.

1.5.6    The Trustee may set aside and invest the income of this Settlement to
answer any liabilities which in his opinion ought to be borne out of

000013-03

13

income or to meet depreciation of the value of the capital of the Trust Fund. In particular, income may be applied to form a sinking fund in respect of leasehold property.

1.6     Application of Capital as Income

The Trustee may apply the capital of the Trust Fund as if it were income arising in the current year. In particular, the Trustee may pay such capital to any Income Beneficiary as his income for the purpose of augmenting his resources. **"Income Beneficiary"** in this paragraph and in Paragraph 1.7 below means a Person to whom the income of this Settlement is payable (as of right or at the discretion of the Trustee).

1.7     Use of Trust Property

1.7.1   The Trustee may acquire any interest in any property for occupation or use by any Income Beneficiary.

1.7.2   The Trustee may permit any Income Beneficiary to occupy or enjoy the use of Trust Property on such terms as he thinks fit.

1.7.3   The Trustee may use the Trust Property to make loans to any Income Beneficiary. Such loans loan may be interest free and unsecured, or on such terms as the Trustee thinks fit. The Trustee may charge the Trust Property as security for any debts or obligations of any Income Beneficiary.

1.8     Trade

The Trustee may carry on a trade, in any part of the world, alone or in partnership.

1.9     Borrowing

The Trustee may borrow money for investment or any other purpose. Money borrowed shall be treated as Trust Property.

1.10    Insurance Policies

1.10.1  The Trustee may insure Trust Property for any amount against any risk.

1.10.2  The Trustee may effect and maintain any policy or policies of insurance on the life of any Beneficiary or any insurance policy or policies of any other type or may enable any Beneficiary to effect and maintain any such policies provided that they are subsequently assigned to the Trustee and may deal with such policies as if he were their beneficial owner. All the proceeds of such policies shall be treated as additional Trust Property.

1.10.3  The Trustee may pay the premiums of any insurance policy out of the income of this Settlement.

EXHIBIT C

1.11    Delegation

The Trustee (or other person in a fiduciary position) may delegate in writing any of his functions to any Person. The Trustee shall not be responsible for the default of that Person (even if the delegation was not strictly necessary or expedient) provided that he took reasonable care in his selection and supervision.

1.12    Deposit of Documents

The Trustee may permit any moneys, bonds, stocks, share certificates, other securities for money (including in each case bearer securities) or documents relating to this Settlement (including documents of title to movable and immovable property) to be deposited (in the name of the depositee in the case of bonds, stocks, share certificates, and similar securities if deemed desirable by the Trustee) with any broker, bank, trust company or like institution in any part of the world.

1.13    Nominee Holders of Trust Property

The Trustee may vest Trust Property in any broker, bank, trust company or like institution in any part of the world as nominee and may place Trust Property in the possession or control of any Person.

1.14    Indemnities

The Trustee may indemnify any Person for any liability relating to this Settlement.

1.15    Mortgage Securities

The Trustee may mortgage or charge Trust Property as security for any liability incurred by him as Trustee (and may grant a floating charge so far as the law allows).

1.16    Appropriation

The Trustee may appropriate Trust Property to any Person or class of Persons in total or partial satisfaction of their interest in the Trust Fund.

1.17    Payments to Charities

Where Trust Property is to be paid or transferred to a charity, the receipt of the treasurer or appropriate officer of the charity shall constitute a sufficient receipt for the Trustee.

1.18    Release of Powers

The Trustee or the Protector (or any other person in a fiduciary position) may by deed revocable or irrevocable (delivered to the Trustee in the case of the Protector or any other person in a fiduciary position) release in whole or in part any of the powers, discretions, rights or functions conferred on him by this Settlement and by so doing may bind his respective successors.

1.19    Ancillary Powers

The Trustee may do anything which is incidental or conducive to the exercise of his functions.

## 2.    Disclaimer by Beneficiaries

A Beneficiary may disclaim his interest under this Settlement in whole or in part.

## 3.    Apportionment of Income and Expenditure

The income and expenditure of this Settlement shall be treated as arising when payable, and not from day to day and consequently no apportionment shall take place. Section 89 (2), (3) & (4) of the Trustee Act 1998 shall not apply to this Settlement.

## 4.    Legal Proceedings

The Trustee may institute or defend any legal or other proceedings which affect him as Trustee of this Settlement or the Trust Fund and may compromise any such proceedings or other differences or submit them to arbitration and may compromise or compound any debts owed to him as Trustee of this Settlement or owed to the Trust Fund, in every case on such terms as he may think fit.

## 5.    Conflicts of Interest

5.1    In this paragraph:

5.1.1    "**The Fiduciary**" means a Person subject to fiduciary duties under this Settlement.

5.1.2    "**An Independent Trustee**", in relation to a Person, means a Trustee who is not:

5.1.2.1    a brother, sister, ancestor, descendant or dependant of the Person;

5.1.2.2    a spouse of the Person or of anyone within Paragraph 5.1.2.1; or

5.1.2.3    a company controlled by anyone within Paragraphs 5.1.2.1 or 5.1.2.2.

5.2    Subject to Paragraph 5.3 the Fiduciary may:

5.2.1    enter into a transaction with the Trustee; or

5.2.2    be interested in a matter in which the Trustee is or might have been interested; or

5.2.3    act (or not act) in any other circumstances

despite the fact that his fiduciary duty under this Settlement conflicts with his other duties or with his personal interest.

000016-03

16

**EXHIBIT C**

5.3      Paragraph 5.2 only has effect if:

         5.3.1    the Fiduciary first discloses to the Trustee the nature and extent of any material interest conflicting with his fiduciary duties; and

         5.3.2    there is an Independent Trustee who does not have any conflict of interest and he considers that the transaction, arrangement or action is not contrary to the general interest of this Settlement.

5.4      The powers of the Trustee may be used to benefit a Trustee (in the same manner as if he were not a Trustee) provided that there is an Independent Trustee who does not have any conflict of interest.

## 6.      The Nature of the Powers and Discretions of the Trustee

6.1      The Trustee may exercise the powers and discretions conferred on him by the law and by this Settlement:

         6.1.1    at his absolute discretion; and

         6.1.2    from time to time as may be necessary.

6.2      Every such power or discretion shall be an absolute and uncontrolled discretion or power.

6.3      When there are two or more Trustees, no Trustee shall be held liable for any loss or damage suffered by this Settlement as a result of him concurring or failing to concur in the exercise of any such power or discretion.

6.4      The Trustee is not under any duty to consult with any Beneficiary or to give effect to the wishes of any Beneficiary or of all the Beneficiaries.

## 7.      Trustee Fees and Remuneration

7.1      When the Trustee carries on a business which consists of or includes the administration of trusts or advising Trustee, he may charge for work done by him or by his firm for this Settlement, including work which a layman could have done personally.

7.2      The Trustee may contract with companies connected with this Settlement to charge for work done by him or by his firm for those companies.

## 8.      Commissions and Bank Charges

8.1      A Person may retain any reasonable commission or profit in respect of any transaction relating to this Settlement even though that was obtained by an exercise of fiduciary powers by that Person or by some other Person provided that:

         8.1.1    The Person would in the normal course of business receive and retain the commission or profit on such transaction.

**EXHIBIT C**

8.1.2    The receipt of the commission or profit shall be disclosed to the Trustee.

8.2    A bank may make loans to this Settlement and generally provide banking services upon its usual terms to this Settlement and may retain any commission or profit in respect of any transaction relating to this Settlement even though that was obtained by an exercise of fiduciary powers by the bank or by some other Person.

## 9.    Liability of Trustee

9.1    The Trustee shall not be liable for a loss to the Trust Fund unless that loss was caused by his own actual fraud or wilful misconduct.

9.2    The Trustee shall not be liable for acting with respect to this Settlement in accordance with the advice of Counsel of at least five years' standing, with respect to the Settlement, unless when he does so:

    9.2.1    he knows or ought reasonably to suspect that the advice was given in ignorance of material facts; or

    9.2.2    proceedings are pending to obtain the decision of the court on the matter.

9.3    The Trustee may recover from the Trust Fund any expenses (including in particular litigation costs) where he has acted with respect to this Settlement in accordance with the advice of Counsel of at least five years' standing, unless when he does so:

    9.3.1    he knows or ought reasonably to suspect that the advice was given in ignorance of material facts; or

    9.3.2    proceedings are pending to obtain the decision of the court on the propriety of so acting.

9.4    The Trustee may distribute Trust Property or its income in accordance with the provisions of this Settlement without having ascertained that there is no Person who is or may be a Beneficiary of this Settlement by virtue of any illegitimate relationship. The Trustee shall not be liable to such a Person unless at the time of the distribution he has actual notice of a claim by the latter.

9.5    This paragraph does not prejudice any right of any Person to follow Trust Property or its income into the hands of any other Person, other than a purchaser, who may have received it

9.6    For the avoidance of doubt, the immunities, exculpatory provisions and indemnities in favour of trustees set out in Paragraphs 11,12,13 and 14 of the First Schedule to the Trustee Act shall form an integral part of this Settlement and shall extend mutatiss mutandis to any former Trustee.

**EXHIBIT C**

**IN WITNESS of the above the Parties have executed this Deed**

**SIGNED SEALED AND DELIVERED BY**

the said **GUSTAVO HERNANDEZ ROMERO**

in the presence of

Felipe Vallhuera

.................................................

.................................................

The **COMMON SEAL** of **BANCO ATLÁNTICO**

**(BAHAMAS) BANK & TRUST COMPANY** was affixed to

this Deed by these two members of the Company

Miguel Coello .......................................... and

Elonido Encinar ..........................................

who have signed this Deed in the presence of

...Michelle..Rahming....

...P.O...Box..SS6289......

East Bay Street

Nassau, Bahamas

SETTLED

000019-03

**EXHIBIT C**

Mr. Miguel Angel Coello
**Banco Atlántico (Bahamas) Bank & Trust Ltd.**
East Bay Street
Nassau, The Bahamas

February 26th, 2003

Dear Sirs:

### Re: <u>Acceptance of the appointment as Protector</u>

We, Cesar Hernandez Frieri and Gustavo Hernandez Frieri on behalf of HH
PROTECTION LTD., having read the terms and conditions of the **HH MASTER
SETTLEMENT** and having understood the powers and discretions conferred upon the
office of Protector, do hereby accept the appointment as Protector of the **HH MASTER
SETTLEMENT.**

Yours truly,

Cesar Hernandez Frieri
on behalf of
HH PROTECTION LTD

Gustavo Hernandez Frieri
on behalf of
HH PROTECTION LTD

In the presence of:

Acknowledged by

GOVERNMENT
EXHIBIT
3

000056-03

**EXHIBIT C**

COMMONWEALTH OF THE BAHAMAS

THE INTERNATIONAL BUSINESS COMPANIES ACT 2000

A COMPANY LIMITED BY SHARES

CERTIFICATE OF INCORPORATION
AND
MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

HH SECURITIES LTD.

Incorporated on the 7th day of March, 2003.

BANCO ATLANTICO (BAHAMAS) BANK & TRUST LIMITED
East Bay Street
Nassau, New Providence
Bahamas.


GOVERNMENT
EXHIBIT
4

000020-03

EXHIBIT C



IBC 01

**Commonwealth of The Bahamas**

The International Business Companies Act

(No. 45 of 2000)

(SECTION 16)

*Certificate of Incorporation*

No. 126438 B

**HH SECURITIES LTD.**

I, JACINDA P. BUTLER, Assistant Registrar General, the Commonwealth of The Bahamas do hereby certify pursuant to the International Business Companies Act 2000, (No. 45 of 2000) that all the requirements of the said Act in respect of incorporation have been satisfied, and that

**HH SECURITIES LTD.**

is incorporated in the Commonwealth of The Bahamas as an International Business Company this 7th day of March, 2003

Given under my hand and seal
At Nassau in the Commonwealth
of The Bahamas

*Assistant Registrar General*

**EXHIBIT C**

COMMONWEALTH OF THE BAHAMAS

New Providence

The International Business Companies Act 2000

MEMORANDUM OF ASSOCIATION

OF

HH SECURITIES LTD.

BANCO ATLANTICO (BAHAMAS) BANK & TRUST LIMITED
East Bay Street
Nassau, New Providence
Bahamas.

000022-03

**EXHIBIT C**

COMMONWEALTH OF THE BAHAMAS

Memorandum of Association

of

<u>HH SECURITIES LTD.</u>

THE INTERNATIONAL BUSINESS COMPANIES ACT 2000

AN INTERNATIONAL BUSINESS COMPANY LIMITED BY SHARES

I.   The name of the Company is HH SECURITIES LTD.

II.  The Registered Office of the Company is situate at East Bay Street in the City of Nassau in the Island of New Providence one of the Islands in the Commonwealth of the Bahamas and its postal address is P.O. Box SS-6289, Nassau, Bahamas.

III. The Registered Agent of the Company is Banco Atlántico (Bahamas) Bank & Trust Limited whose address is East Bay Street, and whose postal address is P.O. Box SS-6289, Nassau, Bahamas.

IV.  The object or purpose for which the Company is established is to engage in any act or activity that is not prohibited under any law for the time being in force in the Commonwealth of the Bahamas.

V.   The liability of the members is limited.

VI.  This Memorandum may be amended at any time and from time to time by ordinary resolution of the Directors.

VII. The capital of the Company is Five thousand dollars in the currency of the United States of America (US$5,000.00) divided into Five thousand (5,000) Ordinary Shares having a par value of One dollar (US$1.00) each, with power to divide the shares in the capital for the time being into several classes and series and with power to increase or reduce the capital and to issue any of the shares in the capital, original, increased or reduced with or subject to any preferential, special or qualified rights or conditions as regards dividends, repayment of capital, voting or otherwise, as the Directors of the Company may from time to time by ordinary resolution designate.  The Company shall also have power to issue redeemable preference shares and share warrants as

000023-03

# EXHIBIT C

provided in its Articles of Association. The Directors are hereby expressly authorized to fix by ordinary resolution of the Directors any designations, powers, preferences, rights, qualifications, limitations or restrictions on each class or series of shares as the Directors think fit.

The persons whose names and addresses are subscribed are desirous of being formed into a company in pursuance of this Memorandum of Association and agree to take the number of shares in the capital of the Company set opposite their respective names.

| Names, Addresses and Descriptions of Subscribers | Number of Shares taken by each Subscriber |
|---|---|
| | |
| 1. I.B.A. MANAGEMENT LTD.<br>    P.O. Box SS 6289<br>    Nassau, Bahamas | One Share |
| 2. I.B.A. SERVICES LTD.<br>    P.O. Box SS 6289<br>    Nassau, Bahamas | One Share |
| TOTAL SHARES TAKEN | Two Shares |

Dated this 6th day of March, A.D., 2003.

WITNESS:

*Lynette Thompson*

Lynette C. Thompson (Mrs.)

COMMONWEALTH OF THE BAHAMAS

Registrar General's Department
I certify the foregoing to be a true copy of the original document.

Registrar General
MAR 0 7 2003

000024-03

# EXHIBIT C

COMMONWEALTH OF THE BAHAMAS

New Providence

The International Business Companies Act 2000

ARTICLES OF ASSOCIATION

OF

HH SECURITIES LTD.

BANCO ATLANTICO (BAHAMAS) BANK & TRUST LIMITED
East Bay Street
Nassau, New Providence
Bahamas.

000025-03

**EXHIBIT C**

COMMONWEALTH OF THE BAHAMAS

Articles of Association

of

HH SECURITIES LTD.

The International Business Companies Act 2000

Company limited by Shares

1. In the interpretation of these presents, unless there be something in the subject or context inconsistent therewith:-

"the Act" means The International Business Companies Act 2000 of the Bahamas as amended from time to time;

"Resolution of Directors" and "Resolution of Members" have the meanings assigned thereto respectively by the Act;

"the Directors" means the Directors for the time being;

"the Office" means the registered office for the time being of the Company;

"the Register" means the register of members to be kept pursuant to Section 29 (1) of the Act;

"month" means calendar month;

"in writing" and "written" include printing, lithography and other modes of representing or reproducing words in a visible form. Words importing the singular number only include the plural number and vice versa;

Words importing persons include corporations.

## REGISTERED SHARES

2. The whole of the unissued shares of the Company for the time being shall be under the control of the Directors who may allot or otherwise dispose of the same to such

**EXHIBIT C**

persons on such terms and conditions and at such times as the Directors think fit. Subject to the provisions of Section 32 of the Act, any shares may be issued on the terms that they are, or at the option of the Company are liable, to be redeemed on such terms and in such manner as the Company before the issue of the shares may by Resolution of Directors determine.

3. Save as herein otherwise provided, the Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not, except as ordered by a Court of competent jurisdiction or as by Act required, be bound to recognize any equitable or other claim to or interest in such share on the part of any other person.

4. All the shares in the Company shall be numbered in regular series; and every surrendered share shall continue to bear the number by which the same was originally distinguished.

5. If several persons are registered as joint holders of any shares, they shall be severally as well as jointly liable for any liability in respect of such shares, but service of notices on the first demand upon the Register shall be deemed proper service to all joint holders. Any of such persons may give effectual receipts for dividends.

6. For the purposes of the quorum, joint holders of any shares shall be considered as one number.

7. Certificates in respect of shares shall be issued and the signatures of all persons empowered to sign such certificates by Section 28(2) of the Act and likewise the Common Seal of the Company on such certificates may be facsimiles. In case any person who has signed or whose facsimile signature has been placed upon such certificate shall have ceased to be such Director or

2

**EXHIBIT C**

Officer before such certificate is issued, it may be issued by the Company with the same effect as if he were such Director or Officer at the date of its issue.

8. Every member shall be entitled to one certificate for all the shares registered in his name or to several certificates, each for one or more of such shares. Every certificate of shares shall specify the number and denoting numbers of the shares in respect of which it is issued and the amount paid up thereon.

9. If any certificate be worn out or defaced then, upon production thereof to the Directors, they may order the same to be cancelled and may issue a new certificate in lieu thereof; and if any certificate be lost or destroyed then, upon proof thereof to the satisfaction of the Directors and on such indemnity as the Directors may deem adequate being given, a new certificate in lieu thereof shall be given to the parties entitled to such lost or destroyed certificate.

10. The certificate of shares registered in the names of two or more persons shall be delivered to the person first named on the Register.

TRANSFER OF REGISTERED SHARES

11. The instrument of transfer (which need not be under Seal) of any share in the Company shall be executed by both the transferor and the transferee and the transferor shall be deemed to remain a holder of such share until the name of the transferee is entered in the Register in respect thereof.

12. Subject to such restrictions contained in these Articles as may be applicable, any member may transfer all or any of his shares by instrument in writing in any usual or common form or any form which the

3

**EXHIBIT C**

Directors may approve.

13. The Directors may decline to register any transfer of shares without assigning any reason therefor.

14. No transfer shall be made to an infant or to a person of unsound mind.

15. The transfer books and the Register may be closed at such times and for such periods as the Directors may from time to time determine.

16. Every instrument of transfer shall be left at the Office of the Company for registration, accompanied by the certificate or certificates covering the shares to be transferred and such other evidence as the Directors may require to prove the title of the transferor or his right to transfer the shares.

## TRANSMISSION OF REGISTERED SHARES

17. The legal representatives of a deceased member (not being one of the several joint holders) shall be the only persons recognized by the Company as having any title to his shares and, in case of the death of any one or more of the joint holders of any registered shares, the survivor or survivors shall be the only person or persons recognized by the Company as having any title to or interest in such shares.

18. Subject to the provisions of Section 31 of the Act any person becoming entitled to any shares in consequence of the death of any member or in any other way than by transfer may, with the consent of the Directors and upon the production of such evidence as may from time to time be required by the Directors, be registered as a member or, subject to the provisions as to transfers hereinbefore contained, may transfer such shares to some other person by executing to the latter an

**EXHIBIT C**

instrument of transfer.

### BORROWING POWERS

19.  The Directors may from time to time, at their
     discretion, raise or borrow or secure the payment of
     any sum or sums of money for the purposes of the
     Company.

20.  The Directors may raise or secure the payment or
     repayment of such money in such manner and upon such
     terms and conditions in all respects as they think fit
     and in particular by the issue of bonds, mortgages,
     debentures or debenture stock, perpetual or otherwise,
     notes or other obligations of the Company charged upon
     all or any part of the property of the Company (both
     present and future).

21.  Debentures, debenture stock and other securities may be
     made assignable, free from any equities, between the
     Company and the person to whom the same may be issued.

### PROCEEDINGS AT GENERAL MEETINGS OF MEMBERS

22.  No business shall be transacted at any general meeting
     of the members unless a quorum is present.  A quorum
     shall consist of one or more members, present in person
     or by proxy, holding more than fifty percent of the
     issued shares of the Company.

23.  If, within one hour from the time appointed for the
     meeting, a quorum is not present, the meeting, if
     convened upon the requisition of members, shall be
     dissolved; in any other case it shall stand adjourned
     to the same day in the next week at the same time and
     place; and if at such adjourned meeting a quorum is not
     present, those members who are present shall be a

5

**EXHIBIT C**

quorum and may transact the business for which the meeting was called.

24. The Chairman of the Board of Directors, if any, shall preside as Chairman at every meeting of the members or, if there is no such Chairman, the Directors present shall elect one of their number to be Chairman of the Meeting.

25. In the absence of the Chairman of the Board of Directors, if any, or if no Director is present or no Director is willing to act as Chairman, the members present shall choose one of their number to be Chairman.

26. The Chairman may, with the consent of the meeting, adjourn any meeting from time to time and from place to place but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

27. Every question submitted to a meeting shall be decided in the first instance by a show of hands and in the case of an equality of votes the Chairman shall, both on a show of hands and at the poll, have a casting vote in addition to the vote or votes to which he may be entitled as a member.

28. (1) At any general meeting of the members, unless a poll is demanded by a member present in person or by proxy, a declaration by the Chairman that a Resolution has been carried and an entry to that effect in the book of proceedings of the members shall be sufficient evidence of the fact, without proof of the number or proportion of the votes recorded in favour of or against such Resolution.

(2) If a quorum be present which is represented by

5

**EXHIBIT C**

only one person then such person may resolve any matter and a Minute signed by such person accompanied, where such person be a proxy, by a copy of the proxy form shall constitute a valid resolution of members.

29. If a poll is demanded, it shall be taken in such manner as the Chairman directs and the result of such poll shall be deemed to be the Resolution of the members.

### VOTES OF MEMBERS

30. Every member holding voting shares shall either in person or by proxy have one vote on a show of hands and on a poll shall have one vote for every voting share held. Where a corporation, being a member, wishes to be present, it must be represented by a proxy; such proxy shall be entitled to vote for such corporation on a show of hands and also on a poll.

31. If any member is a lunatic or idiot, he may vote by any person appointed by a Court of competent jurisdiction as his legal curator.

32. Votes may be given either personally or by permanent or ad hoc proxy.

33. If there be joint registered holders of any shares, the vote of the senior who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders, and for this purpose seniority shall be determined by the order in which the names stand in the Register in respect of the joint holding.

34. No member shall be entitled to be present or to vote on any question, either personally or by proxy or as a proxy for another member, at any meeting or upon a poll or be reckoned in a quorum, whilst any sum shall be due

7

**EXHIBIT C**

and payable to the Company in respect of any of the shares of such member.

35. The instrument appointing a proxy shall be in writing under the hand of the appointor or his attorney or, if such appointor is a corporation with a Common Seal, under such Common Seal or, if such corporation has not by its regulations any such Seal, then in such manner as may be acceptable to the Directors. A proxy need not be

a member of the Company.

36. The instrument appointing a proxy shall be deposited with the Secretary before or at the meeting for which it is to be used and, if permanent, may be recorded with the Secretary.

37. A vote given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death of the principal or revocation of the proxy or transfer of the shares in respect of which the vote is given, provided no intimation in writing of the death, revocation or transfer shall have been received before the meeting.

38. An instrument appointing a proxy shall be in the following form or as near thereto as circumstances admit:-

I,                              of

being a member of

hereby appoint                              of

as my proxy to vote for me and on my behalf at the meeting of the members to be held on the        day of

                    and at any adjournment thereof.

As witness my hand this        day of

Signed by the said

**EXHIBIT C**

<u>OFFICERS</u>

39.  The Officers of the Company shall be appointed by the
     Directors and may consist of a President, one or more
     Vice-Presidents, a Secretary and a Treasurer and such
     other officers as the members or the Directors may from
     time to time think necessary, and such other officers
     shall perform such duties as may be prescribed by the
     Directors.  They shall hold office until their
     successors are appointed, but any officer may be
     removed at any time by Resolution of members or of
     Directors.  If any office becomes vacant, the members
     in general meeting or the Directors may fill the same.

40.  Any person may hold more than one of these offices and
     no officer need be a member of the Company.

<u>PRESIDENT</u>

41.  The President shall perform such duties as may be
     prescribed by these Articles, or by Resolution of
     members or of Directors.

<u>VICE-PRESIDENT</u>

42.  A Vice-President, in the absence or disability of the
     President, may perform the duties and exercise the
     powers of the President and shall perform such other
     duties as may be prescribed by these Articles, or by
     Resolution of members or Directors.

<u>TREASURER</u>

43.  The Treasurer shall perform such duties as may be
     prescribed by these Articles, or by Resolution of

000034-03

**EXHIBIT C**

members or of Directors and, if and when directed so to do by Resolution of members or of Directors, shall keep full and accurate accounts of the receipts and disbursements of the Company and shall render to the Directors at regular meetings of the Directors, or whenever they may require it, a statement of the financial condition of the Company.

## SECRETARY

44. The Secretary shall attend and keep the Minutes of the meetings of the members and of the Directors. He shall also summon meetings and keep such other books and records of the Company and the Directors as may be required by Resolution of members or of Directors and perform such other duties as may be prescribed by these Articles, or by Resolution of members or of Directors.

## THE SEAL

45. The Directors shall provide for the safe custody of the Seal and the Seal shall never be used except by the authority of the Directors of a Committee of the Directors authorized by the Directors for that purpose. Every instrument to which the Seal is to be affixed shall be executed on behalf of the Company by the President or a Vice-President or a Director signing the same and affixing thereto the Seal of the Company in the presence of the Secretary or another Director or another Officer who shall sign the instrument as witness: provided that in the case of Certificates of Title to shares the provisions of Article 7 and of Section 28(2)(b) of the Act shall apply.

19

**EXHIBIT C**

## DIRECTORS

46. The first Directors of the Company shall be elected by the members at a general meeting of the members who shall hold office until replaced at a subsequent general meeting. The Directors shall not be less than two nor more than seven in number.

47. A Director replaced at a subsequent meeting may be re-appointed as a Director of the Company on a subsequent date.

48. A Director need not be a member of the Company and no shareholding qualification shall be necessary to qualify a person as a Director.

49. The remuneration, if any, of the Directors shall from time to time be determined by the members in general meeting or by Resolution of Directors at any time and such remuneration shall be deemed to accrue from day to day. The Directors may also be paid all travelling, hotel and other expenses properly incurred in attending and travelling to and returning from meetings of the Directors or of any committee of the Directors or general meetings of the members or in connection with the business of the Company.

50. The office of a Director shall ipso facto be vacated:-

   (a) If he becomes bankrupt or suspends payment to or compounds with his creditors;

   (b) if he becomes lunatic or of unsound mind or all the other Directors shall have unanimously resolved that he is physically or mentally incapable of performing the functions of a Director;

   (c) if by notice in writing to the Company he resigns his office;

   (d) if he fails to make proper disclosure under the provisions of Section 55 of the Act; and

11

000036-03

# EXHIBIT C

(e)   if he is removed by Resolution of members or if his resignation in writing is requested by not less than three (3) of the Directors.

51.   The continuing Directors may act notwithstanding any vacancy in their body. However, so long as their number is reduced below the number fixed by or established pursuant to these Articles as the necessary quorum of Directors, the continuing Director or Directors may act for the purposes of increasing the number of Directors to the number necessary to constitute a quorum or to the minimum number fixed by Article 47 or of summoning a general meeting of the shareholders, but for no other purpose.

52.   Any casual vacancy in the Board of Directors may at any time be filled by the Directors but every person so chosen shall retain office so long only as the vacating Director would have retained the same if no vacancy had occurred.

## ALTERNATE DIRECTORS

54.   Any Director may at any time appoint any person approved by the Directors to be an alternate Director of the Company and may at any time remove any alternate Director so appointed by him. An alternate Director so appointed shall not be entitled to receive any remuneration from the Company but shall otherwise be subject to the provisions of these presents with regard to Directors. An alternate Director shall (subject to his giving to the Company an address at which notices may be served upon him) be entitled to receive notices of all meetings of the Board and to attend and vote as a Director at any such meeting at which the Director appointing him is not personally present and generally

000037-03

to perform all the functions of his appointor as a
Director in the absence of such appointor. An
alternate Director shall ipso facto cease to be an
alternate Director if his appointor ceases for any
reason to be a Director. All appointments and removals
of alternate Directors shall be effected in writing
under the hand of the Director making or revoking such
appointment and lodged with the Secretary at the
Company's office.

### MANAGING DIRECTORS

55.  The members in general meeting or the Directors may
     from time to time appoint one or more of the Directors
     to be a Managing Director or Managing Directors of the
     Company either for a fixed term or without any
     limitation as to the period for which he or they is or
     are to hold such office and may from time to time
     remove or dismiss him or them from office and appoint
     another or others in his or their place or places.

56.  The remuneration of a Managing Director shall from time
     to time be fixed by the Directors and may be by way of
     salary or commission or participation in profits or by
     any or all of those modes.

57.  The Directors may from time to time entrust to and
     confer upon a Managing Director for the time being such
     of the powers exercisable under these presents by the
     Directors as they think fit and may confer such powers
     for such time and to be exercised for such objects and
     purposes and upon such terms and conditions and with
     such restrictions as they think expedient; and they may
     confer such powers either collaterally with, or to the
     exclusion of, and in substitution for all or any of the
     powers of the Directors in that behalf; and may from

13

000038-03

**EXHIBIT C**

time to time revoke, withdraw or vary all or any of
such powers.

## PROCEEDINGS OF DIRECTORS

58.  The Directors may meet together for the dispatch of
     business, adjourn and otherwise regulate their meetings
     and proceedings as they think fit and may determine the
     quorum necessary for the transaction of business.
     However there shall be a general meeting held at least
     once in every year. Until otherwise determined, two
     Directors shall be a quorum for any and all such
     meetings.  It shall not be necessary to give notice of
     a meeting of Directors to a Director who is not within
     the Bahamas.

59.  The Chairman of the Board of Directors, if any, shall
     preside at all meetings of the Directors or, if there
     is no such Chairman, the Directors present shall choose
     someone of their number to be the Chairman of the
     meeting.  In the absence of the Chairman of the Board
     of Directors, the Directors present shall choose
     someone of their number to be Chairman of the meeting.

60.  A meeting of the Directors for the time being at which
     quorum is present shall be competent to exercise all or
     any of the authorities, powers and discretions by or
     under the regulations of the Company for the time being
     vested in or exercisable by the Directors generally.

61.  A Director may at any time convene a meeting of the
     Directors.  Questions arising at any meeting shall be
     decided by a majority of votes and in case of an
     equality of votes the Chairman shall have a second or
     casting vote.

62.  The Directors may meet as provided by Section 47(2) of

14

**EXHIBIT C**

the Act.

63. The Directors may delegate any of their powers to committees each consisting of two or more members of their body as they think fit. Any committee so formed shall, in the exercise of the powers so delegated, conform to any regulations that may from time to time be made or imposed upon it by the Directors.

64. The meetings and proceedings of any such committee shall be governed by the provisions herein contained for regulating the meetings and proceedings of the Directors, so far as the same are applicable thereto, and not superseded by any regulations made by the Directors under the last preceding clause.

65. All acts done by any meeting of the Directors, or of a committee of Directors or by any person acting as a Director, shall, notwithstanding that it afterwards be discovered that there was some defect in the election of any such Director or persons acting as aforesaid or that they or any of them were or was disqualified, be as valid as though every such person had been elected and was qualified to be a Director.

66. A Resolution in writing signed by a majority of the Directors shall be as valid and effectual as if it had been passed at a meeting of the Directors duly called and constituted.

67. If any Director, being willing, shall be called upon to perform extra services or to make any special exertions in going or residing abroad or otherwise for any of the purposes of the Company, the Company shall remunerate the Director for so doing by a fixed sum or by percentage of profits or otherwise as may be determined by the Directors, and such remuneration may be either in addition to or in substitution for his share in the remuneration above provided.

15

# EXHIBIT C

## POWERS OF DIRECTORS

68. The management of the business of the Company shall be vested in the Directors who, in addition to the powers and authorities by these presents or otherwise expressly conferred upon them, may exercise all such powers and do all such acts as expressly directed or required to be exercised or done by Resolution of members but subject nevertheless to the provisions of the Act and of these presents.

69. Without prejudice to the general powers conferred by the last preceding clause and the other powers conferred by these presents, it is hereby expressly declared that the Directors shall have the following powers, that is to say:-

(1) To pay the costs, charges and expenses, preliminary and incidental to the continuation promotion, formation, establishment and registration of the Company under the Act.

(2) To purchase or otherwise acquire for the Company any property (real or personal), rights or privileges which the Company is authorized to acquire at such price and generally on such terms and conditions as they think fit.

(3) To sell, exchange, assign or otherwise dispose (with or without valuable consideration) of all or any of the property (real or personal) of the Company and to sign, seal, execute and deliver conveyances, transfers and assignments of any property so sold, exchanged, assigned or otherwise disposed of.

(4) At their discretion to pay for any property, rights or privileges acquired by or services rendered to the Company either wholly or partially in cash or in

15

000041-03

shares, bonds, debenture or other securities of the Company; and any such shares shall be issued as fully paid up; and any such bonds, debentures or other securities may be either specifically charged upon all or any part of the property of the Company or not so charged.

(5) To secure fulfillment of any contracts or engagements entered into by the Company by mortgage or charge of all or any of the property of the Company for the time being or in such other manner as they think fit.

(6) To institute, conduct, defend, compound or abandon any legal proceedings by and against the Company or its officers or otherwise concerning the affairs of the Company; and also to compound and allow time for payment or satisfaction of any debts due and of any claims or demands by or against the Company.

(7) From time to time to provide for the management of the affairs of the Company abroad in such manner as they think fit and in particular by power of attorney under seal to appoint any persons to be attorneys or agents of the Company with such powers (including power to subdelegate) and upon such terms as may be thought fit.

(8) To invest and deal with any of the moneys of the Company not immediately required for the purposes of the Company and upon such securities and in such manner as they may think fit and from time to time to vary or realize such investments.

(9) To enter into all such negotiations and contracts and rescind and vary all such contracts and execute and do all such acts, deeds and things in the name of and on behalf of the Company as they may consider expedient for or in relation to any of the matters aforesaid or otherwise for the purposes of the Company.

17

**EXHIBIT C**

## DIVIDENDS

70.  Subject to the rights and interests of any other class of shareholder that may be created, the profits of the Company shall be divisible among the ordinary shareholders in proportion to the capital paid up on the shares held by them respectively.

71.  Subject to the provisions of Sections 36 and 37 of the Act, the Directors may from time to time declare and pay the members entitled thereto such dividends as appear to the Directors to be justified by the profits of the Company.

72.  Unless otherwise directed, any dividend may be paid by cheque or warrant or bank transfer order and in the case of a cheque or warrant may be sent through the post to the registered address of the member entitled thereto or, in the case of joint holders, to the registered address of that holder, whose name stands first on the Register in respect of the joint holding, and every cheque or warrant so sent shall be made payable to the order of the person to whom it is sent.

## RESERVES

73.  The Directors may, before recommending any dividend, set aside out of the profits of the Company such sums as they think proper as a reserve fund to meet contingencies or for equalizing dividends or for special dividends or bonuses or the redemption of preference shares or for repairing, improving and maintaining any of the property of the Company and for such other purposes as the Directors shall in their absolute discretion think conducive to the interests of the Company and may invest the several sums so set

18

# EXHIBIT C

aside upon such investments as they may think fit and from time to time deal with and vary such investments and dispose of all or any part thereof for the benefit of the Company and may divide the reserve fund into such special funds as they think fit and employ the reserve fund or any part thereof in the business of the Company and that without being bound to keep the same separate from the other assets.

## CAPITALIZATION OF PROFITS AND RESERVES

74.  The Directors may resolve that it is desirable to capitalize any undivided profits of the Company not required for paying the dividends on any shares carrying a fixed cumulative preferential dividend (including profits carried and standing to the credit of any reserve or reserves or other special account) and accordingly that the Directors appropriate the profits resolved to be capitalized to the members in the proportions in which such profits would have been divisible amongst them had the same been applied in paying dividends instead of being capitalized and to apply such profits on their behalf in paying up in full unissued shares, debentures or securities of the Company of a nominal amount equal to such profits, such shares, debentures or securities to be allotted and distributed, credited as fully paid up, to and amongst such members in the proportion aforesaid or partly in one way and partly in the other.  Provided that the capital redemption reserve fund may, for the purposes of this Article, only be applied in the paying up of unissued shares to be issued to members as fully paid.

75.  Whenever such a resolution as aforesaid shall have been passed, the Directors shall make all appropriations and

000044-03

applications of the undivided profits resolved to be capitalized thereby and all allotments and issues of fully paid shares, debentures or securities, if any, and generally shall do all acts and things required to give effect thereto with full power to the Directors to make such provision by the issue of fractional certificates or by payment in cash or otherwise as they think fit in the case of shares, debentures or securities becoming distributable in fractions and also to authorize any person to enter, on behalf of all the members interested, into an agreement with the Company providing for the allotment to them respectively, credited as fully paid up, of any further shares, debentures or securities to which they may be entitled upon such capitalization; and any agreement made under such authority shall be effective and binding on all such members.

## ACCOUNTS

76. (1) The Directors shall cause true accounts of the receipts and disbursements of cash and of the assets and liabilities of the Company to be kept at the office of the Company or at such other place as the Directors may from time to time appoint and, subject to any reasonable restrictions as to the time and manner of inspecting the same that may be imposed by the Directors, such accounts shall be open to the inspection of the members during the hours of business.
(2) When called upon to do so by members holding fifty-one percent or more of the issued voting capital, the Directors shall lay before the members in general meeting:-

70

**EXHIBIT C**

    (a)   a Statement of Income and Expenditure for the past year, and

    (b)   a Balance Sheet containing a summary of the assets and liabilities of the Company both such Statement and Balance Sheet being made up to a date not more than six months before such meeting.

## AUDIT

77.   The Directors shall make all necessary arrangements for the audit from time to time as they see fit of the books and accounts of the Company.

## NOTICES

78.   A notice may be served by the Company upon any member either personally or by sending it through the post in a prepaid letter addressed to such member at his registered address.

79.   All notices directed to be given to the members shall, with respect to any share to which persons are jointly entitled, be given to whichever of such persons is named first on the Register; and the notice so given shall be sufficient notice to all the holders of such shares.

80.   The signature to any such notice to be given by the Company may be written, typewritten or printed.

81.   Any notice, if served by post, shall be deemed to have been served at the time when in the ordinary course of post the letter containing the same would be delivered; and in proving such notice it shall be sufficient to prove that the letter containing the notice was properly addressed and put into the post office.

21



**EXHIBIT C**

82. Any member or Director may waive the right to receive notices by an instrument in writing signed by him before, at, or after any meeting.

