**EXHIBIT D**

### AMENDED AND RESTATED
### OPERATING AGREEMENT
### OF
### 3 GRAMERCY PARK WEST LLC

In accordance with the New York Limited Liability Company Act (the "Act") and subject to the Articles of Organization, which were filed on the 29th day of July, 2005 with the New York Department of State. The Gramercy Irrevocable Trust, a Nova Scotia Trust (the "Trust"), as sole member of 3 GRAMERCY PARK WEST LLC adopts the following resolutions as of the ⟶2⟨th⟩ day of ⟶JULY⟶ 2005 regarding the conduct of the business and affairs of 3 GRAMERCY PARK WEST LLC, a New York limited liability company ("Company").

### SECTION 1
### THE COMPANY

1.1     Definitions.

Capitalized words and phrases used in this Operating Agreement have the following meanings:

"Act" means the New York Limited Liability Company Act, Chapter 18, as amended from time to time (or any corresponding provisions of succeeding law).

"Articles" means the Articles of Organization filed with the New York Department of State pursuant to the Act to form the Company, as originally executed and amended, modified, supplemented or restated from time to time, as the context requires.

"Articles of Dissolution" means a certificate filed in accordance with the New York Limited Liability Company Act Section 705.

"Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy." A "Voluntary Bankruptcy" means, with respect to any Person (i) the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; (ii) the filing of any petition or answer by such Person seeking to adjudicate itself as bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property; or, (iii) corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person



GOVERNMENT
EXHIBIT
9
PENGAD 800-631-6989

which petition shall not be dismissed within ninety (90) days, or without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within ninety (90) days.

"Business" means the business of operating and managing 3 GRAMERCY PARK WEST LLC.

"Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed pursuant to this Operating Agreement and the Articles and the limited liability company continuing the business of this Company in the event of dissolution of the Company as herein provided.

"Debt" means (i) any indebtedness for borrowed money or the deferred purchase price of property as evidenced by a note, bonds, or other instruments; (ii) obligations as lessee under capital leases; (iii) obligations secured by any mortgage, pledge, security interest, encumbrance, lien or charge of any kind existing on any asset owned or held by the Company whether or not the Company has assumed or become liable for the obligations secured thereby; (iv) accounts payable; and, (v) obligations under direct or indirect guarantees of [including obligations (contingent or otherwise) to assure a creditor against loss in respect of] indebtedness or obligations of the kinds referred to in clauses (i), (ii), (iii) and (iv), above provided that Debt shall not include obligations in respect of any accounts payable that are incurred in the ordinary course of the Company's business and are not delinquent or are being contested in good faith by appropriate proceedings.

"Dissolution Event" shall have the meaning set forth in Section 10.1 hereof.

"Effective Date" means the date the Articles of Organization were filed.

"GAAP" means generally accepted accounting principles in effect in the United States of America from time to time.

"Involuntary Bankruptcy" has the meaning set forth in the definition of Bankruptcy.

"Liquidation Period" has the meaning set forth in Section 10.7 hereof.

"Liquidator" has the meaning set forth in Section 10.9(a) hereof.

"Manager" means the Member who shall also serve as the Manager of the Company.

"Member" means any Person (i) who is referred to as such in Section 2.1, or who has become a substituted Member pursuant to the terms of this Operating Agreement; and, (ii) who has not ceased to be a Member. "Member(s)" means all such Persons.

EXHIBIT D

"Percentage Interests" means a Member's percentage of LLC interests reflected in Section 2.1.

"Person" means any individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee or other entity.

"Property" shall mean the second floor parlor unit, located at 3 Gramercy Park West, New York, NY 10003.

"Reconstitution Period" has the meaning set forth in Section 10.1(b) hereof.

"Regulations" mean this Operating Agreement of 3 GRAMERCY PARK WEST LLC including all Exhibits and Schedules attached hereto, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Operating Agreement as a whole, unless the context otherwise requires.

"Treasury Regulations" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are amended from time to time.

"Securities Act" means the Securities Act of 1933, as amended.

"Tax Matters Member" has the meaning set forth in Section 7.3(a) hereof.

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, pledge or hypothecation or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of.

"Units or Unit" means any ownership interest in the Company representing a Capital Contribution of $1.00, including any and all benefits to which the holder of such Units may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this agreement.  The Company shall issue 100 Units.

"Voluntary Bankruptcy" has the meaning set forth in the definition of "Bankruptcy."

1.2     Name.

The name of the Company shall be 3 GRAMERCY PARK WEST LLC and all business of the Company shall be conducted in such name. The Manager may change the name of the Company upon ten (10) days notice to the Member(s).

1.3     Purpose; Powers.

(a)     The sole purpose of the Company is to take title to the Property, located at 3 Gramercy Park West, New York, NY 10003, second floor unit.

(b)     The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or in furtherance of the purposes of the Company set forth in Section 1.3(a) hereof and has, without limitation, any and all powers that may be exercised on behalf of the Company by the Manager pursuant to Section 5 hereof. The Company will not be an entity through which other business is conducted or have any liabilities other than liabilities associated with the ownership of the Property.

1.4     Principal Place of Business.

The principal place of business of the Company shall be 2665 South Bayshore Drive, Suite 703, Miami, Florida 33133.  The Manager may change the principal place of business of the Company to any other place within or without the State of New York upon ten (10) days notice to the Member(s). The registered office of the Company in the State of New York initially is located at Corporate Creations Network, Inc., 15 North Mill Street, Nyack, New York  10960.

1.5     Term.

The term of the Company shall commence on the date the articles of organization of the Company (the "Articles") are filed with the New York Department of State in accordance with the Act and shall continue until the winding up and liquidation of the Company and its business is completed following a Dissolution Event, as provided in Section 10 hereof.

1.6     Filings; Agent for Service of Process.

(a)     The Manager is hereby authorized to and shall cause the Articles to be filed with the New York Department of State in accordance with the Act. The Manager shall take any and all other actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of New York, including the preparation and filing of such amendments to the Articles and such other assumed name articles, documents, instruments and publications as may be required by law, including, without limitation, action to reflect:

(i)     a change in the Company name;

(ii)     a correction of false or erroneous statements in the Articles or the desire of the Member(s) to make a change in any statement therein in order that it shall accurately represent the agreement among the Member(s); or,

(iii)     a change in the time for dissolution of the Company as stated in the Articles and in this Operating Agreement.

(b)     The Member(s) and the Manager shall execute and cause to be filed original or amended articles and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the laws of any other jurisdictions in which the Company engages in business.

000880-03

**EXHIBIT D**

(c)      The registered agent for service of process on the Company in the State of New York shall be Corporate Creations Network, Inc., 15 North Mill Street, Nyack, New York 10960 or any successor as appointed by the Member(s) in accordance with the Act.

(d)      Upon the dissolution and completion of the winding up and liquidation of the Company in accordance with Section 10, the Manager shall promptly execute and cause to be filed articles of dissolution in accordance with the Act and the laws of any other jurisdictions in which the Manager deems such filing necessary or advisable.

1.7      Title to Property.

All property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in his individual name, and each Member's interest in the Company shall be personal property for all purposes. At all times after the Effective Date, the Company shall hold title to all of its property in the name of the Company and not in the name of any Member. The Member(s) hereby agree that no Member, nor any successor in interest to any Member, shall have the right while this Operating Agreement remain in effect, including, without limitation, during the period the Company is in liquidation following any dissolution, to have any Company asset partitioned, or to file a complaint or institute any proceedings at law or in equity to have such asset partitioned; and each Member, on behalf of himself, his successors, successors-in-title, and assigns, hereby waives any such right.

1.8      Payments of Individual Obligations.

The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member.

1.9      Independent Activities; Transactions with Member(s).

(a)      The Manager shall be required to devote such time to the affairs of the Company as may be necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that the Manager may deem appropriate in his discretion.

(b)      Insofar as permitted by applicable law, neither this Operating Agreement nor any activity undertaken pursuant hereto shall prevent any Member or the Manager from engaging in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company or any Member, or require any Member or the Manager to permit the Company or any other Member to participate in any such activities, and as a material part of the consideration for the execution of this Operating Agreement by each Member, each Member hereby waives, relinquishes, and renounces any such right or claim of participation.

(c)      To the extent permitted by applicable law and subject to the provisions of this Operating Agreement, the Manager is hereby authorized to cause the Company to purchase property from, sell property to or otherwise deal with any Member or Manager, provided that any

such purchase, sale or other transaction shall be made on terms and conditions which are no less favorable to the Company than if the sale, purchase or other transaction had been made with an independent third party.

## SECTION 2
## MEMBER(S)' CAPITAL CONTRIBUTIONS

2.1    Original Capital Contributions.

The name, address, original capital contribution, and initial percentage interest of each of the Member(s) is as follows:

| Names and Address | Original Capital Percentage Contribution | Interest (%) | Units |
|---|---|---|---|
| Gramercy Irrevocable Operating Trust A Nova Scotia Trust C/O Trustee AMERICAS FIDUCIARY LTD., a Nevis corporation P.O. Box 3463 Road Town, Tortola BVI | $100.00 | 100% | 100 |

2.2    Additional Capital Contributions.

The Member(s) may make additional capital contributions only with the written consent of all Member(s). If any Member contributes additional capital, his Percentage Interest shall not change. Nothing herein shall be construed to require the Member(s) to make any additional capital contributions.

2.3    Capital Account.

A Capital Account shall be maintained for each Member in accordance with Code Section 704(c), and such account shall be adjusted annually to reflect (i) additions or withdrawals of capital by any Member and (ii) allocations of profit, loss or gain allocated to such Member in accordance with Section 3, below.  Capital Accounts shall be adjusted at the end of each calendar year, or more frequently at the direction of the Managers.  No Member shall be permitted to withdraw any capital from his Capital Account without the approval of the majority of the Member(s).

## SECTION 3
## ALLOCATIONS

3.1    Allocation of Profits and Losses.

000882-03

Except as to special allocations set forth in Sections 3.2 and 3.3, all profits, income, gain, deduction and loss shall be allocated to the Member(s) according to their Percentage Interests in the Company.  All allocations of profit, gain or loss shall be reflected in each Member's Capital Account.

3.2     Regulatory Allocations.

(a)     Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in the Company's minimum gain during any fiscal year, each Member shall be specially allocated items of the Company's income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's portion of the net decrease in the Company's minimum gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 3.2(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Section 3, if there is a net decrease in the Member's nonrecourse debt minimum gain attributable to a Member nonrecourse debt during the Company's fiscal year, each Member who has a portion of the Member nonrecourse debt minimum gain attributable to such Member nonrecourse debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of the Company's income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's portion of the net decrease in Member nonrecourse debt minimum gain attributable to such Member nonrecourse debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 3.2(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

(c)     Nonrecourse Deductions. Nonrecourse deductions for any fiscal year shall be specially allocated to the Member(s) in proportion to their respective percentage interests.

(d)     Member Nonrecourse Deductions. Any Member nonrecourse deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member nonrecourse debt to which such Member nonrecourse deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(e)     Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of the Company's assets, pursuant to Code Section 734(b) or Code Section 743(b) is required,

pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining capital accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to the capital accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Member(s) in accordance with their interests in the Company in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member(s) to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

      3.3     <u>Curative Allocations</u>.

The allocations set forth in Section 3.2 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Member(s) that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 3.3. Therefore, notwithstanding any other provision of this Section 3.3 (other than the Regulatory Allocations), the Tax Matters Member, as provided in Section 7.3(a) shall make such offsetting special allocations of the Company's income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's capital account balance is, to the extent possible, equal to the capital account balance such Member would have had if the Regulatory Allocations were not part of this Operating Agreement and all of the Company's items were allocated pursuant to Sections 3.1.

      3.4     <u>Other Allocation Rules</u>.

      (a)     The Member(s) are aware of the income tax consequences of the allocations made by this Section 3 and hereby agree to be bound by the provisions of this Section 3 in reporting their shares of the Company's income and loss for income tax purposes.

      (b)     Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), the Member(s)' interests in the Company's profits are in proportion to their percentage interests.

      (c)     To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Tax Matters Member shall endeavor to treat distributions of net cash from operations or net cash from sales or refinancings as having been made from the proceeds of a nonrecourse liability or a Member nonrecourse debt.

      3.5     <u>Tax Allocations: Code Section 704(c)</u>.

In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Member(s) so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial fair market value.

Any elections or other decisions relating to such allocations shall be made by the Tax Matters Member in any manner that reasonably reflects the purpose and intention of this Operating Agreement. Allocations pursuant to this Section 3.5 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's capital account or share of profits, losses, other items, or distributions pursuant to any provision of this Operating Agreement.

## SECTION 4
## DISTRIBUTIONS

4.1     Distribution.

The Manager shall make distributions of profits and gain to the Member(s) in accordance with their Percentage Interests at such times as the Manager may determine.  All such distributions shall be deducted from the respective Member(s)' Capital Account.

4.2     Minimum Distributions.

Notwithstanding Section 4.1, the Manager shall make minimum annual distributions from the Company on the last day of any calendar year to the extent that any Member incurs an income tax liability due to allocation of profit or gain according to the Member's Percentage Interests in the Company.

4.3     Amounts Withheld.

All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or allocation to the Company or the Member(s) shall be treated as amounts paid or distributed, as the case may be, to the Member(s) with respect to which such amount was withheld pursuant to this Section 4.3 for all purposes under this Operating Agreement. The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Member(s), and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Member(s) with respect to which such amount was withheld.

4.4     Limitations on Distributions.

(a)     The Company shall make no distributions to the Member(s) except (i) as provided in this Section 4 and Section 10 hereof; or, (ii) as agreed to by a majority of the Member(s).

(b)     A Member may not receive a distribution from the Company to the extent that, after giving effect to the distribution, all liabilities of the Company, other than liability to Member(s) on account of their capital contributions, would exceed the fair value of the Company's assets.

000885-03

**SECTION 5**
**MANAGEMENT**

5.1     Manager.

(a)     The management of the Company shall be vested in the Manager designated by the Members as provided in Section 5.1(c) hereof.

(b)     The number of Managers shall be no less than one (1) unless otherwise provided herein. The initial manager of the Company shall be Gustavo Adolfo Hernandez Frieri.

(c)     Each Member shall have the right to appoint one Manager, which may be such Member.

(d)     A Manager shall remain in office until removed by the Class Member who appointed the Manager, or upon the resignation, disability or death of such Manager. The respective Class Member shall replace the departing Manager by delivering to the Company a statement designating a successor Manager and setting forth such successor Manager's business addresses and telephone numbers.

(e)     The Manager shall perform his duties as a Manager in good faith, in a manner he reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A person who so performs his duties shall not have any liability by reason of being or having been the Manager of the Company.

(f)     The Manager shall have the power to delegate authority to such officers, employees, agents and representatives of the Company, as they may from time to time deem appropriate.

(g)     The Manager shall not be liable under a judgment, decree or order of court, or in any other manner, for a debt, obligation or liability of the Company.

5.2     Manager's Powers.

(a)     Except as otherwise provided in this Operating Agreement, all powers to control and manage the Business and affairs of the Company shall be exclusively vested in the Manager and the Manager may exercise all powers of the Company and do all such lawful acts as are not by statute, the Articles or this Operating Agreement directed or required to be exercised or done by the Member(s) and in so doing shall have the right and authority to take all actions which the Manager deems necessary, useful or appropriate for the management and conduct of the Business, including exercising the following specific rights and powers:

(i)     Conduct its business, carry on its operations and have and exercise the powers granted by the Act in any state, territory, district or possession of the United States, or in

000886-03

**EXHIBIT D**

any foreign country which may be necessary or convenient to effect any or all of the purposes for which it is organized;

(ii)    Acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(iii)   Operate, maintain, finance, improve, construct, own, grant operations with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(iv)   Execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of the Business, or in connection with managing the affairs of the Company, including, executing amendments to this Operating Agreement and the Articles in accordance with the terms of this Operating Agreement, both as Manager and, if required, as attorney-in-fact for the Member(s) pursuant to any power of attorney granted by the Member(s) to the Manager;

(v)    Borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Company assets;

(vi)   Execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Company assets;

(vii)  Prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the assets of the Company and in connection therewith execute any extensions or renewals of encumbrances on any or all of such assets;

(viii) Care for and distribute funds to the Member(s) by way of cash income, return of capital, or otherwise, all in accordance with the provisions of this Operating Agreement, and perform all matters in furtherance of the objectives of the Company or this Operating Agreement;

(ix)   Contract on behalf of the Company for the employment and services of employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(x)    Engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company assets and Manager liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of each state in which the Company is then formed or qualified;

**EXHIBIT D**

(xi)     Take, or refrain from taking, all actions, not expressly proscribed or limited by this Operating Agreement, as may be necessary or appropriate to accomplish the purposes of the Company;

(xii)    Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company, the Member(s) or the Manager in connection with activities arising out of, connected with, or incidental to this Operating Agreement, and to engage counsel or others in connection therewith;

(xiii)   Purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited companies, other limited liability companies, or individuals or direct or indirect obligations of the United States or of any government, state, territory, government district or municipality or of any instrumentality of any of them;

(xiv)    Indemnify a Member or the Manager or former Member or Manager, and to make any other indemnification that is authorized by this Operating Agreement in accordance with the Act.

(xv)     All acts of the Manager, taken voluntarily and in good faith, shall be authorized hereunder. Any acts of the Manager under duress or on behalf of any creditor of a Member shall not be authorized hereunder.

5.3     Duties and Obligations of the Manager.

(a)     The Manager shall cause the Company to conduct its business and operations separate and apart from that of any Member or the Manager, including, without limitation, (i) segregating Company assets and not allowing funds or other assets of the Company to be commingled with the funds or other assets of, held by, or registered in the name of, any Member or the Manager; (ii) maintaining books and financial records of the Company separate from the books and financial records of any Member or the Manager, and observing all Company procedures and formalities, including, without limitation, maintaining minutes of Company meetings and acting on behalf of the Company only pursuant to due authorization of the Member(s); (iii) causing the Company to pay its liabilities from assets of the Company; and, (iv) causing the Company to conduct its dealings with third parties in its own name and as a separate and independent entity.

(b)     The Manager shall take all actions which may be necessary or appropriate (i) for the continuation of the Company's valid existence as a limited liability company under the laws of the State of New York and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Member(s) or to enable the Company to conduct the business in which it is engaged; and, (ii) for the accomplishment of the Company's purposes, including the acquisition, development, maintenance, preservation, and operation of property in accordance with the provisions of this Operating Agreement and applicable laws.

000888-03

(c)     The Manager shall be under a fiduciary duty to conduct the affairs of the Company in the best interests of the Company and of the Member(s), including the safekeeping and use of all of the property and the use thereof for the exclusive benefit of the Company.

5.4     Indemnification of the Manager.

(a)     Unless otherwise provided in Section 5.4(d) hereof, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Company's property) shall indemnify, save harmless, and pay all judgments and claims against the Manager relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Manager in connection with the Business, including reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred.

(b)     Unless otherwise provided in Section 5.4(d) hereof, in the event of any action by a Member against the Manager, including a Company derivative suit, the Company shall indemnify, save harmless, and pay all expenses of the Manager, including reasonable attorneys' fees incurred in the defense of such action.

(c)     Unless otherwise provided in Section 5.4(d) hereof, the Company shall indemnify, save harmless, and pay all expenses, costs, or liabilities of the Manager, if for the benefit of the Company and in accordance with this Operating Agreement the Manager makes any deposit or makes any other similar payment or assumes any obligation in connection with any property proposed to be acquired by the Company and suffers any financial loss as the result of such action.

(d)     Notwithstanding the provisions of Sections 5.4(a), 5.4(b) and 5.4(c) above, such Sections shall be enforced only to the maximum extent permitted by law and the Manager shall not be indemnified from any liability for the fraud, intentional misconduct, gross negligence or a knowing violation of the law which was material to the cause of action.

(e)     The obligations of the Company set forth in this Section 5.4 are expressly intended to create third party beneficiary rights of the Manager and any Member is authorized, on behalf of the Company, to give written confirmation to the Manager of the existence and extent of the Company's obligations to the Manager hereunder.

5.5     Bankruptcy, Other Circumstances, and Involuntary Assignment by Managers.

The Manager shall not cease to be such by reason of any of the following. An order for relief against the Manager is entered under Chapter 7 of the federal bankruptcy law, or the Manager: (a) makes a general assignment for the benefit of creditors; (b) files a voluntary petition under the federal bankruptcy law; (c) files a petition or answer seeking for the Manager any reorganization arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; (d) files an answer or other pleading admitting or failing to contest the material

**EXHIBIT D**

allegations of a petition filed against the Manager in any proceeding of this nature; or, (e) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Manager or of all or any substantial part of the Manager's properties. In addition the following circumstance shall not cause a person to cease to be a Manager: sixty days after the commencement of any proceeding against the Manager seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, the proceeding has not been dismissed, or if with sixty days after the appointment without the Manager's consent or acquiescence of a trustee, receiver, or liquidator of the Manager or of all or any substantial part of the Manager's properties, the appointment is not vacated or stayed, or within sixty days after the expiration of any such stay, the appointment is not vacated.

**SECTION 6**
**ROLE OF MEMBER(S)**

6.1     <u>Rights or Powers</u>.

The Member(s) shall not have any right or power to take part in the management or control of the Company or its business and affairs or to act for or bind the Company in any way as a Member. Notwithstanding the foregoing, the Member(s) have all the rights and powers specifically set forth in this Operating Agreement and, to the extent not inconsistent with this Operating Agreement, in the Act.

6.2     <u>Voting Rights</u>.

No Member has any voting right except with respect to those matters specifically reserved for a Member vote which are set forth in this Operating Agreement and as required in the Act.

6.3     <u>Meetings of the Member(s)</u>.

(a)     Meetings of the Member(s) may be called upon the written request of any Member. The call shall state the location of the meeting and the nature of the business to be transacted. Notice of any such meeting shall be given to all Member(s) not less than seven (7) days nor more than thirty (30) days prior to the date of such meeting. Member(s) may vote in person, by proxy or by telephone at such meeting and may waive advance notice of such meeting. Whenever the vote or consent of Member(s) is permitted or required under this Operating Agreement, such vote or consent may be given at a meeting of the Member(s). Except as otherwise expressly provided in this Operating Agreement, the unanimous vote of the Member(s) shall be required to constitute the act of the Member(s).

(b)     For the purpose of determining the Member(s) entitled to vote on, or to vote at, any meeting of the Member(s) or any adjournment thereof, the Manager or the Member requesting such meeting may fix, in advance, a date as the record date for any such determination. Such date shall not be more than thirty (30) days nor less than ten (10) days before any such meeting.

