UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| | x |
| | : |
| | : |
| UNITED STATES OF AMERICA, | : |
| | : |
| | :  Case No. 18-CR-20685 (KMW) |
| | : |
| v. | : |
| | : |
| CARMELO ANTONIO URDANETA AQUI | : |
| | : |
| Defendant. | : |
| | : |
| | : |
| | : |
| | x |

**SENTENCING MEMORANDUM OF CARMELO URDANETA**
**AND MOTION FOR DOWNWARD VARIANCE**

KOBRE & KIM LLP

Victoria R. Morris, Esq.
Florida Bar No. 125272
Victoria.Morris@kobrekim.com
201 South Biscayne Blvd.
Suite 1900
Miami, FL 33131
Tel: +1 305 967 6100
Fax: +1 305 967 6120

Robin Rathmell, Esq. (pro hac vice)
Robin.Rathmell@kobrekim.com
1919 M Street, NW
Washington, DC 20036
Tel. +1 202 664 1900
Fax. +1 202 664 1920

E. Martin De Luca, Esq. (pro hac vice)
Martin.DeLuca@kobrekim.com
New York Bar No. 4894986
800 Third Avenue
New York, New York 10022
Tel.: +1 212 488 1200
Fax: +1 212 488 1220

Jason M. Short (pro hac vice)
New York Bar No. 5140355
Jason.Short@kobrekim.com
800 Third Avenue
New York, NY 10022
Tel.: +1 212 488 1200
Fax: +1 212 488 1220


*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

LEGAL STANDARD ............................................................................................................. 3

18 U.S.C. § 3553(A) SENTENCING FACTORS ................................................................ 4

A.   Mr. Urdaneta's History and Characteristics Support a More Lenient Sentence (18 U.S.C. § 3553(a)(1)) ......................................................................................................................... 4
  i.    Mr. Urdaneta's Personal History and Character ................................................. 4
  ii.   Mr. Urdaneta's Escape from Venezuela ............................................................. 8
  iii.  Mr. Urdaneta's Substantial Cooperation and Assistance with the Government ............... 12

B.   A Below-Guidelines Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A)) ....................... 14

C.   A Below-Guidelines Sentence Would Provide Adequate Specific and General Deterrence (18 U.S.C. §§ 3553(a)(2)(B)-(C)) ................................................................................ 16
  i.    Specific Deterrence .......................................................................................... 16
  ii.   General Deterrence ........................................................................................... 17

D.   A Below-Guidelines Sentence Would Avoid Unwarranted Disparities in Sentences Imposed on Similarly Situated Defendants Guilty of Similar Conduct (18 U.S.C. §§ 3553(a)(6)) ............ 19

FURTHER GROUNDS FOR DOWNWARD VARIANCE ...................................................... 25

A.   A Downward Variance is Appropriate in Light of Mr. Urdaneta's Status as a Deportable Alien ........................................................................................................................... 25

CONCLUSION ..................................................................................................................... 28

# TABLE OF AUTHORITIES

Cases                                                                      Page(s)

83 F.3d 380 (11th Cir. 1996) ...................................................................................... 31
*Gall v. United States,*
    552 U.S. 38 (2007) ........................................................................................... 3, 5
*Koon v. United States,*
    116 S.Ct. 2035 (1996) ......................................................................................... 31
*Lartey v. U.S. Dep't of Justice,*
    790 F. Supp. 130 (W.D. La. 1992) ...................................................................... 32
*Pepper v. United States,*
    562 U.S. 476 (2011) .............................................................................................. 4
*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) .................................................................. 6
*United States v. Apodaca,*
    641 F.3d 1077 (9th Cir. 2011) ............................................................................ 24
*United States v. Barner,*
    572 F.3d 1239 (11th Cir. 2009) ..................................................................... 15, 17
*United States v. Booker,*
    543 U.S. 220 (2005) .......................................................................................... 3, 5
*United States v. Carmona-Rodriguez,*
    No. 04 CR 667 (RWS), 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) .................... 20
*United States v. Croteau,*
    819 F.3d 1293 (11th Cir. 2016) .......................................................................... 25
*United States v. Davoudi,*
    172 F.3d 1130 (9th Cir. 1999) ............................................................................ 30
*United States v. Del Campo,*
    695 F. App'x 453 (11th Cir. 2017) ...................................................................... 24
*United States v. Farouil,*
    124 F.3d 838 (7th Cir. 1997) .............................................................................. 31
*United States v. Fernandez,*
    443 F.3d 19 (2d Cir. 2006)............................................................................ 15, 17
*United States v. Gomez,*
    431 F.3d 818 (D.C. Cir. 2005) ............................................................................ 33
*United States v. Gonzalez-Portillo,*
    121 F.3d 1122 (7th Cir.1997) ............................................................................. 30
*United States v. Graham,*
    83 F.3d 1466 (D.C. Cir. 1996) ............................................................................ 30
*United States v. Grant,*
    493 F.3d 464 (5th Cir. 2007) .............................................................................. 16
*United States v. Gray,*
    453 F.3d 1323 (11th Cir. 2006) .......................................................................... 21
*United States v. Hoffman,*
    710 F.3d 1228 (11th Cir. 2013) ............................................................................ 6

*United States v. Hunt*,
    459 F.3d 1180 (11th Cir. 2006) ........................................................................... 5
*United States v. Jayyousi*,
    657 F.3d 1085 (11th Cir. 2011) ......................................................................... 21
*United States v. Keene*,
    933 F.2d 711 (9th Cir. 1991) ............................................................................ 16
*United States v. Martin*,
    520 F.3d 87 (1st Cir. 2008)............................................... 25, 26, 27, 28, 29
*United States v. Martinez-Carillo*,
    250 F.3d 1101 (7th Cir. 2001) ......................................................................... 30
*United States v. Martinez-Ramos*,
    184 F.3d 1055 (9th Cir.1999) .......................................................................... 30
*United States v. McQueen*,
    727 F.3d 1144 (11th Cir. 2013) ....................................................................... 25
*United States v. Milo*,
    506 F.3d 71 (1st Cir. 2007) ............................................................................. 16
*United States v. Pizano*,
    403 F.3d 991 (8th Cir. 2005) ........................................................................... 16
*United States v. Robinson*,
    741 F.3d 588 (5th Cir. 2014) ........................................................................... 15
*United States v. Smith*,
    27 F.3d 649 (D.C. Cir. 1994) ..................................................................... 30, 33
*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009)............................................................................... 19
*United States v. Thavaraja*,
    740 F.3d 253 (2d Cir. 2014)............................................................................. 33
*United States v. Vigil*,
    476 F. Supp. 2d 1231 (D.N.M. 2007) ........................................................ 18, 19

Statutes

18 U.S.C. § 3553(a) .............................................................................. 1, 2, 3, 6, 33
18 U.S.C. § 3553(a)(1)..................................................................................... 4, 6
18 U.S.C. § 3553(a)(2)(A) .................................................................................. 18
18 U.S.C. § 3624(c) ........................................................................................... 30
18 U.S.C. §§ 1956(h) ................................................................................. 1, 26, 28
18 U.S.C. §§ 3553(a)(2)(B) ............................................................................... 20
18 U.S.C. §§ 3553(a)(6) ..................................................................................... 25

Rules

U.S.S.G. § 5K1.1 ............................................................................................... 14

Other Authorities

61 Wayne L. Rev. 27 (2015)............................................................................... 22

*Punishment Purposes*,
    58 Stan. L. Rev. 67 (2005) ............................................................................... 23
*Purposes and Functions of Sentencing*,
    34 CRIME & JUST. 1 (2006) ............................................................................... 23

On behalf of Carmelo Urdaneta ("Mr. Urdaneta"), we respectfully submit this memorandum and the attached exhibits to assist the Court in determining a reasonable sentence that is "sufficient but not greater than necessary" to satisfy the goals of sentencing set forth in 18 U.S.C. § 3553(a).

