# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CR-20685-WILLIAMS(s)(s)

UNITED STATES OF AMERICA

v.

CARMELO ANTONIO URDANETA AQUI,

    Defendant.

_____/

## FACTUAL PROFFER

    The United States of America and Carmelo Antonio URDANETA Aquí (the "defendant") stipulate and agree that the information stated herein is true and accurate and sufficient basis for the defendant's plea of guilty to the money laundering conspiracy in violation of Title 18, United States Code, Section 1956(h) charged in the instant case and the forfeiture of the assets identified in the Second Superseding Information. Had this matter proceeded to trial, the defendant stipulates and agrees that the government would have proven the facts alleged below beyond a reasonable doubt.

    1.    From in or around January 1997 to in or around August 2015, the defendant held various positions at the Venezuelan Ministry of Oil (the "Oil Ministry"), which was the Venezuelan ministry responsible for the oversight of the country's state-owned and controlled oil entity, Petróleos de Venezuela, S.A. ("PDVSA"). In particular, from in or around April 2009 to in or around August 2015, the defendant served as Legal Counsel of the Oil Ministry. At all relevant times, the President of Venezuela appointed the officers and directors of PDVSA, which was responsible for, among other things, the exploration, production, refining, transportation, marketing, and trade in energy resources in Venezuela and also provided funding for other

operations of the Venezuelan government. During the relevant period, PDVSA had a significant operating budget and awarded billions of U.S. dollars' worth of contracts each year. PDVSA was also Venezuela's primary source of income and foreign currency (namely, U.S. dollars and Euros), and served as the source of foreign currency used to fund several corrupt foreign exchange schemes.

2. Starting in or around 2012, the defendant and others engaged in various foreign currency exchange schemes using loan contracts with PDVSA that were unlawfully obtained via bribes and kickbacks. These schemes exploited the Republic of Venezuela's fixed foreign currency exchange rate, which valued Venezuelan Bolivars artificially high compared to the open foreign currency exchange market. In exchange for his participation, including his facilitation of payments to co-conspirators, the defendant received a portion of the illicit loan proceeds. The defendant laundered the proceeds of the corruptly obtained loan proceeds through a series of financial accounts, transferring, or causing the transfer of, criminally derived proceeds in several transactions involving greater than $10,000 in U.S. currency to purchase real estate, among other assets, in the Southern District of Florida and Panama.

<u>COMPANIES C-D LOAN SCHEME</u>

3. For example, in or around 2012, the defendant, Abraham Edgardo Ortega ("Ortega"), Francisco Convit Guruceaga ("Convit"), Co-Conspirator 1 (who was a Venezuelan official), Co-Conspirator 2, Venezuelan Official 1, Venezuelan Official 4, Venezuelan Official 6, Subject 4, Subject 5, and an individual who later became a Cooperating Source ("CS"), among others, conspired to execute a corrupt foreign currency exchange scheme involving bribes to PDVSA officials, including Ortega, Co-Conspirator 1, and Venezuelan Officials 1, 4, and 6 (the "Companies C-D Loan Scheme").

4. As part of the Companies C-D Loan Scheme, in or around March 2012, Company D obtained a loan contract with PDVSA wherein Company D agreed to loan PDVSA approximately 17.4 billion Venezuelan Bolivars in multiple tranches. Under this contract, PDVSA would repay the loan to Company D in U.S. dollars at a foreign currency exchange rate that was fixed by the Venezuelan government. After Company D entered into the PDVSA loan contract, Company D reassigned its rights under the loan contract to a non-Venezuelan entity, Company C. Company C later reassigned its rights under the loan contract to another foreign entity, Company E.

5. Through the Companies C-D Loan Scheme, the defendant and others were able to obtain access to a Republic of Venezuela fixed foreign currency exchange rate, which valued Venezuelan Bolivars artificially high compared to the open foreign currency exchange market. Company C, and later Company E, were able to exploit the difference between the two foreign currency exchange rates. Specifically, Company C, and later Company E, were able to buy Venezuelan Bolivars on the open market using a relatively small amount of foreign currency, loan the Bolivars to PDVSA, and be reimbursed for the loan in foreign currency at the official, artificially high fixed foreign currency exchange rate, resulting in billions of U.S. dollars in profits. A significant portion of those profits was used to pay bribes to those involved in preparing the loan contract and in the approval process, including to the defendant.

6. In exchange for his role in creating the legal mechanism by which the Companies C-D Loan Scheme operated and drafting the loan contract at the request of Subject 4, the defendant agreed to accept a payment. On or about June 8, 2012, approximately $25 million in U.S. currency was transferred from a Swiss account held in the name of Company E to an account at another financial institution in Switzerland held in the name of Ville Flor Holding SA ("Ville Flor Account

3

1"), which was associated with the defendant. The defendant understood at least a portion of this transfer constituted a payment for his participation in the Companies C-D Loan Scheme.

