UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CR-20685-WILLIAMS(s)(s)

**UNITED STATES OF AMERICA**

vs.

**CARMELO ANTONIO URDANETA AQUI,**

    Defendant.
_____/

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Carmelo Antonio Urdaneta Aqui is scheduled to be sentenced Wednesday, June 15, 2022, at 4 p.m. The Government respectfully submits this memorandum in connection with that sentencing.

## PRELIMINARY STATEMENT

The defendant, a sophisticated public servant with a law degree, conspired to launder more than $1.2 billion in U.S. currency, in part, through accounts in the United States. The defendant personally obtained over $49 million in U.S. currency in bribe payments in exchange for his corrupt acts and decisions in his official capacity as Legal Counsel for the Venezuelan Ministry of Oil (the "Oil Ministry"), which was the Venezuelan ministry responsible for the oversight of the country's state-owned and controlled oil entity, Petróleos de Venezuela, S.A. ("PDVSA"). Such conduct by a high-ranking Venezuelan official warrants appropriate punishment.

The defendant's Sentencing Guidelines sentence reflects his serious criminal conduct. For what he did, the defendant faces an advisory Sentencing Guidelines sentence of 120 months' imprisonment. The Government submits that to serve the legitimate purposes of sentencing,

including promotion of respect for the law and deterrence, the Court should impose the advisory guidelines sentence.

## BACKGROUND

The defendant engaged in an international money laundering conspiracy involving two separate schemes over the course of more than a year between 2012 and 2017, in which he obtained illicit proceeds totaling approximately $49 million in U.S. currency in accounts he controlled, and which he transferred, in part, to the United States to acquire assets in the Southern District of Florida. In addition, the defendant directed an individual who later became a Cooperating Source ("CS") to receive and launder an additional €78.8 million in Euros of illicit funds. The defendant's criminal conduct is more fully described below and in his signed Factual Proffer [ECF No. 446].

*Companies C-D Loan Scheme*

In or around 2012, the defendant, Abraham Edgardo Ortega ("Ortega"), Francisco Convit Guruceaga ("Convit"), Co-Conspirator 1 (who was a Venezuelan official), Co-Conspirator 2, Venezuelan Official 1, Venezuelan Official 4, Venezuelan Official 6, Subject 4, Subject 5, and the CS, among others, conspired to execute a corrupt foreign currency exchange scheme involving bribes to PDVSA officials, including the defendant, Ortega, Co-Conspirator 1, and Venezuelan Officials 1, 4, and 6 (the "Companies C-D Loan Scheme").

Through the Companies C-D Loan Scheme, the defendant and others were able to obtain access to a Republic of Venezuela fixed foreign currency exchange rate, which valued Venezuelan Bolivars artificially high compared to the open foreign currency exchange market. Company C, and later Company E, were able to exploit the difference between the two foreign currency exchange rates. Specifically, Company C, and later Company E, were able to buy Venezuelan Bolivars on the open market using a relatively small amount of foreign currency, loan the Bolivars

2

to PDVSA, and be reimbursed for the loan in foreign currency at the official, artificially high fixed foreign currency exchange rate, resulting in billions of U.S. dollars in profits. A significant portion of those profits was used to pay bribes to those involved in preparing the loan contract and in the approval process, including to the defendant.

In exchange for his role in creating the legal mechanism by which the Companies C-D Loan Scheme operated and drafting the loan contract, the defendant agreed to accept a payment. On or about June 8, 2012, approximately $25 million in U.S. currency was transferred from a Swiss account held in the name of Company E to an account at another financial institution in Switzerland held in the name of Ville Flor Holding SA ("Ville Flor Account 1"), which was associated with the defendant. The defendant understood at least a portion of this transfer constituted a payment for his participation in the Companies C-D Loan Scheme.

Ville Flor Holding SA ("Ville Flor") was a Panamanian company, and the defendant used Ville Flor Account 1 and other accounts to, among other acts, receive, conceal and launder proceeds obtained from corrupt foreign exchange schemes to purchase assets in the Southern District of Florida and elsewhere.

For example, part of the criminal proceeds that the defendant obtained from the Companies C-D Loan Scheme was used to fund the purchase of Condominium Unit 2205 at the Porsche Design Tower ("Unit 2205"), which was located at 18555 Collins Avenue, Sunny Isles Beach, Florida 33160.