<u>INDEMNITY</u>

83. Save and except so far as the provision of this Article shall be avoided by any provision of the Act, the Directors, Secretary and other Officers for the time being of the Company and the Trustees (if any) for the time being acting in relation to any of the affairs of the Company and every one of them and every one of their heirs, executors and administrators shall be indemnified and secured harmless out of the assets and profits of the Company from and against all actions, costs, charges, losses, damages and expenses which they or any of them, their or any of their heirs, executors or administrators shall or may incur or sustain by or by reason of any act done, concurred in or omitted in or about the execution of their duty or supposed duty in their respective offices or trusts except such (if any) as they shall incur or sustain through or by their own wilful neglect or default respectively and none of them shall be answerable for the acts, receipts or defaults of the other or others of them or for joining in any receipt for the sake of conformity or for any bankers or other person with whom any moneys or effects belonging to the Company shall or may be lodged or deposited for safe custody or for the insufficiency or deficiency of any security upon which any moneys of or belonging to the Company shall be placed out or invested or for any other loss, misfortune or damage which may happen in the execution of their respective offices or trusts or in relation thereto except the

22

000047-03

same shall happen by or through their own wilful neglect or default respectively.

AMENDMENT

84. The Directors may from time to time amend the Memorandum of Association or these Articles of Association by Resolution.

IN WITNESS WHEREOF WE, the Subscribers to the Memorandum of Association have hereunto subscribed our names this 6th day of March, A.D., 2003.

I.B.A. MANAGEMENT LTD.

I.B.A. SERVICES LTD.

Signed by the Subscribers to the Memorandum of Association in the presence of:-

Lynette C. Thompson (Mrs.)

COMMONWEALTH OF THE BAHAMAS
Registrar General's Department
I certify the foregoing to be a true copy of the original document.