(c)     Each Member may authorize any Person or Persons to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or its attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it.

(d)     Notwithstanding this Section 6.3, the Company may take any action contemplated under this Operating Agreement as approved by the consent of the Member(s), such consent to be provided in writing, or by telephone or facsimile, if such telephone conversation or facsimile is followed by a written summary of the telephone conversation or facsimile communication sent by registered or certified mail, postage and charges prepaid, addressed as described in Section 12.1 hereof, or to such other address as such Person may from time to time specify by notice to the Member(s) and the Manager.

6.4     Withdrawal/Resignation.

Except as otherwise provided in Sections 4 and 10 hereof, no Member shall demand or receive a return on or of its capital contributions or withdraw from the Company without the consent of all Member(s). Except as otherwise provided in the Act or this Operating Agreement, upon resignation, any resigning member is entitled to receive only the distribution to which he is entitled under this Operating Agreement, which shall be equal to the fair value of his LLC interests the Company as of the date of resignation. Under circumstances requiring a return of any capital contributions, no Member has the right to receive any property other than cash except as may be specifically provided herein.

6.5     Member Compensation.

No Member shall receive any interest, salary or drawing with respect to its capital contributions or its capital account or for services rendered on behalf of the Company, or otherwise, in its capacity as a Member, except as otherwise provided in this Operating Agreement.

6.6     Member(s)' Liability.

No Member shall be liable under a judgment, decree or order of a court, or in any other manner for the Debts or any other obligations or liabilities of the Company. A Member shall be liable only to make its capital contributions and shall not be required to restore a deficit balance in its capital account or to lend any funds to the Company or, after its capital contributions have been made, to make any additional contributions, assessments or payments to the Company, provided that a Member may be required to repay distributions made to it as provided in this Operating Agreement or Section 18-504 of the Act. The Manager shall not have any personal liability for the repayment of any capital contributions of any Member.

6.7     Partition.

**EXHIBIT D**

While the Company remains in effect or is continued, each Member agrees and waives its rights to have any of the Company's property partitioned, or to file a complaint or to institute any suit, action or proceeding at law or in equity to have any of the Company's property partitioned, and each Member, on behalf of itself, its successors and its assigns hereby waives any such right.

6.8     Confidentiality.

Except as contemplated hereby or required by a court of competent authority, each Member shall keep confidential and shall not disclose to others without the prior written consent of all Member(s) any information which (i) pertains to this Operating Agreement, any negotiations pertaining thereto, any of the transactions contemplated hereby, or the Business of the Company; or, (ii) pertains to confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary. No Member shall use any information which (i) pertains to this Operating Agreement, any negotiations pertaining hereto, any of the transactions contemplated hereby, or the Business of the Company; or, (ii) pertains to the confidential or proprietary information of any Member or the Company or which any Member has labeled in writing as confidential or proprietary, except in connection with the transactions contemplated hereby. The term "confidential information" is used in this Section 6.8 to describe information which is confidential, non-public or proprietary in nature, was provided to such Member or its representatives by the Company, any other Member, and relates either directly, or indirectly to the Company or the Business. Information which (i) is available, or becomes available, to the public through no fault or action by such Member; or (ii) becomes available on non-confidential basis from any source other than the Company, any other Member, and such source is not prohibited from disclosing such information, shall not be deemed confidential information.

6.9     Transactions Between a Member and the Company.

Except as otherwise provided by applicable law, any Member may, but shall not be obligated to, lend money to the Company, act as surety for the Company and transact other business with the Company and has the same rights and obligations when transacting business with the Company as a person or entity who is not a Member. A Member may also be an employee or be retained as an agent of the Company. The existence of these relationships and acting in such capacities will not result in the Member being deemed to be participating in the control of the business of the Company or otherwise affect the limited liability of the Member.

6.10     Other Instruments.

Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as the Manager deems necessary, useful or appropriate to comply with any laws, rules or regulations as may be necessary to enable the Company to fulfill its responsibilities under this Operating Agreement.

## SECTION 7
## ACCOUNTING, BOOKS AND RECORDS

    7.1    <u>Accounting, Books and Records</u>.

    (a)    The Company shall keep on site at its principal place of business each of the following:

    (i)    A current list of the full name and last known business address of each Member and the Manager, separately identifying the Member(s) in alphabetical order and the Manager, in alphabetical order;

    (ii)    A copy of the filed Articles of Organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any document has been executed; and

    (iii)    Copies of any then effective Regulations of the Company.

    (b)    The Manager shall determine the accounting methods utilized by the Company.

    7.2    <u>Reports</u>.

    (a)    <u>In General</u>. The Tax Matters Member of the Company shall be responsible for causing the preparation of financial reports of the Company and the coordination of financial matters of the Company with the Company's accountants.

    (b)    <u>Reports</u>. Within ninety (90) days after the end of each fiscal year, the Tax Matters Member shall furnish each Member with a copy of the balance sheet of the Company as of the last day of the applicable period, an income statement for the Company for such period, and a statement of the Company's cash flow for such period. Annual statements shall also include a statement of the Member's capital accounts and changes therein for such fiscal year.

    7.3    <u>Tax Matters</u>.

    (a)    <u>Tax Elections</u>. The Member of the Company has elected Gustavo Adolfo Hernandez Frieri to act as the "Tax Matters Member" under the Code and in any similar capacity under state or local law.

    (b)    <u>Tax Information</u>. Necessary tax information shall be delivered to each Member as soon as practicable after the end of each fiscal year of the Company but not later than five (5) months after the end of each fiscal year.

## SECTION 8
## AMENDMENTS

Amendments to this Operating Agreement may be proposed by any Member(s). Following such proposal, the Member(s) shall submit a verbatim statement of any proposed amendment, providing that counsel for the Company shall have approved of the same in writing as to form, and the Member(s) shall include in any such submission a recommendation as to the proposed amendment. The Member(s) shall seek the written vote of the Member(s) on the proposed amendment or shall call a meeting to vote thereon and to transact any other business that it may deem appropriate. A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the unanimous affirmative vote of the Member(s). Notwithstanding the foregoing, this Operating Agreement shall not be amended without the consent of each Member adversely affected (i) if such amendment would modify the limited liability of a Member; or, (ii) alter the interest of a Member in profits, losses, other items, or any Company distributions.

## SECTION 9
## TRANSFERS

9.1     <u>Restrictions on Transfers</u>.

No Member may Transfer all or any portion of its LLC interests without the written consent of a majority of the Member(s)

9.2     <u>Right of First Refusal</u>.

The Member(s) have a right of first refusal on any LLC interests sold by Member(s) to third parties. A selling Member must offer to sell all, but not less than all of his or her LLC interests to the remaining Member(s), prior to selling to third parties. The sale price shall be at fair market value based on the performance of the Company as determined by the Company's accountant (as defined hereinafter) computed in accordance with Section 9.4 hereof, and payable as provided in Section 9.6(a) of this Operating Agreement.

9.3     <u>Sale of LLC Interests Upon Death of Member</u>.

(a)     <u>Purchase of LLC Interests</u>. Upon the death of a Member, such deceased Member's spouse or personal representative shall have the right to sell such deceased Member's LLC interests at fair market value to third parties, subject to the provisions of Section 9.2. The remaining Member(s) may purchase the deceased Member's LLC interests pro rata, in accordance with the procedures and terms set forth in this Section 9.

(b)     <u>Notice of Death</u>. In the event of the death of a Member, the personal representative or administrator of the deceased Member's estate shall notify the Company (the "Notice") of such Member's death, within thirty (30) days of appointment as personal representative. The actual giving of Notice by the personal representative shall not be construed to be a condition to the right of the remaining Member(s) to purchase the deceased Member's LLC interests.

(c)     <u>Meeting Following Notice</u>. Within ninety (90) days of the Company's receipt of Notice or discovery of the death of the Member, whichever occurs first, the Managers of

**EXHIBIT D**

the Company shall call a meeting of the Member(s) of the Company.  At the meeting, a proportionate share of the LLC interests of the deceased Member shall be offered for sale to the remaining Member(s). If anyone Member declines to purchase his pro rata allocation of LLC interests so offered, the remaining Member(s) shall have an option to purchase such LLC interests on a pro rata basis, under the terms hereof.

(d)     Purchase Price.  The purchase price for the deceased Member's LLC interests shall be determined as set forth in Section 9.4 hereof, and shall be payable as set forth in Section 9.6(b) of this Operating Agreement.

(e)     Continuing Restrictions.  In the event that all of such LLC interests of the deceased Member so offered for sale are not purchased by the remaining Member(s), the heirs or beneficiaries, as the case may be, of the deceased Member shall become the owner(s) of the deceased Member's LLC interests, and the restrictions imposed by this Operating Agreement upon such LLC interests shall continue to apply.  In no event shall the deceased Member's Personal Representative be required to sell less than all of the deceased Member's LLC interests.

9.4     Purchase Price Under Section 9.2.

(a)     For purposes of a purchase and sale of LLC interests pursuant to Section 9.2 hereunder, the purchase price of each interest shall be its fair market value as determined by the Company's accountant ("Accountant"), as of the end of the month immediately preceding the month in which the sale of LLC interests is scheduled to occur.

(b)     In the event a selling Member disagrees with the fair market value as determined by the Company's Accountant, then the selling Member shall appoint his own Accountant to determine such fair market value in accordance with the terms hereof.  In the event such two Accountants cannot agree as to the fair market value of such LLC interests, then the two Accountants shall select one additional Accountant to make such determination, whereupon the fair market value shall be as determined by the majority of such Accountants, or failing a majority decision as to one fair market value, then the average of all three Accountant's estimates shall be and constitute the fair market value of the LLC interests.

(c)     The fair market value determined under this Section 9.4 shall be binding and conclusive on all parties.

(d)     The fees and charges of the Accountant(s) shall be borne by the party who appointed the Accountant, except with respect to the third Accountant, whose fees shall be borne equally by the parties to such purchase and sale.

9.5.    Purchase Price Under Sections 9.3.

(a)     For purposes of a purchase and sale of LLC interests pursuant to Sections 9.3 hereof, the purchase price of each interest shall be the appraised value of each interest taking

**EXHIBIT D**

into consideration goodwill (the "Appraised Value") as determined by a qualified appraiser, familiar with the Business of the Company (the "Appraiser"), and appointed by the Company.

(b)     In the event the personal representative of the deceased Member, as the case may be, disagrees with the Appraised Value as determined by the Company's Appraiser, then the personal representative of the deceased Member shall appoint his own Appraiser to determine the Appraised Value of each interest. In the event such two Appraisers cannot agree as to the Appraised Value of the LLC interests, then the two Appraisers shall select a third Appraiser to make such determination, whereupon the Appraised Value shall be as determined by the majority of such Appraisers, or failing a majority decision as to one Appraised Value, then the average of all three Appraiser's determinations shall be and constitute the Appraised Value of the LLC interests.

(c)     The Appraised Value determined in accordance with this Section 9.5 shall be binding and conclusive on all parties.

(d)     The fees and charges of the Appraiser(s) shall be borne by the party who appointed the Appraiser, except as to the third Appraiser, whose fees shall be borne equally by the parties to such purchase and sale.

9.6.     <u>Payment of Purchase Price</u>.

(a)     <u>Purchase From Selling Member Pursuant to Section 9.2</u>.  Unless otherwise agreed to by the parties, the purchase price for the LLC interests of the selling Member, pursuant to any sale governed by Section 9.2 hereof, shall be paid at the election of the Company either (i) in cash or (ii) by the payment to the selling Member of an amount equal to 10% of the purchase price in cash or by bank or certified check, and the delivery of a promissory note (the "Note") for the balance of the purchase price. The Note shall be paid in twelve (12) consecutive equal quarterly installments of principal and interest in the amount necessary to fully amortize the principal plus interest in thirty six (36) months, the first of which installments shall be payable ninety (90) days from the date of sale, with the remaining eleven (11) installments payable on the same day of each third month as the date of sale over the next thirty six (36) months.  The Note shall bear simple interest at the rate of interest (not necessarily the best or lowest rate) announced by Chase Manhattan Bank, as its prime rate in effect on the date of sale, provided, however, that such interest rate shall never exceed the maximum rate allowed under law on the date of sale.

(b)     <u>Purchase From Deceased Member Pursuant to Section 9.3</u>. Unless otherwise agreed to by the parties, the purchase price for the LLC interests of the deceased Member pursuant to any sale governed by Section 9.3 hereof, shall be paid in cash at the time of the sale.

(c)     <u>Promissory Note</u>.

<u>Events of Default; Remedies</u>.  A failure by the purchasing Member(s) to pay any installment of the promissory note within ten (10) days from the date such installment is due shall constitute a default hereunder.  In the event of a default, the entire amount of the promissory note shall, at the option of the holder, become immediately due and payable. No remedy conferred herein is intended to be exclusive of any other remedy or remedies and each and every remedy shall be

cumulative to every other remedy granted herein or now or hereafter existing at law or in equity or by statute.

9.7     Prohibited Transfers.

Any purported Transfer of LLC interests that is not a permitted Transfer shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a permitted Transfer (or if the Manager, in his sole discretion, elects to recognize a Transfer that is not a permitted Transfer), the LLC interests Transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Operating Agreement with respect to the transferred LLC interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such interest may have to the Company.  The restrictions set forth herein shall not restrict any pledging of interest required pursuant to any loan

In the case of a Transfer or attempted Transfer of LLC interests that is not a Transfer, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Member(s) from all cost, liability, and damage that any of such indemnified Member(s) may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

9.8     Rights of Unadmitted Assignees.

A Person who acquires LLC interests but who is not admitted as a substituted Member pursuant to Section 9.9 hereof shall be entitled only to allocations and distributions with respect to such LLC interests in accordance with this Operating Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Operating Agreement.

9.9     Admission of Substituted Member(s).

Subject to the other provisions of this Section 9, a transferee of LLC interests may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth in this Section 9.9:

(a)     A majority of the Member(s) consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the Member(s);

(b)     The LLC interests with respect to which the transferee is being admitted was acquired by means of a permitted Transfer;

(c)     The transferee of LLC interests (other than, with respect to clause (i) below, a transferee that was a Member prior to the Transfer) shall, by written instrument in form and

substance reasonably satisfactory to the Manager (and, in the case of clause (ii) below, the transferor Member), (i) accept and adopt the terms and provisions of this Operating Agreement, including this Section 9; and, (ii) assume the obligations of the transferor Member under this Operating Agreement with respect to the transferred LLC interests. The transferor Member shall be released from all such assumed obligations except (A) those obligations or liabilities of the transferor Member arising out of a breach of this Operating Agreement; (B) in the case of a Transfer to any Person other than a Member, those obligations or liabilities of the transferor Member based on events occurring, arising or maturing prior to the date of Transfer;

(d)     The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred LLC interests; and,

(e)     Except in the case of an Involuntary Transfer by operation of law, if required by the Manager, the transferee (other than a transferee that was a Member prior to the Transfer) shall deliver to the Company evidence of the authority of such Person to become a Member and to be bound by all of the terms and conditions of this Operating Agreement, and the transferee and transferor shall each execute and deliver such other instruments as the Manager reasonably deems necessary or appropriate to effect, and as a condition to, such Transfer, including amendments to the Articles or any other instrument filed with the State of New York or any other state or governmental authority.

9.10     Distributions and Allocations in Respect of Transferred LLC Interests.

If any LLC interests are Transferred during any fiscal year in compliance with the provisions of this Section 10, profits, losses, each item thereof, and all other items attributable to the Transferred LLC interests for such fiscal year shall be divided and allocated between the transferor and the transferee by taking into account their varying percentage LLC interests during the fiscal year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Tax Matters Member. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Company is given notice of a Transfer at least ten (10) days prior to the Transfer, the Company shall recognize such Transfer as of the date of such Transfer, and provided further that if the Company does not receive a notice stating the date such LLC interests were transferred and such other information as the Tax Matters Member may reasonably require within thirty (30) days after the end of the fiscal year during which the Transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the LLC interests on the last day of such fiscal year. Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 9.10, whether or not any Tax Matters Member or the Company has knowledge of any Transfer of ownership of any LLC interests.

**SECTION 10**

**EXHIBIT D**

## DISSOLUTION AND WINDING UP

10.1     Dissolution Events.

(a)     Dissolution. The Company shall dissolve and shall commence winding up and liquidating upon the first to occur of any of the following (each a "Dissolution Event"):

(i)     The unanimous vote of the Member(s) to dissolve, wind-up, and liquidate the Company.

(ii)     A judicial determination that an event has occurred that makes it unlawful, impossible or impractical to carry on the Business.

(iii)     Unless Sections 10(a)(i) or 10(a)(ii) cause a prior dissolution, the Company's existence shall terminate on December 31, 2049.

The Member(s) hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Dissolution Event.

(b)     Reconstitution. If it is determined, by a court of competent jurisdiction, that the Company has dissolved prior to the occurrence of a Dissolution Event, then within an additional ninety (90) days after such determination (the "Reconstitution Period"), all of the Member(s) may elect to reconstitute the Company and continue its business on the same terms and conditions set forth in this Operating Agreement by forming a new limited liability company on terms identical to those set forth in this Operating Agreement. Unless such an election is made within the Reconstitution Period, the Company shall liquidate and wind up its affairs in accordance with Section 10.2 hereof. If such an election is made within the Reconstitution Period, then:

(i)     The reconstituted limited liability company shall continue until the occurrence of a Dissolution Event as provided in this Section 10.1(a);

(ii)     Unless otherwise agreed to by a majority of the Member(s), the Articles and this Operating Agreement shall automatically constitute the Articles and this Operating Agreement of such new Company. All of the assets and liabilities of the dissolved Company shall be deemed to have been automatically assigned, assumed, conveyed and transferred to the new Company. No bond, collateral, assumption or release of any Member's or the Company's liabilities shall be required; provided that the right of the Member(s) to select successor managers and to reconstitute and continue the Business shall not exist and may not be exercised unless the Company has received an opinion of counsel that the exercise of the right would not result in the loss of limited liability of any Member and neither the Company nor the reconstituted limited liability company would cease to be treated as a partnership for federal income tax purposes upon the exercise of such right to continue.

10.2     Winding Up.

000899-03

Upon the occurrence of (i) a Dissolution Event; or, (ii) the determination by a court of competent jurisdiction that the Company has dissolved prior to the occurrence of a Dissolution Event (unless the Company is reconstituted pursuant to Section 10.1(b) hereof), the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Member(s), and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs, provided that all covenants contained in the Regulations and obligations provided for in this Operating Agreement shall continue to be fully binding upon the Member(s) until such time as the property has been distributed pursuant to this Section 10.2 and the Articles has been canceled pursuant to the Act. The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, which winding up and dissolution shall be completed within ninety (90) days of the occurrence of the Dissolution Event and within ninety (90) days after the last day on which the Company may be reconstituted pursuant to Section 10.1(b) hereof. The Liquidator shall take full account of the Company's liabilities and property and shall cause the property or the proceeds from the sale thereof (as determined pursuant to Section 10.9 hereof), to the extent sufficient therefor, to be applied and distributed, to the maximum extent permitted by law, in the following order:

(a)      First, to creditors (including Member(s) and Managers who are creditors, to the extent otherwise permitted by law) in satisfaction of all of the Company's Debts and other liabilities (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distribution to Member(s) under Section 18-504 or Section 18-604 of the Act;

(b)      Second, except as provided in this Operating Agreement, to Member(s) and former Member(s) of the Company in satisfaction of liabilities for distribution under Section 18-504 or Section 18-604 of the Act; and

(c)      The balance, if any, to the Member(s) in accordance with the positive balance in their capital accounts, after giving effect to all contributions, distributions and allocations for all periods.

No Member or Manager shall receive additional compensation for any services performed pursuant to this Section 10.

10.3      Compliance With Certain Requirements of Operating Agreement; Deficit Capital Accounts.

In the event the Company is "liquidated" within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Section 10 to the Member(s) who have positive capital accounts in compliance with Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member has a deficit balance in his capital account (after giving effect to all contributions, distributions and allocations for all fiscal years, including the fiscal year during which such liquidation occurs), such Member shall have an obligation to contribute to the capital of the Company the amount necessary to restore such deficit balance to zero in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(3). In the discretion of the Liquidator, a pro

rata portion of the distributions that would otherwise be made to the Member(s) pursuant to this Section 10 may be:

        (a)    Distributed to a trust established for the benefit of the Member(s) for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall be distributed to the Member(s) from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Member(s) pursuant to Section 10.2 hereof; or

        (b)    Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Member(s) as soon as practicable.

    10.4    <u>Deemed Distribution and Recontribution</u>.

Notwithstanding any other provision of this Section 10, in the event the Company is liquidated within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g) but no Dissolution Event has occurred, the Property shall not be liquidated, the Company's Debts and other liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed the property in-kind to the Member(s), who shall be deemed to have taken subject to all Debts of the Company and other liabilities all in accordance with their respective capital accounts. Immediately thereafter, the Member(s) shall be deemed to have recontributed the property in-kind to the Company, which shall be deemed to have taken subject to all such liabilities.

    10.5    <u>Rights of Member(s)</u>.

Except as otherwise provided in this Operating Agreement, each Member shall look solely to the property of the Company for the return of its capital contribution and has no right or power to demand or receive property other than cash from the Company. If the assets of the Company remaining after payment or discharge of the debts or liabilities of the Company are insufficient to return such capital contribution, the Member(s) shall have no recourse against the Company or any other Member or the Manager.

    10.6    <u>Notice of Dissolution/Termination</u>.

        (a)    In the event a Dissolution Event occurs or an event occurs that would, but for provisions of Section 10.1, result in a dissolution of the Company, the Manager shall, within thirty (30) days thereafter, provide written notice thereof to each of the Member(s) and to all other parties with whom the Company regularly conducts business (as determined in the discretion of the Managers) and shall publish notice thereof in a newspaper of general circulation in each place in which the Company regularly conducts business (as determined in the discretion of the Manager).

(b)     Upon completion of the distribution of the Company's property as provided in this Section 10, the Company shall be terminated, and the Liquidator shall cause the filing of the Articles of Dissolution pursuant to Section 705 of the Act and shall take all such other actions as may be necessary to terminate the Company.

10.7    Allocations During Period of Liquidation.

During the period commencing on the first day of the fiscal year during which a Dissolution Event occurs and ending on the date on which all of the assets of the Company have been distributed to the Member(s) pursuant to Section 10.2 hereof (the "Liquidation Period"), the Member(s) shall continue to share profits, losses, gain, loss and other items of Company income, gain, loss or deduction in the manner provided in Section 3 hereof.

10.8    Character of Liquidating Distributions.

All payments made in liquidation of the interest of a Member in the Company shall be made in exchange for the interest of such Member in property pursuant to Section 736(b)(1) of the Code, including the interest of such Member in Company goodwill.