## PRELIMINARY STATEMENT

Mr. Urdaneta, a 48-year-old father of two, comes before this Court bearing profound regret and sincere remorse for his criminal conduct.  In ever striving to be an ethical, caring provider and role model, Mr. Urdaneta is deeply ashamed of the deleterious impact his serious transgressions have had upon his family, friends, and community.  Above all else, Mr. Urdaneta accepts – without equivocation – full responsibility for his conduct and acknowledges the long journey that lies before him in redressing his wrongs and restoring his role as a positive and dependable example for his family and community.

As part of that journey, on July 14, 2021, Mr. Urdaneta pled guilty, pursuant to a written plea and proffer agreement,[1] to a Second Superseding Information charging him with Conspiracy to Commit Money Laundering in violation of 18 U.S.C. §§ 1956(h) and 1957(a).  Both the plea agreement and the preliminary Presentence Investigation Report ("PSR")[2] confirm a recommended, advisory Federal Sentencing Guidelines ("Sentencing Guidelines") range of 120 months.[3]  *See* PSR, ECF No. 597, ¶¶ 7, 120–30, 177; Ex. A, Plea Agreement, ¶ 13.  However, the

---

[1] Attached hereto as Exhibit A and Exhibit B, respectively.

[2] On May 3, 2022, the U.S. Probation Office filed under limited access a draft, preliminary Presentence Investigation Report.  *See* ECF No. 597.  On May 18, 2022, we submitted our objections and responses to the report, which are attached hereto as Exhibit C.  Thereafter, on May 20, 2022, the U.S. Probation Office filed under limited access a final revised Presentence Investigation Report.  *See* ECF No. 599.  For purposes of this memorandum, all references to the PSR are to the preliminary Presentence Investigation Report.

[3] Based upon the 10-year statutorily authorized maximum sentence, pursuant to Section 5G1.1(a) of the Sentencing Guidelines.

1

plea agreement expressly reserves Mr. Urdaneta the right to seek a variance outside of the stipulated guidelines range pursuant to 18 U.S.C. § 3553(a). Far from seeking to excuse or otherwise condone his conduct, Mr. Urdaneta instead submits this sentencing memorandum in order to assist the Court in imposing a just and appropriate sentence which takes into consideration the wide and varied range of factors that demonstrate the totality of Mr. Urdaneta's character.

Since voluntarily escaping Venezuela at significant risk to himself and his family, Mr. Urdaneta has cooperated extensively with, and provided substantial assistance to, the United States Government (the "United States" or "Government") as part of multiple ongoing federal criminal investigations and/or proceedings. As set forth in greater detail below, the scope of Mr. Urdaneta's cooperation with the Government has been extraordinary, and is further magnified by his ongoing and prospective cooperation with multiple *foreign* governments in support of their own independent investigations and/or proceedings.

Separate and apart from Mr. Urdaneta's substantial cooperation, there are a number of other relevant factors that weigh in favor of a below-guidelines variance in sentencing Mr. Urdaneta, including but not necessarily limited to: (i) the history and character of Mr. Urdaneta, (ii) the extremely low likelihood of recidivism on the part of Mr. Urdaneta, and (iii) the consistent imposition of below-guidelines sentences for similarly situated co-defendants in this matter.

Based upon the foregoing, we respectfully submit that an assessment of the Section 3553(a) factors, coupled with Mr. Urdaneta's extraordinary cooperation and efforts to completely satisfy the monetary judgement, support this Court entering a substantial downward variance pursuant to 18 U.S.C. § 3553(a).

**LEGAL STANDARD**

Title 18, United States Code, section 3553(a) provides that "[t]he court shall impose a sentence sufficient, *but not greater than necessary*" to comply with the purposes of punishment, while taking into account "the nature and circumstances of the offense and the history and characteristics of the defendant." (emphasis added).   The Supreme Court has held that the Sentencing Guidelines are no longer mandatory or "the only consideration" at sentencing.  *See Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Booker*, 543 U.S. 220 (2005). Rather, in minimizing the impact of the Sentencing Guidelines on determining a reasonable sentence, the Supreme Court has held:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime.

*Pepper v. United States*, 562 U.S. 476, 487–88 (2011).

As such, Section 3553(a) instructs sentencing courts to take a holistic approach to sentencing, requiring the Court to consider: (1) "the history and characteristics of the defendant"; (2) "the nature and circumstances of the offense"; (3) the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (5) the need "to afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(1)–(7).

Ultimately, if the Court finds that – based on an assessment of the Section 3553(a) factors – a sentence within Sentencing Guidelines range does not adequately account for the nature and

circumstances of the offense and history and characteristics of the defendant, the Court may "tailor the sentence" that does. *See Booker*, 543 U.S. at 245; *see also Gall*, 552 U.S. at 39 (holding that a sentencing court "may not presume that the Guideline range is reasonable," but rather "must make an individualized assessment based on the facts presented."); *United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006) (finding that there are "many instances" where the Sentencing Guidelines will not yield a reasonable sentence).

As detailed in the following sections, and when taking into consideration the pertinent Section 3553(a) factors, it is respectfully submitted that a substantial variance from the recommended advisory Sentencing Guidelines range is warranted for Mr. Urdaneta.

## 18 U.S.C. § 3553(a) SENTENCING FACTORS

### A. Mr. Urdaneta's History and Characteristics Support a More Lenient Sentence (18 U.S.C. § 3553(a)(1))

The Eleventh Circuit has held that when imposing a reasonable and just sentence, a court must consider "the history and characteristics of the defendant" within the meaning of 18 U.S.C. § 3553(a)(1). *See United States v. Hoffman*, 710 F.3d 1228, 1233 (11th Cir. 2013). Here, and as noted, Mr. Urdaneta is not seeking to excuse or shirk responsibility for his criminal conduct, but is instead genuinely imploring this Court to consider his personal history and character as a whole when judging that conduct. *See United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006) (holding that "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life . . . it should be at the moment of his sentencing, when his very future hangs in the balance").