7. Ville Flor Holding SA ("Ville Flor") was a Panamanian company, and the defendant used Ville Flor Account 1 and other accounts to, among other acts, receive, conceal and launder proceeds obtained from corrupt foreign exchange schemes to purchase assets in the Southern District of Florida and elsewhere.

8. For example, part of the criminal proceeds that the defendant obtained from the Companies C-D Loan Scheme was used to fund the purchase of Condominium Unit 2205 at the Porsche Design Tower ("Unit 2205"), which was located at 18555 Collins Avenue, Sunny Isles Beach, Florida 33160. On or about both February 6, 2013, and May 6, 2013, a total of approximately $530,000 in U.S. currency derived from the Companies C-D Loan Scheme was transferred from Ville Flor Account 1 to a real estate title company account in the Southern District of Florida as the first and third deposits for the purchase of Unit 2205. The second deposit of $530,000 was funded via a transfer from an attorney trust account, which had received the same sum from proceeds of the Companies C-D Loan Scheme held in Ville Flor Account 1 in or around August 2012. In total, the defendant transferred, or caused to be transferred, to an account in the Southern District of Florida at least $1,590,000 in U.S. currency traceable to the criminal proceeds of the Companies C-D Loan Scheme to purchase Unit 2205. The defendant knew that these transactions to the Southern District of Florida to purchase Unit 2205 involved criminally derived proceeds of a value greater than $10,000.

9. Between in or around February 2013 and in or around November 2013, the balance of the criminally derived funds in Ville Flor Account 1 was transferred to account number CH3008609106086470003, also referred to as account number 10.608647, at Banca Zarattini &

Co. in Switzerland held in the name of Ville Flor (the "Zarattini Ville Flor Account"), which was associated with the defendant.

## EATON-RANTOR LOAN SCHEME

10. After the Companies C-D Loan Scheme, the defendant conspired with others, including Venezuela Official 1, Convit, and Co-Conspirators 1, 2, 3, and 7, in another corrupt foreign exchange scheme involving a loan contract with PDVSA. On or about December 17, 2014, Rantor Capital C.A. ("Rantor"), a Venezuelan shell company, executed a contract with PDVSA in which Rantor agreed to loan 7.2 billion Venezuelan Bolivars to PDVSA. On or about December 23, 2014, an assignment contract was executed between Rantor and Eaton Global Services Limited ("Eaton"), in which Rantor assigned its rights as PDVSA's creditor under the loan contract to Eaton and in which PDVSA was given the right to cancel the debt within 180 days by paying $600 million in U.S. currency (the "Eaton-Rantor Loan Scheme"). Similar to the Companies C-D Loan Scheme, the Eaton-Rantor Loan Scheme enabled the defendant and his co-conspirators to obtain access to the Venezuelan government's fixed foreign currency exchange rate, which valued Venezuelan Bolivars artificially high compared to the rate available on the open market. They exploited the difference between the two foreign currency exchange rates, resulting in hundreds of millions of U.S. dollars in profits.

11. In short, Eaton, a company controlled by members of the conspiracy, ended up with the right to loan PDVSA about 7.2 billion Bolivars (worth around $50 million in U.S. currency based on the open market exchange rate) and to be repaid $600 million in U.S. currency, based on an official fixed exchange rate, when the debt was cancelled, pocketing profits of approximately $550 million in U.S. currency. A significant portion of those illicit profits were paid as bribes to those involved in obtaining the loan contracts, including the defendant, who agreed not to interfere

in the loan approval process and to distribute the funds to some of the co-conspirators involved in approving the contract.

12. In furtherance of the scheme, Venezuelan Official 1 and officials took acts and made decisions in their official capacities to facilitate the Eaton-Rantor Loan Scheme in exchange for receiving bribes. Members of the conspiracy gave cash bribes to Venezuelan Official 1 in exchange for Venezuelan Official 1 signing the loan contract in his capacity as Vice President of PDVSA. The government would prove that one or more members of the conspiracy took steps in furtherance of the bribery scheme while physically present in the United States. The members of the conspiracy agreed to split up the net proceeds of the Eaton-Rantor Loan Scheme with approximately half, or €227 million in Euros, going to the "Bolichicos" (the new bourgeois created by the Chavez Administration), of which Convit was a member. In or about February 2015, approximately €23 million of the €227 million in Euros was transferred to the Zarattini Ville Flor Account. The value of the €23 million in U.S. dollars was approximately $24,265,050.85 based on a currency exchange that occurred in the Zarattini Ville Flor Account shortly after the transfer.

13. On or about November 16, 2015, and on or about November 27, 2015, approximately $300,000 and $2.88 million, respectively, were transferred in two transactions from the Zarattini Ville Flor Account to another real estate title company account in the Southern District of Florida. These funds were used to purchase Apartment A and Apartments B-F at 225 27th Street, Miami Beach, Florida 33140 (the "Miami Beach Apartments"), which were within the Southern District of Florida. The defendant knew that these transactions to purchase the Miami Beach Apartments involved criminally derived proceeds of a value greater than $10,000.