*Eaton-Rantor Loan Scheme*

After the Companies C-D Loan Scheme, the defendant conspired with others, in another corrupt foreign exchange scheme involving a loan contract with PDVSA. Similar to the Companies C-D Loan Scheme, the Eaton-Rantor Loan Scheme enabled the defendant and his co-

conspirators to obtain access to the Venezuelan government's fixed foreign currency exchange rate, which valued Venezuelan Bolivars artificially high compared to the rate available on the open market. They exploited the difference between the two foreign currency exchange rates, resulting in hundreds of millions of U.S. dollars in profits.

In short, Eaton, a company controlled by members of the conspiracy, ended up with the right to loan PDVSA about 7.2 billion Bolivars (worth around $50 million in U.S. currency based on the open market exchange rate) and to be repaid $600 million in U.S. currency, based on an official fixed exchange rate, when the debt was cancelled, pocketing profits of approximately $550 million in U.S. currency. A significant portion of those illicit profits were paid as bribes to those involved in obtaining the loan contracts, including the defendant, who agreed not to interfere in the loan approval process and to distribute the funds to some of the co-conspirators involved in approving the contract.

In furtherance of the scheme, Venezuelan Official 1 and officials took acts and made decisions in their official capacities to facilitate the Eaton-Rantor Loan Scheme in exchange for receiving bribes. Members of the conspiracy gave cash bribes to Venezuelan Official 1 in exchange for Venezuelan Official 1 signing the loan contract in his capacity as Vice President of PDVSA. The members of the conspiracy agreed to split up the net proceeds of the Eaton-Rantor Loan Scheme with approximately half, or €227 million in Euros, going to the "Bolichicos" (the new bourgeoisie created by the Chavez Administration), of which Convit was a member. In or about February 2015, approximately €23 million of the €227 million in Euros was transferred to the Zarattini Ville Flor Account. The value of the €23 million in U.S. dollars was approximately $24,265,050.85 based on a currency exchange that occurred in the Zarattini Ville Flor Account shortly after the transfer.

On or about November 16, 2015, and on or about November 27, 2015, approximately $300,000 and $2.88 million, respectively, were transferred in two transactions from the Zarattini Ville Flor Account to another real estate title company account in the Southern District of Florida. These funds were used to purchase Apartment A and Apartments B-F at 225 27th Street, Miami Beach, Florida 33140 (the "Miami Beach Apartments"), which were within the Southern District of Florida. The defendant knew that these transactions to purchase the Miami Beach Apartments involved criminally derived proceeds of a value greater than $10,000.

As part of their efforts to distribute the Eaton-Rantor Loan Scheme proceeds, Convit and the defendant each met separately with the CS. Convit thereafter caused the transfer of a significant portion of the Eaton-Rantor Loan Scheme proceeds from European Financial Institution 1 to an account belonging to a trust, of which the CS was the ultimate beneficiary. To justify the transfers, Convit sent the CS a false joint venture contract between Eaton and the CS's trust, with a forged trustee's signature. Between in or around January 2015 and in or around February 2015, the account held by the CS's trust received approximately €78.8 million in Euros via four separate wire transfers.

Starting in or around January 2015, in recorded conversations and BlackBerry Messenger chats, Convit and the defendant each discussed separately with the CS the CS's receipt of proceeds from the Eaton-Rantor Loan Scheme and instructed the CS on how to handle the funds. In or around April 2015, the CS began making cash payments in Venezuela and elsewhere at the direction of the defendant and Co-Conspirator 1, including to the defendant, Venezuelan Official 1, and Co-Conspirator 1.

Starting in or around October 2016, the defendant directed the CS to transfer approximately $11 million in U.S. currency of the €78.8 million in Euros to acquire condominium units in Panama.

The defendant also instructed the CS to meet with other co-conspirators, including Jose Vincente Amparan Croquer ("Amparan"), also known as "Chente," and Hugo Gois ("Gois"), to launder the defendant's portion of the proceeds from the Eaton-Rantor Loan Scheme. In order to convince the CS to meet with Amparan and Gois, the defendant told the CS that he had transferred Unit 2205 as a laundering fee to Amparan. In reality this was not a laundering fee for Amparan, and the defendant sought Amparan's assistance in selling Unit 2205. To that end, the defendant caused Unit 2205 to be titled in the name of Paladium Real Estate Group, LLC ("Paladium"), a Florida limited liability company, and in or around September 2016, Amparan's relative became Paladium's manager.

In or around late 2016 or early 2017, the defendant met with Amparan, Gois, and Co-Conspirators 5 and 6 in Madrid, Spain. Gois and Co-Conspirators 5 and 6 agreed with the defendant to launder the remaining Eaton-Rantor Loan Scheme proceeds being held by the CS.