Registrar General
MAR 0 7 2003

Scanned on 30 Jan 2017

**EXHIBIT C**



**APOSTILLE**
(Convention de La Haye du 5 Octobre 1961)

Country: _____ COMMONWEALTH OF THE BAHAMAS _____
This public document

has been signed by _____ DEIRDRE A. CLARKE-MAYCOCK _____

acting in the capacity of ___ ACTING REGISTRAR GENERAL _____

_____ COMMONWEALTH OF THE BAHAMAS _____

bears the seal _____ REGISTRAR GENERAL'S DEPARTMENT _____

_____ NASSAU, NEW PROVIDENCE, THE BAHAMAS _____

CERTIFIED

at NASSAU        6.    24TH JANUARY, 2017

by _____ SHEILA CAREY, PERMANENT SECRETARY _____

_____ MINISTRY OF FOREIGN AFFAIRS _____

260/2017

10:    Signature

~~~~~~~~~~~~~~~~~~~~~~~~~~
PERMANENT SECRETARY
MINISTRY OF FOREIGN AFFAIRS
COMMONWEALTH OF THE BAHAMAS

THE MINISTRY OF FOREIGN AFFAIRS, CONSULAR DIVISION, ACCEPTS NO RESPONSIBILITY FOR THE CONTENT OF
THIS DOCUMENT

000049-03

IBC 08

## COMMONWEALTH OF THE BAHAMAS

### THE INTERNATIONAL BUSINESS COMPANIES ACT 2000
(No. 45 of 2000)

(Section 190)

## CERTIFICATE OF GOOD STANDING

No. 126438 B   HH SECURITIES LTD.

I, **DEIRDRE A. CLARKE-MAYCOCK**, Acting Registrar General of the Commonwealth of The Bahamas, DO HEREBY CERTIFY:

1. The above Company was duly incorporated under the provisions of the International Business Companies Act 2000, (No. 45 of 2000) on the **7th** day of **March 2003** as Company No. **126438** on the Register of International Business Companies.

2. The name of the Company is still on the Register of International Business Companies and the Company has paid all fees, licence fees and penalties due and payable under the provisions of Sections 176 and 177 of the said Act.

3. The Company has not submitted to me Articles of Merger or Consolidation that have not yet been effective.

4. The Company has not submitted to me Articles of Arrangement that has not yet become effective.

5. The Company is not in the process of being wound up and dissolved.

6. No proceedings have been instituted to strike the name of the Company off the said Register.

7. In so far as is evidenced by the documents filed with this Office, the Company is in good legal standing.

Given under my hand and seal at Nassau in the Commonwealth of The Bahamas this **28th day of December, 2016**

**Acting Registrar General**

**EXHIBIT C**

## Register of Shareholders

### HH SECURITIES LTD

| Full Name | GLOBAL IRREVOCABLE TRUST |
| --- | --- |
| Address | 2655 South Bayshore, Suite 703, Miami, FL 33133 |

| Date | No. of Transfer Deed | Shares Acquired | | | Shares Transferred | | | Balance Shares Held | Remarks |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Certificate Number | No. of Shares | Amount Paid Per Share | Certificate Number | No. of Shares | Amount Paid Per Share | | |
| 03/07/03 | | 1 | 5,000 | $ 1.00 | | | | 5,000 | |



LAURA J RIVERA
MY COMMISSION # DD915958
EXPIRES: May 17, 2008
Bonded Thru Notary Service.com

**EXHIBIT C**

# GLOBAL IRREVOCABLE TRUST

## DECLARATION OF TRUST

      **THIS DECLARATION OF TRUST ("TRUST")** dated this 1st day of December, 2004, is made by **GENERAL GUARDIAN CORPORATION** ("Trustee"), a Nevada corporation. The Trustee declares that it has received the property listed on the attached Annex "A," to hold such property in trust according to the terms of this Trust.

**NOW THIS TRUST WITNESSETH AS FOLLOWS**:

## ARTICLE ONE
### The Trust

1.1.   <u>Name</u>.  This Trust shall be known and designated as the GLOBAL IRREVOCABLE TRUST.

1.2.   The Trust:

    1.2.1.   The sum of one hundred Canadian dollars (CDN $100) which has been paid to the Trustee herein together with any other property which may from time to time be held by the Trustee in lieu thereof or in addition thereto to be listed in Annex "A," as amended from time to time (all of which is hereinafter collectively referred to as the ("Trust Estate"), shall be held by the Trustee for the benefit of the beneficiaries herein described (hereinafter referred to as the "Beneficiaries") and in accordance with this Trust as is herein provided. Any additions to the Trust Estate, other than those derived from the administration of the said Estate by the Trustee, shall be subject to the prior approval of the Protector (hereinafter referred to as the "Protector").

    1.2.2.   The Trustee shall stand possessed of and hold the Trust Estate in trust to invest same or such portion thereof as may thereafter be delivered to the Trustee pursuant to the provisions of the present Trust in its absolute discretion, either to retain the same as then invested or to sell or convert the same and to invest the monies realized from such sale or conversion in such investments as the Trustee may deem fit.



GOVERNMENT
EXHIBIT
5

1

000057-03

**EXHIBIT C**

## ARTICLE TWO
### Trust Period

2.1.   The duration of the Trust Period shall run from the date of the execution of these presents and shall expire upon the date:

2.1.1.   on which shall expire the period of eighty (80) years from the execution of this Trust; or

2.1.2.   on which shall expire the period of twenty (20) years from the death of the last survivor of all the descendants, male and female, of His late Majesty King George the Fifth living at the date hereof; or

2.1.3.   one (l) year after the day on which there shall be no Beneficiary in existence, whichever shall first occur; or

2.1.4.   such earlier date as the Protector, as hereinafter described, shall in its absolute discretion by Deed appoint.

2.2.   The completion of distribution shall be deemed to have taken place when the Trust Estate has been distributed in toto in conformity with the provisions of this Trust.

## ARTICLE THREE
### The Trustee

3.1.   Definition and Number

3.1.1.   Trustee means one or more Trustees who is or who are for the time being in office whether he, she, they or it be the Trustee originally appointed hereby or subsequently appointed in accordance with this Trust.

3.1.2.   Those individuals who are Beneficiaries or may become Beneficiaries of this Trust as well as their spouses and relatives to the second degree, including the relatives to the second degree of their spouses, cannot be named Trustee to this Trust.

3.1.3.   An individual, company, corporation or body politic may be named a Trustee to this Trust.   Any Trustee named herein shall assent to all of the terms of this Trust, including paragraph 4.13. of Article Four.

3.1.4.   The Trustee herein named is the Trustee for the time being of the Trust, namely:

**GENERAL GUARDIAN CORPORATION,**
a Nevada corporation

2

**EXHIBIT C**

3.2.    Vacancy and Replacement

    3.2.1.    An individual shall cease to be a Trustee when he or she dies, resigns or becomes unable or unwilling to act or to continue to act or becomes insolvent or bankrupt. A corporation shall cease to be a Trustee hereunder when the Trustee resigns or becomes insolvent or bankrupt or ceases to exist.

    3.2.2.    The power to dismiss, replace, appoint new or additional Trustees shall be vested in the Protector as hereinafter provided.

    3.2.3.    The replacing of a Trustee when a vacancy occurs shall be effected by an appointment as Trustee of any individual or corporation with power under law to contract. If more than one (1) Trustee has been appointed, the remaining Trustees shall agree upon and appoint the Trustee or Trustees required to fill such vacancy or vacancies subject to the approval of the Protector. In the event that any remaining Trustees cannot so agree or that there be no remaining Trustees, the Protector shall appoint the Trustee or Trustees required to fill such vacancy or vacancies.

    3.2.4.    Resignation by a Trustee shall be effected by the delivery or mailing by registered mail of a written notice of resignation to the other Trustee or Trustees acting hereunder, as the case may be, to the Beneficiaries and to the Protector. However, in the case of impossibility to give notice to all parties, the giving of notice to at least one of the above parties shall constitute good and valid notice hereunder.

    3.2.5.    A retiring or replaced Trustee shall execute all transfers and do all acts or things that may be necessary for vesting the Trust Estate in the new, continuing or replacing Trustee or Trustees.

## ARTICLE FOUR
### Administration of Trust

4.1.    Wherever discretion is vested in or power is conferred upon more than one (1) Trustee, such discretion or power must be exercised by a majority of the Trustees. If at any time there are fewer than three (3) Trustees, such discretion or power must be exercised by unanimity if there are two (2) Trustees; and if there is only one (1) Trustee, it may validly exercise such discretion or power alone.

4.2.    Subject to the Protector's approval, as described in Section 6.3 of Article Six, the Trustee hereunder has unlimited rights of ownership of the Trust Estate and, as an owner, has absolute discretion to invest, manage, administer and otherwise deal with any part or the whole of the Trust Estate as the Trustee sees fit, the whole in accordance with the provisions of this Trust. Not to in any way limit or restrict the generality of the foregoing, the Trustee may exercise and/or delegate, in its sole and absolute discretion, whenever and as often as the Trustee shall deem it advisable until the duration of the Trust Period has expired, the power and authority:

3

**EXHIBIT C**

4.2.1.     to invest the cash funds from time to time constituting part of the Trust Estate in any investments or securities which the Trustee may consider advisable and the Trustee is not to be limited to those investments authorized by law for trustees;

4.2.2.     from time to time and at any time to sell, transfer, assign, exchange, or otherwise dispose of any of the securities or investments from time to time constituting the Trust Estate, in any manner the Trustee may deem proper, at any price and terms considered desirable by the Trustee, and the Trustee shall not be bound to secure the consent or approval of any person, official, authority, tribunal or Court whomsoever or whatsoever;

4.2.3.     to vote all stocks and shares, to exercise all rights incidental to the ownership of stocks, shares, bonds, other securities and investments and property held as part of the Trust Estate, and to issue proxies to others; to sell or exercise any subscription rights and in connection with the exercise of subscription rights, to use trust monies for that purpose; to consent to and join in any plan, reorganization, readjustment or amalgamation or consolidation with respect to any corporation whose stock, shares, bonds or other securities at any time form part of the Trust Estate, and to authorize the sale of the undertaking or assets or a substantial portion of the assets or undertaking of any corporation and generally to act in respect of the Trust Estate as fully and effectually from time to time as if the same were not trust property but always for the benefit of the Trust Estate;

4.2.4.     to hold any or all securities or other property in bearer form or in the name of the Trustee or in the name of some other person, company or partnership or in the name or names of nominees without disclosing the fiduciary relationship, and to deposit the said securities and any title deeds or documents belonging or relating to the Trust Estate in any part of the world with any bank or trust company or any other company that undertakes the safe custody of securities as part of its business without being responsible for the default of such bank, trust company or other company or for any loss occasioned thereby;

4.2.5.     notwithstanding anything herein otherwise contained or rule of law to the contrary, to purchase as an investment of the Trust Estate, and hold as part of the Trust Estate, any securities or property at any price and upon any terms that may be deemed expedient or desirable by the Trustee, and any such purchase so made, or the price paid or terms agreed upon in reference thereto shall not be subject to question by any person who may be entitled hereunder or by any Court or tribunal whatsoever;

4

**EXHIBIT C**

4.2.6.     to make any payments, provisions or distributions which may be required under the terms hereof in whole or in part in money, securities or other property and on every division or distribution, the judgment and apportionment of the Trustee and valuations made by the Trustee shall be binding and conclusive on all persons whomsoever;

4.2.7.     to incorporate any company or companies under the laws of any jurisdiction in the world at the expense of the Trust Estate, for the purposes of the powers and authority of the Trustee and more particularly, to invest the whole or any part of the Trust Estate wholly or partly in shares or other securities of such company or companies;

4.2.8.     to lease at any time and from time to time real property or interests in real property entrusted to the Trustee or from time to time held by the Trustee hereunder for such term or terms of months or years, to begin presently or in the future, as to the Trustee may seem proper, even though such lease or leases shall be for a term or terms exceeding that especially authorized by law and be beyond the term of the termination of any trust estate herein created, such leases to be with such options to the lessees of renewal and/or purchase or for the purchase or disposal of buildings thereon or to be placed thereon, and upon such covenants, terms, conditions, agreements and provisions as to the Trustee shall seem proper; and in connection therewith, to make, execute, acknowledge and deliver any and all instruments that may be necessary, proper or desirable;

4.2.9.     to acquire, hold and sell real estate anywhere in the world;

4.2.10.    to acquire and hold debts secured by hypothec or mortgage on real estate anywhere in the world;

4.2.11.    to renew and keep renewed any hypothec or mortgage upon real estate anywhere in the world;

4.2.12.    to register any property, immovable or moveable, in the name of the Trustee or in the names of the nominees;

4.2.13.    to deposit any cash balances in the hands of the Trustee at any time at any bank or trust company;

4.2.14.    to keep the whole or any part of the Trust Estate at any place within the Trustee's discretion;

4.2.15.    to retain any life insurance policy entrusted to the Trustee or from time to time held by the Trustee hereunder; to purchase insurance on the life of any Beneficiary hereunder or on the life of anyone and to select such type of policy and mode of premium payments as the Trustee may deem advisable;

000061-03

**EXHIBIT C**

to exercise all rights with regard to such retained or purchased insurance as the policy contracts grant to the owner thereof; to pay premiums on such policies either out of the principal or out of income or partly out of principal and partly out of income as the Trustee shall deem proper; to name as Beneficiaries of the said new policies either the Trust Estate or the Beneficiaries thereof; to purchase annuities for one or more Beneficiaries and to select such type of annuity and mode of payment therefor as the Trustee may deem advisable; and to purchase and pay the premiums on policies of insurance against fire, other casualty or public liability or other insurance of a similar character, but the Trustee shall not be liable for any omission to purchase any insurance or to purchase a particular amount of any type of insurance;

4.2.16.   to determine whether any monies shall, for the purpose of this Trust, be considered as principal or income of the Trust Estate or whether any taxes, expenses or losses shall be paid out of or borne by principal or income.

4.3.   Notwithstanding the foregoing powers and authority conferred upon the Trustee hereunder, in respect of any corporation the shares of which are comprised in the Trust Estate, the shares not be realized or liquidated but, to the greatest extent possible, that they be distributed in specie to the Beneficiaries in accordance with this Declaration of Trust, in order to ensure to the greatest extent possible the continued existence of such corporations and the ownership of the shares thereof by the Beneficiaries as aforesaid.

4.4.   The Trustee may furthermore act upon the opinion or advice of or information obtained from any reputable solicitor, valuer, broker, auctioneer, accountant or other expert but the Trustee shall not be bound to act upon such opinion or advice and the Trustee shall not be responsible for any loss occasioned by so acting or by not so acting as the case may be.

4.5.   Without limiting the generality of any power or authority otherwise conferred upon the Trustee hereunder, the Trustee shall have the full power and authority, instead of acting personally, to appoint any agent or agents in any part of the world, to assist in the administration of this Trust and in the management of the Trust Estate and, provided that the Trustee exercises reasonable care in the appointment of such agent or agents, the Trustee shall not be responsible for any act or neglect of any such agent or agents.

4.6.   Any Trustee being engaged in a professional business or trade, may, in the discretion of the Trustee, be paid all usual professional, business and trade charges and remuneration for business transacted and time expended and acts done by the Trustee or any employee or partner of the Trustee or by any firm or corporation with which the Trustee is connected in connection with the Trusts hereof including acts which a Trustee not being in any profession, business or trade could have done personally. Amounts paid under the foregoing shall be in addition to that Trustee's remuneration.

4.7.   In addition to their disbursements, the Trustee and the Protector shall be remunerated such fees as are usual for the type of administration.

6

4.8.  The Trustee may, with the prior approval of the Protector, receive and hold as part of the Trust Estate, subject to the Trusts hereof, any property made available by any other person or persons to be added to and to become part of the Trust Estate.

4.9.  The Trustee shall inform personally the Beneficiary or Beneficiaries of the age of majority upon their request with respect to the position of the investment of the Trust Estate. The Trustee shall not, however, give this information, if, in its opinion, the information might be used in an abusive or illicit manner or in any way detrimental to the interests of the Trust Estate or the other Beneficiary or Beneficiaries. The Trustee shall decide in its sole discretion whether the prerequisites for a disclosure of information are met.

4.10.  Notwithstanding the foregoing, the Trustee and the Protector may divulge any and all information relating to this Trust and the Trust Estate if the Trustee is legally bound to do so by ordinance or imperative statutory provision of law.

4.11.  The Trustee and the Protector hereunder agree to execute any further documents or deeds which may be necessary to effectively transfer the Trust Estate to the Trustee.

4.12.  The Trustee shall be protected in acting upon any direction, paper or document believed by the Trustee to be genuine and to have been signed by the proper person or persons.  In case of doubt, the Trustee may refer to the Protector and shall in such case be protected in acting upon any direction, paper or document confirmed or believed by the Protector to be genuine and to have been signed by the proper person or proper persons.

4.13.  Neither the Trustee nor the Protector shall be liable for any error in judgment but only for their own intentional fault or willful misconduct. The Trustee and the Protector shall not be personally liable for any monies to become due by or any claims against this Trust Estate or upon any instrument executed by the Trustee under the provisions hereof. The Trustee shall be indemnified and saved harmless out of the funds of the Trust Estate from time to time and at all times from and against:

    4.13.1.  all costs, charges, and expenses whatsoever which such Trustee sustains or incurs in or about any actions, suits or proceedings which are brought, commenced or prosecuted against the Trustee for or in respect of any act, deed, matter or thing whatsoever done or permitted by the Trustee in or about the execution of the duties of this Trust, and

    4.13.2.  all other costs, charges and expenses which the Trustee sustains or incurs in or about or in relation to the affairs of the present Trust and Trust Estate.

4.14.  The Trustee shall have the power to bind the Trust Estate but shall not render itself personally liable.

000063-03

## ARTICLE FIVE
### Benefit of Trust

5.1.    The Beneficiaries of this Trust shall be those persons enumerated in Annex "B" attached hereto and forming an integral part hereof.

5.2.    The Trust Estate together with any other property which may from time to time be held by the Trustee in lieu thereof or in addition thereto, shall be held by the Trustee upon the following Trust:

    5.2.1.    The Trustee shall hold the Trust Estate during the Trust Period and may accumulate the whole of the income of the Trust Estate for the maximum period of accumulation permitted by law and add such accumulations to the capital thereof provided that during the Trust Period the Trustee may appropriate, or apply any of the capital or the income of the Trust Estate to or for the benefit of the Beneficiaries designated in paragraph 5.1. of this Article Five provided, however, that in the interests of any Beneficiary, the Trustee may, taking into consideration the country of residence of the Beneficiary, tax and duties there exigible, foreign exchange rates and other financial, political, economic or personal considerations, retain any such distribution or payment for the benefit of the Beneficiary.

    5.2.2.    The Trustee shall determine the time of payments, appropriations and applications of the income and/or capital of the Trust Estate to the Beneficiaries as aforesaid at all times in view of the requirements of an adequate standard of living of the Beneficiaries.

5.3.    Upon expiration of the Trust Period and subject to such powers of appointment as may be hereinafter contained, the Trustee shall pay or transfer the remaining capital and income to the Beneficiaries as shall then be living; provided that if at the expiration of the Trust Period no Beneficiary as defined herein shall be alive, the capital and income then remaining in the Trust Estate shall be distributed according 5.10. of this Article Five.

5.4.    All gifts, payments, or benefits made under the present Trust from the proceeds of the Trust Estate are intended as aliment and shall not be subject to seizure for the payment of any debts of the Beneficiaries or their representatives except in the case of express hypothecation or pledge after delivery, donation, or payment to them of any portion of the Trust Estate.

5.5.    The proceeds, payment or other donation of any property to the Beneficiaries shall be and remain his or her private and separate property, free from the control of any consort, and shall not be liable for the debts of the said consort, and shall not form part of any community of property which may subsist between such consorts.

5.6.    If any person should become entitled to any portion or share of the Trust Estate either before attaining the age of 21 or at such time when such person is determined to be mentally

8

incapacitated, such portion or share may, in the Trustee's discretion, in consultation with the Protector, be held and kept invested by the Trustee and the income and capital or some amount thereof as the Trustee, in consultation with the Protector, considers necessary or advisable, shall be used and applied for the benefit of such person until either he or she has either attained the age of 21, whereupon his or her portion or share, or the amount thereof then remaining in the hands of the Trustee shall be paid or transferred to such person or, as the case may be, in the case of mental incapacity, until such time as the Trustee has been determined by the Trustee, in consultation with the Protector, that it is necessary or advisable to pay and transfer the amount of such portion or share to the acting guardian of such person.

5.7. The Trustee shall also have the power to make any payment for any person under the age of 21 to the parent or legal guardian of any such person whose receipt thereof shall be sufficient discharge to the Trustee.

5.8. The determination of mental incapacity shall be made by the Protector after consultation with the Trustee and upon such medical or other expert assessment as the Protector considers necessary or advisable.

5.9. If the Trustee deems it necessary, a prerequisite of the enjoyment of the proceeds of the Trust Estate by any Beneficiary shall be that within a period of two (2) months after the date when any such person becomes a Beneficiary hereunder, he or she declares to the Trustee in a form satisfactory to the Trustee and its legal counsel, that he or she promises to respect all the provisions laid down in the present Trust and the provisions of any conveyance of property by any person or persons to the Trustee to be held as part of the Trust Estate subject to the Trusts hereof. If he or she is in default to so declare and promise, he or she shall lose all of his or her rights to the enjoyment or the proceeds of the present Trust and Trust Estate, and any other trust fund which may have been created in consequence hereof.

5.10. The charitable institutions and purposes to which the right or benefit of the Trust Estate shall possibly pass in accordance with the provisions of this Trust shall be those designated, if any, in Annex "B" hereto.

**ARTICLE SIX**
**The Protector**

6.1. Definition

6.1.1. The Protector shall mean that person or persons or any successors thereto appointed to act as Protector of this Trust.

6.1.2. Any individuals who are not U.S. citizens or residents, or any corporations that are not organized in any state or territory of the U.S., may be the Protector whether individuals (resident or non-resident of Canada) or corporations (Canadian or foreign). Those individuals who are Beneficiaries or may become Beneficiaries of this Trust as well as their spouses and relatives, including the relatives of their

9

**EXHIBIT C**

spouses, may only be named Protector to this Trust to the extent that, in the aggregate, the Trustee does not comprise a majority of the total of persons and corporations appointed to and currently occupying the office of the Protector.

6.1.3.   HH PROTECTION LTD., a Bahamas corporation, is hereby appointed as the initial Protector of the Trust Estate.

6.2.   Resignation and Replacement

6.2.1.   Any Protector shall cease to be a Protector when he or she dies, resigns or becomes unable or unwilling to act or continue to act or becomes insolvent or bankrupt. A corporation shall cease to be a Protector hereunder when the corporation resigns or becomes insolvent or bankrupt or ceases to exist.

6.2.2.   In the event HH PROTECTION LTD., a Bahamas corporation, is unable or unwilling to serve as a Protector, then a majority of the beneficiaries may appoint a Successor Protector.

6.2.3.   Resignation by any Protector shall be effected by the delivery or mailing by registered mail of a written notice of resignation to the Trustee acting hereunder and to the Beneficiaries.

6.2.4.   However, in the case of impossibility to give notice to all parties, the giving of a notice to at least one of the above parties shall constitute good and valid notice hereunder.

6.3.   Powers of the Protector.  Notwithstanding any other provisions of the present Trust and particularly the powers and authority herein granted to the Trustee, the Protector shall at any time or from time to time during the Trust Period or any extension thereof, have the full power and authority:

6.3.1.   to amend, vary or otherwise modify the terms of this Declaration of Trust from time to time with written notice to the Trustee and without limiting the generality of the foregoing, to amend, vary or modify the terms of this Declaration of Trust for the purpose of facilitating the administration of the Trust and Trust Estate provided, however, that nothing herein contained shall permit the Protector to alter the rights of Beneficiaries or change the Beneficiaries by addition to or exclusion and deletion of any of the Beneficiaries named in Article Five nor shall the powers herein contained permit this Declaration of Trust to be amended to increase the obligations or liabilities of the Trustee or the Protector without the consent of the Trustee or each person appointed to the office of the Protector, as the case may be, then in office and no amendment hereto or to paragraph 4.2.14. of Article Four of this Declaration of Trust shall have any effect on the rights of any person who was then serving or has served as a Trustee or as Protector arising out of any state of facts or occurrences which existed or took place before such amendment;

10

000066-03

**EXHIBIT C**

6.3.2.   to appoint in writing the whole or part of the capital or the income of the Trust Estate or create by deed a new trust fund and appoint either in respect of the new trust fund or in respect of the trust fund constituted under any new trust, all or any part of the capital or income thereof to or for anyone or more of the Beneficiaries in such manner as the Protector shall consider advisable, provided, however, that any appointment or distribution of capital or income to such new trust fund or trust fund constituted under a new trust shall respect and be in accordance with paragraph 5.1. of Article Five of this Declaration of Trust;

6.3.3.   to remove from office, or replace the Trustee or appoint new or additional Trustees as the Protector shall consider advisable and without limiting the generality of the foregoing, to fill any vacancy in the office of the Trustee;

6.3.4.   to extinguish, diminish, reduce or otherwise limit the Protector's own powers as Protector during the tenure of persons appointed to and then in the office of the Protector; however, such extinction, diminishment, reduction or limitation shall not affect the powers of subsequent persons who may by replacement or later appointment be named to the office of the Protector subsequently;

6.3.5.   to supervise the accounts of the Trust Estate, receive an accounting from any or all of the Trustee or any other person, company, institution or creditor holding any assets or property of the Trust Estate or any other trust fund which may be created in consequence hereof;

6.3.6.   without limiting the generality of any power or authority otherwise conferred upon the Protector hereunder, the Protector shall have the full power and authority, instead of acting personally, to appoint any agent or agents in any part of the world to assist in the carrying out of the powers of the Protector; and, provided that the Protector exercises reasonable care in the appointment of such agent or agents, the Protector shall not be responsible for any act or neglect of any such agent or agents;

6.3.7.   any person appointed to the office of the Protector being engaged in a profession, business or trade, shall be paid all usual professional business and trade charges and remuneration for business transacted and time expended and acts done by them or any employee or partner of theirs or by any firm or corporation with which they are connected in connection with the present Trust, including acts which persons appointed to the office of the Protector not being in any profession, business or trade could have done personally;

6.3.8.   to appoint, by any irrevocable deed or deeds and without infringing the Trust Period of this Trust or the rule against perpetuities, that the whole or any part of the Trust Estate shall thenceforth be held upon the trusts and with and subject to the powers and provisions of any other trust not infringing the rule against perpetuities applicable to this Trust and approved by the Protector and in favor or for the benefit of all or any one or more exclusively of the others or other of the Beneficiaries, and upon any such appointment being made, the Protector shall direct the transfer to the

11

**EXHIBIT C**

Trustee for the time being of the said appointment and thereupon the Trusts herein contained concerning such property shall cease and determine and the said property shall for all purposes be subject to the trust, powers and provisions contained in the said other trusts and be subject to and governed by the proper law of this Trust or not, provided, however, that such appointment and transfer of the whole or any part of the Trust Estate to such other trust or trusts shall respect and be in accordance with paragraph 5.1. of Article Five of this Trust.  For the purposes of the present paragraph, "trust" shall mean any trust created by any settlement, declaration of trust, will, codicil, or other instrument under the law in force in any part of the world;

6.3.9. to change at any time and from time to time during the Trust Period the governing law and forum for the administration of this Declaration of Trust as hereinafter provided; the power of changing the governing law and the forum for the administration of this Declaration of Trust shall be vested in the Protector who may at the Protector's absolute discretion, direct any such change to some other place in any part of the world on giving not less than fourteen days' notice as hereinafter provided with copies addressed to the Trustee and to the Beneficiaries;

6.3.10. to extend from time to time the Trust Period for further periods of two (2) years upon sending of a notice in writing at least three (3) months prior to the expiration of the Trust Period to the Trustee and Beneficiaries without, however, violating the rule against perpetuities.  The provisions of this paragraph 6.3.10. of this Article Six and all the powers of the Protector shall have effect notwithstanding any rule of law or equity restricting the delegation of a power or discretion.

6.3.11. Any reference to the "Protector" or "Protectors" in this Trust shall be construed as a reference to all of the persons appointed to and then in the office of the Protector if there be more than one.

6.3.12. Wherever herein discretion is vested in or power is conferred upon the Protectors, such discretion or power must be exercised by a majority of the persons appointed to and then in the office of the Protector. If it should happen at any time that there are fewer than three (3) persons then in the office of the Protector, such discretion or power must be exercised by unanimity if there are two (2) such persons and if there is only one (1) such person, he may validly exercise such discretion or power alone.

**ARTICLE SEVEN**
**Interpretation**

7.1.     Any provision or condition of the present Trust which is or becomes void for any reason whatsoever including the fact that it is considered to be or constitutes an impossible condition or one contrary to good morals, to law, to equity, or to public order, shall not annul the present Trust but shall only be considered as not written.

7.2.     For greater clarity, the present Trust is comprised of and includes this Trust and Annexes A

000068-03

**EXHIBIT C**

and B hereto and any further annexes as may subsequently to the execution hereof be added in accordance with and pursuant to its terms.

<div align="center">

**ARTICLE EIGHT**
**Governing Laws**

</div>

8.1.    Subject to the terms of subparagraph 6.3.9. of Article Six hereof, the Trust Estate created herein is created under the law of the Province of Nova Scotia, Canada and the rights of all parties and the construction and effect of every provision hereof shall be subject to the exclusive jurisdiction of and construed and regulated only according to the law of the Province of Nova Scotia, Canada.

8.2.    If the governing law of this Trust is changed and any provision of this Trust be found to be in violation of or contrary to such new governing law, including, by way of example, but without limitation, any law or rule therein prevailing relating to accumulation of trust income and to perpetuity periods, such provision shall be deemed to be amended and to comply with the new governing law.

8.3.    If at any time it appears that the Trust falls within the definition of a "United States Person," as defined in Section 7701(a)(30)(E) of the United States Internal Revenue Code of 1986 and the regulations thereunder, the Trustee may amend the Declaration, change the jurisdiction of the Trust, or do otherwise as it sees fit so the Trust will not fall within such definition.

8.4.    Notwithstanding anything in the Declaration to the contrary, if at any time a United States court attempts to assert jurisdiction over or otherwise supervise the administration of the Trust directly or indirectly, the Trustee shall cause the Trust to migrate from the United States. Notwithstanding anything in the Declaration to the contrary, if any governmental agency or creditor attempts to collect information from or assert a claim against the Trust, the Trustee shall cause one or more substantial decisions of the Trust to be controlled by a person or entity that is not a United States fiduciary. The Trustee may accomplish its objectives set forth in this Section 8.4. by amending the Declaration, changing the jurisdiction of the Trust, or otherwise as the Trustee sees fit at its sole discretion.

<div align="center">

**ARTICLE NINE**
**Acceptance of Trustee and Protector**

</div>

The Trustee accepts the Trust hereby created, and both the Trustee and Protector agree to carry out the provisions hereof to be performed on their part.

000069-03

**EXHIBIT C**

## ARTICLE TEN
### Notices

10.1.  Any notice required or permitted to be given under any of the provisions of this Trust of the provisions of this Trust shall be sent by registered air mail, postage pre-paid, to the last known address of the addressee. No evidence that such notice has been received by any addressee shall be necessary to constitute good and valid notification. Any such notice given as aforesaid shall be deemed to have been given two (2) weeks after the envelope containing same is mailed, pre-paid registered air mail as aforesaid. There shall be no obligation to give any such notice to any party in the case of impossibility to give any such notice.

10.2.  Notwithstanding anything contained in the present Trust, any notice required or permitted to be given to the Beneficiaries shall be given to the Protector and, with the prior written consent of the Protector, to the Beneficiaries, and to such other persons as the Protector may from time to time designate.

## ARTICLE ELEVEN
### Exclusion from Benefits

Whoever contests the validity of this Trust, of the Trust created under it, of the Trusts created by virtue of the present Trust, of the provisions of any conveyance of property by any person or persons to the Trustee to form and be held as part of the Trust Estate, shall cease to be a Beneficiary of any of these Trusts and shall be excluded from any benefits, direct or indirect, deriving from the Trust Estate.

## ARTICLE TWELVE
### Severability

Should any provision of this Trust be determined to be contrary to or invalid under the Governing Law of this Trust by a competent court of that jurisdiction, provided that its removal would not substantially affect or render contradictory or incomprehensible the remainder of this Trust, such provision shall be considered as unwritten and shall not invalidate or otherwise affect this Trust and the Trust hereby created.

*[Remainder of Page Prior to Signature Page Intentionally Left Blank]*

14

**EXHIBIT C**

      **THEREFORE,** the parties hereto have executed this Trust on the date first hereinabove written.

**ACCEPTED** by the Trustee:

GENERAL GUARDIAN CORPORATION,
a Nevada corporation

By: _____          _____
    TIMOTHY D. RICHARDS, Director          Witness

 

                                      _____
                                      Witness

15

**EXHIBIT C**

## ANNEX "A"

## <u>PROPERTY</u>

1.     One Hundred Canadian Dollars (CDN $100.00);

2.     One Hundred Percent (100%) of the common shares of H&H Securities Ltd., a Bahamas corporation

**EXHIBIT C**

## ANNEX "B"

## BENEFICIARY

The Beneficiary of the GLOBAL IRREVOCABLE TRUST ("Trust") is HH MASTER SETTLEMENT, a Nova Scotia Trust dated December 1, 2004.

H:\CLIENTS\Gustavo Hernandez\Global\Nova Scotia_Annex B doc 12-2-04 doc

000073-03

**EXHIBIT C**

# Stribling

December 16, 2004

Members of the Board
3 Gramercy Park West Incorporated
New York, NY 10003

RE: Parlor Floor Purchase:
Amaratti to Hernandez

Dear Members of the Board:

Please find enclosed the Original Board Package (plus 4 copies) for the prospective purchaser, Mr. Gustavo Hernandez-Frieri for the Parlor Floor, presently owned by Mr. Ralf Amaratti and Mrs. Joan Amaratti.

The Board Package is presented in 5 parts:

| | |
|---|---|
| Tab 1 | Transaction Information |
| Tab 2 | Financials |
| Tab 3 | References |
| Tab 4 | Letter from Lawyer of Hernandez-Frieri Family Trust regarding purchase as L.L.C. |
| Tab 5 | Global Securities Documents |

Mr. Hernandez a.k.a. Hernandez-Frieri is a Managing Partner of a family-owned private wealth management business, Global Finance Management Corporation and Global Securities Asset Management with offices in Miami, The Cayman Islands and Greenwich, Connecticut. The business is structured under the umbrella of the Hernandez-Frieri Family Trust, a trust shared by Gustavo and his brother, of which Gustavo Hernandez is a 50% beneficiary. He has a net worth of $28,578,909 which is thoroughly documented under Tab 2 Finances of the Board Package. The firm is currently canvassing prospects for a business office in Manhattan, hopefully in The Chrysler Building.

Mr. Hernandez is very enthusiastic about 3 Gramercy Park West, the Parlor Floor residence and he looks forward to the opportunity to meet with you.

Mr. Hernandez will purchase ALL CASH and plans to be the sole occupant of the property. He would like to purchase in a corporate name 3 Gramercy Park West L.L.C. for estate planning purposes. The details are specified in the Contract of Sale Tab 1 and the Attorney Letter Tab 4.



GOVERNMENT
EXHIBIT
6



STRIBLING &
ASSOCIATES, LTD.
REAL ESTATE

924 MADISON AVENUE, NEW YORK, NEW YORK 10021 *telephone* (212) 570-2440 FAX (212) 570-0138

ALL INFORMATION FURNISHED IS FROM SOURCES BELIEVED TO BE RELIABLE AND IS SUBMITTED SUBJECT TO CHANGE OF PRICE OR RENTAL, CHANGE OF OTHER TERMS AND CONDITIONS, PRIOR SALE, LEASE, OR FINANCING OR WITHDRAWAL WITHOUT NOTICE. NO REPRESENTATION IS MADE AS TO THE ACCURACY OF ANY INFORMATION FURNISHED.

000076-03

**EXHIBIT C**

# Stribling

Members of the Board
RE:     Parlor Floor Purchase:
            Amaratti to Hernandez
December 16, 2004
Page Two

Stribling & Associates and The Corcoran Group highly recommend Mr. Hernandez-Frieri to you as a tenant in this Tenancy In Common Partnership and are happy to provide any further information you may require.

We believe that in your interview you will find Mr. Hernandez-Frieri a most appealing individual of impeccable background and education with strong financial bona fides.

Thank you for your considered review of this Board Package.

Sincerely,

STRIBLING & ASSOCIATES LTD.                    CORCORAN GROUP

Barbara Evans-Butler                                      Dee Simonson
Vice President                                                 Senior Vice President
212-452-4391                                                212-539-4964

BEB:rb
Enclosures

BY HAND

**EXHIBIT C**

# BOARD PACKAGE

----------------------------------------

## Parlor Floor
## 3 Gramercy Park West Incorporated
## New York, NY 10003

----------------------------------------

## Mr. Gustavo Hernandez

000078-03

**EXHIBIT C**

## TABLE OF CONTENTS

1. **Transaction Information**
   (i)     Personal Letter of Introduction
   (ii)    Purchase Application
   (iii)   Contract of Sale

2. **Financials:**
   (i)     Financial statement prepared by CPA
   (ii)    Verification of Assets & Liabilities
           Exhibit I      Cash/Bank Statements
           Exhibit II     Bonds & Stocks
           Exhibit III    Life Insurance Cash Surrender Value
           Exhibit IV     Art Collection
           Exhibit V      Hernandez-Frieri Family Trust
                   (i)  Audited Report of Global Finance Management Corporation
                   (ii) Investment in The Global Securities Market Neutral Fund c/o
                        Dundee Lee Management services (Cayman) Ltd.
           Exhibit VI     Income
           Exhibit VII    Liability, Car
   (iii)   Tax Returns – Letter from CPA and Tax Returns for 2003

3. **Reference Letters**
   (i)     3 Personal
   (ii)    3 Business
   (iii)   Landlord Letter

4. **Letter from attorney regarding Global Securities Advisors Family Trust**

5. **Global Securities Documents – Annexes Referred to in Personal Letter**
   (i)     Organization Chart
   (ii)    NASD Membership Certification
   (iii)   SEC Registration Certification

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

1

000080-03

**EXHIBIT C**

# -1-

# Transaction Information

(i)   **Personal Letter of Introduction from Mr. Gustavo Hernandez**

(ii)  **Purchase Application**

(iii) **Contract of Sale**

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

# (i) Personal Letter of Introduction

Parlor Floor
3 Gramercy Park West

000082-03

**EXHIBIT C**

December 6, 2004

Board of Directors
3 Gramercy Park West
New York, New York

Dear Ladies and Gentlemen of the Board,

The following letter serves the purpose of respectfully presenting to your consideration a brief summary of
my personal and professional background, in the context of the approval process for the acquisition of the
Parlor Floor number in 3 Gramercy Park West.

A foreign national with family business concerns in the United States, I am now residing in the country. I
am a PhD candidate –dissertation pending- and hold a Masters degree from the Institut d'Etudes Politiques
de Paris in the discipline of Political Science, as well as a J.D. from the Universidad del Rosario in Bogotá.
I started my professional career as a professor of Political Economy in the Universidad de los Andes,
Bogotá, and after a year effective in the scholar world I started working in our family business -described
below. My leisure pursuit is centered in collecting contemporary art, reading and running, and I attempt to
dedicate my time for social affiliations to charities related with my native country and region -in particular a
philanthropy dedicated to education to which we are affiliated. I was born in Cartagena, Colombia in a
family of Italian descent on my mother's side and Colombian on my father's.

Regarding the background of the family, it was historically involved in the agricultural commodities
business, which helped it attain a moderate degree of wealth in the context of Latin America. Further along,
our business concerns focused on real estate and financial services. With the advent of insecurity and
instability in the region it turned more and more into the latter, and now our business concerns are
predominantly based in the United States but catering partly to clients in Latin America.

In what concerns my personal financial situation with respect to income in the United States, as foreign
citizen for estate planning purposes the family office for my brother Cesar Hernández Frieri and I is an
overseas trust which holds our investments in US entities and banks.[1] In particular Global Securities
Holdings LLC, a US financial services company whose primary interests are centered in two entities

---

[1] Global Finance Management Corp and Global Securities Asset Management. In Annex please see Organizational
Chart and Financial Statements.

**EXHIBIT C**

involved in this industry: Global Strategic Investments LLC ('GSI'), a Miami-based boutique broker-dealer dedicated to providing wealth management services to Latin American high net-worth individuals, and Global Securities Advisors LLC ('GSA'), a Greenwich-based Investment Advisor dedicated to managing fixed income funds. I happen to be Managing Principal of this entity. In addition, we have modest participations in real estate and private equity ventures in the US. In addition, I hold certain liquid investments in US bank accounts which well exceed the acquisition price of the property in question.[2]

Thanks to the involvement of the family in the financial services industry in the United States, Mexico and other Latin American countries, as shareholder and direct participant in regulated entities, the family has been subject to extensive due diligence by US regulating agencies controlling the industry, as well as by pretty nearly every leading bank with which we have had long-lasting counterparty lines and credit agreements. For instance, GSI is a US SEC Registered Broker-Dealer, member of NASD/SIPC/NFA, correspondent of Pershing, Bank of New York, and holds counterparty lines with nearly every leading bank.[3] Furthermore, the Hernandez-Frieri family has always abided by high ethical and moral standards, credence of which our unblemished personal and professional standing.

Last, for further details regarding my background, please see in Annex ample references available, and as well please accept this letter as consent to perform any further checks you deem of need.[4]

With kind regards,

Gustavo Adolfo Hernandez Frieri

---

SEE
TAB
J.

[2] In Annex please see example of Bank Statements.
[3] In Annex please see Global Strategic Investments LLC, SEC Registration, NASD Membership Certification, and Pershing Bank of New York Clearing Agreement.
[4] In Annex please see References.

**EXHIBIT C**

# Disclosure of Information on
# Lead-Based Paint and/or Lead-Based Paint Hazards
## SALES

### Lead Warning Statement

Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

### Seller's Disclosure

(a) Presence of lead-based paint and/or lead-based paint hazards *(Check (i) or (ii) below):*

    (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing *(explain)*.

    .........................................................................................................................................

    .........................................................................................................................................

    .........................................................................................................................................

    (ii) ☒ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the seller *(Check (i) or (ii) below):*

    (i) ☐ Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing *(list documents below)*.

    .........................................................................................................................................

    .........................................................................................................................................

    (ii) ☒ Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

### Purchaser's Acknowledgment *(initial)*

(c) _____ Purchaser has received copies of all information listed above.

(d) _____ Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*

(e) _____ Purchaser has *(check (i) or (ii) below):*

    (i) ☐ received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

    (ii) ☒ waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

### Agent's Acknowledgment *(initial)*

(f) _____ Agent has informed the lessor of the seller's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

### Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| SELLER  Ralph Ammirati | DATE 12/10/04 | SELLER  Joan Ammirati | DATE 12/10/04 |
| --- | --- | --- | --- |
| PURCHASER  Gustavo Adolfo Hernandez Frieri | DATE 12/16/04 | PURCHASER | DATE |
| AGENT  000085-03 | DATE | AGENT | DATE |

EXHIBIT C

# (ii) Purchase Application

Parlor Floor
3 Gramercy Park West

000086-03



**EXHIBIT C**

# PURCHASE APPLICATION
### FOR THE SALE OF COOPERATIVE APARTMENT

BUILDING: 3 Gramercy Park Incorporated  APT: Parlor Floor  SHARES: 24% of common interest

PURCHASE PRICE OF STOCK: $2,900,000  MONTHLY MAINTENANCE: $1,760