10.9    The Liquidator.

(a)     Definition. The "Liquidator" shall mean a Person appointed by the Managers to oversee the liquidation of the Company.

(b)     Fees. The Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this Section 9 and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

(c)     Indemnification. The Company shall indemnify, save harmless, and pay all judgments and claims against such Liquidator or any officers, directors, agents or employees of the Liquidator relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Liquidator, or any officers, directors, agents or employees of the Liquidator in connection with the liquidation of the Company, including reasonable attorneys' fees incurred by the Liquidator, officer, director, agent or employee in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, except to the extent such liability or damage is caused by the fraud, intentional misconduct of, or a knowing violation of the laws by the Liquidator which was material to the cause of action.

10.10   Form of Liquidating Distributions.

For purposes of making distributions required by Section 10.2 hereof, the Liquidator may determine whether to distribute all or any portion of the property in-kind or to sell all or any portion of the property and distribute the proceeds therefrom.

**EXHIBIT D**

## SECTION 11
## POWER OF ATTORNEY

11.1    Manager as Attorney-In-Fact.

Each Member hereby makes, constitutes, and appoints the Manager, with full power of substitution and resubstitution, its true and lawful attorney-in-fact for it and in its name, place, and stead and for its use and benefit, to sign, execute, certify, acknowledge, swear to, file, publish and record (i) all articles of formation, amended name or similar articles, and other articles and instruments (including counterparts of this Operating Agreement) which the Manager may deem necessary to be filed by the Company under the laws of the State of New York or any other jurisdiction in which the Company is doing or intends to do business; (ii) any and all amendments, restatements or changes to this Operating Agreement and the instruments described in clause (i), as now or hereafter amended, which the Manager may deem necessary to effect a change or modification of the Company in accordance with the terms of this Operating Agreement, including, without limitation, amendments, restatements or changes to reflect (A) any amendments adopted by the Member(s) in accordance with the terms of this Operating Agreement, (B) the admission of any substituted Member and (C) the disposition by any Member of its interest in the Company; (iii) all articles of cancellation and other instruments which the Manager deems necessary or appropriate to effect the dissolution and termination of the Company pursuant to the terms of this Operating Agreement; and, (iv) any other instrument which is now or may hereafter be required by law to be filed on behalf of the Company or is deemed necessary by the Manager to carry out fully the provisions of this Operating Agreement in accordance with its terms. Each Member authorizes each such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary in connection with any of the foregoing, hereby giving each such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite to be done in connection with the foregoing as fully as such Member might or could do personally, and hereby ratify and confirm all that any such attorney-in-fact shall lawfully do, or cause to be done, by virtue thereof or hereof.

11.2    Nature of Special Power.

The power of attorney granted to the Manager pursuant to this Section 11:

(a)    Is a special power of attorney coupled with an interest and is irrevocable;

(b)    May be exercised by any such attorney-in-fact by listing the Member(s) executing any agreement, certificate, instrument, or other document with the single signature of any such attorney-in-fact acting as attorney-in-fact for such Member(s); and

(c)    Shall survive and not be affected by the subsequent Bankruptcy, insolvency, dissolution, or cessation of existence of a Member and shall survive the delivery of an assignment by a Member of the whole or a portion of its interest in the Company (except that where the assignment is of such Member's entire interest in the Company and the assignee, with the consent of the other Member(s), is admitted as a substituted Member, the power of attorney shall survive the

**EXHIBIT D**

delivery of such assignment for the sole purpose of enabling any such attorney-in-fact to effect such substitution) and shall extend to such Member's, or assignee's successors and assigns.

## SECTION 12
## MISCELLANEOUS

12.1    <u>Notices</u>.

Any notice, payment, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (i) if delivered personally to the Person or to an officer of the Person to whom the same is directed; or, (ii) when the same is actually received, if sent either by registered or certified mail, postage and charges prepaid, or by facsimile, if such facsimile is followed by a hard copy of the facsimile communication sent promptly thereafter by registered or certified mail, postage and charges prepaid, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Member(s) and Managers:

(a)    If to the Company, to the address determined pursuant to Section 1.3 hereof;

(b)    If to the Manager or to a Member, to the address set forth in Section 2.1 hereof.

12.2    <u>Binding Effect</u>.

Except as otherwise provided in this Operating Agreement, every covenant, term, and provision of this Operating Agreement shall be binding upon and inure to the benefit of the Member(s) and their respective successors, transferees, and assigns.

12.3    <u>Construction</u>.

Every covenant, term, and provision of this Operating Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

12.4    <u>Time</u>.

In computing any period of time pursuant to this Operating Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

12.5    <u>Headings</u>.

Section and other headings contained in this Operating Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Operating Agreement or any provision hereof.

12.6    <u>Severability</u>.

Except as otherwise provided in the succeeding sentence, every provision of this Operating Agreement is intended to be severable, and, if any term or provision of this Operating Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Operating Agreement. The preceding sentence of this Section 12.6 shall be of no force or effect if the consequence of enforcing the remainder of this Operating Agreement without such illegal or invalid term or provision would be to cause any Member to lose the material benefit of its economic bargain.

12.7    <u>Incorporation by Reference</u>.

Every exhibit, schedule, and other appendix attached to this Operating Agreement and referred to herein is not incorporated in this Operating Agreement by reference unless this Operating Agreement expressly otherwise provide.

12.8    <u>Variation of Terms</u>.

All terms and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

12.9    <u>Governing Law</u>.

The laws of the State of New York shall govern the validity of this Operating Agreement, the construction of its terms, and the interpretation of the rights and duties arising hereunder.

12.10   <u>Waiver of Jury Trial</u>.

Each of the Member(s) irrevocably waives to the extent permitted by law, all rights to trial by jury and all rights to immunity by sovereignty or otherwise in any action, proceeding or counterclaim arising out of or relating to this Operating Agreement.

12.11   <u>Counterpart Execution</u>.

This Operating Agreement may be executed in any number of counterparts with the same effect as if all of the Member(s) had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

<u>THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK</u>

**EXHIBIT D**

### AMENDED AND RESTATED
### OPERATING AGREEMENT OF 3 GRAMERCY PARK WEST LLC
### [SIGNATURE PAGE]

**IN WITNESS WHEREOF**, the parties have executed and entered into this Operating Agreement of the Company as of the day first above set forth.

MANAGER:

By: _____

Gustavo Adolfo Hernandez Frieri

MEMBER:

Gramercy Irrevocable Trust,
a Nova Scotia Trust

By:     Trustee
        Americas Fiduciary, Ltd.,
        A Nevis corporation

By: _____

Timothy D. Richards, Director

H:\TDR\WP\CLIENTS\Gustavo Hernandez\Corp\3 Gramercy Park West LLC\AMENDED AND RESTATED.doc

**EXHIBIT D**

## Written Consent of Authorized Person
## Naming the Manager(s) for
## 3 GRAMERCY PARK WEST, LLC

The undersigned authorized person hereby elects the following person(s) to serve as the Manager(s) for this New York limited liability company:

    Gustavo Adolfo Hernandez Frieri

The Manager(s) shall complete the organization of the limited liability company by appointing officers, issuing units (ownership interests), opening bank accounts and taking all other actions necessary for the organization of the company. This written consent is intended to be part of the documents under which the company is formed.

                          _____

                          Corporate Creations International Inc
                          Karla Sarria Vice President

                          Date: August 5, 2005

STATE OF _Florida_

COUNTY OF _Miami - Dade_

The foregoing instrument was acknowledged before me this 5th day of _August_ 20 _05_ by the above named signatory, who is personally known to me or who produced a drivers license or passport as identification and who did take an oath.

_____
Signature of Notary Public



Yadira A. Guerra
Commission # DD 068610
Expires Oct. 30, 2005
Bonded Thru
Atlantic Bonding Co., Inc.

GOVERNMENT
EXHIBIT
10

000780-03

**EXHIBIT D**

## OCCUPANCY AGREEMENT

3 Gramercy Park West, LLC (the "Owner") a limited liability company wholly owned by Gustavo Adolfo Hernandez Frieri ("Frieri"), is the owner of a 24% interest in the building known as 3 Gramercy Park West, New York, New York with the exclusive right to occupy the parlor (second) floor apartment contained therein (the "Unit").   Notwithstanding the provisions of any other document, the Owner will not permit the occupancy of the Unit by any parties other than Frieri or members of his family.  Any violation of this Occupancy Agreement shall be considered a default by the Owner under that certain Co-Ownership Agreement dated December 12, 1969 between and among Richard W. McCabe, Iris Whitney, Richard J. Wolfenden, William D. McCabe and William Ditfort, as modified by Amendments dated October 1, 1974, May 23, 1975, January 8, 1982, April 26, 1993, February 22, 1997, October 1, 2001, and of even date (collectively, the "Agreement"). The occupant(s) of the Unit shall be subject at all times to the Agreement.

Owner recognizes that Three Gramercy Park, Inc. (the "Co-Ownership Entity") is relying on this Occupancy Agreement in issuing its consent to the assignment of Frieri's right to acquire the Unit to the Owner and that the Co-Ownership Entity would not otherwise consent to such assignment.

This Occupancy Agreement may be modified only by a written instrument signed by Frieri, Owner, and the Co-Ownership Entity in accordance with the terms of the Agreement.

This Occupancy Agreement shall be binding on the estates, heirs, executors, administrators, personal representatives, successors and assigns of the undersigned.

This Occupancy Agreement shall be governed by the internal laws of the State of New York without giving effect to principles of conflicts of law.

IN WITNESS WHEREOF, the undersigned has executed this Occupancy Agreement as of the ⎽⎽ day of August, 2005.

⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽
Gustavo Adolfo Hernandez Frieri

3 Gramercy Park West, LLC

By: ⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽⎽
Name:
Title:

**GOVERNMENT
EXHIBIT
11**

2959456.1

ODC000363

**EXHIBIT D**

VINCENT F. O'HARA
WILLIAM P. HOLM*
WILLIAM E. NAGEL+

MICHAEL L. LANDSMAN
CAROL G. DELL
CHRISTOPHER T. KURTZ
PATRICK S. ROGERS
DAVID E. COHN

*ALSO ADMITTED IN CT
+ALSO ADMITTED IN NJ

HOLM & O'HARA LLP
ATTORNEYS AT LAW
THE GRAYBAR BUILDING
420 LEXINGTON AVENUE
NEW YORK, NEW YORK 10170-1799
(212) 682-2280
FAX (212) 682-2153
www.holmandohara.com

CONNECTICUT OFFICE
73 MAIN STREET
P. O. BOX 215
SHARON, CT 06069
(860) 364-0627

August 23, 2005

**VIA FEDERAL EXPRESS**

Mr. Gustavo Adolfo Hernandez Frieri
3 Gramercy Park West, LLC
71 Bricknell Avenue, Suite 2030
Miami, FL 33131

Re:     3 Gramercy Park West, LLC from Ammirati and Ammirati
        Parlor (Second) Floor of 3 Gramercy Park West, New York, NY 10003
        <u>Our File No. 6082</u>

Dear Mr. Hernandez:

Enclosed please find a copy of the closing report for the above-referenced transaction, together with copies of the closing documents. We also enclose additional copies of the closing report only for your convenience.

Please keep the closing report with your important personal papers. Upon receipt of the original deed and title policy, we will forward those documents to you.

Congratulations on the purchase of your new property in Manhattan. It was a pleasure working with you on this transaction and we thank you for referring this matter to us.

If you have any questions about this matter, please do not hesitate to contact me.

Very truly yours,

Michael L. Landsman

MLL/mmb
Enclosures

L:\Office\RE\Closing-rp\letters\GAHF-01.doc

GOVERNMENT
EXHIBIT
12

# EXHIBIT D

From: Origin ID: (212)682-2280
Michael Landsman
HOLM & O'HARA LLP
420 LEXINGTON AVENUE, SUITE 1745

NEW YORK, NY 10170

FedEx
Express
E

Ship Date: 23AUG05
Actual Wgt: 1 LB
System#: 1184817/INET2200
Account#: S *********

REF: 6082

CL506130333/13

SHIP TO: (212)373-3326      BILL SENDER
**Allwyn Jourdan**
**Global Securities Advisors LLC**
**701 Brickell Avenue**
**Suite 2030**
**Miami, FL 33131**

Delivery Address Bar Code



** 2DAY **

TRK#  **7906 2043 3708**    FORM 0201

**33131**    -FL-US

**SH MPBA**

**THU**
Deliver By:
25AUG05

**MIA**    A2

Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

https://www.fedex.com/cgi-bin/ship_it/unity/2IfUv5HaTw9ChQy1AfSu7HaQy5JeYw1Dg...  8/23/2005

000184-03

**EXHIBIT D**

### HOLM & O'HARA LLP
420 Lexington Avenue
New York, New York 10170
(212) 682-2280

<u>CLOSING REPORT</u>

The closing of the purchase by 3 Gramercy Park West, LLC from Ralph Ammirati and Joan Ammirati of an undivided twenty-four percent (24%) interest as tenants in common in the land, with the building and improvements thereon, know as 3 Gramercy Park West, New York, NY 10003, together with the right to occupy the parlor (second) floor apartment contained therein, was held on Tuesday, August 18, 2005, at the offices of Wilkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, commencing at 9:30 a.m.

The following parties participated in the closing:

<u>PURCHASER</u>

3 Gramercy Park West, LLC
By: Gustavo Adolfo Hernandez Frieri, Manager

<u>PURCHASER'S ATTORNEYS</u>

Holm & O'Hara LLP
By: Michael L. Landsman, Esq.

<u>SELLER</u>

Joan Ammirati
Ralph Ammirati

<u>SELLER'S ATTORNEYS</u>

Wilkie Farr & Gallagher LLP
By: Wendy Shar, Esq.
By: Gary Litke, Esq.

Trachtenberg Rodes & Friedberg LLP
By: David G. Trachtenberg, Esq.

<u>TITLE INSURANCE COMPANY</u>

Commonwealth Land Title Insurance Company
By: Philip O'Hara Associates, Inc.
By: Susan B. Hutchinson

**EXHIBIT D**

PURCHASER'S FINANCIAL STATEMENT

SELLER'S CREDITS:

| | | |
|---|---|---|
| Purchase Price | 2,900,000.00 | |
| BALANCE DUE AT CLOSING: | | 2,900,000.00 |

BALANCE PAID AS FOLLOWS:

| | | |
|---|---|---|
| 1. Holm & O'Hara LLP's certified IOLA check no. 2049 dated 08/16/2005 paid to "Philip O'Hara Associates, Inc." | 52,925.00 | |
| 2. Holm & O'Hara LLP's certified IOLA check no. 2050 dated 08/16/2005 paid to "The Corcoran Group." | 72,500.00 | |
| 3. Holm & O'Hara LLP's certified IOLA check no. 2051 dated 08/16/2005 paid to "Stribling Associates Ltd." | 72,500.00 | |
| 4. Holm & O'Hara LLP's certified IOLA check no. 2052 dated 08/16/2005 paid to "Ralph Ammirati and Joan Ammirati." | 2,702,075.00 | |
| TOTAL BALANCE PAID AT CLOSING: | | 2,900,000.00 |

ADJUSTMENTS DUE FROM PURCHASER:

| | | |
|---|---|---|
| 1. Real Estate Tax Adjustment [21,289.18 x 24% = 5,109.40 (1 ½) ÷ 184 days = 27.77/day x 130 days (08/24/2005 – 12/31/2005)]. | 3,610.10 | |
| 2. Common Charges Adjustment [1,760/month ÷ 31 days = 56.77/day x 8 days (08/24/2005 - 08/31/2005)]. | 454.16 | |

Note: Adjustments paid to "Ralph Ammirati and Joan Ammirati" By Holm & O'Hara LLP's IOLA check no. 2053.

| | | |
|---|---|---|
| TOTAL ADJUSTMENTS DUE FROM PURCHASER: | | 4,064.26 |

-2-

**EXHIBIT D**

PURCHASER'S ADDITIONAL CLOSING COSTS:

1.  Mansion tax (1% of Purchase Price).                          29,000.00

2.  Title charges: fee premium (11,462) departmentals
(275), recording charges for deed (150), filing fee for
the RP 5217 (75) and FedEx (38).                                12,000.00

Note: Mortgage recording tax and title charges paid to
"Philip O'Hara Associates, Inc." by Holm & O'Hara
LLP's IOLA check no. 2054.

3.  Title closing agent's fee paid to "Susan B. Hutchinson"
by Holm & O'Hara LLP's IOLA check no. 2055 dated
08/16/2005.                                                        200.00

4. September 2005 common charges paid to "3
Gramercy Associates" by Holm & O'Hara LLP IOLA
check no. 2056 dated 08/16/2005.                                 1,760.00

5. Holm & O'Hara LLP attorneys' fees and disburs-
ements for the entire transaction (11/30/2004 –
08/16/2005) paid outside of closing.                            13,000.00

PURCHASER'S TOTAL ADDITIONAL CLOSING COSTS:            55,960.00

-3-

**EXHIBIT D**

## RECONCILIATION OF ESCROW ACCOUNT

Deposits into Escrow Account

| | | |
|---|---|---|
| 1. Downpayment (including interest). | 290,514.77 | |
| 2. Wire transfer received on August 15, 2005. | 2,670,000.00 | |
| Total Deposits into Escrow Account: | | 2,960,514.77 |

Payments from Escrow Account:

| | | |
|---|---|---|
| 1. Check no. 2049 paid to "Philip O'Hara Associates, Inc." | 52,925.00 | |
| 2. Check no. 2050 paid to "The Corcoran Group." | 72,500.00 | |
| 3. Check no. 2051 "Ralph Ammirati and Joan Ammirati." | 2,702,075.00 | |
| 4. Check no. 2052 paid to "Stribling Associates Ltd." | 72,500.00 | |
| 5. Check no. 2053 "Ralph Ammirati and Joan Ammirati." | 4,064.26 | |
| 6. Check no. 2054 paid to "Philip O'Hara Associates, Inc." | 41,000.00 | |
| 7. Check no. 2055 paid to "Susan B. Hutchinson." | 200.00 | |
| 8. Check no. 2056 paid to "3 Gramercy Associates." | 1,760.00 | |
| 9. Check no. 2057 paid "Holm & O'Hara LLP." | 8,000.00 | |
| 10. Wire transfer to Gustavo Adolfo Hernandez Frieri on August 17, 2005. | 5,490.51 | |
| Total Payments From Escrow Account: | | 2,960,514.77 |

-4-

000188-03

**EXHIBIT D**

## INDEX OF CLOSING DOCUMENTS

1. Deed.

2. Real Property Transfer Report (RP- 5217 NYC).

3. Letter Regarding Approval of Sale.

4. Approval of Sale by Co-Owners of 3 Gramercy Park.

5. Seventh Amendment to Co-Ownership Agreement.

6. Common Charge Letter.

7. Assignment of Contract of Sale.

8. Consent.

9. Guaranty.

10. Occupancy Agreement.

11. Post Closing Occupancy Agreement.

12. Title Agreement and Indemnity.

13. Seller's Title Affidavit.

14. Section 6045(e) Reporting Form.

15. NYC Real Property Transfer Tax Return (NYC-RPT).

16. Smoke Detector Affidavit and Carbon Monoxide Affidavit.

17. NYS Transfer Real Estate Tax Return (TP-584).

18. Affidavit of Non Multiple Dwelling.

19. Certifications of NonForeign Status.

20. Invoice.

21. Checks presented at closing.

L:\Office\RE\Closing-rpt\3GPWLLC.doc

-5-

**EXHIBIT D**

T 693—Standard N.Y.B.T.U. Form 8004 * Quitclaim deed, Individual or Corporation (single sheet), 11-98

DISTRIBUTED BY Blumberg Excelsior Inc. PUBLISHER NYC 10013

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

**THIS INDENTURE,** made the 16th   day of August, 2005

**BETWEEN**

Ralph Ammirati and Joan Ammirati, husband and wife
having an address at
3 Gramercy Park West
New York, New York   10003

party of the first part, and

3 GRAMERCY PARK WEST, LLC
a New York limited liability company
having an address at
701 Brickell Avenue, Suite 2030
Miami, FL  33131

party of the second part,

**WITNESSETH,** that the party of the first part, in consideration of ten dollars paid by the party of the second part, does hereby remise, release and quitclaim unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

~~**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the~~

An undivided twenty-four percent (24%) interest as tenants in common in the land, with the buildings and improvements thereon, known as 3 Gramercy Park West, New York, New York, and more particularly described in

SCHEDULE A ANNEXED HERETO AND MADE A PART HEREOF

TOGETHER with the right to occupy the parlor (second) floor apartment contained therein, ALL PURSUANT AND SUBJECT to a certain co-ownership agreement dated December 12, 1969 among Richard W. McCabe, Iris Whitney, Richard J. Wolfenden, William D. McCabe and William Ditfort, as amended by agreements dated October 1, 1974, May 23, 1975, January 8, 1982, April 26, 1993, February 22, 1997, October 1, 2001 and of even date (the "Agreement").