#### i.    *Mr. Urdaneta's Personal History and Character*

Above all, Mr. Urdaneta has lived his life seeking to exemplify the central tenets of honesty, hard work, and unwavering dedication to loved ones. Born on October 12, 1973, in

Maracaibo, Venezuela, Mr. Urdaneta was raised in a close-knit family, and was taught at a young age by his parents, Jorge and Sonia, the value of supporting those around him and never declining a request for help by those less fortunate.

It is this same system of values that Mr. Urdaneta and his former spouse, Zenaida Urbano-Taylor Romero, have carried onward and taught their children, Carmelo Andres Urdaneta Urbano-Taylor (18 years old) and Camila Claret Urdaneta Urbano-Taylor (16 years old).  Moreover, it is clear from the emotional letters provided by his family that Mr. Urdaneta – as a son, brother, husband, and father who always endeavored to serve as a steadfast pillar of support and role model for his family – is deeply shamed by his transgressions, and profoundly remorseful for impact his conduct has had upon his loved ones.  As noted by Ms. Urbano-Taylor Romero, who has since reconciled with Mr. Urdaneta during this difficult process:

> Carmelo is a brave man.  His life was in danger [by coming to the U.S. to cooperate] but his love as a father, husband, and son, and his desire to face his responsibilities, show true repentency, ask for forgiveness and clemency is stronger than his fear.  I feel like I'm in intensive care, life is escaping me, and I don't understand life without him by my side.  Our kids need him and his health is extremely fragile. . .  I can proudly say, Carmelo: we are fortunate to have you in our lives, your family suffers alongside you. We know you made a mistake, but you also had the courage to face them. Thank you for not thinking only of yourself, but of all of us and not taking that evasive and cowardly path, nor evading your guilt. [4]

So too do Mr. Urdaneta's father and mother provide their unwavering support for their son, writing:

> Our son Carmelo's repeated and permanent expressions of repentance that we, as his parents, wife, children, siblings, and other family members, have witnessed provides us with the greatest consolation during these difficult times, and, at the same time, provides us hope that this will never happen again.  We have seen first-hand the suffering our son has faced in making the important, but difficult, decision to flee Venezuela and come to the United States to cooperate with the U.S. Government. . .  Although we and

---

[4] *See* Letter of Support – Zenaida Claret Urbano-Taylor Romero, attached hereto as Exhibit D.

> Carmelo recognize the mistakes he has made, for which he takes full responsibility, we want the Court to understand that Carmelo will live an upstanding, honest, and ethical life. He will live a life that will honor and respect his family and as a good role model for his children. Carmelo has proven to be an excellent son, a wonderful father, and a great promoter of charity works that benefit the entire community.[5]

And, in wishing for this Court to understand that Mr. Urdaneta has always been a loving and

devoted father, his daughter Camila writes:

> My relationship with my dad has always been so special and unique; he is my rock and support through the tough times that I and my family have faced. Our relationship is truly invaluable. My dad is always there to listen and help me through any issue, whether big or small. He always understands me and respects my feelings, even when I am wrong. . . [M]y dad, has recognized his mistakes, and most of all, he made the best choice by accepting them. Still, he is human. We all understand the severity of his error and have experienced firsthand the consequences, like the uncertainty, misery, and separation that my family has faced. It hurts my soul that the man who made me who I am today is in this critical situation that he has accepted, but we all hope that we can be happy and united again.[6]

Another family member writes of Mr. Urdaneta's kindness and generosity:

> I have known [Carmelo] for more than 30 years, which allows me to assure with propriety and knowledge that he is an honest and responsible person of straight conduct and with a great altruistic heart. My family, especially my mother and father, were supported by him in times of serious illness without sparing any effort, time, or money. I have seen the same behavior towards many other people who he realizes are having problems and puts his helping hand to help in everything he can – that has always been his way of acting.[7]

Individuals outside of the Urdaneta family also respect and support Mr. Urdaneta, with one such

friend stating:

> I have always considered, and my family knows and understands, that the Urdaneta Family is my other family that God gave me in life. I consider Carmelo Antonio as a brother, who has been there for me in the most

---

[5] *See* Letter of Support – Jorge and Sonia Urdaneta, attached hereto as Exhibit E.

[6] *See* Letter of Support – Camila Urdaneta, attached hereto as Exhibit F.

[7] *See* Letter of Support – Victoria Romero Rodriguez, attached hereto as Exhibit G.

difficult moments of my life and has supported me endlessly. The same is true about Carmelo's brothers, . . . as well as his parents, who were like my parents. . . Carmelo is an admirable and good man.[8]

In addition, and as his loved ones unequivocally attest, Mr. Urdaneta's compassion and generosity extends well beyond his family.[9] Evidence of Mr. Urdaneta and his family's public works and charitable contributions to the wider community and those in need are numerous, and include:

- The taking in and caring for as his own family members a young baby, Gregory, and his mother, who were abandoned and in desperate conditions;[10]

- The donation of food to medical and administrative staff at Venezuelan hospitals during the COVID-19 pandemic;[11]

- The donation of sports equipment to "Titanes del Orituco," a Venezuelan basketball camp for underprivileged youth;[12]

- The funding of recreational events for the elderly in support of the NGO Foundation, "Los Nuecesitos Blancos";[13]

- The funding of development and repair for the "Simoncito" public school in Venezuela;[14]

- The funding of uniforms, bathrooms, and sanitary equipment installation for community athletic fields in the "Cooperativa Los Guires" Sector of Venezuela;[15] and

---

[8] *See* Letter of Support – Javier Gill, attached hereto as Exhibit H.

[9] *See, e.g.*, Letter of Support – Father Eleuterio Segundo Cueva Pereira, attached hereto as Exhibit I.

[10] *See* Exhibit D, Letter of Support – Zenaida Claret Urbano Taylor Romero.

[11] *See* Letters of Charitable Contributions, attached hereto as Exhibit J.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

- The funding of public works projects, including street repair and waste removal, for the entirety of the "El Diamante Sector" of Venezuela.[16]

Ultimately, these are but a few examples of the dedication, support, and compassion that Mr. Urdaneta has demonstrated throughout his life.  And while this lifetime of devotion to his family, friends, and community cannot undo the harm caused by the instant offense, when viewed against the totality of Mr. Urdaneta's personal history, it is clear that Mr. Urdaneta's transgressions do not reflect his true character.  Already, and as detailed further in the following sections, Mr. Urdaneta has taken, and will continue to take, all necessary steps in his journey to right the wrongs he has committed, including escaping Venezuela at great personal risk to himself and his family in order to accept full responsibility for his actions and substantially cooperate with the Government to assist the course of justice and repay his debt to society.

ii.    *Mr. Urdaneta's Escape from Venezuela*

As detailed extensively in the Proffer Agreement and PSR, the foreign currency exchange transactions involving Petroleos de Venezuela, S.A. ("PDVSA") and the Venezuelan Oil of Ministry (the "Oil Ministry"), which form the basis for the instant matter, were ultimately overseen and directed by representatives and officials at the highest levels of the Venezuelan Government, as well as key members of Venezuelan elite, collectively referred to as the "Boliburgues" or "Bolichicos."  *See, e.g.*, PSR, ECF No. 597, ¶¶ 20–21, 25; Ex. B, Proffer Agreement, ¶¶ 3, 10.