14. As part of their efforts to distribute the Eaton-Rantor Loan Scheme proceeds, Convit and the defendant each met separately with the CS. Convit thereafter caused the transfer

6

of a significant portion of the Eaton-Rantor Loan Scheme proceeds from European Financial Institution 1 to an account belonging to a trust, of which the CS was the ultimate beneficiary. To justify the transfers, Convit sent the CS a false joint venture contract between Eaton and the CS's trust, with a forged trustee's signature. Between in or around January 2015 and in or around February 2015, the account held by the CS's trust received approximately €78.8 million in Euros via four separate wire transfers.

15. Starting in or around January 2015, in recorded conversations and BlackBerry Messenger chats, Convit and the defendant each discussed separately with the CS the CS's receipt of proceeds from the Eaton-Rantor Loan Scheme, and instructed the CS on how to handle the funds. In or around April 2015, the CS began making cash payments in Venezuela and elsewhere at the direction of the defendant and Co-Conspirator 1, including to the defendant, Venezuelan Official 1, and Co-Conspirator 1.

16. Starting in or around October 2016, the defendant directed the CS to transfer approximately $11 million in U.S. currency of the €78.8 million in Euros in the following transactions to acquire condominium units in Panama (collectively, the "Panamanian condos"):

(i) In or around May 2015, approximately $9,501,021.42 in U.S. currency was transferred for the purchase of Apartments 2-A, 2-B, 3-B, 5-B, 6-B, 7-B, 8-A, 11-A, and 11-B at the Residencial Santa Maria Signature in Panama in the name of Miglior Investimentos, S.A. ("Miglior Investimentos"), a Panamanian company;

(ii) Between in or around October 2016 and in or around November 2016, approximately $300,020 in U.S. currency and approximately $310,020 in U.S. currency were transferred for the purchases of Apartment No. 24-021 and Apartment No. 24-011,

7

respectively, at the Residencial Costamare in Panama in the name of Miglior Investimentos; and

(iii) In or around January 2017, approximately $900,020 in U.S. currency was transferred for the purchase of Number 3 at Vistamar Golf Village in Panama in the name of Miglior Investimentos.

17. The defendant also instructed the CS to meet with other co-conspirators, including Jose Vincente Amparan Croquer ("Amparan"), also known as "Chente," and Hugo Gois ("Gois"), to launder the defendant's portion of the proceeds from the Eaton-Rantor Loan Scheme. In order to convince the CS to meet with Amparan and Gois, the defendant told the CS that he had transferred Unit 2205 as a laundering fee to Amparan. In reality this was not a laundering fee for Amparan, and the defendant sought Amparan's assistance in selling Unit 2205. To that end, the defendant caused Unit 2205 to be titled in the name of Paladium Real Estate Group, LLC ("Paladium"), a Florida limited liability company, and in or around September 2016, Amparan's relative became Paladium's manager.

18. In or around late 2016 or early 2017, the defendant met with Amparan, Gois, and Co-Conspirators 5 and 6 in Madrid, Spain. Gois and Co-Conspirators 5 and 6 agreed with the defendant to launder the remaining Eaton-Rantor Loan Scheme proceeds being held by the CS.

19. In furtherance of that agreement, on or about March 1, 2017, during a recorded meeting, the defendant met with Amparan, Gois, the CS, and Co-Conspirator 5 at the offices of European Company 1 in Madrid, Spain. At the meeting, Gois and the defendant instructed the CS to use Eaton-Rantor Loan Scheme proceeds to purchase a U.K. gilt (government bond) that would be transferred to an account at Valbury Capital Ltd. ("Valbury") in London, where the gilt would then be swapped with a fake bond. In or around April 2017, at the request of Gois and the

8

defendant, the CS purchased a U.K. gilt for approximately €6 million Euros, using funds traceable to the Eaton-Rantor Loan Scheme. The gilt was then deposited into a Valbury account.

## CONCLUSION

20. During all relevant times, the defendant knew that he was participating in an illegal money laundering conspiracy and that the funds he sought to conceal and transact in were the proceeds of criminal activity.

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

Date: 7/14/21

By: _____
KURT K. LUNKENHEIMER
ASSISTANT UNITED STATES ATTORNEY

DANIEL S. KAHN
ACTING CHIEF, FRAUD SECTION
U.S. Department of Justice, Criminal Division

Date: 7/14/21

By: _____
PAUL A. HAYDEN
TRIAL ATTORNEY

Date: July 9, 2021

By: _____
E. MARTIN DE LUCA
ROBIN RATHMELL
ATTORNEYS FOR DEFENDANT

Date: July 09-2021

By: _____
CARMELO ANTONIO URDANETA AQUÍ
DEFENDANT

9