In furtherance of that agreement, on or about March 1, 2017, during a recorded meeting, the defendant met with Amparan, Gois, the CS, and Co-Conspirator 5 at the offices of European Company 1 in Madrid, Spain. At the meeting, Gois and the defendant instructed the CS to use Eaton-Rantor Loan Scheme proceeds to purchase a U.K. gilt (government bond) that would be transferred to an account at Valbury Capital Ltd. ("Valbury") in London, where the gilt would then be swapped with a fake bond. In or around April 2017, at the request of Gois and the defendant, the CS purchased a U.K. gilt for approximately €6 million in Euros, using funds traceable to the Eaton-Rantor Loan Scheme. The gilt was then deposited into a Valbury account.

## **GOVERNMENT'S ARGUMENT UNDER 18 U.S.C. § 3553(a)**

Every one of the relevant factors set forth in 18 U.S.C. § 3553(a) strongly weighs in favor of a term of imprisonment. The defendant's advisory guidelines sentence is 120 months' imprisonment. The Government submits that to serve the legitimate purposes of sentencing, including promotion of respect for the law and general deterrence, the Court should impose a Guidelines sentence of imprisonment.

**1. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

First, the nature and circumstances of the offense warrant a significant sentence. The defendant knowingly entered into a laundering conspiracy that contemplated more than a billion of U.S. dollars in illicit proceeds, of which approximately $49,265,050.85 that he received in accounts he controlled as bribe payments in exchange for his corrupt acts and decisions in his official capacity as Legal Counsel of the Venezuelan Oil Ministry.

The defendant used his legal position at the Oil Ministry to enrich himself. He then conspired with his co-conspirators to launder illicit proceeds obtained via loan contracts with PDVSA. Further, the defendant's criminal activity in this case was not isolated; on the contrary, it extended for over the course of years. A sophisticated public servant, with a law degree, should have rejected the temptation of bribery. Instead, the defendant placed himself in a pervasive corrupt money laundering conspiracy, triggering his liability.

Second, as to the defendant's personal history and characteristics, there is nothing remarkable about the defendant's age, education, physical or mental capacity, or family circumstances that suggests that he cannot be imprisoned for a term appropriate to his crime. He may argue that he is entitled to leniency because he has no criminal history. While it is true that

the defendant has no prior criminal record, he admitted to participating in two separate schemes to obtain illicit proceeds; his conduct was not an isolated act.

Simply put, the defendant's personal history and characteristics do not justify a substantial deviation from his advisory guidelines sentence, which is consistent with the nature and circumstances of his offense.

### 2. The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The defendant's offense was extremely serious. As the U.S. Department of State explained in 2001:

> Money laundering has devastating social consequences and is a threat to national security. It provides the fuel for drug dealers, terrorists, illegal arms dealers, *corrupt public officials* and other criminals to operate and expand their criminal enterprises….

U.S. Department of State, Money Laundering and Financial Crimes Report, *available at* https://2009-2017.state.gov/j/inl/rls/nrcrpt/2000/959.htm (emphasis added).

The sentence should reflect the seriousness of the defendant's offense as well as the threat posed by money laundering more generally.

### 3. The Need for Adequate Deterrence

This factor also weighs in favor of a substantial sentence. It is particularly challenging to investigate and prosecute successfully international money laundering and corruption schemes, especially where, as here, the scheme involves individuals and actions in multiple countries, foreign bank accounts, and other evidence that is located abroad. This means that when such a scheme is uncovered, and a defendant convicted, a substantial sentence is warranted. *See, e.g., United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence

the punishment required to deter it."); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

Thus, the Court should impose a sentence significant enough to deter others from using the U.S. financial system to launder illicit funds.

**4. To Protect the Public From Further Crimes of the Defendant**

The Government submits that this factor is not a central basis for sentencing in this case, however, notes that the Government does not believe that the defendant is likely to commit future crimes.

**5. To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

The Government submits that this factor is not a central basis for sentencing in this case.

**6. The Kinds of Sentences Available**

The Government submits that this factor does not affect the analysis. There can be no serious argument for any sentence other than imprisonment for this defendant who abused his public trust by accepting bribe payments and pleaded guilty to conspiracy to commit money laundering.

**7. The Kinds of Sentence and the Guidelines Sentence**

As discussed above, the defendant's advisory guidelines sentence is 120 months' imprisonment. The Government submits that to serve the legitimate purposes of sentencing, including promotion of respect for the law and general deterrence, the Court should impose a Guidelines sentence of imprisonment.