AMOUNT OF FINANCING: $ 0 - all cash

DEPOSIT ON CONTRACT: $ 290,000  PROPOSED CLOSING DATE: TBA by mutual agreement Month of January 2005

SPECIAL CONDITIONS IF ANY:

MANAGING AGENT: Self managed  TELEPHONE: ( 201 ) 894-9110

ADDRESS: _____  CONTACT: _____

SELLER (S): Joan Ammarati  SS#: ___-___-___

Ralf Ammarati  SS#: ___-___-___

PRESENT ADDRESS:

ATTORNEY: Janice Levine, Esq.  TEL:( 212 ) 728-8699 FAX:( 212 ) 728-8111

FIRM: Willkie Farr & Gallagher  ADDRESS: 787 Seventh Avenue New York, NY 10019-6099

PURCHASER (S): Gustavo Adolfo Hernandez Frieri  SS#: ███████ 1159

OFFICE #:( 203 ) 742-9822  HOME #:( 305 ) 799-6240

_____  SS#: ___-___-___

OFFICE #:( )  HOME #:( )

PRESENT ADDRESS:

ATTORNEY: Michael Landesman, Esq.  TEL:( 212 ) 682-2280 FAX:( 212 ) 682-2153

FIRM: Holm & O'Hara  ADDRESS: 420 Lexington Ave., Suite 1745 New York, NY 10170

NAMES(S) COOPERATIVE STOCK WOULD BE HELD IN:

B ROKER (S): Barbara Evans-Butler, Stribling / Dee Simonson, Senior VP, Corcoran

TELEPHONE: 212-452-4391  212-539-4964

NEW MORTGAGE LENDER:

ATTORNEY: Not Applicable  TEL:( )  FAX:( )

Rev. Jan./98

000087-03

**EXHIBIT C**

PAGE 2

## PERSONAL INFORMATION REGARDING APPLICANT(s)

DATE  _16 Dec 2004_

|  | APPLICANT | CO-APPLICANT |
|---|---|---|

NAME: _Gustavo Adolfo Hernandez Frieri_

ADDRESS: _120 NW 25th Street_
_Miami, FL 33127_

DATES OF RESIDENCE: _2001_ TO _2004_     TO

CITIZENSHIP: _Colombian_

OCCUPATION: _Managing Partner_

NATURE OF BUSINESS: _Financial Services_

EMPLOYER: _Global Securities Advisors_

ADDRESS: _195 Field Point Road_

_Greenwich, CT 00830_

PERIOD OF EMPLOYMENT: _Sept. '02_ TO _present_     TO

POSITION HELD: _Managing Partner_

PRIOR EMPLOYER AND
POSITION OR RESIDENCE
IF LESS THAN 3 YEARS: _N/A_

INCOME ESTIMATE FOR
THIS YEAR: _$1,116,400_

ACTUAL INCOME LAST YEAR: _$1,031,500_

EDUCATIONAL BACKGROUND: _M.A. Institut d'Etudes Politiques (Paris)_

_Bachelor of Law, University of the Rosary, Bogata_

Rev. Jan/98

## ADDITIONAL INFORMATION REGARDING APPLICANTS

**EXHIBIT C**

Names of all persons who will reside in the Apartment: Sole occupant-Gustavo Adolfo Hernandez

Schools and colleges attended by applicants and occupants (optional): University of Bogata, Institut d'Etudes Politiques (Paris)

Names of anyone in the building known to Applicant: No

Are any pets to be maintained in the Apartment. If yes indicated number and kind: No

Name of organizations to which Applicant belongs (optional): Mr. Hernandez has been working in the U.S. over the last 4 years and is just relocating from Miami to New York. He has spent much time also in Bogata where he is Trustee M.O.M.A.

### REFERENCES

LANDLORD: Mr. David Lombardi

ADDRESS: Lombardi Properties

OCCUPANCY FROM: 2001 TO 2004

Miami, FL 33127

PREVIOUS LANDLORD: _____

ADDRESS: _____

OCCUPANCY FROM: _____ TO _____

### PERSONAL REFERENCES:

**APPLICANT**

**CO-APPLICANT**

1. NAME Mr. Costas C. Hamakiotes

   ADDRESS New York, NY 10022

1. NAME _____

   ADDRESS _____

2. NAME Mr. Henry Harper

   ADDRESS New York, NY 10023

2. NAME _____

   ADDRESS _____

3. NAME Mr. Jack Tilton

   ADDRESS New York, NY 10128

3. NAME _____

   ADDRESS _____

4. NAME _____

   ADDRESS _____

4. NAME _____

   ADDRESS _____

### BUSINESS AND PROFESSIONAL REFERENCES

**APPLICANT**

**CO-APPLICANT**

1. NAME Mr. Marco Santmaria
   Partner, Global Securities

   ADDRESS 195 Field Point Road, Suite 101
   Greenwich, CT 06830

3. NAME Mr. Felipe E. Coello, VP
   Lehman Brothers, Inc.

   ADDRESS 1111 Brickel Avenue
   Miami, FL 33131

2. NAME Mr. Jorge de Cardenas, Partner
   Kaufman, Rossini & Co.

   ADDRESS 2699 S. Bayshore Drive
   Miami, FL 33133

   NAME _____

   ADDRESS _____

000089-03

**EXHIBIT C**

# (iii) Contract of Sale

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

2

000091-03

**EXHIBIT C**

Prepared by the Committee on Real Property Law of the City of New York.

*Note: This form is intended to deal with matters common to most transactions involving the sale of a condominium unit. Provisions should be added, altered or deleted to suit the circumstances of a particular transaction. No representation is made that this form of contract complies with Section 5-702 of the General Obligations Law ("Plain Language Law").*

## CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT

### Contract of Sale – Condominium Unit

**Agreement** made as of ~~November~~ December 15 , 2004   between

Ralph Ammirati and Joan Ammirati
residing at  3 Gramercy Park West, New York, NY  10003

together with the exclusive right to occupy the parlor (second) floor apartment contained therein ("Unit")

("Seller")

and  Gustavo Adolfo Hernandez Frieri

residing at   71 Brickell Avenue, Suite 2030, Miami, FL  33131

("Purchaser")

1. **Unit:** Seller agrees to sell and convey, and Purchaser agrees to purchase, ~~Unit No.~~ ~~("Unit")~~ in the building ("Building") known as Three Gramercy Park, Inc. Condominium ("Condominium") and located at 3 Gramercy Park West, New York, NY  10003 [Building] , New York, together with a 24% percent undivided interest in the ~~Common Elements (as defined in para. 1) appurtenant thereto,~~ all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the ~~Declaration of Condominium Ownership~~ (as the same may be amended from time to time, the "Declaration") of the Condominium, ~~recorded in~~ [Co-Ownership Agreement] ~~County.~~ ~~New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.~~

2. **Personal Property:** (a) The sale includes all of Seller's right, title and interest, if any, in and to:

(i) the refrigerators, freezers, ranges, ovens, dishwashers, washing machines, clothes dryers, cabinets and counters, lighting and plumbing fixtures, air conditioning equipment, venetian blinds, shades, screens, storm windows and other window treatments, wall-to-wall carpeting, bookshelves, switchplates, door hardware, built-ins and articles of property and fixtures attached to or appurtenant to the Unit, except those listed in subpara. 2(b), all of which included property and fixtures are represented to be owned by Seller, free and clear of all liens and encumbrances other than those encumbrances ("Permitted Exceptions") set forth on Schedule A annexed hereto and made a part hereof *(strike out inapplicable clause)*; and

(ii) [to the extent currently located at the Unit]

(b) Excluded from this sale are:

(i) furniture and furnishings (other than as specifically provided in this Contract); and

(ii)

(c) The property referred to in subpara. 2(a)(i) and (ii) may not be purchased if title to the Unit is not conveyed hereunder.

3. **Purchase Price:** (a) The purchase price ("Purchase Price") is
$ 2,900,000.00 , payable as follows:
(i) $ 290,000.00 ("Downpayment") on the signing of this Contract by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to para. 16; and

(ii) $ 2,610,000.00 , constituting the balance of the Purchase Price, by certified check of Purchaser or official bank check (except as otherwise provided in this Contract) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrowee (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Seller (or as Seller otherwise directs pursuant to subparas. 6(e)(ix) or 19(b)).

(c) Except for the Downpayment and checks aggregating not more than ~~one-half of one percent of the Purchase Price,~~ including payment for closing adjustments, all checks delivered by Purchaser shall be certified or official bank checks as hereinabove provided.

4. **Closing of Title:** The closing documents referred to in para. 6 shall be delivered, and payment of the balance of the Purchase Price shall be made, at the closing of title ("Closing"), to be held on or about January 14, 2004 ~~at~~ at 10:00 A.M., at the offices of Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY  10019
P: 212/728-8000; F: 212/728-8111

or at the office of Purchaser's lending institution or its counsel; provided, however, that such office is located in either the City or County in which either (a) Seller's attorney maintains an office or (b) the Unit is located.

5. **Representations, Warranties and Covenants:** Seller represents, warrants and covenants that:
(a) Seller is the sole owner of the Unit and the property referred to in subpara. 2(a), and Seller has the full right, power and authority to sell, convey and transfer the same;

(b) The common charges (excluding separately billed utility charges) for the Unit on the date hereof are $1,760.00 per month:

(c) Seller has not received any written notice of any intended assessment or increase in common charges not reflected in subpara. 5(b). Purchaser acknowledges that it will not have the right to cancel this Contract in the event of the imposition of any assessment or increase in common charges after the date hereof of which Seller has not heretofore received written notice;

~~(d) The sale or lease taxes for the Unit for the fiscal year of~~
~~through~~
~~(e) Seller is not a member or a nominee of the "spouse" under any plan~~
~~of condominium organization affecting the Unit.~~

(f) All refrigerators, freezers, ranges, dishwashers, washing machines, clothes dryers and air conditioning equipment included in this sale will be in working order as of the time of Closing;

~~(g) If a copy is attached to this Contract, the copy of the Certificate of Occupancy covering the Unit is a true and correct copy; and~~

(h) Seller is not a "foreign person" as defined in para. 18. *(If inapplicable, delete and provide for compliance with Code Withholding Section, as defined in para. 18.)*

6. **Closing Documents:** (a) At the Closing, Seller shall deliver to Purchaser the following: [Quit Claim]

(i) ~~Bargain and sale deed with~~ [Quit Claim] against ~~grantor's act ("Deed"), complying with RPL §339 and containing~~ the ~~covenant required by Lien Law §13,~~ conveying to Purchaser title to the Unit ~~and its Common Interest appurtenant thereto, together with its Common Interest (as defined in the Declaration) therein, in proper statutory form for recording;~~ in fee simple deemed to include ~~Seller to give any further assurance(s) which shall be deemed to be included in the Deed, its appurtenant thereto, free and clear of all liens and encumbrances other than Permitted Exceptions. The Deed shall be executed and acknowledged by Seller and, if the Unit is being conveyed by a sponsor, executed or an unit by Purchaser, in proper statutory form for recording;~~

~~(ii) If incorporation and if required pursuant to RPL §339, Seller shall deliver to Purchaser (1) a waiver of right of first refusal pursuant to RPL §339-dd by the board of directors or otherwise, signed with the authority vesting in the officer signing by affidavit, and (2) a certificate signed by the secretary or assistant secretary setting forth facts from the records confirming that the delivery of the Deed is in conformity with the requirements of RPL §339. The Deed shall also contain a recital sufficient to establish compliance with such law;~~ [CO-OWNERS]

(iii) A waiver of right of first refusal of the board of managers of the Condominium ("Board") if required in accordance with para. 8;

(iv) A statement by the Condominium setting forth (that the common charges and any assessments then due and ~~to~~ payable to the Condominium have been paid to the date of the Closing; [to]

(v) All keys to the doors of, and mailbox for, the Unit;

(vi) Such affidavits and/or other evidence as the title company ("Title Company") from which Purchaser has ordered a title insurance report and which is authorized to do business in New York State shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against Seller and persons or entities whose names are the same as or are similar to Seller's name;

~~(vii) Official New York State Real Property Transfer Gains Tax Tentative Assessment and Return (or, if applicable, Official Statement of No Tax Due) duly completed by the New York State Department of Taxation and Finance (or, if applicable, a copy marked received and stamped by an official of such Department) in the State(s) form as the Seller may be obtained from the following, satisfactory form for submission;~~

(viii) New York City Real Property Transfer Tax Return, if applicable, and combined Real Property Transfer Gains Tax Affidavits, prepared, executed and acknowledged by Seller in proper form for submission;

that is a member of the New York Clearing House Association   $1,000.00   and shall be endorsed cashier's, official bank or certified checks to the order of Purchaser   or content of all co-owners to the building   (account for the building)

**EXHIBIT C**

and that Escrowee shall not be liable for any act or omission on its part unless taken or suffered in bad faith or in wilful disregard of this Contract or involving gross negligence on the part of Escrowee. Seller and Purchaser jointly and severally agree to defend, indemnify and hold Escrowee harmless from and against all costs, claims and expenses (including reasonable attorneys' fees) incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith or in wilful disregard of this Contract or involving gross negligence on the part of Escrowee.

(c) Escrowee may act or refrain from acting in respect of any matter referred to herein in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

(d) Escrowee acknowledges receipt of the Downpayment by check subject to collection and Escrowee's agreement to the provisions of this para. 16 by signing in the place indicated in this Contract.

(e) Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

17. New York State Gains Tax: (a) Seller and Purchaser agree to comply in a timely manner with the requirements of article 31-B of the Tax Law and the regulations applicable thereto, as the same from time to time may be amended (collectively, the "Gains Tax Law"). Purchaser agrees to deliver to Seller a duly executed and acknowledged Transferee Questionnaire simultaneously with the execution of this Contract or within 5 business days after subsequent written request from Seller or Seller's attorney. At the Closing, Seller shall deliver (i) an Official Statement of No Tax Due or (ii) an Official Tentative Assessment and Return accompanied by a certified or official bank check drawn on any banking institution described in subpara. (b), payable to the order of the State Tax Commission, in the amount of the tax shown to be due thereon, or (iii) if applicable, a duly executed and acknowledged affidavit in form permitted under the Gains Tax Law claiming exemption therefrom.

(b) Seller agrees (i) to pay promptly any tax due under the Gains Tax Law and any interest and penalties thereon which may be assessed or due after the Closing, (ii) to indemnify and save Purchaser harmless from and against any of the foregoing and any cost, claim and expense (including reasonable attorneys' fees) incurred by Purchaser by reason of the non-payment thereof, and (iii) to make any other payments and execute, acknowledge and deliver such further documents as may be necessary to comply with the Gains Tax Law.

(c) The obligations under this para. 17 shall survive the Closing.

18. FIRPTA: Seller represents and warrants to Purchaser that Seller is not a "foreign person" as defined in IRC § 1445, as amended, and the regulations issued thereunder ("Code Withholding Section"). At the Closing Seller shall deliver to Purchaser a certification stating that Seller is not a foreign person in the form then required by the Code Withholding Section. In the event Seller fails to deliver the aforesaid certification or in the event that Purchaser is not entitled under the Code Withholding Section to rely on such certification, Purchaser shall deduct and withhold from the Purchase Price, a sum equal to 10% thereof and shall at Closing remit the withheld amount with the required forms to the Internal Revenue Service.

19. Title Report; Acceptable Title: (a) Purchaser shall, promptly after the date hereof, or after receipt of the mortgage commitment letter if applicable, order a title insurance report from the Title Company. Promptly after receipt of the title report and thereafter of any continuations thereof and supplements thereto, Purchaser shall forward a copy of each such report, continuation or supplement to the attorney for Seller. Purchaser shall further notify Seller's attorney of any other objections to title not reflected in such title report of which Purchaser becomes aware following the delivery of such report, reasonably promptly after becoming aware of such objections.

Objections accurate...together with the interest and penalties thereon to a date not less than two days following the date of Closing, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser at the Closing official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made not less than 3 business days before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable in the order of the holder of any such lien, charge or encumbrance and otherwise complying with subpara 19(b). If the Title Company is willing to insure Purchaser that any mortgages, liens and encumbrances will not be collected out of or enforced against the Unit and is willing to insure the lien of Purchaser's Institutional Lender (as hereinafter defined) free and clear of any such charges, liens and encumbrances, then Seller shall have the right in lieu of payment and discharge to deposit with the Title Company such funds or to give such assurances or to pay such special or additional premiums as the Title Company may require in order to so insure in such case the charges, liens and encumbrances with respect to which the Title Company has agreed to so insure shall not be considered objections...

(c) Seller shall convey and Purchaser shall accept fee simple title to the Unit in accordance with the terms of this Contract, subject only to: (a) the Permitted Exceptions and (b) such other matters as (i) the Title Company or any other title insurer licensed to do business by the State of New York shall be willing, without special or additional premium, to omit as exceptions to coverage or to except with insurance against collection out of

---

(d) Notwithstanding any contrary provisions in this Contract, express or implied, or any contrary rule of law or custom, if Seller shall be unable to convey the Unit in accordance with this Contract (provided that Seller shall release, discharge or otherwise cure at or prior to Closing any matter created by Seller after the date hereof and any existing mortgage, unless this Contract is subject to it) and if Purchaser elects not to complete this transaction without abatement of the Purchase Price, the sole obligation and liability of Seller shall be to refund the Downpayment to Purchaser, together with the reasonable cost of the examination of title to, and departmental violation searches in respect of, the Unit, and upon the making of such refund and payment, this Contract shall be deemed cancelled and of no further force or effect and neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract. However, nothing contained in this subpara. 19(d) shall be construed to relieve Seller from liability due to a wilful default.

20. Risk of Loss; Casualty: (a) The risk of loss or damage to the Unit or the personal property included in this sale, by fire or other casualty, until the earlier of the Closing or possession of the Unit by Purchaser, is assumed by Seller, but without any obligation of Seller to repair or replace any such loss or damage unless Seller elects to do so as hereinafter provided. Seller shall notify Purchaser of the occurrence of any such loss or damage to the Unit or the personal property included in this sale within 10 days after such occurrence or by the date of Closing, whichever first occurs, and by such notice shall state whether or not Seller elects to repair or restore the Unit and/or the personal property, as the case may be. If Seller elects to make such repairs and restorations, Seller's notice shall set forth an adjourned date for the Closing, which shall be not more than 60 days after the date of the giving of Seller's notice. If Seller either does not elect to do so or, having elected to make such repairs and restorations, fails to complete the same on or before said adjourned date for the Closing, Purchaser shall have the following options:

(i) To declare this Contract cancelled and of no further force or effect and receive a refund of the Downpayment in which event neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this Contract; or

(ii) To complete the purchase in accordance with this Contract without reduction in the Purchase Price, except as provided in the next paragraph. If Seller carries hazard insurance covering such loss or damage, Seller shall turn over to Purchaser at the Closing the net proceeds actually collected by Seller under the provisions of such hazard insurance policies to the extent that they are attributable to loss of or damage to any property included in this sale, less any sums theretofore expended by Seller in repairing or replacing such loss or damage or in collecting such proceeds; and Seller shall assign (without recourse to Seller) Seller's right to receive any additional insurance proceeds which are attributable to the loss of or damage to any property included in this sale.

(b) If Seller does not elect to make such repairs and restorations, Purchaser may exercise the resulting option under (i) or (ii) of (a) above only by notice given to Seller within 10 days after receipt of Seller's notice. If Seller elects to make such repairs and restorations and fails to complete the same on or before the adjourned closing date, Purchaser may exercise either of the resulting options within 10 days after the adjourned closing date.

(c) In the event of any loss of or damage to the Common Elements [Building] which materially and adversely affects access to or use of the Unit, arising after the date of this Contract but prior to the Closing, Seller shall notify Purchaser of the occurrence thereof within 10 days after such occurrence or by the date of Closing, whichever occurs first, in which event Purchaser shall have the following options:

(i) To complete the purchase in accordance with this Contract without reduction in the Purchase Price; or

(ii) To adjourn the Closing until the first to occur of (1) completion of the repair and restoration of the loss or damage to the point that there is no longer a materially adverse effect on the access to or use of the Unit or (2) the 60th day after the date of the giving of Seller's aforesaid notice. In the event Purchaser elects to adjourn the Closing as aforesaid and such loss or damage is not so repaired and restored within 60 days after the date of the giving of Seller's aforesaid notice, then Purchaser shall have the right either to (x) complete the purchase in accordance with this Contract without reduction in the Purchase Price or (y) declare this Contract cancelled and of no further force or effect and receive a refund of the Downpayment, in which latter event neither party shall thereafter have any further rights against, or obligations or liabilities to, the other by reason of this Contract.

(d) In the event of any loss of or damage to the Common Elements [Building] which does not materially and adversely affect access to or use of the Unit, Purchaser shall accept title to the Unit in accordance with this Contract without abatement of the Purchase Price.

21. Internal Revenue Service Reporting Requirement: Each party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, as such other party may reasonably request in order to comply with IRC § 6045(c), as amended, or any successor provision or any regulations promulgated pursuant thereto, insofar as the same requires reporting of information in respect of real estate transactions. The provisions of this para. 21 shall survive the Closing. The parties designate

Willkie Farr & Gallagher LLP

as the attorney responsible for reporting this information as required by law.

**EXHIBIT C**

that the only real estate broker with whom Purchaser had any connection with this Contract and the transaction set forth herein is

The Corcoran Group and Stribling Associates Ltd.

and that they know of no other real estate broker who has claimed or may have the right to claim a commission in connection with this transaction. The commission of such real estate broker shall be paid by Seller pursuant to separate agreement. If no real estate broker is specified above, the parties acknowledge that this Contract was brought about by direct negotiation between Seller and Purchaser and each represents to the other that it knows of no real estate broker entitled to a commission in connection with this transaction. Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses (including reasonable attorneys' fees) arising out of the breach on their respective parts of any representation, warranty or agreement contained in this para. 22. The provisions of this para. 21 shall survive the Closing or, if the Closing does not occur, the termination of this Contract.

**22. Mortgage Contingency.** (Delete if inapplicable) (a) The obligations of Purchaser hereunder are conditioned upon issuance on or before _____ (the "Commitment Date") of a written commitment from any Institutional Lender pursuant to which such Institutional Lender agrees to make a loan, other than a VA, FHA or other governmentally insured loan to Purchaser, at Purchaser's sole cost and expense, of $

(b) For purposes of this Contract, an "Institutional Lender" is any bank, savings bank, private banker, trust company, savings and loan association and credit union or similar banking institution whether organized under the laws of this state, the United States or any other state; foreign banking corporation licensed by the Superintendent of Banks of New York or the Comptroller of the Currency to transact business in New York State; insurance company duly organized or licensed to do business in New York State; mortgage banker licensed pursuant to Article 12-D of the Banking Law; and any instrumentality created by the United States or any state with the power to make mortgage loans.

(Delete if inapplicable) (c) Purchaser and Seller agree that the submission of an application to a mortgage banker registered pursuant to Article 12-D of the New York Banking Law ("Mortgage Broker") shall constitute full compliance with the terms and conditions set forth in para. 2X(a)(1) of this Contract, and that Purchaser's cooperation in good faith with such Mortgage Broker to obtain a commitment from an Institutional Lender (together with Purchaser's cooperation in good faith with any Institutional Lender to which Purchaser's application has been submitted by such Mortgage Broker), and the prompt giving of notice by Purchaser to Seller of the name and address of each Mortgage Broker to which Purchaser has submitted such an application shall constitute full compliance with the terms and conditions set forth in para.

**24. Gender, Etc.:** As used in this Contract, the neuter includes the masculine and feminine, the singular includes the plural and the plural includes the singular, as the context may require.

**25. Entire Contract:** All prior understandings and agreements between Seller and Purchaser are merged in this Contract and this Contract supersedes any and all understandings and agreements between the parties and constitutes the entire agreement between them with respect to the subject matter hereof.

**26. Captions:** The captions in this Contract are for convenience and reference only and in no way define, limit or describe the scope of this Contract and shall not be considered in the interpretation of this Contract or any provision hereof.

**27. No Assignment by Purchaser:** Purchaser may not assign this Contract or any of Purchaser's rights hereunder.

**28. Successors and Assigns:** Subject to the provisions of para. 27, the provisions of this Contract shall bind and inure to the benefit of both Purchaser and Seller and their respective distributees, executors, administrators, heirs, legal representatives, successors and permitted assigns.

**29. No Oral Change:** This Contract cannot be changed or terminated orally. Any changes or additional provisions must be set forth in a rider attached hereto or in a separate written agreement signed by both parties to this Contract.

**30. Contract Not Binding Until Signed:** This Contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

**In Witness Whereof,** the parties hereto have duly executed this Contract on the day and year first above written.

Seller _____ (Soc. Sec. No.)

Seller (Ralph Ammirati) _____ (Soc. Sec. No.)

Agreed to as to para. 16: By: Willkie Farr & Gallagher LLP

Purchaser Gustavo Adolfo Hernández Frías ___ 1159 (Soc. Sec. No.)

Purchaser _____ (Soc. Sec. No.)

Escrow Depository:

1. Zoning laws and regulations and landmark, historic or wetlands designation which are not violated by the Unit and which are not violated by the Building which to the extent that access to or use of the Unit would be materially and adversely affected. **Building**

2. Consents for the erection of any structure or structures on, under or above any street or streets on which the Building may abut.

3. The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations set forth in the Declaration, plans of the Condominium, all as may be amended from time to time.

4. Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Building, provided that none of such rights imposes any monetary obligation on the owner of the Unit or materially interferes with the use of or access to the Unit.

5. Encroachments of stoops, areas, cellar stairs, trim, cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Building over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Unit.

6. Any state of facts which an accurate survey or personal inspection of the Building or Unit would disclose, provided that

such facts do not prevent the use of the Unit for dwelling purposes. For the purposes of this Contract, none of the facts shown on the survey, if any, identified below, shall be deemed to prevent the use of the Unit for dwelling purposes, and Purchaser shall accept title subject thereto.

7. The lien of any unpaid common charge, real estate tax, water charge, sewer rent or vault charge, provided the same are paid as of the Closing as herein provided.

8. The lien of any unpaid assessments to the extent of installments thereof payable after the Closing. **Building**

9. Liens, encumbrances and title conditions affecting the Common Elements which do not materially and adversely affect the right of the Unit owner to use and enjoy the Common Elements. **Building**

10. Notes or notices of violations of law or governmental orders, ordinances or requirements (a) affecting the Unit and noted or issued subsequent to the date of this Contract by any governmental department, agency or bureau having jurisdiction and (b) any such notes or notices affecting the Common Elements which were noted or issued prior to or on the date of this Contract or at any time hereafter. **Building**

11. Any other matters or encumbrances subject to which Purchaser is required to accept title to the Unit pursuant to this Contract.

000094-03

RIDER ANNEXED TO CONTRACT OF SALE
DATED AS OF NOVEMBER 15, 2004 BETWEEN
RALPH AMMIRATI AND JOAN AMMIRATI, AS SELLER
AND GUSTAVO ADOLFO HERNANDEZ FRIERI, AS PURCHASER

R1.   In the event of any inconsistency or conflict between the terms and provisions of
this Rider and those contained in the agreement to which this Rider is annexed, the terms and
provisions of this Rider shall govern and be binding.

The following definitions shall apply to the Contract and this Rider:

(a)   use of the term "Condominium" shall be deemed to mean the "co-
ownership interests in the building located at 3 Gramercy Park West, New York, New York
10003" as defined in paragraph 1 of the Contract.

(b)   use of the term "Unit" shall be deemed to mean "Seller's 24% undivided
interest in the Building, together with the right to occupy the parlor (second) floor apartment
contained therein" as defined in paragraph 1 of the Contract.

(c)   use of the term "Board" shall be deemed to mean the "co-owners of the
Building" as defined in paragraph 6(iii) of the Contract.

(d)   use of the term "Declaration" shall be deemed to mean that "certain Co-
Ownership Agreement dated December 12, 1969, as amended by that certain Amendment of
October 1, 1974, to Co-Ownership Agreement dated December 12, 1969, as further amended by
that certain Second Amendment of May 25, 1975 to Co-Ownership Agreement dated December
12, 1969, as further amended by that certain Third Amendment to Co-Ownership Agreement
dated December 12, 1969, dated January 8, 1982, as further amended by Amendments dated
April 26, 1993, February 22, 1997 and as further amended by that certain Sixth Amendment to
Co-Ownership Agreement dated October 1, 2001.

R2.   Supplementing Paragraph 16 of the printed form of this Contract, Purchaser shall
not receive any credit against the purchase price hereunder for any interest earned on the
Downpayment.

(a)   With respect to the indemnity set forth in Paragraph 16(b) of the printed
form of this Contract, reasonable attorneys' fees shall include, but not be limited to, the fair value
of legal services, if any, rendered by Escrowee to itself.

(b)   Notices from Escrowee to Seller and Purchaser shall be given in the same
manner as notices to either party are given under this Contract.  Notices from Seller or Purchaser
to Escrowee shall be given in the same manner as notices to either party given under the
Contract, addressed to it at 787 Seventh Avenue, New York, New York  10019-6099, marked
"Attention: Janice E. Levine, Esq." with a copy by telephone facsimile to (212) 728-8111, or to
such other address and/or facsimile number as Escrowee may hereafter notify Seller and
Purchaser.

R3.   Supplementing and modifying Paragraph 2 of the printed form of this Contract,
no portion of the Purchase Price is allocated to the personal property included in this transaction.

R4.   Seller may omit from the deed to be delivered under this Contract all of the
"subject to" provisions contained herein, and Purchaser agrees that such provisions shall,
nevertheless, survive the delivery of the deed.

R5.   Supplementing Schedule A of the printed form of this Contract, the Unit is sold
and shall be conveyed subject to:

a.   Those items listed on Schedule B Exception Nos. 5 and 15 of Title
Policy Number R953157NY (TPS6-712590) of Commonwealth
Land Title Insurance Company dated January 8, 1982;

**EXHIBIT C**

    b.    All other covenants, agreements, reservations and restrictions of record, provided Purchaser's title company insures that any violations thereof will not result in a forfeiture or reversion of title;

    c.    Variations between fences and record lines, if any; variations between record lines and tax lot lines, if any; and

    d.    Standard printed exceptions to coverage contained in the form of title insurance policy insuring Purchaser's title to the Unit;

R6.    Supplementing the provisions of Paragraph 19 of the printed form of this Contract, Purchaser shall furnish a written statement to Seller setting forth any objections that Purchaser may have to the title to the Unit within 10 days after receipt of a copy of the title report and within 10 days after receipt of any additions thereto.

R7.    Supplementing and modifying Paragraph 14 of the printed form of this Contract, copies of all Notices to Seller shall be given at the same time and in the same manner to Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099, Attention: Janice E. Levine, Esq. Copies of all Notices to Purchaser shall be given at the same time and in the same manner to Holm & O'Hara, 420 Lexington Avenue, Suite 1745, New York, NY 10170, Attention: Michael L. Landsman, Esq. (LLP)

R8.    If any instrument for the payment of the Downpayment fails of collection, Seller may, at its option, sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided that Seller gives Purchaser notice of such failure of collection and Purchaser fails to deliver to Escrowee, within six (6) business days after notice is given, the uncollected funds by good, unendorsed certified check, bank check or immediately available funds. Purchaser's failure to cure such default shall entitle Seller to terminate this contract and exercise its remedies under Paragraph 13 of the printed form of this Contract.

R9.    This Contract shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of New York applicable to agreements made and to be performed wholly within such State.

R10.    This Contract shall not be recorded by either party.

R11.    Purchaser is hereby notified that the subject property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in children may produce permanent neurological damage, including learning disabilities, reduced intelligent quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. Sellers of real property built prior to 1978 are required by Federal Law to provide Purchaser with any information on lead-based paint hazards from risk assessments or inspections in Seller's possession and to notify the Purchaser of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

Purchaser hereby acknowledges receipt of the above Lead Warning Statement, has received a lead hazard information pamphlet and has had a ten (10) day opportunity before becoming obligated under this Contract to conduct a risk assessment or inspection for lead-based hazards, or by signing below hereby waives the right to conduct such risk assessment or inspection. In the event that the Condominium requires any lead paint remediation work to be performed in the Unit as a condition to the Closing, Purchaser shall be solely responsible for complying with the Condominium's requirements, and all such remediation work shall be performed at Purchaser's sole cost and expense.

R12.    In the event of any dispute arising hereunder, the parties agree that jurisdiction shall be vested solely with the courts of New York State in New York County.

R13.    Purchaser shall be solely responsible for the New York State "Mansion Tax" (if any) and Purchaser shall indemnify and hold Seller harmless from the imposition of the "Mansion Tax" or any other tax which is primarily the responsibility of Purchaser. The provisions of this paragraph shall survive the Closing.

000096-03

**EXHIBIT C**

R14.   This Contract may be executed by facsimile and/or in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same original.

R15.   Purchaser acknowledges that the floors, doors, walls, ceilings and other surfaces at the Unit are being sold in their "as is" condition and Purchaser agrees that Seller shall not be required to repaint or refinish the floors, doors, walls, ceilings or any other surface at the Unit. Furthermore, Purchaser shall accept the walls at the Unit subject to such chips, holes and/or indentations as are ordinarily created by the removal of hanging pictures and other removable items being taken by Seller, provided that such chips, holes and/or indentations are capable of being repaired by the application of spackling or other similar compound. The repair of such chips, holes and/or indentations shall be the responsibility of Purchaser, at Purchaser's expense, to repair.

R16.   Purchaser agrees that Purchaser is responsible for the replacement of any checks paid at Closing for the balance of the Purchase Price and any adjustments in the event that any such checks are returned to Seller due to insufficient funds or for any other reason, whether such checks shall have been tendered by Purchaser, Purchaser's lending institution or any other party acting on behalf of Purchaser or Purchaser's lending institution. The amount of any unpaid or returned checks shall constitute a lien on the Premises for which Seller may file a Notice of Pendency and foreclose upon. The provisions of this paragraph shall survive the Closing.

R17.   Seller shall use reasonable efforts to deliver to Purchaser copies of any notices from the Condominium, Board or other co-owners relating to: (1) any increase in the amount of the monthly common charges; (2) any proposed assessment; (3) any intended or proposed changes to the "flip tax" or other transfer fee imposed by the Board, or co-owners; (4) any proposed amendment or modification of the Declaration or other condominium document, or the Condominium's by-laws, rules or regulations; (5) any proposed construction or repair work the cost of which is intended to be borne by the Seller and/or other co-owners of the building; (6) any damage or casualty to the Unit or the Premises; or (7) any increase in the amount of property taxes imposed on the Premises. Failure to deliver any such notices to Purchaser shall not be a default under this Contract.

R18.   Seller hereby represents, to Seller's actual knowledge, that: (a) there have been no leaks into the walls, bathrooms or any other areas of the Unit and Seller has not been notified of any water leaks which purport to emanate from the Unit within the past twelve (12) months; and (b) there have been no complaints by Seller regarding noise, offensive odors or offensive conduct to the Condominium, Board or other co-owners of the building.

R19.   Should either party default in its obligations hereunder, the defaulting party shall be liable to the other party for reasonable attorneys' fees and costs incurred by the other party in enforcing the Contract. The prevailing party in any lawsuit shall recover its reasonable attorneys' fees and costs from the non-prevailing party.

R20.   The parties hereto agree and acknowledge that although the obligations of the Purchaser hereunder are not conditioned upon obtaining a loan commitment letter, Purchaser may obtain a loan from an Institutional Lender in order to finance Purchaser's purchase of the Unit provided same shall not delay the Closing.

R21.   Seller represents and warrants that the heating, cooling, plumbing, electric system, fixtures and appliances within the Unit, to the extent that they are Seller's responsibility under the co-ownership agreement to maintain or repair, shall be in working order at the time of the Closing, other than the fireplaces and the exhaust fan in the master bathroom. If any of such systems, fixture or appliances are not in working order at the time of the Closing, then Seller shall, at Seller's sole cost and expense, make any necessary repairs or, at Seller's option, give Purchaser a credit for the costs of such repairs, against the balance of the purchase price due at Closing.

R22.   Seller agrees to transfer Seller's right, if any, to use a storage space located in the basement of the Premises to Purchaser at the Closing.

R23.   Notwithstanding anything to the contrary contained herein, if the co-owners of the Building do not approve the transfer to Purchaser, Seller shall promptly refund to Purchaser the

000097-03

2092023.4                    EXHIBIT C

Downpayment and upon the making of such refund, this Contract shall be deemed cancelled and of no further force or effect and neither party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract.

R24.    This Contract is subject to and conditioned upon the consent of the majority percentage interest of the co-owners of the Building to the Purchaser's ability, for estate and tax planning purposes, to take title to the Unit in a domestic Limited Liability Company (LLC). The LLC shall be formed by Purchaser, wholly owned by Purchaser and/or Purchaser's family and Purchaser shall retain the exclusive right to use the Unit. Purchaser also agrees to execute a personal guaranty (that all amounts due with respect to the ownership of the Unit will be paid) and an occupancy agreement (that only Purchaser or members of Purchaser's family can occupy the Unit). Upon receipt of a fully executed counterpart of the Contract, Purchaser shall promptly provide the co-owners with information reasonably requested about the LLC. If the majority co-owners of the Building refuse to permit the Purchaser to take title to the Unit in a domestic LLC, then Seller or Seller's attorney shall notify Purchaser's attorney in writing of such refusal and Purchaser shall have the right to cancel this Contract by written notice to Seller within five (5) business days after Purchaser's attorney's receipt of notification from Seller or Seller's attorney of such refusal. Upon such cancellation, Seller shall promptly refund the Downpayment to Purchaser, the Contract shall terminate and neither party shall have any further claim against the other hereunder except with respect to any provisions that are specifically stated to survive a termination of the Contract. If such cancellation notice is not sent by Purchaser as required hereunder, Purchaser's right to cancel the Contract pursuant to this provision shall be deemed waived.

SELLER:

Ralph Ammirati

Joan Ammirati

PURCHASER:

Gustavo Adolfo Hernandez Frieri

Escrowee agrees to the
provisions of Paragraph R2
hereof.

Willkie Farr & Gallagher LLP

By:

A Partner

4

**EXHIBIT C**

## SCHEDULE A

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, City and County and State of New York, being one of the 66 lots surrounding the park square mentioned or referred to in a certain deed from Samuel B. Ruggles and his wife to Charles A. Davis and others, dated December 17, 1831, and recorded with the map annexed to the Register's Office of New York County in Liber 278 of Conveyances, page 528, the lot hereby described being laid down and distinguished on the said map by Lot Number 3 and is bounded and described as follows:

BEGINNING at a point on the westerly side of a street or way running from 20th Street to 21st Street on the westerly side of Gramercy Park at the center of the northerly side or gable wall of house on the premises hereby described, which is erected as a party wall resting partly on the lot hereby described and partly on Lot Number 2 on said 66 lots at a point 52 feet 6-6/7 inches southerly from 21st Street;

RUNNING THENCE westerly on a line parallel with 21st Street and through the center of said gable or side wall 110 feet;

THENCE southerly parallel with said street or way on the westerly side of Gramercy Park, 26 feet 3-3/7 inches to Lot Number 4 as laid down on said map;

THENCE easterly parallel with 21st Street, and through the center of a party wall between the house on the premises hereby described and the house adjoining on the south along the northerly line of said Lot Number 4, 110 feet to said street on the westerly side of Gramercy Park; and

THENCE Northerly along said last mentioned street, 26 feet 3-3/7 inches to the point or place of BEGINNING.

*For conveyancing only,*
*if intended to be conveyed.*
{ Together with all right, title and interest of, in and to any streets and
{ roads abutting the above described premises, to the center line thereof

-00—938—1   CERTIFICATE AND REPORT OF TITLE—NEW YORK
000099-03

**EXHIBIT C**

SCHEDULE B

SCHEDULE B in which are set forth the additional matters which will appear in the policy as exceptions from coverage, unless disposed of to the Company's satisfaction prior to the closing or delivery of the policy:

1. ~~Taxes, tax liens, tax sales, water rates, sewer rents and assessments set forth in schedule herein.~~

2. ~~Mortgages returned herein ( two ). Detailed statement within.~~

3. ~~Any state of facts which an accurate survey might show.~~
   ~~-or-~~
   ~~Survey exceptions set forth herein.~~

4. ~~Rights of tenants or persons in possession.~~

5. Covenants, conditions, easements, leases, agreements of record, etc., more fully set forth in Schedule herein:—

   a.  Declaration and Agreement contained in deed recorded in Liber 278 cp 528 – copy within.

   b.  Confirmation Agreement recorded in Liber 308 cp 194 a re-recorded in Liber 167 Sec. 3 cp 462.

   c.  Covenants and Restrictions contained in deed recorded in Liber 280 cp 309 and repeated in deeds recorded in Liber 314 cp 570; Liber 324 cp 1; Liber 392 cp 420 and subsequent deeds of record.

   d.  Sewer Agreement recorded in Liber 509 cp 424 – copy within.

   e.  Notice of Designation as a landmark recorded in Record Liber 108 pg 211 – copy within.

6. ~~Proof is required that R. GREGORY SWOFFORD aka REASE GREGORY SWOFFORD and SUSAN KELLEY aka SUSAN SWOFFORD have not been known by any other names within the past ten (10) years; otherwise, such other name(s) must be revealed to the Company and the Office searches amended to cover.~~

7. ~~NOTE. The purpose of this search is to insure the undivided 24% fee interest to be conveyed by R. Gregory Swofford and Susan Kelley Swofford. All other matters set forth herein as affecting other undivided fee interests in the premises described in Schedule "A", are set forth~~

**EXHIBIT C**

SCHEDULE "B" CONTINUED

~~for information only and without liability for any omissions.~~

~~8. Except the right of the City of New York to maintain vaults,
if any, in streets and charges therefore if any.~~

~~9. Application states title (as to the 24% undivided interest)
in Susan Kelley aka Swoffold; we find title as certified.~~

~~10. Consents to the subject transaction, if any, which may be
required by the other signatories to the co-ownership agreement
dated 12/12/1969 as modified by amendment dated 10/1/1974 and
further modified by amendment dated May, 1975.~~

~~11. Subject to the terms and conditions of the agreements
recited in Exception 10 above (copies to be provided to this
Company).~~

~~12. Subject to the Right of first refusal; and possible unpaid
carrying charges, as set forth in the agreements recited in
Exception 10.~~

~~13. Proof is required that there are no outstanding unpaid common
charges or assessments levied against the subject apartment unit or
interest.~~

~~14. Four (4) judgments and nine (9) parking violations returned
herein to be disposed of.~~

15. SURVEY READING:   See within.

~~16. Policy will except any state of facts an accurate survey
would show subsequent to 4/22/1969.~~

~~17. FOR INFORMATION: Returned herein are judgments and parking
violations which may effect other interests in the described
premises.   (See Schedule)~~

~~18. NOTE: If the purchase price of $320,000. does not take into
account the unpaid balance of the Tremont Savings and Loan
Association mortgage; then the insurance being issued herein
should be increased by 24% of the unpaid principal balance of
said mortgage.~~

CONTINUED.....

**EXHIBIT C**

## S U R V E Y   E X C E P T I O N S

Survey made by George C. Hollerith dated October 18, 1926, inspected by J. George Hollerith on November 14, 1931 and inspected by Earl B. Lovell – S. P. Belcher, Inc. on April 23, 1959 shows a four story and basement brick and brownstone building with party walls on the north and south, three story and basement brick building with party wall on south at rear of said four story and basement brick and brownstone building and two story and basement brick building at rear of said three story and basement brick building and the following survey exceptions:

1. Encroachments on Gramercy Park West:  Court yard, fence, stoop, stoop column, stoop wall and fence on stoop wall.

2. The northerly party wall of the four story and basement building on the premises herein has been carried upward for the use of the four story and basement building on the premises adjoining on the north.  Some windows in said upward extension when open, project on the premises herein – extent not shown, and air conditioners at windows in said upward extension project 8 inches on the premises herein.

3. Roof of porch of four story and basement building on the premises herein projects 4 inches on the premises adjoining on the north.

4. Variation between yard coping, yard walls, fence and the northerly and southerly record lines of title.

5. The southerly independent wall of the four story and basement building on the premises adjoining on the north encroaches up to 6-1/2 inches on the premises herein.

6. Porch and stoop of one story and basement building on premises adjoining on the south and chimney of said building are anchored to the southerly wall of the two story and basement building on the premises herein and all encroach 2 inches on the premises herein.