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, hereby covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF,** the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF:

_____
Ralph Ammirati

_____
Joan Ammirati

000190-03

**EXHIBIT D**

ACKNOWLEDGMENT IN NEW YORK STATE (RPL 309-a)

**State of New York, County of** New York  ss.:
On  August 16, 2005  before me, the undersigned, personally appeared

Ralph Ammirati and Joan Ammirati
personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_(signature and office of individual taking acknowledgment)_
SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County
Commission Expires March 30, 2006

ACKNOWLEDGMENT OUTSIDE NEW YORK STATE (RPL 309-b)

**State of**          **County of**          ss.:
On          before me, the undersigned, personally appeared

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in

_(insert city or political subdivision and state or county or other place acknowledgment taken)_

_(signature and office of individual taking acknowledgment)_

ACKNOWLEDGMENT BY SUBSCRIBING WITNESS(ES)

**State of**
**County of**          } ss.:

On          before me, the undersigned, personally appeared

the subscribing witness(es) to the foregoing instrument, with whom I am personally acquainted, who, being by me duly sworn, did depose and say that he/she/they reside(s) in _(if the place of residence is in a city, include the street and street number, if any, thereof)_;

that he/she/they know(s)

to be the individual(s) described in and who executed the foregoing instrument; that said subscribing witness(es) was (were) present and saw said

execute the same; and that said witness(es) at the same time subscribed his/her/their name(s) as a witness(es) thereto.
( ☐ _if taken outside New York State insert city or political subdivision and state or country or other place acknowledgment taken_  And that said subscribing witness(es) made such appearance before the undersigned in

_____ )

_(signature and office of individual taking acknowledgment)_

---

**Quitclaim Deed**
WITH COVENANT AGAINST GRANTOR'S ACTS
TITLE No.  MTB-36534

Ralph Ammirati and
Joan Ammirati
**TO**

3 Gramercy Park West, LLC

| | |
|---|---|
| SECTION | 3 |
| BLOCK | 876 |
| LOT | 12 |
| COUNTY OR TOWN | New York |

**RETURN BY MAIL TO:**

Michael L. Landsman, Esq.
Holm & O'Hara LLP
420 Lexington Avenue, Suite 1745
New York, New York
Zip No.  10170-1799

_Reserve this space for use of Recording Office._

000191-03

**EXHIBIT D**

SCHEDULE A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, being one of the 66 Lots surrounding the park square mentioned or referred to in a certain Deed from Samuel B. Ruggles and Wife to Charles A. Davis and others, dated December 17, 1831 and recorded with the Map annexed in the Register's Office of New York County in Liber 278 of Conveyances, Page 528, the Lot hereby described being laid down and distinguished on the said Map by the Lot Number 3 and is bounded and described as follows:

BEGINNING at a point on the westerly side of a street or way running from 20th Street to 21st Street on the westerly side of Gramercy Park at the center of the northerly side or gable wall of house on the premises hereby described, which is erected as a party wall resting partly on the Lot hereby described and partly on Lot Number 2 of said 66 Lots at a point 52 feet 6-6/7 inches southerly from 21st Street;

RUNNING THENCE westerly on a line parallel with 21st Street and through the center of said gable or side wall, 110 feet;

THENCE southerly, parallel with said street or way on the westerly side of Gramercy Park, 26 feet 3-3/7 inches to Lot Number 4 laid down on said Map;

THENCE easterly, parallel with 21st Street and through the center of a party wall between the house on the premises hereby described and the house adjoining on the south and along the northerly line of said Lot Number 4, 110 feet to said street on the westerly side of Gramercy Park;

AND THENCE northerly along the said last mentioned street, 26 feet 3-3/7 inches to the point or place of BEGINNING.

000192-03

**EXHIBIT D**

**REAL PROPERTY TRANSFER REPORT**
STATE OF NEW YORK
STATE BOARD OF REAL PROPERTY SERVICES

**RP - 5217NYC**
(Rev 11/2002)

FOR CITY USE ONLY

| C1. County Code | | C2. Date Deed Recorded | Month | Day | Year |
| C3. Book OR | | C4. Page | | | |
| C5. CRFN | | | | | |

**PROPERTY INFORMATION**

1. Property Location
| 3 | GRAMERCY PARK WEST 2ND F | MANHATTAN | 10003 |
| STREET NUMBER | STREET NAME | BOROUGH | ZIP CODE |

2. Buyer Name
3 GRAMERCY PARK WEST, LLC
LAST NAME / COMPANY                    FIRST NAME

LAST NAME / COMPANY                    FIRST NAME

3. Tax Billing Address — Indicate where future Tax Bills are to be sent if other than buyer address (at bottom of form)
LAST NAME / COMPANY                    FIRST NAME

STREET NUMBER AND STREET NAME          CITY OR TOWN          STATE   ZIP CODE

4. Indicate the number of Assessment Roll parcels transferred on the deed | 1 | # of Parcels OR | Part of a Parcel
4A. Planning Board Approval - N/A for NYC
4B. Agricultural District Notice - N/A for NYC

5. Deed Property Size
| X | FRONT FEET | DEPTH | OR | ACRES |

Check the boxes below as they apply:
6. Ownership Type is Condominium ☐
7. New Construction on Vacant Land ☐

8. Seller Name
| AMMIRATI | RALPH |
| LAST NAME / COMPANY | FIRST NAME |
| AMMIRATI | JOAN |
| LAST NAME / COMPANY | FIRST NAME |

9. Check the box below which most accurately describes the use of the property at the time of sale:

| A ✔ | One Family Residential | C ☐ | Residential Vacant Land | E ☐ | Commercial | G ☐ | Entertainment / Amusement | I ☐ | Industrial |
| B ☐ | 2 or 3 Family Residential | D ☐ | Non-Residential Vacant Land | F ☐ | Apartment | H ☐ | Community Service | J ☐ | Public Service |

**SALE INFORMATION**

10. Sale Contract Date | 12 / 15 / 2004 |
   Month   Day   Year

11. Date of Sale / Transfer | 8 / 16 / 2005 |
   Month   Day   Year

12. Full Sale Price $ | 2,900,000 |
( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.) *Please round to the nearest whole dollar amount.*

13. Indicate the value of personal property included in the sale | 0 |

14. Check one or more of these conditions as applicable to transfer:
| A ☐ | Sale Between Relatives or Former Relatives |
| B ☐ | Sale Between Related Companies or Partners in Business |
| C ☐ | One of the Buyers is also a Seller |
| D ☐ | Buyer or Seller is Government Agency or Lending Institution |
| E ☐ | Deed Type not Warranty or Bargain and Sale (Specify Below) |
| F ☐ | Sale of Fractional or Less than Fee Interest ( Specify Below ) |
| G ☐ | Significant Change in Property Between Taxable Status and Sale Dates |
| H ☐ | Sale of Business is Included in Sale Price |
| I ☐ | Other Unusual Factors Affecting Sale Price ( Specify Below ) |
| J ✔ | None |

**ASSESSMENT INFORMATION** - Data should reflect the latest Final Assessment Roll and Tax Bill

15. Building Class | C, 5 |   16. Total Assessed Value (of all parcels in transfer) | 3,4,5,7,3,5 |

17. Borough, Block and Lot / Roll Identifier(s) ( if more than three, attach sheet with additional identifier(s) )

| MANHATTAN 876 12 | | |

**CERTIFICATION**   I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and I understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments.

BUYER
3 Gramercy Park West, LLC
BUYER SIGNATURE          08/  /05  DATE
Gustavo Adolfo Hernandez Frieri, Manager

| 701 | Brickell Avenue |
| STREET NUMBER | STREET NAME (AFTER SALE) |

| Miami | F, L | 33131 |
| CITY OR TOWN | STATE | ZIP CODE |

BUYER'S ATTORNEY
| Landsman | Michael |
| LAST NAME | FIRST NAME |
| 212 | 682-2280 |
| AREA CODE | TELEPHONE NUMBER |

SELLER
SELLER SIGNATURE          08/  /05  DATE
Ralph Ammirati

2005060300412201

000193-03

**EXHIBIT D**



| CERTIFICATION | I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments. |
|---|---|

3 Gramercy Park West, LLC

| BUYER | | | BUYER'S ATTORNEY | |
|---|---|---|---|---|
| By: | 08/ /05 | | Landsman | Michael |
| BUYER SIGNATURE | DATE | | LAST NAME | FIRST NAME |
| Gustavo Adolfo Hernandez Frieri, Manager | | | 212 | 682-2280 |
| 701       Brickell Avenue | | | AREA CODE | TELEPHONE NUMBER |
| STREET NUMBER  STREET NAME (AFTER SALE) | | | | SELLER |
| Miami | FL | 33131 | | 08/ /05 |
| CITY OR TOWN | STATE | ZIP CODE | SELLER SIGNATURE | DATE |
| | | | Ralph Ammirati | |

2005060300412201

000194-03

## ANDERSON & OCHS, LLP
### 369 LEXINGTON AVENUE
### SIXTEENTH FLOOR
NEW YORK, NEW YORK 10017
TELEPHONE (212) 661-3366
TELECOPIER (212) 661-3369
WWW.ANDERSONOCHS.COM

MITCHEL H. OCHS
MEMBER
MOCHS@ANDERSONOCHS.COM

August 15, 2005

**BY HAND**

David G. Trachtenberg, Esq.
Trachtenberg Rodes & Friedberg LLP
545 Fifth Avenue, Suite 640
New York, New York 10017

Re:     3 Gramercy Park West

Dear Mr. Trachtenberg:

This firm represents W. Bowman Cutter, Abigail Cutter and Richard W. McCabe, who, collectively, are owners of 56 percent of the co-ownership interests in the property known as 3 Gramercy Park West, New York, New York (the "Premises").

We are in receipt of the Approval of Sale documentation executed by your clients Ralph Ammirati and Joan Ammirati relating to the proposed sale of their second floor unit, and corresponding 24 percent interest (the "Unit"), to either Mr. and Mrs. Vander Schauw or Mr. Gustavo Adolfo Hernandez Frieri.

Pursuant to paragraph Ninth of the Co-Ownership Agreement, dated December 12, 1969, as amended from time to time, I am enclosing my clients' signed approval form reflecting their consent to, and approval of, the sale of the Unit by your clients to Mr. Gustavo Adolfo Hernandez Frieri. Together with the approval of Mr. and Mrs. Ammirati to such sale, the sale to Mr. Gustavo Adolfo Hernandez Frieri has the requisite approval of more than 60 percent of the co-ownership interests required of any and all sales under the Co-Ownership Agreement, and as determined by the June 14, 2005 Award in the Matter of the Arbitration between Ralph Ammirati and Joan Ammirati v. W. Bowman Cutter, Abigail Cutter, Richard McCabe and Gerard Vander Schauw and Judy Vander Schauw, 13 115 00467 05.

In that connection, I am also enclosing the form of Amendment to the Co-Ownership Agreement provided by your office and executed by my clients, reflecting the sale of the Unit and corresponding 24 percent ownership interest to Mr. Gustavo Adolfo Hernandez Frieri, and substituting Mr. Hernandez's name and ownership interest in place of your clients.

Very truly yours,

Mitchel H. Ochs

MHO:seb
1812.01
Encls.

EXHIBIT D

## APPROVAL OF SALE

Pursuant to Paragraph Ninth of the Co-Ownership Agreement for 3 Gramercy Park, New York, New York dated December 12, 1969, the undersigned Richard W. McCabe, W. Bowman Cutter, Abigail T. Cutter, Ralph Annunziati and Joan Annunziati approve the proposed sale of the second floor unit by Ralph Annunziati and Joan Annunziati to Gustavo Adolfo Hernandez Frieri.

AGREED TO BY:

W. Bowman Cutter

Ralph Annunziati

Abigail T. Cutter (by WBC)

Joan Annunziati

Richard W. McCabe

August ___, 2005

000196-03

## APPROVAL OF SALE

Pursuant to Paragraph Ninth of the Co-Ownership Agreement for 3 Gramercy Park, New York, New York dated December 12, 1969, the undersigned Richard W. McCabe, W. Bowman Cutter, Abigail T. Cutter, Ralph Ammirati and Joan Ammirati approve the proposed sale of the second floor unit by Ralph Ammirati and Joan Ammirati to Gustavo Adolfo Hernandez Frieri.

AGREED TO BY:

_____
W. Bowman Cutter

_____
Ralph Ammirati

_____
Abigail T. Cutter

_____
Joan Ammirati

_____
Richard W. McCabe

August 15, 2005

**EXHIBIT D**

## SEVENTH AMENDMENT DATED AUGUST ⟨15⟩, 2005 TO CO-OWNERSHIP AGREEMENT DATED DECEMBER 12, 1969

The undersigned do hereby certify that:

Pursuant to Paragraph TWELFTH of the Co-Ownership Agreement dated December 12, 1969 (the "Agreement") between and among Richard W. McCabe, Iris Whitney, Richard J. Wolfenden, William D. McCabe and William Ditfort, as modified by Amendments dated October 1, 1974, May 23, 1975, January 8, 1982, April 26, 1993, February 22, 1997, and October 1, 2001, respectively, the Agreement as so amended, is hereby further amended as follows:

1.    Inasmuch as Ralph Ammirati and Joan Ammirati have agreed to sell, and Gustavo Adolfo Hernandez Frieri has agreed to buy the twenty-four percent (24%) interest of Ralph Ammirati and Joan Ammirati in the premises at 3 Gramercy Park West, New York, New York (the "Premises") said Gustavo Adolfo Hernandez Frieri is hereby substituted in the Agreement, as so amended, for all purposes in place and instead of said Ralph Ammirati and Joan Ammirati as co-owners of the Premises. Therefore, the current owners under the Agreement shall be W. Bowman Cutter and Abigail T. Cutter (with respect to a 36% interest), Richard W. McCabe (with respect to a 20% interest), Gerard Vander Schauw and Judy Vander Schauw (with respect to a 20% interest) and Gustavo Adolfo Hernandez Frieri (with respect to a 24% interest).

2.    Paragraph FIRST (b) of the Agreement is hereby revoked and the following is substituted therefore:

"(b) Gustavo Adolfo Hernandez Frieri shall own a twenty-four percent (24%) interest in the premises and pay twenty-four percent (24%) of the maintenance. Said Gustavo Adolfo Hernandez Frieri is hereby allocated and shall be entitled to possession and occupancy of the entire "parlor" (second) floor and small porch at the front (east side) of the premises."

3.    Gustavo Adolfo Hernandez Frieri hereby specifically accepts and agrees to abide by all of the terms and provisions of the Agreement and the Basic House Rules.

4.    This Amendment may be executed in one or more counterparts, each of which when so executed and delivered shall be deemed an original, but all of which when taken together shall constitute but one and the same original.

000198-03

**EXHIBIT D**

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the
_____ day of August, 2005.


_____                    _____
W. Bowman Cutter                                    Richard W. McCabe


_____                    _____
Abigail T. Cutter                                   Gerard Vander Schauw


                                                    _____
                                                    Judy Vander Schauw


                                                    _____
                                                    Gustavo Adolfo Hernandez Frieri

**EXHIBIT D**

**Garen & Company LLC**
CERTIFIED PUBLIC ACCOUNTANTS

560 Sylvan Avenue
Englewood Cliffs
New Jersey 07632
(201) 894-9110
(212) 513-7111

Fax (201) 894-9088
www.garencpa.com

August 15, 2005

Mr. Gary Litke
Wilkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019-6099

Re: August Maintenance

Dear Mr. Litke:

This letter is to confirm that Ralph & Joan Ammirati have paid all their maintenance fees to 3 Gramercy Associates which were due through August, 2005.

If there are any questions about this matter please do not hesitate to call us.

Sincerely,

Gerald Brandt
Garen & Company LLC

**EXHIBIT D**

### ASSIGNMENT OF CONTRACT OF SALE

In consideration of the sum of ten dollars ($10.00) in hand paid and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I, Gustavo Adolfo Hernandez Frieri ("Assignor"), hereby assign to 3 Gramercy Park West, LLC ("Assignee"), a New York limited liability company, all of Assignor's right, title and interest as purchaser in and to a certain Contract of Sale ("Contract") dated December 15, 2004, between Ralph Ammirati and Joan Ammirati ("Seller") and Gustavo Adolfo Hernandez Frieri ("Purchaser") for the purchase of Parlor (Second) Floor, 3 Gramercy Park West, New York, New York, 10003, at a price of $2,900,000.00, including, but not limited to, the Assignor's rights in and to the Downpayment, and the letter agreement that revived the Contract of Sale dated April 28, 2005.

Assignor warrants that the Contract is valid and enforceable; that it is in full force and effect and has not been breached by either party; and that there are no set-offs or counterclaims against Assignor.

Assignee hereby assumes all of the rights and obligations of the Assignor in and to the Contract, including, but not limited to, the obligation to pay the balance of the purchase price.

The undersigned acknowledges and agrees that a facsimile signature shall be valid and binding as if signed in the original in ink.

Dated: New York, New York
    August ___, 2005

ASSIGNOR:

_____
Gustavo Adolfo Hernandez Frieri

ASSIGNEE:
3 GRAMERCY PARK WEST, LLC

By: _____
    Gustavo Adolfo Hernandez Frieri
    Manager

C:\Documents and Settings\sharw\Local Settings\Temporary Internet Files\OLK17C\Assign-GAHF-3GPWLLC-011.doc

**EXHIBIT D**

<u>**CONSENT**</u>

The undersigned, being the Manager of 3 Gramercy Park West, LLC, a New York limited liability company (the "Company"), hereby consents to the purchase by the Company of the Parlor (Second) Floor of 3 Gramercy Park West, New York, New York, 10003, for the price of $2,900,000.00, pursuant to that certain Contract of Sale dated December 15, 2004, between Ralph Ammirati and Joan Ammirati, as Seller, and Gustavo Adolfo Hernandez Frieri, as Purchaser, which Contract was assigned by Gustavo Adolfo Hernandez Frieri to the Company by assignment dated August 16, 2005.

The Manager further consents and agrees that Gustavo Adolfo Hernandez Frieri, Manager of the Company, be and hereby is authorized to execute all documents at the closing of the purchase of said property, including, without limitation, all title documents and tax documents.

Dated: New York, New York
        August 16, 2005

3 GRAMERCY PARK WEST, LLC

By: _____
    Gustavo Adolfo Hernandez Frieri
    Manager

C:\Documents and Settings\sharw\Local Settings\Temporary Internet Files\OLK17C\Consent-3GPWLLC1.doc

000202-03

EXHIBIT D

### GUARANTY

The undersigned hereby unconditionally and irrevocably guarantees the full and punctual payment, when due, of all of the monetary obligations of 3 Gramercy Park West, LLC, the predecessor-in-interest to the undersigned (the "Owner") arising out of the ownership of the Unit owed to Three Gramercy Park, Inc. (the "Co-Ownership Entity") in collecting such obligations and enforcing any rights hereunder or under that certain Co-Ownership Agreement dated December 12, 1969 between and among Richard W. McCabe, Iris Whitney, Richard J. Wolfenden, William D. McCabe and William Ditfort, as modified by Amendments dated October 1, 1974, May 23, 1975, January 8, 1982, April 26, 1993, February 22, 1997, October 1, 2001, and of even date (collectively, the "Agreement").

The Co-Ownership Entity, in its sole discretion, may proceed to exercise any right or remedy which it may have under this Guaranty without pursuing or exhausting any right or remedy it may have against the Owner or any other person; and the Co-Ownership Entity may proceed to exercise any right or remedy which it may have under this Guaranty without regard to any actions or omissions of the Co-Ownership Entity or any other entity.

The obligations of Guarantor hereunder shall be absolute and unconditional irrespective of the fact that the obligations may not then be enforceable against the Owner owing to a bankruptcy of Owner; it being agreed that the obligations of Guarantor hereunder shall not be discharged except by payment of all of the obligations of Owner and the transfer of the Unit to a bona fide purchaser.

The Guarantor hereby consents and agrees that at any time and from time to time, the Agreement may be amended or modified as provided therein, the common charges for the Unit may be increased or decreased at the sole discretion of the Co-Ownership Entity, special assessments may be levied, the time for performance of or compliance with any terms, covenants or agreements contained in the Agreement or any other agreement between the Owner and the Co-Ownership Entity may be extended or delayed, and the liability of the Owner to pay any or all of the obligations arising as a result of ownership of the Unit may be settled or compromised with Owner, whether with or without notice to or further assent from Guarantor, and all without affecting this Guaranty or the obligations of Guarantor hereunder, which shall continue in full force and effect until the Owner shall cease to be the owner of record of the Unit.

The Guarantor hereby waives notice of acceptance of this Guaranty, presentment, demand for payment, protest, notice of occurrence of an event of default under the Agreement, or any other notice of any kind whatsoever with respect to any or all of the obligations of Owner as aforesaid, and waives any objection to the promptness in making any claim or demand hereunder; and no act or omission of any kind shall in any way affect or impair this Guaranty.

Guarantor hereby represents and agrees that this is a continuing Guaranty which shall remain in full force and effect until the Owner shall cease to be the owner of record of the Unit and all obligations of Owner to the Co-Ownership Entity are paid in full. In any action commenced by the Co-Ownership Entity on this Guaranty, Guarantor agrees that Guarantor shall not assert any counterclaims, offsets or claims which Guarantor may have against the Co-Ownership Entity.

4975/007/310879.1

000203-03

2959367.2

**EXHIBIT D**

This Guaranty is given to induce the Co-Ownership Entity to consent to the assignment of the undersigned's right to acquire the Unit to Owner.

This Guaranty shall be governed and construed by the laws of the State of New York.

Guarantor hereby subjects himself to the jurisdiction of the courts of the State of New York for the enforcement of any provision of this Guaranty or the resolution of any dispute hereunder.

Guarantor does hereby irrevocably designate _Hernandez Frieri_ , residing at _3 Greenwich Park West_ , New York, New York _2003_ , and such agent's successors and assigns, and each of them, as Guarantor's agent, pursuant to CPLR Section 318, authorized to receive and accept any notice of legal process from the Co-Ownership Entity, or their legal counsel. This designation shall not be affected by the subsequent disability, incompetence or death of Guarantor and shall be binding on Guarantor's heirs, legal representatives, successor and assigns.

If the above-named agent shall die, become incapacitated, retire or resign or fail to maintain an office or residence in the City of New York, the undersigned agrees immediately to secure a substitute agent reasonably acceptable to the Co-Ownership Entity and to execute and file a replacement of his designation of agent naming the new agent for service of process.

This Guaranty shall be binding on Guarantor, Guarantor's heirs, successors, assigns and legal representatives and shall survive the death of Guarantor.

Dated: August 16, 2005

GUARANTOR:

Gustavo Adolfo Hernandez Frieri

4975/007/310879.1

- 2 -

2959367.2

**EXHIBIT D**

STATE OF NEW YORK     )
                      )  ss.:
COUNTY OF NEW YORK  )

On the *16th* day of August in the year 2005 before me, the undersigned, personally appeared Gustavo Adolfo Hernandez Frieri, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the State of New York, County of New York.

_____
Notary Public

ANTOINETTE RUDZINSKI
Notary Public, State of New York
No. 02RU6001560
Qualified In Dutchess County
Certificate Filed in New York County
Commission Expires Sept. 8, 2006

**EXHIBIT D**

## OCCUPANCY AGREEMENT

    3 Gramercy Park West, LLC (the "Owner") a limited liability company wholly owned by Gustavo Adolfo Hernandez Frieri ("Frieri"), is the owner of a 24% interest in the building known as 3 Gramercy Park West, New York, New York with the exclusive right to occupy the parlor (second) floor apartment contained therein (the "Unit"). Notwithstanding the provisions of any other document, the Owner will not permit the occupancy of the Unit by any parties other than Frieri or members of his family. Any violation of this Occupancy Agreement shall be considered a default by the Owner under that certain Co-Ownership Agreement dated December 12, 1969 between and among Richard W. McCabe, Iris Whitney, Richard J. Wolfenden, William D. McCabe and William Ditfort, as modified by Amendments dated October 1, 1974, May 23, 1975, January 8, 1982, April 26, 1993, February 22, 1997, October 1, 2001, and of even date (collectively, the "Agreement"). The occupant(s) of the Unit shall be subject at all times to the Agreement.