As such, when the Criminal Complaint and Indictment were unsealed in late 2018, Mr. Urdaneta was immediately faced with enormous pressure from Venezuelan Government officials and key members of the Venezuelan elite to avoid surrendering to or otherwise cooperating with any foreign authorities, and to instead immediately return to and reside in Venezuela under the

---

[16] *Id.*

"protection" of the Maduro Administration.   Indeed, the Venezuelan Government deployed resources to ensure Mr. Urdaneta immediately returned to Venezuela upon learning of the U.S. investigation.   During this period, Mr. Urdaneta and his family were at the mercy of the Venezuelan Government and lived under constant surveillance and the threat of arrest, imprisonment, and torture, should officials have determined that Mr. Urdaneta sought to cooperate with the United States.

Nonetheless, and despite the clear danger posed to himself and his loved ones, Mr. Urdaneta understood that the only course of action he could take to uphold his values, restore his honor, reunite with his partner and children, and ensure that his family could live and grow without a constant shadow of reprisal looming over them, was to make contact with the United States Government and – with the Government's assistance – engineer his and his family's escape from Venezuela.

From the start, such a plan was fraught with peril.  In the months leading up to his escape from Venezuela, Mr. Urdaneta began to, in secret, meticulously gather primary records and documentation relating to transactions associated with PDVSA and the Oil Ministry.  In order to avoid detection, Mr. Urdaneta personally reviewed these records and transferred them to a series of USB pen drives that could be concealed during the course of his prospective escape.

During this period, and although Mr. Urdaneta and the undersigned remained in contact with the United States, it became clear that the Government would be unable to directly assist Mr. Urdaneta in securing safe passage from Venezuela.  The escape from Venezuela was particularly challenging for Mr. Urdaneta for three reasons: (i) Mr. Urdaneta was under constant surveillance from Venezuelan intelligence services due to the value of the information he could cooperate about, (ii) Covid-19 restrictions in Venezuela were very strict at the time, with stringent lockdowns

that prohibited the general population from traveling outside their neighborhoods, and (iii) rampant fuel shortages throughout Venezuela had led to government-mandated restrictions on the purchase of more than 30 liters of fuel per week, thereby further limiting the options for long-distance travel. Further, the Covid-19 restrictions had resulted in the grounding of all flights and sea vessels, making the escape routes extremely limited. Nonetheless, at great personal risk and without any protections provided by the United States, Mr. Urdaneta single-handedly planned and undertook his escape under these conditions.

On or about August 27, 2020, in a truck loaded with fuel containers and with numerous USB pen drives concealed on his person, Mr. Urdaneta began the arduous and dangerous process of crossing no fewer than 14 military checkpoints in a route from Caracas through western Venezuela, toward the Colombian border. During each of these checkpoints, Mr. Urdaneta was required to obfuscate and conceal his purpose of travel, overcoming intense questioning by Venezuelan soldiers and using false documentation he had prepared for this journey.

Although Mr. Urdaneta initially succeeded in reaching the Venezuelan border town of San Antonio del Tachira, his respite was short-lived. Soon after registering in a guest room under a false name, Mr. Urdaneta was alerted that the Dirección General de Contrainteligencia Militar ("DGCIM") – the brutal military counterintelligence agency of Venezuela – had arrived in the town and was conducting a house-by-house, room-by-room search of every premise, reviewing and confirming the identities of all residents, likely in connection with suspicions raised by soldiers at one of the last checkpoints Mr. Urdaneta crossed. Knowing that – if discovered – DGCIM would subject him to arrest and torture, and even execution, Mr. Urdaneta was forced immediately to flee from the town, leaving behind his belongings and carrying with him only the USB pen drives and his remaining funds.

After taking refuge in a shelter concealed in the surrounding jungle by local smugglers, or *coyotes*, Mr. Urdaneta waited until the cover of dark to cross through the jungle on foot toward the Colombian border.  By daybreak, on August 28, 2020, Mr. Urdaneta had managed to cross a safe point of the Río Táchira, and into Colombia, by passing through a number of checkpoints controlled by the Revolutionary Armed Forces of Colombia ("FARC").

Upon arriving in the Colombian border town, Mr. Urdaneta was able to re-establish contact with the undersigned and federal agents of Homeland Security Investigations ("HSI").  From there, Mr. Urdaneta was transported to Cúcuta, Colombia, for immediate extraction on a U.S. government aircraft to Miami.

Upon discovery of Mr. Urdaneta's escape, the response of the Venezuelan Government was swift and ruthless.  Immediately, any and all property associated with Mr. Urdaneta and his family – including homes, farms, and other businesses owned by Jorge and Sonia for decades – were targeted for seizure for purposes of "repatriation."  Moreover, known associates and even distant family members of Mr. Urdaneta have faced reprisal.  For example, Ms. Urbano-Taylor Romero's father was detained without explanation by agents of the Servicio Bolivariano de Inteligencia Nacional ("SEBIN") – the primary intelligence agency of Venezuela and political police of the Maduro Administration – while attempting to travel from Caracas to the Dominican Republic in or around November 2020.  Ms. Urbano-Taylor Romero's elderly father was subjected to intense interrogation for the next 15 hours and was released only after Mr. Urdaneta was able to secure an extortion payment through local associates.  This is one of many examples of the ongoing retaliation those close to Mr. Urdaneta have suffered as a result of his decision to cooperate.

In the end, it was only through great risk and tremendous sacrifice that Mr. Urdaneta and his family escaped Venezuela.  In so doing, they have lost the places they considered home, their businesses, their communities, their very history, and – so long as the Maduro Administration and its associates in the elite class retain their grip over Venezuela – any hope of ever returning to their country.  And yet, while Mr. Urdaneta deeply regrets having subjected his loved ones to such terrible misfortune, he and his family understand that – above all else – this was the *only* appropriate and just path to embark upon in order to truly acknowledge his misdeeds and begin to rectify his wrongs.

    iii.        *Mr. Urdaneta's Substantial Cooperation and Assistance with the Government*

Since self-surrendering to the United States Government, Mr. Urdaneta has provided substantial cooperation and assistance in a variety of ongoing investigations and proceedings.  To date, Mr. Urdaneta has provided cooperative testimony and/or produced primary documentation with respect to dozens of individuals and corporate entities, through personal and/or attorney proffer meetings with the Government on at least **24** occasions, as well as producing to the Government thousands of pages of records and correspondence.[17]

However, despite Mr. Urdaneta's extensive and ongoing cooperation, it is the understanding of the undersigned that the Government will not at this time be submitting a motion for downward departure under Sentencing Guidelines § 5K1.1, based upon the Government's policy in this district that such a motion is only "ripe" once the full extent of cooperation has been completed, and that Mr. Urdaneta's cooperation remains ongoing.  Nonetheless, the Eleventh Circuit has held that a court "may take a defendant's substantial assistance into account even if a prosecutor withdraws . . .  or does not file" a motion pursuant to U.S.S.G. § 5K1.1.  *See United*

---

[17] A general overview of the scope of Mr. Urdaneta's cooperation has been included as a sealed memorandum, attached hereto as Exhibit K.