**8. Any Pertinent Policy Statement Issued by the Sentencing Commission**

There are no policy statements in the Sentencing Guidelines that justify a substantial variance for the defendant. The Government reserves the right to supplement our position based on any relevant filing the defendant may submit implicating other policy statements.

**9. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

The purpose of the Sentencing Guidelines is to ensure "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S.S.G. Ch. 1.3.

The defendant, along with seven other co-defendants, in part, was first charged by complaint [ECF No. 3] and then indicted for his role in a massive $1.2 billion money laundering conspiracy involving bribery of PDVSA officials, among others, to obtain a loan contract that essentially functioned as a foreign currency exchange contract. [ECF No. 19.] As discussed in the Government's sentencing memorandum of co-defendant Ortega [ECF No. 393], those indicted in the conspiracy fall into five categories or bands, which include, based on the timing of their respective involvement: (1) two foreign officials (the defendant and Ortega) who agreed to accept bribe payments for their roles in facilitating the currency exchange loan and other contracts and then engaged others to launder their proceeds; (2) one individual (co-defendant Convit) who agreed to pay bribes to the two foreign officials in exchange for the loan contract and then laundered his proceeds; (3) three individuals (co-defendant Gustavo Adolfo Hernandez Frieri ("Hernandez"), co-defendant Amparan, and co-defendant Gois) who agreed to assist in laundering the illegal proceeds obtained as a result of the loan contract and facilitated the laundering of the illegal proceeds; (4) one individual (co-defendant Marcelo Federico Gutierrez Acosta y Lara) whose bank was used by the defendant in an attempt to launder Ortega's bribery proceeds; and (5)

one individual (co-defendant Mario Enrique Bonilla Vallera) who acted as a strawman for as yet unindicted co-conspirators.

Also charged in the same complaint as those indicted above (along with reference to nine unnamed co-conspirators and three additional Venezuelan officials), but pleading guilty to a separate one count information charging him with the money laundering conspiracy, was Matthias Krull ("Krull"), a Swiss banker who assisted in facilitating the laundering of the proceeds obtained from the corrupt loan contract. Krull was brought into the conspiracy by Co-Conspirator 7 and his role was to facilitate the laundering of Co-Conspirator 7's illegal proceeds obtained as a result of the corrupt loan contract. This involved Krull introducing Co-Conspirator 7 to other banks and individuals that would launder Co-Conspirator 7's proceeds. [*See* Case No. 18-CR-20682-CMA, Krull Factual Proffer, ¶¶ 24-25, ECF No. 30.] Krull never actually held nor controlled any proceeds from the underlying conduct (forfeiting the $600,000 he received in referral fees) yet was charged and sentenced based on the whole amount of the conspiracy, approximately $1.2 billion in U.S. currency. Arguably, Krull falls into a separate category or band of facilitators. This band would include those like Krull who facilitated contact with other money launderers and other co-conspirators.

As summarized in the chart below, Krull, Hernandez, and Ortega are the only individuals who have been sentenced in the conspiracy to date:

| Name | Case/Judge | Offense | Approximate Bribes Laundered | Guidelines | Sentence | Post-Sentence R-35 Reduction |
|---|---|---|---|---|---|---|
| Matthias Krull | 18-20682 (Altonaga, SDFL) | 18 U.S.C. § 1956(h) with a § 1957 object | $1.2 billion ($600,000 forfeiture for referral fee) | 360 months to life; statutorily capped at 120 months | 120 months $600,000 forfeiture (Oct. 29, 2018) | 42 months (Sept. 9, 2020) |
| Gustavo Hernandez Frieri | 18-20685 (Williams, SDFL) | 18 U.S.C. § 1956(h) with a § 1956 object | $12.3 million ($12.3 million forfeiture) | 97-121 months | 46 months $12.3 million forfeiture (April 30, 2021) | N/A |
| Abraham Edgardo Ortega | 18-20685 (Williams, SDFL) | 18 U.S.C. § 1956(h) with a § 1957 object | $12 million ($12 million forfeiture) | 63-78 months | 28 months (5K) $12 million forfeiture (May 5, 2021) | N/A |