7. The northerly wall of the one story and basement building on the premises adjoining on the south encroaches up to 2 inches on the premises herein.

8. The southerly wall of the three story and basement building on the premises herein consists of a party wall used by said building and the two story and basement building on the premises adjoining on the south and an independent wall which overtops said party wall.  Said overtopping independent wall encroaches 4-1/2 inches on the premises adjoining on the south, but policy insures that the same may remain undisturbed so long as said building stands.

**EXHIBIT C**

## -2-

# Financials

(i)  Personal Financial Statement prepared by CPA Jose Padial
(ii)  Verification of Assets
  Net worth $28,578,909
(iii)  Letter from Tax Attorney
  2003 Tax Returns
(iv)  Liabilities

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

# (i) Financial Statement prepared by CPA

Parlor Floor
3 Gramercy Park West

000104-03

**EXHIBIT C**



*Jose I. Padial* PA
*Certified Public Accountant ~ Consultant*

REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT

Gustavo Hernandez
Miami, Florida

I have compiled the accompanying statement of financial condition of Gustavo Hernandez as of November 30, 2004 in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

My compilation is limited to presenting in a prescribed form, information that is the representation of the individuals whose financial statement is presented. I have not audited or reviewed the accompanying financial statement, and accordingly, do not express an opinion or any other form of assurance on them.

This financial statement is presented in accordance with the requirements of a prescribed form which differs from generally accepted accounting principles. Accordingly, this financial statement is not designed for those who are not informed about such differences.

Except as prescribed by the form, this financial statement is intended to present assets of Gustavo Hernandez at estimated current values and their liabilities at estimated current amounts.

*Jose J. Padial PA.*

December 7, 2004

Member of American Institute of Certified Public Accountants • Florida Institute of Certified Public Accountants

Douglas Centre, PH6 • 2600 Douglas Road • Coral Gables, FL 33134 • Tel: 305 443-8010 • Fax: 305 443-4749 • www.jpcpa.com

000105-03

**EXHIBIT C**

| FINANCIAL STATEMENT — Individual |
|---|

Name GUSTAVO HERNANDEZ

Home address 120 NW 25 ST. #202 MIAMI, FL. 33127    Phone 305-373-3326

Business address 701 BRICKELL AVENUE # 2030 MIAMI, FL. 33131    Phone _____

## INSTRUCTIONS

Please:    1. Complete the Balance Sheet Section:
            a) Review the Balance Sheet
            b) Complete the appropriate schedules (Pages 2 & 3)
            c) Total each schedule's balances & transfer totals to Balance Sheet
            d) Complete the remaining Balance Sheet Items
            e) Total Assets, Liabilities, & calculate Net Worth
     2. Complete the remaining two Sections:
            a) Contingent Liabilities (Page 1)
            b) Income Statement (Page 4)
     3. Sign & date Page 4 after reviewing financial & credit report statements
       (Please use additional sheets if necessary)

I guarantee that the information I have given you below is a true and accurate statement of my financial condition as of

NOVEMBER 30, _____ , 2004

## BALANCE SHEET

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash on Hand & in Accounts (Sch. 1) . . . . . . | . . . . 6,572.00 | Accounts Payable . . . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . |
| Accounts & Notes Receivable (Sch. 2) . . . . . | . . . . . . . . . . . . . | Notes Payable (Sch. 6) . . . . . . . . . . . . . . . | . . . 44,121.00 |
| U.S. Government Bonds . . . . . . . . . . . . . . . | . . . . . . . . . . . . . | Mortgages (Sch. 5) . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . |
| Listed Marketable Stocks & Bonds (Sch. 3) . . | 3,936,529.00 | Installment Loans (Sch. 7) . . . . . . . . . . . . | . . . . . . . . . . . . . |
| Unlisted, Non-Liquid Stocks & Bonds (Sch. 4) | . . . . . . . . . . . . . | Life Insurance Loans . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . |
| Real Estate (Sch. 5) . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . | Other Liabilities: (Detail Below) . . . . . . . . . | . . . . . . . . . . . . . |
| Life Insurance (Cash Value) . . . . . . . . . . . . | . . . . . . . . 7,787 | | |
| Furniture & Fixtures . . . . . . . . . . . . . . . . . . | . . . . . . . . . . . . . | | |
| Automobiles . . . . . . . . . . . . . . . . . . . . . . . . | . . . . . . 90,000 | | |
| Other Assets: (Detail Below, Include IRA,-KEOGH, & Vested Pension Funds) . . . . . . . . . . . . . . . . . . . . . . . . . . . | . . 24,582,142 | | |
| Total Assets . . . . . . . . . . . . . . . . . . . . . . . . | 28,623,030.00 | Total Liabilities . . . . . . . . . . . . . . . . . . . . . . . | . . . . 44,121.00 |
| | | Net Worth . . . . . . . . . . . . . . . . . . . . . . . . . . | 28,578,909.00 |

## CONTINGENT LIABILITIES

Do you have any contingent liabilities? If so, please describe:

As endorser, co-maker or guarantor? . . . . . $ _____ 0      Legal claims . . . . . . . . . . . . . . . . . . $ _____ 0
On leases or contracts? . . . . . . . . . . . . . . $ _____ 0      Other special debt . . . . . . . . . . . . . . $ _____ 0
Amount of contested income tax liens . . . . . $ _____ 0

STF PRA1018F.1

**EXHIBIT C**

Schedule 1: CASH ACCOUNTS

| Depository Institution | In Name Of | Account Type | Balance |
|---|---|---|---|
| BANK OF AMERICA | GUSTAVO HERNANDEZ | CHECKING | 6,572 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Total: | 6,572.00 |

Schedule 2: NOTES AND ACCOUNTS RECEIVABLE

| Debtor's Name | Purpose | Monthly Payment | (Specify if Principal and/or Interest) | Balance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | Total: |

Schedule 3: LISTED MARKETABLE STOCKS AND BONDS

| No. Shares | Issue | Owner | Pledged Yes | Pledged No | Market Value |
|---|---|---|---|---|---|
| 3,165 | GLOBAL SECURITIES GROUP FUND | GUSTAVO HERNANDEZ | | Y | 3,936,529 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | Total: | 3,936,529.00 |

STF PPA1916F.2

000107-03

**Schedule 4: UNLISTED, NON-LIQUID STOCKS AND BONDS**

| No. Shares | Issue | Owner | Valuation Method | Value |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | Total: | |

**Schedule 5: REAL ESTATE**

| No. | Location and Description | Title In Name Of | Purchase Date and Price | Market Value |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| | | | Total: | |

| | Mortgage | Collateral Position | Original Amount | Monthly Payment | (Specify if Principal and/or Interest) | Present Balance |
|---|---|---|---|---|---|---|
| 1. | | | | | | |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |
| | | | | | Total: | |

**Schedule 6: NOTES PAYABLE**

| Creditor's Name | Purpose | Collateral | Monthly Payment | (Specify if Principal and/or Interest) | Balance |
|---|---|---|---|---|---|
| PORSCHE FINANCIAL | AUTO LOAN | AUTO | | | 44,121.21 |
| | | | | | |
| | | | | | |
| | | | | Total: | 44,121.00 |

**Schedule 7: INSTALLMENT LOANS**

| Creditor's Name | Purpose | Collateral | Monthly Payment | Balance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | Total: | |

STT PRA108F.3

000108-03

**EXHIBIT C**

## INCOME STATEMENT

A simplified Income Statement is outlined below. If you would prefer to attach your Income Tax Return for a recent year, this form does not have to be completed.

| Fiscal Year Ended DECEMBER 31 , 2004 | Amount |
|---|---|
| Business Income | |
| Salary | 168,000 |
| Commissions and Bonuses | |
| Dividends | 850,000 |
| Interest | 98,400 |
| Capital Gains | |
| Net Rental | |
| (Depreciation)        $ | |
| (Interest)        $ | |
| Other: (Describe Below) | |
| | |
| | |
| Total | 1,116,400.00 |

Signature _Jose J. Padial_          Date _17 Dec 2004_

STF PRA1018F.4

**EXHIBIT C**

STATEMENT ATTACHED AND MADE
PART OF THE PERSONAL FINANCIAL STATEMENT OF

GUSTAVO HERNANDEZ

NOVEMBER 30, 2004

OTHER ASSETS

| | | |
|---|---|---:|
| Beneficial Interest in Trust | | |
| of the Hernandez Frieri Family: | | |
| Investment in Global Finance Management | | |
| Corporation and Subsidiaries | $ | 24,649,602 |
| Investment in The Global Securities Market | | |
| Neutral Fund c/o Dundee Leeds Management | | |
| Services (Cayman) Ltd. | | 23,286,359 |
| Total Assets of the Trust | $ | 47,935,961 |
| | | |
| Gustavo Hernandez Beneficial Interest- 50% | $ | 23,967,981 |
| | | |
| Art Objects | | 614,161 |
| | | |
| TOTAL OTHER ASSETS | $ | 24,582,142 |

See accountant's compilation report.

**EXHIBIT C**

# (ii) Verification of Assets

| | | |
|---|---|---:|
| Exhibit I | Cash | $      6,572 |
| Exhibit II | Bonds & Stocks | $ 3,936,529 |
| Exhibit III | Life Insurance | |
| | Cash surrender value | $      7,787 |
| Exhibit IV | Art Collection | $    614,161 |
| Exhibit V | Hernandez Frieri Family Trust | $23,967,981 |
| | Gustavo Hernandez 50% beneficiary | |
| (iii) | Global Finance Management Corporation and subsidiaries | $24,649,602 |
| (iv) | Investment in The Global Securities Market Neutral Fund c/o Dundee Lees Managements Services (Cayman) Ltd. | $23,286,359 |

| | | |
|---|---|---:|
| Total Assets of Trust | | $47,935,961 |
| Gustavo Hernandez Beneficial Interest 50% | | $23,967,981 |
| Exhibit VI | Income 2004 | $ 1,116,400 |

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

# Exhibit I
# Cash/Bank Statements
**Bank of America**
**$6,572**

Parlor Floor
3 Gramercy Park West

000112-03

**EXHIBIT C**

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

Page 1 of 3
Statement Period
10-22-04 through 11-19-04
Number of checks enclosed: 0
B 14 0 A P  14          0329766

Account Number: 0054 8935 6082

lulluullulllulllulllllulllulllullullludldull

22075 001 SCM999 I1 34 0

GUSTAVO HERNANDEZ FRIERI
CESAR GABRIEL HERNANDEZ
701 BRICKELL AVE STE 2030
MIAMI FL 33131-2834

*Premier Banking Client*

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
**With Online Banking you can also view up to 18 months of this statement**
**online and even turn off delivery of your paper statement.**
Enroll at www.bankofamerica.com.

## Customer Service Information
## www.bankofamerica.com

For additional information or service, you may call:
☎ 1.800.432.1000 Priority Telephone Banking
1.800.288.4408 TDD/TTY Users Only
1.800.688.6086 En Español

Or you may write to:
✉ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

## Regular Checking

GUSTAVO HERNANDEZ FRIERI          CESAR GABRIEL HERNANDEZ

### Your Account at a Glance

| | |
|---|---|
| Account Number ............................................ | 6082 |
| Beginning Balance on 10-22-04 ................. $ | 9,366.68 |
| Deposits and Other Additions ............+ | 10,457.50 |
| Checks Posted ....................................- | 10,992.55 |
| ATM and Debit Card Subtractions ..., - | 1,759.27 |
| Other Subtractions ............................- | 500.00 |
| **Ending Balance on 11-19-04 ................. $** | **6,572.36** |

Did you know that your online statements are secure and protected in Online Banking? You can even stop delivery of this paper statement altogether. Enroll or sign in to Online Banking today at www.bankofamerica.com. Select the Account Activity tab and click on the "Stop/Resume mailing paper statements" link.

000113-03

**EXHIBIT C**

GUSTAVO HERNANDEZ FRIERI
CESAR GABRIEL HERNANDEZ

Page 2 of 3
Statement Period
10-22-04 through 11-19-04
Number of checks enclosed: 0
B  14  0  A  P   14

Account Number ▮▮▮▮6082

## Regular Checking Additions and Subtractions

| Date Posted | Amount($) | Resulting Balance($) | Transaction |
|---|---|---|---|
| 10-25 | 158.32- | 9,208.36 | Svb  4046_boca  10/24 #000882685 Withdrwl 4046_boca Grande    1300100Cartag |
| 10-25 | 158.12- | 9,050.24 | Svb  4046_boca  10/24 #000882715 Withdrwl 4046_boca Grande    1300100Cartag |
| 10-25 | 158.12- | 8,892.12 | Svb  4046_boca  10/24 #000882737 Withdrwl 4046_boca Grande    1300100Cartag |
| 10-25 | 63.37- | 8,828.75 | CheckCard  1023 Carulla Castillo Grande Cartagena      7451307429829803050920 3 |
| 10-26 | 500.00- | 8,328.75 | Metlife      ;Des= payment    ;ID= 20005138767 Eff Date: 041026;Indn:Gustavo Hernandez |
| 10-27 | 51.60- | 8,277.15 | Check      365 |
| 10-28 | 80.00- | 8,197.15 | Check      367 |
| 10-29 | 5,228.75+ | 13,425.90 | Global Securitie;Des= payroll   ;ID= 14622200006717X Eff Date: 041029;Indn:Hernandez, Gustavo |
| 10-29 | 5,000.00- | 8,425.90 | Check      373 |
| 11-01 | 200.00- | 8,225.90 | BkofAmerica ATM 10/30 #000009876 Withdrwl Brickell #2      Miami       FL |
| 11-02 | 1,760.00- | 6,465.90 | Check      374 |
| 11-02 | 20.80- | 6,445.10 | Check      366 |
| 11-10 | 105.15- | 6,339.95 | Check      579 |
| 11-15 | 5,228.75+ | 11,568.70 | Global Securitie;Des= payroll   ;ID= 14729800017895X Eff Date: 041115;Indn:Hernandez, Gustavo |
| 11-15 | 1,000.00- | 10,568.70 | Check      577 |
| 11-15 | 258.15- | 10,310.55 | 24000      11/13 #000024809 Withdrwl Ubs Sa        Cointrin |
| 11-15 | 163.76- | 10,146.79 | CheckCard  1113 Le Cintra 74Megeve      7497606431865424406257 8 |
| 11-15 | 130.91- | 10,015.88 | LA Poste/Avenu  11/13 #000009579 Withdrwl LA Poste/Avenue D  Sallanches |
| 11-15 | 45.00- | 9,970.88 | Check      375 |
| 11-16 | 2,000.00- | 7,970.88 | Check      578 |
| 11-16 | 930.00- | 7,040.88 | Check      580 |
| 11-16 | 34.66- | 7,006.22 | CheckCard  1114 Le Gerbier     5636167 7474 Megeve     7497568432186882082494 3 |
| 11-18 | 260.32- | 6,745.90 | 78800      11/18 #000078369 Withdrwl Banque Cantonale   Geneve |
| 11-18 | 173.54- | 6,572.36 | 78800      11/18 #000078370 Withdrwl Banque Cantonale   Geneve |

## Checks Posted in Numerical Order

| Check Number | Date Posted | Amount($) | Check Number | Date Posted | Amount($) | Check Number | Date Posted | Amount($) |
|---|---|---|---|---|---|---|---|---|
| 365 | 10-27 | 51.60 | 374 | 11-02 | 1,760.00 | 579 | 11-10 | 105.15 |
| 366 | 11-02 | 20.80 | 375 | 11-15 | 45.00 | 580 | 11-16 | 930.00 |
| 367 | 10-28 | 80.00 | 577* | 11-15 | 1,000.00 | | | |
| 373* | 10-29 | 5,000.00 | 578 | 11-16 | 2,000.00 | | | |

**Total Checks Posted** $10,992.55

* The asterisk shows a break in the check number order. Your check may have been in a previous statement or may still be outstanding.

**EXHIBIT C**

GUSTAVO HERNANDEZ FRIERI
CESAR GABRIEL HERNANDEZ

Page 3 of 3
Statement Period
10-22-04 through 11-19-04
Number of checks enclosed: 0
B  14  0  A  P   14                0329768

Account Number:          6082

## Daily Balance Summary

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| Beginning | 9,366.68 | 10-28 | 8,197.15 | 11-10 | 6,339.95 |
| 10-25 | 8,828.75 | 10-29 | 8,425.90 | 11-15 | 9,970.88 |
| 10-26 | 8,328.75 | 11-01 | 8,225.90 | 11-16 | 7,006.22 |
| 10-27 | 8,277.15 | 11-02 | 6,445.10 | 11-18 | 6,572.36 |

**EXHIBIT C**

### How To Balance Your Bank of America Account

**FIRST, start with your Account Register/Checkbook:**

1. List your Account Register/Checkbook Balance here ............................................................................................... $ _____

2. Subtract any service charges or other deductions not previously recorded that are listed on this statement ................. $ _____

3. Add any credits not previously recorded that are listed on this statement (for example interest) .................................. $ _____

4. This is your NEW ACCOUNT REGISTER BALANCE ............................................................................................ $ _____

**NOW, with your Account Statement:**

1. List your Statement Ending Balance here ............................................................................................................... $ _____

2. Add any deposits not shown on this statement ......................................................................................................... $ _____

_____

_____

SUBTOTAL .............. $ _____

3. List and total all outstanding checks, ATM, Check Card and other electronic withdrawals

| Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | |
|---|---|---|---|---|---|
| Date/Check # | Amount | Date/Check # | Amount | Date/Check # | Amount |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ | _____ |

4. TOTAL OF OUTSTANDING CHECKS, ATM, Check Card and other electronic withdrawals .............................. $ _____

5. Subtract total outstanding checks, ATM, Check Card and other electronic withdrawals from Subtotal
   This Balance should match your new Account Register Balance ................................................................... $ _____

Upon receipt of your statement, differences, if any, should be reported to the bank promptly in writing and in accordance with provisions in your deposit agreement.

## Important Information

**Change of Address.** Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Deposit Agreement.** When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule, which contain the current version of the terms and conditions of your account relationship, may be obtained at our banking centers.

**Electronic transfers: In case of errors or questions about your electronic transfers**
If you think your statement or receipt is wrong or if you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
* Tell us your name and account number
* Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
* Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting Other Problems.** You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or unauthorized transactions within the time periods specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree not to make a claim against us for the problems or unauthorized transactions.

**Direct Deposits.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.

Bank of America, N.A. Member FDIC and  Equal Housing Lender

*Thank You for Choosing Bank of America*



**GLOBAL STRATEGIC INVESTMENTS, LLC**

A000000043712C8F30001

GUSTAVO HERNANDEZ
120 NW 25TH STREET
UNIT 202
MIAMI FL 33127

**Your Portfolio Manager:**
CESAR HERNANDEZ
(305) 373-3326

# Brokerage
## Account Statement

**Account Number:** ▮▮▮▮048
**Statement Period:** 11/01/2004 - 11/30/2004

## Valuation at a Glance

| | This Period |
|---|---|
| Beginning Account Value | $3,936,529.05 |
| Change in Account Value | 0.00 |
| Ending Account Value | $3,936,529.05 |

## Asset Allocation

| | Value This Period | Percent Allocation | |
|---|---|---|---|
| Equities | 3,936,532.05 | 100% | Your Account is 100% invested in Equities. |
| Cash and Cash Equivalents | -3.00 | 0% | |
| **Account Total** | **$3,936,529.05** | **100%** | |

Clearing through **Pershing** A BNY Securities Group Co. Solutions from The Bank of New York   One Pershing Plaza, Jersey City, New Jersey 07399
Pershing LLC, member NASB NYSE, SIPC, limited liability of Pershing Investments LLC

A000000043712C8F30001

PAR-02-CUTSHEET

DALBAR RATED
FOR COMMUNICATION

000117-03

# Customer Service Information

Customer Service Telephone Number: (888) 376-8738

Your Portfolio Manager:
Identification Number: 502
CESAR HERNANDEZ
701 BRICKELL AVENUE - SUITE 2030
MIAMI        FL 33131-2834
Telephone Number: (305) 373-3326
Fax Number: (305) 373-8680

# Portfolio Holdings

| Quantity | Description | Opening Balance | Closing Balance | Accrued Income | Income This Year | 30-day Yield |
|---|---|---|---|---|---|---|
| | **Cash and Cash Equivalents  0.00% of Portfolio** | | | | | |
| | Cash Balance | -3.00 | -3.00 | | | |
| | **Total Cash and Cash Equivalents** | **-$3.00** | **-$3.00** | **$0.00** | **$0.00** | |

| Quantity | Description | Market Price | Market Value | Accrued Income | Estimated Annual Income | Estimated Yield |
|---|---|---|---|---|---|---|
| | **Equities  100.00% of Portfolio** | | | | | |
| | **Stocks, Rights and Warrants** | | | | | |
| 3,165.000 | GLOBAL SECURITIES GROUP FUNDS SPC USD CL A NON VTG PTG SHS SER 1 MKT NEUTRAL FD PORT ISIN#KYG39303I052 Dividend Option: Cash *Security Identifier:* G39303105 | 1,243.7700 | 3,936,532.05 | | | |
| | **Total Stocks, Rights and Warrants** | | **$3,936,532.05** | | **$0.00** | |
| | **Total Equities** | | **$3,936,532.05** | | **$0.00** | |

| Description | Market Value | Estimated Annual Income |
|---|---|---|
| **Total Portfolio Holdings** | **$3,936,529.05** | **$0.00** |

Account Number: 0C2 300048
GUSTAVO HERNANDEZ

Clearing Through **Pershing** A BNY Securities Group Co. One Pershing Plaza, Jersey City, New Jersey 07399
Subsidiary from The Bank of New York  Pershing LLC, member FINRA, NYSE, Trademark(s) of Pershing Investments LLC.

A000000094371JC58930001

GLOBAL STRATEGIC INVESTMENTS, LLC
111 Montehaven Suite 2200
Miami, FL 33131
Tel :    (305) 373-3305
Fax :    (305) 373-4495
Toll Free : (866) 376-4416

000119-03

## Brokerage
## Account Statement

**Statement Period: 11/01/2004 - 11/30/2004**

## Portfolio Holdings *(continued)*

### Disclosures and Other Information

Pricing - Securities prices may vary from actual liquidation value. Prices shown should only be used as a general guide to portfolio value. Prices are received from various pricing services. However, pricing services are sometimes unable to provide timely information. Where pricing sources are not readily available, particularly on certain debt securities, estimated prices may be generated by a matrix system taking various factors into consideration. The pricing of listed options takes into account the last closing price, as well as the current bid and offer prices. Where securities have not been priced, such securities have not been included in the Asset Allocation information at the beginning of this statement.

Reinvestment - The dollar amount of Mutual Fund distributions, Money Market Fund income, or dividends or other securities shown on your statement may have been reinvested into additional shares. You will not receive confirmation of these reinvestment transactions. However, information pertaining to these transactions which would otherwise appear on confirmations, including the time of

execution and the name of the person from whom your security was purchased, will be furnished to you upon written request to your introducing firm. In dividend reinvestment transactions, Pershing acts as your agent and receives payment for order flow, the source and nature of which payment will be furnished to you upon written request to your introducing firm.

Option Disclosure - Information with respect to commissions and other charges incurred in connection with the execution of option transactions has been included in confirmations previously furnished to you. A summary of this information is available to you promptly upon your written request directed to your introducing firm. In order to assist your introducing firm in maintaining current background and financial information concerning your option accounts, please promptly advise them in writing of any material change in your investment objectives or financial situation. Expiring options which are valuable are exercised automatically pursuant to the exercise by exception procedure of the Options Clearing Corporation. Additional information regarding this procedure is available upon written request to your introducing firm.

PALMER RATED
FOR COMMUNICATION

**Account Number: 0C2-300048**
GUSTAVO HERNANDEZ

A0000000043712CSF30001

Page 3 of 3

Clearing Through **Pershing** · A BNY Securities Group Co.     One Pershing Plaza, Jersey City, New Jersey 07399
PAR-02-CUTSHEET                Subsidiary from The Bank of New York     Pershing LLC, member NASD, NYSE, SIPC. Trademark(s) of Pershing Investments LLC.

**EXHIBIT C**

# Exhibit III
# Life Insurance Cash Surrender Value
### New England Financial Products
### $7,787

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

DEC. 07. 2004 (TUE) 16:14

New England Financial Products

Page 1 of 2

Client Search > Client List > Product List >

 print

Disclaimers

# Gustavo Hernandez

## Life Insurance

| Policy Number | Policy | | AsOfDate | Benefit |
|---|---|---|---|---|
| ▓▓2541 | Variable Universal Life (variable death benefit) | | 11/27/04 (A) | $1,007,863.74 |
| Owner | Gustavo Hernandez | Basic Death Benefit | | $1,007,864.00 |
| Insured | Gustavo Hernandez | Net Death Benefit (1) (2) | | $1,007,863.74 |
| Premium (9) - Freq | $500.00 - Monthly | | | |
| Next Premium Due | Dec 27, 2004 | Gross Cash Value (15) | | $7,787.83 |
| Date Issued | Dec 27, 2002 | - As of Date | | Dec 6, 2004 |
| Status | Active | Loan (2) | | $0.00 |
| | | Cash Value (4) | | $7,787.83 |

Sub Accounts as of Dec 6, 2004

| Name | Class | Future Allocation | Accum Units | Accum Unit Value | Balance | % of Total |
|---|---|---|---|---|---|---|
| Amer Funds Growth | Growth | 20% | 1.006888631 | $1601.489088 | $1,612.49 | 20.71% |
| Davis Venture Value | Growth | 20% | 4.640170172 | $349.660592 | $1,622.46 | 20.83% |
| SSR Investment | Growth | 20% | 1.851817765 | $876.968410 | $1,600.03 | 20.02% |
| PIMCO Total Return | Income | 20% | 11.572957757 | $127.425494 | $1,474.85 | 18.94% |
| SSR Bond Income | Income | 20% | 2.418796130 | $608.640304 | $1,472.18 | 18.90% |

Riders

| Name | Benefit Amount | | |
|---|---|---|---|
| Waiver of Monthly Deduct | n/a | | |

| Address | 120 NW 25TH ST | Servicing Agent/Agency: | |
|---|---|---|---|
| | STE 202 | | JOSE F VELASCO |
| | MIAMI, FL 33127-4459 | | German Plasencia & Associates |

For a printed version of this account click here then press your browser's "print" button.
This portion of Asset View prepared on Dec 7, 2004.

SURRENDER
VALUE #

## Important Disclaimer Information

(A) **Death benefit and loan values are updated monthly. Sub-account values and gross cash values are updated daily.**
(1) Net Death Benefit includes rider benefits on the primary insured(s) only and is net of Loan amount shown.
(2) Loans are not available on all contracts. If a loan has been taken against a policy, loan shown does not include outstanding loan interest due. Loan values will affect the payout values. For variable products, any loan values will not participate in selected sub-account performances.
(4) Cash Value, though net of loan amount shown, does not take into account any applicable surrender charge and is not the surrender value.
(9) Premium payment amount includes rider charges.
(15) Gross cash value does not consider any loan, applicable surrender charges and is not the surrender value.

Life insurance and annuities issued by New England Life Insurance Company, 501 Boylston Street, Boston, MA 02116. Variable products and other securities offered through New England Securities Corporation, 501 Boylston Street, Boston, MA 02116.

**EXHIBIT C**

DEC. 07. 2004 (TUE) 16:15

### Surrender Quote

**Policy Number:** ███ 2541

**REQ: A097BJO  DATE: 120704  NEL  VUNIV  TNEGA  TNE01**

| | | | |
|---|---|---|---|
| SURRENDER VALUE AS OF: | 120604 | PREMIUMS ASSUMED PAID TO: | 122704 |
| BASIC POLICY VALUE | | PREMIUM REFUND: | |
| GENERAL ACCOUNT: | | DISC PREMIUM REFUND: | |
| SSR Bond Income | 382.37 | LOAN BALANCE: | |
| Davis Venture Value | 421.40 | LOAN INTEREST: | |
| SSR Investment | 417.13 | CLAIM VALUE: | $ 2,022.71 |
| PIMCO Total Return | 383.01 | | SURRENDER |
| Amer Funds Growth | 418.80 | | VALUE. |
| | | SURRENDER CHARGE: | 5,850.00 |

*W-V55 QUOTE EFFECTIVE DATE CHANGED 120604*
*H-G250 TRANSACTION COMPLETE*

pcorwitz

Copyright © 1998, 1999 NELIC, New England Financial All Rights Reserved. Terms and Conditions of Use and Privacy Statement.

FROM NEW ENGLAND FINANCIA        (TUE)12  7 2004 18:19/ST. 18:18/NO. 5011778235 P

**EXHIBIT C**

# Exhibit IV
### Art Collection
### Valued by Art Insure - $614,161

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

# artinsure.com

SURPLUS LINES AGENT'S NAME: ___OSCAR SEIKALY___

SURPLUS LINES AGENT'S ADDRESS: 8181 NW 154TH ST, SUITE 230

MIAMI LAKES, FL. 33016

SURPLUS LINES AGENT'S LICENSE #: A237975

PRODUCING AGENT'S NAME: Oscar Seikaly

PRODUCING AGENT'S ADDRESS: 8181 N W 154 St #230

CERTIFICATE OF INSURANCE
Miami Lakes Fl 33016

No: "THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW. PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER."

**TYPE:** ALL RISKS FINE ART

TOTAL PREMIUM: 1625  TAX: 105.63  SERVICE FEE: 47.88

SURPLUS LINES AGENT'S COUNTERSIGNATURE: _Oscar Seikaly_

**REFERENCE NUMBER:** 1077016608/004

**FORM:** (J) Form plus wording as attached.

**ASSURED:** GUSTAVO HERNANDEZ

**LOCATION:** 120 NW 25 STREET #202, MIAMI, Florida, 33127, US

**PERIOD:** 12 months

From: 22 April 2004 at 12:01 a.m. Local Standard Time.

To: 22 April 2005 at 12:01 a.m. Local Standard Time.

**INTEREST:** Fine Art of every nature and description (and/or interest as described below) as per schedule held in the office of Benfield Limited.

**MAX LIMIT:** USD 614,161

**LIMITS:** USD 614,161 at the Assured's residence as above.

**CONDITIONS:** Lloyd's Privacy Policy Statement (LSW 1135) Premium Payment Clause (LSW 3000) Service of Suit Clause (NY) Several Liability Clause LSW 1001 NMA2920 Terrorism Exclusion CL370 CL380 As standard wording

**PREMIUM & DEDUCTIBLE:**

| Premium (USA) | Deductible (USA) |
|---|---|
| 1,600.00 | 1,000.00 |

**U.S. CLASSIFICATION**
Fidelity & Marine
15476 N.W. 77 Court
Box 248
Miami Lakes
FL 33016, USA

**TAX:** Plus Local Taxes as applicable

**AUTHORISED SIGNATORY:**

For and on behalf of certain Underwriters at Lloyd's

**DATE:** 23 April 2004

**EXHIBIT C**

| ARTIST | TITLE | YEAR | MEDIUM | DIMENSIONS | ACQ DATE | INV # | PRICE |
|---|---|---|---|---|---|---|---|
| von Bonin, Cosima | Internationales Weiberkonterfei | 2003 | Wood, cotton, Joden | 108 1/4 x 113 | 3/14/03 | Inv 03-89 | $ 32,670.00 |
| Klasewetter, Thomas | Untitled | 2000 | Painted metal and wood | 115 x 63 x 53 | 3/14/03 | Inv 3-92 | $ 15,000.00 |
| Peyton, Elizabeth | Rick (one) | 2002 | Monotype on Twinrocker paper | 11 x 8 1/2 | 4/16/03 | Inv 3-138 | $ 5,670.00 |
| Klasewetter, Thomas | Untitled | 1999 | Metal and wood | 26 x 29 1/2 x 19 | 6/30/03 | Inv 3-213 | $ 7,920.00 |
| Jenson, Sergej | Komm wir machen halbe halbe | 2003 | Fabric on linen | 89 3/4 x 54 2/3 | 7/1/03 | Inv 03-220 | $ 7,700.00 |
| Kippenberger, Martin | Lebden Warum, Leben Wozu | 1982 | Oil on canvas | 47 1/4 x 39 1/4 | 7/5/03 | Inv 3-227 | $ 82,500.00 |
| Müller, Stefan | Untitled | 2002 | Acrylic, crayon, felt pen on nettle | 59 x 60 | 7/11/03 | Inv 3-253 | $ 5,221.00 |
| Corpeter, Martin | Communism Time for a Bath (origin | 2003 | Acrylic paint on MDF-box | 78 3/4 x 59 x 11 | 10/30/03 | Inv 03-338 | $ 5,610.00 |
| Wolff, Katharina | Die Befreiung | 2003 | Colored pencil and pencil on paper | 8 x 11 | 11/7/03 | Inv 03-338 | $ 2,293.50 |
| Grotjahn, Mark | Butterfly (black, red, orange) | 2003 | Pastel on paper | 24 x 19 | 11/18/03 | Inv 3-356 | $ 1,980.00 |
| Grienfort, Tue | Untitled | 1983 | Acrylic and lacquer on fabric | Dieyc 36 x 36" o | 11/21/03 | Inv 3-362 | $ 80,290.00 |
| Pöhle, Sigmar | Untitled | 2003 | Mixed media on paper | 18 x 13 1/8 | 1/5/04 | Inv 4-14 | 1,108.80 |
| Bell, Dirk | Untitled | 1993 | Oil on canvas | 6 x 7 3/4 | 1/5/04 | Inv 4-17 | 20,900.00 |
| Alys, Francis | Untitled (man in suit) | 2003 | Mixed media on paper | 8 x 5 1/2 | 1/7/04 | Inv 4-31 | 5,115.00 |
| Ackermann, Franz | Untitled (mental map, wild wild wir | 2002 | Boat lacquer, paper on canvas, | 23.5 x 31.5 x 3.3 | 2/19/03 | Inv 1996 | 24,000.00 |
| Althoff, Kai | Liebe | 2003 | Plastic straws and silicone | 15 x 19 x 19 | 6/27/03 | Inv 2126 | 4,100.00 |
| Abanix, Eduardo | Untitled | 2001 | Oil on canvas | 47.2 x 39.4 | 12/11/02 | Inv 1961 | 9,500.00 |
| Krebber, Michael | Untitled | 2002 | Acrylic on canvas | 82.7 x 59 | 12/11/02 | Inv 1961 | 5,610.00 |
| Selg, Marcus | Mein Weg is dein Weg | 2002 | Red Silicone Rubber | 22 x 18 1/8 x 15 | 1/13/04 | Apr-37 | 66,000.00 |
| McCarthy, Paul | Dick Eve | | | | | | |
| Olowska, Paulina | Cry lubisc malaritivo abstakcyjne | 2000 | Oil on canvas | 27 x 22 cm | 10/29/03 | Inv 3-362 | $ 2,106 |
| Dotson, Paulina | Untitled | 2002 | Gouache on paper | 26×21 cm | 10/29/03 | Inv 4-14 | 1,170 |
| Tokarski, Wawrzyniec | Preview nvIII | 2001 | Aquarell auf Papier | 82 x 125 cm | 6/28/03 | Inv 4-31 | 2,441 |
| Tokarski, Wawrzyniec | | 2001 | | | 6/28/03 | | 1,920 |
| Heneken, Uwe | Summer comes sq ien | 2003 | Oil on canvas | 88 x 67 cm | 11/5/03 | | 3,192 |
| Meise, Michael | Bas Jan Ader Box | 2003 | Cardboard, colour copy, oil, editing | 36.5×29.5 cm | 11/3/03 | | 944 |
| Cardoso, María Fernanda | Dibuix de Mariosa | 2003 | Acrylic, Archival Butterflies, metal | 49 x 49.7 cm | 12/22/03 | | 11,200 |
| Matta, Roberto | Untitled | 1957 | Pastel and charcoal on paper | 54 x 68 cm | 4/3/03 | | 75,000 |
| Leon, Wilfredo | Untitled | | | | 2/15/03 | | 25,000 |
| Quintana, Carlos | | | | | | | 7,000 |
| Leiva, Nicolás | | | | | | | 5,000 |
| Grau, Enrique | | | | | | | 8,000 |
| Salcedo, Bernardo | | | | | | | 5,000 |
| Obregon, Alejandro | | | | | | | 12,000 |
| Obregon, Alejandro | | | | | | | 20,000 |
| Wiedemann, Guillermo | | | | | | | 22,000 |
| Caballero, Luis | | | | | | | 14,000 |
| Jaramillo, Lorenzo | | | | | | | 2,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Fuenmayor, Gonzalo | | | | | | | 1,000 |
| Van Der Heide, Sara | Untitled (Sean Pen and Susan Sar | 2002 | Chinese Ink on paper | 11 3/4 x 15 2/3 | 4/1/03 | Inv3-125 | $ 770 |
| | | | | | | | $614,161.30 |

**EXHIBIT C**

Fine Art and Collectibles Insurance     011-44-20-7578-7102.     Page 1 of 4

# Fine Art and Collectibles Insurance

**I.** General Information

**A.** Name:     GUSTAVO HERNANDEZ

    Address:     120 N W 25 STREET #202

    City/Town:     MIAMI

    Country:     United States

    State/County:     Florida

    Zip/Postal Codes:     33127

**B.** Date of Birth:     18   03   1973

**C.** Number of Other locations to be included:     0

    Number/Name/Street     City/Town     State/County     Zip     Country

**D.** Occupation:     FUND MANAGER

**E.** Marital Status:     ◯ Married ◉ Single ◯ Divorced

**F.** Person to Contact (if different from Applicant):     GUSTAVO HERNANDEZ

**II.** Insurance Period

    From which date would you wish Twelve Months Insurance to Attach?     13   02   2004

**III.** Building Construction and Security

**A.** Please state the building type and construction of each location:     Location 1: MASONRY
E.g. House, Apartment, Office etc.
Built of Brick, Wood Frame, Concrete etc.

**B.** Are any of the properties used Professionally or Commercially?     ◯ Yes ◉ No

**C.** Are all locations occupied?     ◉ Yes ◯ No

**D.** What Protective Devices or Systems are in use?     CENTRAL ALARM
E.g. Central Station Alarm, Security Alarm, Fire Alarm, Safe etc.

**E.** Has a Security Survey been carried out on all or any of the locations?     ◉ Yes ◯ No

    Number of documents to be uploaded:     3

    Please upload document(s) here:

**IV.** Coverage

**A.** Coverage Limit Required per Location:     Currency United States Dollars

    Location 1: 120 N W 25 STREET #202

    Total Limit Required:     $614,161.30

**B.** Is any of the Collection to be exhibited?     ◯ Yes ◉ No

**C.** Is any of the Collection to be kept permanently outside?     ◯ Yes ◉ No

    E.g. Statues, Garden Ornaments, Machinery etc.

**V.** Schedule of Property

**A.** Please provide detailed description of each item that you wish to insure on an agreed value basis. Values should be supported by the attachment of copies of all available Appraisals, Bills of Sale or other evidence of true value.

    Number of items to be included:     44

**EXHIBIT C**

Fine Art and Collectibles Insurance                                                                 Page 2 of 4

| | Description | Purchase/Appraisal Date | | | Amount of Insurance |
|---|---|---|---|---|---|
| 1. | VON BONIN, COSINA | 01 | 01 | 2003 | 32,670.00 |
| 2. | KIESEWETTER, THOMAS | 01 | 01 | 2000 | 15,000 |
| 3. | PEYTON, ELIZABETH | 01 | 01 | 2002 | 5,670.00 |
| 4. | KIESEWETTER, THOMAS | 01 | 01 | 1999 | 7,920.00 |
| 5. | JENSON, SERGEI | 01 | 01 | 2003 | 7,700.00 |
| 6. | KIPPEBERGER, MARTIN | 01 | 01 | 1982 | 82,500.00 |
| 7. | MULLER, STEFAN | 01 | 01 | 2002 | 5,221.00 |
| 8. | CARPENTER, MERLIN | 01 | 01 | 2003 | 11,440.00 |
| 9. | WULFF, KATHARINA | 01 | 01 | 2003 | 2,293.50 |
| 10. | GROTJAHN, MARK | 01 | 01 | 2003 | 1,980.00 |
| 11. | POLKE, SIGMAR | 01 | 01 | 1983 | 80,290.00 |
| 12. | BELL, DIRK | 01 | 01 | 2003 | 1,108.00 |
| 13. | ALYS, FRANCIS | 01 | 01 | 1993 | 20,900.00 |
| 14. | ACKERMAN, FRANZ | 01 | 01 | 2003 | 5,115.00 |
| 15. | ALTHOFF, KAI | 01 | 01 | 2002 | 24,000.00 |
| 16. | ABAROA, EDUARDO | 01 | 01 | 2003 | 4,100.00 |
| 17. | KREBBER, MICHAEL | 01 | 01 | 2001 | 9,900.00 |
| 18. | SELO, MARCUS | 01 | 01 | 2002 | 5,610.00 |
| 19. | McCARTHY, PAUL | 01 | 01 | 2002 | 66,000.00 |
| 20. | OLOWSKA, PAULINA | 01 | 01 | 2000 | 2,106.00 |
| 21. | OSKOWA, PAULINA | 01 | 01 | 2002 | 1,170.00 |
| 22. | TOKARSKI, WAWRZYNIEC | 01 | 01 | 2001 | 2,441.00 |
| 23. | TOKARSKI, WAWRZYNIEC | 01 | 01 | 2001 | 1,920.00 |
| 24. | HENEKKEN, UWE | 01 | 01 | 2003 | 3,192.00 |
| 25. | MEISE, MICHAEL | 01 | 01 | 2003 | 944.00 |
| 26. | CARDOSO, MARIA FERNANDA | 01 | 01 | 2003 | 11,200.00 |
| 27. | MATTA, ROBERTO | 01 | 01 | 1957 | 75,000.00 |
| 28. | LAM, WILFREDO | DD | MM | YYYY | 25,000.00 |
| 29. | QUINTANA, CARLOS | DD | MM | YYYY | 7,000.00 |
| 30. | LEIVA, NICOLAS | DD | MM | YYYY | 5,000.00 |
| 31. | GRAU, ENRIQUE | DD | MM | YYYY | 8,000.00 |
| 32. | SALCEDO, BERNARDO | DD | MM | YYYY | 5,000.00 |
| 33. | OBREGON, ALEJANDRO | DD | MM | YYYY | 12,000.00 |
| 34. | OBREGON, ALEJANDRO | DD | MM | YYYY | 20,000.00 |
| 35. | OBREGON, ALEJANDRO | DD | MM | YYYY | 22,000.00 |
| 36. | WEIDEMMAN, GUILLERMO | DD | MM | YYYY | 14,000.00 |
| 37. | CABALLERO, LUIS | DD | MM | YYYY | 2,000.00 |
| 38. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |
| 39. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |
| 40. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |
| 41. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |
| 42. | FUENMAYOR, GONZALO | DD | MM | YYYY | 1,000.00 |

Fine Art and Collectibles Insurance                              Page 3 of 4

43.  FUENMAYOR, GONZALO          DD   MM   YYYY        1,000.00

44.  VAN DER HELDE SARA          DD   MM   YYYY        770.00

Number of documents to be uploaded:              44

Please upload document(s) here:

000128-03

**EXHIBIT C**

Fine Art and Collectibles Insurance                                      Page 4 of 4

B. What further coverage limits are required for items not schedule above?

1. Fine Arts:              614,161.30
2. Jewellery:
3. Silverware:
4. , Coins:
5. Stamps:
6. Books:
7. Furs:
8. Musical Instruments:
9. Other

VI. History

A. Have any losses been suffered or claims been made during the last three years?   ○ Yes ◉ No

B. Have you ever had previous insurance cancelled by a previous insurer?   ○ Yes ◉ No

C. Applicants Statement:
The Applicant warrants to the best of his or her knowledge and belief that the statements set forth herein are true and include all material information. The Applicant further warrants that if the information supplied on this application changes between the date of this application and the inception date of the policy, the Applicant will immediately notify underwriters of such change. Signing this application does not bind the Underwriters to offer nor the Applicant to accept insurance, but it is agreed that this application shall be the basis of the insurance and will be attached and made part of the policy should the policy be issued.   ☑ I agree

Please supply any additional information to support this application:

Additionally, please attach any supporting documentation.
Number of documents to be uploaded:

Please upload document(s) here:

Submit

**EXHIBIT C**

# Exhibit V
## Hernandez Frieri Family Trust

| | | |
|---|---|---|
| (i) | Audited Report of Global Finance Management Corporation | $24,649,602 |
| (ii) | Investment in The Global Securities Market Neutral Fund c/o Dundee Lee Management Services (Cayman) Ltd. | $23,286,359 |

Parlor Floor
3 Gramercy Park West

***REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS***

To the Partners of
HH Securities Ltd.

We have audited the accompanying consolidated statement of financial condition of Global Finance Management Corporation and Subsidiaries (A Wholly-Owned Subsidiary of HH Securities Ltd.) as of June 30, 2004. This consolidated financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this consolidated financial statement based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statement is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statement referred to above presents fairly, in all material respects, the consolidated financial position of Global Finance Management Corporation as of June 30, 2004 in conformity with accounting principles generally accepted in the United States of America.

Morrison, Brown, Argiz & Farra, LLP

Miami, Florida
October 19, 2004

**EXHIBIT C**

# GLOBAL FINANCE MANAGEMENT
# CORPORATION AND SUBSIDIARIES
### (A Wholly-Owned Subsidiary of HH Securities Ltd.)

CONSOLIDATED FINANCIAL STATEMENT

JUNE 30, 2004

000132-03

**EXHIBIT C**

### GLOBAL FINANCE MANAGEMENT
### CORPORATION AND SUBSIDIARES
### (A Wholly-Owned Subsidiary of HH Securities Ltd.)

CONSOLIDATED STATEMENT OF FINANCIAL CONDITION
JUNE 30, 2004

*ASSETS*

| | | |
|---|---|---:|
| CASH | $ | 472,459 |
| RECEIVABLES FROM BROKER-DEALERS AND CLEARING ORGANIZATIONS | | 1,167,872 |
| ACCOUNTS RECEIVABLE | | 1,082,928 |
| INVESTMENT IN MARKETABLE SECURITIES | | 18,236,152 |
| REPURCHASE AGREEMENT | | 2,080,000 |
| PROPERTY AND EQUIPMENT, NET | | 232,764 |
| INVESTMENTS CARRIED ON THE EQUITY METHOD | | 1,095,644 |
| OTHER ASSETS | | |
| Customer list | | 2,274,014 |
| Due from related party | | 810,615 |
| Due from shareholders | | 390,004 |
| Prepaid | | 236,142 |
| Other assets | | 8,990 |
| | | $ 28,087,584 |

*LIABILITIES AND STOCKHOLDER'S EQUITY*

| | | |
|---|---|---:|
| LIABILITIES | | |
| Accounts payable and accrued expenses | $ | 756,673 |
| Note payable due to acquisition (note 2) | | 1,180,000 |
| Note payable capital calls (note 4) | | 383,400 |
| Payable to broker-dealers and clearing organizations | | 149,453 |
| Due to related parties | | 757,372 |
| TOTAL LIABILITIES | | 3,226,898 |
| MINORITY INTEREST | | 211,084 |
| COMMITMENTS AND CONTINGENCIES | | |
| STOCKHOLDER'S EQUITY | | |
| Common stock, par value $1, authorized, issued and outstanding 50,000 shares | | 50,000 |
| Paid-in-capital | | 20,846,000 |
| Retained earnings | | 834,556 |
| Accumulated other comprehensive income | | 2,919,046 |
| TOTAL STOCKHOLDER'S EQUITY | | 24,649,602 |
| | | $ 28,087,584 |

The accompanying notes are an integral part of this consolidated financial statement.

-2-

000133-03

**EXHIBIT C**

GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 1.   *SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES*

### *Description of Business and Organization*

Global Finance Management Corporation and subsidiaries (the "Company"), a wholly-owned subsidiary of HH Securities Ltd., is a registered corporation in the British Virgin Islands. The Company has 100% ownership interest in Strategic Asset Management ("SAM"), a registered corporation in the British Virgin Islands and Global Fixed Income Advisors ("GFIA"). The Company also has 90% ownership interest in Global Securities Holdings, LLC ("GSH"). GSH, a Florida limited liability corporation, has three wholly owned subsidiaries, Global Strategic Investments, LLC ("GSI"), a broker dealer registered with the Securities and Exchange Commission (SEC), Global Securities Management, LLC, a Florida limited liability corporation and GSI Consultores Mexico, SA, a company registered in Mexico. In addition, GSH has a 50% ownership interest in Global Securities Advisors, LLC ("GSA"), an investment advisor.

GSI, a Florida limited liability corporation, membership in the National Association of Securities Dealers, Inc. (NASD) became effective June 6, 2002. It acts in an agency capacity, buying and selling securities for its customers, primarily within Latin America, and charging a commission.

GFIA, a corporation registered in the British Virgin Islands and the investment advisor of a fixed income offshore fund, Global Securities Fixed Income Fund ("Fund II"), that is related by common ownership. GFIA is responsible for monitoring the funds, investments, and it has full discretion to decide the investment securities to be purchased and sold by the fund consistent with the fund's investment objectives.

GSA is a Florida limited liability corporation formed on October 25, 2002. GSA is the investment advisor and general partner of The Global Securities Market Neutral Fund Segregated Portfolio, an offshore fund, ("Fund") which is related by common ownership. GSA is responsible for monitoring the Fund's investments and it has full discretion to decide the investment securities to be purchased and sold by the Fund consistent with the Fund's investment objectives. As of June 30, 2004, the assets under management of the Fund were approximately $50 million.

**EXHIBIT C**

GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 1.   *SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)*

### Basis of Financial Reporting

The accompanying consolidated financial statement has been prepared in conformity with accounting principles generally accepted in the United States of America. The following is a summary of the significant accounting principles followed by the Company.

### Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its subsidiaries. Intercompany transactions and balances have been eliminated in consolidation.

### Government and Other Regulation

GSI's business is subject to significant regulation by various governmental agencies and self-regulatory organizations, including the SEC and the NASD. Such regulation includes, among other things, periodic examinations by these regulatory bodies to determine whether the Company is conducting and reporting its operations in accordance with the applicable requirements of these organizations.

### Cash and Cash Equivalents

The Company considers all highly liquid debt instruments having maturities of three months or less at the date of acquisition to be cash equivalents. The Company may, during the ordinary course of business, maintain account balances with banks in excess of federally insured limits.

### Concentration of Credit Risk

Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of cash deposits which at times are in excess of FDIC-insured limit, accounts receivable and investments. The Company generally limits its exposure regarding cash deposits by placing its deposits with quality financial institutions. The Company has approximately $20 million invested in the Fund. A decline in the market value of this investment could have a material effect in the Company's financial position.

**EXHIBIT C**

**GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)**

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 1.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Securities Transactions

Securities transactions, along with related commission income, clearing costs and commission expenses, are reported by GSI on a trade date basis.

### Investment Securities

Investment in marketable securities consist of shares of the Fund. The Company classifies its investment in marketable securities as available for sale.

Available-for-sale securities are recorded at fair value. Unrealized holdings gains or losses, net of the related tax effect, on available-for-sale securities are excluded from earnings and are reported as a separate component of other comprehensive income until realized. Realized gains and losses from the sale of securities are determined on a specific-identification basis.

A decline in the fair value of any available-for-sale securities below cost that is deemed other than temporary results in a reduction in carrying amount to fair value. The impairment is charged to earnings and a new cost basis for the security is established. Dividend and interest income are recognized when earned.

### Property and Equipment, Net

Property and equipment is recorded at cost. Expenditures for major betterments and additions are charged to the asset accounts while replacements, maintenance and repairs which do not improve or extend the lives of the respective assets are charged to expense currently.

Depreciation and amortization are computed using the straight-line method based upon estimated useful lives of five to seven years.

### Use of Estimates in the Preparation of Financial Statements

The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

000136-03                                    -5-

**EXHIBIT C**

GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 1.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

### Impairment of Long-Lived Assets

The Company adopted Statement of Financial Accounting Standard ("SFAS") No. 144, Accounting for the Impairment or Disposal of Long-Term Assets. SFAS No. 144 provides a single accounting model for long-lived assets to be disposed of. SFAS No. 144 also changes the criteria for classifying an asset as held for sale; and broadens the scope of businesses to be disposed of that qualify for reporting as discontinued operations and changes the timing of recognizing losses on such operations.

### Revenue Recognition of Fees

Management and incentive fees are recorded as revenues when earned.  Management fees are billed monthly, in arrears, based on 1.5% of the Fund's net asset value.  Incentive fees are recognized, quarterly, at a rate of 20% of the Fund's new high net profits per share per series of shares for the then past quarter multiplied by the number of outstanding shares per series when performance has been completed and the fees have been earned.

### Income Taxes

The Company accounts for income taxes under the liability method, which provides that deferred tax assets and liabilities are recorded based on the difference between the tax bases of assets and liabilities and their carrying amounts for financial reporting purposes, referred to as "temporary differences."

Under this method, deferred taxes are adjusted for tax rate changes as they occur. Deferred income taxes arise from differences between the treatment for income tax purposes and for financial reporting purposes.

### Other Assets

The Company adopted the provision of Statement of Financial Accounting Standard No. 142, "Goodwill and Other Intangible Assets" ("SFAS No. 142"). SFAS No. 142 requires that goodwill and intangible assets not subject to amortization are tested annually for impairment, and are tested for impairment more frequently if events and circumstances indicate that the assets might be impaired.  An impairment loss is recognized to the extent that the carrying amount exceeds the asset's fair value.  Based on its most recent analysis, the Company believes that no impairment of its Customer List intangible asset exist as of June 30, 2004. (See Note 2)

**EXHIBIT C**

GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

### NOTE 2.    ACQUISITIONS

On June 8, 2004, GSI acquired 50%, 49% and 51% of the outstanding common stock of First Capital Securities Corp. ("FCSC"), Capital Asesoria Internacional, S.A. de C.V. ("CAI") and Capital Asesoria Patrimonial, S.A. de C.V. ("CAP"), respectively.  The combined purchase price for the three companies was $2,495,290 including costs of approximately $245,000 directly associated with the acquisition.  The Company financed the acquisitions by paying approximately $70,000 and transferring shares of the Fund valued at approximately $1,000,000. The remaining balance in the amount of $1,180,000 plus accrued interest at prime plus 1% is payable in two installments of $350,000, plus accrued interest, on December 5, 2004 and $830,000, plus accrued interest in June, 2005. GSI accounted for the purchase of the three entities in accordance with the purchase method of accounting. The investment in these companies is recorded under the equity method of accounting. The excess of the purchase price over the recorded amount of the net assets purchased and liabilities assumed, was assigned to a customer list intangible asset, which is not subject to amortization. The value assigned to the customer list was approximately $2,274,000.  In accordance with the provisions of SFAS 142, the recorded amount of the customer list will be assessed for impairment on an annual basis.