    Owner recognizes that Three Gramercy Park, Inc. (the "Co-Ownership Entity") is relying on this Occupancy Agreement in issuing its consent to the assignment of Frieri's right to acquire the Unit to the Owner and that the Co-Ownership Entity would not otherwise consent to such assignment.

    This Occupancy Agreement may be modified only by a written instrument signed by Frieri, Owner, and the Co-Ownership Entity in accordance with the terms of the Agreement.

    This Occupancy Agreement shall be binding on the estates, heirs, executors, administrators, personal representatives, successors and assigns of the undersigned.

    This Occupancy Agreement shall be governed by the internal laws of the State of New York without giving effect to principles of conflicts of law.

    IN WITNESS WHEREOF, the undersigned has executed this Occupancy Agreement as of the ____ day of August, 2005.

                              _____
                              Gustavo Adolfo Hernandez Frieri

                              3 Gramercy Park West, LLC

                              By: _____
                                    Name:
                                    Title:

2959456.1

**EXHIBIT D**

## OCCUPANCY AGREEMENT

Occupancy Agreement (this "Agreement"), made as of the 16 day of August, 2005, by and between Ralph Ammirati and Joan Ammirati (collectively, "Seller") and 3 Gramercy Park West, LLC ("Purchaser").

WHEREAS, Seller and Purchaser's predecessor-in-interest, Gustavo Adolfo Hernandez Frieri ("Hernandez"), have entered into that certain Contract of Sale dated December 15, 2004 (the "Hernandez Contract"), as amended and re-instated by that certain Letter Agreement between Seller and Hernandez dated April 28, 2005 ("Letter Agreement") and assigned to Purchaser ("Assignment" and together with the Hernandez Contract and Letter Agreement, the "Contract") for the conveyance of the Unit (such term and all other capitalized terms used but not defined herein shall have the meanings given to such terms in the Contract), and Seller and Purchaser have agreed that the closing shall occur on the date hereof, with Seller having the right to remain in possession of the Unit through 11:59 am on August 23, 2005;

NOW THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1. Seller shall have the right to remain in occupancy of the Unit for the period (the "Occupancy Period") commencing on the date hereof and terminating at 11:59 am on August 23, 2005 (the "Vacating Date").

2. Seller shall: (i) on the Vacating Date deliver the Unit to Purchaser broom clean, vacant, free of all occupants and rights of possession; and (ii) remove all of Seller's property from the Unit by the Vacating Date (except for such items, which, pursuant to the Contract, are included in the sale to Purchaser), and Seller hereby agrees to indemnify Purchaser against any loss, cost or damage incurred by Purchaser as a result of damage to the Unit caused by Seller during the removal of such property from the Unit.

3. Any notice, demand or other communication hereunder (collectively, "Notice") shall be in writing and delivered in accordance with the provisions of the Contract.

4. During the Occupancy Period, Seller shall be responsible for all utilities affecting or serving the Unit, including gas, electric, telephone and cable television, and Seller shall make payment for such utilities directly to the suppliers thereof.

5. Seller shall pay for common area charges attributable to the Unit in respect of the Occupancy Period in the amount $56.77 per day which may at Seller's option be adjusted at the Closing occurring on the date hereof.

6. During the Occupancy Period, Purchaser shall insure the Unit against any and all risk of loss and, in the event that any portion of the Unit is destroyed without fault of the Seller, Purchaser shall accept the Unit in its as is condition after the occurrence of such loss.

000207-03

**EXHIBIT D**

2957971.2

7. If Seller fails to vacate the Unit by the Vacating Date, then Seller shall pay to Purchaser $250.00 per day for each day or fraction thereof during which Seller remains in occupancy of the Unit beyond the Vacating Date.

8. Purchaser shall have the right to inspect the Unit at a reasonable time and with reasonable notice on or before the Vacating Date.

9. Seller shall have no monetary obligations in respect of the occupancy of the Unit except to the extent set forth herein.

10. Nothing herein contained shall be deemed to create a landlord/tenant relationship between Seller and Purchaser.

IN WITNESS WHEREOF, the parties have executed this Agreement this 16 day of August , 2005.

**SELLER:**

Ralph Ammirati

Joan Ammirati

**PURCHASER:**

3 Gramercy Park West, LLC

By:

    Name: Gustavo Adolfo Hernandez Frieri
    Title:   Manager

-2-

**EXHIBIT D**

AGREEMENT

AGREEMENT (this "Agreement"), made as of August 16, 2005 by and between Ralph Ammirati and Joan Ammirati, having an address at P.O. Box 2494, Southampton, New York 11969 (collectively, "Seller"), Three Gramercy Park West, LLC, having an address at 3 Gramercy Park West, New York, New York 10003 ("Purchaser") and Philip O'Hara Associates, Inc., having an address at 140 Remsen Street, Brooklyn, New York 11201 ("Title Company").

WHEREAS, Seller and Purchaser's predecessor-in-interest, Gustavo Adolfo Hernandez Frieri ("Hernandez"), have entered into that certain Contract of Sale dated December 15, 2004 (the "Hernandez Contract"), as amended and re-instated by that certain Letter Agreement between Seller and Hernandez dated April 28, 2005 ("Letter Agreement") and assigned to Purchaser ("Assignment" and together with the Hernandez Contract and Letter Agreement, the "Contract") with respect to the conveyance from Seller to Purchaser of the Unit (such term and all other capitalized terms used but not defined herein shall have the meanings given such terms in the Contract) located at 3 Gramercy Park West, New York, New York;

WHEREAS, on the date hereof, Seller has executed that certain Deed conveying the Unit to Purchaser (the "Deed") and Seller and Purchaser have executed the (i) Affidavit of Compliance With Smoke Detector Requirement For One And Two Family Dwellings, (ii) NYC RPT, (iii) RP-5217NYC and (iv) TP 584 ((i), (ii), (iii) and (iv) collectively, the "Transfer Documents" and together with the Deed, the "Closing Documents") in connection with the transaction contemplated by the Contract; and

WHEREAS Title Company is hereby undertaking to record the Closing Documents.

NOW, THEREFORE, in consideration of mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1.      Title Company is authorized by Seller and Purchaser to record the Closing Documents.

2.      In the event that Title Company is unable to record the Deed due to the same being rejected by the clerk's office, (i) Seller and Purchaser shall take any and all reasonable action necessary to revise the Transfer Documents and re-execute the same in order to get the Deed recorded and (ii) Seller shall pay any additional transfer taxes, interest and/or penalties that may be due in connection with the recording of the Deed.

3.      Purchaser and Seller jointly and severally shall indemnify, save and hold harmless Title Company from any loss or damage whatsoever (unless due to Title Company's negligence) arising out of or by reason of the failure of Title Company to record the Deed or any audit by the New York State Department of Taxation and Finance in connection with the Transfer Documents.

4.      Any notice, demand or other communication hereunder shall be sent in the manner set forth in the Contract, except that Purchaser, Seller and Title Company shall receive

000209-03

2958137.1

**EXHIBIT D**

all notices, demands or other communication hereunder at their respective addresses set forth in the first paragraph of this Agreement.  Title Company has received a copy of the Contract.

IN WITNESS WHEREOF, the parties have executed this Agreement this ___ day of August, 2005.

SELLER:

_____
Ralph Ammirati

_____
Joan Ammirati

PURCHASER:

3 Gramercy Park West, LLC

By:_____
   Name: Gustavo Adolfo Hernandez Frieri
   Title:  Manager

TITLE COMPANY

Philip O'Hara Associates, Inc.

By:_____
   Name:  SUSAN B. HUTCHISON
   Title:  Closer

-2-

000210-03

SELLER'S ~~~~ ~~~~ AFFIDAVIT

**EXHIBIT D**

STATE OF NEW YORK)
                  )  SS:
COUNTY OF *New York* )

TITLE NO.

DATE: 8/16/05

*Ralph Ammirati* _____ and *Joan Ammirati* _____
each being duly sworn, deposes and says:

1. That I am one of the grantors ~~grantees~~ in deed bearing even date
   herewith conveying premises known as *3 Gramercy Park West*
   *2nd Flr., N.Y. N.Y.*

2. That I have not been known by any other name in the past ten (10)
   years except *None*
   and that there are no Judgments, Federal Tax Liens, Parking Viola-
   tion Judgments, Environmental Control Board Liens or any other
   liens against me in any jurisdiction.

3. That the Judgments or liens, if any, returned in the above cap-
   tioned report of title are not against your deponent, but, against
   someone of the same or similar name, and the I have never resid-
   ed at or done business at any of the addresses listed therein.

4. That I am the same person who acquired title to the premises herein
   by deed recorded in the *New York* County Register's (Clerk's)
   office in Liber (Reel) *605* , page *832* *and*
   *Reel 605 page 835.*

5. That there are no street vaults or street vault charges affecting
   the premises herein.

6. That there has been no work performed upon the premises which would
   result in the filing of an Emergency Repair Lien.  That I have not
   been advised that any Emergency Repair Lien has been ordered against
   the premises herein.

7. That I have not received notice to install or repair the sidewalks
   and/or curbs on premises herein.

This affidavit is made to induce *3 Gramercy Park West LLC*
to accept a (deed) ~~(mortgage)~~ covering said premises, and to induce
Lawyers Title Insurance Corp. to issue its policy insuring same, know-
ing that they will rely on the statements herein made.

Sworn to before me this 16th
day of *August* 18 2005

SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County
Commission Expires March 30, 2006

000211-03

**EXHIBIT D**

## DESIGNATION OF REAL ESTATE REPORTING PERSON

Section 6045(e) of the Internal Revenue Code of 1986, as amended, together with regulations promulgated thereunder, requires a report or information with respect to real estate transactions to the Internal Revenue Service (the "IRS") and to the transferor of the real estate transaction.

Pursuant to Treasury Regulation Section 1.6045-4(e)(5) **Ralph Ammirati and Joan Ammirati** (together, the "Transferor"), and **3 Gramercy Park West, LLC** (the "Transferee"), agree as follows:

**Willkie Farr & Gallagher** LLP is designated as the Real Estate Reporting Person with respect to the transfer of premises located at **3 Gramercy Park West, Parlor (Second) Floor, New York, New York.** Block: **876** Lot: **12.** For a total consideration of **$2,900,000.00.**

**Willkie Farr & Gallagher** LLP is qualified to be designated as the Real Estate Reporting Person in its capacity as:

    _ (a) the person responsible for closing the transaction (as defined in Treas. Reg. 1.6045-1(e)(3));

    _ (b) the Transferee's attorney (as provided under Treasury Reg. 1.6045-1(e)(3)(iii)(B));

    x (c) the Transferor's attorney (as provided under Treas. Reg. 1.6045-4(e)(3)(iii)(B));

    _ (d) the Disbursing Title or Escrow Company that is most significant in terms of gross proceeds disbursed; or

    _ (e) the Mortgage Lender (as defined in Treas. Reg. 1.6045-4(e)(6)(I)).

The Transferor's Social Security Number and address after the transfer is:



    (RA) and (JA)
P.O. Box 2494
Southampton, New York 11969

The property being transferred:

    _ (a) was the primary residence of Transferor

    x (b) was not the primary residence of Transferor

(If the property being transferred was the primary residence of the Transferor and the total consideration is $250,000.00 or less ($500,000.00 or less for married) then a 1099 filing need not be done)

2889884.1

2889884.1

**EXHIBIT D**

The Transferee's social security number and address after the transfer is:

███████6213
**3 Gramercy Park West, LLC**
**a New York limited liability company**
**701 Brickell Avenue, Suite 2030**
**Miami, Florida 33131**
**ATTN: Allwyn Jourdan**

The address of the Real Estate Reporting Person:

**Willkie Farr & Gallagher** LLP
**787 Seventh Avenue**
**New York, New York 10019**

Pursuant to Treasury Regulation Section 1.6045-4(4)(5)(iii), the Transferor, the Transferee, and the Real Estate Reporting Person designated herein shall retain a copy of this Agreement for four years following the close of this calendar year and, upon request by the IRS or any person involved in the transaction who did not participate in this Agreement, shall make it available for inspection.

Dated: August 16, 2005

**The Transferors:**

Ralph Ammirati

Joan Ammirati

**The Transferee:**

**3 Gramercy Park West, LLC**

By:

Name: Gustavo Adolfo Hernandez Frieri
Title: Manager

**The Designated Real Estate Reporting Person:**

Willkie Farr & Gallagher LLP
by: ~~Gary R. Litke~~, Esq., Associate
Wendi Shor

2

**EXHIBIT D**



**N Y C**
**RPT**

NEW YORK CITY DEPARTMENT OF FINANCE
**REAL PROPERTY TRANSFER TAX RETURN**
(Pursuant to Title 11, Chapter 21, NYC Administrative Code)

FINANCE
NEW • YORK
THE CITY OF NEW YORK
DEPARTMENT OF FINANCE

## GRANTOR ▼

● Name  RALPH AMMIRATI

● Grantor is a(n): ☑ individual ☐ partnership (must complete Schedule 3)
(check one) ☐ corporation ☐ other _____

Telephone Number

● Permanent mailing address after transfer (number and street)  P.O. BOX 2494

● City and State SOUTHAMPTON, NY

Zip Code  11969

● EMPLOYER IDENTIFICATION NUMBER    OR    ● SOCIAL SECURITY NUMBER

DO NOT WRITE IN THIS SPACE
FOR OFFICE USE ONLY

● RETURN NUMBER ▲

## GRANTEE ▼

● Name  3 GRAMERCY PARK WEST, LLC

● Grantee is a(n): ☐ individual ☐ partnership (must complete Schedule 3)
(check one) ☐ corporation ☑ other _____

Telephone Number

● Permanent mailing address after transfer (number and street)  701 BRICKELL AVENUE, SUITE 2030  ATTN: ALLWYN JOURDAN

● City and State MIAMI, FL.

Zip Code  33131

● EMPLOYER IDENTIFICATION NUMBER  6 2 1 3  OR  ● SOCIAL SECURITY NUMBER

● DEED SERIAL NUMBER ▲

● NYS REAL ESTATE TRANSFER TAX PAID ▲

## PROPERTY LOCATION ▼

LIST EACH LOT SEPARATELY. ATTACH A RIDER IF ADDITIONAL SPACE IS REQUIRED

| Address (number and street) | Apt. No. | Borough | Block | Lot | # of Floors | Square Feet | Assessed Value of Property |
|---|---|---|---|---|---|---|---|
| 3 GRAMERCY PARK WEST | 2ND F | MANHATTAN | 876 | 12 | 4 | 7,415 | 373,393.00 |

● DATE OF TRANSFER TO GRANTEE: 8/16/2005    ● PERCENTAGE OF INTEREST TRANSFERRED: 100 %

## CONDITION OF TRANSFER ▼ See Instructions

● Check (✓) all of the conditions that apply and fill out the appropriate schedules on pages 5-11 of this return. Additionally, Schedules 1 and 2 must be completed for all transfers.

a. ☑ ....Arms length transfer
b. ☐ ....Transfer in exercise of option to purchase
c. ☐ ....Transfer from cooperative sponsor to cooperative corporation
d. ☐ ....Transfer by referee or receiver (complete Schedule A, page 5)
e. ☐ ....Transfer pursuant to marital settlement agreement or divorce decree
f. ☐ ....Deed in lieu of foreclosure (complete Schedule C, page 6)
g. ☐ ....Transfer pursuant to liquidation of an entity (complete Schedule D, page 6)
h. ☐ ....Transfer from principal to agent, dummy, strawman or conduit or vice-versa (complete Schedule E, page 7)
i. ☐ ....Transfer pursuant to trust agreement or will (attach a copy of trust agreement or will)
j. ☐ ....Gift transfer not subject to indebtedness
k. ☐ ....Gift transfer subject to indebtedness
l. ☐ ....Transfer to a business entity in exchange for an interest in the business entity (complete Schedule F, page 7)

m. ☐ ....Transfer to a governmental body
n. ☐ ....Correction deed
o. ☐ ....Transfer by or to a tax exempt organization (complete Schedule G, page 8)
p. ☐ ....Transfer of property partly within and partly without NYC
q. ☐ ....Transfer of successful bid pursuant to foreclosure
r. ☐ ....Transfer by borrower solely as security for a debt or a transfer by lender solely to return such security
s. ☐ ....Transfer wholly or partly exempt as a mere change of identity or form of ownership. Complete Schedule M, page 9)
t. ☐ ....Transfer to a REIT or to a corporation or partnership controlled by a REIT. (Complete Schedule R, pages 10 and 11)
u. ☐ ....Other transfer in connection with financing (describe): _____
v. ☐ ....Other (describe): _____

② 200506030041210107

**EXHIBIT D**

Form NYC-RPT                                                                                                         Page 2

| ● TYPE OF PROPERTY (✓) | | |
|---|---|---|
| a. ☐ | 1-3 family house | |
| b. ☑ | Individual residential condominium unit | |
| c. ☐ | Individual cooperative apartment | |
| d. ☐ | Commercial condominium unit | |
| e. ☐ | Commercial cooperative | |
| f. ☐ | Apartment building | |
| g. ☐ | Office building | |
| h. ☐ | Industrial building | |
| i. ☐ | Utility | |
| j. ☐ | OTHER. (describe): | |

| ● TYPE OF INTEREST (✓) | | | |
|---|---|---|---|
| Check box at LEFT if you intend to record a document related to this transfer. Check box at RIGHT if you do not intend to record a document related to this transfer. | | | |
| | REC. | | NON REC. |
| a. | ☑ | Fee | ☐ |
| b. | ☐ | Leasehold Grant | ☐ |
| c. | ☐ | Leasehold Assignment or Surrender | ☐ |
| d. | ☐ | Easement | ☐ |
| e. | ☐ | Development Rights | ☐ |
| f. | ☐ | Stock | ☐ |
| g. | ☐ | Partnership Interest | ☐ |
| h. | ☐ | OTHER. (describe): | ☐ |

### SCHEDULE 1 - DETAILS OF CONSIDERATION ▼

COMPLETE THIS SCHEDULE FOR ALL TRANSFERS AFTER COMPLETING THE APPROPRIATE SCHEDULES ON PAGES 5 THROUGH 11. ENTER "ZERO" ON LINE 11 IF THE TRANSFER REPORTED WAS WITHOUT CONSIDERATION.

| | | | |
|---|---|---|---|
| 1. | Cash | 1. | 2,900,000 00 |
| 2. | Purchase money mortgage | 2. | 0 00 |
| 3. | Unpaid principal of pre-existing mortgage(s) | 3. | 0 00 |
| 4. | Accrued interest on pre-existing mortgage(s) | 4. | 0 00 |
| 5. | Accrued real estate taxes | 5. | 0 00 |
| 6. | Amounts of other liens on property | 6. | 0 00 |
| 7. | Value of shares of stock or of partnership interest received | 7. | 0 00 |
| 8. | Value of real or personal property received in exchange | 8. | 0 00 |
| 9. | Amount of Real Property Transfer Tax and/or other taxes or expenses of the grantor which are paid by the grantee | 9. | 0 00 |
| 10. | Other (describe): | 10. | 0 00 |
| 11. | **TOTAL CONSIDERATION** (add lines 1 through 10 - must equal amount entered on line 1 of Schedule 2) (see instructions) | 11. | 2,900,000 00 |

> See instructions for special rules relating to transfers of cooperative units, liquidations, marital settlements and transfers of property to a business entity in return for an interest in the entity.

### SCHEDULE 2 - COMPUTATION OF TAX ▼

| A. | Payment | Pay amount shown on line 14 - *See Instructions* | | Payment Enclosed |
|---|---|---|---|---|
| 1. | Total Consideration (from line 11, above) | | 1. | 2,900,000 00 |
| 2. | Excludable liens (see instructions) | | 2. | 0 00 |
| 3. | Consideration (Line 1 less line 2) | | 3. | 2,900,000 00 |
| 4. | Tax Rate (see instructions) | | 4. | 1.425 % |
| 5. | Percentage change in beneficial ownership *(see instructions)* | | 5. | 100 % |
| 6. | Taxable consideration (multiply line 3 by line 5) | | 6. | 2,900,000 00 |
| 7. | Tax (multiply line 6 by line 4) | | 7. | 41,325 00 |
| 8. | Credit (see instructions) | | 8. | 0 00 |
| 9. | Tax due (line 7 less line 8) (if the result is negative, enter zero) | | 9. | 41,325 00 |
| 10. | Interest (see instructions) | | 10. | 0 00 |
| 11. | Penalty (see instructions) | | 11. | 0 00 |
| 12. | **Total Tax Due** (add lines 9, 10 and 11) | | 12. | 41,325 00 |

(3)

200506030041210107

000215-03

**EXHIBIT D**

Form NYC-RPT

**SCHEDULE 3 - TRANSFERS INVOLVING MULTIPLE GRANTORS AND/OR GRANTEES OR A PARTNERSHIP ▼**

**NOTE** If additional space is needed, attach copies of this schedule or an addendum listing all of the information required below.

### GRANTOR(S)/PARTNER(S)

**NAME** JOAN AMMIRATI

**PERMANENT MAILING ADDRESS AFTER TRANSFER** P.O. BOX 2494

**CITY AND STATE** SOUTHAMPTON , NY   **ZIP CODE** 11969

### GRANTEE(S)/PARTNER(S)

(4)

200506030041210107

000216-03

**EXHIBIT D**

Form NYC-RPT                                                                                              Page 4

## GRANTOR'S ATTORNEY ▼

| | |
|---|---|
| Name of Attorney  WILLKIE FARR & GALLAGHER LLP (JANICE LEVINE) | Telephone Number ( 212 ) 728-8000 |
| Address (number and street)  787 SEVENTH AVENUE | City and State NEW YORK, NY     Zip Code 10019 |

EMPLOYER IDENTIFICATION NUMBER  1 3 - 5 5 3 6 8 4 4   OR   SOCIAL SECURITY NUMBER

## GRANTEE'S ATTORNEY ▼

| | |
|---|---|
| Name of Attorney  HOLM & O'HARA LLP (MICHAEL LANDSMAN) | Telephone Number ( 212 ) 682-2280 |
| Address (number and street)  THE GRAYBAR BUILDING 420 LEXINGTON AVENUE | City and State NEW YORK, NY     Zip Code 10170 |

EMPLOYER IDENTIFICATION NUMBER  OR  SOCIAL SECURITY NUMBER

## CERTIFICATION ▼

I swear or affirm that this return, including any accompanying schedules, affidavits and attachments, has been examined by me and is, to the best of my knowledge, a true and complete return made in good faith, pursuant to Title 11, Chapter 21 of the Administrative Code and the regulations issued thereunder.

| GRANTOR | GRANTEE |
|---|---|
| Sworn to and subscribed to | Sworn to and subscribed to |
| before me on this 16+ day | before me on this 16+ day |
| of August 2005 | of August 2005 |
| Ralph Ammirati | 3 Gramercy Park West, LLC |
| Name of Grantor | Name of Grantee |
| Signature of Notary   Signature of Grantor | Signature of Notary   By: Signature of Grantee |
| | Name: Gustavo Adolfo Hernandez Frieri |
| | Title: Manager |

SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County
Commission Expires March 30, 2006

SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County
Commission Expires March 30, 2006

GRANTEE: To ensure that your property and water/sewer tax bills are sent to the proper address you must complete the Registration forms included in this packet. Owner's Registration Cards can also be obtained by calling the Department of Finance at (718) 935-9500.