*States v. Barner*, 572 F.3d 1239, 1250 (11th Cir. 2009) (citing *United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (reasoning that because "[s]ection 3553(a)(1), in particular, is worded broadly, and it contains no express limitations as to what 'history and characteristics of the defendant' are relevant . . . [t]his sweeping provision presumably includes the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation."); *see also United States v. Robinson*, 741 F.3d 588, 599 (5th Cir. 2014) (collecting cases from a majority of circuit courts "holding that a sentencing court has the power to consider a defendant's cooperation under § 3553(a), irrespective of whether the Government files a [substantial assistance] motion").

Mr. Urdaneta's cooperation has been "substantial" by any metric.  While the Government has indicated that it will not at this time file a motion for downward departure, on the basis of the Government's policy in this district not to file such motions until a defendant's cooperation is complete and the motion is "ripe," the undersigned is confident that the Government will strongly attest to the scope and value of Mr. Urdaneta's extraordinary and ongoing assistance to date.

Additionally, this Court may take into consideration Mr. Urdaneta's cooperation and assistance with respect to *foreign* government authorities presently conducting independent investigations arising from or otherwise relating to the currency exchange transactions involving PDVSA.  For instance, at present Mr. Urdaneta and his counsel are actively engaging in cooperative discussions with the at least two European law enforcement agencies – including scheduling prospective in-person and/or attorney proffer sessions – in order to provide substantial assistance toward the prosecution of ongoing investigations and proceedings involving the recovery of hundreds of millions of dollars.

Lastly, this Court may separately take into consideration Mr. Urdaneta's considerable efforts in ensuring the complete satisfaction of the US $49,265,060.85 forfeiture money judgment entered pursuant to his plea agreement. *See* Ex. A, Plea Agreement, ¶ 16(a)-(b).  As part of this ongoing cooperation, Mr. Urdaneta and members of his family have worked alongside the Government in order to identify and voluntarily forfeit numerous assets, together with a collective estimated value equaling, if not exceeding, this money judgment.  In so doing, it is Mr. Urdaneta's sincere goal to fully satisfy this money judgment as soon as possible, and complete this integral part of his ongoing journey to rectify the wrongs he has committed.

In light of such considerable cooperative efforts, achievable only through great personal risk to himself and his family in escaping Venezuela, Mr. Urdaneta respectfully submits that this Court may, in its discretion, place significant weight upon these compelling mitigating circumstances in order to impose a substantial downward variance from Mr. Urdaneta's guidelines range.

**B.  A Below-Guidelines Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A))**

Mr. Urdaneta wholly acknowledges that he committed a serious offense that warrants punishment.  However, without excusing Mr. Urdaneta's conduct, the undersigned respectfully submits that a sentence imposed without a substantial downward variance would be manifestly unjust, particularly given the considerable and severe punishments that Mr. Urdaneta has already faced and the lifelong retaliation from his native country's government.  *See United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) ("[W]hen evaluating the justness of [the defendant's] punishment for the purposes of reaching a reasonable sentence under *United States v. Booker*, it is important to consider all other forms of punishment [the defendant] has already suffered.").

14

Mr. Urdaneta, who is a first-time offender, has experienced firsthand the total collapse of nearly every facet of his life.  As aforementioned, Mr. Urdaneta's transgressions – along with his genuine efforts to rectify his wrongdoings – have resulted in the loss of his livelihood, his family home, his community, his assets, his family's various businesses in Venezuela dating back decades, and any hope of ever returning to his native country.  Even more devastatingly, these same severe and lasting hardships have been imposed upon Mr. Urdaneta's family and loved ones, who have been blindsided by these developments.  That Mr. Urdaneta has uncontestably suffered severe losses to his professional and personal life may be considered mitigating factors by the Court when determining a just punishment.  *See, e.g.*, *Vigil*, 476 F. Supp. 2d at 1315 (granting downward variance where defendant had "suffered incalculable damage to his personal and professional reputation as a result of tremendous media coverage of his case and the case against his co-conspirators."); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (finding that sentencing court properly considered that the "conviction itself already visit[ed] substantial punishment" on defendant by likely barring him from future work in his profession (internal quotation marks omitted)).

Ultimately, Mr. Urdaneta bears profound regret for the lasting pain he has brought upon himself, his family, and his community, and understands that he will further bear the stigma of his felony conviction for the rest of his days.  Given the punishments that Mr. Urdaneta and his family have already endured for *both* his transgressions *and* the steps he has taken to redress those transgressions, a sentence below the stipulated guidelines range would fully vindicate the goals of Section 3553(a)(2)(A).

## C.  A Below-Guidelines Sentence Would Provide Adequate Specific and General Deterrence (18 U.S.C. §§ 3553(a)(2)(B)-(C))

The Court is required to consider both specific and general deterrence in fashioning a sentence that is sufficient but not greater than necessary to "afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B) and (C).  We respectfully submit that both of these objectives militate in favor of a substantial downward variance from the sentencing guidelines.

### i.    *Specific Deterrence*

The Court can have confidence that Mr. Urdaneta will never again be able, much less desire, to commit a crime.  As noted, this case has resulted in the complete loss of Mr. Urdaneta's reputation, whereas his cooperation with the Government has ensured that it will remain impossible for him and his family to ever rebuild a life in Venezuela.  Now, it is Mr. Urdaneta's sole wish to one day move past the harms he has caused and spend his remaining years living a peaceful life with his family.

In further weighing the need for specific deterrence, the undersigned respectfully requests that the Court consider that Mr. Urdaneta is nearly 50 years old.  Notably, recidivism rates for individuals over the age of 50 are lower than for any other age group besides those over 60.[18]  *See* U.S. Sentencing Commission, RECIDIVISM AMONG FEDERAL OFFENDERS: A COMPREHENSIVE OVERVIEW (2016) (*available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-

---

[18] Meanwhile, defendants "over the age of forty . . . exhibit markedly lower rates of recidivism in comparison to younger defendants." *United States v. Carmona-Rodriguez*, No. 04 CR 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005); *see also* U.S. Sentencing Commission, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES (2004) (*available at*: https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines) ("Recidivism rates decline relatively consistently as age increases.  Generally, the younger the offender, the more likely the offender recidivates . . .  Among all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent.")

publications/researchpublications/2016/recidivism_overview.pdf); *see also United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) ("[R]ecidivism ordinarily decreases with age . . ."). Accordingly, in considering the Section 3553(a) factors, courts have imposed below-guidelines sentences on account of older age. *See, e.g.*, *United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006) (affirming below-guidelines sentence over the Government's objection, explaining that the sentencing court appropriately took into account the defendant's age, among other issues, in fashioning a sentence).