After the defendant voluntarily self-surrendered by crossing the border of Venezuela, a non-extraditable country, into Colombia to resolve the criminal charges filed against him in the United States, the United States filed a superseding information against the defendant charging him with the money laundering conspiracy with an object of the conspiracy being the engagement in a monetary transaction in criminally derived property with a value over $10,000. [ECF No. 440.] Also, as discussed in the Government's Sentencing Memorandum for Ortega, the crimes charged and the crime to which the defendant pleaded guilty involve money laundering of illicit proceeds obtained from bribes paid to him as a foreign official and others, in part, ranking these categories in order of culpability is not an easy task, as the categories cannot be arranged in a clear

hierarchy. This is because money laundering necessarily involves two serious offenses, the laundering as well as the predicate offense (specified unlawful activity) generating the proceeds being laundered. In the view of the Government, based on all of the information and evidence in this criminal case, the most culpable category would be those individuals who masterminded and benefited from the schemes, and who bribed the foreign officials to obtain access to the PDVSA loan contract which allowed them to gain the illegal proceeds, and who also laundered the proceeds for their and other co-conspirators' benefit. The next level of culpability involves the bribe recipients, the money launderers, and the facilitators of the money laundering. Within this level, the participants are nearly equally culpable as they are two sides of the same coin: one involving foreign officials who abused the public trust and accepted a bribe, in this case either by allowing access to a loan contract or not stopping the loan contract from being approved; and the other involving those entrusted to move the illegal proceeds so that the bribe recipients and the others who benefited from access to the loan contracts could hide and use their proceeds. The next level would be those connected to the money launderers and others involved in the criminal conspiracy.

The defendant falls into the second tier of these delineated categories – a foreign official who received bribes and engaged the services of an individual who laundered his illegal proceeds for his own benefit. In addition, the defendant created the legal mechanism by which the Companies C-D Loan Scheme operated and drafted the loan contract at the request of Subject 4. A similar legal mechanism and loan contract were utilized in the Eaton-Rantor Loan Scheme in which the defendant agreed not to interfere in the loan approval process.

At Hernandez's sentencing hearing on April 30, 2021, the Court stated that in its view the properly calculated Sentencing Guidelines range for Hernandez, 97-121 months, overstated his culpability and that Krull was more culpable than Hernandez. In addition, the Court in sentencing

13

Hernandez stated that it was factoring in his extensive charity work, his impact on minor family friends, and his inability to be forthright with the Government, Probation and the Court concerning his assets and finances. Therefore, the Government assumed at that time that the Court had begun determining the sentence for Hernandez at around 60 months' imprisonment. At Ortega's sentencing hearing on May 5, 2021, the Government viewed Ortega as being in the same band or category as Hernandez, yet slightly more culpable as he was a foreign official who took part in a joint-venture schemes in which he took bribes and was paid a bribe from the Company C-D Loan Scheme, and because he used a United States based money launderer, Hernandez, to help him conceal the bribe payments and to provide him access to them. The Court agreed finding that Ortega's culpability was "higher than that of Mr. [Hernandez] Frieri, since it is his conduct, his corrupt acts that led to the laundering of the funds" [Ortega Sentencing Tr. 39, ECF No. 419] and noted Ortega's substantial ongoing cooperation when sentencing him to 28 months' imprisonment. The defendant, like Ortega, falls into that level of culpability band higher than Hernandez. Within that level though, the Government views the defendant as even more culpable than Ortega by virtue of his high-ranking position within the Oil Ministry, his actions in the Companies C-D Loan Scheme and the Eaton-Rantor Loan Scheme, and the sheer amount of bribes he received and laundered, more than $49 million in U.S. currency. The Government is prepared to answer any questions that the Court may have concerning the culpability of the defendant compared to his co-defendants.

**10. The Need to Provide Restitution to Any Victims of the Offense**

There is no issue of restitution in this case, so the § 3553(a)(7) factor is not addressed here.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a term of imprisonment consistent with the applicable advisory guidelines sentence of 120 months' imprisonment, along with a fine, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully Submitted,

| | |
|---|---|
| LORINDA LARYEA | JUAN ANTONIO GONZALEZ |
| ACTING CHIEF, FRAUD SECTION | UNITED STATES ATTORNEY |

By: */s/ Paul A. Hayden*  
PAUL A. HAYDEN  
Trial Attorney  
Fraud Section, Criminal Division  
U.S. Department of Justice  
1400 New York Avenue, N.W.  
Washington, D.C. 20005  
Telephone: 202-353-9370  
Email: paul.hayden2@usdoj.gov

By: */s/ Kurt K. Lunkenheimer*  
KURT K. LUNKENHEIMER  
Assistant United States Attorney  
Court ID No. A5501535  
U.S. Attorney's Office - SDFL  
99 N.E. 4th Street, Suite 600  
Miami, FL 33132-2111  
Telephone: (305) 961-9008  
Email: Kurt.Lunkenheimer@usdoj.gov