### NOTE 3.    INVESTMENT SECURITIES AVAILABLE FOR SALE

As of June 30, 2004, the cost of the available for sales securities and the fair value were approximately $15,617,000 and $18,236,000, respectively. The gross unrealized holding gain was approximately $2,619,000 and is included in accumulated other comprehensive income in the consolidated statement of financial condition.

### NOTE 4.    INVESTMENTS

The Company invested $800,000 for a 31% partnership ownership interest in Vail, Colorado property ("Partnership"). The investment is recorded under the equity method. In addition, the Company is responsible for additional capital calls that may be made from time to time. As of June 30, 2004, there were additional capital calls in the amount of $383,400 made. The Company financed these amounts with the Partnership. The amounts due plus interest at 24% were due on September 1, 2004. Of this amount, $180,000 plus the accrued interest was paid on September 9, 2004.

000138-03

**EXHIBIT C**

**GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)**

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 5.    PROPERTY AND EQUIPMENT, NET

Property and equipment consisted of the following at June 30, 2004:

| | | |
|---|---|---:|
| Furniture and fixtures | $ | 61,270 |
| Leasehold improvements | | 67,594 |
| Office equipment | | 145,017 |
| | | 273,881 |
| Less accumulated depreciation and amortization | | (41,117) |
| | $ | 232,764 |

## NOTE 6.    NET CAPITAL REQUIREMENTS

GSI, as a registered broker-dealer, is subject to the Securities and Exchange Commission Uniform Net Capital Rule (Rule 15c3-1), which requires that GSI maintain "Net Capital" equal to the greater of $100,000 or 6 2/3% of "Aggregate Indebtedness", as defined, and requires that the ratio of aggregate indebtedness to net capital shall not exceed 15 to 1. At June 30, 2004, GSI's "Net Capital" was $500,493 and the "Required Net Capital" was $100,000. At June 30, 2004, GSI's ratio of "Aggregate Indebtedness" to "Net Capital" was 1.25 to 1.

## NOTE 7.    RISK CONCENTRATIONS

### Clearing and Depository Concentrations

The clearing and depository operations for GSI securities transactions are provided by Pershing Investments LLC and Bear Stearns Securities Corp. At June 30, 2004, the receivables from brokers included in the accompanying consolidated statement of financial condition are due from these brokers.

## NOTE 8.    INCOME TAXES

The Company and its subsidiaries file all appropriate U.S. state and federal income tax returns.

The Company has approximately $40,000 of Federal net operating loss carryforwards which expire in the year 2024. A valuation allowance was recorded to reduce the deferred tax asset that is expected to more likely than not be realized. This valuation allowance reflects management's assessment, based on available information, that it is more likely than not that the net deferred income tax asset will not be realized. The benefit of these net deferred income tax assets may be recognized when management believes it is more likely than not that the deferred income tax is realizable.

**EXHIBIT C**

### GLOBAL FINANCE MANAGEMENT
### CORPORATION AND SUBSIDIARES
### (A Wholly-Owned Subsidiary of HH Securities Ltd.)

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 9.    COMMITMENTS

### Leases

The Company is obligated under non-cancelable operating leases for office facilities and equipment through the year 2009. The Company has secured the office lease with a stand-by letter of credit for $40,000.

GSA leases its office facilities on a month-to-month basis. The lease calls for monthly rental payments of approximately $2,900.

Approximate future minimum payments under the non-cancelable operating leases and service contracts as of June 30, 2004 are as follows:

| | |
|---|---|
| 2005 | $    156,000 |
| 2006 | 161,000 |
| 2007 | 166,000 |
| 2008 | 171,000 |
| 2009 | 59,000 |
| | $    713,000 |

### Employment Contracts

GSA has employment contracts with two of its members who provide Fund manager services for minimum annual salaries of $240,000 collectively, subject to other incentives based on the Fund's increase in "assets under management".

## NOTE 10.    REPURCHASE AGREEMENT

On May 13, 2004, the Company participated in a repurchase agreement transaction. A transaction whereby the Servicio De Cesantia De La Policia Nacional Del Ecuador (the "Cesantia") lent $800,000 to Global Securities Asset Management Corp. ("GSAM"), a related party, collateralized by 1,780 shares of Global Securities Market Neutral Fund (the "Collateral") owned by the Company. The Cesantia acknowledges that upon the repayment of all principal and interest obligations by GSAM to the Cesantia related to this transaction, the Cesantia will release any claim to the Collateral and return it to the account of the Company. The Cesantia further acknowledges that it has not placed any claims or liens on the Collateral and all interest payments have been received and the transaction is in good standing.

**EXHIBIT C**

**GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)**

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

### NOTE 10. REPURCHASE AGREEMENT (CONTINUED)

As of June 30, 2004, the fair market value of this Collateral was approximately $2,080,000 and the unrealized gain, which is included in accumulated other comprehensive income, was approximately $300,000.

### NOTE 11. RELATED PARTY TRANSACTIONS

GSAM, a British Virgin Islands Corporation, owned by common ownership by the shareholders of the Company, has a due from / due to the Company of $810,615 and $757,372, respectively, as of June 30, 2004. These amounts bear interest at a rate of 5% and are due within one year.

As of June 30, 2004, the total amount due to GSA from the Fund for management and incentive fees amounted to approximately $490,000.

GSA has trailer fee agreements with companies related by common ownership. The trailer fee paid out by GSA from the management fee charged to the Fund ranges from 0.5% to 0.75% and it is based on the current aggregate value of all investments in the Fund made by investors in compliance with the distribution relationship on the valuation date. As of June 30, 2004, the total amount due by GSA for trailer fees amounted to approximately $130,000.

As of June 30, 2004, GFIA has a receivable in the amount of $445,599 from the Fund II.

### NOTE 12. FINANCIAL INSTRUMENTS WITH OFF-BALANCE-SHEET RISK

GSI enters into various transactions involving off-balance sheet financial instruments. These financial instruments include securities purchased and sold on a when-issued basis (when-issued securities). These financial instruments are used to meet the needs of customers and are subject to varying degrees of market and credit risk.

GSI's customer securities activities are provided to a diverse group of institutional, corporate and individual investors. In the normal course of business, the GSI's customer activities involve the execution, settlement, and financing of various customer securities transactions. These activities may expose GSI to off-balance-sheet risk in the event the customer or other broker is unable to fulfill its contracted obligations and GSI has to purchase or sell the financial instrument underlying the contract at a loss.

000141-03

**EXHIBIT C**

GLOBAL FINANCE MANAGEMENT
CORPORATION AND SUBSIDIARES
(A Wholly-Owned Subsidiary of HH Securities Ltd.)

NOTES TO CONSOLIDATED FINANCIAL STATEMENT
JUNE 30, 2004

## NOTE 12. FINANCIAL INSTRUMENTS WITH OFF-BALANCE-SHEET RISK (CONTINUED)

GSI is engaged in various securities, trading and brokerage activities in which GSI counterparties primarily include broker/dealers, banks, other financial institutions and corporations. In the event counterparties do not fulfill their obligations GSI may be exposed to risk. The risk of default depends on the creditworthiness of the counterparty or issuer of the instrument. It is GSI's policy to review, as necessary, the credit standing of each counterparty.

In the normal course of business, GSA and GFIA encounter economic risk, mainly comprised of credit risk and market risk. Credit risk arises from the potential inability of counterparties to perform in accordance with the terms of the contract. GSA and GFIA generate management fees based on a percentage of assets under management and its incentive fees are based on the Funds' investment performance versus various market indicators as dictated by the management agreement. Large fluctuations in market prices of financial instruments could have a material adverse effect on the companies operations.

## NOTE 13. SUBSEQUENT EVENT

On July 28, 2004, GSI exercised an option to purchase an additional 10% of the shares of capital of FCSC and CAP and an additional 11% of CAI for $540,251. In addition, on August 2, 2004, GSI contributed as additional capital, $24,453 and $215,606 to FCSC and to CAI respectively, in response to a capital call.

**EXHIBIT C**

# The Global Securities Market Neutral Fund

c/o Dundee Leeds Management Services (Cayman) Ltd.
2nd Floor, Waterfront Centre, 28 N. Church Street, George Town
GRAND CAYMAN, CAYMAN ISLANDS, B.W.I.
Tel: 345-945-1510,  Fax: 345-945-4673

December 10, 2004

Citivic Nominees Limited
5 Carmelite Street
London EC4Y 0PA
United Kingdom

| Post-it® Fax Note | 7671 | Date 12/10 | # of pages ► |
|---|---|---|---|
| To Allwyn Jourdan | | From Chantal | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # | |
| Fax # 305-579-2114 | | Fax # | |

Attention:  Citivic Nominees Limited
Facimile #:  011-44 207-508 3871

The following exhibit is an unaudited statement of changes in your shareholder account
for the month ended  October 31, 2004.

If you have questions on this information, please feel free to contact us at shareholderservices@dundeeleeds.bm.

## STATEMENT OF CHANGES IN NET ASSET VALUE & SHARES

### For the Month Ended October 31, 2004

### CITIVIC NOMINEES LIMITED - Class A Series 1

| | Shares | | Dollars | |
|---|---|---|---|---|
| | Month | Year | Month | Year |
| *At beginning of period* | 18,721.0000 | | $ 23,284,543.29 | $ 0.00 |
| *Shareholder's contributions* | | 18,721.0000 | $ 0.00 | $ 18,721,000.00 |
| *Shareholder's transfers* | | | $ 0.00 | $ 0.00 |
| *Shareholder's withdrawals* | | | $ 0.00 | $ 0.00 |
| *Net income* | | | $ 1,815.94 | $ 4,565,359.22 |
| *At October 31, 2004* | 18,721.0000 | 18,721.0000 | $ 23,286,359.22 | $ 23,286,359.22 |
| *Net asset value per share* | | | $ 1,243.8630 | $ 1,243.8630 |
| *% change in net asset value per share* | | | 0.01% | 8.45% |

Prepared by



Dundee Leeds Management Services (Cayman) Ltd.

TOTAL P.01

**EXHIBIT C**

# Exhibit VI
## *Income

## *Note:   we have not included income in
the asset total

Parlor Floor
3 Gramercy Park West

000144-03

**EXHIBIT C**



_Jose I. Padial_, P.A.
Certified Public Accountant & Consultant

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT

Gustavo Hernandez
Miami, Florida

I have compiled the accompanying Summary of Income of Gustavo Hernandez for the years 2002, 2003 and 2004 in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

My compilation is limited to presenting information that is the representation of the individuals whose financial statement is presented. I have not audited or reviewed the accompanying financial statement, and accordingly, do not express an opinion or any other form of assurance on them.

This financial statement is presented in accordance with the requirements of a prescribed form which differs from generally accepted accounting principles. Accordingly, this financial statement is not designed for those who are not informed about such differences.

December 16, 2004

Member of American Institute of Certified Public Accountants • Florida Institute of Certified Public Accountants

Douglas Centre, PH6 • 2600 Douglas Road • Coral Gables, FL 33134 • Tel: 305 443-8010 • Fax: 305 443-4749 • www.jpcpa.com

000145-03

**EXHIBIT C**

Gustavo Hernandez

Summary of Income

For the Years 2002, 2003 and 2004

| | | 2004 | | 2003 | | 2002 |
|---|---|---|---|---|---|---|
| Salary | $ | 168,000 | $ | 150,000 | $ | 145,000 |
| Dividends | | 850,000 | | 790,000 | | 683,000 |
| Interests | | 98,400 | | 91,500 | | 94,700 |
| Total | $ | 1,116,400 | $ | 1,031,500 | $ | 922,700 |

**EXHIBIT C**

# (iii) Tax Returns – Letter from CPA

**EXHIBIT C**

2699 s. bayshore drive
miami, florida 33133

**305** 858 5600
**305** 856 3284 fax

www.kaufmanrossin.com

December 9, 2004

Board of Directors
3 Gramercy Park West
New York, NY 10003

Ref: Purchase of Parlor by Mr. Gustavo Hernandez
Purchaser: 3 Gramercy Park West Property LLC

To Whom It May Concern:

We are the accountants for Mr. Hernandez.    Mr. Hernandez has given us authorization to
correspond with you regarding 2003 tax year.

Please be advised that Form 4868, Application for Automatic Extension of Time To File U.S.
Individual Income Tax Return and Form 2688, Application for Additional Extension of Time
To File U.S. Individual Income Tax Return were filed on behalf of Mr. Hernandez.

The additional extension of time was requested because Mr. Hernandez was expecting additional
tax information.  As soon as the additional information is received, we will be in a position to
accurately complete Mr. Hernandez's Form 1040, U.S. Individual Income Tax Return for 2003.

With respect to Mr. Hernandez's 2002 U.S. Individual Income Tax Return, please note that he
was considered a nonresident alien for purposes of U.S. income taxation.  Since he was not
present in the U.S. for 183 days or more (weighted-average over three years), and did not
possess a Green-Card (permanent lawful status in the U.S.) he is treated as a nonresident alien
for 2002.  Moreover, given that Mr. Hernandez did not earn any U.S. source income nor had a
business in the U.S., he was not required to file a U.S. Nonresident Income Tax Return – Form
1040NR for the year ended December 31, 2002.

Should you have any questions, please contact us.

Very truly yours,

Jorge De Cardenas
Manager
Kaufman, Rossin & Co.

cc:     Gustavo Hernandez
        Leandro Barbuscio

f:\cl\08077000\2003\gco\ltr re 2003 tax return in process.doc

**KAUFMAN
ROSSIN
CO.** PROFESSIONAL
ASSOCIATION
CERTIFIED PUBLIC ACCOUNTANTS

000148-03

M I A M I   ■   F T .   L A U D E R D A L E   ■   B O C A   R A T O N

**EXHIBIT C**

| Form **1040** | U.S. Individual Income Tax Return | **2003** (99) | | IRS Use Only - Do not write or staple in this space. | OMB No. 1545-0074 |
|---|---|---|---|---|---|

For the year Jan. 1-Dec. 31, 2003, or other tax year beginning _____ , 2003, ending _____ , 20 ___

| Label (See instructions on page 19.) Use the IRS label. Otherwise, please print or type. | Your first name and initial **GUSTAVO** | Last name **HERNANDEZ** | | Your social security number ▓▓▓ **1159** |
|---|---|---|---|---|
| | If a joint return, spouse's first name and initial | Last name | | Spouse's social security number |
| | Home address (number and street). If you have a P.O. box, see page 19. **120 NW 25 STREET** | | Apt. no. | ▲ **Important!** ▲ You must enter your SSN(s) above. |
| | City, town or post office, state, and ZIP code. If you have a foreign address, see page 19. **MIAMI , FL 33127** | | | |

**Presidential Election Campaign** (See page 19.) ▶

Note. Checking "Yes" will not change your tax or reduce your refund. Do you, or your spouse if filing a joint return, want $3 to go to this fund?........▶ **You** ☐ Yes ☐ No  **Spouse** ☐ Yes ☐ No

**Filing Status**

Check only one box.

1. [X] Single
2. ☐ Married filing jointly (even if only one had income)
3. ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4. ☐ Head of household (with qualifying person). (See page 20.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5. ☐ Qualifying widow(er) with dependent child. (See page 20.)

**Exemptions**

6a [X] Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, **do not** check box 6a ............

b ☐ Spouse ...........................................................

| c Dependents: | | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see page 21) |
|---|---|---|---|---|
| (1) First name | Last name | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

If more than five dependents, see page 21.

No. of boxes checked on 6a and 6b **1**

No. of children on 6c who:
● lived with you
● did not live with you due to divorce or separation (see page 21)

Dependents on 6c not entered above

Add numbers on lines above ▶ **1**

d Total number of exemptions claimed ...........................................

**Income**

Attach Forms W-2 and W-2G here. Also attach Form(s) 1099-R if tax was withheld.

If you did not get a W-2, see page 22.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 .......................................... | 7 | **131,955.** |
|---|---|---|---|
| 8a | Taxable interest. Attach Schedule B if required .......................................... | 8a | |
| b | Tax-exempt interest. Do not include on line 8a ......... 8b | | | |
| 9a | Ordinary dividends. Attach Schedule B if required .......................................... | 9a | |
| b | Qualified dividends (see page 23) ......... 9b | | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes ..................... | 10 | |
| 11 | Alimony received ....................................................................... | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ ................................... | 12 | |
| 13a | Capital gain or (loss). Attach Schedule D if required. If not required, check here ...... ▶ ☐ | 13a | |
| b | If box on 13a is checked, enter post-May 5 capital gain distributions ...... 13b | | | |
| 14 | Other gains or (losses). Attach Form 4797 ............................................. | 14 | |
| 15a | IRA distributions ............. 15a | b Taxable amount (see page 25) | 15b | |
| 16a | Pensions and annuities ......... 16a | b Taxable amount (see page 25) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E ..... | 17 | **35,000.** |
| 18 | Farm income or (loss). Attach Schedule F ............................................. | 18 | |
| 19 | Unemployment compensation ......................................................... | 19 | |
| 20a | Social security benefits ......... 20a | b Taxable amount (see page 27) | 20b | |
| 21 | Other income. List type and amount (see page 27) _____ | | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ...... ▶ | 22 | **166,955.** |

**Adjusted Gross Income**

| 23 | Educator expenses (see page 29) ......................... 23 | | |
|---|---|---|---|
| 24 | IRA deduction (see page 29) ............................. 24 | | |
| 25 | Student loan interest deduction (see page 31) ............. 25 | | |
| 26 | Tuition and fees deduction (see page 32) ................. 26 | | |
| 27 | Moving expenses. Attach Form 3903 ..................... 27 | | |
| 28 | One-half of self-employment tax. Attach Schedule SE ..... 28 | | |
| 29 | Self-employed health insurance deduction (see page 33) .... 29 | | |
| 30 | Self-employed SEP, SIMPLE, and qualified plans ......... 30 | | |
| 31 | Penalty on early withdrawal of savings .................. 31 | | |
| 32a | Alimony paid  b Recipient's SSN ▶ _____ 32a | | |
| 33 | Add lines 23 through 32a ............................................................. | 33 | |
| 34 | Subtract line 33 from line 22. This is your **adjusted gross income** ............... ▶ | 34 | **166,955.** |

910001 11-18-03

LHA   **For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 77.**  Form **1040** (2003)

**EXHIBIT C**

| Form 1040 (2003) | GUSTAVO HERNANDEZ | ■■■■ 1159 | | Page 2 |
|---|---|---|---|---|

| Tax and Credits | 35 | Amount from line 34 (adjusted gross income) | | 35 | 166,955. |
|---|---|---|---|---|---|
| Standard Deduction for - | 36a | Check if: ☐ You were born before January 2, 1939, ☐ Blind. ☐ Spouse was born before January 2, 1939, ☐ Blind. Total boxes checked ► 36a | | | |
| ● People who checked any box on line 36a or 36b OR who can be claimed as a dependent. | b | If you are married filing separately and your spouse itemizes deductions, or you were a dual-status alien ... ► 36b ☐ | | | |
| | 37 | Itemized deductions (from Schedule A) or your standard deduction (see left margin) | | 37 | 4,750. |
| | 38 | Subtract line 37 from line 35 | | 38 | 162,205. |
| ● All others: | 39 | If line 35 is $104,625 or less, multiply $3,050 by the total number of exemptions claimed on line 6d. If line 35 is over $104,625, see the worksheet on page 35 | | 39 | 2,379. |
| Single, or Married filing separately, $4,750 | 40 | Taxable income. Subtract line 39 from line 38. If line 39 is more than line 38, enter -0- | | 40 | 159,826. |
| | 41 | Tax. Check if any tax is from: a ☐ Form(s) 8814 b ☐ Form 4972 | | 41 | 40,314. |
| Married filing jointly or Qualifying widow(er), $9,500 | 42 | Alternative minimum tax. Attach Form 6251 | | 42 | |
| | 43 | Add lines 41 and 42 ► | | 43 | 40,314. |
| | 44 | Foreign tax credit. Attach Form 1116 if required | 44 | | |
| Head of household, $7,000 | 45 | Credit for child and dependent care expenses. Attach Form 2441 | 45 | | |
| | 46 | Credit for the elderly or the disabled. Attach Schedule R | 46 | | |
| | 47 | Education credits. Attach Form 8863 | 47 | | |
| | 48 | Retirement savings contributions credit. Attach Form 8880 | 48 | | |
| | 49 | Child tax credit (see page 40) | 49 | | |
| | 50 | Adoption credit. Attach Form 8839 | 50 | | |
| | 51 | Credits from: a ☐ Form 8396 b ☐ Form 8859 | 51 | | |
| | 52 | Other credits. Check applicable box(es): a ☐ Form 3800 b ☐ Form 8801 c ☐ Specify | 52 | | |
| | 53 | Add lines 44 through 52. These are your total credits | | 53 | |
| | 54 | Subtract line 53 from line 43. If line 53 is more than line 43, enter -0- ► | | 54 | 40,314. |
| Other Taxes | 55 | Self-employment tax. Attach Schedule SE | | 55 | |
| | 56 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137 | | 56 | |
| | 57 | Tax on qualified plans, including IRAs, and other tax-favored accounts. Attach Form 5329 if required | | 57 | |
| | 58 | Advance earned income credit payments from Form(s) W-2 | | 58 | |
| | 59 | Household employment taxes. Attach Schedule H | | 59 | |
| | 60 | Add lines 54 through 59. This is your total tax ► | | 60 | 40,314. |
| Payments | 61 | Federal income tax withheld from Forms W-2 and 1099 | 61 | 28,664. | |
| If you have a qualifying child, attach Schedule EIC. | 62 | 2003 estimated tax payments and amount applied from 2002 return | 62 | | |
| | 63 | Earned income credit (EIC) | 63 | | |
| | 64 | Excess social security and tier 1 RRTA tax withheld (see page 56) STMT 3 | 64 | 3,449. | |
| | 65 | Additional child tax credit. Attach Form 8812 | 65 | | |
| | 66 | Amount paid with request for extension to file (see page 56) | 66 | 5,000. | |
| | 67 | Other payments from: a ☐ Form 2439 b ☐ Form 4136 c ☐ Form 8885 | 67 | | |
| | 68 | Add lines 61 through 67. These are your total payments ► | | 68 | 37,113. |
| Refund | 69 | If line 68 is more than line 60, subtract line 60 from line 68. This is the amount you overpaid | | 69 | |
| Direct deposit? See page 56 and fill in 70b, 70c, and 70d. | 70a | Amount of line 69 you want refunded to you ► | | 70a | |
| | b | Routing number ► c Type ☐ Checking ☐ Savings ► d Account number ► | | | |
| | 71 | Amount of line 69 you want applied to your 2004 estimated tax ► | 71 | | |
| Amount You Owe | 72 | Amount you owe. Subtract line 68 from line 60. For details on how to pay, see page 57 ► | | 72 | 3,321. |
| | 73 | Estimated tax penalty (see page 58) | 73 | 120. | |

| Third Party Designee | Do you want to allow another person to discuss this return with the IRS (see page 58)? ☒ Yes. Complete the following. ☐ No |
|---|---|
| | Designee's name ► PREPARER    Phone no. ►    Personal identification number (PIN) ► |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Joint return? See page 20. Keep a copy for your records.

| Your signature | Date | Your occupation | Daytime phone number |
|---|---|---|---|
| *DRAFT* | | BROKER DEALER | |
| Spouse's signature. If a joint return, both must sign. | Date | Spouse's occupation | |

**Paid Preparer's Use Only**

| Preparer's signature | | Date | Check if self-employed ☐ | Preparer's SSN or PTIN |
|---|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code | KAUFMAN, ROSSIN & CO., P.A. 2699 S. BAYSHORE DRIVE MIAMI, FLORIDA 33133 | | EIN ■■■■3353 | Phone no. (305) 858-5600 |

310002 12-12-03

000150-03

**EXHIBIT C**

Schedule E (Form 1040) 2009

Name(s) shown on return. Do not enter name and social security number if shown on page 1.

Attachment Sequence No. **13**  Page **2**

Your social security number

**GUSTAVO HERNANDEZ** ▮▮▮▮▮1159

**Part II** Income or Loss From Partnerships and S Corporations  Note. If you report a loss from an at-risk activity for which any amount is not at risk, you must check column (e) on line 28 and attach Form 6198. See page E-1.

| 27 | Are you reporting losses not allowed in prior years due to the at-risk or basis limitations, passive losses not reported on Form 8582, or unreimbursed partnership expenses? | ☐ Yes | ☒ No |
|---|---|---|---|

If you answered "Yes," see page E-5 before completing this section.

Caution: The IRS compares amounts reported on your tax return with amounts shown on Schedule(s) K-1.

| 28 | (a) Name | (b) Enter P for partnership; S for S corporation | (c) Check if foreign partnership | (d) Employer identification number | (e) Check if any amount is not at risk |
|---|---|---|---|---|---|
| A | GLOBAL SECURITY HOLDINGS, LLC | P | | ▮▮6483 | |
| B | | | | | |
| C | | | | | |
| D | | | | | |

| | **Passive Income and Loss** | | | **Nonpassive Income and Loss** | |
|---|---|---|---|---|---|
| | (f) Passive loss allowed (attach Form 8582 if required) | (g) Passive income from Schedule K-1 | (h) Nonpassive loss from Schedule K-1 | (i) Section 179 expense deduction from Form 4562 | (j) Nonpassive income from Schedule K-1 |
| A | | 35,000. | | | |
| B | | | | | |
| C | | | | | |
| D | | | | | |
| 29a | Totals | 35,000. | | | |
| b | Totals | | | | |

| 30 | Add columns (g) and (j) of line 29a | | 30 | 35,000. |
|---|---|---|---|---|
| 31 | Add columns (f), (h), and (i) of line 29b | | 31 | ( ) |
| 32 | Total partnership and S corporation income or (loss). Combine lines 30 and 31. Enter the result here and include in the total on line 41 below | | 32 | 35,000. |

**Part III** Income or Loss From Estates and Trusts

| 33 | (a) Name | (b) Employer identification number |
|---|---|---|
| A | | |
| B | | |

| | **Passive Income and Loss** | | **Nonpassive Income and Loss** | |
|---|---|---|---|---|
| | (c) Passive deduction or loss allowed (attach Form 8582 if required) | (d) Passive income from Schedule K-1 | (e) Deduction or loss from Schedule K-1 | (f) Other income from Schedule K-1 |
| A | | | | |
| B | | | | |
| 34a | Totals | | | |
| b | Totals | | | |

| 35 | Add columns (d) and (f) of line 34a | | 35 | |
|---|---|---|---|---|
| 36 | Add columns (c) and (e) of line 34b | | 36 | ( ) |
| 37 | Total estate and trust income or (loss). Combine lines 35 and 36. Enter the result here and include in the total on line 41 below | | 37 | |

**Part IV** Income or Loss From Real Estate Mortgage Investment Conduit (REMICs) - Residual Holder

| 38 | (a) Name | (b) Employer identification number | (c) Excess inclusion from Schedules Q, line 2c | (d) Taxable income (net loss) from Schedules Q, line 1b | (e) Income from Schedules Q, line 3b |
|---|---|---|---|---|---|
| | | | | | |

| 39 | Combine columns (d) and (e) only. Enter the result here and include in the total on line 41 below | 39 | |
|---|---|---|---|

**Part V** Summary

| 40 | Net farm rental income or (loss) from Form 4835. Also, complete line 42 below | 40 | |
|---|---|---|---|
| 41 | Total income or (loss). Combine lines 26, 32, 37, 39, and 40. Enter the result here and on Form 1040, line 17 ▶ | 41 | 35,000. |
| 42 | Reconciliation of Farming and Fishing Income. Enter your gross farming and fishing income reported on Form 4835, line 7; Schedule K-1 (Form 1065), line 15b; Schedule K-1 (Form 1120S), line 23; and Schedule K-1 (Form 1041), line 14 (see page E-6) | 42 | |
| 43 | Reconciliation for Real Estate Professionals. If you were a real estate professional, (see page E-1), enter the net income or (loss) you reported anywhere on Form 1040 from all rental real estate activities in which you materially participated under the passive activity loss rules | 43 | |

321501
10-06-03

Schedule E (Form 1040) 2003

16221207  756350 08077000  2003.07000 HERNANDEZ, GUSTAVO  08077001
000151-03

8

**EXHIBIT C**

## 2003 Income from Passthroughs

GLOBAL SECURITY HOLDINGS, LLC
I.D. NUMBER: ████6483
TYPE: PARTNERSHIP

ACTIVITY INFORMATION:

GLOBAL SECURITY HOLDINGS, LLC

OTHER PASSIVE ACTIVITY

ORDINARY INCOME (LOSS)                        35,000

    SCHEDULE E ACTIVITY INCOME (LOSS)      35,000

328021
08-01-03

000152-03

**EXHIBIT C**

GUSTAVO   HERNANDEZ                                                         ██1159

---

| FORM 1040 | PERSONAL EXEMPTION WORKSHEET | STATEMENT | 1 |

1. IS THE AMOUNT ON FORM 1040, LINE 35, MORE THAN THE AMOUNT SHOWN ON LINE 4
   BELOW FOR YOUR FILING STATUS?
   NO.  STOP. MULTIPLY $3,050 BY THE TOTAL NUMBER OF EXEMPTIONS CLAIMED ON
        FORM 1040, LINE 6D, AND ENTER THE RESULT ON LINE 39.
   YES. GO TO LINE 2.
2. MULTIPLY $3,050 BY THE TOTAL NUMBER OF EXEMPTIONS CLAIMED
   ON FORM 1040, LINE 6D . . . . . . . . . . . . . . . . . .        3,050.
3. ENTER THE AMOUNT FROM FORM 1040, LINE 35 . .       166,955.
4. ENTER THE AMOUNT FOR YOUR FILING STATUS  . .       139,500.
      MARRIED FILING SEPARATE          $104,625
      SINGLE                           $139,500
      HEAD OF HOUSEHOLD                $174,400
      MARRIED FILING JOINT OR WIDOW(ER)  $209,250
5. SUBTRACT LINE 4 FROM LINE 3 . . . . . . . . .        27,455.
   IF LINE 5 IS MORE THAN $122,500 ($61,250 IF
   MARRIED FILING SEPARATE) ENTER ZERO
   ON FORM 1040, LINE 39.
6. DIVIDE LINE 5 BY $2,500 ($1,250 IF MFS)  . .            11.
7. MULTIPLY LINE 6 BY 2% (.02) AND ENTER THE RESULT
   AS A DECIMAL . . . . . . . . . . . . . . . . .          0.22
8. MULTIPLY LINE 2 BY LINE 7  . . . . . . . . . . . . . . . . .       671.

9. SUBTRACT LINE 8 FROM LINE 2. TOTAL TO FORM 1040, LINE 39.          2,379.

---

| FORM 1040 | WAGES RECEIVED AND TAXES WITHHELD | STATEMENT | 2 |

| T S EMPLOYER'S NAME | AMOUNT PAID | FEDERAL TAX WITHHELD | STATE TAX WITHHELD | CITY SDI TAX W/H | FICA TAX | MEDICARE TAX |
|---|---|---|---|---|---|---|
| GLOBAL SECURITIES ADVISORS LLC | 76,319. | 14,772. | | | 5,394. | 1,281. |
| GLOBAL SECURITIES ADVISORY CORP | 11,636. | 1,921. | | | 721. | 169. |
| GLOBAL SECURITY HOLDINGS LLC | 44,000. | 11,971. | | | 2,728. | 638. |
| TOTALS | 131,955. | 28,664. | | | 8,843. | 2,088. |

**EXHIBIT C**

GUSTAVO   HERNANDEZ

███████ .159

FORM 1040          EXCESS SOCIAL SECURITY TAX WORKSHEET          STATEMENT   3

|  | TAXPAYER | SPOUSE |
|---|---|---|
| 1. ADD ALL SOCIAL SECURITY TAX WITHHELD BUT NOT MORE THAN $5,394.00 FOR EACH EMPLOYER (THIS TAX SHOULD BE SHOWN IN BOX 4 OF YOUR W-2 FORMS). ENTER THE TOTAL HERE . . . . . . . . . . . . . . . . . . . . . | 8,843. | |
| 2. ENTER ANY UNCOLLECTED SOCIAL SECURITY TAX ON TIPS OR GROUP-TERM LIFE INSURANCE INCLUDED IN THE TOTAL ON FORM 1040, LINE 60 . . . . . . . . . . . . . . . . . . | | |
| 3. ADD LINES 1 AND 2 . . . . . . . . . . . . . . . . . | 8,843. | |
| 4. SOCIAL SECURITY TAX LIMIT . . . . . . . . . . . . . | 5,394. | |
| 5. SUBTRACT LINE 4 FROM LINE 3. EXCESS SOCIAL SECURITY TAX INCLUDED IN FORM 1040, LINE 64. . . . . . . . . | 3,449. | |

EXHIBIT C

# Exhibit VII
## Liabilities, Car

**EXHIBIT C**

DEC 16. 2004 (THU)  16:00

PAGE. 2/2

## Champion MOTORS

Porsche · Audi

**VEHICLE PURCHASE CONTRACT**

500 West Copans Road
POMPANO BEACH, FLORIDA 33064
(954) 946-4020 · (800) 940-4020
Fax (954) 942-8871
www.champion-motors.com

**BUYER**
GUSTAVO HERNANDEZ
**ADDRESS**
120 NW 25TH ST #202
**CITY** MIAMI  **STATE** FL  **ZIP** 33127
**COUNTY** DADE  **RES. PHONE** (305) 799-6240  **BUS. PHONE** (305) 357-5561
**S** ____1159  **D.O.B.** 03/08/1973  **STATE**
**DRIVER'S LICENSE #** H655280730880

**CO-BUYER**
**ADDRESS**
**CITY**  **STATE**  **ZIP**
**COUNTY**  **RES. PHONE**  **BUS. PHONE**
**SOC. SEC. #**  **D.O.B.**
**DRIVER'S LICENSE #**  **STATE**

**STOCK #:** 031217  **MILEAGE:** 30
☒ NEW  ☐ USED  ☐ DEMO

| YEAR | MAKE | MODEL | COLOR |
|------|------|-------|-------|
| 2003 | PORSCHE | TURBO COU | SILVER |

**MODEL #:** TURBO COUPE  **SALESMAN:** PAUL ANTHONY K
**INTERIOR**
**VEHICLE IDENTIFICATION NUMBER**
W P 0 A B 2 9 9 6 3 S 6 8 6 4 3 6

**INSURANCE CO.**
**POLICY NO.**
**AGENT**  **PHONE NO.**

### TRADE-IN INFORMATION

| YEAR | MAKE | MODEL | COLOR |
|------|------|-------|-------|
| 2001 | PORSCHE | CPE | BLUE |

**VEHICLE IDENTIFICATION NUMBER** WP0AA29911S620487
**TAG. NO.**  **MILEAGE**

**TRADE ALLOW.** ✳ 55000.00  **TOTAL PRICE**
**LESS PAYOFF** (21134.45)  **TRADE ALLOW.** 55000.00
**NET EQUITY** (33865.55)  **TRADE DIFFERENCE**

### PAYOFF INFORMATION

**LIEN HOLDER**
**ADDRESS**
**CITY**  **STATE**  **ZIP**
**PHONE NO.**  **ACCOUNT NO.**
**CONFIRMED AMOUNT $** 21134.45  **GOOD TIL**
**VERIFIED TITLE**
CONFORMING ☐  NON-CONFORMING ☐
**QUOTED BY**  **CONFIRMED BY**

| | | |
|---|---|---|
| **LIST PRICE OF VEHICLE** | $ | 115000.00 |
| **FACTORY INSTALLED EQUIPMENT:** | + | |
| | + | |
| | + | |
| | + | |
| | + | |
| | + | |
| | + | |
| | + | |
| **DEALER INSTALLED EQUIPMENT:** | + | |
| | + | |
| | + | |
| | + | |
| | + | |
| **TOTAL PRICE OF VEHICLE WITH OPTIONS** | $ | 115000.00 |
| **EXTENDED WARRANTY** YEARS _____ MILES _____ | + | N/A |
| FL. LAW-WASTE TIRE FEE | + | 5.00 |
| FL. LAW-ACID BATTERY FEE | + | 1.50 |
| **TOTAL TAXABLE PRICE** | $ | 115006.50 |
| SALES TAX | + | 3627.39 |
| TAG AND TITLE FEES | + | 103.10 |
| LUXURY EXCISE TAX | + | N/A |
| IMPACT FEE | + | |

Owing $44,121

000156-03

**EXHIBIT C**

3

000157-03

**EXHIBIT C**

# -3-
# Reference Letters

## (i)    3 Personal Letters

### Dr. Costas Hamakiotes

### Mr. Henry E. Harper-McCausland

### Mr. Jack Tilton

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

Costas C. Hamakiotes

New York, NY 10022
Home Tel. No.
Home e-mail:

December 13, 2004

Board of Directors
3 Gramercy Park West
New York City, NY 10003

Dear Members of the Board:

It is with great pleasure that I write this recommendation letter for Gustavo Adolfo
Hernandez. I have known him for four years. What started as a business client
relationship grew to a dear personal friendship and, subsequently, to a new business
partnership that we formed two and a half years ago.

During our two-and-a-half year partnership, our business has grown successfully albeit
not without its share of growing pains. Every step of the way, Gustavo has been a tireless
worker, a steady and relentless leader, a loyal friend, a savvy businessman and a reliable
partner. His word is his bond. On every transaction, that I have been directly or indirectly
involved, Gustavo has always followed through and performed impeccably.

Personally, I have had occasion to get to know Gustavo and his family very well. When
in Cartagena, my family and I always stay with Gustavo in his family home with his
parents, brother and sisters. When in New York City, Gustavo stays with me and my
family. My wife and my three young daughters so enjoy Gustavo. He is the most pleasant
and quiet guest we have ever had. He works almost all the time or reads quietly in his
room. My daughters adore him and love to play with him and read with him. He is
always fun, courteous, polite and patient. I notice that he finds a way to play with them in
a creative and educational way. Gustavo is very generous and thoughtful. He is always
bringing gifts to my wife and children. He is extremely appreciative of our hospitality as
it has allowed him to look carefully for his Manhattan home. He has told us how much he
is looking forward to the possibility of living at #3 Gramercy Park West. Listening to
him, my wife and children became a bit sad and told him how much they will miss his
company and presence in our household. Gustavo is family to us now and vice versa. In
Columbia when we visit with his family we feel very much at home. Gustavo's family is
very sophisticated and cosmopolitan. They have all been highly educated at American,
French and local Universities. They are all very cultured, well read individuals who are
extremely well versed in history and international relations. Gustavo has an impressive
collection of Latin American Contemporary Art as well as books and furniture.

000160-03

**EXHIBIT C**

He is a bon vivant , a wine aficionado and a person who appreciates fine cuisine and sharing it with friends.

It is a pleasure for me to act as a reference for Gustavo. His character, work ethic, business principles and moral values that I have got to know in him over the years make this a very easy task for me.

For further questions regarding Gustavo I shall be at your disposal any time and unreserved through telephone, (203) 661-0641, or e-mail, chamakiotes@gsadvisors.net

Sincerely,

Costas C. Hamakiotes, Ph.D.

**EXHIBIT C**

Jack Tilton

████████████

New York, NY 10128
December 10, 2004

Board of Directors
3 Gramercy Park West
New York, NY 10003

Ref: Purchase of Parlor Floor by Mr. Gustavo Hernandez, Purchaser; 3 Gramercy Park
West Property LLC

Dear Madame/Sir:

It is with great pleasure that I write this recommendation letter for Gustavo Adolfo
Hernandez. I have known him 3 years.

Gustavo has always displayed a high degree of integrity, responsibility, and ambition. He
is definitely a leader rather than a follower. In addition to his well rounded personality he
has proven his loyalty and friendship throughout the years.

He is also a most dependable friend. His good judgment and outlook on life ensure a
logical and practical approach to his endeavors.

It has been a true blessing having had the opportunity to have Gustavo as a friend, and I
am happy to have been to give this opportunity to express wholehearted to be able to
comment on a friend such as Gustavo.

If you would like additional information about Gustavo please feel free to contact me
directly at ████████████

Sincerely,

Jack Tilton

000162-03

**EXHIBIT C**



THE
**INTREPID**
REAL ESTATE COMPANY
*Private Equity & Development*

Board of Directors
3 Gramercy Park West
New York, NY 10003

Dear Members of the Board:

I, Henry E. Harper-McCausland, have known Mr. Gustavo Hernandez for over 11 years. Moreover, over time I have had the pleasure to meet his parents, brother, sisters, nieces and nephews. During that time both personal and professional time has been spent in the company of Gustavo Hernandez.

Gustavo is the rare combination of a multifaceted academic character with the ambition required for a financial executive. He is reliable, responsible and loyal; always to be counted upon if one is in need.  In today's world of shallow two dimensional individuals; Gustavo is as comfortable speaking about the nuances of Italian Opera or Egon Schiele as he is structuring complex financial derivatives. Gustavo is also a very loyal family man; who travels to spend at least one weekend a month –religiously- with his father no matter what his financial or social commitment might be. Gustavo is a lover or poetry, modern art, philosophy, politics, jogging and the financial markets.

Gustavo's business career is as interesting as his personal elements and as successful as one could wish to be. His company based in Greenwich, CT has excellent managers and many of his clients are people whom I respect and who more importantly continue to enjoy conducting capitalist affairs with his firm.

I would recommend Gustavo Hernandez to your board for approval without question. He is a solid gentleman in every respect.

Yours truly,

Henry E. Harper-McCausland

New York, New York 10024

701 Brickell Ave, S2050, Miami FL 33131 P: 305.357.7653 F: 305.579.9739 | www.intrepidrealestate.com

**EXHIBIT C**

## (ii)   **3 Business Letters**

**Mr. Felipe Coello, Vice President**
**Lehman Brothers Inc.**

**Mr. Jorge DeCardenas, Partner**
**Kaufman, Rossin & Co.**

**Mr. Marco Santamaria**
**Co-Managing Partner**
**Global Securities Advisors, L.L.C.**

**EXHIBIT C**

# LEHMAN BROTHERS

Felipe E. Coello
Vice President

December 1st 2004

Dear Mrs. Barbara Evans-Butler
Stribling and Associates
924  Madison Av
New York, NY.

Re:  Mr. Gustavo Hernandez
      Global Securities Asset Management

This letter serves to confirm that Mr. Hernandez's   Firm, Global Securities
Asset Management,  has been a valued customer and friend of our institution
for the past 5 years.  GSAM  has maintained significant six figure deposits with
Lehman Brothers since inception and has always conducted its financial
affairs in a very satisfactory manner.

Our Firm has always enjoyed an outstanding relationship with Mr. Hernandez
and his Firm and we anticipate this relationship to continue.

Please feel free to contact me at any time to confirm my friendship and the
highest respect towards Mr.Hernandez and his family. My friendship with his
family dates back to 1998.

Best regards,

Felipe E. Coello
Vice President
Lehman Brothers Inc.
1111 Brickell Av suite 1200
Miami, Fl
(305)789-8754

000165-03

**EXHIBIT C**

2699 s. bayshore drive
miami, florida 33133

**305** 858 5600
**305** 856 3284 fax

www.kaufmanrossin.com

December 1, 2004

Board of 3 Gramercy Park West
3 Gramercy Park West
New York, NY 10003

Re: Acquisition of Parlor (Second) Floor

To Whom It May Concern:

I have known Gustavo Adolfo Hernandez-Frieri for over four years, both professionally and personally. My accounting firm has been working with his companies for over four years. His companies have been excellent clients of the firm and we look forward to serving them and their business interests for many years to come.

During the time I have worked with Mr. Hernandez-Frieri, he has shown very high professional standards, extensive knowledge of the matters he get involved with, and has conducted his affairs with the utmost integrity.

If you have any questions, please feel free to contact me.

Very truly yours,

Jorge De Cardenas
Kaufman, Rossin & Co.

**KAUFMAN
ROSSIN**
**CO.** PROFESSIONAL
ASSOCIATION
CERTIFIED PUBLIC ACCOUNTANTS

cc: Ms. Barbara Evans-Butler - Stribling & Associates

s:\08077000,2004,gco,reference ltr board 3 gramercy park.dot

000166-03 M I A M I ■ F T   L A U D E R D A L E ■ B O C A   R A T O N

 **GLOBAL SECURITIES ADVISORS, LLC**

December 10, 2004

Board of Directors
3 Gramercy Park West
New York, NY 10003

Dear Members of the Board:

I am pleased to provide this letter of recommendation for Gustavo Adolfo Hernandez. I have known Gustavo for 6 years on both a personal and a professional level.

Gustavo and I are partners in Global Securities Advisors, an investment management firm that we started two and a half years ago. Our activities are focused on managing our flagship product – a fixed-income arbitrage hedge fund. I have found working with Gustavo a thoroughly satisfying experience; he has sharp business acumen, a resolutely ethical approach to management issues, and a tireless work ethic. Under his stewardship, the investment advisor has grown by leaps and bounds. In just 2 short years, Gustavo has tripled the investment advisor's assets under management, and has worked diligently to ensure that the firm runs on a sound operational platform. He has developed a strong relationship for our firm with leading institutional investors and in the process has ensured that that our client base is both solid and diversified.

On a personal level, Gustavo has many diverse cultural interests, and is one of the most well-rounded individuals I have met. More importantly, Gustavo has consistently displayed loyalty and friendship throughout the years. He is a most dependable friend, and his good judgment and outlook on life ensure a logical and practical approach to his endeavors.

It has been a true blessing to have had the opportunity to have Gustavo as a partner and friend, and I am happy to have been given this opportunity to express unreserved support for him.

Sincerely,

Marco Santamaria
Co-Managing Partner
Global Securities Advisors, LLC

**EXHIBIT C**

### (iii)   Landlord Letter

**Mr. Adam Weinbaum DTM, LLC**

EXHIBIT C

# Lombardi Properties
167 N.W. 25th St. Miami, FL 33127

December 9, 2004

Board of Directors
3 Gramercy Park West
New York, NY 10003

**Re: Purchase of Parlor Floor by Mr. Gustavo Hernandez, Purchaser: 3 Gramercy Park West Property, LLC**

To Whom It May Concern:

I am writing this letter in reference to Mr. Gustavo Hernandez who has been a tenant of mine at 120 N.W. 25th Street in Miami, FL for over 3 years. Mr. Hernandez has been nothing but a pleasure to have, as he takes great care of both his apartment and the building. His rental payment history is immaculate, always on time and in full. I would highly recommend Mr. Hernandez for your building as he has been a wonderful tenant in mine.

In the event of any additional questions please feel free to call me at 305.695.1600.

Sincerely,

Adam Weinbaum
DTM, LLC

000169-03

sales@lombardiproperties.com

Phone: (305) 695-1600

**EXHIBIT C**

4

000170-03

-4-

# Letter from Attorney regarding purchase as 3 Gramercy Park West Property LLC

**EXHIBIT C**

# RICHARDS & POLANSKY

A PROFESSIONAL ASSOCIATION

ATTORNEYS AT LAW

GRAND BAY PLAZA

2665 SOUTH BAYSHORE DRIVE

SUITE 703

MIAMI, FLORIDA 33133

TELEPHONE: 305-858-9900

TELECOPIER: 305-285-0015

E-MAIL: rpa@richards-polansky.com

http://www.richards-polansky.com

**VIA COURIER**

Board of Directors
Gramercy Park West
Gramercy, NY 10003

Re: Purchase of Parlor Floor by Mr. Gustavo A. Hernandez Frieri ("Purchaser")

Dear Members of the Board of Directors:

Please be advised that I represent the Purchaser.  As the Purchaser's legal advisor, I am recommending that he purchase and hold the condominium located at 3 Gramercy Park West (the "Condominium") through a limited liability company, 3 Gramercy Park West Property LLC, for asset protection purposes.  By holding the Condominium through a limited liability company of which the Purchaser is the beneficial owner, the Purchaser may protect his other assets from potential lawsuits filed by any contractors working on his property; any visitors injured on his property or from any other third party lawsuits related to the Condominium.

Should you have any further questions regarding the foregoing matter, please do not hesitate to contact me.

Sincerely,

Andrea Darling de Cortés, Esq.

IAG INTERNATIONAL®

An association of independent professional firms

CARACAS

EXHIBIT C

5

000173-03

## -5-
# Global Securities Documents -
# Annexes Referred to in Personal Letter

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

**(i)     Organization Chart**

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**



000176-03

**EXHIBIT C**

# (ii) NASD Membership Certification

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

# GLOBAL STRATEGIC INVESTMENTS, LLC

MEMBER NASD AND SIPC

---

FULLY DISCLOSED CLEARING AGREEMENT

OF

PERSHING LLC

THIS AGREEMENT is made and entered into this ⁸ᵀᴴ day of JANUARY , 200 4 by and between the Pershing LLC ("Pershing"), a Limited Liability Company, and Global Strategic Investments ("Broker"), a Limited Liability Company Corporation.

### 1.0 APPROVAL

This Agreement shall be subject to approval by the New York Stock Exchange, Inc. ("NYSE") and by any other self-regulatory organization vested with the authority to review or approve it. Pershing shall submit this Agreement to the NYSE and Broker shall submit the Agreement to any other such organization from which Broker is required to obtain approval. In the event of disapproval, the parties shall bargain in good faith to achieve the requisite approval.

### 2.0 AGREEMENT

From the date of this Agreement until the termination of this Agreement as provided in Paragraph 22 hereof, Pershing shall carry the proprietary accounts of Broker and the cash and margin accounts of the customers of Broker introduced by Broker to Pershing, and accepted by Pershing, and shall clear transactions on a fully disclosed basis for such accounts, in the manner and to the extent set forth in this Agreement.

### 3.0 ALLOCATION OF RESPONSIBILITY

#### 3.1 Responsibilities of the Parties.

Pursuant to NYSE Rule 382, responsibility for compliance with applicable laws, rules, and regulations of the Securities and Exchange Commission ("SEC"), the National Association of Securities Dealers, Inc. ("NASD"), the NYSE, and any other regulatory or self-regulatory agency or organization (collectively the "Rules") shall be allocated between Pershing and Broker as set forth in this Agreement. To the extent that a particular function is allocated to one party under this Agreement, the other party shall supply that party with information in its possession pertinent to the performance and supervision of that function.

#### 3.2 Relationship with Customers.

Except as provided in Paragraph 27.11 of this Agreement, all customers receiving services pursuant to this Agreement shall remain customers of Broker. Pershing shall provide services under this Agreement to Broker only to the extent explicitly required by specific provisions contained in this Agreement and shall not be responsible for any duties or obligations not specifically allocated to Pershing pursuant to this Agreement. Broker shall enter into appropriate contractual arrangements with customers on its own behalf, and such agreements shall make Broker, and not Pershing, responsible to customers for the provision of services. Broker shall not be deemed to be an agent of Pershing for any purpose, nor

**EXHIBIT C**

instructs Pershing to provide access to information concerning options contracts, it has obtained a written agreement in which the customer agrees that he or she: (1) shall receive options information solely for such person's own use; (2) shall not retransmit or otherwise furnish options information to any other person; (3) shall acknowledge that options information is and shall remain the property of the respective exchange or other market on which a reported transaction took place or a reported quotation was entered; and (4) shall acknowledge that; (i) neither the Options Price Reporting Authority (OPRA), OPRA's processor, nor any OPRA Participant guarantees the

timeliness, sequence, accuracy, or completeness of any options last sale price, quotation information, or other market information provided by OPRA; (ii) neither OPRA, OPRA's processor nor any OPRA Participant shall be liable in any way to such customer, broker or any other person for any loss, damages, cost, or expense which may arise from any failure of performance by OPRA, OPRA's processor, or any OPRA Participant, or from any delays, inaccuracies, errors in or omissions of, any Options Information, or in the transmission or delivery thereof, whether or not due to any negligent act or omission on the part of OPRA, OPRA's processor or any OPRA Participant; and (iii) in no event shall OPRA, OPRA's processor or any OPRA Participant be liable for any incidental, special, indirect, or consequential damages, including but not limited to, lost profits, trading losses, or damages resulting from inconvenience, or loss of use of the Service. Such written agreement shall state that it is for the express benefit of OPRA, OPRA's processor, and each OPRA Participant. In addition, Broker, on its own behalf, acknowledges its understanding of OPRA's responsibilities under this Paragraph 28.6. In addition, Broker agrees that it shall maintain and preserve for at least three years sufficient records to identify the names and addresses of its customers to whom it is authorized to provide the Service, together with copies of all customer agreements and billing records. At the request of OPRA, Broker agrees to permit representatives of OPRA to have access to such records, and to provide to OPRA any information that OPRA may reasonably request concerning its customers. Broker further acknowledges that its acknowledgments and agreements as stated above should are for the express benefit of OPRA, OPRA's processor, and each OPRA participant.