(5)

2005060300412101

**EXHIBIT D**

Affidavit of Compliance with Smoke Detector Requirement for One and-Two Family Dwellings

# AFFIDAVIT OF COMPLIANCE
## WITH SMOKE DETECTOR REQUIREMENT
### FOR ONE- AND TWO-FAMILY DWELLINGS

State of New York )
                  ) SS.:
County of New York )

The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

| 3 GRAMERCY PARK WEST | | 2ND F |
|---|---|---|
| Street Address | | Unit/Apt. |

| MANHATTAN | New York, | 876 | 12 | (the "Premises"); |
|---|---|---|---|---|
| Borough | | Block | Lot | |

That the Premises is a one or two family dwelling, or a cooperative apartment or condominium unit in a one- or two-family dwelling, and that installed in the Premises is an approved and operational smoke detecting device in compliance with the provisions of Article 6 of Subchapter 17 of Chapter 1 of Title 27 of the Administrative Code of the City of New York concerning smoke detecting devices;

That they make affidavit in compliance with New York City Administrative Code Section 11-2105 (g). (The signatures of at least one grantor and one grantee are required, and must be notarized).

Ralph Ammirati

Name of Grantor (Type or Print)

_____
Signature of Grantor

3 Gramercy Park West, LLC
By: Gustavo Adolfo Hernandez Frieri, Manager

Name of Grantee (Type or Print)

_____
Signature of Grantee

Sworn to before me
this 16th date of August 18 2005

SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County
Commission Expires March 30, 2006

Sworn to before me
this 16th date of August 18 2005

SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County
Commission Expires March 30, 2006

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Law.

NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED ON OR AFTER FEBRUARY 6th, 1990, WITH RESPECT TO THE CONVEYANCE OF A ONE- OR TWO-FAMILY DWELLING, OR A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT IN A ONE- OR TWO-FAMILY DWELLING, WILL NOT BE ACCEPTED FOR FILING UNLESS ACCOMPANIED BY THIS AFFIDAVIT.

( 1 )

2005060300412101

**EXHIBIT D**

WITH CARBON MONOXIDE DETECTOR
REQUIREMENTS FOR ONE AND TWO FAMILY DWELLINGS

State of New York   )
                  ) ss.:
County of New York )

      The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and the grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

**3 Gramercy Park West, Parlor (Second) Floor, New York, New York**

Borough of **Manhattan** Block: **876** Lot: **12**

      That the Premises is a one or two family dwelling, or a cooperative apartment or condominium unit, and that installed in the Premises is an approved and operational carbon monoxide detecting device in compliance with the provisions of Section 378 5-a of the Executive Law of the State of New York concerning carbon monoxide detector devices.

      That they make this affidavit in compliance with New York City Administrative Code Section 11-2105(g). (The signatures of at least one grantor and one grantee are required, and must be notarized.)

 

Grantor: Ralph Ammirati

3 Gramercy Park West, LLC

By: _____
   Name: Gustavo Adolfo Hernandez Frieri
   Title:   Manager

Sworn to before me this _16th_ day
of **August, 2005**

Sworn to before me this _16th_ day
of **August, 2005**

Notary Public

SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County
Commission Expires March 30, 2006

Notary Public

SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County
Commission Expires March 30, 2006

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Code.

WITH RESPECT TO CARBON MONOXIDE DEVICES-NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED
ON OR AFTER NOVEMBER 27, 2002, WITH RESPECT TO THE CONVEYANCE OF A ONE-OR TWO-FAMILY DWELLING, OR
A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT, WILL NOT BE ACCEPTED FOR FILING UNLESS
ACCOMPANIED BY THIS AFFIDAVIT.

2889884.1



TP-584 (10/03)

**EXHIBIT D**

| | Recording office time stamp |
|---|---|

New York State Department of Taxation and Finance

## Combined Real Estate
### Transfer Tax Return,
### Credit Line Mortgage Certificate, and
### Certification of Exemption from the
### Payment of Estimated Personal Income Tax

*See instructions (TP-584-I) before completing this form. Please print or type.*

### Schedule A — Information relating to conveyance

| Grantor/Transferor | Name *(if individual; last, first, middle initial)* AMMIRATI RALPH | Social security number |
|---|---|---|
| ☑ Individual | | ▮▮▮▮▮▮▮ |
| ☐ Corporation | Mailing address     P.O. BOX 2494 | Social security number |
| ☐ Partnership | | |
| ☐ Estate/Trust | City                              State                    ZIP code | Federal employer ident. number |
| ☐ Other | SOUTHAMPTON          NY                  11969 | |
| Grantee/Transferee | Name *(if individual; last, first, middle initial)* 3 GRAMERCY PARK WEST, LLC | Social security number |
| ☐ Individual | | |
| ☐ Corporation | Mailing address    701 BRICKELL AVENUE, SUITE 2030  ATTN: ALLWYN JOURDAN | Social security number |
| ☐ Partnership | | |
| ☐ Estate/Trust | City                              State                    ZIP code | Federal employer ident. number |
| ☑ Other | MIAMI                             FL                  33131 | ▮▮▮▮213 |

Location and description of property conveyed

| Tax map designation | | | Address | City/village | Town | County |
|---|---|---|---|---|---|---|
| Section | Block | Lot | 3 GRAMERCY PARK WEST  Unit 2ND F | NEW YORK | | MANHATTAN / NEW YORK |
| 1 | 876 | 12 | | | | |

Type of property conveyed *(check applicable box)*

| 1 | ☐ One- to three-family house | 5 | ☐ Commercial/Industrial | Date of conveyance | Percentage of real property |
|---|---|---|---|---|---|
| 2 | ☐ Residential cooperative | 6 | ☐ Apartment building | | conveyed which is residential |
| 3 | ☑ Residential condominium | 7 | ☐ Office building | 8    16    2005 | real property_____100 % |
| 4 | ☐ Vacant land | 8 | ☐ Other _____ | month  day   year | *(see instructions)* |

Condition of conveyance *(check all that apply)*

a. ☑ Conveyance of fee interest

b. ☐ Acquisition of a controlling interest (state percentage acquired _____ %)

c. ☐ Transfer of a controlling interest (state percentage transferred_____ %)

d. ☐ Conveyance to cooperative housing corporation

e. ☐ Conveyance pursuant to or in lieu of foreclosure or enforcement of security interest (attach Form TP-584.1, Schedule E)

f. ☐ Conveyance which consists of a mere change of identify or form of ownership or organization (attach Form TP-584.1, Schedule F)

g. ☐ Conveyance for which credit for tax previously paid will be claimed (attach Form TP-584.1, Schedule G)

h. ☐ Conveyance of cooperative apartment(s)

i. ☐ Syndication

j. ☐ Conveyance of air rights or development rights

k. ☐ Contract assignment

l. ☐ Option assignment or surrender

m. ☐ Leasehold assignment or surrender

n. ☐ Leasehold grant

o. ☐ Conveyance of an easement

p. ☐ Conveyance for which exemption from transfer tax claimed *(complete Schedule B, Part III)*

q. ☐ Conveyance of property partly within and partly outside the state

r. ☐ Other *(describe)* _____

| For recording officer's use | Amount received | Date received | Transaction number |
|---|---|---|---|
| | Schedule B, Part I  $ | | |
| | Schedule B, Part II $ | | |

200506030041230109

**EXHIBIT D**

---

**Schedule B — Real estate transfer tax return** (Tax Law, Article 31)

**Part I** – Computation of tax due

| | | |
|---|---|---|
| 1 Enter amount of consideration for the conveyance *(if you are claiming a total exemption from tax, check the exemption claimed box, enter consideration and proceed to Part III)* ................... ☐ **Exemption claimed** | 1. | 2,900,000 00 |
| 2 Continuing lien deduction *(see instructions if property is taken subject to mortgage or lien)* .................... | 2. | 0 00 |
| 3 Taxable consideration *(subtract line 2 from line 1)* ............................................................. | 3. | 2,900,000 00 |
| 4 Tax: $2 for each $500, or fractional part thereof, of consideration on line 3 .......................... | 4. | 11,600 00 |
| 5 Amount of credit claimed *(see instructions and attach Form TP-584.1, Schedule G)* ..................... | 5. | 0 00 |
| 6 Total tax due* *(subtract line 5 from line 4)* ...................................................................... | 6. | 11,600 00 |

**Part II** – Computation of additional tax due on the conveyance of residential real property for $1 million or more

| | | |
|---|---|---|
| 1 Enter amount of consideration for conveyance *(from Part I, line 1)* ....................................... | 1. | 2,900,000 00 |
| 2 Taxable consideration *(multiply line 1 by the percentage of the premises which is residential real property, as shown in Schedule A)* ..... | 2. | 2,900,000 00 |
| 3 Total additional transfer tax due* *(multiply line 2 by 1% (.01))* ....................................... | 3. | 29,000 00 |

**Part III** – Explanation of exemption claimed on Part I, line 1 *(check any boxes that apply)*

The conveyance of real property is exempt from the real estate transfer tax for the following reason:

a. Conveyance is to the United Nations, the United States of America, the state of New York, or any of their instrumentalities, agencies, or political subdivisions (or any public corporation, including a public corporation created pursuant to agreement or compact with another state or Canada) ...................................................................................................... a ☐

b. Conveyance is to secure a debt or other obligation ................................................................................. b ☐

c. Conveyance is without additional consideration to confirm, correct, modify, or supplement a prior conveyance ........................... c ☐

d. Conveyance of real property is without consideration and not in connection with a sale, including conveyances conveying realty as bona fide gifts .............................................................................................................. d ☐

e. Conveyance is given in connection with a tax sale ................................................................................. e ☐

f. Conveyance is a mere change of identity or form of ownership or organization where there is no change in beneficial ownership. (This exemption cannot be claimed for a conveyance to a cooperative housing corporation of real property comprising the cooperative dwelling or dwellings.) Attach Form TP-584.1, Schedule F ................................................ f ☐

g. Conveyance consists of deed of partition .............................................................................................. g ☐

h. Conveyance is given pursuant to the federal Bankruptcy Act ..................................................................... h ☐

i. Conveyance consists of the execution of a contract to sell real property, without the use or occupancy of such property, or the granting of an option to purchase real property, without the use or occupancy of such property ................................ i ☐

j. Conveyance of an option or contract to purchase real property with the use or occupancy of such property where the consideration is less than $200,000 and such property was used solely by the grantor as the grantor's personal residence and consists of a one-, two-, or three-family house, an individual residential condominium unit, or the sale of stock in a cooperative housing corporation in connection with the grant or transfer of a proprietary leasehold covering an individual residential cooperative apartment ......................................................................................................... j ☐

k. Conveyance is not a conveyance within the meaning of Tax Law, Article 31, section 1401(e) *(attach documents supporting such claim)* .................................................................................................................... k ☐

l. Other *(attach explanation)* .............................................................................................................. l ☐

*Please make check(s) payable to the county clerk where the recording is to take place. If the recording is to take place in New York City, make check(s) payable to the **NYC Department of Finance.** If a recording is not required, send this return and your check(s) made payable to the **NYS Department of Taxation and Finance,** directly to the NYS Tax Department, RETT Return Processing, PO Box 5045, Albany NY 12205-5045.

200506030041230108

**EXHIBIT D**

Schedule C — Credit Line Mortgage Certificate (Tax Law, Article 11)

**Complete the following only if the interest being transferred is a fee simple interest.**
I (we) certify that: *(check the appropriate box)*

1. [✓] The real property being sold or transferred is not subject to an outstanding credit line mortgage.

2. [ ] The real property being sold or transferred is subject to an outstanding credit line mortgage. However, an exemption from the tax is claimed for the following reason:

   [ ] The transfer of real property is a transfer of a fee simple interest to a person or persons who held a fee simple interest in the real property (whether as a joint tenant, a tenant in common or otherwise) immediately before the transfer.

   [ ] The transfer of real property is (A) to a person or persons related by blood, marriage or adoption to the original obligor or to one or more of the original obligors or (B) to a person or entity where 50% or more of the beneficial interest in such real property after the transfer is held by the transferor or such related person or persons (as in the case of a transfer to a trustee for the benefit of a minor or the transfer to a trust for the benefit of the transferor).

   [ ] The transfer of real property is a transfer to a trustee in bankruptcy, a receiver, assignee, or other officer of a court.

   [ ] The maximum principal amount secured by the credit line mortgage is $3,000,000 or more, and the real property being sold or transferred is **not** principally improved nor will it be improved by a one- to six-family owner-occupied residence or dwelling.

   **Please note:** for purposes of determining whether the maximum principal amount secured is $3,000,000 or more as described above, the amounts secured by two or more credit line mortgages may be aggregated under certain circumstances. See TSB-M-96(6)-R for more information regarding these aggregation requirements.

   [ ] Other *(attach detailed explanation).*

3. [ ] The real property being transferred is presently subject to an outstanding credit line mortgage. However, no tax is due for the following reason:

   [ ] A certificate of discharge of the credit line mortgage is being offered at the time of recording the deed.

   [ ] A check has been drawn payable for transmission to the credit line mortgagee or his agent for the balance due, and a satisfaction of such mortgage will be recorded as soon as it is available.

4. [ ] The real property being transferred is subject to an outstanding credit line mortgage recorded in _____ (insert liber and page or reel or other identification of the mortgage). The maximum principal amount of debt or obligation secured by the mortgage is _____ . No exemption from tax is claimed and the tax of _____ is being paid herewith. *(Make check payable to county clerk where deed will be recorded or, if the recording is to take place in New York City, make check payable to the NYC Department of Finance.)*

Signature (both the grantor(s) and grantee(s) must sign)

The undersigned certify that the above information contained in schedules A, B, and C, including any return, certification, schedule, or attachment, is to the best of his/her knowledge, true and complete.

| Grantor signature | Title |
| --- | --- |
| Ralph Ammirati | |

3 Gramercy Park West, LLC

By: _____

| Grantee signature | Title |
| --- | --- |
| Name:  Gustavo Adolfo Hernandez Frieri | |
| Title: Manager | |

| Grantor signature | Title |
| --- | --- |
| Joan Ammirati | |

| Grantee signature | Title |
| --- | --- |

**Reminder:** Did you complete all of the required information in Schedules A, B, and C? Are you required to complete Schedule D? If you checked e, f, or g in Schedule A, did you complete Form TP-584.1? Have you attached your check(s) made payable to the county clerk where recording will take place or, if the recording is in New York City, to the *NYC Department of Finance*? If no recording is required, send your check(s), made payable to the *Department of Taxation and Finance*, directly to the NYS Tax Department, RETT Return Processing, PO Box 5045, Albany NY 12205-5045.

2005060300412301

**EXHIBIT D**

---

Signature (both the grantor(s) and grantee(s) must sign)

The undersigned certify that the above information contained in schedules A, B, and C, including any return, certification, schedule, or attachment, is to the best of his/her knowledge, true and complete.

3 Gramercy Park West, LLC

By:

|                   |       | Grantee signature | Title |
|-------------------|-------|-------------------|-------|
| Grantor signature | Title | Name:  Gustavo Adolfo Hernandez Frieri |       |

Ralph Ammirati

Title: Manager

|                   |       |                   |       |
|-------------------|-------|-------------------|-------|
| Grantor signature | Title | Grantee signature | Title |

Joan Ammirati

2005060300412301

**EXHIBIT D**

**Schedule D - Certification of exemption from the payment of estimated personal income tax** (Tax Law, Article 22, section 663)

**Complete the following only if a fee simple interest is being transferred by an individual or estate or trust.**

**Part I -** New York State residents

If you are a New York State resident transferor(s)/seller(s) listed in Schedule A of Form TP-584 (or an attachment to Form TP-584), you must sign the certification below. If one or more transferors/sellers of the property is a resident of New York State, **each** resident transferor/seller must sign in the space provided. If more space is needed, please photocopy this Schedule D and submit as many schedules as necessary to accommodate all resident transferors/sellers.

**Certification of resident transferor(s)/seller(s)**

This is to certify that at the time of the sale or transfer of the real property, the transferor(s)/seller(s) as signed below was a resident of New York State, and therefore is not required to pay estimated personal income tax under Tax Law, section 663(a) upon the sale or transfer of this property.

| Signature | Print full name | Date |
|---|---|---|
| | Ralph Ammirati | 08/16/05 |
| | Joan Ammirati | 08/16/05 |
| | | |
| | | |

**Note:** A resident of New York State may still be required to pay estimated tax under Tax Law, section 685(c), but not as a condition of recording a deed.

**Part II -** Nonresidents of New York State

If you are a nonresident of New York State listed as a transferor/seller in Schedule A of Form TP-584 (or an attachment to Form TP-584) but are not required to pay estimated tax because one of the exemptions below applies under Tax Law, section 663(c), check the box of the appropriate exemption below. If any one of the exemptions below applies to the transferor(s)/seller(s), that transferor(s)/seller(s) is not required to pay estimated personal income tax to New York State under Tax Law, section 663. **Each** nonresident transferor/seller who qualifies under one of the exemptions below must sign in the space provided. If more space is needed, please photocopy this Schedule D and submit as many schedules as necessary to accommodate all nonresident transferors/sellers.

If none of these exemption statements apply, you must use Form IT-2663, *Nonresident Real Property Estimated Income Tax Payment Form,* and pay the full amount of estimated tax, if any, to the recording officer at the time the deed is presented for recording.

**Exemption for nonresident transferor(s)/seller(s)**

This is to certify that at the time of the sale or transfer of the real property, the transferor(s)/seller(s) (grantor) of this property was a nonresident of New York State, but is not required to pay estimated tax under Tax Law, section 663 due to one of the following exemptions:

☐ The property being sold or transferred qualifies in total as the transferor's/seller's principal residence (within the meaning of Internal Revenue Code, section 121) from _____ to _____ *(see instructions).*

☐ The transferor/seller is a mortgagor conveying the mortgaged property to a mortgagee in foreclosure, or in lieu of foreclosure with no additional consideration.

☐ The transferor or transferee is an agency or authority of the United States of America, an agency or authority of the state of New York, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

| Signature | Print full name | Date |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

2005060300412301

**EXHIBIT D**

---

Certification of resident transferor(s)/seller(s)

This is to certify that at the time of the sale or transfer of the real property, the transferor(s)/seller(s) as signed below was a resident of New York State, and therefore is not required to pay estimated personal income tax under Tax Law, section 663(a) upon the sale or transfer of this property.

| Signature | Print full name | Date |
|---|---|---|
| | Ralph Ammirati | 08/16/05 |
| Signature | Print full name | Date |
| | Joan Ammirati | 08/16/05 |
| Signature | Print full name | Date |
| | | |
| Signature | Print full name | Date |
| | | |

---

Exemption for nonresident transferor(s)/seller(s)

This is to certify that at the time of the sale or transfer of the real property, the transferor(s)/seller(s) (grantor) of this property was a nonresident of New York State, but is not required to pay estimated tax under Tax Law, section 663 due to one of the following exemptions:

☐ The property being sold or transferred qualifies in total as the transferor's/seller's principal residence (within the meaning of Internal Revenue Code, section 121) _____ to _____ (see instructions).
Date        Date

☐ The transferor/seller is a mortgagor conveying the mortgaged property to a mortgagee in foreclosure, or in lieu of foreclosure with no additional consideration.

☐ The transferor or transferee is an agency or authority of the United States of America, an agency or authority of the state of New York, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, or a private mortgage insurance company.

| Signature | Print full name | Date |
|---|---|---|
| | | |
| Signature | Print full name | Date |
| | | |
| Signature | Print full name | Date |
| | | |
| Signature | Print full name | Date |
| | | |

2005060300412301

000225-03

**EXHIBIT D**

TP-584

| TRANSFERS INVOLVING MULTIPLE GRANTORS AND/OR GRANTEES OR A PARTNERSHIP ▼ |
|---|

**NOTE** | If additional space is needed, attach copies of this schedule or an addendum listing all of the information required below.

## GRANTOR(S)/PARTNER(S)

NAME  JOAN AMMIRATI

PERMANENT MAILING ADDRESS AFTER TRANSFER    P.O. BOX 2494

CITY AND STATE  SOUTHAMPTON , NY

ZIP CODE  11969

SOCIAL SECURITY NUMBER

OR

EMPLOYER IDENTIFICATION NUMBER

---

## GRANTEE(S)/PARTNER(S)

200506030041230108

**EXHIBIT D**

**AFFIDAVIT OF NON MULTIPLE DWELLING**

STATE OF NEW YORK

COUNTY OF NEW YORK

      **Gustavo Adolfo Hernandez Frieri** being duly sworn deposes and says

1.    I am familiar with the real property known by the street address of

      **3 Gramercy Park West, Parlor (Second) Floor, New York, New York**

      BLOCK **876** LOT **12** and make this affidavit as: **Buyer**

2.    The annexed deed, lease or memorandum of lease does not affect an entire multiple dwelling as such term is defined by Section D26-I.97(a)(1) of the Administrative Code of the City of New York and Section 4(7) of the Multiple Dwelling Law. Such instrument does not affect a dwelling which is to be occupied as the residence of three or more families because it affects the following: (check applicable item)

        ( )   commercial building

        ( )   one or two family dwelling

        (x)   condominium unit in a multiple dwelling

        ( )   cooperative corporation shares relating to a single residential unit in a multiple dwelling

        ( )   lease of commercial space in a multiple dwelling

        ( )   ground lease

        ( )   mineral, gas, water, air or other similar rights not affecting a multiple dwelling

        ( )   vacant land

Alternatively, registration is not required by reason of the following: (check applicable item)

        ( )   The instrument being offered for recording is to clarify title or to correct an instrument previously recorded on_____ in Reel/Liber _____ Page _____.

        ( )   The interest described in the instrument submitted for recording is being or has been or shall be transferred to the grantor/assignor or shall be transferred to the ultimate grantee/assignee and an instrument to that effect is simultaneously herewith presented for recording with a registration statement therefore.