Notwithstanding his advanced age, such studies further indicate that Mr. Urdaneta falls within the category of individuals that are least likely to reoffend. According to the U.S. Sentencing Commission, convicted persons are less likely to recidivate when they are: (1) married; (2) college graduates; (3) sentenced under financial fraud guidelines; (4) non-violent offenders; (5) first-time offenders; (6) employed; and (7) non-drug users.[19] Other than being married, although presently reconciling with Ms. Urbano-Taylor Romero, and unemployed while awaiting sentencing, each of these categories squarely apply to Mr. Urdaneta.

   *ii.* *General Deterrence*

Similarly, studies have debunked the notion that longer prison sentences serve as a general deterrent. *See, e.g.*, "Five Things about Deterrence" Nat'l Institute of Justice, U.S. Dep't of Just. (2016) (*available at*: *https://nij.gov/five-things/pages/deterrence.aspx*) ("Sending an individual convicted of a crime to prison isn't a very effective way to deter crime;" "Increasing the severity of punishment does little to deter crime"); Gary Kleck & J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is there a "Collective Wisdom"?*, 59 CRIME & DELINQ. 1006,

---

[19] *Id.*

1031-33 (2013) ("[T]here is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves.").

Instead, there is widespread recognition that the *certainty* of enforcement and prosecution for financial crimes is a far more effective deterrent to would-be white-collar offenders than is the *length* of any sentence imposed upon them. *See, e.g.*, Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27, 48-49 (2015); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."); Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28-29 (2006) (noting that three National Academy of Science panels and "every major survey of the evidence" has reached the conclusion that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects"); Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty.").  In fact, this fundamental principle formed the basis of the original Sentencing Guidelines, which were written to "ensure a short but definite period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence."[20]

Already, the consequences suffered by Mr. Urdaneta and his family send a powerful reminder to the public, whether based in the United States or internationally, that at all times they

---

[20] *See* U.S. Sentencing Commission, FIFTEEN YEARS OF GUIDELINES SENTENCING (2004) (*available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf).

must ensure that their financial activities remain legitimate and never run afoul of the law.  Indeed, to impose a lengthy sentence upon Mr. Urdaneta *now*, nearly 2 years after his arraignment, and after he has done everything possible in seeking to rectify his wrongs – including escaping from Venezuela (a non-extradition country where he was being actively protected by the government), accepting full responsibility for his conduct, pleading guilty, providing substantial cooperation and assistance to multiple Government investigations, forfeiting substantial assets to satisfy the money judgment, and committing to further cooperate as part of multiple foreign government investigations – would, if anything, *send precisely the wrong message* to the general public and any would-be offenders.

As such, we respectfully urge the Court, in determining a sentence that is sufficient but not greater than necessary to protect the public from future crimes of Mr. Urdaneta, to take into consideration both the statistically low risk of recidivism presented by Mr. Urdaneta's history and characteristics, as well as the deleterious message a lengthy sentence would send to the public where the offender has accepted guilt and strived to make amends for their conduct.  *See, e.g.*, *United States v. Del Campo*, 695 F. App'x 453, 458 (11th Cir. 2017); *United States v. Apodaca*, 641 F.3d 1077, 1080 (9th Cir. 2011) (affirming downward departure where defendant presented low risk of recidivism).

### D. A Below-Guidelines Sentence Would Avoid Unwarranted Disparities in Sentences Imposed on Similarly Situated Defendants Guilty of Similar Conduct (18 U.S.C. §§ 3553(a)(6))

Sentencing courts are required to consider the need to avoid unwarranted sentencing disparities.  *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016).  The key to this analysis is reviewing similarly situated defendants and comparable cases to Mr. Urdaneta and the present matter.  *See, e.g.*, *United States v. McQueen,* 727 F.3d 1144, 1160 (11th Cir. 2013) ("[T]he

19

need to avoid unwarranted sentencing disparity . . . requires the [district] court to consider other similarly situated defendants . . . who were convicted of similar crimes."); *United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008) ("[D]istrict courts have discretion, in appropriate cases, to align codefendants' sentences somewhat in order to reflect comparable degrees of culpability—at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system.").

Broadly, a sentence below the applicable guidelines range is warranted in light of the clear sentencing trends for similarly situated white collar offenders. Indeed, "since *Booker*, virtually every judge faced with a top-level corporate fraud defendant [with an advisory range based primarily on the loss amount under § 2B1.1] has concluded that sentences called for by the Guidelines were too high." Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds after* Booker, 20 FED. SENT'G REP. 167, 169 (2008). Accordingly, defendants convicted of money laundering offenses are overwhelmingly sentenced to below-guidelines sentences. In 2021, 75.5 percent of nationwide defendants whose primary offense of conviction was money laundering received a sentence below the applicable guidelines range.[21] For money laundering offenders sentenced below the Guidelines range, the median variance below the low end of the Guidelines was a 45.6 percent decrease from the low end of the applicable Guidelines range.[22]

More particularly, a within-guidelines range sentence for Mr. Urdaneta would not only result in a disparate sentence in comparison to similarly situated defendants nationally, but it would

---

[21] U.S. Sentencing Commission, 2021 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, TABLE 31: SENTENCE IMPOSED RELATIVE TO THE GUIDELINE RANGE BY TYPE OF CRIME (*available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table31.pdf).

[22] U.S. Sentencing Commission, 2021 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, TABLE 40: EXTENT OF DOWNWARD VARIANCES BY TYPE OF CRIME (*available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table40.pdf).

*also* result in an unwarranted disparate sentence from his own co-conspirators.  Here, a review of the material facts surrounding the sentencings of Abraham Edgardo Ortega ("Mr. Ortega") and Gustavo Adolfo Hernandez Frieri ("Mr. Frieri") may be instructive.

At the outset, a substantial downward variance would avoid unwarranted sentencing disparities among similarly situated defendants like Mr. Ortega, who also pled guilty to conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h) and 1957(a).  *United States v. Ortega*, 18-CR-20685-KMW (ECF No. 64).  As Your Honor is of course aware, Mr. Ortega's applicable guideline range was 63 to 78 months based on a total offense level of 26.  *See id.*, ECF. No. 419 at 10:2-8.  And, ultimately, Your Honor sentenced Mr. Ortega to a 28-month custodial sentence, which constituted a 55.5 to 64.1 percent downward variance from the recommended guideline range. *Id.*, ECF No. 396.