28.7    Receipt of Information from Third-Parties and Reality Online Inc. In providing the Systems and Software Products, Broker may allow access to information to its customers or itself, which information has been licensed to Pershing by a third-party, including without limitation Reality Online Inc. Broker acknowledges that it has read and executed the agreement attached hereto as Exhibit A – Reuters Services – NetExchange ClientTM Agreement and thereby has the right to distribute the information provided by Reality Online Inc.

IN WITNESS WHEREOF the parties have hereto affixed their hands and seals by their duly authorized officers on the day and date first above written.

This Agreement contains a pre-dispute arbitration clause in Paragraph 26. Broker acknowledges receiving a copy of this Agreement.

BROKER: GLOBAL STRATEGIC INVESTMENTS

By: _____

Title: PRESIDENT

PERSHING LLC

By: _____

Title: MANAGING DIRECTOR

**EXHIBIT C**

# (iii) SEC Registration Certification

Parlor Floor
3 Gramercy Park West

**EXHIBIT C**

# GLOBAL STRATEGIC INVESTMENTS, LLC
MEMBER NASD AND SIPC

Document Title                                                    Page 1 of 1

File for:                                           Data Current as of: 05/18/2004
CRD# 117028
GLOBAL STRATEGIC INVESTMENTS, LLC

## ADDRESS/GENERAL INFORMATION

This section provides the brokerage firm's name, CRD number, SEC number, Applicant Name on Form BD, NASD District where the brokerage firm is located, and the brokerage firm's main and mailing addresses.

| | |
|---|---|
| **NASD Member Firm** | GLOBAL STRATEGIC INVESTMENTS, LLC |
| **CRD Number** | 117028 |
| **SEC Number** | 8-053580 |
| **Applicant Name on Form BD** | GLOBAL STRATEGIC INVESTMENTS, LLC |
| **Business Phone Number** | 305 373-3326 |
| **Main Office** | Located in NASD District: 7-Atlanta |
| **Main Office Address** | 701 BRICKELL AVENUE, SUITE 2030 MIAMI, FL 33131 |
| **Mailing Address** | 701 BRICKELL AVENUE, SUITE 2030 MIAMI, FL 33131 |

**EXHIBIT C**



# GLOBAL STRATEGIC INVESTMENTS, LLC

MEMBER NASD AND SIPC

## Organization Registration Status

| Organization CRD#: 117028 | Organization Name: GLOBAL STRATEGIC INVESTMENTS, LLC |
|---|---|
| Organization SEC#: 8-53580 | Applicant Name: GLOBAL STRATEGIC INVESTMENTS, LLC |
| No IA Record | |

| SEC / SRO / Jurisdiction | Registration Status | Status Effective Date |
|---|---|---|
| SEC | Approved  - | 06/06/2002 |
| NASD | Approved  - | 06/06/2002 |
| FL | Approved  - | 06/11/2002 |
| NY | Approved  - | 09/17/2002 |

**EXHIBIT C**

EXHIBIT D

## GRAMERCY IRREVOCABLE OPERATING TRUST

### DECLARATION OF TRUST

    **THIS DECLARATION OF TRUST ("TRUST")** dated this _1_ day of July 2005, is made by **AMERICAS FIDUCIARY LTD** ("Trustee"), a Nevis corporation. The Trustee declares that it has received the property listed on the attached Annex "A," to hold such property in trust according to the terms of this Trust.

**NOW THIS TRUST WITNESSETH AS FOLLOWS:**

### ARTICLE ONE
### The Trust

1.1.   <u>Name</u>. This Trust shall be known and designated as the GRAMERCY IRREVOCABLE OPERATING TRUST.

1.2.   The Trust:

    1.2.1.   The sum of one hundred Canadian dollars (CDN $100) which has been paid to the Trustee herein together with any other property which may from time to time be held by the Trustee in lieu thereof or in addition thereto to be listed in Annex "A," as amended from time to time (all of which is hereinafter collectively referred to as the ("Trust Estate"), shall be held by the Trustee for the benefit of the beneficiaries herein described (hereinafter referred to as the "Beneficiaries") and in accordance with this Trust as is herein provided. Any additions to the Trust Estate, other than those derived from the administration of the said Estate by the Trustee, shall be subject to the prior approval of the Protector (hereinafter referred to as the "Protector").

    1.2.2.   The Trustee shall stand possessed of and hold the Trust Estate in trust to invest same or such portion thereof as may thereafter be delivered to the Trustee pursuant to the provisions of the present Trust in its absolute discretion, either to retain the same as then invested or to sell or convert the same and to invest the monies realized from such sale or conversion in such investments as the Trustee may deem fit.

1


GOVERNMENT EXHIBIT 7

**EXHIBIT C**

## ARTICLE TWO
### Trust Period

2.1.   The duration of the Trust Period shall run from the date of the execution of these presents and shall expire upon the date:

    2.1.1.   on which shall expire the period of eighty (80) years from the execution of this Trust; or

    2.1.2.   on which shall expire the period of twenty (20) years from the death of the last survivor of all the descendants, male and female, of His late Majesty King George the Fifth living at the date hereof; or

    2.1.3.   one (l) year after the day on which there shall be no Beneficiary in existence, whichever shall first occur; or

    2.1.4.   such earlier date as the Protector, as hereinafter described, shall in its absolute discretion by Deed appoint.

2.2.   The completion of distribution shall be deemed to have taken place when the Trust Estate has been distributed in toto in conformity with the provisions of this Trust.

## ARTICLE THREE
### The Trustee

3.1.   Definition and Number

    3.1.1.   Trustee means one or more Trustees who is or who are for the time being in office whether he, she, they or it be the Trustee originally appointed hereby or subsequently appointed in accordance with this Trust.

    3.1.2.   Those individuals who are Beneficiaries or may become Beneficiaries of this Trust as well as their spouses and relatives to the second degree, including the relatives to the second degree of their spouses, cannot be named Trustee to this Trust.

    3.1.3.   An individual, company, corporation or body politic may be named a Trustee to this Trust.  Any Trustee named herein shall assent to all of the terms of this Trust, including paragraph 4.13. of Article Four.

    3.1.4.   The Trustee herein named is the Trustee for the time being of the Trust, namely:

**AMERICAS FIDUCIARY LTD.,**
a Nevis corporation

2

**EXHIBIT C**

3.2.  Vacancy and Replacement

3.2.1.  An individual shall cease to be a Trustee when he or she dies, resigns or becomes unable or unwilling to act or to continue to act or becomes insolvent or bankrupt. A corporation shall cease to be a Trustee hereunder when the Trustee resigns or becomes insolvent or bankrupt or ceases to exist.

3.2.2.  The power to dismiss, replace, appoint new or additional Trustees shall be vested in the Protector as hereinafter provided.

3.2.3.  The replacing of a Trustee when a vacancy occurs shall be effected by an appointment as Trustee of any individual or corporation with power under law to contract. If more than one (1) Trustee has been appointed, the remaining Trustees shall agree upon and appoint the Trustee or Trustees required to fill such vacancy or vacancies subject to the approval of the Protector. In the event that any remaining Trustees cannot so agree or that there be no remaining Trustees, the Protector shall appoint the Trustee or Trustees required to fill such vacancy or vacancies.

3.2.4.  Resignation by a Trustee shall be effected by the delivery or mailing by registered mail of a written notice of resignation to the other Trustee or Trustees acting hereunder, as the case may be, to the Beneficiaries and to the Protector. However, in the case of impossibility to give notice to all parties, the giving of notice to at least one of the above parties shall constitute good and valid notice hereunder.

3.2.5.  A retiring or replaced Trustee shall execute all transfers and do all acts or things that may be necessary for vesting the Trust Estate in the new, continuing or replacing Trustee or Trustees.

**ARTICLE FOUR**
**Administration of Trust**

4.1.  Wherever discretion is vested in or power is conferred upon more than one (1) Trustee, such discretion or power must be exercised by a majority of the Trustees. If at any time there are fewer than three (3) Trustees, such discretion or power must be exercised by unanimity if there are two (2) Trustees; and if there is only one (1) Trustee, it may validly exercise such discretion or power alone.

4.2.  Subject to the Protector's approval, as described in Section 6.3 of Article Six, the Trustee hereunder has unlimited rights of ownership of the Trust Estate and, as an owner, has absolute discretion to invest, manage, administer and otherwise deal with any part or the whole of the Trust Estate as the Trustee sees fit, the whole in accordance with the provisions of this Trust. Not to in any way limit or restrict the generality of the foregoing, the Trustee may exercise and/or delegate, in its sole and absolute discretion, whenever and as often as the Trustee shall deem it advisable until the duration of the Trust Period has expired, the power and authority:

3

**EXHIBIT C**

4.2.1.    to invest the cash funds from time to time constituting part of the Trust Estate in any investments or securities which the Trustee may consider advisable and the Trustee is not to be limited to those investments authorized by law for trustees;

4.2.2.    from time to time and at any time to sell, transfer, assign, exchange, or otherwise dispose of any of the securities or investments from time to time constituting the Trust Estate, in any manner the Trustee may deem proper, at any price and terms considered desirable by the Trustee, and the Trustee shall not be bound to secure the consent or approval of any person, official, authority, tribunal or Court whomsoever or whatsoever;

4.2.3.    to vote all stocks and shares, to exercise all rights incidental to the ownership of stocks, shares, bonds, other securities and investments and property held as part of the Trust Estate, and to issue proxies to others; to sell or exercise any subscription rights and in connection with the exercise of subscription rights, to use trust monies for that purpose; to consent to and join in any plan, reorganization, readjustment or amalgamation or consolidation with respect to any corporation whose stock, shares, bonds or other securities at any time form part of the Trust Estate, and to authorize the sale of the undertaking or assets or a substantial portion of the assets or undertaking of any corporation and generally to act in respect of the Trust Estate as fully and effectually from time to time as if the same were not trust property but always for the benefit of the Trust Estate;

4.2.4.    to hold any or all securities or other property in bearer form or in the name of the Trustee or in the name of some other person, company or partnership or in the name or names of nominees without disclosing the fiduciary relationship, and to deposit the said securities and any title deeds or documents belonging or relating to the Trust Estate in any part of the world with any bank or trust company or any other company that undertakes the safe custody of securities as part of its business without being responsible for the default of such bank, trust company or other company or for any loss occasioned thereby;

4.2.5.    notwithstanding anything herein otherwise contained or rule of law to the contrary, to purchase as an investment of the Trust Estate, and hold as part of the Trust Estate, any securities or property at any price and upon any terms that may be deemed expedient or desirable by the Trustee, and any such purchase so made, or the price paid or terms agreed upon in reference thereto shall not be subject to question by any person who may be entitled hereunder or by any Court or tribunal whatsoever;

4.2.6.   to make any payments, provisions or distributions which may be required under the terms hereof in whole or in part in money, securities or other property and on every division or distribution, the judgment and apportionment of the Trustee and valuations made by the Trustee shall be binding and conclusive on all persons whomsoever;

4.2.7.   to incorporate any company or companies under the laws of any jurisdiction in the world at the expense of the Trust Estate, for the purposes of the powers and authority of the Trustee and more particularly, to invest the whole or any part of the Trust Estate wholly or partly in shares or other securities of such company or companies;

4.2.8.   to lease at any time and from time to time real property or interests in real property entrusted to the Trustee or from time to time held by the Trustee hereunder for such term or terms of months or years, to begin presently or in the future, as to the Trustee may seem proper, even though such lease or leases shall be for a term or terms exceeding that especially authorized by law and be beyond the term of the termination of any trust estate herein created, such leases to be with such options to the lessees of renewal and/or purchase or for the purchase or disposal of buildings thereon or to be placed thereon, and upon such covenants, terms, conditions, agreements and provisions as to the Trustee shall seem proper; and in connection therewith, to make, execute, acknowledge and deliver any and all instruments that may be necessary, proper or desirable;

4.2.9.   to acquire, hold and sell real estate anywhere in the world;

4.2.10.   to acquire and hold debts secured by hypothec or mortgage on real estate anywhere in the world;

4.2.11.   to renew and keep renewed any hypothec or mortgage upon real estate anywhere in the world;

4.2.12.   to register any property, immovable or moveable, in the name of the Trustee or in the names of the nominees;

4.2.13.   to deposit any cash balances in the hands of the Trustee at any time at any bank or trust company;

4.2.14.   to keep the whole or any part of the Trust Estate at any place within the Trustee's discretion;

4.2.15.   to retain any life insurance policy entrusted to the Trustee or from time to time held by the Trustee hereunder; to purchase insurance on the life of any Beneficiary hereunder or on the life of anyone and to select such type of policy and mode of premium payments as the Trustee may deem advisable;

**EXHIBIT C**

to exercise all rights with regard to such retained or purchased insurance as the policy contracts grant to the owner thereof; to pay premiums on such policies either out of the principal or out of income or partly out of principal and partly out of income as the Trustee shall deem proper; to name as Beneficiaries of the said new policies either the Trust Estate or the Beneficiaries thereof; to purchase annuities for one or more Beneficiaries and to select such type of annuity and mode of payment therefor as the Trustee may deem advisable; and to purchase and pay the premiums on policies of insurance against fire, other casualty or public liability or other insurance of a similar character, but the Trustee shall not be liable for any omission to purchase any insurance or to purchase a particular amount of any type of insurance;

4.2.16.  to determine whether any monies shall, for the purpose of this Trust, be considered as principal or income of the Trust Estate or whether any taxes, expenses or losses shall be paid out of or borne by principal or income.

4.3.  Notwithstanding the foregoing powers and authority conferred upon the Trustee hereunder, in respect of any corporation the shares of which are comprised in the Trust Estate, the shares not be realized or liquidated but, to the greatest extent possible, that they be distributed in specie to the Beneficiaries in accordance with this Declaration of Trust, in order to ensure to the greatest extent possible the continued existence of such corporations and the ownership of the shares thereof by the Beneficiaries as aforesaid.

4.4.  The Trustee may furthermore act upon the opinion or advice of or information obtained from any reputable solicitor, valuer, broker, auctioneer, accountant or other expert but the Trustee shall not be bound to act upon such opinion or advice and the Trustee shall not be responsible for any loss occasioned by so acting or by not so acting as the case may be.

4.5.  Without limiting the generality of any power or authority otherwise conferred upon the Trustee hereunder, the Trustee shall have the full power and authority, instead of acting personally, to appoint any agent or agents in any part of the world, to assist in the administration of this Trust and in the management of the Trust Estate and, provided that the Trustee exercises reasonable care in the appointment of such agent or agents, the Trustee shall not be responsible for any act or neglect of any such agent or agents.

4.6.  Any Trustee being engaged in a professional business or trade, may, in the discretion of the Trustee, be paid all usual professional, business and trade charges and remuneration for business transacted and time expended and acts done by the Trustee or any employee or partner of the Trustee or by any firm or corporation with which the Trustee is connected in connection with the Trusts hereof including acts which a Trustee not being in any profession, business or trade could have done personally. Amounts paid under the foregoing shall be in addition to that Trustee's remuneration.

4.7.  In addition to their disbursements, the Trustee and the Protector shall be remunerated such fees as are usual for the type of administration.

6

**EXHIBIT C**

4.8.    The Trustee may, with the prior approval of the Protector, receive and hold as part of the Trust Estate, subject to the Trusts hereof, any property made available by any other person or persons to be added to and to become part of the Trust Estate.

4.9.    The Trustee shall inform personally the Beneficiary or Beneficiaries of the age of majority upon their request with respect to the position of the investment of the Trust Estate. The Trustee shall not, however, give this information, if, in its opinion, the information might be used in an abusive or illicit manner or in any way detrimental to the interests of the Trust Estate or the other Beneficiary or Beneficiaries. The Trustee shall decide in its sole discretion whether the prerequisites for a disclosure of information are met.

4.10.    Notwithstanding the foregoing, the Trustee and the Protector may divulge any and all information relating to this Trust and the Trust Estate if the Trustee is legally bound to do so by ordinance or imperative statutory provision of law.

4.11.    The Trustee and the Protector hereunder agree to execute any further documents or deeds which may be necessary to effectively transfer the Trust Estate to the Trustee.

4.12.    The Trustee shall be protected in acting upon any direction, paper or document believed by the Trustee to be genuine and to have been signed by the proper person or persons.   In case of doubt, the Trustee may refer to the Protector and shall in such case be protected in acting upon any direction, paper or document confirmed or believed by the Protector to be genuine and to have been signed by the proper person or proper persons.

4.13.    Neither the Trustee nor the Protector shall be liable for any error in judgment but only for their own intentional fault or willful misconduct. The Trustee and the Protector shall not be personally liable for any monies to become due by or any claims against this Trust Estate or upon any instrument executed by the Trustee under the provisions hereof. The Trustee shall be indemnified and saved harmless out of the funds of the Trust Estate from time to time and at all times from and against:

    4.13.1.    all costs, charges, and expenses whatsoever which such Trustee sustains or incurs in or about any actions, suits or proceedings which are brought, commenced or prosecuted against the Trustee for or in respect of any act, deed, matter or thing whatsoever done or permitted by the Trustee in or about the execution of the duties of this Trust, and

    4.13.2.    all other costs, charges and expenses which the Trustee sustains or incurs in or about or in relation to the affairs of the present Trust and Trust Estate.

4.14.    The Trustee shall have the power to bind the Trust Estate but shall not render itself personally liable.

EXHIBIT C

## ARTICLE FIVE
### Benefit of Trust

5.1.    The Beneficiaries of this Trust shall be those persons enumerated in Annex "B" attached hereto and forming an integral part hereof.

5.2.    The Trust Estate together with any other property which may from time to time be held by the Trustee in lieu thereof or in addition thereto, shall be held by the Trustee upon the following Trust:

    5.2.1.    The Trustee shall hold the Trust Estate during the Trust Period and may accumulate the whole of the income of the Trust Estate for the maximum period of accumulation permitted by law and add such accumulations to the capital thereof provided that during the Trust Period the Trustee may apply any of the capital or the income of the Trust Estate to or for the benefit of the Beneficiaries designated in paragraph 5.1. of this Article Five provided, however, that in the interests of any Beneficiary, the Trustee may, taking into consideration the country of residence of the Beneficiary, tax and duties there exigible, foreign exchange rates and other financial, political, economic or personal considerations, retain any such distribution or payment for the benefit of the Beneficiary.

    5.2.2.    The Trustee shall determine the time of payments, appropriations and applications of the income and/or capital of the Trust Estate to the Beneficiaries as aforesaid at all times in view of the requirements of an adequate standard of living of the Beneficiaries.

5.3.    Upon expiration of the Trust Period and subject to such powers of appointment as may be hereinafter contained, the Trustee shall pay or transfer the remaining capital and income to the Beneficiaries; provided that if at the expiration of the Trust Period no Beneficiary as defined herein shall be alive, the capital and income then remaining in the Trust Estate shall be distributed according 5.10. of this Article Five.

5.4.    All gifts, payments, or benefits made under the present Trust from the proceeds of the Trust Estate are intended as aliment and shall not be subject to seizure for the payment of any debts of the Beneficiaries or their representatives except in the case of express hypothecation or pledge after delivery, donation, or payment to them of any portion of the Trust Estate.

5.5.    The proceeds, payment or other donation of any property to the Beneficiaries shall be and remain his or her private and separate property, free from the control of any consort, and shall not be liable for the debts of the said consort, and shall not form part of any community of property which may subsist between such consorts.

**EXHIBIT C**

5.6.   If any person should become entitled to any portion or share of the Trust Estate either before attaining the age of 21 or at such time when such person is determined to be mentally incapacitated, such portion or share may, in the Trustee's discretion, in consultation with the Protector, be held and kept invested by the Trustee and the income and capital or some amount thereof as the Trustee, in consultation with the Protector, considers necessary or advisable, shall be used and applied for the benefit of such person until either he or she has either attained the age of 21, whereupon his or her portion or share, or the amount thereof then remaining in the hands of the Trustee shall be paid or transferred to such person or, as the case may be, in the case of mental incapacity, until such time as the Trustee has been determined by the Trustee, in consultation with the Protector, that it is necessary or advisable to pay and transfer the amount of such portion or share to the acting guardian of such person.

5.7.   The Trustee shall also have the power to make any payment for any person under the age of 21 to the parent or legal guardian of any such person whose receipt thereof shall be sufficient discharge to the Trustee.

5.8.   The determination of mental incapacity shall be made by the Protector after consultation with the Trustee and upon such medical or other expert assessment as the Protector considers necessary or advisable.

5.9.   If the Trustee deems it necessary, a prerequisite of the enjoyment of the proceeds of the Trust Estate by any Beneficiary shall be that within a period of two (2) months after the date when any such person becomes a Beneficiary hereunder, he or she declares to the Trustee in a form satisfactory to the Trustee and its legal counsel, that he or she promises to respect all the provisions laid down in the present Trust and the provisions of any conveyance of property by any person or persons to the Trustee to be held as part of the Trust Estate sub-ject to the Trusts hereof.  If he or she is in default to so declare and promise, he or she shall lose all of his or her rights to the enjoyment or the proceeds of the present Trust and Trust Estate, and any other trust fund which may have been created in consequence hereof.

5.10.  The charitable institutions and purposes to which the right or benefit of the Trust Estate shall possibly pass in accordance with the provisions of this Trust shall be those designated, if any, in Annex "B" hereto.

### ARTICLE SIX
### The Protector

6.1.   Definition

6.1.1.  The Protector shall mean that person or persons or any successors thereto appointed to act as Protector of this Trust.

6.1.2.  Any individuals who are not U.S. citizens or residents, or any corporations that are not organized in any state or territory of the U.S., may be the Protector whether individuals (resident or non-resident of Canada) or corporations (Canadian or

**EXHIBIT C**

foreign). Those individuals who are Beneficiaries or may become Beneficiaries of this Trust as well as their spouses and relatives, including the relatives of their spouses, may only be named Protector to this Trust to the extent that, in the aggregate, the Trustee does not comprise a majority of the total of persons and corporations appointed to and currently occupying the office of the Protector.

6.1.3. H&H PROTECTORS IBC, a Bahamian company, is hereby appointed as the initial Protector of the Trust Estate.

6.2. <u>Resignation and Replacement</u>

6.2.1. Any Protector shall cease to be a Protector when he or she dies, resigns or becomes unable or unwilling to act or continue to act or becomes insolvent or bankrupt. A corporation shall cease to be a Protector hereunder when the corporation resigns or becomes insolvent or bankrupt or ceases to exist.

6.2.2. In the event an individual appointed as Protector in section 6.1.3. of Article 6 is unable or unwilling to serve as a Protector, then a successor protector shall be appointed by a majority vote of the Beneficiaries then entitled to receive income. If there are only two (2) Beneficiaries then entitled to receive income, such power shall be exercised by unanimity. If there is only one (1) Beneficiary then entitled to receive income, such power shall be exercised alone.

6.2.3. Resignation by any Protector shall be effected by the delivery or mailing by registered mail of a written notice of resignation to the Trustee acting hereunder and to the Beneficiaries.

6.2.4. However, in the case of impossibility to give notice to all parties, the giving of a notice to at least one of the above parties shall constitute good and valid notice hereunder.

6.3. <u>Powers of the Protector</u>. Notwithstanding any other provisions of the present Trust and particularly the powers and authority herein granted to the Trustee, the Protector shall at any time or from time to time during the Trust Period or any extension thereof, have the full power and authority:

6.3.1. to amend, vary or otherwise modify the terms of this Declaration of Trust from time to time with written notice to the Trustee and without limiting the generality of the foregoing, to amend, vary or modify the terms of this Declaration of Trust for the purpose of facilitating the administration of the Trust and Trust Estate provided, however, that nothing herein contained shall permit the Protector to alter the rights of Beneficiaries or change the Beneficiaries by addition to or exclusion and deletion of any of the Beneficiaries named in Article Five nor shall the powers herein contained permit this Declaration of Trust to be amended to increase the obligations or liabilities of the Trustee or the Protector without the consent of the Trustee or each person appointed to the office of the Protector, as the case may be, then in

10

office and no amendment hereto or to paragraph 4.2.14. of Article Four of this Declaration of Trust shall have any effect on the rights of any person who was then serving or has served as a Trustee or as Protector arising out of any state of facts or occurrences which existed or took place before such amendment;

6.3.2.  to appoint in writing the whole or part of the capital or the income of the Trust Estate or create by deed a new trust fund and appoint either in respect of the new trust fund or in respect of the trust fund constituted under any new trust, all or any part of the capital or income thereof to or for anyone or more of the Beneficiaries in such manner as the Protector shall consider advisable, provided, however, that any appointment or distribution of capital or income to such new trust fund or trust fund constituted under a new trust shall respect and be in accordance with paragraph 5.1. of Article Five of this Declaration of Trust;

6.3.3.  to remove from office, or replace the Trustee or appoint new or additional Trustees as the Protector shall consider advisable and without limiting the generality of the foregoing, to fill any vacancy in the office of the Trustee;

6.3.4.  to extinguish, diminish, reduce or otherwise limit the Protector's own powers as Protector during the tenure of persons appointed to and then in the office of the Protector; however, such extinction, diminishment, reduction or limitation shall not affect the powers of subsequent persons who may by replacement or later appointment be named to the office of the Protector subsequently;

6.3.5.  to supervise the accounts of the Trust Estate, receive an accounting from any or all of the Trustee or any other person, company, institution or creditor holding any assets or property of the Trust Estate or any other trust fund which may be created in consequence hereof;

6.3.6.  without limiting the generality of any power or authority otherwise conferred upon the Protector hereunder, the Protector shall have the full power and authority, instead of acting personally, to appoint any agent or agents in any part of the world to assist in the carrying out of the powers of the Protector; and, provided that the Protector exercises reasonable care in the appointment of such agent or agents, the Protector shall not be responsible for any act or neglect of any such agent or agents;

6.3.7.  any person appointed to the office of the Protector being engaged in a profession, business or trade, shall be paid all usual professional business and trade charges and remuneration for business transacted and time expended and acts done by them or any employee or partner of theirs or by any firm or corporation with which they are connected in connection with the present Trust, including acts which persons appointed to the office of the Protector not being in any profession, business or trade could have done personally;

6.3.8.  to appoint, by any irrevocable deed or deeds and without infringing the Trust Period of this Trust or the rule against perpetuities, that the whole or any part of the Trust

**EXHIBIT C**

Estate shall thenceforth be held upon the trusts and with and subject to the powers and provisions of any other trust not infringing the rule against perpetuities applicable to this Trust and approved by the Protector and in favor or for the benefit of all or any one or more exclusively of the others or other of the Beneficiaries, and upon any such appointment being made, the Protector shall direct the transfer to the Trustee for the time being of the said appointment and thereupon the Trusts herein contained concerning such property shall cease and determine and the said property shall for all purposes be subject to the trust, powers and provisions contained in the said other trusts and be subject to and governed by the proper law of this Trust or not, provided, however, that such appointment and transfer of the whole or any part of the Trust Estate to such other trust or trusts shall respect and be in accordance with paragraph 5.1. of Article Five of this Trust. For the purposes of the present paragraph, "trust" shall mean any trust created by any settlement, declaration of trust, will, codicil, or other instrument under the law in force in any part of the world;

6.3.9. to change at any time and from time to time during the Trust Period the governing law and forum for the administration of this Declaration of Trust as hereinafter provided; the power of changing the governing law and the forum for the administration of this Declaration of Trust shall be vested in the Protector who may at the Protector's absolute discretion, direct any such change to some other place in any part of the world on giving not less than fourteen days' notice as hereinafter provided with copies addressed to the Trustee and to the Beneficiaries;

6.3.10. to extend from time to time the Trust Period for further periods of two (2) years upon sending of a notice in writing at least three (3) months prior to the expiration of the Trust Period to the Trustee and Beneficiaries without, however, violating the rule against perpetuities. The provisions of this paragraph 6.3.10. of this Article Six and all the powers of the Protector shall have effect notwithstanding any rule of law or equity restricting the delegation of a power or discretion.

6.3.11. Any reference to the "Protector" or "Protectors" in this Trust shall be construed as a reference to all of the persons appointed to and then in the office of the Protector if there be more than one.

6.3.12. Wherever herein discretion is vested in or power is conferred upon the Protectors, such discretion or power must be exercised by a majority of the persons appointed to and then in the office of the Protector. If it should happen at any time that there are fewer than three (3) persons then in the office of the Protector, such discretion or power must be exercised by unanimity if there are two (2) such persons and if there is only one (1) such person, he may validly exercise such discretion or power alone.

### ARTICLE SEVEN
#### Interpretation

7.1. Any provision or condition of the present Trust which is or becomes void for any reason

whatsoever including the fact that it is considered to be or constitutes an impossible condition or one contrary to good morals, to law, to equity, or to public order, shall not annul the present Trust but shall only be considered as not written.

7.2.    For greater clarity, the present Trust is comprised of and includes this Trust and Annexes A and B hereto and any further annexes as may subsequently to the execution hereof be added in accordance with and pursuant to its terms.

## ARTICLE EIGHT
### Governing Laws

8.1.    Subject to the terms of subparagraph 6.3.9. of Article Six hereof, the Trust Estate created herein is created under the law of the Province of Nova Scotia, Canada and the rights of all parties and the construction and effect of every provision hereof shall be subject to the exclusive jurisdiction of and construed and regulated only according to the law of the Province of Nova Scotia, Canada.

8.2.    If the governing law of this Trust is changed and any provision of this Trust be found to be in violation of or contrary to such new governing law, including, by way of example, but without limitation, any law or rule therein prevailing relating to accumulation of trust income and to perpetuity periods, such provision shall be deemed to be amended and to comply with the new governing law.

8.3.    If at any time it appears that the Trust falls within the definition of a "United States Person," as defined in Section 7701(a)(30)(E) of the United States Internal Revenue Code of 1986 and the regulations thereunder, the Trustee may amend the Declaration, change the jurisdiction of the Trust, or do otherwise as it sees fit so the Trust will not fall within such definition.

8.4.    Notwithstanding anything in the Declaration to the contrary, if at any time a United States court attempts to assert jurisdiction over or otherwise supervise the administration of the Trust directly or indirectly, the Trustee shall cause the Trust to migrate from the United States. Notwithstanding anything in the Declaration to the contrary, if any governmental agency or creditor attempts to collect information from or assert a claim against the Trust, the Trustee shall cause one or more substantial decisions of the Trust to be controlled by a person or entity that is not a United States fiduciary. The Trustee may accomplish its objectives set forth in this Section 8.4. by amending the Declaration, changing the jurisdiction of the Trust, or otherwise as the Trustee sees fit at its sole discretion.

## ARTICLE NINE
### Acceptance of Trustee and Protector

The Trustee accepts the Trust hereby created, and both the Trustee and Protector agree to carry out the provisions hereof to be performed on their part.

**EXHIBIT C**

## ARTICLE TEN
### Notices

10.1. Any notice required or permitted to be given under any of the provisions of this Trust of the provisions of this Trust shall be sent by registered air mail, postage pre-paid, to the last known address of the addressee. No evidence that such notice has been received by any addressee shall be necessary to constitute good and valid notification. Any such notice given as aforesaid shall be deemed to have been given two (2) weeks after the envelope containing same is mailed, pre-paid registered air mail as aforesaid. There shall be no obligation to give any such notice to any party in the case of impossibility to give any such notice.

10.2. Notwithstanding anything contained in the present Trust, any notice required or permitted to be given to the Beneficiaries shall be given to the Protector and, with the prior written consent of the Protector, to the Beneficiaries, and to such other persons as the Protector may from time to time designate.

## ARTICLE ELEVEN
### Exclusion from Benefits

Whoever contests the validity of this Trust, of the Trust created under it, of the Trusts created by virtue of the present Trust, of the provisions of any conveyance of property by any person or persons to the Trustee to form and be held as part of the Trust Estate, shall cease to be a Beneficiary of any of these Trusts and shall be excluded from any benefits, direct or indirect, deriving from the Trust Estate.

## ARTICLE TWELVE
### Severability

Should any provision of this Trust be determined to be contrary to or invalid under the Governing Law of this Trust by a competent court of that jurisdiction, provided that its removal would not substantially affect or render contradictory or incomprehensible the remainder of this Trust, such provision shall be considered as unwritten and shall not invalidate or otherwise affect this Trust and the Trust hereby created.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

**EXHIBIT C**

WHEREFORE, the parties hereto have executed this Trust on the date first hereinabove written.

ACCEPTED by the Trustee:

AMERICAS FIDUCIARY LTD.,
a Nevis corporation

By: _____        _____
Timothy D. Richards, Director                            Witness

                                                                              _____
                                                                              Witness

**EXHIBIT C**

ANNEX "A"

<u>PROPERTY</u>

1.  One Hundred Canadian Dollars (CDN $100.00);

2.  100% of the Membership Interest in 3 Gramercy Park West LLC, a New York limited liability company.

**EXHIBIT C**

ANNEX "B"

<u>BENEFICIARY</u>

   The Beneficiary of the GRAMERCY IRREVOCABLE OPERATING TRUST ("Trust") is the HH MASTER SETTLEMENT, a Nova Scotia trust, dated December 1, 2004.

Annex B

EXHIBIT C                    EXHIBIT H

**OPERATING AGREEMENT
OF
3 GRAMERCY PARK WEST LLC**

In accordance with the New York Limited Liability Company Act (the "Act") and subject to the Articles of Organization, which were filed on the 29th day of July, 2005 with the New York Department of State. The Gramercy Irrevocable Trust, a Nova Scotia Trust (the "Trust"), as sole member of 3 GRAMERCY PARK WEST LLC adopts the following resolutions regarding the conduct of the business and affairs of 3 GRAMERCY PARK WEST LLC, a New York limited liability company ("Company").

**SECTION 1
THE COMPANY**

1.1    Definitions.

Capitalized words and phrases used in this Operating Agreement have the following meanings:

"Act" means the New York Limited Liability Company Act, Chapter 18, as amended from time to time (or any corresponding provisions of succeeding law).

"Articles" means the Articles of Organization filed with the New York Department of State pursuant to the Act to form the Company, as originally executed and amended, modified, supplemented or restated from time to time, as the context requires.

"Articles of Dissolution" means a certificate filed in accordance with the New York Limited Liability Company Act Section 705.

"Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy." A "Voluntary Bankruptcy" means, with respect to any Person (i) the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; (ii) the filing of any petition or answer by such Person seeking to adjudicate itself as bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property; or, (iii) corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or without the consent or


GOVERNMENT
EXHIBIT
8

**EXHIBIT C**

acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within ninety (90) days.

"Business" means the business of operating and managing 3 GRAMERCY PARK WEST LLC.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed pursuant to this Operating Agreement and the Articles and the limited liability company continuing the business of this Company in the event of dissolution of the Company as herein provided.

"Debt" means (i) any indebtedness for borrowed money or the deferred purchase price of property as evidenced by a note, bonds, or other instruments; (ii) obligations as lessee under capital leases; (iii) obligations secured by any mortgage, pledge, security interest, encumbrance, lien or charge of any kind existing on any asset owned or held by the Company whether or not the Company has assumed or become liable for the obligations secured thereby; (iv) accounts payable; and, (v) obligations under direct or indirect guarantees of [including obligations (contingent or otherwise) to assure a creditor against loss in respect of] indebtedness or obligations of the kinds referred to in clauses (i), (ii), (iii) and (iv), above provided that Debt shall not include obligations in respect of any accounts payable that are incurred in the ordinary course of the Company's business and are not delinquent or are being contested in good faith by appropriate proceedings.

"Dissolution Event" shall have the meaning set forth in Section 10.1 hereof.

"Effective Date" means the date the Articles of Organization were filed.

"GAAP" means generally accepted accounting principles in effect in the United States of America from time to time.

"Involuntary Bankruptcy" has the meaning set forth in the definition of Bankruptcy.

"Liquidation Period" has the meaning set forth in Section 10.7 hereof.

"Liquidator" has the meaning set forth in Section 10.9(a) hereof.

"Manager" means the Member who shall also serve as the Manager of the Company.

"Member" means any Person (i) who is referred to as such in Section 2.1, or who has become a substituted Member pursuant to the terms of this Operating Agreement; and, (ii) who has not ceased to be a Member. "Member(s)" means all such Persons.

"Percentage Interests" means a Member's percentage of LLC interests reflected in Section 2.1.

**EXHIBIT C**

"Person" means any individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee or other entity.

"Reconstitution Period" has the meaning set forth in Section 10.1(b) hereof.

"Regulations" mean this Operating Agreement of 3 GRAMERCY PARK WEST LLC including all Exhibits and Schedules attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Operating Agreement as a whole, unless the context otherwise requires.

"Treasury Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

"Securities Act" means the Securities Act of 1933, as amended.

"Tax Matters Member" has the meaning set forth in Section 7.3(a) hereof.

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of.

"Units or Unit" means any ownership interest in the Company representing a Capital Contribution of $1.00, including any and all benefits to which the holder of such Units may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this agreement. The Company shall issue 100 Units.

"Voluntary Bankruptcy" has the meaning set forth in the definition of "Bankruptcy."

1.2   Name.

The name of the Company shall be 3 GRAMERCY PARK WEST LLC and all business of the Company shall be conducted in such name. The Manager may change the name of the Company upon ten (10) days notice to the Member(s).

1.3   Purpose; Powers.

(a)   The purposes of the Company are (i) to operate the Business; (ii) to make such additional investments and engage in such additional activities as the Members may approve; and, (iii) to engage in any and all activities related or incidental to the purposes set forth in clauses (i) and (ii).

(b)   The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the purposes of the Company set forth in Section 1.3(a) hereof and has, without limitation, any and all powers that may be exercised on behalf of the Company by the Manager pursuant to Section 5 hereof.

1.4     Principal Place of Business.

The principal place of business of the Company shall be 2665 South Bayshore Drive, Suite 703, Miami, Florida 33133.  The Manager may change the principal place of business of the Company to any other place within or without the State of New York upon ten (10) days notice to the Member(s). The registered office of the Company in the State of New York initially is located at Corporate Creations Network, Inc., 15 North Mill Street, Nyack, New York  10960.

1.5     Term.

The term of the Company shall commence on the date the articles of organization of the Company (the "Articles") are filed with the New York Department of State in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed following a Dissolution Event, as provided in Section 10 hereof.

1.6     Filings; Agent for Service of Process.

(a)     The Manager is hereby authorized to and shall cause the Articles to be filed with the New York Department of State in accordance with the Act. The Manager shall take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of New York, including the preparation and filing of such amendments to the Articles and such other assumed name articles, documents, instruments and publications as may be required by law, including, without limitation, action to reflect:

(i)     a change in the Company name;

(ii)     a correction of false or erroneous statements in the Articles or the desire of the Member(s) to make a change in any statement therein in order that it shall accurately represent the agreement among the Member(s); or,

(iii)     a change in the time for dissolution of the Company as stated in the Articles and in this Operating Agreement.

(b)     The Member(s) and the Manager shall execute and cause to be filed original or amended articles and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the laws of any other jurisdictions in which the Company engages in business.

(c)     The registered agent for service of process on the Company in the State of New York shall be Corporate Creations Network, Inc., 15 North Mill Street, Nyack, New York 10960 or any successor as appointed by the Member(s) in accordance with the Act.

(d)     Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with Section 10, the Manager shall promptly execute and cause to be filed

EXHIBIT C

articles of dissolution in accordance with the Act and the laws of any other jurisdictions in which the Manager deems such filing necessary or advisable.

1.7  Title to Property.

All property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in his individual name, and each Member's interest in the Company shall be personal property for all purposes. At all times after the Effective Date, the Company shall hold title to all of its property in the name of the Company and not in the name of any Member. The Member(s) hereby agree that no Member, nor any successor in interest to any Member, shall have the right while this Operating Agreement remain in effect, including, without limitation, during the period the Company is in liquidation following any dissolution, to have any Company asset partitioned, or to file a complaint or institute any proceedings at law or in equity to have such asset partitioned; and each Member, on behalf of himself, his successors, successors-in-title, and assigns, hereby waives any such right.

1.8  Payments of Individual Obligations.

The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member.

1.9  Independent Activities; Transactions with Member(s).

(a)  The Manager shall be required to devote such time to the affairs of the Company as may be necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that the Manager may deem appropriate in his discretion.

(b)  Insofar as permitted by applicable law, neither this Operating Agreement nor any activity undertaken pursuant hereto shall prevent any Member or the Manager from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member or the Manager to permit the Company or any other Member to participate in any such activities, and as a material part of the consideration for the execution of this Operating Agreement by each Member, each Member hereby waives, relinquishes, and renounces any such right or claim of participation.

(c)  To the extent permitted by applicable law and subject to the provisions of this Operating Agreement, the Manager is hereby authorized to cause the Company to purchase property from, sell property to or otherwise deal with any Member or Manager, provided that any such purchase, sale or other transaction shall be made on terms and conditions which are no less favorable to the Company than if the sale, purchase or other transaction had been made with an independent third party.

**EXHIBIT C**

## SECTION 2
## MEMBER(S)' CAPITAL CONTRIBUTIONS

2.1   Original Capital Contributions.

The name, address, original capital contribution, and initial percentage interest of each of the Member(s) is as follows:

| Names and Address | Original Capital Percentage Contribution | Interest (%) | Units |
|---|---|---|---|
| Gramercy Irrevocable Operating Trust A Nova Scotia Trust C/O Trustee AMERICAS FIDUCIARY LTD., a Nevis corporation P.O. Box 3463 Road Town, Tortola BVI | $100.00 | 100% | 100 |

2.2   Additional Capital Contributions.

The Member(s) may make additional capital contributions only with the written consent of all Member(s). If any Member contributes additional capital, his Percentage Interest shall not change. Nothing herein shall be construed to require the Member(s) to make any additional capital contributions.

2.3   Capital Account.

A Capital Account shall be maintained for each Member in accordance with Code Section 704(c), and such account shall be adjusted annually to reflect (i) additions or withdrawals of capital by any Member and (ii) allocations of profit, loss and gain allocated to such Member in accordance with Section 3, below. Capital Accounts shall be adjusted at the end of each calendar year, or more frequently at the direction of the Managers. No Member shall be permitted to withdraw any capital from his Capital Account without the approval of the majority of the Member(s).

## SECTION 3
## ALLOCATIONS

3.1   Allocation of Profits and Losses.