2889884.1

2889884.1

**EXHIBIT D**

Based upon the foregoing, the undersigned concludes that the filing of a registration statement under Article forty-one of Title D of Chapter twenty-six of such Code is not required for this real property at this time and so represents in order that this instrument be accepted for filing without being accompanied by such registration statement.

_____
Signature
Name:  Gustavo Adolfo Hernandez Frieri
Address:
Telephone:

Sworn to before me this
16ᵗʰ day of August, 2005

_____
Notary Public

SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County
Commission Expires March 30, _2006_

2

000228-03

**EXHIBIT D**

### NONFOREIGN AFFIDAVIT (FIRPTA)
### UNDER INTERNAL REVENUE CODE SECTION 1145(b)(2)
### (Individual Certification)

State of  New York    )

                )ss.:

County of  New York)

      **Joan Ammirati** , being first duly sworn, state under penalties of perjury:

      That I am a transferor of property located at:

> **3 Gramercy Park West**
> **Parlor (Second) Floor**
> **New York, New York**

      and described as follows:

> **Block:  876 Lot:  12**

      That my United States taxpayer identification number is:

> **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**

      That I am not a "foreign person" as that term is defined in Section 1445(f) of the Internal Revenue Code.

      That this Affidavit is given to **3 Gramercy Park West, LLC** the transferee of the property described in paragraph 1 above, for the purpose of establishing and documenting the nonforeign affidavit exemption to the withholding requirement of Section 1445 of the Internal Revenue Code.

**Joan Ammirati**

Subscribed and sworn to before me
this _16_ day of August, 2005.

Notary Public

               SUSAN B. HUTCHISON
               Notary Public, State of New York
               No. 43-4772183
               Qualified in Richmond County
               Commission Expires March 30, _2006_

**NOTE:**      This affidavit may be used where the transferor is a nonforeign person as referred to in the Foreign Investment in Real Property Act, as amended by the Deficit Reduction Act of 1984

2889884.1

000229-03

**EXHIBIT D**

**NONFOREIGN AFFIDAVIT (FIRPTA)**
**UNDER INTERNAL REVENUE CODE SECTION 1145(b)(2)**
**(Individual Certification)**

State of  New York   )
                     )ss.:
County of  New York)

      **Ralph Ammirati**, being first duly sworn, state under penalties of perjury:

    That I am a transferor of property located at:

**3 Gramercy Park West**
**Parlor (Second) Floor**
**New York, New York**

    and described as follows:

**Block:  876 Lot:  12**

    That my United States taxpayer identification number is:

**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**

    That I am not a "foreign person" as that term is defined in Section 1445(f) of the Internal Revenue Code.

    That this Affidavit is given to **3 Gramercy Park West, LLC** the transferee of the property described in paragraph 1 above, for the purpose of establishing and documenting the nonforeign affidavit exemption to the withholding requirement of Section 1445 of the Internal Revenue Code.

Ralph Ammirati

Subscribed and sworn to before me
this _16_ day of August, 2005.

Notary Public

SUSAN B. HUTCHISON
Notary Public, State of New York
No. 43-4772183
Qualified in Richmond County _2006_
Commission Expires March 30, _____

NOTE:    This affidavit may be used where the transferor is a nonforeign person as referred to in the Foreign Investment in Real Property Act, as amended by the Deficit Reduction Act of 1984

2889884.1

000230-03

**EXHIBIT D**

PHILIP O'HARA ASSOCIATES INC
140 REMSEN STREET
BROOKLYN, NEW YORK  11201
(718)-875-7506   FAX: (718)-403-0956

*SUSAN   B.   HUTCHISON*
******************************************************************

Applicant: HOLM & O'HARA, LLP                    Premises: 3 GRAMERCY PARK WEST
                                                           MANHATTAN NEW YORK

Purchaser/Mortgagor(s):                          Seller(s):
GUSTAVO ADOLFO HERNANDEZ FRIERI or LLC            < SEE CERTIFICATION RIDER >
TO BE FORMED

Mortgage Insurance:                              Date:   07/27/05

Fee Insurance:           2,900,000.00            Title Number:   MTB-36534

Closing Date:   _8/16/05_

Purchaser(s)/Mortgagor(s)                                     Seller(s)

| | | |
|---|---|---|
| Fee Insurance | 1462 – | |
| Market Value Rider | | |
| Mortgage Insurance | | |
| Endorsements | | |
| Municipal Searches | 275.00 | |
| UCC-1 Searches | | |
| Survey Charge | | |
| *fed ex* | 38 – | |
| Extra Chain | | |
| DEED | 150 – | |
| Mortgage | | |
| Satisfaction | | |
| Asst of Mtge | | |
| Agreement | | |
| UCC-1 | | |
| Power of Attorney | | |
| Affidavit | | |
| *Mansion tax* | 29000 – | |
| Mortgage Tax | | |
| Mortgage Tax (Bank) | | |
| *file RP-5217* | 75 – | |
| Escrow Service Charge | | |
| Escrow | | |

Total   *Chun no 6082*   (41,000 –)

| | | |
|---|---|---|
| NYC Comm of Finance | 41325 – | |
| NYS Transfer Tax(Stamps) | 11600 – | |
| Satisfaction | | |
| Power of Attorney | | |
| Release of Lien | | |
| Satisfaction(PV's) | | |
| Satisfaction(Jud) | | |
| Escrow Service Charge | | |
| Escrow | | |
| Total | (52925 –) | |

*Chun no. 2049*

Checks Received:

**EXHIBIT D**



HOLM & O'HARA LLP
ATTORNEY TRUST - IOLA ACCOUNT
THE GRAYBAR BUILDING
420 LEXINGTON AVE. 212-682-2280
NEW YORK, NY 10170-0002

NO. 279106

2049

CERTIFIED

PAYABLE ONLY AS ORIGINALLY DRAWN
AND WHEN PROPERLY ENDORSED    August 16, 2005

1-1-210

PAY TO THE ORDER OF    Philip O'Hara Associates, Inc    AUG 16 2005    $ 52,925.00

FIFTY-Two Thousand, Nine Hundred and Twenty Five and xx/100    DOLLARS

THE BANK OF NEW YORK
AUTHORIZED SIGNATURE
DO NOT DESTROY
BRANCH NO. 01

39 PW LLC From Ammirati
Parlor Floor, 3 Gramercy Park West
Sellers Transfer Taxes
Hernandez
THIS CHECK IS DELIVERED FOR PAYMENT ON THE ACCOUNTS LISTED
— DO NOT REMOVE —



HOLM & O'HARA LLP
ATTORNEY TRUST - IOLA ACCOUNT
THE GRAYBAR BUILDING
420 LEXINGTON AVE. 212-682-2280
NEW YORK, NY 10170-0002

NO. 279104

2050

CERTIFIED

PAYABLE ONLY AS ORIGINALLY DRAWN
AND WHEN PROPERLY ENDORSED    August 16, 2005

1-1-210

PAY TO THE ORDER OF    The Corcoran Group    AUG 16 2005    $ 72,500.00

Seventy-Two Thousand, Five Hundred and xx/100    DOLLARS

THE BANK OF NEW YORK
AUTHORIZED SIGNATURE
DO NOT DESTROY
BRANCH NO. 01

36 PW LLC From Ammirati
Parlor Floor, 3 Gramercy Park West
Real Estate Broker's Commission
Hernandez
THIS CHECK IS DELIVERED FOR PAYMENT ON THE ACCOUNTS LISTED
— DO NOT REMOVE —



HOLM & O'HARA LLP
ATTORNEY TRUST - IOLA ACCOUNT
THE GRAYBAR BUILDING
420 LEXINGTON AVE. 212-682-2280
NEW YORK, NY 10170-0002

NO. 279107

2051

CERTIFIED

PAYABLE ONLY AS ORIGINALLY DRAWN
AND WHEN PROPERLY ENDORSED    August 16, 2005

1-1-210

PAY TO THE ORDER OF    Ralph Ammirati and Joan Ammirati    AUG 16 2005    $ 2,702,075.00

Two Million, Seven Hundred and Two Thousand, Seventy Five and xx/100    DOLLARS

THE BANK OF NEW YORK
AUTHORIZED SIGNATURE
DO NOT DESTROY
BRANCH NO. 01

39 PW LLC From Ammirati and Ammirati
Parlor Floor, 3 Gramercy Park West
Balance of Purchase Price
Hernandez
THIS CHECK IS DELIVERED FOR PAYMENT ON THE ACCOUNTS LISTED
— DO NOT REMOVE —

000232-03

**EXHIBIT D**



HOLM & O'HARA LLP
ATTORNEY TRUST - IOLA ACCOUNT
THE GRAYBAR BUILDING
420 LEXINGTON AVE.  212-682-2280
NEW YORK, NY  10170-0002

NO. 279105

2052

1-1-210

CERTIFIED
PAYABLE ONLY AS ORIGINALLY DRAWN
AND WHEN PROPERLY ENDORSED

PAY TO THE ORDER OF  Stribling Associates Ltd.

AUG 1 6 2005

$ 72,500.00

Seventy-Two Thousand, Five Hundred                    DOLLARS

THE BANK OF NEW YORK

AUTHORIZED SIGNATURE
DO NOT DESTROY
BRANCH NO. 017

36 PW LLC Fam Ammirati and Ammirati
Parlor Floor, 3 Gramercy Park West
Seller's broker's commission
Hernandez
THIS CHECK IS DELIVERED FOR PAYMENT ON THE ACCOUNTS LISTED

CERTIFICATION LABEL

DO NOT REMOVE

---

HOLM & O'HARA LLP
ATTORNEY TRUST - IOLA ACCOUNT
THE GRAYBAR BUILDING
420 LEXINGTON AVE.  212-682-2280
NEW YORK, NY  10170-0002

2053

DATE  August 16, 2005

1-1-210

PAY TO THE ORDER OF  Ralph Ammirati and Joan Ammirati

$ 4,064.26

Four Thousand Sixty-Four and 26/100                    DOLLARS

36 PW LLC Fam Ammirati and Ammirati
Parlor Floor, 3 Gramercy Park West
Adjustments
Hernandez
THIS CHECK IS DELIVERED FOR PAYMENT ON THE ACCOUNTS LISTED

---

HOLM & O'HARA LLP
ATTORNEY TRUST - IOLA ACCOUNT
THE GRAYBAR BUILDING
420 LEXINGTON AVE.  212-682-2280
NEW YORK, NY  10170-0002

2054

DATE  August 16, 2005

1-1-210

PAY TO THE ORDER OF  Philip O'Hara Associates, Inc.

$ 41,000.00

Forty-One Thousand and XX/100                    DOLLARS

36 PW LLC Fam Ammirati and Ammirati
Parlor Floor, 3 Gramercy Park West
Title Charges
Hernandez
THIS CHECK IS DELIVERED FOR PAYMENT ON THE ACCOUNTS LISTED

**EXHIBIT D**

2055

**HOLM & O'HARA LLP**
ATTORNEY TRUST - IOLA ACCOUNT
THE GRAYBAR BUILDING
420 LEXINGTON AVE. 212-682-2280
NEW YORK, NY 10170-0002                    1-1-210

100 East 42nd Street
New York, NY 10017

DATE  August 16, 2005

PAY TO THE ORDER OF  Susan B. Hutchinson                    $ 200.00

Two Hundred and XX/100                    DOLLARS

THE BANK OF NEW YORK

3GPWLLC from Amminadi and Amminadi
Parbtipur, 3 Gramm Park maur
title Elsers Re
Hernandez

THIS CHECK IS DELIVERED FOR PAYMENT ON THE ACCOUNTS LISTED


2056

**HOLM & O'HARA LLP**
ATTORNEY TRUST - IOLA ACCOUNT
THE GRAYBAR BUILDING
420 LEXINGTON AVE. 212-682-2280
NEW YORK, NY 10170-0002                    1-1-210

100 East 42nd Street
New York, NY 10017

DATE  August 16, 2005

PAY TO THE ORDER OF  3 Gramercy Associates                    $ 1,760.00

One Thousand Seven Hundred and Sixty and XX/100                    DOLLARS

THE BANK OF NEW YORK

39PWLLC from Amminadi and Amminadi
Parbar Moor, 3 Gram Park Owens
September Maintence
Hernandez

THIS CHECK IS DELIVERED FOR PAYMENT ON THE ACCOUNTS LISTED

000234-03

EXHIBIT D

EXHIBIT E

## THE AMENDED AND RESTATED
## HH MASTER SETTLEMENT

### DECLARATION OF TRUST

THIS DECLARATION OF TRUST ("TRUST") is made this 13th day of November 2006 by Americas Fiduciary Ltd ("Trustee"), a Nevis corporation which hereby Amends and Restates the HH MASTER SETTLEMENT dated December 1st, 2004. The Trustee declares that it has received the property listed on the attached Annex "A", to hold such property in trust according to the terms of this Trust.

NOW THIS TRUST WITNESSETH AS FOLLOWS:

This Trust shall be known and designated as the:

HH MASTER SETTLEMENT.

1.2. The Trust:

1.2.1. The sum of two hundred Canadian dollars (CDN $200) which has been paid to the Trustee herein together with any other property which may from time to time be held by the Trustee in lieu thereof or in addition thereto, listed in Annex "A" hereto as amended from time to time (all of which is hereinafter referred to as the "Trust Estate"), shall be held by the Trustee for the benefit of the beneficiaries herein described (hereinafter referred to as the "Beneficiaries") and in accordance with this Trust as is herein provided. Any additions to the Trust Estate, other than those derived from the administration of the said Estate by the Trustee, shall be subject to prior notice of the Protector (hereinafter referred to as the "Protector").

1.2.2. The Trustee shall stand possessed of and hold the Trust Estate in trust to invest same or such portion thereof as may thereafter be delivered to it pursuant to the provisions of the present Trust in its absolute discretion, either to retain the same as then invested or to sell or convert the same and to invest the monies realized from such sale or conversion in such investments as the Trustee may deem fit.

1



GOVERNMENT EXHIBIT
13
PENGAD 800-631-6989

**EXHIBIT D**

## ARTICLE TWO
### Trust Period

2.1.  The duration of the Trust Period shall run from the date of the execution of these presents and shall expire upon the date:

2.1.1.  on which shall expire the period of eighty (80) years from the execution of this Trust; or

2.1.2.  on which shall expire the period of twenty (20) years from the death of the last survivor of all the descendants, male and female, of His late Majesty King George the Fifth living at the date hereof; or

2.1.3.  one (l) year after the day on which there shall be no beneficiary in existence; whichever shall first occur.

2.1.4.  such earlier date as the Protector, as hereinafter described, shall in its absolute discretion by Declaration appoint.

2.2.  The completion of distribution shall be deemed to have taken place when the Trust Estate has been distributed in toto in conformity with the provisions of this Trust.

## ARTICLE THREE
### The Trustee

3.1.  Definition and Number

3.1.1.  Trustee means one or more Trustees who is or who are for the time being in office whether he, she, they or it be the Trustee originally appointed hereby or subsequently appointed in accordance with this Trust.

3.1.2.  Those individuals who are Beneficiaries or may become Beneficiaries of this Trust as well as their spouses and relatives to the second degree, including the relatives to the second degree of their spouses, cannot be named Trustee to this Trust.

3.1.3.  An individual, company, corporation or body politic may be named a Trustee to this Trust.  Any Trustee named herein shall assent to all of the terms of this Trust, including paragraph 4.13. of Article Four.

3.1.4.  The Trustee herein named is the Trustee for the time being of the Trust, namely:

### AMERICAS FIDUCIARY LIMITED,
a Nevis corporation

3.2.   Vacancy and Replacement

    3.2.1.   An individual shall cease to be a Trustee when he or she dies, resigns or becomes unable or unwilling to act or to continue to act or becomes insolvent or bankrupt. A corporation shall cease to be a Trustee hereunder when the Trustee resigns or becomes insolvent or bankrupt or ceases to exist.

    3.2.2.   The power to dismiss, replace, appoint new or additional Trustees shall be vested in the Protector as hereinafter provided.

    3.2.3.   The replacing of a Trustee when a vacancy occurs shall be effected by an appointment as Trustee of any individual or corporation with power under law to contract. If more than one (1) Trustee has been appointed, the remaining Trustees shall agree upon and appoint the Trustee or Trustees required to fill such vacancy or vacancies subject to the approval of the Protector. In the event that the remaining Trustees cannot so agree or that there be no remaining Trustees, the Protector shall appoint the Trustee or Trustees required to fill such vacancy or vacancies.

    3.2.4.   Resignation by a Trustee shall be effected by the delivery or mailing by registered mail of a written notice of resignation to the other Trustee or Trustees acting hereunder, as the case may be to the Beneficiaries and to the Protector. However, in the case of impossibility to give notice to all parties, the giving of notice to at least one of the above parties shall constitute good and valid notice hereunder.

    3.2.5.   A retiring or replaced Trustee shall execute all transfers and do all acts or things that may be necessary for vesting the Trust Estate in the new, continuing or replacing Trustee or Trustees.

### ARTICLE FOUR
### Administration of Trust

4.1.   Wherever discretion is vested in or power is conferred upon more than one (1) Trustee, such discretion or power must be exercised by a majority of the Trustees. If there are fewer than three Trustees, such discretion or power must be exercised by unanimity if there are two Trustees and if there is only one Trustee, it may validly exercise such discretion or power alone.

4.2.   The Trustee hereunder has unlimited rights of ownership of the Trust Estate and, as owners, have absolute discretion to invest, manage, administer and otherwise deal with any part or the whole of the Trust Estate as the Trustee sees fit, the whole in accordance with the provisions of this Trust. Not to in any way limit or restrict the generality of the foregoing, the Trustee shall provide prior written notice to the Protector in investing, managing, administering and otherwise dealing with any part or the whole of the Trust Estate and may exercise and/or delegate, in its sole and absolute discretion, whenever and as often as the Trustee shall deem it advisable until the duration of the Trust Period has expired, the power and authority:

**EXHIBIT D**

4.2.1.        to invest the cash funds from time to time constituting part of the Trust Estate in any investments or securities which the Trustee may consider advisable and the Trustee is not to be limited to those investments authorized by law for trustees;

4.2.2.        from time to time and at any time to sell, transfer, assign, exchange, or otherwise dispose of any of the securities or investments from time to time constituting the Trust Estate, in any manner the Trustee may deem proper, at any price and terms considered desirable by the Trustee, and the Trustee shall not be bound to secure the consent or approval of any person, official, authority, tribunal or Court whomsoever or whatsoever;

4.2.3.        to vote all stocks and shares, to exercise all rights incidental to the ownership of stocks, shares, bonds, other securities and investments and property held as part of the Trust Estate, and to issue proxies to others; to sell or exercise any subscription rights and in connection with the exercise of subscription rights, to use trust monies for that purpose; to consent to and join in any plan, reorganization, readjustment or amalgamation or consolidation with respect to any corporation whose stock, shares, bonds or other securities at any time form part of the Trust Estate, and to authorize the sale of the undertaking or assets or a substantial portion of the assets or undertaking of any corporation and generally to act in respect of the Trust Estate as fully and effectually from time to time as if the same were not trust property but always for the benefit of the Trust Estate;

4.2.4.        to hold any or all securities or other property in bearer form or in the name of the Trustee or in the name of some other person, company or partnership or in the name or names of nominees without disclosing the fiduciary relationship, and to deposit the said securities and any title deeds or documents belonging or relating to the Trust Estate in any part of the world with any bank or trust company or any other company that undertakes the safe custody of securities as part of its business without being responsible for the default of such bank, trust company or other company or for any loss occasioned thereby;

4.2.5.        notwithstanding anything herein otherwise contained or rule of law to the contrary, to purchase as an investment of the Trust Estate, and hold as part of the Trust Estate, any securities or property at any price and upon any terms that may be deemed expedient or desirable by the Trustee;

4.2.6.        to make any payments, provisions or distributions which may be required under the terms hereof in whole or in part in money, securities or other property and on every division or distribution, the judgment and apportionment of the Trustee and valuations made by the Trustee shall be binding and conclusive on all persons whomsoever;

**EXHIBIT D**

4.2.7.        to incorporate any company or companies under the laws of any jurisdiction in the world at the expense of the Trust Estate, for the purposes of the powers and authority of the Trustee and more particularly, to invest the whole or any part of the Trust Estate wholly or partly in shares or other securities of such company or companies;

4.2.8.        to lease at any time and from time to time real property or interests in real property entrusted to it or from time to time held by it hereunder for such term or terms of months or years, to begin presently or in the future, as to them may seem proper, even though such lease or leases shall be for a term or terms exceeding that especially authorized by law and be beyond the term of the termination of any trust estate herein created, such leases to be with such options to the lessees of renewal and/or purchase or for the purchase or disposal of buildings thereon or to be placed thereon, and upon such covenants, terms, conditions, agreements and provisions as to it shall seem proper; and in connection therewith, to make, execute, acknowledge and deliver any and all instruments that may be necessary, proper or desirable;

4.2.9.        to acquire, hold and sell real estate anywhere in the world;

4.2.10.        to acquire and hold debts secured by hypothec or mortgage on real estate anywhere in the world;

4.2.11.        to renew and keep renewed any hypothec or mortgage upon real estate anywhere in the world;

4.2.12.        to register any property, immovable or moveable, in the name of the Trustee or in the names of the nominees;

4.2.13.        to deposit any cash balances in the hands of the Trustee at any time at any bank or trust company;

4.2.14.        to keep the whole or any part of the Trust Estate at any place within its discretion;

4.2.15.        to retain any life insurance policy entrusted to it or from time to time held by it hereunder; to purchase insurance on the life of any Beneficiary hereunder or on the life of anyone and to select such type of policy and mode of premium payments as the Trustee may deem advisable; to exercise all rights with regard to such retained or purchased insurance as the policy contracts grant to the owner thereof; to pay premiums on such policies either out of the principal or out of income or partly out of principal and partly out of income as the Trustee shall deem proper;  to name as Beneficiaries of the said new policies either the Trust Estate or the Beneficiaries thereof; to

**EXHIBIT D**

purchase annuities for one or more Beneficiaries and to select such type of annuity and mode of payment therefore as the Trustee may deem advisable; and to purchase and pay the premiums on policies of insurance against fire, other casualty or public liability or other insurance of a similar character, but the Trustee shall not be liable for any omission to purchase any insurance or to purchase a particular amount of any type of insurance;

4.2.16.          to determine whether any monies shall, for the purpose of this Trust, be considered as principal or income of the Trust Estate or whether any taxes, expenses or losses shall be paid out of or borne by principal or income.

4.3.   Notwithstanding the foregoing powers and authority conferred upon the Trustee hereunder, in respect of any corporation the shares of which are comprised in the Trust Estate, the shares not be realized or liquidated but, to the greatest extent possible, that they be distributed in specie to the Beneficiaries in accordance with this Declaration of Trust, in order to ensure to the greatest extent possible the continued existence of such corporations and the ownership of the shares thereof by the Beneficiaries as aforesaid.