There are a number of overlapping factors that merit consideration when comparing and assessing the sentencing of Mr. Ortega alongside the prospective sentencing of Mr. Urdaneta. *First*, understanding and wholly accepting that Mr. Urdaneta's applicable guideline range is capped at 120 months based on a total offense level of 32,[23] Mr. Urdaneta's offense level computation reflects upward adjustments as both "organizer, leader, manager, or supervisor" and "abuse[] [of] a position of public or private trust" which were *not* applied to Mr. Ortega.  *Compare* Ex. A, Plea Agreement, ¶ 13; PSR, ECF No. 597, ¶¶ 123–24, *with United States v. Ortega*, ECF No. 64, ¶ 12.  That Mr. Urdaneta was *alone* subject to such enhancements, despite their equally appropriate application to Mr. Ortega, who was also a senior foreign government official with signatory authority over the contracts in question in the scheme, may itself be considered a

---

[23] When taking into consideration the -2 adjustment for acceptance of responsibility, pursuant to § 3E1.1(a), as well as the -1 adjustment for timely notification of misconduct, pursuant to § 3E1.1(b).  *See* PSR, ECF No. 597, ¶¶ 120–30.

disparate impact that warrants mitigation through a variance outside of the guidelines range. *See, e.g., United States v. Ortega*, ECF No. 65, ¶ 6 ("From January 2014 through March 2016, ORTEGA was Executive Director of Financial Planning at PDVSA. At all times during this conspiracy, ORTEGA was a 'foreign official' as that term is defined in the FCPA."); *id.*, ¶ 9 ("ORTEGA participated in a bribery scheme . . . in which ORTEGA received 5 million U.S. dollars in exchange for acts and decisions in his official capacity to give both Company A and Company B 'priority' status for this type of agreement."). Therefore, if those enhancements had not been applied *solely* to Mr. Urdaneta, his applicable offense level would have been just two points above Mr. Ortega, at 28, and thus the advisory sentencing guideline range for Mr. Urdaneta would have been 78 to 97 months.

*Second*, and as the Government itself has previously acknowledged, the core, underlying allegations against Mr. Ortega and Mr. Urdaneta bear noted similarities. Indeed, the Government has previously grouped Mr. Ortega and Mr. Urdaneta into the same "categories" or "bands" in this matter:

> Those indicted in the conspiracy fall into five categories or bands, which include, based on the timing of their respective involvement: (1) two foreign officials (Carmelo Urdaneta Aqui and the defendant [Mr. Ortega]) who agreed to accept bribe payments for their roles in facilitating the currency exchange loan and other contracts and then engaged others to launder their proceeds . . .

*Id.*, at ECF No. 393 at 9.

*Third*, and equally importantly, Mr. Ortega – as with Mr. Urdaneta – was a non-violent, first-time offender, had no indications of recidivism, voluntarily self-surrendered to the Government, accepted responsibility for his conduct, and dedicated himself to providing extraordinary cooperation and assistance to the Government. Notably, Mr. Ortega surrendered himself from Mexico, which was an extraditable country from where the Government could have

brought Mr. Ortega to the United States.  Mr. Urdaneta, on the other hand, self-surrendered from Venezuela, a non-extradition country where he was under the "protection" of the Venezuelan government.

Comparatively, Mr. Frieri pled guilty to conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  *United States v. Frieri*, 18-CR-20685-KMW (ECF No. 163). As Your Honor is also aware, Mr. Frieri's applicable guideline range was 97 to 121 months based on a total offense level of 30.  *See id*., ECF. No. 346 (citing ECF No. 331).  And, ultimately, Your Honor sentenced Mr. Frieri to a 46-month custodial sentence. *Id*., ECF No. 388.

Understanding that Mr. Frieri's custodial sentence constituted a 52.5 percent downward variance from the 97-month sentence recommended by the Probation Office (as well as an even greater downward variance from the "middle to high end of the Sentencing Guidelines Range" recommended by the Government), *see id.*, ECF. 346 at 2, the undersigned respectfully submits that a greater variance is warranted for Mr. Urdaneta.

Here, there are a number of distinguishing factors that merit consideration when comparing and assessing the sentencing of Mr. Frieri alongside the prospective sentencing of Mr. Urdaneta. *First*, Mr. Frieri did not self-surrender to DOJ for purposes of providing cooperation but was instead brought before the Court only after exhausting all avenues to contest his extradition from Italy.   *Second*, since arriving in the United States, Mr. Frieri's purported acceptance of responsibility and cooperation with the Government has appeared strained, at best.  For instance, and despite entering into a plea and proffer agreement, Mr. Frieri appears to have repeatedly sought to re-characterize his involvement in the underlying conspiracy.  *Compare id*. at ECF No. 345 at 2 ("Simply put, Mr. Hernandez was brought into the orbit of Money Flight under the watchful eyes of federal agents and with the urging of their Confidential Source"), *with id.* at ECF No. 364 at 12

("[T]he Government takes issue with the defendant's characterization . . . [t]his statement is misleading and in direct contradiction of the defendant's signed Factual Proffer . . .").  Similarly, and as noted by the Government:

> [Mr. Frieri] has also failed to properly assist the Government in identifying his actual financial condition, as required by the defendant's plea agreement. The Government has attempted to gather documents and information from the defendant concerning his financial condition, but he has failed to meaningfully "assist" the Government in that process, as he agreed to do in his plea agreement, instead forcing the Government to issue subpoenas and call witnesses to determine whether the family trusts that the defendant claims own and control the property are/were legitimate or actually just a veil hiding the fact that the defendant ultimately owned and controlled the property.

*Id.*, ECF No. 346 at 15.

And Mr. Frieri's reluctance to cooperate does not appear limited to the Government, but instead includes "fail[ure] to heed the orders of this Court," such as through (i) attempting to access an account that had been restrained for forfeiture, and (ii) potentially encumbering a property pledged as bond. *Id.*, at ECF No. 364 at 14–15.  As a result of such conduct, which stands in stark contrast to how Mr. Urdaneta has comported himself throughout this process, the Government ultimately declined to file a motion seeking a one-level decrease pursuant to Section 3E1.1(b), noting that Mr. Frieri "has failed 'to fully assist in the forfeiture of assets as set forth in this plea agreement." *Id.*, ECF No. 346 at 4.

When considered together, and in light of the factors detailed above, a below-guidelines sentence for Mr. Urdaneta would avoid unwarranted disparities with the sentences imposed upon his co-conspirators, in addition to the numerous other similarly situated defendants throughout the country.

## FURTHER GROUNDS FOR DOWNWARD VARIANCE

### A. A Downward Variance is Appropriate in Light of Mr. Urdaneta's Status as a Deportable Alien

Courts have previously recognized that a downward departure "may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence." *See United States v. Smith*, 27 F.3d 649, 655–56 (D.C. Cir. 1994); *see also United States v. Martinez-Carillo*, 250 F.3d 1101, 1107 (7th Cir. 2001) ("[W]e have found that 'the status of being a deportable alien can affect the conditions of imprisonment' and thus have held that a departure based on conditions of confinement for a deportable alien is generally permissible."); *United States v. Davoudi*, 172 F.3d 1130, 1133–34 (9th Cir. 1999) (finding that "the district court had the legal discretion to depart downward because deportable aliens may be unable to take advantage of the up to six months of home confinement authorized by 18 U.S.C. § 3624(c)."); *United States v. Graham*, 83 F.3d 1466, 1481 (D.C. Cir. 1996) (holding that "because such aliens were ineligible for spending the last 10% of their sentences in community-based confinement and could not be assigned to minimum security prisons, a defendant's deportable alien status would 'substantial[ly] . . . affect the severity of his confinement.'").[24]   Although Mr. Urdaneta is not seeking a departure for this or any other reason, the rationale of these courts and the treatment of similarly situated non-citizen defendants may nonetheless weigh in favor of a further variance given Mr. Urdaneta's status.[25]

---

[24] This case is distinguishable from that of other defendants who are sentenced for an offense, such as illegal reentry, that by its nature is committed only by deportable aliens.  *See United States v. Gonzalez-Portillo*, 121 F.3d 1122, 1124–25 (7th Cir.1997) (departure based on deportable alien status inappropriate where defendant convicted of illegal reentry, because deportable alien status was inherent element of the crime and was considered in formulating guideline); *United States v. Martinez-Ramos*, 184 F.3d 1055, 1056 (9th Cir.1999) (defendant's status as deportable alien could not be a ground for downward departure because "deportable alien status is an element of the crime that was necessarily taken into account by the Sentencing Commission in crafting the offense level for a § 1326 violation.").