Except as to special allocations set forth in Sections 3.2 and 3.3, all profits, income, gain, deduction and loss shall be allocated to the Member(s) according to their Percentage Interests in the Company. All allocations of profit, gain or loss shall be reflected in each Member's Capital Account.

3.2   Regulatory Allocations.

(a)      Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in the Company's minimum gain during any fiscal year, each Member shall be specially allocated items of the Company's income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's portion of the net decrease in the Company's minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 3.2(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)      Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in the Member's nonrecourse debt minimum gain attributable to a Member nonrecourse debt during the Company's fiscal year, each Member who has a portion of the Member nonrecourse debt minimum gain attributable to such Member nonrecourse debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of the Company's income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's portion of the net decrease in Member nonrecourse debt minimum gain attributable to such Member nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 3.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)      Nonrecourse Deductions. Nonrecourse deductions for any fiscal year shall be specially allocated to the Member(s) in proportion to their respective percentage interests.

(d)      Member Nonrecourse Deductions. Any Member nonrecourse deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member nonrecourse debt to which such Member nonrecourse deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(e)      Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of the Company's assets, pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining capital accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to the capital accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Member(s) in accordance with their interests in the Company in the event Treasury

EXHIBIT C

Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member(s) to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

### 3.3    Curative Allocations.

The allocations set forth in Section 3.2 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Member(s) that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 3.3. Therefore, notwithstanding any other provision of this Section 3.3 (other than the Regulatory Allocations), the Tax Matters Member, as provided in Section 7.3(a) shall make such offsetting special allocations of the Company's income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's capital account balance is, to the extent possible, equal to the capital account balance such Member would have had if the Regulatory Allocations were not part of this Operating Agreement and all of the Company's items were allocated pursuant to Sections 3.1.

### 3.4    Other Allocation Rules.

(a)    The Member(s) are aware of the income tax consequences of the allocations made by this Section 3 and hereby agree to be bound by the provisions of this Section 3 in reporting their shares of the Company's income and loss for income tax purposes.

(b)    Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Member(s)' interests in the Company's profits are in proportion to their percentage interests.

(c)    To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Tax Matters Member shall endeavor to treat distributions of net cash from operations or net cash from sales or refinancings as having been made from the proceeds of a nonrecourse liability or a Member nonrecourse debt.

### 3.5    Tax Allocations: Code Section 704(c).

In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Member(s) so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial fair market value.

Any elections or other decisions relating to such allocations shall be made by the Tax Matters Member in any manner that reasonably reflects the purpose and intention of this Operating Agreement. Allocations pursuant to this Section 3.5 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's

capital account or share of profits, losses, other items, or distributions pursuant to any provision of this Operating Agreement.

## SECTION 4
## DISTRIBUTIONS

4.1     Distribution.

The Manager shall make distributions of profits and gain to the Member(s) in accordance with their Percentage Interests at such times as the Manager may determine. All such distributions shall be deducted from the respective Member(s)' Capital Account.

4.2     Minimum Distributions.

Notwithstanding Section 4.1, the Manager shall make minimum annual distributions from the Company on the last day of any calendar year to the extent that any Member incurs an income tax liability due to allocation of profit or gain according to the Member's Percentage Interests in the Company.

4.3     Amounts Withheld.

All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Member(s) shall be treated as amounts paid or distributed, as the case may be, to the Member(s) with respect to which such amount was withheld pursuant to this Section 4.3 for all purposes under this Operating Agreement. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Member(s), and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Member(s) with respect to which such amount was withheld.

4.4     Limitations on Distributions.

(a)     The Company shall make no distributions to the Member(s) except (i) as provided in this Section 4 and Section 10 hereof; or, (ii) as agreed to by a majority of the Member(s).

(b)     A Member may not receive a distribution from the Company to the extent that, after giving effect to the distribution, all liabilities of the Company, other than liability to Member(s) on account of their capital contributions, would exceed the fair value of the Company's assets.

## SECTION 5
## MANAGEMENT

5.1     Manager.

**EXHIBIT C**

(a)     The management of the Company shall be vested in the Manager designated by the Members as provided in Section 5.1(c) hereof.

(b)     The number of Managers shall be no less than one (1) unless otherwise provided herein. The initial manager of the Company shall be Gustavo Adolfo Hernandez Frieri.

(c)     Each Member shall have the right to appoint one Manager, which may be such Member.

(d)     A Manager shall remain in office until removed by the Class Member who appointed the Manager, or upon the resignation, disability or death of such Manager. The respective Class Member shall replace the departing Manager by delivering to the Company a statement designating a successor Manager and setting forth such successor Manager's business addresses and telephone numbers.

(e)     The Manager shall perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A person who so performs his duties shall not have any liability by reason of being or having been the Manager of the Company.

(f)     The Manager shall have the power to delegate authority to such officers, employees, agents and representatives of the Company, as they may from time to time deem appropriate.

(g)     The Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the Company.

5.2     Manager's Powers.

(a)     Except as otherwise provided in this Operating Agreement, all powers to control and manage the Business and affairs of the Company shall be exclusively vested in the Manager and the Manager may exercise all powers of the Company and do all such lawful acts as are not by statute, the Articles or this Operating Agreement directed or required to be exercised or done by the Member(s) and in so doing shall have the right and authority to take all actions which the Manager deems necessary, useful or appropriate for the management and conduct of the Business, including exercising the following specific rights and powers:

(i)     Conduct its business, carry on its operations and have and exercise the powers granted by the Act in any state, territory, district or possession of the United States, or in any foreign country which may be necessary or convenient to effect any or all of the purposes for which it is organized;

**EXHIBIT C**

      (ii)    Acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

      (iii)    Operate, maintain, finance, improve, construct, own, grant operations with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

      (iv)    Execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of the Business, or in connection with managing the affairs of the Company, including, executing amendments to this Operating Agreement and the Articles in accordance with the terms of this Operating Agreement, both as Manager and, if required, as attorney-in-fact for the Member(s) pursuant to any power of attorney granted by the Member(s) to the Manager;

      (v)    Borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Company assets;

      (vi)    Execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Company assets;

      (vii)    Prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the assets of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of such assets;

      (viii)    Care for and distribute funds to the Member(s) by way of cash income, return of capital, or otherwise, all in accordance with the provisions of this Operating Agreement, and perform all matters in furtherance of the objectives of the Company or this Operating Agreement;

      (ix)    Contract on behalf of the Company for the employment and services of employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

      (x)    Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company assets and Manager liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified;

      (xi)    Take, or refrain from taking, all actions, not expressly proscribed or limited by this Operating Agreement, as may be necessary or appropriate to accomplish the purposes of the Company;

(xii)    Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company, the Member(s) or the Manager in connection with activities arising out of, connected with, or incidental to this Operating Agreement, and to engage counsel or others in connection therewith;

(xiii)    Purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited companies, other limited liability companies, or individuals or direct or indirect obligations of the United States or of any government, state, territory, government district or municipality or of any instrumentality of any of them;

(xiv)    Indemnify a Member or the Manager or former Member or Manager, and to make any other indemnification that is authorized by this Operating Agreement in accordance with the Act.

(xv)    All acts of the Manager, taken voluntarily and in good faith, shall be authorized hereunder. Any acts of the Manager under duress or on behalf of any creditor of a Member shall not be authorized hereunder.

5.3    Duties and Obligations of the Manager.

(a)    The Manager shall cause the Company to conduct its business and operations separate and apart from that of any Member or the Manager, including, without limitation, (i) segregating Company assets and not allowing funds or other assets of the Company to be commingled with the funds or other assets of, held by, or registered in the name of, any Member or the Manager; (ii) maintaining books and financial records of the Company separate from the books and financial records of any Member or the Manager, and observing all Company procedures and formalities, including, without limitation, maintaining minutes of Company meetings and acting on behalf of the Company only pursuant to due authorization of the Member(s); (iii) causing the Company to pay its liabilities from assets of the Company; and, (iv) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity.

(b)    The Manager shall take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of New York and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Member(s) or to enable the Company to conduct the business in which it is engaged; and, (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of property in accordance with the provisions of this Operating Agreement and applicable laws.

(c)    The Manager shall be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the Member(s), including the safekeeping and use of all of the property and the use thereof for the exclusive benefit of the Company.

5.4    Indemnification of the Manager.

(a)    Unless otherwise provided in Section 5.4(d) hereof, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Company's property) shall indemnify, save harmless, and pay all judgments and claims against the Manager relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Manager in connection with the Business, including reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred.

(b)    Unless otherwise provided in Section 5.4(d) hereof, in the event of any action by a Member against the Manager, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of the Manager, including reasonable attorneys' fees incurred in the defense of such action.

(c)    Unless otherwise provided in Section 5.4(d) hereof, the Company shall indemnify, save harmless, and pay all expenses, costs, or liabilities of the Manager, if for the benefit of the Company and in accordance with this Operating Agreement the Manager makes any deposit or makes any other similar payment or assumes any obligation in connection with any property proposed to be acquired by the Company and suffers any financial loss as the result of such action.

(d)    Notwithstanding the provisions of Sections 5.4(a), 5.4(b) and 5.4(c) above, such Sections shall be enforced only to the maximum extent permitted by law and the Manager shall not be indemnified from any liability for the fraud, intentional misconduct, gross negligence or a knowing violation of the law which was material to the cause of action.

(e)    The obligations of the Company set forth in this Section 5.4 are expressly intended to create third party beneficiary rights of the Manager and any Member is authorized, on behalf of the Company, to give written confirmation to the Manager of the existence and extent of the Company's obligations to the Manager hereunder.

5.5    Bankruptcy, Other Circumstances, and Involuntary Assignment by Managers.

The Manager shall not cease to be such by reason of any of the following. An order for relief against the Manager is entered under Chapter 7 of the federal bankruptcy law, or the Manager: (a) makes a general assignment for the benefit of creditors; (b) files a voluntary petition under the federal bankruptcy law; (c) files a petition or answer seeking for the Manager any reorganization arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; (d) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Manager in any proceeding of this nature; or, (e) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Manager or of all or any substantial part of the Manager's properties. In addition the following circumstance shall not cause a person to cease to be a Manager: sixty days after the commencement of any

**EXHIBIT C**

proceeding against the Manager seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, the proceeding has not been dismissed, or if with sixty days after the appointment without the Manager's consent or acquiescence of a trustee, receiver, or liquidator of the Manager or of all or any substantial part of the Manager's properties, the appointment is not vacated or stayed, or within sixty days after the expiration of any such stay, the appointment is not vacated.

## SECTION 6
## ROLE OF MEMBER(S)

### 6.1    Rights or Powers.

The Member(s) shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way as a Member. Notwithstanding the foregoing, the Member(s) have all the rights and powers specifically set forth in this Operating Agreement and, to the extent not inconsistent with this Operating Agreement, in the Act.

### 6.2    Voting Rights.

No Member has any voting right except with respect to those matters specifically reserved for a Member vote which are set forth in this Operating Agreement and as required in the Act.

### 6.3    Meetings of the Member(s).

(a)    Meetings of the Member(s) may be called upon the written request of any Member. The call shall state the location of the meeting and the nature of the business to be transacted. Notice of any such meeting shall be given to all Member(s) not less than seven (7) days nor more than thirty (30) days prior to the date of such meeting. Member(s) may vote in person, by proxy or by telephone at such meeting and may waive advance notice of such meeting. Whenever the vote or consent of Member(s) is permitted or required under this Operating Agreement, such vote or consent may be given at a meeting of the Member(s). Except as otherwise expressly provided in this Operating Agreement, the unanimous vote of the Member(s) shall be required to constitute the act of the Member(s).

(b)    For the purpose of determining the Member(s) entitled to vote on, or to vote at, any meeting of the Member(s) or any adjournment thereof, the Manager or the Member requesting such meeting may fix, in advance, a date as the record date for any such determination. Such date shall not be more than thirty (30) days nor less than ten (10) days before any such meeting.

(c)    Each Member may authorize any Person or Persons to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or its attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date

thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it.

(d) Notwithstanding this Section 6.3, the Company may take any action contemplated under this Operating Agreement as approved by the consent of the Member(s), such consent to be provided in writing, or by telephone or facsimile, if such telephone conversation or facsimile is followed by a written summary of the telephone conversation or facsimile communication sent by registered or certified mail, postage and charges prepaid, addressed as described in Section 12.1 hereof, or to such other address as such Person may from time to time specify by notice to the Member(s) and the Manager.

6.4    Withdrawal/Resignation.

Except as otherwise provided in Sections 4 and 10 hereof, no Member shall demand or receive a return on or of its capital contributions or withdraw from the Company without the consent of all Member(s). Except as otherwise provided in the Act or this Operating Agreement, upon resignation, any resigning member is entitled to receive only the distribution to which he is entitled under this Operating Agreement, which shall be equal to the fair value of his LLC interests the Company as of the date of resignation. Under circumstances requiring a return of any capital contributions, no Member has the right to receive any property other than cash except as may be specifically provided herein.

6.5    Member Compensation.

No Member shall receive any interest, salary or drawing with respect to its capital contributions or its capital account or for services rendered on behalf of the Company, or otherwise, in its capacity as a Member, except as otherwise provided in this Operating Agreement.

6.6    Member(s)' Liability.

No Member shall be liable under a judgment, decree or order of a court, or in any other manner for the Debts or any other obligations or liabilities of the Company. A Member shall be liable only to make its capital contributions and shall not be required to restore a deficit balance in its capital account or to lend any funds to the Company or, after its capital contributions have been made, to make any additional contributions, assessments or payments to the Company, provided that a Member may be required to repay distributions made to it as provided in this Operating Agreement or Section 18-504 of the Act. The Manager shall not have any personal liability for the repayment of any capital contributions of any Member.

6.7    Partition.

While the Company remains in effect or is continued, each Member agrees and waives its rights to have any of the Company's property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any of the Company's property partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

6.8     Confidentiality.

Except as contemplated hereby or required by a court of competent authority, each Member shall keep confidential and shall not disclose to others without the prior written consent of all Member(s) any information which (i) pertains to this Operating Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the Business of the Company; or, (ii) pertains to confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary. No Member shall use any information which (i) pertains to this Operating Agreement, any negotiations pertaining hereto, any of the transactions contemplated hereby, or the Business of the Company; or, (ii) pertains to the confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary, except in connection with the transactions contemplated hereby. The term "confidential information" is used in this Section 6.8 to describe information which is confidential, non-public or proprietary in nature, was provided to such Member or its representatives by the Company, any other Member, and relates either directly, or indirectly to the Company or the Business. Information which (i) is available, or becomes available, to the public through no fault or action by such Member; or (ii) becomes available on non-confidential basis from any source other than the Company, any other Member, and such source is not prohibited from disclosing such information, shall not be deemed confidential information.

6.9     Transactions Between a Member and the Company.

Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a person or entity who is not a Member. A Member may also be an employee or be retained as an agent of the Company. The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

6.10     Other Instruments.

Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Manager deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Operating Agreement.

### SECTION 7
### ACCOUNTING, BOOKS AND RECORDS

7.1     Accounting, Books and Records.

(a)     The Company shall keep on site at its principal place of business each of the following:

(i)     A current list of the full name and last known business address of each Member and the Manager, separately identifying the Member(s) in alphabetical order and the Manager, in alphabetical order;

(ii)     A copy of the filed Articles of Organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any document has been executed; and

(iii)     Copies of any then effective Regulations of the Company.

(b)     The Manager shall determine the accounting methods utilized by the Company.

7.2     Reports.

(a)     In General. The Tax Matters Member of the Company shall be responsible for causing the preparation of financial reports of the Company and the coordination of financial matters of the Company with the Company's accountants.

(b)     Reports. Within ninety (90) days after the end of each fiscal year, the Tax Matters Member shall furnish each Member with a copy of the balance sheet of the Company as of the last day of the applicable period, an income statement for the Company for such period, and a statement of the Company's cash flow for such period. Annual statements shall also include a statement of the Member's capital accounts and changes therein for such fiscal year.

7.3     Tax Matters.

(a)     Tax Elections. The Member of the Company has elected Gustavo Adolfo Hernandez Frieri to act as the "Tax Matters Member" under the Code and in any similar capacity under state or local law.

(b)     Tax Information. Necessary tax information shall be delivered to each Member as soon as practicable after the end of each fiscal year of the Company but not later than five (5) months after the end of each fiscal year.

## SECTION 8
## AMENDMENTS

Amendments to this Operating Agreement may be proposed by any Member(s). Following such proposal, the Member(s) shall submit a verbatim statement of any proposed amendment, providing that counsel for the Company shall have approved of the same in writing as to form, and the Member(s) shall include in any such submission a recommendation as to the proposed amendment. The Member(s) shall seek the written vote of the Member(s) on the proposed

**EXHIBIT C**

amendment or shall call a meeting to vote thereon and to transact any other business that it may deem appropriate. A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the unanimous affirmative vote of the Member(s). Notwithstanding the foregoing, this Operating Agreement shall not be amended without the consent of each Member adversely affected (i) if such amendment would modify the limited liability of a Member; or, (ii) alter the interest of a Member in profits, losses, other items, or any Company distributions.

## SECTION 9
## TRANSFERS

9.1     Restrictions on Transfers.

No Member may Transfer all or any portion of its LLC interests without the written consent of a majority of the Member(s)

9.2     Right of First Refusal.

The Member(s) have a right of first refusal on any LLC interests sold by Member(s) to third parties. A selling Member must offer to sell all, but not less than all of his or her LLC interests to the remaining Member(s), prior to selling to third parties. The sale price shall be at fair market value based on the performance of the Company as determined by the Company's accountant (as defined hereinafter) computed in accordance with Section 9.4 hereof, and payable as provided in Section 9.6(a) of this Operating Agreement.

9.3     Sale of LLC Interests Upon Death of Member.

(a)     Purchase of LLC Interests. Upon the death of a Member, such deceased Member's spouse or personal representative shall have the right to sell such deceased Member's LLC interests at fair market value to third parties, subject to the provisions of Section 9.2. The remaining Member(s) may purchase the deceased Member's LLC interests pro rata, in accordance with the procedures and terms set forth in this Section 9.

(b)     Notice of Death. In the event of the death of a Member, the personal representative or administrator of the deceased Member's estate shall notify the Company (the "Notice") of such Member's death, within thirty (30) days of appointment as personal representative. The actual giving of Notice by the personal representative shall not be construed to be a condition to the right of the remaining Member(s) to purchase the deceased Member's LLC interests.

(c)     Meeting Following Notice. Within ninety (90) days of the Company's receipt of Notice or discovery of the death of the Member, whichever occurs first, the Managers of the Company shall call a meeting of the Member(s) of the Company. At the meeting, a proportionate share of the LLC interests of the deceased Member shall be offered for sale to the remaining Member(s). If anyone Member declines to purchase his pro rata allocation of LLC interests so offered, the remaining Member(s) shall have an option to purchase such LLC interests on a pro rata basis, under the terms hereof.

**EXHIBIT C**

(d)     Purchase Price.  The purchase price for the deceased Member's LLC interests shall be determined as set forth in Section 9.4 hereof, and shall be payable as set forth in Section 9.6(b) of this Operating Agreement.

(e)     Continuing Restrictions.  In the event that all of such LLC interests of the deceased Member so offered for sale are not purchased by the remaining Member(s), the heirs or beneficiaries, as the case may be, of the deceased Member shall become the owner(s) of the deceased Member's LLC interests, and the restrictions imposed by this Operating Agreement upon such LLC interests shall continue to apply.  In no event shall the deceased Member's Personal Representative be required to sell less than all of the deceased Member's LLC interests.

9.4     Purchase Price Under Section 9.2.

(a)     For purposes of a purchase and sale of LLC interests pursuant to Section 9.2 hereunder, the purchase price of each interest shall be its fair market value as determined by the Company's accountant ("Accountant"), as of the end of the month immediately preceding the month in which the sale of LLC interests is scheduled to occur.

(b)     In the event a selling Member disagrees with the fair market value as determined by the Company's Accountant, then the selling Member shall appoint his own Accountant to determine such fair market value in accordance with the terms hereof.  In the event such two Accountants cannot agree as to the fair market value of such LLC interests, then the two Accountants shall select one additional Accountant to make such determination, whereupon the fair market value shall be as determined by the majority of such Accountants, or failing a majority decision as to one fair market value, then the average of all three Accountant's estimates shall be and constitute the fair market value of the LLC interests.

(c)     The fair market value determined under this Section 9.4 shall be binding and conclusive on all parties.

(d)     The fees and charges of the Accountant(s) shall be borne by the party who appointed the Accountant, except with respect to the third Accountant, whose fees shall be borne equally by the parties to such purchase and sale.

9.5.     Purchase Price Under Sections 9.3.

(a)     For purposes of a purchase and sale of LLC interests pursuant to Sections 9.3 hereof, the purchase price of each interest shall be the appraised value of each interest taking into consideration goodwill (the "Appraised Value") as determined by a qualified appraiser, familiar with the Business of the Company (the "Appraiser"), and appointed by the Company.

(b)     In the event the personal representative of the deceased Member, as the case may be, disagrees with the Appraised Value as determined by the Company's Appraiser, then the

**EXHIBIT C**

personal representative of the deceased Member shall appoint his own Appraiser to determine the Appraised Value of each interest. In the event such two Appraisers cannot agree as to the Appraised Value of the LLC interests, then the two Appraisers shall select a third Appraiser to make such determination, whereupon the Appraised Value shall be as determined by the majority of such Appraisers, or failing a majority decision as to one Appraised Value, then the average of all three Appraiser's determinations shall be and constitute the Appraised Value of the LLC interests.

(c)     The Appraised Value determined in accordance with this Section 9.5 shall be binding and conclusive on all parties.

(d)     The fees and charges of the Appraiser(s) shall be borne by the party who appointed the Appraiser, except as to the third Appraiser, whose fees shall be borne equally by the parties to such purchase and sale.

9.6.    Payment of Purchase Price.

(a)     Purchase From Selling Member Pursuant to Section 9.2.  Unless otherwise agreed to by the parties, the purchase price for the LLC interests of the selling Member, pursuant to any sale governed by Section 9.2 hereof, shall be paid at the election of the Company either (i) in cash or (ii) by the payment to the selling Member of an amount equal to 10% of the purchase price in cash or by bank or certified check, and the delivery of a promissory note (the "Note") for the balance of the purchase price. The Note shall be paid in twelve (12) consecutive equal quarterly installments of principal and interest in the amount necessary to fully amortize the principal plus interest in thirty six (36) months, the first of which installments shall be payable ninety (90) days from the date of sale, with the remaining eleven (11) installments payable on the same day of each third month as the date of sale over the next thirty six (36) months.  The Note shall bear simple interest at the rate of interest (not necessarily the best or lowest rate) announced by Chase Manhattan Bank, as its prime rate in effect on the date of sale, provided, however, that such interest rate shall never exceed the maximum rate allowed under law on the date of sale.

(b)     Purchase From Deceased Member Pursuant to Section 9.3. Unless otherwise agreed to by the parties, the purchase price for the LLC interests of the deceased Member pursuant to any sale governed by Section 9.3 hereof, shall be paid in cash at the time of the sale.

(c)     Promissory Note.

Events of Default; Remedies.  A failure by the purchasing Member(s) to pay any installment of the promissory note within ten (10) days from the date such installment is due shall constitute a default hereunder.  In the event of a default, the entire amount of the promissory note shall, at the option of the holder, become immediately due and payable. No remedy conferred herein is intended to be exclusive of any other remedy or remedies and each and every remedy shall be cumulative to every other remedy granted herein or now or hereafter existing at law or in equity or by statute.

9.7     Prohibited Transfers.

Any purported Transfer of LLC interests that is not a permitted Transfer shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a permitted Transfer (or if the Manager, in his sole discretion, elects to recognize a Transfer that is not a permitted Transfer), the LLC interests Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Operating Agreement with respect to the transferred LLC interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such interest may have to the Company. The restrictions set forth herein shall not restrict any pledging of interest required pursuant to any loan

In the case of a Transfer or attempted Transfer of LLC interests that is not a Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Member(s) from all cost, liability, and damage that any of such indemnified Member(s) may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

9.8    Rights of Unadmitted Assignees.

A Person who acquires LLC interests but who is not admitted as a substituted Member pursuant to Section 9.9 hereof shall be entitled only to allocations and distributions with respect to such LLC interests in accordance with this Operating Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Operating Agreement.

9.9    Admission of Substituted Member(s).

Subject to the other provisions of this Section 9, a transferee of LLC interests may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this Section 9.9:

(a)    A majority of the Member(s) consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the Member(s);

(b)    The LLC interests with respect to which the transferee is being admitted was acquired by means of a permitted Transfer;

(c)    The transferee of LLC interests (other than, with respect to clause (i) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and substance reasonably satisfactory to the Manager (and, in the case of clause (ii) below, the transferor Member), (i) accept and adopt the terms and provisions of this Operating Agreement, including this Section 9; and, (ii) assume the obligations of the transferor Member under this Operating Agreement with respect to the transferred LLC interests. The transferor Member shall be released from all such assumed obligations except (A) those obligations or liabilities of the transferor

Member arising out of a breach of this Operating Agreement; (B) in the case of a Transfer to any Person other than a Member, those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer;

(d)　　The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred LLC interests; and,

(e)　　Except in the case of an Involuntary Transfer by operation of law, if required by the Manager, the transferee (other than a transferee that was a Member prior to the Transfer) shall deliver to the Company evidence of the authority of such Person to become a Member and to be bound by all of the terms and conditions of this Operating Agreement, and the transferee and transferor shall each execute and deliver such other instruments as the Manager reasonably deems necessary or appropriate to effect, and as a condition to, such Transfer, including amendments to the Articles or any other instrument filed with the State of New York or any other state or governmental authority.

9.10　　Distributions and Allocations in Respect of Transferred LLC Interests.

If any LLC interests are Transferred during any fiscal year in compliance with the provisions of this Section 10, profits, losses, each item thereof, and all other items attributable to the Transferred LLC interests for such fiscal year shall be divided and allocated between the transferor and the transferee by taking into account their varying percentage LLC interests during the fiscal year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Tax Matters Member. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Company is given notice of a Transfer at least ten (10) days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer, and provided further that if the Company does not receive a notice stating the date such LLC interests were transferred and such other information as the Tax Matters Member may reasonably require within thirty (30) days after the end of the fiscal year during which the Transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the LLC interests on the last day of such fiscal year. Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 9.10, whether or not any Tax Matters Member or the Company has knowledge of any Transfer of ownership of any LLC interests.

**SECTION 10**
**DISSOLUTION AND WINDING UP**

10.1　　Dissolution Events.

(a)　　Dissolution. The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

**EXHIBIT C**

        (i)     The unanimous vote of the Member(s) to dissolve, wind-up, and liquidate the Company.

        (ii)    A judicial determination that an event has occurred that makes it unlawful, impossible or impractical to carry on the Business.

        (iii)   Unless Sections 10(a)(i) or 10(a)(ii) cause a prior dissolution, the Company's existence shall terminate on December 31, 2049.

        The Member(s) hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

        (b)    Reconstitution. If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Dissolution Event, then within an additional ninety (90) days after such determination (the "Reconstitution Period"), all of the Member(s) may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Operating Agreement by forming a new limited liability company on terms identical to those set forth in this Operating Agreement. Unless such an election is made within the Reconstitution Period, the Company shall liquidate and wind up its affairs in accordance with Section 10.2 hereof. If such an election is made within the Reconstitution Period, then:

        (i)     The reconstituted limited liability company shall continue until the occurrence of a Dissolution Event as provided in this Section 10.1(a);

        (ii)    Unless otherwise agreed to by a majority of the Member(s), the Articles and this Operating Agreement shall automatically constitute the Articles and this Operating Agreement of such new Company. All of the assets and liabilities of the dissolved Company shall be deemed to have been automatically assigned, assumed, conveyed and transferred to the new Company. No bond, collateral, assumption or release of any Member's or the Company's liabilities shall be required; provided that the right of the Member(s) to select successor managers and to reconstitute and continue the Business shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted limited liability company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

    10.2   Winding Up.

        Upon the occurrence of (i) a Dissolution Event; or, (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 10.1(b) hereof), the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Member(s), and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's

**EXHIBIT C**

business and affairs, provided that all covenants contained in the Regulations and obligations provided for in this Operating Agreement shall continue to be fully binding upon the Member(s) until such time as the property has been distributed pursuant to this Section 10.2 and the Articles has been canceled pursuant to the Act. The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event and within ninety (90) days after the last day on which the Company may be reconstituted pursuant to Section 10.1(b) hereof. The Liquidator shall take full account of the Company's liabilities and property and shall cause the property or the proceeds from the sale thereof (as determined pursuant to Section 10.9 hereof), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

        (a)    First, to creditors (including Member(s) and Managers who are creditors, to the extent otherwise permitted by law) in satisfaction of all of the Company's Debts and other liabilities (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Member(s) under Section 18-504 or Section 18-604 of the Act;

        (b)    Second, except as provided in this Operating Agreement, to Member(s) and former Member(s) of the Company in satisfaction of liabilities for distribution under Section 18-504 or Section 18-604 of the Act; and

        (c)    The balance, if any, to the Member(s) in accordance with the positive balance in their capital accounts, after giving effect to all contributions, distributions and allocations for all periods.

No Member or Manager shall receive additional compensation for any services performed pursuant to this Section 10.

    10.3    Compliance With Certain Requirements of Operating Agreement: Deficit Capital Accounts.

In the event the Company is "liquidated" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Section 10 to the Member(s) who have positive capital accounts in compliance with Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his capital account (after giving effect to all contributions, distributions and allocations for all fiscal years, including the fiscal year during which such liquidation occurs), such Member shall have an obligation to contribute to the capital of the Company the amount necessary to restore such deficit balance to zero in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(3). In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the Member(s) pursuant to this Section 10 may be:

        (a)    Distributed to a trust established for the benefit of the Member(s) for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall

be distributed to the Member(s) from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Member(s) pursuant to Section 10.2 hereof; or

   (b) Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Member(s) as soon as practicable.

  10.4 <u>Deemed Distribution and Recontribution</u>.

  Notwithstanding any other provision of this Section 10, in the event the Company is liquidated within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g) but no Dissolution Event has occurred, the Property shall not be liquidated, the Company's Debts and other liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed the property in-kind to the Member(s), who shall be deemed to have taken subject to all Debts of the Company and other liabilities all in accordance with their respective capital accounts. Immediately thereafter, the Member(s) shall be deemed to have recontributed the property in-kind to the Company, which shall be deemed to have taken subject to all such liabilities.

  10.5 <u>Rights of Member(s)</u>.

  Except as otherwise provided in this Operating Agreement, each Member shall look solely to the property of the Company for the return of its capital contribution and has no right or power to demand or receive property other than cash from the Company. If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such capital contribution, the Member(s) shall have no recourse against the Company or any other Member or the Manager.

  10.6 <u>Notice of Dissolution/Termination</u>.

   (a) In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 10.1, result in a dissolution of the Company, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Member(s) and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Managers) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Manager).

   (b) Upon completion of the distribution of the Company's property as provided in this Section 10, the Company shall be terminated, and the Liquidator shall cause the filing of the Articles of Dissolution pursuant to Section 705 of the Act and shall take all such other actions as may be necessary to terminate the Company.

  10.7 <u>Allocations During Period of Liquidation</u>.

**EXHIBIT C**

During the period commencing on the first day of the fiscal year during which a Dissolution Event occurs and ending on the date on which all of the assets of the Company have been distributed to the Member(s) pursuant to Section 10.2 hereof (the "Liquidation Period"), the Member(s) shall continue to share profits, losses, gain, loss and other items of Company income, gain, loss or deduction in the manner provided in Section 3 hereof.

10.8    Character of Liquidating Distributions.

All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

10.9    The Liquidator.

(a)    Definition. The "Liquidator" shall mean a Person appointed by the Managers to oversee the liquidation of the Company.

(b)    Fees. The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this Section 9 and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)    Indemnification. The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator which was material to the cause of action.

10.10    Form of Liquidating Distributions.

For purposes of making distributions required by Section 10.2 hereof, the Liquidator may determine whether to distribute all or any portion of the property in-kind or to sell all or any portion of the property and distribute the proceeds therefrom.

**SECTION 11**
**POWER OF ATTORNEY**

11.1    Manager as Attorney-In-Fact.

Each Member hereby makes, constitutes, and appoints the Manager, with full power of substitution and resubstitution, its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file, publish and record (i) all articles of formation, amended name or similar articles, and other articles and

instruments (including counterparts of this Operating Agreement) which the Manager may deem necessary to be filed by the Company under the laws of the State of New York or any other jurisdiction in which the Company is doing or intends to do business; (ii) any and all amendments, restatements or changes to this Operating Agreement and the instruments described in clause (i), as now or hereafter amended, which the Manager may deem necessary to effect a change or modification of the Company in accordance with the terms of this Operating Agreement, including, without limitation, amendments, restatements or changes to reflect (A) any amendments adopted by the Member(s) in accordance with the terms of this Operating Agreement, (B) the admission of any substituted Member and (C) the disposition by any Member of its interest in the Company; (iii) all articles of cancellation and other instruments which the Manager deems necessary or appropriate to effect the dissolution and termination of the Company pursuant to the terms of this Operating Agreement; and, (iv) any other instrument which is now or may hereafter be required by law to be filed on behalf of the Company or is deemed necessary by the Manager to carry out fully the provisions of this Operating Agreement in accordance with its terms. Each Member authorizes each such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary in connection with any of the foregoing, hereby giving each such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite to be done in connection with the foregoing as fully as such Member might or could do personally, and hereby ratify and confirm all that any such attorney-in-fact shall lawfully do, or cause to be done, by virtue thereof or hereof.

11.2  Nature of Special Power.

The power of attorney granted to the Manager pursuant to this Section 11:

(a)  Is a special power of attorney coupled with an interest and is irrevocable;

(b)  May be exercised by any such attorney-in-fact by listing the Member(s) executing any agreement, certificate, instrument, or other document with the single signature of any such attorney-in-fact acting as attorney-in-fact for such Member(s); and

(c)  Shall survive and not be affected by the subsequent Bankruptcy, insolvency, dissolution, or cessation of existence of a Member and shall survive the delivery of an assignment by a Member of the whole or a portion of its interest in the Company (except that where the assignment is of such Member's entire interest in the Company and the assignee, with the consent of the other Member(s), is admitted as a substituted Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling any such attorney-in-fact to effect such substitution) and shall extend to such Member's, or assignee's successors and assigns.

### SECTION 12
### MISCELLANEOUS

12.1  Notices.

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the Person or to an

**EXHIBIT C**

officer of the Person to whom the same is directed; or, (ii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, or by facsimile, if such facsimile is followed by a hard copy of the facsimile communication sent promptly thereafter by registered or certified mail, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Member(s) and Managers:

(a) If to the Company, to the address determined pursuant to Section 1.3 hereof;

(b) If to the Manager or to a Member, to the address set forth in Section 2.1 hereof.

### 12.2 Binding Effect.

Except as otherwise provided in this Operating Agreement, every covenant, term, and provision of this Operating Agreement shall be binding upon and inure to the benefit of the Member(s) and their respective successors, transferees, and assigns.

### 12.3 Construction.

Every covenant, term, and provision of this Operating Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

### 12.4 Time.

In computing any period of time pursuant to this Operating Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

### 12.5 Headings.

Section and other headings contained in this Operating Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Operating Agreement or any provision hereof.

### 12.6 Severability.

Except as otherwise provided in the succeeding sentence, every provision of this Operating Agreement is intended to be severable, and, if any term or provision of this Operating Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Operating Agreement. The preceding sentence of this Section 12.6 shall be of no force or effect if the consequence of enforcing the remainder of this Operating Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

**EXHIBIT C**

12.7   Incorporation by Reference.

Every exhibit, schedule, and other appendix attached to this Operating Agreement and referred to herein is not incorporated in this Operating Agreement by reference unless this Operating Agreement expressly otherwise provide.

12.8   Variation of Terms.

All terms and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

12.9   Governing Law.

The laws of the State of New York shall govern the validity of this Operating Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder.

12.10   Waiver of Jury Trial.

Each of the Member(s) irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Operating Agreement.

12.11   Counterpart Execution.

This Operating Agreement may be executed in any number of counterparts with the same effect as if all of the Member(s) had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

**THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK**

**EXHIBIT C**

## OPERATING AGREEMENT OF 3 GRAMERCY PARK WEST LLC
### [SIGNATURE PAGE]

**IN WITNESS WHEREOF,** the parties have executed and entered into this Operating Agreement of the Company as of the day first above set forth.

MANAGER:

By: _____
       Gustavo Adolfo Hernandez Frieri

MEMBER:

Gramercy Irrevocable Trust,
a Nova Scotia Trust

By:   Trustee
      Americas Fiduciary, Ltd.,
      A Nevis corporation

By: _____
      Timothy D. Richards, Director

H:\CLIENTS\Gustavo Hernandez\Corp\3 Gramercy Park West LLC\OPERATING AGREEMENT.doc