4.4.   The Trustee may furthermore act upon the opinion or advice of or information obtained from any reputable solicitor, valuer, broker, auctioneer, accountant or other expert but the Trustee shall not be bound to act upon such opinion or advice and the Trustee shall not be responsible for any loss occasioned by so acting or by not so acting as the case may be save for its own intentional default or willful misconduct.

4.5.   Without limiting the generality of any power or authority otherwise conferred upon the Trustee hereunder, the Trustee shall have the full power and authority, instead of acting personally, to appoint any agent or agents in any part of the world, to assist in the administration of this Trust and in the management of the Trust Estate and, provided that the Trustee exercises reasonable care in the appointment of such agent or agents, the Trustee shall not be responsible for any act or neglect of any such agent or agents.

4.6.   Any Trustee being engaged in a professional business or trade, may, in the discretion of the Trustee, be paid all usual professional, business and trade charges and remuneration for business transacted and time expended and acts done by it or any employee or partner of the Trustee or by any firm or corporation with which it is connected in connection with the Trusts hereof including acts which a Trustee not being in any profession, business or trade could have done personally. Amounts paid under the foregoing shall be in addition to that Trustee's remuneration.

4.7.   In addition to their disbursements, the Trustee and the Protector shall be remunerated such fees as are usual for the type of administration.

4.8.   The Trustee may, with the prior approval of the Protector, receive and hold as part of the Trust Estate, subject to the Trusts hereof, any property made available by any other person or persons to be added to and to become part of the Trust Estate.

**EXHIBIT D**

4.9. The Trustee shall inform personally the Beneficiary or Beneficiaries of the age of majority upon their request with respect to the position of the investment of the Trust Estate. The Trustee shall not, however, give this information, if, in its opinion, the information might be used in an abusive or illicit manner or in any way detrimental to the interests of the Trust Estate or the other Beneficiary or Beneficiaries. The Trustee shall decide in its sole discretion whether the prerequisites for a disclosure of information are met.

4.10. Notwithstanding the foregoing, the Trustee and the Protector may divulge any and all information relating to this Trust and the Trust Estate if the Trustee is legally bound to do so by ordinance or imperative statutory provision of law.

4.11. The Trustee and the Protector hereunder agree to execute any further documents or deeds which may be necessary to effectively transfer the Trust Estate to the Trustee.

4.12. The Trustee shall be protected in acting upon any direction, paper or document believed by them to be genuine and to have been signed by the proper person or persons. In case of doubt, the Trustee may refer to the Protector and shall in such case be protected in acting upon any direction, paper or document confirmed or believed by the Protector to be genuine and to have been signed by the proper person or proper persons.

4.13. Neither the Trustee nor the Protector shall be liable for any error in judgment but only for its own intentional fault or willful misconduct. The Trustee and the Protector shall not be personally liable for any monies to become due by or any claims against this Trust Estate or upon any instrument executed by the Trustee under the provisions hereof. The Trustee shall be indemnified and saved harmless out of the funds of the Trust Estate from time to time and at all times from and against:

    4.13.1. all costs, charges, and expenses whatsoever which such Trustee sustains or incurs in or about any actions, suits or proceedings which are brought, commenced or prosecuted against the Trustee for or in respect of any act, deed, matter or thing whatsoever done or permitted by it in or about the execution of the duties of this Trust, and

    4.13.2. all other costs, charges and expenses which the Trustee sustains or incurs in or about or in relation to the affairs of the present Trust and Trust Estate.

4.14. The Trustee shall have the power to bind the Trust Estate but shall not render itself personally liable.

4.15. <u>Power to Amend</u>.

    4.15.1 Subject to the prior written notice to the Protector the Trustee may, at any time or times during the Trust Period, by writing, make any alterations or additions to the provisions of the Trust which it considers, in its absolute discretion, to be for the

**EXHIBIT D**

benefit of all or any one or more of the Beneficiaries (and for the avoidance of doubt, may change or amend the duration of the Trust Period, provided that in no case shall the Trust Period exceed the period as may be permitted from time to time by the Applicable Law or be shorter than ten (10) years from the date hereof).

4.15.2 Subject to the prior written notice to the Protector the Trustee may, at any time or times during the Trust Period, by writing, extinguish or restrict the future exercise of any of the powers conferred on it by the Trust or by the Applicable Law, including the exercise of any of the powers contained in this Article 4.

4.15.3 Subject to the prior written notice to the Protector the Trustee may during the Trust Period in its sole discretion by deed exercise its powers pursuant to this Article 4, to add or remove any Beneficiary or Beneficiaries. Any such addition or exclusion so made shall name or describe the Person or Persons or class or classes of Persons to be thereby added or excluded and shall specify the date (not being earlier than the date of the declaration, but during the Trust Period) from which such Person or Persons or class or classes of Persons shall be so added or excluded and the period (if terminating before the end of the Trust Period) for which such Person or Persons shall be added or excluded. In exercising its power pursuant to this Section 4.15.4, the Trustee may add or delete a Beneficiary or Beneficiaries without regard for the interests of the current Beneficiaries' in the Trust Fund or any income thereon.

4.15.4 Except as otherwise provided herein, any appointment or exclusion made pursuant to this Section 4.15.4. may be revocable or irrevocable, and shall have effect from the date specified by the Trustee.

4.15.5 Notwithstanding the provisions of this Trust, in no circumstances shall a Beneficiary be appointed as Trustee and if any Trustee becomes a Beneficiary such Trustee shall immediately and without further action retire as Trustee in accordance with Section 3.2.4 or 6.2.3 hereof.

4.16    Subject to the prior written notice to the Protector the Trustee may change at any time and from time to time during the Trust Period the governing law and forum for the administration of this Trust as hereinafter provided.

**ARTICLE FIVE**
**Benefit of Trust**

5.1.    The Beneficiaries of this Trust shall be those persons enumerated in Annex "B" attached hereto and forming an integral part hereof or  as appointed by deed pursuant to the powers under clause 4.15.4 hereof.

5.2.    The Trust Estate together with any other property which may from time to time be held by the Trustee in lieu thereof or in addition thereto, shall be held by the Trustee upon the following Trust:

**EXHIBIT D**

5.2.1.    The Trustee shall hold the Trust Estate during the Trust Period and may accumulate the whole of the income of the Trust Estate for the maximum period of accumulation permitted by law and add such accumulations to the principal thereof provided that during the Trust Period the Trustee may, upon making payments, apply any of the principal or the income of the Trust Estate to or for the benefit of the Beneficiaries designated in paragraph 5.1. of this Article Five provided, however, that in the interests of any Beneficiary, the Trustee may, taking into consideration the country of residence of the Beneficiary, tax and duties there eligible, foreign exchange rates and other financial, political, economic or personal considerations, retain any such distribution or payment for the benefit of the Beneficiary and provided further that any discretion herein contained shall be subject to Annex "B" referred to in paragraph 5.1. of this Article Five.

5.2.2.    The Trustee shall, in its sole discretion, determine the time and amount of payments, appropriations and applications of the income and/or principal of the Trust Estate to the Beneficiaries as aforesaid at all times.

5.3.    Upon expiration of the Trust Period and subject to such powers of appointment as may be hereinafter contained, the Trustee shall pay or transfer the remaining principal and income to the Beneficiaries as shall then be living in such manner as set forth in Annex "B" referred to in subparagraph 5.1. of this Article Five; provided that if at the expiration of the Trust Period no Beneficiary as defined herein shall be alive, the principal and income then remaining in the Trust Estate shall be distributed according to subparagraph 5.11. of this Article Five.

5.4.    All gifts, payments, or benefits made under the present Trust from the proceeds of the Trust Estate are intended as aliment and shall not be subject to seizure for the payment of any debts of the Beneficiaries or their representatives except in the case of express hypothecation or pledge after delivery, donation, or payment to them of any portion of the Trust Estate.

5.5    The proceeds, payment or other donation of any property to the Beneficiaries shall be and remain his or her private and separate property, free from the control of any consort, and shall not be liable for the debts of the said consort, and shall not form part of any community of property which may subsist between such consorts.

5.6.    If any person should become entitled to any portion or share of the Trust Estate either before attaining the age of 21 or at such time when such person is determined to be mentally incapacitated, such portion or share may, in the Trustee's discretion, in consultation with the Protector, be held and kept invested by the Trustee and the income and principal or some amount thereof as the Trustee, in consultation with the Protector, considers necessary or advisable, shall be used and applied for the benefit of such person until either he or she has either attained the age of 21, whereupon his or her portion or share, or the amount thereof then remaining in the hands of the Trustee shall be paid or transferred to such person or, as the case may be, in the case of mental incapacity, until such time as the Trustee has been

**EXHIBIT D**

determined by the Trustee, in consultation with the Protector, that it is necessary or advisable to pay and transfer the amount of such portion or share to the acting guardian of such person.

5.7.   The Trustee shall also have the power to make any payment for any person under the age of 21 to the parent or legal guardian of any such person whose receipt thereof shall be sufficient discharge to the Trustee.

5.8.   The determination of mental incapacity shall be made by the Protector after consultation with the Trustee and upon such medical or other expert assessment as the Protector considers necessary or advisable.

5.9.   The words "child," "children," "issue" when used herein, refer to a legitimate child, legitimate children or their respective legitimate issue but do not include an adopted child, adopted children, or their respective issue or adopted issue.

5.10.   If the Trustee deems it necessary, a prerequisite of the enjoyment of the proceeds of the Trust Estate by any Beneficiary shall be that within a period of two months after the date when any such person is appointed Beneficiary hereunder, he or she declares to the Trustee in a form satisfactory to the Trustee and the Trustee's legal counsel, that he or she promises to respect all the provisions laid down in the present Trust and the provisions of any conveyance of property by any person or persons to the Trustee to be held as part of the Trust Estate subject to the Trusts hereof. If he or she is in default to so declare and promise, he or she shall lose all of his or her rights to the enjoyment or the proceeds of the present Trust and Trust Estate, and any other trust fund which may have been created in consequence hereof and be excluded by the Trustee in accordance with the positions of clause 4.15.4 hereof.

5.11.   The charitable institutions and purposes to which the right or benefit of the Trust Estate shall possibly pass in accordance with the provisions of this Trust shall be those designated, if any, in Annex "B" hereto or as appointed by deed pursuant to the power under clause 4.15.4 hereof.

### ARTICLE SIX
### The Protector

6.1.   Definition

6.1.1.   The Protector shall be the person who is, for the time being, in office, whether the Protector originally appointed hereby or subsequently appointed in accordance with this Trust.

6.1.2.   Any individual who is not a U.S. citizen or resident, or any corporation that is not organized in any state or territory of the U.S., may be the Protector whether an individual (resident or non-resident of Canada) or a corporation (Canadian or

**EXHIBIT D**

foreign). Those individuals who are Beneficiaries or may become Beneficiaries of this Trust as well as their spouses and relatives, including the relatives of their spouses, may only be named Protector to this Trust to the extent that, in the aggregate, the Trustee does not comprise a majority of the total of persons and corporations appointed to and currently occupying the office of the Protector.

6.1.3.  The Protector(s), for the time being, of the present Trust, shall be H&H Protectors Ltd., a Bahamas corporation.

6.2.  <u>Resignation and Replacement</u>

6.2.1.  A Protector shall cease to be a Protector when he or she dies, resigns or becomes unable or unwilling to act or continue to act or becomes insolvent or bankrupt. A corporation shall cease to be a Protector hereunder when the Trustee resigns or becomes insolvent or bankrupt or ceases to exist.

6.2.2.  In the event an individual appointed as Protector in section 6.1.3. of Article 6 is unable or unwilling to serve as a Protector, then a successor protector shall be appointed by the Trustee.

6.2.3.  Resignation by a Protector shall be effected by the delivery or mailing by registered mail of a written notice of resignation to the Trustee acting.

6.3.  <u>Powers of the Protector</u>.  Notwithstanding any other provisions of the present Trust and particularly the powers and authority herein granted to the Trustee, the Protector shall at any time or from time to time during the Trust Period or any extension thereof, have the full power and authority:

6.3.1.  to remove from office, or appoint new or additional Trustees as the Protector shall consider advisable and without limiting the generality of the foregoing, to fill any vacancy in the office of the Trustee.

6.3.2.  to veto distributions of capital or income by the Trustee to any Beneficiary, provided such veto is exercised reasonably.

6.3.3.  to extinguish, diminish, reduce or otherwise limit the Protector's own powers as Protector during the tenure of persons appointed to and then in the office of the Protector; however, such extinction, diminishment, reduction or limitation shall not affect the powers of subsequent persons who may by replacement or later appointment be named to the office of Protector subsequently.

6.3.4.  to supervise the accounts of the Trust Estate, receive an accounting from any or all of the Trustee or any other person, company, institution or creditor holding any assets or property of the Trust Estate or any other trust fund which may be created in consequence hereof.

**EXHIBIT D**

6.3.5. without limiting the generality of any power or authority otherwise conferred upon the Protector hereunder, the Protector shall have the full power and authority, instead of acting personally, to appoint any agent or agents in any part of the world to assist in the carrying out of the powers of the Protector; and, provided that the Protector exercises reasonable care in the appointment of such agent or agents, the Protector shall not be responsible for any act or neglect of any such agent or agents.

6.3.6. any person appointed to the office of Protector being engaged in a profession, business or trade, shall be paid all usual professional business and trade charges and remuneration for business transacted and time expended and acts done by it or any employee or partner of the Trustee or by any firm or corporation with which it is connected in connection with the present Trust, including acts which persons appointed to the office of Protector not being in any profession, business or trade could have done personally.

6.3.7. Any reference to the "Protector" in this Trust shall be construed as a reference to all of the persons appointed to and then in the office of the Protector if there be more than one.

6.3.8. Wherever herein discretion is vested in or power is conferred upon the Protector, such discretion or power must be exercised by a majority of the persons appointed to and then in the office of the Protector. If it should happen at any time that there are fewer than three (3) persons then in the office of the Protector, such discretion or power must be exercised by unanimity if there are two (2) such persons and if there is only one (1) such person, he may validly exercise such discretion or power alone.

## ARTICLE SEVEN
### Power to Revoke and Amend

This Trust is irrevocable and no Trust provisions or interests may be altered, amended, revoked or terminated under this Trust or under any statute or other rule of law.

## ARTICLE EIGHT
### Interpretation

8.1. Any provision or condition of this declaration of Trust which is or becomes void for any reason whatsoever including the fact that it is considered to be or constitutes an impossible condition or one contrary to good morals, to law, to equity, or to public order, shall not annul this declaration Trust but shall only be considered as not written.

**EXHIBIT D**

## ARTICLE NINE
### Governing Laws

9.1.   Subject to the terms of subparagraph 4.16 of Article Four hereof, the Trust Estate created herein is created under the law of the Province of Nova Scotia, Canada and the rights of all parties and the construction and effect of every provision hereof shall be subject to the exclusive jurisdiction of and construed and regulated only according to the law of the Province of Nova Scotia, Canada.

9.2.   If the governing law of this Trust is changed and any provision of this Trust be found to be in violation of or contrary to such new governing law, including, by way of example, but without limitation, any law or rule therein prevailing relating to accumulation of trust income and to perpetuity periods, such provision shall be deemed to be amended and to comply with the new governing law.

9.3.   If at any time it appears that the Trust falls within the definition of a "United States Person," as defined in Section 7701(a)(30)(E) of the United States Internal Revenue Code of 1986 and the regulations thereunder, the Trustee may amend the Declaration, change the jurisdiction of the Trust, or do otherwise as it sees fit so the Trust will not fall within such definition in accordance with the provisions of subparagraph 4.16 hereof.

9.4.   Notwithstanding anything in the Declaration to the contrary, if at any time a United States court attempts to assert jurisdiction over or otherwise supervise the administration of the Trust directly or indirectly, the Trustee shall cause the Trust to migrate from the United States. Notwithstanding anything in the Declaration to the contrary, if any governmental agency or creditor attempts to collect information from or assert a claim against the Trust, the Trustee shall cause one or more substantial decisions of the Trust to be controlled by a person or entity that is not a United States fiduciary. The Trustee may accomplish its objectives set forth in this Section 9.4. by amending the Declaration, changing the jurisdiction of the Trust, or otherwise as the Trustee sees fit at its sole discretion.

## ARTICLE TEN
### Acceptance of Trustee and Protector

The Trustee accepts the Trust hereby created, and both the Trustee and Protector agree to carry out the provisions hereof to be performed on their part.

## ARTICLE ELEVEN
### Notices

11.1.   Any notice required or permitted to be given under any of the provisions of this Trust of the provisions of this Trust shall be sent by registered air mail, postage pre-paid, to the last known address of the addressee. No evidence that such notice has been received by any addressee shall be necessary to constitute good and valid notification. Any such notice given as aforesaid shall be deemed to have been given two (2) weeks after the envelope containing same is mailed, pre-paid registered air mail as aforesaid. There shall be no

**EXHIBIT D**

obligation to give any such notice to any party in the case of impossibility to give any such notice.

### ARTICLE TWELVE
### Exclusion from Benefits

Whoever contests the validity of this Trust, of the Trust created under it, of the Trusts created by virtue of the present Trust, of the provisions of any conveyance of property by any person or persons to the Trustee to form and be held as part of the Trust Estate, shall cease to be a Beneficiary of any of these Trusts and shall be excluded from any benefits, direct or indirect, deriving from the Trust Estate in accordance with the provisions of subparagraph 4.15.4 hereof

### ARTICLE THIRTEEN
### Severability

Should any provision of this Trust be determined to be contrary to or invalid under the Governing Law of this Trust by a competent court of that jurisdiction, provided that its removal would not substantially affect or render contradictory or incomprehensible the remainder of this Trust, such provision shall be considered as unwritten and shall not invalidate or otherwise affect this Trust and the Trust hereby created.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

**EXHIBIT D**

   **WHEREFORE,** the parties hereto have executed this Trust on the date first hereinabove written.


**ACCEPTED** by


The Trustee:


AMERICAS FIDUCIARY LIMITED,
a Nevis corporation


By: _____            _____
   TIMOTHY D. RICHARDS, Director          Witness

                                          _____
                                          Witness


15

**EXHIBIT D**

**AMENDED AND RESTATED**
**ANNEX "A"**

**November 13, 2006**

**THE TRUST ESTATE**

1.  Two Hundred Canadian Dollars (CDN $200.00);

2.  100% of the Beneficial interest in the Global Irrevocable Trust, a Nova Scotia Trust dated December 1, 2004;

3.  100% of the Beneficial interest in the Gramercy Irrevocable Operating Trust, a Nova Scotia Trust dated July 1, 2005.

**EXHIBIT D**

**AMENDED AND RESTATED
ANNEX "B"**

**November 13, 2006**

**BENEFICIARIES**

A. <u>Beneficiaries</u>

    1.    The Beneficiary of the HH MASTER SETTLEMENT ("Trust") shall be GUSTAVO HERNANDEZ ROMERO (the "Settlor").

    2.    Upon the death of GUSTAVO HERNANDEZ ROMERO, the Contingent Beneficiaries of the Trust shall be the Settlor's daughters: MARIA LUCIA HERNANDEZ FRIERI and MARIA ELENA HERNANDEZ FRIERI.

    4.    During the lifetime of the Settlor, the Trust Estate shall not be vested in the Contingent Beneficiaries and the Contingent Beneficiaries shall have no claim of any kind, including the right to receive accountings on the Trust Estate.

    5.    Upon the death of the Settlor, the remainder of the Trust Estate shall become vested in the Contingent Beneficiary.

B. <u>Payments from the Trust Estate</u>

    1.  During the lifetime of the Settlor, the Trustee, at its discretion, may pay to or for the benefit of the Settlor so much of the capital or income of the Trust Estate as the Trustee deems necessary in view of the requirements of an adequate standard of living of the Settlor, and taking into consideration the accustomed standard of living of the Settlor and any special needs of the Settlor, such as health, educational expenses or other similar needs.

    2.  Upon the death of the Settlor, the Trustee shall divide the remaining principal and accumulated but undistributed income of the Trust Estate into separate and equal shares of Fifty-Percent (50%) ("Trust Share") for the benefit of the Contingent Beneficiaries and shall distribute each respective Trust Shares in accordance with the following provisions:

        a.  The Trustee may pay to or for the benefit of each Contingent Beneficiary his/her respective Trust Share as the Trustee deems necessary in view of the requirements of an adequate standard of living of the Contingent Beneficiary, taking into consideration the accustomed standard of living of the Contingent Beneficiary and any special needs of the Contingent Beneficiary, such as health care, educational expenses or other similar needs.

**EXHIBIT D**

i.  Upon the Protector's determination, the Trustee shall pay to each of the Contingent Beneficiaries his/her respective Trust Share, outright, Per Stirpes.

ii.  If any of the Contingent Beneficiaries die prior to receiving full and final distribution, with surviving Issue, then the deceased Contingent Beneficiary's Trust Share shall be divided into so many shares so as to provide one (1) separate and equal share ("Issue's Share") for each of the deceased Contingent Beneficiary's then-living Issue. Any payments from an Issue's Share shall be made in accordance with the provisions of this section (2) of Annex B.

iii.  If any of the Contingent Beneficiaries die prior to receiving full and final distribution, without surviving Issue, then the deceased Contingent Beneficiary's Trust Share shall be distributed among the other Contingent Beneficiaries, Per Stirpes, in equal shares.

iv.  In the event no Contingent Beneficiary survives prior to full and final distribution of the Trust Estate, then the Trustee shall distribute the Trust Estate pursuant to written instructions of the Protector. In default and subject as aforesaid, the Trustee shall stand possessed of the principal and income of the Trust Estate absolutely for the Beneficiaries at the expiry of the Trust Period and if more than one, in equal shares, Per Stirpes.

3. Upon distribution of the entire Trust Estate and any income thereon to the Beneficiaries hereunder, the Trust shall terminate.

4. "Per Stirpes" shall mean that method of distribution pursuant to which a class or group of distributees take by right of representation through a deceased ancestor, a share to which such ancestor would have been entitled had he/she not been deceased. If, for example, distribution is to be made "Per Stirpes" to a specified person, and said person is deceased but is survived by children, then the share which would otherwise have been distributable to such deceased specified person had he/she then been living shall be divided equally among the children of such deceased person. As a further example, and consistent with the example in the preceding sentence, if all of the children of such specified person shall be deceased, then the share which would otherwise have been distributable to each such deceased child shall be divided equally among the children of each deceased child, with the effect that the children of each such deceased child of each such specified person will receive by right of representation the share which his/her parent would have received had he/she then been living.