[25] The undersigned notes the ruling of this Circuit in *United States v. Veloza*, which adopted the reasoning of the

In essence, a further downward variance may be warranted for deportable aliens such as Mr. Urdaneta who, through no fault of their own, are ineligible for placement in a halfway house or minimum-security prison and are therefore subject to harsher sentences than if they were United States citizens.   In addition, by virtue of their status as deportable aliens, these individuals are excluded from rehabilitative Bureau of Prisons programs and benefits that make life in prison more tolerable, thereby increasing the severity of their sentences.   The rules and regulations providing for differential treatment for aliens that increase both the length and the severity of their confinement include, but are not necessarily limited to, the following:

- **More Severe Inmate Classification**.  The BOP Program Statement indicates that if a prisoner is a "deportable alien," defined as "[a] male or female inmate who is not a citizen of the United States," he or she "shall be housed in at least a Low security level institution." In other words, deportable aliens are ineligible for placement into a minimum-security facility, also known as a Federal Prison Camp.  *See* Federal Bureau of Prisons, U.S. Department of Justice, P5100.08, Inmate Security and Designation and Custody Classification, Ch. 5, at 9 (2006).

- **Ineligibility for Some Vocational Training**.  Deportable aliens are frequently if not always ineligible for vocational training.  *See, e.g*., FCI Schuylkill, Federal Bureau of Prisons, Admission and Orientation (A&O) Inmate Handbook at 19-20 (2013) ("Inmates

---

Second Circuit in holding that a defendant's status as a deportable alien did not warrant a downward departure. 83 F.3d 380, 382 (11th Cir. 1996).  However, to the extent that the Circuit's decision in *Veloza* held that a defendant's status as a deportable alien is not a proper basis for departure, that position has been effectively overruled by the Supreme Court in *Koon v. United States*, 116 S.Ct. 2035 (1996).  In essence, as a defendant's status as a deportable alien and any additional form of punishment that may result therefrom are not included in that finite list of prohibited factors, and – accordingly – courts cannot hold that a defendant's status as a deportable alien and any additional punishment that may result from that status are impermissible grounds for departure. *See also United States v. Farouil*, 124 F.3d 838, 846–47 (7th Cir. 1997) (recognizing *Veloza* as a having "preceded *Koon*" and that *Koon* "generally informs us that the district courts enjoy broad discretion in deciding whether to depart when the particular facts of the case are outside the 'heartland' of Guidelines cases.").

who have a verified High School Diploma or GED certificate and are not deportable aliens, have the opportunity to develop a marketable skill in the areas of Carpentry, Horticulture, and Culinary Arts").

- **Ineligibility for Halfway Houses.** Although U.S. citizen inmates are eligible to serve the latter part of their sentences in halfway houses, deportable aliens are not eligible for early placement into a halfway house and must serve the entire length of their sentences. *See Lartey v. U.S. Dep't of Justice*, 790 F. Supp. 130, 133 (W.D. La. 1992) (recognizing that 18 U.S.C. § 3624(c) does not apply to deportable aliens); *see also* Office of Research and Evaluation, Federal Bureau of Prisons, TRIAD Drug Treatment Evaluation Project Final Report of Three Year Outcomes: Part 1 70 at 70 (2000) ("An inmate will most likely be determined *ineligible* for a CCC [community correction center, or halfway house] placement if he or she meets any of the following conditions: is a deportable alien").

That Mr. Urdaneta, as a deportable alien, will be subject to a more severe sentence on account of his status is all the more unjust and undeserved given that *he self-surrendered to the United States after orchestrating his own escape from Venezuela*, all for the purposes of cooperating with the Government and making amends for his wrongdoing. Perhaps worse still, Mr. Urdaneta faces significant collateral consequences as the result of the instant conviction, including potential deportation following completion of his sentence. Such a result would understandably cause tremendous suffering for Mr. Urdaneta and his family, ripping him away from his new community in the United States, and endangering his very life with the prospect of a forced deportation to Venezuela. Such an impact cannot be understated and may be properly considered as part of a sentencing decision. *See, e.g.*, *United States v. Thavaraja*, 740 F.3d 253, 263 (2d Cir. 2014) (court may account for "uncertainties presented by the prospect of removal

proceedings and the impact deportation will have on the defendant and his family."); *United States v. Gomez*, 431 F.3d 818, 825–26 (D.C. Cir. 2005) (finding as proper a district court's consideration of the hardship that deportation and being permanently separated from family would cause on a defendant in determining a sentence).

Therefore, in light of Mr. Urdaneta's history and characteristics – and the egregious collateral consequences he faces as a deportable alien – this greater severity is "undeserved," *Smith*, 27 F.3d at 655, and an additional downward variance should be part of the total downward variance applied by the Court in this matter.

## **<u>CONCLUSION</u>**

Mr. Urdaneta deeply regrets his actions and is fully committed to rectifying the wrongs he has committed.  Based upon the unique, individual circumstances outlined above, we respectfully request that the Court exercise its discretion and vary downward substantially from the sentence recommended by the Guidelines, and below the sentence recommended by the Government, as being more than sufficient to accomplish the purposes of sentencing under the analysis required by 18 U.S.C. § 3553(a).

Dated: June 13, 2022

Miami, Florida

Respectfully submitted,

KOBRE & KIM LLP

/s/ Jason M. Short

Victoria R. Morris, Esq.
Florida Bar No. 125272
Victoria.Morris@kobrekim.com
201 South Biscayne Blvd.Suite 1900
Miami, FL 33131
Tel: +1 305 967 6100
Fax: +1 305 967 6120

Robin Rathmell, Esq. (pro hac vice)
Robin.Rathmell@kobrekim.com
1919 M Street, NW
Washington, DC 20036
Tel. +1 202 664 1900
Fax. +1 202 664 1920

E. Martin De Luca, Esq. (pro hac vice)
Martin.DeLuca@kobrekim.com
New York Bar No. 4894986
800 Third Avenue
New York, New York 10022
Tel.: +1 212 488 1200
Fax: +1 212 488 1220

Jason M. Short (pro hac vice)
New York Bar No. 5140355
Jason.Short@kobrekim.com
800 Third Avenue
New York, NY 10022
Tel.: +1 212 488 1200
Fax: +1 212 488 1220

*Attorneys for Carmelo Urdaneta Aqui*

29